IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TNT AMUSEMENTS, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:23-cv-330 JAR |
| TORCH ELECTRONICS, LLC, et al., | ) ) ) |
| Defendants. | ) |

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Defendants Steven and Sondra Miltenberger run Torch Electronics, LLC ("Torch") as a criminal enterprise. Over the course of several years, the Defendants have flouted the criminal gambling laws of the state of Missouri by placing their illegal slot machines, which they fraudulently market as "No Chance Gaming Devices," into dozens if not hundreds of gas stations, truck stops, bars, and restaurants across the state. The Defendants have tricked many of those law-abiding landlords and business owners into allowing these illegal machines onto their premises—and thousands of consumers into playing these illegal machines—by assuring them that the Defendants' machines do not involve any element of chance and are therefore not illegal to possess or play under Missouri law. Nothing could be further from the truth.

In truth and fact, the Torch Devices are games of chance, and possession of such devices is flatly prohibited by Missouri's gambling laws. And you don't have to take our word for it: the Missouri Gaming Commission has said so; the Circuit Court of Platte County has said so; the prosecutors of three Missouri counties have said so; industry experts have said so; and judges and law enforcement authorities in at least four other states have said so under their similar laws. But, thanks to the Missouri Gaming Commission's position that its enforcement authority, which covers

casinos, does not extend to gas stations, truck stops, and the like, enforcement of the state's gambling laws has been left to the discretion of local prosecutors and police departments in each of Missouri's 114 counties. This quirk of Missouri law has permitted the Defendants to treat the risk of criminal prosecution merely as a cost of doing business—a risk they have been willing to take rather than give up the millions of dollars they fleece each year from the pockets of hardworking Missourians across the state. And until today, their gamble has paid off.

This Court should call the Defendants' bluff. At a preliminary injunction hearing, TNT Amusements, Inc. ("TNT") will produce compelling evidence that the Defendants' so-called "no-chance gaming devices" (hereafter, the "Torch Devices") violate Missouri's criminal prohibition on the possession of slot machines and other similar gambling devices. We will prove what is obvious from simply watching a single spin of the Torch Devices' wheels: just like slot machines, the Torch Devices are games of chance that pay out (or, more often, don't pay out) not based upon the skill of the player, but based upon circumstances out of the player's control.

We will further show that the Defendants have knowingly engaged in a fraudulent scheme to distribute the Torch Devices that violates numerous state and federal criminal statutes and marketed them in violation of the Lanham Act's prohibition on false advertising. And we will demonstrate that the Defendants' unbridled continuation of their scheme will cause irreparable harm to law-abiding competitors, the business owners and players they have defrauded, and the public at large. For these reasons, we respectfully request that the Court grant a preliminary injunction to prevent the Defendants from continuing to distribute and operate their illegal gambling machines within the state of Missouri.

## DISCUSSION

It is beyond good-faith dispute that the Torch Devices meet the definitions of both "slot machines" and "gambling devices" under Missouri's gambling laws and therefore are illegal to possess or operate. *See infra* § I-A. It is likewise uncontroversial that the Defendants' continued marketing, distribution, possession, and operation of the Torch Devices violates numerous federal statutes, notably including the Lanham Act and the Racketeer-Influenced and Corrupt Organizations Act ("RICO"). *See infra* §§ I-B, I-C. These facts entitle TNT to a presumption of irreparable harm under the Lanham Act, which permits irreparable harm to be presumed wherever a plaintiff demonstrates a likelihood of success on the merits. *See infra* § II.

Nonetheless, TNT will present evidence to establish that, as Torch's chief competitor in the Missouri amusement gaming industry, it will suffer irreparable harm in the absence of injunctive relief from this Court. To do so, TNT will present evidence at the hearing to demonstrate that the Defendants have already decimated countless business relationships that TNT has spent decades building with its customers, and that, without relief from this Court, that trend is likely to put TNT out of business entirely. *See infra* § II. Given the Defendants' blatant disregard for prior judicial and executive branch determinations, there is no question that a preliminary injunction is both appropriate and necessary to prevent Torch from continuing its illegal scheme, especially once the public interest in halting the Defendants' criminal enterprise is weighed in the balance. *See infra* § III; *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (1981) (identifying probability of success on the merits, the presence of irreparable harm, balancing of harms, and the public interest as the four factors to be considered in a ruling on a preliminary injunction motion).

**I.     TNT Is Likely to Succeed on the Merits of Its Claims That the Defendants' Scheme Violates at Least One of More Than a Dozen State and Federal Laws**

TNT has brought numerous claims against the Defendants in this case, but for purposes of the preliminary injunction hearing, it should suffice to focus on two: the Lanham Act and the RICO Act. The Defendants have violated the Lanham Act by falsely advertising their machines to be legal "no-chance" devices when they are, in fact, illegal slot machines whose play depends upon chance. And the Defendants have violated the RICO Act by distributing those devices across the state in violation of Missouri gambling laws and several other federal criminal statutes. Thus, as explained further below, TNT is likely to succeed on the merits of its claims.

**A.     The Torch Devices Are Illegal Under Missouri Law**

We are far from the first to assert the illegal nature of the Torch Devices. Judges, prosecutors, and industry associations have all declared that similar "no chance" devices are illegal devices under Missouri law. *See* Compl. ¶¶ 65–87. And although TNT will present persuasive evidence to establish the illegality of the Torch Devices, it does not take a rocket scientist to make that determination. Under Missouri law, the Torch Devices qualify as illegal gambling devices because they invite players to "risk[] something of value upon a contest of chance or a future contingent event not under [their] control or influence." Mo. Rev. Stat. § 572.010. Likewise, they qualify as illegal slot machines because they are devices that, "as a result of the insertion of a coin or other object[,] operate[] . . . in such a manner that, depending upon elements of chance, . . . [they] may eject something of value." Mo. Rev. Stat. § 572.010(11).

In written advertisements, the Defendants have claimed that the Torch Devices are not illegal because of they include a "pre-reveal" mechanism that allows a player, at her option, to see the outcome of the next "spin" of the reels immediately before each "spin." *See* Compl. ¶¶ 88– 108. But that claim is nothing more than a red herring designed to dupe players into playing the

Torch Devices—and otherwise law-abiding business owners into permitting such illegal devices on their premises.

This Court should not be so easily fooled. Whether or not the Torch Devices will pay out over the course of play is subject to chance, which is enough to make them illegal gambling devices. *See* Compl. ¶¶ 36–64. And Missouri law is clear: even if it were *possible* to operate the Torch Devices in a lawful manner, that would not exclude them from the broad sweep of Chapter 572 of the Missouri Revised Statutes. That chapter makes a device illegal not only if it is "used" in a gambling activity, but also if it is "***usable***" in such an activity. Mo. Rev. Stat. § 572.010(5) (emphasis added). Likewise, the definition of "slot machine" specifically states:

> A device so constructed or readily adaptable or convertible to such use is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. Nor is it any less a slot machine because apart from its use or adaptability as such it may also sell or deliver something of value on a basis other than chance[.]

Mo. Rev. Stat. § 572.010(11). Given these unambiguous provisions of Missouri law (which the Defendants' false advertisements conspicuously ignore), the existence of a "pre-reveal" mechanism is irrelevant to the determination of the Torch Devices' illegality. Instead, this Court should apply the same straightforward, common sense reasoning that led the Florida Court of Appeals to declare similar devices to be illegal under Florida law:

> While it is true that the user [can choose to be] advised of the outcome of [each play of the] game at hand ahead of time through the preview feature, the user cannot predict that outcome until it is randomly generated and then displayed by the machine. Nor can the user predict the outcome of Game 2 while playing Game 1.

*Gator Coin II, Inc. v. Fla. Dep't of Bus. & Prof'l Regulation*, 254 So. 3d 1113, 1118 (Fla. Dist. Ct. App. 2018); *cf. Mayle Bingo Co., L.L.C.*, 152 N.E.2d 1237, 1242 (Ohio 2020) (affirming trial court's decision describing a similar "pre-reveal" mechanism as a "façade" intended to "take an otherwise illegal game outside of the scope of" laws that, like Missouri, make such devices illegal).

B. **The Defendants' Repeated Misrepresentation of the Torch Devices as Legal "No-Chance Gaming Devices" Establishes a Likely Violation of the Lanham Act**

In marketing the Torch Devices as "legal" "no chance" games when they are in fact illegal slot machines, Torch has repeatedly violated the Lanham Act's prohibition on false advertising and unfair competition. Torch's two key claims—that the devices are "no chance" games and that they are therefore "legal" to possess or operate—are demonstrably false, as explained above. As a result, the continued illegal marketing of the Torch Devices easily satisfies each of the elements of a Lanham Act claim, as set forth in *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178 (8th Cir. 2011):

> [Torch's claims constitute] false statement[s] of fact by [Torch] in a commercial advertisement about its own . . . product; (2) the statement[s] actually deceived or ha[ve] the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) [Torch] caused its false statement to enter interstate commerce; and (5) [TNT] has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to [Torch] or by a loss of goodwill associated with its products.

*Id.* at 1182–83 (8th Cir. 2011); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014) (holding that Lanham Act permits a claim to be made by any competitor who is proximately injured by a false advertisement).

Torch's two key claims are literally false—but they need not be in order for TNT to prevail. Even if Torch's statements were only "misleading," that is enough for them to form the basis for a Lanham Act claim. *See Allsup, Inc. v. Advantage 2000 Consultants Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005) (holding that a statement under the Lanham Act qualifies as a misrepresentation if it is "literally false, or . . . literally true or ambiguous, but renders a 'false impression' when viewed in context"). If, however, as TNT will demonstrate, the Court finds that Torch's claims are literally false, then that alone is enough to create a presumption of harm to competitors. *See Buetow*, 650 F.3d at 1183 ("[W]hen a competitor's advertisement . . . is proved to be literally false, the court

may presume that consumers were misled . . . without requiring consumer surveys or other evidence of the ad's impact on the buying public.").

Likewise, Torch's statements are deceptive and material, insofar as they are specifically addressed to and designed to trick patrons into believing that they can play the Torch Devices without violating Missouri's gambling laws, and business owners into believing they can legally offer the Torch Devices to patrons at their locations. *See id.* at 1182 (holding that a deception is material if "it is likely to influence the purchasing decision"); *Pfizer, Inc. v. Miles, Inc.*, 868 F. Supp. 437, 442 (D. Conn. 1994) (noting that likelihood of confusion—not actual confusion—is sufficient to show deceptive nature of advertisement). These statements have also been posted on Torch's website and on the Torch Devices themselves, thereby satisfying the interstate commerce requirement. *See* Compl. ¶¶ 93–98; *Leatherman Tool Grp., Inc. v. Coast Cutlery Co.*, 823 F. Supp. 2d 1150, 1156 (D. Or. 2011) (finding that a competitor's false statements entered interstate commerce where the false statements appeared on the competitor's website, product packaging, catalogs, and the product itself).

**C.   The Defendants' Marketing and Distribution of the Torch Devices Constitutes a Criminal Enterprise in Violation of the RICO Act**

In addition to their Lanham Act violations, the Defendants' marketing and distribution of the Torch Machines likewise violates the RICO Act's prohibitions on the operation of a criminal enterprise.[1] The Defendants have violated the RICO Act in innumerable ways, s*ee* Compl. ¶¶ 135–203, but their clearest violations relate to their operation of an unlawful gambling business. In

---

[1]   The Complaint asserts claims under numerous provisions of the RICO statute, but here we focus on the violation asserted in Count III, relating to the ownership, conduct, and management of the illegal enterprise. The elements of a civil RICO claim under that provision are (1) the existence of an enterprise; (2) the defendants' association with the enterprise; (3) the defendants' participation in predicate acts of racketeering; and (4) that the defendants' actions constitute a pattern of racketeering activity. *See United HealthCare Corp. v. Am. Trade Ins. Co.*, 88 F.3d 563, 570 (8th Cir. 1996).

order for that criminal statute to be violated, TNT must merely show that the Torch Devices violate Missouri's gambling laws; that Defendants' business involves five or more people; and that it has either been in operation for more than 30 days or that it has had gross revenue of $2,000 or more in a single day. *See* 18 U.S.C. § 1955. Each of these elements readily follow from the illegal nature of the gambling business, as described in § I-A above. *See United States v. Thompson*, 690 F.3d 977, 985 (8th Cir. 2012) (holding that requirements of Section 1955 can be met by the conduct of "both high level bosses and street employees"). For similar reasons, the Defendants have repeatedly violated the Travel Act, 18 U.S.C. § 1952, by using facilities of interstate commerce, including mail and telephone, in order to carry on and promote their criminal activities, and the mail and wire fraud statutes, *id*. §§ 1341, 1343, by using the mail and wires, including telephones and the internet, in order to execute their fraudulent scheme. *See* Compl. ¶¶ 154–92.

These acts together constitute the predicates to establish a criminal enterprise within the meaning of the RICO Act. *See* 18 U.S.C. § 1961(1) (listing violations of §§ 1341, 1343, 1952, and 1955 as RICO predicates). The existence of such an enterprise may be established either by showing that the entity has a legal existence or proof of an association in fact, both of which are true here. *United States v. Turkette*, 452 U.S. 576, 582 (1981) (citing 18 U.S.C. § 1961(4), which defines "enterprise" to include "a corporation . . . or other legal entity," as well as "any group of individuals associated in fact although not a legal entity"). Torch is itself a legal entity, and the Miltenbergers are in fact associated with Torch with respect to its illegal activities. *See Boyle v. United States*, 556 U.S. 938, 944–45 (2009) ("RICO reaches a group of persons associated together for a common purpose of engaging in a course of conduct. Such an enterprise is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." (internal quotations and citations omitted)). As a result, the

Defendants have continually and repeatedly violated the RICO Act by operating, owning, and profiting from their criminal enterprise. *See* Compl. ¶¶ 135–203 *et seq.*

## II. Absent an Injunction, TNT Is Likely to Suffer Irreparable Harm from the Destruction of Its Long-Established Business Relationships with Its Customers That Outweighs Any Interest Torch Might Assert

Under the Lanham Act, a court need not make a specific finding of irreparable harm in order to grant preliminary injunctive relief; rather, irreparable harm is presumed once a plaintiff establishes a likelihood of success on the merits. *See* 15 U.S.C. § 1116(a) ("A plaintiff . . . shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation [under § 1125] in the case of a motion for a preliminary injunction."); *see also Buetow*, 650 F.3d at 1183 (applying similar presumption even before the 2020 amendments to § 1116); *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 (8th Cir. 1980) (same). But despite the benefit of this presumption, TNT shall present evidence at the hearing to demonstrate that it has been and will continue to be irreparably harmed by the Defendants' conduct. TNT will also demonstrate that Torch lacks any legitimate competing interest that might outweigh TNT's entitlement to preliminary injunctive relief.

### A. TNT Has Already Suffered, and Continues to Suffer, Irreparable Harm from the Defendants' Illegal Conduct

At the hearing, TNT will bring forth evidence to demonstrate that it has seen a precipitous decline it its revenue as a result of the Defendants' illegal marketing and distribution of the Torch Devices, largely as a result of the Defendants' usurping TNT's existing business relationships by persuading its customers to replace TNT's legal amusement games with Torch's illegal devices. It has also crowded out the market for new opportunities by enticing the owners of gas stations, truck stops, bars, and other amusement locations throughout the state with the promise of exorbitant returns from their illegal gambling activities. Ultimately, TNT has not only had its business model

brought to the brink of collapse by Torch's illegal activities; it has also lost the goodwill of its customers that it had spent more than 30 years cultivating before the Defendants' illegal machines entered the scene.

Even without the benefit of the Lanham Act's presumption of irreparable harm, these facts are sufficient to demonstrate irreparable harm to TNT. As the Supreme Court has recognized, the "paradigmatic direct injury" from false advertising like that alleged in this case is the "diversion of sales to a direct competitor." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–38 (2014). Likewise, loss of goodwill and harm to commercial interests are cognizable injuries requiring relief under the Lanham Act. *See id.* at 131–32; *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."); *Black Hills*, 633 F.2d at 753 (holding that an "injunction was proper" because defendant's conduct resulted in loss of "reputation and good will"). Those same injuries likewise give rise to TNT's claims under the RICO Act. Under RICO, a plaintiff can establish it has been proximately harmed by showing a "direct[] . . . relationship between the injury asserted and the injurious conduct alleged." *See Bieter Co. v. Blomquist*, 987 F.2d 1319, 1327 (8th Cir. 1993) (internal quotations omitted). Each of these standards is satisfied by evidence, such as will be presented by TNT, that its customers have replaced TNT's legal amusement devices with Torch's illegal machines.

Although these injuries are sufficiently direct and proximate to be actionable under both the Lanham Act and the RICO Act, that does not mean that they are entirely measurable in money damages. That is because, in cases of false marketing such as this, "[a]ctually measuring which customers have been lost and calculating money damages to compensate for them would not be possible with any degree of accuracy." *Charter Comm'ns, Inc. v. Sw. Bell Tel. Co.*, 202 F. Supp.

2d 918, 930 (E.D. Mo. 2001), *aff'd*, 23 F. App'x 635 (8th Cir. 2002); *see also Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) ("The irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values." (internal quotation omitted)); *Boehringer Ingelheim G.m.b.H. v. Pharmadyne Labs.*, 532 F. Supp. 1040, 1065 (D.N.J. 1980) ("It would be impossible to calculate the dollar value of sales lost to the defendants in the future because of defendants' unlawful behavior. And plaintiffs' damages become even more speculative when lost good will is considered."). Instead, as the Lanham Act's presumption itself recognizes, false advertising is the sort of deceptive and pernicious conduct that justifies a presumption that irreparable harm has resulted to competitors. *See* 15 U.S.C. § 1116(a).

### B. Torch Has No Interest in Continuing Its Illegal Business That Outweighs the Hardship to TNT

Although Torch may seek to rebut the Lanham Act's presumption of irreparable harm by claiming that any such harms are outweighed by Torch's legitimate business interests, that statement relies on a false premise: Torch has no *legitimate* interest in continuing its illegal enterprise. As explained above, Torch's marketing, sale, and distribution of the Torch Devices is in flagrant violation of both Missouri and federal criminal laws, and there is, by definition, no legitimate interest to be had in the proceeds of crime. *See Luis v. United States*, 578 U.S. 5, 12–13 (2016) (holding that a defendant's interest in criminal proceeds, even if needed to retain an attorney, is subject to pretrial restraint because it is subject to forfeiture). While Torch will undoubtedly see a marked decrease it its revenue if preliminary injunctive relief is granted, that is only further proof of the thoroughly illegal nature of Torch's business model. *Central Presbyterian Church v. Black Liberation Front*, 303 F. Supp. 894, 901 (E.D. Mo. 1969) ("If defendants are committing illegal acts, then it is unnecessary to weigh the injuries."); *cf. Yournetdating, LLC v.*

*Mitchell*, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) (finding injunction was warranted where "no honest business" of defendant's would be affected by the injunction).

**III. The Public Interest Weighs Decidedly in Favor of Issuing a Preliminary Injunction**

In most cases, a mere interest in upholding legal norms is a sufficient public interest to justify the issuance of a preliminary injunction. *See Ronnoco LLC v. Peoples*, 2020 WL 6875754, at *8 (E.D. Mo. Nov. 23, 2020) (finding that the enforcement of contractual relationships to be a sufficient public interest to warrant an injunction). But here, the public interest is perhaps the strongest factor favoring issuance of a preliminary injunction.

Each day that the Defendants' unlawful conduct continues unabated is another day that business owners across the state unwittingly subject themselves to potential criminal liability for possessing what they may honestly (but incorrectly) believe to be a legal gaming device. *See* Mo. Rev. Stat. § 572.070.[2] And consumers all across the state, beyond the financial losses they are bound to incur as a result of Torch's false promises of a "no-chance" game, are likewise unwittingly subjecting themselves to criminal liability simply by playing the Defendants' illegal slot machines. *See* Mo. Rev. Stat. § 572.020. Absent an injunction, these victims have no remedy available to protect themselves against these harms.

The Defendants, meanwhile, as explained above, have no countervailing interest in continuing what is transparently an illegal enterprise. Yes, the Defendants have been making money hand over fist from their distribution of the Torch Devices—but all of that money constitutes the proceeds of criminal activity. The Defendants' criminal activity diverts this money from the legal gambling industry, and, consequently, the critical social services that rely on

---

[2] TNT does not doubt that some business owners have knowingly conspired with Defendants to join their illegal enterprise. But determination of that question with respect to any particular business owner is unnecessary to the Court's evaluation of the motion for a preliminary injunction against Defendants.

revenue from the legal gambling industry. *See* **Ex. 1** (Mo. Gaming Comm'n, *2022 Annual Report*, www.mgc.dps.mo.gov/annual_reports/AR_2022.pdf) at 8, 13. Under Missouri law, the revenue from Missouri's legal gambling industry benefits military veterans, the Missouri National Guard, law enforcement programs for the reduction of gang violence, the Missouri Education Fund, and lower-income college students. **Ex. 1** (Annual Report) at 9 ("Missouri's 13 casinos pay a Gaming Tax . . . 90% is paid to the State of Missouri Gaming Proceeds for Education Fund.");  **Ex. 2** (Kevin P. Mullally, *Illegal and Unregulated Gambling in America*, Gaming Labs. Int'l, 2020) at 10.

Unlike legal casinos, however, the Defendants have evaded the restrictions that state programs have created for the prevention of problematic and compulsive gambling. In contrast to those who play Torch's gambling devices, visitors to legal casinos encounter a variety of signs promoting resources for problem gambling, such as for 1-888-BETSOFF, a public-private partnership focused on problem gambling intervention and rehabilitation. *See* **Ex. 3** (*About Us*, www.888betsoff.org/aboutUs/aboutUs.jsp). The Missouri Gaming Commission (the "Commission") participates in this partnership as one of its many efforts to support those struggling with gambling addiction. *See* Mo. Rev. Stat. §§ 313.820, 313.842 ("The department . . . shall administer programs, either directly or by contract, for compulsive gamblers [and] . . . administer programs to educate the public about problem gambling and promote treatment programs offered by the department of mental health."). The Commission also supports problem gamblers through the Problem Gambling List. *See* **Ex. 4** (Mo. Gaming Comm'n, *Problem Gambling List*, www.bityl.co/I2Na) at 1. Individuals who voluntarily join this program "self-exclude [themselves] from ALL licensed casinos in the State of Missouri," aiding in their recovery and preventing relapse. *Id*.

By contrast, illegal, unregulated gambling companies like Torch "prey upon the addicted and the vulnerable." **Ex. 2** (Mullaly) at 4. Individuals whose recovery depends on self-exclusion may now find Torch's thousands of illegal slot machines—and with them, the temptation to relapse—unavoidable. That is especially troublesome given the pervasiveness of the Torch Devices at locations providing public necessities, like gas stations. Without a preliminary injunction, Torch's illegal enterprise will continue to exploit problem gamblers and undermine the state's efforts to support them.

Likewise, while Missouri law prevents individuals under 21 years old from gambling in state casinos, the Defendants' illegal gambling devices do not adhere to any such limitations. *See* Mo. Rev. Stat. § 313.817.4. The plaintiffs in a recently filed class action lawsuit against Torch have produced photographic evidence of children—some appearing as young as ten years old—playing Torch's illegal slot machines. *See* **Ex. 5** (Compl. (Doc. #1) in *Romano v. Torch Electronics, LLC*, Case No. 2:23-cv-04043-WJE) ¶¶ 57–61. That is especially problematic due to the documented connection between gambling in adolescence and the development of severe compulsive and problematic gambling behaviors later in life. *See* **Ex. 6** (Alesia N. Burge et al., *Age of Gambling Initiation and Severity of Gambling and Health Problems Among Older Adult Problem Gamblers*, www.bityl.co/II6D) (describing psychiatric research evaluating problem gamblers that suggests those who begin gambling in adolescence experience an elevated severity of problems throughout their life).

The state's regulation of gambling also bars certain convicted criminals from gaming or conducting other criminal activity from within casinos, and requires casinos to report suspected violations of law. *See* Mo. Code Regs. Ann. tit. 11, §§ 45-15.030, 45–5.053(3)(M). The Defendants, however, do not adhere to such reporting requirements, despite the fact that illegal

gambling devices are known to attract "gang activity, organized crime, drugs, [and] violent crime." **Ex. 2** (Mullally) at 7. Illegal gambling creates "hives for gangs and organized crime," and the presence of illegal gambling has resulted in "a tenfold increase in crime" in some areas. *Id*. at 4–5. Nor do the criminal activity of enterprises like Torch stop at gambling. "Outside the purview of regulators, the illegal gambling industry is rife with opportunity for money laundering and other activities," including drug trafficking, fraud, and tax evasion. *Id*. at 4.

## CONCLUSION

The evidence put forth at the hearing will persuasively demonstrate that the Torch Devices are illegal gambling devices, from which each of the other *Dataphase* factors readily follows:

- If the Torch Devices are illegal, then the Defendants have violated the Lanham Act and the RICO Act by distributing and marketing them as legal "no chance" devices, making TNT likely to succeed on its claims.

- If the Torch Devices are illegal, then TNT is entitled to a presumption that, as a competitor to Torch, it has been irreparably harmed by the Defendants' violations of the Lanham Act.

- If the Torch Devices are illegal, then the Defendants have no interest in continuing their illegal endeavor that could possibly outweigh the irreparable harm caused to TNT.

- And, if the Torch Devices are illegal, then the public interest weighs decidedly in favor of putting a halt to the Defendants' illegal scheme and the damage it inflicts not only to competitors like TNT, but to the public at large.

The Torch Devices are illegal. We therefore respectfully request that the Court grant TNT a preliminary injunction as requested in its motion.

Dated: April 20, 2023

Respectfully submitted,

BRYAN CAVE LEIGHTON
PAISNER LLP

*/s/ Mary Grace Warren*
RICHARD E. FINNERAN, #60768MO
SASHA RIEDISSER, #71141MO
MARY GRACE WARREN, #73147MO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*
*marygrace.warren@bryancave.com*
*sasha.riedisser@bclplaw.com*

*Attorneys for TNT Amusements, Inc.*
*d/b/a Play-Mor Coin-Op*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2023, a copy of the foregoing was served on all counsel of record by operation of the Court's electronic filing system.

*/s/ Mary Grace Warren*
MARY GRACE WARREN, #73147MO