# Exhibit 2
Kevin P. Mullally

*Illegal and Unregulated Gambling in America*
Gaming Laboratories International
2020



# ILLEGAL & UNREGULATED GAMBLING IN AMERICA

## How New Game Designs Are Eroding State and Tribal Public Policy

**By Kevin P. Mullally**
Vice President of Government Relations
and General Counsel
Gaming Laboratories International, LLC

# TABLE OF CONTENTS

**Gambling Expansion Without Rules**             **03**
    Executive Summary                            03

**Background**                                   **04**
    The Dilemma                                  04
    Policy Erosion                               04

**Eroding State & Tribal Public Policy**         **09**
    State & Tribal Policy Objectives             10
    Emerging Forms of Illegal Gambling           11
    The Endless Litigation Repeat Loop           12
    The Arcade/Video Game Parlor Dilemma         15

**The Solution: Protecting Public Policy Objectives**  **16**
    Reinforcing the Presumption that             17
    Unregulated Gambling Is Illegal
    A Regulatory Framework to Oversee            17
    Modern Gaming Technology

**Conclusion**                                   **20**

# GAMBLING EXPANSION WITHOUT RULES

## EXECUTIVE SUMMARY

Every state in the union makes gambling a crime. Enacting exceptions to that rule is difficult and taken with great care. Regulatory structures are well-crafted and well-funded, designed to prevent criminal activity, ensure transparency in the legal gambling operations, dedicate funds from gambling to worthy causes, and to create protections for the vulnerable.

Illegal gambling in the United States has expanded to the point that it might be considered a rampant issue with violators being reported regularly across the country. Violent and other types of crime tend to be present around illegal gaming establishments. The rising occurrence of unregulated and illegal gambling operations is weakening state policy objectives. This phenomenon is being fueled by increasingly sophisticated technology designed to take advantage of archaic, often vague, criminal gambling statutes that never envisioned modern game designs. This allows for the creation of devices that present themselves as slot machines while allowing operators to argue the machines escape the definition of illegal gambling. They operate without any supervision and do not adhere to any reviewable set of operational guidelines designed to prevent fraud, theft, money laundering and a variety of other criminal behaviors. There are no protections for consumers and no protection for problem gambling.

There is a desire among policymakers to distinguish between what they perceive to be harmless family entertainment games found in high-end, multipurpose entertainment centers/arcades, and strip-mall slot parlors/mini-casinos most view as problematic. Frequently, policymakers and regulators seek to create an exception for "skill-based amusement devices" or "amusement games" to resolve this dilemma. The problem is that technology always wins. Because of the inherent conflict in these two goals, developers can circumvent the definition of an illegal gambling device by creating "something that isn't that". States are losing revenue, economic development opportunities and financial support for important causes, and individuals are placed at increased risk. Litigation has proven to be a costly and repetitive attempt at damage control that is failing.

Our studied view is that the only effective way to protect the fidelity of a jurisdiction's purposeful gambling policy is to require regulatory review of every type of gambling device. A suggested regulatory framework, adjustable to the spectrum of jurisdictions, is contained herein.

**3**

# BACKGROUND

*"This is a game room that steals from people on fixed incomes. There's crime that happens in and around these places."*

*Constable Alan Rosen, South Houston, Texas*

### The Dilemma

Using a wide variety of technology and game types, purveyors of unregulated and illegal gambling are multiplying more rapidly across the U.S. These operations often lead to a wide variety of social ills including fraud, money laundering, violent crime, drug trafficking, and preying on problem gamblers.

### POLICY EROSION

Unregulated and illegal gambling operations erode state gambling policy by siphoning tax dollars away from worthy causes, preying upon the vulnerable and facilitating a wide array of criminal activity. Moreover, they circumvent the purposeful gambling policy goals set by the states and sovereign tribal governments.

Illegal gambling in the United States is expanding so rapidly that it is now a nationwide problem. Consider just a few of the troubling cases recently reported across the country:



- Since January 2018, the Kern County, California Sheriff's Office (KCSO) has raided over 100 establishments with illegal video gambling machines. KCSO reports that each game can gross between $50,000 and $100,000 per month.[1] The illegal gambling parlors have resulted in a tenfold increase in crime and the operators prey on the addicted and the vulnerable.[2]

- In South Houston, Texas, police raided an illegal gambling hall with over 200 gambling devices that were grossing between $60,000 and $100,000 per day.[3] After seizing piles of cash, Constable Alan Rosen commented, "This is a game room that steals from people on fixed incomes. There's crime that happens in and around these places."

---

[1] Kotowski, Jason (2019, March 29) KCSO has busted roughly 100 illegal video gambling parlors in past 14 months. The Record. https://www.bakersfield.com

[2] Ibid.

[3] White, Dawson (2019, June 25) Sparks fly as Houston officers find stacks of cash in raid of illegal gambling room. The Kansas City Star. www.kansascity.com

[4] Consillio, Kristen (2020, January 15) Man convicted of manslaughter in Honolulu game room shooting. Honolulu Star Adviser. www.staradvertiser.com

[5] Nirappil, Fenit (2020, January 27) Games that offer cash rewards are flooding the region. Is it illegal gambling? The Washington Post. www.washingtonpost.com

4

- A Honolulu man was recently convicted of killing a patron at Gameroom Rock Za Sura as part of a botched robbery attempt.[4]

- In the District of Columbia and Virginia, thousands of games that operators allege to rely on skill have flooded into bars, convenience stores and restaurants, causing widespread alarm among state and local public officials. "You are not winning $150 playing Pac-Man," said Fred Moosally, the director of the D.C. Alcoholic Beverage Regulation Administration, which proposed new restrictions. "What we don't want is to have illegal games that are unregulated that are actually gambling devices in the District of Columbia."[5]

- While four local governments in Virginia have taken steps to try to eradicate the growing number of "skill gambling machines," the devices continue to spread rapidly throughout the state. The Virginia Lottery estimates that it will lose $140 million over the next year as a result of the growing number of these gambling devices. "It's keeping me awake at night," said Virginia Lottery executive director, Kevin Hall. "It is not right; they are allowed to operate without any oversight, any regulation, any rules of the road, with no tax benefits to the locality or to the state?"[6]

- The problem has become so bad in Missouri that the House of Representatives established an Interim Committee to study this issue in the second half of 2019. During a hearing, the Missouri State Highway Patrol testified that complaints about illegal gambling have increased from 39 in 2018 to 145 through September 2019.[7]

Missouri Lottery commissioner, Paul Kinkaid, estimates that almost 14,000 machines may be in operation throughout Missouri.[8]

- In California, police have shut down at least eight illegal gambling halls since 2019. Long Beach Police Chief Robert Luna stated that ". . . what we are seeing around these locations are people carrying guns."[9] LBPD Lt. Aaron Alu observed that "these places can make a lot of money," and are hives for gangs and organized crime. In the past six months, two people have died and two have been wounded in three different shootings associated with the gambling houses.[10]

- In North Carolina, law enforcement officials seized 93 illegal gambling machines and over $12,000 in a raid of "sweepstakes parlor" that was operating as a mini-casino. GLI served as the expert witness for the Alamance County Prosecutor which resulted in a guilty plea, destruction of the devices and surrendering of the cash to the local school district.

- In Hawaii, federal agents raided two illegal gambling houses in Waipahu and Pearl City, seizing 60 illegal gambling machines and about $150,000 in cash. The U.S. Department of Justice issued federal indictments against 15 people for crimes that included illegal gambling, possession of controlled substances with the intent to distribute and possession of firearms in furtherance of drug trafficking, robbery and arson. GLI served as the expert witness for the DOJ for the illegal gambling charges resulting in convictions in federal court.[11]

[6] A bad bet? 'Skill machines' could cost the Virginia Lottery and local schools millions. (2019, December 9) retrieved from https://www.wavy.com/news/investigative/a-bad-bet-skill-machines-could-cost-the-virginia-lottery-and-local-schools-millions/

[7] Missouri General Assembly, House of Representatives (2019). Report of the House of Representatives Special Interim Committee on Gaming. p. 9.

[8] Id. At 8.

[9] Osier, Valerie. (2020, January 26). What's a slaphouse? Police say they're fighting new wave of illegal gambling. Long Beach Post. www.lbpost.com

[10] Id.

[11] CS-00-UHI-19-01 (Honolulu PD and HSI Joint Op - 2019) Case Number: CR 19-00119 JMS

- When an illegal gambling house containing "eight-liners" became a serious problem in Fort Worth, Texas, the city council enacted an ordinance prohibiting them. The gambling operators sued, and the case is currently pending before the Supreme Court. The gambling operators argue that the machines fit under an exemption for machines that pay out small, non-cash prizes, like machines found in arcades. The attorney for the city has argued that "the prizes aren't fuzzy animals. They're X-boxes. They're flat screen TVs."[12]

- On January 24, 2020, the Waco Police Department's SWAT team raided an illegal gambling house containing 24 slot machines. Charges are pending.[13]

- In Oakland, California, a 22-year-old man was recently convicted of fatally shooting a man outside of an illegal gambling club. In April 2019, a man was shot and another pistol-whipped during a robbery at the same illegal gambling parlor. Indicative of the lack of law enforcement resources available to respond to this growing problem, the defense attorney in the case, a former local prosecutor, commented, "In my 26 years of experience in the criminal justice system, I've never known it to be a priority to crack down on illegal gambling clubs in Oakland."[14]

- In Michigan, the Gaming Control Board has worked with the Attorney General's Office and local law enforcement to aggressively pursue enforcement actions against illegal gambling operations. This strategy has seen great success.

MGCB Executive Director Rick Kalm provided an overview of this effort as follows:

- 96 locations have been investigated to date
- 27 locations were closed via search warrants by the Attorney General's office or local police
- 41 Cease and Desist letters were served on owners and locations resulting in the closure of another 26 locations
- 45 additional locations closed for unknown reasons or moved locations to different addresses
- 981 machines seized
- More than $172,000 in cash forfeited to local law enforcement
- 36 individuals faced 146 charges
- 105 Felonies
- 41 Misdemeanors

- While the Michigan experience is to be applauded, it is also an outlier.  Other states, such as Texas and Florida, that have had temporary success using an enforcement strategy have found the effort to be difficult to maintain over the years, with temporary eradication of illegal gambling operations, only to see them reemerge after a period of hibernation.

- In Between January 22 and February 25, 2020, Pennsylvania state police and liquor control agents raided 17 locations housing what they allege are illegal gambling devices, seizing 71 machines and more than $115,000 in cash.  "Illegal, unregulated gambling is a serious and growing problem facing the Commonwealth," said Captain Jeffrey

---

[12] Weinberg, Tessa. (2020, January 28). Fort Worth asks Texas Supreme Court to declare eight-liner machines illegal lotteries. Forth Worth Star-Telegram.
  https://amp.star-telegram.com

[13] Larson, Jerry. (2020, January 24). Waco Tribune-Herald. www.wacotrib.com

[14] KPIX TV. Man Gets 8-Year Prison Term In Shooting Death Outside Oakland Illegal Gambling Club. Retrieved from
  https://sanfrancisco.cbslocal.com/2020/01/24/8-years-prison-shooting-death-oakland-illegal-gambling-club/

[15] Kellar, Travis. (2020, February, 28).  'Skill-based,' other gambling devices seized statewide: state police.  https://www.pennlive.com.



A typical unregulated "skill" gambling parlor in Pennsylvania.

Rineer, acting director the Pennsylvania State Police Bureau of Liquor Control Enforcement. He noted that "So far in 2020, gambling machine seizures have been reported from every BLCE office, in counties from Erie to Philadelphia." [15]

These examples are just a small sampling of the rapidly expanding illegal gambling market that is eroding state gambling policy and leaving a trail of devastating social harms that is the certain result of unregulated gambling. There is a reason why every state in the union makes gambling a crime. There are also reasons why it is difficult to enact exceptions to that rule.

When states chose to allow exceptions to the general rule that gambling is illegal, they crafted extensive and well-funded regulatory structures to control it. These systems prevent criminal activity, ensure transparency in the legal gambling operations, dedicate funds from the gaming operation to worthy causes, and create protections for the vulnerable. These important safeguards are missing from illegal gambling operations, so it is not surprising that it attracts gang activity, organized crime, drugs, violent crime, and preys upon the vulnerable and the addicted.

This *GLI Policy Series White Paper* will examine the key state policy goals that are being compromised by the rapid expansion of illegal gambling devices and offer a solution to eradicate existing operations.



## Unregulated and illegal gaming venues operate without any supervision. They do not adhere to prescribed operational guidelines designed to prevent fraud, theft, money laundering, and a variety of other criminal behaviors.

**7**

These important safeguards are missing from illegal gambling operations, so it is not surprising that it attracts gang activity, organized crime, drugs, violent crime, and preys upon the vulnerable and the addicted.

# ERODING STATE & TRIBAL PUBLIC POLICY

Nearly every state in the union has a criminal prohibition against gambling. These laws were enacted as part of what Professor I. Nelson Rose calls the end of the second wave of legalized gambling in the U.S.[16]

Beginning with Nevada in 1936, many states have created exceptions to this general prohibition, with each state having specific public policy objectives for the gambling activities they have chosen to legalize. In his 1986 book, Gambling and the law, Professor Rose observes, "Thirty-five years ago, gambling for money was illegal, period. It did not matter if it was a nickel-ante game of poker played in a neighbor's den or a friendly bet on Monday night football with a co-worker over a beer."

Since, Rose penned this in 1986, nearly every state has authorized some form of gambling. However, they have done it with strict controls and for specific policy reasons." Rose goes on to comment, "It is difficult to think of another area of the law where 50 individual states have changed their thinking 180 degrees within such a short time."[17] And yet, despite the clear articulation of policy by the states – that gambling is illegal except when authorized to fulfill specific and purposeful policy objectives – the rising occurrence of unregulated and illegal gambling operations is eroding these state policy objectives.

The problem is further exacerbated by the impact unregulated and illegal gambling operations are having on the enormously successful implementation of tribal gaming policy. Since the landmark California v. Cabazon Band of Mission Indians[18] decision was handed down in 1987 and the subsequent enactment of the Indian Gaming Regulatory Act (IGRA) in 1988, gambling has provided invaluable resources to tribes throughout the country to improve the safety, economic security, and quality of life in tribal communities.

The unregulated and illegal gambling movement threatens this progress. This phenomenon is fueled by increasingly sophisticated technology designed to take advantage of archaic, often vague, criminal gambling statutes that never envisioned modern game designs. These statutes allow for the creation of devices that present themselves as slot machines while allowing operators to argue that the design escapes the definition of illegal gambling.

[16] Rose, I. Nelson. (2010). Gambling and the Law: The Third Wave of Legal Gambling, 17 Jeffrey S. Moorad Sports L.J. 361

[17] Rose, I. Nelson (1986). Gambling and the law. Gambling Times.

[18] 480 U.S. 202 (1987)

**Despite the clear articulation of policy by federal, state and tribal law – that gambling is illegal except when authorized to fulfill specific and purposeful policy objectives – the rising occurrence of unregulated and illegal gambling operations is undermining these important policy goals.**

## STATE & TRIBAL POLICY OBJECTIVES

When Missouri legalized riverboat gambling in 1993, its goal was to encourage "economic development, job creation and the promotion of Missouri as a major tourist attraction."[19] The funds for gaming were to be devoted to specific causes, with all the tax revenue from gambling dedicated to education. In addition, the casinos would pay a fee for each admission, which would support the local government where the casino was based; the cost of regulation; and important causes such as funding for nursing homes for veterans, early childhood education programs, and law enforcement programs to reduce gang violence.[20]

Upon passage of the legislation, the Missouri Riverboat Gaming Association (MRGA) predicted that the next two years would produce six licensed casinos generating 5,400 new jobs and $78 million in tax revenue for education.[21] The actual results would shatter the MRGA's estimate, as Missouri Gaming Commission would license seven casinos in its first two years, employing 8,234 people and depositing $96.7 million into the state's education fund.

Missouri's first-generation casino projects would inject nearly $675 million of capital investment into the Missouri economy and contribute an additional $45.1 million in gaming fees dedicated to local governments and special causes.[22] Since that time, it has become clear that Missouri's policy goals have been fulfilled. From 1994-2018, the Missouri casino industry has produced:

- $6.93 billion for educational programs (elementary, secondary and early childhood)
- $3.2 billion in capital investments in Missouri
- $927.5 million to all causes supported by admission fees including $324.2 million for veterans programs[23]

**This phenomenon is fueled by increasingly sophisticated technology designed to take advantage of archaic, often vague, criminal gambling statutes that never envisioned modern game designs. This allows for the creation of devices that present themselves as slot machines while allowing operators to argue that the design escapes the definition of illegal gambling.**

[19] *Missouri Gaming Commission 1994 Annual Report, page 3.*

[20] *Mo. Rev. Stat. § 313.822 (A.L. 1993 S.B. 10 & 11 § 10).*

[21] *Missouri Riverboat Gaming Association. (1993, April 30). Missouri Riverboat Gaming Association Supports State Riverboat Gaming Legislation.*

[22] *Missouri Gaming Commission 1994 Annual Report. Pages 51-59.*

[23] *Missouri Gaming Association Annual Report (2018).*

It is important to understand that Missouri's Constitution limits the number of casinos to 13, reflecting the state's limited tolerance for gambling and its policy decision to focus on reinvestment in quality properties, rather than having a free-market approach to gambling policy. It is clear that having as many as 14,000 unregulated, illegal devices spread throughout the state is undermining this constitutional policy decision that was enacted by Missouri's citizens.

Similarly, Pennsylvania created the Pennsylvania Gaming Control Board (PGCB) in 2004, giving it the authority to license 14 casinos with the objective of invigorating the economy, creating jobs, preserving the state's horse racing industry, and providing property tax relief for homeowners. Since the industry's inception in 2006, it has produced $17 billion in tax revenues for the commonwealth, while creating 16,000 direct casino jobs.[24] As in Missouri, and a majority of the other states, the rampant growth of unregulated and illegal gambling is rendering carefully crafted state and tribal gambling policies meaningless.

The positive results of tribal gaming policy have been even more impressive. Since 1985, the National Indian Gaming Association (NIGA) has worked to promote tribal gaming policy objectives that include "protecting and preserving tribal sovereignty and the ability of tribes to attain economic self-sufficiency through gaming and other forms of economic development."[25] Its mission has been a resounding success. In 2018, 501 Native American casinos produced $33.7 billion in gross gaming revenue while creating 676,428 jobs.[26] In 2019, the estimated economic impact of tribal gaming was $105.42 billion.

**The rampant growth of unregulated and illegal gambling is rendering carefully crafted state and tribal gambling policies meaningless.**

## EMERGING FORMS OF ILLEGAL GAMBLING

Many forms of unregulated and illegal gambling devices that we are seeing today are using more advanced technology to disguise them as "skill games" or "arcade games." The random number generator (RNG) is often shielded by game features offering the player a choice of whether to cash out or continue. This is commonly referred to as a "pre-reveal" feature, where, after the player sees the outcome of a game, they are given the opportunity to cash out or continue playing. Other games give a player the option of playing some game of skill to avoid a loss or they can accept the loss and continue playing the device like a traditional slot machine. Of course, few, if any, players use these features because it makes playing the game tedious and lacks entertainment value. To understand how technology is being used to camouflage gambling devices, consider how a manufacturer in Virginia, who has placed approximately 5,000 of the devices, describes its technology as reported in *The Virginia Mercury*:

> "... the company insists that it's the only one in the state that's operating legally because its proprietary software also includes a secondary game that, in theory, allows a player to win a few

[24] *Pennsylvania Gaming Control Board Annual Report 2018-19. Page 5.*

[25] *National Indian Gaming Association. http://www.indiangaming.org/about*

[26] *National Indian Gaming Commission. 2018 Gross Gaming Revenue Reports. https://www.nigc.gov/commission/gaming-revenue-reports*

[27] *Oliver, Ned. (2019, October 30). A slot machine showdown in Chesterfield parking lot highlights legal uncertainty. The Virginia Mercury. https://www.virginiamercury.com*

*cents on every spin if they take the time to complete it and have the mental wherewithal to remember a Simon Says-style 20-beat pattern. Users can easily skip over it in favor of a faster-paced, slot-machine style of play, but the company says its existence means that a player can win on every try based on skill alone."*[27]

The policy debate in Virginia has created an odd conflict between operators of these devices, leaving them to engage in bizarre, pro wrestling style, publicity battles over whose devices are more illegal.[28] Meanwhile, the Commonwealth's attorney in Charlottesville ruled that the machines were illegal. The operators responded by filing a lawsuit to overturn the decision. As the litigation proceeds, the Legislature is considering several bills to clarify that the machines are illegal gambling devices. Moreover, the Legislature spent last year preparing a report to assist in developing a comprehensive gambling policy.[29] The report contained specific findings regarding the impact of the growing number of unregulated gambling devices in the state:

> *Proliferation of unregulated electronic gaming devices, or "grey machines" around the state, could pose direct competition to Virginia's authorized gaming such as lottery, charitable gaming, and historical horse racing, as well as any additional forms of gaming that could be authorized in the future. These unregulated grey machines create risks for players and businesses. Virginia currently uses a local approach to enforce the legality of the devices, which has led to inconsistent and insufficient oversight. Other states have addressed grey machines, through regulation or an outright ban on the devices.*[30]

The experience in Virginia is common in the United States. Nearly every jurisdiction attempting to combat the devices by using the obsolete definition of gambling device in its criminal code has either been overruled, presented with additional guidance further complicating enforcement or has been frustrated by cycles of expensive litigation that wastes resources and does not produce conclusive results.



Photo courtesy of Penn National Gaming from Special Report by Spectrum Gaming. Used with permission.

## THE ENDLESS LITIGATION LOOP

A common experience in many jurisdictions is what we will refer to as the *endless litigation loop.* Prosecutors and law enforcement officials throughout the country will find the following scenario familiar:

1.  Law enforcement begins to receive complaints about an unregulated gambling operation that is involved in one or more of the following:

    a. Openly offering games that function similarly or identical to a typical casino slot machine with citizens questioning their legality.

    b. Patrons complain they have been deceived or the devices are "rigged."

[28] Ibid.

[29] Regulatory Management Counselors, P.C. (2019). Comparative Governance and Regulatory Structures of Gaming Regulation Related to Expanded Legalized Gaming Activities in the Commonwealth of Virginia. Prepared for The Innovation Group as Part of Its Report to the Virginia Joint Legislative Audit and Review Commission.

[30] Ibid.

Consumer complaints are not addressed by the operator.

   c. A consumer complains that they are becoming dependent on the devices, or a relative or friend of a player complains that a player is addicted to the machines or is spending too much time/money gambling at the unregulated venue.

   d. The venue is a gathering place for gangs and persons with extensive criminal records. A variety of criminal behavior is being reported in or around the gaming facility.

   e. There are reports of persons who appear to be underage that are either unsupervised, playing the devices, or accompanying persons who are playing the devices.

   f. People who are intoxicated with alcohol or drugs are observed playing the devices.

   g. Players are observed putting large amounts of money into the machines, playing a very short time and then cashing out; then repeating the cycle (money laundering).

2. Law enforcement investigates the location and concludes there is reason to believe that it is an illegal gambling operation.

3. Law enforcement contacts GLI and requests an estimate for an initial forensic evaluation of machines.

4. After signing a contract as an expert to be paid by local taxpayers, GLI provides law enforcement with a report describing the technology behind the machines and the methodology to achieve game outcome.

5. Law enforcement works with local prosecutors to analyze the report and determine that the games violate the state's criminal statute prohibiting the operation of gambling devices without a license.

6. The local prosecutor files a criminal complaint and seizes the machines.

7. The gaming operator seeks a temporary restraining order (TRO) preventing the seizure, pending the outcome of the litigation. The operators argue that the devices contain some game logic, typically introducing some element of skill, which allows them to fall outside the criminal definition for a gambling device.

8. The prosecutor enters into a contract with GLI to provide expert witness testimony in the case, at further expense to the local government.

9. Months of discovery, depositions and pretrial motions consume more local resources at taxpayer expense.

10. As the case nears trial, the gambling operator agrees to plea to a misdemeanor gambling charge and agrees not to operate the machines that are the subject of the litigation in the future.

11. A few months after the settlement, a new corporation, with a new version of gaming software appears, claiming "it learned a lot from the previous litigation" and now have a device containing even more skill that does not run afoul of the criminal gambling statute.

12. Repeat steps 1–11.

13

Nearly every jurisdiction attempting to combat the devices by using the obsolete definition of a gambling device in its criminal code has either been overruled, presented with additional guidance further complicating enforcement, or has been frustrated by cycles of expensive litigation that waste resources and does not produce conclusive results.

We have seen this cycle play out in jurisdictions throughout the U.S. From Florida to California, from Ohio to Texas and Pennsylvania to Hawaii. Litigation results, at best, are temporary victories and shortly celebrated before the cycle starts again. It is expensive. It is inefficient. It is contrary to the bedrock principle in every state authorizing legal gambling: the industry is responsible for the cost of its own regulation.

It is regulation in reverse:

• First, operators flagrantly introduce games that receive money, offer a short game primarily based on chance with minor elements of remedial skill;

• then make taxpayers foot the bill to show that the operators are violating nearly every consumer protection and public policy objective the jurisdiction has established for gambling; and

• after the expensive exercise, the operators start a new cycle of unregulated behavior with purportedly new technology or game strategy, forcing the taxpayers to start the process over again.

## THE ARCADE/VIDEO GAME PARLOR DILEMMA

The endless litigation loop has its origins in policymakers desire to distinguish between what they perceive to be harmless entertainment games (e.g., Dave & Busters, Chuck E. Cheese, Main Event, bowling alleys, etc.) and the mini-casinos and strip mall slot parlors that so many consumers and policy makers find offensive. Thus, they try to craft an exception for "skill-based amusement devices" or "amusement games" that only pay out in small prizes or tickets that can be redeemed for prizes.

The problem with this strategy is that technology will always win. Any exception we have seen, no matter how artfully drafted, can be circumvented by even more clever game design that provides an actual or perceived work-around.

Because of the inherent conflict in these two policy goals, developers can circumvent the definition of illegal gambling device by creating "something that isn't that." It allows gaming operators ample room to set up business and enjoy the fruits of the endless litigation loop. An equally prevalent outcome is when unregulated and illegal operators evade any consequences because law enforcement and prosecutors are busy with other criminal activity they deem a higher priority.



Photo courtesy of Penn National Gaming from Special Report by Spectrum Gaming. Used with permission from Penn National Gaming.

# THE SOLUTION: PROTECTING PUBLIC POLICY OBJECTIVES

Our introduction discussed the remarkable consistency in which state and tribal law address gambling policy. Every U.S. state and territory has a criminal statute, and, in most cases, a constitutional provision, prohibiting gambling and making it a crime to operate gambling games. The federal government has a host of statutes prohibiting various types of gambling activity. Since the mid-1800s, our nation's starting point is that gambling is generally illegal.

Since that time, many states and the federal government have enacted exceptions to this general prohibition. In each instance, the exceptions were designed to fulfill specific public policy objectives of the particular jurisdiction. Some wanted revenue dedicated to worthy causes like education, health care and tax relief. Others wanted to stimulate job creation, economic activity or to redevelop blighted areas. Some desired to increase tourism or assist minority and women-owned businesses. The federal government and sovereign tribal nations saw an opportunity to dramatically improve the quality of life for Native Americans. In each instance, the jurisdiction had a specific strategy that was narrowly defined to meet an identified need.

Allowing unregulated and illegal gambling operations undermines these policy objectives. They operate without the extensive prior approval and vetting processes in all regulated environments. They are not confined to certain locations, as is the case with the great majority of jurisdictions in the U.S., nor are they subject to competitive bidding processes that are also prevalent in the states.

Unregulated and illegal gaming venues operate without any supervision. They do not adhere to prescribed operational guidelines designed to prevent fraud, theft, money laundering, and a variety of other criminal behaviors. There are no protections for consumers. For instance, there are no controls to protect players from devices designed to deceive or cheat them. There are no minimum payout percentages, nor any transparency about how much the operator is allowed to win from players.

Perhaps the most egregious offense is that the games appeal to the most vulnerable in our population without any protections for problem gambling. There is no self-exclusion list, no signs for where to get help if you have a gambling problem and often the marketing of these facilities appears to be designed to entice the addicted.

## REINFORCING THE PRESUMPTION THAT UNREGULATED GAMBLING IS ILLEGAL

We now have several decades of experience demonstrating the futility the impossible task of attempting to define a gambling device with the intention of allowing some types of games but prohibiting others. It has not been successful, and the overwhelming evidence suggests it is a flawed and expensive strategy.

Our studied view is that the only effective way to protect the fidelity of a jurisdiction's purposeful gambling policy is to require regulatory review of every type of gambling device. The technology used in these devices is becoming increasingly complex. Understanding how the games function and the software logic behind game play requires specific expertise that can only be managed by a dedicated gaming regulatory agency such as a gaming commission, control board or lottery commission.

Because criminal gambling statutes, constitutional provisions, regulatory structures and tribal compacts are so varied, it would be imprudent to offer model language. However, we believe the following proposed regulatory framework provides policymakers with sufficient guidance to develop an affordable, efficient and effective regulatory structure. This framework minimizes the burden on family-oriented or purely leisure businesses, while protecting the jurisdiction against the infection of illegal gambling operations that undermine jurisdictional policy, prey upon the vulnerable and foster criminal behavior.

**There are no protections for consumers. For instance, there are no controls to protect players from devices designed to deceive or cheat them. There are no minimum payout percentages, nor any transparency about how much the operator is allowed to win from players. Perhaps the most egregious offense is that the games appeal to the most vulnerable in our population without any protections for problem gambling.**

## A REGULATORY FRAMEWORK TO OVERSEE MODERN GAMING TECHNOLOGY

We suggest reconsidering the definition of gambling and gambling devices in the criminal code to clarify that any type of game requiring something of value to play with the opportunity to win something of value, is presumed to be a gambling game. The definition should allow for exemptions of certain types of contests that do not require devices, such as sporting events, and contests of skill that are sponsored by or overseen by recognized organizational bodies. The definition can set criteria for those types of bodies.

**17**

Understanding how the games function and the software logic behind game play requires specific expertise that can only be managed by a dedicated gaming regulatory agency such as a gaming commission, control board or lottery commission.

Moreover, the statute should empower the gambling regulatory agency with the ability to grant waivers to categories of entertainment facilities that the agency finds meet policy objectives for non-gambling entertainment facilities by evaluating criteria established in the legislation. Some factors to consider include:

- The percentage of gross revenue derived from food and beverage services, retail or other non-gaming entertainment activities.

- The capital investment in the facility where the games are offered.

- The types of games being offered (e.g., traditional arcade games such as skeeball, pinball, racing games, sports games, etc.).

- The maximum amount allowed for a single play of each game.

- The maximum payout of the machines and the procedures for payout and redemption.

- Whether cash is allowed as a prize payout, either directly or indirectly.

- The method of accounting for net win of each device and the internal controls for governing the integrity of game play.

- The appropriateness of the game being available for play to minors.

- The extent of consumer protections included in the game design.

- The impact of the gaming facility on public safety.

- Other criteria as may be approved by the regulatory agency through the administrative rulemaking process.

Those businesses applying for a waiver would be subject to a small fee to offset, but not necessarily cover, the administrative costs of the review process. In most jurisdictions, fees from licensed gambling activities can be used to pay for the cost of the regulatory waiver process.

Waiver applicants would submit an affidavit drafted by the regulatory agency attesting that it agrees to conform to any conditions or criteria the agency deems necessary for waiver. Moreover, they will agree to cooperate with audits of any game if the regulator establishes a reasonable suspicion that the operator is violating the terms of the waiver.

## Our studied view is that the only effective way to protect the fidelity of a jurisdiction's purposeful gambling policy is to require regulatory review of every type of gambling device.

The gambling regulator is given the authority to investigate allegations of illegal gambling and has the power of search and subpoena. It would not have the authority to file charges for illegal gambling, but would be required to submit its cases to local law enforcement and prosecutors. The gaming regulator would also be required to cooperate with local law enforcement efforts to investigate illegal gambling and to aid local prosecutors filing criminal charges for illegal gambling.

**19**

# CONCLUSION

Since legalized gambling has emerged in the U.S., GLI has served gaming regulators as the independent technical expert tasked with evaluating gaming technology against the government's technical standards. We serve over 475 gaming regulatory agencies globally and have advised hundreds of jurisdictions on a wide variety of public policy issues related to the regulation and control of gambling.

We are the government's chosen expert in nearly all gambling prosecutions. Many of those have succeeded. Yet, we remain as frustrated as our clients in seeing the fruits of victory rapidly evaporate as a new wave of unregulated gambling machines becomes a focus of law enforcement. States and tribes have developed many purposefully designed and well-meaning strategies to combat this phenomenon. As we have demonstrated, each of those efforts have failed. We hope the information presented in this analysis is helpful as each jurisdiction considers its future path. Regardless of the strategy you choose, we stand ready to support you in achieving your goals.

The information contained in this white paper is for general guidance only and is subject to change without notice. While reasonable efforts have been made in the preparation of this document to ensure its accuracy, the information in this document is provided "as is" without any warranty, express or implied, including without limitation any warranties of merchantability, fitness for a particular purpose and any warranty or condition of non-infringement. GLI® assumes no liability resulting from errors or omissions in this document or from the use of the information contained herein.



gaminglabs.com  |  +1.732.942-3999

© 2020 Gaming Laboratories International
All rights reserved. All registered and unregistered trademarks are the property of their respective owners.