IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TNT AMUSEMENTS, INC., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:23-cv-330 JAR |
| TORCH ELECTRONICS, LLC, et al., | ) |
| Defendants. | ) |

**PLAINTIFF TNT AMUSEMENTS, INC.'S**
**MEMORANDUM IN OPPOSITION TO PARTIAL MOTION TO DISMISS**

In ruling upon a motion to dismiss, this Court takes the factual allegations of the complaint as true, granting the motion only if those allegations, together with all reasonable inferences therefrom, fail to plausibly state a claim upon which relief might be granted. *Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017). The Defendants' Memorandum in Support of Partial Motion to Dismiss (Doc. #19) (the "Memorandum") recites that standard, but it fails to properly apply it. Instead, it seeks to dismiss most (but, importantly, not all) of TNT's claims by portraying its RICO and common law unfair competition claims as "conclusory" and insufficiently particular. To do so, the Memorandum cherry-picks from the Complaint's summary allegations but ignores the specific factual allegations that either precede or follow those summary allegations. But, far from being a bare-bones pleading that is long on the law but short on the facts, TNT's Complaint provides 400 paragraphs of allegations, over the course of 56 pages, that together paint a damning picture of the Defendants' illegal conduct and the consequences of that conduct for both TNT and the public at large. Reading the Complaint as a whole, as this Court must, there is no question that it contains more than sufficient factual matter to survive the Defendants' motion to dismiss. TNT therefore respectfully requests that the Defendants' motion be denied.

**DISCUSSION**

This memorandum will respond specifically to each of the arguments presented in the Memorandum—but first, it is important to emphasize the aspects of the Complaint the Defendants do ***not*** challenge as insufficiently pled. First, and perhaps most significantly, the Defendants do not assert that their supposed "no chance" gaming devices are, as a matter of law, excluded from the reach of Missouri's gambling laws. *See* Compl. ¶¶ 36–64. They do not claim that the "pre-reveal" mechanism in the Torch Devices is sufficient to make them legal "no chance" devices, as the Defendants have represented in numerous written advertisements. *See* Compl. ¶¶ 88–107. Nor do the Defendants claim that Count One, which alleges false and deceptive advertising under the Lanham Act, has been insufficiently pled. *See* Compl. ¶¶ 227–59. Finally, the Defendants do not contest that the Complaint adequately alleges the operation of an illegal gambling business or the unlawful use of facilities of interstate commerce, each of which are themselves predicate acts under RICO. *See* 18 U.S.C. § 1961(1). Thus, in assessing the sufficiency of the Complaint, this Court may assume that the following are true:

(1) The Torch Devices are illegal gambling devices and illegal slot machines under Missouri law because, among other things, they involve an element of chance and produce outcomes that are beyond the control of the player.

(2) The Defendants nonetheless falsely represented the Torch Devices were legal "no chance" devices to business owners and players in the course of marketing and distributing the devices, in violation of the Lanham Act.

(3) These acts and the others alleged in the Complaint constitute violations of 18 U.S.C. § 1952 (use of interstate facilities in aid of racketeering) and § 1955 (illegal gambling business).

If those allegations are sufficient to state a claim under the Lanham Act, as the Defendants effectively concede they are, then it is hard to fathom how they could be insufficient under RICO and the Missouri common law of unfair competition. Nonetheless, TNT responds to each of the Memorandum's arguments below.

**I.     TNT's Complaint Sufficiently Pleads All Required Elements of Its RICO Counts**

The Defendants' attacks on the sufficiency of the Complaint's RICO counts are ill-founded. In challenging the Complaint's allegations (1) that the Defendants and their confederates together have formed a RICO enterprise and (2) that TNT's loss of business has been proximately caused by the Defendants' conduct, the Defendants invite this Court to ignore the standard that applies to this Court's review. At this stage of the litigation, this Court is not at liberty to question the availability or adequacy of the proof of TNT's allegations; instead, it must assume all of the facts in the Complaint are true and ask whether those facts, together with all reasonable inferences therefrom, state a plausible claim for relief. *Torti*, 868 F.3d at 671. Applying that standard here, there is no doubt that TNT has adequately pled serious violations of RICO that entitle TNT to proceed past the pleadings stage.

**A.     The Complaint Adequately Alleges Injuries That Have Been Proximately Caused by the Defendants' Unlawful Conduct**

The Defendants are right to recognize that RICO requires a plaintiff like TNT ***ultimately*** to prove proximate cause between a pattern of racketeering activity and the harm alleged. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). But at the motion to dismiss stage, TNT need not prove anything; it must only plead a plausible claim. And TNT has adequately pled that its injuries have been proximately caused by the Defendants' operation of their illegal gambling business, the unlawful use of facilities of interstate commerce in furtherance of that business, and their acts of mail and wire fraud, among other things.

**1.     TNT Is an "Immediate Victim" of the RICO Violations Alleged in the Complaint**

Contrary to the Defendants' characterizations, the Complaint does not merely allege an unspecified economic injury or nebulous loss of market share; rather, it specifically alleges that TNT's customers have replaced TNT's legal amusement devices with the Torch Devices in

particular locations. In that respect, the instant Complaint stands in stark contrast to the circumstances considered in each of the Defendants' principal authorities, as explained below.

In challenging the RICO counts' sufficiency, the Defendants rely chiefly on *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), where the Supreme Court held that the harms caused to a competitor by the defendant's alleged failure to charge its customers state sales taxes were too remote to establish proximate cause:

> [Plaintiff] asserts it suffered its own harms when the [defendants] failed to charge customers for the applicable sales tax. The cause of [plaintiff's] asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State).

*Id.* at 458. The Court held that these harms were too attenuated because the state, not the plaintiff, was the party most directly harmed by the conduct alleged. *Id.* at 461.

Here, by contrast, TNT is an "immediate victim" of the Defendants' illegal conduct. Unlike in *Anza*, the Complaint in this case does not allege a mere cost-savings to the Defendants that has put TNT at a competitive disadvantage. To the contrary, TNT has alleged that "some Amusement Locations . . . have **actually removed** TNT's machines to create space for additional Torch Devices," and that others have "actually ended their relationship with TNT" altogether as a result of the Defendants' deceptive marketing and illegal distribution of the Torch Devices. *See* Compl. ¶¶ 117, 119 (emphasis added).[1] The Complaint further alleges that Amusement Locations have been lured by the promise of a split of the substantial revenue generated by the Torch Devices "to dedicate space within their facilities to the illegal Torch Devices rather than TNT's legal amusement games." *See* Compl. ¶¶ 110–11. These statements, taken as true, establish a

---

[1] Although the Complaint does not identify these locations by name, TNT is prepared to do so, and, if need be, will amend its Complaint to specify numerous locations from which its legal amusement games have been removed in favor of the Torch Devices.

direct harm to TNT that is more than adequate to surpass the proximate cause hurdle erected by *Anza*. *Cf. Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (recognizing that proximate cause is satisfied under the Lanham Act when "deception of consumers causes them to withhold trade from the plaintiff").

The Defendants also rely upon the Ninth Circuit's decision in *Club One Casino, Inc. v. Perry*, 837 F. App'x 459 (9th Cir. 2020), which the Memorandum characterizes as a "recent case on facts similar to ours." Mem. (Doc. #19) at 9. But aside from the superficial fact that both cases involve gambling, the allegations in *Club One* bear little similarity to the instant Complaint. In *Club One*, a casino alleged that the defendants had misrepresented the identity and qualifications of their investors to state regulators, causing the state to issue a license for a new casino that then competed with the plaintiff. *Id.* at 460–61. The Ninth Circuit said that the "the State, not Club One, [was] the immediate victim of Defendants' illegal actions" because the "Defendants' alleged misrepresentations were directed at State agencies in an attempt to avoid California's gambling license requirements." *Id.* at 461.

Here, by contrast, the Defendants' misrepresentations are explicitly alleged to have been made to TNT's existing customers in order to persuade them to replace TNT's legal amusement games with the Defendants' illegal slot machines. Unlike in *Anza*, where the alleged racketeering activity was designed principally to deprive the state of tax revenue, the Defendants' illegal enterprise directly victimizes legitimate competitors like TNT who compete with Torch in the market for amusement games. In that respect, this case bears a much closer resemblance to *Corcel Corp. v. Ferguson Enterprises, Inc.*, 551 F. App'x 571 (11th Cir. 2014), where the Eleventh Circuit held that a plaintiff had adequately alleged that its injuries were proximately caused by a competitor's bid-rigging scheme, since the plaintiff "was next in line" to receive the government

contracts in question. *See id.* at 577. Similarly here, where TNT has alleged that its games have been removed from Amusement Locations to make room for the Torch Devices, the Complaint alleges a close connection between the Defendants' illegal conduct and TNT's asserted injuries. That is enough (as the Defendants effectively concede) to establish proximate cause for Lanham Act purposes; the result under RICO should be no different. *See Lexmark*, 572 U.S. at 133.

    2.    **Other Affected Parties Are Unlikely to Pursue Similar Claims**

The Amusement Locations, meanwhile, rather than being economically harmed by the Defendants' illegal conduct, significantly profit from it, making it exceedingly unlikely that they "can be expected to vindicate the laws by pursuing their own claims." *Anza*, 547 U.S. at 460; *cf. Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 5–6 (2010) (noting that one consideration in assessing proximate cause is "whether better situated plaintiffs would have an incentive to sue"). And while it is not impossible to imagine that an individual player might bring a lawsuit to challenge the legality of the Torch Devices, that is unlikely to occur, both because a single player's damages are not likely to be significant, and because a short three-month statute of limitations applies to recovery of such damages. *See* Mo. Rev. Stat. § 434.030 (creating cause of action for a person who has lost money as a result of using a gambling device); *id.* § 434.090 (providing that any such cause of action must be brought within three months of accrual). Not to mention that, in seeking any such recovery, a player would effectively have to confess to the commission of a crime. *See id.* § 572.020 (making it a class C felony to knowingly engage in illegal gambling).

As the *Holmes* Court noted, "proximate cause" is a term used "to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." 503 U.S. at 268. "At bottom," *Holmes* said, "proximate cause reflects ideas of what justice demands, or of what is administratively possible and convenient." *Id.* 268. Here, recognizing the

directness of the injuries alleged in the Complaint will not cause difficulties in "ascertain[ing] the amount of a plaintiff's damages attributable to the violation" or "apportioning damages among plaintiffs removed at different levels of injury from the violative acts." *Id.* at 269. TNT has alleged a direct injury resulting from the removal of its legal games from the Amusement Locations that is distinct and separate from any gambling losses that might be claimed by the players who have suffered gambling losses at the hands of the Defendants. The loss of TNT's existing customers' business is the natural, the foreseeable, and indeed the intended result of the Defendants' illegal conduct, and justice demands that TNT be given the opportunity to seek recovery for those harms. *Cf. Corcel*, 551 F. App'x at 577–59 (finding proximate cause adequately alleged when plaintiff "was next in line" to receive government contract, damages were possible to ascertain, duplicative recoveries could be avoided, and "no other immediate victims . . . [were] more likely to vindicate the laws by pursuing their own claims").[2]

**B.     The Complaint Sufficiently Pleads the Existence of a Criminal Enterprise Because Torch, the Miltenbergers, and Their Confederates Are Associated in Fact**

The Defendants confusingly claim that the Complaint is insufficient because it identifies Torch as both "the enterprise and a person-defendant." Mem. (Doc. #19) at 12. Yet the Defendants themselves quote the applicable paragraph of the Complaint that identifies the alleged RICO enterprise as "consisting of 'Torch, the Miltenbergers, and other as-yet unidentified associates, agents, and employees.'" Mem. (Doc. #19) at 12 (quoting Compl. ¶ 137). As such, the Complaint does not plead that Torch is itself the "enterprise" in which the Defendants have unlawfully

---

[2]  TNT has, of course, suffered other cognizable economic losses as a result of the Defendants' illegal conduct. At the motion to dismiss stage, however, it is more than enough for TNT to have plausibly alleged at least one such injury as a direct and proximate result of the Defendants' conduct, of which the removal of its games and their replacement by the Torch Devices is but the clearest example. The precise extent of TNT's damages is a matter for later adjudication.

associated; rather, it pleads that Torch, the Miltenbergers, **and others** have associated in fact with one another, and that their association-in-fact constitutes a RICO enterprise. *See United States v. Turkette*, 452 U.S. 576, 582 (1981) (citing 18 U.S.C. § 1961(4), which defines "enterprise" to include "a corporation . . . or other legal entity," as well as any "group of individuals associated in fact although not a legal entity"). Therefore, even if the Defendants were correct in their submission that an enterprise cannot be exclusively composed of an LLC and its agents, the Complaint expressly alleges that the Defendants joined with other "associates" to form an unlawful association-in-fact. *See* Compl. ¶ 3 (alleging that some business owners have placed Torch Devices in their establishments "with full knowledge of the illegal nature of the devices"), ¶ 113 (alleging that the proprietors of some Amusement Locations "have joined in Torch's illegal enterprise, either knowing or having reasonable cause to believe that the machines are not legal as Torch has suggested"), ¶ 138 ("The members of the Torch Enterprise further conspired with as-yet unidentified owners and operators of Amusement Locations housing Torch Devices."), ¶ 269 ("[T]he Defendants associated in fact with each other *and others* so as to constitute an enterprise within the meaning of §§ 1961(4) . . . .").[3]

---

[3] The Defendants seek to dismiss the significance of these allegations by claiming that the existence of a RICO enterprise must be pled with particularity. But the case they cite, *Crest Construction II, Inc. v. Doe*, 660 F.3d 346 (8th Cir. 2011), merely provides that allegations **of fraud** in a RICO claim (i.e., certain RICO predicate acts) must be pled with particularity under Rule 9(b). *Id.* at 353. No provision of Rule 9 requires heightened particularity with respect to pleading the existence of a RICO enterprise. *See Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 919 (2001) (rejecting argument that the heightened pleading standard of Rule 9(b) applied to allegations of a "pattern of racketeering activity"; Rule 9(b) only applied "because the allegations are allegations of fraud, not because particularized allegations are needed in order to determine whether a pattern exists"). Notably, in *Crest*, mail and wire fraud were the **only** predicate acts alleged by the plaintiff; here, they are two among multiple predicate acts, others of which do not have fraud as an element. *See supra* p. 2–3.

Ignoring these allegations, the Defendants go on to misconstrue Second Circuit authority by claiming that employees of a corporation cannot form an "enterprise" under RICO. Mem. (Doc. #19) at 12 (asserting that it is insufficient for a plaintiff to plead "a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant"). As explained above, the Complaint alleges more than that. But even if it did not, controlling Supreme Court authority recognizes that a RICO enterprise may be established by even one person acting in control of a single legal entity. *See, e.g.*, *Cedric Kushner Promotions, Ltd. v. King*, 53 U.S. 158, 160 (2001) ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statue that requires more 'separateness' than that."); *see also Atlas Pile Driving Co. v DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir. 1989) (noting, when discussing a RICO enterprise, that "[a] collective entity is something more than the members of which it is comprised."). Thus, even if the Complaint could be read to allege merely (or alternatively) that the Miltenbergers (and not Torch) were RICO "persons" and that Torch was a RICO enterprise (as opposed to a participant in the association-in-fact that the Complaint labels the "Torch Enterprise"), that might cast doubt on the RICO allegations against Torch—but not against either of the Miltenbergers, who would themselves be subject to personal liability for participation in such a RICO enterprise.

But, as explained above, the Complaint plausibly alleges that Torch and the Miltenbergers have joined with others in an illegal association-in-fact, including the owners of Amusement Locations, to engage in their illegal gambling enterprise. At this stage of the litigation, that is all that is required. *See Boyle v. United States*, 556 U.S. 938, 944–45 (2009) ("RICO reaches a group of persons associated together for a common purpose of engaging in a course of conduct. Such

an enterprise . . . is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." (internal quotations and citations omitted)); *cf. SLS Int'l, Inc. v. Adone Media, Inc.*, No. 4:06-CV-00811 RWS, 2007 WL 38677 at *2–3 (E.D. Mo. Jan. 4, 2007) (permitting both RICO claim against individual defendants for forming corporate defendant as criminal enterprise and alternative claim against individual and corporate defendants for forming association-in-fact to proceed). [4]

### C. The Complaint Alleges Violations of the Mail and Wire Fraud Statutes with Sufficient Particularity

As explained above, the Defendants have not challenged the sufficiency of TNT's allegations with respect to two of the RICO predicate acts identified in the Complaint: operation of an illegal gambling business, 18 U.S.C. § 1955, and violation of the Travel Act, 18 U.S.C. § 1952. These predicates are sufficient to establish a violation of RICO, irrespective of whether the mail and wire fraud counts have been sufficiently pled. It is therefore unnecessary for this Court to assess the sufficiency of what are, in essence, alternative allegations supporting the RICO counts.

Still, the Defendants are incorrect to claim that the Complaint's allegations of mail and wire fraud are insufficient to satisfy the pleadings standards of Rule 9(b), which requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud," while permitting "malice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally."

---

[4] Though the Complaint specifically alleges that some Amusement Locations have joined the Defendants' criminal enterprise, the allegation that the Torch Enterprise also encompasses "other as-yet unidentified associates, agents, and employees" is broad enough to potentially include numerous others, such as the manufacturer of the devices in question, any distributors who sell the devices to the Defendants, spokespeople hired by the Defendants, and any number of sales, collection, delivery, and repair personnel that the Defendants may either contract with or employ to accomplish their illegal aims. If needed, TNT is prepared to include any available specifics regarding such other individuals and entities in an amended complaint.

Fed. R. Civ. P. 9(b). The Defendants characterize the Complaint's acknowledgment that "[i]t is not possible, without further investigation and discovery, for [TNT] to plead with particularity **all** instances of mail and wire fraud" committed by the Defendants as an "implicit admission" that it had not pled **any** such instances with particularity. *See* Mem. (Doc. #19) at 13 (citing Compl. ¶ 161) (emphasis added). Yet the Defendants ignore the immediately following nine paragraphs of the Complaint, in which multiple fraudulent misrepresentations are specifically recited, as well as numerous other paragraphs alleging fraudulent conduct on the part of the Defendants.[5] These allegations of express false representations by the Defendants, along with the various allegations of the Complaint describing the nature of the Defendants' scheme, are sufficient to plead facts "constituting the fraud" as required by Rule 9(b). *See Abels*, 259 F.3d at 920 (holding that mail and wire fraud were sufficiently pled under Rule 9(b) when facts such as the "time, place and contents of false representations," the "identity" of the fraudsters, and "what was obtained or given up thereby" were alleged).

## II. The Complaint Adequately Pleads a Cause of Action Under Missouri's Common Law of Unfair Competition

With respect to their challenge to Count Two, which alleges unfair competition under Missouri's common law, the Defendants have simply got the law wrong. Missouri follows the Restatement (Third) of Unfair Competition (the "Restatement") with respect to claims of unfair competition. *Am. Equity Mortg., Inc. v. Vinson*, 371 S.W.3dd 62, 64 (Mo. Ct. App. 2012). Section 2 of the Restatement specifically provides that "one who advertises goods or services in

---

[5] *See, e.g.*, Compl. ¶¶ 163–67 (describing false statements on Torch's website to the effect that "the element of chance has no role in the outcome" and that the "'Prize Viewer' option eliminates chance"), ¶¶ 88–92 (identifying additional false representations on Torch's website), ¶¶ 168–69 (identifying signs on the Torch Devices as false representations), ¶¶ 93–95 (describing signs in detail), ¶ 170 (identifying public statements distributed through media as additional false representations).

a way likely to deceive or mislead prospective patrons to the commercial detriment of another is subject to liability for such deceptive practices." *Id.* (citing, with approval, Restatement § 2). Similarly, this Court has previously described the provisions of Missouri's unfair competition law as following the general provisions of the Lanham Act, which likewise prohibits false and deceptive marketing practices. *Home Builders Ass'n of Greater St. Louis v. L & L Exhibition Mgmt., Inc.*, No. 4:97-CV-1905 MLM, 1999 WL 34803788, at *15 (E.D. Mo. Aug. 13, 1999), *aff'd*, 226 F.3d 944 (8th Cir. 2000).

In the teeth of these authorities, the Defendants rely upon two of this Court's cases, neither of which supports their assertion that Missouri's common law does not provide a remedy against the sort of conduct alleged in the Complaint. First, the Defendants misleadingly quote this Court's decision in *Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc.*, 73 F. Supp. 2d 1044 (E.D. Mo. 1999) for the proposition that "[i]n Missouri, common law unfair competition encompassed several categories of legal claims, including palming or passing off, trademark violations, and misappropriation." *Id.* at 1048. But they leave out the very next two sentences of *Moviefone*:

> In *National Tel. Directory Co. v. Dawson Mfg. Co.*, 263 S.W. 483, 484 (1924), the Missouri Court of Appeals held that unfair competition **comprised more than merely** the traditional passing off to the public the goods or business of one person for that of another. The court cited *International News Service* [248 U.S. 215 (1918)] for the proposition that the doctrine of unfair competition had been expanded to "encompass the schemes and inventions of the modern genius bent upon reaping where he has not sown."

*Id.* (parallel citation omitted). Thus, read in its entirety, *Moviefone* stands for the proposition that the Missouri common law of unfair competition is ***not*** limited to passing off and similar acts— the exact opposite of the proposition the Defendants cite it for. *Cf. GilbertRobinson, Inc. v. Carrie-Beverage-Missouri, Inc.*, 758 F. Supp. 512, 527 (1991) (cited in Mem. (Doc. #19) at 14)

(noting that "[t]he essence of law for unfair competition is fair play" and citing "passing-off" as but one example).

Perhaps even more deceptively, however, the Defendants cite *Nestle Purina PetCare Co. v. Blue Buffalo Co.,* 4:14-CV-859-RWS, 2015 WL 1782661 (E.D. Mo. Apr. 20, 2015), for the proposition that Missouri does not recognize a distinct tort of false advertising. And it is true that, in *Nestle,* this Court did dismiss a count that sought to state a claim for "false advertising." *Id.* at \*10. But in the very next paragraph, this Court **upheld** a claim for unfair competition under Missouri common law based on a theory of false or deceptive marketing. *See id.* (holding that unfair competition count alleged plausible claim under Missouri law, which "requires proof that defendant caused harm to plaintiff's commercial relations and that the harm resulted from acts or practices relating to deceptive marketing" (citing Restatement § 1)).

As a basic reading of the cases illustrates, the Defendants' own cited authorities establish that claims of false and deceptive marketing are cognizable under Missouri's common law of unfair competition. Count Two therefore plausibly alleges a claim upon which relief could be granted.

### III. Even If the Defendants Had Identified a Genuine Deficiency in TNT's Complaint, Dismissal with Leave to Amend Would Be the Appropriate Remedy

The Defendants seek an extraordinary remedy from this Court for the asserted lack of specificity in TNT's Complaint: a dismissal of six of the Complaint's seven counts **without leave to amend**. Mem. (Doc. #19) at 3. Even if TNT had failed to adequately plead any of those six counts, the proper relief would be to dismiss those counts **with** leave to amend, which the Federal Rules instruct this Court to grant "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(2); *Owen Cont'l Dev., LLC v. Vill. Green Mgmt. Co.*, No. 4:11-CV-1195 FRB, 2011 WL 5330412,

at *5 (E.D. Mo. Nov. 4, 2011) (recognizing dismissal with leave to amend as the "appropriate remedy" where a plaintiff fails to state a claim with sufficient particularity).

That is especially true here, where, as the Defendants effectively acknowledge, the Complaint states a claim upon which relief could be granted with respect to Count One, and the discovery that will be required to establish the merits of that claim will overlap significantly (if not entirely) with the discovery for the other six counts of the Complaint. *See* Mem. (Doc. #19) at 1 (failing to seek dismissal of Count One because, "at this early stage, Torch is limited to pointing out only the most glaring deficiencies in TNT's Complaint"); *cf. Fryberger v. Univ. of Arkansas-Fayetteville*, No. 5:16-CV-05224, 2016 WL 6892085, at *2 (W.D. Ark. Nov. 22, 2016) ("Where facts and reasonable inferences 'raise a reasonable expectation that discovery will reveal evidence' in support of a plaintiff's claim, the Court should deny a motion to dismiss."), *aff'd*, 889 F.3d 471 (8th Cir. 2018).

Imagine, if you would, that this Court were to dismiss with prejudice one or more of TNT's RICO claims for failure to state a claim, only for the case to proceed to discovery under Count One, and for evidence of additional mail and wire fraud offenses to be discovered. Would the Defendants seriously have the Court refuse TNT leave to amend to include such predicate acts in its case? Such an absurd result would be antithetical to the command of Rule 15(a)(2). *See Berces v. Kombinat*, No. 94 CIV 3381 (KMW), 1995 WL 640486, at *2 (S.D.N.Y. Oct. 31, 1995) (dismissing claims without prejudice so that plaintiff could amend complaint "when and if specific evidence that would support" her claims was uncovered through discovery on remaining claims; any other result "would be contrary to justice in that if plaintiff had simply not initially named [a dismissed defendant] in her complaint . . . , she would be able to amend her complaint

to add [that defendant] or bring a separate action against [that defendant] after discovering this new evidence").

Nor should this Court take seriously the Defendants' insinuation that TNT's allegations are merely the moorings for a planned "fishing expedition" into the Defendants' records. Mem. (Doc. #19) at 13–14. As this Court is well aware, TNT has filed a motion for preliminary injunction in this matter, and it is prepared to proceed to a hearing on that motion without the benefit of any discovery whatsoever. *See* Mot. for Preliminary Injunction (Doc. #15). It would make little sense for TNT to have sought such expedited relief if it was merely hoping to go scrounging through the Defendants' records for evidence of some speculative claim of wrongdoing. Instead, as the Complaint plainly recites, the illegal nature of the Defendants' conduct has been well-recognized by numerous courts, agencies, and law enforcement authorities, and one need not look much further than the face of one of the Defendants' illegal gambling devices to see it for what it is: an illegal slot machine.

## CONCLUSION

The Defendants' Memorandum effectively concedes that TNT has alleged a violation of the Lanham Act that is sufficient for this case to move past the pleadings stage and into discovery. TNT's remaining claims rely upon the same basic facts to plausibly allege additional violations of RICO and Missouri's common law of unfair competition. At this earliest stage of the proceedings, that is enough for this Court to find that those facts, if true, state claims upon which relief could be granted. TNT therefore respectfully requests that the Defendants' motion be denied, and in the alternative, that it be granted leave to amend its Complaint to provide additional specific facts to further establish the Defendant's violations of the law.

Dated: April 28, 2023

Respectfully submitted,

BRYAN CAVE LEIGHTON
PAISNER LLP

*/s/ Sasha Riedisser*
RICHARD E. FINNERAN, #60768MO
SASHA RIEDISSER, #71141MO
MARY GRACE WARREN, #73147MO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*
*sasha.riedisser@bryancave.com*
*marygrace.warren@bryancave.com*

*Attorneys for TNT Amusements, Inc.*
*d/b/a Play-Mor Coin-Op*

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2023, a copy of the foregoing was served on all counsel of record by operation of the Court's electronic filing system.

*/s/ Sasha Riedisser*
SASHA RIEDISSER, #71141MO