# Exhibit 7

Declaration of Stacy Friedman

# DECLARATION OF STACY FRIEDMAN

I, Stacy Friedman, being of sound mind and over the age of 21, make the following declaration based upon my personal knowledge, information, and belief.

1. I am a professional game designer and casino gaming mathematician intimately familiar with the issues and technology relating to electronic gaming systems, including regulated land-based or Internet casino gaming systems (including, *e.g.*, Class II and Class III games under IGRA, lottery games and video lottery terminals, central determinant gaming systems, sweepstakes games, historical horse race games); mobile, console or PC-based non-wagering game systems; and other electronic or video arcade games. I have personally designed, implemented, tested, and analyzed many games, including dozens of single-player and multi-player games, both wagering and non-wagering.

2. I am the President of Olympian Gaming, LLC in Lake Oswego, Oregon, a position that I have held since 2001. In that capacity, I have consulted in the gaming industry regarding, among other things, game design and development, slot machine and table game mathematics, game software and hardware development, and gaming patent infringement and validity. I have served as a subject matter expert in many matters related to gaming machines or gaming technology, including over thirty cases involving gaming-related intellectual property. Many of these cases have involved distributed software systems running on networked computers, and in several of these cases I have performed source code reviews.

3. In 1996, I earned my Bachelor of Arts degree in Computer Science, *magna cum laude,* from Harvard College, Harvard University, Cambridge, Massachusetts. During my college career, I became familiar with a wider variety of game genres, including RTS or "real time strategy" computer games (specifically Warcraft: Orcs vs. Humans), CCG or "collectible card games" (specifically Magic: The Gathering), and expanded my knowledge of wagering card games to blackjack, baccarat, and casino poker. After college, I became interested in the mathematics of casino games. I subsequently gained expertise in probability theory—the origins of which are based in wagering games—and gaming mathematics, including "advantage play" techniques such as blackjack card counting.

4. I have twenty-five years of professional experience in developing regulated casino games, gaming mathematics, and professional software design. My professional experience in the gaming industry started in 1998 when I joined Silicon Gaming in Palo Alto, California as a game model engineer before it was acquired by International Game Technology ("IGT"). Silicon Gaming designed and developed interactive video slot machines. I was also responsible for managing the statistical verification and mathematical gameplay testing for Silicon Gaming's products.

5. As a game model engineer (i.e., mathematician), I worked on the designs of video slot games, video keno games, and video poker games. I helped produce dozens of innovative new games and engaged regulatory agencies to achieve regulatory approval for the mathematics used in the games. In addition, I designed and developed game flow and storyboards for slot machines, and I developed and shipped mathematical models for over 50 games. I also served as a liaison to state regulatory agencies and corrected prior errors in gaming lab submissions, which led to savings of over $50,000 in regulatory fees.

6. In 2001, I started an independent casino game design and analysis consultancy, Olympian Gaming LLC. Based on my experience designing, developing, and placing dozens of games in Las Vegas, Reno, and Atlantic City casinos, I advise Internet casino software vendors, new game inventors, and casino game manufacturers in the fields of wagering, gameplay design, mathematical analysis, and statistical verification.

7. I have invented and applied for patents on over two dozen gaming methods and systems and, together with my patent attorney and frequent co-inventor, control a patent portfolio of over thirty issued and/or pending patents across several categories of the gaming industry. Several of the patents on which I am a named inventor involve novel electronic wagering game devices, systems, or methods, including U.S. Patents 7,690,985 and 8,740,699 ("Slot machine with sliding symbols"), 8,257,159, 8,696,549, and 9,754,459 ("Slot machine with synchronized spinning reels"), 8,403,737 and 8,998,693 ("Royal re-draw video poker side bet"), 9,659,445 ("Slot machine with variable suspense factor"), and 9,978,221 ("Gaming system and method for providing a multiple dimension symbol game with expanding wild symbols"). I performed the game design and/or mathematical analysis on the games described therein. Olympian Gaming has received regulatory approvals for several of its patented gaming products in Nevada, Mississippi, and Washington State, and formerly held regulatory licenses from the Washington State Gambling Commission and the Nisqually Tribal Gaming Commission.

8. In my work as an expert in gaming-related matters, I have been involved with many cases involving regulated electronic gaming machines and systems, including mechanical and video slot machines and the networked casino operations systems to which they are connected. I have also been involved with matters, patents, and software source code relating to Class II games, historical horse racing games, and both electronic instant lottery games and electronic sweepstakes games where sets of predetermined results are delivered to gaming machines from central servers, or are pre-loaded onto gaming machines, and where the results are displayed in a manner that mimics the display of a video slot machine, including a graphical depiction of spinning, symbol-bearing reels. I have also been engaged to perform game design and/or mathematical analyses for such games.

9. I have previously provided analysis and testimony in matters relating to a preview feature. In *Savvy Dog Systems, LLC and POM of Pennsylvania, LLC v. Pennsylvania Coin, LLC and PA Coin Holdings, LLC,* No. 3:19-cv-01470 (M.D. Penn.),

asserted U.S. Patent No. 7,735,223 was entitled "Electronic Gaming Method and System Having Preview Screen" and was "directed to a system and method for providing a game preview display to players of an amusement or entertainment electronic game before playing the game." '223 patent at 1:64-67. The '223 patent also taught that "the preview display could also be implemented in other forms of electronic or electromechanical games. For example, it could be used in the context of an electronic or electromechanical slot machine having a plurality of spinning reels (actual or simulated) and displaying one or more lines of symbols." '223 patent at 11:43-48.

10. On March 2, 2023, I was retained as an expert by TNT Amusements, Inc. ("TNT") for the purpose of providing analysis and potential testimony relating to so-called "No Chance" gaming devices, a line of gaming devices distributed and operated within the state of Missouri by Torch Electronics, LLC (hereafter, the "Torch Devices"). This declaration does not endeavor to describe the entirety of my investigation or analysis to date but is instead provided for the limited purpose of supporting TNT's request for a hearing on its motion for a preliminary injunction.

11. In the course of my engagement by TNT, I have undertaken to analyze whether the software design and operation of the Torch Devices involves any of the factual predicates that would bring them within the definition of "gambling devices" and/or "slot machines" under the provisions of Missouri Revised Statutes § 572.010, including, but not limited to:

(1) whether Torch Devices allow a player to stake "something of value" upon the outcome of "a contest of chance," defined as "any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that the skill of the contestants may also be a factor therein";

(2) whether the Torch Devices allow a player to stake "something of value" upon the outcome of a "future contingent event not under his control or influence";

(3) whether the Torch Devices are "usable in the playing phase of any gambling activity, whether that activity consists of gambling between persons or gambling by a person with a machine";

(4) whether the Torch Devices, "as a result of the insertion of a coin or other object, operate[], either completely automatically or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, [they] may eject something of value"; and

3

  (5) whether the Torch Devices are "constructed or readily adaptable or convertible" to the use described in (4) above based upon a "mechanical act of manipulation."

  12. Based upon my investigation to date, and as I expect to elaborate further in my testimony at the preliminary injunction hearing, the answer to each of these questions is "yes."

  13. In the course of my engagement by TNT, I have been asked to evaluate two items of sworn testimony that I understand to have been presented by Torch Electronics, LLC and its owners in their opposition to TNT's motion for preliminary injunction: a "Transcript of Preliminary Hearing Held on April 22, 2022" (hereafter, "Transcript") and a "Declaration of Nick Farley" dated April 23, 2023 (hereafter, "Declaration"). Upon my review, I have made several observations that I believe would assist the Court in determining whether TNT is entitled to a hearing on its motion for injunctive relief.

  14. First, as the testimony of Mr. Hanavan appears to acknowledge, the Torch Devices he has observed "operate similar to a slot machine" in their "basic function." Transcript 49:8–16. He further testified that the Torch Devices permit a player to "place money in them, select [a] game, select a wager, play the game where [the player has a] winning or losing outcome, cash out, take that ticket up to the counter and redeem it for cash." Transcript 47:38–41. He further acknowledged that "absent the use of the pre-reveal button," the Torch Devices "essentially play just like a slot machine" and that the pre-reveal button is not "required for use in order to play the machine." Transcript 51:13–22.

  15. In this respect, Mr. Hanavan's testimony is consistent with my conclusion that the Torch Devices satisfy at least the last four of the five criteria set forth in paragraph 11 of this declaration. Mr. Hanavan's testimony, taken as true, reflects that the Torch Devices satisfy the following conditions that suffice to make them "gambling devices" and/or "slot machines" as those terms are defined in Missouri Revised Statutes § 572.010:

- The Torch Devices allow a player to stake "something of value" upon the outcome of a "future contingent event not under his control or influence" in that a wager is placed and then the game pays (or does not pay) a prize depending on the outcome of that wager, wherein the outcome is not under the player's control or influence.

- The Torch Devices are "usable in the playing phase of a[] gambling activity" because making wagers and revealing gaming outcomes are both playing phases of gambling activity.

- The Torch Devices, "as a result of the insertion of a coin or other object, operate[], either completely automatically or with the aid of some physical act by the player, in such a manner that, depending upon

4

elements of chance, [they] may eject something of value": when the player makes a wager in a Torch Device, the next game outcome from a previously-ordered list of game outcomes (each of which is either a winning or losing outcome) is delivered to the player.

- o   The Torch Devices are "constructed or readily adaptable or convertible," based upon a player's decision to use or not use the Prize Viewer mechanism, to a use by which, "as a result of the insertion of a coin or other object, operate[], either completely automatically or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, [they] may eject something of value": when the player declines to use the Prize Viewer option, the Torch Device plays "just like a slot machine" in that the player makes a wager to operate the game, the game reveals an outcome, and depending on whether the outcome was a winning or losing one, the game pays or does not pay a prize.

16. Mr. Hanavan's testimony on cross-examination appears equivocal about the degree to which he believes chance is involved in the operation of the Torch Devices in cases where the player utilizes the Prize Viewer option. To the extent, however, that his testimony can be read as acknowledging the absence of any element of chance in such cases, his testimony is inconsistent with my expert opinion, as informed by my investigation to date, as I explain further below.

17. Mr. Farley's Declaration, by contrast, appears to acknowledge that at least two of the criteria set forth in paragraph 11 of this declaration are satisfied. His Declaration reflects that "Neither the operators nor the players have the ability to affect the game outcomes that are distributed from the finite pools." Declaration ¶ 7. That statement, along with the Declaration's other statements about the operation of the Torch Devices, is consistent with my conclusion, as informed by investigation to date, that the Torch Devices satisfy the following two criteria that suffice to make them "gambling devices," as that term is defined in Missouri Revised Statute § 572.010:

- o   The Torch Devices allow a player to stake "something of value" upon the outcome of a "future contingent event not under his control or influence" because the players do not "have the ability to affect the game outcomes that are distributed from the finite pools."

- o   The Torch Devices are "usable in the playing phase of a[] gambling activity" because they are used in the playing phase of the game described above.

18. Mr. Farley's Declaration contends, however, that "chance does not play a role" in the outcomes delivered by the Torch Devices "on any given play of the game,"

5

including plays where the player does not make use of the "Prize Viewer" option. Based upon my expertise, and informed by my investigation to date, I disagree with that conclusion.

19. Mr. Farley bases his conclusion on two distinct premises: that "the game outcomes are determined sequentially from [a] predetermined finite pool," and that "the 'Prize Viewer' feature will always have the game outcomes available to be displayed if the player chooses to utilize that feature." It is unclear from the Declaration whether Mr. Farley views these premises as mutually necessary or independently sufficient to establish his conclusion, but in any event, those premises are insufficient, separately or together, to establish that "chance does not play a role" in the operation of the Torch Devices.

20. Mr. Farley suggests that one reason chance plays no role in the Torch Devices is that "none of the games on the Torch Device utilizes a random number generator to determine an outcome of the game or the prize awarded." Declaration ¶ 8. But a gaming machine can involve chance even if it does not use an internal random number generator. Moreover, other known games based on finite pools of predetermined outcomes can (and often do) rely upon elements of chance.

21. Mr. Farley's Declaration does not address how the finite pool of predetermined outcomes was arranged in the first place. For example, a casino dealer who shuffles a standard deck of cards and then deals cards from the top of that deck is dealing sequentially from a "finite pool" of "predetermined" cards, yet a blackjack game played with those cards is indisputably a gambling game. One element of chance in blackjack is the ordering of the deck prior to the first hand being dealt.

22. Similarly, a pre-printed roll of scratch-off instant lottery tickets contains a predetermined sequence of predetermined outcomes, yet Mr. Farley would presumably agree that lottery scratch tickets do in fact involve an element of chance. In a roll of instant lottery tickets the quantity of each prize amount is determined in advance. When they are printed, the lottery tickets are arranged into an unpredictable sequence, introducing an element of chance to the roll of lottery tickets. The Torch Devices similarly use a predetermined but unpredictable sequence of predetermined outcomes, drawn sequentially, akin to a roll of instant lottery tickets.

23. The particular point in a predetermined sequence of outcomes at which a player begins drawing those outcomes also involves an element of chance, and this is equally true for the Torch Devices as it is for lottery scratch tickets. Both lottery scratch tickets and the Torch Devices rely on a sequence of predetermined outcomes (tickets), but whether any particular ticket is a winning one is nonetheless predicated on chance. In both lottery scratch tickets and the Torch Devices, the player cannot control or influence where in that sequence they begin playing, and the player can only draw the next outcome or ticket and cannot skip any.

6

24. Many electronic gaming machines (EGMs) use finite pools of predetermined outcomes rather than internal random number generators to determine the outcome of each play, including video lottery terminals in the state of New York and Appendix X machines in the state of Washington. Nevertheless, these devices involve an element of chance similar to the instant lottery tickets described above. According to Mr. Farley, Torch Devices operate using a similar finite pool of predetermined outcomes. In my opinion, such devices are still "gambling devices" as that term is defined in Missouri Revised Statutes § 572.010 because, among other reasons, "the outcome depends in a material degree upon an element of chance."

25. Likewise, the existence of the "Prize Viewer" option within the Torch Devices' interface does not eliminate the element of chance. Mr. Farley acknowledges that this feature is optional, and the player can choose not to use it. As noted by Mr. Hanavan in his testimony, when the player does not use the Prize Viewer, the Torch Devices "essentially play just like a slot machine." Transcript 51:13–17.

26. According to Mr. Hanavan's testimony, even when a player uses the "Prize Viewer" on a Torch Device and knows that his next play will be a loser (pay out $0.00), the player can only learn the outcome of the subsequent play by first paying for that losing outcome and then revealing the subsequent one. At the time the player pays for the losing outcome, they have no information about the subsequent outcome or any later outcome. Similarly, a player who purchases a first lottery scratch ticket has no information about the subsequent ticket or any later ticket. Yet both games involve an element of chance.

27. For these reasons, and others I will explain in my forthcoming testimony, I disagree with Mr. Farley's conclusion that "chance plays no role" on plays when a player uses the "Prize Viewer" option. But even if Mr. Farley's opinion were correct on that point, that does not alter my conclusion that the Torch Devices satisfy other criteria that make them gambling devices as defined in Missouri Revised Statutes § 572.010, including that they allow a player who does not use the "Prize Viewer" option to stake "something of value" upon the outcome of a "future contingent event not under his control or influence." Specifically, the Torch Devices allow a player to stake money on the chance that revealing the next predetermined outcome will exceed the money staked.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 5, 2023.

_____
STACY FRIEDMAN