## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF MISSOURI
### EASTERN DISTRICT

| | |
|---|---|
| TNT AMUSEMENTS, INC., d/b/a ) <br> PLAY-MOR COIN-OP, ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> TORCH ELECTRONICS, LLC, ) <br> STEVEN MILTENBERGER, and ) <br> SONDRA MILTENBERGER ) <br> ) <br>     Defendants. ) | Case No. 4:23-cv-00330-JAR <br><br> **JURY TRIAL DEMANDED** |

### DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT AND COUNTERCLAIMS

Defendants Torch Electronics, LLC ("Torch"), Steven Miltenberger, and Sondra Miltenberger (collectively, "Defendants") answer TNT's Complaint as follows.

### PRELIMINARY STATEMENT

TNT has improperly brought four civil RICO counts for which TNT does not have standing, and improperly brought a Missouri common law claim that is not recognized. On April 21, 2023, Defendants moved to dismiss these claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

In filing their Answer and Counterclaims, Defendants do not withdraw their April 21, 2023 Partial Motion to Dismiss or waive arguments stated therein. Instead, on September 6, 2023, the Court ordered Defendants to file their "answer and assert any counterclaims" within 7 days from the date of the Order, making Defendants' Answer and Counterclaims due on September 13, 2023. (Doc. #43). Defendants file these pleadings at this time to comply with the Court's September 6, 2023 Order, but Defendants do not hereby withdraw or waive their fully briefed April 21, 2023

Partial Motion to Dismiss, nor do Defendants waive any of the arguments asserted in that Motion or its accompanying Memorandum in Support.

## ANSWER

1.      Denied.

2.      Defendants admit that Torch does not have a Missouri gaming license and does not own or operate Torch amusement devices in a licensed Missouri casino. The remainder of Paragraph 2 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny all remaining allegations in Paragraph 2.

3.      Denied.

4.      Denied.

5.      Defendants admit that TNT seeks both equitable relief and legal damages but Defendants deny that TNT is entitled to any form of relief or damages. Defendants deny all remaining allegations in Paragraph 5.

6.      Defendants are without sufficient knowledge or information to either admit or deny the allegations of Paragraph 6 of TNT's Complaint, and therefore deny the same.

7.      Defendants admit that Torch is a Missouri limited liability company. Defendants deny the remaining allegations in Paragraph 7.

8.      Defendants admit that Steven Miltenberger is an individual residing in St. Louis County, Missouri, and is a co-owner of Torch.

9.      Defendants admit that Sondra Miltenberger is an individual residing in St. Louis County, Missouri. Defendants deny the remaining allegations in Paragraph 9.

10.      Denied.

11.     Denied.

12.     Denied.

13.     Defendants admit that the Court has personal jurisdiction over Defendants.

14.     Defendants admit that Steven and Sondra Miltenberger reside within the Eastern District of Missouri.

15.     Defendants admit that Torch conducts business within the Eastern District of Missouri.

16.     Defendants admit that Torch is subject to the benefits and protections of Missouri law.

17.     Denied.

18.     Denied.

19.     Defendants admit that TNT owns and operates coin-, cash-, credit- and debit-card-operated devices in various Missouri retail locations. Defendants deny that all such devices are "legal." Defendants are without sufficient knowledge or information to either admit or deny the remaining allegations of Paragraph 19 of TNT's Complaint, and therefore deny the same.

20.     Defendants are without sufficient knowledge or information to either admit or deny the allegations in Paragraph 20 of TNT's Complaint, and therefore deny the same.

21.     Defendants admit that the amusement device industry is highly competitive and there is finite space for such devices to be placed in existing retail locations. Defendants deny the remining allegations of Paragraph 21 of TNT's Complaint.

22.     Defendants admit that a company's competitive advantage is in large part dependent upon its ability to develop, maintain, and protect goodwill and relationships with customers. Defendants deny the remining allegations of Paragraph 22 of TNT's Complaint.

23.     Defendants are without sufficient knowledge or information to either admit or deny the allegations of Paragraph 23 of TNT's Complaint, and therefore deny the same.

24.     Defendants admit that RSMo. § 572.010 contains a definition of "gambling." RSMo. § 572.010 is a legislative statute that speaks for itself, and Defendants object to TNT's attempt to interpret, modify, or cherry pick language from the statute. The remainder of Paragraph 24 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny all remaining allegations in Paragraph 24.

25.     Defendants admit that RSMo. § 572.010 contains a definition of "contest of chance." RSMo. § 572.010 is a legislative statute that speaks for itself, and Defendants object to TNT's attempt to interpret, modify, or cherry pick language from the statute. The remainder of Paragraph 25 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny all remaining allegations in Paragraph 25.

26.     Defendants admit that RSMo. § 572.010 contains a definition of "gambling device." RSMo. § 572.010 is a legislative statute that speaks for itself, and Defendants object to TNT's attempt to interpret, modify, or cherry pick language from the statute. The remainder of Paragraph 26 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny all remaining allegations in Paragraph 26.

27.     Defendants admit that RSMo. § 572.010 contains a definition of "slot machine." RSMo. § 572.010 is a legislative statute that speaks for itself, and Defendants object to TNT's attempt to interpret, modify, or cherry pick language from the statute. The remainder of Paragraph

4

27 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny all remaining allegations in Paragraph 27.

28.     Defendants admit that RSMo. § 572.010 contains a definition of "slot machine." RSMo. § 572.010 is a legislative statute that speaks for itself, and Defendants object to TNT's attempt to interpret, modify, or cherry pick language from the statute. The remainder of Paragraph 28 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny all remaining allegations in Paragraph 28.

29.     Paragraph 29 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny the allegations in Paragraph 29.

30.     Paragraph 30 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny the allegations in Paragraph 30.

31.     Paragraph 31 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny the allegations in Paragraph 31.

32.     Paragraph 32 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny the allegations in Paragraph 32.

33.     Paragraph 33 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny the allegations in Paragraph 33.

34.     Paragraph 34 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny the allegations in Paragraph 34.

35.     Paragraph 35 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny the allegations in Paragraph 35.

36.     Defendants admit that Torch's business includes placing legal amusement devices at locations.

37.     Denied.

38.     Defendants admit that Torch has distributed Torch amusement devices in the state of Missouri. Defendants deny the remaining allegations of Paragraph 38 of TNT's Complaint.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Denied.

43.     Defendants are without sufficient knowledge or information to either admit or deny the allegations of Paragraph 43 of TNT's Complaint, and therefore deny the same.

44.     Defendants admit that if a player wins money, they can cash out. Defendants deny the remaining allegations of Paragraph 44.

45.     Defendants admit that Torch has written about Missouri's definition of "gambling device." Defendants deny the remaining allegations of Paragraph 45.

46.     Defendants admit that Torch devices are designed in a manner that eliminates the element of "chance" as that term of art is defined under Missouri law. Defendants deny the remaining allegations of Paragraph 46.

47.     Defendants admit that Torch amusement device software ensures that each outcome is pre-determined and sequential. Defendants deny the remaining allegations of Paragraph 47.

48.     Defendants admit that players can pre-reveal the outcome of the next game on a Torch amusement device before deciding whether to play a given turn. Defendants deny the remaining allegations of Paragraph 48.

49.     Denied.

50.     Denied.

51.     Defendants deny that a player's subjective intent or "perspective" is relevant to determining whether a device is a "gambling device" as defined under Missouri law. Specifically, the Missouri legislature has previously proposed amendments to the definition of "gambling device" that would have, if passed, injected the issue of a player's subjective intent into the definition of "gambling device," but those amendments were rejected by the Missouri legislature and never became law. Defendants deny the remaining allegations of Paragraph 51.

52.     Denied.

53.     Defendants deny that a player's subjective intent or "perspective" is relevant to determining whether a device is a "gambling device" as defined under Missouri law. Specifically, the Missouri legislature has previously proposed amendments to the definition of "gambling device" that would have, if passed, injected the issue of a player's subjective intent into the definition of "gambling device," but those amendments were rejected by the Missouri legislature and never became law. Defendants deny the remaining allegations of Paragraph 53.

54. Defendants deny that a player's subjective intent or "perspective" is relevant to determining whether a device is a "gambling device" as defined under Missouri law. Specifically, the Missouri legislature has previously proposed amendments to the definition of "gambling device" that would have, if passed, injected the issue of a player's subjective intent into the definition of "gambling device," but those amendments were rejected by the Missouri legislature and never became law. Defendants deny the remaining allegations of Paragraph 54.

55. Paragraph 55 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny the allegations in Paragraph 55.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. Defendants admit that a putative class action lawsuit was filed in the Western District of Missouri, captioned as *Romano, et al. v. Torch Electronics, LLC, et al.*, Case No. 2:23-04043-CV-BCW (W.D. Mo. Mar. 3, 2023), shortly before TNT filed its Complaint. Defendants further admit that on August 21, 2023, the court granted Torch's Motion to Dismiss the plaintiffs' civil RICO claim and dismissed the case in its entirety. Defendants deny the remaining allegations in Paragraph 60.

61. Denied.

62. Denied.

63. Defendants admit to the existence of 11 CSR 45-5.190(1), which is a regulation that speaks for itself and applies to regulated slot machines in licensed Missouri excursion boat casinos.

Defendants deny that the Missouri Gaming Commission's regulatory authority extends to regulating Torch amusement devices. Defendants deny the remaining allegations in Paragraph 63.

64.     Defendants are without sufficient knowledge or information to either admit or deny the allegations of Paragraph 64 of TNT's Complaint, and therefore deny the same.

65.     Denied.

66.     Denied.

67.     Defendants deny that the opinion of the Missouri Gaming Association, a private casino lobbying entity, regarding Torch amusement devices is relevant to the legal question of whether Torch amusement devices are "gambling devices" as that term of art is defined under Missouri law. Defendants deny the remaining allegation in Paragraph 67.

68.     Defendants deny that the opinion of the Missouri Gaming Association, a private casino lobbying entity, regarding Torch amusement devices is relevant to the legal question of whether Torch amusement devices are "gambling devices" as that term of art is defined under Missouri law. Defendants deny the remaining allegation in Paragraph 68.

69.     Defendants deny that the Missouri Gaming Commission has any regulatory or rulemaking authority to regulate Torch amusement devices, and, thus, any alleged "declaration" by the Missouri Gaming Commission with respect to Torch amusement devices is irrelevant and moot. Defendants deny the remaining allegations in Paragraph 69.

70.     Defendants deny that the Missouri Highway Patrol has authority to "declare" Torch amusement devices to be illegal. Thus, any alleged "declaration" by the Missouri Highway Patrol is irrelevant and moot. Defendants deny the remaining allegations in Paragraph 70.

71.     Defendants are without sufficient knowledge or information to either admit or deny the allegations of Paragraph 71 of TNT's Complaint, and therefore deny the same. Regardless,

even if a committee was formed in 2019 by certain members of the Missouri House of Representatives, the committee failed to amend the definition of "gambling device," and Torch amusement devices continue to fall outside the definition of "gambling device" under Missouri law.

72.     Defendants deny that comments by one state senator are sufficient to amend, alter, or modify Missouri law. Defendants deny the allegations in Paragraph 72.

73.     Defendants admit that on January 6, 2020, Linn County Prosecutor Shiante McMahon filed charges against Torch and two other vendors for promoting illegal gambling in the first degree, which Missouri law defines as a class E felony, and that the aforementioned charges were dismissed by the state court following a probable cause hearing (Prosecutor Shiante McMahon then attempted to reassert charges against Torch, but those charges were dropped by the Linn County Prosecutor who replaced Shiante). Defendants deny that Torch amusement devices are illegal, and they note that no Missouri court has ever issued an order finding Torch amusement devices are illegal gambling devices under Missouri law. Defendants deny all remaining allegations in Paragraph 73.

74.     Defendants admit that in December 2020, Franklin County Prosecutor Matthew Becker filed charges against James McNutt in Case No. 20AB-CR03465 as detailed in the State's charging documents, and Torch was not and is not a party to that case, which is still pending. Defendants deny all remaining allegations in Paragraph 74.

75.     Defendants admit that on March 31, 2021, Platte County Prosecuting Attorney Eric Zahnd filed a petition against Torch for "forfeiture of gambling devices," claiming Torch amusement devices were illegal gambling devices, and that on April 15, 2021, those charges were dismissed because the prosecutor's office erroneously believed it had confiscated Torch

amusement devices when it, in fact, had not. Defendants deny all remaining allegations in Paragraph 75.

76.     Defendants admit that on or about June 14, 2021, Greene County Prosecutor Dan Patterson issued a subpoena to Torch, which Torch sought to quash in Greene County, Case No. 2131-CC00764 (dismissed without prejudice on June 6, 2022). Defendants deny all remaining allegations in Paragraph 76.

77.     Defendants admit charges were filed against Steven Miltenberger in Adair County for alleged possession of a gambling device, but all charges were subsequently dismissed. Defendants deny all remaining allegations in Paragraph 77.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Denied.

82.     Torch denies that how judges from other states interpret laws issued by legislative bodies outside the State of Missouri is relevant to Missouri's unique laws applicable to "gambling devices" as the Missouri Legislature has chosen to define that term of art. Defendants deny all remaining allegations in Paragraph 82.

83.     Torch denies that how judges from other states interpret laws issued by legislative bodies outside the State of Missouri is relevant to Missouri's unique laws applicable to "gambling devices" as the Missouri Legislature has chosen to define that term of art. Defendants deny all remaining allegations in Paragraph 83.

84.     Torch denies that how judges from other states interpret laws issued by legislative bodies outside the State of Missouri is relevant to Missouri's unique laws applicable to "gambling

devices" as the Missouri Legislature has chosen to define that term of art. Defendants deny all remaining allegations in Paragraph 84.

85.     Torch denies that how judges from other states interpret laws issued by legislative bodies outside the State of Missouri is relevant to Missouri's unique laws applicable to "gambling devices" as the Missouri Legislature has chosen to define that term of art. Defendants deny all remaining allegations in Paragraph 85.

86.     Torch denies that how judges from other states interpret laws issued by legislative bodies outside the State of Missouri is relevant to Missouri's unique laws applicable to "gambling devices" as the Missouri Legislature has chosen to define that term of art. Defendants deny all remaining allegations in Paragraph 86.

87.     Torch denies that how judges from other states interpret laws issued by legislative bodies outside the State of Missouri is relevant to Missouri's unique laws applicable to "gambling devices" as the Missouri Legislature has chosen to define that term of art. Defendants deny all remaining allegations in Paragraph 87.

88.     Denied.

89.     Denied.

90.     Denied.

91.     Denied.

92.     Denied.

93.     Denied.

94.     Denied.

95.     Denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

100.    Defendants admit that Torch has claimed (and continues to claim) Torch amusement devices are not "gambling devices" under Missouri law. Defendants deny all remaining allegations of Paragraph 100.

101.    RSMo. § 572.010 is a legislative statute that speaks for itself, and Defendants object to TNT's attempt to interpret, modify, or cherry pick language from the statute. The remainder of Paragraph 101 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny all remaining allegations in Paragraph 101.

102.    RSMo. § 572.010 is a legislative statute that speaks for itself, and Defendants object to TNT's attempt to interpret, modify, or cherry pick language from the statute. The remainder of Paragraph 102 of TNT's Complaint states legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants deny all remaining allegations in Paragraph 102.

103.    Denied.

104.    Denied.

105.    Denied.

106.    Defendants admit that Torch does not have, has never applied for, and does not have an application pending for a Missouri gambling license because Torch amusement devices are not gambling devices. Defendants deny all remaining allegations of Paragraph 106.

107.     Defendants admit that RSMo. §§ 572.030 and 527.070, as well as regulations within 11 CSR 45, exist in written legislation and administrative codes that speak for themselves. Defendants deny that Torch amusement devices are "gambling devices." Defendants deny all remaining allegations of Paragraph 107.

108.     Defendants admit that TNT and Torch are direct competitors "in the market for amusement games" in certain locations within the State of Missouri. Defendants deny all remaining allegations of Paragraph 108.

109.     Denied.

110.     Denied.

111.     Denied.

112.     Denied.

113.     Denied.

114.     Denied.

115.     Defendants admit that TNT and Torch are direct competitors "in the market for amusement games" in certain locations within the State of Missouri. Defendants deny all remaining allegations of Paragraph 115.

116.     Denied. Defendants demand specific evidence by way of full and fair discovery supporting TNT's claim that Torch's conduct has directly impacted TNT's business.

117.     Denied.

118.     Denied.

119.     Denied.

120.     Denied.

## FACTS TNT ALLEGED IN SUPPORT OF ITS CIVIL RICO CLAIMS

Defendants have filed a Partial Motion to Dismiss TNT's Counts Three through Six, all of which allege violation of civil RICO. (*See* Doc. ##18 and 19). Defendants' Partial Motion to Dismiss was fully briefed on May 8, 2023. (*See* Doc. #24). As Defendants explained in their Partial Motion to Dismiss, TNT has failed to state a civil RICO claim upon which relief can be granted. Therefore, Defendants should not be forced to Answer TNT's averments specific to its civil RICO claims at this time. If the Court deems responses are required to TNT's averments specific to its civil RICO claims, Defendants deny paragraphs 121-203. Please see Defendants' Partial Motion to Dismiss and Memorandum in Support of Partial Motion to Dismiss (Doc. ##18-19) for further detail regarding why TNT's Counts Three through Six should be dismissed with prejudice.

204.    Denied.

205.    Denied.

206.    Denied.

207.    Denied.

208.    Denied.

209.    Denied.

210.    Denied.

211.    Denied.

212.    Denied.

213.    Denied.

214.    Denied.

215.    Denied.

216.    Denied.

217.    Denied.

218.    Denied.

219.    Denied.

220.    Denied.

221.    Denied.

222.    Denied.

223.    Denied.

224.    Defendants admit that they have never applied for or received a Missouri gambling or gaming license. Defendants deny all remaining allegations in Paragraph 224.

225.    Denied.

226.    Denied. More specifically, Defendants deny that they have wrongfully caused TNT to suffer an irreparable injury or sustain any damages, and Defendants demand an opportunity to engage in full and fair discovery into the veracity of TNT's claims to the contrary (as well as all other issues and claims upon which TNT has the burden of proof).

**TNT's Count One (Lanham Act, Alleged Unfair Competition)**

227.    Defendants reassert and incorporate by reference their responses to Paragraphs 1-226 of TNT's Complaint as if fully set forth herein.

228.    Denied.

229.    Denied.

230.    Denied.

231.    Denied.

232.    Denied.

233.    Denied.

234.    Denied.

235.    Defendants admit that they have never applied for or received a Missouri gambling or gaming license. Defendants deny all remaining allegations in Paragraph 235.

236.    Defendants admit that they have never applied for or received a Missouri gambling or gaming license. Defendants deny all remaining allegations in Paragraph 236.

237.    Denied.

238.    Denied.

239.    Denied.

240.    Denied.

241.    Denied.

242.    Denied.

243.    Denied.

244.    Denied.

245.    Denied.

246.    Denied.

247.    Denied.

248.    Denied.

249.    Denied.

250.    Denied.

251.    Denied.

252.    Denied.

253.    Denied.

254.    Denied.

255.     Denied. More specifically, Defendants deny that they have wrongfully caused TNT to suffer an irreparable injury or sustain any damages, and Defendants demand an opportunity to engage in full and fair discovery into the veracity of TNT's claims to the contrary (as well as all other issues and claims upon which TNT has the burden of proof).

256.     Denied.

257.     Denied.

258.     Denied. More specifically, Defendants deny that they have wrongfully caused TNT to suffer an irreparable injury or sustain any damages, and Defendants demand an opportunity to engage in full and fair discovery into the veracity of TNT's claims to the contrary (as well as all other issues and claims upon which TNT has the burden of proof).

259.     Denied. More specifically, Defendants deny that they have wrongfully caused TNT to suffer an irreparable injury or sustain any damages, and Defendants demand an opportunity to engage in full and fair discovery into the veracity of TNT's claims to the contrary (as well as all other issues and claims upon which TNT has the burden of proof).

Further responding to the "WHEREFORE" paragraph, including all subparts thereto, following Paragraph 259, Defendants deny all allegations in the "WHEREFORE" paragraph and all subparts; Defendants deny that they have wrongfully caused TNT to suffer an irreparable injury or sustain any damages; Defendants deny that TNT is entitled to any relief sought; and Defendants demand an opportunity to engage in full and fair discovery into the veracity of TNT's claims.

**TNT's Count Two (Missouri Common Law of Unfair Competition)**

Defendants have filed a Partial Motion to Dismiss TNT's Count Two, which attempts to plead a Missouri Common Law of Unfair Competition claim. (*See* Doc. ##18 and 19). Defendants' Partial Motion to Dismiss was fully briefed on May 8, 2023. (*See* Doc. #24). As Defendants

explained in their Partial Motion to Dismiss, TNT has failed to state a Missouri common law claim for unfair competition upon which relief can be granted. Therefore, Defendants should not be forced to Answer TNT's averments specific to its Count Two claim at this time. If the Court deems responses are required to TNT's averments specific to its Count Two, Defendants deny paragraphs 260-266, including all averments and requests in the "WHEREFORE" paragraph, including subparts, following paragraph 266. Please see Defendants' Partial Motion to Dismiss and Memorandum in Support of Partial Motion to Dismiss (Doc. ##18-19) for further detail regarding why TNT's Count Two should be dismissed with prejudice.

### TNT's Counts Three through Six (Civil RICO)

As explained above, Defendants have filed a Partial Motion to Dismiss TNT's Counts Three through Six, all of which allege violation of civil RICO. (*See* Doc. ##18 and 19). Defendants' Partial Motion to Dismiss was fully briefed on May 8, 2023. (*See* Doc. #24). As Defendants explained in their Partial Motion to Dismiss, TNT has failed to state a civil RICO claim upon which relief can be granted. Therefore, Defendants should not be forced to Answer TNT's averments specific to its civil RICO claims at this time. If the Court deems responses are required to TNT's averments specific to its civil RICO claims, Defendants deny paragraphs 267-385, including all averments and requests in any "WHEREFORE" paragraphs, including subparts, following paragraphs 301, 336, 371, and 385. Please see Defendants' Partial Motion to Dismiss and Memorandum in Support of Partial Motion to Dismiss (Doc. ##18-19) for further detail regarding why TNT's Counts Three through Six should be dismissed with prejudice.

### TNT's Count Seven (Declaratory Judgment)

386.    Defendants reassert and incorporate by reference their responses to Paragraphs 1-385 of TNT's Complaint as if fully set forth herein.

387.    Defendants admit that TNT seeks a declaration that Torch amusement devices are illegal gambling devices and slot machines. Defendants deny that Torch amusement devices are illegal gambling devices or "slot machines" and further deny that TNT is entitled to any declaratory relief. Defendants deny all remaining allegations in Paragraph 387.

388.    Denied.

389.    Denied.

390.    Denied.

391.    Denied.

392.    Denied.

393.    Defendants admit that Torch does not hold a gaming license issued by the Missouri Gaming Commission because Torch amusement devices are not "gambling devices" and the Missouri Gaming Commission lacks authority to regulate Torch amusement devices. Defendants deny all remaining allegations in Paragraph 393.

394.    Denied.

395.    As stated above, Defendants have filed a Partial Motion to Dismiss seeking, among other things, dismissal of TNT's Missouri common law of unfair competition claim. Accordingly, Defendants should not be forced to answer TNT's averments specific to that claim. To the extent the Court deems a response to this Paragraph is required, Defendants deny Paragraph 395.

396.    As stated above, Defendants have filed a Partial Motion to Dismiss seeking, among other things, dismissal of TNT's civil RICO claims. Accordingly, Defendants should not be forced to answer TNT's averments specific to those claims. To the extent the Court deems a response to this Paragraph is required, Defendants deny Paragraph 396.

397.    As stated above, Defendants have filed a Partial Motion to Dismiss seeking, among other things, dismissal of TNT's civil RICO claims. Accordingly, Defendants should not be forced to answer TNT's averments specific to those claims. To the extent the Court deems a response to this Paragraph is required, Defendants deny Paragraph 397.

398.    As stated above, Defendants have filed a Partial Motion to Dismiss seeking, among other things, dismissal of TNT's civil RICO claims. Accordingly, Defendants should not be forced to answer TNT's averments specific to those claims. To the extent the Court deems a response to this Paragraph is required, Defendants deny Paragraph 398.

399.    Denied.

400.    Denied.

Further responding to the "WHEREFORE" paragraph, including all subparts thereto, following Paragraph 400, Defendants deny all allegations in the "WHEREFORE" paragraph and all subparts; Defendants deny that they have wrongfully caused TNT to suffer an irreparable injury or sustain any damages; Defendants deny that TNT is entitled to any relief sought; and Defendants demand an opportunity to engage in full and fair discovery into the veracity of TNT's claims.

WHEREFORE, Defendants respectfully request that the Court:

    i.    dismiss TNT's Complaint;

    ii.    grant Torch its costs incurred in this action; and

    iii.    grant such other and further relief as the Court may deem just and equitable.

## DEFENDANTS' AFFIRMATIVE DEFENSES

1.    TNT's Complaint fails to state a claim upon which relief may be granted.

2.    TNT's Complaint fails to state a claim upon which relief may be granted specific to TNT's Count II (Missouri common law unfair practice) and Counts III-VI (civil RICO) for the

reasons specified in Torch's Partial Motion to Dismiss and Memorandum in support of the same, which are incorporated by reference.

3.      Defendants deny each allegation in the Complaint that is not specifically admitted herein.

4.      TNT's claims are barred by applicable statutes of limitations.

5.      TNT's claims are barred by principles of estoppel.

6.      TNT's claims are barred by the unclean hands doctrine.

7.      TNT's claims are barred by latches.

8.      TNT's claims are barred due to TNT's fraud.

9.      TNT's claims are barred by release.

10.     TNT's claims are barred by res judicata.

11.     TNT's claims are barred by TNT's waiver.

12.     TNT's damages, if any, were directly caused or directly contributed to by TNT's own fault, negligence, or intentional acts.

13.     TNT's damages, if any, were directly caused or directly contributed to by the conduct, fault, actions, inactions, or negligence of third parties other than Defendants.

14.     To the extent the acts or omissions of third persons caused or contributed to cause TNT's alleged damaged, if any, Defendants are not liable or are entitled to an allocation of fault with those third persons.

15.     TNT fails to state a claim upon which relief may be granted because no actions of Defendants were the proximate cause of any alleged injury to TNT.

16.     TNT's claims are barred by the doctrine of in pari delicto.

17.     Any award of statutory penalties would violate Defendants' Due Process rights.

22

18.     Defendants incorporate by reference each and every other affirmative defense that may be uncovered or made known during the investigation and discovery of this case.

19.     Defendants incorporate here by reference any affirmative defense TNT may assert in its answer and affirmative defenses to Torch's counterclaims.

20.     Defendants reserve their right to amend their pleading and affirmative defenses as discovery progresses and new affirmative defenses are discovered.

### TORCH ELECTRONIC'S COUNTERCLAIMS AGAISNT TNT AMUSEMENTS, INC., d/b/a PLAY-MOR COIN-OP

For its counterclaims against Counterclaim Defendant TNT Amusements, Inc., d/b/a Play-Mor Coin-Op, Counterclaim Plaintiff Torch Electronics, LLC states and alleges as follows:

### Background

1.     For years now, TNT has engaged in a campaign of meritless filed complaints, baseless litigation, media harassment, and the distribution of knowingly false statements, advertisements, and promotions regarding Torch and Torch devices. Among other things, TNT has demonstrated a pattern and practice of, for example, providing interviews to news media that clearly seeks to disparage Torch and falsely claim that Torch's amusement devices are illegal gambling devices and "slot machines" in an effort to harm Torch and enhance TNT's own pecuniary interests. TNT has engaged in wrongful anticompetitive and unfair conduct in restraint of trade—not to out-compete Torch but to eliminate Torch from competing altogether.

2.     Additionally, as described below, while TNT claims its games and business are entirely legal, TNT promotes, operates, and places games that, while marketed and promoted as "skill" games, are actually illegal "contest[s] of chance," "gambling devices," or "slot machines" as those terms are defined in RSMo. § 572.010.

3.      TNT's wrongful conduct violates the Lanham Act, the Sherman Act, and Missouri law and directly harmed Torch as more fully described below.

4.      Torch seeks actual and multiplied damages as well as injunctive relief for these wrongs.

5.      Torch also seeks an award of its costs and attorney's fees incurred in defending and prosecuting this action.

**Parties and Jurisdiction**

6.      Counterclaim Defendant TNT Amusements, Inc., which also does business as Play-Mor Coin-Op (referred to herein as "TNT" or "Counterclaim Defendant"), is, as alleged by TNT, a Missouri corporation with its principal place of business in West Sullivan, Missouri.

7.      Torch is a Missouri limited liability company with its principal place of business in Wildwood, Missouri.

8.      This Court has subject matter jurisdiction over all claims in this Counterclaim.

9.      Federal jurisdiction is proper under 28 U.S.C. § 1331 because multiple of Torch's claims in this action arise under federal laws, to wit, the Lanham Act, 15 U.S.C. § 1121, *et seq.*, and the Sherman Act, 15 U.S.C. § 1, *et seq.*

10.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over any and all claims that arise under the laws of the State of Missouri because those claims are so related to the federal claims that they form a part of the same case or controversy and are derived from a common nucleus of operative facts.

11.     This Court has personal jurisdiction over Counterclaim Defendant TNT.

12.     Counterclaim Defendant TNT actively conducts business within this District.

24

13.     Counterclaim Defendant TNT is a Missouri corporation purposefully availing itself of the benefits and protections of Missouri law.

14.     Counterclaim Defendant TNT has engaged in commercial activity in this District that gives rise, in part, to Counterclaim Plaintiff's claims.

15.     Venue is proper in this District because Counterclaim Defendant resides in this District.

**Facts Generally Applicable to All Claims**

16.     TNT's business is the promotion, distribution, and placement of a variety of games, entertainment, ATM's and other coin-operated equipment in various consumer and retail locations in the State of Missouri (and the Eastern District of Missouri more specifically).

17.     In addition to promoting, distributing, and placing games like dart boards and pool tables, upon information and belief, TNT promotes, distributes, and places devices like claw machines, coin pusher-type machines, and other devices that represent to players that if the player performs a certain task correctly, like push a button to stop an array of sequentially illuminated lightbulbs on a specific lightbulb, then the player will win some sort of prize.

18.     While devices like the aforementioned claw machines, coin pusher-type machines, and other devices represent to a player that if the player performs a certain task correctly they will win some sort of prize, these machines contain mechanisms or software that operate as a form of random outcome generator that results in the outcome of a given turn on the machine depending in a material degree upon an element of chance, notwithstanding that the skill of the player may also be a factor in the outcome. For example, an all too familiar event for anyone who has played one of these claw machines is upon placing money in the machine, perfectly positioning the claw machine atop a stuffed animal, pushing the button to drop the mechanical claw, watching the

25

mechanical claw land perfectly atop the targeted stuffed animal, and then watching the mechanical claw retract without applying any detectable clamping pressure to the targeted and trapped stuffed animal (and then, of course, the player must repeat this frustrating process because  their son, daughter, or significant other would really like the targeted stuffed animal). The player in this scenario might believe he or she possibly did something wrong (failed to hold the button long enough, missed by millimeter in some material direction, or did not hold their tongue just right), but more likely than not electronic software within the system randomly dictated that despite the player's skillful play the turn would result in a loss by prohibiting the claw mechanism to apply adequate clamping pressure to secure the targeted animal on that specific turn.

19.     The random outcome generators present in many devices like the claw machines and other devices TNT promotes, distributes, and places are similar to the random number/outcome generators used in regulated Missouri casino slot machines. The devices are effectively rigged against even the most "skillful" player and outcomes are largely dictated by an adjustable ratio of randomly generated "wins" to losses regardless of player skill.

20.     RSMo. § 572.010 contains definitions related to gambling in the State of Missouri.

21.     RSMo. § 572.010 defines, in relevant part, "gambling" as:

a person engages in gambling when he or she stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his or her control or influence, upon and agreement or understanding that he or she will receive something of value in the event of a certain outcome.

22.     RSMo. § 572.010(3) defines "contest of chance" as "any contest, game, gaming scheme or gaming device in which the outcome depends in material degree upon an element of chance, notwithstanding that the skill of the contestants may also be a factor therein."

23.     RSMo. § 572.010(5), in relevant part, defines "gambling device" as "any device, machine, paraphernalia or equipment that is used or usable in the playing phases of any gambling

activity, whether that activity consists of gambling between persons or gambling by a person with a machine."

24.     RSMo. § 572.010(11), in relevant part, defines "slot machine" as "a gambling device that as a result of the insertion of a coin or other object operates, either completely automatically or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value."

25.     Upon information and belief, many of the "coin-op" devices TNT has promoted, distributed, or placed and continues to promote, distribute, or place fall within the definitions of a "contest of chance," "gambling device," and "slot machine." Sticking with the example of a claw machine, a player "insert[s] [] a coin or other object" of value into the machine, the machine operates with the aid of some physical act by the player (i.e., operating the joystick controlling the claw mechanism and pushing the button over the targeted item the player hopes to win), and the device operates in such a manner that "depending upon elements of chance" (i.e., whether the device's software or random outcome generator will allow the claw mechanism to apply clamping force), the device "may eject something of value" (i.e., that stuffed animal the player targeted). Under those circumstances, the claw machine satisfies all elements necessary to qualify as a "slot machine" under Missouri law. All elements of "gambling" under Missouri law (i.e., consideration, prize, and chance) are present. The claw machine is properly classified as a "device, machine . . . or equipment that is used or usable in the playing phases of any gambling activity." And the claw machine gaming device and its gaming scheme involve an outcome that "depends in a material degree upon an element of chance, notwithstanding that the skill of the contestants may also be a factor" in the outcome (i.e., a "contest of chance" as defined by Missouri law).

26. Based on information and belief, TNT does not now and has not ever held a gaming license issued by the Missouri Gaming Commission to operate "gambling devices," "slot machines," or "contests of chance."

27. Accordingly, many of the "coin-op" devices TNT has promoted, distributed, or placed for use by consumers at various business establishments and retail locations are, in fact, illegal "gambling devices," "slot machines," or "contests of chance."

28. Discovery is necessary to allow Torch to examine TNT's various "coin-op" devices to identify all TNT devices, in addition to those like TNT's aforementioned claw machines, coin pusher-type machines, or "catch the light" type machines, in which the outcome depends in a material degree upon an element of chance, notwithstanding that the skill of the contestants may also be a factor in the outcome (these devices are hereinafter referred to as the "Illegal TNT Games").

29. TNT has made, and upon information and belief continues to make, factual representations in commerce and publications claiming its games, including the Illegal TNT Games, are legal and its business and products comply with "the letter of the law."

30. TNT makes such factual representations while simultaneously and falsely claiming Torch's amusement devices, which are specifically designed to eliminate the element of chance, are illegal gambling devices in an intentional and malicious effort to slander, harass, defame, and harm Torch.

31. Additionally, for years now TNT and its owner Jim Turntine have engaged in improper "lawfare," filing multiple meritless lawsuits against Torch alleging false claims. Through these meritless lawsuits, TNT and Jim Turntine have repeated their false claims that Torch is an illegal operation and Torch devices are illegal gambling devices or slot machines. At the same

time, TNT, its owner Jim Turntine, TNT's employees, and others associated with TNT and/or Turntine have advocated (and donated generously to friendly Missouri politicians who would champion TNT's crusade against Torch) for the Missouri Legislature to amend its definitions for gambling, gambling device, and other terms to specifically bring Torch's amusement devices within the definition of "gambling device." In other words, TNT knew at the time it claimed in multiple pleadings and filings to various courts in Missouri that Torch's amusement devices are illegal that these claims of illegality were untrue and would only be true if the Missouri Legislature amended its gambling laws.

32.     In fact, various Missouri legislators who received donations and support from TNT and its officers and employees made multiple attempts in recent years to amend Missouri's gambling laws to, for example, inject a player's subjective perception and intent into the definition of "gambling device" such that if a player reasonably believed he or she was gambling on a device the device would be a "gambling device." Those attempts, however, failed.

33.     Torch is confident discovery will reveal communications between TNT and its officers, agents, and representatives and third parties that highlight the untenable juxtaposition and positional conflict between TNT's representations to the media, public, consumers, and courts claiming Torch's amusement devices were illegal gambling devices or slot machines and TNT's desire and efforts to advocate for the change in Missouri law that would be necessary for those claims to be true.

34.     Additionally, for years TNT and its owner Mr. Turntine (as well as others associated with TNT) have lodged numerous harassing complaints with the Missouri Gaming Commission and, upon information and belief, the Missouri Highway Patrol against Torch and retail locations

where Torch amusement devices are located claiming Torch's amusement devices are illegal gambling devices despite knowledge and awareness that such statements are false.

35.     As explained below, upon information and belief, TNT and its officers, agents, or representatives have conspired with others to take unlawful steps, file unwarranted and untrue complaints, and pursue meritless and harassing legal claims, theories, and injunctive relief for improper and tortious purposes.

**TNT's Illegal Conspiracy and Monopolization Efforts in Violation of the Sherman Act**

36.     TNT's business is the distribution of onsite gaming devices at third-party retail locations. TNT is a major, dominant player in this field, and its business is well established in Eastern, Central, and Southeastern Missouri, including in the Columbia, Missouri and St. Louis, Missouri metropolitan areas.

37.     Upon information and belief, TNT has and does seek to exert monopoly power over the distribution of onsite amusement devices at retail locations in the region.

38.     Torch has emerged as a competitor of TNT in this region. Rather than engage in legitimate competition with Torch, TNT has engaged in a campaign of unreasonable and anticompetitive behavior, seeking to eliminate Torch from the marketplace to support TNT's monopolization efforts.

39.     Upon information and belief, TNT agreed with the Missouri Gaming Association (the "MGA") and/or currently unidentified co-conspirators to launch a series of unrelenting anticompetitive attacks on Torch for the mutual benefit of the Association, TNT, and the currently unidentified co-conspirators.

40.     The MGA is the Missouri statewide trade association of Missouri's 13 riverboat casinos. These riverboat casinos are highly incentivized to describe any product or service that, in

the mind of consumers, might resemble the types of games played at their casinos as gambling because "gambling" as defined by Missouri law is generally prohibited unless performed on the casinos' premises and for the casinos' own financial benefit.

41.     From both TNT's and the MGA's self-interested perspective, the technical definition of gambling is less important than creating and maintaining the perception that devices that resemble those played at the riverboat casinos are only properly played by traveling to and playing at the riverboat casinos.

42.     TNT and the MGA, who petitioned for and received interpleader status to Torch's Cole County declaratory judgment action (Cole County Circuit Court Case Number 21AC-CC00044), allege Torch's devices visually resemble popular slot machines that form part of the bread-and-butter revenue generation for the members of the MGA, with certain entertaining features such as the bright and enticing visuals, game themes, sounds, and rotating numbers reminiscent of—yet materially distinct in gameplay, software, and functionality from—regulated slot machines found in Missouri casinos.

43.     TNT, for its part, also wants to create and reinforce the false perception in the public that because a Torch amusement device allegedly resembles a regulated slot machine in a Missouri casino, Torch devices are illegal "gambling devices," regardless of whether Torch devices are in fact "gambling devices" under Missouri law.

44.     TNT distributes entertainment devices it promotes as "legal," but that, unlike Torch amusement devices, actually satisfy the elements of gambling (namely, because these devices causes a player to risk consideration/money to play a contest of chance for the opportunity to win a prize) and are designed to deceive the public into believing that they are playing a game of "skill."

45.     Upon information and belief, such games include TNT's claw machines, its light-stopper machines, its coin pusher machines, and other games that involve a means or mechanism of randomly generating potential outcomes regardless of a player's "skill."

46.     Upon information and belief, as a result of their mutual interest in restraining Torch and creating and maintaining a false perception about the legality of devices like Torch's, TNT, the MGA, and/or currently unidentified co-conspirators agreed that they would work to eliminate Torch through a variety of unreasonable and improper means.

47.     Upon information and belief, TNT's role in this conspiracy was multifaceted. TNT's large reach in Missouri, including in Missouri's largest metropolitan area, St. Louis, and in rural surrounding counties, enabled TNT to do much of the "leg work," such as directing TNT's employment force to travel to retail locations in TNT's service area where TNT then submitted requests for the removal of Torch machines. Through a repeat campaign, on dozens or more occasions, employees and managers of TNT including Jim Turntine, Jamie Campbell, Donna Havey, Jordan Thexton, and Marla Turntine have submitted formal complaints to the Missouri Gaming Commission, often filled with false and inflammatory rhetoric about not only Torch devices but Torch as an entity and the owners and employees affiliated with Torch.

48.     In turn, the MGA regularly requests copies of these complaints from the Missouri Gaming Commission, reviewing the information from these complaints submitted by TNT and using them to MGA's advantage.

49.     In addition, in multiple hit pieces in the news media, TNT, through its President Jim Turntine, has used inflammatory rhetoric and false claims of illegality in an attempt to persuade public opinion in a way beneficial to TNT and the MGA.

50.     For example, Jim Turntine has told the news media (with intent his statements be published) that he was "beyond fed up," and was "infuriated" by the "massive spread" of Torch's allegedly illegal machines.

51.     And on another occasion, Turntine told the news media (with intent his statements be published) that Torch's devices are illegal while, he claimed, TNT's business follows "the letter of the law." Turntine called on legislative action to "put more teeth in the law" to get Torch's devices removed, and at the same time, Turntine falsely told the media unequivocally that Torch's devices are illegal devices.

52.     TNT has repeatedly taken this position in public and, upon information and belief, in written and oral publications, advertisements, promotional material, and distributed written statements to actual and potential customers and business partners.

53.     On information and belief, and based on the above examples, TNT through its owner Jim Turntine or its other representatives or agents has continued to make similar false statements to news media, owners of locations where amusement devices might be placed, and members of the public regarding both the illegality of Torch's business and amusement devices and the legality of TNT's devices.

54.     In these and other statements, TNT mirrors many of the positions publicly promoted by the MGA.

55.     Through these and other statements, TNT sought to create a false public perception about the nature of gambling laws in Missouri and, particularly, the legality of Torch's amusement devices.

56.     TNT, the MGA and its members, and/or currently unidentified co-conspirators ultimately benefit from creating and reinforcing false perceptions of the nature of gambling under Missouri laws.

57.     Similarly, through these and other statements, TNT sought to obfuscate the fact many of the devices it places in retail and other locations involve elements of (1) consideration, (2) prize, and (3) chance, the three essential elements Missouri courts have regularly explained are necessary for a device to fall within the definition of "gambling device" under Missouri law.

58.     For example, on March 18, 2022, in sworn deposition testimony, Sergeant Jason Trammell of the Missouri Highway Patrol, the senior of two officers in the gambling device task force, noted that based on his understanding of Missouri's definition of "gambling device" he believes coin pusher type devices, which upon information and belief TNT has or does own, operate, and place in various retail and public locations, are illegal "gambling devices."

59.     Nevertheless, TNT continues to falsely present itself as a selfless crusader for the law, concealing the wrongful motivations for its anticompetitive actions.

60.     Further, upon information and belief, on the MGA's behalf, at its request, or with its approval, TNT and its owner Jim Turntine have engaged in a pattern and practice of improper "lawfare" targeting Torch, repeatedly filing lawsuits against Torch, and often failing to even pursue their claims.

61.     TNT first sued Torch on November 26, 2019, in Crawford County, Missouri, pursuing essentially the same underlying claims that TNT pursues in the present action. That case was pending for more than 3 years while TNT did nothing to prosecute the case. The case was placed on the court's dismissal docket after TNT failed to appear at a scheduled case management

conference. TNT ended up voluntarily dismissing that case on March 15, 2023, the same day it filed this lawsuit.

62.     Upon information and belief, after failing to pursue its claims in the 2019-filed lawsuit, TNT filed this present lawsuit and sought fervently for a preliminary injunction hearing to, at least in part, allow the MGA a preview of Torch's claims and defenses regarding the issue before Torch's previously filed Cole County declaratory judgment action was scheduled to start in late July 2023.

63.     Upon information and belief, TNT's present litigation is pursued in a bad faith attempt to bolster MGA's interests, while also furthering TNT's monopolistic and anticompetitive goals.

64.     Two months after TNT filed its 2019 Crawford County lawsuit against Torch, on January 29, 2020, TNT's President and principal, Jim Turntine, sued Torch in Crawford County, alleging yet again that Torch's machines violate gambling laws and seeking a declaratory judgment that Torch had unpaid tax obligations.

65.     On the heels of these suits came another lawsuit filed in Crawford County on April 21, 2020, this one by a different plaintiff, Paul Blankenship, but represented by the same counsel representing Jim Turntine in his litigation against Torch, alleging that playing Torch games constitutes gambling and that, therefore, he was entitled to statutory damages. That lawsuit was never prosecuted, and the circuit court dismissed it on September 17, 2021, for failure to prosecute.

66.     Despite the fact that multiple of these lawsuits were not even pursued, they managed to be major events in the major news media, including the St. Louis Post-Dispatch, which does not generally, without being directed by an interested party, comment on miscellaneous, unprosecuted Crawford County cases—here, upon information and belief, TNT, the MGA, and/or

currently unidentified co-conspirators used these lawsuits to restrain trade rather than to pursue valid claims.

67. There is a lack of economic justification for TNT's behavior absent a conspiracy. Through its campaign of harassing complaints, multiple lawsuits, written and oral statements, and media appearances single-mindedly aimed at attacking Torch, TNT spends excessive time attempting to persuade public officials and the public at large singularly about false claims of the illegality of Torch's devices. TNT even appears to direct its own employees to engage in these activities, rather than devoting time and energy to proper competitive aims, such as growing its business.

68. Upon information and belief, TNT nevertheless pursues its conspiracy with the MGA and/or currently unidentified co-conspirators not because of procompetitive economic motivations but because of wrongful anticompetitive ones: TNT is able to continue to distribute products that violate Missouri's gambling laws due to the co-conspirators' mutual interest in creating and maintaining a public perception and environment in which a Torch device's visual resemblance to riverboat casino games is perceived as determinative of whether the device is prohibited by Missouri law (despite the fact that a prospective player's subjective perception of a devices plays no role in determining whether a device is a "gambling device" under Missouri law).

69. TNT's, the MGA's, and/or currently unidentified co-conspirators' acts, including the foregoing, demonstrate a conscious commitment to the common scheme of denigrating Torch's business efforts and falsely painting Torch's legal devices as violating the law to achieve the unlawful objectives of market consolidation and improper restraint of a competitor.

<u>TNT Seeks to Acquire or Maintain a Monopoly in the Relevant Market</u>

70. Upon information and belief, TNT currently controls more than approximately 40 percent of the relevant product and geographic market, which is the market for onsite amusement

devices at third-party retail locations in the service area ("Service Area") below (the "Relevant Market").



71.     Torch's operations directly compete with TNT's operations in the Relevant Market.

72.     Upon information and belief, TNT is willfully maintaining or attempting to acquire monopoly power in the Relevant Market rather than compete on the merits of its products or business acumen.

73.     TNT's efforts to maintain or acquire such monopoly power are evidenced by TNT's use of its campaign of meritless filed complaints, baseless litigation, media harassment, and knowingly false advertisements and promotions regarding Torch's products and services while, separately, knowingly distributing false advertisements regarding TNT's own products, and publishing injurious falsehoods in written and oral publications to customers and the consuming

public with the direct and intended effect to eliminate, hinder, or slow Torch's efforts to compete in the Relevant Market, and acquire or maintain a dominant, monopolistic position.

74.     TNT's campaign of meritless filed complaints, baseless litigation, media harassment, distributing knowingly false advertisements and promotions regarding Torch's products and services while, separately, knowingly distributing false advertisements regarding TNT's own products, and publishing injurious falsehoods in written and oral publications to customers and the consuming public are exclusionary and unreasonably restrain competition. TNT is abusing these means for exclusionary and anticompetitive purposes, with the direct and intended effect of stopping or minimizing Torch's presence in the marketplace.

75.     Upon information and belief, TNT uses its campaign of meritless filed complaints, baseless litigation, media harassment, distributing knowingly false advertisements and promotions regarding Torch's products and services while, separately, knowingly distributing false advertisements regarding TNT's own products, and publishing injurious falsehoods in written and oral publications to customers and the consuming public in an attempt to prevent Torch from rightfully competing in the marketplace, and to attain or maintain a monopoly position in the market for onsite amusement devices at third-party retail locations. Torch has historically competed against TNT in the market for onsite amusement devices at third-party retail locations in the relevant area, but TNT was previously the dominant player in this market. Upon information and belief, TNT considers Torch an increasing threat to its market position.

76.     As a direct and proximate result of TNT's improper and exclusionary conduct, consumers in the Service Area are being or in the future will be limited in their ability to choose between competitors.

**TNT's Campaign of False and Misleading Advertisements and Injurious False Statements Directed at Torch's Devices**

77.     Upon information and belief, TNT falsely claims in its commercial advertisements and promotions that Torch's devices are illegal gambling machines that are subject to and in violation of Missouri's gaming laws and regulations.

78.     TNT further amplifies these claims by repeating them to the news media.

79.     In addition, upon information and belief, TNT, through its sales representatives, falsely advertises these claims in oral presentations to actual and prospective customers.

80.     TNT's assertions in advertising and promotions regarding Torch's devices are knowingly false.

**TNT Falsely Advertises Its Devices as Legal Devices**
**Despite Many of Them Falling Within the Definition of Illegal "Gambling Devices"**

81.     In addition to legitimate products like pool tables and ATMs, TNT promotes and distributes the Illegal TNT Games, which it claims are legal but actually violate Missouri's gambling laws. TNT falsely claims in its advertisements and promotions that the Illegal TNT Games comply with applicable laws and regulations.

82.     Upon information and belief, in TNT's commercial advertising or promotions, TNT has or does falsely represent that the Illegal TNT Games are legal games that comply with applicable laws and regulations.

83.     Upon information and belief, TNT further has or does represent in its commercial advertising and promotions that the Illegal TNT Games are legal for use by consumers at retail establishments, including through its sales representatives.

84.     TNT's assertions are even made in news media, where TNT has proclaimed that its business and products comply with "the letter of the law."

85.     TNT's assertions in commercial advertising and promotions regarding the Illegal TNT Games are knowingly false.

## Count I
### Lanham Act—15 U.S.C § 1125(a)—Misrepresentation of Other Person's Goods, Services, and Commercial Activities

86.     Torch incorporates all allegations in this Counterclaim as if set forth in full in this paragraph.

87.     TNT has and continues to make representations of fact about the Torch devices in commercial advertisements and promotions and to the consuming public at large via repeated statements to the media, namely that Torch amusement devices are illegal gambling devices.

88.     TNT makes these statements knowing that they are false.

89.     TNT makes these statements knowing that gambling under Missouri law is illegal. By falsely claiming Torch's amusement devices are illegal gambling devices and playing them allegedly violates the law, Counterclaim Defendant seeks to dissuade the public from enjoying Torch's games.

90.     TNT's representation that Torch's amusement devices violate Missouri law is false because the Torch devices are, in fact, not gambling devices or "slot machines" under current Missouri law.

91.     TNT has caused these false statements to enter interstate commerce through promotional material, news media, and distributed written statements.

92.     Upon information and belief, TNT has also caused its false statements to enter interstate commerce through statements to Torch's, as well as TNT's, customers and potential business partners.

93.     TNT is economically motivated to make these statements.

40

94.     TNT's false statements cause significant duress for Torch and dissuade Torch's business partners and consumers throughout Missouri from doing business with Torch, greatly impacting Torch's basic ability to earn revenue.

95.     Through its extensive contacts in the gaming industry and in its persistent efforts to seek new legislation in Missouri to alter gambling laws so that Torch's devices would violate new laws, TNT knows the elements of gambling in Missouri as well as the definitions of "contest of chance," "gambling device," and "slot machine" as defined in RSMo. § 572.010.

96.     In contravention of this and other knowledge it possesses, TNT acted knowingly and intentionally, recklessly, and maliciously in publishing advertisements with the known falsehood that Torch's devices violate laws.

97.     Torch has suffered irreparable injury and substantial damages due to TNT's deceptive advertising practices.

98.     TNT's actions constitute unfair competition in violation the Lanham Act, 15 U.S.C. § 1125(a).

99.     TNT's actions described herein have been willful, intentional, reckless, and malicious, with knowledge of their wrongful nature.

100.     TNT, through its owner and President, has spent considerable sums on political advocacy to change Missouri law to make Torch's devices illegal.

101.     Despite pursuing a change in the law designed to *prospectively* render Torch's amusement devices illegal gambling devices (attempts that have failed), TNT has represented to the public, to consumers, and to actual and potential business partners that Torch's amusement devices violate existing laws.

102.    TNT knows these representations were and are literally false, or at least, cannot reasonably believe they are true.

103.    At the very least, TNT's representations were sufficiently misleading so as to render a false impression when viewed in context.

104.    Further, the foregoing acts have created and will continue to create a likelihood of confusion, deception, or mistake on the part of the consuming public.

105.    The foregoing acts of TNT, separately and in combination, materially misrepresent the nature, characteristics, or qualities of the Torch devices.

106.    The foregoing acts materially deceive TNT's audience in that the misrepresentations are likely to influence the decisions of consumers.

107.    As a proximate result of TNT's willful conduct, Torch has suffered irreparable harm.

108.    Torch will continue to suffer irreparable harm unless and until TNT ceases making false statements in connection with the Torch devices.

109.    Unless TNT's activities cease, TNT will unjustly profit based on consumer reliance on the false statements that TNT has made and is making about the Torch devices.

110.    Torch has suffered and will continue to suffer economic harms, including losses in revenue as proximately caused by TNT's actions.

111.    Torch has suffered and will continue to suffer economic harms and injuries to its commercial interests, including losses in revenue, which have been and are being proximately caused by TNT's actions and misrepresentations.

WHEREFORE, Torch Electronics, LLC, prays for the Court to enter a judgment against TNT and in favor of Torch:

a.  awarding Counterclaim Plaintiff actual damages in an amount to be determined at or before trial;

b.  awarding Counterclaim Plaintiff an amount of damages equal to three times the actual damages determined at or before trial;

c.  ordering Counterclaim Defendant TNT to disgorge its profits resulting from its unlawful activities;

d.  granting Counterclaim Plaintiff injunctive relief precluding the Counterclaim Defendant TNT from falsely representing the Torch devices to be "illegal" or "gambling devices" in Counterclaim Defendant's commercial advertisements or promotions;

e.  awarding Counterclaim Plaintiff to be reimbursed for its attorneys' fees and the costs of this action; and

f.  granting such other and further relief as the Court deems just and proper.

## Count II
### Lanham Act—15 U.S.C § 1125(a)— Misrepresentation of TNT's Own Goods, Services, and Commercial Activities

112.    Torch incorporates all allegations in this Counterclaim as if set forth in full in this paragraph.

113.    TNT has and continues to make false or misleading statements of fact about the Illegal TNT Games in commercial advertisements: that the Illegal TNT Games are legal, useable, or otherwise properly playable devices in Missouri when, in fact, the Illegal TNT Games violate Missouri gambling laws, RSMo. § 572.010 et seq.

114.    TNT's false or misleading statements deceived or had the capacity to deceive a substantial segment of potential consumers.

115.    TNT's deception is material because it is likely to influence a consumer's purchasing decision.

43

116.    TNT has made and disseminated these false or misleading statements in interstate commerce through, among other things, promotional material, news media, and distributed written statements.

117.    TNT has also caused its false statements to enter interstate commerce through, among other things, advertisements and promotions to customers and potential business partners.

118.    Because Torch competes with TNT for placing devices in retail locations, and because TNT makes false statements about its devices both to place its devices at locations and to draw customers in, TNT's false or misleading statements have injured or are likely to injure Torch.

119.    TNT makes these statements knowing that they are literally false.

120.    TNT makes these statements knowing that gambling on its Illegal TNT Games is illegal under Missouri law.

121.    TNT is economically motivated to make these statements.

122.    Torch has suffered irreparable injury and substantial damages due to TNT's deceptive advertising practices.

123.    Torch will continue to suffer irreparable harm unless and until TNT ceases making false statements in connection with the Illegal TNT Games.

124.    TNT's actions constitute unfair competition in violation the Lanham Act, 15 U.S.C. § 1125(a).

125.    TNT's actions described herein have been willful, intentional, reckless, and malicious, with knowledge of their wrongful nature.

126.    Unless TNT's activities cease, TNT will unjustly profit based on consumer reliance on the false statements that TNT has made and is making about the Illegal TNT Games.

127.    Torch has suffered and will continue to suffer economic harms, including losses in revenue as proximately caused by TNT's actions.

128.    Torch has suffered and will continue to suffer economic harms and injuries to its commercial interests, including losses in revenue, which have been and are being proximately caused by TNT's actions and misrepresentations.

WHEREFORE, Torch Electronics, LLC, prays for the Court to enter a judgment against TNT and in favor of Torch:

a.   awarding Counterclaim Plaintiff actual damages in an amount to be determined at or before trial;

b.   awarding Counterclaim Plaintiff an amount of damages equal to three times the actual damages determined at or before trial;

c.   ordering Counterclaim Defendant TNT to disgorge its profits resulting from its unlawful activities;

d.   granting Counterclaim Plaintiff injunctive relief precluding the Counterclaim Defendant TNT from falsely marketing and representing the Illegal TNT Games to be "legal" devices or otherwise proper for consumers to play in Missouri;

e.   awarding Counterclaim Plaintiff to be reimbursed for its attorneys' fees and the costs of this action; and

f.   granting such other and further relief as the Court deems just and proper.

<u>**Count III**</u>
**Antitrust Violations —Sherman Act, 15 U.S.C. § 1**

129.    Torch incorporates all allegations in this Counterclaim as if set forth in full in this paragraph.

130.    Upon information and belief, there is a conspiracy between TNT, the MGA, and/or currently unidentified co-conspirators, under which TNT, the MGA, and/or currently unidentified co-conspirators agreed to work to promote a false narrative regarding Torch devices and gambling laws in Missouri aimed at stifling rightful competition (while allowing TNT to distribute the Illegal

TNT Games in Missouri), to lodge harassing complaints against Torch to hamper its ability to freely compete, to file multiple bad faith lawsuits against Torch, and to proliferate and promote false claims about the legality of Torch's devices in oral and written publications, in news media, and in other advertising and promotions.

131.    This conspiracy is not the result of valid or justifiable competition, nor are TNT's or its co-conspirators' actions the result of uncoordinated conduct.

132.    This conspiracy unreasonably restrains trade, in that Torch's ability to freely compete is hampered, Torch is forced to expend money to defend itself against baseless complaints and lawsuits, and a false public perception about the nature of Missouri gambling laws has created widespread mistrust and suspicion about the propriety of enjoying Torch's amusement devices.

133.    This arrangement has had the effect of foreclosing competition in a substantial share of the line of commerce affected and the relevant market for amusement devices in the State of Missouri.

134.    The restraint affects interstate commerce. Consumers from surrounding states and beyond come to Missouri for the enjoyment of amusement devices.

135.    As a result of TNT's anticompetitive and illegal conduct, Torch has suffered injuries to its business and property, including suffering from loss of business, revenue, goodwill, business prospects, reputation, and removal of goods from the marketplace.

136.    Torch is a proper plaintiff to bring these claims because it is a competitor injured through the wrongful conspiracy to restrain Torch's trade.

137.    Because Torch has suffered or will suffer injuries to its business and property by reason of TNT's violations of the Sherman Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Torch is entitled to treble damages, prejudgment interest, costs of suit, and attorney's fees.

WHEREFORE, Torch Electronics, LLC, prays for the Court to enter a judgment against TNT and in favor of Torch:

    a.   awarding Counterclaim Plaintiff actual damages in an amount to be determined at or before trial;

    b.   awarding Counterclaim Plaintiff an amount of damages equal to three times the actual damages determined at or before trial;

    c.   awarding Counterclaim Plaintiff to be reimbursed for its attorneys' fees and the costs of this action; and

    d.   granting such other and further relief as the Court deems just and proper.

## <u>Count IV</u>
## Antitrust Violations—Sherman Act, 15 U.S.C. § 2

138.    Torch incorporates all allegations in this Counterclaim as if set forth in full in this paragraph.

139.    TNT possesses or has attempted to gain monopoly power with specific intent to monopolize in the Relevant Market.

140.    To the extent TNT does not yet have monopoly power in the Relevant Market, TNT has a dangerous probability of achieving monopoly power.

141.    TNT has engaged and continues to engage in exclusionary and predatory conduct for the purpose of maintaining or acquiring monopoly power, including without limitation engaging in a campaign of meritless filed complaints, baseless litigation, media harassment, distributing knowingly false advertisements and promotions regarding Torch's products and services while, separately, knowingly distributing false advertisements regarding TNT's own products, and publishing injurious falsehoods in written and oral publications to customers and the consuming public to harm Torch's commercial interests.

142.    By, without limitation, engaging in a campaign of meritless filed complaints, baseless litigation, media harassment, distributing knowingly false advertisements and promotions

regarding Torch's products and services while, separately, knowingly distributing false advertisements regarding TNT's own products, and publishing injurious falsehoods in written and oral publications to customers and the consuming public to harm Torch's commercial interests, TNT has unlawfully and willfully attempted to maintain or acquire monopoly power in the Relevant Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

143.   TNT does not have a legitimate, pro-competitive business purpose for engaging in a campaign of meritless filed complaints, baseless litigation, media harassment, distributing knowingly false advertisements and promotions regarding Torch's products and services while, separately, knowingly distributing false advertisements regarding TNT's own products, and publishing injurious falsehoods in written and oral publications to customers and the consuming public to harm Torch's commercial interests.

144.   TNT's engaging in a campaign of meritless filed complaints, baseless litigation, media harassment, distributing knowingly false advertisements and promotions regarding Torch's products and services while, separately, knowingly distributing false advertisements regarding TNT's own products, and publishing injurious falsehoods in written and oral publications to customers and the consuming public to harm Torch's commercial interests, in further of its unlawful monopoly or attempted monopoly, has had the effect of deterring Torch from fully competing in the relevant market, during which time:

a.   Competition in the sale and distribution of onsite amusement devices at third-party retail locations in the Service Area is restrained and suppressed; and

b.   Deprived of the benefits of free and open competition in the market for of on-site retail amusement products, consumers who play on-site retail amusement products have been and will continue to be forced to purchase from an artificially narrowed

field of options or be forced to pay artificially high, monopolistic prices for on-site retail amusement products.

145.    As a result of TNT's anticompetitive and illegal conduct, Torch has suffered or will suffer injuries to its business and property, including suffering from loss of business, revenue, goodwill, business prospects, reputation, and removal of goods from the marketplace.

146.    Further, by engaging in a campaign of meritless filed complaints, baseless litigation, media harassment, distributing knowingly false advertisements and promotions regarding Torch's products and services while, separately, knowingly distributing false advertisements regarding TNT's own products, publishing injurious falsehoods in written and oral publications to customers and the consuming public to harm Torch's commercial interests, and intentionally interfering with Torch's prospective business relationships, TNT is likely to further entrench itself as the dominant player for onsite amusement devices at third-party retail locations in the Service Area, more so than TNT would be in the absence of such anticompetitive conduct.

147.    Because Torch has suffered or will suffer injuries to its business and property by reason of TNT's violations of the Sherman Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Torch is entitled to treble damages, prejudgment interest, costs of suit, and attorney's fees.

WHEREFORE, Torch Electronics, LLC, prays for the Court to enter a judgment against TNT and in favor of Torch:

a.  awarding Counterclaim Plaintiff actual damages in an amount to be determined at or before trial;

b.  awarding Counterclaim Plaintiff an amount of damages equal to three times the actual damages determined at or before trial;

c.  awarding Counterclaim Plaintiff to be reimbursed for its attorneys' fees and the costs of this action; and

d.  granting such other and further relief as the Court deems just and proper.

## Count V
## Injurious Falsehood

148.    Torch incorporates all allegations in this Counterclaim as if set forth in full in this paragraph.

149.    In its written advertisements and promotional material, through the news media, and through distributed written statements and oral publications to groups of potential customers, business partners, and the public at large, TNT has falsely published statements that Torch's machines are illegal and Torch's business is illegitimate.

150.    TNT made these statements because of its economic self-interest. TNT intended for these statements to result in financial loss to Torch for TNT's gain.

151.    In the alternative, TNT either recognized or should have recognized that these statements would cause Torch financial harm.

152.    TNT knew that these statements were false or, at the very least, acted in reckless disregard for the statements' truth or falsity.

153.    In making these statements, TNT acted with an evil and malicious will and intentionally harmed Torch without just cause.

154.    As a result, Torch has suffered or will suffer pecuniary harm in the form of lost profits, loss of goodwill, lost customers, lost business prospects, loss of reputation, and its devices actually removed or denied placement.

WHEREFORE, Torch Electronics, LLC, prays for the Court to enter a judgment against TNT and in favor of Torch:

   a.  awarding Counterclaim Plaintiff actual damages in an amount to be determined at or before trial;

   b.  entering an award of punitive damages against Counterclaim Defendant in an amount sufficient to punish it for its wrongful conduct and deter others from committing such intentional harms in the future; and

     c.   granting such other and further relief as the Court deems just and proper.

**Count VI**
**Tortious Interference with Business Relations**

155.    Torch incorporates all allegations in this Counterclaim as if set forth in full in this paragraph.

156.    Torch had and has a reasonable expectation of economic advantage or commercial relation in its dealing with Missouri retail locations seeking to place amusement devices onsite and other potential business partners related to the distribution of Torch's goods in the State of Missouri.

157.    Torch had and has a reasonable expectation of economic advantage or commercial relation in its dealing with Missouri consumers that wish to play Torch's amusement devices.

158.    TNT knew and knows about Torch's prospective relations with retail locations, other potential business partners, and Missouri amusement device consumers.

159.    TNT intentionally and without justification has induced and is inducing retail locations, potential business partners, and Missouri amusement device consumers to cease any potential business relationship with Torch by disseminating, privately and publicly, false claims that Torch's devices violate the law and that Torch is an illegitimate business.

160.    TNT has filed and, upon information and belief, convinced other parties to become involved in the filing of baseless litigation against Torch with no intention of pursuing it, solely to denigrate Torch's goods and services and to create and maintain widespread public distrust in Torch and fear in doing business with Torch.

161.    Upon information and belief, retail locations, potential distribution-related partners, and potential customers have, as a result of this interference, refused to do business with Torch, which proximately caused Torch harm.

51

162.    TNT's actions were not justified.

163.    TNT committed these acts with an evil and malicious will and with intent to injure Torch.

164.    As a result, Torch has suffered or will suffer damages in the form of lost profits, loss of goodwill, lost customers, lost new potential retail partners, lost business prospects, and loss of reputation.

WHEREFORE, Torch Electronics, LLC, prays for the Court to enter a judgment against TNT and in favor of Torch:

   a. awarding Counterclaim Plaintiff actual damages in an amount to be determined at or before trial;

   b. entering an award of punitive damages against Counterclaim Defendant in an amount sufficient to punish it for its wrongful conduct and deter others from committing such intentional harms in the future; and

   c. granting such other and further relief as the Court deems just and proper.

### Count VII
### Civil Conspiracy

165.    Torch incorporates all allegations in this Counterclaim as if set forth in full in this paragraph.

166.    Upon information and belief, TNT had a meeting of the minds with the MGA and/or currently unidentified co-conspirators, under which TNT would, at the MGA's and/or currently unidentified co-conspirators' behest or with their permission or approval, lodge harassing complaints against Torch, file and compound bad faith lawsuits against Torch, seek preliminary injunctive relief in this case in an effort to provide the MGA with a preview of Torch's trial strategy, evidence, and arguments before Torch's previously filed declaratory action went to trial (which was previously scheduled for the end of July/early August), and proliferate and promote false

claims about the legality of Torch's devices in oral and written publications, in news media, and in advertising and promotions.

167.    TNT, the MGA and/or currently unidentified co-conspirators had at least one unlawful objective, including to promote false claims about the legality of Torch's devices, to hamper and dilute rightful competition in Missouri, and to wrongfully harm Torch's business interests.

168.    In its written advertisements or promotional material, through the news media, and through distributed written statements and oral publications to groups of potential customers, business partners, and the public at large, TNT has falsely published statements that Torch's machines are illegal and Torch's business is illegitimate.

169.    TNT, the MGA and/or currently unidentified co-conspirators committed at least one act in furtherance of the conspiracy, including TNT's campaign of meritless filed complaints, baseless litigation, media harassment, false complaints lodged with the Missouri Gaming Commission, distributing knowingly false advertisements and promotions regarding Torch's products and services and, separately, regarding TNT's own products, and publishing injurious falsehoods in written and oral publications to customers and the consuming public to harm Torch's commercial interests, all for TNT's wrongful pecuniary gain.

170.    TNT committed these acts with an evil and malicious will and with intent to injure Torch.

171.    As a result, Torch has suffered or will suffer damages in the form of lost profits, loss of goodwill, lost customers, lost business prospects, loss of reputation, and its devices actually removed or denied placement.

WHEREFORE, Torch Electronics, LLC, prays for the Court to enter a judgment against TNT and in favor of Torch:

    a. awarding Counterclaim Plaintiff actual damages in an amount to be determined at or before trial;

    b. entering an award of punitive damages against Counterclaim Defendant in an amount sufficient to punish it for its wrongful conduct and deter others from committing such intentional harms in the future; and

    c. granting such other and further relief as the Court deems just and proper.

<u>Count VIII</u>
**Declaratory Judgment and Injunctive Relief**

172. Torch incorporates all allegations in this Counterclaim as if set forth in full in this paragraph.

173. Torch seeks a declaration that TNT's Illegal TNT Games are illegal "gambling devices," "contests of chance," or "slot machines" as those terms are defined by Missouri law in RSMo. § 572.010.

174. This case presents an actual controversy within this jurisdiction.

175. The controversy concerns the illegality of the Illegal TNT Games.

176. Torch is an interested party within the meaning of 28 U.S.C. § 2201(a).

177. Torch is entitled to judicial determination of its rights and other legal relations pursuant to 28 U.S.C. § 2201 and the Federal Rules of Civil Procedure.

178. A declaratory judgment holding TNT's Illegal TNT Games are illegal gambling devices is warranted because TNT operates these gambling devices in contravention of state and federal law.

179. TNT operates its Illegal TNT Games without a gaming license issued by the Missouri Gaming Commission.

180.   TNT's representations and promotions claiming TNT's Illegal TNT Games are legal constitute violations of the Lanham Act.

181.   TNT's representations and promotions claiming its Illegal TNT Games are legal constitute violations of the Sherman Act.

182.   As described above, TNT has engaged in an unlawful civil conspiracy aimed at wrongfully and tortiously damaging Torch for TNT's own pecuniary gain and that of its co-conspirators.

183.   As described above, TNT has taken steps to tortiously interfere with Torch's business and business relations and expectations.

184.   As described above, TNT has engaged in a pattern and practice of tortiously disseminating injurious falsehoods and intentionally defamatory untrue representations and statements regarding Torch and Torch's amusement devices.

185.   TNT's continued use and promotion of its Illegal TNT Games constitute a violation of the federal prohibition of illegal gambling businesses, 18 U.S.C. § 1955.

186.   Accordingly, the Court should enter an order finding that TNT's Illegal TNT Games are illegal gambling devices and TNT operates an illegal gambling business.

187.   Torch's requested order shall have the force and effect of a final judgment.

WHEREFORE Counterclaim Plaintiff Torch Electronics, LLC, respectfully requests that the Court:

    a.   Enter declaratory judgment as requested above;

    b.   Award Counterclaim Plaintiff actual damages in an amount to be determine at or before trial;

    c.   Award Counterclaim Plaintiff an amount of damages equal to three times the actual damages determined at or before trial;

d.  Order TNT to disgorge its profits earned from its promotion and operations of its Illegal TNT Games;

e.  Grant Counterclaim Plaintiff permanent injunctive relief precluding TNT from falsely marketing or promoting its Illegal TNT Games to be legal games of skill as opposed to the games of chance they truly are;

f.  Award Counterclaim Plaintiff be reimbursed for its attorneys' fees and costs of this action; and

g.  Grant such other and further relief as the Court deems just and proper.


Dated:  September 13, 2023                     Respectfully submitted,

GRAVES GARRETT LLC

By:  _/s/ J. Aaron Craig_____
        Todd P. Graves #41319 (MO)
        J. Aaron Craig #62041 (MO)
        1100 Main Street, Suite 2700
        Kansas City, MO 64105
        Phone: (816) 256-3181
        Fax: (816) 256-5958
        tgraves@gravesgarrett.com
        acraig@gravesgarrett.com

        **Attorneys for Defendants Torch Electronics, LLC, Steven Miltenberger, and Sondra Miltenberger**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u> */s/  J. Aaron Craig*                     </u>
Attorneys for Defendants Torch
Electronics, LLC, Steven Miltenberger, and
Sondra Miltenberger