# EXHIBIT 23



# PohlmanUSA
## Court Reporting and Litigation Services

Robert Kneuper, Ph.D.

December 14, 2023

TNT Amusements, Inc., et al.

vs.

Torch Electronics, LLC, et al.

1  Exhibit 5 you will see that this was a document
2  that was filed on May 5, 2023.  Do you see that?
3      **A.   I see that at the very top in red**
4  **filed 5-5-23.**
5      Q.   Then there's a case number and
6  obviously that's the case number here; correct?
7           MS. HARGIS: Objection; foundation.
8      **A.   Yeah.  I mean, we could look at another**
9  **document like a complaint but I can't speak to that**
10 **really.**
11     Q.   (By Mr. Craig) Have you been -- if you
12 look at the front page of your November 6th report
13 and tell me if the case number that's on the top
14 right-hand part of your November 6th report matches
15 the case number of the top of Exhibit 5.
16     **A.   Yeah.  It's very similar.  For some**
17 **reason this one says CC-30-JAR and I think mine**
18 **says CC330 but I'm just -- I'm not trying to be**
19 **difficult.  I just never focus on case numbers.**
20     Q.   Well, you don't dispute that this came
21 from our case; fair?
22     **A.   That's fair.**
23     Q.   It's titled Exhibit 9, Time Line of
24 Removal of TNT's Machines; correct?
25     **A.   Yes.  That's the title on the first**

1 **page; correct.**

2 Q. And then at the bottom there is a
3 yellow exhibit sticker that says Exhibit 3 and it
4 is dated 10-19-23; correct?

5 **A. Yes. That's what it says at the bottom**
6 **right-hand of this Exhibit 5 to my deposition.**

7 Q. Okay, and you said that as you sit here
8 today you have had an opportunity previously to
9 look at TNT's 30(b)(6) corporate representative
10 deposition transcript; right?

11 **A. Yes; the deposition of Mr. Turntine.**

12 Q. Correct, and then did you see this as
13 Exhibit 3 to that deposition?

14 **A. It generally looks familiar.**

15 Q. Well, I'll represent that yellow label
16 indicates that was Exhibit 3 to TNT's 30(b)(6)
17 representative deposition. Okay? Can we have that
18 understanding?

19 **A. Sure.**

20 Q. All right, and then if you go to page 2
21 it says Time Line of Removal of TNT Machines at the
22 top. Do you see that?

23 **A. Yes.**

24 Q. Then there's a list of dates of
25 removal, name of the location, name of TNT

1  machines -- I'm sorry.  Number of TNT machines
2  removed.  Do you see that?
3       **A.   Yes.**
4       Q.   I take it this is not something that
5  you had seen prior to November 6th; is that fair?
6       **A.   I don't recall seeing it.  I don't**
7  **recall seeing it.  I don't recall when I saw this**
8  **but I certainly saw it.  If it was part of his**
9  **exhibits I would have seen it when I reviewed the**
10 **30(b)(6) deposition.**
11      Q.   I think you didn't rely on this list in
12 drafting your November 6th report.  That is
13 correct; right?
14      **A.   That is correct.**
15      Q.   Now, had you known about this list and
16 assuming that you had the information available,
17 what would have prevented you from taking this list
18 of 12 locations, digging into TNT's device level
19 historical records, identifying specific devices
20 TNT alleged were removed from these 12 locations
21 because of Torch and analyzing the profitability of
22 those devices from a historical perspective and
23 then use that to project or forecast estimated lost
24 profits into the future?
25      **A.   Yeah.  I potentially could have done**

1  **that as of November 6th.  I think one of the**
2  **important things is at least my recollection it**
3  **didn't have all of this information that's here,**
4  **but more recently I've seen, I think after I issued**
5  **my report I've seen an agreed upon list between TNT**
6  **and Torch of locations that potentially --**
7        Q.   Yes.  Look.  I'm sorry, look --
8        **A.   No, no, no.**
9        Q.   Wait, wait, wait.
10       **A.   Can I finish my answer, please?**
11       Q.   No, wait.
12       **A.   I'm allowed to finish my answer.**
13       MS. HARGIS: Dr. Kneuper --
14       Q.   (By Mr. Craig) This is in breach of our
15 prior original understanding that when I ask you a
16 question about November 6th that you won't then go
17 forward and volunteer information that you learned
18 after November 6th and that's exactly what you are
19 trying to do here.  Okay?
20       **A.   Okay.**
21       Q.   So I'm not trying -- I'm not trying to
22 tell you off to be rude.  I'm trying to tell you
23 off because when we started this I was very clear
24 about what my intention was and why and I thought
25 we had an agreement, okay?  We're going to get

1  there.  You are going to have an opportunity either
2  because I ask you those questions or if the
3  November(sic) 12th report stands out, then you will
4  be able to talk and when and where and what you
5  knew later.  Okay?
6       A.   Let me just --
7            MS. HARGIS: Dr. Kneuper, I think we
8  don't want to argue on the record or anything so if
9  you want to respond go ahead.
10      **A.   Okay.  That's fair.  That's fair.  With**
11 **these particular locations at this point in time,**
12 **assuming it was available before November 6th,**
13 **potentially I could have done the kind of analysis**
14 **that you are talking about.**
15      Q.   (By Mr. Craig) Okay. Thank you.  And
16 you don't dispute that this list was available to
17 TNT as of November 5, 2023; right?
18      **A.   Yes.  It appears to have been available**
19 **before then.**
20      Q.   Okay. I mean, and I will just represent
21 to you that this is an exhibit that originally came
22 from TNT's own reply in support of TNT's motion for
23 preliminary injunction, okay, so that was filed
24 back in May, okay, and I think what you testified
25 to was with this information and sufficient time

1    and ask from TNT, that type of more detailed device

2    and location type analysis, that's something you

3    were capable of doing, right, prior to

4    November 6th?

5         **A.   Potentially, yes.  It certainly is**

6    **something I'm capable of doing, yes, and just going**

7    **back, I apologize when I was answering that**

8    **question.  I forgot I'm trying to avoid the**

9    **bifurcation we discussed, but when I answered that**

10   **I forgot that so I apologize.**

11        Q.   That's fair, and really I don't want to

12   be rude to you either.  I'm trying to keep a clear

13   record, trying to.

14        **A.   Understood.**

15        Q.   All right.  Were you aware from any

16   source, whether it be somebody told you this or you

17   read it in the 30(b)(6) maybe that before you

18   finalized your November 6th report that, in fact, I

19   had personally outlined a pathway to engaging in

20   basically that exact same methodology for Jim

21   Turntine TNT's October 19th 30(b)(6) deposition?

22        **A.   I just -- I didn't focus on that part**

23   **of the deposition when I reviewed it so I just**

24   **can't -- I don't recall.  I can't answer that**

25   **without looking at the deposition.**

1   Q.   So do you still have Mr. Turntine's
2   deposition?  It would be Exhibit 1.
3   **A.   Yes.**
4   Q.   Could you grab that and then turn to
5   page 216 beginning at line 6 and while you do that,
6   just as a lead in I'll represent at this point Mr.
7   Turntine and myself were discussing the Exhibit 3
8   which is Kneuper Exhibit 5, TNT's Time Line of
9   Removal.  Let me know when you get there.
10  **A.   Okay.  I'm there.**
11  Q.   Okay. So it starts with the question by
12  myself, "Well, I don't know.  I don't disagree with
13  you.  There's more context.  I mean, it would be
14  helpful for me to go back and look as well but I
15  assume, I assume this was the list of at the time
16  this was submitted the locations and number of
17  devices that you alleged were displaced by Torch
18  devices, but that is not the case; correct?" And
19  Mr. Turntine responds, "I believe that is not the
20  case, correct, and if we went back to context it
21  probably will say that was the entire list.  It
22  probably said this was a partial sampling or
23  something to that effect, sir."  Question: "Okay,
24  and regardless of that, you don't dispute that you
25  could update this list with all the locations and

1  devices that you have now testified to.  You could
2  update this list to contain that information in a
3  similar format and fashion; correct?" Response: "I
4  believe that is correct, yes."  Question: "And you
5  don't dispute that that could have been done before
6  today; right?" Answer: "Well, it certainly could
7  have been done.  I didn't -- sorry, didn't know it
8  needed to be done."  Question: "But you don't
9  disagree that that would be information that would
10 be relevant to TNT's damages in this case;
11 correct?" Response: "Relevant in so much as
12 answering questions today I don't think it's real
13 relevant.  I think it's part of getting you the
14 damages information and I've told you how we were
15 able to pull together what we have reported so far
16 and why we can't figure out the rest" -- "why we
17 can't figure the rest out because it's an ongoing
18 problem."  I'm going to skip a few lines.  I'm
19 going to go start again at page 218, line 24 with a
20 question.  "And based on the prior testimony that
21 you could look at, any given machine and you could
22 determine how much money that machine was making
23 for a period of time; it would be possible to say
24 Item No. 1 on Exhibit 3, Breaktime Bar & Grill,
25 Hazlewood, Missouri, one TNT machine allegedly

1 removed, you should be able to go to a record
2 within TNT that will say what that device
3 historically made at that location and provide that
4 information; correct?" Response: "I do think that
5 is correct, yes." Question: "But that's not
6 information that you were prepared for today to
7 give me; correct?" Answer: "That is also correct,
8 yes." Question: "And it would be fair to say that
9 if you did that for every machine that you alleged
10 was removed due to a Torch device or Torch's
11 conduct, that you could by the number and the
12 specific machine come up with a pretty specific
13 number about historical profitability of that
14 particular machine; correct?" Answer: "Of that
15 particular machine, I think so, yes." Question:
16 "And then that historical information could then be
17 used potentially to project future earnings of that
18 machine had it stayed in place at whatever location
19 we are talking about; correct?" Answer: "I think
20 so." I'll stop there. His response goes on but
21 it's irrelevant to the conversation. First of all,
22 without a few stumbles along the way -- I was
23 getting a lot of e-mails, but did I generally read
24 that in a fashion that you could follow and track
25 that seems correct to you?

1     **A.   Yes.  Yes.  I mean, obviously I don't**
2   **know -- I don't have the whole -- we probably don't**
3   **have time to go through the whole testimony so I**
4   **don't have a complete understanding of what the**
5   **dialogue was, but I get the gist of what you are**
6   **talking about in terms of the equipment at least.**
7     Q.   So having heard that testimony, you
8   would agree that on October 19, 2023 I basically
9   outlined the road map for TNT to take TNT's
10  May 2023 list of 12 locations, bring that list of
11  locations for any additional locations TNT might be
12  that it had devices removed because of Torch up to
13  date, dig into TNT's device level historical
14  records, identify specific devices that TNT alleged
15  were removed from those locations because of Torch,
16  analyze profitability of those devices from a
17  historical perspective and then use that historical
18  profitability analysis to forecast or project
19  limited lost future profits; fair?
20      MS. HARGIS: Objection; mischaracterizes
21  and speculates. You may please respond.
22     **A.   I mean, what you quoted here seems**
23  **similar to what you just said to me about some sort**
24  **of equipment specific analysis that you are**
25  **suggesting.**