**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| TNT AMUSEMENTS, INC., d/b/a | ) | |
| PLAY-MOR COIN-OP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cv-00330-JAR |
| | ) | |
| TORCH ELECTRONICS, LLC, | ) | |
| STEVEN MILTENBERGER, and | ) | |
| SONDRA MILTENBERGER | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 4.01(E), Defendants Torch Electronics, LLC, Steven Miltenberger, and Sondra Miltenberger (collectively, "Defendants" or "Torch") submit the following Response to Plaintiff TNT Amusements, Inc.'s ("Plaintiff" or "TNT") Statement of Uncontroverted Material Facts (Doc. # 98), as well as Defendants' Statement of Additional Material Facts.

Pursuant to Local Rule 4.01(E), ***solely for purposes of Plaintiff's Motion for Partial Summary Judgment***, Defendants do not controvert the following statements of fact:[1] 1-8, 21-32, 34-46, 49, 58-60, 64-65, 69-73, 84, 86-88, 91-92, 95, 98-104, 109-125, 128-130, and 132-138.[2]

Pursuant to Rule 56(c) and Local Rule 4.01(E), for the reasons stated below mirroring Plaintiff's numbered paragraph statements, Defendants controvert the following alleged facts

---

[1] L.R. 4.01(E); *accord Riggs v. Shinseki*, No. 4:08 CV 998 FRB, 2010 WL 3584296, at *1 (E.D. Mo. Sept. 7, 2010) (Local Rule 4.01(E) admitted facts are only deemed admitted for purposes of the motion and not for trial).

[2] To the extent Defendants have specifically disputed a Statement of Fact listed here in error, Defendants' specific responses and objections to TNT's Statements of Fact following below should control.

based on one or more of: Plaintiff's failure to support those alleged facts with admissible evidence; the existence of contrary evidence that disputes and controverts Plaintiff's alleged fact and that create a genuine material factual dispute; or Plaintiff's citation to materials that do not establish the absence or presence of a genuine dispute. Defendants further provide Defendants' Statement of Additional Material Facts below.

## CONTROVERTED STATEMENTS OF FACT

9. Defendants dispute TNT's Statement of Fact ("SOF") 9. TNT has not laid any foundation sufficient to suggest or allow Defendants to confirm or deny that the device depicted in the photograph attached as TNT's Exhibit 11 is, in fact, a device distributed by Torch. *See* Fed. R. Civ. P. 56(c)(2). There are other distributors that place similar looking devices throughout the state of Missouri.

10. Defendants dispute TNT's SOF 10. TNT has not laid any foundation sufficient to suggest or allow Defendants to confirm or deny that the device depicted in the photograph attached as TNT's Exhibit 12 is, in fact, a device distributed by Torch. *See* Fed. R. Civ. P. 56(c)(2). There are other distributors that place similar looking devices throughout the state of Missouri.

11. Defendants dispute TNT's SOF 11. TNT has not laid any foundation sufficient to suggest or allow Defendants to confirm or deny that the device depicted in the photograph attached as TNT's Exhibit 13 is, in fact, a device distributed by Torch. *See* Fed. R. Civ. P. 56(c)(2). There are other distributors that place similar looking devices throughout the state of Missouri.

12. Defendants dispute TNT's SOF 12. TNT's Exhibit 14 is not a "picture of a Torch Device." In fact, there is no photograph of an actual device depicted in TNT's Exhibit 14 whatsoever. TNT's Exhibit 14 appears to contain a computerized 3D model.

13. Defendants dispute TNT's SOF 13. TNT's Exhibit 15 does not appear to be a

"picture of a Torch Device." TNT's Exhibit 15 appears to contain computerized 3D models.

14.     Defendants dispute TNT's SOF 14. TNT has not laid any foundation sufficient to suggest or allow Defendants to confirm or deny that the device depicted in the photograph attached as TNT's Exhibit 16 is, in fact, a device distributed by Torch. *See* Fed. R. Civ. P. 56(c)(2). There are other distributors that place similar looking devices throughout the state of Missouri.

15.     Defendants dispute TNT's SOF 15. TNT has not laid any foundation sufficient to suggest or allow Defendants to confirm or deny that the device depicted in the photograph attached as TNT's Exhibit 17 is, in fact, a device distributed by Torch. *See* Fed. R. Civ. P. 56(c)(2). There are other distributors that place similar looking devices throughout the state of Missouri.

16.     Defendants dispute TNT's SOF 16. TNT has not laid any foundation sufficient to suggest or allow Defendants to confirm or deny that the devices depicted in the photograph attached as TNT's Exhibit 18 are, in fact, devices distributed by Torch. *See* Fed. R. Civ. P. 56(c)(2). There are other distributors that place similar looking devices throughout the state of Missouri.

17.     Defendants dispute TNT's SOF 17. The photograph shown in TNT's Exhibit 19 is exceedingly poor quality and lacking critical detail to allow positive identification. Furthermore, TNT has not laid any foundation sufficient to suggest or allow Defendants to confirm or deny that the device depicted in the photograph attached as TNT's Exhibit 19 is, in fact, a device distributed by Torch. *See* Fed. R. Civ. P. 56(c)(2). There are other distributors that place similar looking devices throughout the state of Missouri.

18.     Defendants dispute TNT's SOF 18. TNT has not laid any foundation sufficient to suggest or allow Defendants to confirm or deny that the device depicted in the photograph attached as TNT's Exhibit 20 is, in fact, a device distributed by Torch. *See* Fed. R. Civ. P. 56(c)(2). There are other distributors that place similar looking devices throughout the state of Missouri.

19.     Defendants dispute TNT's SOF 19. TNT has not laid any foundation sufficient to suggest or allow Defendants to confirm or deny that the device depicted in the photograph attached as TNT's Exhibit 21 is, in fact, a device distributed by Torch. *See* Fed. R. Civ. P. 56(c)(2). There are other distributors that place similar looking devices throughout the state of Missouri.

20.     Defendants dispute that Kevin Morse, as Banilla Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2). Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT failed to lay any foundation during Morse's deposition that would allow TNT to qualify Morse as an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical manner in which Banilla's devices operate. *See, e.g., Erickson v. Pope County, Minn.*, Case No. 19-cv-3061, 2021 WL 9772304, at *6 (D. Minn. June 14, 2021) ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907-08 (5th Cir. 2010) (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions") (quoting *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434-35 (5th Cir. 2006) ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot

make comments that would otherwise require expert qualifications.")); *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001) ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in *Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF. TNT's SOF is based on inadmissible testimony that may not be used to support TNT's Motion for Summary Judgment, and the SOF is, thus, disputed.

33.     Defendants dispute TNT's SOF 33. The total TNT alludes to is not gross "revenue," it is simply the total count from the devices' hard meter of money in but not money out, as made clear by the labelling on each of the spreadsheets TNT attached as exhibits in support of this SOF.

47.     Defendants dispute TNT's SOF 47. As Nick Farley pointed out in the testimony TNT cites, whether a person who is illiterate is able understand how to play a Torch device is subjective and person specific. As a matter of common sense, there certainly may be illiterate individuals who choose not to play a Torch device because their illiteracy prevents them from understanding how the device works.

48.     Defendants dispute TNT's SOF 48.  As Nick Farley pointed out in the testimony TNT cites, whether a person who is illiterate is able understand how to play a Torch device is subjective and person specific. As a matter of common sense, there certainly may be illiterate individuals who choose not to play a Torch device because their illiteracy prevents them from understanding how the device works.

50.     Defendants dispute TNT's use of the phrase "Bet Amount" as used in TNT's SOF 50 and continuing. There is no support in any of TNT's cited record evidence referring to the

amount a player must pay to play a give turn as a "bet." For every turn, a prospective player can see the outcome of that turn before choosing to push play and play that given turn. (*See* Farley's Nov. 6th Report, TNT's Ex. 1, pp. 2-3).

51. Defendants dispute TNT's SOF 51. Defendants dispute TNT's use of the phrase "Bet Amount" as used in TNT's SOF 51 and continuing. There is no support in any of TNT cited record evidence referring to the amount a player must pay to play a give turn as a "bet." For every turn, a prospective player can see the outcome of that turn before choosing to push play and play that given turn. (*See* Farley's Nov. 6th Report, TNT's Ex. 1, pp. 2-3).

Defendants further dispute TNT's suggestion outcomes are arranged "in an unpredictable order that has no discernible pattern." This is simply untrue. As Cody Hanavan, the Missouri Gaming Commission's Device Specialist II, testified, "Torch devices use a fixed and finite pool of predetermined outcomes that play in a sequential order and repeating pattern"; "There's nothing random about the outcome of a given turn on a Torch device"; "There is nothing by chance about when a Torch device is going to pay out"; a "Torch device is going to do the exact same thing every time until it runs back through the sequence of fixed outcomes"; and "there's nothing by chance about when a Torch device is going to pay out." (Cody Hanavan, 46:14-50:3). Far from having an "unpredictable order" or "no discernible pattern," both Cody Hanavan and Nick Farley have explained Torch devices have a fixed (i.e., certain and definite) pool of predetermined outcomes that could be thought of as analogous "to imagin[ing] a Rolodex of cards containing predetermined outcomes starting at Outcome 1 and continuing through Outcome 1000; following sequential play of Outcomes 1 to Outcome 1000, play continues by cycling back to Outcome 1 and continuing sequentially again through Outcome 1000." (Farley's Nov. 6th Report, TNT's Ex. 1, p. 3; Codey Hanavan, 47:14-48:8).

52.     Defendants dispute TNT's SOF 52. The fixed and finite pool of predetermined outcomes is not "unpredictable" or "random." As Cody Hanavan, the Missouri Gaming Commissions' Device Specialist II,  testified, "Torch devices use a fixed and finite pool of predetermined outcomes that play in a sequential order and repeating pattern"; "There's nothing random about the outcome of a given turn on a Torch device"; "There is nothing by chance about when a Torch device is going to pay out"; a "Torch device is going to do the exact same thing every time until it runs back through the sequence of fixed outcomes"; and "there's nothing by chance about when a Torch device is going to pay out." (Cody Hanavan, 46:14-50:3). Far from having an "unpredictable order" or "no discernible pattern," both Cody Hanavan and Nick Farley have explained Torch devices have a fixed (i.e., certain and definite) pool of predetermined outcomes that could be thought of as analogous "to imagin[ing] a Rolodex of cards containing predetermined outcomes starting at Outcome 1 and continuing through Outcome 1000; following sequential play of Outcomes 1 to Outcome 1000, play continues by cycling back to Outcome 1 and continuing sequentially again through Outcome 1000." (Farley's Nov. 6th Report, TNT's Ex. 1, p. 3; Codey Hanavan, 47:14-48:8).

Furthermore, Defendants object to this SOF on grounds that TNT has failed to cite to admissible evidence in support. Fed. R. Civ. P. 56(c)(2). Defendants dispute that Kevin Morse, as Banilla Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2). Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT failed to lay any foundation during Morse's deposition that

would allow TNT to qualify Morse as an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical manner in which Banilla's devices operate. *See, e.g., Erickson*, 2021 WL 9772304, at *6 ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump*, 404 F. App'x at 907-08 (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions") (quoting *Brazos River*, 469 F.3d at 434-35 ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot make comments that would otherwise require expert qualifications.")); *Peoples*, 250 F.3d at 641 ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in *Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF.

Additionally, the only other support for this SOF is TNT's Exhibit 22, which does not include ¶ 56, 64, or 89. Even if TNT had cited to Friedman's report, Friedman's opinions are far from uncontroverted. (*See* discussion of Nick Farley's and Cody Hanavan's contrary testimony and opinions; *see also* Doc. ## 73, 74, Defendants' *Daubert* Motion to Exclude Expert Testimony and Opinions of Stacy Friedman).

53.     Defendants dispute TNT's SOF 53.  TNT has failed to cite to admissible evidence to support TNT's SOF. Fed. R. Civ. P. 56(c)(2). Defendants dispute that Kevin Morse, as Banilla

Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2). Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT failed to lay any foundation during Morse's deposition that would allow TNT to qualify Morse as an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical manner in which Banilla's devices operate. *See, e.g., Erickson*, 2021 WL 9772304, at *6 ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump*, 404 F. App'x at 907-08 (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions") (quoting *Brazos River*, 469 F.3d at 434-35 ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot make comments that would otherwise require expert qualifications.")); *Peoples*, 250 F.3d at 641 ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in *Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF.

Additionally, the only other support for this SOF is Stacy Friedman's improper and

untimely December 15, 2023 rebuttal report. Defendants obviously dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

Further, while Defendants object to TNT's reliance on Kevin Morse's improper expert opinion testimony, Defendants would note that even if Kevin Morse's testimony were admissible (which it is not), Morse's testimony fails to support this SOF. Morse's testimony regarding the initial starting point does not help TNT's cause. With respect to when and how a Banilla device allegedly selects the initial starting point in a given predetermined and finite pool at a given pay level, Morse testified, "So with that prize view, with that prize pool for that game, a human being has picked 12 potential starting indices, and then as that game is first turned on and operated, when that *play level of the game, when that button is first pushed*, it picks one of those 12 [starting points]

that were preselected and it starts there." (30(b)(6) Deposition of Kevin Morse on behalf of Banilla, taken January 10, 2024 ("Morse Dep."), 45:3-10). The play/pay level (i.e., whether the potential player wants to play a turn for 25 cents, 50 cents, $1.00, etc.) must be selected *before* any player can ever actually play a turn on the device (i.e., before the first turn of any device, at any play/pay level, is played, the starting point for each predetermined finite pool is fixed and certain). Morse further undermined TNT's argument regarding alleged randomness in the one first turn on a new device by explaining that the first play starting point will *always* be a $0.00 turn. (Morris Dep., 74:8-15 (A: "But there's a question that you haven't asked me. That first play is always going to be a zero, so the player is showing a zero." Q: "I see. So in each case, each of the starting indices corresponds to a zero dollar prize value." A: "Yes, that's my understanding."). In other words, if Morris were able to offer Fed. R. Evid. 702 expert opinions regarding how he believes Banilla's devices function (which Defendants deny), his testimony would support the conclusion there is nothing random about the outcome of the very first initial turn on any device at any play/pay level – that outcome of that game will *always* be $0.00.

This SOF is also further disputed based on Cody Hanavan's testimony. (*See, e.g.*, Hanavan Dep., 48:9-11 (Q: "There's nothing random about the outcome of a given turn on a Torch device; agree?" A: "Correct."), 49:23-50:3 (Q: "[Y]ou agree that there's nothing by chance about when a Torch device is going to pay out?" A: "Correct. Correct."), 30:10-13 (testifying he has spent approximately a hundred hours inspecting Torch devices)).

54.    Defendants object to TNT's SOF 54. This SOF is supported only by Stacy Friedman's improper and untimely December 15, 2023 rebuttal report. Defendants obviously dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by

reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

This SOF is also further disputed based on Cody Hanavan's testimony. (*See, e.g.*, Hanavan Dep., 48:9-11 (Q: "There's nothing random about the outcome of a given turn on a Torch device; agree?" A: "Correct."), 49:23-50:3 (Q: "[Y]ou agree that there's nothing by chance about when a Torch device is going to pay out?" A: "Correct. Correct."), 30:10-13 (testifying he has spent approximately a hundred hours inspecting Torch devices)).

55. Defendants object to TNT's SOF 55. This SOF is supported only by Stacy Friedman's improper and untimely December 15, 2023 rebuttal report. Defendants obviously dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants'

Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

This SOF is also further disputed based on Cody Hanavan's testimony. (*See, e.g.*, Hanavan Dep., 48:9-11 (Q: "There's nothing random about the outcome of a given turn on a Torch device; agree?" A: "Correct."), 49:23-50:3 (Q: "[Y]ou agree that there's nothing by chance about when a Torch device is going to pay out?" A: "Correct. Correct."), 30:10-13 (testifying he has spent approximately a hundred hours inspecting Torch devices)).

56.    Defendants object to TNT's SOF 55. This SOF is supported only by Kevin Morse's improper expert opinion testimony and Stacy Friedman's improper and untimely December 15, 2023 rebuttal report opinions. Defendants dispute that Kevin Morse, as Banilla Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2). Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT

failed to lay any foundation during Morse's deposition that would allow TNT to qualify Morse as an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical manner in which Banilla's devices operate. *See, e.g., Erickson*, 2021 WL 9772304, at *6 ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump*, 404 F. App'x at 907-08 (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions") (quoting *Brazos River*, 469 F.3d at 434-35 ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot make comments that would otherwise require expert qualifications.")); *Peoples*, 250 F.3d at 641 ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in *Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF. Defendants would also point out that if Morse's testimony were admissible (which it is not), Morse testified "[w]hen the player pushes the play button, the game goes to that finite pool of prizes. It says, 'Tell me what is the next prize,' and then the game reveals that prize if you will to the play in an entertaining fashion. The game doesn't determine anything. The win values are strictly determined by that index or list of prize values that is associated with that play level of the game." (TNT Ex. 10, 34:10-35:3). The symbols that are displayed on a given turn are meaningless information meant to entertain; they do not alter,

influence, or dictate the outcome of any turn.

Defendants obviously dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

57.     For purposes of summary judgment, Defendants admit each "Torch device is coded and designed to contain a 'Prize Viewer' feature for each game and monetary level available for gameplay that allows the player to view upcoming game outcomes." (TNT's Ex. 1, Nick Farley's Nov. 6, 2023 Report, p. 2). For purposes of summary judgment, Defendants further admit prospective players may, but they are not forced to, use the Prize Viewer feature. However, Defendants deny that any player can "wager money" on a Torch device, and therefore controvert TNT's SOF 57 to the extent TNT suggests otherwise. None of the record sources support TNT's

claim a player can "wager" on a Torch device. Nick Farley never used the word "wager" during his deposition in reference to a Torch device; neither did Kevin Morse (and his cited testimony is inadmissible for the reasons explained in response to TNT's SOF 56, above, regardless); and TNT's Ex. 22 is not actually Friedman's November 6, 2023 Report. Moreover, "wager" is a legal term of art, not a fact upon which summary judgment can be based.

61.     Defendants dispute TNT's SOF 61. TNT's citations to the record do not support the contention TNT attempts to make in this SOF. Nick Farley merely testified at the cited portions of this deposition testimony that a player must actually hit the play button to play the game and alter the graphical display. (TNT's Ex. 8 (Dep. Of N. Farley) at 197:12-198:1). The only other citation TNT offers in support of this SOF is to TNT's Ex. 22 at "¶¶ 56-58, 64, 89," but TNT's Ex. 22 contains only 27 paragraphs in total, none of which supports this SOF.

62.     Defendants dispute TNT's SOF 62. TNT's citations to the record do not support the contention TNT attempts to make in this SOF. Nick Farley merely testified at the cited portions of this deposition testimony that a player must actually hit the play button to play the game to advance gameplay at a given play level for a given game. (TNT's Ex. 8 (Dep. Of N. Farley), 191:14-16, 197:12-198:1). The only other citation TNT offers in support of this SOF is to TNT's Ex. 22 at "¶¶ 56-58, 65-68," but TNT's Ex. 22 contains only 27 paragraphs in total, none of which supports this SOF.

63.     Defendants dispute TNT's SOF 63. TNT's citations to the record do not support the contention TNT attempts to make in this SOF. Nick Farley merely testified at the cited portions of this deposition testimony that a player must actually hit the play button to play the game to advance gameplay at a given play level for a given game. (TNT's Ex. 8 (Dep. Of N. Farley), 191:14-16, 197:12-198:1). TNT's second citation in support of this SOF is to TNT's Ex. 22 at "¶¶

56-58, 65-68, 89" but TNT's Ex. 22 contains only 27 paragraphs in total, none of which supports this SOF. And TNT's third citation in support points to testimony by Cody Hanavan that does not actually support TNT's SOF. As a threshold matter, Defendants' counsel objected to the form of TNT's question to Hanavan. But in any event, Cody Hanavan testified to suggest a player who had "watched the game for a very long period of time" might know the outcome of the next turn (as the deposition transcript indicates neither TNT's question nor Hanavan's response comes well formed). (TNT's Ex. 24, Dep. of C. Hanavan), 80:13-21).

66.     Defendants dispute TNT's SOF 66. TNT's SOF is pure speculation that attempts to divine a specific player's subjective intent regarding why he or she may want to play any turn on a Torch device. Furthermore, the evidence TNT cites does not support this SOF. TNT's first citation in support of this SOF is to TNT's Ex. 22 at "¶¶ 56-58, 65-68, 89" but TNT's Ex. 22 contains only 27 paragraphs in total, none of which supports this SOF. TNT's second citation is to Cody Hanavan's testimony, and, once again, Hanavan's testimony undercut's TNT's claim. When asked, "So would you also agree with me, then, that what they are doing by paying that dollar is wagering on the possibility that they might win on the next play," Defendants' counsel objected the question called for speculation and Hanavan thereafter replied, "I can't really say that the player is necessarily looking for the outcome after the outcome, but the player's looking for an outcome." (TNT's Ex. 24, Dep. of C. Hanavan, 84:4-16). Cody Hanavan further testified and admitted that he has no idea "why a player wants to play a game," he has no idea why the player might want to play an initial game, including whether that player has any desire or intention of playing a second game. (*Id*. at 161:17-162:7). Cody Hanavan further testified it would be "sheer speculation" on his part about why a player might want to do with respect to a potential second turn on any Torch device. (*Id*.). As he agreed, the reason a player might want to play the initial turn simply because

he/she is bored, has spare cash, the machines look interesting, and they do not care about playing additional turns or that the device has informed them a turn will lose. (*Id.* at 162:4-164:8). Cody Hanavan also testified that his understanding, as a Missouri Gaming Commission's Electronic Device Specialist II, is that such subjective and speculative issues are irrelevant to how devices are classified under Missouri law – an objective standard based on how the device itself operates applies, not whatever subjective intentions a player decides to attribute to a device. (*Id.* at 164:10-165:19; *see also id.* at 51:21-52:18 (Q: "Now, as far as you know, given your position as the Missouri Gaming Commission's Electronic Gaming Device Specialist, a Level II, charged with inspecting slot machines and gaming devices, is there anything in Missouri statutes, regarding classification, that talks about the subjective intentions of a player affecting whether a game is a gambling device or slot machine?" A: "Nothing that I – nothing that I am aware of." Q: "So as far as you're aware, there's nothing in Missouri statutes that say that; correct?" A: "Correct." Q: "The classification would be based entirely on how the machine itself operates; fair?" A: "I think that would be accurate.").

67.     Defendants dispute TNT's SOF 67. This SOF is based on a hearsay news article, does not relate to Defendants, does not relate to Torch devices, is entirely irrelevant to any claim or defense, and has no probative value while being unduly and unfairly prejudicial. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 701 & 403. Accordingly, this SOF is improperly supported and cannot support TNT's Motion for Summary Judgment (the fact is immaterial and does not support TNT's Motion for Summary Judgment regardless).

68.     Defendants dispute TNT's SOF 68. TNT's SOF 68 is premised upon the admissibility and relevance of the information contained in TNT's SOF 67, which is improper and inadmissible for the reasons set forth in Defendants' response to TNT's SOF 67 incorporated here

by reference. Accordingly, this SOF is improperly supported and cannot support TNT's Motion for Summary Judgment (the fact is immaterial and does not support TNT's Motion for Summary Judgment regardless).

74.     Defendants dispute TNT's SOF 74. This SOF is supported only by Kevin Morse's improper expert opinion testimony and Stacy Friedman's improper and untimely December 15, 2023 rebuttal report opinions. Defendants dispute that Kevin Morse, as Banilla Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2). Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT failed to lay any foundation during Morse's deposition that would allow TNT to qualify Morse as an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical manner in which Banilla's devices operate. *See, e.g., Erickson*, 2021 WL 9772304, at *6 ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump*, 404 F. App'x at 907-08 (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions") (quoting *Brazos River*, 469 F.3d at 434-35 ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot make comments that would otherwise require expert

qualifications.")); *Peoples*, 250 F.3d at 641 ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in *Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF.

Defendants obviously dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

75. Defendants dispute TNT's SOF 75. This SOF is supported only by Stacy Friedman's improper and untimely December 15, 2023 rebuttal report opinions. Fed. R. Civ. P. 56(c)(2). Defendants obviously dispute the admissibility of any opinion Friedman attempted to

offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102).

Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

Further, TNT fails to cite any evidence supporting TNT's claim Defendant Sondra Miltenberger has access or an ability to alter Torch devices.

76.     Defendants dispute TNT's SOF 76. This SOF is supported only by Kevin Morse's improper expert opinion testimony and Stacy Friedman's improper and untimely December 15, 2023 rebuttal report opinions (TNT cites to deposition testimony by Steven Miltenberger, but that testimony does not actually support TNT's SOF point, but rather merely that there are operator setting settings on Torch devices). Defendants dispute that Kevin Morse, as Banilla Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2).

Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT failed to lay any foundation during Morse's deposition that would allow TNT to qualify Morse as an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical manner in which Banilla's devices operate. *See, e.g., Erickson*, 2021 WL 9772304, at *6 ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump*, 404 F. App'x at 907-08 (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions") (quoting *Brazos River*, 469 F.3d at 434-35 ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot make comments that would otherwise require expert qualifications.")); *Peoples*, 250 F.3d at 641 ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in *Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF.

Defendants obviously dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion

to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

Further, TNT fails to cite any evidence supporting TNT's claim Defendant Sondra Miltenberger has access or an ability to alter Torch devices.

77.     Defendants dispute TNT's SOF 77. This SOF is supported only by Kevin Morse's improper expert opinion testimony and Stacy Friedman's improper and untimely December 15, 2023 rebuttal report opinions. Defendants dispute that Kevin Morse, as Banilla Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2). Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT failed to lay any foundation during Morse's deposition that would allow TNT to qualify Morse as

an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical manner in which Banilla's devices operate. *See, e.g., Erickson*, 2021 WL 9772304, at *6 ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump*, 404 F. App'x at 907-08 (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions") (quoting *Brazos River*, 469 F.3d at 434-35 ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot make comments that would otherwise require expert qualifications.")); *Peoples*, 250 F.3d at 641 ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in *Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF.

Defendants obviously dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded

and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

78.     Defendants dispute TNT's SOF 78. This SOF is supported only by Kevin Morse's improper expert opinion testimony and Stacy Friedman's improper and untimely December 15, 2023 rebuttal report opinions (TNT cites to deposition testimony by Steven Miltenberger, but that testimony does not actually support TNT's SOF point, but rather merely that there are operator setting settings on Torch devices). Defendants dispute that Kevin Morse, as Banilla Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2). Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT failed to lay any foundation during Morse's deposition that would allow TNT to qualify Morse as an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical

manner in which Banilla's devices operate. *See, e.g., Erickson*, 2021 WL 9772304, at *6 ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump*, 404 F. App'x at 907-08 (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions") (quoting *Brazos River*, 469 F.3d at 434-35 ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot make comments that would otherwise require expert qualifications.")); *Peoples*, 250 F.3d at 641 ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in *Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF.

Defendants obviously dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each

finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

Further, TNT fails to cite any evidence supporting TNT's claim Defendant Sondra Miltenberger has access or an ability to utilize Torch device administrator options.

79. Defendants dispute TNT's SOF 79. This SOF is supported only by Kevin Morse's improper expert opinion testimony and Stacy Friedman's improper and untimely December 15, 2023 rebuttal report opinions. Defendants dispute that Kevin Morse, as Banilla Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2). Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT failed to lay any foundation during Morse's deposition that would allow TNT to qualify Morse as an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical manner in which Banilla's devices operate. *See, e.g., Erickson*, 2021 WL 9772304, at *6 ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump*, 404 F. App'x at 907-08 (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is]

hearsay not falling within one of the authorized exceptions") (quoting *Brazos River*, 469 F.3d at 434-35 ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot make comments that would otherwise require expert qualifications.")); *Peoples*, 250 F.3d at 641 ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in *Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF.

Defendants obviously dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

80.     Defendants dispute TNT's SOF 80. This SOF is supported only by Kevin Morse's improper expert opinion testimony and Stacy Friedman's improper and untimely December 15, 2023 rebuttal report opinions. Defendants dispute that Kevin Morse, as Banilla Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2). Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT failed to lay any foundation during Morse's deposition that would allow TNT to qualify Morse as an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical manner in which Banilla's devices operate. *See, e.g., Erickson*, 2021 WL 9772304, at *6 ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump*, 404 F. App'x at 907-08 (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions") (quoting *Brazos River*, 469 F.3d at 434-35 ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot make comments that would otherwise require expert qualifications.")); *Peoples*, 250 F.3d at 641 ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in

*Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF.

Defendants obviously dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Also, in response to TNT's complaints and request to exclude certain testimony of Defendants' expert Nick Farley, Defendants agree to voluntarily preclude Nick Farley from offering any testimony or opinions at trial regarding the manner in which a Torch device selects the initial starting point within each finite and predetermined pool of outcomes. (*See* Doc. #104, Defendants' Memorandum in Opposition to Plaintiff's Motion to Exclude Certain Testimony of Defendants' Proposed Expert, Nick Farley, pp. 9-11). Consequently, Friedman's "supplemental" opinions rebutting those opinions are moot and should not be admissible.

81.     Defendants dispute SOF 81. There is no support for TNT's use of the legal phrase "Bet Amount," and TNT's decision to use that phrase, which incorporates many issues of disputed fact and law, highlights the improper nature and futility of TNT's Motion for Summary Judgment. Defendants dispute a player "bets" on a turn when the player can know in advance the outcome of the turn.

82.     Defendants dispute SOF 82. There is no support for TNT's use of the legal term

"stake," and TNT's decision to use that phrase, which incorporates many issues of disputed fact and law, highlights the improper nature and futility of TNT's Motion for Summary Judgment. Defendants dispute a player "stakes" money on a turn when the player can know in advance the outcome of the turn.

83.     Defendants dispute SOF 83. There is no support for TNT's use of the legal phrase "Bet Amount," and TNT's decision to use that phrase, which incorporates many issues of disputed fact and law, highlights the improper nature and futility of TNT's Motion for Summary Judgment. Defendants dispute a player "bets" on a turn when the player can know in advance the outcome of the turn.

85.     Defendants dispute SOF 85. There is no support for TNT's use of the legal phrase "Bet Amount," and TNT's decision to use that phrase, which incorporates many issues of disputed fact and law, highlights the improper nature and futility of TNT's Motion for Summary Judgment. Defendants dispute a player "bets" on a turn when the player can know in advance the outcome of the turn.

89.     Defendants dispute SOF 89. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger sets the payout rate for any Torch device. Fed. R. Civ. P. 56(c)(2).

90.     Defendants dispute SOF 90. TNT cites no evidence to support TNT's claim that the payout rate of Torch devices affects the amount of profit Defendant Sondra Miltenberger, who is a salaried employee of Defendant Torch Electronics, LLC, makes.

93.     Defendants dispute SOF 93. TNT does not support this SOF other than with a single line from the deposition of Nick Farley, but that line is not testimony from Farley, it is during a question being asked about TNT's counsel, with the cited portion being TNT's counsel's words while reading from an opinion in a court case in Florida about different devices, laws, and parties.

This evidence does not support any of TNT's claims in this SOF. Fed. R. Civ. P. 56(c)(2).

94. Defendants dispute TNT's SOF 94. This SOF is supported only by Kevin Morse's improper expert opinion testimony. Defendants dispute that Kevin Morse, as Banilla Games' representative, is qualified to offer expert opinion testimony regarding the technical nature of the manner in which Banilla's electronic devices operate. Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2). Kevin Morse lives in Greenville, North Carolina, and is presumably not going to testify live at trial (Morse is certainly outside the Court's subpoena power and TNT has no means by which to compel Morse to appear at trial). (*See* Cover Page of Kevin Morse's Deposition). Despite these facts, TNT failed to lay any foundation during Morse's deposition that would allow TNT to qualify Morse as an expert witness pursuant to Fed. R. Evid. 702 to offer expert opinion testimony regarding his opinions about how Torch's Banilla devices operate. It is also entirely unclear from Morse's testimony what opinions he might hold based on his own personal knowledge versus hearsay statements and opinions by others within Banilla regarding expert opinions about the technical manner in which Banilla's devices operate. *See, e.g., Erickson*, 2021 WL 9772304, at *6 ("[A] party is not permitted to seek Rule 30(b)(6) deposition testimony in the form of expert opinions or legal conclusions."); *Union Pump*, 404 F. App'x at 907-08 (holding a corporate representative may not testify to matters outside his own personal knowledge "to the extent that information [is] hearsay not falling within one of the authorized exceptions") (quoting *Brazos River*, 469 F.3d at 434-35 ("Of course, in testifying as to matters within [the company's] corporate knowledge or subjective belief, [an expert] cannot make comments that would otherwise require expert qualifications.")); *Peoples*, 250 F.3d at 641 ("What is essentially expert testimony, however, may not be admitted under the guise of lay opinions . . . . Such a substitution subverts the disclosure and discovery requirements . . . and the reliability requirements for expert testimony as set forth in

*Daubert* . . .") (internal citations omitted). Accordingly, Defendants' counsel objected to the questions and answers TNT cites in support of this SOF.

96.     Defendants dispute SOF 96. There is no support for TNT's use of the legal phrase "Bet Amount," and TNT's decision to use that phrase, which incorporates many issues of disputed fact and law, highlights the improper nature and futility of TNT's Motion for Summary Judgment. Defendants dispute a player "bets" on a turn when the player can know in advance the outcome of the turn.

97.     Defendants dispute SOF 97. There is no support for TNT's use of the legal phrase "Bet Amount," and TNT's decision to use that phrase, which incorporates many issues of disputed fact and law, highlights the improper nature and futility of TNT's Motion for Summary Judgment. Defendants dispute a player "bets" on a turn when the player can know in advance the outcome of the turn.

105.     Defendants dispute TNT's SOF 105. TNT fails to cite to any record evidence to support TNT's contention the document attached as TNT's Exhibit 53 was taken from Torch's website on September 13, 2022. Obviously, TNT's cover-page information, which includes an alleged date, is not admissible evidence that can support TNT's request for summary judgment. TNT's Exhibit 53 is inadmissible hearsay without proper foundation or authentication whatsoever, not just with respect to TNT's alleged relevant date.

106.     Defendants dispute TNT's SOF 106. TNT fails to cite to any record evidence to support TNT's contention the document attached as TNT's Exhibit 53 was taken from Torch's website on September 13, 2022. Obviously, TNT's cover-page information, which includes an alleged date, is not admissible evidence that can support TNT's request for summary judgment. TNT's Exhibit 53 is inadmissible hearsay without proper foundation or authentication whatsoever,

not just with respect to TNT's alleged relevant date.

107.    Defendants dispute TNT's SOF 107. TNT fails to cite to any record evidence to support TNT's contention the document attached as TNT's Exhibit 54 was taken from Torch's website on September 19, 2022. Moreover, TNT fails to cite to any record evidence supporting its claim TNT removed information from Torch's website on that date. Obviously, TNT's cover-page information, which includes an alleged date, is not admissible evidence that can support TNT's request for summary judgment. TNT's Exhibit 54 is inadmissible hearsay without proper foundation or authentication whatsoever, not just with respect to TNT's alleged relevant date.

108.    Defendants dispute TNT's SOF 108. This SOF is derivative of TNT's SOFs 106 and 107, and, thus, fails to support TNT's SOF 108 for the same reasons. Defendants incorporate their responses and objections to TNT's SOFs 106 and 107 here by reference.

126.    Defendants dispute SOF 126. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger orders Torch devices. Fed. R. Civ. P. 56(c)(2).

127.    Defendants dispute SOF 127. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger purchase Torch devices in their personal capacity. Fed. R. Civ. P. 56(c)(2).

131.    Defendants dispute SOF 131. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger transport or install Torch devices. Fed. R. Civ. P. 56(c)(2).

139.    Defendants dispute SOF 139. TNT claims in this SOF some Torch customers once had but now do not have any TNT devices, but TNT fails to cite any admissible evidence to support that conclusion. TNT cites to a self-serving declaration from Marla Turntine at paragraph 4, but Mrs. Turntine fails to claim any Torch customer location once had TNT devices but now has none.

Steven Miltenberger's cited testimony also fails to support this fact, as does the Stipulation as to Agreed Locations. This SOF is not properly supported and, thus, is disputed. Fed. R. Civ. P. 56(c)(2).

140. Defendants dispute SOF 139. TNT's SOF is supported by Marla Turntine's self-serving declaration, which fails to aver Marla Turntine has personal knowledge of the facts and information contained in her self-serving declaration and is based, in part, on "information, and belief." This violates Federal Rule of Evidence 56(c)(4) rule requiring that any "declaration used to support . . . a motion must be made *on personal knowledge*, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." (Emphasis added). Consequently, Marla Turntine's self-serving declaration must be ignored and cannot support TNT's Motion for Summary Judgment. *See Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1367 (8th Cir. 1983) ("[A]n affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; *information and belief is insufficient*.") (emphasis added); *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1306 n.24 and 1317 (11th Cir. 2011) ("Whatever the merit of [the declarant's] belief, his showing before the district court was not enough to preclude summary judgment."); *Dewey v. Clark*, 180 F.2d 766, 770 (D.C. Cir. 1950) ("We disregard those portions of appellant's affidavit which are based on information and belief."); *Custom Hardware Eng'g & Consulting, Inc. v. Dowell*, 919 F. Supp. 2d 1018, 1027 (E.D. Mo. 2013) ("Dowell's Declaration does not explain the basis of his knowledge for his post-deposition statement made in Paragraph 19 . . . [n]or does the Declaration supply a factual basis for his asserted [] damage . . . [a]s such, the statement contained in Paragraph 19 does not meet Rule 56's standards and cannot be considered for purposes of summary judgment."); *Weitlauf v. Parkway School Dist.*, No. 4:07CV00407 ERW,

2008 WL 3925162, at *4 (E.D. Mo. Aug. 20, 2008) ("It is undisputed that the contents of an affidavit must be based upon the affiant's personal knowledge. *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995). The Court further recognizes that an affiant's belief as to certain facts, when not based on personal knowledge, is not admissible as evidence.").

Marla Turntine fails to supply any facts sufficient to demonstrate her alleged beliefs outlined in paragraph 4 of her Declaration (TNT's Ex. 57) are based upon her own personal knowledge. Further, Marla Turntine fails to supply any underlying factual information supporting her contentions in paragraph 4 of her Declaration. The Stipulation (Doc. #55-1) provides no support for Marla Turntine's contentions. Accordingly, this fact is unsupported and must be ignored for purposes of TNT's Motion for Summary Judgment.

141. Defendants dispute TNT's SOF 141. TNT's SOF is supported by Marla Turntine's self-serving declaration, which fails to aver Marla Turntine has personal knowledge of the facts and information contained in her self-serving declaration and is based, in part, on "information, and belief." This violates Federal Rule of Evidence 56(c)(4) rule requiring that any "declaration used to support . . . a motion must be made *on personal knowledge*, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." (Emphasis added). Consequently, Marla Turntine's self-serving declaration must be ignored and cannot support TNT's Motion for Summary Judgment. *See Camfield Tires*, 719 F.2d at 1367 ("[A]n affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; *information and belief is insufficient*.") (emphasis added); *Josendis*, 662 F.3d at 1306 n.24 and 1317 ("Whatever the merit of [the declarant's] belief, his showing before the district court was not enough to preclude summary judgment."); *Dewey*, 180 F.2d at 770 ("We disregard those portions of appellant's affidavit which

are based on information and belief."); *Custom Hardware Eng'g*, 919 F. Supp. 2d at 1027 ("Dowell's Declaration does not explain the basis of his knowledge for his post-deposition statement made in Paragraph 19 . . . [n]or does the Declaration supply a factual basis for his asserted [] damage . . . [a]s such, the statement contained in Paragraph 19 does not meet Rule 56's standards and cannot be considered for purposes of summary judgment."); *Weitlauf*, 2008 WL 3925162, at *4 ("It is undisputed that the contents of an affidavit must be based upon the affiant's personal knowledge. *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995). The Court further recognizes that an affiant's belief as to certain facts, when not based on personal knowledge, is not admissible as evidence.").

Marla Turntine fails to supply any facts sufficient to demonstrate her alleged beliefs outlined in paragraph 4 of her Declaration (TNT's Ex. 57) are based upon her own personal knowledge. Further, Marla Turntine fails to supply any underlying factual information supporting her contentions in paragraph 4 of her Declaration. The Stipulation (Doc. #55-1) provides no support for Marla Turntine's contentions. Accordingly, this fact is unsupported and must be ignored for purposes of TNT's Motion for Summary Judgment.

142.    TNT disputes TNT's SOF 142. TNT attempts to make the outlandish claim "there is no dispute that TNT has lost revenue and profits" as a result of certain events. Defendants obviously dispute this claim, which is unsupported by TNT's citation to the record and contradicted by available evidence in the record.

TNT's first citation allegedly in support of this SOF is improper expert opinion testimony offered in the form of Marla Turntine's Declaration. Marla Turntine alleges that based on her "review of TNT's books and records, TNT has suffered at least $125,486.32 lost profits of [sic] since 2018 due to displacement of TNT amusement devices by Torch Devices." (TNT's Ex. 57, ¶

5). Marla Turntine was not disclosed as TNT's expert economist. TNT apparently also forgot to attach a copy of her CV to Marla Turntine's Declaration to establish Marla Turntine is qualified to offer expert opinion testimony regarding TNT's alleged damages calculation. Marla Turntine also fails completely in identifying the information that allegedly exists to support her expert opinion testimony regarding TNT's alleged damages. In short, Marla Turntine is not TNT's damages expert and her opinions regarding TNT's alleged damages are improper, unsupported, and inadmissible under Federal Rule of Civil Procedure 56 and Federal Rule of Evidence 702. *See also Eischeid v. Dover Const., Inc.*, 265 F. Supp. 2d 1047, 1060-61 (N.D. Iowa 2003) ("A mere statement of opinion . . . is not admissible.") (quoting *Lasiter v. Washington Nat. Ins. Co.*, 412 F.2d 594, 597 (5th Cir. 1969)). Obviously, Marla Turntine's improper *opinions* cannot create admissible *facts*.

TNT's only other citation to the record is to the "Supplemental Expert Report of Robert Kneuper, Ph.D." dated December 12, 2023. (TNT's Ex. 58). As a threshold issue, Defendants note the expert disclosure deadline was November 6, 2023, per the Court's Case Management Order, yet TNT is forced to cite to a December 12, 2023 "supplemental" expert report to allegedly support TNT's claims of damages. Defendants obviously dispute the admissibility of any opinion Kneuper attempted to offer in his improper and untimely December 12, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Kneuper's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Further, even if there

were admissible (which they are not), Kneuper's *opinions* cannot create *facts* for purposes of summary judgment.

Additionally, the nature of Marla Turntine's improper opinions when layered on top of Knueper's improper opinions is, standing alone, sufficient to raise questions of fact regarding TNT's allegations of damages. Marla Turntine claims her opinion that TNT "has suffered at least $125,486.32 lost profits" "[b]ased upon my review of TNT's books and records" (TNT's Ex. 57, ¶ 5) when contrast against Kneuper's allegedly independent opinion (first disclosed to Defendants 36 days *after* the expert disclosure deadline) that TNT's alleged damages totalled "$125,486" on the allegedly low end raises factual questions about where this very specific number of $125,486 allegedly came from. Was Marla Turntine really just parroting Kneuper? Was Kneuper parroting Marla Turntine?

Regardless of the above, this claim is disputed simply by looking to the deposition testimony of Jim Turntine as TNT's corporate representative where Turntine admitted TNT (which would include Marla Turntine as TNT's employee) did not know how to properly engage in a "but for" causal analysis to provide any sort of reliable estimate of TNT's alleged damages. (*See* TNT 30(b)(6) Deposition taken Oct. 19, 2023, Doc. #76-5, 192:13-198:11).

Further, Tracy Head, the former manager of one of the larger location TNT complains about, offered testimony that substantially undercuts TNT's stories of alleged harm and damages. Tracy Head was deposed on December 28, 2023. (Deposition of Tracy Head taken December 28, 2023, Doc. #88-6 ("Head Dec. 28, 2023 Dep."), p. 1). Turntine testified that Tracy Head was the manager at the Midwest Petroleum Truck Stop who was TNT's contact regarding taking out games. (*See* Doc. #88-2, Oct. 19th TNT 30(b)(6) Dep.,44:6-45:25). Head testified that he has known Jim Turntine "probably [his] entire adult career. 20 plus years, probably, 30 years," and that he knows

Jim Turntine's wife Marla Turntine well: "We went to school together. Our families are all good friends. We've known each other." (Doc. #88-6, Head Dec. 28, 2023 Dep., 43:23-44:11). During Head's deposition, he was presented with a document containing notes from TNT's Donna Havey, which said Head "spoke with me (Donna Havey) stating that he wanted us to move everything out of our game room because he was making it a quote poker room end quote. After we pulled our games, immediately Torch installed machines in what was our game room." (*Id.* at 62:18-64:1). During his deposition, however, Head said he "never called that room a poker room," so he did not "know where Donna's getting that" and did not "agree with calling that room a poker room," because he had "never called it a poker room," and "would have never called anything a poker room." Head reiterated that in reading the document he was only reading what Donna Havey had written down. (*Id*. at 65:1-18; 126:14-127:3). During his deposition, Head was asked about having a call with Havey on or around August 17, 2018, to discuss moving TNT's games. Asked, "And it's correct that the substance of that phone call was to discuss moving out TNT games[?]," Head answered, "Yes. Yeah, I guess to make room for some additional games and also make room for their new games, for TNT's Play-Mor games. And I don't see the work orders for those." (*Id*. at 67:7-12). Head was shown additional documents that he testified he had never seen before and asked about the removal of a handful of TNT devices: a hunting video game, an amusement device called a "Megatouch Force," and a pinball machine; when asked about the motivation to remove them, Head said "it was not a motivation. It's just that we – we needed more room for the other games because the . . . games that TNT had in that . . . room were not doing very well." (*Id*. at 69:3-12, 126:14-127:3). Head also testified that some games were moved to "allow[] [TNT] to switch out their games." (*Id*. at 71:1-10). Head was asked "it's correct that at that time [in 2019], this was moved out, was a – and a Torch device was put into the location at Midwest, correct?", to

which Head answered "No, not correct." (*Id*. at 87:24-88:2). Head also said that some of TNT's documents showed that TNT's devices were removed for "preventative maintenance." (*Id*. at 91:25-93:23 (Q: "And so these are -- this is a work order detail talking about moving out that gumball machine from Midwest, right? A. Yeah. It looks like they performed preventative maintenance to make sure it's ready for its next location. Q. Okay. And you see where it says from location to shop; is that right? A. To perform the preventative maintenance, yes.")). The Cuba, Missouri location of Midwest Petroleum was sold in September 2022. (*Id*. at 27:23-28:4). Head was curious about why TNT was "on the Torch Electronics things" with respect to the removal of the coin pusher machines because, he said, TNT devices "were replaced with Midwest owned games. . . . It had nothing to do with Torch, Midwest bought their [Midwest's] own games." (*Id*. at 127:10-128:5). Head said new owners of the Cuba, Missouri truck stop "took everything out" from the location, including TNT games and Torch devices. (*Id*. at 81:25-82:9 (Q: "So it's true that whenever TA Travel Center bought Midwest Petroleum, that they chose not to take on or continue to take on TNT as a vendor, right? A. Yeah. That would be totally -- that was totally up to TA. And they -- they took everything out. Q. But TA kept Torch devices in there, correct? A. No."); *see also* Doc. #88-21, Miltenberger Dep., 103:3-21 (testifying Torch stopped operating devices at the Midwest Petroleum in Cuba, Missouri, when the locations were sold to new owners)). Accordingly, not even TNT's own former customer and Marla Turntine's old classmate, Tracy Head, appears to support TNT's claims of alleged damages or causation.

This SOF presents genuine issues of material fact on essential elements of causation and damages that preclude granting TNT's Motion for Summary Judgment.

143.    Defendants dispute TNT's SOF 143. TNT's SOF is supported by Marla Turntine's self-serving declaration, which fails to aver Marla Turntine has personal knowledge of the facts

and information contained in her self-serving declaration and is based, in part, on "information, and belief." This violates Federal Rule of Evidence 56(c)(4) rule requiring that any "declaration used to support . . . a motion must be made *on personal knowledge*, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." (Emphasis added). Consequently, Marla Turntine's self-serving declaration must be ignored and cannot support TNT's Motion for Summary Judgment. *See Camfield Tires*, 719 F.2d at 1367 ("[A]n affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; *information and belief is insufficient*.") (emphasis added); *Josendis*, 662 F.3d at 1306 n.24 and 1317 ("Whatever the merit of [the declarant's] belief, his showing before the district court was not enough to preclude summary judgment."); *Dewey*, 180 F.2d at 770 ("We disregard those portions of appellant's affidavit which are based on information and belief."); *Custom Hardware Eng'g*, 919 F. Supp. 2d at 1027 ("Dowell's Declaration does not explain the basis of his knowledge for his post-deposition statement made in Paragraph 19 . . . [n]or does the Declaration supply a factual basis for his asserted [] damage . . . [a]s such, the statement contained in Paragraph 19 does not meet Rule 56's standards and cannot be considered for purposes of summary judgment."); *Weitlauf*, 2008 WL 3925162, at *4 ("It is undisputed that the contents of an affidavit must be based upon the affiant's personal knowledge. *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995). The Court further recognizes that an affiant's belief as to certain facts, when not based on personal knowledge, is not admissible as evidence.").

Marla Turntine fails to supply any facts sufficient to demonstrate her alleged beliefs outlined in paragraph 6 of her Declaration (TNT's Ex. 57) are based upon her own personal knowledge. Further, Marla Turntine fails to supply any underlying factual information supporting

her contentions in paragraph 6 of her Declaration. Marla Turntine fails even to identify the "one pre-existing business relationship" she discusses in paragraph 6 of her Declaration. Accordingly, this fact is unsupported and must be ignored for purposes of TNT's Motion for Summary Judgment.

144.     Defendants dispute TNT's SOF 144. TNT's SOF is supported by Marla Turntine's self-serving declaration, which fails to aver Marla Turntine has personal knowledge of the facts and information contained in her self-serving declaration and is based, in part, on "information, and belief." This violates Federal Rule of Evidence 56(c)(4) rule requiring that any "declaration used to support . . . a motion must be made *on personal knowledge*, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." (Emphasis added). Consequently, Marla Turntine's self-serving declaration must be ignored and cannot support TNT's Motion for Summary Judgment. *See Camfield Tires*, 719 F.2d at 1367 ("[A]n affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; *information and belief is insufficient*.") (emphasis added); *Josendis*, 662 F.3d at 1306 n.24 and 1317 ("Whatever the merit of [the declarant's] belief, his showing before the district court was not enough to preclude summary judgment."); *Dewey*, 180 F.2d at 770 ("We disregard those portions of appellant's affidavit which are based on information and belief."); *Custom Hardware Eng'g*, 919 F. Supp. 2d at 1027 ("Dowell's Declaration does not explain the basis of his knowledge for his post-deposition statement made in Paragraph 19 . . . [n]or does the Declaration supply a factual basis for his asserted [] damage . . . [a]s such, the statement contained in Paragraph 19 does not meet Rule 56's standards and cannot be considered for purposes of summary judgment."); *Weitlauf*, 2008 WL 3925162, at *4 ("It is undisputed that the contents of an affidavit must be based upon the affiant's

personal knowledge. *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995). The Court further recognizes that an affiant's belief as to certain facts, when not based on personal knowledge, is not admissible as evidence.").

Marla Turntine fails to supply any facts sufficient to demonstrate her alleged beliefs outlined in paragraph 7 of her Declaration (TNT's Ex. 57) are based upon her own personal knowledge. Further, Marla Turntine fails to supply any underlying factual information supporting her contentions in paragraph 7 of her Declaration. Moreover, while it might be that TNT keeps some form of a "Move Ticket" as business records, Jim Turntine testified on behalf of TNT as its corporate representative he believed many of the documents that TNT has referred to as "Move Tickets" contain information and descriptions TNT's employees added *long after* the underlying event and business record would have occurred to add narrative information as part of the litigation process. (*See* James Turntine as 30(b)(6) Representative for TNT, Vol. II, taken December 22, 2023, a true and correct copy of excerpts from the same is attached as **Exhibit A**, 305:9-309:15) (*e.g.*, Q: "And – and did you ask Donna Havey to do that sort of summary for the move tickets as part of the –" A: "I – I – I think you might –" Q: " – litigation process? Sorry." A: "I'm sorry. I didn't mean to talk over you. I think I did ask her to write down anything that she could remember as well as the documents that we have. And whether she wrote it that day on the 17th of August, 2018, or whether she wrote it, you know, two months ago as she was pulling the [discovery] documents together, sitting here right this moment, I can't say because I don't know if that's what a version of our call log looks like.")). In other words, TNT's "Move Tickets" contain hearsay for which there is no exception to admissibility because they are no longer contemporaneously made business records pursuant to Fed. R. Evid. 803(6), and they are inadmissible under Fed. R. Evid. 802. TNT has failed to sort out what information came from whom and when with respect to these

"Move Tickets," which are all facts in dispute relating to TNT's claims of causation and damages that prevent granting TNT's request for summary judgment.

These "Move Tickets" cannot be used as a means to support TNT's own Motion for Summary Judgment. Accordingly, this fact is unsupported and disputed factually. This SOF highlights the unsettled factual issues and disputes that preclude granting TNT's Motion for Summary Judgment.

145.    Defendants dispute TNT's SOF 145. TNT's SOF is supported by Marla Turntine's self-serving declaration, which fails to aver Marla Turntine has personal knowledge of the facts and information contained in her self-serving declaration and is based, in part, on "information, and belief." This violates Federal Rule of Evidence 56(c)(4) rule requiring that any "declaration used to support . . . a motion must be made *on personal knowledge*, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." (Emphasis added). Consequently, Marla Turntine's self-serving declaration must be ignored and cannot support TNT's Motion for Summary Judgment. *See Camfield Tires*, 719 F.2d at 1367 ("[A]n affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; *information and belief is insufficient*.") (emphasis added); *Josendis*, 662 F.3d at 1306 n.24 and 1317 ("Whatever the merit of [the declarant's] belief, his showing before the district court was not enough to preclude summary judgment."); *Dewey*, 180 F.2d at 770 ("We disregard those portions of appellant's affidavit which are based on information and belief."); *Custom Hardware Eng'g*, 919 F. Supp. 2d at 1027 ("Dowell's Declaration does not explain the basis of his knowledge for his post-deposition statement made in Paragraph 19 . . . [n]or does the Declaration supply a factual basis for his asserted [] damage . . . [a]s such, the statement contained in Paragraph 19 does not meet Rule 56's

standards and cannot be considered for purposes of summary judgment."); *Weitlauf*, 2008 WL 3925162, at *4 ("It is undisputed that the contents of an affidavit must be based upon the affiant's personal knowledge. *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995). The Court further recognizes that an affiant's belief as to certain facts, when not based on personal knowledge, is not admissible as evidence.").

Marla Turntine fails to supply any facts sufficient to demonstrate her alleged beliefs outlined in paragraph 9 of her Declaration (TNT's Ex. 57) are based upon her own personal knowledge. Further, Marla Turntine fails to supply any underlying factual information supporting her contentions in paragraph 9 of her Declaration. Moreover, while it might be that TNT keeps some form of a "Call Log" as business records, none appear to have been attached as an exhibit to TNT's Statement of Fact or Motion for Summary Judgment briefing. To the extent TNT suggests the "call logs" are represented by the narrative portions of the exhibit TNT labelled "Move Tickets" (TNT's Ex. 59), just reading those narrative proves they cannot possibly be contemporaneous business records. For example, on page 10 of TNT's Ex. 59 discussing "Rehab" the author – in a single "call log" entry – purports to discuss events that allegedly occurred on February 10, 2022, *and* July 7, 2022. (*See* TNT's Ex. 59, p. 10). Accordingly, Marla Turntine seems to be mistaken and her claim is disputed by TNT's own evidence.

Further, as discussed above, Jim Turntine testified on behalf of TNT as its corporate representative he believed many of the documents that TNT has referred to as "Move Tickets" contain information and descriptions TNT's employees added *long after* the underlying event and business record would have occurred to add narrative information as part of the litigation process. (*See* **Ex. A**, James Turntine as 30(b)(6) Representative for TNT, Vol. II, 305:9-309:15) (*e.g.*, Q: "And – and did you ask Donna Havey to do that sort of summary for the move tickets as part of

the –" A: "I – I – I think you might –" Q: " – litigation process? Sorry." A: "I'm sorry. I didn't mean to talk over you. I think I did ask her to write down anything that she could remember as well as the documents that we have. And whether she wrote it that day on the 17th of August, 2018, or whether she wrote it, you know, two months ago as she was pulling the [discovery] documents together, sitting here right this moment, I can't say because I don't know if that's what a version of our call log looks like.")). In other words, TNT's "Move Tickets" contain hearsay for which there is no exception to admissibility because they are no longer contemporaneously made business records pursuant to Fed. R. Evid. 803(6), and they are inadmissible under Fed. R. Evid. 802. TNT has failed to sort out what information came from whom and when with respect to these "Move Tickets," which are all facts in dispute relating to TNT's claims of causation and damages that prevent granting TNT's request for summary judgment.

These "Move Tickets" or "call logs" cannot be used as a means to support TNT's own Motion for Summary Judgment. Accordingly, this fact is unsupported and disputed factually. This SOF highlights the unsettled factual issues and disputes that preclude granting TNT's Motion for Summary Judgment.

146. TNT disputes TNT's SOF 146. TNT's only support for this SOF is TNT's Ex. 59, which is TNT alleged "Move Tickets." For the reasons addressed in Defendants' response and objection to TNT's SOF 145, which is incorporated here by reference, TNT may not rely upon its "Move Tickets" to support TNT's Motion for Summary Judgment. *See also* Fed. R. Civ. P. 56(c)(2). Further, also as discussed above, Tracy Head, the former manager of the Midwest Petroleum Truck Stop in Cuba, Missouri, TNT alludes to in this SOF, provided sworn deposition testimony that disputes and undercuts TNT's claims and this SOF.

Turntine testified that Tracy Head was the manager at the Midwest Petroleum Truck Stop

who was TNT's contact regarding taking out games. (*See* Doc. #88-2, Oct. 19th TNT 30(b)(6) Dep.,44:6-45:25). Head testified that he has known Jim Turntine "probably [his] entire adult career. 20 plus years, probably, 30 years," and that he knows Jim Turntine's wife Marla Turntine well: "We went to school together. Our families are all good friends. We've known each other." (Doc. #88-6, Head Dec. 28, 2023 Dep., 43:23-44:11). During Head's deposition, he was presented with a document containing notes from TNT's Donna Havey, which said Head "spoke with me (Donna Havey) stating that he wanted us to move everything out of our game room because he was making it a quote poker room end quote. After we pulled our games, immediately Torch installed machines in what was our game room." (*Id.* at 62:18-64:1). During his deposition, however, Head said he "never called that room a poker room," so he did not "know where Donna's getting that" and did not "agree with calling that room a poker room," because he had "never called it a poker room," and "would have never called anything a poker room." Head reiterated that in reading the document he was only reading what Donna Havey had written down. (*Id*. at 65:1-18; 126:14-127:3). During his deposition, Head was asked about having a call with Havey on or around August 17, 2018, to discuss moving TNT's games. Asked, "And it's correct that the substance of that phone call was to discuss moving out TNT games[?]," Head answered, "Yes. Yeah, I guess to make room for some additional games and also make room for their new games, for TNT's Play-Mor games. And I don't see the work orders for those." (*Id*. at 67:7-12). Head was shown additional documents that he testified he had never seen before and asked about the removal of a handful of TNT devices: a hunting video game, an amusement device called a "Megatouch Force," and a pinball machine; asked about the motivation to remove them, Head said "it was not a motivation. It's just that we – we needed more room for the other games because the . . . games that TNT had in that . . . room were not doing very well." (*Id*. at 69:3-12, 126:14-127:3). Head also testified that some games

were moved to "allow[] [TNT] to switch out their games." (*Id*. at 71:1-10). Head was asked "it's correct that at that time [in 2019], this was moved out, was a – and a Torch device was put into the location at Midwest, correct?", to which Head answered "No, not correct." (*Id*. at 87:24-88:2). Head also said that some of TNT's documents showed that TNT's devices were removed for "preventative maintenance." (*Id*. at 91:25-93:23 (Q: "And so these are -- this is a work order detail talking about moving out that gumball machine from Midwest, right? A. Yeah. It looks like they performed preventative maintenance to make sure it's ready for its next location. Q. Okay. And you see where it says from location to shop; is that right? A. To perform the preventative maintenance, yes.")). The Cuba, Missouri location of Midwest Petroleum was sold in September 2022. (*Id*. at 27:23-28:4). Head was curious about why TNT was "on the Torch Electronics things" with respect to the removal of the coin pusher machines because, he said, TNT devices "were replaced with Midwest owned games. . . . It had nothing to do with Torch, Midwest bought their [Midwest's] own games." (*Id*. at 127:10-128:5). Head said new owners of the Cuba, Missouri truck stop "took everything out" from the location, including TNT games and Torch devices. (*Id*. at 81:25-82:9 (Q: "So it's true that whenever TA Travel Center bought Midwest Petroleum, that they chose not to take on or continue to take on TNT as a vendor, right? A. Yeah. That would be totally -- that was totally up to TA. And they -- they took everything out. Q. But TA kept Torch devices in there, correct? A. No."); *see also* Doc. #88-21, Miltenberger Dep., 103:3-21 (testifying Torch stopped operating devices at the Midwest Petroleum in Cuba, Missouri, when the locations were sold to new owners)). Accordingly, not even TNT's own former customer and Marla Turntine's old classmate, Tracy Head, appears to support TNT's claims of alleged damages or causation.

147. Defendants dispute TNT's SOF 147. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is

incorporated here by reference.

148.    Defendants dispute SOF 148. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

149.    Defendants dispute TNT's SOF 149. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

150.    Defendants dispute TNT's SOF 150. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference. TNT failed to depose the owners of Breaktime Bar & Grill to get admissible evidence regarding alleged removal of TNT's devices and the circumstances leading to a removal, if any, of TNT's devices. However, Tracy Head (the only person associated with a location TNT claims to have suffered losses allegedly caused by Torch Electronics, LLC TNT chose to depose during discovery) offered sworn deposition testimony that undercuts TNT's allegations of TNT device removal and the alleged reasons for such alleged removal, which is sufficient to call into question and dispute TNT's similar claims with respect to any other location. TNT's "Move Tickets" are unreliable, contain inadmissible hearsay, and cannot be used to support TNT's own Motion for Summary Judgment. This SOF highlights the unsettled factual issues and disputes that preclude granting TNT's Motion for Summary Judgment.

151.    Defendants dispute TNT's SOF 151. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

152.    Defendants dispute SOF 152. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

153.    Defendants dispute TNT's SOF 153. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

154.    Defendants dispute TNT's SOF 154. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

155.    Defendants dispute SOF 155. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

156.    Defendants dispute TNT's SOF 156. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

157.    Defendants dispute TNT's SOF 157. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

158.    Defendants dispute SOF 158. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P.

56(c)(2).

159.    Defendants dispute TNT's SOF 159. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

160.    Defendants dispute TNT's SOF 160. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

161.    Defendants dispute SOF 161. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

162.    Defendants dispute TNT's SOF 162. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

163.    Defendants dispute TNT's SOF 163. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

164.    Defendants dispute SOF 164. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

165.    Defendants dispute TNT's SOF 165. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is

incorporated here by reference.

166.    Defendants dispute TNT's SOF 166. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

167.    Defendants dispute SOF 167. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

168.    Defendants dispute TNT's SOF 168. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

169.    Defendants dispute TNT's SOF 169. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

170.    Defendants dispute SOF 170. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

171.    Defendants dispute TNT's SOF 171. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

172.    Defendants dispute TNT's SOF 172. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is

incorporated here by reference.

173.     Defendants dispute SOF 173. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

174.     Defendants dispute TNT's SOF 174. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

175.     Defendants dispute TNT's SOF 175. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

176.     Defendants dispute SOF 176. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

177.     Defendants dispute TNT's SOF 177. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

178.     Defendants dispute TNT's SOF 178. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

179.     Defendants dispute TNT's SOF 179. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is

incorporated here by reference.

180.     Defendants dispute TNT's SOF 180. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

181.     Defendants dispute SOF 181. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

182.     Defendants dispute TNT's SOF 182. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

183.     Defendants dispute TNT's SOF 183. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

184.     Defendants dispute SOF 184. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

185.     Defendants dispute TNT's SOF 185. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

186.     Defendants dispute TNT's SOF 186. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is

incorporated here by reference.

187.    Defendants dispute SOF 187. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

188.    Defendants dispute TNT's SOF 188. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

189.    Defendants dispute TNT's SOF 189. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

190.    Defendants dispute SOF 190. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

191.    Defendants dispute TNT's SOF 191. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

192.    Defendants dispute TNT's SOF 192. This SOF is unsupported and contradicted for the same reasons explained in Defendants' response and objection to TNT's SOF 146, which is incorporated here by reference.

193.    Defendants dispute SOF 193. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger "performed a collection of

Torch Device profits" in their personal capacity at this, or any other, location. Fed. R. Civ. P. 56(c)(2).

194. Defendants dispute SOF 194. TNT cites no evidence to support TNT's claims that Defendant Sondra Miltenberger or Defendant Steven Miltenberger perform collection of Torch devices in their personal capacity at this, or any other, location at any time. Fed. R. Civ. P. 56(c)(2).

195. Defendants dispute SOF 195. The Missouri Gaming Commission's July 3, 2019 letter, which related to TNT's own independently sourced no chance device – not a device owned and operated by Torch Electronics, LLC – did not state TNT's no chance device was an "illegal gambling device." In fact, the phrase "illegal gambling device" does not appear anywhere in the Missouri Gaming Commission's July 3, 2019 letter. Defendants further note Ed Grewach is no longer employed by the Missouri Gaming Commission, and since Mr. Grewach authored that letter the Missouri Gaming Commission has offered its expert witness Cody Hanavan, Electronic Device Specialist II, to Missouri prosecuting attorneys as the Missouri Gaming Commission's representative to provide contradictory testimony and opinions. (*See* TNT's Ex. 24, Deposition of Cody Hanavan, taken November 29, 2023, 174:1-175:22 (Q: "If you would look at Exhibit 4, which is Ed . . . Grewa[ch] . . . His letter that Mr. Finneran has – has talked to you about, do you have that?" A: "Yes." Q: "Okay. Were you aware of this letter before you offered testimony in front of the Court in the Henry County case in 2022?" A: "I was aware of it . . . I knew of its existence." A: "And Ed is not currently still employed with the Missouri Gaming Commission; correct?" A: "Correct." Q: "Was Ed – was Ed ever, as far as you know, employed by the Missouri Gaming Commission as an Electronic Device Specialist?" A: "No." Q: "Do you have any information that leads you to believe that Ed spent the same or similar 100 hours-plus that you have inspecting Torch devices, and how they work?" A: "Not to my knowledge." ), 37:6-39:18

(Q: "And it would be fair to say the Missouri Gaming Commission doesn't necessarily hold an opinion on how these Torch devices are classified; correct?" A: "I can't speak for the organization's opinions." Q: "So if you look at Exhibit 1, your prior testimony in the Hussain case in Henry County, at page 48, how – we could just start at the question around Line 40 – Mr. Shields, the – I believe prosecuting attorney for Henry County said – asked you: 'So the pre-reveal button does – does that change the Gaming Commission's opinion about whether or not those are gambling devices?' Do you see that?" A: "Yep." Q: "And your response was, at that time: '**The Gaming Commission doesn't necessarily hold an opinion on – on how these are classified**.' Did I read that correctly?" A: "**Yeah**." Q: "Now, is that – is that still your opinion – your personal opinion about the Gaming Commission's position?" A: "I mean, in reference to my statements that were made, I could say – I mean, yeah, I don't – I don't know that the Commission has an opinion. I can't say for sure." Q: " Well, and you were testifying in official capacity on behalf of, you know, the —the State here; correct?" A: "Correct." Q: "And at that time, you were willing to testify in open court that, quote, The Gaming Commission doesn't necessarily hold an opinion on – on how these are classified; correct?" A: "Correct." Q: "Were – were you given authority at that time to give statements about the Gaming Commission's position regarding their opinion on how Torch devices are classified?" A: "I could say that I wasn't put in a very good position there by the agency, so I think that the statement there is correct . . ." Q: "And there weren't any objections by anybody during that hearing in response to you giving that opinion – that you didn't have authority to give that opinion; correct?" A: "Correct.") (emphasis added)). Further, Cody Hanavan also testified to confirm (as does the Missouri Gaming Commission's enabling act) the Missouri Gaming Commission has no regulatory authority outside of licensed Missouri casinos and bingo halls. (*Id*. At 36:4-13). Cody Hanavan also confirmed that, unlike TNT, the Missouri Gaming

Commission does not call Torch-type devices "slot machines." (*Id*. At 36:15-25). Accordingly, Defendants dispute TNT's suggestion the Missouri Gaming Commission has an opinion regarding the legality of Torch Electronics, LLC's amusement devices.

196.     Defendants dispute SOF 196. Defendants agree Turntine/TNT purchased an independently sourced Banilla no chance device, but all other information contained in this SOF is disputed and unsupported by admissible evidence. For example, TNT cites to Friedman's improper and untimely "supplemental" rebuttal report as evidence of the specific version of TNT's own no chance device. However, as explained above, Defendants dispute the admissibility of any opinion Friedman attempted to offer in his improper and untimely December 15, 2023 rebuttal report. (*See* Doc. ## 65, 66, 102). Defendants incorporate here by reference Defendants' Memorandum in Support of Their Motion to Strike Untimely and Improper Expert Reports and For Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #66) and Defendants' Reply in Support of Their Motion to Strike Untimely and Improper Expert Reports and for Sanctions Pursuant to Fed. R. Civ. P. 37(c)(1) (Doc. #102). Friedman's opinions contained in his improper and untimely rebuttal report should be excluded and, thus, cannot support TNT's Motion for Summary Judgment. Fed. R. Civ. P. 56(c)(2).

## DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

Defendants provide the following Statement of Additional Material Facts which contradict Plaintiff's Motion for Partial Summary Judgment:

1.     On February 5, 2020, TNT's President, Jim Turntine, sent an email to Ed Grewach, who was at that time still General Counsel of the MGC, and admitted, "[I]n my career I succumbed to pressure from a minority of my customers who demanded illegal devices too . . . ." (Turntine

Dep. Ex. 42, Email from Jim Turntine to former Missouri Gaming Commission ("MGC") General Counsel Ed Grewach and others dated February 5, 2020, at p. 1 (Doc. #88-1)).

2.      Ed Grewach is the former General Counsel of the MGC. (December 29, 2023 Deposition of James Turntine ("Turntine Dec. 29, 2023 Dep.," 43:22-25 (Doc. 88-5)).

3.      Turntine testified that in his personal opinion coin pushers have "been illegal forever." (October 19, 2023 Corporate Representative Deposition of James Turntine ("Oct. 19th TNT 30(b)(6) Dep."), 48:16-22 (Doc. #88-2)).

4.      Turntine further testified he does not believe TNT "ever had a machine that was a coin pusher or we ordered one or bought one or anything else, operated one." (*Id*. at 48:23-25).

5.      Turntine testified that Tracy Head was the manager at the Midwest Petroleum Truck Stop who was TNT's contact regarding taking out games. (*Id*. at 44:6-45:25).

6.      Tracy Head was deposed on December 28, 2023. (Deposition of Tracy Head taken December 28, 2023 ("Head Dec. 28, 2023 Dep."), p. 1 (Doc. #88-6)).

7.      Head was asked about the removal of TNT's "gumball machines" from the truck stop. Head interjected: "It says gumball, but they're actually gumball **quarter pusher machines**." (*Id*. at 87:7-91:8 (emphasis added)).

8.      Turntine testified on October 19, 2023, and referred to these devices as "gumball dispensing machines that we bought." (*See* Oct. 19th TNT 30(b)(6) Dep., 49:48:23-50:13; *see more specifically id.* at 49:11-15 (Doc. #88-2)).

9.      Turntine went on to explain these "gumball dispensing machines" "[a]fter the gumball is dispensed, the quarter more or less, for free, was my view of it, could go down and land on a shelf. It didn't have a bulldozer, like a little toy bulldozer or anything, but it did have some movement to it, some arms, and it could sometimes push a quarter back off and it either – would

be a free prize to someone. And we did have that feature. Now, I don't call that machine a coin pusher because that's not all it did, it's not its sole purpose." (*Id*. at 49:20-50:5).

10.     Turntine also refers to the aforementioned "gumball dispensing machines" as "Silver Falls" machines. (*Id.* at 46:23-47:1).

11.     When asked whether it would be fair "to say you would agree that small modifications like adding a feature to the Silver Falls that dispenses a gumball at the same time that you're essentially playing a quarter pushing machine could change the nature of the machine in your opinion from something that might be illegal gambling to something – a device that is not illegal gambling," Turntine responded by saying, "I disagree thoroughly with the concept of the question. I think the exchange of a tangible good changes everything. It's not a modification to a coin pusher, as you sort of described it there if I heard what you were saying correctly." (*Id*. at 67:3-21).

12.     On October 19, 2023, when asked whether TNT had ever placed pull tab type machines in Missouri, Turntine also testified TNT "might have had a machine at one point . . . that were either horoscopes, you could buy a horoscope, I think. Or a phone card. Maybe it was phone cards, I don't remember . . . But I think at one time we did have a horoscope card and/or a phone card that you could buy, and then it had a pull tab, and you bought like a box of them and they would have some prize in them." (*Id*. at 136:17-137:17).

13.     On December 29, 2023, Turntine confirmed TNT did previously operate "horoscope machines," which he described as "a machine that vended a – a Horoscope, and you would – I think you looked at it, and there was a number you could call, if I remember, because I couldn't remember if it was a – phone card machine or a Horoscope, as I recall, when we Talked about it in October. But, obviously, our inventory shows that they were Horoscope cards. And then

they also had a free pull tab that you could pull, and there was a certain amount of – a certain number of prizes for every deck, so to speak, that was purchased from the manufacturer." (Deposition of James Turntine as Corporate Representative of TNT Amusements, Inc. taken December 29, 2023 ("Dec. 29th TNT 30(b)(6) Dep."), 582:1-21 (Doc. #88-7)).

14.     Turntine agreed the customer had to purchase the pull tab card from TNT's Horoscope device to receive the card. (*Id.* at 583:24-584:7).

15.     Turntine further agreed that "whether or not the ticket would also give the patron or the customer, if they bought the pull tab, a – a prize of some monetary amount, that was – that was just dictated by luck of the draw." (*Id*. at 584:20-585:9 (Q: And then whether – whether or not the ticket would also give the patron or the customer, if they bout the pull tab, a – a prize of some monetary amount, that was – that was just dictated by luck of the draw? A: Yeah. But – yeah. It was a – a pre - -- a stack, if you will, of pre-printed pull tabs. We don't – we don't know what they said. They were literally like a – a – a pull – a pull tab would be where there's 1,000. And in that 1,000, there's some, you know, $10 prizes and some $20 prizes or what have you. And there'd be a couple of hundred dollars in prizes in that, you know certain number of tickets. And that's how they work.")).

16.     When asked, "it looks like a lot of them [the horoscope devices] were sold kind of around March of 2019. Why – why is that[?]," Turntine testified that TNT made a decision that it "didn't want to have devices that were anything – for ex – the reason you're asking the question today. You know, they – they – they [in Turntine's opinion] were lawful from the standpoint of everything that we knew. We didn't have any issues with anyone upset about the machines necessarily. But as I was, in part, thinking that perhaps I could find a way to move my company forward in an industry that was beginning to change, I didn't want anything questionable. And so,

again, there are elements of these machines' novelty that were on – on the edge, I guess you could say, and – and I – and I will admit that I didn't want anything on the edge. And so I began to eliminate those from our inventory." (*Id*. at 585:10-586:4).

17.     In response to the next question of, "You thought those [horoscope devices] were potentially gambling devices," Turntine responded, in relevant part, "No. I won't say that. I – I think that people could – could make something out of it that I didn't want to have to deal with." (*Id*. at 586:5-9).

18.     During his deposition, Tracy Head testified that he has known Jim Turntine "probably [his] entire adult career. 20 plus years, probably, 30 years," and that he knows Jim Turntine's wife Marla Turntine well: "We went to school together. Our families are all good friends. We've known each other." (Head Dec. 28, 2023 Dep., 43:23-44:11 (Doc. #88-6)).

19.     During Head's deposition, he was presented with a document containing notes from TNT's Donna Havey, which said Head "spoke with me (Donna Havey) stating that he wanted us to move everything out of our game room because he was making it a quote poker room end quote. After we pulled our games, immediately Torch installed machines in what was our game room." (*Id*. at 62:18-64:1).

20.     During his deposition, however, Head said he "never called that room a poker room," so he did not "know where Donna's getting that" and did not "agree with calling that room a poker room," because he had "never called it a poker room," and "would have never called anything a poker room." Head reiterated that in reading the document he was only reading what Donna Havey had written down. (*Id*. at 65:1-18; 126:14-127:3).

21.     During his deposition, Head was asked about having a call with Havey on or around August 17, 2018, to discuss moving TNT's games. Asked, "And it's correct that the substance of

that phone call was to discuss moving out TNT games[?]," Head answered, "Yes. Yeah, I guess to make room for some additional games and also make room for their new games, for TNT's Play-Mor games. And I don't see the work orders for those." (*Id*. at 67:7-12).

22.     Head was shown additional documents that he testified he had never seen before and asked about the removal of a handful of TNT devices: a hunting video game, an amusement device called a "Megatouch Force," and a pinball machine; asked about the motivation to remove them, Head said "it was not a motivation. It's just that we – we needed more room for the other games because the . . . games that TNT had in that . . . room were not doing very well." (*Id*. at 69:3-12, 126:14-127:3).

23.     Head also testified that some games were moved to "allow[] [TNT] to switch out their games." (*Id*. at 71:1-10).

24.     When asked if he recalled a "number of TNT devices moved out in or around [August 2018?]," Head answered: "I don't know. Because I expanded the room of the . . . commons area up front and added more of their games to the commons area. So I don't have that. I don't see where [on TNT's internal document] they show where they've added the rest. But you say there's 22 pages. So I'm assuming I'll get to see that soon." (*Id*. at 73:6-11).

25.     Head also testified that some other TNT devices were in some cases simply moved to other parts of the same truck stop. When asked if this was "to make room for the Torch devices . . . because the Torch devices were making more money[?]," Head responded "Well, not necessarily making more money. . . . we wanted [the Torch devices] moved to the back of the commons are to make more room for the – all the travelers coming in. So we don't bog down anything in the front of the commons area. . . ." When pressed whether he "had asked . . . to take out that specific [TNT] game and put nothing in its place . . . ?," Head responded "Yeah. At that -

- at that particular spot. But, again, . . . they changed out their -- their games in the front of the commons area quite often." (*Id*. at 77:23-79:10).

26.     Head was asked "it's correct that at that time [in 2019], this was moved out, was a – and a Torch device was put into the location at Midwest, correct?", to which Head answered "No, not correct." (*Id*. at 87:24-88:2).

27.     Head also said that some of TNT's documents showed that TNT's devices were removed for "preventative maintenance." (*Id*. at 91:25-93:23 (Q: "And so these are -- this is a work order detail talking about moving out that gumball machine from Midwest, right? A. Yeah. It looks like they performed preventative maintenance to make sure it's ready for its next location. Q. Okay. And you see where it says from location to shop; is that right? A. To perform the preventative maintenance, yes.")).

28.     The Cuba, Missouri location of Midwest Petroleum was sold in September 2022. (*Id*. at 27:23-28:4).

29.     Head was curious about why TNT was "on the Torch Electronics things" with respect to the removal of the coin pusher machines because, he said, TNT devices "were replaced with Midwest owned games. . . . It had nothing to do with Torch, Midwest bought their [Midwest's] own games." (*Id*. at 127:10-128:5).

30.     Head said new owners of the Cuba, Missouri truck stop "took everything out" from the location, including TNT games and Torch devices. (*Id*. at 81:25-82:9 (Q: "So it's true that whenever TA Travel Center bought Midwest Petroleum, that they chose not to take on or continue to take on TNT as a vendor, right? A. Yeah. That would be totally -- that was totally up to TA. And they -- they took everything out. Q. But TA kept Torch devices in there, correct? A. No.")).

Dated:  February 2, 2024.

Respectfully submitted,

GRAVES GARRETT GREIM LLC,

By: _/s/ J. Aaron Craig_
    Todd P. Graves #41319 (MO)
    J. Aaron Craig #62041 (MO)
    1100 Main Street, Suite 2700
    Kansas City, MO 64105
    Phone: (816) 256-3181
    Fax: (816) 256-5958
    tgraves@gravesgarrett.com
    acraig@gravesgarrett.com

    **Attorneys for Defendants Torch Electronics, LLC, Steven Miltenberger, and Sondra Miltenberger**

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2024, I caused the foregoing to be filed on the Court's ECF electronic filing system, which automatically gave notice of this filing to all counsel of record.

 /s/ J. Aaron Craig

Attorneys for Defendants Torch
Electronics, LLC, Steven Miltenberger, and
Sondra Miltenberger
