## THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF MISSOURI
## EASTERN DISTRICT

| | | |
|---|---|---|
| TNT AMUSEMENTS, INC., d/b/a PLAY-MOR COIN-OP, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:23-cv-00330-JAR |
| TORCH ELECTRONICS, LLC, et al., | ) ) ) | |
| Defendants. | ) ) | |

### TNT AMUSEMENTS, INC.'S RESPONSE
### TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56 and Local Rule 4(E), Plaintiff TNT Amusements, Inc. ("TNT") hereby submits the following responses and objections to Defendants' Statement of Uncontroverted Material Facts (Doc. #88) ("SUMF").

### PRELIMINARY STATEMENT

The vast majority of the "facts" set forth in Defendants' SUMF are entirely immaterial to the bases upon which they seek summary judgment against TNT. *See* Defs.' Mem. in Supp. (Doc. #84). Defendants seek summary judgment on three grounds (each of which TNT disputes in its contemporaneously filed Memorandum in Opposition to Defendants' Motion for Summary Judgment): (1) TNT's alleged failure to identify actionable statements of fact to support its Lanham Act and Missouri common law claims, Mem. (Doc. #84) at 4–11; (2) TNT's alleged failure to identify a criminal enterprise to support its RICO claims, *id.* at 12; and (3) TNT's alleged failure to establish causation between Defendants' illegal conduct and their injuries, *id.* 13–14.

Defendants' SUMF includes only seven paragraphs that even arguably relate to the first asserted basis for relief, relating to the accuracy of Defendants' representations as to the operation

of the Torch Devices. *See infra* ¶¶ 63, 111–15. Defendants do not cite a single fact relating to their second asserted basis for relief. And Defendants cite, by the most generous possible count, eleven paragraphs relating to the third asserted basis for relief. *See infra* ¶¶ 123, 125–32, 134–35.

Nearly all of the remaining 100-plus paragraphs of Defendants' SUMF recite facts that are immaterial to Defendants' Motion for Summary Judgment (Doc. #83), and most are not even relevant to any fact of consequence in the case. Rather than cite any allegedly undisputed facts that bear upon this Court's consideration of the parties' respective summary judgment motions, Defendants spend dozens of paragraphs detailing TNT President Turntine's "moral" views on gambling and lay opinions about Missouri law (*see infra* ¶¶ 8–17, 40–41), their unsubstantiated claims that TNT has itself operated what Defendants consider to be illegal "coin pusher" or "horoscope" games (*see infra* ¶¶ 18–34), Mr. Turntine's lobbying efforts in opposition to illegal gambling (*see infra* ¶¶ 42–80), and Mr. Turntine's efforts to challenge Defendants' illegal conduct in litigation and to encourage prosecution of violators of Missouri's gambling laws (*see infra* ¶¶ 81–92). At best, these allegations are distractions from the questions that this Court must address in ruling on Defendants' Motion for Summary Judgment (Doc. #83), namely, whether the Defendants have falsely represented the Torch Devices to be legal "no chance" gaming devices, when they have in fact been operating an illegal gambling business.

Most revealingly, Defendants do not cite any facts to establish, as they have long represented to the public—and more recently, to this Court— that the Torch Devices do not involve any "element of chance" or any "future contingent event outside [the player's] control or influence." *See* Mo. Rev. Stat. § 572.010(3)–(5). Defendants' tacit acknowledgment that that those facts, at the very least, are in dispute is alone enough to preclude summary judgment in their favor. Indeed, as TNT has persuasively argued in its own Motion for Summary Judgment, there is no

genuine dispute: the Torch Devices *are* illegal gambling devices, which makes TNT, not Defendants, entitled to summary judgment with respect to Defendants' liability. *See* Mem. in Supp. of Pl.'s Mot. for Summ. J. (Doc. #82).

### OBJECTIONS AND RESPONSES TO DEFENDANTS' STATED "FACTS"

1.      Defendant Torch Electronics, LLC ("Torch") is a Missouri limited liability company. (*See* Complaint, Doc. #1 at ¶ 7, and Answer, Doc. #44 at ¶ 7).

**Response**: Admitted.

2.      Defendant Steven Miltenberger is an individual person and an owner of Torch. (*See* Complaint, Doc. #1 at ¶ 8, and Answer, Doc. #44 at ¶ 8).

**Response:** Admitted. In fact, Steven Miltenberger owns 51% of Torch, with the remaining 49% of Torch being owned by a trust for the benefit of Mr. Miltenberger's family. *See* Pl.'s SUMF (Doc. #95) ¶ 114 and supporting exhibits.

3.      Defendant Sondra Miltenberger is an individual person. (*See* Complaint, Doc. #1 at ¶ 9, and Answer, Doc. #44 at ¶ 9).

**Response**: Admitted.

4.      Torch's business includes placing devices ("Torch devices") at locations in the State of Missouri. (*See* Answer, Doc. #44 at ¶¶ 36, 38).

**Response:** Admitted. As used herein, TNT understands the term "Torch Devices" to include each of the following devices manufactured by Banilla Games, Inc., which Torch admits placing at locations within the state of Missouri: "No Chance Game Suite I Terminal version 2.3.0.23596," " No Chance Game Suite II Terminal version 3.2.0.19403," "No Chance Game Suite 3 Terminal version 3.4.0.1," "NCG Suite 4 Terminal version 4.2.1.31972," "NCG Deluxe

Terminal version 5.5.0.17," "NCG 5," "NCG Deluxe 1," "NCG Deluxe 2," "NCG Deluxe 3,"

"NCG Deluxe 4," "NCG Dual," "NCG Skyriser," and "NCG Hot Locks." *See* Pl.'s SUMF (Doc.

#95) ¶¶ 1–4 and supporting exhibits.

5.      TNT is a Missouri corporation with its principal place of business in West Sullivan, Missouri. (Complaint, Doc. #1 at ¶ 6).

**Response:** Admitted.

6.      TNT owns and operates machines like pool tables, toy cranes, and pinball machines in retail establishments throughout central Missouri. (Turntine Dep. Ex. 42, Email from Jim Turntine to former Missouri Gaming Commission ("MGC") General Counsel Ed Grewach and others dated February 5, 2020, a true and correct copy of which is attached as Exhibit A, p. 1).

**Response:** Admitted. TNT's business is not, however, limited to central Missouri but instead extends to locations across the state. *See* Pl.'s SUMF (Doc. #95) ¶¶ 31, 135–39  and supporting exhibits.

7.      James (Jim) Turntine ("Turntine") is the "President/CEO/chief cook" and owner of TNT. (Deposition of James Turntine as Corporate Representative of TNT Amusements, Inc. taken October 19, 2023 ("Oct. 19th TNT 30(b)(6) Dep."), a true and correct copy of excerpts of the same are attached as Exhibit B, 13:13-17).

**Response:** Admitted, although Mr. Turntine's "chief cook" remark was made in jest.

8.     As long as the device in question is a device that Turntine personally believes is legal to gamble on in the State of Missouri, Turntine is okay with that device replacing a device that, in his opinion, is illegal under Missouri's criminal gambling statutes. (Deposition of James Turntine as Corporate Representative of TNT Amusements, Inc. taken December 22, 2023 ("Dec. 22, 2023 TNT 30(b)(6) Dep."), a true and correct copy of excerpts of the same is attached as **Exhibit C**, 398:10-16).

**Objections**: The allegations contained in Paragraph 8 are not relevant to any fact of

consequence in the case, *see* Fed. R. Evid. 402, much less material to any basis upon which

Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation also includes a

lay opinion of Mr. Turntine's on a legal matter, which is not admissible. *See* Fed. R. Evid. 701,

702.

**Response:** TNT controverts this paragraph to the extent it imputes meaning to the

testimony of Mr. Turntine that is not supported by evidence. Specifically, Defendants rely on

excerpts of Mr. Turntine's deposition that discuss his advocacy on behalf of a trade association.

*See* **Ex. 63** hereto (Dec. 22, 2023 Dep. of J. Turntine) at 398:25–400:8.[1]

9.     On May 4, 2017, Turntine emailed Missouri Senator Dan Brown and former Missouri Senator Dave Schatz to say, in relevant part, "I was disappointed to hear that the Missouri Legislature has decided to reward Diamond Games and the Missouri Lottery's, gambling expansion, with full funding of $4,321,000 in the 2017 budget – even though both ignored or circumvented the Legislative process during their, possible, illegal gambling expansion last year." (Email Dated May 4, 2017 (Turntine Deposition Ex. 6), a true and correct copy of which is attached as **Exhibit D**, p. 1).

**Objections**: The allegations contained in Paragraph 9 are not relevant to any fact of

consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which

Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation also includes a

lay opinion of Mr. Turntine's on a legal matter, which is not admissible. *See* Fed. R. Evid. 701,

---

[1]     To avoid confusion, the exhibits attached hereto are numbered consecutively with the exhibits to TNT's SUMF (Doc. #95).

702. To the extent that the excerpted statement is offered to prove the truth of the matters asserted therein, it contains inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 9 accurately describes the contents of Ex. D to Defs.' SUMF (Doc. #88-4).

10.     In the first email (dated March 6, 2017) to the same May 4, 2017, email chain, Turntine represented to Senator Brown, "Unfortunately, the proliferation of the Missouri Lottery Diamond Games pull tab machine program, 267 machines, takes business opportunities from my company." (*Id*. at pp. 2-3).

**Objections**: The allegations contained in Paragraph 10 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 10 accurately describes the contents of Exhibit D to Defendants' SUMF (Doc. #88-4).

11.     In the same email to Senator Brown, Turntine went on to say he and others in his trade association "oppose Diamond Games and the Mo Lottery operating ANY machines in any type of location here in Missouri because doing so directly competes with our business." (*Id.*).

**Objections**: The allegations contained in Paragraph 11 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 10 accurately describes the contents of Ex. D to Defendants' SUMF (Doc. #88-4).

12.     Turntine testified on December 22, 2023, that he was against Diamond Games operating anywhere in the State of Missouri in 2017. (**Ex. C**, Dec. 22, 2023 TNT 30(b)(6) Dep., 402:8-14).

**Objections**: The allegations contained in Paragraph 12 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation also includes a lay opinion of Mr. Turntine's, which is not admissible. *See* Fed. R. Evid. 701. The allegation is also vague as to time frame.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 12 accurately recites testimony of Jim Turntine.

13.     Turntine further explained that at the same time in 2017, he "was fighting, if you will, elbowing [his] way into the conversation." (*Id.*).

**Objections**: The allegations contained in Paragraph 13 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation also includes a lay opinion of Mr. Turntine's, which is not admissible. *See* Fed. R. Evid. 701. The allegation is also vague as to what "conversation" Mr. Turntine's testimony refers to.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 13 accurately recites testimony of Jim Turntine.

14.     When further asked, "eventually, I think what you kind of foreshadowed was you did elbow your way . . . you did elbow your way into that competitive arena; right? And you got eventually a deal struck between yourself and other members of Mo AMOA to actually start working with Diamond Games; correct[?]," Turntine responded, "[e]ventually, we did come to terms with some opportunities that we could work together to try to expand the VPTs in a way that our members could potentially then make money and help to service and place those machines and maintain them." (*Id.* at 402:17-403:3).

**Objections**: The allegations contained in Paragraph 14 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 14 accurately recites testimony of Jim Turntine.

15.     When further asked, "[s]o then if you're saying that you went from the point of representing [to Senator Brown] that your own business was being impacted by Diamond Games' allegedly illegal activity to then saying, well, we've reached – we, being me and everybody else in MO AMOA, have reached an agreement that will benefit all of us, that by implication, you and your businesses would also benefit[?]," Turntine responded, "I think that it's unfair the way you're characterizing that. If you go back and see what I said, I was talking about me and my friends then and I'm talking about me and my friends now." (Id. at 405:1-12).

**Objections**: The allegations contained in Paragraph 15 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague as to what is referred to by "an agreement," "implication," and "friends."

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 15 accurately recites testimony of Jim Turntine.

16.     Turntine was next asked, "Right. You were all benefiting by the fact that you were able to, as you say, elbow your way into the conversation and get yourselves a seat at that table to play along with Diamond [Games]; right[?]," and Turntine answered, "Yeah. I – I – I think we've said that." (*Id.* at 405:13-20).

**Objections**: The allegations contained in Paragraph 16 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague as to what is referred to by "the conversation" and "a seat at the table."

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 16 accurately recites testimony of Jim Turntine.


17.     Turntine agreed this was an "if we can't beat 'em, let's join 'em type strategy." (*Id.* at 354:7-16).

**Objections**: The allegations contained in Paragraph 17 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague as to what is referred to by "the conversation" and "a seat at the table."

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 17 accurately recites testimony of Jim Turntine. As Mr. Turntine explained in his December 22, 2023 deposition, TNT's relationship with Diamond Games included the efforts of TNT and the trade association Missouri Amusement Machine Operators Association ("MO AMOA") to aid Diamond Games in fulfilling its contract with the Missouri State Lottery to provide legal, regulated pull-tab amusement devices in certain fraternal organizations throughout the state. *See* **Ex. 63** hereto (Dec. 22, 2023 Dep. of J. Turntine) at 320:4–13, 349:24–350:21.

18.     Ed Grewach is the former General Counsel of the MGC. (December 29, 2023 Deposition of James Turntine ("Turntine Dec. 29, 2023 Dep.," a true and correct copy of which is attached as **Exhibit E**, 43:22-25).

**Response**: Admitted.


19.     On February 5, 2020, Turntine sent an email to Ed Grewach, who was at that time still General Counsel of the MGC, and admitted, "[I]n my career I succumbed to pressure from a minority of my customers who demanded illegal devices too. . . ." (**Ex. A,** Turntine Dep. Ex. 42, at p. 1).

**Objections**: The allegations contained in Paragraph 19 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation also includes a lay opinion of Mr. Turntine's on a legal matter, which is not admissible. *See* Fed. R. Evid. 701, 702. TNT also objects to Defendants argumentative framing of the foregoing quotation as an "admission."

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 19 accurately recites testimony of Jim Turntine. The quotation, however, omits the second half of the sentence in question, which makes it clear that Mr. Turntine did not "admit" to Mr. Grewach that he had in fact operated any such illegal devices. The relevant portion of Defendants' Exhibit A reads, in context, as follows: "I succumbed to pressure from a minority of my customers who demanded illegal devices too, but I ***soon learned better*** and chose to never operate anything that ***could be*** illegal. Since the day of that decision I have lost business and gone backward in this business." Defs.' SUMF Ex. A (Doc. #88-1) at 1 (emphasis added).

20.     Turntine testified that in his personal opinion coin pushers have "been illegal forever." (**Ex. B**, Oct. 19th TNT 30(b)(6) Dep., 48:16-22).

**Objections**: The allegations contained in Paragraph 20 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation also includes a lay opinion of Mr. Turntine's on a legal matter, which is not admissible. *See* Fed. R. Evid. 701, 702. The allegation is also vague as to what is alleged to constitute a "coin pusher."

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 20 accurately recites testimony of Jim Turntine. The quotation, however, does not provide any clarity as to what Mr. Turntine understood by the term "coin pusher."

21.     Turntine further testified he does not believe TNT "ever had a machine that was a coin pusher or we ordered one or bought one or anything else, operated one." (*Id*. at 48:23-25).

**Objections**: The allegations contained in Paragraph 21 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation also includes a lay opinion of Mr. Turntine's on a legal matter, which is not admissible. *See* Fed. R. Evid. 701, 702. The allegation is also vague as to what is alleged to constitute a "coin pusher."

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 21 accurately recites testimony of Jim Turntine. The quotation, however, does not provide any clarity as to what Mr. Turntine understood by the phrase "coin pusher."

22.     Turntine testified that Tracy Head was the manager at the Midwest Petroleum Truck Stop who was TNT's contact regarding taking out games. (*Id*. at 44:6-45:25).

**Objections**: The allegation is vague as to time frame, as well as what is referred to by the phrase "taking out games."

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 22 accurately recites testimony of Jim Turntine.

23.     Tracy Head was deposed on December 28, 2023. (Deposition of Tracy Head taken December 28, 2023, a true and correct copy of excerpts of the same are attached as **Exhibit F** ("Head Dec. 28, 2023 Dep."), p. 1).

**Response**: Admitted.

24.     Head was asked about the removal of TNT's "gumball machines" from the truck stop. Head interjected: "It says gumball, but they're actually gumball **quarter pusher machines**." (*Id*. at 87:7-91:8 (emphasis added)).

**Objections**: The allegations contained in Paragraph 24 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation is vague as to time frame, as well as what is referred to by the phrase "gumball quarter pusher machines." TNT also objects to the extent that the allegation is intended to imply that the gumball machines placed by TNT at the Midwest Petroleum store were illegal gambling devices. As Mr. Turntine testified, those machines dispensed gumballs to patrons for a quarter a piece. *See* **Ex. 64** hereto (Dec. 29, 2023 Dep. of J. Turntine) at 577:6–578:21; *see* Mo. Rev. Stat. § 572.010 ("Gambling does not include bona fide business transactions valid under the law of contracts . . . ."). To the extent that Defendants seek to portray Mr. Head's testimony as a legal opinion as to the legality of such machines, Mr. Head lacks the expertise to render such an opinion. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 24 accurately recites testimony of Tracy Head.

25.     Turntine testified on October 19, 2023, and referred to these devices as "gumball dispensing machines that we bought." (*See* **Ex. B**, Oct. 19th TNT 30(b)(6) Dep., 49:48:23-50:13; *see more specifically id.* at 49:11-15).

**Objections**: The allegations contained in Paragraph 25 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague as to time frame, as well as what is referred to by the phrase "gumball dispensing machines."

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 25 accurately recites testimony of Jim Turntine. It is disputed whether the devices described by Mr. Head are the same devices described in Mr. Turntine's testimony, and Defendants have not produced evidence to substantiate any such allegation.

26.     Turntine went on to explain these "gumball dispensing machines" "[a]fter the gumball is dispensed, the quarter more or less, for free, was my view of it, could go down and land on a shelf. It didn't have a bulldozer, like a little toy bulldozer or anything, but it did have some movement to it, some arms, and it could sometimes push a quarter back off and it either – would be a free prize to someone. And we did have that feature. Now, I don't call that machine a coin pusher because that's not all it did, it's not its sole purpose." (*Id.* at 49:20-50:5).

**Objections**: The allegations contained in Paragraph 26 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague as to time frame and location, as well as what is referred to by the phrase "gumball dispensing machines." TNT also objects to the extent that the allegation is intended to imply that the gumball machines placed by TNT at the Midwest Petroleum store were illegal gambling devices. As Mr.

Turntine testified, those machines dispensed gumballs to patrons for a quarter a piece. *See* **Ex. 64** hereto (Dec. 29, 2023 Dep. of J. Turntine) at 577:6–578:21; *see* Mo. Rev. Stat. § 572.010 ("Gambling does not include bona fide business transactions valid under the law of contracts . . . ."). To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 26 accurately recites testimony of Jim Turntine. It is disputed whether the devices described by Mr. Head are the same devices described in Mr. Turntine's testimony, and Defendants have not produced evidence to substantiate any such allegation.

27.     Turntine also refers to the aforementioned "gumball dispensing machines" as "Silver Falls" machines. (*Id.* at 46:23-47:1).

**Objections**: The allegations contained in Paragraph 27 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague as to time frame and location, as well as what is referred to by the phrase "gumball dispensing machines." TNT also objects to the extent that the allegation is intended to imply that the gumball machines placed by TNT at the Midwest Petroleum store were illegal gambling devices. As Mr. Turntine testified, those machines dispensed gumballs to patrons for a quarter a piece. *See* **Ex. 64** hereto (Dec. 29, 2023 Dep. of J. Turntine) at 577:6–578:21; *see* Mo. Rev. Stat. § 572.010 ("Gambling does not include bona fide business transactions valid under the law of contracts . . . ."). To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion

as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: TNT denies the allegation, as the cited deposition testimony does not support the allegation.

28.     When asked whether it would be fair "to say you would agree that small modifications like adding a feature to the Silver Falls that dispenses a gumball at the same time that you're essentially playing a quarter pushing machine could change the nature of the machine in your opinion from something that might be illegal gambling to something – a device that is not illegal gambling," Turntine responded by saying, "I disagree thoroughly with the concept of the question. I think the exchange of a tangible good changes everything. It's not a modification to a coin pusher, as you sort of described it there if I heard what you were saying correctly." (*Id.* at 67:3-21).

**Objections**: The allegations contained in Paragraph 28 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation is also vague as to time frame, as well as what is referred to by the phrase "gumball dispensing machines." TNT also objects to the extent that the allegation is intended to imply that the gumball machines placed by TNT at the Midwest Petroleum store were illegal gambling devices. As Mr. Turntine testified, those machines dispensed gumballs to patrons for a quarter a piece. *See* **Ex. 64** hereto (Dec. 29, 2023 Dep. of J. Turntine) at 577:6–578:21; *see* Mo. Rev. Stat. § 572.010 ("Gambling does not include bona fide business transactions valid under the law of contracts . . . ."). To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 28 accurately recites testimony of Jim Turntine. At best, the foregoing testimony

establishes a dispute of fact as to whether such machines are illegal gambling devices, which would

not entitle Defendants to summary judgment even if such facts were material.


29.     On October 19, 2023, when asked whether TNT had ever placed pull tab type machines in Missouri, Turntine also testified TNT "might have had a machine at one point . . . that were either horoscopes, you could buy a horoscope, I think. Or a phone card. Maybe it was phone cards, I don't remember . . . But I think at one time we did have a horoscope card and/or a phone card that you could buy, and then it had a pull tab, and you bought like a box of them and they would have some prize in them." (*Id*. at 136:17-137:17).

**Objections**: The allegations contained in Paragraph 29 are not relevant to any fact of

consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which

Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague

as to time frame and location.  TNT also objects to the extent that the allegation is intended to

imply that the gumball machines placed by TNT at the Midwest Petroleum store were illegal

gambling devices. As Mr. Turntine testified, those machines dispensed gumballs to patrons for a

quarter a piece. *See* **Ex. 64** hereto (Dec. 29, 2023 Dep. of J. Turntine) at 577:6–578:21; *see* Mo.

Rev. Stat. § 572.010 ("Gambling does not include bona fide business transactions valid under the

law of contracts . . . ."). To the extent that Defendants seek to portray Mr. Turntine's testimony as

a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is

not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that

Paragraph 29 accurately recites testimony of Jim Turntine. At best, the foregoing testimony

establishes a dispute of fact as to whether such machines are illegal gambling devices, which would

not entitle Defendants to summary judgment, even if such facts were material (which they are not).

30.     On December 29, 2023, Turntine confirmed TNT did previously operate "horoscope machines," which he described as "a machine that vended a – a Horoscope, and you would – I think you looked at it, and there was a number you could call, if I remember, because I couldn't remember if it was a – phone card machine or a Horoscope, as I recall, when we Talked about it in October. But, obviously, our inventory shows that they were Horoscope cards. And then they also had a free pull tab that you could pull, and there was a certain amount of – a certain number of prizes for every deck, so to speak, that was purchased from the manufacturer." (Deposition of James Turntine as Corporate Representative of TNT Amusements, Inc. taken December 29, 2023 ("Dec. 29th TNT 30(b)(6) Dep."), a true and correct copy of excerpts of the same are attached as **Exhibit G**, 582:1-21).

**Objections**: The allegations contained in Paragraph 30 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague as to time frame and location. TNT also objects to the extent that the allegation is intended to imply any "phone card" or "horoscope" machines described in the allegation store were illegal gambling devices. As Mr. Turntine testified, those machines dispensed horoscopes or phone cards to patrons in exchange for consideration. Defs.' SUMF Ex. G (Doc. #88-7) at 584:2–14; *see* Mo. Rev. Stat. § 572.010 ("Gambling does not include bona fide business transactions valid under the law of contracts . . . ."). To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 30 accurately recites testimony of Jim Turntine. At best, the foregoing testimony establishes a dispute of fact as to whether such machines are illegal gambling devices, which would not entitle Defendants to summary judgment, even if such facts were material (which they are not).

31.     Turntine agreed the customer had to purchase the pull tab card from TNT's Horoscope device to receive the card. (*Id.* at 583:24-584:7).

**Objections**: The allegations contained in Paragraph 31 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague as to time frame and location. TNT also objects to the extent that the allegation is intended to imply any "horoscope" machines described in the allegation store were illegal gambling devices. As Mr. Turntine testified, those machines dispensed horoscopes or phone cards to patrons in exchange for consideration. Defs.' SUMF Ex. G (Doc. #88-7) at 584:2–14; *see* Mo. Rev. Stat. § 572.010 ("Gambling does not include bona fide business transactions valid under the law of contracts . . . ."). To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 31 accurately recites testimony of Jim Turntine. At best, the foregoing testimony establishes a dispute of fact as to whether such machines are illegal gambling devices, which would not entitle Defendants to summary judgment, even if such facts were material (which they are not).

32.     Turntine further agreed that "whether or not the ticket would also give the patron or the customer, if they bought the pull tab, a – a prize of some monetary amount, that was – that was just dictated by luck of the draw." (*Id*. at 584:20-585:9 (Q: And then whether – whether or not the ticket would also give the patron or the customer, if they bout the pull tab, a – a prize of some monetary amount, that was – that was just dictated by luck of the draw? A: Yeah. But – yeah. It was a – a pre - -- a stack, if you will, of pre-printed pull tabs. We don't – we don't know what they said. They were literally like a – a – a pull – a pull tab would be where there's 1,000. And in that 1,000, there's some, you know, $10 prizes and some $20 prizes or what have you. And there'd be a couple of hundred dollars in prizes in that, you know certain number of tickets. And that's how they work.")).

**Objections**: The allegations contained in Paragraph 32 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague as to time frame and location. TNT also objects to the extent that the allegation is intended to imply any "phone card" or "horoscope" machines described in the allegation store were illegal gambling devices. As Mr. Turntine testified, those machines dispensed horoscopes or phone cards to patrons in exchange for consideration. Defs.' SUMF Ex. G (Doc. #88-7) at 584:2–14; *see* Mo. Rev. Stat. § 572.010 ("Gambling does not include bona fide business transactions valid under the law of contracts . . . ."). To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 32 accurately recites testimony of Jim Turntine. At best, the foregoing testimony establishes a dispute of fact as to whether such machines are illegal gambling devices, which would not entitle Defendants to summary judgment, even if such facts were material (which they are not).

33.     When asked, "it looks like a lot of them [the horoscope devices] were sold kind of around March of 2019. Why – why is that[?]," Turntine testified that TNT made a decision that it "didn't want to have devices that were anything – for ex – the reason you're asking the question today. You know, they – they – they [in Turntine's opinion] were lawful from the standpoint of everything that we knew. We didn't have any issues with anyone upset about the machines necessarily. But as I was, in part, thinking that perhaps I could find a way to move my company forward in an industry that was beginning to change, I didn't want anything questionable. And so, again, there are elements of these machines' novelty that were on – on the edge, I guess you could say, and – and I – and I will admit that I didn't want anything on the edge. And so I began to eliminate those from our inventory." (*Id.* at 585:10-586:4).

**Objections**: The allegations contained in Paragraph 33 are not relevant to any fact of

consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which

Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague

as to time frame and location. TNT also objects to the extent that the allegation is intended to imply

any "horoscope" machines described in the allegation store were illegal gambling devices. As Mr.

Turntine testified, those machines dispensed horoscopes or phone cards to patrons in exchange for

consideration. Defs.' SUMF Ex. G (Doc. #88-7) at 584:2–14; *see* Mo. Rev. Stat. § 572.010

("Gambling does not include bona fide business transactions valid under the law of

contracts . . . ."). To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal

opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not

admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that

Paragraph 33 accurately recites testimony of Jim Turntine. At best, the foregoing testimony

establishes a dispute of fact as to whether such machines are illegal gambling devices, which would

not entitle Defendants to summary judgment, even if such facts were material (which they are not).

34.     In response to the next question of, "You thought those [horoscope devices] were potentially gambling devices," Turntine responded, in relevant part, "No. I won't say that. I – I think that people could – could make something out of it that I didn't want to have to deal with." (*Id*. at 586:5-9).

**Objections**: The allegations contained in Paragraph 34 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegations are also vague as to time frame and location. TNT also objects to the extent that the allegation is intended to imply any "horoscope" machines described in the allegation store were illegal gambling devices. As Mr. Turntine testified, those machines dispensed horoscopes or phone cards to patrons in exchange for consideration. Defs.' SUMF Ex. G (Doc. #88-7) at 584:2–14; *see* Mo. Rev. Stat. § 572.010 ("Gambling does not include bona fide business transactions valid under the law of contracts . . . ."). To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 34 accurately recites testimony of Jim Turntine. At best, the foregoing testimony establishes a dispute of fact as to whether such machines are illegal gambling devices, which would not entitle Defendants to summary judgment, even if such facts were material (which they are not).

35.     The legality or illegality of Torch devices vis-à-vis whether or not they are gambling devices or slot machines under Missouri law is a question that has never been answered by any court applying Missouri law in the State of Missouri. (**Ex. B**, Oct. 19th TNT 30(b)(6) Dep., 189:21-190:6).

**Objections**: To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: TNT denies the allegation of Paragraph 35. Multiple courts in the state of Missouri have found materially identical devices to be illegal gambling devices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 67–69; *see infra* ¶¶ 140–44.

36.     However, it is Turntine's personal opinion, as the president of TNT, that Torch devices should be deemed illegal gambling devices or slot machines by the Eastern District Court of Missouri. (*Id.* at 190:12-21 (Q: But it's your personal opinion, as the president of TNT, that Torch's devices should be deemed illegal gambling devices or slot machines by the Eastern District Court of Missouri? A. Is it my opinion they should be? Is that what you're saying? I'm Sorry. Q: Yes. A. My opinion is yes. When they are adjudicated, they will be. And so yes, they should be.)).

**Objections**: The allegations contained in Paragraph 36 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 36 accurately recites testimony of Jim Turntine.

37.    When asked whether he would agree it would be better to have a Missouri state court going through law enforcement channels make the decision regarding the legality of Torch devices, Turntine answered, "I would not agree" and further explained he would not agree because of "[c]oncerns about, among other things, potential corruption." (*Id.* at 190:22-191:8).

**Objections**: The allegations contained in Paragraph 37 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 37 accurately recites testimony of Jim Turntine.

38.    When Turntine was asked, "So it's your opinion that all the counties where Torch has devices in the State of Missouri, that all the prosecutors, state court judges, the highway patrol tasked with enforcing law, that they – there is somehow corruption in that system that would prevent those law enforcement and legal authorities to make a decision on the legality of Torch devices[?]," Turntine answered, "You use a really broad brush. I do not agree with what you said. I'm not saying they're *all* corrupt." (*Id.* at 191:9-22 (emphasis added)).

**Objections**: The allegations contained in Paragraph 38 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702. TNT also objects to Defendants' added emphasis to Mr. Turntine's testimony to the extent it is it intended to alter the meaning of that statement.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 38 accurately recites testimony of Jim Turntine.

39.     When Turntine was asked whether he could provide any specific instances or examples of corruption specific to Torch devices and law enforcement or judicial authorities in the State of Missouri, Turntine answered, "No, just suspicions. That's all." (*Id.* at 191:23-192:2).

**Objections**: The allegations contained in Paragraph 39 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702. TNT also objects to Defendants' added emphasis to Mr. Turntine's testimony to the extent it is it intended to alter the meaning of that statement.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 39 accurately recites testimony of Jim Turntine.


40.     In his February 5, 2020, email to Ed Grewach, then still General Counsel of the MGC, and others, Turntine said, "My sincere desire is to see an outcome that ensures every type of illegal device we encounter on a daily basis is included and clarified illegal within this new law – to avoid any waste of time and energy. . . . [S]urely we can do the hard work and try to find a real solution to kill illegal gambling . . . **leaving any ambiguity in the law** will continue to cause millions of dollars to be stolen year-after-year from the Education Fund in Missouri and will continue to force me to compete with criminals." (**Ex. A,** Turntine Dep. Ex. 42, p. 1 (emphasis added)).

**Objections**: The allegations contained in Paragraph 40 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702. TNT also objects to Defendants' added emphasis to Mr. Turntine's statements to the extent it is it intended to alter the meaning of those statements.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 40 accurately excerpts the contents of Ex. A to Defendants' SUMF (Doc. #88-1). In context, however, and as Mr. Turntine explained in his December 29, 2023 deposition, the statement refers to any potential ambiguity in the law in general, not to an ambiguity in any preexisting Missouri statute. *See* Defs.' SUMF Ex. A (Doc. #88-1) at 1 ("[L]eaving any ambiguity in the law will continue to cause millions of dollars to be stolen year-after-year from the Education Fund in Missouri and will continue to force me to compete with criminals"); *see also* **Ex. 65** hereto (Dec. 29, 2023 Dep. of J. Turntine) at 51:7–23 ("A. I honestly think that my collective messaging, if everything that I've written or said was able to be processed at one time, I didn't  feel like we needed new law. But if there's going to be new law, I had feelings about what needed to be done and said if I can answer your question fairly that way. . . . Q.   So wouldn't it be fair to say that if there were no at that time ambiguity in the law in the State of Missouri regarding gambling, then in your opinion, millions of dollars would not have been stolen from the education fund in Missouri? . . . A.  No.").

41.      During his deposition, discussing the email above, Turntine agreed he was saying there was a need "to fix ambiguities in the law to make sure that millions of dollars are not stolen from the education fund in Missouri." (**Ex. E**, Turntine Dec. 29, 2023 Dep., 51:24-52:3).

**Objections**: The allegations contained in Paragraph 41 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that Defendants seek to portray Mr. Turntine's testimony as a legal opinion as to the legality of such devices, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 41 accurately excerpts the contents of Ex. A to Defendants' SUMF (Doc. #88-1). In context, however, and as Mr. Turntine explained in his December 29, 2023 deposition, the statement refers to any potential ambiguity in the law in general, not to an ambiguity in any preexisting Missouri statute. *See* Defs.' SUMF Ex. A (Doc. #88-1) at 1 ("[L]eaving any ambiguity in the law will continue to cause millions of dollars to be stolen year-after-year from the Education Fund in Missouri and will continue to force me to compete with criminals"); *see also* **Ex. 65** hereto (Dec. 29, 2023 Dep. of J. Turntine) at 51:7–23.

42.     Turntine has known former Missouri Senator Dave Schatz for "pushing 40 years." (**Ex. B**, Oct. 19th TNT 30(b)(6) Dep., 158:23-159:5).

**Objections**: The allegations contained in Paragraph 42 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:**  Subject to and without waiving the foregoing objections, admitted.

43.     Turntine testified Dave Schatz "is an extended family member." (*Id.*).

**Objections**: The allegations contained in Paragraph 43 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:**  Subject to and without waiving the foregoing objections, admitted.

44.     Turntine considers Dave Schatz a good friend. (*Id.*).

**Objections**: The allegations contained in Paragraph 44 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:**  Subject to and without waiving the foregoing objections, admitted.


45.     When asked, "At that point in time in July 1 or 2 or 2019, had you expressed to Dave Schatz that you believed the no chance devices similar to Torch devices are illegal gambling devices[?]," Turntine responded, in part, "I don't remember when we came to that conclusion. I think he might have said it to me." (*Id.*).

**Objections**: The allegations contained in Paragraph 45 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:**  Subject to and without waiving the foregoing objections, TNT admits that Paragraph 45 accurately recites testimony of Jim Turntine.


46.     When asked, "And at one point you said that you believed Senator Schatz was close to this issue. Would it be fair to say you – one of [the] reasons why he was close to it was because of his friendship with you[?]," Turntine responded, "Yeah, I would – I would hope to say that but, it is a problem for me, but I will tell you this. He told me – told me – he answered that question various times over our relationship the last several years. Dave is a very devout Christian. He is a member of the Baptist church. Literally, this is what he told me, and morally, he knows right and wrong and he wants to do the right thing and he believes that, whatever the outcome politically for him, that he wanted to get that problem under control." (*Id.* at 162:17-163:10).

**Objections**: The allegations contained in Paragraph 46 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 46 accurately recites testimony of Jim Turntine.

47.     When asked in a follow-up question, "Is that, as you put it, problem, is that something that you had asked him to look into[?]," Turntine responded, "So I hesitate because the short answer is probably yes." (*Id.* at 163:11-15).

**Objections**: The allegations contained in Paragraph 47 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 47 accurately recites testimony of Jim Turntine. To the extent Defendants attempt to characterize the quotations in Paragraph 47 as a pointed attack by TNT against Torch, that is controverted by the testimony immediately following that quotation, testimony Defendants omit from Paragraph 47. In context, Mr. Turntine explained that he and Senator Schatz spoke about illegal gambling being a problem in Missouri "well before" Mr. Turntine "even [knew] about Torch." Pl.'s SUMF Ex. 62 (Doc. #96-14) (October 19, 2023 Dep. of J. Turntine) at 164:6–25. That occurred as early as 2011, four years before Torch entered the Missouri market, and "was not aimed at any one thing. It was just the problem of gambling, illegal gambling in the industry in Missouri." Pl.'s SUMF Ex. 62 (Doc. #96-14) (October 19, 2023 Dep. of J. Turntine) at 164:19–25.

48.     Turntine has confirmed that TNT and his trade association, MO AMO, "used lobbyists to try to, to the extent that [they] could, influence any lawmaking that would impact [their] industry from 2014 to the present." (**Ex. C**, Dec. 22, 2023 TNT 30(b)(6) Dep., 426:20-25).

**Objections**: The allegations contained in Paragraph 48 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 48 accurately recites testimony of Jim Turntine.

49.     Turntine, in conjunction with his political lobbyist and members of his trade association, worked closely with then current Senator Dave Schatz to help propose new language to amend RSMo. § 572.010. (*See* Email Chain Dated March 29, 2019 (Turntine Ex. 15), a true and correct copy of which is attached as **Exhibit H**; *see also* **Ex. C**, Dec. 22, 2023 TNT 30(b)(6) Dep., 459:5-474:6)

**Objections**: The allegations contained in Paragraph 49 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT denies that the cited documents establish the proposition that Mr. Turntine "worked closely" with Senator Schatz in the manner described in Paragraph 49.

50.     Turntine even joked to others that Turntine was proposing new statutory language as a "fix for 'Dave's law' . . . haha." (**Ex. H**, Email Chain Dated March 29, 2019 (Turntine Ex. 15), p. 2).

**Objections**: The allegations contained in Paragraph 50 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that the cited allegation constitutes a legal opinion, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that the allegations of Paragraph 50 accurately recites an excerpt from Ex. H to Defendants' SUMF (Doc. #88-8).

51.     Schatz was working on, Turntine proposed new language, which was emailed to Dave Schatz and his aide, that Turntine said he believed "would allow Dave and Busters, Worlds of Fun, Six Flags, FECs, Bowling redemptions centers and Chuck E-Cheese to continue their operations, as is, for prizes, **but would stop Torch** and all other Black market devices in bars and all other types of locations. Just need to enforce the law as is from there . . . . . . . . . . ." (*Id.*).

**Objections**: The allegations contained in Paragraph 51 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that the cited allegation constitutes a legal opinion, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 51 accurately recites an excerpt from Ex. H to Defendants' SUMF (Doc. #88-8).

52.     Turntine testified "Dave's law" was never passed into Missouri law. (**Ex. C**, Dec. 22, 2023 TNT 30(b)(6) Dep., 481:10-12).

**Objections**: The allegations contained in Paragraph 52 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 52 accurately recites testimony of Jim Turntine.

53.     On January 18, 2020, in an email chain where Turntine discussed with his lobbyist and trade association members different proposed bills aimed at amending Missouri's gambling laws, Turntine stated, "I[n] reading the bill you sent with your weekly update, I do not see our language.... What happened to the language we helped write last year??? . . . I am gravely concerned and beyond upset if this has been dropped! Please let me know what I am missing and what we can do to **ensure we actually get language to kill all of the illegal machines.... Not just Torch's**." (Email Chain Dated January 19, 2019 (Turntine Ex. 40), a true and correct copy of which is attached as **Exhibit I**, pp. 2-3) (emphasis added).

**Objections**: The allegations contained in Paragraph 53 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that the cited allegation constitutes a legal opinion, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 53 accurately recites an excerpt from Ex. I to Defendants' SUMF (Doc. #88-9).

54.     In that same email chain, on January 19, 2020, Turntine sent another email, saying, "[I]n light of this discovery of the failure of GC to address the illegal gambling issue in a broad and proper manner . . . I had the following revelations that I feel should be added to the language of last year to succeed in accomplishing our real goals for this change in law." (*Id.* at p. 1).

**Objections**: The allegations contained in Paragraph 54 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that the cited allegation constitutes a legal opinion, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 54 accurately recites an excerpt from Ex. I to Defendants' SUMF (Doc. #88-9).

55.     In that email, Turntine said: "Please see the highlighted words in yellow below. I am not strong on the use of proper punctuations and need help in placing proper punctuation so as to ensure the words when read together do not conflict with each other or the obvious intent of the words. Let me know your thoughts. Please." (*Id*. at pp. 1-2) (alterations omitted).

**Objections**: The allegations contained in Paragraph 55 are not relevant to any fact of

consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which

Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that the cited

allegation constitutes a legal opinion, Mr. Turntine's lay opinion on a legal matter is not

admissible. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that

Paragraph 55 accurately recites an excerpt from Ex. I to Defendants' SUMF (Doc. #88-9).


56.     After including additional proposed statutory language following the defined term "Gambling device," Turntine wrote: "I truly believe this language will kill the Missouri e-raffle machines, the Torch machines, coin pushers and all of the gray machines too; as long as  someone will prosecute! Given our current plight of apathy and weakness in prosecuting, as I recall there is other language in this bill to cause the AG to get involved like never before.... so maybe that will cover this part of the problems. But, if there is an idea to make it more certain for prosecutions to happen, at a level other than a county level, we should certainly consider urging that idea/language to be added too." (*Id*. at p. 2) (emphasis in original).

**Objections**: The allegations contained in Paragraph 56 are not relevant to any fact of

consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which

Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that the cited

allegation constitutes a legal opinion, Mr. Turntine's lay opinion on a legal matter is not

admissible. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that

Paragraph 56 accurately recites an excerpt from Ex. I to Defendants' SUMF (Doc. #88-9).

57.     In his deposition, Turntine agreed part of why he wanted new legislation passed was to "kill Torch's machines," and "every other company's machines that [he] believed were illegal[.]" (**Ex. E**, Turntine Dec. 29, 2023 Dep., 40:19-41:2).

**Objections**: The allegations contained in Paragraph 57 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that the cited allegation constitutes a legal opinion, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 57 accurately recites testimony of Jim Turntine.

58.     In his testimony, Turntine also noted with respect to the January 2020 email that he "wanted to see Torch's machines dealt with . . . if there was going to be new law, then make sure that problem gets solved too." (*Id.* at 39:19-24).

**Objections**: The allegations contained in Paragraph 58 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. To the extent that the cited allegation constitutes a legal opinion, Mr. Turntine's lay opinion on a legal matter is not admissible. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 58 accurately recites testimony of Jim Turntine. In context, however, and as Mr. Turntine explained in his December 29, 2023 deposition, the statement refers to any potential ambiguity in the law in general, not to an ambiguity in any preexisting Missouri statute. *See* Defs.' SUMF Ex. A (Doc. #88-1) at 1 ("[L]eaving any ambiguity in the law will continue to cause millions of dollars to be stolen year-after-year from the Education Fund in Missouri and will

continue to force me to compete with criminals"); *see also* **Ex. 65** hereto (Dec. 29, 2023 Dep. of

J. Turntine) at 51:7–23 ("A. I honestly think that my collective messaging, if everything that I've

written or said was able to be processed at one time, I didn't  feel like we needed new law. But if

there's going to be new law, I had feelings about what needed to be done and said if I can answer

your question fairly that way. . . . Q.  So wouldn't it be fair to say that if there were no at that time

ambiguity in the law in the State of Missouri regarding gambling, then in your opinion, millions

of dollars would not have been stolen from the education fund in Missouri? . . . A.  No.").

59.     As another example of proposed legislation to amend Missouri's criminal gambling statutes, Senator Hegeman of the Missouri Senate introduced Senate Bill No. 632 during the second regular session of the 101st General Assembly, last action taken on January 13, 2022 (hearing), the proposed amendments to Missouri's statutes related to illegal gambling. (*See* "Current Bill Summary" for SB 632, a true and correct copy of which is attached as **Exhibit J**, and publicly available at the Missouri Senates [sic] website: https://www.senate.mo.gov/22info/ BTS_Web/Bill.aspx?SessionType=R&BillID=71259642).

**Objections**: The allegations contained in Paragraph 59 are not relevant to any fact of

consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which

Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, admitted.

60.     Among other things, Senate Bill No. 632 proposed amendments to "the definitions of 'gambling device' and 'slot machine' for the purposes of provisions of law relating to the prosecution of illegal gambling. (Section 572.010)." (**Ex. J** ("Current Bill Summary" for SB 632)).

**Objections**: The allegations contained in Paragraph 60 are not relevant to any fact of

consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which

Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, admitted.

61.     Among other things, Senate Bill No. 632 proposed to expand the scope of the MGC's and State Lottery Commission's regulatory authority by amending the term "gambling device" as used in RSMo. § 572.010(5) to include any device "**not approved by the Missouri gaming commission or state lottery commission under the provisions of chapter 313 and that**" meets certain criteria. (Senate Bill No. 632, a true and correct copy of which is attached as **Exhibit K** (Friedman Ex. 8), p. 20, lines 52-55 (emphasis in original to denote new proposed language)).

**Objections**: The allegations contained in Paragraph 61 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. TNT objects to Defendants' citation to the deposition of Mr. Friedman to the extent it implies that Mr. Friedman has the personal knowledge or expert qualifications necessary to offer a lay opinion, legal opinion, or otherwise comment on the legislative process of Missouri's House of Representatives. Mr. Friedman is a Harvard-educated computer scientist and mathematician who is retained in this litigation to offer his opinion on subjects related to his expertise. Additionally, in that same line of questioning, Mr. Friedman informed Mr. Craig that he was unable to comment on Mr. Craig's questions related to Missouri's lawmaking process, and so his responses were most often limited to whether Mr. Craig's recitation of the language of Exhibit K accurately reflected what was written by its author.

**Response:** Subject to and without waiving the foregoing objections, admitted.

62.     Senate Bill No. 632 also proposed amending the definition of "gambling device" in RSMo. § 572.010(5) to include new language making any device not approved by the MGC or State Lottery Commission that is used or usable in the playing phases of any gambling activity "**regardless of whether the machine or device or system or network of devices includes a preview of the outcome or whether the outcome is known, displayed, or capable of being known or displayed to the user**" illegal. (*See* **Ex. K**, Senate Bill No. 632, p. 20, line 52 through p. 21, line 68 (emphasis in original to denote new proposed language)).

**Objections**: The allegations contained in Paragraph 61 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, admitted.


63.     Torch devices contain a Prize Viewer feature that allows the user to preview the outcome of the next game on a Torch device before deciding whether to play a given turn. (*See* Complaint, Doc. #1 at ¶ 48; Answer, Doc. #44 at ¶ 48).

**Response:** Denied. The Prize Viewer mechanism on the Torch Devices permits allows a player to see, at most, the payout amount for the very next play of the device. The Prize Viewer feature does not display to the player the combination of "winning" or "losing" symbols that will be displayed on the next turn, which is part of the "outcome" of the game. *See* Pl.'s SUMF (Doc. #95) ¶¶ 56, 64. Moreover, Torch Devices require a player to insert at least $1.00 to play any game on the Torch Devices, and a player who plays a single play of a $0.25 game has no ability to obtain a voucher for the remaining $0.75 after her first play; as a result, the player is forced to play three additional turns or else abandon his $0.75 that remains "on the machine"—or at the very least, to wager that $0.75 to see the next turn. *See* Pl.'s SUMF (Doc. #95) ¶¶ 82–87.

64.     During his deposition on December 20, 2023, while reviewing Freidman Exhibit 8 (**Ex. K**), Stacy Friedman testified as follows:

Q: Okay, you've been handed what's been marked as Friedman Exhibit 8, which is a Senate Bill Number 632 of the Second Regular Session of the Missouri Senate, correct?

**A: I'll have to take your work for that.**

Q: Okay.

**A: I see Senate Bill Number 632 and 101ˢᵗ General Assembly at the top.**

Q: Are you aware that the interpretation of Section 572.010 has been hotly debated and contested in both the Missouri Senate and the Missouri House over the course of the past three or four years?

**A: I don't believe I am, no.**

* * *

Q: [I]f you look at the proposed changes, the amendment language that would start on Page 65 – I'm sorry, Page 20, Line 65, where it says: Regardless of whether the machine or device or system or network of devices includes a preview of the outcome, or whether the outcome is known to display or capable of being known or displayed to the user

I don't think either one of us would disagree that [if] that was the current state of the law in Missouri that Torch Devices would then f[all] [with]in the langue of that statute, correct?

**A: Well, so I guess I'll say this, I haven't seen this language before.**

Q: Sure.

**A: And I'm a little weary of making sort of final formal opinions based on material that you're just putting in front of me for the first time. I think as far as I'm willing to go is as a matter of first impression that seems right, but I don't want to fully agree without actually looking more thoroughly.**

(Deposition of Stacy Friedman, taken December 20, 2023 ("Friedman Dep."), a true and correct copy of excerpts of the same are attached as **Exhibit L**, 200:6-19, 204:18-205:14).

**Objections**: The allegations contained in Paragraph 64 are not relevant to any fact of

consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which

Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. TNT objects to Defendants'

citation to the deposition of Mr. Friedman to the extent it implies that Mr. Friedman has the personal

knowledge or expert qualifications necessary to offer a lay opinion, legal opinion, or otherwise comment on the legislative process of Missouri's House of Representatives. Mr. Friedman is a Harvard-educated computer scientist and mathematician who is retained in this litigation to offer his opinion on subjects related to his expertise. Additionally, in that same line of questioning, Mr. Friedman informed Mr. Craig that he was unable to comment on Mr. Craig's questions related to Missouri's lawmaking process, and so his responses were most often limited to whether Mr. Craig's recitation of the language of Exhibit K accurately reflected what was written by its author.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 64 accurately recites portions of the testimony of Stacy Friedman.

65.     Senate Bill No. 632 further proposed amending the definition of "gambling device" in RSMo. § 572.010(5) to include new language stating: "**Any device not described in paragraphs (a) to (c) of this subdivision that a reasonable person would believe is usable or can be made readily usable in the gambling or any phases of gambling activity shall be prima facia evidence of a gambling device and may be subject to seizure by any peace officer in this state.**" (*See* **Ex. K**, Senate Bill No. 632, p. 21, lines 69-74 (emphasis in original to denote new proposed language)).

**Objections**: The allegations contained in Paragraph 64 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 65 accurately recites a portion of the contents of Exhibit K to Defendants' SUMF (Doc. #88-11).

66.     During his deposition on December 20, 2023, Stacy Friedman testified as follows:

Q: Is it your opinion that that classification under Missouri law depends on a player's subjective intentions?

[Objection by TNT's counsel that the question calls for a legal conclusion]

**A: Well, so I quote the definition of gambling in paragraph 20 of my report.**

Q: You would agree with me that subjective intention is not included anywhere in those definitions, correct?

[Same objection]

**A: I believe that's correct, yes.**

(**Ex. L**, Friedman Dep., 177:9-22).

**Objections**: The allegations contained in Paragraph 66 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. TNT objects to Defendants' citation to the deposition of Mr. Friedman to the extent it implies that Mr. Friedman has the personal knowledge or expert qualifications necessary to offer a lay opinion, legal opinion, or otherwise comment on the legislative process of Missouri's House of Representatives. Mr. Friedman is a Harvard-educated computer scientist and mathematician who is retained in this litigation to offer his opinion on subjects related to his expertise. Additionally, in that same line of questioning, Mr. Friedman informed Mr. Craig that he was unable to comment on Mr. Craig's questions related to Missouri's lawmaking process, and so his responses were most often limited to whether Mr. Craig's recitation of the language of Exhibit K accurately reflected what was written by its author.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 66 accurately recites portions of the testimony of Stacy Friedman. But TNT does not admit that the questions asked to Mr. Friedman accurately or properly recite the contents of Missouri law. Section 572.010(5) defines "gambling device" to include any device that "used ***or usable***" in a gambling activity. Thus, while the "subjective intent" of any particular player is not relevant to whether a device is "usable" in a gambling activity, the fact that the Torch Devices ***may***

be used in such a manner is sufficient to satisfy the definition of "gambling device." Moreover, the Torch Devices have in fact been "used" in such a manner, which likewise makes them gambling devices under Missouri law. *See* Pl.'s SUMF (Doc. #95) ¶¶ 57–68.

67.     During his deposition on December 20, 2023, while reviewing Freidman Exhibit 8 (**Ex. K**), Stacy Friedman testified as follows:

Q: [W]ould it be fair to say that then starting at Page 21, Line 69, the intent would be to even further expand the potential to classify a game that doesn't fall within paragraphs A to C, again, proposed but not enacted, to additional devices that aren't specified in A to C if – as gambling devices, if a reasonable person would believe that it's useable or can be made readily useable in gambling or any phases of the gambling activity, right?

A: I think that's how I would read this, yes.

Q: So it's essentially expanding even further the State's ability to say that even if we didn't specifically describe something, a characteristic of the device in A to C, we can still essentially classify it as a gambling device if a reasonable person would believe that it is a gambling device, right?

[Counsel for TNT: Objection, calls for a legal conclusion; you may answer.]

A: I . . . I think that's how this reads, yes.

Q: . . . You know, as you sit here today, that this is not currently Missouri law as stated in Missouri Revised Statute 572.010, correct?

A: So my understanding of current Missouri Revised Statute 572.010 is set out in my report, which does not include this language.

Q: Right, so it wouldn't surprise you that, even though this Senate Bill 632 was proposed in [the] 2022 legislative session [it] did not ever pass into law in the State of Missouri, right?

A: As far as I'm currently aware, that's true.

(**Ex. L**, Friedman Dep., 213:6-214:18).

**Objections**: The allegations contained in Paragraph 67 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which

Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. TNT objects to Defendants' citation to the deposition of Mr. Friedman to the extent it implies that Mr. Friedman has the personal knowledge or expert qualifications necessary to offer a lay opinion, legal opinion, or otherwise comment on the legislative process of Missouri's House of Representatives. Mr. Friedman is a Harvard-educated computer scientist and mathematician who is retained in this litigation to offer his opinion on subjects related to his expertise. Additionally, in that same line of questioning, Mr. Friedman informed Mr. Craig that he was unable to comment on Mr. Craig's questions related to Missouri's lawmaking process, and so his responses were most often limited to whether Mr. Craig's recitation of the language of Exhibit K accurately reflected what was written by its author.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 67 accurately recites portions of the testimony of Stacy Friedman.

68.     According to the Missouri's Senate's Current Bill Summary for Senate Bill 632, "[t]his act is identical to SB 1237 (2022) and HB 2910 (2022), and is substantially similar to SS/SB 10 (2021), SB 87 (2021), SCS/SB 530 (2020), SB 557 (2020), and SCS/SB 431 (2019), and to provisions in SCS/SB 98 (2021) and SS#3/SCS/SB 44 (2019)." (**Ex. K** ("Current Bill Summary" for SB 632)).

**Objections**: The allegations contained in Paragraph 68 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 68 accurately recites portions of Ex. K to Defendants' SUMF (Doc. #88-11).

69.     House Bill No. 1056 was introduced in the Missouri House of Representatives by Representative McMullen during the 102nd General Assembly on February 6, 2023. (*See* Journal of the House, First Regular Session, 102nd General Assembly, a true and correct copy of which is attached as **Exhibit M**,[1] p. 481; House Bill No. 1056, a true and correct copy of which is attached as **Exhibit N** (Friedman Ex. 9)).

**Objections**: The allegations contained in Paragraph 68 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 69 accurately describes portions of Exs. M and N to Defendants' SUMF (Doc. ## 88-13, 88-14).

70.     Among other things, House Bill No. 1056 proposed amending the definition of "slot machine" in RSMo. § 572.010(11) to read (new proposed statutory language shown in bold text), in relevant part:

"Slot machine", a gambling device that as a result of the insertion of a coin or other object operates . . . in such a manner that, depending upon elements of chance, **from the perspective of a player or a reasonable person,** it may eject something of value, **regardless of whether the machine, device, system, or network of devices includes a preview of the outcome or whether the outcome is known, displayed, or capable of being known or displayed to the user**.

(**Ex. N**, House Bill No. 1056, p. 13).

**Objections**: The allegations contained in Paragraph 70 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 70 accurately recites portions of Ex. N to Defendants' SUMF (Doc. #88-14).

71.     RSMo. § 572.010 has not been amended since January 1, 2017. RSMo. §572.010.

**Response:** TNT admits that Mo. Rev. Stat. § 572.010 has not been amended since January 1, 2017, but TNT denies that such legislative inaction or silence carries legal significance.

72.     All attempts since January 1, 2017, to amend RSMo. § 572.010 have failed. RSMo. § 572.010; (*see also* **Ex. B**, Oct. 19th TNT 30(b)(6) Dep., 252:19-255:3).

**Response:** TNT admits that Mo. Rev. Stat. § 572.010 has not been amended since January 1, 2017, but TNT denies that such legislative inaction or silence carries legal significance.

73.     On July 28, 2020, Turntine sent an email to Tom Cobb and Missouri State Senator Tony Luetkemeyer, forwarding an email with an attached memorandum, saying "Tony, . . . I have been in communication with Senator Schatz and he is going to take some action on this soon." (Email Chain Dated July 28, 2020, a true and correct copy of which is attached as **Exhibit O**, (Turntine Dep. Ex. 45), p. 1).

**Objections**: The allegations contained in Paragraph 73 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 73 accurately recites portions of Ex. O to Defendants' SUMF (Doc. #88-15).

74.     The memorandum attached to that email says it is from "PMH" to "ELK," with a carbon copy to Jim Turntine. (*Id*. at p. 2).

**Objections**: The allegations contained in Paragraph 74 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 74 accurately recites portions of Ex. N to Defendants' SUMF (Doc. #88-14).

75.     According to Turntine, "PMH" was attorney Peter Hamilton, one of TNT's attorneys, and he thought ELK was a reference to Elkin Kistner, another TNT attorney. (**Ex. E**, Turntine Dec. 29, 2023 Dep., 65:25-66:9).

**Objections**: The allegations contained in Paragraph 75 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 75 accurately recites the testimony of Jim Turntine.

76.     In that memorandum, the "Factual Background" section states "Our client, Jim Turntine, ***has been lobbying to no avail across the State of Missouri*** to get law enforcement engaged in putting a stop to the illegal gaming machines placed by Torch Electronics . . . Mr. Turntine approached MGC to encourage it to take whatever action it could to stop the illegal machines which were decimating his legal coin-operated amusement device business." (**Ex. O**, Turntine Dep. Ex. 45, p. 2 (emphasis added)).

**Objections**: The allegations contained in Paragraph 76 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 76 accurately recites a portion of the contents of Ex. O to Defendants' SUMF (Doc. #88-15).

77.     The "Factual Background" section of that memorandum then states: "MGC has consistently taken the confounding position that it has no jurisdiction outside of licensed casinos to regulate gaming machines . . . We have been asked to perform a thorough review of Missouri law related to MGC and to provide our independent analysis of what, if anything MGC is empowered to do . . . ." (*Id.*).

**Objections**: The allegations contained in Paragraph 77 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 77 accurately recites a portion of the contents of Ex. O to Defendants' SUMF (Doc. #15).

78.     Later, the "Analysis" section of that memorandum states: "Amazingly, MGC has claimed that it lacks authority to do anything about [Torch's devices]." (*Id.* at p. 4).

**Objections**: The allegations contained in Paragraph 78 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 78 accurately recites a portion of the contents of Ex. O to Defendants' SUMF (Doc. #88-15).

79.     Turntine testified that "it certainly seemed to, to many of us, that the [MGC] has authority and an obligation to do more than what they were doing or had been doing." (**Ex. E**, Turntine Dec. 29, 2023 Dep., 61:20-23).

**Objections**: The allegations contained in Paragraph 79 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 79 accurately recites the testimony of Jim Turntine.

80.    Turntine said that he did not recall if Mr. Grothaus responded to his email, but he "tend[ed] to think he did not[.]" (*Id*. at 62:7-14).

**Objections**: The allegations contained in Paragraph 80 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 80 accurately recites the testimony of Jim Turntine.

81.    In 2019 (and continuing to the present), Turntine was "frustrated by the lack of willingness on behalf of prosecutors in various counties or the attorney general in Missouri to act on what [Turntine] believe[d] were illegal Torch no chance devices." (**Ex. C**, Dec. 22, 2023 TNT 30(b)(6) Dep., 557:21-559:4 (A: Yes. I was and remain frustrated that the law is not being enforced on these slot machines. Yes.")).

**Objections**: The allegations contained in Paragraph 81 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 81 accurately recites the testimony of Jim Turntine.

82.     On April 17, 2019, in an email received by a number of individuals, Turntine informed the group, in relevant part, "I am working with Senator Brown and Schatz to coordinate with five County prosecutors along I-44 (Franklin, Crawford, Phelps, Pulaski, Laclede), the State Patrol's Division of Drug and Crime Control (DDCC) and the State's Attorney Generals office to designate a special prosecutor – all together **to investigate, confiscate and prosecute the Torch Electronics business model**." (April 17, 2019 Email Chain "Re: Update on legislative efforts ref: MPTs, Black-market, VLTs, Casinos," a true and correct copy of which is attached as **Exhibit P** (Turntine Ex. 18), p. 2 (emphasis added); *see also* **Ex. C**, Dec. 22, 2023 TNT 30(b)(6) Dep., 493:4-498:2).

**Objections**: The allegations contained in Paragraph 82 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 82 accurately recites a portion of the contents of Ex. C to Defendant's SUMF (Doc. #88-3).

83.     When asked during his deposition, "It sounds to me like you, in connection with two then Missouri Senators were leading an offensive aimed specifically to investigate, confiscate, and prosecute the Torch Electronic business model[?]," Turntine answered, "It sounds like that." (*Id.* at 497:3-8).

**Objections**: The allegations contained in Paragraph 83 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 83 accurately recites the testimony of Jim Turntine.

84.     Turntine was next asked, "Well, and, in fact, that is exactly your intention, wasn't it[?]," and Turntine agreed, saying "I had hoped we could. Yes." (*Id*. at 497:9-11).

**Objections**: The allegations contained in Paragraph 81 are not relevant to any fact of consequence in the case, see Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 84 accurately recites the testimony of Jim Turntine.

85.     Turntine said he was aware that former Senator Schatz did get an allocation of money to a small two-person Missouri highway patrol unit specifically tasked with investigating gambling in the State of Missouri. (**Ex**. **E**, Turntine Dec. 29, 2023 Dep., 12:2-9).

**Objections**: The allegations contained in Paragraph 85 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 85 accurately recites the testimony of Jim Turntine.

86.     Turntine further testified that he was "impressed and appreciated the effort on [Senator Schatz's] part." (*Id.* at 12:2-14).

**Objections**: The allegations contained in Paragraph 86 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 86 accurately recites the testimony of Jim Turntine.

87.     On June 20, 2019, Turntine emailed his lobbyist and others to alert them to the fact Turntine had asked "[his] attorneys [to] investigate if [he] [could] sue Torch Electronics for tortious interference in some of [his] locations where they have placed [in Turntine's opinion] illegal games . . . This civil action could seriously speed up the process of getting that legal determination made. Plus Torch is not going to like having this happen to them." (**Ex. C**, Dec. 22, 2023 TNT 30(b)(6) Dep, 509:10-511:25; Email Chain Dated June 20, 2019 (Turntine Ex. 21), a true and correct copy of which is attached as **Exhibit Q**, p. 1).

**Objections**: The allegations contained in Paragraph 87 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 87 accurately recites portions of Ex. Q to Defendants' SUMF (Doc. #88-17).

88.     When asked whether he was, at that time, "looking for new creative, I would say ["lawfare"] ways to potentially get the gaming commission to somehow intervene on your behalf to make a determination about Torch's devices," Turntine answered, "It's fair for you to say that." (Ex. D, Dec. 22, 2023 TNT 30(b)(6) Dep., 511:18-25).

**Objections**: The allegations contained in Paragraph 88 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 88 accurately recites the testimony of Jim Turntine.  Paragraph 88, however, omits Mr. Turntine's next response in which he states he does not know the meaning of "lawfare," which was Defendants' phrasing, saying: "you used the term 'law[fare]' which I think is a play on the word warfare or something. I don't know what you're intimating there. I'm – I'm working on strategies to get the law enforced to solve the problem of the illegal gambling machines. That's what it says to me. That's what I would say." *See* **Ex. 63** hereto (Dec. 22, 2023 Dep. of J. Turntine) at 512:4–11.

89.     A few days later, on June 24, 2019, Turntine emailed Dave Smith, Crawford County, Missouri, to similarly explain his plan to "possibly [] help you and other prosecutors here in Missouri" by "potentially fil[ing] a tortuous interreference case against Torch Electronics in locations where I have reasonable business expectancies." (*Id.* at 522:17-531:9; Email dated June 24, 2019, to Prosecutor David Smith (Turntine Ex. 23), a true and correct copy of which is attached as **Exhibit R**, p. 1).

**Objections**: The allegations contained in Paragraph 89 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 89 accurately recites a portion of Ex. R to Defendants' SUMF (Doc. #88-18).

90.     Of course, on November 26, 2019, TNT filed its first state court case against Torch in Crawford County alleging similar unfair competition claims (but under Missouri state law). (Doc. #21-6, November 26, 2019 Crawford County Petition).

**Objections**: The allegations contained in Paragraph 90 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that it filed a tortious interference case on November 26, 2019, in Crawford County against Torch Electronics, LLC. *See* **Ex. 66** hereto (Petition in *TNT Amusements Inc. v Torch Electronics Inc. et al.*, Case No. 19CF-CC00065 (the "Crawford County case")). The claims, however, are not "similar unfair competition claims" to any claim in this case, if that is what Defendants mean by "similar." The claims in this case alleged distinct theories from any claims pled in the tortious interference case referred to in this allegation. In that case, TNT brought a claim for tortious interference with business expectancy and action for declaratory judgment against Defendants Midwest Petroleum Company and Torch due to Torch's placement of Torch Devices at Midwest

locations. That case did not assert unfair competition claims under the Lanham Act or Missouri's common law of unfair competition based upon Torch's false advertising.

91.     That case was pending for more than three years before TNT voluntarily dismissed its claims on March 15, 2023. (*See generally* Doc. ##21-7, 21-8, 21-9, 21-10, 21-11, 21-12).

**Objections**: The allegations contained in Paragraph 91 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that it voluntarily dismissed the tortious interference case on March 15, 2023.

92.     TNT filed the present case the same day (March 15, 2023). (*See generally* Doc. #1, Complaint).

**Objections**: The allegations contained in Paragraph 92 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits it filed this case on March 15, 2023.

93.     On October 24, 2018, Kathi Harness of Harness & Associates forwarded an email received from Andy Arnold to Jim Turntine and others. (October 24, 2018 Email, "FW: Correspondence in support of illegal gaming machines popping up" (Turntine Dep. Ex. 12), a true and accurate copy of which is attached as **Exhibit S**).

**Objections**: The allegations contained in Paragraph 93 are not relevant to any fact of consequence in the case, see Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, admitted.

94.     In the forwarded email, Andy Arnold stated he was attaching "an email from Phelps County Prosecutor Brendon Fox[,]" and then Arnold wrote, "[a]s you can see by the correspondence, the general belief is that the games attributed to Torch Electronics that are popping up everywhere are "No-Chance" games because the player can "preview" the outcome of the next play (a future event) to see whether or not they will win a prize." (*Id*. at p. 1).

**Objections**: The allegations contained in Paragraph 94 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The email in question also constitutes inadmissible hearsay. *See* Fed. R. Evid. 801, 802. To the extent that the email is offered to establish the legality of the Torch Devices, the email contains inadmissible lay opinion testimony on a legal matter. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 94 accurately recites a portion of the contents of **Exhibit S** to Defendants' SUMF (Doc. #88-19).

95.     In the email attachment, Phelps County Prosecutor Brendon Fox said:

It was brought to my attention that Torch Electronics, LLC (hereinafter "Torch") has recently installed several game machines at gas stations, restaurants, and bars throughout the county. I know some of you may have concerns that the machines are illegal gambling machines,

however I have researched the issue and am of the opinion that they are in fact legal. I have advised Torch that I would not be prosecuting them for any of their gaming systems located in Phelps County.

If any of you have questions, please don't hesitate to ask. If you would like a more detailed explanation, I am happy to give it. If you get calls or complaints regarding the games, please let the callers know that the issue has been evaluated by the prosecuting attorney and he does not believe they are illegal.

(*Id.* at p. 6).

**Objections**: The allegations contained in Paragraph 95 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The email in question also constitutes inadmissible hearsay. *See* Fed. R. Evid. 801, 802. To the extent that the email is offered to establish the legality of the Torch Devices, the email contains inadmissible lay opinion testimony on a legal matter. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 95 accurately recites a portion of the contents of **Exhibit S** to Defendants' SUMF (Doc. #88-19).

96.    In Turntine's December 22, 2023 deposition as TNT's Fed. R. Civ. P. 30(b)(6) corporate representative, Turntine acknowledged that he saw the email. (**Ex. C**, Dec. 22, 2023 TNT 30(b)(6) Dep., 371:18-372:4; 375:10-14).

**Objections**: The allegations contained in Paragraph 96 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 96 accurately recites the testimony of Jim Turntine.

97.     Turntine testified that "I'm of the opinion that Brendon Fox is absolutely wrong, was absolutely wrong at that time and would still be today." (*Id.* at 375:24-376:1).

**Objections**: The allegations contained in Paragraph 97 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation also includes a lay opinion of Mr. Turntine's on a legal matter, which is not admissible. *See* Fed. R. Evid. 701, 702.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 97 accurately recites the testimony of Jim Turntine.

98.     A Probable Cause Statement was issued by Tom Bunnell, an officer with Brookfield Police Department and filed in the Circuit Court of Linn County, Missouri, Division II, on October 21, 2020, in a case captioned *State of Missouri v. Torch Electronics, LLC*. (Probable Cause Statement dated October 21, 2020 (STM Ex. 30), a true and correct copy of which is attached as **Exhibit T**).

**Response**: Admitted.

99.     During his deposition on December 15, 2023, Steven Miltenberger testified as follows:

Q: We'll mark this as STM 30 . . . So I've just handed you a document that is entitled Probable Cause Statement, State of Missouri versus Torch Electronics, LLC in the County of Linn dated December 14, 2019. Is this a document that you've seen before?

**A: Yes.**

Q: Okay. How did you come to learn of this probable cause statement? Again, if that was through communication through your attorney, tell me you cannot answer my question.

**A: I cannot answer that question.**

Q: Okay. Through – after receiving this, hat, if any actions did you take in response to this probable cause statement?

**A: Again, we communicated with our attorney.**

Q: Do not tell me the content of that communication. That's fine. To your knowledge, was that device that is discussed in this probable cause statement a Torch device?

**A: Yes, I believe so.**

Q: Okay. The location that is discussed here is the County Line Convenience Store. Is that a Torch customer?

**A: Yes.**

Q: Okay. Does this also reflect that Gaming Commission employees performed a review of the device? You can see that in the second to last paragraph on the first page?

**A: Yes.**

Q: And does this also reflect a statement by the declarant that the gaming device appears to meet RSMo 572.010(5) gambling device following the definition: is that what the declarant states?

[Objection]

Q: I'm just asking you if that's what the document reflects.

**A: It's what the document says.**

Q: Okay. Do you happen to know which version, which – I think you called it suite – which suite of games was on the device that is reflected in this document?

**A: I don't – I don't remember.**

Q: Okay. Do you recall what ultimately occurred in this case with respect to this device?

**A: With respect to this, I know initially the case was dismissed at the probable cause hearing. Then I know that it was filed again only to get eventually dismissed again. And all of the machines were returned.**

(Deposition of Steven Miltenberger, taken December 15, 2023 ("Miltenberger Dep."), a true and correct copy of relevant excerpts of which is 99 as **Exhibit U**, 246:13-248:21).

**Objections**: The allegations contained in Paragraph 100 are not material to any basis upon which Defendants have sought summary judgment. *See* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 99 accurately recites the testimony of Steven Miltenberger.

100.    Torch has also had Torch devices seized by Missouri law enforcement agents in Jefferson County, Missouri, only to have those Torch devices returned to Torch. (*Id*. at 297:3-20).

**Objections**: The allegations contained in Paragraph 100 are not material to any basis upon which Defendants have sought summary judgment. *See* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 100 accurately recites the testimony of Steven Miltenberger.

101.    Steven Miltenberger has also met with prosecuting attorneys in Missouri for the purpose of demonstrating how the games worked and how they functioned to the prosecutor. (*Id*. at 288:19-289:18).-

**Objections**: The allegations contained in Paragraph 101 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56.

**Response**: Subject to and without waiving the foregoing objections, TNT admits that Paragraph 101 accurately recites the testimony of Steven Miltenberger.

102.    During his deposition, Cody Hanavan testified that he is a Gaming Device Specialist II for the MGC. (Deposition of Cody Hanavan taken November 29, 2023, a true and correct copy of excerpts from the same is attached as **Exhibit V** ("Hanavan Dep."), 12:9-12).

**Response:** Admitted.

103.    Hanavan testified that his job responsibilities in that role include ensuring "the integrity of gaming in casinos, on slot machines and electronic table games, shufflers," and "anything electronic in a casino that has to do with gaming, we enforce the rules and regulations." (*Id*. at 12:13-19).

**Response:** Admitted.

104.    Hanavan testified that in this role, he must be "aware" of Missouri state law with respect to gambling devices, and he testified he relies on those Missouri laws on a daily basis to do his job. (*Id*. at 13:8-23).

**Response:** Admitted.

105.    Hanavan said he has examined tens of thousands of slot machines during his time with the MGC. (*Id*. at 28:10-14).

**Response:** Admitted.

106.    Hanavan also said he has examined Torch devices "[p]robably eight or nine times, something like that." (*Id*. at 28:18-29:3).

**Response:** Admitted.

107.    Hanavan testified he has spent "[m]aybe a hundred hours" inspecting Torch devices and is familiar with how they operate. (*Id*. at 30:10-16).

**Response:** Admitted.

108.    Hanavan testified that he was called as a witness on behalf of the Henry County prosecuting attorney in the Circuit Court of Henry County, Missouri, in a criminal proceeding brought against Ijaz Hussain. (*Id*. at 19:24-20:16).

**Response:** Admitted.

109.    In his sworn testimony in Henry County, Hanavan testified "The Gaming Commission doesn't necessarily hold an opinion on—on how these are classified." (Exhibit 1 to Hanavan Dep., a true and correct copy of which is attached as **Exhibit W** ("Hanavan Ex. 1"), 48:31-49:1).

**Response:** TNT admits that paragraph 109 contains excerpts from the testimony of Mr. Hanavan. But TNT disputes the accuracy of Mr. Hanavan's statements, which contradicts the official statement of the Missouri Gaming Commission (MGC) in its 2019 Letter. *See* Pl.'s SUMF (Doc. #95) ¶¶ 195–196 and supporting exhibits. In that letter, the MGC details its determination that, after examining a so-called "no-chance game," it concluded that the device was an illegal gambling device under Missouri law. The MGC has not retracted the position stated in the 2019 Letter. *See* Pl.'s SUMF Ex. 24 (Doc. #95-24) (Nov. 29, 2023 Dep. of C. Hanavan) at 74:15–19. Mr. Hanavan's testimony in Paragraph 109 refers to another so-called "no chance" device. Additionally, TNT controverts Paragraph 109 to the extent Defendants attempt to represent that the device in Paragraph 109 is representative of any Torch Device at issue in the present suit, as that fact was not established in the Henry County lawsuit and has not been established in the present litigation.

110.    In his sworn testimony in Henry County, Hanavan agreed that when a person plays a slot machine in a casino, "they have no idea whether the next play is a winner or a loser" and "they have no way of knowing" that. (**Ex. W**, Hanavan Ex. 1, 53:12-20).

**Response:** Admitted.

111.    In his sworn Henry County testimony, Hanavan further agreed, "Torch machines do not have random number generators in them"; he believed "[t]hey're called fixed algorithm outcome"; "[t]here's nothing random about it . . . [n]othing by chance about when it's going to pay out. [A Torch device is] going to do the exact same every time until it runs back through the sequence . . . [a]nd then it goes back through the exact same winning spot. Nothing random about it. Nothing by chance about it"; and Torch devices operate "[t]otally opposite" of a "slot machine." (**Ex. W**, Hanavan Ex. 1, 53:38-54:44).

**Response:** TNT admits that Paragraph 111 contains excerpts from the testimony of Mr. Hanavan, although several of those excerpts are taken out of context. TNT disputes, however, the accuracy of Mr. Hanavan's testimony. It is now established beyond dispute that the Torch Devices *do* contain random number generators. *See* Pl.'s SUMF (Doc. #95) ¶¶ 52–56, 80. It is also now established that the Torch Devices randomly select the starting point for each combination of bet amount and game theme from one of several possible starting indices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 53–55. It has further been established that the Torch Devices utilize a random process to determine what combination of "winning" or "losing" symbols will be displayed to a player. *See See* Pl.'s SUMF (Doc. #95) ¶ 5. According to Cody Hanvan, whose testimony Defendants chiefly rely upon in their Statement of Uncontroverted Material Facts (Doc. #88), if the starting point of a Torch Device's list of game outcomes is "selected by a random number generator," then that selection "would be chance." *See also* **Ex. 67** hereto (Dep. of Cody Hanavan on July 10, 2023) at 150:23–151:6 ("Q. What if the entry point into the finite pool, the very first spot was randomly generated by a random number generator, would that be chance? A. It would be - - in a random - - yeah. Chance is essentially something outside of your control, so yeah." (emphasis added)). It has further been established that the sequence of payout amounts is randomized by the Torch Devices' manufacturer before they are placed in the field. *See* Pl.'s SUMF (Doc. #95) ¶¶ 51. The sequence of payout amounts is arranged in an unpredictable order that has no pattern to it. *See* Pl.'s SUMF (Doc. #95) ¶¶ 51–52.

112.    In his testimony in this proceeding, Hanavan agreed in order for a device to be categorized as a "slot machine," three elements are necessary: prize, consideration, and chance. (**Ex. V**, Hanavan Dep., 26:20-27:28:5).

**Response:** TNT admits that Paragraph 112 contains excerpts of the testimony of Mr. Hanavan, but those statements are taken out of context. Mr. Hanavan also agreed that the definition of gambling under Missouri law includes "a contest of chance or future contingent event not under the control or influence of the player. *See* Pl.'s SUMF Ex. 24 (Doc. #95-24) (Nov. 29, 2023 Dep. of C. Hanavan) at 69:2–70:10.

113.    Hanavan testified that, to his knowledge, the MGC has never classified Torch devices as "slot machines," and further said when asked about the MGC's position regarding the classification of Torch devices, "I don't believe the Gaming Commission has an opinion." (*Id.* at 35:19-25, 38:2-39:12).

**Response:** TNT admits that Paragraph 113 contains excerpts from the testimony of Mr. Hanavan, although those excerpts are taken out of context. TNT disputes, however, the accuracy of Mr. Hanavan's testimony. But TNT disputes the accuracy of Mr. Hanavan's statements, which contradicts the official statement of the Missouri Gaming Commission (MGC) in its 2019 Letter. *See* Pl.'s SUMF (Doc. #95) ¶¶ 195–96 and supporting exhibits. In that letter, the MGC details its determination that, after examining a so-called "no-chance game," it concluded that the device was an illegal gambling device under Missouri law. The MGC has not retracted the position stated in the 2019 Letter. *See* Pl.'s SUMF Ex. 24 (Doc. #95-24) (Nov. 29, 2023 Dep. of C. Hanavan) at 74:15–19.

114.    In his testimony, Hanavan agreed "[t]here's nothing random about the outcome of a given turn on a Torch device," and that there is "nothing by chance about when a Torch device is going to pay out." (*Id*. at 48:9-11, 49:11-50:3).

**Response:** TNT admits that Paragraph 114 contains excerpts from the testimony of Mr. Hanavan, although those excerpts are taken out of context. TNT disputes, however, the accuracy of Mr. Hanavan's testimony. It is now established beyond dispute that the Torch Devices ***do*** contain random number generators. *See* Pl.'s SUMF (Doc. #95) ¶¶ 52–56, 80. It is also now established that the Torch Devices randomly select the starting point for each combination of bet amount and game theme from one of several possible starting indices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 53–55. It has further been established that the Torch Devices utilize a random process to determine what combination of "winning" or "losing" symbols will be displayed to a player. *See See* Pl.'s SUMF (Doc. #95) ¶ 5. According to Cody Hanvan, whose testimony Defendants chiefly rely upon in their Statement of Uncontroverted Material Facts (Doc. #88), if the starting point of a Torch Device's list of game outcomes is "selected by a random number generator," then that selection "would be chance." *See also* **Ex. 67** hereto (Dep. of Cody Hanavan on July 10, 2023) at 150:23–151:6 ("Q. What if the entry point into the finite pool, the very first spot was randomly generated by a random number generator, would that be chance? A. It would be - - in a random - - yeah. Chance is essentially something outside of your control, so yeah." (emphasis added)). It has further been established that the sequence of payout amounts is randomized by the Torch Devices' manufacturer before they are placed in the field. *See* Pl.'s SUMF (Doc. #95) ¶¶ 51. The sequence of payout amounts is arranged in an unpredictable order that has no pattern to it. *See* Pl.'s SUMF (Doc. #95) ¶¶ 51–52.

115.    In his testimony in this case, Hanavan was read back prior testimony wherein he agreed that on a Torch device "there's no chance because [t]here's a preset number of when it's going to pay out each time it works with a sequence," and Hanavan said that he still stands by that testimony. (*Id*. at 54:19-55:15).

**Response:** TNT admits that Paragraph 115 contains excerpts from the testimony of Mr. Hanavan, although those excerpts are taken out of context. TNT disputes, however, the accuracy of Mr. Hanavan's testimony. It is now established beyond dispute that the Torch Devices ***do*** contain random number generators. *See* Pl.'s SUMF (Doc. #95) ¶¶ 52–56, 80. It is also now established that the Torch Devices randomly select the starting point for each combination of bet amount and game theme from one of several possible starting indices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 53–55. It has further been established that the Torch Devices utilize a random process to determine what combination of "winning" or "losing" symbols will be displayed to a player. *See See* Pl.'s SUMF (Doc. #95) ¶ 5. According to Cody Hanvan, whose testimony Defendants chiefly rely upon in their Statement of Uncontroverted Material Facts (Doc. #88), if the starting point of a Torch Device's list of game outcomes is "selected by a random number generator," then that selection "would be chance." *See also* **Ex. 67** hereto (Dep. of Cody Hanavan on July 10, 2023) at 150:23–151:6 ("Q. What if the entry point into the finite pool, the very first spot was randomly generated by a random number generator, would that be chance? A. It would be - - in a random - - yeah. Chance is essentially something outside of your control, so yeah." (emphasis added)). It has further been established that the sequence of payout amounts is randomized by the Torch Devices' manufacturer before they are placed in the field. *See* Pl.'s SUMF (Doc. #95) ¶¶ 51. The sequence of payout amounts is arranged in an unpredictable order that has no pattern to it. *See* Pl.'s SUMF (Doc. #95) ¶¶ 51–52.

116.    In his testimony in this case, Hanavan agreed that he understands Missouri's gambling device laws to use an "objective" standard. (*Id*. at 164:10-165:15).

**Response:** Admitted.

117.    Hanavan also said "[t]here's nothing written in the state statute [about the subjective intention of the player when classifying a device as a gambling device or not]. I would agree with that." (*Id*. at 157:16-25).

**Response:** TNT admits that Paragraph 117 contains excerpts from the testimony of Mr. Hanavan. But TNT does not admit that the questions asked to Mr. Hanavan accurately or properly recite the contents of Missouri law. Section 572.010(5) defines "gambling device" to include any device that "used ***or usable***" in a gambling activity. Thus, while the "subjective intent" of any particular player is not relevant to whether a device is "usable" in a gambling activity, the fact that the Torch Devices ***may*** be used in such a manner is sufficient to satisfy the definition of "gambling device." Moreover, the Torch Devices have in fact been "used" in such a manner, which likewise makes them gambling devices under Missouri law. *See* Pl.'s SUMF (Doc. #95) at ¶¶ 57–68.

118.    In a letter with the subject "Notice of Lease Termination," sent to Donna Havey of TNT and dated September 6, 2023, Jeri Collins of Area 51 Food Co, LLC said:

This letter serves as formal notification of our intent to terminate the lease agreement for your property (games) . . . for the following reasons:

. . .

2. Immediately after signing the document, you became rude and informed us that you would report us to the gaming commission if you saw anything in our restaurant that you believed did not comply with your interpretation of the laws. Your attitude and abrupt remarks lead us to believe that you would be very difficult to work with. Had you made those remarks prior to me signing the document, I would never have signed an agreement with you.

(TNT's Area 51 Food Company Documents (Turntine Dep. Ex. 35), a true and correct copy of which is attached as **Exhibit X**, p. 3).

**Objections**: The allegations contained in Paragraph 118 are not material to any basis upon which Defendants have sought summary judgment. *See* Fed. R. Civ. P. 56. The email in question also constitutes inadmissible hearsay. *See* Fed. R. Evid. 801, 802. To the extent that the email contains an opinion relating to the legality of the Torch Devices, the email contains inadmissible lay opinion testimony on a legal matter. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 118 accurately recites a portion of Ex. X to Defendants' SUMF (Doc. #88-24).

119.    In Turntine's deposition as a corporate representative of TNT, Turntine, when asked if he "could understand how [Donna Havey telling a customer she was reporting the illegal games they had in their location] might rub a customer of TNT's the wrong way," answered "Yeah. I think if people believe the . . . false information about Torch's slot machines and they – they believe that they're legal . . . that can create a . . . point of contention, and it, apparently, did." (**Ex. G**, Dec. 29th TNT 30(b)(6) Dep., 595:2-20).

**Objections**: The allegations contained in Paragraph 119 are not material to any basis upon which Defendants have sought summary judgment. *See* Fed. R. Civ. P. 56. To the extent that the testimony contains an opinion relating to the legality of the Torch Devices, the allegation contains inadmissible lay opinion testimony on a legal matter. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 118 accurately recites a portion of the testimony of Jim Turntine.

120.    In Turntine's deposition as a corporate representative of TNT, Turntine, in explaining an alleged drop in gross revenue from 2017 to 2018, said "I can point a hundred percent to one major location that Torch Electronics pushed us out of," referring to the Midwest Petroleum Truck Stop in Cuba, Missouri. (**Ex. B**, Oct. 19th TNT 30(b)(6) Dep., 41:2-42:1).

**Response:** Admitted.

121.    Turntine testified that Tracy Head was the manager at the Midwest Petroleum Truck Stop who was TNT's contact regarding taking out games. (*Id*. at 44:6-45:25).

**Objections**: The allegation is vague as to time frame, as well as what is referred to by the phrase "taking out games."

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 121 accurately recites testimony of Jim Turntine.

122.    Tracy Head was deposed on December 28, 2023. Head testified that he has known Jim Turntine "probably [his] entire adult career. 20 plus years, probably, 30 years," and that he knows Jim Turntine's wife Marla Turntine well: "We went to school together. Our families are all good friends. We've known each other." (**Ex. F**, Head Dec. 28, 2023 Dep., 43:23-44:11).

**Response:** Admitted.

123.    During Head's deposition, he was presented with a document containing notes from TNT's Donna Havey, which said Head "spoke with me (Donna Havey) stating that he wanted us to move everything out of our game room because he was making it a quote poker room end quote. After we pulled our games, immediately Torch installed machines in what was our game room." (*Id*. at 62:18-64:1).

**Response:** Admitted.

124.    During his deposition, however, Head said he "never called that room a poker room," so he did not "know where Donna's getting that" and did not "agree with calling that room a poker room," because he had "never called it a poker room," and "would have never called anything a poker room." Head reiterated that in reading the document he was only reading what Donna Havey had written down. (*Id*. at 65:1-18; 126:14-127:3).

**Response:** TNT admits that Paragraph 124 accurately recites a portion of Mr. Head's testimony.

125.    During his deposition, Head was asked about having a call with Havey on or around August 17, 2018, to discuss moving TNT's games. Asked, "And it's correct that the substance of that phone call was to discuss moving out TNT games[?]," Head answered, "Yes. Yeah, I guess to make room for some additional games and also make room for their new games, for TNT's Play-Mor games. And I don't see the work orders for those." (*Id.* at 67:7-12).

**Response:** TNT admits that Paragraph 125 accurately recites a portion of Mr. Head's testimony. To the extent that Defendants imply that the foregoing statements indicate that the removal of TNT's devices from Midwest Petroleum was not requested in order to make room for additional Torch Devices, that is inconsistent with other portions of Mr. Head's testimony. For example, Mr. Head testified that TNT's amusement devices were removed because Torch Devices were more profitable. *See* **Ex. 60** (Doc. #98-23) (Dep. of Tracy Head) at 69:13–70:6. Moreover, the timing of the removal of TNT's devices vis-à-vis the introduction of additional Torch Devices supports the inference that TNT's devices were, as Mr. Head stated, removed to make room for additional Torch Devices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 135–194. TNT's business records likewise support that inference. *See* Pl.'s SUMF Ex. 59 (Doc. #96-12) at 43–63.

126.    Head was shown additional documents that he testified he had never seen before and asked about the removal of a handful of TNT devices: a hunting video game, an amusement device called a "Megatouch Force," and a pinball machine; asked about the motivation to remove them, Head said "it was not a motivation. It's just that we – we needed more room for the other games because the . . . games that TNT had in that . . . room were not doing very well." (*Id.* at 69:3-12, 126:14-127:3).

**Response:** TNT admits that Paragraph 126 accurately recites a portion of Mr. Head's testimony. To the extent that Defendants imply that the foregoing statements indicate that the removal of TNT's devices from Midwest Petroleum was not requested in order to make room for additional Torch Devices, that is inconsistent with other portions of Mr. Head's testimony. For example, Mr. Head testified that TNT's amusement devices were removed because Torch Devices were more profitable. *See* **Ex. 60** (Doc. #98-23) (Dep. of Tracy Head) at 69:13–70:6. Moreover, the

timing of the removal of TNT's devices vis-à-vis the introduction of additional Torch Devices supports the inference that TNT's devices were, as Mr. Head stated, removed to make room for additional Torch Devices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 135–194. TNT's business records likewise support that inference. *See* Pl.'s SUMF Ex. 59 (Doc. #96-12) at 43–63.

127.    Head also testified that some games were moved to "allow[] [TNT] to switch out their games." (*Id*. at 71:1-10).

**Response:** TNT admits that Paragraph 127 accurately recites a portion of Mr. Head's testimony. To the extent that Defendants imply that the foregoing statements indicate that the removal of TNT's devices from Midwest Petroleum was not requested in order to make room for additional Torch Devices, that is inconsistent with other portions of Mr. Head's testimony. For example, Mr. Head testified that TNT's amusement devices were removed because Torch Devices were more profitable. *See* **Ex. 60** (Doc. #98-23) (Dep. of Tracy Head) at 69:13–70:6. Moreover, the timing of the removal of TNT's devices vis-à-vis the introduction of additional Torch Devices supports the inference that TNT's devices were, as Mr. Head stated, removed to make room for additional Torch Devices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 135–194. TNT's business records likewise support that inference. *See* Pl.'s SUMF Ex. 59 (Doc. #96-12) at 43–63.

128.    When asked if he recalled a "number of TNT devices moved out in or around [August 2018?]," Head answered: "I don't know. Because I expanded the room of the . . . commons area up front and added more of their games to the commons area. So I don't have that. I don't see where [on TNT's internal document] they show where they've added the rest. But you say there's 22 pages. So I'm assuming I'll get to see that soon." (*Id*. at 73:6-11).

**Response:** TNT admits that Paragraph 128 accurately recites a portion of Mr. Head's testimony. To the extent that Defendants imply that the foregoing statements indicate that the removal of TNT's devices from Midwest Petroleum was not requested in order to make room for

additional Torch Devices, that is inconsistent with other portions of Mr. Head's testimony. For example, Mr. Head testified that TNT's amusement devices were removed because Torch Devices were more profitable. *See* **Ex. 60** (Doc. #98-23) (Dep. of Tracy Head) at 69:13–70:6. Moreover, the timing of the removal of TNT's devices vis-à-vis the introduction of additional Torch Devices supports the inference that TNT's devices were, as Mr. Head stated, removed to make room for additional Torch Devices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 135–194. TNT's business records likewise support that inference. *See* Pl.'s SUMF Ex. 59 (Doc. #96-12) at 43–63.

129.    Head also testified that some other TNT devices were in some cases simply moved to other parts of the same truck stop. When asked if this was "to make room for the Torch devices . . . because the Torch devices were making more money[?]," Head responded "Well, not necessarily making more money. . . . we wanted [the Torch devices] moved to the back of the commons are to make more room for the – all the travelers coming in. So we don't bog down anything in the front of the commons area. . . ." When pressed whether he "had asked . . . to take out that specific [TNT] game and put nothing in its place . . . ?," Head responded "Yeah. At that - - at that particular spot. But, again, . . . they changed out their -- their games in the front of the commons area quite often." (*Id.* at 77:23-79:10).

**Response:** TNT admits that Paragraph 129 accurately recites a portion of Mr. Head's testimony. To the extent that Defendants imply that the foregoing statements indicate that the removal of TNT's devices from Midwest Petroleum was not requested in order to make room for additional Torch Devices, that is inconsistent with other portions of Mr. Head's testimony. For example, Mr. Head testified that TNT's amusement devices were removed because Torch Devices were more profitable. *See* **Ex. 60** (Doc. #98-23) (Dep. of Tracy Head) at 69:13–70:6. Moreover, the timing of the removal of TNT's devices vis-à-vis the introduction of additional Torch Devices supports the inference that TNT's devices were, as Mr. Head stated, removed to make room for additional Torch Devices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 135–194. TNT's business records likewise support that inference. *See* Pl.'s SUMF Ex. 59 (Doc. #96-12) at 43–63.

130.    Head was asked about the removal of TNT's "gumball machines" from the truck stop. Head interjected that "It says gumball, but they're actually gumball quarter pusher machines." (*Id*. at 87:7-91:8).

**Objections**: The allegations contained in Paragraph 130 are not relevant to any fact of consequence in the case, *see* Fed. R. Evid. 401, 402, much less material to any basis upon which Defendants have sought summary judgment, *see* Fed. R. Civ. P. 56. The allegation is vague as to time frame, as well as what is referred to by the phrase "gumball quarter pusher machines." TNT also objects to the extent that the allegation is intended to imply that the gumball machines placed by TNT at the Midwest Petroleum store were illegal gambling devices. As Mr. Turntine testified, those machines dispensed gumballs to patrons for a quarter a piece. *See* **Ex. 64** (Dec. 29, 2023 Dep. of J. Turntine) at 577:6–578:21; *see also* Mo. Rev. Stat. § 572.010 ("Gambling does not include bona fide business transactions valid under the law of contracts . . . ."). To the extent that Defendants seek to portray Mr. Head's testimony as a legal opinion as to the legality of such machines, Mr. Head lacks the expertise to render such an opinion. *See* Fed. R. Evid. 701, 702.

**Response:** Subject to and without waiving the foregoing objections, TNT admits that Paragraph 130 accurately recites testimony of Tracy Head.

131.    Head was asked "it's correct that at that time [in 2019], this was moved out, was a – and a Torch device was put into the location at Midwest, correct?", to which Head answered "No, not correct." (*Id*. at 87:24-88:2).

**Response**: TNT admits that Paragraph 131 accurately recites a portion of Mr. Head's testimony. To the extent that Defendants imply that the foregoing statements indicate that the removal of TNT's devices from Midwest Petroleum was not requested in order to make room for additional Torch Devices, that is inconsistent with other portions of Mr. Head's testimony. For example, Mr. Head testified that TNT's amusement devices were removed because Torch Devices

were more profitable. *See* **Ex. 60** (Doc. #98-23) (Dep. of Tracy Head) at 69:13–70:6. Moreover, the

timing of the removal of TNT's devices vis-à-vis the introduction of additional Torch Devices

supports the inference that TNT's devices were, as Mr. Head stated, removed to make room for

additional Torch Devices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 135–194. TNT's business records

likewise support that inference. *See* Pl.'s SUMF Ex. 59 (Doc. #96-12) at 43–63.


132.   Head also said that some of TNT's documents showed that TNT's devices were
removed for "preventative maintenance." (*Id*. at 91:25-93:23 (Q: "And so these are -- this is a work
order detail talking about moving out that gumball machine from Midwest, right? A. Yeah. It looks
like they performed preventative maintenance to make sure it's ready for its next location. Q.
Okay. And you see where it says from location to shop; is that right? A. To perform the
preventative maintenance, yes.")).

**Response:** TNT admits that Paragraph 132 accurately recites a portion of Mr. Head's

testimony. To the extent that Defendants imply that the foregoing statements indicate that the

removal of TNT's devices from Midwest Petroleum was not requested in order to make room for

additional Torch Devices, that is inconsistent with other portions of Mr. Head's testimony. For

example, Mr. Head testified that TNT's amusement devices were removed because Torch Devices

were more profitable. *See* **Ex. 60** (Doc. #98-23) (Dep. of Tracy Head) at 69:13–70:6. Moreover, the

timing of the removal of TNT's devices vis-à-vis the introduction of additional Torch Devices

supports the inference that TNT's devices were, as Mr. Head stated, removed to make room for

additional Torch Devices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 135–194. TNT's business records

likewise support that inference. *See* Pl.'s SUMF Ex. 59 (Doc. #96-12) at 43–63.


133.   The Cuba, Missouri location of Midwest Petroleum was sold in September 2022.
(*Id*. at 27:23-28:4).

**Response:** Admitted.

134.    Head was curious about why TNT was "on the Torch Electronics things" with respect to the removal of the coin pusher machines because, he said, TNT devices "were replaced with Midwest owned games. . . . It had nothing to do with Torch, Midwest bought their [Midwest's] own games." (*Id.* at 127:10-128:5).

**Response:** TNT admits that Paragraph 134 accurately recites a portion of Mr. Head's testimony. To the extent that Defendants imply that the foregoing statements indicate that the removal of TNT's devices from Midwest Petroleum was not requested in order to make room for additional Torch Devices, that is inconsistent with other portions of Mr. Head's testimony. For example, Mr. Head testified that TNT's amusement devices were removed because Torch Devices were more profitable. *See* **Ex. 60** (Doc. #98-23) (Dep. of Tracy Head) at 69:13–70:6. Moreover, the timing of the removal of TNT's devices vis-à-vis the introduction of additional Torch Devices supports the inference that TNT's devices were, as Mr. Head stated, removed to make room for additional Torch Devices. *See* Pl.'s SUMF (Doc. #95) ¶¶ 135–194. TNT's business records likewise support that inference. *See* Pl.'s SUMF Ex. 59 (Doc. #96-12) at 43–63.

135.    Head said new owners of the Cuba, Missouri truck stop "took everything out" from the location, including TNT games and Torch devices. (*Id.* at 81:25-82:9 (Q: "So it's true that whenever TA Travel Center bought Midwest Petroleum, that they chose not to take on or continue to take on TNT as a vendor, right? A. Yeah. That would be totally -- that was totally up to TA. And they -- they took everything out. Q. But TA kept Torch devices in there, correct? A. No."); *see also* **Ex. U**, Miltenberger Dep., 103:3-21 (testifying Torch stopped operating devices at the Midwest Petroleum in Cuba, Missouri, when the locations were sold to new owners)).

**Objection:** Mr. Head is not employed by TA, which purchased the Cuba, Missouri Midwest Petroleum location, and therefore there is insufficient foundation that he has personal knowledge as to what TA did or did not do. *See* Dep. of Tracy Head at 43:20–23 (testifying that Mr. Head did not work for TA after November 2022).

**Response:** Subject to and without waiving the foregoing objections, TNT admits that the Paragraph 135 accurately recites portions of Mr. Head's testimony.

136.    Torch's Cole County declaratory judgment lawsuit against the Missouri Department of Public Safety (to include the Missouri Highway Patrol) continues. The case is presently on appeal following a decision by the circuit court the parties lacked standing to maintain the lawsuit. (*See* State Court Docket Sheets, true and correct copies of which are attached as **Exhibit Y**).

**Response:** TNT admits that Torch has appealed the judgment of the Circuit Court of Cole County, which dismissed Torch's declaratory judgment lawsuit for lack of standing.

### ADDITIONAL EVIDENCE PRECLUDING SUMMARY JUDGMENT FOR DEFENDANTS

**A. Defendants Have Made Numerous False <u>Factual</u> Representations as to the Functions of the Torch Devices**

137.    TNT hereby incorporates by reference, as if fully set forth herein, Paragraphs 1, 4, 7, 8, 20–22, and 50–100 of its SUMF (Doc. #95) (describing the functions of the Torch Devices) and paragraphs 100–11 of its SUMF (Doc. #95) (detailing Defendants' misrepresentations), along with any response Defendants may make to the same.

**B. Defendants Have Expressly Misrepresented the Text of Missouri Revised Statute § 572.010 to the Public**

138.    TNT hereby incorporates by reference, as if fully set forth herein, Paragraphs 102 and 103 of its SUMF (Doc. #95) (describing decal falsely stating that Missouri law provides that, "in order for a device to be considered a 'gambling device,' the device must be ***designed for use*** in the playing phase of 'gambling'"), along with any response Defendants may make to the same. *Cf.* Mo. Rev. Stat. § 572.010 (defining "gambling device" to include any device that is "***used or usable***" in the playing phase of a gambling activity).

**C. Defendants Have Made Numerous Objectively False Representations as to the Legality of the Torch Devices**

139.    TNT hereby incorporates by reference, as if fully set forth herein, Paragraphs 1, 4, 7, 8, 20–22, and 50–100 of its SUMF (Doc. #95) (describing the functions of the Torch Devices)

and paragraphs 100–11 of its SUMF (Doc. #95) (detailing Defendants' misrepresentations), along with any response Defendants may make to the same.

**D.  The Missouri Gaming Commission and Multiple Missouri Courts Have Declared the Torch Devices or Devices Like Them to Be Illegal Gambling Devices**

140.    TNT hereby incorporates by reference, as if fully set forth herein, Paragraphs 195 and 196 of its SUMF (Doc. #95) (describing 2019 MGC Letter), along with any response Defendants may make to the same.

141.    Defendants Torch and Steven Miltenberger received a copy of the MGC's July 3, 2019, Letter on or before July 5, 2019. *See* Pl.'s SUMF Ex. 2 (Doc. #95-2) at 171:13–176:21.

142.    Defendants Torch and Steven Miltenberger were aware of the September 2020 Platte County case in which a gas station owner plead guilty to felony promotion of gambling as a result of placing 11 "no chance" devices in his business. *See* Pl.'s SUMF (Doc. #95) ¶¶ 67–68 (indicating that Miltenberger was aware of the Integrity Vending case, and that the only difference he was aware of between the Torch Devices and the "no chance" devices in that case was whether the player had to insert money to utilize the "Prize Viewer" mechanism); *see also* Pl.'s SUMF (Doc. #95) ¶ 81 (March 2021 guilty plea of Andrew County gas station owner for possession of a gambling device for 11 "no chance" games).

143.    Defendants Torch and Steven Miltenberger were aware of the ongoing prosecution in Franklin County of James McNutt, President of Midwest Petroleum, for three misdemeanor counts of possession of a gambling device. *See* Pl.'s SUMF Ex. 2 (Doc. #95-2) (Dec. 15, 2023 Dep. of Steven Miltenberger) at 303:2–303:18; **Ex. 68** hereto (summons to James McNutt).

144.    Defendants are paying for Mr. McNutt's legal fees, as they offer to do for all of customers charged with criminal offenses due to placing Torch Devices in their businesses. Pl.'s SUMF Ex. 2 (Doc. #95-2) (Dec. 15, 2023 Dep. of Steven Miltenberger) at 303:2–303:18.

**E. TNT Has Adduced Evidence of Damages, Including the Removal of TNT Devices from Overlapping Locations, as a Result of Torch's Illegal Conduct**

145.    TNT hereby incorporates by reference, as if fully set forth herein, Paragraphs 135–96 of its SUMF (Doc. #95) (describing impacts on TNT's business), along with any response Defendants may make to the same.

Dated: February 2, 2024                    Respectfully submitted,

                                           BRYAN CAVE LEIGHTON
                                           PAISNER LLP

                                           */s/ Richard E. Finneran*
                                           RICHARD E. FINNERAN, #60768MO
                                           MARY GRACE WARREN, #73147MO
                                           211 North Broadway, Suite 3600
                                           St. Louis, Missouri 63102
                                           Tel: (314) 259-2000
                                           Fax: (314) 259-2020
                                           richard.finneran@bryancave.com
                                           marygrace.warren@bryancave.com

                                           *Attorneys for TNT Amusements, Inc.*
                                           *d/b/a Play-Mor Coin-Op*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 2, 2024, the foregoing was served via the Court's electronic filing system upon all parties of record.

                                           */s/ Richard E. Finneran*