**Exhibit 1**

Excerpts of Rule 30(b)(6) Deposition of S. Miltenberger
January 9, 2024

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MISSOURI
 2                   EASTERN DIVISION
 3
    TNT AMUSEMENTS, INC.,      )
 4  d/b/a PLAY-MOR COIN-OP,    )
                               )
 5            Plaintiff,       )
                               )
 6                             )
    vs.                        ) Case No. 4:23-cv-330
 7                             ) JAR
    TORCH ELECTRONICS,         )
 8  LLC., et al,               )
                               )
 9            Defendants.      )
                               )
10
11
12
13        *PORTIONS DESIGNATED CONFIDENTIAL*
14              ATTORNEYS EYES ONLY
15
16
17        ZOOM VIDEOTAPED 30(b)(6) DEPOSITION OF
18  STEVEN MILTENBERGER on behalf of Torch
19  Electronics, Defendants, taken on behalf of the
20  Plaintiff before Peggy E. Corbett, CSR, CCR, RDR,
21  pursuant to Notice on the 9th day of January,
22  2024, at the residence of the witness in
23  St. Louis, Missouri.
24
25
```

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 18

1      Q.   Have you and your wife been employees

2    since the founding of Torch?

3            MR. CRAIG:  Jonathan, this was

4    completely covered already in his personal

5    deposition and this is not a topic that was

6    noticed.

7            MR. POTTS:  Aaron, he had to

8    prepare for the deposition today, didn't he?

9            MR. CRAIG:  This is not a topic he

10    had to prepare about.  Point me to in your topics

11    where you are talking about the history of Torch

12    and its employees.

13            MR. POTTS:  Aaron, we're going to

14    have a very, very long day.

15            MR. CRAIG:  You're right.  Point me

16    to where it's at in your topics.

17      Q.   (BY MR. POTTS)  Mr. Miltenberger, who

18    did you consult with to prepare for your

19    deposition today, other than your attorneys?

20      A.   My attorneys.

21      Q.   Did you consult with your wife Sondra

22    about the topics that are set forth in your

23    deposition?

24      A.   No.

25            MR. CRAIG:  Object to form.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 20

```
 1              MR. POTTS:  That's the identity --
 2              MR. CRAIG:  That's the reason why
 3    we had the agreement to move his personal
 4    deposition earlier, was so that we didn't have to
 5    re-do this whole nonsense.
 6              Rich Finneran made a decision, probably
 7    without you, to strike out this and other topics,
 8    okay.  So that is not a topic that is on the
 9    board for today.  All right?
10       Q.   (BY MR. POTTS)  Uh-huh.  Does Torch
11    currently employ any independent contractors?
12              MR. CRAIG:  Do not answer the
13    question.  Jonathan, move to a topic that is
14    noticed up and not stricken.
15       Q.   (BY MR. POTTS)  Are you going to follow
16    your attorney's instruction and refuse to answer
17    that question?
18       A.   Yes.
19       Q.   Did you consult with any of Torch's
20    independent contractors to prepare for today's
21    deposition?
22       A.   No.
23       Q.   Would it have been possible for you to
24    consult with any of Torch's independent
25    contractors to prepare for today's deposition?
```

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 21

1          MR. CRAIG:  Object to form.

2      A.   What do you mean would it be possible?

3  What does that mean?

4      Q.   (BY MR. POTTS)  Do you have means of

5  communicating with Torch's independent

6  contractors?

7      A.   Yes, I'm able to communicate with

8  Torch's independent contractors.

9      Q.   If you had questions could you call the

10  independent contractors on the phone and ask

11  them?

12      A.   If I had questions, could I call them?

13      Q.   Yes.

14      A.   Yes, I can call people.  I can call

15  independent contractors.

16      Q.   If you had questions about preparing for

17  today's deposition, could you send the

18  independent contractors a text to ask them those

19  questions?

20          MR. CRAIG: Object to form.

21      A.   Yes, I could send them a text.

22      Q.   (BY MR. POTTS)  If you had questions to

23  prepare for today's deposition could you send

24  those independent contractors an e-mail?

25      A.   Yes.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 23

1        MR. CRAIG:  Object to form, I mean

2    considering this has been like a month long or

3    more process.  You can answer to the extent you

4    are able.

5        MR. POTTS:  Aaron, I think the

6    speaking objections need to get nipped in the bud

7    really, really quickly today.  I won't hesitate

8    to call up Judge Ross' chambers and go through

9    all of this.

10       MR. CRAIG:  Okay, keep going.

11    A.   I don't remember when we -- when I

12    started.

13    Q.   (BY MR. POTTS)  Have you been preparing

14    for more or less than a week for today's

15    deposition.

16            MR. CRAIG: Object to form.

17    A.    We have been talking about it for more

18    than a week.

19    Q.   (BY MR. POTTS)  I appreciate that, but

20    that's not quite my question.  How long have you

21    actually been preparing for today's deposition?

22            MR. CRAIG: Object to form.

23    A.    I don't remember.

24    Q.   (BY MR. POTTS)  How many times did you

25    meet with your attorneys to prepare for today's

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 24

1   deposition?

2           MR. CRAIG: Object to form.

3      A.   I don't remember that.

4      Q.   (BY MR. POTTS)  When was the last time

5   you met with your attorneys to prepare for

6   today's deposition?

7      A.   Yesterday.

8      Q.   Before yesterday, when was the previous

9   time you met with your attorneys to testify -- to

10  prepare for today's deposition?

11          MR. CRAIG: Object to form.

12     A.   I don't remember.

13     Q.   (BY MR. POTTS)  Did you meet with your

14  attorneys last week to prepare for today's

15  deposition?

16          MR. CRAIG: Object to form.

17     A.   Yeah, I don't remember that.

18     Q.   (BY MR. POTTS)  Why didn't you speak

19  with your wife to prepare for your deposition

20  today?

21          MR. CRAIG: Object to form.

22     A.   I just didn't.

23     Q.   (BY MR. POTTS)  Did you consider

24  speaking to her to prepare for the topics in

25  today's deposition?

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 25

1              MR. CRAIG: Object to form.

2        A.    No.

3        Q.    (BY MR. POTTS)  Why didn't you speak

4    with any of the independent contractors to

5    prepare for today's deposition?

6              MR. CRAIG: Object to form.

7        A.    I don't know.  I didn't feel like I

8    needed to.

9        Q.    (BY MR. POTTS)  Did you speak with Nick

10   Farley to prepare for today's deposition?

11             MR. CRAIG: Object to form.

12       A.    No.

13       Q.    (BY MR. POTTS)  So other than your

14   attorneys, did you speak with anyone to prepare

15   for today's deposition?

16             MR. CRAIG: Object to form.

17       A.    No.

18       Q.    (BY MR. POTTS)  Did you create any

19   documents to prepare for today's deposition?

20             MR. CRAIG: Object to form.

21       A.    Not that I can remember.

22       Q.    (BY MR. POTTS)  Did you prepare yourself

23   to discuss Torch's financial information with

24   respect to certain locations?

25       A.    I reviewed with counsel.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 42

1      A.   Ask the question again.

2      Q.   (BY MR. POTTS)   Okay.  For all of these

3   devices, does the prize viewer show the outcome

4   of any play after the next play?

5           MR. CRAIG:   Same objection.

6      A.   Ask the question again.

7      Q.   (BY MR. POTTS)   For all of these

8   devices, does the prize viewer show the outcome

9   of any play after the next play?

10          MR. CRAIG: Object to form.

11     A.   I don't know.

12     Q.   (BY MR. POTTS)   For all of these

13   devices, do they all have a sequential list of

14   outcomes?

15          MR. CRAIG:   Object to form, calls

16   for expert testimony.

17     A.   I don't know.

18     Q.   (BY MR. POTTS)   For all of these

19   devices, do the games cycle through that

20   sequential list of outcomes?

21          MR. CRAIG: Object to form, calls

22   for expert testimony and opinion.

23     A.   I don't know.

24     Q.   (BY MR. POTTS)   For all of these

25   devices, does the game repeat the same sequential

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 43

1    list after it cycles through?

2                  MR. CRAIG: Object to form, calls

3    for expert testimony and opinions.

4         A.    I don't know.

5         Q.    (BY MR. POTTS)   For all of these devices

6    is that list pre-determined before the player

7    begins playing the game?

8                  MR. CRAIG:   Object to form, calls

9    for expert testimony and opinions.

10        A.    I don't know.

11        Q.    (BY MR. POTTS)   For all of these

12   devices, is that list finite?

13                 MR. CRAIG: Object to form, calls

14   for expert testimony and opinions.

15        A.    I don't know.

16        Q.    (BY MR. POTTS)   For all of these

17   devices, does the device randomly select the

18   first outcome on that list?

19                 MR. CRAIG: Object to form, calls

20   for expert testimony and opinions.

21        A.    I don't know.

22        Q.    (BY MR. POTTS)   For all of these devices

23   can players or location owners modify, influence

24   or otherwise control the outcome of any turn?

25                 MR. CRAIG: Object to form, object,

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 44

1    ambiguous, vague, calls for expert testimony and

2    opinions.

3         A.    I don't know.

4         Q.    (BY MR. POTTS)   As the president of the

5    company can you tell the jury how these games

6    work?

7                   MR. CRAIG: Object to form, calls

8    for expert testimony and opinions, vague and

9    ambiguous.

10        A.    I don't know.

11        Q.    (BY MR. POTTS)   Earlier you used the

12   word "suite," right?

13        A.    Yes.

14        Q.    Are there individual types of game play

15   on each one of these devices?

16                   MR. CRAIG: Object to form.

17        A.    I don't know what you mean.

18        Q.    (BY MR. POTTS)   Sure.   So let's say that

19   a player walks up to an NCGI okay?   Are you

20   following me at least so far?

21        A.    Yes.

22        Q.    How does someone play the game?

23                   MR. CRAIG: Object to form,

24   speculation.

25        A.    I don't know how they play the game.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 45

1        Q.    (BY MR. POTTS)   As the president of

2    Torch you don't know how patrons use your games?

3                MR. CRAIG: Object to form,

4    speculation, argumentative.

5        A.    I don't know how they play the game.

6        Q.    (BY MR. POTTS)   Are all of these devices

7    manufactured exclusively by Banilla Games?

8                MR. CRAIG: Object to form.

9        A.    Yes.

10       Q.    (BY MR. POTTS)   Has Torch requested that

11   Banilla make changes to any of these devices

12   listed on Interrogatory Exhibit A?

13               MR. CRAIG: Object to form.

14       A.    What kind of changes?

15       Q.    (BY MR. POTTS)   Any kind of changes.

16               MR. CRAIG: Object to form.

17       A.    Can you ask again?

18       Q.    (BY MR. POTTS)   Has Torch requested that

19   Banilla make any types of changes to any of these

20   devices?

21               MR. CRAIG: Object to form.

22       A.    Yes.

23       Q.    (BY MR. POTTS)   Okay.   Let's just go

24   through each one of these sequentially.   Has

25   Torch requested that Banilla Games make changes

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 46

1     to NCG 1?

2                    MR. CRAIG: Object to form.

3          A.    I don't remember.

4          Q.    (BY MR. POTTS)  Has Torch requested that

5     Banilla make changes to NCG 2?

6                    MR. CRAIG: Object to form.

7          A.    I don't remember.

8          Q.    (BY MR. POTTS)  Has Torch requested that

9     Banilla make changes to NCG 3?

10                    MR. CRAIG: Object to form.

11         A.    I don't remember.

12         Q.    (BY MR. POTTS)  Has Torch requested that

13    Banilla make changes to NCG 4?

14                    MR. CRAIG: Object to form.

15         A.    I don't remember.

16         Q.    (BY MR. POTTS)  Has Torch requested that

17    Banilla make changes to NCG 5?

18                    MR. CRAIG: Object to form.

19         A.    I don't remember.

20         Q.    (BY MR. POTTS)  Has Torch requested that

21    Banilla make changes to NCG Deluxe 1?

22                    MR. CRAIG: Object to form.

23         A.    I don't remember.

24         Q.    (BY MR. POTTS)  Has Torch requested that

25    Banilla make changes to NCG Deluxe 2?

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 47

1           MR. CRAIG: Object to form.

2      A.    I don't remember.

3      Q.    (BY MR. POTTS)   Has Torch requested that

4  Banilla make changes to NCG Deluxe 3?

5           MR. CRAIG: Object to form.

6      A.    I don't remember.

7      Q.    (BY MR. POTTS)   Has Torch requested that

8  Banilla make changes to NCG Deluxe 4?

9           MR. CRAIG:   I don't remember.

10     Q.    (BY MR. POTTS)   Has Torch requested that

11  Banilla make changes to NCG Deluxe 5?

12          MR. CRAIG: Object to form.

13     A.    I don't remember.

14     Q.    (BY MR. POTTS)   Has Torch requested that

15  Banilla make changes to NCG Dual?

16          MR. CRAIG: Object to form.

17     A.    I don't remember.

18     Q.    (BY MR. POTTS)   Has Torch requested that

19  Banilla make changes to NCG Skyriser?

20          MR. CRAIG: Object to form.

21     A.    I don't remember.

22     Q.    (BY MR. POTTS)   Has Torch requested that

23  Banilla make changes to NCG Hot Locks?

24          MR. CRAIG: Object to form.

25     A.    I don't remember.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 53

1  for legal conclusions and expert testimony.  You
2  can answer.
3       A.   Torch then places equipment in
4  locations.  You know, it would be looked at.
5  Again, we place equipment and we share in the
6  revenue.
7       Q.   (BY MR. POTTS)  Do you place that
8  equipment on the premises of your customers?
9       A.   Yes.
10      Q.   Do you place that equipment on the
11  premises with the permission of your customers?
12      A.   Yes.
13              THE VIDEOGRAPHER:  Jonathan, did
14  you want to leave that exhibit up?
15              MR. POTTS:  It's fine for right
16  now.
17              THE VIDEOGRAPHER:  Okay.
18      Q.   (BY MR. POTTS)  With respect to any of
19  the overlapping locations, has Torch ever had a
20  written contract with any of those customers.
21              MR. CRAIG:  Object.
22      A.   I can't remember.
23      Q.   (BY MR. POTTS)  With respect to the
24  overlapping locations, has Torch ever had an oral
25  agreement with any of those customers?

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 54

1          MR. CRAIG:  Object to form, vague

2     and ambiguous, calls for a legal conclusion.

3          A.   With respect to the overlapping

4     locations, yes, Torch had a, had an agreement

5     with the location.

6          Q.   (BY MR. POTTS)  Is it the same agreement

7     for each one of those locations?

8          A.   Yes, the agreement is we place the

9     equipment and share in the profit.

10          Q.   Are those all of the terms of those

11     agreements?

12          MR. CRAIG: Object to form, calls

13     for a legal conclusion.

14          A.   I don't remember.

15          Q.   (BY MR. POTTS) As the president of the

16     company you're responsible for the company's

17     contractual commitments, right?

18          MR. CRAIG: Object to form, calls

19     for a legal conclusion.

20          A.   I don't know.

21          Q.   (BY MR. POTTS)  As the president of the

22     company can you tell the jury all the terms of

23     your oral agreements with these overlapping

24     locations?

25          MR. CRAIG:  Object to form, calls

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 55

1   for a legal conclusion.  You can answer to the

2   extent you can answer.

3       A.   I don't remember.

4       Q.   (BY MR. POTTS)  As the president of the

5   company, other than the terms you've already

6   described, can you tell the jury any other terms

7   of these agreements that you have with the

8   customers at the overlapping locations?

9           MR. CRAIG: Object to form, calls

10  for a legal conclusion.

11      A.   I don't remember.

12      Q.   (BY MR. POTTS)  I think we're due for a

13  break right now.  Do you want to take 10?

14          MR. CRAIG:  Sounds good.

15          MR. POTTS:  All right.

16          THE VIDEOGRAPHER:  The time is

17  approximately 10:17 a.m.  We are going off the

18  video record.

19                (Recess)

20          THE VIDEOGRAPHER:  The time is

21  approximately 10:32 a.m.  We are back on the

22  video record.  Go ahead.

23      Q.   (BY MR. POTTS)  All right.  We are back

24  and you are still under oath, Mr. Miltenberger.

25  Who was responsible for maintaining the financial

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 57

1      A.   Overseeing the company and running the

2  business.

3      Q.   Does overseeing the company and running

4  the business include oversight of the financial

5  management of the company?

6      A.   Yeah.

7           MR. CRAIG:  Object to form.

8      Q.   (BY MR. POTTS)  Did you speak with your

9  accountants to prepare for today's deposition?

10     A.   No.

11     Q.   A few other costs I want to delve into.

12  Does Torch own or lease any real property?

13          MR. CRAIG:  Object to form.

14     A.   Torch leases property.

15     Q.   (BY MR. POTTS) What property does Torch

16  lease?

17     A.   Torch leases a warehouse, two warehouse

18  facilities in Chesterfield, Missouri, Torch

19  leases a warehouse in Springfield, Missouri and

20  Torch leases a warehouse in Boonville, Missouri,

21  and a warehouse in Kirksville, Missouri.

22     Q.   Let's start with the two warehouses in

23  Chesterfield.  How long has Torch leased those

24  two warehouses in Chesterfield?

25     A.   I don't remember that.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 70

1   Torch pays for devices, and I am willing to allow

2   him to again testify consistent with that prior

3   testimony here today, okay.

4           So with that caveat and knowing that

5   you're asking him about the shared device

6   locations, you can respond, Mr. Miltenberger.

7           And is it okay if I have a running

8   objection so that I don't have to do this every

9   single time that you ask him about every single

10  device that's on Interrogatory Exhibit A.

11          MR. POTTS:  Yes, you can have a

12  running objection.

13          MR. CRAIG:  Okay.

14      Q.  (BY MR. POTTS)  Would you like me to

15  repeat the question, Mr. Miltenberger?

16      A.  Please.

17      Q.  (BY MR. POTTS)  What is the price that

18  Torch pays for an NCG Hot Locks device at the

19  overlapping locations?

20      A.  I don't remember.

21      Q.  What is the price that Torch pays for an

22  NCG Skyriser device at the overlapping locations?

23      A.  I don't remember.

24      Q.  What is the price that Torch pays for an

25  NCG Dual device at the overlapping locations?

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 71

1        A.    I don't remember.

2        Q.    What is the price that Torch pays for an

3    NCG Deluxe 5 at the overlapping locations?

4        A.    I don't remember.

5        Q.    What is the price that Torch pays for a

6    Deluxe 4 device at the overlapping locations?

7        A.    I don't remember.

8        Q.    What is the price that Torch pays for an

9    NCG Deluxe 3 at the overlapping locations?

10        A.    I don't remember.

11        Q.    What is the price that Torch pays for an

12    NCG Deluxe 2 at the overlapping locations?

13        A.    I don't remember.

14        Q.    What is the price that Torch pays for an

15    NCG Deluxe 1 at the overlapping locations?

16        A.    I don't remember.

17        Q.    What is the price that Torch pays for an

18    NCG 5 at the overlapping locations?

19        A.    I don't remember.

20        Q.    What is the price that Torch pays for an

21    NCG 4 at the overlapping locations?

22        A.    I don't remember.

23        Q.    What is the price that Torch pays for an

24    NCG 3 device at the overlapping locations?

25        A.    I don't remember.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 72

1      Q.    What is the price that Torch pays for an
2   NCG 2 at the overlapping locations?
3      A.    I don't remember.
4      Q.    What is the price that Torch pays for an
5   NCG 1 at the overlapping locations?
6      A.    I don't remember.
7      Q.    As the president of the company are you
8   unable to tell the jury the price that Torch has
9   paid for any one of these 13 devices at the
10  overlapping locations?
11          MR. CRAIG: Object to form,
12  inconsistent with the prior testimony.  He said
13  he doesn't remember.
14     A.    I don't remember the prices.
15     Q.    (BY MR. POTTS)  In the ordinary course
16  of business, how does Torch calculate its profit?
17          MR. CRAIG: Object to form.
18     A.    How does it calculate its profits?  What
19  do you mean?
20     Q.    (BY MR. POTTS)  In the ordinary course
21  of business how does Torch calculate its profits
22  in running its business.
23          MR. CRAIG: Object to form, vague
24  and ambiguous, speculative.
25     A.    As far as our annual profits that's

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 80

1    exist?

2                MR. CRAIG:  Object to form, assumes

3    facts.

4        A.    What documents?

5        Q.    (BY MR. POTTS)  Are there any documents

6    that exist that were created in the ordinary

7    course of Torch's business that described the

8    profitability of the overlapping locations?

9        A.    Not that I can remember.

10               MR. CRAIG:  Object to form.  Yeah,

11   that's fine.

12       Q.    (BY MR. POTTS)  Have you searched for

13   those documents at all?

14               MR. CRAIG: Object to form, assumes

15   facts, such as he has that obligation and not his

16   attorneys.

17       Q.    (BY MR. POTTS)  You can answer.

18       A.    I don't remember.

19       Q.    In 2023 what was Torch's overhead for

20   labor costs?

21               MR. CRAIG: Object to form, beyond

22   the scope of the deposition and goes beyond the

23   agreement of the parties and the Court's

24   stipulated order as to overall profitability

25   which would include costs.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 82

1          MR. CRAIG:  Object to form, asked
2    and answered, I believe.  You can respond.
3        A.   I mean as far as the profitability for
4    the company, everything gets put together as a
5    total.  The location reports, you know, they show
6    our -- the net which is our gross profit.
7        Q.   (BY MR. POTTS)  With respect to the cost
8    of labor, in particular, let's say you have a big
9    number, a number of X.  Let's do a fake number
10   actually.  Let's strike that.
11            Let's say your annual costs of labor
12   were $100,000, okay, across the entire business
13   in the State of Missouri okay are you following
14   me so far?
15       A.   Yes.
16       Q.   How would Torch allocate that $100,000
17   of labor costs across the individual locations?
18            MR. CRAIG: Object to form, improper
19   hypothetical, calls for expert testimony.
20       A.   I don't know.
21       Q.   (BY MR. POTTS)  You don't know?
22       A.   No.
23       Q.   Is your salary a cost that's allocated
24   to individual customer locations to determine
25   profitability?

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 84

1    those profits pro rata based on equity ownership?

2            MR. CRAIG: Object to form, beyond

3    the scope.

4        A.   Ask it again.

5        Q.   (BY MR. POTTS)    Has Torch distributed

6    those profits to the owners pro rata based on

7    equity ownership?

8            MR. CRAIG: Object to form, beyond

9    the scope.   To the extent you can answer,

10   limiting your response to the overlapping

11   locations, you can do so.

12       A.   I don't know.

13       Q.   (BY MR. POTTS)    Who decided how to

14   distribute those profits?

15            MR. CRAIG: Object to form, same

16   instructions.

17       A.   I don't know.

18       Q.   (BY MR. POTTS)    You're the majority

19   owner of the company, right?

20       A.   Yes.

21       Q.   As the majority owner of the company you

22   don't know who made the decision how to

23   distribute the profits?

24            MR. CRAIG: Object to form,

25   argumentative.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 85

1    A.    I don't know how the profits were

2    distributed in relation to the locations that

3    we're talking about.

4    Q.    (BY MR. POTTS)  And just to be clear,

5    when we're talking about these overlapping

6    locations we're talking about locations where TNT

7    and Torch devices have been located at one time

8    or another, correct?

9             MR. CRAIG: Object to form.  I

10   believe that's technically an inaccurate

11   description but you can respond to the extent you

12   can.

13   A.    From what I understand minus a couple of

14   locations that were on the list in error.

15   Q.    (BY MR. POTTS)  And let's go ahead and

16   jump into that topic.  I'm going to go ahead and

17   share my screen.  And I'm sorry, Peggy, do you

18   know, are we on Exhibit --

19             MR. CRAIG: 6.

20             MR. POTTS: -- 6?

21             THE REPORTER: We had 4.  I'm not

22   sure I'm finding 5.  Hang on.

23             MR. CRAIG: 5 is the South Bistro.

24             (Exhibit 6 was marked by the

25   reporter for identification.)

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 165

1      A.   I am.

2      Q.   How long has Torch had a business

3  relationship with Mr. Farley or his company?

4           MR. CRAIG:   Object to form.

5      A.   I'm not sure.  I don't know.

6      Q.   (BY MR. POTTS)  Over the years either

7  Mr. Farley or his company have examined various

8  Torch devices, correct?

9      A.   That's correct.

10     Q.   Have you reviewed the results of those

11 examinations?

12     A.   I have.

13     Q.   Are Mr. Farley's expenses one of Torch's

14 costs over the years?

15     A.   They are.

16     Q.   Over the years how much has Torch paid

17 Mr. Farley for all of his testing?

18     A.   I don't know that.

19     Q.   And Torch has designated Mr. Farley as a

20 potential expert in this case, correct?

21     A.   From what I understand, yes, from what I

22 understand.

23     Q.   And have you reviewed Mr. Farley's

24 report dated November 6th in this case?

25     A.   I don't remember that.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 169

1    do you see any other devices that are listed

2    there on the first page of Mr. Farley's report?

3        A.   No, I don't see any.

4        Q.   We're going to take that down now.

5    Let's go ahead and pull up what I believe was

6    Exhibit 2.  Are you able to see Exhibit 2,

7    Mr. Miltenberger?  Actually, that's not Exhibit

8    2.  That should actually be Exhibit 4.  I

9    apologize.  Are you able to see Exhibit 4?

10              MR. CRAIG:  So this is Exhibit 4

11   from the deposition today, correct?

12              MR. POTTS:  Correct, yeah.

13              MR. CRAIG:  Okay.

14       Q.   (BY MR. POTTS)  Are you able to see

15   that, Mr. Miltenberger?

16       A.   Yes, I see it.

17       Q.   All right.  So we were just looking

18   through Mr. Farley's report and we saw references

19   to NCG 1, NCG 2, NCG 3, NCG 4, NCG 5, and NCG

20   Deluxe 1, right?

21       A.   That's correct.

22       Q.   Okay.  Have you ever retained Mr. Farley

23   to examine NCG 5?

24              MR. CRAIG:  Object to form.

25       A.   I believe so.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 170

1      Q.    (BY MR. POTTS)   Did he prepare a written
2    report with the contents of his findings?
3      A.    I can't remember.
4      Q.    Have you ever retained Mr. Farley to
5    examine NCG Deluxe 2?
6            MR. CRAIG:   Object to form.
7      A.    I believe so.
8      Q.    (BY MR. POTTS)   Did he prepare a written
9    report with his findings?
10     A.    I can't remember.   All of that went
11   through our attorney.
12     Q.    Did you ever retain Mr. Farley to
13   examine NCG Deluxe 3?
14           MR. CRAIG:   Object to form.
15     A.    Again, that would be our attorney doing
16   that.
17     Q.    (BY MR. POTTS)   Do you know one way or
18   another whether Mr. Farley was retained by you or
19   your attorneys to examine NCG Deluxe 3?
20           MR. CRAIG:   Object to form.
21     A.    I can't remember.
22     Q.    (BY MR. POTTS)   Do you know whether you
23   or your attorneys have ever retained Mr. Farley
24   to examine NCG Deluxe 4?
25           MR. CRAIG:   Object to form.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 171

1        A.     I believe we have, but I can't remember.

2        Q.     (BY MR. POTTS)    Did Mr. Farley prepare a

3    report with respect to his findings regarding NCG

4    Deluxe 4?

5        A.     I don't remember.

6        Q.     Have you or your attorneys retained

7    Mr. Farley to examine NCG Deluxe 5?

8        A.     I don't remember that.

9        Q.     Have you or your attorneys retained

10   Mr. Farley to examine NCG Dual?

11       A.     I don't remember.

12       Q.     Have you or your attorneys retained

13   Mr. Farley to examine NCG Skyriser?

14            MR. CRAIG:   Object to form.

15       A.     I don't remember.

16       Q.     (BY MR. POTTS)    Have you or your

17   attorneys retained Mr. Farley to examine NCG Hot

18   Locks?

19            MR. CRAIG:   Object to form.

20       A.     I don't remember.

21       Q.     (BY MR. POTTS)    Did you review any of

22   his findings with respect to any of those devices

23   to prepare for your deposition today?

24            MR. CRAIG:   Object to form.

25       A.     I don't remember that.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 173

1      Q.   (BY MR. POTTS)  As the president of this
2  company, can you tell the jury why you're not
3  involved in a gambling business?
4           MR. CRAIG:  Object to the form of
5  the question, calls for legal conclusions, legal
6  opinions, expert testimony.
7      A.   I can't answer.
8      Q.   (BY MR. POTTS)  Did any Torch employees
9  ever independently examine the software for the
10  Torch devices?
11           MR. CRAIG:  Object to the form of
12  the question.
13      A.   Ask that again.
14      Q.   (BY MR. POTTS)  Has any Torch employees
15  or independent contractors other than Mr. Farley
16  ever examined the software for any Torch devices?
17      A.   I don't remember.
18           MR. CRAIG:  Object to the form of
19  the question.
20      Q.   (BY MR. POTTS)  Are there any
21  independent contractors within the company who
22  would be qualified to conduct that type of
23  examination?
24           MR. CRAIG:  Object to the form of
25  the question, speculation, improper hypothetical,

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 174

1   calls for expert testimony.

2       A.   I don't know.

3       Q.   (BY MR. POTTS)  Do you know the

4   qualifications of the company's independent

5   contractors?

6            MR. CRAIG:  Object to the form of

7   the question.

8       A.   I don't know.

9       Q.   (BY MR. POTTS)   Let's talk about what

10  Torch devices all have in common, okay, and I can

11  pull up the list if you want to, but I'm talking

12  about NCG 1 through 5, NCG Deluxe 1 through 5,

13  NCG Dual, NCG Skyriser, and NCG Hot Locks, okay?

14  Can you hear me okay?

15      A.   Yes.

16      Q.   Okay.  All right, when someone walks up

17  to a Torch device, what's the first step that

18  they do in order to engage with the game?

19            MR. CRAIG:  Object to the form of

20  the question, seeks speculative testimony.

21      A.   I don't know.

22      Q.   Can they put in money?

23      A.   Can they put money into the Torch

24  device?

25      Q.   Yes.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 176

1        Q.    And then do players play the game?

2    Would you use that type of terminology if you

3    were talking within the company?

4               MR. CRAIG:  Object to form,

5    ambiguous, vague.

6        A.    It depends how the player is using the

7    game.  I don't know.

8        Q.    (BY MR. POTTS)  Okay.  So if someone

9    isn't inserting money, are they playing the game?

10              MR. CRAIG:  Object to form,

11   ambiguous, speculative.

12       A.    I'm not sure I understand.

13       Q.    (BY MR. POTTS)  Well, how do I play a

14   game on a Torch device?

15       A.    I don't know.

16              MR. CRAIG:  Object to form, calls

17   for speculation.

18       Q.    (BY MR. POTTS)   As the president of

19   this company can you tell the jury how someone

20   plays the games that you make available to the

21   Pub?

22              MR. CRAIG:  Object to form,

23   speculation.

24       A.    I cannot tell the jury how they play the

25   game.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 178

1      A.   I don't know what you mean, does the
2  screen have a different name?
3      Q.   (BY MR. POTTS)  Yeah, are there names
4  like Lucky Strike or something like that?  What
5  are the names of the different games that you can
6  play?
7      A.   Well, there's different names of
8  different games.
9      Q.   Okay.  What are some examples of games?
10     A.   I don't know.
11     Q.   You don't know the names of the games on
12  Torch's devices?
13     A.   No.
14     Q.   What is the range of monetary amounts
15  that a player can insert into the game?
16          MR. CRAIG:  Object to form.
17     A.   Can you ask the question again?  I'm
18  trying to understand.
19     Q.   (BY MR. POTTS)  Yeah.  So if a player
20  wants to play a game, what's the lowest amount of
21  money that someone can insert into the game to
22  play?
23          MR. CRAIG:  Object to form.
24     A.   $1 dollar.
25     Q.   (BY MR. POTTS)  What's the highest

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 184

1      Q.    Does the prize viewer allow a player to
2   see the outcome two turns ahead?
3              MR. CRAIG:  Object to form,
4   ambiguous as to time.
5      A.    If you play the game, you can see the
6   next play ahead.
7      Q.    (BY MR. POTTS)  But a player has to
8   insert money and play the game once to see the
9   prize two turns ahead, right?
10             MR. CRAIG:  Object to form.
11     A.    That's correct.
12     Q.    (BY MR. POTTS)  And inserting money and
13  taking turns on the game is really the only way
14  to make the game progress, right?
15             MR. CRAIG:  Object to form.
16     A.    That is how the game progresses, yes.
17     Q.    (BY MR. POTTS)  When a player inserts
18  money for no prize, what's the player's chance of
19  winning on the next turn?
20             MR. CRAIG:  Object to form, calls
21  for a legal conclusion, calls for expert
22  testimony on technical issues, ambiguous.  You
23  can respond to the extent you know.
24     A.    I don't know.
25     Q.    Is it possible to know?

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 185

1          MR. CRAIG:  Object to form for all

2    the same reasons, calls for expert testimony,

3    speculative, ambiguous as to what specific turn

4    you're talking about.

5        A.   I don't know.

6        Q.   (BY MR. POTTS)  When a player walks up

7    to a Torch device and checks all the prize viewer

8    options on all the play amounts and there's no

9    chance of winning on any setting how many times

10   will that player have to insert money before they

11   win?

12          MR. CRAIG:  Object to form,

13   improper hypothetical, speculation, vague and

14   ambiguous as to time.  I'm sorry, go ahead.

15       A.   I don't know.

16       Q.   (BY MR. POTTS)  Is it possible to know?

17       A.   I don't know.

18          MR. CRAIG:  Object to form.

19       Q.   (BY MR. POTTS)  What's the range of

20   payouts on Torch devices?

21          MR. CRAIG:  Object to form.

22       A.   I don't know.

23       Q.   (BY MR. POTTS)  Does it pay out a

24   nickle?

25          MR. CRAIG:  Object to form.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 186

1      A.    I don't know.

2      Q.    (BY MR. POTTS)    As the president of this

3  company, you don't know the amounts that the game

4  pays out?

5              MR. CRAIG:    Object to form,

6  ambiguous, vague, argumentative.

7      A.    Different games have different prizes.

8  I don't know.

9      Q.    (BY MR. POTTS)    What's the lowest amount

10  of a payout?

11              MR. CRAIG:    Object to form,

12  ambiguous, speculative.

13      A.    I don't know.

14      Q.    (BY MR. POTTS)    What's the highest

15  amount of a payout?

16              MR. CRAIG:    Objection, form,

17  speculative, vague, ambiguous.

18      Q.    (BY MR. POTTS)    What's the lowest payout

19  that you have seen in your own personal

20  experience?

21              MR. CRAIG:    Object to form,

22  ambiguous as to time and scope.    You can answer

23  to the extent you know.

24      A.    I don't remember.

25      Q.    (BY MR. POTTS)    What's the highest

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 187

1    payout that you have seen in your personal

2    experience?

3                 MR. CRAIG:   Same objections.

4         A.   I don't remember.

5         Q.   (BY MR. POTTS)   Torch devices rely on a

6    sequential list of pre-determined outcomes,

7    right?

8                 MR. CRAIG:  Object to form, calls

9    for expert testimony.

10        A.   I don't know.

11        Q.   (BY MR. POTTS)   As the president of this

12   company can you tell the jury how Torch devices

13   work in terms of their list of outcomes?

14                MR. CRAIG:  Object to form, calls

15   for expert testimony, ambiguous as stated.

16        A.   I don't know.

17        Q.   (BY MR. POTTS)   How long is that list of

18   pre-determined outcomes?

19                MR. CRAIG:  Object to form, calls

20   for expert testimony, ambiguous.

21        A.   I don't know.

22        Q.   (BY MR. POTTS)   For any device that your

23   company owns, can you tell the jury how long the

24   list is of predetermined outcomes?

25                MR. CRAIG:  Object to form, calls

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 188

1   for expert testimony, ambiguous, non-specific,

2   vague.

3         A.   I don't know.

4         Q.   (BY MR. POTTS)  For any of the devices

5   that your company owns, how is the list

6   generated?

7              MR. CRAIG:  Object to form, calls

8   for expert testimony, ambiguous, vague,

9   speculative as asked.

10        A.   I don't know.

11        Q.   (BY MR. POTTS)  Who selected the length

12  of the list of pre-determined outcomes?

13             MR. CRAIG:  Object to form.

14        A.   I don't know.

15        Q.   (BY MR. POTTS)  Is it possible for a

16  player to view the list of pre-determined

17  outcomes?

18             MR. CRAIG:  Object to form,

19  speculation.

20        A.   I don't know.

21        Q.   (BY MR. POTTS)  Does a player always

22  have to pay to see the second and third outcome

23  on the list?

24             MR. CRAIG:  Object to form,

25  speculation, ambiguous as phrased, and vague, as

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 189

1    well.

2        A.   I don't know.

3        Q.   (BY MR. POTTS)   Does every player use

4    the prize viewer?

5              MR. CRAIG:   Objection, speculation.

6        A.   I don't know.

7        Q.   (BY MR. POTTS)   Is Torch able to review

8    the metadata of the devices with respect to use

9    of the prize viewer button?

10             MR. CRAIG:   Object to form,

11   speculation, assumes facts.

12       A.   I don't know.

13       Q.   (BY MR. POTTS)   Has Torch ever attempted

14   to review the metadata to see whether it can see

15   how frequently players use the prize viewer

16   button?

17             MR. CRAIG:   Object to form, calls

18   for expert testimony, ambiguous, superlative.

19       A.   I don't know.

20       Q.   (BY MR. POTTS)   In your personal

21   experience have you ever observed someone play

22   the game without using the prize viewer?

23       A.   I don't remember.

24       Q.   Has any employee or independent

25   contractor for Torch ever observed someone play

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 190

1    the game without using the prize viewer?

2              MR. CRAIG:   Objection to form,

3    calls for speculation.

4        A.   I don't know.

5        Q.   (BY MR. POTTS)   Have you ever heard

6    stories of any players ever playing the game

7    without using the prize viewer?

8              MR. CRAIG:   Object to form, calls

9    for improper opinion testimony, hearsay.

10       A.   I don't know.

11       Q.   (BY MR. POTTS)   Were all of these games

12   designed with the assistance of an attorney?

13             MR. CRAIG:   Object to form,

14   speculation, assumes facts, ambiguous and vague

15   as phrased.

16       A.   Attorneys were involved.

17       Q.   (BY MR. POTTS)   Is that true for every

18   game on every Torch device?

19             MR. CRAIG:   Object to form, calls

20   for speculation, calls for third-party

21   information, calls for expert testimony.   You

22   can answer to the extent you can do so without

23   divulging attorney/client privileged information.

24       A.   I can't answer.

25       Q.   (BY MR. POTTS)   As the president of this

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 196

1      A.    No.   The screen is blocked by the

2    window.

3      Q.    Okay, it might be blocked then, okay.

4    Well, I promise you it is there but I'll keep

5    scrolling through.

6            MR. CRAIG:   You can move, Steven,

7    you can move to where the window is, where you

8    see our faces, you can move that around to the

9    extent you need to, to see.

10     A.    Oh, I see it.

11     Q.    (BY MR. POTTS)   Are you able to see that

12    now, Torch 010109?

13     A.    Yeah, I see it now.

14     Q.    And then this goes all the way through

15    Torch 010112.

16     A.    Yes.

17     Q.    Okay.   Do you recognize this document?

18     A.    Yes.

19     Q.    All right, what is it?

20     A.    It's a flier that we used to give to

21    locations.

22     Q.    Did you give this flier to any of the

23    overlapping locations?

24     A.    I don't remember that.

25     Q.    Who prepared this flier?

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 197

1       A.    I believe I did, but I can't remember.

2    I don't remember.

3       Q.    This first sentence here you say, "In

4    the No Chance Game chance has absolutely no role

5    in any possible outcome."  Do you see that?

6       A.    Yes.

7       Q.    What did you mean?

8              MR. CRAIG:  Object to form.

9       A.    That, I copied off of something, but I

10   can't remember where I copied it from.

11      Q.    (BY MR. POTTS)  Why did you choose to

12   copy that language?

13             MR. CRAIG:  Object to form.

14      A.    It's just the language that I chose to

15   copy.  I can't remember.

16      Q.    (BY MR. POTTS)  Well, you could have

17   written the language yourself, right?

18             MR. CRAIG:  Object to form.

19      A.    I could have written language myself,

20   sure.

21      Q.    (BY MR. POTTS)  Is it true that chance

22   has absolutely no role in any possible outcome?

23             MR. CRAIG:  Object to form, calls

24   for a legal conclusion and expert technical

25   testimony, calls for legal opinions.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 199

1      Q.   (BY MR. POTTS)  Fair enough, Aaron.

2           Is that statement true that any ticket

3    not redeemed within 24 hours is null and void?

4           MR. CRAIG:   Object to form, calls

5    for a legal conclusion.

6      A.   I don't know.

7      Q.   (BY MR. POTTS)  Next it says, "Tickets

8    will print to the nearest dollar."  Is that

9    statement true?

10     A.   Tickets will print in whole dollar

11   amounts, and the balance stays on the game.

12     Q.   So let's say that I have been playing

13   for awhile and I have $1.25 on the game.  What

14   you're saying is I can get a ticket for $1

15   dollar, but .25 cents will stay on the game?

16     A.   That's correct.

17     Q.   What if I want to get that .25 cents

18   back?  How do I get it?

19     A.   It stays on the game.

20     Q.   A player has to play that .25 cents

21   that's left on the game in order to potentially

22   get that?

23           MR. CRAIG:  Object to form, calls

24   for speculation, inconsistent with prior

25   testimony.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 204

1    include paying its customers' legal fees?

2              MR. CRAIG:  Object to form.

3        A.   Torch's costs include legal fees that,

4    yeah, that it paid on behalf of customers.

5        Q.   (BY MR. POTTS)  So when a problem

6    arises, does a customer reach out to Torch and

7    ask for assistance?

8              MR. CRAIG:  Object to form, vague,

9    ambiguous, speculative as to time or instance.

10       A.   I don't remember.

11       Q.   (BY MR. POTTS)  How many customers'

12   legal fees has Torch paid?

13             MR. CRAIG:  Object to form, beyond

14   the scope.  You can answer to the extent you can

15   answer.

16       A.   I don't know.

17       Q.   (BY MR. POTTS)  Does Torch ever offer to

18   pay its customers' legal fees in advance of them

19   installing the machine at their location?

20       A.   I don't remember that.

21       Q.   Is Torch aware of any individuals with

22   gambling problems playing Torch devices?

23             MR. CRAIG:  Object to form.

24       A.   I don't know.

25       Q.   (BY MR. POTTS)  Is it something that

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 206

1      Q.   (BY MR. POTTS)  All right.  We're almost

2  across the finish line here, Mr. Miltenberger.

3  Do Torch's costs including paying for lobbyists?

4      A.   Yes.

5      Q.   What lobbying firms has Torch hired from

6  2016 to present?

7      A.   I don't remember.

8      Q.   You don't remember any of the lobbying

9  firms that Torch has hired at any time during its

10  history?

11      A.   I remember some of them.  I don't

12  remember all of them.

13      Q.   Let's start with the ones you do

14  remember.  Can you list them?

15      A.   One is Strategic Capitol Consulting.

16  That's one, another one is Palm Consulting maybe.

17  Another is Atlas something.  I can't remember.

18  But those are the ones that I remember.

19      Q.   Are there potentially more lobbying

20  firms beyond those three?

21           MR. CRAIG:  Objection, form.

22      A.   I think there was one more, but I can't

23  remember.

24      Q.   (BY MR. POTTS)  Let's start with

25  Strategic Capitol Consulting.  When did you

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 207

1  first, strike that.  When did Torch first retain

2  Strategic Capitol Consulting as a lobbyist?

3       A.   I don't remember that.  It might have

4  been 2018 or 2019.  I can't remember.

5       Q.   Does Strategic Capitol Consulting still

6  do lobbying business on behalf of Torch today?

7       A.   They do, yes.

8       Q.   Have they continuously done lobbying

9  business since their first hire in approximately

10 2018 through the present?

11      A.   Yes.  It's been -- are you saying was

12 there a gap or what are you asking?

13      Q.   Yeah, was there ever a gap?

14      A.   No.

15      Q.   Okay.  Do you pay a retainer to

16 Strategic Capitol Consulting?

17      A.   We pay a fee but I can't remember what

18 that is.

19      Q.   Approximately what's the size of the

20 fee?

21           MR. CRAIG:  Object to form, that's

22 beyond of the scope and outside the bounds of our

23 agreement and the Order, the Court's Stipulation

24 and Order.  Don't respond.

25      Q.   (BY MR. POTTS)  Are you going to follow

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 209

1      Q.    Is that monthly fee smaller or larger

2   than the monthly fee at Strategic Capitol

3   Consulting?

4      A.    That monthly fee is smaller.

5      Q.    When did Torch first hire Atlas as a

6   lobbyist?

7      A.    I believe it was right around the same

8   time, I can't remember exactly.

9      Q.    So 2018?

10     A.    I believe so, but I can't remember the

11  exact date.

12     Q.    Does Torch pay a retainer to Atlas to

13  lobby on behalf of Torch?

14     A.    Torch pays a monthly fee.

15     Q.    Is that monthly fee smaller or larger

16  than Strategic Capitol Consulting's monthly fee?

17     A.    Smaller.

18     Q.    What are the types of lobbying

19  activities that Strategic Capitol Consulting has

20  taken on behalf of Torch?

21     A.    I don't know.  What do you mean?

22     Q.    What do you pay Strategic Capitol

23  Consulting to do?

24     A.    To consult.

25     Q.    Consult with whom?

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 210

1       A.      They consult with us, with Torch.

2       Q.      Do you pay them to consult with anyone

3    else?

4       A.      I don't know that.

5       Q.      Do you pay for them to lobby in

6    Jefferson City on behalf of Torch?

7       A.      We do.

8       Q.      Do you pay them to have meetings with

9    legislators on behalf of Torch?

10              MR. CRAIG:   Object to form.

11      A.      I don't know what meetings.  I don't

12    know what meetings they have.

13      Q.      (BY MR. POTTS)  Do you pay them to

14    advocate for legislation that would benefit

15    Torch?

16              MR. CRAIG:   Object to form.

17      A.      We pay them to support Torch and our

18    business.

19      Q.      (BY MR. POTTS)  Do you pay them to

20    advocate for legislation that would benefit

21    Torch?

22              MR. CRAIG:   Object to form.

23      A.      We pay them as a lobbyist, yes.

24      Q.      (BY MR. POTTS)  What types of

25    legislation have you asked them to lobby for?

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 211

```
 1          MR. CRAIG:  Object to form, assumes
 2   facts.
 3       A.   I don't remember.
 4       Q.   (BY MR. POTTS)  Are you paying them a
 5   lot of money?
 6               MR. CRAIG:  Object to form
 7   generally improper question.  I'll object to
 8   form.
 9       A.   Yeah, I don't know.  I don't remember.
10       Q.   Well, you don't know what they are
11   actually doing in Jefferson City on behalf of
12   Torch?
13               MR. CRAIG:  Object to form,
14   argumentative.
15       A.   Yeah, yes, I don't know what they are
16   doing.
17       Q.   Do you know whether they are meeting
18   with any officers within the State of Missouri on
19   behalf of Torch?
20               MR. CRAIG:  Object to form.
21       A.   I don't know that.
22       Q.   (BY MR. POTTS)  Have you asked them to
23   do that?
24       A.   I don't remember.
25       Q.   Why did you hire Strategic Capitol
```

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 212

1    Consulting?

2        A.    So help consult us.

3        Q.    Why did you select them over other

4    lobbying firms?

5        A.    They were referred to us.

6        Q.    Who referred them to you?

7        A.    I can't remember that.

8        Q.    What did this person say when they

9    referred Strategic Capitol Consulting to you?

10       A.    I don't remember what they said.  I

11   don't remember who it was.

12       Q.    So you don't know why you originally

13   hired Strategic Capitol Consulting five years

14   ago?

15             MR. CRAIG:   Object to form,

16   misstates testimony. You can answer.

17       A.    I don't remember.

18       Q.    (BY MR. POTTS)   Why did you hire Palm

19   Consulting?

20       A.    I don't remember that.

21       Q.    Was there another recommendation that

22   led you to hire Palm Consulting?

23       A.    I would assume so, but I can't remember.

24       Q.    You don't know what anyone said in that

25   recommendation that made you choose to hire Palm

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 213

1   Consulting?

2        A.   No, I don't remember.

3        Q.   What types of lobbying efforts does Palm

4   Consulting conduct on behalf of Torch?

5        A.   I don't know.

6        Q.   Does Palm Consulting meet with

7   legislators on behalf of Torch?

8        A.   I'm not sure.  I don't know.

9        Q.   Does Palm Consulting meet with members

10  of the Executive Department within Missouri on

11  behalf of Torch?

12       A.   I don't know.

13       Q.   Does Palm Consulting advocate for

14  changes in legislation on behalf of Torch?

15       A.   I don't know.

16       Q.   Does Palm Consulting advocate for

17  changes in regulations on behalf of Torch?

18       A.   I don't know.

19       Q.   Does Strategic Capitol Consulting

20  advocate for changes in regulations on behalf of

21  Torch?

22       A.   I don't know.

23       Q.   Does Strategic Capitol Consulting

24  provide Torch with any reports of how they are

25  earning their monthly fee?

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 214

1           MR. CRAIG:   Object to form.

2      A.   I don't know.

3      Q.   (BY MR. POTTS)   Does Palm Consulting

4  provide Torch with reports on how they are

5  earning their monthly fee?

6           MR. CRAIG:   Object to form.

7      A.   I don't know.

8      Q.   (BY MR. POTTS)   Why did you originally

9  hire Atlas as a lobbyist?

10      A.   I don't remember.   I would assume it was

11  a recommendation.

12      Q.   And what does that recommendation say

13  about Atlas?

14           MR. CRAIG:   Object to form.

15      A.   I don't remember.

16      Q.   (BY MR. POTTS)   Do you remember who

17  provided the recommendation for Atlas?

18      A.   I do not.

19      Q.   Do you remember who provided the

20  recommendation for Palm Consulting?

21      A.   I do not.

22      Q.   What types of lobbying efforts does

23  Atlas conduct on behalf of Torch?

24      A.   I don't know.

25      Q.   Does Atlas advocate for changes in

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 215

1    legislation on behalf of Torch?

2         A.    I don't know.

3         Q.    Does Atlas advocate for changes in

4    regulations on behalf of Torch?

5         A.    I don't know.

6         Q.    Does Atlas meet with legislators on

7    behalf of Torch?

8         A.    I don't know.

9         Q.    Does Atlas have meetings with members of

10   the Executive Department on behalf of Torch?

11        A.    I don't know.

12        Q.    Do any of these lobbying firms do any

13   work outside of Jefferson City on behalf of

14   Torch?

15        A.    I don't know that.

16        Q.    Does Atlas provide Torch with any

17   reports of how it's earning its monthly fee?

18        A.    I don't know.

19        Q.    Have you seen any results from any of

20   these three firms' lobbying efforts over the past

21   five years?

22             MR. CRAIG:   Object to form.

23        A.    I don't know.

24        Q.    (BY MR. POTTS)   What type of change are

25   you wanting these lobbying firms to make in

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 216

1    Jefferson City?

2                MR. CRAIG:   Object to form.

3        A.   I don't know.

4        Q.   (BY MR. POTTS)   Do you know why you're

5    paying these lobbying firms a monthly fee?

6        A.   For consulting.

7        Q.   And when you say consulting, what type

8    of consulting are they providing to you?

9        A.   I don't know.

10       Q.   And I apologize, I actually have to jump

11   off really quickly.  I hate to do this after 15

12   minutes.  I have to call someone back.  Can we

13   please jump off the record?

14               MR. CRAIG:   Yeah, that's fine.

15               THE VIDEOGRAPHER:   The time is

16   approximately 4:02 p.m.  We are going off the

17   video record.

18               (Brief recess taken.)

19               THE VIDEOGRAPHER:   The time is

20   approximately 4:13 p.m.  We are back on the video

21   record.  Go ahead.

22       Q.   (BY MR. POTTS)   All right,

23   Mr. Miltenberger, we are getting close to the

24   end.  I'm sorry, I'm closing my door because

25   there was some background noise there.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 217

1          (Exhibit 26 was marked by the
2     reporter for identification.)
3          Q.   (BY MR. POTTS)  All right.  By my count
4     I think we are up to Exhibit 26, so I'm going to
5     go ahead and mark this as Exhibit 26 and share my
6     screen right now.  Are you able to see that,
7     Mr. Miltenberger?
8          A.   Yes, yep, I see it.
9          Q.   And it's a document with "Torch
10    Electronics" at the top, and you'll see there's
11    an exhibit sticker labeled STM3 and dated
12    12/15/23 at the top right corner.
13         A.   Yes, I see it.
14         Q.   All right.  Do you recognize this
15    document?
16         A.   I have seen it before, yes.
17         Q.   Do you remember being asked about this
18    document at your prior deposition in December?
19         A.   I remember seeing it there, yes.
20         Q.   Did this text appear on Torch's website
21    as of early September of 2022?
22         A.   I don't know that for sure.
23         Q.   Who was the author of this text on this
24    document?
25         A.   I don't know.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 218

1      Q.    Since your deposition in December have

2    you taken any action to determine who wrote this

3    text?

4      A.    I have not.

5                (Exhibit 27 was marked by the

6    reporter for identification.)

7      Q.    (BY MR. POTTS)  All right.  I'm going to

8    take that down.  Next I'm going to put up what's

9    been marked as Exhibit 27 and share my screen.

10   Are you able to see that, Mr. Miltenberger?

11     A.    Yes, I see it.

12     Q.    Do you recognize this document?

13     A.    I remember seeing it before, yes.

14     Q.    By that, do you remember being asked

15   about this document at the prior deposition?

16     A.    Yes, I believe I saw it there.

17     Q.    Did this text appear on Torch's website

18   as of late September of 2022?

19     A.    I don't remember that.

20     Q.    Who was the author of the text on this

21   document?

22     A.    I don't remember that either.

23     Q.    Have you done anything since the prior

24   deposition to identify who wrote this text?

25     A.    No.

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 219

1    Q.    And the contents of this Exhibit 27 are
2    different than Exhibit 26, correct?
3    A.    It is different, yes.
4    Q.    Do you know why the different, why the
5    change was made to the text?
6    A.    I don't know.  I don't remember why.
7    Q.    I can take that down.  And have you done
8    any sort of follow-up to determine why this
9    change was made on Torch's website?
10   A.    No.
11   Q.    How frequently has Torch used What's App
12   in the course of its business?
13   A.    Not.
14        MR. CRAIG:  Object to form.
15   A.    Not really frequently at all.
16   Q.    (BY MR. POTTS)  What's the context in
17   which Torch has used What's App in the course of
18   its business?
19   A.    Typically what we use What's App, with
20   locations, sharing videos.  What's App's good
21   with sharing videos of break-ins, people trying
22   to damage the games . So different video footage
23   is easier to share on What's App, so that's
24   really what we use it for.
25   Q.    Are there any other contexts in which

PORTIONS DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY

Page 223

1    you can respond without divulging attorney/client

2    privileged information, you may do so.

3         A.   I can't answer that.

4         Q.   (BY MR. POTTS)  I'm sorry, you said you

5    cannot answer that?

6         A.   I cannot.

7         Q.   Have you ever played any of Torch's

8    games, Mr. Miltenberger?

9         A.   Not that I can remember.

10        Q.   So in the however many years that you

11   have been running this company, you have never

12   sat down and played one of the games?

13        A.   Not that I can remember.

14        Q.   The next sentence says, "Every outcome

15   can be viewed from a pre-determined finite pool

16   of events."  Do you see that?

17        A.   Yes, I see it.

18        Q.   Is that statement accurate?

19             MR. CRAIG:  Object to the form of

20   the question, calls for expert testimony.  To the

21   extent you can answer without divulging

22   attorney/client privileged information, you may

23   do so.

24        A.   I cannot answer that.

25        Q.   (BY MR. POTTS)  Are you saying you can't