IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TNT AMUSEMENTS, INC., | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:23-cv-330-JAR |
| | ) |
| TORCH ELECTRONICS, LLC, et al., | ) |
| | ) |
|    Defendants. | ) |

**PLAINTIFF TNT AMUSEMENT, INC.'S OMNIBUS
MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
TO STRIKE AND IN SUPPORT OF ITS MOTION FOR LEAVE TO SUPPLEMENT**

After initially indicating their resistance to complying with TNT's Request for Inspection (Doc. #159-1), Defendants finally produced four hard drives to TNT on January 25, 2024. Defendants represented those hard drives to be exemplars from four types of Torch Devices: the NCG2, NCG3, NCG4, and NCG DLX 1 (the "Exemplars").[1] A review of those Exemplars by TNT's retained expert Stacy Friedman confirms what TNT has contended all along: that the Torch Devices utilize several random functions to determine both the payouts and combination of "winning" or "losing" symbols that are displayed to players by the Torch Devices. *See* Ex. 5 to Mot. for Leave (2d Supp. Report of S. Friedman) (Doc #159-5) at ¶ 46. Having now determined that the statements of Defendants and their retained expert Nick Farley (which Mr. Friedman had previously relied on in his earlier reports) were inaccurate, TNT seeks to supplement Mr.

---

[1] Defendants had initially indicated that TNT would be receiving cloned copies of the devices that Mr. Farley reviewed in preparing the various reports he produced in this case. Upon examination, however, it appears that the Exemplars that TNT received from Defendants contain files that post-date the dates of Mr. Farley's reports. TNT's counsel requested an explanation from Defendants' counsel for the discrepancy on February 20, 2024, but Defendants have yet to provide any explanation.

1

Friedman's earlier reports to correct those inaccuracies and set the record straight with respect to the existence of random functions within the Torch Devices.

Even before Mr. Friedman completed his examination, however, Defendants signaled their opposition to Mr. Friedman's supplementing his report to recite the results of that examination, and they have now followed through on their promise to seek to strike his Second Supplemental Report. *See* Mot. to Strike (Doc. #158); *see also* Ex. D to Mot. to Strike (Doc. #158-4) at 1. In so doing, Defendants replay the same theme they trumpeted in moving to strike Mr. Friedman's first Supplemental Report, in which he reported the results of his examination of a TNT-owned device that was functionally similar to one of the Torch Devices examined by Defendants' retained expert, Nick Farley. For the reasons explained in TNT's opposition to Defendants' earlier Motion to Strike, which TNT hereby incorporates as if fully set forth herein, those arguments are without merit. *See* Opp. on Mot. to Strike (Doc. #69). But Defendants have even *less* of a basis to object to Mr. Friedman's supplementation of his report in this instance, since Mr. Friedman's Second Supplemental Report concerns an examination of devices that Defendants did not even produce until *four weeks ago*, on January 25, 2024, despite TNT having served its Request for Inspection on Defendants more than *12 weeks ago*, on December 1, 2023.

As such, it was not possible for Mr. Friedman to have produced a report of his recent findings prior to the November 6, 2023 deadline for disclosure of the identity and initial reports of each party's experts (which, as explained in TNT's Opposition to the Motion to Strike, TNT has complied with). *See* Opp. to Mot. to Strike (Doc. #69) at 2. And when supplementation of an expert report is required as the result of the revelation of new information by a party's adversary, it would be unjust to reward the adversary for having previously withheld the very information that the expert needed in order to reach his conclusions. *Lael v. Six Flags Theme Parks, Inc.*, No. 4:13–cv–

01226–SPM, 2014 WL 4092261, at *5 (E.D. Mo. Aug. 15, 2014) ("There is a preference in the federal system that trials be determined on the merits and not on constructions of the Federal Rules of Civil Procedure that operate to unnecessarily deprive a party of its right to have a merits-based determination of a claim." (cleaned up)); *see also* Fed. R. Civ. P. 1 (the Rules are to be construed and administered to secure "the just . . . determination of every action").

TNT does not believe that leave of court is necessary for Mr. Friedman to supplement his report; indeed, such supplementation is permitted (if not required) by Federal Rule of Civil Procedure 26(e). But, given Defendants' expressed opposition to the supplementation of Mr. Friedman's prior reports, TNT asks this Court to grant it leave to do so in order to ensure that Mr. Friedman's conclusions can be properly considered by the trier of fact in deciding whether the Torch Devices have been falsely advertised as "legal" "no chance" games that "do not involve an element of chance"—which, as Mr. Friedman's analysis plainly indicates, they do. *See* Ex. 5 to Mot. for Leave (Doc. #159-5) (2d Supp. Report of S. Friedman) at ¶¶ 41, 45–47.  For those reasons, TNT respectfully requests that Mr. Friedman be permitted to testify to the conclusions stated in his Second Supplemental Report.

## DISCUSSION

**I.     It Is Proper for Mr. Friedman to Supplement His Report Based Upon the Examination of Devices Only Recently Produced by Defendants to TNT**

Defendants cannot rightfully complain about the timeliness of Mr. Friedman's Second Supplemental Report without acknowledging that it is **Defendants** who waited more three months before supplying TNT with the Exemplars it requested, and then only with four of the five devices TNT it initially promised.[2]  TNT propounded its Request for Inspection (the "Request") on

---

[2]  Defendants ultimately produced exemplar hard drives for only four devices, claiming that there were no NCG Suite I Terminal version 2.3.0.23596 devices remaining in their possession.

3

December 1, 2023, requesting Defendants permit an examination of the exemplar devices by December 14, 2023. *See* Ex. 1 to Mot. for Leave (Doc. #159-1) (Request). TNT's formal Request and proposed examination date were both well before the discovery cut-off, which was originally set for January 2, 2024 under the original Case Management Order (Doc. #45) and was later extended to January 11, 2024 by order of the Court. *See* Order (Doc. #68). Weeks before serving the Request, TNT's counsel had informally approached Defendants' counsel to request the opportunity to examine such exemplar devices. *See* Ex. C to Defs.' Mot. to Strike (Doc. #158-3) at 3 (November 28, 2023 email reflecting that "when we discussed the inspection a couple weeks ago, [Defendants' counsel] didn't raise any objection then"). Nonetheless, TNT served its Request on December 1, 2023, in order to ensure it would have the ability to seek to compel production of exemplar devices in the event that Defendants did not honor TNT's earlier informal requests.

Ultimately, Defendants did not serve a formal objection to the Request. Instead, Defendants notified TNT on December 11, 2023 that they would not produce exemplar devices on December 14, 2023 as requested by TNT and instead would reserve their right to object on or before January 2, 2024, the original discovery cut-off date. *See* Ex. 2 to Mot. for Leave (Doc. #158-2) (chain of correspondence ending December 11, 2023) at 1. TNT subsequently agreed to extend Defendants' time to respond to the Request in light of Defendants' counsel's assurance that they would produce copies to TNT of the hard drives that Mr. Farley had examined for five exemplar devices. *See* Ex. 3 to Mot. for Leave (Doc. #158-3) (chain of correspondence ending December 30, 2023) at 1; Ex. 4 to Mot. for Leave (Doc. #158-4) (chain of correspondence ending January 10, 2024) at 1–2.

Ultimately, Defendants produced four of the five promised hard drives, but did not do so until January 25, 2024, nearly three months after TNT's initial request (and nearly two months since its formal Request) and two weeks after the discovery cut-off, the deadline for dispositive

4

motions, and the *Daubert* motion deadline. *See* Case Management Order (Doc. #45) at 2–3; Order (Doc. #68) at 1–2. After requesting and receiving Defendants' consent on January 29, 2024, TNT's counsel forwarded the Exemplars to Mr. Friedman that same day. Mr. Friedman was away when the Exemplars arrived on January 31, 2024, and so he began his analysis on February 3, 2024 after obtaining physical access to the Exemplars. In just three weeks after receiving them, Mr. Friedman performed an analysis of all four Exemplars and synthesized his analysis into his Second Supplemental Report, which was produced to Defendants on two days ago, on Monday, February 26, 2024.

Mr. Friedman's supplementation is entirely proper, especially given Defendants' delayed disclosure of the Exemplars. *See United States v. STABL, Inc.*, 800 F.3d 476, 488 (8th Cir. 2015) (upholding denial of motion to strike supplemental report when damages expert "simply changed the assumptions in her original report based on the new information she had received" during discovery); *Lael*, 2014 WL 4092261, at *3 (denying motion to exclude supplemental report of expert produced three months after original expert disclosures; finding the additional report proper under Rule 26(e) to supplement "for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report" (emphasis added)).[3] Moreover, Mr. Friedman's original report assumed the veracity of certain prior representations by Defendants

---

[3] Although Defendants complain that TNT did not formally request access to the Exemplars prior to November 6, 2023, Defendants evidently would not have been able to produce the exemplars prior to November 6, 2023 even if TNT had done so. Discovery in this case did not open until October 3, 2023, when the parties held their Rule 26 conference. Despite making a timely formal request for access to exemplar devices on December 1, it took Defendants 55 days to disclose the Exemplars to TNT. And even once the Exemplars were received. Mr. Friedman's analysis took approximately three weeks to complete. Thus, even if TNT had served a formal request for inspection on the first day of discovery, there is no realistic possibility that TNT would have been able both obtain to access to the Exemplars and to have an analysis of those devices completed by the time TNT served Mr. Friedman's opening report.

and their retained expert Mr. Farley as to the function and operation of the Torch Devices, but Mr. Friedman's own analysis has now demonstrated that those representations were in fact *false*. *See* Friedman Opening Report (Doc. #69-2) ¶¶ 55–59, 64, 73, 83, 87, 88–91 (relying upon claims by Defendants' expert that "[t]he outcomes of the games and prizes awarded are . . . based on predetermined finite outcomes that are in sequential order" and that "[n]either the operators nor the players have the ability to affect the game outcomes that are distributed from the finite pools").[4] Thus, those prior representations by Defendants and Mr. Farley, which Mr. Friedman relied upon in his original report, were "incomplete or incorrect," thus requiring supplementation under Federal Rule of Civil Procedure 26(e). *See McClurg v. Mallinckrodt, Inc.*, No. 4:12-CV-00361-AGF, 2017 WL 3116138, at *3 (E.D. Mo. July 21, 2017) ("The duty to supplement arises when the expert subsequently learns of information that was previously unknown or unavailable, and the new information renders the earlier report incomplete or inaccurate.").

**II.  Mr. Friedman's Second Supplemental Report Is Not Susceptible to the Same Objections Defendants Have Raised to His Original Report or Earlier Supplemental Report**

Defendants' Motion to Strike (Doc. #157) continues their strategy of resisting any effort by TNT to introduce the expert testimony of Mr. Friedman, both by seeking to exclude his original report under *Daubert* and by moving to strike his earlier supplemental report. *See* Mot. to Exclude (Doc. #74); Mot. to Strike (Doc. #66). Yet none of the objections Defendants have previously

---

[4] Indeed, Mr. Friedman's opening report expressly noted "Mr. Farley failed to address how the 'finite pool' of predetermined outcomes was sequentially arranged in the first place," including whether "the finite pool was randomly shuffled before being stored in the Torch Device." *See* Friedman Opening Report (Doc. #69-2) ¶ 89. As Mr. Friedman's Second Supplemental Report demonstrates, the "finite pool" is not only shuffled "before being stored in the Torch Device"; it is shuffled as players continue to play the devices. *See* Ex. 5 to Mot. for Leave (Doc. #189-5) (2d Supp. Report of S. Friedman) at ¶¶ 35–41.

raised apply here. They therefore cannot serve as a basis for excluding Mr. Friedman's Second Supplemental Report.

When seeking to strike Mr. Friedman's November 6, 2023 report under *Daubert*, Defendants attacked Mr. Friedman's report for assuming that Mr. Farley's analysis accurately reflected how Torch Devices operate, rather than conducting his own tests using the same protocols as Mr. Farley. *See* Defs.' Mem. in Support of Mot. to Exclude (Doc. #74) at 12–13. Although an expert's "failure to perform the tests preferred by defendants is not a basis to exclude his opinions," *Johnson v. Avco Corp.*, 702 F. Supp. 2d 1093, 1101 (E.D. Mo. 2010), Mr. Friedman's Second Supplemental Report's employs the very sort of scientific testing that Defendants have previously claimed is required. And while Defendants dispute whether Mr. Friedman has the expertise necessary to opine on whether the Torch Devices involve, "in a material degree," an "element of chance" as required by Missouri law, *see* Mo. Rev. Stat. § 527.010(3)–(5), Defendants do not dispute that Mr. Friedman has the necessary expertise as a computer scientist to analyze the underlying software of the Torch Devices, nor have they sought to exclude his Second Supplemental Report on that basis.

Unable to challenge Mr. Friedman's technical capability to analyze the Torch Devices' software, Defendants pivoted when challenging Mr. Friedman's earlier Supplemental Report. Rather than seeking to exclude that report under *Daubert*, they instead argued it was untimely. *See* Defs.' Mem. in Support of Mot. to Strike ("Mot. to Strike Mem.") (Doc #66). Under a tortured reading of the Court's Scheduling Order, Defendants expected Mr. Friedman to produce a "rebuttal" report at the same time he produced his opening report, despite having no report *to* rebut until Defendants shared Mr. Farley's report—which they did not do until that very same day. *See* Mot. to Strike Mem. (Doc. #66) at 12. Although Defendants argued that Mr. Friedman should have

7

included his analysis of TNT's independently sourced "no chance" device in his opening report, Mot. to Strike Mem. (Doc. #66) at 13–15, Mr. Friedman did not have the information necessary to verify that TNT's device matched any of the Torch Devices until Mr. Farley produced his reports on November 6, 2023. *See* Mem. in Opp. Defs.' Mot. to Strike (Doc. #69) at 11. As TNT explained in its Opposition, once that occurred, Mr. Friedman had both the right and the duty to supplement his report after he gained new information. *See* Mem. in Opp. to Mot. to Strike (Doc. #69) at 10.

The same reasoning applies with even greater force here. With respect to Mr. Friedman's first supplemental report, it was at least ***possible*** for Mr. Friedman to have analyzed TNT's independently sourced "no chance" device before receiving Mr. Farley's expert reports (although Mr. Friedman lacked the ability until then to confirm that the TNT device was functionally similar to any of the Torch Devices). In this instance, though, it was literally ***impossible*** for Mr. Friedman to examine the exemplar Torch Devices until TNT received them on January 25, 2024 and Mr. Friedman gained access to them on February 3, 2024.

Even then, Mr. Friedman was not required to supplement his testimony unless and until his review of the Exemplars revealed that his prior reports or testimony were "incorrect or incomplete." *See* Fed. R. Civ. P. 26(e). In the event that Defendants' and Mr. Farley's representations regarding the operation and function of the Torch Devices, which Mr. Friedman had relied upon in his earlier reports, were confirmed by Mr. Friedman's review, then no supplementation would have been necessary. It is only because Mr. Friedman's analysis revealed that Defendants' and Mr. Farley's prior representations were ***false*** that Mr. Friedman had the right and responsibility to supplement his testimony, which he has done through his Second Supplemental Report. *See McClurg*, 2017 WL 3116138, at *3.

8

Thus, even if Defendants' arguments against Mr. Friedman's original report and earlier supplemental report had merit (which they do not), that would not undermine the admissibility of the conclusions in Mr. Friedman's Second Supplemental Report. The Second Supplemental Report analyzes Exemplars that were not even produced to TNT until after the discovery cut-off date had passed, and the analysis reflected in that report falls squarely within Mr. Friedman's acknowledged expertise as a computer scientist. As a result, Mr. Friedman's report is both proper and timely, and the opinions reflected in that report should be admitted.

### III. Defendants Cannot Fairly Claim Prejudice from Mr. Friedman's Supplementation of His Report

"[T]he exclusion of evidence is a harsh penalty . . . and should be used sparingly." *See Wood v. Robert Bosch Tool Corp.*, No. 4:13CV01888 TCM, 2015 WL 5638035, at *3–4 (E.D. Mo. Sept. 24, 2015) (admitting expert declaration, which defendant characterized as "essentially a Supplemental Report," despite its being filed after expert's deposition and the expiration of the deadline for the completion of discovery). Defendants cannot credibly claim that Mr. Friedman's Second Supplemental Report unfairly prejudices them, when the Exemplars that it analyzes have been within Defendants' exclusive control for several years, and when Defendants delayed in producing the exemplar devices until two weeks after the close of discovery, more than eight weeks after first being served with a formal request requiring an inspection of those devices.

Defendants will suffer no prejudice due to "surprise" because of Mr. Friedman's supplemental report. While Mr. Friedman's supplemental report provides new facts, based upon his review of the recently produced exemplar devices, supporting the analysis in his initial report, his ultimate conclusions have not been altered by the supplement. *See Wood*, 2015 WL 5638035, at *5 (permitting new expert declaration after the close of discovery, and noting that "[t]here is no indication that the challenged [testimony is] either inaccurate or surprising to Defendant. While

9

[it] may expand on earlier references, [it is] not contradictory to or inconsistent with those references, but clarify them"). Instead, the supplement is required in order to correct inaccuracies in the evidence that Mr. Friedman had previously relied upon to support his conclusions, namely, the false representations of Defendants and Mr. Farley regarding the operation and function of the Torch Devices. And two of the principal findings of the supplemental report—that, contrary to those representations, the Torch Devices use random functions to determine (1) the initial starting index for each combination of each game theme and bet amount and (2) the combination of "winning" or "losing" symbols that will be displayed to a player—are facts that have been previously disclosed to Defendants through the deposition testimony of the manufacturer of the devices, as well as in Mr. Friedman's first supplemental report. *See* Ex. 10 to Pl.'s Statement of Uncontroverted Material Facts ("SUMF") (Doc. #95-10) (Dep. of K. Morse, Corp. Rep. of Banilla Games, Inc.) at 45:11–1, 46:14–47:21, 61:24–65:5, 72:10–23; Ex. 48 to Pl.'s SUMF (Doc. #86-1) (Doc. #87-7) (1st Supp. Report of S. Friedman) ¶¶ 28, 35–41.

Moreover, the Exemplars have been under Defendants' control for years, as they have been in their retained expert's possession. Defendants could have performed their own analysis of those Exemplars at any time—which, indeed, they did, through Mr. Farley. Mr. Friedman's Second Supplemental Report simply performs a portion of that analysis that Mr. Farley evidently failed to conduct. *See* Pl.'s Mot. to Exclude Certain Testimony of Nick Farley (Doc. #78) at 4–5 ("Mr. Farley also previously submitted a declaration in this case stating that he reviewed the software source code. . . . At his deposition, however, Mr. Farley admitted he did not personally review the source code of the Torch Devices himself."). Nothing prevents Defendants from asking Mr. Farley to perform the same examination that Mr. Friedman performed in his Second Supplemental Report to verify Mr. Friedman's findings, nor did anything prevent them from doing so prior to receiving

10

Mr. Friedman's Second Supplemental Report. As such, there can be no prejudice to Defendants from Mr. Friedman's simply reciting portions of source code from devices that have been in Defendants continuous possession and control since before this litigation even began.[5]

Likewise, Defendants face no prejudice because they have "sufficient opportunity to depose the expert" prior to trial. *Soo Line R.R. Co. v. Werner Enters.*, 8 F. Supp. 3d 1130, 1138 (D. Minn. 2014), *aff'd* 825 F.3d 413 (8th Cir. 2016) (denying party's motion to exclude expert testimony that was disclosed after close of discovery, noting that there was no prejudice as opponent had "a sufficient opportunity to depose" the expert). Just as TNT does not seek to deny Defendants the opportunity to depose Mr. Friedman on his first supplemental report, TNT would not oppose a request by Defendants to depose Mr. Friedman prior to trial on the contents of his Second Supplemental Report, as well as his earlier supplemental report, for up to four (4) additional hours.

In point of fact, it is not Defendants, but TNT that has been prejudiced by Defendants' delayed disclosure. Despite receiving TNT's Request on December 1, 2023, Defendants delayed in producing the drives for 55 days, until January 25, 2024. Defendants' delay of nearly two months meant that TNT received the Exemplars only ***after*** the discovery cut-off date, the deadline for *Daubert* motions, and the deadline for motions for summary judgment had all passed. That required TNT to undergo the time and expense of preparing and submitting dispositive motions without the benefit of Mr. Friedman's analysis of the Exemplars later produced by the Defendants.

---

[5] At least with respect to the report's findings regarding the presence of random functions in the source code of the Devices relating to payout and symbol selection, Defendants have been on notice of the existence of such functions since at least December 15, 2023, when Mr. Friedman produced his first supplemental report describing the presence of those functions in a functionally similar Banilla device. Indeed, Defendants were aware of the existence of such functions no later than August 21, 2023, when a Banilla representative testified to the existence of such random functions in prior litigation involving Torch. TNT has repeatedly requested that Defendants supplement Mr. Farley's prior testimony to correct his misstatements on those topics, but Defendants have refused. *See infra* § IV.

Had TNT had that evidence prior to the discovery cut-off, then it could have submitted Mr. Friedman's findings as additional uncontroverted evidence of the existence of elements of chance within the Torch Devices, which would have simplified the task of establishing TNT's entitlement to judgment as a matter of law. As it stands, Defendants' delayed disclosure means that TNT has been deprived of the opportunity to use evidence of the contents of the Torch Devices themselves in support of its Motion for Summary Judgment (Doc. #81).

**IV.   Even If Leave Were Required, There Is Good Cause to Permit Mr. Friedman to Supplement His Report**

For the reasons explained above and in TNT's Memorandum in Opposition to Defendants' earlier Motion to Strike Mr. Friedman's testimony, Rule 26(e) permits (and arguably requires) experts like Mr. Friedman to supplement their reports upon the discovery of new information without first seeking leave of Court. *See* Mem. in Opp. (Doc. #69) at 11–12. Likewise, this Court's original Case Management Order, which required the disclosure of the identity of expert witnesses by November 6, 2023, could not—and did not—require TNT to produce expert reports based on information that had not yet been produced to TNT in discovery. *See* Case Management Order (Doc. #45) (requiring the parties to "identify" expert witnesses and disclose "the reports required by Rule 26(a)(2)" by November 6, 2023); Mem. in Opp. (Doc. #69) at 2–3 (discussing same). But even if the Case Management Order could be read to compel such an illogical result, this Court should recognize that Defendants' delayed disclosure of the Exemplars constitutes an "extraordinary circumstance" that would justify granting TNT leave to supplement Mr. Friedman's original report to include the findings from his examination of the Exemplars. *See* Case Management Order (Doc. #45) at 2 (permitting the Court to grant relief from the deadlines stated therein based upon "exceptional circumstances").

While TNT's lack of access to the Exemplars prior the discovery cut-off would be a sufficient basis on its own to grant TNT leave (if leave were required), Defendants' and its expert's false representations about the operation and function of the Torch Devices constitute an additional and separately sufficient basis to justify permitting Mr. Friedman to supplement his report. Defendants have been made aware of the existence of random functions in the Torch Devices' software on numerous occasions, including but not limited to:

- August 21, 2023, when a representative of Banilla Games, Inc. ("Banilla"), the manufacturer of the Torch Devices, testified, in a deposition in litigation involving Defendant Torch Electronics, LLC ("Torch"), that the starting point of each pool of game outcomes is "randomly pick[ed]" "using a random number generator." Ex. __ to Pl.'s SUMF (Doc. #86-11) (Aug. 21, 2023 Dep. of K. Morse, Corp. Rep. of Banilla Games, Inc.) at 82:16–21;

- December 12, 2023, when counsel for TNT presented Mr. Farley with excerpts of a Banilla device's source code during his deposition;

- December 15, 2023, when TNT served Mr. Friedman's first supplemental report on Defendants; and

- January 10, 2024, when a representative of Banilla again testified that Torch Devices use a "random number generator" to select the starting indices within each prize pool. Ex. 10 to Pl.'s SUMF (Doc. #95-10) (Jan. 10, 2024 Dep. of K. Morse, Corp. Rep. of Banilla Games, Inc.) at 45:11–18.

TNT has repeatedly requested that Defendants supplement Mr. Farley's prior testimony to correct his misstatements regarding the absence of such random functions in the Torch Devices' software, but Defendants have refused to do so. Instead, they have sought to strike Mr. Friedman's supplemental reports, *see* Mots. to Strike (Doc. ##66, 158); exclude the opinions expressed in his original report, *see* Daubert Mem. (Doc. #74); challenged the admissibility of Banilla's testimony as to the existence of such functions, *see* Resp. to TNT's SUMF (Doc. #109) ¶¶ 20, 52–53, 56, 74, 76–80, 94; resisted TNT's effort to compel Mr. Farley to address questions regarding the devices' source code, *see* Opp. to Mot. to Compel Testimony of N. Farley (Doc. #140); and even feigned ignorance when similar questions were put to Torch's corporate representative, s*ee* Opp to Mot. to

13

Compel Testimony of Torch Electronics, LLC (Doc. #141). None of these proceedings would have been necessary if Defendants would simply acknowledge the central fact over which there is now no room for dispute: the software in the Torch Devices involves numerous random elements of. Instead, Defendants have doubled down on the misrepresentations which form the basis of TNT's Lanham Act and RICO Act claims, making it necessary for TNT to once again call their bluff.

Among other things, the result of Defendants' misrepresentations has been to deprive TNT and its retained expert Mr. Friedman of information that would have been useful to Mr. Friedman's initial analysis. Had Defendants informed TNT (and the public) of the existence of random functions in the Torch Devices previously, then Mr. Friedman could have included such assumptions in the initial analysis reflected in his opening report. But since Defendants instead concealed—and continue to make efforts to conceal—the truth, Mr. Friedman's initial analysis was based part upon false representations of Defendants and Mr. Farley as to the operation and function of the Torch Devices that have now proven to be incorrect. Although the existence of additional random functions beyond those initially identified by Mr. Friedman ultimately reinforces Mr. Friedman's conclusion that the Torch Devices do involve an "element of chance," Defendants' prior false statements and repeated efforts to conceal the existence of those functions constitutes an additional basis to permit supplementation here.

## CONCLUSION

Defendant's Motion to Strike is only the latest in a series of desperate tactics designed to conceal one inescapable but devastating fact: the Torch Devices are not, as Defendants have long claimed, "legal" "no chance" amusement devices. Instead, the Torch Devices utilize an array of random functions to choose the starting point for combination of game theme and bet amount, to select which combination of "winning" or "losing" symbols will be displayed to the player, and,

14

as Mr. Friedman's recent analysis has uncovered, to shuffle payout amounts as the devices are played. The existence of random elements in the Torch Devices' software was confirmed months ago by the manufacturer of the devices; now it has been verified by the independent examination of TNT's retained expert based upon Exemplars that Torch produced only a month ago. Defendants have known of the existence of such random elements at least since August 2023, if not substantially earlier—and they have been in exclusive possession of the software necessary to confirm the existence of such elements for many years. Allowing evidence of such random elements in the Torch Devices to be introduced is not only permitted by the Federal Rules of Civil Procedure; it is required in order to permit the trier of fact to reach a proper determination of the merits of this action. For those reasons and all others discussed above, TNT respectfully requests that the Court deny Defendants' Motion to Strike (Doc. #157) and grant TNT leave to supplement the expert report and testimony of Stacy Friedman to reflect his analysis of the Exemplars produced by Defendants on January 25, 2024.

Dated: February 28, 2024

Respectfully submitted,

BRYAN CAVE LEIGHTON
PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
MARY GRACE WARREN, #73147MO
ZOE WOLKOWITZ BRANNON, #74007MO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
richard.finneran@bryancave.com
marygrace.warren@bryancave.com
zoe.brannon@bclplaw.com

*Attorneys for TNT Amusements, Inc.*
*d/b/a Play-Mor Coin-Op*

## CERTIFICATE OF SERVICE

    I hereby certify that on February 28, 2024, a copy of the foregoing was served on all counsel of record by operation of the Court's electronic filing system.

                                                                 */s/ Richard E. Finneran*
                                                                 RICHARD E. FINNERAN, #60768MO