1
                    UNITED STATES DISTRICT COURT
2                   EASTERN DISTRICT OF MISSOURI

3
TNT AMUSEMENTS, INC,            )
4                               )
                 Plaintiff,     )
5                               )
                 vs.            )   Cause No.4:23CV-330JAR
6                               )
TORCH ELECTRONICS, LLC et al.,)
7                               )
                 Defendant.     )
8  _____
                          MOTION HEARING
9
             BEFORE THE HONORABLE JOHN A. ROSS
10                 UNITED STATES DISTRICT JUDGE

11                      February 21, 2024
   _____
12                        APPEARANCES

13
For Plaintiff:
14 Mr. Richard Finneran
   Ms. Zoe Wolkowitz-Brannon
15 Ms. Mary Grace Warren
   BRYAN CAVE LLP
16 One Metropolitan Square
   211 N. Broadway, Suite 3600
17 St. Louis, MO 63102

18 For Defendant:
   Mr. Aaron Craig
19 Mr. Todd Graves
   GRAVES GARRETT GREIM, LLC
20 1100 Main Street, Suite 2700
   Kansas City, MO 64105

21

22
           Stenographically Reported and Produced by:
23             Lisa M. Paczkowski, CCR, CSR, RPR
                   Official Court Reporter
24             United States District Court
                   111 South 10th Street
25                 St. Louis, MO 63102
                      (314)244-7985

1          <u>FEBRUARY 21, 2024</u>

2    (The proceedings commenced at 3:38 p.m.)

3          THE COURT:  We are here and on the record in the

4    case of TNT Amusements Incorporated versus Torch Electronics

5    LLC, et al.  It is cause number 4:23CV-330.

6          The record should reflect on behalf of TNT

7    Amusements, they appear by counsel Rich Finneran, Mary Grace

8    Warren, and Zoe Brannon.  Do you go by Wolkowitz-Brannon or

9    Brannon?

10          MS. WOLKOWITZ-BRANNON:  Wolkowitz-Brannon.

11          THE COURT:  Okay.  I'll try to remember that.  The

12    Defendant, Torch Electronics, appears by counsel Aaron Craig

13    and Todd Graves.

14          We are here today to take up certain matters.  I

15    just want to say for everybody's sake, I understand there are

16    a lot of things pending.  There is a motion to dismiss.

17    There is a motion for partial summary judgment.  There are a

18    number of issues that are pending in this case.

19          Having said that, when I saw the motions to compel,

20    I thought it was important that we have this hearing, meet,

21    because I want to make sure that I get you something on the

22    motions to compel, because I want to continue to move with

23    the case.  We have a case management order in place.  We have

24    a trial setting of April 15th.  The dispositive motion

25    deadline has passed.  I know there is still some briefing I

1    believe that's -- and that may be completed.

2          MR. CRAIG:  I think it is fully-briefed now, your

3    Honor.

4          THE COURT:  Okay.  In any event, I understand that

5    there are a number of matters for the Court to rule on, and I

6    intend to do that.  But I wanted to meet to take up the

7    issues about the motions to compel.

8          It is, in my view, important that I get very

9    concise reports from you on what is still at issue on the

10   motions to compel, and how we can resolve those so that we

11   can move forward with the case.  Motions to compel many times

12   are very difficult for the Court to determine, because a lot

13   of times people are saying well you did this.  We did this.

14   And I'm trying to sort through all of that, and I need you to

15   very clearly, concisely, briefly tell me what the issue is,

16   and what you are asking for from the Court, and then I'm

17   going to give the other side an opportunity to respond to

18   that.

19         But again, I want even the response to be brief,

20   concise, and to the point.  So that's the situation that we

21   are in.

22         So the first motion to compel that I want to take

23   up is TNT's motion to compel as it relates to the testimony

24   of Nick Farley.  Mr. Finneran, I don't know who is speaking

25   on behalf of TNT, but whoever is speaking -- and I know you

1    have your laptops going with the --  okay.

2           MR. FINNERAN:  Your Honor, I will --

3           THE COURT:  I should note my law clerk, Sarah

4    Koppenaal, is in the jury box.  So we are turning on the

5    monitor so that she can see the exhibit as well.  Go ahead,

6    Mr. Finneran.

7           MR. FINNERAN:  I was going to mention that if we

8    are going to take the Farley motion first, I may take my

9    slides out of order a little bit.

10          THE COURT:  Tell me, which motion do you want to

11   talk about first?

12          MR. FINNERAN:  I have the Miltenberger 30(b)(6)

13   motion to compel first on my order but.

14          THE COURT:  Any objection to taking that up first?

15          MR. CRAIG:  No, your Honor.

16          THE COURT:  Go ahead.

17          MR. FINNERAN:  Your Honor, I think they both

18   present sort of an overlapping issue, and before I get into

19   it, I do want to compliment opposing counsel on resolving

20   many other issues that we had in the course of discovery.

21   These are the only two lingering ones from our side that

22   unfortunately required the Court's intervention.

23          And so both of these motions basically concern the

24   same issue, which is the refusal of the Defendants on the one

25   hand, and its expert on the other hand, to answer what we

1  consider fairly basic questions about the function of the

2  Torch devices that are the central issue in this case.

3       As the Court I think knows, one of the big issues

4  under our complaint in this case is whether the Torch devices

5  involve any element of chance.  That is a critical

6  determination among others under Missouri law as to whether

7  or not they are illegal gaming devices.

8       In this both of these examples, what we are seeking

9  is to require Mr. Farley on the one hand, and

10 Mr. Miltenberger or any other representative of Torch on the

11 other hand, to answer questions about that particular topic.

12 And in one case, those questions were put to Mr. Farley.  He

13 refused to answer them.  In the other case, the questions

14 were put to Mr. Miltenberger, and he claimed not to know the

15 answers, despite it being a 30(b)(6) when that topic was

16 noticed.

17      So I know you asked us to be concise.  I'll try to

18 do so without skipping important points.  Starting with

19 Torch's failure to prepare for its 30(b)(6), I think the

20 easiest thing to look at to see how Torch was deficient in

21 its preparation is to look at the document I put on the

22 screen here, which is exhibits where we introduced in

23 Mr. Miltenberger's personal deposition.  It is an excerpt of

24 Torch's website from September 13, 2022, and we asked

25 Mr. Miltenberger in that original personal deposition if he

1    knew whether this was language from the website, who authored

2    that language, whether he was part of it.  In each case, he

3    said he didn't remember, which is a fair answer in a personal

4    deposition if you have failure of recollection.

5           But after that, we noticed Mr. Miltenberger --

6    well, we noticed Torch for a deposition, and among the topics

7    was the changes in reasons, for such changes, to any

8    representations on any website owned or operated by Torch.

9    And the only objection that Torch made to that notice topic

10   was that to the extent the questions call for privileged

11   information, the witness would be instructed not to answer.

12          As you can see here in purple, I said I understood,

13   and then we moved forward with the deposition.  But at the

14   corporate deposition, Mr. Miltenberger was asked the very

15   same questions, expressed a failure of recollection, and when

16   I asked whether or not he had taken any steps since his

17   deposition in December to determine who wrote the text and

18   what the changes were, he indicated that he had none.

19          The other thing about the website that is important

20   is it contains a number of representations that are among the

21   commercial representations that we claim were false in this

22   case, and I have highlighted a few of them here.  The Court

23   can read them.  I'm also happy to send these slides after, so

24   we cannot spend too much time staring at this, but among

25   other things you can see here that Torch made representations

1    to the public on its website about how Torch's no chance

2    games -- the priority software behind Torch's no chance games

3    -- ensures that each game outcome is predetermined and in

4    sequence; and therefore, there is no chance of an unexpected

5    outcome.

6              These were commercial representations that as

7    recently as September of 2022, Torch was making.  These

8    statements were actually removed from Torch's website some

9    time later in 2022, but there are things that were at one

10   time within Torch's corporate knowledge.  Yet, at the

11   deposition on January 9th, when asked questions about these

12   representations, Mr. Miltenberger again claimed that he did

13   not know whether, for example, the devices had a sequential

14   list of outcomes and whether the games cycle through those

15   outcomes.

16             That's especially concerning from our prospective,

17   because three weeks earlier in his personal deposition,

18   Mr. Miltenberger did recall how the machines worked, and you

19   can see here on the screen -- and I won't read it into the

20   record -- but he gave a fairly detailed explanation of how

21   the machines worked.  Yet somehow his knowledge went into the

22   wrong direction between his personal and corporate

23   deposition, so as now that he had claimed to have a lack of

24   knowledge, when in fact, if he had any obligation, it was to

25   inform himself of these issues between his personal and the

1   corporate deposition.

2          Now, we only have the responses from one other

3   yesterday.  We are playing catch up a little bit in

4   responding to those points, but one point that Mr. Craig

5   raised in his response was that essentially some of these

6   items asked were expert testimony.  And first, we would say

7   that merely because something is expert testimony, or it

8   might be susceptible to expert testimony, does not mean it is

9   also not within the corporate knowledge of Torch Electronics.

10          Mr. Miltenberger, in fact, admits that he received

11  reports from an expert, Nick Farley, describing these

12  devices, but as you will see in a moment, he said he did not

13  review or read those reports in preparation for his

14  deposition, but many of the questions I asked -- or Mr. Potts

15  asked in this case -- were not about anything technical about

16  the devices.  It was about just how they work.  What range of

17  payouts do the devices produce.

18          Mr. Miltenberger claimed he did not know.  What is

19  the highest prize that can be produced.  What is the lowest.

20  He claimed not to know.  And then when asked even the very

21  basic question of what are some examples of the games on the

22  devices that are the central issue in this litigation,

23  Mr. Miltenberger said he did not know.

24          Our exhibit to our motion to compel, including the

25  examples where Mr. Miltenberger expressed a failure of

1  recollection in his 30(b)(6) deposition, spans more than 50

2  pages, and the coverings of a great number of topics that

3  were noticed in advance of the deposition.

4  THE COURT:  So let me ask you, as I understand it,

5  you noticed the deposition.  Then there were e-mail exchanges

6  between you and Mr. Craig or counsel.

7  MR. FINNERAN:  Mr. Craig.

8  THE COURT:  About -- it seemed to me to be limiting

9  some of the topics, and the argument that is being made is

10  that, well, you went beyond the agreement as to what topics

11  would be covered.

12  Again, from the Court's standpoint, for me to sift

13  through that and try to determine, okay, what did you agree

14  to limit.  To what extent did Mr. Miltenberger not meet what

15  would be necessary for a 30(b)(6) witness, that's difficult

16  to say.

17  What are you asking me to do with regard to

18  Mr. Miltenberger.  Do you want me to order him to be produced

19  to re-depose, and ask him on certain subjects, and have you

20  identified those subjects for Mr. Craig?

21  MR. FINNERAN:  Yes, your Honor.  So first of all,

22  the two topics that I'm discussing in my presentation today

23  are two topics where the only objection raised was to the

24  extent it called for privileged communications.  So you are

25  right in his response, Mr. Craig provided the correspondence

1    that he had had.  I have a chart.  We can go through it

2    one-by-one if we have to, but it may be better suited for us

3    to do in a reply after today's hearing for the other topics.

4    But topics were ones where there was no agreement to limit

5    the scope of his testimony.

6              Mr. Craig did assert an objection on the basis of

7    privilege, but that was the objection that was raised.  And

8    so in each of these two topics, 25 and 35, that's the only

9    limitation that was even suggested by Mr. Craig and agreed to

10   by TNT.

11             In terms of what we are asking for, we would ask

12   the Court to order Mr. Miltenberger to sit for another

13   deposition.  Our motion identifies the topics that we believe

14   that Mr. Miltenberger was --

15             THE COURT:  What topics?

16             MR. FINNERAN:  I believe it is approximately 10

17   topics that we have indicated.  Let's see, 2, 3, 10 topics,

18   so we have 10 topics, your Honor, that were identified in the

19   motion where we believe that his answers and responses were

20   deficient, and we believe that even in light of the

21   agreements that we reached with Mr. Craig to limit some of

22   those topics.

23             Again, if the Court is inclined to entertain and

24   grant our motion, I expect we would be happy to provide any

25   detailed account of responses to Mr. Craig's arguments in his

1     response.  I can do so orally today, if the Court would like,

2     but that might take more time than we would want to take to

3     do it.

4             THE COURT:  How long was the deposition of

5     Mr. Miltenberger, if you know?

6             MR. FINNERAN:  His personal deposition, I don't

7     recall.

8             THE COURT:  30(b)(6).

9             MR. FINNERAN:  30(b)(6), I'm sure it was less than

10    seven hours, but I --

11            MR. CRAIG:  Seven hours and 45 minutes from start

12    to finish, but we took a lunch break.  So I don't know on the

13    record count, but it was slightly less than eight hours

14    total, your Honor.

15            THE COURT:  Just -- that's Mr. Craig on behalf of

16    Torch.

17            MR. FINNERAN:  The other example, your Honor,

18    though that I wanted to point out is Torch's relationship and

19    communication with Nick Farley, which we will talk about in a

20    moment.  That was another notice topic.  As you can see, the

21    only objection was on privilege grounds, as said, we will

22    ask.  You can strike the answer to the extent you can.  They

23    filed the rule of privilege, and in this example, again

24    Mr. Miltenberger expressed a failure of recollection in terms

25    of just even how long has Torch had a business relationship.

1  I don't know.  How much has Torch paid Mr. Farley.  I don't

2  know.  And when I asked if he has reviewed any of

3  Mr. Farley's reports, he said he didn't remember doing so in

4  advance of the deposition.

5          So those are my remarks on Mr. Miltenberger's

6  motion.  I'm happy to cover Mr. Farley's, or if you'd like

7  to hear the --

8          THE COURT:  You may as well -- or tell me what.

9          MR. CRAIG:  I mean, if you don't mind, I might

10  rebut those, because Farley is a different animal, in my

11  opinion.

12          THE COURT:  All right, let's just take up the --

13  Mr. Craig, you can pull out the side.

14          MR. CRAIG:  One second, your Honor.  Okay, your

15  Honor, may it please the Court.  So we have heard about

16  Mr. Miltenberger's 30(b)(6) deposition.  Yeah, I don't have

17  an exact count of the hours on the record, but it was really

18  close to seven, and then also there was no -- there were no

19  objections at the time, or that this was something we needed

20  to call the Court about.  That this was problematic.  That we

21  are going to hold the deposition open.

22          The first time that I heard about any of these

23  problems it was 10 days after the deposition.  It was another

24  17 -- something like that -- before the motions got filed, I

25  believe.  But I don't see things quite as Mr. Finneran does.

1   I will say --

2       THE COURT:  That's not necessarily shocking to me.

3       MR. CRAIG:  Exactly.  I will say that that's

4   probably not shocking to the Court.  I will just say thank

5   you to Mr. Finneran.  We have been able to meet and agree on

6   a lot of discovery issues, and we have narrowed them down

7   significantly.

8       But in our opinion, TNT's motion to compel Torch is

9   by and large focused on frankly poorly-asked questions.  This

10   was not Mr. Finneran.  This was another attorney named

11   Jonathan Potts, who came in kind of after the fact to do a

12   pretty important deposition of a corporate witness that was

13   one of the last ones in this case.

14       THE COURT:  Here is the thing, the questions and

15   the answers that Mr. Finneran just brought up.

16       MR. CRAIG:  Sure.

17       THE COURT:  Those are matters that a 30(b)(6)

18   witness would be expected to be able to answer, and a

19   30(b)(6) witness, when you put forth that witness, they have

20   to be prepared to answer on behalf of the entity, the

21   corporation.  And it just seems to me that those are such

22   basic topics and basic issues, they can't just come in and

23   say well, I didn't look at the underlying documents, or I

24   don't know.  That's just not sufficient for a 30(b)(6)

25   witness.

1          To say, I understand from the response that you

2     don't agree with some of the things that Mr. Finneran is

3     saying; but again, just it is clear to me that the witness

4     was not prepared to answer on behalf of the entity.

5          MR. CRAIG:  On those particular issues, your Honor,

6     and if you would let me --

7          THE COURT:  Those particular issues, and there are

8     some other issues as well.  There is some -- okay, I grant

9     you perhaps a 30(b)(6) witness wouldn't necessarily know, and

10    I understand that you assert a privilege at some point or a

11    couple of points.  I'm not quite sure what that privilege is

12    that you are asserting there.

13         In any event, I guess my concern is it does appear

14    to me that there is a basis for me to order a continuation of

15    a 30(b)(6) depo.  The issue in my mind is okay what topics am

16    I going to order you to cover.

17         MR. CRAIG:  Yeah.

18         THE COURT:  And in what respect am I going to order

19    that deposition to go forward.  I'm not planning on entering

20    an order that says they can just do an entirely new 30(b)(6)

21    deposition.

22         MR. CRAIG:  We definitely appreciate that.

23         THE COURT:  That's not my intent.  But I need an

24    informed way of determining what topics can be covered in the

25    continuation of that 30(b)(6) deposition.  Tell me how do I

1    arrive at that.

2         MR. CRAIG:  So on top of 18, which is one I think

3    the discussion was a critical element of their case is

4    whether Torch devices involve an element of chance, right.

5    And there is an underlying disagreement about necessarily

6    what that means.  An element of chance is defined in the law.

7    That's a legal term of art here that's defined under Missouri

8    Statutes 572.010.

9         THE COURT:  Okay.  What's the point?

10        MR. CRAIG:  The point is that a lot of the topics

11   that related to how the devices operate allegedly, those are

12   topics specifically for expert witnesses, and that is an

13   objection that I made over and over.

14        THE COURT:  How it operates.  It may be true that

15   to ask a 30(b)(6) witness "Does your device involve an

16   element of chance."  I guess I would accept that there is an

17   argument that that's a legal conclusion.  But in other

18   respects in terms of what gains there are, or what the payout

19   is or what.  Those are not expert opinions.  Those are just

20   facts.

21        MR. CRAIG:  Well, what the games are, that is, in

22   my opinion, a question problem where the question was not

23   great.

24        THE COURT:  How can that possibly be a legal issue,

25   or a legal question, or a problem at all.  I mean, the games

1    are what the games are.

2              MR. CRAIG:  Well, we are talking about multiple

3    devices that go back to 2014, your Honor.  So for there to be

4    just a general question about what games are on the devices,

5    on all of your devices, to have an -- to have

6    Mr. Miltenberger --

7              THE COURT:  How many different versions of the

8    machines are there going back to 2014?

9              MR. CRAIG:  I don't have that information right off

10   the top of my head, but I mean, it is.

11             THE COURT:  Are we talking about 10, or are we

12   talking about a thousand?

13             MR. CRAIG:  We talking around 10, and each one

14   would have a suite of games that are approximately six or so

15   game suites.

16             THE COURT:  That's 60 games.

17             MR. CRAIG:  That's fine, and if your Honor wants to

18   -- I mean, frankly, I think we can probably do that by giving

19   them a list, and we can see if the list of the actual names

20   of the games, that's probably not at issue.  But it was a

21   high-level topic, and I think what they wanted, and what they

22   will probably try to do, if they get an opportunity, is to

23   ask him more specific questions about how does this

24   particular game work.  How does this particular game work.

25   And then -- and that is a little bit a different animal, but

1    as far as --

2          THE COURT:  Mr. Craig, you are talking about what

3    you think that they were going to try to get to, and you may

4    be right that that's what they were going to get to, and if

5    the 30(b)(6) witness said, "Well, I don't know how each of

6    these individual games works."  I'd say, okay, I understand

7    that.  They may not know how all 60 games work.  But to just

8    say "I don't know" is unacceptable.

9          That's just not what you would expect from a

10   30(b)(6) witness who is speaking on behalf of the entity,

11   speaking on behalf of the corporation with corporate

12   knowledge.  That's just not acceptable.

13         MR. CRAIG:  So I don't necessarily disagree with

14   you on the point of what a lay witness can know by looking at

15   a list of games, right, but I think where the biggest problem

16   is -- where I have the demarkation between what they are

17   asking for, and I think what you highlighted, which is fair,

18   and we have given a list of these are the game names for all

19   of the games, and then if they want to ask them, you know,

20   specific questions about well what's this game name, theme,

21   right, that's fine, because a person who is looking at that,

22   even away, could describe the user interface as far as how it

23   works and that sort of thing.

24         The bigger problem, and the thing that they really

25   want is for Mr. Miltenberger, who is not a computer science

1   expert, has no background, and neither does anyone else in

2   Torch.  What they really want is somebody from Torch to come

3   in and say, your devices on a software code level, they

4   operate like this.  They operate like that.  And that's clear

5   from some of the examples of questions that they have

6   highlighted on page four of their deposition.  Whether Torch

7   devices have a finite list of payouts, the predetermined --

8   the way the games predetermined outcomes.  Like that is why

9   we have hired Nick Farley as an expert, because Torch doesn't

10  have an internal expert, and as much as they want to try to

11  make Nick Farley's report in this case and his opinions for

12  litigation purposes some sort of corporate knowledge on

13  behalf of Torch, that's not something that Mr. Miltenberger,

14  or anybody else as a corporate representative knows, right.

15  There is a difference.

16          They had an opportunity to do it, and they did put

17  in as an exhibit Nick Farley's report, and I have had

18  conversations with Mr. Finneran beforehand, and I said, look

19  do you want to ask him -- if you want to ask him if he has

20  opinions about Nick Farley's opinions, that's one thing.  If

21  you want to ask him does he know how these devices operate on

22  an expert computer software code level, whatever.  How do

23  they actually function internally, right, beyond what

24  somebody could just look.  How does it operate when I play

25  the device.  That's expert testimony.  That is not something

1    that is proper for a corporation to be forced to do, and that

2    is really the only thing I'm concerned about as far as

3    limiting.

4            If there are factual issues that you believe

5    Mr. Miltenberger should have prepared for, as far as the

6    games, the name of the games, we can supply that information.

7    I think we can work through that, but that is not my concern.

8    It is that they want to put Nick Farley's words and his

9    opinions about how the Torch devices operate that he gave in

10   this litigation, and for purposes of litigation, in the mouth

11   of a corporate representative for Torch, and I believe that's

12   part and parcel to -- another major underlying problem here

13   is they have their own expert, Stacy Friedman, who TNT did

14   not ask to do an independent evaluation of any Torch device.

15           THE COURT:  We are going a bit away from --

16           MR. CRAIG:  Sure, but that is the reason that --

17           THE COURT:  -- we are talking about

18   Mr. Miltenberger.

19           MR. CRAIG:  That is the reason why they want to put

20   Nick Farley's expert testimony in the mouth.

21           THE COURT:  But that's a separate issue.  I'm

22   talking about Mr. Miltenberger.  Mr. Miltenberger is the CEO

23   of Torch, correct?

24           MR. CRAIG:  Correct.

25           THE COURT:  He has to have basic understanding

1    about what they do and about what their machines do.

2            MR. CRAIG:  I think he can have a basic

3    understanding, yes, on a lay witness.  But what they can't

4    make him do, I believe, is turn him into an expert based on

5    the testimony.

6            THE COURT:  I believe that they can't make him

7    answer questions about the underlying software involved.

8            MR. CRAIG:  Right.

9            THE COURT:  But he knows how these machines work.

10   He knows what happens.  Quite frankly, I have never seen one

11   of these machines, so I'm assuming you put a quarter in, and

12   you push a button.

13           MR. CRAIG:  Not exactly.  It is more complicated

14   than that.

15           THE COURT:  All right.

16           MR. CRAIG:  There is a difference between I think

17   knowing something and having read somebody's opinions about

18   it.  I think once you get a little bit further in the record,

19   right, if you ask four different experts about how the games

20   -- how the software and the computer side of these devices

21   work, you might get four different answers.

22           THE COURT:  I'm not expecting him to know how the

23   software works.

24           MR. CRAIG:  Okay.

25           THE COURT:  I am expecting that a proper 30(b)(6)

1　witness would be able to testify about basic factual

2　information about the games on the devices.

3　　　　　MR. CRAIG:  Fair.

4　　　　　THE COURT:  The number of different devices there

5　have been over the years.  The changes that have been made.

6　When those changes were made.  He may know why the changes

7　were made.  He would know the payouts.  He is a businessman.

8　　　　　MR. CRAIG:  That's fair.  The changes that were

9　made to the games, that is a specific instance where we did

10　come to an agreement that Mr. Miltenberger wouldn't have to

11　go through 10,000 documents prior to his deposition, and come

12　up with those -- and so that is an instance where we had a

13　limitation, and the limitation was we will show up.  We will

14　put documents that you produced in front of him to the extent

15　that you want to ask.  And that's what happened on a lot of

16　cases here, and then they didn't ask --

17　　　　　THE COURT:  It is clear to me that I'm going to

18　order a continuation of the 30(b)(6) deposition.  Is

19　Mr. Miltenberger still going to be your 30(b)(6) witness?

20　　　　　MR. CRAIG:  Yeah.  It is himself and his wife.

21　　　　　THE COURT:  Okay, that's fine.  I assumed that was

22　right, but I thought I would go ahead and ask the question.

23　　　　　MR. CRAIG:  Yep.

24　　　　　THE COURT:  Tell me how you believe I should limit

25　that deposition.

1              MR. CRAIG:  Well, I believe you should limit it to

2      the facts about -- I mean, if we are talking about just the

3      topic 18, and the functionality, or whatever.  I believe that

4      should be limited to, as you said, factual information about

5      the actual games that are on the devices, and it should

6      exclude --

7              THE COURT:  Let me go to a different issue.  Mr.

8      Finneran brought up this issue about, you know, how much have

9      they paid Nick Farley.

10             MR. CRAIG:  Well, I mean, we already disclosed what

11     they are entitled to on that, and that is part and parcel to

12     Nick Farley's expert disclosure where he says in this

13     litigation, he has been paid "X" amount.

14             THE COURT:  The 30(b)(6) witness would know that.

15             MR. CRAIG:  That's fine.  I mean -- yeah, I guess

16     during the testimony, if they want to ask him how much we

17     have paid Nick Farley for the litigation in the case, I'll

18     make sure and prepare him.

19             THE COURT:  I'm talking about the scope of this

20     deposition.

21             MR. CRAIG:  Yeah.

22             THE COURT:  And I'm saying to you that any factual

23     information about the company, the 30(b)(6) witness would be

24     expected to know that information, would have been expected

25     to review records to know relevant information as it relates

1    to this lawsuit.

2         MR. CRAIG:  I do.  I do agree with you.  I also

3    think that -- and I just want to get this out there -- we

4    originally got 45 exceedingly broad topics, and then they got

5    narrowed down to 24, and then we limited them much more.

6    They were still very very broad.  So like if it was me, I

7    probably would have -- and I wanted to know that question,

8    you know, and the answer, if I wanted to know an answer for

9    that question, which I wouldn't, because I have already got

10   it in writing from the expert how much money was paid so.

11   But if that was something that I wanted, I would have put it

12   in my 30(b)(6).

13        So while I'd say that, you know, yes, a 30(b)(6)

14   witness has an obligation to prepare, I objected to the

15   overbreadth, and then there is also limits on when there is

16   overbreadth, how much you have to prepare, right.  That was

17   the specific question about a specific dollar amount that I

18   really don't think it was necessarily fair.

19        Now, I have no problem with him testifying about

20   it, again, but as far as preparedness, I'm not sure that

21   that's a primary example of lack of preparedness, your Honor.

22        THE COURT:  Okay.  Anything else you want to tell

23   me about how to limit the deposition?

24        MR. CRAIG:  Well, I mean, there is a whole lot of,

25   you know, additional topics other than just --

1              THE COURT:  I know there are.

2              MR. CRAIG:  -- those two, and.

3              THE COURT:  I'm just asking you, and I really do,

4    I'm intending on keeping this brief.

5              MR. CRAIG:  Yeah.

6              THE COURT:  So I just need to know, tell me how you

7    would propose that I limit the deposition.

8              MR. CRAIG:  I think the only other area where I

9    would say I could find some common ground would be the

10   website.  That testimony relating to the website -- I don't

11   -- I think Mr. Miltenberger can go back to his records and

12   work, and to the extent that there are records that are still

13   available about any communications that he had with the

14   website developer about changes to the website, I think we

15   can have him testify about that, your Honor.  Other than

16   that --

17             THE COURT:  Mr. Craig, here is the thing with that.

18   I mean, those changes to the website, they didn't happen

19   spontaneously.  So I'm assuming Mr. Miltenberger, or his

20   wife, conveyed something to the website developer to say

21   change this.  So somewhere those documents exist; and again,

22   I would expect the CEO, the 30(b)(6) representative of the

23   corporation, to be able to say how and why those changes were

24   made.

25             MR. CRAIG:  That's fair.  I mean, to the extent

1    that those are records that exist within -- it is also

2    possible that an attorney on behalf of Torch that I can't see

3    -- I don't see their documents -- maybe they were the ones

4    that communicated.

5         THE COURT:  An attorney wouldn't have done that

6    spontaneously either.

7         MR. CRAIG:  Oh, no, no -- I'm not saying -- I'm

8    saying we will try to find those communications with the

9    website developer, and I don't disagree that that's something

10   that potentially could have been done beforehand.  So I agree

11   with you.  That's an area where I think we have some

12   agreement.

13        Other than that though, your Honor, I don't think

14   -- I think the limitations that we have had prior and going

15   into this deposition, and the fact that they spent basically

16   their entire time with Mr. Miltenberger -- two days with

17   Mr. Miltenberger -- there are seven hours on the record

18   essentially.  I don't believe any other topics should be

19   addressed.

20        THE COURT:  Okay.  All right, Mr. Finneran, real

21   quickly.

22        MR. FINNERAN:  Yes, your Honor.  So I think that if

23   we --

24        THE COURT:  Why don't you come up here.

25        MR. FINNERAN:  Yes, sir.

1          THE COURT:  I guess before I actually just turn it

2     over to you, really what I'm focused on is this, I think you

3     are correct in some limited sense that there should be a

4     continuation of the 30(b)(6) deposition.  The issue is how do

5     I limit it.  So tell me briefly how you think I can limit it.

6          MR. FINNERAN:  So, your Honor, first of all, I'm

7     happy to confer with Mr. Craig, and see if we can come to a

8     proposed order after the hearing, and that may be one way to

9     try to do it.  We would say, you know, as Mr. Craig

10    mentioned, we noticed many more topics than these.  We then

11    object on these topics.  We believe if you look at page five

12    through --

13         THE COURT:  But I have to tell you, you know, I

14    agree with Mr. Craig that the initial notice of deposition is

15    incredibly overbroad.  It is just overbroad.  There is no

16    other way to put it.

17         So I appreciate the fact that you all have worked

18    together in an effort to try to limit things, and I recognize

19    that.  What I'm concerned about right now is an order that

20    limits this continuation of the deposition.  So tell me how

21    you would propose that I would do that.

22         MR. FINNERAN:  Well, your Honor, in addition to

23    having the broad topics, also in our motion we specified

24    individual questions that Mr. Miltenberger said he was unable

25    to answer, did not recall answering it.  While I don't think

1    it would be fair to say that it is just those questions, and

2    an order that allowed us to ask those questions, and

3    reasonable followups from those questions, or things that

4    those questions serve as foundation for.  That would be one

5    practical way to limit the deposition, but I think would be

6    acceptable to TNT.

7          The one thing I do note, and I want to raise, your

8    Honor, because I think it is going to be -- if we don't

9    resolve it today, the next thing we will be in front of you

10   talking about is really -- as Mr. Craig said -- where is the

11   line between what Mr. Miltenberger should be expected to know

12   as the corporate designee about the operation of the devices

13   that his company markets, sells, and he and his wife are the

14   only employees.  This is the only thing they do is they sell

15   these devices.

16         But, of course, even if he somehow lacks knowledge,

17   which we know from communications he previously had this

18   knowledge, of whether the devices use finite lists, whether

19   there are random number generators.  Those are facts, which

20   yes, it may require an expert to determine the truth of by

21   examining a device, but they are also facts that

22   Mr. Miltenberger and his company know, and we know they know,

23   and knew then, because he and his company on the website made

24   representations about how the devices work.

25         So obviously, you won't be there at the deposition

1    to rule about questions of what is or is not expert opinion,

2    but we don't think this should be limited nearly to what he

3    can see from looking at the device, rather we believe

4    anything that is within Torch's corporate knowledge about the

5    functions of the device, is something that he should be

6    required to testify about.

7           And so I think one can renounce that we may need to

8    do -- to have an order from this Court that sets forward good

9    limitations is that it is clear guidance as to where we draw

10   the line between what he is expected to prepare for or not

11   when it comes to the function of devices, which frankly is

12   the most -- that and the website I would say are the two most

13   significant topics that we think go very directly on the

14   merits of this case, and that Mr. Miltenberger has failed to

15   answer.

16          THE COURT:  How long do you think this would take

17   to do with Mr. Miltenberger?

18          MR. FINNERAN:  I would say, your Honor, if he is

19   un-evasive, we can do it in half a day.  If it is -- if he

20   continues to claim lack of knowledge on things, obviously, it

21   could take longer.  I don't anticipate it taking longer than

22   the seven hours that are typically permitted for a

23   deposition.

24          I should also note that in my client's case,

25   concerns were raised about Mr. Turntime's answers in his

1  corporate deposition, and we did, without seeking the Court's

2  intervention, produce him for a second corporate deposition

3  and a personal deposition, and he has been deposed for 16

4  plus hours.

5         So I don't think it is unfair in the circumstances

6  here that Mr. Miltenberger would be required to sit and to

7  answer these questions, which he was not prepared to answer

8  the last time.

9         THE COURT:  Okay. Mr. Craig, just if you have

10  something very brief.

11         MR. CRAIG:  Yeah, I mean, the 16 hours is a total.

12         THE COURT:  I don't want to worry about 16 hours.

13  That's not --

14         MR. CRAIG:  Well, yeah.  It is personal and

15  corporate.  So basically, they have 16 hours, and we have

16  basically the same with Mr. Miltenberger.  But yeah, they

17  definitely don't need even half a day, your Honor.  These are

18  questions that -- and topics that should be able to be

19  covered in 90 minutes.

20         And then secondarily, to the extent that Mr.

21  Finneran noted or asked the Court to just order

22  Mr. Miltenberger to respond to the specific bullet-pointed

23  questions and answers, I mean, I don't think that's

24  necessarily fair.  A lot of those questions and answers

25  weren't great questions.  There is many reasons why they are

1    objectionable.  So yeah, I just -- I would caution -- I would

2    hope that that would not be where we are headed here.

3          As he has said, he has already addressed the two

4    biggest topics.  It should be limited to that, and we are

5    already past the point of where all of the dispositive

6    motions are fully-briefed.  All Daubert motions are

7    full-briefed.  We are headed to trial.  He can ask these

8    questions frankly from Mr. Miltenberger at trial and nothing

9    really changes.

10          THE COURT:  Let's be realistic and fair, the

11   Federal Rules don't require him to discover this stuff at the

12   time of the trial.

13          MR. CRAIG:  And I'm not saying --

14          THE COURT:  That's not going to be the way we

15   proceed.

16          MR. CRAIG:  No -- and I agree, but he is telling --

17   he has already told you what he really cares about, and that

18   should be the focus I think of the order here, your Honor.

19   And then the only other thing would be that the idea, you

20   know, of this expert corporate knowledge.

21          THE COURT:  Here is what concerns me.  I don't mean

22   to interrupt you, but I am going to do it.

23          MR. CRAIG:  Sure.

24          THE COURT:  What you are asking me to do is to

25   limit it to the facts.

1          MR. CRAIG:  Yeah.

2          THE COURT:  And I fear that you are not going to

3    agree on what's facts and what's opinion, but certainly

4    what's on the website, you know, if it appeared on a website,

5    I mean Mr. Miltenberger may not know the underlying thing

6    about whether or not -- well, I'm fearful of giving an

7    example.

8          MR. CRAIG:  I know what you are saying.  I do, and

9    I think that it is one thing for Mr. Miltenberger to say,

10   yes, I said that.  Yes, Torch said that.  That's the thing

11   Torch said.  And then a followup question is that -- is that

12   still your opinion.  Yes, it is my opinion, but my opinion is

13   different than that is, in fact, how it operates, because the

14   basis of those statements, those came from experts who looked

15   at it.  So it is an opinion about an expert's opinion.  You

16   see, that's the distinction.

17         I think one is very different than the other, and

18   all of the questions that I'm concerned about, they weren't

19   asking for Mr. Miltenberger's opinions about Nick Farley's

20   opinions about how the devices operate, right --

21         THE COURT:  Okay.

22         MR. CRAIG:  -- they are asking as a matter of fact,

23   is this how the games work, and he doesn't know.

24         THE COURT:  I understand.  Tell me about Nick

25   Farley.

1      MR. FINNERAN:  Okay.  For some reason, it looks

2  like I lost -- oh no, actually, it is just my fault.  Sorry,

3  the connection got jarred.  So let me try to fix this.  I

4  apologize.  My computer is mad, because it is trying to get

5  back online, but it can't do it.  There we go.

6      THE COURT:  While you are trying to pull that up,

7  let me go to you, Mr. Craig, am I correct you still intend to

8  call Nick Farley at trial; is that correct?

9      MR. CRAIG:  I mean.

10      THE COURT:  I'm asking you that, because if you are

11  not going to offer his opinions --

12      MR. CRAIG:  Right.

13      THE COURT:  -- then we are talking about an issue

14  that's a nonissue.

15      MR. CRAIG:  So I think the issue that is a

16  nonissue, that is an issue.  It is currently our position

17  that Nick Farley would be called as a rebuttal expert, which

18  he is, to the extent that he is necessary based on probably

19  some rulings that relate to their expert -- their affirmative

20  expert Stacy Friedman, but with regard to specifically the

21  questions that are at issue here about the code in this

22  device that is not a Torch device, but a Banilla device --

23      THE COURT:  Again, when you say that, Banilla

24  manufacturers Torch's devices.

25      MR. CRAIG:  Sure.  Banilla manufactures a whole

1   bunch of devices.

2          THE COURT:  Okay.  That's fine.

3          MR. CRAIG:  Right.  And so we -- this is a device

4   that we have never looked at.  We never had an opportunity to

5   review.  Nick Farley got ambushed with this, and so it is a

6   little unfair, in our opinion, but that's neither here nor

7   there.  What the problem is, I think, is this moot, right?

8   Should we even need to address it.  Is this starting point

9   within the finite pools issue, and that is something that

10  essentially -- or the randomness in the software code with

11  regards to where does the machine determine the starting

12  point and the finite pools.  Those are not opinions that Nick

13  Farley will offer at trial.

14          That is something that he expressly stated during

15  his deposition he had not looked into, and he had not formed

16  any opinions about those things.  And then he was pressed

17  further by Mr. Finneran, and trying to be helpful, he said,

18  you know all I really know about that comes from what I

19  believe I read from Banilla, 30(b)(6) witness, and then he

20  elaborated on what he could recall.  But he never made those

21  his opinions, because they aren't.  What he stated was, I

22  don't know.

23          And so in our -- this is a different area -- but in

24  our responses to Daubert motions, we specifically stated in

25  response to their request that Nick Farley not be allowed to

1    say those things.  We agreed.  Those are not opinions that he

2    is going to give.  We also agreed that whether there is an

3    element of chance is a legal matter, and you know, be removed

4    from Stacy Freidman not to be able to say those things.  We

5    also said to the extent Stacy won't do it.  Our expert won't

6    either.

7         He did testify that, in his opinion, he doesn't

8    believe chance plays a role or is involved in the devices,

9    but in my opinion, that is a legal conclusion, and it is an

10   ultimate legal conclusion in this case, and both parties seem

11   to agree that that is something that experts -- and the

12   Eighth Circuit also agrees -- that that's something the

13   experts should not testify to.

14        So I think when you combine those two things, this

15   is an absolute nonissue, and then you throw in the fact that

16   this was filed in the wrong District, based on Rule 37(a)(2),

17   because Nick Farley is not a party to this case.

18        THE COURT:  And I understand that that would relate

19   to the motion to compel the witness.

20        MR. CRAIG:  That's right.

21        THE COURT:  But it does overlap with the Daubert

22   motion, which is properly in this District.

23        MR. CRAIG:  Yes.

24        THE COURT:  And so I think actually this Court has

25   reason and basis to consider the motion to compel when I view

1    it in its totality.

2          MR. CRAIG:  I think that, yeah.  I do agree, but to

3    the extent what they are actually asking for is for an order

4    for you to personally compel testimony of Nick Farley, and

5    overrule his objections based -- because they weren't my

6    objections.  I didn't instruct him not to answer.

7          THE COURT:  He is theoretically your witness.  He

8    is a witness you are going to put forth, and he has refused

9    to answer questions in a deposition.  Whether you directed

10   him or not, you have a witness who you are intending, I

11   gather, to put forth, to present expert testimony, that that

12   witness won't answer some questions.  And if the Court

13   believes that those are relevant questions, I think he has to

14   answer them or he doesn't testify.

15         I'm not sure I necessarily have the ability to

16   order him to testify, or order him to violate what he

17   believes to be his confidentiality agreement.  My remedy, in

18   my mind, is to exclude him.

19         MR. CRAIG:  In total?  Because these are very

20   specific limited things that he is frankly not going to offer

21   affirmatively as opinions.

22         THE COURT:  But he can't just come in and say what

23   he wants to say, but not be questioned about other relevant

24   matters.  So the issue becomes is it relevant to this overall

25   case.  Mr. Finneran, or any attorney, would have the right to

1    question him.  It would go to his credibility, his

2    believability, his background and experience.  So they would

3    certainly have the right to question him about other matters.

4    You are just saying that you think that these aren't

5    relevant; is that right?

6              MR. CRAIG:  Well, yeah, I definitely don't think

7    they are relevant, but I didn't instruct him not to answer,

8    and I think --

9              THE COURT:  Well, it doesn't make a difference in

10   my mind --

11             MR. CRAIG:  Right.

12             THE COURT:  -- whether you instructed him or not.

13             MR. CRAIG:  It does under the rules, I believe,

14   your Honor, and but it's --

15             THE COURT:  It does in some sense, but in others,

16   it doesn't in the sense that he is your witness.

17             MR. CRAIG:  I understand that.

18             THE COURT:  You are putting him forth as an expert,

19   and he is refusing to answer questions.

20             MR. CRAIG:  I agree with you that those are things

21   that are facts.  I think the distinction is is the Federal

22   Rule says that if you want to move to compel Nick Farley to

23   say a thing, you have to move in the District where the

24   discovery is taken, because --

25             THE COURT:  I understand, but do you understand my

1  point is it overlaps with the Daubert motion.

2      MR. CRAIG:  I agree -- I agree, but if he is here

3  present, and he is testifying, and he does not -- and he

4  takes that stand, and he is clearly in your personal

5  jurisdiction, and then he refuses to answer, which if you

6  direct him to answer and overrule his objections, based on

7  what Banilla's confidential agreement says, I have no reason

8  to believe that Nick Farley won't answer those questions,

9  right.

10      The problem today is that Nick Farley is not a

11  party, and what they are asking for is a motion to compel

12  Nick Farley, who is not a party.  Nick Farley is not Torch.

13  Torch is not Nick Farley, right --  to do a thing in Las

14  Vegas, show up, and overrule his objections.  I can't.  And

15  regardless of what you say today, or you order me to do, I

16  can't -- I have no authority over Nick Farley to get him to

17  testify a certain way.  I can reproduce him.

18      THE COURT:  I assure you, I'm not going to order

19  you to tell him to testify.

20      MR. CRAIG:  Yeah.

21      THE COURT:  I may say that he is not going to be

22  allowed to testify.

23      MR. CRAIG:  In total?  I mean, that would be a

24  complete -- because that is.

25      THE COURT:  He can't pick and choose what he is

1    going to testify about.

2              MR. CRAIG:  He is not picking and choosing.  He has

3    what he believes is a legally binding agreement that would

4    prohibit him from doing a thing.  So you are going to have to

5    order -- you going to order that you do not believe that his

6    objections -- his objections, not mine -- his objections, not

7    Torch's, were meritless, and that he nonetheless has to give

8    that testimony, right?

9              And I don't have authority to do that, and I

10   believe under Rule 37, this is the wrong venue, as a matter

11   of fact, and --

12             THE COURT:  On the motion to compel, I agree.

13             MR. CRAIG:  On the motion to compel, yeah.

14             THE COURT:  I agree with that.

15             MR. CRAIG:  Okay.  So that's why today for the

16   motion to compel, I think it has to be overruled and denied,

17   that's it.

18             THE COURT:  Okay.  Anything you want to tell me,

19   Mr. Finneran?

20             MR. FINNERAN:  Yes, your Honor.  You covered some

21   of the bases, so I can skip through a lot of this.  I think

22   you understand the issue.  I just want to point this out to

23   the Court, this is sort of what alerted us to this problem is

24   that we received a report that is among the reports that

25   Mr. Farley said would be his opinions in this case, where

1    Mr. Farley included the highlighted sentence.  The first

2    outcome selected from each predetermined finite pool is

3    selected indiscriminately from a table of predetermined

4    indices.

5         We have located another report of Mr. Farley's

6    containing nearly the exact same sentence for another Banilla

7    device, not the same device, but the sentence is exactly the

8    same, except for the word "randomly", and so we had our

9    expert investigate this question.  I am going to ask --

10        THE COURT:  You are going into the merits of all of

11   this.

12        MR. FINNERAN:  Yeah, I know.

13        THE COURT:  I need to get to the heart of the

14   matter.

15        MR. FINNERAN:  I got it.  So as long as we are all

16   clear on what the testimony is.

17        THE COURT:  But this is testimony about a Banilla

18   Game --

19        MR. FINNERAN:  So, your Honor --

20        THE COURT: -- device.

21        MR. FINNERAN:  So Banilla is the manufacturer of

22   the devices.

23        THE COURT:  I understand.

24        MR. FINNERAN:  And each of the devices has a

25   version number.  So this one is 3.2 and a bunch of other

1    digits after it.  So my client, Mr. Turntime, years ago was

2    able to purchase a device with one such model number.

3          On November 6th -- and this should follow disclosed

4    his reports to us -- we learn that that model number, in

5    fact, matched one of the five devices at that point Torch

6    disclosed to us, as being among the devices marketed in

7    Missouri and analyzed by Mr. Farley.  So once we knew that,

8    we now know we have the same machine that Mr. Farley

9    analyzed, and we looked at it, and we found that the

10   statement about being discriminate probably wasn't

11   inaccurate, because there were random functions in that

12   device.

13          As you know, we then moved to -- I got a deposition

14   of the manufacturer.  It is on the screen here.  It is where

15   the manufacturer confirmed that information, and under Rule

16   -- you know -- under Rule 26, once Torch knows now that his

17   testimony on this point is incorrect, they should have a duty

18   to supplement and correct that testimony.  And that's the

19   first thing I asked from Mr. Craig was will he simply correct

20   the testimony to say there are random functions.

21          Quite obviously, they don't want to do that,

22   because then that makes their case much more difficult to try

23   to say these are not games of chance.  And of course, that

24   includes not just information in the report, but the

25   information given during his deposition.

1           So I'm turning to the question of are we in the

2     right place for this motion, and with respect, your Honor, I

3     believe we are.  So under Rule 30, which is one of the

4     grounds of which we base our motion, what we are seeking is a

5     second deposition of Mr. Farley.  And in the event that a

6     person has already been deposed, then we must obtain this

7     Court's leave to depose Mr. Farley again.

8           That's the remedy I requested from Mr. Craig in

9     which he -- after we were not getting the supplementation,

10    and that was refused.  So Mr. Craig's argument is that

11    37(a)(2) means that we should have brought this motion in

12    Nevada.  But what it says is that a motion for an order to an

13    nonparty must be made where the discovery is or will be

14    taken.  And we don't have to depose Mr. Farley in Nevada.

15    Mr. Farley is their retained expert witness.  We can require

16    him to appear in this District to sit for a deposition.

17          That is the usual -- you know -- under 26, it says

18    that he has to sit for a deposition, and we don't have to

19    comply with Rule 45, and --

20          THE COURT:  Slow down a little.

21          MR. FINNERAN:  Sorry.  And get within a hundred

22    miles of his residence.  He is an expert -- retained expert

23    witness, and we, you know, we have dug hard today to try to

24    find cases on it.  But here, we found a case that tells us

25    the typical rule that we all know that a party seeking

1   discovery may set the place where the deposition will take

2   place.

3           And we would ask the deposition to be taken in this

4   District, which is not a Rule 45 issue, where we have to be

5   near the home of the deponent.  This is a retained expert

6   witness.  We have a right to depose under Rule 26.  Courts

7   repeatedly -- and that we have two slides on this, which I'll

8   be happy to give the Court later -- that tells that Rule 45

9   subpoenas are not appropriate for retained experts.  If we

10  had tried to go down that route, we may be arguing the

11  opposite thing that we should have come to this Court first.

12          And frankly, your Honor, it doesn't make much sense

13  to require us to go to Nevada to file this motion, because

14  that's simply a venue provision, as this Court acknowledged a

15  few moments ago, it has jurisdiction over this issue, and if

16  we go back to Nevada, then Nevada will have the ability to

17  transfer the motion back here, because this is the Court

18  where the action is pending.  We would be asking to do that

19  anyway.

20          So frankly, we don't think that this argument,

21  which we only saw last night, and we'll be happy to brief

22  further for the Court, in any way precludes the Court from

23  ruling on the motion to compel.  And Mr. Farley, from our

24  prospective, is their retained witness.  The Court has the

25  power to compel him to testify.  The objections --

1          THE COURT:  Let me ask you this.

2          MR. FINNERAN:  Yes, your Honor.

3          THE COURT:  Is the only issue this issue of the

4    language in those two reports that differ?

5          MR. FINNERAN:  Not just the language, your Honor,

6    but the underlying facts reflected by that statement, because

7    this is a very important fact in the case.  Did they say we

8    won't offer that opinion.  That's how the starting entries

9    are selected.  But that opinion goes to Mr. Farley's ultimate

10   conclusion, his opinion, that chance plays no role in the

11   operation of the games.  That's what he says in his report.

12         Well, if it is not true, as Banilla has told us, as

13   our expert has established, although they wanted to exclude

14   that as well, and as the evidence that we have provided

15   shows, then that undermines the basis for his ultimate

16   conclusion.

17         THE COURT:  How long do you need to file a reply to

18   the response as it relates to this issue?

19         MR. FINNERAN:  It would be no problem.  I can do

20   Friday, if you need me to do Friday.

21         THE COURT:  I mean, again, the whole reason for

22   doing this is that you wanted an expedited schedule.  We have

23   given you an expedited schedule.  I'm trying to make sure

24   that we can stick with that.

25         MR. FINNERAN:  We will do it by Friday.

1          THE COURT:  Okay.  All right, okay, I don't really

2    want to get too much more into this.  If there is something

3    else very briefly that you want to tell me.

4          MR. CRAIG:  Yeah, I mean, hopefully very briefly.

5    We don't believe that this testimony is relevant.  You let

6    him get into the reason why they believe this is relevant and

7    somehow --

8          THE COURT:  Tell me briefly why it is not relevant.

9          MR. CRAIG:  Yeah.  Because this is, in their best

10   case scenario, this is a software function that happens, as

11   they say it, before any player can even press play on a

12   single device, right?  So this is like saying there is a

13   regulation that says you are going to be held in contempt if

14   you don't have -- every vehicle has to have a steering wheel,

15   right, but then before you are saying okay, well, every

16   assembly line car now that doesn't have an --

17         THE COURT:  The issue is, as I understand it, is

18   whether or not it is a random selection.

19         MR. CRAIG:  But if it is just in the starting point

20   for the very -- this is so minute -- it is -- we are talking

21   about how the software selects the very first initial

22   starting point in the finite pool of repeating

23   finite outcomes.

24         THE COURT:  Doesn't that affect who wins and who

25   loses?

1          MR. CRAIG:  No, it doesn't, because it is set

2    before any player pushes play.  So before a player plays the

3    device, before a player pushes play, all of that is fixed.

4    Everything is fixed.  When the player presses play, it is all

5    fixed.  It is not random anymore.

6          THE COURT:  All right, you've got --

7          MR. CRAIG:  I mean, secondarily, this is testimony

8    that we were ambushed with about a device that is not a Torch

9    device.  It is a irrelevant, and we have not had an

10   opportunity -- Farley has not had an opportunity to look at

11   the device.  All we are hearing is testimony from Rich that

12   they are identical, because they believe it is, and --

13         THE COURT:  It does have a do with a Banilla Game

14   device, and it is -- what's the evidence that it is the same?

15         MR. FINNERAN:  So in addition to the fact that they

16   share the same model numbers, 3.2 etc., the supplemental

17   report of Mr. Friedman demonstrates that he performed the

18   same analysis Mr. Farley did, which is called a CheckSum,

19   which basically is a way of confirming that two devices

20   contain the same executable files, and we confirmed they did.

21   I will just --

22         THE COURT:  Okay.  I'll give you until Friday to

23   file a response to -- a reply to the response.

24         MR. FINNERAN:  Yes, your Honor.  Sure.

25         MR. CRAIG:  We filed --

1          THE COURT:  I have heard enough about it.  Well, go

2     ahead.

3          MR. CRAIG:  Just can I have one more tiny thing --

4     is we filed a motion to strike the supplemental report of

5     Stacy Friedman.  And so if that's gone, this is totally

6     irrelevant.

7          THE COURT:  Okay.  All right, I want to give you a

8     chance to tell me about your motion to compel.

9          MR. CRAIG:  Thank you, your Honor.  Okay, so

10    Defendant's moves to compel on just a couple of issues.  The

11    first is is fairly general in that we were interested in

12    knowing a little bit more about TNT's production, and how

13    they went about looking at documents.

14          They have provided now some additional information

15    regarding that process, or lack thereof, to collect and

16    review potentially responsive documents, which we do

17    appreciate.  But it doesn't alleviate my concerns that TNT's

18    corporate representative testified, and that he and others

19    made judgment calls regarding relevant and responsiveness,

20    which I believe that they necessarily understand what that

21    means within the scope of the Federal Rules.  And then also

22    when I deposed Turntime for his 30(b)(6) deposition, he told

23    me that yes, he alone, and his people alone made judgment

24    calls about what was responsive, and then it was turned over.

25    And when he did that, he said, I sent them quote "thousands

1    of documents."

2            And then in this case, we have been -- have

3    produced us approximately 600 documents, many of which are

4    highly duplicative, some e-mail chains, sometimes there is

5    complete duplicates.  And the aside from Mr. Turntime's

6    testimony, now TNT's own opposition brief raised additional

7    questions regarding TNT's document review production process,

8    specifically on page four of TNT's memorandum in support at

9    footnote two.

10           TNT stated, "Although Defendants previously had

11   brought counterclaims against TNT that might have supported a

12   more searching inquiry into TNT's own business records,

13   Defendants have dismissed those claims."  This footnote is

14   literally the first time -- it was yesterday was the first

15   time that TNT indicated to the Defendants that otherwise

16   responsive documents were being withheld from Defendants

17   based on TNT's belief that the simple fact Defendant's agreed

18   to dismiss their counterclaim somehow excused TNT's full

19   compliance when responding and objecting to Defendant's

20   written request for production.

21           Defendant's written request for production were not

22   promised or contingent upon Defendant's counterclaims, and

23   despite Defendant's willingness to voluntarily dismiss those

24   counterclaims for a number of reasons --

25           THE COURT:  Mr. Craig, let me just interrupt you.

1       MR. CRAIG:  Sure.

2       THE COURT:  What are you asking me to do as it

3  relates to this motion to compel?

4       MR. CRAIG:  Yeah, well, if it is true, for one

5  thing, if it is true, they have withheld documents that would

6  otherwise be responsive to our original and only RFP's in

7  this case based on a fact that dismissing our counterclaims

8  somehow limited and narrowed the scope of what they did agree

9  to give us in their responses.  We need those produced, your

10 Honor.

11      There was no agreement.  We never heard that before

12 footnote two, and we have other basis like unclean hands, our

13 own defenses.  We believe that this case was brought for

14 improper purposes and improper grounds.  So we are entitled

15 to a very broad discovery.  These are very serious claims

16 against my clients, and we are entitled to defend ourselves.

17      So I would ask, based on their own footnote, saying

18 that it appears they withheld potential responsive documents

19 after we agreed to dismiss counterclaims, that they produce

20 the documents they agreed to produce to us.

21      THE COURT:  Okay.

22      MR. CRAIG:  Secondarily, there is a waiver of

23 argument, your Honor, and a waiver of argument here is fairly

24 broad.  Frankly, in our motion -- in our brief, we pointed

25 out multiple examples of communications between TNT's

1    president and owner, and numerous non-parties, and third

2    parties, mostly Mr. Turntime's friends and business

3    acquaintances from MeloMelo (phonetically), and his trade

4    association, where they span approximately four years from

5    about the middle of 2019 until a few days before this case

6    was filed.

7            THE COURT:  Let me stop you for just a moment.  Mr.

8    Finneran, have you produced a privilege log, because it does

9    appear to me that you are asserting a privilege as it relates

10   to communications between Mr. Turntime and attorneys.

11           MR. FINNERAN:  So your Honor, as you actually see

12   in our response we have attached.  At the outset of

13   litigation, there was an agreement reached between myself and

14   Mr. Craig that to the extent the communications are

15   communications between Mr. Turntime, TNT, on the one hand,

16   and then we each provided another list of attorneys that we

17   basically then dispute were, you know, attorneys who would --

18   the privilege would cover.  That we would not -- either party

19   -- produce a privilege log of those communications.

20           In fact, I believe at this point, neither party has

21   produced any privilege log to the other side based on that

22   agreement.

23           THE COURT:  I guess the question that's being

24   raised, and I think it is accurate, is to the extent that

25   e-mails were forwarded or sent to -- whether it was

1    legislatures, prosecutors, other people that included

2    attorney-client communications, the privilege would be

3    waived.

4           MR. FINNERAN:  The reason Mr. Craig has those

5    e-mails is because if there was an actual waiver of a

6    specific communication -- so like you said, it was forwarded

7    to a third party, we did -- we have not claimed privilege

8    over those or we have produced those documents.

9           Mr. Craig, as I understand, is seeking is on the

10   basis of Mr. Turntime having forwarded what we view as a

11   small set of communications that reveal some communication he

12   may have had with an attorney, that that subjects the

13   entirety of his communications relating to the subject matter

14   of this litigation to a waiver.

15          And so, for example, communications with myself

16   prior to the initiation of this lawsuit, I understand, so --

17          MR. CRAIG:  I'm looking -- I'm not -- go ahead.

18          THE COURT:  Okay, go ahead.

19          MR. CRAIG:  Yeah.  So I don't believe that there

20   will be communications with Mr. Finneran would be the

21   communications that we would be after here.  I never saw an

22   example where I think Mr. Finneran had a communication that

23   was waived.

24          What all of these communications -- almost all of

25   them were -- were not just forwarding on necessarily an

1  e-mail.  This is Mr. Turntime saying like this is what I'm

2  going to tell my counsel.  This is what our game plan is.

3  This is what my counsel is telling me how we are going to go

4  after and "kill Torch".

5          These are broad waivers about a subject matter that

6  relates directly to my client and directly to this case.

7          THE COURT:  But let me just ask you this --

8          MR. CRAIG:  Sure.

9          THE COURT: -- do you agree that there was an

10 agreement at the beginning of the case that neither side

11 would produce a privilege log as it relates to communications

12 between certain attorneys and either Torch or TNT; is that

13 correct?

14         MR. CRAIG:  That was an agreement very early in

15 this case before we saw the documents where there was a very

16 clear waiver with a broad subject matter.  That frankly, I

17 don't need a privilege log to get an order that says if it is

18 related to this subject matter, produce it, but yes before --

19         THE COURT:  You know, what you are actually just

20 asking me to do is order that okay go back through, and if

21 you waived attorney-client privilege, then send it to -- it

22 is discoverable.

23         MR. CRAIG:  It would be under the preexisting case

24 law.

25         THE COURT:  Again, without a privilege log, I can't

1     identify certain communications.

2          MR. CRAIG:  We would ask that you would order them

3     to produce a privilege log to the extent that it relates to

4     those specific topics then, your Honor, because I couldn't

5     have known if they waived privilege in this manner by talking

6     with third parties many many times.  When we first -- we are

7     trying to narrow the scope of this expedited case, so we

8     didn't have to produce broad privilege logs.

9          THE COURT:  Okay.  Mr. Finneran, you are telling me

10    in any case where there is an e-mail that is between

11    Mr. Turntime, an attorney, and it is forwarded to a third

12    party, you have produced all of those e-mails, all of those

13    documents.

14         MR. FINNERAN:  Yes, your Honor.  There are -- I

15    will say there are two e-mails that I need to discuss with

16    Mr. Craig, because we believe that another client was on the

17    e-mails, and I believe there is two of those.  Those have not

18    been produced.  That's probably what our privilege log would

19    constitute, if we have one on this case on those issues, but

20    those are the only two -- just in candor, I learned about

21    these the other day, and I want to have a chance to discuss

22    it with Mr. Craig, but if those -- with those two aside, if

23    there was a circumstance where a third party was on the

24    communication, or a communication between TNT and one of the

25    attorneys was forwarded to a third party, we produced that

1   communication.  And I'll consult with Mr. Craig about these

2   other two e-mails, I think I likely produced them as well.

3           MR. CRAIG:  Your Honor, the scope of a privilege

4   waiver is the subject matter.  Now, they cite to rule --

5   Federal Rule of Evidence 502, but that doesn't apply here,

6   because Rule 502 only applies if it is a waiver that was in

7   the context of litigation, either State or Federal, under A

8   or C, I believe, or if it was inadvertent.

9           None of those things exist here, and the specific

10  -- the specific comments by the committee, the Rules

11  Committee, specifically say that 502, which was supposed to

12  just -- really, it was targeted towards us, moving into a new

13  digital era, and everybody has millions of documents, and you

14  can't hold house on all of them, and so the old rule of

15  inadvertence subject -- it used to be if you inadvertently

16  produce, purposely, with an attorney-client privilege, a lot

17  of courts will say you have waived all privilege on that

18  subject matter, but if you did that in response to discovery.

19  502 was a specific limited waiver only to specific instances

20  that aren't covered here, when you are producing documents in

21  the context of litigation.  That's not what happened here.

22          They are not saying they inadvertently produced

23  these -- the actual statements, the communications between

24  Mr. Turntime and the third parties, they were extrajudicial.

25  This was him going out and telling people, you know, these

1   are my plans.  Do you have any ways to help me get Torch.

2   When you operate in that, right, and it is not a specific

3   exception, how it is defined by the Rules Committee.  It is

4   an exception to traditional rules of subject matter waiver,

5   right.

6             If you are not within those exceptions, you are

7   right back in the same case law that has existed and

8   continues to exist about subject matter waiver in the Eighth

9   Circuit and abroad, which is -- you talk about an issue

10  voluntarily with third parties, and you have now waived

11  privilege on the subject matter, and that's where we are at.

12            So the fact that he is saying we produced all

13  communications, well, that's irrelevant, because what we know

14  is these were broad conversations, and as you probably know,

15  very rarely do you actually get documented evidence of these

16  types of waivers, but we have many, and they span four years.

17  So this is also in the context of a very very limited

18  production to us.

19            THE COURT:  So what are you asking me to do?

20            MR. CRAIG:  I mean, I think, as you pointed out, I

21  don't have a privilege log.  That would be helpful.  So I

22  think the starting point is ordering them to produce a

23  privilege log of communications would be good.  I think they

24  have waived privilege, though, on the subject matter that is

25  our strategy related to the litigation to Torch prior filings

1    in this case.  I'm not looking for Mr. Finneran's

2    communications with his client, because I have not seen any

3    instance where Mr. Turntime was specifically talking about

4    communications with Mr. Finneran, but you literally see in

5    the documents, if you look at our exhibits to this motion,

6    you see the light bulb moment in Mr. Turntime when he -- and

7    I think it is July or June of 2019 -- where a light bulb goes

8    off where he is talking to all of these third parties about

9    how he is going to go after Torch, and the light bulb went

10   off, and I'm going to use the courts, and I have talked to my

11   lawyers about it, and here is what I think, and here is what

12   they think, and do you guys have any other, you know,

13   opinions, and then that carries on a conversation between all

14   of these people for four years.

15          THE COURT:  All right.  Mr. Finneran, it is clear

16   to me that there were communications between your client and

17   third parties that discuss here is what my lawyers tell me.

18   Here is what I'm planning on doing.  I think there is no

19   privilege as it relates to those communications.  I think

20   those are going to have to be turned over.

21          I'm going to -- how long do you need to produce a

22   privilege log?

23          MR. FINNERAN:  If I understand correctly, your

24   Honor, you were asking if we were to log all of the

25   communications that we previously agreed with Mr. Craig not

1   to have to log, how long would that take -- do you know how

2   long?  I think that part of that is confusion, I guess so,

3   and since he is not interested in e-mails with my firm, so I

4   guess -- can you clarify what you are interested in?

5           MR. CRAIG:  Yeah.  Almost all of the communications

6   that seem to relate to this, relate to -- as you know, there

7   is 2019 -- there is the November 2019 case that was filed in

8   Crawford County by TNT.  So it is really Mr. Elkin -- what is

9   it, Elkins?

10          THE COURT:  Kistner.

11          MR. CRAIG:  Elkin Kistner?

12          THE COURT:  Yes, sir.

13          MR. CRAIG:  I think all of those communications it

14  is really Elkin Kistner's law firm communications with

15  Mr. Turntime.

16          MR. FINNERAN:  So, your Honor, I'm not sure if we

17  can figure out as we sit here today what the volume of those

18  communications is.  We could do it expeditiously, but I would

19  like to be heard on why we don't believe that, you know,

20  assuming that there were the communications you are

21  referencing that that would create a subject matter waiver

22  over communications that were not forwarded to any third

23  parties.  So if I can be heard on that, I'd appreciate it.

24          THE COURT:  Well, go ahead.

25          MR. FINNERAN:  So, your Honor, would you like me to

1    approach the podium or sit here?

2         THE COURT:  You are probably fine right there as

3    long as you speak into the microphone.

4         MR. FINNERAN:  Okay.  So your Honor, focusing on

5    the privilege issue first.  So again, we don't dispute that

6    when Mr. Turntime forwards an e-mail to a third party, that

7    he waives a privilege over that e-mail.  What Mr. Craig is

8    now saying is that if you reveal anything outside the context

9    of the litigation to somebody else about a communication

10   involving the attorney, now you have to reveal all of your

11   communications with that attorney on that same subject

12   matter.  And as we have -- we haven't had the chance to fully

13   speak to you about this, but there is cases cited in our

14   brief in response that demonstrate that that rule only

15   applies when it is in the context of litigation, and it is

16   sort of the sword and shield problem where parties

17   selectively revealing something to use to its advantage,

18   while then gaining the advantage of the privilege on the

19   other side.

20        That's clearly not what is taking place here.

21   These were not revealed in the context of any litigation, and

22   we don't intend to offer any of these communications as

23   evidence in our case.  So it is --

24        THE COURT:  Whether you intend to offer them or not

25   is not the relevant issue.

1          MR. FINNERAN:  Correct.

2          THE COURT:  The issue is to the extent that your

3    client communicated with third parties, and included

4    attorney-client communications or advice, or planning, there

5    is a waiver as to all of those communications, and the

6    subject matter of those communications may also be waived.

7          So I am a little bit concerned when you start

8    talking about the Crawford County case and communication with

9    Mr. Kistner.  I don't see how they necessarily waived

10   privilege as it relates to all aspects of the Crawford County

11   case.  I just don't see that.

12          Again, I do agree that to the extent that there

13   were subjects that were discussed in communications with

14   third parties about communications with attorneys, that it

15   waives the privilege as it relates to that subject.  So to

16   the extent that he might be saying, well okay, if you change

17   the law in this way, that will help us, or urging a

18   prosecutor to prosecute someone, and that your attorney says

19   that it is illegal, or whatever.  I mean, it waives the

20   privilege as it relates to those subjects so.

21          MR. FINNERAN:  Your Honor, I understand your

22   inclination there, but I think the concern is that if the

23   Court's reasoning is that merely because I disclosed

24   something specifically, and an attorney told me outside the

25   context of the litigation that I can waive the privilege,

1    then I think that's opens a very broad rule.  For example, as

2    we said in our briefing, in this case Mr. Miltenberger

3    testified that the decals that they place on every Torch

4    device was drafted by a lawyer.  So they have obviously

5    waived the privilege over decal.

6            Does that mean I now get to go and get every

7    communication of the lawyers in advance of that.

8            THE COURT:  I agree with you, it is not that broad.

9    I agree with that.  But it certainly relates to any

10   communication that is forwarded to a third party, whether it

11   is a friend, or again, the categories of people that we have

12   talked about that it appears that your client was

13   communicating with.  Those communications are -- there is no

14   attorney-client privilege as to that.

15           I'm going to want a privilege log on Friday.  You

16   can tell me how long it will take to produce that privilege

17   log.  You are going to file your reply as it relates to Nick

18   Farley?

19           MR. FINNERAN:  Yes, your Honor.

20           THE COURT:  Well --

21           MR. FINNERAN:  And to be clear, we are not being

22   asked to log any communication my firm has had, only

23   communications that Mr. Kistner and his firm may have had

24   with Mr. Turntime.  It will take us a lot longer if we have

25   to log our communications with our firm.

1          THE COURT:  You are not asking for communications

2    with Brian Cave, correct?

3          MR. CRAIG:  Certainly nothing after the filing of

4    the case.  I don't think that I am.  I don't think that I

5    have seen any reason to believe there is a waiver with

6    respect to Mr. Finneran's firm.

7          THE COURT:  Okay.  So I think the answer is no as

8    it relates to Brian Cave, and I don't know whether or not

9    there are other law firms other than Mr. Kistner's law firm

10   who have provided advice or direction to your client to TNT.

11          In any event, I want to know by Friday how long it

12   will take you to put together the privilege log.  I

13   understand that that could be voluminous.  I don't know how

14   much of an issue.  So again, by Friday, you are going to give

15   me the reply on Nick Farley.

16          What I'm going to order with regard to

17   Mr. Miltenberger is that he sit for another deposition for

18   two hours.  No more than two hours.  That's what you are

19   going to have.  I want you to try to come up with an

20   agreement.  I agree that it is based on the facts as opposed

21   to legal opinions, but I also understand that that line is

22   not a clear line necessarily.  So I need you all to meet and

23   confer and see if you can agree on that.

24          Honestly, I'm going to tell you have to meet and

25   confer on all three of these issues and try to come to some

1  agreements.  Again, I'm going to try to keep pushing you to

2  move forward.

3         As it relates to Mr. Miltenberger, I'm granting the

4  motion to compel as it relates to him, and if he answers

5  everything "I don't know" again, I'm going to impose

6  sanctions.  So you just need to be aware of that.  Having

7  said that, again, I think two hours it is enough time for you

8  to get those questions answered that are fact-based

9  questions.  So I'm going to ask that you meet and confer and

10 try to reach an agreement.  So that's the issue with regard

11 to Miltenberger.

12        With regard to Farley, again I'll get your reply on

13 Friday.  We'll get you an order as quickly as we can as it

14 relates to Farley.  I do think you have an issue about the

15 motion to compel.  I understand your argument, but I

16 frequently get miscellaneous matters filed here, motions to

17 compel on out-of-state litigation.  So it is not unusual.

18        MR. FINNERAN:  For expert witnesses, that would

19 surprise me, because we have looked everywhere.

20        THE COURT:  They are miscellaneous matters that are

21 filed.  It is --

22        MR. FINNERAN:  For Rule 45 subpoenaed witness,

23 yeah, we found a thousand of those and very few on this

24 expert issue.

25        THE COURT:  It is hard to find those miscellaneous

1    matters, because the Clerk's Office opens them and closes

2    them on the same day.  So in any event, I'll give you an

3    opportunity to file that reply on Friday, and then I'll enter

4    an order as it relates to all three motions to compel.

5              But on Friday, I need you to give me proposed

6    language on Miltenberger on the topics and the timeframe on

7    the privilege log.

8              MR. FINNERAN:  Okay.  I have not yet been heard yet

9    on the first topic in the motion to compel meaning our

10   collection process for Mr. Turntime and TNT.  Do you have any

11   ruling on that, or would you like oral arguments?

12             THE COURT:  I just want you -- I mean, really what

13   you are saying to me is there is this incredible disparity

14   which --

15             MR. CRAIG:  Kind of.  I think that would be true

16   until we got the reply, your Honor, and footnote two is very

17   problematic.  Prior to seeing footnote two, yeah, basically I

18   needed to come to you, tell you there is a disparity.  If you

19   agree, then that's the end of the inquiry.  I'm not calling

20   Mr. Finneran a liar.  I think there is a disparity between

21   the broad questions that we asked, because we had to, because

22   we only got one shot at it, and the lack of objections in the

23   600 documents that we got produced, especially when my client

24   has spent hundreds of thousand of dollars and plus 10,000

25   plus 12,000 documents.

1          So, but footnote two is problematic in that it sure

2     seems like they have made some sort of judgment call.

3          THE COURT:  I don't know --

4          MR. FINNERAN:  Your Honor, I can clarify what I

5     have mentioned in footnote two.  So first of all, I am -- as

6     we said in our filing, we believe we have done a diligent

7     search.  We are not aware of any document we withheld, and

8     certainly footnote two is not meant to suggest that we have

9     withheld a document.

10          I was saying that -- well, what was said there is

11     the idea of a more searching inquiry, meaning that if, for

12     example, there were requests brought that related to those

13     counterclaims, perhaps we would have had to do more, but by

14     no means was I meaning to suggest by that that we have

15     withheld a document that is not either privileged or

16     nonresponsive.  And the fact that Mr. Turntime did turn over

17     an excess of a thousand documents to us, that we have

18     produced a smaller number of those reflects that --

19          THE COURT:  I'm not worried about necessarily just

20     a disparity, but I want to make sure you have done a complete

21     thorough search, and I think to the extent that your client

22     is exercising judgment about what is relevant and what isn't

23     relevant is concerning to me.  I think you need to make sure

24     that there has been a thorough, complete search, because the

25     last thing you are going to want to have happen is for them

1      to find a document you have not produced it.  We are in the

2      middle of trial, because you are not going to want to hear

3      what I'm going to do as a result of that.

4              MR. FINNERAN:  Of course, your Honor, and I should

5      just clarify while we did -- Mr. Turntime consulted with me

6      and my colleagues before he conducted his search.  We gave

7      him guidance as to what to look for, the kind of things to

8      do.  He then produced a large volume of documents to us, many

9      of which were not responsive, which were duplicative, etc.

10     Our attorneys then reviewed those documents to confirm that

11     we would be producing and meeting our discovery obligation.

12              So as I sit here today, I'm very confident that

13     this issue has been going on for some time, and I have had

14     numerous conversations with my client to ensure that we don't

15     believe anything has been withheld.  I will have another of

16     those conversations, and if we discover something we have

17     overlooked, I will turn it over to Mr. Craig without any

18     further intervention of this Court.

19              THE COURT:  Okay.  I mean, I know that there has

20     been a lot that has gone on between TNT and Torch in terms of

21     different matters.  So it does somewhat surprise me if there

22     are only 600 documents that are responsive.  So I would just

23     urge you to make sure you have done a thorough, complete

24     search, and disclosed any discoverable documents.

25              MR. FINNERAN:  Yes, your Honor.

1          THE COURT:  All right.  So that's where we are at.

2     Again, we have a tight timeframe, a lot of things going on.

3     Just get those filings to me, and then we will get an order

4     out.  Thanks for being here.

5          MR. FINNERAN:  Thank you.

6          MR. CRAIG:  Thank you, your Honor.

7          THE COURT:  Okay.

8     (The proceedings concluded at 5:01 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3          I, Lisa M. Paczkowski, Registered Professional

4   Reporter, do hereby certify that I am a duly appointed

5   Official Court Reporter for the United States District Court,

6   Eastern District of Missouri, and that the foregoing is a

7   true and accurate reproduction of requested proceedings had

8   in the matter of:

9   TNT Amusements, Inc., vs. Torch Electronics, LLC

10          In the event copies are made of the transcript

11  herein, the court reporter takes no responsibility for

12  missing or damaged pages.

13          Dated this 28th day of May, 2024.

14

15

16          ___/s/  Lisa M. Paczkowski_____
            Lisa M. Paczkowski
17          Official Court Reporter
            United States District Court
18          Eastern District of Missouri

19

20

21

22

23

24

25