**THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
EASTERN DISTRICT**

| | | |
|---|---|---|
| TNT AMUSEMENTS, INC., d/b/a | ) | |
| PLAY-MOR COIN-OP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cv-00330-JAR |
| | ) | |
| TORCH ELECTRONICS, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF TNT AMUSEMENTS, INC.'S MEMORANDUM IN
SUPPORT OF ITS RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT**

Months of discovery have confirmed what TNT alleged in its Complaint: the devices marketed and distributed throughout the state of Missouri by Defendants Torch Electronics, LLC, Steve Miltenberger, Sondra Miltenberger, and their confederates (the "Torch Devices") are not, as they long have claimed, legal "no chance" gaming devices; instead, the Torch Devices are illegal gambling devices under Missouri law. Given the documents produced and the sworn admissions of Defendants and their expert witness, there is no longer any factual dispute as to how the Torch Devices function. The legality of the Torch Devices is therefore a question of law that this Court can and must answer on summary judgment. Most critically, the following 13 facts are not in dispute:

1. The Torch Devices each feature a number of different "game themes," such as "Lucky Striker," "Lucky Lollipop," "Lucky's Loot," "Lightning Strike," "Bourbon Street Dice," and "Fabulous Las Vegas" ("Game Themes"). SUMF ¶ 8.[1]

2. The Torch Devices each feature a number of different "play levels" that represent the amounts that a player must pay in order to play the next turn of the game (a "Play Amount"). SUMF ¶ 50.

---

[1] "SUMF" is used herein to refer to TNT's contemporaneously filed Statement of Uncontroverted Material Facts.

3. For each combination of Game Theme and Play Amount, the Torch Devices are programmed to pay the player an amount (or pay the player nothing) based upon one of several "pre-determined finite pools" of payout amounts (a "Payout Pool"). The Payout Pools are sequentially arranged in an ***unpredictable order*** that has ***no discernible pattern***. SUMF ¶ 51.

4. The Payout Pool for each specific Torch Device has ***its own unique, unpredictable sequence*** of payout amounts. The sequence of the Payout Pool for each specific Torch Device is ***randomized*** by the manufacturer before the Torch Device is placed into use in any amusement location. SUMF ¶ 52.

5. The first time that a player plays any particular Game Theme and Play Amount on a Torch Device, the software of the Torch Device ***randomly*** selects the first payout amount that will be displayed to the player from the applicable Payout Pool. SUMF ¶ 53.

6. The Torch Device also ***randomly*** selects which combination of "winning" or "losing" symbols to display to a player on each and every play of the devices. SUMF ¶ 56.

7. Even players who use the "Prize Viewer" mechanism that is available in each of the Torch Devices have ***no way of predicting*** which combination of winning and losing symbols will be shown on any play of the device. SUMF ¶ 64.

8. The "Prize Viewer" mechanism is an ***optional*** feature that players need not use in order to spend money, play the any of the Game Themes, or win money. SUMF ¶ 57.

9. A player who is unaware of or does not use the "Prize Viewer" mechanism has ***no way of predicting*** the outcome of the next turn. SUMF ¶ 61.

10. Even if a player uses the "Prize Viewer" mechanism, the "Prize Viewer" only displays the ***immediately next payout amount*** for the ***immediately next turn***. SUMF ¶ 58.

11. The "Prize Viewer" does not display any future payout amounts ***after*** the immediately next turn. Nor does the Prize Viewer allow the player to preview the combination of symbols that will be displayed to the player on even the immediately next turn. SUMF ¶ 70.

12. A player who uses the "Prize Viewer" mechanism and sees that the next game will result in a $0 payout amount ***must still expend the Play Amount*** and "claim" the $0 "prize" in order to view the subsequent payout amount and thereby have the chance to receive a positive return. SUMF ¶ 62.

13. A player who uses the "Prize Viewer" mechanism and sees that the immediately next game will result in a $0 payout amount has ***no way of predicting*** whether the subsequent payout amount will be more than $0 without first expending the

Play Amount to "claim" the $0 "prize" displayed by the "Prize Viewer" mechanism. SUMF ¶ 63.

Defendants did not provide evidence to controvert these facts in their response to TNT's original Motion for Summary Judgment, *see* Resp. to TNT's SUMF (Doc. #109), and now Defendants have admitted the truth even of the facts they previously disputed through their expert, Mr. Nick Farley. Nonetheless, they maintain that those facts are not sufficient to make the Torch Devices "gambling devices" under Missouri law. But as explained below, a straightforward application of Missouri law makes those undisputed facts more than sufficient to make the Torch Devices "gambling devices" and "slot machines" as those terms are defined in Missouri Revised Statute § 572.010 (hereafter, "§ 572.010"). *See infra* § I.

With that proposition established, it readily follows that TNT is entitled to judgment as a matter of law on Defendants' liability on each of counts of its Complaint.[2] With respect to TNT's claim for declaratory judgment (Count Seven), the mere fact that the Torch Devices are illegal gambling devices is adequate to entitle TNT to declaratory and injunctive relief. *See infra* § I. With respect to TNT's Lanham Act and unfair competition counts (Counts One and Two), there is no genuine dispute that Defendants have represented their devices to be "legal" "no chance" devices within the stream of commerce and that those statements are material. *See infra* § II. Lastly, with respect to TNT's RICO counts (Counts Three through Six), there is no genuine dispute that Defendants have conspired together to engage nearly 100 independent contractors to carry out their illegal enterprise and committed an unfathomable number of predicate acts in furtherance of that enterprise, including most obviously mail fraud, wire fraud, and conducting an illegal gambling

---

[2] TNT acknowledges that there are genuine disputes of material fact as to the extent of TNT's damages, and it therefore does not move for summary judgment on the issue of damages.

enterprise. *See infra* § III. For those reasons, TNT respectfully requests that the Court grant it summary judgment with respect to Defendants' liability on each of the counts of the Complaint.

DISCUSSION

**I. The Undisputed Facts Establish That the Torch Devices Are Illegal Gambling Devices Under Missouri Law and That TNT Is Therefore Entitled to Declaratory Judgment on Count Seven of Its Complaint**

Given the undisputed facts as to the attributes of the Torch Devices recited above, the only question remaining to be resolved is one of law: whether those attributes make the Torch Devices illegal "gambling devices" and/or "slot machines" under Missouri law. As explained below, the answer to that question is "yes," for two independently sufficient reasons. First, it is undisputed that the Torch Devices are "usable in the playing phases of a gambling activity" because their operation depends "in a material degree upon an element of chance." *See infra* § I-A. Second, it is undisputed that the Torch Devices are "usable in the playing phases of a gambling activity" because they permit players to stake money on "a future contingent event not under [the players'] control or influence." *See infra* § I-B. Either of these qualities is enough to make the Torch Devices illegal gambling devices under Missouri law.[3]

**A. The Torch Devices Are "Usable" in the Playing Phases of a Gambling Activity Because Their Operation Depends to a Material Degree on an Element of Chance**

Missouri Revised Statute § 572.010(4) defines "gambling" to include "stak[ing] or risk[ing] something of value upon . . . the outcome of a contest of chance." "Contest of chance" is in turn defined to include "any contest, game, gaming scheme or gaming device in which the

---

[3] Despite Defendants' recent protestations, the Missouri Court of Appeals' recent decision in *Torch v. Missouri Department of Public Safety* is no obstacle to this Court's determining the illegality of the Torch Devices as a matter of law. *See generally* Resp. to Supp. Authority (Doc. #211). The same Missouri Court of Appeals has recognized the authority of federal courts to construe the meaning of state gambling laws in RICO actions, *see id.* at 3, and numerous federal appellate courts, including the Eighth Circuit Court of Appeals, have had no difficulty interpreting state gambling laws under RICO, even in the absence of any controlling state court pronouncements, *see id.* at 4–6, let alone a specific application to the facts at hand.

outcome depends *in a material degree* upon an *element of chance*." § 572.010(3) (emphasis added). The operation of the Torch Devices unequivocally depends in a material degree upon not just one element of chance, but several.

### 1.  The Torch Devices Involve a Number of Random Elements

As set forth above, the Torch Devices involve numerous random processes in their operation. The Payout Pools that dictate payout amounts are randomly distributed in a sequence that has no discernible pattern, having been randomized by the manufacturer before the devices are even shipped to Defendants. SUMF ¶¶ 51–52. Once put into use, the Torch Devices' software then uses a random process to select the initial starting position in the Payout Pools for each combination of Game Theme and Play Amount. SUMF ¶¶ 53, 55. Thus, at least for a player who approaches a game prior to that initial selection, the amount of the initial payout (or lack thereof) "depends in a material degree upon an element of chance." § 572.010(3). That initial random selection then impacts the order of payouts, and their amounts, for all future players on all future turns. Likewise, the combination of "winning" or "losing" symbols to display on each and every play of the game is determined by the Torch Devices' software using a randomized process. SUMF ¶ 56. As a result, the "winning" or "losing" combinations of symbols displayed to any player on every turn of the machines depends almost *entirely* on chance.

Defendants acknowledge these facts, but they disagree with the inevitable legal conclusions that follow from them. In numerous advertisements, Defendants have falsely claimed that the "Prize Viewer" feature, which gives players the option to view the payout amount for the immediately next play of the game, "eliminates chance." SUMF ¶¶ 101–11. But that claim is no more true today than when Defendants slapped their false decal on the very first Torch Device, for several reasons.

### 2. Players Are Not Required to Use the Prize Viewer, Meaning That the Torch Devices Are "Usable" as Gambling Devices

As a threshold matter, the fact that the payout amounts might be knowable to players who use the Prize Viewer feature does not "eliminate the element of chance." Chance—including explicitly random processes—is used to generate the order of payout amounts (including $0, the most common "payout amount") in each Payout Pool, to select the first outcome for each combination of Game Theme and Bet Level, and to select which combination of "winning" or "losing" symbols will be shown to a player. SUMF ¶¶ 51–53, 55–56. Thus, even for players who know of and utilize the Prize Viewer, the payout amount and combination of symbols for each turn of each game are determined by chance before they are even displayed to the player. SUMF ¶¶ 51–53, 55–56, 63–64.

But even if those undisputed facts were not enough to make the games on the Torch Devices "contests of chance" for players who use the Prize Viewer feature, that would not take them outside the scope of the definition of "gambling device" under Missouri law. That is because Missouri law defines a "gambling device" to include "any device . . . that is used *or usable* in the playing phases of any gambling activity." § 572.010(5) (emphasis added). Moreover, the definition of "slot machine" specifically states that a gambling device is "no less a slot machine . . . because some mechanical act of manipulation is required" in order for it to be used to gamble, "[n]or is it any less a slot machine because apart from its use or adaptability as such it may *also* sell or deliver something of value *on a basis other than chance*." § 572.010(11) (emphasis added). Thus, even if it were *possible* to play the Torch Devices in such a way that there would be no element of chance, the fact that they are still *usable* in such a fashion is sufficient to brings the Torch Devices within the definitions of "gambling device" and "slot machine" under Missouri law. SUMF ¶¶ 195–96 (citing Missouri Gaming Commission opinion emphasizing the word "usable" in

§ 572.010 and expressing its view that "the fact that the player can choose to reveal a prize prior to the first game play . . . does not remove the devices from the prohibitions" of Missouri law).

As Defendants admit, the Prize Viewer mechanism is an *optional* feature; it is not mandatory. SUMF ¶ 57. Thus, any player who is either unaware of or chooses not to use the Prize Viewer mechanism is able to use the Torch Devices to play a game in which they stake money, are unaware of the next payout amount, and then either win or lose. SUMF ¶ 61. Any such player is using the Torch Devices *to gamble*—and since the Torch Devices are "usable" in such a manner, that makes them "gambling devices" and "slot machines" under § 572.010.

That conclusion is consistent not only with the opinion of the Missouri Gaming Commission cited above, but the conclusions of numerous courts across the country who have found similar devices to be illegal gambling devices under their similar state laws. For example, in *Mayle Bingo Co., LLC v. Ohio Department of Public Safety*, 152 N.E.3d 1237 (Ohio Ct. App. 2020), the Ohio Court of Appeals upheld the trial court's entry of summary judgment and entry of a declaratory judgment that a very similar device was a "game of chance" and a "slot machine" under state law. The court wrote that, "[p]ractically speaking, despite the fact that the prizes are finite and defined, the results of each play of the game are randomly revealed without any observable order or cause." *Id.* at 1243. The court also rejected the notion that a "prize viewer" mechanism eliminates chance:

> [T]he fact the outcome of the next play is revealed after a player activates the mandatory preview function does not render the game a "no-chance" game, as appellants claim. Game play technically commences the moment the player interacts with the game and activates the preview function. It is only after this initial engagement with the game that the outcome is revealed. Chance pre-exists the revelation of the outcome and resides in the window between the time between the time the player first engages the game and when the outcome of the next play is revealed through the mandatory preview function. A player activates the mandatory preview hoping for a gain, and the outcome is largely determined by chance.

*Id.* Furthermore, the court said, "[t]he mandatory preview does not remove the hope for gain. Although the player may still proceed to play despite seeing that he or she will not win the next play based on the mandatory preview, the reason the player proceeds to play despite knowing the negative outcome for the next play is that the player hopes to obtain a positive gain ***in the play after the negative play.*** " *Id.* at 1242–43 (emphasis added).

Likewise, in *Banilla Games, Inc. v. Iowa Dept. of Inspections & Appeals*, 919 N.W.2d 6 (Iowa 2018), a case involving the manufacturer of Torch Devices, the Iowa Supreme Court held that similar devices were gambling devices subject to state registration requirements. With respect to the "prize viewer" mechanism present in those games, the court stated: "The prize viewer does not give a player any advantage in his or her play affecting the chances of winning a prize, other than to notify the player of the potential prize." *Banilla Games*, 919 N.W.2d at 18; *see also Gracie Techs., Inc. v. Commonwealth*, 225 A.3d 943, 2020 Pa Commw. Unpub. LEXIS 160, at *13 (Pa. Commw. Ct. Mar. 13, 2020) (notwithstanding a similar "prize viewer" mechanism, "this Court cannot ignore the reality that chance ultimately determines losing outcomes, winning outcomes, and the different prize levels, which are programmed into the SkillTouch machine's finite pool for random sequential delivery"). Just as every other court has done, this Court should see through the façade of Defendants' "Prize Viewer" mechanism and hold that the actual and potential use of the Torch Devices to spend on a contest of chance makes them "gambling devices" under Missouri law.

### 3. Because the Torch Devices Only Return Vouchers in $1.00 Increments, They Require Players at Certain Play Amounts to Wager on Entirely Unknowable Outcomes

The role of chance in the Torch Devices is especially clear in the case of Play Amounts less than $1.00. It is undisputed that Torch Devices only permit a player to see the immediately next payout amount that will be returned by the games; they are not able to see any subsequent payout

amounts until they play that immediately next turn. SUMF ¶¶ 62–63, 70. Defendants claim that this means that the player is not "gambling" because the player has the ability to withdraw her credits before playing any turn where the payout amount is not knowable. But the undisputed facts contradict that claim.

Defendants admit that the Torch Devices only dispense vouchers in $1.00 increments, and any amounts in excess of the nearest whole dollar are not returned to the player but instead "stay on the machine." SUMF ¶¶ 84, 86. Defendants also admit that the lowest Play Amount available on the Torch Devices is $0.25. SUMF ¶ 82. As a result, a player who inserts $1.00 into a Torch Device at the $0.25 play level and accesses the Prize Viewer may well be able to see the payout amount for the next turn is $0, but once she has played that turn, she has committed her remaining $0.75 to the next three turns, about which the Prize Viewer has displayed to her no information. Thus, even if the "Prize Viewer" had "eliminate[d] the element of chance" for that player's first turn, the element of chance is indisputably present for the next three turns, which the player must play in order to have any hope of redeeming his remaining credits. And since players can play the Torch Devices at that $0.25 play level, the devices are "usable" in the playing phases of a gambling activity and are therefore illegal gambling devices under § 572.010(4).

### 4. Because the Torch Devices Can Be Modified, Through a Mechanical Act of Manipulation, to Require Payment in Order to Access the "Prize Viewer," They Are "Slot Machines" Under Missouri Law

Finally, there is at least one more alternative basis upon which the Torch Devices qualify as illegal gambling devices and "slot machines" under Missouri law. The definition of "slot machine" expressly provides that a device is "no less a slot machine . . . because some mechanical act of manipulation . . . is required" to accomplish its adaptation to that purpose. § 572.010(11). As the facts establish, which Defendants admit through the testimony of their expert, there are a number of

operator settings within the software of the Torch Devices that can be modified to increase the number of elements of chance in the game.

For example, one operator setting permits Defendants and anyone else with access to the operator menu (typically, not players) to require that money be inserted into the Torch Devices before a player can access the Prize Viewer feature. SUMF ¶¶ 69, 75–76. Likewise, the operator settings contain a mechanism called "Restore Terminal," which, once activated, resets the starting position of each of the Payout Pools, such that the selection of the first outcome for each Game Theme and Play Amount will once again be randomized. SUMF ¶¶ 77–79. Modifying each of those settings on a Torch Device would insert an additional element of chance into the game, and thus, even if those features were never **used**, the device is still **usable** in such a way, and the Torch Devices are "no less a slot machine" because such a "mechanical act of manipulation" is required in order to make them so. *See* § 571.010(5).

**B.  The Torch Devices Are Usable in the Playing Phases of a Gambling Activity Because They Permit Players to Wager Money on a Future Contingent Event Not Under the Players' Control or Influence**

Even if the Torch Devices did not permit players to stake money on a "contest of chance," that would still not exempt them from the prohibitions of Missouri law. Although Defendants have repeatedly misrepresented that their devices are legal because they remove "the element of chance," Missouri law creates an alternative avenue by which the Torch Devices are made illegal. That is because § 572.010(4) alternatively defines gambling to include "stak[ing] or risk[ing] something of value upon . . . a future contingent event not under [a player's] control or influence."[4] Even without the presence of random or chanced-based elements in the operation of the Torch

---

[4]  For that reason, Defendants' repeated assertion that "gambling" under Missouri law requires "consideration, chance, and prize" is a misstatement of the law, since it fails to consider the alternative "future contingent event" prong of the statute. *See* SUMF ¶¶ 102–03 (decal stating definition of "gambling" including "future contingent event" language).

Devices as explained above, the Torch Devices are nonetheless "gambling devices" under that alternative definition, as explained below.

Defendants have admitted that there is nothing that a player can do to affect either the amount of the payouts or the combination of symbols that the Torch Devices will produce, which satisfies the requirement that such events not be under the players' "control or influence." SUMF ¶¶ 51, 53, 56, 64, 98. Likewise, the amounts of those payouts and combinations of symbols are "future contingent events" because they are unpredictable to the player. *See* Merriam-Webster Dictionary, *available at* http://tinyurl.com/2mbdxjy9 (providing definitions of "contingent" including "unpredictable," "subject to chance or unseen effects," and "happening by chance or unforeseen causes").[54] Thus, based upon a plain reading of the statute, the Torch Devices are illegal gambling devices under the alternative definition in § 572.010(4). *Cf. Gracie Techs.*, 2020 Pa Commw. Unpub. LEXIS 160, at *13 ("Furthermore, the Court cannot overlook the fact that there is no level of skill a player can employ to change the predetermined outcome or predetermined valued prize.").

That is especially easy to illustrate in the any case in which the "Prize Viewer" mechanism would show a $0 payout amount (i.e., the vast majority of the time). As Defendants acknowledge,

---

[5]    Since the statute does not define the word "contingent," this Court is left to apply the plain and ordinary meaning of that word in the context of the statute. *See Payne v. Rehab. Inst. Of St. Louis, LLC*, 640 S.W.3d 144, 146 (Mo. Ct. App. 2022). The first definition of "contingent" provided by Merriam-Webster is "dependent or conditioned on something else," but" that definition is difficult to square with the language of the statute. Each of the examples of that use of the word "contingent" is followed by the word "on"—but § 572.010(4) does not include the phrase "contingent on," which would leave an ambiguity in the statute as to what such an event must be "dependent or conditioned" on if that sense of the word to be applied. The more natural reading, and the one suggested by the statute's plain text (including the phrase "not under [the player's] control or influence") suggests that "unpredictable" is the fairest meaning for this Court to give to the word "contingent." But even if this Court were to interpret contingent to mean "dependent," the outcome of any particular spin of the Torch Devices is still dependent on numerous elements of chance, as described above.

such a player may see that the next spin of the Torch Device will produce a $0 return, but he must expend the Play Amount in order to see what the payout amount of the ***following*** spin will be. SUMF ¶¶ 62–63. No rational player of the Torch Devices would expend the Play Amount on what she knows to be a $0 payout, unless she had the hope that the ***next*** payout might have a positive value— a future event that is both unknown and unpredictable to the player. *Cf. Mayle Bingo*, 152 N.E.3d at 1242–43 (noting that players using a preview feature are still "hoping for a gain"). In order to avoid the inevitable conclusion that such a player is gambling, Defendants resort to wordplay by claiming that such a player has paid the Play Amount in order to "claim" the $0 "prize"—but what the player has ***actually*** done is ***spend*** the Play Amount in order to see payout amount for ***the next spin***, which the Prize Viewer mechanism has not yet displayed.

Thus, at least in the case where the "Prize Viewer" mechanism displays a $0 prize, every player who then hits "play" "stakes or risks something of value upon . . . a future contingent event not under his or her control or influence." § 572.010(4).[6] And since the Torch Devices are "usable" in such a manner, that is enough, standing alone, to make them "gambling devices" and "slot machines" under § 572.010.

---

[6] The same is true of any player who does not know of the Prize Viewer, for example, because they are illiterate or cannot read the English language. Defendants have acknowledged that their games can be played both by adults who do not speak English and those who are illiterate. SUMF ¶¶ 47–48. They also acknowledge that nothing prevents children (who, under a certain age, likely cannot read) from playing Torch Devices, although Defendants claim to have asked location owners and managers to discourage them from doing so. SUMF ¶ 44.

**C. The Missouri Court of Appeals Has Previously Found a Device Very Similar to the Torch Devices to Violate Missouri's Gambling Laws**

In its letter ruling the Torch Devices[7] to be illegal gambling devices, the Missouri Gaming Commission cited the canonical precedent for interpreting § 572.010, *Thole v. Westfall*, 682 S.W.2d 33 (Mo. Ct. App. 1984). In *Thole*, the Missouri Court of Appeals considered the legality of a game that resembled the Torch Devices in a striking number of respects.

The *Thole* court found that a device that was "programmed to produce, at random, images of various objects which 'rotate' on the screen" to "***simulate[] slot machine play***" was an illegal gambling device. *Id.* at 35. After reiterating that "[i]n Missouri, a machine may be deemed a gambling device even when there is no showing that it has been used for gambling" so long as the device was "usable" in gambling, the court construed § 572.010 to hold that gambling included (but was not limited to) "playing games wherein 1) players stake or risk ***something of value***, 2) chance is a ***material factor*** and 3) successful play is rewarded by '***something of value***.'" *Id.* at 36–37 (emphasis added). Applying that construction, the *Thole* court readily found the "simulated slot machine" games at issue were gambling devices:

> In the slot machine games, the objects that appear on the screen ***are determined by the devices' electronic circuitry*** and the player has ***no control over which combination of objects will appear.*** Thus, ***from the player's point of view***, winning is ***purely a matter of luck, a matter of chance.*** In the Black Jack and draw poker games, the player ***decides whether additional cards will be dealt*** but ***has no control over other factors materially affecting the composition of the final hand***: the cards initially displayed and the cards selected either as additions to the original hand (in the case of Black Jack) or as replacements for the discards (in the case of draw poker) ***are determined by the games' electronic circuitry***. Thus, for even the most exceptional player, chance plays a significant role in determining whether he wins or loses.

---

[7]     At the time of the TNT's original Motion for Summary Judgment (Doc. #81), it had not yet been confirmed that the Banilla device examined by the Missouri Gaming Commission was the same sort of "no chance" device marketed by Defendants. But thanks to the work of TNT's expert, Stacy Friedman, it is now confirmed that the device reviewed by the Missouri Gaming Commission in 2019 is functionally ***identical*** to the NCG II Device marketed by Defendants. *See* SUMF ¶ 198.

*Id.* at 36–37 (emphasis added). Based on those facts, the *Thole* court concluded that it was "apparent that the outcome of the games depends, in a material way, upon the element of chance." *Id.* at 36.

As the Missouri Gaming Commission has itself already recognized, a straightforward application of *Thole* makes the Torch Devices illegal gambling devices under Missouri law. Just as in *Thole*, the outcome of the "simulate[d] slot machine" games on the Torch Devices is "determined by the devices' electronic circuitry," and "the player has no control over which combination of objects will appear." *Id.* at 35–36. And that is true not only "from the player's point of view," which the *Thole* court found to be sufficient, *id.* at 36, but as an objective matter: as Defendants admit, the Torch Devices "randomly select[] which combination of 'winning' or 'losing' symbols to display to a player on each and every play of the devices." SUMF ¶ 56.

## II.    The Undisputed Facts Establish That Defendants Have Violated the Lanham Act and the Missouri Common Law of Unfair Competition and That TNT Is Therefore Entitled to Partial Summary Judgment on Counts One and Two of Its Complaint

With the illegality of Torch's Devices firmly established by the undisputed facts, Defendants' liability under the Lanham Act and the Missouri common law of unfair competition readily follows. As the Eighth Circuit held in *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178 (8th Cir. 2011), Defendants' admitted conduct satisfies each of the remaining elements of TNT's Lanham Act claim:

> (1) [Torch's claims constitute] false statement[s] of fact by the defendant in a commercial advertisement about its own . . . product; (2) the statement[s] actually deceived or ha[ve] the tendency to deceive a substantial segment of [their] audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Id.* at 1182–83 (8th Cir. 2011) (citing *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998)). A similar showing supports Defendants' liability under Missouri's common law of

unfair competition, which requires that TNT show that Defendants, "in connection with the marketing of goods or services, ma[de] a representation relating to [Defendants'] own goods, services, or commercial activities that is likely to deceive or mislead prospective purchasers to the likely commercial detriment" of TNT. Restatement (Third) of Unfair Competition § 2; *see also Hubbs Mach. & Mfg., Inc. v. Brunson Instrument Co.*, 635 F. Supp. 2d 1016, 1018–19 (E.D. Mo. 2009) (noting that Missouri follows the Restatement approach).

The undisputed facts supporting these elements are legion. The Defendants have placed their false claims about the Torch Devices being "legal" "no chance" devices into the stream of interstate commerce in innumerable ways: on its website, through flyers created and provided to customers, through oral representations made by Mr. Miltenberger personally, and, most obviously, in the decals that Defendants place on every single one of the Torch Devices. SUMF ¶¶ 101–11. Those decals falsely and deceptively claim that the Torch Devices are "designed to offer no contest of chance." SUMF ¶¶ 102–03. Statements from Torch's website and commercial advertisements mimic those false representations. *See* SUMF ¶ 106 (reciting language from Torch website to the effect that "[e]very No Chance Game is carefully designed to ensure that the element of chance has no role in the outcome" and that the Torch Devices "have been carefully designed to eliminate the element of 'chance'").

Indeed, even the very moniker Torch uses to market the devices—"No Chance Games"—is itself a false and deceptive statement. *See Allsup, Inc. v. Advantage 2000 Consultants Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005) (holding that a statement under the Lanham Act qualifies as a misrepresentation if it is "literally false, or . . . literally true or ambiguous, but renders a 'false impression' when viewed in context"). And those  misrepresentations are material, as no reputable location owner would allow the Torch Devices to be placed in her establishment—and no law-abiding citizen would play the Torch Devices—if not for the false assurance that the games

involved no element of chance and were therefore legal to operate. *See 3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 958, 971 (noting that materiality considers "whether the false or misleading statement is likely to make a difference to purchasers" (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312 n.10 (1st Cir. 2002))).

TNT can satisfy the final element of its Lanham Act claim in several ways, each of which it has done in this case. First, it can show that it has been actually injured "by direct diversion of sales" from itself to Torch, as reflected by both TNT's business records reflecting customer requests to remove its legal amusement devices to make room for Torch Devices, and by the deposition testimony of at least one location manager who admitted replacing TNT's devices with Torch's due their enhanced profitability. SUMF ¶¶ 140–94.

But TNT need not show ***actual*** injury in order to be entitled to summary judgment on the question of Defendants' liability; it is enough for TNT to show a likelihood of injury, which the Court may presume from the mere fact of a materially false representation. *See Buetow*, 650 F.3d at 1183 ("[W]hen a competitor's advertisement . . . is proved to be literally false, the court may presume that consumers were misled and grant an irreparably injured competitor injunctive relief without requiring consumer surveys or other evidence of the ad's impact on the buying public."). That inference is yet stronger here, since Defendants acknowledge they directly compete with TNT both for floor space at amusement locations and customers who play their respective games. SUMF ¶¶ 135–38; *see Corizon, Inc. v. Wexford Health Sources*, Inc., No. 4:10 CV 2430 DDN, 2013 WL 3821268, at *4 (E.D. Mo. July 23, 2013) ("A plaintiff may establish an injury by ***creating a chain of inferences*** showing how defendant's false advertising could harm plaintiff's business. Evidence of ***direct competition*** is strong proof of injury in fact." (emphasis added)). Accordingly, summary judgment is appropriate as to liability on Counts One and Two.

**III. The Undisputed Facts Likewise Establish That Defendants Have Violated the RICO Act and That TNT Is Therefore Entitled to Partial Summary on Counts Three Through Six of Its Complaint**

As explained above, the undisputed facts demonstrate that Defendants are liable under Counts One, Two, and Seven of the Complaint. The same is true of Defendants' liability under the various provisions of the RICO Act cited in TNT's Complaint in Counts Three through Six.

As required by each of those provisions, TNT has established both the existence of a criminal enterprise and the commission of numerous predicate acts. Defendants and others have "associated in fact" in order to form a criminal enterprise, and discovery in this case has borne that out. *See* TNT's Memorandum in Opposition to Defendants' Motion to Dismiss (Doc. #20) at 7–9 (discussing showing required to demonstrate association-in-fact). Defendants acknowledge that they have hired no fewer than 96 "independent contractors" to carry out the affairs of their illegal enterprise, from installing and servicing the Torch Devices to collecting the proceeds of the enterprise and depositing them into one or more bank accounts controlled by Defendants. SUMF ¶¶ 117, 120. Likewise, Defendants have admitted that they have placed their devices in hundreds of locations across the state with the permission of the proprietors of those establishments. SUMF ¶ 27. Based upon these facts, there can be no question that Defendants and others have "associated in fact" to form a qualifying enterprise under the RICO Act and conspired to violate it.

The number of predicate acts that Defendants and their confederates have committed is unfathomable. By Mr. Miltenberger's own sworn admission, members of the RICO enterprise engage in regularly weekly pickups to collect the proceeds of their wrongdoing from each individual Torch Device. SUMF ¶¶ 121, 194. Defendants have also engaged in numerous acts of mail and wire fraud by utilizing both the U.S. mails and private interstate carriers to carry out the regular affairs of their business, and by causing transmissions by wire of emails, phone calls, and transfers of funds through the banking system. SUMF ¶¶ 130, 132–34; *see United States v. Garbacz*, 33 F.4th

459, 467 (8th Cir. 2022) ("The use of a wire furthers a fraudulent scheme if it is a part of the execution of the fraud that is at least incident to an essential part of the scheme." (internal quotations and citations omitted)).

They have likewise violated 18 U.S.C. § 1955(a) by conducting, financing, managing, supervising, directing, and owning an illegal gambling business in violation of the laws of the State of Missouri—and there is no genuine dispute that that business both involves five or more persons, *id.* § 1955(b)(ii), and has remained in substantially continuous operation for a period in excess of thirty days, *id.* § 1955(b)(iii). SUMF ¶¶ 117, 125. And they have violated the Travel Act, *id.* § 1952(a)(3), by using facilities of interstate commerce with the intent to carry on their illegal gambling business, including by causing the Torch Devices to be shipped into Missouri from out of state. SUMF ¶¶ 126–29.

With both the existence of a RICO enterprise and the commission of predicate acts established, all that remains to be demonstrated is that Defendants have violated each of the subsections of 18 U.S.C. § 1952 through their control of, conduct of, and use of income from their illegal enterprise. *See id.* § 1952(a) (criminalizing use of criminal proceeds in the operation of a criminal enterprise); *id.* § 1952(b) (criminalizing the act of maintaining any interest in or control over a criminal enterprise); *id.* § 1952(c) (criminalizing the act of conducting or participating in the affairs of a criminal enterprise); *id.* § 1953(d) (criminalizing conspiracy to violate RICO). There too, there is no genuine dispute.

Defendant Steven Miltenberger and a trust for his family's benefit, for which Defendant Sondra Miltenberger serves as the trustee, own Torch Electronics, LLC, and Mr. Miltenberger and Torch indisputably control the criminal enterprise's operations. SUMF ¶¶ 112, 114. Defendants all conduct the operations of that criminal enterprise through the commission of acts too numerous to count, but which include the innumerable predicate acts described above. SUMF ¶¶ 112–25.

And Defendants use the proceeds of those illegal activities to pay the expenses of the enterprise, including the purchase of Torch Devices and the payment of the independent contractors that carry out the enterprise's daily affairs. SUMF ¶¶ 121–22, 127. And given their close association with one another and with the independent contractors they employ, there is no doubt that their actions are the result of a conspiracy in violation of the statute as well. SUMF ¶ 112–25. Each of the elements of the RICO Act are thereby satisfied, and Defendants are indisputably liable under Counts Three through Six of TNT's Complaint.

<h2 style="text-align:center">CONCLUSION</h2>

The game is over. Discovery in this case has shown that there is no genuine dispute as to any material fact necessary to establish Defendants' liability. Defendants acknowledge that they purchase, market, and place Torch Devices in business establishments across the state. They acknowledge that they have claimed in numerous commercial advertisements for years that the Torch Devices are "legal" "no chance" gaming devices. And they acknowledge that they have made an unspeakable amount of money by splitting revenues from their devices with the owners and managers of those businesses.

The only question that Defendants dispute is whether the Torch Devices are illegal gambling devices—but they cannot genuinely dispute any of the facts as to how those devices actually work, as even their expert Nick Farley has reluctantly admitted. Defendants cannot dispute that the devices utilize random number generators both to select certain outcomes and to determine what combination of "winning" or "losing" symbols will be shown to players. They cannot dispute that the devices' Payout Pools are arranged in a randomized order that has no discernible pattern to it. And they cannot dispute that players who are not aware of, who cannot read English, or who simply choose not use the "Prize Viewer" mechanism have no way of influencing or predicting any particular payout of the devices, or that players who see a $0 payout on the Prize Viewer must

wager their credits to see if the next spin will be a "win." As a result of the Defendants' failure to create a genuine issue of material fact on any of these factual premises, this Court must be led to a single, inescapable legal conclusion: the Torch Devices are illegal gambling devices as a matter of law.

For these reasons, TNT respectfully requests that the Court grant it summary judgment on Count Seven of its Complaint, that it grant summary judgment as to Defendants' liability on Counts One through Six of its Complaint, and that it grant a preliminary and permanent injunction against Defendants' continued violations of the law, leaving the questions of TNT's damages and other remedies to be determined at or after trial.

Dated: August 5, 2024

Respectfully submitted,

BRYAN CAVE LEIGHTON
PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
MARY GRACE WARREN, #73147MO
ZOE WOLKOWITZ BRANNON, #74007
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*
*marygrace.warren@bryancave.com*
*zoe.brannon@bryancave.com*

*Attorneys for TNT Amusements,*
*Inc. d/b/a Play-Mor Coin-Op*

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2024, a copy of the foregoing was served on all counsel of record by operation of the Court's electronic filing system.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO