**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| TNT AMUSEMENTS, INC., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:23-cv-330-JAR |
| | ) |
| TORCH ELECTRONICS, LLC, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S RENEWED MOTION TO
EXCLUDE TESTIMONY OF DEFENDANTS' PROPOSED EXPERT NICK FARLEY**

Pursuant to Federal Rule of Evidence 702, Plaintiff TNT Amusements, Inc. ("TNT") hereby moves this Court to exclude testimony of the Defendants' proffered expert witness, Nick Farley. TNT has now confirmed that Mr. Farley has ***no personal knowledge*** of the operation and function of the Torch Devices whatsoever—indeed, he has never even examined them. Instead, his opinions rely entirely on information provided by Banilla, the manufacturer of the devices— one of Mr. Farley's largest clients to whom he is bound by a Confidentiality Agreement—and Mr. Farley's staff at Nick Farley & Associates ("NFA"), who Mr. Farley admits did not perform a competent examination of the Torch Devices themselves. Despite maintaining for years that there was "nothing random" about the Torch Devices, Mr. Farley now admits he was wrong. This admission came ***after*** (and only after) receiving the independent analysis of ***TNT's*** proffered expert, Stacy Friedman ("Mr. Friedman"), such that Mr. Farley now acknowledges the Torch Devices have multiple random functions that affect gameplay. His explanation for his admittedly incorrect initial conclusions? That he and his staff evidently ***never even performed an examination of the database files that contained the random functions***.

1

Mr. Farley now admits that he and his staff have, on **_multiple_** occasions, simply trusted the word of the Torch Devices' manufacturer, without performing any independent verification of their claims. His methodology, or lack thereof, is to selectively review the device based on information spoonfed to him by Banilla, the manufacturer of the devices in question—**_not_** based on independent examination or scientific methods. Tellingly, Mr. Farley's ever-evolving opinions coincide with Defendants' recent shift in litigation strategy, whereby he and his client no longer dispute there are random functions in the Torch Devices, instead arguing that those random functions are not "relevant." Given these facts, which are established by Mr. Farley's own deposition testimony, it is now evident that Mr. Farley is nothing more than a "qualified puppet." *DataQuill Ltd. v. Handspring, Inc.*, 2003 WL 737785, at *4 (N.D. Ill. Feb. 28, 2003) ("We doubt the value to the trier of fact of a hired expert's opinion when the party hiring him has put words in his mouth—or in this case, in his report—leaving him, in essence, a highly qualified puppet.").

As a result, Mr. Farley is not qualified to offer expert testimony in this case, despite any experience he may profess to have in "game classification." Mr. Farley lacks the specialized knowledge needed to inform the trier of fact of the critical facts bearing on the legality of Torch Devices under Missouri law, and in fact expressly refuses to do so. Instead, Mr. Farley claims the authority to "classify" the Torch Devices based on his own personal definition of "gambling," a definition inconsistent with Missouri law, which will serve only to confuse the trier of fact.

For those reasons and the others discussed below, Mr. Farley's testimony and reports should all be excluded because he lacks specialized knowledge to help the trier of fact and offers unreliable testimony. Fed. R. Evid. 702(a)–(d). Accordingly, under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court should exclude Mr. Farley's testimony entirely.

Mr. Farley originally submitted a report in this case on November 6, 2023. **Ex. A** (excerpt from N. Farley's Report dated November 6, 2023) (the "Original Report"). Mr. Farley's Original Report is based on his staff's review of five Torch Devices (the "Torch Devices") between 2018 and 2021, two to five years ***before*** this litigation began. *Id.* Throughout this litigation, Defendants resisted TNT's efforts to obtain its own inspection of the devices Mr. Farley examined (or any Torch Devices).[1] Ultimately, the Court ordered Defendants to provide TNT copies of the Torch Devices discussed in the Original Report. *See* Order (Doc. #165). After Defendants sent TNT devices that they represented to be cloned copies of the Torch Devices (the "March 2024 Devices"),[2] TNT's own expert, Mr. Friedman, reviewed the March 2024 Devices and issued a Third Supplemental Report (the "Third Supplemental Report"). **Ex. B** (Third Supplemental

---

[1] When TNT subpoenaed the devices' manufacturer to obtain its testimony regarding the same issues, Defendants sought to blockade TNT's efforts to obtain that testimony. *See* Opp. to Mot. for Leave (Doc. #67). TNT filed a Motion to Compel Testimony of Nick Farley after Mr. Farley refused to answer questions about the programming of the Torch Devices, based upon a previously undisclosed Confidentiality Agreement with the devices' manufacturer. *See* Mot. to Compel (Doc. # 117). TNT also filed—and the Court granted—a motion to compel Torch's corporate representative, Steve Miltenberger, to answer questions about how the Torch Devices functioned over which he previously professed ignorance. *See* Mot. (Doc. #120); Order (Doc. #144).

[2] As Mr. Friedman's Third Supplemental Report explains, the March 2024 Drives included files bearing date stamps in 2024, meaning that they likewise are not exact copies of the drives reviewed by Mr. Farley's staff in 2018 through 2021. **Ex. B** ¶¶ 47–50. According to Farley, the discrepancy can be explained by his staff's contacting Banilla to conduct an "activation procedure" before the March 2024 Drives were sent to Mr. Friedman. **Ex. D** ¶ 16. Mr. Farley claims that the March 2024 devices are identical to the drives reviewed by his staff in 2018 through 2021, "with the exception of the updated date stamps that were unavoidably created during the activation process." *Id.* ¶ 17; *see also* **Ex. E** at 220:1–13 (opining that there were no "relevant" differences between the drives). Notably, however, Mr. Farley does not know either how the copying of the device or the "activation procedure" actually works. **Ex. E** at 107:8–110:3 (with respect to what the activation procedure involves, "[y]ou would have to ask Banilla"); *id.* at 269:25–270:24 (with respect to copying, "I don't know" what might be required other than "clicking 'copy' and wait[ing]").

Report). The Third Supplemental Report identified several random features in the Torch Devices' database that were absent from Mr. Farley's Original Report and that Mr. Farley allegedly did not know about until years *after* his staff's "verification" of Mr. Friedman's findings.

On April 18, 2024, Mr. Farley submitted a rebuttal to Friedman's Report (the "Rebuttal"), based on his staff's review of the Torch Devices prompted solely because of the findings in the Third Supplemental Report. **Ex. C** (Rebuttal). Although Mr. Farley's sworn statement suggests that he personally examined the drives that his staff sent to Mr. Friedman, in his deposition Mr. Farley admitted that he did not personally review the drives nor did his staff perform an in depth "verification" as detailed in the declaration, primarily due to lack of "time." **Ex. D** (Decl. of N. Farley dated Apr. 26, 2024) ¶ 17; **Ex. E** (excerpts from Apr. 30, 2024 Dep. of N. Farley) at 43:24–44:4, 208:14–218:3.

Despite being characterized as a "rebuttal," Mr. Farley does not actually disagree with the facts recited in Mr. Friedman's Third Supplemental Report. Instead, Mr. Farley merely disagrees with the "relevance" of the random functions Mr. Friedman discovered in the stored procedures in the Torch Devices' database files (functions that Mr. Farley's staff had not previously discovered on their review) to his own "classification" of the Torch Devices. *Id.* at 3–7.

## A. Mr. Farley's Background

Mr. Farley has a bachelor's degree in electrical engineering and computer science. *See* **Ex. F** (excerpts from Dec. 10, 2023 Dep. of N. Farley) at 9:17–20. More than 30 years ago, he spent time working at the New Jersey Division of Gaming Enforcement in Atlantic City, where he tested and evaluated electronic gaming devices and systems for use in Atlantic City casinos, and then worked at Gaming Laboratories International ("GLI"), an independent testing laboratory. *Id.* at 10:6–20. As part of his job at GLI, Mr. Farley would "verify that the software that was installed

in the machines was identical to what we tested in the lab," and analyze random number generators. *Id.* 20:13–16, 11:10–11, 21:15–18.

In 2000, Mr. Farley founded Nick Farley & Associates ("NFA"). *Id.* at 10:2–3. NFA purportedly performs the same testing Mr. Farley conducted at GLI and the Division of Gaming Enforcement. *Id.* at 35:6–14. While Mr. Farley refused to share how much of NFA's total revenue he obtains from Defendant Torch and Torch's manufacturer, Banilla, it appears both parties are significant NFA clients. **Ex. E** at 260:19–262:23. Mr. Farley is not a lawyer, and NFA does not render legal services or legal opinions. **Ex. F** at 54:7–13.

### B. Mr. Farley's Staff's Methodology for "Testing" the Torch Devices

Mr. Farley never personally examined the Torch Devices before authoring his Original Report in 2023 or any of the device-specific reports attached to the Original Report.[3] **Ex. F** at 245:4–9; **Ex. E** at 48:12–15, 50:4–11, 68:22–69:3, 95:6–22, 236:11–20, 238:8–13. According to Mr. Farley, he rarely personally examines devices as he is busy with "company travel" and "it's hard to nail [him] down to look at things." **Ex. E** at 365:1–5. Instead, he relies on his staff at NFA to conduct the review. *Id.* Mr. Farley's staff then discuss their findings with Mr. Farley, and Mr. Farley puts his signature on reports they draft based on those discussions, without personally reviewing any devices himself. *Id.* at 73:14–25.

As noted above, his staff's "review" of the devices occurred several years ***prior*** to this litigation. **Ex. A** at 1 ("My analysis of the aforementioned Torch devices, as well as my opinions related to the same, predates TNT's March 15, 2023 filing in the United States District Court for

---

[3] Nonetheless, Mr. Farley provided sworn declarations stating he had reviewed the devices. *See, e.g.*, **Ex. I** ¶ 3 ("I have previously had the opportunity to review and examine" the Torch Devices and "reviewed each game, each possible configuration, the software source code, and the system software storage media for the Torch Device"); **Ex. D** ¶ 17 ("I personally verified . . . .").

the Eastern District of Missouri" and identifying the five prior reports as exhibits). During testing of the Torch Devices, an actual physical machine is not tested. Instead, manufacturers typically send NFA the files for the devices for testing in his laboratory, which entail three components: (1) the executable software; (2) any database files, and (3) source code represented by the manufacturer to mirror the executable software. For Mr. Farley's *staff's* review of the Torch Devices between 2018 and 2021, Banilla, the manufacturer, sent NFA the executable software and source code *separately* from the database files. **Ex. E** at 333:4–21. Mr. Farley's staff utilized the same examination process for each Torch Device. **Ex. F** at 102:4–5. Admittedly, Mr. Farley's staff "didn't do that deep of a dive." *Id.* at 141:1–141:2. The "methodology" used to analyze those two portions of devices are discussed below.

### 1. "Trust-*Not*-Verify" Method

When reviewing devices, Mr. Farley claims that his staff's usual technique is to ask the manufacturer or client to provide information about the device and then, in Mr. Farley's own words, "trust but verify" that the devices function and operate as the manufacturer or client claims. **Ex. F** at 121:10–122:12, 126:5–14; 182:8–13 (Mr. Farley "relies on client[s] providing accurate information about their programs"). In reality, however, Mr. Farley's staff does not verify—and did not verify in this case—whether the source code provide by the manufacturer matched the devices' software, nor did they examine database files that may (and in this case do) affect the gameplay of the devices. For example, when asked how Mr. Farley "verified" that the Torch Devices contained "finite pools" of payout amounts *without ever reviewing* the database files containing those "finite pools" (as well as the random index selection and symbol display procedures described above), Mr. Farley claimed "it was a trust and verify situation." **Ex. E** at 360:11–17. But without examining the database procedures himself, Mr. Farley (and his staff) have merely trusted—not verified.

6

Discovery in this case revealed at least one example where Mr. Farley was expressly provided with information from Banilla, the manufacturer of the Torch Devices, which he and his staff took at face value rather than independently test. *See* **Ex. G** (letter from K. Morse to N. Farley dated July 25, 2023). In that letter, Banilla informed Mr. Farley that there were "twelve possible starting indices" that were "specifically picked by game developers as appropriate points to start in the finite pool of prizes." *Id.* at 2. In his first deposition, Mr. Farley testified, as the Banilla letter suggested, that the starting point for any particular game was picked by a human at Banilla. **Ex. F** at 165:12–25; 225:23–226:10; 228:21–232:13. Mr. Farley subsequently admitted he learned this from Banilla, rather than testing or verifying it himself. **Ex. E** at 362:17–363:4; **Ex. F** at 165:12–25; 225:23–226:10; 228:21–232:13. Yet, after Mr. Friedman discovered the existence of a random process to make that selection, Mr. Farley now admits that the selection among the twelve starting indices is made randomly by the Torch Devices. **Ex. E** at 235:15–236:18, 74:16–24.[4]

### 2. "Relevance" Method

Mr. Farley's staff also uses what Mr. Farley calls a "relevance" method, which means his staff does ***not*** review or analyze portions of a device (and Mr. Farley omits from his reports) functions/operations that the manufacturer or client indicates are not "relevant." *See, e.g.*, **Ex. E** at 71:17–74:13, 73:11–76:15, 360:7–361:17, 126:12–127:7, 236:1–10; 278:21–279:13, 375:4–21; **Ex. F** at 121:3–123:14. This "relevance" method impacted his staff's review in this case in three important ways.

---

[4]     Mr. Farley has also provided inconsistent statements as to whom he is actually "trusting," given discrepancies in Mr. Farley's ***own*** testimony and his report regarding how he obtained the Torch Devices. *Compare* **Ex. F** at 311:16–21 (stating Banilla provided Mr. Farley the Torch Devices'), *with* **Ex. H** at 7 ("Torch Electronics, LLC. has provided Nick Mr. Farley & Associates, Inc. with the software source code . . . .").

First, using the "relevance" method, Mr. Farley's staff did ***not*** review (or even know about) portions of the Torch Devices that Banilla deemed not "relevant" to tell NFA. As one example, because Banilla did not tell NFA about the random starting-index-selection feature, Mr. Farley was not "informed[] about the randomness that was involved in" the Torch Devices. **Ex. E** at 359:20–361:17. Simply stated, the client or manufacturer tells Mr. Farley's staff what portions of the device to review and then NFA "analyzes" the device based on those selective portions.

A second use of this methodology is where Mr. Farley's staff "works with the manufacturer to determine the purpose and intent of each of the files" on the device and the manufacturer determines whether the contents are relevant. **Ex. F** at 120:24–122:2; *see also id.* at 126:1–14 (ordinary practice is the manufacturer would tell NFA that electronic files are not used in the configuration of the game). In this case, Mr. Farley's staff determined the "relevance" of the executable files in the Torch Devices from discussions with Banilla, the devices' manufacturer. *Id.* at 111:14–126:14. As one example, Mr. Farley's staff crossed out several files deemed not relevant—***not*** based upon independent examination, but conversations with Banilla. *Id.* In fact, NFA themselves could not ascertain why files from other games appeared during testing of the Torch Devices, so, in Mr. Farley's own words, "we crossed it out rather than do something else." *Id.* at 118:9–10. When asked why these several files were crossed out, i.e., deemed "not relevant" ***by Banilla***, Mr. Farley could not provide an answer. *E.g.*, *id.* at 124:9–125:2. NFA simply "crossed out" electronic files that ***Banilla*** deemed not relevant, without even understanding why. *See id.* at 117:8–127:19.

Third, Mr. Farley claims that the determination of "relevance" might also be made by him or his staff, but his definition of "relevant" has itself shifted in the course of this case. **Ex. E** at 354:1–17. Sometimes, "relevant" means something Mr. Farley does not agree with. *Id.* at 177:3–

5. Other times, it means something that does not affect Mr. Farley's ultimate conclusion. *Id.* at 345:5–9, 353:1–6. Recently, it means affecting game "outcome" (which according to Mr. Farley means only prize or win/payout amount, to the exclusion of other gameplay features). **Ex. C** at 2; **Ex. E** at 356:21–25; *see also id.* at 370:18-371:5 ("Anything else is just fluff."). Yet other times, Mr. Farley has no definition. *Id.* at 177:18–23 ("I have never given consideration to my definition of 'relevance'").

### 3. Executable Software Review Method

When reviewing the "system operation, integrity and/or game outcome determination" on the Torch Devices, **Ex. H** (excerpts from Farley Report dated May 1, 2018) at 8, NFA receives source code directly from the device manufacturer, **Ex. E** at 247:3–5. Mr. Farley's staff does not decompile the executable software provided by the manufacturer; instead, his staff simply reviews source code provided directly by the manufacturer and assumes that it is "representative" of the device's actual executable software. **Ex. E** at 247:3–249:12; *see also id.* at 251:1–6, 51:15–52:21. Mr. Farley acknowledges that this process is "not foolproof." *Id.*

While Mr. Farley was unable to identify what procedures his staff used to verify that the source code his staff reviews matches the executable files provided by the manufacturer, Mr. Farley acknowledged that whatever the process is does "not always [produce] an exact match," though he claims "it's pretty close." *Id.* Instead, Mr. Farley simply ***assumes*** that the source code provided by the manufacturer matches the actual software of the devices—neither he nor his staff has any method to confirm whether the source code and the devices' software match or not.

Initially, Mr. Farley refused to discuss source code review due to a Confidentiality Agreement with Banilla. **Ex. F** at 255:21–24 ("I'm not at liberty to discuss source codes for Banilla."); *see also id.* 256:9–11, 259:5–23, 264:17–265:4. Later, after a Motion to Compel, *see*

Mot. to Compel (Doc. # 117), and Banilla subsequently granting Mr. Farley permission, Mr. Farley discussed the source code. **Ex. E** at 245:7–22.

### 4. Signature Verification Method

Mr. Farley claims his staff examines the software's "signature" to verify that the executable software examined in NFA's laboratory is the same as the software installed in devices in the field.[5] **Ex. F** at 111:11–12. Mr. Farley's team uses a program called FileCheck to identify the files on the devices, but the method is used only for executable software—not the database files. Mr. Farley claimed to be unaware of any method of determining whether the database files in any two devices are identical. **Ex. F** at 240:8–23.

But neither Mr. Farley nor his staff employed their usual method of verification (*e.g.*, the FileCheck program) during their review to confirm that the devices' executable software reviewed in the laboratory were the same as devices used in the field, and as a result, did not verify that the Torch Devices tested were the same devices as those used in Missouri.[6] **Ex. F** at 312:11–18; **Ex. E** at 85:17–23, 116:14–17. Mr. Farley provided no justification for why he failed to use a methodology he typically uses in verifying the integrity of the devices, despite also admitting that it could have easily been done. **Ex. E** at 85:7–23. According to Mr. Farley, verifying the integrity

---

[5]　In any event, this method has proven unreliable as it already resulted in a "snafu" in this very case, whereby Mr. Farley's team sent TNT copies of four drives containing what Defendants claimed were "exact duplicates" of the software Mr. Farley's team had previously reviewed—but which Mr. Farley subsequently claimed were not actually representative. Even though Mr. Farley's staff "verified the FileCheck signatures" of devices to ensure those January 2024 devices matched the software previously tested, **Ex. I** ¶ 9, they sent the snafu drives to TNT.

[6]　These differences in provenance matter because of the existence of after-market changes to the software. *See* **Ex. F** at 175:9-12 (acknowledging he was unaware of changes that had made to the Torch Devices at the request of Mr. Miltenberger). As Mr. Farley confirmed in his deposition, as explicitly stated in the Original Report, any changes to a device requires a new review/test to ensure prior conclusions remain true, including the operation, function, and integrity of the device. *Id.* at 178:14-179:15; **Ex. H** at 9–10; **Ex. E** at 115:17–116:24; 327:25–328:7. Mr. Farley and his staff did ***not*** perform any such analysis.

(i.e., signatures) of the devices in this case was not "relevant" because it has no "material effect" on the game. **Ex. F** at 113:5–10, 120:20–23. Neither Mr. Farley nor his staff have ever examined a Torch Device in the field, and he therefore cannot confirm that the executable files provide to him by the manufacturer bear any resemblance to what may be on any particular device in the field. **Ex. E** at 58:3–4, 85:17–23 ("We have not independently made a tour of Missouri to find out what's in operation with Torch, no.").

### 5. "Game Classification" Methodology

Mr. Farley claims expertise in "game classification." *See, e.g.*, **Ex. C** at 2–3, 6 n.2; **Ex. E** 162:18–163:12, 353:1–6; **Ex. F** at 18:4–7. Confusingly, Mr. Farley claims that his "game classification" does not turn on the specifics of any particular jurisdiction's laws relating to gambling devices but from "questions or criteria" from legal counsel. **Ex. F** at 53:7–55:2. Instead, when "classifying" a device, Mr. Farley believes whether a device is a gambling device is "universally" determined by "three elements"—consideration, prize, and chance—rather than the relevant statute at issue. **Ex. E** at 145:17–146:1, 164:4–165:12, 181:8–20; **Ex. F** at 90:11–12, 270:24–272:15. According to Farley, the presence of a prize viewer "completely" removes the "element" of chance from a device. **Ex. F** at 201:17–19, 202:9–15, 291:9–15, 209:23–210:10; **Ex. E** at 231:25–232:4.

In applying this methodology here, Defendants' prior attorney "provided [Mr. Farley] with a battery of questions that he wanted [Mr. Farley] to answer to help him render . . . a legal determination on this case" and Mr. Farley "***assumed*** that his line of questions were in line with how he needed to interpret Missouri law." **Ex. E** at 163:14–20 (emphasis added). Resultingly, Mr. Farley acknowledged his conclusions are not based on any understanding of the definitions of Missouri's statutes, which he had not reviewed prior to preparing any of his reports. *E.g.*, **Ex. F** at 270:24–272:15, 266:20–272:15. Instead, Mr. Farley evaluated the legality of Torch Devices based

on *his own* "three elements" and admits that his opinions in this case are based on this misunderstanding of governing law. **Ex. F** at 270:24–272:15; **Ex. E** at 164:4–165:12; 181:8–20. He also used ***personal*** definitions, which he admits are ***not*** in line with the relevant Missouri statute. *See, e.g.*, **Ex. E** at 160:5–7 ("Well, I don't want to assume that the State of Missouri interprets outcome as I do to mean the payout amount."). For example, Mr. Farley utilizes his own definition of "outcome"—i.e., prize or win/payout amount. **Ex. E** at 139:24–140:4. When asked if he knew his personal definition was ***inconsistent*** with Missouri's definition of "gambling"— which distinguishes between the word "outcome" and the receipt of "something of value" (i.e, the win amount or "prize")[7]—Mr. Farley admitted he never even "considered" it. **Ex. E** at 157:4–21 ("I have never considered . . . whether something of value is different than outcome.").

### C. Mr. Farley's Original Report and Opinions

Despite his failure to personally review the Torch Devices and his staff's initial failure to identify the existence of multiple random functions within the Torch Devices, Mr. Farley's Original Report nonetheless concludes that the "Torch devices are designed and hard coded to specifically eliminate randomized outcomes or outcomes based on chance." **Ex. A** at 3, ¶ 10. Mr. Farley opines that the Torch Devices are not games of chance are based on his own "three elements" of gambling, rather than the Missouri statute at issue. **Ex. F** at 270:24–272:15. Mr. Farley thus concludes that the Torch Devices are not "gambling devices" because he believes that the Torch Devices contain no element of chance. **Ex. H** at 3, 9; *see also* **Ex. A** at 3; **Ex. I** ¶ 9. Ultimately Mr. Farley bases his conclusion exclusively on the existence of a prize viewer on the

---

[7]    Mo. Rev. Stat. § 572.010(4) ("A person engages in gambling when he . . . risks something of value . . . upon an agreement or understanding that he or she will receive ***something of value*** in the event of a certain ***outcome***.").

Torch Devices. **Ex. H** at 9; **Ex. F** at 291:9–15, 202:9–15; **Ex. E** at 230:7–14; 228:25–229:16; **Ex. J** at 7.

As clarified in Mr. Farley's deposition, the "source code" referenced in the Original Report pertains to executable files/software only, not the devices' database files. **Ex. E** at 333:16–21. Nonetheless, Mr. Farley's Original Report discusses several elements that are exclusively located in the ***database—not the executable software***. For example, Mr. Farley discusses the idea that the Torch Devices' payout amounts are delivered "sequentially" from a predetermined list of between 75,000 and 100,000 "predetermined outcomes." **Ex. J** at 3; **Ex. A** at 3, ¶ 7. But, those lists of payout amounts are undisputedly ***not in the executable software***, as Mr. Farley correctly explained in his depositions. *E.g.*, **Ex. E** at 366:22–367:7, 126:5–8; **Ex. F** at 231:6–10. Indeed, as Mr. Farley explained the finite list of payout amounts "has nothing to do with the source code." *Id.*

Yet, the Original Report does not mention the database, and Mr. Farley admits that there is nothing about database review in the Original Reports. **Ex. F** at 140:15–141:5; **Ex. E** at 331:8–12. Mr. Farley does not merely concede that ***he did not personally examine the database*** files; he admits that he cannot confirm if any of his staff did either, acknowledging that ***review of the database files may have been entirely "overlooked"*** in preparing the Original Report.[8] **Ex. E** at 372:4–12, 126:12–127:7, 81:18–25, 82:16–83:9, 366:8–20; *see also id.* at 366:21–367:20 (reflecting Mr. Farley unable to verify who if anyone reviewed pools in database); *id.* at 331:8–12 (agreeing Original Reports do not mention database). Nonetheless, despite being unable to confirm

---

[8]    *See* **Ex. E** at 366:1–20 (indicating that Mr. Farley's "former employee" was "tasked with reviewing the source code and if the stored procedures were not included with the source code, it is possible that they were over[looked] . . . [b]ecause I don't know if he would have went to the drive to look at that"). (Although the transcript suggests that Mr. Farley said "overruled" instead of "overlooked," a review of the video recording of his deposition reflects that Mr. Farley in fact said "overlooked.")

whether such a review ever occurred, Mr. Farley opined several times that there is nothing "random" in the Torch Devices, including the database. *E.g.*, **Ex. F** at 145:10–11 ("There is nothing random about anything in this ***software*** or the ***database***.") (emphasis added); *id.* at 142:19–143:3 ("[T]here's no random selection of anything, no random selection of game outcome, no random selection of the symbols, no random selection of anything."); *id.* at 208:20–209:4 (stating that random number generator was "not existent" on Torch Devices).

Additionally, Mr. Farley explained "nothing" in his staff's testing of the Torch Devices before the start of this litigation "indicated where the starting position" in the pools would be. **Ex. F** at 232:11–13. Despite admitting his inability to scientifically determine the method for selecting the initial starting index (which, it just so happens, turns out to be random), Mr. Farley opined that the starting points are selected "indiscriminately,"[9] which Mr. Farley initially said in his December 2023 deposition meant there was "no apparent rhyme or reason" for how the sequence in each pool began. *See* **Ex. H** at 9; **Ex. J** at 3; **Ex. F** at 229:6–15. Eventually, Mr. Farley confessed that at the time of writing his Original Report, he simply did not know how the starting point of each pool was determined. **Ex. F** at 165:23–25, 229:19–23. According to Mr. Farley at some time in between the November 2023 Report and December 2023 deposition, he "dug deeper" to understand the entry point of the pool, solely because "it became an issue" in ***this*** litigation. **Ex. F** at 230:2–6. So, at his first deposition, Mr. Farley indicated that a "human at Banilla" made the determination, **Ex. F** at 229:13-15, but that he did not entirely understand how Banilla programs that starting position, *id.* at 165:23–25, 310:3–311:14.

---

[9]    Mr. Farley's conclusion is even more questionable given that Mr. Farley had previously authored a report analyzing a similar device by the same manufacturer that contained an almost identical sentence, except that the word "randomly" had been substituted for "indiscriminately." *See* TNT's Opp. to Mot. to Exclude Friedman (Doc. #103) at 10.

### D.  Mr. Farley's Staff's "Review" of Torch Devices Post-Friedman Report

After finally receiving purported copies of the Torch Devices Mr. Farley reviewed, Mr. Friedman issued his Third Supplemental Report discussing several random functions found in the ***database*** of the Torch Devices. **Ex. B**. According to Mr. Farley, he did ***not*** know of these random features from his staff's initial review of the Torch Devices. **Ex. E** at 235:23–236:10, 69:13–70:8, 71:17–74:13, 75:19–25; 123:23–124:5. So, Mr. Farley's staff "verified" the findings in the Third Supplemental Report.[10] Like the review for the Original Report, Mr. Farley did not ***personally*** review the database, including the stored procedures that Mr. Farley now acknowledges include random functions. **Ex. E** at 48:12–15, 50:4–11, 68:22–69:3, 95:6–22, 236:11–20, 238:8–13.

When asked to explain how his staff "verified" the existence of those random functions, Mr. Farley could not explain their methodology, instead stating that his staff simply "looked through the source code again, they looked at the stored procedures, and, you know, just verified that information." **Ex. E** at 272:1–273:16. When asked specifically about what method his staff uses to determine the relevance of a database file (such as the stored procedures at issue in this case), Mr. Farley had no answer. *Id.* at 355:23–356:25. That is a question NFA has "been asking for a long time, one we've not been able to answer." *Id.* Mr. Farley is "open to suggestions" because NFA "ha[s]n't been able to nail that down." *Id.*[11] Instead, Mr. Farley's staff just "[l]ooked at what [the functions] did" and then "discuss[ed] internally" whether those functions "contribute to determining the outcome" of the game. *Id.* at 356:21–358:22.

---

[10]  Notably, the NFA staff member who "verified" those features does not typically conduct a review to discover these features. **Ex. E** at 67:18–23, 82:6–11, 367:16–20. This only leads to more unreliability regarding any "verification" used in the "trust but verify" method.

[11]  Q: "[S]o then what is the process that you use then to determine in those cases whether the database information is relevant or not?" A: "We're open to suggestions. We haven't been able to nail that down." **Ex. E** at 356:10–15.

### E.  Mr. Farley's Changed Opinions Based Upon "Verification" of Friedman's Report

Mr. Farley admits that Mr. Friedman's Third Supplemental Report has caused him to change several of his prior opinions. Yet, Mr. Farley has yet to supplement his Original Report (or subsequent opinions). Indeed, Mr. Farley was unaware of any duty to supplement until informed by TNT's counsel in April 2023, and Defendants' counsel never asked him to do so.[12] **Ex. E** at 239:12–240:6. Additionally, these new admissions and changes in opinions have caused Mr. Farley to change his tune, proffering inconsistent stories and multiple shifting opinions.

#### 1.  Shifting Opinions on "Random" Functions in Torch Devices

Mr. Farley originally opined that there is "no random selection of anything" in the Torch Devices, but now admits that is "an overstatement," given the several random features in Torch Devices discussed in Mr. Friedman's Third Supplemental Report. **Ex. E** at 234:14–17. As to the database files, Mr. Farley had previously opined that there was nothing random in those files, but he now disagrees with his own conclusion, as he has been "enlightened" since. *Id.* at 234:18–235:1. Additionally, Mr. Farley admits that his previous opinion that the Torch Devices do not contain a random number generator was wrong, given the random number generators identified in Mr. Friedman's Third Supplemental Report. *Id.* at 235:15–237:9.

When asked why NFA originally failed to discover the several random functions located in the database discussed in Mr. Friedman's Third Supplemental Report, Mr. Farley admitted the Torch Devices were not reviewed in sufficient detail to identify the presence of the random functions in those devices when the Original Reports were prepared. **Ex. E** at 236:11–20, 238:8–13. When asked how he could have previously opined on several features located in the database

---

[12]  TNT has repeatedly requested Defendants supplement Mr. Farley's testimony under Federal Rule of Civil Procedure 26(e) to account for his many misstatements, but Defendants have yet to do so.

files, like the "finite list of predetermined outcomes" described repeatedly in his Original Report, without discovering the random functions in that same database, Mr. Farley could not provide a straight answer. *See, e.g.*, **Ex. E** at 359:20–365:5, 373:3–19, 374:22–375:21, 74:17–77:19. When pressed, Mr. Farley punted and blamed his staff. *Id.* at 364:11–365:1; *see also id.* at 236:20 (blaming staff for failure to previously identify the existence of random number generators in the Torch Devices' database stored procedures). And while Mr. Farley originally reached his conclusion that the Torch Devices do not contain an element of chance based in part upon his assumption that the Torch Devices "sequentially delivered" "outcomes" from a "predetermined finite pool" without any randomization or employing a random number generator, **Ex. F** at 208:20–209:4 & **Ex. A** at 3, ¶ 6, he now believes that the presence of a random number generator is irrelevant to game classification in this case, **Ex. E** at 146:8–10.

### 2. Shifting Definition of "Outcome"

Now that he admits the existence of such random functions, Mr. Farley has since changed his definition of "outcome." Mr. Farley now suggests that all of his opinions in this case that use the term "outcome" refer to only the "win amount" or "prize"—to the exclusion, for example, of the combination of "winning" or "losing" symbols shown on the reels of the Torch Devices, which he acknowledges are determined randomly. **Ex. E** at 143:11–16. Yet Mr. Farley's new definition of "outcome" is inconsistent with his prior use of that same term in his Original Report, which explicitly distinguished between "outcomes" and "prizes." *See, e.g.*, **Ex. I** ¶ 8 (stating that "[t]he *outcomes* of the games *and prizes awarded* are instead based on predetermined finite outcomes" and "[n]one of the games on the Torch Device utilizes a random number generator to determine the outcome of a game *or* the prize awarded") (emphasis added); **Ex. A** at 3 ("Unlike regulated casino slot machines, Torch devices do not *contain or use random number generators* to determine the *outcome* of a game *or* the *prize awarded*."); **Ex. J** at 7 ("The 'Prize Viewer' feature

displays the total **win amount** of the upcoming game **outcomes**."). During his deposition, all of this flipflopping even appeared to confuse Mr. Farley as to his **own** definition of "outcome." **Ex. E** at 137:5–17.[13]

### 3. Shifting Definition of the Term "Indiscriminately" Used in Original Report

Mr. Farley's multifarious answers for his use of the word "indiscriminate" in the Original Report in relation to the starting index has a history prior to and beyond the Third Supplemental Report. Initially, Mr. Farley did not agree that his use of the word "indiscriminately" in his Original Report reflected the existence of any "random" functions within the Torch Devices, but simply his lack of understanding of how the selection was made. *See* **Ex. F** at 229:6–23. He then claimed that his use of the word "indiscriminately" was not inaccurate, because he had "since . . . learned" that the selection of the starting index had been hard-coded by a human being at Banilla. *See id.* at 229:10–230:14. Suddenly, after reading the Third Supplemental Report, in a surprise twist, Mr. Farley now says that "random *is* a synonym for 'indiscriminate,'" and that he always meant so. **Ex. E** at 78:7–8, 360:18–361:17 (emphasis added). Yet Mr. Farley admittedly did not know about the random procedure for selecting the starting index in his Original Reports, based on his staff's own inability to scientifically identify such features upon their review. *See* **Ex. F** at 232:11–13.

### F. Mr. Farley's Rebuttal Opinion and Conclusions

Despite Mr. Farley's repeated fluctuations in his opinions and his staff's apparent failure to examine the Torch Devices' database files that contained the random functions identified by

---

[13] A: "Remember . . . when I wrote this report three years ago, we hadn't defined 'outcome' to be payout amount. ***That happened today***." Q: "Well, I believe that in your rebuttal report you defined 'outcome' to be payout amount; correct?" A: "Well, it seems that it worked out that way." Q: "Well, isn't there a section of your report where you explicitly state that the outcome is only considered to be the payout amount?" A: "I do believe I said that, yes." **Ex. E** at 137:5–17 (emphasis added).

Mr. Friedman, Mr. Farley has ***not*** changed his ultimate conclusion that the Torch Devices "completely eliminate the element of chance." That is because, he claims, those features are not "relevant" and "do nothing to determine game outcome." **Ex. E** at 353:12–24, 73:8–75:4, 375:1–21. Despite admitting that the database files in the Torch Devices inform his current understanding of how the devices operate and function, **Ex. E** at 368:16–22, 331:13–17, Mr. Farley claims his conclusions in his Original Report are still valid, notwithstanding the fact that he lacked a complete understanding of the Torch Devices when those reports were written. When pressed on this inconsistency, Mr. Farley became angry, argumentative, and shut down. **Ex. E** at 370:18–378:30.

In his Rebuttal, Mr. Farley states these random functions "are immaterial to game classification and do not alter [his] prior opinions." **Ex. C** at 6. Mr. Farley denies that any of these admitted random functions are relevant to what he refers to as "game classification," which he claims has to do only with "outcome," which he ***now*** defines to include only the payout amount. *See, e.g.*, **Ex. C** at 6 ("Only events/procedures that influence or dictate the outcome are relevant to game classification."); **Ex. E** at 127:17–19 (claiming that the Torch Devices involve "no random function that determines the game outcome, but there are random functions that are used for insignificant purposes").

Against the backdrop of Mr. Farley's most recent definition of "outcome," the Rebuttal discusses three admitted random functions: (1) the random selection of the starting index, (2) the random selection of symbols displayed by the game's reels, and (3) the shuffle feature, the first two of which Mr. Farley admits are present in the Torch Devices. **Ex. C** at 3–7.

### 1. Random Selection of the Starting Index

Despite admitting his lack of knowledge and inability to determine how the Torch Devices select the starting index for each game theme and play amount, Mr. Farley offered opinions in his Rebuttal on the selection of the starting index, portraying that process as a "one-time software

setup" function. **Ex. C** at 3; *id.* at 6 (calling the selection of the starting index a "very limited system setup issue that should only happen one time after device activation"). But in his deposition, Mr. Farley walked back that statement. He now concedes, the starting index is randomly selected the first time that a Torch Device is operated at a given play level and game theme. **Ex. E** at 96:13–97:7, 97:21–24; *see also id.* at 91:2–93:20. For a Torch Device that has six game themes and five play levels, that means that the starting index will be randomly selected not just once, but at least 30 times as the device is played. When asked how he ***now*** knew how the selection was made, Mr. Farley explained that while he did not personally examine the database files, he feels "very confident" in his staff's review. **Ex. E** at 95:6–22.

Mr. Farley also opines that other events, such as the Torch Device being "reset, reactivated, or impermissibly tampered with (hacked or cracked)" can cause the random starting index selection to occur more than "only one time." **Ex. C** at 3. But, when asked about those occurrences, Mr. Farley stated he lacked sufficient knowledge regarding how they would occur. **Ex. E** at 109:20–110:3, 113:15–23, 117:4–16. Nonetheless, Mr. Farley opines that the random starting-index-selection procedure "does not change his opinion that the Torch Devices are not games of chance" because he says it is "not relevant" and has no "effect on game outcome," which he now defines to include only the "win amount." *Id.* at 74:15–77:12; **Ex. C** at 4.

### 2. Random Selection of "Winning" or "Losing" Symbols

Despite conceding he did not learn about the random process for selecting the combination of "winning" or "losing" symbols displayed by Torch Devices until Mr. Friedman's Third Supplemental Report,[14] Mr. Farley simply disregards the existence of randomness in the symbol

---

[14]   Yet Mr. Farley says it is possible that his staff at NFA was aware of this function but chose not to tell Mr. Farley. **Ex. E** at 71:17–74:13.

display. Even though those symbols are selected by the Torch Devices using what Mr. Farley concedes is a random number generator, Mr. Farley believes that fact is "irrelevant" and does not "add an element of chance." **Ex. E** at 72:23–74:3; **Ex. C** at 6 ("These visualization features may impact player enjoyment, but they are irrelevant to classification."). According to Mr. Farley, since the "entertaining display/symbols" shown to the player do not influence the prize to be awarded to the player, they are not part of the "outcome" of the game, which Mr. Farley defines, in an apparent example of circular reasoning, to exclude the combination of "winning" or "losing" symbols displayed by the devices. **Ex. C** at 6.

### 3. Shuffling of Payout Amounts

Mr. Farley opines that the Torch Devices do not contain a feature that shuffles the order of payout amounts. **Ex. C** at 6. He makes this conclusion despite admitting that any evidence of such a shuffle feature would be located in the devices' database files, an aspect of the Torch Devices that NFA admittedly failed to sufficiently (or possibly ever) analyze. Mr. Farley also opines that no devices "in the State of Missouri contain a shuffling feature." *Id.* Yet he admittedly has ***no*** knowledge of what devices Torch has in operation in Missouri. **Ex. E** at 85:17–23, 116:14–17. Mr. Farley says he has never reviewed a Torch Device with the shuffling feature, even though his staff previously sent TNT drives with "No Chance" games that did contain that feature. *Id.* at 84:20–85:2.[15] Still, he opines that even if the Torch Devices ***did*** contain a shuffle feature, it would be irrelevant to his opinion on "game classification." *Id.* at 228:25–229:5, 230:7–14.

---

[15] Mr. Farley claims, however, that the shuffling procedures in the drives sent to TNT in January were provided in error and were a "snafu." *See* **Ex. D** (Decl. of N. Farley dated Apr. 26, 2024) ¶¶ 11–13.

Under Federal Rule of Evidence 702(a), a qualified expert witness may testify if his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony must be "based on sufficient facts or data" and "product of reliable principles and methods." Fed. R. Evid. 702(b), (c). Additionally, for an opinion to be admissible, the expert must "reliably appl[y] the principles and methods to the facts of the case." *Id.* at 702(d). Expert testimony is excluded where it is "based primarily on assumptions instead of testing, measurement, or scientific analysis" and not on "any independent investigation or scientific foundation." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 982–83 (8th Cir. 2010).

**ANALYSIS**

## I. Mr. Farley Lacks Knowledge of Torch Device Function and Operation, and His Conclusions Are Based on Unreliable Methods and Principles

Mr. Farley has ***never*** personally reviewed the Torch Devices. Instead, he relies entirely upon conclusions fed to him by his staff at NFA or Banilla. Yet Mr. Farley's reliance on his staff's "review" of the Torch Devices (which forms the entire basis of his knowledge as to the operation and function of the Torch Devices) is unreliable given the fact that their review (if one can call it that) was ***not based on independent investigation*** or ***thorough review*** of the devices, but instead based only on selective portions of the devices designated by Banilla, the device manufacturer.

While Mr. Farley previously suggested that his staff's method was to "trust, but verify" the representations of the device manufacturers or client, his testimony and flip-flopping opinions make it clear that Mr. Farley and his staff merely trust; they do ***not*** verify. The fact that Mr. Farley is subject to a Confidentiality Agreement with that same manufacturer, which he originally claimed inhibited the scope of his testimony, makes his methodology even more suspect and entirely unreliable.

Equally problematic is the "relevance" method which caused Mr. Farley and his staff to neglect review of critical elements of the Torch Device, including entire portions of the devices that Mr. Farley now admits are essential to fully understanding game function, like the random functions found in the database. **Ex. E** at 368:16–22, 331:13–17. Worse, though, this did not stop Mr. Farley from providing opinion testimony on portions of the Torch Devices ***neither he nor his staff had never even reviewed*** (because they just took Banilla's word for it).

The methodology in device review has proven so deficient that Mr. Farley—who opined under oath several times that there is no randomness in the Torch Devices—now ***admits he was wrong***. Indeed, Mr. Farley acknowledges that randomness is present not merely in one but ***several*** aspects of the Torch Devices. Given these undisputed random functions, Defendants have now changed their litigation strategy, which Mr. Farley has dutifully followed. Now that Defendants can no longer argue there is no "randomness" in the Torch Devices, Mr. Farley has pivoted and now claims that he meant there is no "randomness" involved in the game "outcome," which he now defines as being limited to the "prize" or win/payout amount. That new approach, however, is flatly inconsistent with Mr. Farley's Original Report, in which he distinguished the two. *E.g.*, **Ex. I** ¶ 8; **Ex. J** at 7. Mr. Farley's flipflopping opinions—which are so difficult to keep track of that even Mr. Farley is confused—all seem to coincide with Defendants' shift in litigation strategy, rendering him unreliable as an expert.

Mr. Farley is not an expert; he is a parrot. He admits his conclusions were based solely on the representations of Banilla (or his staff's reliance on Banilla's representations), rather than employing any independent method to determine how the devices function. His methodology, or lack thereof, shows that his opinions are nothing but a "house of cards," built on faulty assumptions now contradicted by the undisputed evidence. *In re Wholesale Grocery*, 946 F.3d at 1002. While

there is a laundry list of examples highlighting the unreliable and unqualified testimony of Mr. Farley (as set out in the background section above), there are a few notable ones worth emphasizing.

### A. The "Trust But Verify" Method Has Proven Unreliable.

While Mr. Farley previously opined there were no random functions, he now admits he was wrong. *E.g.*, **Ex. E** at 234:14–237:9. Mr. Farley's change in tune came about only ***after*** Mr. Friedman's analysis, which was then confirmed by Mr. Farley's staff verification of those random features in the Torch Device. If Mr. Farley's staff easily discovered those random features in the Torch Devices upon review, how could Mr. Farley have initially opined that those functions did ***not*** exist? Simple: by ***relying entirely on the representations of the devices' manufacturer***, without performing any independent examination or scientific analysis to verify those representations.

It has become evident that Mr. Farley (and his staff) simply relied on Banilla's untested conclusions, which, notably, were conclusions that, years later, they quickly and easily confirmed. By failing to test the premises on which his conclusions relied, Mr. Farley employed unreliable methods. *Polski v. Quigley Corp.*, 538 F.3d 836, 840 (8th Cir. 2008) (affirming exclusion of expert where expert "relied on an unproven and indeed untested premise" and the expert's theory "could have been easily and ethically tested").

Critically, however, Mr. Farley's initial inaccurate conclusions are not what dooms his status as an expert—it is the ***reason*** they were wrong that makes his opinions inadmissible under *Daubert*: namely, that they are the product of unreliable methods.[16] He admits his conclusions

---

[16]  *See In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019) ("In exercising [its] gatekeeping function, the trial court must first make a 'preliminary assessment of whether the reasoning or methodology underlying the [proposed expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue,'

were wrong because he relied upon representations from Banilla that he ***never tested*** (and now acknowledges were incorrect), rather than employ ***any*** "testing, measurement, or scientific analysis." *See Barrett,* 606 F.3d at 982–83 (stating that expert testimony should be excluded where it is "based primarily on assumptions instead of testing, measurement, or scientific analysis."). By consistently relying on third parties' explanation of device function and operation, instead of independently testing those functions and operations, Mr. Farley's methodology is to merely serve as a mouthpiece for Banilla, Torch, or both.

### B. Mr. Farley Has No Reliable Method for Determining the "Relevance" of Files on the Torch Devices

Mr. Farley admittedly has no method for determining the "relevance" of any particular file or function within a device. Instead, he and his staff simply cherry-picks the files they are told are "relevant" in order to reach the desired conclusion. This is evident from what has unfolded here. Mr. Farley and his staff did not discover the undisputed random features initially because they admittedly failed to conduct a comprehensive review because ***they "reviewed" only what Banilla (or Torch) told them to***. *E.g.*, **Ex. E** at 236:11–18, 359:20–361:17 (explaining Banilla did not previously tell NFA about the random index selection feature, so Mr. Farley was never "informed" about the existence of such random functions). In other words, NFA only reviewed whatever, by whomever, was deemed "relevant"—which just so happened to be ***none of the "random" features*** Mr. Friedman later identified.

It is clear that Mr. Farley's staff do ***not*** conduct an independent investigation or thorough review of the devices. Indeed, Mr. Farley admits as much. **Ex. E** at 236:11–20, 238:8–13. Instead,

---

focusing specifically on the methodology and not the conclusions." (quoting *Daubert*, 509 U.S. at 592–93)); *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021) ("*Daubert* instructed that the focus of the reliability inquiry 'must be solely on principles and methodology, not on the conclusions that they generate,'" subject to exceptions not applicable here).

they review selective portions of the device that ***someone else*** deems "relevant"—a chameleon-like definition to support whatever conclusion Mr. Farley (or his clients) may want to reach. That is not a reliable method of investigation. *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("[S]elective use of facts fails to satisfy the scientific method and *Daubert*.").

At other times, NFA simply accepted whatever ***Banilla*** deemed relevant, instead of attempting to understand, test, or review the information themselves, which was demonstrated by Mr. Farley's inability to explain Banilla's relevance determinations. **Ex. F** at 111:14–127:19. While Mr. Farley provides no answer to many of the questions relating to NFA's "testing" of the Torch Devices, the one thing that it is readily apparent is that NFA cherry picked the data they wanted to use, evidently in consultation with Banilla, and tossed aside other data without explanation. *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889–90 (E.D. Wis. 2010) (excluding expert witness who "cherry picks" data).

Perhaps the most outlandish example of the "relevance" methodology process is Mr. Farley's Rebuttal opinion, whereby he concludes none of these now-admitted random functions are "relevant" to his opinion, **Ex. C** at 2, despite previously characterizing them as a principal basis for his conclusions. *Compare* **Ex. A** at 3, ¶ 6, *with* **Ex. E** at 146:8–10 (random number generators). He makes that conclusion despite admitting he and his staff have ***no*** method of internally determining the relevance of a database file. *E.g.*, **Ex. Ex. E** at 355:23–356:25. In any event, given Mr. Farley's own admitted failure to scientifically determine the random functions during the initial review, he cannot reliably opine that those random operations and functions do not involve "an element of chance." *See J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (affirming exclusion of testimony as "mere speculation and pure conjecture" where the expert admitted his own inability to scientifically reconstruct the accident but opined that the accident was indeed a three-impact collision). This unreliability is only bolstered given that Mr.

Farley admitted that the database files in the Torch Devices inform his current understanding of how devices operate and function, **Ex. E** at 368:16–22, 331:13–17, yet he never even discovered them upon review (only after "verifying" Mr. Friedman's Third Supplemental Report).

Mr. Farley also states that even though he has ***never*** reviewed a Torch Device with the shuffling feature, he opines that even if the Torch Devices ***did*** contain the shuffle feature, it would be irrelevant to game classification. **Ex. E** at 84:20–85:2, 228:25–229:5, 230:7–14. He reaches that conclusion, ***like the rest of his conclusions***, based on his own say-so, without any "independent investigation or scientific foundation." *Barrett*, 606 F.3d at 982–83. Mr. Farley cannot be allowed to offer "subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharmaceuticals Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

### C. Mr. Farley Lacks Personal Knowledge of Critical Aspects of the Torch Devices

As explained above, Mr. Farley's "knowledge" of the Torch Devices, which he has derived only from the work of his staff, is based on Banilla's representations as to the functions of the devices—or rather, selectively chosen portions of the Torch Devices. Even then, he lacks knowledge of critical aspects of the Torch Devices' operation and function.

Indeed, when asked several times to explain certain functions of the device or methods of review, Mr. Farley punted and replied that his staff or Banilla—not him—would be the correct person to ask. *See, e.g.*, **Ex. E** 67:18–69:3, 109:5–110:3, 210:16–211:34, 217:4–218:3, 265:2–267:7, 100:21–101:1, 51:4–8; **Ex. F** at 120:24–122:2. Mr. Farley's inability to answer basic questions, let alone demonstrate that he possesses basic knowledge to provide helpful testimony, shows that he has not employed a reliable method to reach his conclusions, instead obediently selecting only those facts that support the preordained conclusion that his clients have led him to reach. Mr. Farley's failure to personally analyze and his staff's failure to independently investigate

the Torch Devices, coupled with the unreliable and unscientific foundation on which his opinions rely, require his exclusion. *Barrett*, 606 F.3d at 982 (affirming district court's decision that expert was unqualified to testify based on lack of "evidence of any independent investigation or scientific foundation").

## II. Mr. Farley Lacks Knowledge to Provide Opinions on Whether Torch Devices Meet the Factual Predicates That Might Make Them "Gambling" Devices Under Missouri Law and Instead Offers Testimony That Will Only Confuse the Jury

Beyond his (and his staffs') failure to adequately review the Torch Devices before reaching their conclusions, Mr. Farley fails to offer any conclusions other than his opinions based on his ***personal definition*** of "gambling." Mr. Farley believes whether a device is a gambling device is "universally" determined by his own "three elements"—rather than the relevant statue at issue. **Ex. E** at 145:17–146:1, 164:4–165:12, 181:8–20; **Ex. F** at 90:11–12, 270:24–272:15. Mr. Farley's methodology of determining the legality of a Torch Device based on his own personal definition is unreliable and will only serve to confuse the jury.

Indeed, Mr. Farley lacks specialized knowledge to assist the trier of fact in determining the ultimate issue in this case—whether Torch Devices are illegal gambling devices under ***Missouri*** law. Despite Mr. Farley's asserted experience in "game classification," Mr. Farley has no useful knowledge or expertise here: indeed, he admits a lack of familiarity with ***Missouri*** law.[17] In other words, what "gambling" means according to Mr. Farley—even if it were "universal" in the gaming world as he claims or based on his personal understanding of games in Atlantic City or Las

---

[17] Mr. Farley has not shied away, however, from offering his opinion as the relevance recent proposed bills that were never enacted by the Missouri legislature to the construction of the longstanding provisions of Missouri law at issue in this case. *See, e.g.,* **Ex. A** at 5 ("I'm aware multiple bills have been proposed in the Missouri Legislature that, at least in part, sought to inject the concept of a player's subjective intent into the definition of 'gambling device' or 'slot machines,' and the Missouri Legislature has uniformly rejected those proposed amendments.").

Vegas—is irrelevant here. The issue in this case is whether Torch Devices are gambling devices under ***Missouri*** law.

Most troubling, Mr. Farley actually ***refuses*** to assess Torch Devices under the Missouri statute because he believes whether a device is a gambling device is "universally" determined by his own personal definition. *E.g.*, **Ex. F** at 270:24–272:15. But here, whether the operation of Torch Devices constitute "gambling" depends on how that word is defined in Missouri Revised Statute § 572.010(4), which has a distinct definition[18] that Mr. Farley refused to consider. *Id.* As a result, Farley injects his own ***personal*** definitions of other statutory terms—rather than the definitions in applicable Missouri statute—which is an unhelpful distraction that will only confuse the jury. Worse yet, Mr. Farley uses definitions (*e.g.*, "outcome") that are flatly ***inconsistent*** with Missouri law. *Compare* **Ex. E** at 157:4–21, 160:5–7, 139:24–140:4, *with* Mo. Rev. Stat. § 572.010(4) (definition of gambling).

Mr. Farley offers no expertise or opinion on how to identify which Torch Devices possess the factual prerequisites to meet Missouri's statutory definition of gambling, much less how his opinions could be used to help identify when a game is a gambling device under Missouri law. *E.g.*, **Ex. E** at 164:4–165:12. As such, it will only serve to confuse the trier of fact for him to offer "game classification" opinions that are based not on the factual predicates required under Missouri law but instead his own personal definition of "gambling," which he incorrectly clams are "universal." *See* **Ex. E** at 145:17–146:1.

---

[18] Mo. Rev. Stat. § 572.010(4) (defining "gambling" as "when [a person] stakes or risks ***something of value*** upon the outcome of a contest of chance ***or a future contingent event not under his or her control or influence***, upon an agreement or understanding that he or she will ***receive something of value*** in the event of a certain outcome" (emphasis added)).

### III. Mr. Farley's Ultimate Opinion That the "Prize Viewer" Feature on the Torch Devices "Eliminates" Chance Is Not Based on Any Reliable Method and Serves as an Impermissible Legal Conclusion

At bottom, Mr. Farley's real purpose in this case is to parrot Torch's fallacious legal position: that the Torch Devices are not "gambling devices" because the "Prize Viewer" eliminates the element of chance. *E.g.*, **Ex. E** 228:25–229:16 ("[T]he fact that you can see what the next outcome is takes away that element of chance. And, therefore, it's not a gambling device."). This *alone* requires exclusion. *See In re Acceptance Ins.*, 423 F.3d at 905 (excluding expert opinions sufficient where "the expert opinions were merely opinions meant to substitute the judgment of the district court").

But Mr. Farley's methodology of determining the legality of a Torch Device based solely on the presence of a "Prize Viewer" mechanism is itself unreliable. **Ex. F** at 202:9-15, 291:9-15, 201:17–19; **Ex. E** at 231:25–232:4. According to Mr. Farley, the existence of a prize viewer *always* eliminates chance, regardless of other device features or functions (including the randomized functions he learned of after reading Mr. Friedman's report). **Ex. F** at 201:6–19, 291:9–15; **Ex. E** at 231:25–232:4; 230:7–14, 228:25–229:16. Mr. Farley makes this conclusion without citing to any actual standards, rules, guidelines, industry sources, gaming publications, or data in support of his opinion. Rather, Mr. Farley acknowledges he is applying his own *personal* belief on the effect of the "Prize Viewer" mechanism. Those conclusions are *ipse dixit* and therefore unreliable. *In re Wholesale Grocery,* 946 F.3d at 1002 ("A court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert.'" (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997))).

This inadmissible *ipse dixit* opinion is especially problematic for two additional reasons. First, Mr. Farley cannot opine that the presence of the "Prize Viewer" mechanism eliminates chance from a device, since he (and his staff) undisputedly failed to perform an analysis necessary

to identify all of the ways in which chance ***does*** play a role in the operation of the Torch devices. Simply put, an expert does not assist the trier of fact if his conclusion that a device is not a game of chance is based upon the incorrect and circular assumption that the device has no element of chance. *See also United States v. Hall,* 93 F.3d 1337, 1343 (7th Cir. 1996) ("Unless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting undue influence on the jury.").

Second, Mr. Farley's exact conclusion has been rejected by other courts analyzing similar devices—despite those courts' having received and reviewed Mr. Farley's analysis. *See, e.g., Mayle Bingo Co., LLC v. Ohio Dep't of Pub. Safety,* 2020-Ohio-1087, ¶¶ 19-20, 152 N.E.3d 1237, 1242–43 (noting Mr. Farley appeared as an expert in the case and rejecting Mr. Farley's view that "the mandatory preview function [] eliminate[s] chance; in fact, it has no effect on chance . . . . [T]he fact the outcome of the next play is revealed after a player activates the mandatory preview function does not render the game a 'no-chance' game . . . ."); *Gator Coin II, Inc. v. Fla. Dep't of Bus. & Prof'l Reg.,* 254 So. 3d 1113, 1118 (Fla. Dist. Ct. App. 2018) (rejecting argument that the "preview feature removes any element of chance or unpredictability because the player knows the outcome of the game"); **Ex. F** at 78:18–21 (acknowledging Farley provided a contrary opinion in *Gator Coin II*).

## CONCLUSION

For reasons discussed in this memorandum, Mr. Farley cannot provide expert testimony in this case because he did not reliably reach his conclusions, does not possess specialized knowledge to provide expert testimony, and is unlikely to assist the trier of fact in understanding the function or operation of the Torch Devices. Mr. Farley acknowledges that his original opinions were incorrect because his staff did not employ a reliable methodology to identify the existence of

random functions in the Torch Devices, and Mr. Farley has still not personally performed an examination of the Torch Devices to determine the validity of any of his conclusions. To allow Mr. Farley to testify on the "classification" of the Torch Devices based upon his own personal definition of "gambling" is only likely to confuse the jury in their efforts to apply Missouri law to the facts of this case. For those reasons and the others explained above, the Court should exclude Defendants' proffered expert witness, Nick Farley, entirely.

Dated: August 5, 2024

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
MARY GRACE WARREN, #73147MO
ZOE WOLKOWITZ BRANNON, #74007MO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*
*marygrace.warren@bryancave.com*
*zoe.brannon@bclplaw.com*

*Attorneys for TNT Amusements, Inc.*
*d/b/a Play-Mor Coin-Op*

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2024, a copy of the foregoing was served on all counsel of record by operation of the Court's electronic filing system.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO