**Exhibit F**
**Excerpts from Dec. 10, 2023**
**Dep. of N. Farley**

Page 1

1              THE UNITED STATES DISTRICT COURT FOR
2                THE EASTERN DISTRICT OF MISSOURI
3                       EASTERN DISTRICT
4

   TNT AMUSEMENTS, INC. dba    )
5  PLAY-MOR COIN-OP,           )
                               )
6              Plaintiff,      )
                               )
7  vs.                         ) Case No.
                               ) 4:23-cv-00330-JAR
8  TORCH ELECTRONICS, LLC;     )
   et al.,                     )
9                              )
               Defendants.     )
10 _____)
11
12
13
14            DEPOSITION OF NICOLA FARLEY
15        Taken on Tuesday, December 12, 2023
16           By a Certified Court Reporter
17              and Legal Videographer
18                   At 9:07 a.m.
19        At 6375 South Pecos Road, Suite 103
20                 Las Vegas, Nevada
21
22
23
24  Reported by:  Suzanne M. Stone, CCR 970, RPR
25

1    Q.    Second, I'm going to try to make my

2    questions clear, but if there's a question that you

3    don't understand, I'd appreciate if you'd ask for a

4    clarification, or if you just need the court

5    reporter to read the question back, that's also

6    possible.

7        A.    Okay.

8        Q.    And if I do ask a question and you give

9    an answer, I'm going to presume that you understood

10   the question.  So can we agree that if you answer a

11   question, you believe at least you understood what I

12   was asking?

13       A.    Yes.

14       Q.    Okay.  So before we get too much further

15   in, can you tell me a little bit about your

16   educational background?

17       A.    Certainly.  I have a Bachelor of

18   Engineering degree in electrical engineering and

19   computer science from Stevens Institute of

20   Technology in Hoboken, New Jersey.

21       Q.    Okay.  And I know that today you are

22   affiliated with -- with Nick Farley & Associates; is

23   that correct?

24       A.    Yes.

25       Q.    And how long have you been affiliated

Page 10

1    with that entity?

2         A.     I founded Nick Farley & Associates in

3    November of -- November of 2000, so 23 years.

4         Q.     Okay.  And what did you do before

5    starting Nick Farley & Associates?

6         A.     Prior to Nick Farley & Associates, I was

7    employed by another independent testing laboratory,

8    Gaming Laboratories International, or GLI, as

9    they're more commonly known.  I had worked there for

10   nine years.  And prior to GLI, I worked for the

11   New Jersey Division of Gaming Enforcement in

12   Atlantic City for four years.

13        Q.     What was your title with the New Jersey

14   Division of Gaming Enforcement?

15        A.     I want to recall test engineer.

16        Q.     Okay.  And what was your job function?

17   What did you do?

18        A.     Tested and evaluated electronic gaming

19   devices and systems for use in Atlantic City

20   casinos.

21        Q.     And when you say "tested" them, how would

22   you go about doing that?  Would you go to the

23   casinos?  Would you do forensic examinations at a

24   lab?  How would you do your job?

25        A.     All -- all the examinations were

1   performed in a lab.  We had a lab in Atlantic City,

2   and manufacturers would submit their devices to us

3   for testing.  And we would test them in the lab for

4   compliance with the New Jersey requirements.

5        Q.    And I don't need you to give me all of

6   the New Jersey -- New Jersey requirements, but what

7   are some examples of the sort of things you might

8   have been testing to make sure the machines did work

9   properly?

10       A.    Well, random number generator analysis

11  was one thing that we did.  We verified that all the

12  prizes paid accurately, all the meters incremented

13  correctly, and the games functioned as designed.

14       Q.    And how does one go about performing

15  those tests?  What sort of things does one do?

16       A.    Well, collection of -- the RNG analysis

17  involved the collection of data from -- from the

18  device.  We would work with the manufacturer to get

19  a program put together so that we can collect that

20  data and analyze it.  Pay verification involved

21  using in-circuit emulators so that we could control

22  the software and set break points so that the -- we

23  can tell the machine where we wanted the reels to

24  stop, and then, you know, verify that the prizes

25  paid correctly.

Page 9

1      Q.    Second, I'm going to try to make my

2   questions clear, but if there's a question that you

3   don't understand, I'd appreciate if you'd ask for a

4   clarification, or if you just need the court

5   reporter to read the question back, that's also

6   possible.

7      A.    Okay.

8      Q.    And if I do ask a question and you give

9   an answer, I'm going to presume that you understood

10   the question.  So can we agree that if you answer a

11   question, you believe at least you understood what I

12   was asking?

13      A.    Yes.

14      Q.    Okay.  So before we get too much further

15   in, can you tell me a little bit about your

16   educational background?

17      A.    Certainly.  I have a Bachelor of

18   Engineering degree in electrical engineering and

19   computer science from Stevens Institute of

20   Technology in Hoboken, New Jersey.

21      Q.    Okay.  And I know that today you are

22   affiliated with -- with Nick Farley & Associates; is

23   that correct?

24      A.    Yes.

25      Q.    And how long have you been affiliated

Page 21

1    casino opening.

2         Q.    Okay.  But -- but in general, most of

3    your work at the Division of Gaming Enforcement was

4    in the lab?

5         A.    Yes.

6         Q.    Is it -- you -- you've mentioned that in

7    the context of GLI, you did some onsite visits.  Was

8    that the majority of your work at GLI, or was it a

9    majority lab work at GLI, as well?

10        A.    It was mixed, yes.  I did both, lab work

11   and field work.

12        Q.    Okay.  So let's talk about the lab work

13   for a moment.  We talked about a few things that you

14   did at the New Jersey Division of Gaming Enforcement

15   with respect to testing.  Would testing random

16   number generators be a thing that you did at GLI as

17   well?

18        A.    Yes.

19        Q.    Would testing payout percentages also be

20   a thing you would have done?

21        A.    Yes.

22        Q.    Are there any other things, that we

23   haven't mentioned, that you would have done at GLI

24   that you didn't do in terms of testing at the

25   New -- New Jersey Division of Gaming Enforcement?

Page 27

1   game of pure skill?

2          A.     Sure.

3          Q.     Okay.

4          A.     Another good game that I -- I -- I find

5   is analogous to skill is Skee-Ball.

6          Q.     Okay.  And -- and go ahead explain then

7   why that's a game of skill.

8          A.     It's an -- it's an alley roll game.  Like

9   your basketball game, the -- the balls roll down,

10  but there's a finite number of them, and you have to

11  roll the ball down the alley toward the targets and

12  try and put the ball through the targets.  Generally

13  speaking, there's not much that would impede a

14  player's ability to perform that task other

15  than their own skills; so -- yeah.

16         Q.     Okay.  And I'm struggling to think of

17  one, so can you think of a game of pure chance that

18  you might find at a casino, for example?

19         A.     Oh, a slot machine.

20         Q.     Okay.  And why is a slot machine game a

21  game of pure chance?

22         A.     Well, it's based upon a random number

23  generator.  So a random number generator determines

24  what the outcome is going to be, and then that's

25  presented to the player.  The player has no

1 interaction with it other than to press the spin

2 button to initiate a game play.

3      Q.   I promise this is going to stop at some

4 point when we've used all these words once, but

5 "slot machine" is, of course, a term that's

6 determined in many jurisdictions, including

7 Missouri's.

8      A.   It is.

9      Q.   So when you use the term "slot machine,"

10 can you tell me what you just meant when you

11 referred to a slot machine?

12      A.   Sure.  Generally speaking, a slot machine

13 is considered a game or a gambling device which has

14 three elements, which is consideration, chance, and

15 prize.  So it's putting up something of value for an

16 outcome that's outside of the player's control for

17 an opportunity to win something of value, like

18 money.

19      Q.   Okay.  And most slot machine games that

20 we might find in a casino here in Las Vegas, they

21 typically have a display that involves what we call

22 a reel; is that correct?

23      A.   Yes.

24      Q.   And can you explain what a reel is and

25 what that display looks like?

Page 53

1    of that 30 percent is game classification.  And,

2    generally speaking, those games don't fall within a

3    regulatory purview, so there's no regulatory agency

4    that we can go to and ask for advice or criteria

5    that we need to test to.  So we have to kind of take

6    the game at its merits and describe how it works.

7         Q.    Okay.  So in a typical engagement

8    on -- for -- I'm sorry.  You just used a term, and

9    it slipped out of my mind.  You said "game

10   classification."  Was that what you called it?

11        A.    Yes.

12        Q.    In a typical example of game

13   classification, would you be solicited by the law

14   firm to provide an opinion as to whether or not a

15   particular device qualifies as a gambling device

16   under some state's jurisdiction?

17        A.    Well, we're very careful to not render a

18   legal opinion because we're not a lawyer.  But we do

19   encourage legal counsel to provide us with questions

20   or criteria that they want us to use when we do our

21   analysis.  So we'll -- we'll go through the

22   analysis.  We'll go through the software.  We'll go

23   through the source code.  We'll go through all the

24   configuration settings, how the player interfaces

25   with the device.  And we'll write up -- I think it's

Page 54

1    a pretty comprehensive report on how that all works,

2    and typically, in our findings and conclusions

3    section, we address the questions from counsel or

4    the criteria that they provided us and kind of

5    compare how the operation of the game fares with

6    their questions or their criteria.

7         Q.    Okay.  So you raised an important point,

8    which is that you are not a lawyer?

9         A.    Correct.

10        Q.    And you do not render legal advice?

11        A.    That's correct.

12        Q.    Or legal opinions?

13        A.    Correct.

14        Q.    But you do have familiarity, do you not,

15   with various state statutes and regulations in the

16   gaming and gambling industries?

17        A.    Yes.

18        Q.    And when you are engaging in an analysis

19   of a machine, do you consider the existence of

20   statutory definitions of any terms?

21        A.    If they're provided to me, yes.

22        Q.    And how do those factor into your

23   analysis?

24        A.    Like I said, if -- if legal counsel is

25   providing us with that as guidance or criteria or

Page 55

1   a -- you know, questions about that, then we
2   incorporate that into the report.
3        Q.   Okay.  You can put this aside for a
4   moment.  We will come back to it, but we've got more
5   preliminaries to -- to work through.
6        A.   Sure.
7        Q.   So I know from your submission that you
8   have been deposed before.  How many times have you
9   been deposed before, roughly?
10       A.   More than 50.
11       Q.   And would the majority of those
12  depositions have been given on behalf of the law
13  firms, as we were discussing moments ago?
14       A.   Yes.
15       Q.   Okay.  Okay.  Have there been prior cases
16  where you have rendered opinions as to whether a
17  particular device involves an element of chance?
18       A.   Yes.
19       Q.   Is one of those examples a case called
20  Gracie Tech?  Are you familiar with that case?
21       A.   I'm not --
22       Q.   Not --
23       A.   -- not sure.
24       Q.   That's okay.
25       A.   We do work for Gracie Tech, but I'm not

1     Q.    Again, as we go through this and I ask

2    questions, if there are significant differences

3    between what's in this report and others, I'd

4    appreciate you calling it to our attention.  But I

5    want to turn you first to Appendix B to your report.

6    A.    Okay.

7    Q.    And can you describe what this is.

8    A.    It's an appendix that identifies the

9    software files and their respective signatures, as

10    we call them, which is CRC-32 value.  And it's used

11    to verify that the software installed anywhere is

12    the same as the software that we examined in our

13    laboratory.

14    Q.    Okay.  And so as we look through this

15    document, there are a number of lines that have been

16    crossed out.

17    A.    Yes.

18    Q.    Can you explain why those lines have been

19    crossed out?

20    A.    Generally speaking, when we cross out

21    files, it's done because those files are -- they're

22    not static.  So they might be a text file that gets

23    updated with log information or something like that.

24    And if you were to take a signature at any given

25    time, it would be different than the signature we

1  had in the lab.  So we just put a strike-through on

2  that so that you know that's not significant and

3  you're not going to get the same signature as what

4  we had in the lab.

5       Q.    When you say "signature," what do you

6  mean?

7       A.    The CRC-32 value under the column labeled

8  CRC-32.

9       Q.    And can you explain in a little more

10  detail what that is.

11       A.    CRC-32 is an acronym for cyclical

12  redundancy check, a 32-bit.  So it is an algorithm

13  that's used to analyze a file and come up with what

14  we call a signature.  And that's that eight

15  character CRC-32 that's listed there.

16       Q.   Okay.  So if I'm understanding

17  correctly -- and please correct me; I'm not sure I

18  got this right.

19       But basically, you're saying that the

20  CRC-32 is a way of verifying that the software that

21  might be on some other terminal is the same as the

22  software that is on the terminal that you've

23  reviewed?

24       A.    Correct.

25       Q.    And the reason that you've crossed these

1    lines out is that it's your view that even if those

2    items are missing from the software on that second

3    terminal, that that would not alter the way that the

4    machine operates?

5         A.    Oh, yeah.  It won't alter the way the

6    machine operates, but it's not so much if it's

7    missing, but if you get a different signature, if

8    you get a different CRC-32 value when you do the

9    comparison, that it's not going to -- it has no

10   material effect on -- on the game.

11        Q.    So if a line is crossed through in this

12   log, it is because it's your view that that doesn't

13   affect the way the game operates?

14        A.    Well, it's -- it's not static; so it's

15   not going to be the same.  It's -- it's -- it

16   becomes a frustrating situation to try and compare

17   the signature of what's stricken through to what's

18   in our report because it won't match.

19        Q.    So maybe I'm -- let me see if I can

20   understand.  Why don't we flip ahead a little bit so

21   I can find a file and see if we can get on the same

22   page.  Or maybe why don't we look at that first

23   page, page A-1.

24             The fourth thing that's crossed through

25   is a line that says, "DefaultFateLog.text."  Do you

Page 114

1    see that?

2         A.    Yes.

3         Q.    Is that the sort of thing that you're

4    saying is not static and therefore has been crossed

5    out?

6         A.    Correct.  It's a log file.

7         Q.    Right.  A log file is not static because

8    it is updated every time an event occurs that is

9    programmed to be logged.

10        A.    Correct.

11        Q.    And so if this -- so basically, am I

12   correct that what you're saying is that if this file

13   were the reason that the CRC-32 check would differ

14   between your machine and another machine, that's not

15   unexpected or -- or problematic?

16        A.    Correct.

17        Q.    Okay.  If you can flip to the next page,

18   you can see that you have some other items that are

19   crossed through on this page.  I'll just point to

20   one towards the bottom of the page, which is a file

21   called "SkillGameSelectionScreenBackground.jpg."

22              First of all, do you agree with me that a

23   jpg is an image file?

24        A.    Yes, it is.

25        Q.    And do you agree it's a static file?

Page 115

1      A.    Yeah, not necessarily.

2      Q.    Okay.  Do you happen to know whether this

3  particular game tile is a static file or not?

4      A.    I don't.

5      Q.    Okay.  Can you explain to me then why

6  this jpg file has been crossed out.

7      A.    I'm -- I'm not sure.  I would have to go

8  back to my records on this.

9      Q.    Okay.  If we look a little further down,

10  it seems also you crossed out something called

11  "SuperiorSkillGameTile."

12           Do you see that?

13      A.    Yes.

14      Q.    Can you tell me why that's been crossed

15  out?

16      A.    I -- I don't recall why.

17      Q.    Okay.  If we go down further, it's -- we

18  can see that there are cross outs for Choice Skill

19  Game Selection Screen Background, Diamond Skill HS

20  Game Selection Screen Background, Diamond Skill

21  II -- I'm on the next page now -- Game Selection

22  Screen Background, all of which are png files.

23           First, are png files also image files?

24      A.    They are.

25      Q.    Are they also static files?

Page 116

1      A.    They can be, but they -- they may change

2   because of what's displayed at the time; so I'm not

3   sure.

4      Q.    Okay.  Do you know why any of those files

5   have been crossed out?

6      A.    I don't recall.

7      Q.    Okay.  If we go down to page A-5, do you

8   see the set of cross outs about halfway down the

9   page on page 5?

10     A.    Yes.

11     Q.    It says there that you crossed out -- I

12  believe these are all different directories or

13  folders called Choice Skill, Choice Skill II,

14  Diamond Skill HS, Diamond Skill II, Diamond

15  Skill III, Diamond Skill NF, and then those

16  directories are all crossed out.

17          Do you know why they've been crossed out?

18     A.    I don't recall.

19     Q.    Do you know whether those directories

20  contained files?

21     A.    I don't recall.

22     Q.    If we go further down, it says,

23  "BonanzaBucksGameTile.png, FruitySevensGameTile.png,

24  MajorCashGameTile.png," all of which have been

25  crossed out.

Page 117

1            Do you have any recollection of why those

2   have been crossed out?

3       A.    I don't -- I don't -- I don't recall.

4       Q.    Okay.  So rather than go through this

5   report in great detail, if you could just flip

6   through the next couple of pages and review the

7   cross outs.

8            I will ask you, do you have any

9   recollection of why any of these items were crossed

10  out on this report?

11       A.    I honestly don't recall why we crossed

12  them out.

13       Q.    Okay.  The fact that there are game tiles

14  or images here for games such as Choice Skill and

15  Diamond Skill, does that reflect that there is

16  materials from other games that are within the

17  software of this game?

18       A.    No.  I'm not sure why that's there.  I

19  don't recall why.  But we crossed it out for a

20  reason.  It is entirely plausible that there may

21  have been something on a terminal that we have that

22  held some legacy files on there from something else

23  we tested previously.

24       Q.    Sorry.  I'm not sure I understood that.

25  What -- why would there be files from another test

1   on this terminal?

2          A.     I'm speculating.

3          Q.     Okay.  Well, I thought --

4          A.     I'm speculating on that, that it may have

5   been just legacy from a previous examination and it

6   may have just been retained by the memory of the

7   device.

8          Q.     Well --

9          A.     And we crossed it out rather than do

10  something else.

11         Q.     All right.  So let's be -- let's be clear

12  here.  So what we described a moment ago in terms of

13  your process was that you were disconnecting a hard

14  drive from the terminal and then adding a new hard

15  drive in that reflects the software for one of these

16  machines?

17         A.     Correct.

18         Q.     How, if that's the case, would it be

19  possible for any legacy files to be left on that

20  hard drive if you received that hard drive from

21  Torch or from Banilla?

22         A.     Well, I think I talked to you about a

23  logic board.

24         Q.     Yes.

25         A.     So it's possible that the logic board

1    would held -- held some memory, retained some

2    memory --

3        Q.    So a logic --

4        A.    -- that was on there previously.

5        Q.    -- a logic board might hold files in

6    active memory, but it would not have a file system

7    in the way that a hard drive would, would it?

8        A.    I don't know.  I wouldn't say that.

9        Q.    You would say that a logic board would

10    have -- would have stored memory in the way that a

11    hard drive would?

12        A.    It's possible.

13        Q.    Well --

14        A.    It's possible that it reads what's on the

15    hard drive and stores something on it.

16        Q.    So is what's listed here a directory of

17    the files that are on the hard drive, a directory of

18    the files that are on the logic board, or both?

19        A.    This is what we extracted from the

20    terminal that we examined.

21        Q.    And so you're saying you cannot -- you

22    cannot, with confidence, testify today whether any

23    of the items on this list came from the particular

24    hard drive that you were asked to review?

25        A.    If I had known you were going to ask me

1    questions about the crossed-out files, I would have

2    gone back and prepared for that, but I wasn't

3    prepared for that, and this report is more than five

4    years old.

5         Q.    Well, this is the -- this is a portion of

6    the report that you submitted in this case slightly

7    more than a month ago; correct?

8         A.    No.  This is a report that I prepared

9    May 1st, 2018, and we said that we haven't gone back

10   and done an examination.

11        Q.    Okay.

12        A.    You received this report a month ago.

13        Q.    So -- but this was an exhibit to the

14   report that you prepared about a month ago?

15        A.    Yes.

16        Q.    Okay.  Did you not review your reports

17   prior to coming to your deposition today?

18        A.    I did review my reports.  I didn't think

19   we were going to get into the file structure and the

20   file signatures.  I didn't think that was relevant.

21   I think the salient parts of -- point of this and

22   what I thought was relevant is how the game

23   operates.

24        Q.    Okay.  So if I were to take you through

25   the other exhibits to the -- so Exhibits B through

1    E, which also are reports that you previously

2    prepared and which also contain strikes to various

3    files, would you have any ability to give me

4    testimony today as to what the basis for those

5    strikes was?

6         A.    I would not.

7         Q.    Okay.  Who -- who strikes these things

8    out?  Is that a decision that you make?

9         A.    It's -- there's a member of my staff that

10   gets these signatures, and he works with the

11   manufacturer to determine the purpose and intent of

12   each of the files, and then we make that

13   determination as to whether it's relevant or not.

14        Q.    When you say you work with the

15   manufacturer to determine the purpose and intent of

16   the files, what does that mean?  How do you work

17   with them?

18        A.    We provide the signatures that we extract

19   from the device to the manufacturer, and then we ask

20   them to verify that that's an accurate depiction of

21   what's there.  They'll often come back and say that,

22   "Well, this file is not static."  You know, it's

23   dynamic.  It's like a log file.

24        Q.    Yeah.

25        A.    And then if there's any other files that

1  aren't relevant, well, they'll tell us why they're

2  not relevant.

3          Q.      Okay.

4          A.      And I don't have that information with me

5  today.

6          Q.      Fair enough.

7                  And you then -- do you then accept

8  the -- the statements of the manufacturers as to

9  which files are not relevant and simply implement

10  their strikes?

11         A.      Well, in the immortal words of former

12  President Ronald Reagan, we trust and verify.

13         Q.      Okay.  So in other words, if they had

14  asked you to strike out something that you believed

15  was important to the game play, you would have had a

16  dialogue about that --

17         A.      Yes.

18         Q.      -- and made a -- reached a conclusion?

19         A.      Yes.

20         Q.      Okay.  And when you say, "we verify," is

21  that something you would do or your associate would

22  do?

23         A.      Generally, my associate would do that.

24         Q.      Okay.

25         A.      But if I need to be involved, I will be

                                                      Page 123

1    involved.

2         Q.    Let me turn you to page 6 --

3         A.    Okay.

4         Q.    -- A-6 of your Appendix B.

5         A.    Sure.

6         Q.    So some things that are not crossed out

7    on this page are the file folder names.  And so you

8    can see here that there is a section called Game

9    Tiles/Diamond Skill HS; another folder -- I'm not

10   going to read the whole file path, but it ends

11   Diamond Skill II; another file folder that ends with

12   Diamond Skill III; another that ends with Diamond

13   Skill NF.

14        Is it fair to say that these are folders

15   that contain image files from the games Diamond

16   Skill HS, Diamond Skill II, Diamond Skill III, and

17   Diamond Skill NF?

18        A.    Well, we didn't strike those specific

19   files because they were stricken in the previous

20   directory.  If you go back to page A-5 --

21        Q.    Uh-huh.

22        A.    -- well, it should be B-5.  That was a

23   mistake on our part.  But if you go back to page 5

24   of 22, you'll see under -- about the middle of page

25   there, "Program Files/bin/Applications/Front End --

```
                                              Page 124
  1        Q.     Oh, I see.
  2        A.     -- Images/Game Tiles."  All those
  3   directories have been stricken.  We just didn't
  4   restrike them.
  5        Q.     I understand.  Well, thank you.  I
  6   actually hadn't noticed that; so I appreciate that
  7   clarification.
  8        A.     No worries.
  9        Q.     But -- but my question is are these all
 10   folders that contained images from these -- these
 11   other games?
 12        A.     I -- I don't know why they're there.
 13        Q.     Okay.
 14        A.     They -- they had no bearing.  My
 15   understanding is that they had no bearing on
 16   the -- I believe there are five game themes in -- in
 17   No Chance Game Suite I, and they had no bearing on
 18   that.
 19        Q.     Okay.  If you turn to page 9.
 20        A.     Sure.
 21               Okay.
 22        Q.     There's a folder there that is called
 23   "Application/Helios Agent."
 24               Do you know what Helios Agent is?
 25        A.     I don't.
```

Page 125

1      Q.     Do you know why it's struck through?

2      A.     I don't.  I don't recall.

3      Q.     Oh, my staples fell out.

4             Okay.  So I know that you don't recall

5    the specific reasons that any of these things were

6    struck out, but can you give me an explanation once

7    more of why generally things are struck out in

8    exhibits like Appendix B?

9      A.     Typically, they're not static or they're

10   not relevant.

11     Q.     Not static or not relevant.  And so I

12   understand --

13     A.     Right.  That means they don't -- they

14   don't have any purpose for the operation of the

15   games.

16     Q.     Okay.  I'm sorry.  I didn't mean to speak

17   over you.

18            I understand what you mean by "not

19   static."  And can you now define what you mean by

20   "not relevant."

21     A.     They have -- they have no purpose in the

22   operation of the games that are offered.

23     Q.     So to take an example -- and I -- I know

24   I'm partly asking you to speculate a little bit,

25   but -- so if we look at Appendix B once again.  I am

Page 126

1    on -- yeah.  Appendix B, let's just take page A-8.

2    As we can see, there's a series of strikes through

3    Classic Sevens Game Tile, Hot Tamales Game Tile,

4    et cetera.

5              Based upon your ordinary practice, do I

6    understand that what would happen here is that you

7    would -- the manufacturer would tell you that those

8    tiles are not used in this configuration of the

9    game, and then you would verify that that's the

10   case --

11        A.    Correct.

12        Q.    -- and then based upon that, you would

13   have struck out these tiles?

14        A.    Correct.

15        Q.    Okay.  Did you examine whether it was

16   possible to reconfigure the game in such a way that

17   these tiles would be used?

18        A.    Yes.

19        Q.    And what did you conclude?

20        A.    They -- they were not able to be enabled.

21        Q.    I'm sorry?  Say that again.

22        A.    These games were not -- there was no

23   ability to enable those games.

24        Q.    When you say "no ability," for whom?

25        A.    The operator specifically or the player.

1    rejected that argument.  So is it fair to say that

2    you disagree then that the existence of the preview

3    feature does not render the game a no-chance game?

4        A.    I have no opinion on the court's opinion.

5        Q.    Do you have an opinion as to whether or

6    not the existence of a mandatory preview feature

7    renders the game at issue in this case a no-chance

8    game?

9             MR. CRAIG:  Object to form.

10            THE WITNESS:  As I see it, to be a

11   gambling device, universally, across all 50 states,

12   you have to have consideration, chance, and prize.

13   BY MR. FINNERAN:

14       Q.    Okay.

15       A.    Eliminate any one of those three

16   elements, and you no longer have a gambling device.

17   I often refer to it as a three-legged stool.

18   Eliminate one of the legs, and the stool falls over.

19            If you know what the outcome is, then

20   you're eliminating that unknown element, which would

21   be considered chance.  So if you know what the next

22   outcome is, then there's no chance in what the next

23   outcome is.  It seems that the court is focused on a

24   hope of gain and not the next outcome, but the

25   outcome after that, which is really getting into

1    any significant differences.  But describe generally

2    to me what your examination of the No Chance Game

3    Suite 1 Terminal Version 2.3.0.23596 consisted of.

4         A.    If it helps, our examination and our

5    process was the same for all five.

6         Q.    Great.

7         A.    So we -- we look at these games from

8    three different perspectives:  from the

9    manufacturer's perspective, how they design their

10   software, how it's intended to work, and what's in

11   the source code because we do a source code

12   analysis; from the operator's perspective of what

13   features and options are available for the operator

14   that they can configure; and from a player's

15   perspective as to how the player interacts with the

16   game and how they play the game.  And that's the

17   three-prong approach.

18             Now, we can dig deeper on any one of

19   those, but the reports that we issued kind of get

20   into the details of the different game themes that

21   are available, and then the operator has the ability

22   to enable or disable any of those game themes.

23             How the player interacts with that,

24   there's usually a bill accepter on the exterior of

25   the machine.  They can put money in it.  But in

1          Q.      Okay.

2          A.      So the player had no access to it.   The

3    operator had no access to it.   The only games that

4    were available for the operator were the five games

5    offered there, and there's a list of them.   I saw

6    it.   It was on page -- in this Appendix B.   And it's

7    easily found in the report.

8          Q.      Yeah.

9          A.      I believe it's on the --

10         Q.      It's on the second --

11         A.      -- on the second page.

12         Q.      On the second page of the report, there's

13   a list of six games.

14         A.      Okay.   On page A-9 of the -- of

15   Appendix B, there's a list of the five games

16   offered -- or six games I guess.   So Kitty Kash,

17   Lucky Lollipops, Searing Sevens, Shammy Sevens,

18   Spooky's Loot, and Wheel Deal.

19         Q.      Okay.   Very helpful.   Thank you.

20         A.      Yeah.

21         Q.      So is it your testimony that it is not

22   possible for -- let's start with the player.

23         A.      Sure.

24         Q.      For a player of the game to access any of

25   the games other than the six listed on that page you

Page 140

1    machines and that the RNG picks the stop positions.

2          Q.    Right.

3          A.    And those stop positions are mapped to

4    the symbols that are going to be displayed.  Yes.

5          Q.    Okay.  So now turning -- to draw an

6    analogy here, make sure I'm understanding how this

7    machine works.  When you say there's a list of

8    predetermined outcomes, are those predetermined

9    outcomes dollar amounts or arrangements of the

10   pictures or some combination of the two?

11         A.    I'm not exact on that, but I think it's a

12   combination of the two.

13         Q.    Okay.  Can you explain what you mean by

14   that.

15         A.    I -- there's a database, and I

16   believe -- a table and a database.  And I believe

17   that the information in that contains the prize

18   value and like a mapping of the symbols that are

19   going to be there --

20         Q.    Okay.

21         A.    -- that will be presented.

22         Q.    Okay.  I don't believe I've seen anything

23   to reflect that in any of your reports.

24         A.    No.

25         Q.    How confident --

Page 141

1        A.    We didn't -- we didn't do that deep of a
2    dive, and I'm trying to pull this out of five years
3    of memory; so --
4        Q.    No, I understand.
5        A.    Yeah.
6        Q.    Well, you understand why I have to ask
7    the question as well; right?
8        A.    I do understand why you're asking the
9    question, and that's why I'm trying to give you an
10   answer, but I guess I'd rather not speculate.
11   Possibly, that's -- that's my best recollection, but
12   I am --
13       Q.    Okay.
14       A.    -- you know, stretching to try and recall
15   that.
16       Q.    Fair enough.
17             Why don't we -- why don't I try this:  So
18   the prize viewer --
19       A.    Yes.
20       Q.    -- does that display an amount, or does
21   that display a combination of symbols or both?
22       A.    My recollection it -- it presents a prize
23   value.
24       Q.    Okay.  So when you refer in your reports
25   then to the idea of the outcomes being predetermined

1    and knowable to the player, are you referring to the

2    dollar amount, the arrangement of symbols, or both?

3         A.    Well, it's reflected as a dollar amount.

4    So it's reflected as the prize value, and that's all

5    predetermined.

6         Q.    Right.

7         A.    Yeah.

8         Q.    And so am I correct that when you use the

9    word "outcome" in your -- your reports, you're

10   referring to predetermined outcomes, it's the dollar

11   amount you're referring to?

12        A.    The prize value.

13        Q.    Is there any way for the player to

14   predict what combination of reels of symbols will be

15   shown to him on the next play of the game?

16        A.    I don't recall if that's the case or not.

17   It's --

18        Q.    How would player --

19        A.    There is -- there's no -- I know that

20   there's no randomness in the software; so there's no

21   random selection of anything, no random selection of

22   game outcome, no random selection of the symbols, no

23   random selection of anything.  So that's

24   why -- that's why I'm recalling that the database,

25   the table and the database, contains the prize value

1    and a mapping of the symbols, because there's

2    nothing going on that would enable the symbols to be

3    selected, you know, from the pool.

4        Q.    Right.  But my question is now about the

5    prize viewer feature.  And so is there any way for

6    the player to predict what the assortment of symbols

7    will be on the screen by using the prize viewer

8    feature?

9        A.    I'll be honest with you, I don't know

10   what relevance that has.  If the player knows what

11   the prize value is, that's really what's important,

12   that they want to play for the prize value.  I mean,

13   what the symbols are that are going to be presented

14   for that prize, I don't know if it has any

15   relevance.  So I really don't know the answer to

16   your question, because I can't recall that, but --

17       Q.    We can -- we can determine the -- the

18   relevance of it, but I'm just asking the question.

19       A.    Sure.

20       Q.    Is there a way for the player to predict,

21   based upon viewing the prize viewer feature, what

22   symbols will then appear on the screen next to

23   indicate whether there's a win or not?

24       A.    I think that the player will be able to

25   see the prize, and if they want to examine the pay

Page 145

1  these games as well?

2      A.    I do.

3      Q.    Okay.  Would you agree with me that where

4  the -- what the various outcomes are on this

5  predetermined list about sequence list of outcomes,

6  that the winning outcomes are distributed randomly

7  within that sequence?

8      A.    There's nothing --

9          MR. CRAIG:  Object to form.

10          THE WITNESS:  There is nothing random

11  about anything in this software or the database.

12  BY MR. FINNERAN:

13      Q.    I'm not asking about what the software

14  does.  I'm asking about the distribution of the

15  winning outcomes in the list of sequential outcomes.

16          Is there -- is that random?

17          MR. CRAIG:  Object to form.

18          THE WITNESS:  No, it's not random.

19  BY MR. FINNERAN:

20      Q.    Is there any predictable sequence of

21  those numbers within the 100,000, let's say, pool?

22      A.    If we --

23          MR. CRAIG:  Object to form.

24          THE REPORTER:  Hold on.

25          THE WITNESS:  I'm sorry.  If you've

1  different Rolodexes:  one representing the 25-cent

2  Rolodex and the other, the 50-cent Rolodex.

3       Q.    I thought you told me that it was

4  one -- that it's one Rolodex but multipliers of

5  those different pools?

6       A.    So it's in a database, and the database

7  is able to track each denomination of the same

8  sequence.  So it's just here's times one, here's

9  time two, here's times four.  Okay.  25 cent,

10 50 cent, dollar.  And it just knows where each of

11 those denominations are in the same sequence.

12      Q.    Okay.  We talked a little bit about this

13 idea of entry points.  Is the determination of where

14 the game enters the sequence, is that -- how is that

15 determined by the machine?

16      A.    Banilla.

17           MR. CRAIG:  Object to form.

18           THE WITNESS:  Banilla determines the

19 entry point.

20 BY MR. FINNERAN:

21      Q.    Is it hard coded into the code of the

22 machine?

23      A.    It -- it is determined -- I'm not certain

24 on how they do it.  It is done by a human being at

25 Banilla.  They determine that entry point, and it is

Page 175

1    come back to it, but otherwise, we can be done with

2    that.  Let me make a note so I can try and track it

3    down.

4              Okay.  You don't need to reference your

5    report, but just referring to the five devices that

6    you were sent to review, we talked earlier you were

7    sent hard drives for those devices; is that correct?

8        A.    Yes.

9        Q.    Are you aware of any changes that were

10   made by either Banilla or Torch to the devices

11   before they were sent to you for review?

12       A.    Not that I'm aware of.

13       Q.    Okay.  Let me show you --

14             MR. FINNERAN:  What are we on?  I'm

15   sorry.

16             THE REPORTER:  9.

17   BY MR. FINNERAN:

18       Q.    I'm going to hand you what I've asked to

19   be marked for identification as Exhibit 9.

20       A.    Thank you.

21             (Farley Exhibit 9 marked.)

22   BY MR. FINNERAN:

23       Q.    Okay.  So this is an email chain, and as

24   with all email chains, it sort of goes in reverse

25   chronological order.  So if I bring you to the

1  Nick review everything and make sure that is the

2  only issue before we decide to make any change."

3           And then you can look at the top email,

4  if you'd like.

5           So, first of all, I read you a couple

6  other emails.  I assume you were not aware of those

7  emails either?

8       A.    Correct.

9       Q.    Okay.  We talked earlier about the

10  Appendix Bs to your reports --

11      A.    Yes.

12      Q.    -- that list all those files.

13      A.    Yes.

14      Q.    If there were changes made to the devices

15  after you had reviewed them, would that alter what

16  would appear in those Appendix Bs?

17      A.    Yes.

18      Q.    Would it potentially at least require a

19  new test then to validate that the machines actually

20  were, you know -- that your conclusions were still

21  true of the machines?

22           MR. CRAIG:  Object to form.

23           THE WITNESS:  It would change the

24  signatures, not that it would change the operation

25  of the game, but we would recommend that it be

Page 179

1    reevaluated and a new report be issued to ensure

2    that the signatures match what we reported upon.

3    That would be our recommendation.

4    BY MR. FINNERAN:

5         Q.    Right.  So you would not be able to say

6    your conclusion would change.  It might; it might

7    not?

8         A.    Correct.

9         Q.    But you would recommend that a new test

10   be done in order to ensure that your conclusion

11   still holds?

12             MR. CRAIG:  Object to form.

13             THE WITNESS:  Well, at the very least to

14   make sure that Appendix B is updated to reflect

15   the -- the correct software that's being utilized.

16             MR. FINNERAN:  Okay.  If I can mark this

17   as Farley Exhibit 10.

18             (Farley Exhibit 10 marked.)

19   BY MR. FINNERAN:

20        Q.    Okay.  This is an email chain branching

21   off the chain we just looked at before.  So if you

22   look at the very bottom of the email, you'll see

23   where it says, "Thank you, Jason.  Just make sure

24   we're talking about the same thing."

25             And if you'd like to refer back to the

1  set.  We just need you to verify the source code,

2  please."

3          First, have you seen these emails before?

4      A.    No, I haven't.

5      Q.    Do you recall a conversation with

6  Mr. Smith about source code around this time?

7      A.    I don't recall that.

8      Q.    Okay.  Is it fair to say that in putting

9  together any opinion or report or analysis

10  from -- on behalf of any client, you rely upon the

11  client providing you with accurate information about

12  their programs?

13      A.    Absolutely.

14      Q.    Okay.  I tried to get organized over

15  lunch, and it's already all gone to hell, but okay.

16          I would like to talk to you a little bit

17  more about some of the topics we were discussing

18  before our lunch break about the operation of the

19  Torch devices.

20      A.    Okay.

21      Q.    So we talked about the idea that the

22  Torch devices deliver outcomes within any particular

23  game and play level in a sequential order; correct?

24      A.    Yes.

25      Q.    Is there any way for a user to reset the

1      A.    Well, it's an electronic pull-tab, and

2   that's considered a -- a game of chance.

3      Q.    Okay.  Do you also agree then that

4   the -- well, we're going to argue about what the

5   word "contingent" means; so I'll skip that.

6          So now I want you to imagine -- well, let

7   me ask you this: Are there games that do involve

8   prize viewers where instead of having a sequentially

9   delivered set of outcomes, there's a randomly

10  selected set of outcomes using a random number

11  generator?

12     A.    I think some of the court decisions that

13  you presented to me earlier discussed that.

14     Q.    Indeed.

15          In your opinion, are those games games

16  that involve an element of chance?

17     A.    I really think that the prize viewer

18  takes out the element of chance from a gambling

19  device.

20     Q.    So in your view -- this -- what I'm

21  trying to get to is the prize viewer in your view is

22  the most important aspect of why the Torch devices,

23  in your opinion, are not either games of chance or

24  games that depend on future contingent events

25  outside the control of the player.  Is that fair to

Page 202

1    say?

2         A.    Okay.  I'll go with that.  I don't know

3    what "contingent" means, but you said it, and for

4    argument's sake, okay.

5         Q.    Let's -- let's stick with -- let's stick

6    with games of chance then, because we all agree on

7    what that is, I think.

8         A.    Sure.

9         Q.    So, in other words, the presence of the

10   prize viewer feature in your mind, because it gives

11   knowledge to the player of what the next outcome is,

12   in your view, that removes the element of chance in

13   the game that would otherwise be present; is that

14   correct?

15        A.    Absolutely.

16        Q.    Okay.

17        A.    That's what chance is, it's an unknown

18   event.

19        Q.    Okay.  So now I want you to imagine a

20   player who is unaware of the existence of the prize

21   viewer feature.  So they -- they see the words

22   "prize viewer" on the screen, but they don't

23   understand what it is and don't press the button.

24   If that player plays the game in that fashion, is

25   the player playing a game of chance?

Page 208

1    BY MR. FINNERAN:

2        Q.    I'm not asking about their intent.  I'm

3    asking about their ability to read the English

4    language.

5            MR. CRAIG:  Same objection.

6            THE WITNESS:  It goes to their intent.

7    If a player is intent to play this game and cannot

8    read what's on the screen, regardless of whether

9    they're illiterate or speak a different language,

10   that is their intent.  It doesn't change the game.

11   The game has the prize viewer feature, and that's

12   the way it was designed.

13   BY MR. FINNERAN:

14       Q.    Okay.  I think you said earlier that you

15   are not certain as to how the sequentially ordered

16   list of predetermined finite outcomes is initially

17   generated by Banilla; is that correct?

18       A.    Yeah, that's correct.  My understanding

19   is it's done by a human being.

20       Q.    Would you agree with me if instead it was

21   generated through a pseudorandom number generator,

22   then that would mean the game would involve an

23   element of chance?

24       A.    No.

25       Q.    Why not?

Page 209

1          A.    Because that pseudorandom number

2     generator is not existent on the device.  There is

3     nothing in the software installed in the Torch

4     devices that has the random number generator.

5          Q.    Okay.  So we talked a moment ago about an

6     electronic pull-tab machine.

7          A.    Yes.

8          Q.    Is there -- and I think we said there

9     were some examples of those machines that don't

10    involve random number generators?

11         A.    Some do; some don't.  Correct.

12         Q.    And so I think we agreed that those which

13    do not involve random number generators but which do

14    not involve any prize viewer feature are nonetheless

15    games of chance?

16              MR. CRAIG:  Object to form.

17              THE WITNESS:  They don't have a prize

18    viewer.

19    BY MR. FINNERAN:

20         Q.    Correct.

21         A.    Right.

22         Q.    So -- okay.  I think I understand, but

23    let me make sure we're on the same page.  What

24    you're saying is that even if the list of outcomes

25    were determined randomly, in your view, the

Page 210

1    existence of the prize viewer feature removes the

2    element of chance from the game?

3            MR. CRAIG:  Object to form.

4            THE WITNESS:  The prize viewer feature

5    eliminates that third leg of a stool that is the

6    element of chance.  Players know what -- what the

7    outcome is going to be; so there's no chance

8    involved in it.  There's no -- there's nothing

9    unpredictable about the outcome if you use the prize

10   viewer feature.

11   BY MR. FINNERAN:

12       Q.    Okay.  Is there any skill involved in the

13   operation of a Torch device by a player?

14       A.    Not that I'm aware of.  I mean, you can

15   use strategy to try and find the best outcome but

16   there's no skill.

17       Q.    Okay.  We talked about horse racing

18   earlier.  You brought up horse racing.  Would you

19   agree with me that horse racing is a game

20   where -- excuse me -- not horse racing.  That's the

21   same thing I mixed up with you earlier.  Betting on

22   horse racing is what I'm talking about.

23       A.    Sure.

24       Q.    A person who bets on a horse race, is it

25   fair to say that they are betting on a future

Page 225

1    finite pool."

2            And then if you skip two sentences

3    forward, it says, "After the selection of the first

4    game outcome starting point in the table of

5    predefined outcomes, the software does not randomize

6    or shuffle outcomes based on play, nor does it allow

7    operator interaction with the machine to alter the

8    predefined outcomes.  Neither the player" -- excuse

9    me -- "neither the operators nor the players have

10   the ability to affect the game outcomes that are

11   distributed from the finite pools."

12           First, did I read paragraph 7 correctly?

13       A.   Yes.  With the exception of skipping a

14   couple of sentences.

15       Q.   Correct.  Thank you.

16           So in both the first sentence and that

17   fourth sentence, you refer to after the initial game

18   outcome selected and after the selection of the

19   first game outcome starting point.  Prior

20   to -- well, let me start here.  How is the first

21   game outcome selected?

22           MR. CRAIG:  Object to form.

23           THE WITNESS:  So the first game outcome

24   is selected from the pool by an index that's

25   selected by Banilla Games.

Page 226

1    BY MR. FINNERAN:

2        Q.    When you say "selected by Banilla Games,"

3    what do you mean?

4        A.    Banilla determines the starting point in

5    the pool.

6        Q.    Okay.  You mean a human being at

7    Banilla --

8        A.    Yes.

9        Q.    -- makes that decision?

10        A.    A human being.

11        Q.    Okay.  Let me show you at page -- excuse

12    me -- paragraph 8.  It says -- wait a second.

13            Okay.  Sorry.  I meant paragraph 9.  It

14    says, "Because the game outcomes are determined

15    sequentially from the appropriate predetermined

16    finite pool and further because the prize viewer

17    feature will always have the game outcomes available

18    to be displayed to the player, if the player chooses

19    to utilize that feature on any given play of the

20    game on the Torch devices, chance does not play a

21    role."

22            First, did I read that paragraph

23    correctly?

24        A.    Yes.

25        Q.    And is that consistent with

Page 228

1    you could return to that, please.

2            A.      That would be my case file.

3            Q.      I'm sorry.  It's not Farley 2.

4                    Exhibit A to your report, which I believe

5    we've put in as an exhibit already.  I didn't mark

6    it unfortunately.

7                    MR. CRAIG:  It's 7.

8                    MR. FINNERAN:  7.

9                    MR. CRAIG:  This one (indicating).

10                   THE WITNESS:  That's my report on the No

11   Chance Game Suite I?

12   BY MR. FINNERAN:

13           Q.      Correct.

14           A.      Okay.

15           Q.      Thank you.

16                   Can I turn your attention to page 2 of

17   that document.

18           A.      Sure.

19           Q.      Okay.  At the very bottom of the page,

20   can you read that sentence with me that says, "The

21   first game outcome selected from each predetermined

22   finite pool is selected indiscriminately from a

23   table of predefined starting indices."

24                   And then it goes on to say, "The No

25   Chance Game Suite I Terminal then continues to

Page 229

1  deliver each of the game outcomes sequentially to

2  the player from the predetermined finite pools of

3  available game outcomes."

4            First, did I read that correctly?

5      A.    Yes, you did.

6      Q.    Okay.  So in that first sentence, you

7  used the word "indiscriminately."

8      A.    Yes.

9      Q.    Can you tell me what you mean by that?

10     A.    It -- there's no -- no apparent rhyme or

11  reason.  When we wrote this report, we didn't think

12  that it was relevant; so we used that term.  It

13  seems to have become relevant in recent history, and

14  since then I've learned that it is done by a human

15  being at Banilla.

16     Q.    So I need to understand --

17     A.    We wrote this report in 2018.

18     Q.    Yes.

19     A.    Yes.  So in 2018, we decided that there's

20  a starting point that's determined in the pool, but

21  we don't know how it's done.  I don't know how

22  important it is; so we're just going to say it's

23  done indiscriminately.

24     Q.    Okay.

25     A.    So it just gives an overarching method of

Page 230

1   determining that starting -- the starting index.  It

2   seems that now in this litigation and the Cole

3   County litigation it became an issue; so we dug

4   deeper, and we were able to learn that the starting

5   index is determined by a human being at Banilla

6   Games.

7        Q.     And is it your testimony that's true of

8   each of the five Torch devices that you considered?

9        A.     Yes.

10       Q.     And what is the basis for your belief

11  that this is determined by a human being?

12       A.     The testimony of Kevin Morse and

13  follow-up discussions with folks at Banilla Games.

14       Q.     Okay.  Is it based upon your own review

15  of the machines?

16       A.     Well, yeah, I mean, follow-up subsequent.

17  Well, I mean, we reviewed the machines, and then

18  this topic came up.

19       Q.     Right.

20       A.     And then we inquired as to how it's done.

21       Q.     Have you since revisited the source code

22  of the machines to confirm whether what Banilla, you

23  say has -- what they have said is actually true?

24       A.     Well, this wouldn't be in the source

25  code.

Page 231

1              MR. CRAIG:  Right.

2    BY MR. FINNERAN:

3         Q.    Why would it not be in the source code?

4         A.    Because it's done by a human being.

5         Q.    Well --

6         A.    It's the index in a database; so it's

7    done by a human being as to where that index is in

8    the database.  It has nothing to do with the source

9    code.  The source codes just looks at where it is

10   and goes to the next one.

11        Q.    But that assumes that Banilla's statement

12   that you are recounting that a human being does it

13   is correct.  My question is have you done anything

14   by reviewing the source code to confirm that there

15   is no other method by which the pool is -- the

16   starting position of the pool is chosen?

17             MR. CRAIG:  Object to form.  I think he

18   just testified that's impossible.

19             MR. FINNERAN:  I'm sorry.

20             MR. CRAIG:  He just testified that it's

21   impossible because it's not in the source code.

22   BY MR. FINNERAN:

23        Q.    Can you answer the question, please.

24        A.    It's not in the source code.  We did

25   review the source code, and the starting location is

1    not in the source code.

2         Q.    You've done so since hearing that from

3    Banilla?

4         A.    No.  We did it when we did this initial

5    review in 2018.

6         Q.    And you were confident based upon that

7    review now seven years -- sorry -- five years ago

8    that there's nothing in the source code that would

9    reflect something other than human choice dictating

10   which of the -- where the starting position is?

11        A.    There was nothing in the source code that

12   we saw that indicated where the starting position

13   would be in the code.

14        Q.    Okay.

15              THE REPORTER:  In the code?

16              THE WITNESS:  In the code, yes.  Sorry.

17              I'll take a swig of water.  I'm getting

18   soft.  I'm getting quiet.

19   BY MR. FINNERAN:

20        Q.    Have you -- have you been retained by

21   Banilla before?

22        A.    In what regard?

23        Q.    As an expert witness.

24        A.    Not by Banilla.

25        Q.    Have you been retained by an attorney

1          You can put those away.

2          You mentioned earlier -- I asked you this

3     question that the directory list in Appendix B to

4     each of your reports is a complete list of all the

5     files, whether struck through or not, on each

6     device; is that correct?

7          A.     That's my recollection, yes.

8          Q.     Does that include any SQL databases that

9     might be connected to or associated with the device?

10         A.     No.

11         Q.     Why does it not include that?

12         A.     SQL is not generally a software file; so

13    it's not in the software directory.  It's usually

14    separate, and the SQL database can't be signatured.

15         Q.     Just for the benefit of the court

16    reporter, SQL is S-Q-L, all capital letters;

17    correct?

18         A.     Correct, yes.

19         Q.     So when you say cannot be signatured,

20    what does that mean?

21         A.     There's no software associated; so trying

22    to use a signature tool, like our CRC-32, it doesn't

23    render any results that are meaningful.

24         Q.     Did you -- in the course of your analysis

25    of any of the five Torch devices you've reviewed,

1    scope of his opinions in the report.

2              THE WITNESS:  I cannot.

3    BY MR. FINNERAN:

4         Q.    You did examine the source code in

5    preparing your opinions; correct?

6         A.    One of my staff did.

7         Q.    Did you not personally examine the source

8    code?

9         A.    I did not.

10        Q.    Okay.  Did your staff report to you at

11   any point that there were random functions inside of

12   the source code for any of the Torch devices in your

13   report?

14             MR. CRAIG:  Object to form.

15             THE WITNESS:  They confirmed to me that

16   there were no random functions in there, but I don't

17   know where this source code came from.  You're

18   telling me it came from there.  I don't know that.

19   BY MR. FINNERAN:

20        Q.    I know.

21        A.    And I'll tell you right now, this wasn't

22   obtained legally.  He reverse engineered something

23   without permission from Banilla, which means that he

24   broke security codes to do that --

25        Q.    Well --

1    that he hasn't actually personally reviewed the

2    source code, I think we're going to be done with

3    this pretty soon.

4              I just want to ask a couple questions

5    about Farley 18.  Again, the same representation

6    with respect to Farley 18, this is an excerpt of

7    source code from an independently sourced device

8    that TNT purchased that matches the version number

9    and name of the second device in Mr. Farley's

10   report.

11             MR. CRAIG:  We'll designate it as

12   confidential, attorneys' eyes only.

13   BY MR. FINNERAN:

14        Q.    Okay.  So here do you see a statement

15   that says, "DECLARE@randomIndexId"?

16        A.    Yes.

17        Q.    Can you tell me what the declare function

18   means.

19             MR. CRAIG:  Object to form.  Beyond the

20   scope of his testimony and opinions in this case.

21             THE WITNESS:  I'm under a nondisclosure

22   agreement, and I'm not at liberty to discuss source

23   codes for Banilla.  And Banilla is not a party in

24   this case.

25   // // //

Page 256

1    BY MR. FINNERAN:

2        Q.    That's true.

3        A.    So I'm very uncomfortable with this line

4    of questioning and you asking me specific questions

5    about code that you're alleging is Banilla's, which

6    was acquired, quite honestly, illegally.  It was

7    hacked.  And I know of another lawsuit filed against

8    another expert who did the same thing, and I'm

9    not -- I'm not at liberty to discuss the source code

10    for Banilla in this matter because I'm under a

11    confidentiality agreement.

12        Q.    What is that -- I'm not aware of this

13    confidentiality agreement; so tell me what

14    confidentiality agreement you're under.

15            MR. CRAIG:  I think that I'll object to

16    that.

17    BY MR. FINNERAN:

18        Q.    With whom -- with whom -- who is a party

19    to this confidentiality agreement?

20        A.    I'm not positive if it's Banilla or

21    Grover but one of their two companies.

22        Q.    Okay.  And I understand the -- the

23    agreement made prevents you from revealing some

24    information to me without violating the agreement.

25    What -- can you describe generally what source of

Page 259

1    that that is somehow unethical or illegal?

2         A.    I do.

3         Q.    Okay.  Does that prevent -- does that

4    prevent you from answering my questions?

5         A.    I don't think it's appropriate for me to

6    discuss what you're portraying to me as Banilla's

7    source code when I'm under a nondisclosure agreement

8    with Banilla.

9         Q.    Okay.

10              MR. FINNERAN:  Aaron, if you -- will you

11   instruct him to answer?  If not, we'll have

12   to -- we'll preserve objection on this.

13              MR. CRAIG:  Can you preserve an objection

14   on this because it'll be interesting as to how you

15   describe this to the court, and I will have

16   objections.

17              MR. FINNERAN:  I understand.

18   BY MR. FINNERAN:

19        Q.    So I just want to be clear, Mr. Farley,

20   are you refusing to answer any questions about the

21   source code I put in front of you on the basis of

22   your nondisclosure agreement with Banilla?

23        A.    In part of because of it, yes.

24        Q.    What is the other reason?

25        A.    I don't think it was ethically obtained,

Page 264

1    do you know how Stacy Friedman even got to this

2    screen?

3              MR. FINNERAN:  I have a basic

4    understanding, but not with the level of depth that

5    I'm sure that either Mr. Farley or Mr. Friedman

6    would have.

7              MR. CRAIG:  Okay.  I mean, therein lies

8    the rub; right?

9              MR. FINNERAN:  I understand.

10             MR. CRAIG:  Okay.  All right.  Ask him

11   your question.

12   BY MR. FINNERAN:

13       Q.    I am -- I will ask you the question.

14             Do you understand what the declare

15   function does in the code that you're looking at in

16   Farley 18?

17       A.    I am not at liberty to discuss that as

18   you've portrayed this as Banilla's source code.

19       Q.    Okay.  So am I understanding that to the

20   extent that I ask you questions about Exhibit 18 and

21   what is contained in Exhibit 18, you believe you

22   cannot answer those questions without violating your

23   confidentiality agreement with Banilla and therefore

24   will not answer those questions?

25       A.    Correct.  And I may have already violated

Page 265

1    it in 14 through 17; so I'm going to request that if

2    you want me to discuss source code for Banilla, that

3    you get me a court order and that you get me

4    authentic source code from Banilla.

5        Q.    Okay.  And so with respect to 14 through

6    17, if I ask you a question about the text on 14

7    through 17 at this point, will you give me the same

8    answer?

9        A.    Yes, I will.

10       Q.    Okay.  Thank you.  I respect that.

11       A.    Thank you.

12       Q.    All right.  Okay.  We talked earlier

13   about how you're not an attorney.

14       A.    Correct.

15       Q.    And so you are not purporting to issue

16   any opinion about the legal -- the meaning of any

17   statute in Missouri.

18            Is that fair to say?

19       A.    I wouldn't be giving any legal opinion

20   unless the court asked me to.

21       Q.    Right.  That said, in the course of doing

22   your work, do you typically review any relevant

23   regulations or statutes in the course of doing your

24   work?

25       A.    Yes.

Page 266

1           MR. CRAIG:  Object to form.

2           THE WITNESS:  Yes, we review relevant

3    statutes and regulations in the course of our

4    everyday work.

5    BY MR. FINNERAN:

6       Q.    Do you also review any case law or

7    guidance from regulatory agencies?

8           MR. CRAIG:  Object to form.

9           THE WITNESS:  Regulatory agencies rarely,

10   if ever, provide us with case law.

11   BY MR. FINNERAN:

12      Q.    Oh, sorry.  My question was confusing.

13           Do you ever review any case law?

14      A.    If it's provided for me to review, I'll

15   review it.

16      Q.    Okay.  What about guidance from

17   regulatory agencies, would you typically review that

18   in the course of doing any review or analysis?

19      A.    Every day.

20      Q.    Okay.  In the course of your work in this

21   case, did you review any of the Missouri statutes

22   that define the terms "gambling" and "gambling

23   devices"?

24      A.    I believe I was provided a deposition.  I

25   don't recall if it was this case or the Cole County

Page 267

```
 1   case.
 2          Q.     Okay.
 3                 THE REPORTER:  I'm sorry.  Cole?
 4                 THE WITNESS:  Cole, Cole County, C-O-L-E.
 5   BY MR. FINNERAN:
 6          Q.     Are you familiar with -- whether it was
 7   here in the Cole County case, are you familiar with
 8   Missouri laws relating to gambling and gambling
 9   devices?
10          A.     If you've got something that you want me
11   to look at to refresh my memory, that would be
12   wonderful.
13          Q.     Fantastic.  I will do just that.
14                 MR. FINNERAN:  Farley --
15                 THE REPORTER:  19.
16                 MR. FINNERAN:  -- 19.
17                 Here you go, Aaron.
18                 THE WITNESS:  That's yours.
19                 MR. FINNERAN:  I'll figure that out --
20                 THE WITNESS:  Keep them all with the
21   exhibits over there.
22                 Thank you.
23                 (Farley Exhibit 19 marked.)
24   BY MR. FINNERAN:
25          Q.     So I've handed you a copy of Missouri
```

1    Revised Statute 572.010, chapter definitions.  Is

2    this a section of the statute that you recall

3    reviewing previously?

4         A.    I think I've seen it.

5         Q.    And -- and have you familiarized yourself

6    with it in the course of this case?

7         A.    I don't recall that.  I saw some

8    preliminary proposed legislation to changes for

9    this --

10        Q.    Uh-huh.

11        A.    -- but I really focused on the edits and

12   changes.

13        Q.    Okay.  And I recall you actually attached

14   those bills as exhibits to your report; is that

15   correct?

16        A.    Yes, uh-huh.

17        Q.    But you don't have a specific -- well,

18   strike that.

19             So I'm going to just go through a few of

20   these definitions with you real quick.

21        A.    Sure.

22        Q.    So the first is Number 3.  Do you see

23   where it says a "Contest of Chance."

24        A.    Yes.

25        Q.    And so it says, "Any contest, game,

Page 269

1    gaming scheme, or gaming device in which the outcome

2    depends in a material degree upon an element of

3    chance, notwithstanding that the skill of the

4    contestants may also be a factor therein."

5            So, first, did I read that correctly?

6        A.    Yes.

7        Q.    Second, you've used the term "chance" in

8    the course of your reports.  Is your use of that

9    term consistent with the definition here in the

10   Missouri statute, or do you think there's any

11   difference?

12       A.    Well, the definition of "contest of

13   chance" includes the word "chance"; so --

14       Q.    Well, that's true.

15       A.    -- it becomes a little confusing --

16       Q.    Fair enough.

17       A.    -- and ambiguous.

18       Q.    Fair enough.  That's -- that's fair.

19            Let's then turn to -- to the word

20   "gambling," which is the next section.

21       A.    Sure.

22       Q.    It says, "a person engages in gambling

23   when he or she stakes or risks something of value

24   upon the outcome of a contest of chance or a future

25   contingent event not under his or her control or

Page 270

1   influence upon an agreement or understanding that he

2   or she will receive something of value in the event

3   of a certain outcome."

4           First, did I read that correctly?

5       A.    Yes, you did.

6       Q.    Second, does that match your

7   understanding of how you would use the word

8   "gambling" in any report or testimony you've given?

9           MR. CRAIG:  Object to form.

10          THE WITNESS:  There is -- there is a

11  statement in this definition that says "future

12  contingent event not under his or her control or

13  influence."

14  BY MR. FINNERAN:

15      Q.    Yes.

16      A.    And I don't know what "contingent" means

17  in that context.

18      Q.    Okay.  Fair enough.

19          I think you testified earlier that in

20  your experience, gambling or gambling devices,

21  gambling games, involve three elements, those being

22  prize, consideration, and chance?

23      A.    Correct.

24      Q.    Is it fair to say that your testimony and

25  opinions in this case all are based upon the notion

1  that those three things are essential elements of a

2  device being a gambling device?

3      A.    Yes.

4      Q.    So as you just saw here, Missouri

5  actually has a broader definition that includes not

6  only a contest of chance, but also a future

7  contingent event not under the player's control or

8  influence?

9          MR. CRAIG:  Object to form.  Misstates

10  the law, and it's your opinion that it's broader.

11  BY MR. FINNERAN:

12      Q.    Okay.  As we just discussed, the words

13  "future contingent event not under his or her

14  control or influence" are in the Missouri statute.

15          You see them; correct?

16      A.    Yes.

17      Q.    Have you rendered any opinion in this

18  case as to whether or not the Torch devices involve

19  a future contingent event not under his or her

20  control or influence?

21      A.    I'm unclear as to what is meant by

22  "contingent," and I don't want to make assumptions

23  because it is a legal term here.

24      Q.    Fair enough.

25          So is it fair to say you then have not

Page 272

1    rendered an opinion as to whether or not that

2    element is satisfied for any of the Torch devices?

3         A.    I -- I -- I don't think that it violates

4    that because, I mean, if you take "contingent" out

5    of that, I think that it doesn't violate any of

6    that.  But I don't know why "contingent" is in

7    there.  I mean, I have thoughts of what "contingent"

8    means, but I'm -- I'm not going to even venture to

9    go out -- go there because it's a legal term.

10        Q.    Okay.  So my question was have you -- so

11   am I understanding your answer correctly that you

12   have not then formulated an opinion as to whether

13   the Torch devices involve a future contingent event

14   not under the control or influence of a player?

15        A.    I have no opinion on that at this point.

16        Q.    Okay.  Can I turn you to page 5.  Not

17   page 5.  Excuse me.  Number 5.

18        A.    Gambling device.

19        Q.    Yes.

20        A.    Sure.

21        Q.    So I'll just read this into the record.

22   Gambling device says, "Any device, machine,

23   paraphernalia, or equipment that is used or usable

24   in the playing phases of any gambling activity,

25   whether that activity consists of gambling between

Page 291

1    then.

2           A.    All right.

3           Q.    All right.  I suspect I know your answer,

4    but is there any way that an operator, through the

5    operator settings on any of the Torch devices, could

6    change those settings in such a way that the game

7    would involve an element of chance?

8           A.    No, there's no way to do that.

9           Q.    As we discussed before, the prize viewer

10   feature is a key component in your view of why you

11   believe these devices do not involve an element of

12   chance?

13          A.    Yes.  It's also the key component in why

14   this is a no-chance game and the whole design behind

15   the NCG series.

16          Q.    If we were to walk down the street to a

17   casino here in Las Vegas -- I probably don't need to

18   go to a casino.  I think I could walk -- walk even

19   less farther than that -- and we were to find what

20   we would all agree is a slot machine game, and that

21   machine were to simply have incorporated into the

22   software a prize viewer feature, in your view, would

23   that also be sufficient to make that device not a

24   game of chance?

25               MR. CRAIG:  Object to form.  Calls for

Page 310

1  pool?

2          A.    That wasn't clear.

3          Q.    Okay.  My question, though, is, is how

4  does the programmer, who you say at Banilla would

5  set this to your understanding, how does that

6  programmer decide at which entry point to set each

7  of the different games of play levels?

8          A.    I don't know.

9          Q.    Okay.  Do you believe it to be a random

10  selection?

11          A.    I -- I don't know.

12          Q.    Okay.  We also talked about the -- the

13  lists themselves --

14          A.    Sure.

15          Q.    -- of predetermined sequential outcomes.

16  Do you know how those lists are generated?

17          A.    Again, recalling testimony from

18  Kevin Morse's deposition, I believe he said that

19  they -- there was a group at Banilla, including the

20  vice president of software development, that -- that

21  built -- that built the pool manually and put it in

22  sequence.

23          Q.    Okay.  And so when you say "manually," do

24  you mean that the sequencing of the pool was done

25  without any computer assistance?

Page 311

1          A.     It may have been put into a computer, but

2     it was done -- you know, they started out on paper

3     and then put it into a computer.

4          Q.     So it's your understanding and belief

5     that a human being for each of 100,000 outcomes in

6     each of these pools, or 75,000 as the case might be,

7     manually selected each one of those outcomes to

8     create these sequential lists?

9          A.     That's my --

10               MR. CRAIG:  Object -- object to form.

11    Don't speculate.  You can answer.

12               THE WITNESS:  My understanding is that,

13    yes, a human being put together all 60,000, 75,000,

14    100,000, whatever it was.

15    BY MR. FINNERAN:

16         Q.     Okay.  So the devices you've reviewed

17    were five different exemplar devices that were sent

18    to you by Torch; is that correct?

19         A.     No.  Banilla provided us with the

20    software to install in the cabinet in our -- at our

21    lab.

22         Q.     Thank you.

23               The software you received was received on

24    a hard drive --

25         A.     Yes.

1      Q.   -- for each of the devices?

2      A.   Yes.

3      Q.   Okay.  Are you able to indicate whether

4  any of those devices were actually played at a

5  location in the state of Missouri?

6      A.   Am I able to?

7      Q.   Yeah.  Do you know?

8      A.   I don't know.  I don't know, but am I

9  able to verify if what's in operation is the same?

10  That's why we put together Appendix B.

11     Q.   Right.  So, in other words, you have not

12  independently confirmed at this point that any

13  particular device at any location in Missouri does

14  match what's in Appendix B to your reports that are

15  Exhibits A, B, C, D, or E to your main report.

16        You've not validated that at this point;

17  is that correct?

18      A.   That's correct.

19     Q.   But it is your belief that by preparing

20  Appendix B, it's capable to be -- it's possible for

21  a person then to validate that the machine you

22  reviewed is operationally equivalent to any machine

23  that might be in any store in Missouri?

24      A.   Yes.

25     Q.   We talked earlier about the kinds of

Page 324

1                    REPORTER'S CERTIFICATE
2
    STATE OF NEVADA         )
3                           ) ss
    COUNTY OF CLARK         )
4
5           I, Suzanne M. Stone, a duly certified court
    reporter licensed in and for the State of Nevada, do
6   hereby certify:
7           That I reported the taking of the deposition
    of the witness, NICOLA FARLEY, at the time and place
8   aforesaid;
9           That prior to being examined, the witness was
    by me duly sworn to testify to the truth, the whole
10  truth, and nothing but the truth;
11          That I thereafter transcribed my shorthand
    notes into typewriting and that the typewritten
12  transcript of said deposition is a complete, true
    and accurate record of testimony provided by the
13  witness at said time to the best of my ability.
14          I further certify (1) that I am not a
    relative, employee or independent contractor of
15  counsel of any of the parties; nor a relative,
    employee or independent contractor of the parties
16  involved in said action; nor a person financially
    interested in the action; nor do I have any other
17  relationship with any of the parties or with counsel
    of any of the parties involved in the action that
18  may reasonably cause my impartiality to be
    questioned; and (2) that transcript review pursuant
19  to FRCP 30(e) was requested.
20          IN WITNESS WHEREOF, I have hereunto set my
    hand in the County of Clark, State of Nevada, this
21  18th day of Dec
22
23              Suzanne M. Stone, CCR 970, RPR
24
25