# Exhibit 47

Deposition of Sondra Miltenberger

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TNT AMUSEMENTS, INC., )
d/b/a PLAY-MORE COIN-OP, )
)
Plaintiff, )
)
vs. ) No. 4:23-cv-00330-JAR
)
TORCH ELECTRONICS, LLC, )
STEVEN MILTENBERGER, and )
SONDRA MILTENBERGER, )
)
Defendants. )

VIDEO-RECORDED DEPOSITION OF SONDRA MILTENBERGER
TAKEN ON BEHALF OF THE PLAINTIFFS
DECEMBER 8, 2023

INDEX

WITNESSES


ALL WITNESSES PAGE

For Plaintiffs

SONDRA MILTENBERGER

Examination by Mr. Finneran 9


EXHIBITS


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Exhibit A list of Agreed Locations | 49 |
| Exhibit 2 | No Contest/No Chance Amusement Device sticker affixed to a Torch device | 63 |
| Exhibit 3 | About No Chance Gaming article from Torch website | 66 |
| Exhibit 4 | About No Chance Games article from Torch website | 68 |
| Exhibit 5 | MGC July 3, 2019, letter to St. James VFW Post 5608 | 82 |
| Exhibit 6 | Missouri MSHP Probable Cause Statement dated 10/5/2020 | 84 |
| Exhibit 7 | Information In A Misdemeanor Case against James McNutt | 85 |
| Exhibit 8 | Petition for Forfeiture Pursuant to Missouri Revised Statute Section 513.660 | 86 |

EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Investigative Subpoena to Torch Electronics dated July 16, 2021 | 88 |
| Exhibit 10 | Decision Rendered on March 24, 2020, in Mayle Bingo v. Ohio Department of Public Safety | 89 |
| Exhibit 11 | Decision decided on March 13, 2020, in Gracie Technologies, Incorporated, versus Commonwealth of Pennsylvania | 90 |
| Exhibit 12 | Decision in Gift Surplus versus State of North Carolina, 2/11/2022 | 91 |
| Exhibit 13 | Plaintiff TNT Amusements, Inc.'s First Set of Interrogatories | 115 |
| Exhibit 14 | Plaintiff TNT Amusements, Inc.'s First Requests for Production | 115 |
| Exhibit 15 | Plaintiff TNT Amusements, Inc.'s Second Requests for Production | 117 |
| Exhibit 16 | Plaintiff TNT Amusements, Inc.'s Second Set of Interrogatories | 117 |
| Exhibit 17 | Probable Cause Statement dated 12/14/2019 | 118 |
| Exhibit 18 | 11/6/2019 letter from Timothy Sigmund to Shiante McMahon with attachment | 119 |
| Exhibit 19 | 7/5/2019 email, Subject: Fwd: MGC letter, with attachment | 120 |

EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 20 | Application and Affidavit for Search Warrant for Evidence of a Criminal Offense, dated 8/12/2021 | 121 |
| Exhibit 21 | 1/21/2019 letter from Timothy Sigmund to John Hessel | 122 |
| Exhibit 22 | 11/8/2018 letter from Timothy Sigmund to David Bandre | 122 |
| Exhibit 23 | Picture of children playing a Torch device | 123 |
| Exhibit 24 | Picture of people playing a Torch device | 123 |
| Exhibit 25 | Missouri Revised Statute 572.010 | 131 |


(Exhibits attached to transcript.)

.oOo.

VIDEO-RECORDED DEPOSITION OF WITNESS, SONDRA MILTENBERGER, produced, sworn and examined on the 8th day of December, 2023, at the offices of Bryan Cave Leighton Paisner, 211 North Broadway, Suite 3600, St. Louis, Missouri, before Tara Schwake, a Registered Professional Reporter, Certified Realtime Reporter, Certified Shorthand Reporter (IL), Certified Court Reporter (MO), and Notary Public within and for the State of Missouri.

APPEARANCES

FOR THE PLAINTIFF:
BRYAN CAVE LEIGHTON PAISNER, LLP
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000
by: Mr. Richard Finneran
Ms. Mary Grace Warren
richard.finneran@bclplaw.com
marygrace.warren@bclplaw.com

FOR THE DEFENDANTS:
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
(816) 256-3181
by: Mr. J. Aaron Craig
acraig@gravesgarrett.com

FOR THE WITNESS:
SIGMUND BROWNING, LLC
305 East McCarty Street, Suite 300
Jefferson City, Missouri 65101
(573) 635-7699
by: Mr. Timothy T. Sigmund
tsigmund@msblawfirm.com

COURT REPORTER:

TARA SCHWAKE, CRR, RPR, CCR, CSR
TIM PERRY, CLVS, Videographer
Veritext Legal Solutions
701 Market Street, Suite 310
St. Louis, Missouri  63101
(888) 391-3376
calendar-midwest@veritext.com

IT IS HEREBY STIPULATED AND AGREED by and between Counsel for Plaintiff and Counsel for Defendants that this deposition may be taken by Tara Schwake, Notary Public and Certified Realtime Reporter, thereafter transcribed into typewriting, with the signature of the witness being expressly reserved.

* * * * *

(Deposition commenced at 9:17 AM.)

THE VIDEOGRAPHER: Good morning. We are on the record at 9:17 on December 8, 2023. This is media unit one of the video-recorded deposition of Sondra Miltenberger taken by counsel for Plaintiff in the matter of TNT Amusements, Inc., versus Torch Electronics, LLC, et al., filed in the US District Court for the Eastern District of Missouri, Eastern Division, Case Number 4:23-cv-00330.

This deposition is being held at Bryan Cave Leighton Paisner at 211 North Broadway in St. Louis, Missouri. And my name is Tim Perry, Certified Legal Video Specialist. Our certified court reporter is Tara Schwake. We are with Veritext Legal Solutions.

And, Counsel, I would ask you now to introduce yourselves for the record, please.

MR. FINNERAN: Richard Finneran on behalf of Plaintiff, TNT Amusements, and accompanied by my colleague, Mary Grace Warren.

MR. CRAIG: Aaron Craig on behalf of Defendants.

THE VIDEOGRAPHER: Thank you. Tara, please swear in the witness.

* * * * *

SONDRA MILTENBERGER,

of lawful age, having been produced, sworn, and examined on the part of the Plaintiffs, testified as follows:

EXAMINATION

QUESTIONS BY MR. FINNERAN:

Q Hello, Ms. Miltenberger, would you please just state and spell your name for the record?

A Sure, it's Sondra, and it's spelled S-o-n-d-r-a, Miltenberger is spelled M-i-l-t-e-n-b-e-r-g-e-r.

Q And that is your married name?

A Yes.

Q What's your maiden name?

A Walther, W-a-l-t-h-e-r.
Q Okay. And how long have you been married to your husband?
A We just celebrated our 25th.
Q Congratulations.
A Thank you.
Q What's your husband's full name?
A Steven, S-t-e-v-e-n, and Miltenberger, M-i-l-t-e-n-b-e-r-g-e-r.
Q Great. So we're going to -- I'm going to go over some ground rules with you real, real quick first. I know that being deposed is not a comfortable proposition for anybody, but my goal is not to make this more uncomfortable than it has to be. So hopefully if we can agree on a few ground rules, it'll just make it easier as we go through the day.
A Yes.
Q So the first thing is that, as you know, we've got a court reporter here who is transcribing everything that we say. So it's important for that reason we not talk over each other. It's really for her benefit because we want to make sure there's a clear record. She'll yell at us if we start doing it, but if we can try to

remember to just, I ask a question, you give an answer, I'll wait for your answer to be done before I ask my next question and we'll just proceed in that fashion. Is that okay?

A Yes, sir.

Q Um, secondly, you know, it may be that I ask a question that's confusing to you, or doesn't make sense to you. If that's the case, you're welcome to ask the court reporter to repeat it. You're welcome to tell me you don't understand and ask my to clarify and I'll do my best to do so. But if you give me an answer to a question, then I'm going to presume that means you understood the question and you know what I'm asking for.

A That's fine.

Q Okay. You also, any time you need to take a break, you can take a break, you just need to say "Can we take a break" and you and your attorney can step out and speak during the deposition any time you like. The only exception to that rule is you can't do that while a question is pending. So if I've asked you a question, you need to give an answer to the question before we take the break.

A Okay. Yes, sir.

Q And finally, I'm going to be asking you about, you know, communications you've had with people and conversations you've had with people. One conversation I'm never interested in is a conversation you've had with any of your attorneys.
A Okay.
Q So if I ask you a question that calls you -- calls for you to have to answer it by revealing a communication with your attorney, you need to say, "I'm sorry, the only communications I've had about that are with my attorney," or something along those lines, and that way we'll move on from that.
A Okay.
Q We're not trying to invade your privilege with your lawyer. That's your right, and so we're not trying to get into that.
A Yes, sir.
Q Does that all make sense?
A Mm-hmm.
Q Okay. If you have any questions in the process, you know, we can always take a break and you can talk with your lawyer, so.
A Okay.
Q Again, I'm trying to make this as

-- as comfortable as it can be under the circumstances.

A Mm-hmm. Thank you.

Q So first, have you ever been deposed before?

A No.

Q Okay. Well, then I guess those were all new ground rules for you. Have you ever testified in a courtroom before?

A No.

Q Have you ever given any testimony under oath orally?

A No.

Q Okay. All right. You're the first person I've had the chance to depose from Torch or affiliated with Torch and so a lot of my questions in the beginning at least are going to be very basic questions, I think.

A Okay.

Q Obviously, if you don't know the answer to a question, you can just tell me you don't know the answer.

But why don't we start by just telling me what is your role, as you would describe it, at Torch Electronics?

A Um, I do the accounting work and -- basic accounting and the -- the payroll for Torch Electronics.
Q Okay. Do you have a title?
A Um, no. Um, that's basically just the way to put it. Steven's wife. Um, I would -- I would say just that. There's no reason for a title to me actually.
Q That's fair. Do you have your signature block on your emails or your letters -- you don't have --
A Yeah, I do. I do. Just, you know, my name and then "Torch Electronics" and then "accounting/payroll," so.
Q Okay.
A And it's really basic accounting. It's not, you know, we -- it's not -- I don't do the big stuff, you know. It's just basic.
Q And can you describe to me what you mean by that? So when you say the basic versus the big stuff, where do you -- tell me what you do and what you don't do?
A What I don't do is I don't do our taxes, our income taxes. And I -- that's basically that part of the big part. The smaller part is

like bank reconciliations and accounts payable.
Q Okay.
A Yeah.
Q Is that the entirety of your role, then, is accounts payable and -- and accounting?
A Mm-hmm.
Q Do you have any -- sorry, is that a yes or a no?
(Simultaneous speaking - inaudible.)
Q (BY MR. FINNERAN) You got to say yes or no for the record.
A Oh, I'm sorry, yes. Yes.
Q Do you -- do you have any involvement with sales?
A No.
Q Any involvement with marketing?
A No.
Q Do you communicate with the customers? I say "customers," let me define that. The people who you place devices with, do you --
A No.
Q -- typically have communications with them?
A No.
Q Okay. And please don't talk over me

when I'm asking the question. Again, it's fine. We just got to get used -- we got to get in that rhythm so we don't drive her crazy all day.

Okay. So then tell me how, um, how you first came to be involved in Torch, was it at the very beginning, and tell me the story of how Torch came to be, if it was.

A Um, goodness. Um, Steven and I just been through a lot and I want to just -- basically 2015, 2016, Steven started the business. Um, I actually was -- and I didn't talk this over with Aaron, but I was -- I was a direct sales for 31, it's actually -- it's an independent sales company like Mary Kay and all that.

Q Mm-hmm.

A And I did that for about six or seven years, and then I seen we were growing and he needed assistance and I've worked with Steven before. Actually, we've worked together all of our marriage. And so then I started helping him probably '17 -- 2017, 2018, and then that was -- that's where I kind of started. So. Yeah. Yeah.

Q Okay. Um, so you said that when the business first started, you didn't have any involvement in it then; is that what I understood

your answer to be?
A No, but -- no.
Q Oh. No, you did not have any involvement or --
A No, I didn't have any involvement, yeah.
Q Okay. So, and you said it was probably then around 2017 where you started to become involved?
A Yes, sir.
Q Okay. Do you have an ownership interest in the business?
A No.
Q How -- who owns Torch?
A Steven --
Q A hundred percent?
A -- Miltenberger, my -- my husband. Yes.
Q Okay. And make sure we don't talk over each other. So that's partly my fault, but I'll try to do better.
A Sorry.
Q Okay. Do you have any people, then, -- well, first of all, let me ask this. Does Torch have any employees other than yourself and your

husband?

A No.

Q Am I correct everybody else is considered an independent contractor?

A Yes, sir.

Q Okay. Given that, are there any people that you would say report to you among the independent contractors where you're their supervisor or their direct report?

A No.

Q Okay. So you don't handle the accounting of the taxes, I heard. So who is your accounting firm that you -- your outside accounting firm, or do you have one?

A We do. Actually, they are here based in St. Louis. It's Wolff and Taylor.

Q Okay.

A Yeah.

Q And can you spell Wolff for me?

A Wolff is spelled W-o-l-f-f, and Taylor.

Q Okay. And Taylor with a T-a-y-l-o-r?

A Yes. Yes.

Q Okay. All right. So then just maybe describe for me on a day-to-day basis, as of today,

what would your day-to-day work look like for Torch in general?

A Oh, goodness. I -- basically just making sure that the bank reconciliations, um, you know, I work on those, and -- gosh. Paying the bills, um, and, um, I don't know.

Q Okay. That's a good enough answer for the moment. So then what's Steven's title with Torch; do you know?

A Well, he's basically the manager because it's an LLC.

Q Mm-hmm.

A So it's not a incorporated business.

Q Right.

A So.

Q So manager is his title?

A Yes.

Q Do you know if he also holds the title of president?

A Yeah, I mean it's there but it's -- most of the time legal wise, legally, it's manager.

Q Okay.

A So, yeah, I mean with it being an LLC far as --

Q Mm-hmm. Okay. We just discussed a

moment ago what your job duties are today. Are those similar to what your job duties would have been at the beginning and all the way through, or have they changed over time?

A Um, I don't remember. I don't remember. It's just been just -- yeah. I don't remember.

Q Okay. Do you take a salary from Torch?

A Yes.

Q And what is your salary?

A 4,000 -- 4,500. 4,500 a week.

Q And has that been the case that you've taken a salary throughout your time with Torch?

A Yes.

Q Has the amount of the salary changed?

A No.

Q Okay. Do you -- do you have any additional commissions or bonuses that are available to you?

A No.

Q Okay. You said that Steven's the manager of the business. Are you a manager of the business?

A No.
Q Okay. All right. That covers some of this. Okay. So you said that the other individuals are independent contractors. Is there any hierarchy among the independent contractors in terms of is there someone who supervisors a group of them or anything like that?
A No.
Q Okay. Can you tell me the kind of roles the independent contractors generally carry out?
A Basically they -- we have locations and they basically just audit the -- audit the locations and that's really all I know. Steven -- Steven handles the majority of that.
Q Okay. But you --
A Actually all of that.
Q But you also do the payroll; right?
A Yes.
Q And that's for everybody in the company?
A Yes.
Q Okay. So are you aware of salespeople as well?
A Am I aware of salespeople?

Q Yeah, who are independent contractors for Torch?

A You mean for -- like they are salespeople but they're independent contractors?

Q I guess maybe does Torch retain anybody as an independent contractor who does a sales function?

A No.

Q No. Does Torch retain anybody who -- who does a sort of customer relations function?

A No.

Q Okay. So when you say that they audit the locations then, can you describe to me what you mean by that?

A Um, basically it's just they, you know, they go into the locations, there may be like four, um, machines in there, and then they basically, you know, once a week, sometimes more but not usually, but they basically just go in and -- and basically balance the numbers and then, um, we give the location half of the revenue that those machines have take -- have made and then we take the other half.

Q Okay. When you say "balance the numbers," what are they -- what are they reviewing

or looking at to, quote, "balance the numbers"?
A Basically little slips of paper that are printed off from the machines and then the cash that's put into the machine. They make sure those numbers balance each other, like they equal each other basically, yeah.
Q Mm-hmm, right, okay. Do they review any of the records of the -- the location itself, so the register at the -- at the location?
A No.
Q Okay. Has that been true throughout the time period we're talking about?
A Yes.
Q Okay. Maybe I'll skip ahead a little bit because we're getting onto one of the topics I wanted to cover, and I'll come back to that in a moment then.
So you mentioned the idea that there's a 50/50 split of revenue with the locations; is that correct?
A Yes.
Q Is that uniform throughout Torch's business?
A Yes.
Q Are you aware of any circumstances

where a higher or a lower percentage of the returns have been agreed to?
A No.
Q Okay. So help me understand, then, how that is sort of happens on a -- on a -- just a very basic basis. If the machine is collecting money and money is being fed into the machine, does the location owner have the ability to take money out of the machine?
A No.
Q Okay. So it would be these -- what should we call these individuals who audit the locations? What's the term you use to refer to them?
A We just call them auditors.
Q Auditors.
A Yeah.
Q Okay. So Would an auditor then be the one to go to the location to remove the money from the machine?
A Yeah.
Q And when you say that the money is split with the location owners or location managers, is it -- does that happen on site? They literally just take half the cash and hand it to

the manager --
A Yes.
Q -- and then you take the other half?
A Yes.
Q Yes, okay. Are there any records kept of how much money was earned by each of the machines?
A I don't know.
Q Are there any records kept of how much money is paid out to those individual amusement location proprietors?
A I don't know.
Q Okay. That's not part of the accounting function that you serve?
A No.
Q Okay. Are you aware of anybody else in the company who might -- might be aware of whether there are records of those transactions?
A I don't know.
Q Okay. And I said in the company, so I have to ask again, are you aware of any independent contractor who might be aware of records of that sort?
A I don't know.
Q Okay. You said that they balance the

machines and you said that there's slips of paper. Can you describe what you meant by the slips of paper?

A Um, well, you know, like a receipt that you would get from like a retail store. It's basically just a little bit smaller than that and it just prints like what went in and what was -- what came out and what was paid to the -- the player.

Q Okay.

A Yeah.

Q And so this is a single slip of paper the machine would produce to say here's what happened since the last time --

A Yes.

Q Okay. Let's talk then about how the players get paid. So if a player plays the game and wins money, how are they paid?

A It's different everywhere.

Q Okay. Well, give me one -- one version of how it works.

A Well, basically on the spot. Basically, you know, there's agreement with the location and Torch Electronics, and then they basically just pay them right there. So.

Q When you say "they pay them right there," who pays them?
A I'm sorry, the auditor. The store manager. The store manager.
Q Okay.
A Yeah.
Q Just to be clear, not the auditor?
A No, not the auditor. We were talking about that for a second and then -- but no, it's the store manager.
Q Yeah, and I get it, but since we're on the record, I want to make sure that your answer is clear. It's the store manager, not the auditor?
A Yes.
Q That's correct?
A Yes, sir.
Q Okay. So the store manager then would pay them using money from the machine or money from the register or some other source?
A I don't know.
Q Okay. When the machine does pay out a prize to a player, do they receive a voucher and then hand that to the store manager or does the machine itself dispense money or is it some other system?

A Um, the store manager. Will end up giving them, yeah.
Q So how does the store manager know how much to give them?
A Usually it's on the ticket, and then there's like a little QR code that kinda verifies that that really is what came out of the machine.
Q Okay.
A Yeah.
Q Has that basic procedure been consistent throughout Torch's existence, or has that changed over time?
A That's what it's been, yes, sir.
Q Okay. All right. Let me just make sure that I hit those points now.
All right. We may come back to some of that as we go forward, but I just, since we were on the topic, I wanted to try to cover it.
So going back to the other independent contractors that Torch works with, you say these are auditors. How are the auditors compensated?
A How are they paid for, is that what you're asking?
Q Mm-hmm, yes.

A They basically turn in a sheet every week, and then I process -- process it with the payroll. Like when Steven and I and then the auditor will -- they email it to me, and then we kinda -- well, we review it and then, and we know what they're doing, so just review it and then, basically I put into the Paychex and they get direct deposited and that's pretty much it.
Q Okay. When you say "into Paychex," is that the program Paychex? Or is that -- when you say --
A Paychex like ADP being like a payroll company, Paychex is a payroll company and that's what I mean, yeah. Yeah.
Q Yeah, and that's -- is that spelled P-a-y-c-h-e-x; is that right?
A Yes, sir.
Q Okay. And So you say that the way that would work, then, is you would put it into that system and then Paychex, the company, would issue a direct deposit through the Federal Reserve system basically --
A Right.
Q -- to that person's bank account; is that correct?

A Correct. Yes. Correct, sir.
Q Okay. You said that they turn in a sheet. What -- what do they have to tell you on the sheet in order to validate their right to be paid?
A Basically, well, they're service calls, so they put service calls on there, and then they put, um, um, and then they put where they've been. Like which location. And that's really it. So. Yeah.
Q Okay. Are they paid on an hourly basis?
A No. They're paid per machine. Like if they go into a location, if there's four in there?
Q Mm-hmm.
A They get paid a set amount for each machine that they audit.
Q Understood.
A Yes.
Q Okay. And you said something about service calls as well?
A Yes.
Q What is a service call?
A If a bill is jammed, if a ticket is

jammed, if -- yeah. That's -- that's what a service call. Yeah.

Q Okay. And they also get paid on a per service call basis?

A Yes. Yes.

Q Okay. And so when you say they get paid on a per machine basis, is it fair to say that they get paid either per audit or per service call?

A Per -- per audit and --

Q Per machine --

A -- service call, if it applies.

Q Okay.

A Yes.

Q Okay.

A Yeah.

Q So if there's four machines in a location, one needs service and all four need to be audited, they would submit a ticket to you that would say I audited four machines, I serviced one, and then that would determine how much they were paid?

A Yes, sir.

Q Okay. Other than independent contractors or auditors, do you also have vendors for example who work with you on marketing issues?

A No.
Q Do you pay any outside companies that are not your auditors to do anything for you?
A No.
Q Obviously you pay attorneys to help you with attorney matters; correct?
A Yes.
Q Okay. And there's no one else like that in the world of marketing where you have paid a company to help you with, you know, a marketing flyer or a communication or a website, nothing of that sort?
A I don't know.
Q Okay. These auditors that you mentioned, do they have technical expertise to be able to actually access the software of the machines?
A Can you reword that?
Q Yeah, I'll try repeating it and then if it doesn't make sense --
A Yeah, or repeat it, yeah.
Q -- you can ask for clarification.
Do the auditors have technical expertise to interface or work with the software of the machine, or they -- or do they only have the

ability to fix a bill acceptor or some sort of, you know, mechanical issue?

MR. CRAIG: Object to form, speculation. You can answer if you know.

Q (BY MR. FINNERAN) Okay. You can answer.

A No.

Q No -- I asked two different possibilities, so which one is it? They don't have technical expertise with software?

A They do not have technical expertise, no.

Q With software. Okay. Are you aware of auditors ever making modifications to the software of the machines?

A No.

Q Okay. How familiar are you with the software of the machines?

A I don't know anything about it.

Q Okay.

A To be honest, I don't -- I mean, I will just tell you point blank.

Q That's fair. I may ask you some more questions to make sure that we're on the same page about that.

A That's too much.
Q That's understandable. And I don't expect you to be an expert at everything or have the answer to every question --
A Right.
Q -- but I have to -- until I ask the question, I don't know.
A I understand.
Q Right. Okay. So we'll maybe come back to that in a moment. Let's just talk about the way you conduct your business. So do you make frequent use of email in the course of your business?
A You mean I myself or --
Q You personally, yes.
A Oh. Yes. Yes.
Q And what sort of emails would you be regularly sending and to whom?
A Oh, it could be anywhere from Paychex because an employee needed something or um, um, you know, or an employee, if they needed something, or if, um, that's -- that's really it, yeah.
Q And when you say employee, just to be clear, you mean --
A Not employee. I mean contractor.

Q Yeah.
A I meant contractor.
Q And I totally understand you might use that term colloquially. It doesn't --
A Yeah.
Q -- I think matter for our case whether we call them employees or not, but I just want to be clear, that's who you're referring to when you say employees?
A Yes. Yes.
Q Okay. How about the telephone? Do you frequently use the telephone while you're engaged in your work?
A No.
Q Okay. And I wasn't clear in that question. I was thinking about talking on the telephone. But do you also sometimes text message in connection with your work?
A No.
Q You never text message in connection with your work?
A No.
Q Okay. Do you never use the telephone? Or rarely use the telephone?
A Yeah, for our children.

Q I'm sorry. In connection with your work.
A No.
Q No, you don't ever use the telephone?
A I do not ever use the phone for Torch Electronics.
Q Okay. Do you have occasion during your work for Torch Electronics where you have to mail things? Put things in the US Mail?
A Yeah, we're -- I had mentioned I do the accounts payable, so basically mailing those.
Q Okay.
A Mailing those checks, yeah.
Q And do you typically use the US Mail or FedEx or UPS or some other service, or does it vary?
A United States Postal Service.
Q Okay. I'm sorry, I just need to -- these may seem like very, very basic questions but I just need to ask these questions.
So what means of communication then do you use in the context of your business other than email, if any?
A Email.
Q Okay. Do you ever use Zoom?

A No.

Q Do you ever have videoconferences in connection with your business?

A No.

Q Do you ever use WhatsApp in connection with your business?

A No.

Q Do you ever use Slack in connection with your business?

A No. I never heard of that. No.

Q Okay. We got to ask because we don't know until we know; right?

A Never heard of that one.

Q Have -- do you ever use Signal in connection with your business?

A No, sir.

Q And do you ever use Facebook Messenger?

A No.

Q Any other social media service do you use in connection with your business?

A No.

Q Are you aware of a company called Banilla?

A Yes.

Q And can you tell me what Banilla is?
A Banilla is our main vendor for our machines in the locations.
Q Okay. When you say "vendor," what do you mean?
A Um, "vendor" means we're paying them for the machines. I mean, you know, that's only way I can look at it, is it's they're a vendor, you know.
Q So in other words, do you buy the machines from Banilla?
A Yes.
Q You don't rent or lease the machines?
A Um, no.
Q So the owner of each of the machines is Torch?
A Yes.
Q And likewise, with respect to the amusement locations that we've talked about, when the devices are placed in those locations, are you leasing the devices to the owners, or are they still owned and operated by Torch?
A They're owned and operated by Torch.
Q Okay. How do Banilla's machines get to you when they -- when you buy a machine? Are

they shipped? Are they picked up? How do they get to you?

A They are basically out of Wisconsin and North Carolina, so they are shipped to -- shipped to us, yes.

Q And when I say "to you," where are they shipped specifically?

A In the, um, Chesterfield Valley. Basically. We have a shop there and they, you know, come in a big truck. I'll be honest, I've never seen it happen but probably once, but yeah, that's usually how they get down there is they come from there and then they are dropped off at our shop in the Valley.

Q Okay. And then -- and I grew up out there, so I know exactly where you're talking about. How do then those devices get from your shop to any particular location where you are placing them?

A That's where the, um -- well, that's where the auditor kind of slack (sic) technician, and I can go back on the technician part if you want me to, but they end up, the technicians load them on a truck and then they basically take them to a location. But -- that Steven has acquired.

Q Okay.
A Yeah.
Q And you said auditors --
A Are Torch, I should say. Sorry.
Q Yeah. I think you may have misspoke. you said You said "auditors slack technicians." Did you mean slash technicians?
A Slash, yeah.
Q Okay. So I said --
A Yeah, my mouth is dry.
Q -- I said slack a moment ago and I get I guess got the word in your head. So yeah, come back to me then on the idea of technicians. Who were the technicians?
A Okay. The technicians basically are just strictly -- they're paid like a contractor, because they're 1099s, but they service our locations also, and that's all they -- that's all they do. They don't go into the location and audit the machines. They are just technicians that work -- well, that are contracted by Torch Electronics and that's when they go in and fix the -- like the, you know -- if it need be, go to that location and fix it, with a bill jam or the -- there's the receipt jam.

Q Okay.
A Yeah.
Q So is it that there are some people who are just technicians, some who are just auditors, and some who are both, or how does that -- how does that divide?
A Some are just technicians, some are just auditors, but then some are both.
Q Great, that's helpful. And so who would be responsible, then, for initially installing a machine at a location?
A Our technicians.
Q Okay.
A Yes.
Q And is that a -- as far -- you may not know. Is that a complicated process? What is involved in setting up a machine the first time?
A I don't know.
Q Okay.
A Yeah.
Q Let's talk about the arrangements that you then have with the specific locations. So you mentioned the idea there is a 50/50 split of the revenue. Is that correct?
A Yes.

Q Are there any written agreements that you have with locations memorializing that division of -- of revenue?
A I don't know.
Q How is -- how is that agreement reached with the locations, then, if it's -- if you don't know if it's in writing. Do you know how, if these are verbal agreements?
A I don't know.
Q Have you ever seen a contract with a location relating to the payment of money from a Torch device?
A I can't remember.
Q Okay. Are there any scenarios where instead of the location owner paying the player who wins playing a game, that the payment is instead made by Torch directly to the player?
A I don't know.
Q Do you recall any circumstances over the course of your time with Torch where Torch has made a payment directly to a player?
A I don't know.
Q Okay. Are there -- does Torch own any payment kiosks that are separate from the amusement games?

A I don't know.
Q Let me -- I'll try and ask a different way and you can tell me if it makes sense and you may still not know.
But we mentioned earlier that players can take a voucher, go to the counter, and get paid that way. Does Torch have any locations where instead of going to a counter to get paid, they would go to a automated kiosk, insert the voucher, and be paid by a machine?
A I don't know.
Q Okay. Do you know if Torch offers any trainings to location owners about how to manage the machines or operate the machines?
A Yes. It's been -- yes.
Q What do you know about that?
A Well, because when you asked that, I was thinking, it just went back in my head. Um, couple months ago we acquired a new company and gave them training, offered -- gave them training basically on how everything works. And, um, yeah.
Q You said "gave them training." Are you referring to the amusement location proprietors? That's who you gave the training to?
A We gave the training to the -- the

business. The convenient store business. Convenient store owners is what I'm trying to say.

Q So can we agree those people are your customers? Is that how you refer to them, or is there another better way we can agree on to refer to those locations?

A I don't know.

Q Well, we just need to pick a word. Can I call them "the locations"? Is that a fair way to refer to them?

A Sure.

Q Okay. So you're saying that you recently acquired a company and then gave training to locations about how to operate and use the machines?

MR. CRAIG: Object to form.

Q (BY MR. FINNERAN) You may answer.

A Can you reword that, please?

Q Yes.

A Not reword it, repeat it.

Q Yeah, I'm going to try to phrase it in a way so that it's clearer.

You mentioned a moment ago that you acquired a company. What was the name of that company?

A I don't know.
Q Can you tell me what that company did or does?
A They have convenient stores. That's all I know.
Q I guess I'm a little confused. Sorry, I think I misunderstood what you said before. So, um, you say the company that Torch acquired.
A Uh-huh.
Q Owns convenient stores?
A No.
Q No. Okay. What do you mean then when you say "They have convenient stores"?
A This company has convenient stores. We don't have convenient stores.
Q Right.
A Torch Electronics doesn't have convenient stores.
Q When you say "have," you mean Torch Electronics does not own convenient stores?
A No. No.
Q No, it does not?
A No, it does not.
Q Okay. This other company, though,

does own convenient stores?
A Yes.
Q And then Torch acquired this other company?
MR. CRAIG: Object to form. Just to be clear, I think "acquired" is the -- you need to ask her --
Q (BY MR. FINNERAN) Okay. What do you mean by -- and thank you, Aaron.
What do you mean by acquired?
A If I said "acquired," I'm not sure why I did, but they basically -- we basically um --
Q I don't want to interrupt you but is it somebody that you hired?
A No. Basically Torch --
Q Well, tell me what you do now and we'll see if we can figure it out together.
A We basically -- okay, so let's say there's QuikTrip, let's just say that I'll use as an example. So Steven was in, you know, communication with them -- and QT is not the customer. I'm just using them as an example.
Q I understand.
A So Steven was in communication with them and has put machines in their locations now.

Q Okay.
A Does that make sense?
Q Yes. That makes sense.
A Okay. That's what I am trying to say.
Q Okay. I totally misunderstood your earlier testimony.
A I'm sorry. I can't imagine what it sounds like, but...
Q I'm sure it's totally my misunderstanding, so thank you for clarifying it. And again, one of my goals is that we mutually understand each other. That's why I'm asking these questions.
A Mm-hmm, understand.
Q So thank you for helping to clarify that. So you're just -- what you're saying is that there's a recent new set of locations that Torch has -- has started to work with let's just say?
A Mm-hmm.
Q And in that scenario, some training was offered to those -- to those locations?
A Correct. Yes, sir.
Q Okay. Is that a new thing, or has that happened historically as well in other

situations?
A It's happened before, yeah. Yeah, it's happened before. Sometimes when we, you know, get a location, it's only like one or two. This -- this one was fairly, you know, good size, so. Yeah.
Q Okay. What was the name of this location, the new one?
A I don't know.
Q Okay. What sort of training do you typically then provide to locations like this?
MR. CRAIG: Object to form.
Q (BY MR. FINNERAN) Or excuse me, does the company typically provide to locations like this?
A I don't know.
Q Were you present for any of these trainings?
A No.
Q How did you hear about these trainings?
A Steven attended.
Q Okay.
A I mean Steven was in charge of it.
Q Okay. Does Torch charge any fee to

the proprietors of locations for placing the devices in their locations?

A No.

Q I think I know the answer but I'll just confirm, does Torch lease space in the locations from any of these owners?

A I don't know.

Q Okay. How would you describe, then, the kind of agreement that Torch has with any of these locations in terms of placing a device there? Is it a rental agreement? Is it a loan of a device? How would you describe it?

A I don't know.

(Simultaneous speaking - inaudible.)

MR. FINNERAN: I'd like to mark this as -- now, we've come up with a strange way to label these exhibits. We're doing Son M 1 to try to distinguish you from your husband as we label these exhibits, so don't be confused by that, but we'll label this Son M 1 for identification. Copy for you, Aaron.

(Son M Exhibit 1 marked for identification by the court reporter.)

MR. FINNERAN: Thank you.

Q (BY MR. FINNERAN) So I've just

handed you a copy of what we've marked for identification as Son M 1. I will make a representation to you as to what this document is. This is a list of locations that your attorney and I worked together to develop.

These are locations where either we agree that Torch and TNT have both had devices at different points or the same point in time, or there are a couple examples where I think there may be a dispute about that, but at least TNT contends that's the case.

So, and I can point those out as we go if we need to, but I just want you look down the list that's in front of you and can you tell me if you're familiar with all the locations on this list, if any of them look unfamiliar to you?

MR. CRAIG: Object to form.

A Am I familiar with any of them?

Q (BY MR. FINNERAN) Yes.

A No.

Q Do you not typically deal with any of the location owners?

A No.

Q Okay. So you're not familiar with any of the people on this list then?

A No.
Q Okay. Thank you.
(Simultaneous speaking - inaudible.)
MR. CRAIG: Are you at a good stopping point? I should have went to the restroom before we started.
MR. FINNERAN: Yeah we can take a short -- it's actually great. I've got to check off things we talked about, so.
MR. CRAIG: Okay. Does that work, five minutes?
MR. FINNERAN: We can take a short break.
THE VIDEOGRAPHER: Off the record at 9:57.
(Off the record.)
THE VIDEOGRAPHER: We are back on the record. This is media unit number two, the time is 10:12.
Q (BY MR. FINNERAN) Okay. Ms. Miltenberger, we're back on the record. First, any time we take a break, I'll probably ask you if there's anything you thought of over the break that you feel you need to clarify or correct in your prior testimony. So anything of that sort?

A I don't think so. Thank you.
Q Okay. I'm probably going to ask you what may seem like a series of random questions just because there were things we kind of skipped over as we were talking and so they may not seem like they're connected. If you get disoriented, just ask for a clarification.
So we talked about your responsibilities at Torch. Can you describe your husband's responsibilities and what he does?
A Um, it's a lot. Um, I would say basic, you know, he's on the phone with, you know, either customers or contractors or attorneys and that, I mean, he's constantly, I mean, it's 7:00 to -- AM to 10:00, 11:00 at night. And customers also meaning the customers that are in the store. And our customers that we have machines with.
Q So you're saying he communicates both with proprietors of locations and players of games. Is that what you mean?
A The players of the games, no, they like to call him, but that's kind of someone else's, you know, to do and take care of that. But I'm kinda confused about the proprietor part you said first.

Q When I say proprietor, I just mean the person who operates a location --
A Oh, okay.
Q -- wherever you have it and --
A And he does. He does, yes. He has talked to those locations, yes.
Q Would you say that he's principally responsible for marketing Torch's products to new locations?
MR. CRAIG: Object to form.
Q (BY MR. FINNERAN) You may answer.
A The marketing I mean, yes.
Q Would you say that he's principally responsible for managing the relationships with any of the locations where you have devices?
A Yes. Of course.
Q What role, if any, does he have with respect to collections?
A Well, that's where the auditors came in that we talked about earlier. I mean, they deposit the money. So, I mean, basically it's just seeing it on the bank statement basically, and then we kinda reconcile from that. But he doesn't really have the hands-on in the -- the cash, you know, because we have those people that -- that are

contractors for us.
Q Okay. Is -- does Mr. Miltenberger take a salary from Torch?
A Yes.
Q Do you know what his salary is?
A Yes. It's 5,000 a week.
Q Okay. Does he have any people who directly report to him?
A Yes. He has a -- he has a few, a couple main guys and then they -- and then the other people that are contractors for us, they report to those guys.
Q Okay. And who are the main guys you're referring to?
A I don't know.
Q Okay. But you know there are two of them?
A Mm-hmm.
MR. CRAIG: Is that a yes?
Q (BY MR. FINNERAN) Sorry, was that a yes?
A Yes.
Q You don't know either of their names?
A No.
Q Do you know their first names?

A No.

Q Okay. When you say that they report to Mr. Miltenberger, how do they interact, to your knowledge?

A Um, can you rephrase that?

Q Well, you said that they report to him. I'm asking what you mean by that. What do you mean by they report to him?

A Basically like, you know, what's going on with the, you know, the other auditors that are below them and, um, and just kind of, you know, if they need assistance on something, or whatever it may be.

Q So then would it not be typical for Mr. Miltenberger to communicate with the auditors that report to these two gentlemen directly but instead to communicate with these two gentlemen directly?

A That --

MR. CRAIG: Object to form.

A That's the point, but it doesn't happen that way all the time.

Q (BY MR. FINNERAN) So there are exceptions where an auditor would be speaking with Mr. Miltenberger directly?

A Yes.
Q Okay. Does Mr. Miltenberger receive any commissions?
A No.
Q Does he receive any bonuses?
A No.
Q Is there any employee or independent contractor of Torch who receives a commission?
A No.
Q Does Torch have any parent company? Is it owned by any other company?
A No.
Q Does it own any companies?
A No.
Q Does it have any subsidiaries?
A No.
Q Are there any other companies that are affiliated with Torch Electronics in some other way?
A No.
Q Okay. I've seen an understanding that there may be more an one Torch Electronics. There may be a Torch Electronics that's incorporated in Missouri, or that's an LLC in Missouri, and then a Torch Electronics elsewhere.

Do you have any information about that?
A I didn't even -- cross my mind. I'm in Missouri. Didn't even think about it. But yes, Torch Electronics, Tennessee, yes.
Q And that's a separate corporation from Torch Electronics, LLC, that's based in Missouri?
A Yes. It has a different federal ID, yes.
Q Okay. And is there any -- does Mr. Miltenberger also own the Tennessee corporation?
A Yes.
Q Do you have any ownership interest in that corporation?
A No.
Q Is it a corporation or an LLC, or some other -- some other kind of corporate structure?
A It's an LLC.
Q Okay. You keep the accounting for Torch Electronics, the Missouri company. Do you keep the accounting for Torch Electronics, the Tennessee company?
A Yes.

Q You said they have different tax IDs?
A Yes.
Q Do you combine financials for the two companies, or do you have separate financials?
A I don't take care of that part. Wolff and Taylor does.
Q Okay. Do you happen to know whether Wolff and Taylor prepares joint or separate financials for the two companies?
A Separate financials, yes.
Q Okay. We talked a little bit about the auditors. What, if any, qualifications do auditors typically have when they enter the job?
A Um, most of our auditors -- most of our auditors are retired policemen. So they have that, um, what do you call it, um -- that's basically it. I mean far as doing the audit work, there's, you know -- like they're -- they're shown, they're trained on it, so.
Q Okay. What about the technicians? Do the technicians have any qualifications or training before they start the job?
A No. Some might be retired, younger policemen, or they were policemen, or they worked on the SWAT Team, but that's -- but that's it.

Q Okay. Is there any reason that Torch tends to recruit former police officers?
A No, they just want to work for Steven. Basically it just happens to be that way. Some are not. Some are, you know, just done with their job or whatever, but the policemen is kind of a safety thing when they go into locations and, I mean, you're pulling cash out of a machine in North County, so yeah.
Q Mm-hmm. Do you -- does Torch have independent contractor relationships with any current police officers, or only former police officers?
A Can you repeat that?
Q Does Torch have any independent contractor relationships with any current police officers, or only retired or former police officers?
A I don't know.
Q Okay. We talked earlier about the nature of the agreements that Torch Electronics might have with proprietors of amusement locations, and you told me that there's this 50/50 split agreement.
Are there any circumstances you're

aware of where there had been disputes with amusement location owners about the split?

A No.

Q Okay. Are you aware of any records that are kept by amusement location owners or managers to reflect the amount of money paid out to -- to Torch -- to players of the Torch machines?

A No.

Q Are you aware of whether there is any reporting to the Internal Revenue Service, either by Torch or by those proprietors, regarding payouts?

A Can you repeat that, please?

Q Yeah, well, maybe we'll break it into two. Are you aware of any reporting by Torch to the Internal Revenue Service about payouts to players of the machines?

A I don't know.

Q Are you aware of any reporting by any of the amusement location owners or managers to the Internal Revenue Service about payouts from the machines?

A I don't know.

Q Okay. Are you aware of the requirement to provide a 1099 or other form to

somebody who receives more than $600 from a business in the course of a calendar year?

A I don't know.

Q You're not -- are you not aware of that?

A No.

Q Okay. Do you know if Torch has ever issued a 1099 to a player?

A No. I mean, no, they haven't. Yeah.

Q Okay. Do you know if Torch has ever issued a 1099 misc, an M-I-S-C, to a player?

A No.

Q You don't know, or they have not?

A They have not.

Q Okay. Do you know if Torch -- and I'll stop with the do you know because that gets confusing. I'll just say has Torch ever issued a W-2 to a player?

A No.

Q Has Torch ever issued a W-2G to a player?

A No.

Q Has Torch ever issued a W-9 to a player?

A To a player, no.

Q Okay. There's also a new one apparently called the 1099 NEC. Has Torch ever issued such a form to a -- to a player?
A I know what you're talking about. No.
Q Okay. Has Torch issued any of the forms that I've just mentioned to any amusement location owners or operators?
A I don't know.
Q Is that something that you typically would have handled, or would that be handled by your outside accounting firm if such tax forms had to be issued?
A Outside accounting firm.
Q Okay. I warned you I was going to jump around a little bit. Do you know who Grover Gaming is?
A Yes. They are basically affiliated with Banilla. Don't ask me how, but I think that they do maybe the part of the machine that Banilla doesn't do and they do the basic cabinets and then Grover does the -- and I'm probably wrong on this but, of course, Steven will know.
Q Yeah.
A But that's all I really know about

Grover. Yeah.

Q Okay. We talked earlier about how Torch does not, from your understanding, employ any independent contractors to do any marketing work. How does Torch accomplish any marketing, if any? What marketing does Torch do? Let me ask that.

MR. CRAIG: Objection, form.

Q (BY MR. FINNERAN) What, if any, marketing does Torch do?

MR. CRAIG: Same objection. To the extent you know based on your personal knowledge.

A I don't know.

Q (BY MR. FINNERAN) Okay. Do you have an understanding of approximately how many Torch devices there are in the State of Missouri?

A No.

Q Do you have a rough sense?

A No.

Q Do you believe it's more than ten?

A Yeah.

Q Okay. Do you believe it's more than a hundred?

A I don't know. I really don't. Yeah.

Q Okay. Okay. Um, I'm going to mark another exhibit for identification. This is going

to be Son M 2. I'm not sure why we have it stapled together. Break it apart. It's two copies of the same thing.

(Son M Exhibit 2 marked for identification by the court reporter.)

Q (BY MR. FINNERAN) Do you recognize the document I've just put in front of you?

A Yes.

Q What is it?

A Um, pretty much explains itself but, um, I don't really know much about it. I mean it's just basically just, you know, telling the customer about the machine, so. That's all I can say. I -- I don't know any more.

Q Do you understand this is a sticker that is affixed to a Torch device? Is that where you've seen it before?

A Yes.

Q Okay. Are you aware of whether the language of these stickers has changed over time?

A No.

Q You don't know one way or the other or you --

A I don't know that it's changed over time.

Q Okay. Do you believe it has changed?
A No. I do not believe it's changed.
Q Okay. Did you have any role in drafting any of this language on this decal?
A I do not. I did not.
Q Did you have any role in reviewing the language on this decal at any point?
A No, I did not.
Q Okay. Can you, just in your own words, explain to me what you understand the purpose of this decal to be?
MR. CRAIG: Object to form, calls for expert testimony, speculation. You can answer.
Q (BY MR. FINNERAN) You may answer if you know.
A I don't know.
Q Okay. Do you know who created the language on this decal?
A No.
Q Do you know when this decal was created?
A The beginning of the LLC, or beginning of Torch Electronics-Missouri.
Q So -- yes. So in and around what time, what year would that be?

A '15, '16?
Q Okay.
A 2015, 2016, I should say. Sorry.
Q Have you -- have you read a sticker like this before?
MR. CRAIG: Object to form.
A No, I -- no.
Q (BY MR. FINNERAN) You said you --
A Huh?
Q You said you've seen a sticker like this before?
A No, I mean I haven't really looked for a sticker like this before, but I don't have a -- no.
Q Maybe I'll just ask then. You said you did recognize the document. Where do you recognize it from?
A Because it's our document. It's Torch Electronics document. I shouldn't say our, but yeah, it's Torch Electronics document.
Q Right. So under what circumstances did you see this document previously?
A Because we put them on the machines. I don't put them on the machines but our contractors put on them -- put them on the machines

and it's basically, I mean like it says, it's a disclaimer, so.

Q Okay. We may come back to it but I'll stop there for now, given your answers. I'm also going to show you then what I'd like to mark as document Son M 3. Sorry, here you go. She'll hand you the marked one in a moment.

(Son M Exhibit 3 marked for identification by the court reporter.)

Q (BY MR. FINNERAN) And so I'll just ask you to look at the first page of this document. Do you recognize anything on the first page of this document?

A Can you rephrase that? Or --

MR. CRAIG: Could you tell her what --

A What do you mean recognize?

MR. CRAIG: -- tell her what it is, identify it?

Q (BY MR. FINNERAN) Sure. Yeah, um, sure. So for the record, this is an excerpt of a -- we've taken a portion of Torch's website and we've put it onto this document, and so I'm asking you if you've seen that portion of the document that is in front of you before.

A Yeah, I've seen it, but I mean, I didn't see it like yesterday or two weeks ago. I mean. This is off the website?
Q Yes.
A Hmm.
Q And then it -- perhaps actually it looks like we got this stapled incorrectly. Could you pull the last page off of it and then we'll mark that as a separate document. We'll do this as Son M 4.
(Son M Exhibit 4 marked for identification by the court reporter.)
Q (BY MR. FINNERAN) And this is a different portion of the same website at a different time, is Son M 4. So you have both of them in front of you?
A Okay.
Q Are you familiar with the idea that the Torch website was changed at some point?
A No.
Q Did you have any involvement in making any changes to Torch's website at any point?
A No.
Q What, if any, involvement do you have with Torch's website?

A I don't have any, yeah.
Q Okay. Do you pay invoices to anybody who updates Torch's website?
A I'm sure I do, but I don't know -- I don't know as far as it goes. I just do the -- you know, just pay it and just go, so yeah.
Q Okay, you answered the questions. That's all I had to ask you about that.
A Okay. On both?
Q Yeah. You can put it aside for the moment.
A Okay. Okay. I'll give them to her.
Q Do you know if Mr. Miltenberger has been involved in modifying language on the website?
A No.
Q You don't know?
A I don't know. I mean, no. I -- no.
Q Okay. Do you know if Mr. Miltenberger has been involved in creating the language that's on Son M 2?
A No.
Q You don't know?
A No, I'm saying, yeah, I -- no.
Q Sorry. You believe he has not, or you don't know whether he has?

A I believe he has not.
Q Had involvement in creating this language?
A No. Correct.
Q Okay.
A Sorry.
Q That's okay. Is the decision, to your knowledge, to place this sticker on Torch devices, is that one that is made by Torch, or by the amusement locations themselves?
MR. CRAIG: Object to form. To the extent you know, you can answer.
A It's by Torch. Yeah.
Q (BY MR. FINNERAN) Okay. Did that. What sort of communication, if any, do you have with the people at Banilla?
A Just invoicing. Just the bills.
Q Would you be the one placing an order for a Torch device?
A No.
Q Would you only be the one then paying the bill?
A Paying the bill.
Q Okay. We talked earlier about Grover Gaming. Would you have occasion to interface with

the people at Grover Gaming?
A No, because they do their billing through Banilla and then Banilla bills us if it need be, so.
Q Okay. And I think you may have answered this already, so forgive me, but do you have communication ever with amusement location operators and managers?
A No.
Q And do you ever have communication with players of the devices?
A No.
Q Have you ever played the devices yourself?
A No.
Q No?
A Hmm-mm.
Q Have you seen them played?
A Um, yeah. Yeah, if I go into a convenient store and go to the bathroom, yeah, that's really it.
Q In other words, you've seen other players playing them from afar?
A Yes.
Q Have you ever sort of sat next to

somebody while they played the machines?

A No.

Q Okay. Can you give me just your description of how the machines work, to your understanding?

A I don't know.

Q Okay. Are you familiar with the term "no chance" game?

A Yes.

Q Okay. Part of what we're all here to talk about is whether these documents are -- excuse me, these devices are no chance games or not, but I want to make sure I'm understanding is whether there are other kinds of devices that Torch puts out that are not those what you call no chance games.

So is it fair to say that, to your knowledge, all of the devices that Torch places in any location in Missouri are what you refer to as, quote, "no chance" games?

A Correct.

Q Okay. So, for example, you don't place any other kind of amusement device any locations?

A No.

Q No pool tables?
A No.
Q No Big Buck Hunter?
A No. I'm sorry, it's funny, but no.
Q No pinball machines?
A No.
Q Okay. So is it fair to say that all the devices that Torch places in locations in Missouri are electronic game machines that have an entertaining display in which a player can insert money and potentially win money in return?
MR. CRAIG: Object to form.
A Correct.
Q (BY MR. FINNERAN) Okay. I'm suspecting that some of the answers I'm going to ask you next -- the questions I ask you next may be outside your knowledge, but I just need to ask so I can be sure of that.
A I understand.
Q Okay. So are you familiar with the different models or versions of the Torch devices?
A No.
Q I'm going to read something off --
MR. CRAIG: I'm sorry, was that a no?
THE WITNESS: That was a no, yes.

Q (BY MR. FINNERAN) I'm going to make sure of that by saying have you heard of something called NCG deluxe terminal version 5.5.0.17?

A No.

Q Is it fair to say that if I read four other model numbers to you, you would give the same answer?

A Yes.

Q Okay.

A That would be correct.

Q Fair enough. Then I will get past some of that for you. Is it also fair to say that if I were to ask you if you can tell me how many of any particular model number of device Torch has in Missouri, you would not be able to answer that question?

A I cannot answer that.

Q Okay. Fair enough. Okay. To your knowledge, do all of the devices that Torch places at locations in Missouri have a prize viewer feature?

A I don't know.

Q Do you know what a prize viewer feature is?

A I don't know what it is but Steven --

I've heard Steven talk about it, but that's --
that's really it.
Q Okay.
A That, I don't really know any more
about it.
Q Okay. Are you aware of the fact that
at least some Torch devices give the player the
ability to view the outcome of the next game before
they hit the Play button on the game?
A Yes, I'm aware of that.
Q Okay. Are you familiar with -- to
your understanding, is that feature called a prize
viewer, that ability?
A I believe so.
Q Okay. And to your knowledge, do the
games that Torch has in Missouri all have a feature
like that?
A I don't know.
Q Okay. Are you aware with the --
excuse me. Are you familiar with the idea that
Torch devices, at least some Torch devices, have
outcomes that are dictated from a predetermined
finite pool of sequentially ordered outcomes?
MR. CRAIG: Object to form. Calls
for expert testimony.

A I don't.
Q (BY MR. FINNERAN) Are you aware of hearing of such a thing?
A I don't know.
Q Okay. Do you have any understanding of to what degree THE element of chance exists in any Torch device?
MR. CRAIG: Object to form.
A I don't know.
Q (BY MR. FINNERAN) Okay. To your understanding, is there anything that a player of a Torch device can do to affect whether the next turn of the game will be a winner or a loser?
MR. CRAIG: Object to form.
A I don't know.
Q (BY MR. FINNERAN) Okay. Maybe tell me what you do know about the way these devices operate. From your perspective and your knowledge, how -- how do the Torch devices work?
A Um, I mentioned earlier they print the tickets and, you know, they have the cash in the little cash bin. I really don't know. I mean I just -- I just take care of what needs to be on the, you know -- helping him run the business and as far as accounting and stuff and payroll stuff.

I don't get involved with the games.
Q Okay. I believe you, but I got to ask the questions, so.
A I understand.
Q Is it fair to say that, to your knowledge, each of the Torch devices accepts cash as a payment from a player?
A I don't --
MR. CRAIG: Object to form.
A I don't know.
Q (BY MR. FINNERAN) Do Torch devices generally have bill acceptors?
A Yeah. Yeah.
Q Okay.
A I mean -- I don't want to say yeah, but I don't know 100 percent.
Q Okay.
A To be honest.
Q Do you know if there are any Torch devices that accept payments in any other way other than cash payments?
A No. No.
Q Sorry, you don't know? Or you --
A I don't know.
Q You don't know.

A Yeah.
Q All right. You're going to save us a lot of time by not knowing some of this stuff, so we'll get through this a lot faster.
Are you aware of any testing that Torch has had ordered of the devices to evaluate whether they comply with -- with Missouri law?
A Um, I am aware of the testing, yes. But that's as far as it goes.
Q Okay.
A I do know about the testing, though.
Q Do you know who has performed the testing?
A It's Banilla usually, and then, you know, of course, we'll try it when it gets here to St. Louis and...
Q Okay.
A I don't know who does it. Steven does it some of the time, some of his guys do it. You know, it's just -- it's kinda all over.
Q Okay. Do you know what the testing involves?
A No.
Q Okay. Are you familiar with a person by the name of Nick Farley?

A No.

Q Are you familiar with a company called Nick Farley & Associates?

A No.

Q Okay. Are you aware of any circumstances where Torch has requested a modification to a Banilla device?

A Can you --

MR. CRAIG: Object to the form.

Q (BY MR. FINNERAN) Have you -- yes, I will repeat the question. Are you aware of any circumstance where Torch has requested a modification to a Banilla device?

MR. CRAIG: Object to form.

Q (BY MR. FINNERAN) You may answer.

A I don't know.

Q Okay. Are you aware of the fact that on some Torch devices a player can choose from six different games to play?

MR. CRAIG: Object to form.

Q (BY MR. FINNERAN) You may answer.

A I mean, yeah, but that's all I know about it.

Q Okay. Is it fair to say then -- I have to ask -- is it fair to say that you would not

have an understanding of how the first outcome of a game is selected once the player chooses any particular game?
A No.
Q You don't have --
A I don't know. Sorry.
Q Okay. And just to -- to make it a little easier on us and the record, if you, rather than just saying "yes" or "no," say "no, I don't; yes, I do." Give us a full little sentence there.
A Okay.
Q That way we know exactly what you meant to say, and we don't have a situation where I ask a question with a not and you say no and we thought you meant yes. Do you understand what I'm saying?
A Yes, I understand.
Q Okay. Are you aware of the rate at which Torch devices are programmed to pay out?
A No, I don't.
Q Are you aware of the fact that there is a menu in the Torch devices that allows the operator to choose high, medium, or low as the payout amounts?
A No, I --

MR. CRAIG: Object to form.
A I don't know.
Q (BY MR. FINNERAN) Okay. Are you aware of how frequently Torch devices are programmed to pay out?
A No.
Q Are you aware if the Torch devices have any maximum amount they can pay out?
A No.
Q Are you aware of the percentage return that Torch devices generally produce?
A No. I mean, I think I know, but I really don't know.
Q Do you have a rough sense?
A No.
Q Let's just say there is a machine that over the course of its life has had $50,000 inserted into it by players. Do you have a sense of how much of that money would be -- would be given back to players in terms of payouts?
MR. CRAIG: Object to form, calls for speculation.
A No. I don't know.
Q (BY MR. FINNERAN) Okay. So we're going to do a sort of possibly rapid fire here

where I'm going to show you some things that you may have seen before and if the answer is "I've never seen this before," that's fine.

A Oh, okay. That'll be fun.

Q But that's -- in other cases what I'm likely to do is ask you if you have seen it, and if you have seen it, when you recall seeing it.

A Okay.

Q Okay?

MR. FINNERAN: So we'll mark Son M 5.

(Son M Exhibit 5 marked for identification by the court reporter.)

Q (BY MR. FINNERAN) I gave you the one I already marked.

MR. CRAIG: That's fine.

Q (BY MR. FINNERAN) Is this a document that you've seen before?

A No. 2019.

Q Okay. If you would, it's not a very long letter, if you'd take a moment just to read the last paragraph in that letter silently to yourself and I'll --

A This one?

Q Excuse me, sorry, on the first page of the letter.

A Oh, okay.
Q My fault. Forgot it was two pages. If you'd like to read the last paragraph and then just let me know when you're finished reading it to yourself?
A This one; right?
Q The last one, yes.
A Okay.
Q Yes. And I'm sorry, I should have asked you but can you read the short paragraph right above the one you just read to yourself as well, and then I'll ask you a question.
Okay?
A Okay.
Q So you just told me a moment ago you don't recall seeing this letter. Having read it now, is that still your testimony?
MR. CRAIG: Object to form. She didn't actually read the whole letter. You directed her to two paragraphs.
MR. FINNERAN: Fair enough.
Q (BY MR. FINNERAN) Having read the two paragraphs that I asked you to read, does that refresh your recollection as to whether you've seen this document before or not?

A No, I have not seen this letter.
Q Okay. Do you have a recollection of hearing about a letter of this sort from the Missouri Gaming Commission?
A No.
Q Do you have any recollection in this time frame -- you can see the late of the letter is July 3, 2019 -- of any discussions between and you Mr. Miltenberger or others about a letter from the Missouri Gaming Commission?
A No.
Q Okay. As I said, that may be the answer for many of these things, but we've got to run through them, so.
MR. FINNERAN: I will mark this one as Son M 6.
(Son M Exhibit 6 marked for identification by the court reporter.)
Q (BY MR. FINNERAN) Oh. They're all clipped together. Hand it back. I'm going to have to break it out. It's going to be a big mess. All right. I didn't think it was this long. It is not this long. It's one page. So there's the correct one page and if you want to collate these while we're getting that together.

MS. WARREN: Yes.
MR. FINNERAN: Okay. And now I've lost -- did you have a copy?
MR. CRAIG: I did, but I gave it back to you.
MR. FINNERAN: Take that one. I'll get another one. Okay.
Q (BY MR. FINNERAN) Ms. Miltenberger, take a moment to familiarize yourself with this document. I will tell you it is a Probable Cause Statement relating to a charge of possession of a gambling device against a James Robert McNutt and there's a date on here somewhere --
A 10/5/2020.
Q 10/5/2020 at the top. Yes. Do you recognize this document?
A No.
Q Do you -- have you seen this document before?
A No.
Q Do you have any recollection of hearing about a charge brought against Mr. McNutt for possession of a gambling device in and around October 2020?
A No.

Q Okay. All right.
MR. FINNERAN: This will be Son M 7.
(Son M Exhibit 7 marked for identification by the court reporter.)
Q (BY MR. FINNERAN) No wait. Only the first page. And then the next one will be --
MR. CRAIG: Can I just hold on to them?
MR. FINNERAN: Yeah, if you want to, that's fine.
MR. CRAIG: It'll be 8; right?
MR. FINNERAN: And I think this is right, but just try and make sure that's correct. Okay.
Q (BY MR. FINNERAN) Ms. Miltenberger, do you recognize Son M 7?
A No.
Q This is a Information in a Misdemeanor Case against James McNutt. Is it fair to say you have not seen this document before?
A I have not seen this document before.
Q Do you have recollection of hearing about a pair of misdemeanor possession charges brought against James McNutt in and around October of 2020?

A No, I have not.
Q Okay.
MR. FINNERAN: Is this exhibit actually the exhibit to this? This is one --
(Simultaneous speaking - inaudible.)
MR. FINNERAN: Okay. Aaron, it's just this page is Son M 8, so you got to split it apart again.
(Son M Exhibit 8 marked for identification by the court reporter.)
Q (BY MR. FINNERAN) Um, this is a Petition for Forfeiture against Torch Electronics, Steven Miltenberger and Two Gambling Devices pursuant to Missouri Revised Statute Section 513.660.
Ms. Miltenberger, do you recognize this document?
A No.
Q Have you seen it before?
A No.
Q Do you have any recollection of hearing about a forfeiture action brought against your husband, Torch Electronics, and Two Gambling Devices in and around March 2021?
A Yeah, but that's -- I've heard about

it, but that's all I know.
Q You've heard that -- what have you heard about it?
A I'm sorry, I heard about my husband with the -- you know, with the Two Gambling Devices and the Platte County Prosecuting Attorney's Office, and that's all I've heard.
Q That's all you've heard?
A Yes.
Q Okay. Do you recall when you heard about it?
A I can't remember.
Q Would it have been in and around the time that it occurred in --
A Yeah --
Q -- March 25 of 2021, or thereabouts?
A Yes. Yeah.
Q Okay.
MR. FINNERAN: All right. The next document we'll mark as Son M 9.
MR. CRAIG: Is that this one?
MR. FINNERAN: Yeah.
MR. CRAIG: Front and back?
MR. FINNERAN: Front and back, yeah.
MR. CRAIG: Okay.

(Son M Exhibit 9 marked for identification by the court reporter.)

Q (BY MR. FINNERAN) Flip over to the back, this is Investigative Subpoena to Torch Electronics. It is dated July 16, 2021, is the date for the return, and it is witnessed on June 14, 2021.

Ms. Miltenberger, do you have any familiarity with this document?

A No.

Q Do you recall hearing of a subpoena to Torch Electronics in and around June of 2021?

A No.

Q Okay. All right. I'm sorry to keep having to do these but we'll -- I'm doing them as quick as we can.

A No worries.

Q This is Son M 10.

(Son M Exhibit 10 marked for identification by the court reporter.)

Q (BY MR. FINNERAN) What I've handed you is a copy of a Decision rendered on March 24, 2020, in the Court of Appeals of Ohio, the Tenth Appellate District, Case is Mayle Bingo Company, et al., versus Ohio Department of Public Safety, et

al.

Ms. Miltenberger, are you familiar at all with this decision?

A No.

Q Do you recall ever learning of a decision in Ohio relating to no chance gaming devices?

A No.

Q Okay. This next one will be Son M 11.

(Son M Exhibit 11 marked for identification by the court reporter.)

Q (BY MR. FINNERAN) Ms. Miltenberger, what I've handed to you now is a copy of a Decision decided on March 13, 2020, by the Commonwealth Court of Pennsylvania, it is Gracie Technologies, Incorporated, versus Commonwealth of Pennsylvania.

Do you have any recollection of hearing about this case?

A No. I -- I probably shouldn't ask this, but what does this have to do with Torch?

MR. CRAIG: Don't, don't, don't. He gets to ask the questions; you get to answer them. The sooner we can do that, the faster we're out of here.

THE WITNESS: Okay. Sorry.
MR. FINNERAN: Absolutely.
Q (BY MR. FINNERAN) But what's the answer to my question; do you have any familiarity with this decision?
A I do not, no.
Q Okay. Fair to say you've never seen this decision before?
A No.
Q Okay.
(Son M Exhibit 12 marked for identification by the court reporter.)
Q (BY MR. FINNERAN) This is a Decision in the Supreme Court of North Carolina, Gift Surplus versus State of North Carolina, filed February 11, 2022.
Ms. Miltenberger, are you familiar at all with this decision?
A No.
Q Fair to say that you've never heard of a decision in North Carolina relating to no chance gaming devices?
A No.
Q Okay. Thank you.
A You're welcome.

Q All right. So I've just shown you a number of things that you said you weren't aware of, which I credit and believe. Are you aware of any other legal actions relating to Torch that we did not just go over?

A No.

Q Are you aware of a case that Torch brought in Cole County, Missouri, against various agencies of the Missouri government?

A No.

Q Okay. Are you aware of any other inquiries by law enforcement relating to any Torch devices other than the ones that we've just discussed?

MR. CRAIG: Object to form. You can answer.

A No.

Q (BY MR. FINNERAN) Okay. And by law enforcement, I -- I -- let me just go through some things. Are you aware of any inquiries by members of the Missouri Highway Patrol?

A No.

Q Are you aware of any inquiries by any federal investigator relating to the Torch devices?

A No.

Q Are you aware of any inquiries by any member of the Missouri Gaming Commission relating to the Torch devices?
A No.
Q Fair to say that you are not aware of any inquiry by any government official other than the ones we've just shown you relating to the Torch devices?
A None. No.
Q Is it fair to say that?
A Yes.
Q That you are not aware?
A Not aware. Sorry.
Q Great. Thank you. Are you aware of a company called Integrity Vending?
A No.
Q Are you aware of a action in Platte County, Missouri, in October 2018 relating to the seizure of Integrity Vending devices?
A No.
Q Okay. Are you aware of a company called Amusement Concepts, Incorporated?
A No.
Q Are you aware of a gentleman, we just said his name earlier, named James McNutt?

A No.
Q Are you aware of a company called Midwest Petroleum?
A No.
Q Your lack of knowledge is rendering many of my questions irrelevant, so I'm just trying to go through them real quick.
A I understand.
Q Are you aware of a company called Accel Entertainment, A-c-c-e-l Entertainment?
A No.
Q You are aware of Banilla. We talked about Banilla.
A Mm-hmm.
Q Are you aware of any financial or contractual arrangements between Banilla and Torch?
A No.
Q Other than -- let me ask -- let me ask this way. Other than paying Banilla for devices, are you aware of any other payments that Torch makes to Banilla?
A No.
Q Okay. Do you know if Torch gets any sort of discount on its devices from Banilla?
A No. I don't know that Torch gets --

no.

Q Fair to say you just pay the bills so you don't know --

A Right, yeah.

Q -- how those things get negotiated, you're not -- you're just not aware?

A No, I'm not aware.

Q Okay. To your knowledge, do Torch and Banilla share any employees?

A No.

Q Do Torch and Banilla use any of the same independent contractors, to your knowledge?

A No.

Q Are you aware of any agreements that Torch has reached with any law enforcement agency or prosecutor?

A No.

Q Do you have any familiarity with my client TNT Amusements, Incorporated?

A No. Just heard his name, that's it.

Q Whose name?

A Your client, TNT.

Q Oh, okay. You've heard the name TNT Amusements, Incorporated?

A That's why I'm here today, yes.

Q Have you read the Complaint in this case?
A No.
Q Are you -- sorry?
A I don't -- I'm sorry. I don't know if I did or not. I --
Q Unfortunately, we don't have a copy of the Complaint, but let me try to say some things that might refresh your recollection and we can grab a copy on a break if we need to.
A Okay.
Q Our client, TNT, filed a Complaint on March 15 of this year in federal court against yourself, your husband, and Torch Electronics, LLC.
A Right.
Q It was a 50-plus page document with numbered paragraphs, had some photographs in it. Do you have any recollection of that?
A Yes. Yes.
Q Okay. Do you believe you read that document?
A I probably skimmed the document. But that's really it. I remember seeing the photographs because it was interesting, yes.
Q Okay. Do you have any knowledge of a

person named Jim Turntine?
A Isn't he affiliated with TNT?
Q Yes.
A Okay, yeah.
Q But I have to ask, I don't want to give you the answer.
A I understand, yes.
Q So yes --
A I just was trying to --
Q Do you have any knowledge of a person named Marla Turntine?
A No.
Q Okay. What do you know of Jim Turntine?
A I just know that he owns TNT and that's it.
Q Okay.
A Yeah.
Q Do you have any knowledge of any other TNT employees?
A No.
Q Any other independent contractors of TNT's?
A No.
Q Okay. Are you aware of the idea of a

random number generator?
A No.
Q Are you familiar with the term "finite pool"?
A No.
Q You mentioned that this outside firm, Wolff -- I forgot the other name.
A Wolff and Taylor.
Q -- Wolff and Taylor, they handle your financials.
A Correct.
Q Do they produce annual financial statements for you?
A Yes.
Q Do they produce profit and loss statements for you?
A Yes.
Q Do you have any hand in providing information for those statements?
A Yes.
Q What sort of information do you tend to provide?
A Just basically we use QuickBooks, so I take the accounts payable, bank statement -- bank statements, as that kind of feeds into the AR part

of accounting, and then, um, basically they -- they just kinda go into our files and do it and then they produce the income, federal income tax return for us, that we pay every year.

Q And do you review the annual financials for accuracy?

A Um, I have, but we've used them for as long as Steven and I been married, which is 25 years. I don't tend to check them anymore.

Q Okay. Based upon your review of the financial statements, is it fair to say that Torch's business has grown considerably each year that it's been in business?

A I don't know.

Q Do you have a rough sense of whether the company has grown over time?

A I feel like it has, but I -- that's all I can say.

Q Do you not, um, have an understanding, and I'm not getting -- I don't want a number. Don't give me a number. But do you have an understanding of whether the company has increased in revenue from year to year?

A I don't know.

Q Okay. That's probably as close as I

can get without getting past things --

MR. CRAIG: I agree with that.

MR. FINNERAN: I guess we can't really...

Q (BY MR. FINNERAN) Can I get Son 1 back, please, the first exhibit just for a moment? If you can put it back in front of you, I guess, and then I'll take a look at it. Thank you. It's the one that looks like this.

A Yep.

Q Okay.

A Got it.

Q So I think you said you were not familiar with these -- these particular locations. When you are doing accounting for Torch, do you track revenues on a location-by-location basis?

A No.

Q How does Torch account for and track its revenues?

MR. CRAIG: Object to form. If you know.

A I don't know.

Q (BY MR. FINNERAN) I guess I need to understand your answer better because it must be the case that somehow you get information about

what revenue Torch has received. So how do you obtain information about Torch's revenue?

A Well, through the bank, through the bank statements.

Q So am I to understand then that the auditors would directly deposit into your bank account the money that they collect from various locations?

A Correct, yes, that's the way it works.

Q How are they -- are they -- how do they have the authority to deposit that into your bank account? Do they all have signatory authority over your bank accounts, or how do they have that ability?

A I know they don't have signature authority. They basically, you know, talk to Steven. They know that, you know, I don't know, have used so many names. They know that our auditor is going to deposit into that bank, the people of the bank, the people that work at the bank, I don't know how to word that. But they -- so Steven talks to that auditor and then talks to the bank and then the bank knows that auditor's going to come in and deposit for Torch Electronics.

Q Okay.
A Yes.
Q So in other words, Mr. Miltenberger would authorize each of the auditors to make deposits into a Torch Electronics bank account.
A Yes.
Q Where does Torch's bank account reside? What bank I mean?
A I don't know. We have quite a few.
Q Well, what are the banks that you bank at, Torch Electronics banks at?
A I don't know. I mean there's -- there's a few.
Q Yeah, so can you --
A I'm not meaning like two or three. Because we -- I mean there's a few banks.
Q Okay. Can you name at least some that you remember?
A Phelps County. Um, Legends Bank. I mean there's a few others.
Q And so does Torch maintain bank accounts at each of the banks that you're thinking of?
A Yes. Oh, yeah.
Q And when it then assesses its

revenues, does it transfer money from those banks to a single account, or does it keep those moneys where they were originally deposited as a general rule?

A It transfers.

Q Okay.

A Yeah.

Q Is there one bank account to which money is typically transferred?

A Yes.

Q And what bank is that?

A It's a Busey Bank account.

Q Okay. And so going back to the accounting piece, which is where I tried to start here, so is there any way for you, with that information, to track the particular locations that any deposits are coming from?

A Yeah, but the tracking, when I said no, it's because I don't do it. Steven sees those numbers. So that's where it's at.

Q And how does Mr. Miltenberger determine then how each device, or each location, how much money is being made at each location, how would he have that information?

A I don't know.

Q Okay.
A Yeah. I don't know that part.
Q Okay.
A Yeah.
Q You mentioned earlier that the auditors will get receipts from the machines and then balance that against the cash in the machines?
A Mm-hmm.
MR. CRAIG: Is that a yes? Sorry.
A I'm sorry. Yes. Yes.
Q (BY MR. FINNERAN) Do you -- do you happen to know whether those receipts are kept by Torch Electronics?
A Yes.
Q They are kept?
A Yes, they are kept by Torch Electronics.
Q Okay. That -- that might be a way to figure it out, then, if you have those records.
A Right.
Q Okay. Do you make any effort, from an accounting standpoint, to balance what those receipts show against what the deposits are to your bank accounts?
A Yes.

Q And typically do things balance?
A 98 percent of the time. Depends on what's going on out there.
Q Yeah, fair enough. Okay. All right.
A Is that -- oh, I thought it was -- never mind.
Q Okay. I asked you earlier about your knowledge of TNT Amusements and Jim Turntine, its owner. Do you have any knowledge of what sort of machines or devices TNT markets?
A No.
Q Okay. If you've -- if you've at least seen of Complaint at some point, you probably understand that TNT contends that the Torch devices are illegal gambling devices.
Do you have any recollection of when you first learned that TNT had raised that contention?
A I don't know. It feels like a hundred years ago but, um, no. I don't. I don't know. I know it was maybe a couple years ago? Or a year ago? You said March 15.
Q That's when the Complaint was filed.
A Oh, okay.
Q I'm asking prior to the Complaint

were you aware of any allegation by TNT or Jim Turntine that Torch's devices were illegal?
A Yes. I mean, that's what they claimed, yes.
Q When did you become aware of that allegation?
A Like two years, two, two and a half years ago.
Q Okay.
A That's a guess.
Q Are you aware of any news reporting about Torch's machines?
A No.
Q Have you never seen a newspaper article about Torch's machines?
MR. CRAIG: Object to form.
A Not newspaper, but I mean online. I guess it's the same thing, but...
Q (BY MR. FINNERAN) Okay. Well, you --
A Sorry.
Q You didn't read it in an actual newspaper, but who does these days.
A Right.
Q But you are -- are you aware of there

being news articles published by news -- news entities about Torch's devices?
A Yes.
Q And what generally is your understanding of those news articles?
MR. CRAIG: Object to form.
A I don't know. I mean...
Q (BY MR. FINNERAN) Are you aware of allegations in news articles that the Torch devices are illegal devices?
MR. CRAIG: Object to form.
A I mean, yeah, but -- yeah, I am aware, but it's the news. So. Run with that.
Q (BY MR. FINNERAN) And do you recall when you first learned of an allegation in a newspaper or news article about Torch's devices being illegal?
MR. CRAIG: Object to form.
A Yeah, I mean, that feels like a hundred years ago too, but I don't -- two years ago? Three years ago?
Q (BY MR. FINNERAN) Okay.
A I -- I'm just kinda throwing the years out there.
Q I mean you can only give me your best

recollection.

A Yeah.

Q So whatever you recall is fine.

A Yes.

Q Have you seen any television reports about Torch's devices?

A Yes.

Q And what do you recall about those reports?

A Oh, my God. Um, just the same thing basically that the news says. I mean it's just basically the same thing, I mean. I don't know.

Q Do you recall when you first saw a television story about Torch's devices?

A About a month ago.

Q Do you recall what news station it was on?

A I know it was here, but I can't remember, maybe Fox News 2 or something like that? I don't...

Q When you say "here," do you mean in the St. Louis area?

A I'm sorry, yes, St. Louis.

Q Okay. Do you recall any radio coverage or interviews about Torch devices?

A No.

Q Okay. Are you aware of a company called Rocket Convenience?

A No.

Q Does Torch have any agreements with any lobbyists?

A I don't know.

Q Are you aware of a gentleman named Steve Tilley?

A No.

Q Have you ever paid an invoice to a gentleman named Steve Tilley?

A Not to Steve Tilley himself. I mean, there's a, you know, group or whatever, but that was -- that was really it.

Q Okay. Are you thinking of a company called Strategic Capitol Consulting?

A Mm-hmm.

Q Are you aware that that's a company affiliated with Mr. Tilley?

A Yes. Yes, I mean, I just pay it and go -- I just don't think about it.

Q Okay. But you at least know that Mr. Tilley is affiliated with that company?

A Yes, but he is not the only one.

Q     Fair enough.
A     Yes.
Q     And do you know what Torch pays Strategic Capitol Consulting to do?
A     What to do?
Q     Yeah.  Do you know what -- what you're paying them for?
A     No.
Q     Okay.  Have you ever met with people from Strategic Capitol Consulting?
A     Besides Steve?
Q     Including Steve.  If you have.
A     Yeah, but it's -- I mean, yes, but it's been a little bit probably, yeah.
Q     Okay.  So when did you meet with Mr. Tilley?
A     Oh, it's been a -- it's been a little while.  I mean I could say eight months.
Q     Okay.
A     Yeah.
Q     Is Mr. Tilley an attorney?
A     No.  He was Speaker of the House, I know that, but...
Q     I don't think he is, but --
A     Okay.

Q So can you tell me then what your -- what your meeting -- the purpose was of your meeting with Mr. Tilley?
A I didn't meet with him. Steven met with him.
Q I'm sorry.
A Sorry. I should have said that clearer, but I didn't meet with him.
Q You did not meet with him?
A I did not meet with him. Steven -- Steven did.
Q Okay. Have you ever met with Mr. Tilley?
A Yeah, but it was like lunch or something like that, that Steven and I would go to a lunch, but it wasn't like, you know, we would talked about whatever. It was just lunch.
Q Okay. Have you ever had a meeting -- I'm sorry to keep asking. I just want to make sure we nail it down.
Have you ever had a meeting with Mr. Tilley where you have discussed lobbying on behalf of Torch Electronics?
A No.
Q Okay. That will do it.

Are you aware of any efforts that Mr. Tilley and Strategic Capitol Consulting engaged in to amend Missouri's gambling laws?
A No.
Q Are you aware of any efforts that were undertaken in the legislature to amend Missouri's gambling laws?
A No. Oh, wait a minute. I'm sorry. Are you -- I mean yes, I think if I -- if I know what you're talking about. Are you talking about like the VLT thing?
Q That's one possible thing, sure.
A Okay. Yeah, that's all I know.
Q And What's your awareness of that?
A That it's a VLT. It's a video lottery gambling device and things would get rewarded to the lottery. That's all I know.
Q Okay. How did -- how did you come to learn about that?
A I don't know. How? Steven?
Q Okay. Are you aware of any political contributions that Torch Electronics has made?
A No.
Q Are you aware of any, um, events that Torch Electronics has hosted on behalf of any

political candidate?
A No. I mean, no, we haven't done that. No.
Q Okay. Are you aware of any contributions that you or your husband have made to any political candidate in Missouri?
A No.
Q Are you aware of any events that you or your husband have hosted for a political candidate in Missouri?
A No. We have -- no, not hosted.
Q Okay. Have you attended any fundraising events for candidates in the State of Missouri? You personally?
A My -- myself? I -- myself?
Q Yes.
A I mean yeah, but -- yes, but not recently.
Q Okay.
A Yeah.
Q How recently?
A Five months ago maybe? Four months ago? Whatever -- I'd say like August.
Q Okay.
A Whatever August is.

Q And what event are you thinking of?
A It was just basically a fundraiser for four guys that were in the House, or Senate, and I have no clue what their names are, I don't remember.
Q Okay.
A So that is about as far as that will go.
Q Okay. Do you know if you or your husband made contributions to -- to any political candidates in connection with that event?
A No.
Q You don't know?
A I don't know, no.
Q Okay. Do you know who Greg Keller is?
A No.
Q Okay.
MR. FINNERAN: I'm going to take my mic off for a second so I can grab the exhibits real quick.
MR. CRAIG: Could we take a break while you --
MR. FINNERAN: Yeah, sure, that'll be a good time.

THE VIDEOGRAPHER: Off the record at 11:19.

(Off the record.)

(Son M Exhibits 13 through 22 marked for identification by the court reporter.)

THE VIDEOGRAPHER: We are back on the record. This is media unit number three, the time is 11:34.

Q (BY MR. FINNERAN) All right, Ms. Miltenberger, a few housekeeping matters. First, these will hopefully go quickly. I'm going to hand you a copy of what have been marked Exhibits 13 and 14. We got ahead on marking them on the break.

MR. CRAIG: Thank you.

MR. FINNERAN: You're welcome.

Q (BY MR. FINNERAN) These are copies of the first request for production that we provided to Torch and a copy of the first set of interrogatories that we provided to Torch.

I want to be clear when I'm asking these questions, I am not asking for any communications with your attorney. All I would like to know is with respect to each of these, what did you do in order to gather documents that might

be responsive to our requests?
A I'm -- can you rephrase that?
Q (BY MR. FINNERAN) Yeah. So first of all, have you seen these documents before?
A Oh. Yeah, I've seen it and I read it, sort of, and that was about it.
Q Okay. Did you take any steps thereafter to gather documents to provide to your attorney for review?
A Oh, I'm sorry. If -- so Steven would have provided those documents.
Q Okay. Did you have any involvement in that process?
A No.
Q Okay. Do you have an email account that is separate from Steven's email account?
A Yes.
Q Does Steven have access to your email account?
A Yes.
Q Do you understand whether he reviewed your email account in order to provide information to your attorney?
A Yeah, I mean...
Q Do you happen to know whether he

looked in your email account to see if there were any responsive documents to our requests?

A Yes, I mean, but there wasn't.

Q Okay.

A Yeah.

Q Okay. What about text messages? Did you have -- did you provide either your husband or your attorneys access to your text messages?

A No.

Q Okay. What about your paper files? Did you provide either your husband or your attorneys access to your paper files to respond to these requests?

A No.

Q Okay. Do you recall reading the interrogatories which are labeled as --

A 13?

Q 13, yes.

A Yeah, this is I'm saying, I did like read it, but to be honest, I didn't like totally consume it.

Q Okay. I understand. Do you recall looking up any information in order to be able to respond to these interrogatories?

A No.

Q Okay. I'm going to hand you now what have been marked as 15 and 16.

MR. FINNERAN: Aaron, here you go. Sorry. 15 and 16. Here you go.

MR. CRAIG: Thank you.

Q (BY MR. FINNERAN) So now what I've handed to you are copies of TNT's second request for production and second set of interrogatories. I will tell you that we only provided these to your attorneys last week, so I don't want to surprise with you anything, but have you seen either of these documents before?

A I've seen them, yes. Yes.

Q Okay. And have you, so far, understanding that you have more time to respond, but have you so far taken any steps to provide either your husband or your attorneys with documents to be able to respond to these requests?

A No.

Q Okay. All right. You can put those aside. All right. We're back to that sort of, um, rapid fire we did a while ago where I'm going to show you documents you probably haven't seen based upon your prior statements and you just need to confirm that for me.

A Okay.
Q But obviously if you have seen it, let me know that as well.
A Okay.
Q So the first one is number 17.
A Oh, sorry.
Q You're all right.
MR. FINNERAN: Aaron, here is 17.
Q (BY MR. FINNERAN) I've handed you a document that is titled Probable Cause Statement. It's State of Missouri versus Torch Electronics, the date on the document is December 14, 2019, and it is reflected as being in the county of Linn, L-i-n-n. And then there is a file stamp that actually says 10/21/2020.
Do you recognize this document?
A No.
Q Do you believe you've ever seen it before?
A No.
Q Okay. Are you -- were you aware in and around this time of a Probable Cause Statement being filed against Torch Electronics?
A No.
Q Okay. Here is 18. Okay.

MR. CRAIG: Thank you.

MR. FINNERAN: Do you have another stack? I lost my copy. Tim, I actually have a copy of this if you -- you're probably familiar.

MR. SIGMUND: I think I've seen it before. Thanks.

Q (BY MR. FINNERAN) These are actually -- looks like two got stapled together, but rather than making us redo that, do you see here that there is -- or actually perhaps it's an attachment. Let me see if I can figure that out real quick. Well, it's consecutively numbered, so I'll just ask you about both of them.

So what I'm showing you now is a letter dated November 6, 2019, to a Shinate McMahon, Prosecuting Attorney of Linn County, signed by your attorney, Tim Sigmund, and attached to it is an email chain of correspondence.

Do you recognize this document?

A No.

Q Have you ever seen it before?

A I have not seen it before.

Q And do you have any recollection of there being a discussion between your attorney and Mr. McMahon, the Prosecuting Attorney for Linn

County, in and around November of 2019?

A No.

Q Okay. On to Number 19. Here we have a communication from July of 2019 from your husband, Mr. Miltenberger, to a Wayne Baker, as well as two other email addresses, both ending in baker@woilco.com and if you flip to the second and third pages, you'll see it attaches a copy of the MGC letter that we discussed previously.

Do you have any recollection of seeing an email like this in and around July of 2019?

A No.

Q Do you believe you've ever seen this document before?

A No, I have not seen this.

Q And do you have -- well, we already talked about that letter, so we can move on. Here is number 20.

MR. FINNERAN: Aaron.

Q (BY MR. FINNERAN) I've just handed you a document that is marked Application and Affidavit for Search Warrant for Evidence of a Criminal Offense for the County of Greene. This is a affidavit by a Sergeant Jason B. Trammell and the

date at the end of the document is August 12, 2021.
Does this document look familiar to you?
A No.
Q Have you ever seen a document like this before?
A No.
Q Do you have any recollection of learning about an affidavit for a search warrant issued in the County of Greene in and around August of 2021?
A No.
Q Okay. Just two more. I have handed you a document marked for identification as document 21. This is a letter again from your attorney, Mr. Sigmund, to a John M. Hessel dated January 21, 2019.
Do you recognize this document?
A No.
Q Do you have any recollection of seeing a document -- this document before?
A No.
Q Do you have any recollection of there being a discussion with Mr. Hessel around 2019 -- excuse me, January of 2019 relating to Torch

devices?

A No.

Q Okay. And the last one. This is a letter dated November 8, 2018, to a City Attorney David Bandre in the City of Holts Summit, Missouri. It is also a letter from Tim Sigmund dated -- well, the letter is dated November 8, 2018.

Do you have any recollection of this document?

A No.

Q Do you believe you've ever seen it before?

A No.

Q Do you have any recollection of a discussion in around 2018 with the City Attorney of Holts Summit about the Torch devices?

A No.

Q Okay. I hope I didn't talk too fast. Just trying to move through that. Okay. Where did the photos go. All right.

Ms. Miltenberger, do you recall a Complaint being filed against Torch Electronics in the Western District of Missouri in March of this year, a class action lawsuit called Romano?

A No.

Q Do you believe you ever reviewed a copy of that lawsuit?

A No.

MR. FINNERAN: Okay. I'm going to mark this for identification as document 23, Son M 23. And let's go ahead and mark 24 at the same time.

(Son M Exhibits 23 and 24 marked for identification by the court reporter.)

Q (BY MR. FINNERAN) What I've handed you are two photographs that were provided in the lawsuit I just mentioned of children playing what appear to be, at least in one of photos, a Torch device.

Do you -- have you seen these photos before?

A Yeah, and you asked me about the lawsuit thing, um, first, and then I said no. I haven't seen that part but I had seen the photos, yeah. So I've seen these photos.

Q Okay. Was it in the context of the lawsuit you saw the photos? Or some other context?

A It was probably in that, but then I just don't remember the lawsuit part of it, but then remember this more 'cause --

Q Totally understandable. They're pictures.
A Yeah, and I don't know that they're ours but...
Q Well, if you look at the first of the two photos which is marked 23 --
A Yeah.
Q -- do you see in the center of the photograph a Torch sticker on the device?
A Yeah, I believe that's what it is.
Q Okay. And I will admit to you that I cannot make out a Torch sticker on any of the devices in the second document, but do you recognize those devices as being either similar or dissimilar to Torch devices?
MR. CRAIG: Object to form.
A I -- I don't know because I can't -- that side -- that side sticker there --
Q (BY MR. FINNERAN) Oh, I'm sorry, you're looking at a different --
A No, I see that. Anybody can Photoshop that, but yeah, I don't -- I'm not sure about -- what did you ask me?
Q Well, I'm sorry, I think we -- we've miscommunicated. So I was asking about the second

photograph.
A Oh, yes. Oh, these are not Torch machines.
Q Okay. And How do you know they're not Torch machines?
A Um, just because I'm pretty familiar with what they look like, and that's really it, yeah.
Q Okay. So you believe that the -- the physical appearance of these devices convinces you they're not Torch machines?
A Yeah. This is -- yeah.
Q Okay. So we, on the first photograph of 23 --
A This one?
Q -- yes, that one -- um, we agree that there is what appears to be a Torch sticker in the center of the photograph; correct?
A Sure.
Q And just now looking -- just ignoring the Torch sticker for the moment and looking at the rest of the machine, does that machine look like the kind of machines that Torch typically places in locations?
A Um, I don't know because there's

different kinds, but -- and they have different fronts, but I don't know that these look like Torches.

Q Okay. Fair enough. Other than seeing these photographs today and seeing them previously, do you have any awareness of children playing Torch devices?

MR. CRAIG: Object to form.

A There -- there are no children playing the Torch devices.

Q (BY MR. FINNERAN) How do you know that?

A I -- I don't, but, I mean -- I mean, especially after people saw this, they were, you know, made aware that, you know, especially children not to play. So that's all I really know.

Q Okay. Other than seeing these photographs, had you previously received any reports of children playing the machines?

A No.

Q Have you subsequently received reports of children playing the machines?

A No.

Q Are there any steps that Torch takes to prevent children from playing the machines?

A Um, I don't know.
Q You're not aware of any steps?
A At this time, no.
Q Okay. Why shouldn't children play the machines?
MR. CRAIG: Object to form.
A You're supposed to be 18.
Q (BY MR. FINNERAN) Under -- why are they supposed to be 18?
A I don't know. I thought that was on the other document. Um...
Q Is it --
A Or maybe 16. Maybe 16. It might be 16.
Q Is it your understanding there's some law that prevents children from playing the devices?
A No, there's no law, no.
Q Well, then, what is it that would prevent a child from playing the devices?
A I -- I don't know.
Q Is there a Torch policy that prevents children from playing the devices?
A Um, no.
Q Are, to your knowledge, does Torch

instruct amusement location owners to not allow children to play the devices?

A Can you repeat that?

Q Yes. To your knowledge, does Torch instruct amusement location owners and operators not to permit children to play the devices?

A Yeah, they encourage it, yeah.

Q They encourage what? Sorry?

A They encourage them not to play the machines --

Q There's two theys in the sentence.

A -- the children.

Q Who encourages whom? Torch encourages --

A Torch encourages the location for the children not to play the machines.

Q How does Torch do that?

A I don't know. I mean, I -- I don't know.

Q Okay. What is the reason that children would not be permitted to play the machines?

MR. CRAIG: Object to form. Only if you know.

A I don't know.

Q (BY MR. FINNERAN) Is it -- is it fair to assume that you -- you believe that the machines are not gambling devices?
A Oh, I definitely believe they're not gambling devices, yes.
Q So if they're not gambling devices, why would children not be permitted to play them?
MR. CRAIG: Object to form.
A I don't know. You go into a casino, can you play at ten years old?
Q (BY MR. FINNERAN) No.
A Okay.
Q But that would be a gambling device.
A Right.
Q So I'm asking you, if they're not gambling devices, why is it that a child should not be permitted to play the Torch devices?
MR. CRAIG: Object to form. If you know.
A I don't know.
Q (BY MR. FINNERAN) Okay. Do you know if Torch takes any steps to prevent what are sometimes called problem gamblers or gambling addicts from playing Torch devices?
A I don't know. I mean, Torch -- I

don't know.

Q Um, is it fair to say, then, you're not aware of any steps Torch takes to prevent problem gamblers --

A At this time, no.

Q Sorry, let me finish the question for the court reporter.

You're not aware of any steps that Torch takes to prevent problem gamblers or gambling addicts from playing Torch devices?

A Correct.

Q Okay. Do you believe that it's appropriate for Torch to prevent gambling addicts and problem gamblers from playing Torch devices?

MR. CRAIG: Object to form, calls for improper speculation.

A Um, can you repeat that?

Q (BY MR. FINNERAN) Yeah. Do you believe that it would be appropriate for Torch to take steps to prevent problem gamblers or gambling addicts from playing Torch devices?

MR. CRAIG: Same objection.

A I -- I don't know.

Q (BY MR. FINNERAN) I'm sorry, you said?

A I don't know.
MR. FINNERAN: Okay. The statute, please? We'll mark this as 25.
(Son M Exhibit 25 marked for identification by the court reporter.)
Q (BY MR. FINNERAN) Ms. Miltenberger, what I've just handed you is a copy of Missouri Revised Statute 572.010. It is the section of the Missouri law that defines, among other things, the terms "gambling, contest of chance, gambling device," and "slot machine."
A Mm-hmm.
Q Are you familiar with this section of the Missouri Statutes?
A No.
Q Has -- have -- other than a conversation with an attorney, because I don't want to know about those attorney -- those conversations, has anyone ever discussed with you the definitions of either "gambling" or "gambling device" under Missouri law? Not a conversation with your attorneys --
MR. CRAIG: Not just me, but any attorney ever.
MR. FINNERAN: Any attorney, right.

A Yeah, it's just something that -- I don't know that I've ever had a conversation with. I just kind of assume.

Q (BY MR. FINNERAN) What is it that you assume?

A That, well, what you just asked me about it being a gambling device or non-gambling device, you know, that's just -- I mean, because we been doing this for a little bit, it's just -- I just kind of feel like I know. I don't know that anybody's ever really told me.

Q Okay.

A Even Steven.

Q Told you what?

A About it being a gambling device or whatever.

Q Okay.

A Yeah.

Q So you don't recall a conversation with your husband or with any other person who is not an attorney about whether Torch devices are or are not gambling devices?

A Right.

Q Okay. Do you have an opinion as to whether they are or are not gambling devices?

MR. CRAIG: Object to form, calls for expert and legal testimony.

Q (BY MR. FINNERAN) You may answer if you have an opinion.

A Yeah, I have an opinion. They're not.

Q Why do you believe they are not?

A Just because the different forms of, you know, Steven and I have discussed to, you know, like we've been through with these questions and whatever and, you know, I just -- I just believe, I mean, I've been to Vegas, you know?

Q Mm-hmm.

A And so I know what those do and what these do and, you know, I don't know the ins and outs of it 100 percent, but I do know the logistics of just a little bit of it.

Q Okay.

A And Torch's machines are not illegal.

Q Okay. And what is it in your mind that makes a Torch machine different from a gambling device like you might have seen when you were in Vegas?

MR. CRAIG: Object to form, calls for expert testimony.

A I don't recall. I don't know.
Q (BY MR. FINNERAN) But you -- so you don't have an understanding of how they're different, but you believe that they are different in a significant way?
A Yeah, I mean, that's real technical and I don't know that I can...
Q No, that's fine if you --
A I know. I know. But I'm just saying it's real technical. I just don't know the deep, you know, the deep part of it, you know, or the ins and outs 100 percent, you know. I know the basic.
Q I understand. So I'd like to direct your attention to the first page of the document I've handed you.
A Okay.
Q You see where it says number 4 and then it says the word "Gambling"?
A Mm-hmm.
Q Okay. I'm just going to read into the record the first sentence and then ask you to read along with me to make sure I'm reading it correctly. It says (quote as read):
...a person engages in gambling
when he or she stakes or risks

something of value upon the
outcome of a contest of chance or
a future contingent event not
under his or her control or
influence, upon an agreement or
understanding that he or she will
receive something of value in the
event of a certain outcome.

First of all, did I read that correctly?

A Yes.

Q Okay. Do you have an understanding of whether the Torch devices involve a player staking something of value when they play the devices?

MR. CRAIG: Object to form, calls a legal expert opinions.

A Don't know that.

Q (BY MR. FINNERAN) Do you agree with me that in order to play the device, a player must insert money into the machine?

MR. CRAIG: Object to form, expert testimony.

A Yeah.

Q (BY MR. FINNERAN) Okay. Then at the

end of this it says that (quote as read):

...upon agreement or understanding that he or she will receive something of value in the event of a certain outcome.

Do you agree with me the Torch devices involve a agreement or understanding that the player will receive something of value in the event of a certain outcome?

MR. CRAIG: Object to the form, calls for legal and technical expert opinion.

A I don't know.

Q (BY MR. FINNERAN) Okay. Do you agree with me that a player of a Torch device has the capability of winning money in the event that the device produces a non-zero outcome?

MR. CRAIG: Object to the form of the question, expert testimony, legal and technical.

A I don't know.

Q (BY MR. FINNERAN) You don't know whether the Torch devices pay out money?

A Well, yeah, I know that they pay out money, but that's all I know. Do you have a better -- I thought there was more to the question.

Q Okay. There may have been.

A Confusing me.

Q Sorry, I don't mean to confuse you. I'm just trying to find out what we agree --

A Doesn't take much.

Q That's all right. I'm just trying to find out what we agree about and we don't agree about.

So you agree the machines sometimes pay out money; correct?

A Yes. Yes.

Q Do you agree the player who is playing the game has an understanding that it's possible for him to win money?

MR. CRAIG: Object to form, speculation as to what a player knows or understands.

A I don't know. Yeah.

Q (BY MR. FINNERAN) Okay. So the middle of the definition says (quote as read):

...upon the outcome of a contest of chance.

Do you believe that the Torch devices involve players playing a contest of chance?

MR. CRAIG: Object to form, calls for expert testimony, technical and legal.

A I don't know.
Q (BY MR. FINNERAN) Okay. And do you believe that the -- it also says (quote as read):
...a future contingent event not under his control or influence.
Do you believe the Torch devices allow a player to win or lose money on the basis of a future contingent event not under her control or influence?
MR. CRAIG: Objection, calls for speculation, legal and technical.
Q (BY MR. FINNERAN) You may answer.
A I don't know.
Q Okay. Do you agree with me that the player has no ability to control whether any particular spin of the game will be a winner or a loser for him?
MR. CRAIG: Objection, speculation, calls for technical and legal expertise.
A I don't know.
MR. FINNERAN: Okay. Okay. I think we've sufficiently covered that. Aaron, if you give me five minutes to make sure I haven't missed anything, I will be able to wrap up.
MR. CRAIG: Absolutely. Okay.

THE VIDEOGRAPHER: Off the record at 11:57.

(Off the record.)

THE VIDEOGRAPHER: We're back on the record, this is media unit number four, the time is 12:07.

Q (BY MR. FINNERAN) Okay. We are back on the record. Miss Miltenberger, thank you again for being here today. As usual, I'd like to ask and I may not have asked last time, is there anything that, on the break, that makes you want to correct or change any of the testimony you've given today?

A I don't think so. Thank you.

Q Okay. Great. Absolutely. We want to give you the fair chance to give us your best recollections to things.

So I have a series of somewhat random questions, so they won't be all that connected, but it's -- I'm trying to just get through them quickly.

So first of all, I asked you about the stickers or decals on the devices. We can pull it back up if you want to look at it?

A Oh, yeah, I know, yeah.

Q Okay. My question is, is it Torch's policy to put a sticker of that sort on every one of its devices?
A Yes.
Q Okay. I think that you told me you do not typically communicate directly with customers about -- about issues, but are you aware of any communications where customers have raised concerns about the legality of the Torch devices?
A No.
Q You're not aware?
A I'm not aware.
Q Okay. I may have asked you this question already but forgive me, have you ever been interviewed by any law enforcement official or regulatory official about the Torch devices?
A No.
Q Okay. Earlier I asked you if you'd reviewed text messages in connection with our Request for Production. Do you believe that you have any text messages that would relate to Torch or its business?
A No. I have none.
Q You believe you have none?
A I believe I have none.

Q Okay. I asked you earlier about a company called Accel Entertainment, A-c-c-e-l. I believe that your husband at one point had that listed on his LinkedIn profile as an employer of his from January of 2014 to March of 2018?
A Mm-hmm.
Q Does that reflect your --
MR. CRAIG: Is that a yes? Sorry. Excuse me.
A I'm just agreeing, yeah.
MR. CRAIG: Not that there's a question --
MR. FINNERAN: Actually, I was --
MR. CRAIG: -- there was an mm-hmm. I'm just trying to get --
Q (BY MR. FINNERAN) I haven't quite asked the question yet.
MR. CRAIG: Okay. Sorry.
Q (BY MR. FINNERAN) So my question is, does that refresh your recollection about the company Accel Entertainment?
A Yes. I don't remember the question earlier, but yes, he worked for -- for them --
Q Okay.
A -- at those time periods roundabout

yeah. Yeah.
Q Yeah. But my question before was simply if you were aware of such a company, and I don't think you recalled it at that --
A Oh, that's what it was.
Q Hopefully I've refreshed your recollection.
A Yes.
Q So what do you know of that company?
A They are, um, they're just another -- well, they're a gambling business. I don't know what you want to, call it gambling or whatever. They're an entertainment company in Illinois.
Q Okay.
A Closer to Chicago area, so.
Q Was he an employee of that company?
A He was an employee. I think he did the marketing. Marketing part of that, so.
Q Did that company sell devices that are similar in kind to the Torch devices?
MR. CRAIG: Object to form.
A I don't know that.
Q (BY MR. FINNERAN) Okay. Do you know what the -- do you know what sort of products that company sold or distributed?

A Oh, no. No.
Q Okay. What -- you said that he had some involvement in marketing. Do you have a more understanding of what specifically he did?
A No.
Q Okay. Was that his only occupation during the time of January 2014 to January 2018 was working for Accel Entertainment?
A Yes, sir.
Q Okay. Do you know if Mr. Miltenberger has any ownership interest in Accel Entertainment?
A He does not, no. He does not have any.
Q Okay. Does -- does -- does Mr. Miltenberger have any contractual relationship today with Accel Entertainment?
A No.
Q Does Mr. Miltenberger have any prior contractual relationship with Accel Entertainment other than his employment?
A No.
Q Okay. I think this is implicit, but do you have any of those connections with Accel Entertainment?

A No.

Q Have you ever been employed by Accel Entertainment?

A No.

Q Does Torch have any common ownership with Accel Entertainment?

A No.

Q Okay. Do you know a person by the name of Sherri Harris?

A No.

Q I'll try to refresh your recollection. Do you know a person named Sherri Harris who works with Banilla?

A No. I'm trying to go through my names of Banilla people I know and --

Q Okay.

A -- no. Sherri Harris or Garris?

Q Oh, I'm sorry, Garris. My bad.

A Oh, okay, that's why it was taking a second.

Q Okay.

A Yes, I do know her. I -- alls I know her from is invoicing, though.

Q Okay.

A Yeah.

Q What is her role at Banilla?
A Accounts payable maybe? Accounting? Yeah.
Q Does she send you invoices on a regular basis?
A Just when we've made a purchase, when Torch Electronics has made a purchase, yeah.
Q Would she be the person who would typically send you an invoice under those circumstances?
A There's three of them.
Q Okay. Who are the others?
A Kelly, Kelly somebody, and Charity Randolph. That's all I can remember.
Q Okay. Does -- does Banilla only invoice -- strike that.
Does Banilla ever invoice Torch on a more regular basis than simply whenever it purchases products from Banilla?
A No, it's just as we purchase.
Q Okay.
A Yeah. But everything's due at the end of the month and we do a wire and that's how it's taken care of.
Q Okay. Are you familiar with a

company called Swizzle Stick?
A No.
Q Do you recall a company called Swizzle Stick at one point providing any services to Torch?
A No.
Q Okay. Do you know a person by the name of Dan Bryan, B-r-y-a-n, Bryan?
A No, I'm just thinking of somebody that works for us, but his last name is Grace, so no.
Q Okay. That's great then. You mentioned earlier that you have never played a Torch device; is that correct?
A Correct.
Q Is there any reason that you have never played a Torch device?
A No, not really. I mean, you know, if -- to be honest, if I've played it, it was in the shop and it was just trying it out. And I really just don't want to be like in the convenient store and playing it and it's -- I'm his wife and that's just, I don't know. Just the image.
I just don't want to be -- I just want it to be like -- I wanted -- if I wanted to --

I just don't gamble or entertain myself with those kinds of things, so.

MR. FINNERAN: Okay. Fair enough. I believe that concludes my examination.

THE WITNESS: Awesome.

MR. FINNERAN: So thank you so much for your time, I really do genuinely appreciate it.

THE WITNESS: Of course, okay.

MR. FINNERAN: Aaron?

MR. CRAIG: I've got nothing.

MR. FINNERAN: Okay.

THE VIDEOGRAPHER: We are off the video record at 12:14.

THE WITNESS: Great.

THE REPORTER: What would you like to do about signature?

MR. CRAIG: Yeah, we'll read and sign.

MR. FINNERAN: And we'll take a rough and a final.

THE REPORTER: Mr. Craig, do you need a rough draft as well?

MR. CRAIG: Yeah, that'd be great.

(Wherein, the taking of the instant deposition ceased at 12:14 PM.)

(Deposition to be read and signed by the witness.)

CERTIFICATE OF REPORTER

I, TARA SCHWAKE, a Registered Professional Reporter and Notary Public within and for the State of Missouri, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Notary Public in and for
The State of Missouri

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

December 22, 2023

To: Mr. Craig

Case Name: TNT Amusements, Inc., D/B/A Play-Mor Coin-Op v. Torch Electronics, LLC., Et Al

Veritext Reference Number: 6343994

Witness: Sondra Miltenberger        Deposition Date: 12/8/2023

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 6343994
CASE NAME: TNT Amusements, Inc., D/B/A Play-Mor Coin-Op v. Torch Electronics, LLC., Et Al
DATE OF DEPOSITION: 12/8/2023
WITNESS' NAME: Sondra Miltenberger

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ ________________________
Date Sondra Miltenberger

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 6343994
CASE NAME: TNT Amusements, Inc., D/B/A Play-Mor Coin-Op v. Torch Electronics, LLC., Et Al
DATE OF DEPOSITION: 12/8/2023
WITNESS' NAME: Sondra Miltenberger

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_______________ ________________________
Date Sondra Miltenberger

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this ______ day of____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 6343994

PAGE/LINE(S) / CHANGE /REASON

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

________________ __________________________

Date Sondra Miltenberger

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

___________________________________

Notary Public

___________________________________

Commission Expiration Date

**&**

**&** 79:3

**0**

**00330** 1:7 8:18

**1**

**1** 2:10 49:17,20 49:22 50:2 100:5
**1/21/2019** 4:5
**10** 3:5 89:18,19
**10/21/2020** 119:15
**10/5/2020** 2:19 85:14,15
**100** 77:16 134:16 135:12
**1099** 60:25 61:8,11 62:2
**1099s** 40:17
**10:00** 52:15
**10:12** 51:19
**11** 3:7 90:10,11 91:16
**11/6/2019** 3:22
**11/8/2018** 4:7
**1100** 6:14 151:1
**115** 3:13,15
**117** 3:17,19
**118** 3:21
**119** 3:23
**11:00** 52:15
**11:19** 115:2
**11:34** 115:8
**11:57** 140:2
**12** 3:10 91:11 122:1
**12/14/2019** 3:21
**12/8/2023** 151:9 152:3 153:3
**120** 3:25
**121** 4:4
**122** 4:6,8
**123** 4:10,11
**12:07** 140:6
**12:14** 148:13 148:25
**13** 3:8,12 90:15 115:4,13 117:17,18
**131** 4:13
**14** 3:14 89:7 115:13 119:12
**15** 3:16 66:1 96:13 105:22 118:2,4
**16** 3:4,18 66:1 89:5 118:2,4 128:13,13,14
**17** 3:20 16:21 119:5,8
**18** 3:22 119:25 128:7,9
**1820** 151:2
**19** 3:24 121:3

**2**

**2** 2:11 61:18 64:1,4 69:20 108:19
**2/11/2022** 3:11
**20** 4:3 121:19 152:16 153:22 154:22
**2014** 142:5 144:7
**2015** 16:10 66:3
**2016** 16:10 66:3
**2017** 16:21 17:8
**2018** 16:21 93:18 123:4,7 123:15 142:5 144:7
**2019** 2:16 82:18 84:8 119:12 120:15 121:1,4,12 122:17,24,25
**2020** 3:5,8 85:24 86:25 89:23 90:15
**2021** 3:4 87:24 88:16 89:5,7 89:12 122:1,11
**2022** 91:16
**2023** 1:20 5:5 8:11 151:4
**21** 4:5 122:15 122:17
**211** 5:6 6:5 8:20
**216-523-1313** 151:3
**22** 4:7 115:4 151:4
**23** 4:9 124:5,6 124:8 125:6 126:14
**24** 3:5 4:11 89:22 124:6,8
**25** 4:12 88:16 99:8 132:3,4
**256-3181** 6:16
**259-2000** 6:7
**25th** 10:4
**2700** 6:14
**28396** 150:19
**2g** 61:20

**3**

**3** 2:13,16 67:6 67:8 84:8
**300** 6:21
**305** 6:21
**31** 16:12
**310** 7:5
**314** 6:7
**3600** 5:7 6:5
**391-3376** 7:7

**4**

**4** 2:15 68:10,11 68:15 135:17

**4,000** 20:12
**4,500** 20:12,12
**44114** 151:2
**49** 2:10
**4:23** 1:7 8:18

**5**

**5** 2:16 82:10,11
**5,000** 54:6
**5.5.0.17** 74:3
**50** 96:16
**50,000** 81:17
**50/50** 23:19 41:23 59:23
**513.660** 2:23
**513.660.** 87:15
**5608** 2:17
**572.010** 4:13
**572.010.** 132:8
**573** 6:23

**6**

**6** 2:18 84:16,17 120:15
**600** 61:1
**63** 2:12
**63101** 7:6
**63102** 6:6
**6343994** 151:8 152:2 153:2 154:2
**635-7699** 6:23
**64105** 6:15
**65101** 6:22
**66** 2:14
**68** 2:15

**7**

**7** 2:20 86:2,3 86:16
**7/5/2019** 3:24
**701** 7:5
**7:00** 52:14

**8**

**8** 1:20 2:22 8:11 86:11 87:7,9 123:4,7
**8/12/2021** 4:4
**816** 6:16
**82** 2:17
**84** 2:19
**85** 2:21
**86** 2:23
**88** 3:4
**888** 7:7
**89** 3:6
**8th** 5:5

**9**

**9** 2:6 3:3 61:23 88:20 89:1
**90** 3:9
**91** 3:11
**98** 105:2
**9:17** 8:9,11
**9:57** 51:15

**a**

**aaron** 6:17 9:6 16:12 46:9 49:21 87:6 118:3 119:8 121:20 139:22 148:9
**ability** 24:8 33:1 75:8,13 101:15 139:15 150:9
**able** 32:16 74:15 117:23 118:18 139:24
**above** 83:11 151:17
**absolutely** 91:2 139:25 140:15
**accel** 94:10 142:2,21 144:8 144:11,17,20 144:24 145:2,6
**accept** 77:20
**acceptor** 33:1
**acceptors** 77:12
**accepts** 77:6
**access** 32:16 116:18 117:8 117:12
**accompanied** 9:5
**accomplish** 63:5
**accordance** 152:5 153:5
**account** 29:24 100:18 101:7 101:13 102:5,7 103:2,8,12 116:15,16,19 116:22 117:1
**accounting** 14:1,2,14,16 15:5 18:12,13 18:13 25:14 57:21,23 62:12 62:14 76:25 99:1 100:15 103:14 104:22 146:2
**accounts** 15:1,5 36:11 98:24 101:14 102:22 104:24 146:2
**accuracy** 99:6
**acknowledge** 152:11 153:16
**acquired** 39:25 43:19 44:13,24 45:9 46:3,6,10 46:11
**acraig** 6:18
**act** 152:14 153:20
**action** 87:22 93:17 123:24 150:12,16
**actions** 92:4
**actual** 106:22
**actually** 14:8 16:11,13,19 18:15 21:17 32:16 51:8 68:6 83:19

87:4 119:15 120:3,7,10 142:13
**addicts** 130:24 131:10,13,21
**additional** 20:20
**address** 151:16
**addresses** 121:6
**admit** 125:11
**adp** 29:12
**afar** 71:23
**affect** 76:12
**affidavit** 4:3 121:23,25 122:9
**affiliated** 13:16 56:18 62:18 97:2 109:20,24
**affixed** 2:12 64:16 152:15 153:21
**age** 9:12
**agencies** 92:9
**agency** 95:15
**ago** 20:1 40:11 43:19 44:23 68:2 83:15 105:20,21,22 106:8 107:20 107:21,21 108:15 113:22 113:23 118:22
**agree** 10:15 44:3,5 50:7 100:2 126:16 136:19 137:6 137:14 138:3,6 138:6,8,11 139:14
**agreed** 2:10 8:1 24:2
**agreeing** 142:10
**agreement** 26:23 42:5 49:9,11 59:24 136:5 137:2,7
**agreements** 42:1,8 59:21 95:14 109:5
**ahead** 23:14 115:13 124:6
**al** 8:15 89:25 90:1 151:7 152:3 153:3
**allegation** 106:1,6 107:15
**allegations** 107:9
**allow** 129:1 139:7
**allows** 80:22
**alls** 145:22
**amend** 112:3,6
**amount** 20:17 30:17 60:6 81:8
**amounts** 80:24
**amusement** 2:12 25:11 38:19 42:25 43:23 59:22 60:2,5,20 62:7 70:10 71:7 72:23 93:22 129:1,5
**amusements** 1:5 3:12,14,16 3:18 8:14 9:4 95:19,24 105:8 151:6 152:3 153:3
**annual** 98:12 99:5
**answer** 11:2,2 11:12,23 12:8 13:21,22 17:1 19:7 27:12 33:4,6 34:4 44:17 49:4 53:11 65:13,14 70:12 74:7,15 74:17 79:15,21 82:2 84:13 90:23 91:4 92:16 97:6 100:24 134:3 139:12
**answered** 69:7 71:6
**answers** 67:4 73:15
**anybody** 10:13 22:6,9 25:16 69:2 125:21
**anybody's** 133:11
**anymore** 99:9
**apart** 64:2 87:8
**apparently** 62:2
**appeals** 89:23
**appear** 124:13 152:11 153:15
**appearance** 126:10
**appearances** 6:1
**appears** 126:17 150:6
**appellate** 89:24
**appended** 153:11,18
**application** 4:3 121:22
**applies** 31:11
**appreciate** 148:7
**appropriate** 131:13,19
**approximately** 63:14
**ar** 98:25
**area** 108:22 143:15
**arrangements** 41:21 94:16

**article** 2:14,15 106:15 107:16
**articles** 107:1,5 107:9
**aside** 69:10 118:21
**asked** 11:22 33:8 43:17 83:10,23 105:7 124:17 133:6 140:10,22 141:13,18 142:1,17
**asking** 11:14 12:1 16:1 28:24 47:13 55:7 67:23 105:25 111:19 115:21,22 125:25 130:15
**assesses** 102:25
**assignment** 152:2 153:2 154:2
**assistance** 16:18 55:12
**associates** 79:3
**assume** 130:2 133:3,5
**attached** 4:18 120:17 153:7
**attaches** 121:8
**attachment** 3:23,25 120:10
**attended** 48:22 113:12
**attention** 135:14
**attorney** 11:19 12:9,11 32:6 50:4 110:21 115:23 116:9 116:23 120:16 120:17,24,25 122:16 123:4 123:15 132:17 132:18,24,25 133:21 150:14
**attorney's** 88:6
**attorneys** 12:5 32:5 52:13 117:8,12 118:10,17 132:22
**audit** 21:13,13 22:13 24:12 30:18 31:8,9 40:19 58:17
**audited** 31:18 31:19
**auditor** 24:18 27:3,7,8,13 29:4 39:21 55:24 101:20 101:23
**auditor's** 101:24
**auditors** 24:15 24:16 28:21,21 31:24 32:3,14 32:23 33:14 40:3,6 41:5,8 53:19 55:10,15 58:12,13,14,15 101:6 102:4 104:6
**august** 113:23 113:25 122:1 122:10
**authority** 101:12,13,17
**authorize** 102:4 153:11
**automated** 43:9
**available** 20:21
**ave** 151:1
**aware** 21:23,25 23:25 25:16,17 25:21,22 33:13 37:23 60:1,4,9 60:15,19,24 61:4 64:19 75:6,10,19 76:2 78:5,8 79:5,11,17 80:18,21 81:4 81:7,10 92:2,3 92:7,11,20,23 93:1,5,12,13,14 93:17,21,24 94:2,9,12,15,20 95:6,7,14 97:25 106:1,5 106:11,25 107:8,13 109:2 109:8,19 112:1 112:5,21,24 113:4,8 119:21 127:15 128:2 131:3,8 141:7 141:11,12 143:3
**awareness** 112:14 127:6
**awesome** 148:5

**b**

**b** 1:5 9:22 10:9 121:25 147:8 151:6 152:3 153:3
**back** 23:16 28:16,19 34:10 39:22 40:13 43:18 51:17,21 67:3 81:20 84:20 85:4 88:23,24 89:4 100:6,7 103:13 115:6 118:21 140:4,7,24 151:16
**bad** 145:18
**baker** 121:5,7
**balance** 22:20 22:24 23:1,5 25:25 104:7,22 105:1

**bandre** 4:8 123:5
**banilla** 37:24 38:1,2,11 62:19,20 70:16 71:3,3 78:14 79:7,13 94:12 94:13,16,19,21 94:24 95:9,11 145:13,15 146:1,15,17,19
**banilla's** 38:24
**bank** 15:1 19:4 29:24 53:22 98:24,24 101:3 101:4,6,13,14 101:20,21,22 101:24,24 102:5,7,8,11,19 102:21 103:8 103:11,12 104:24
**banks** 102:10 102:11,16,22 103:1
**based** 18:15 57:6 63:11 99:10 118:23
**basic** 13:18 14:2,16,18,20 24:6 28:10 36:19 52:12 62:21 135:12
**basically** 14:5 14:24 16:9 19:3,10 21:12 21:13 22:15,18 22:19,20 23:2 23:6 26:6,22 26:23,25 29:1 29:7,22 30:6 36:11 39:3,9 39:24 40:15 43:21 46:12,12 46:15,18 53:21 53:22 55:9 58:17 59:4 62:18 64:12 67:1 98:23 99:1 101:17 108:11,12 114:2
**basis** 18:25 24:6 30:12 31:4,7 100:16 139:7 146:5,18
**bathroom** 71:20
**bclplaw.com** 6:10,11
**beginning** 13:17 16:6 20:3 65:22,23
**behalf** 1:19 9:4 9:6 111:23 112:25
**believe** 63:19 63:21 65:1,2 69:24 70:1 75:14 77:2 92:3 96:20 119:18 121:14 123:11 124:1 125:10 126:9 130:2,4 131:12 131:19 134:7 134:11 135:4 138:22 139:3,6 141:20,24,25 142:3 148:4
**benefit** 10:23
**best** 11:11 107:25 140:16 150:9
**better** 17:21 44:5 100:24 137:23
**big** 14:18,21,25 39:10 73:3 84:21
**bill** 30:25 33:1 40:24 70:22,23 77:12
**billing** 71:2
**bills** 19:6 70:17 71:3 95:2
**bin** 76:22
**bingo** 3:6 89:24
**bit** 23:15 26:6 58:11 62:16 110:14 133:9 134:17
**blank** 33:22
**block** 14:10
**bonuses** 20:20 56:5
**break** 11:17,17 11:18,24 12:22 51:13,22,23 60:14 64:2 84:21 96:10 114:22 115:14 140:11
**broadway** 5:6 6:5 8:20
**brought** 85:22 86:24 87:22 92:8
**browning** 6:20
**bryan** 5:6 6:4 8:20 147:8,8
**buck** 73:3
**busey** 103:12
**business** 16:10 16:24 17:12 19:13 20:24,25 23:23 34:11,13 36:22 37:3,6,9 37:15,21 44:1 44:1 61:2 76:24 99:12,13 141:22 143:11
**button** 75:9
**buy** 38:10,25

**c**

**c** 29:16 61:11 94:10,10 142:2 142:2

**ca** 151:25
**cabinets** 62:21
**calendar** 7:8 61:2
**call** 24:12,15 30:24 31:2,4,8 31:11 35:7 44:9 52:22 58:16 72:15 143:12
**called** 37:23 62:2 74:3 75:12 79:3 93:15,22 94:2 94:9 109:3,17 123:24 130:23 142:2 147:1,3
**calls** 12:7,8 30:7,7,22 65:12 75:24 81:21 131:15 134:1,24 136:16 137:10 138:24 139:10 139:19
**candidate** 113:1,6,10
**candidates** 113:13 114:11
**capability** 137:15
**capitol** 109:17 110:4,10 112:2
**care** 52:23 58:5 76:23 146:24
**carolina** 3:11 39:4 91:14,15 91:21
**carry** 21:10
**case** 2:20 8:17 11:8 20:13 35:6 50:11 86:19 89:24 90:19 92:7 96:2 100:25 151:6 152:3 153:3
**cases** 82:5
**cash** 23:3 24:25 53:24 59:8 76:21,22 77:6 77:21 104:7
**casino** 130:9
**cause** 2:18 3:20 85:10 119:10 119:22 124:25
**cave** 5:6 6:4 8:20
**ccr** 7:2
**ceased** 148:25
**celebrated** 10:4
**center** 125:8 126:18
**certain** 136:8 137:5,9
**certificate** 150:1 153:11
**certification** 152:1 153:1
**certified** 5:9,9 5:10 8:4,23,23
**certify** 150:5
**chain** 120:18
**chance** 2:11,13 2:15 13:15 72:8,12,15,20 76:6 90:6 91:22 132:10 136:2 138:21 138:23 140:16
**change** 140:12 151:14,15 153:8 154:3
**changed** 20:4 20:17 28:12 64:20,24 65:1 65:2 68:19
**changes** 68:22 151:13 152:7 153:7,9
**charge** 48:24 48:25 85:11,22
**charges** 86:23
**charity** 146:13
**check** 51:8 99:9
**checks** 36:13
**chesterfield** 39:8
**chicago** 143:15
**child** 128:20 130:16
**children** 4:9 35:25 124:12 127:6,9,16,19 127:22,25 128:4,16,23 129:2,6,12,16 129:21 130:7
**choose** 79:18 80:23
**chooses** 80:2
**circumstance** 79:12
**circumstances** 13:2 23:25 42:19 59:25 66:21 79:6 146:10
**city** 6:15,22 123:4,5,15
**civil** 152:5 153:5
**claimed** 106:4
**clarification** 32:22 52:7
**clarify** 11:11 47:16 51:24
**clarifying** 47:11
**class** 123:24
**clear** 10:24 27:7,13 34:24 35:8,15 46:6 115:21
**clearer** 44:22 111:8
**cleveland** 151:2
**client** 95:19,22 96:12

**clipped** 84:20
**close** 99:25
**closer** 143:15
**clue** 114:4
**clvs** 7:3
**code** 28:6
**coin** 1:5 151:6 152:3 153:3
**cole** 92:8
**collate** 84:24
**colleague** 9:5
**collect** 101:7
**collecting** 24:6
**collections** 53:18
**colloquially** 35:4
**combine** 58:3
**come** 23:16 28:16 34:9 39:10,12 40:13 49:16 67:3 101:25 112:18
**comfortable** 10:13 13:1
**coming** 103:17
**commenced** 8:9
**commission** 56:8 84:4,10 93:2 152:19 153:25 154:25
**commissions** 20:20 56:3
**common** 145:5
**commonwealth** 3:9 90:15,17
**communicate** 15:18 55:15,17 141:6
**communicates** 52:18
**communication** 12:9 32:11 36:21 46:21,24 70:15 71:7,10 121:4
**communicati...** 12:2,10 15:22 115:23 141:8
**companies** 32:2 56:13,17 58:4 58:9
**company** 16:13 21:21 25:17,20 29:13,13,20 32:10 37:23 43:19 44:13,24 44:25 45:2,8 45:15,25 46:4 48:14 56:10,11 57:22,24 79:2 89:24 93:15,21 94:2,9 99:16 99:22 109:2,16 109:19,24 142:2,21 143:3 143:9,13,16,19 143:25 147:1,3
**compensated** 28:22
**complaint** 96:1 96:8,12 105:13 105:23,25 123:22
**completed** 151:16
**complicated** 41:16
**comply** 78:7
**concepts** 93:22
**concerns** 141:9
**concludes** 148:4
**conduct** 34:11
**confirm** 49:5 118:25
**confuse** 138:2
**confused** 45:6 49:19 52:24
**confusing** 11:7 61:17 138:1
**congratulations** 10:5
**connected** 52:6 140:19
**connection** 35:18,20 36:1 37:3,6,8,15,21 114:11 141:19
**connections** 144:24
**consecutively** 120:12
**considerably** 99:12
**considered** 18:4
**consistent** 28:11
**constantly** 52:14
**consulting** 109:17 110:4 110:10 112:2
**consume** 117:21
**contends** 50:10 105:14
**contention** 105:18
**contest** 2:11 132:10 136:2 138:20,23
**context** 36:22 124:21,22
**contingent** 136:3 139:4,8
**contract** 42:10
**contracted** 40:21
**contractor** 18:4 22:6 25:22 34:25 35:2 40:16 56:8 59:11,16
**contractors** 18:8 21:4,5,10 22:1,4 28:20

31:24 52:13 54:1,11 63:4 66:25 95:12 97:22
**contractual** 94:16 144:16 144:20
**contributions** 112:22 113:5 114:10
**control** 136:4 139:5,8,15
**convenience** 109:3
**convenient** 44:1,2 45:4,11 45:14,15,16,19 45:21 46:1 71:20 147:21
**conversation** 12:4,5 132:17 132:21 133:2 133:19
**conversations** 12:3 132:19
**convinces** 126:10
**copies** 64:2 115:17 118:7
**copy** 49:20 50:1 85:3 89:22 90:14 96:7,10 115:12 115:19 120:3,4 121:8 124:2 132:7
**corporate** 57:18
**corporation** 57:5,12,15,17
**correct** 18:3 23:20 27:15 29:25 30:1,1 32:6 41:24 47:23 51:24 70:4 72:21 73:13 74:10 84:23 86:13 98:11 101:9 126:18 131:11 138:9 140:12 147:14,15
**corrections** 151:13 153:17
**correctly** 135:23 136:10
**corresponden...** 120:18
**counsel** 8:2,2 8:13 9:1 150:11,14
**counter** 43:6,8
**county** 59:9 88:6 92:8 93:18 102:19 119:13 120:16 121:1,24 122:10 152:10 153:15
**couple** 43:19 50:9 54:10 105:21
**course** 34:12 42:20 53:16 61:2 62:23 78:15 81:17 148:8
**court** 1:1 5:10 7:1 8:16,24 10:20 11:9 49:23 64:5 67:9 68:12 82:12 84:18 86:4 87:10 89:2,20,23 90:12,16 91:12 91:14 96:13 115:5 124:9 131:7 132:5 152:7
**courtroom** 13:9
**cover** 23:16 28:18
**coverage** 108:25
**covered** 139:22
**covers** 21:2
**craig** 6:17 9:6,6 33:3 44:16 46:5 48:12 50:17 51:4,10 53:10 54:19 55:20 63:7,10 65:12 66:6 67:15,18 70:11 73:12,24 75:24 76:8,14 77:9 79:9,14,20 81:1,21 82:15 83:18 85:4 86:7,11 88:21 88:23,25 90:22 92:15 100:2,20 104:9 106:16 107:6,11,18 114:22 115:15 118:5 120:1 125:16 127:8 128:6 129:23 130:8,18 131:15,22 132:23 134:1 134:24 136:16 136:22 137:10 137:17 138:14 138:24 139:10 139:18,25 142:8,11,14,18 143:21 148:10 148:17,21,23 151:5
**crazy** 16:3
**created** 65:17 65:21
**creating** 69:19 70:2
**credit** 92:3
**criminal** 4:4 121:24

**cross** 57:2
**crr** 7:2
**csr** 7:2
**current** 59:12 59:16
**customer** 22:10 46:22 64:12
**customers** 15:19,19 44:4 52:13,15,16,17 141:7,8
**cv** 1:7 8:18

**d**

**d** 1:5 2:1 9:21 151:6 152:3 153:3
**dan** 147:8
**date** 85:13 89:6 119:12 122:1 151:9 152:3,9 152:19 153:3 153:13,25 154:20,25
**dated** 2:18 3:3 3:21 4:4 89:5 120:15 122:16 123:4,6,7
**david** 4:8 123:5
**day** 5:5 10:17 16:3 18:25,25 19:1,1 152:16 153:22 154:22
**days** 106:23 151:19
**deal** 50:21
**dear** 151:10
**decal** 65:4,7,11 65:18,20
**decals** 140:23
**december** 1:20 5:5 8:11 119:12 151:4
**decided** 3:7 90:15
**decision** 3:5,7 3:10 70:7 89:22 90:3,6 90:14 91:5,8 91:13,18,21
**deed** 152:14 153:20
**deemed** 151:20
**deep** 135:10,11
**defendants** 1:10 6:12 8:3 9:7
**define** 15:19
**defines** 132:9
**definitely** 130:4
**definition** 138:19
**definitions** 132:20
**degree** 76:6
**deluxe** 74:3
**department** 3:6 89:25 151:22
**depends** 105:2
**depose** 13:15
**deposed** 10:12 13:4
**deposit** 29:21 53:21 101:6,12 101:20,25
**deposited** 29:8 103:3
**deposition** 1:18 5:3 8:3,9,13,19 11:20 148:25 149:1 150:7,12 151:9,12 152:1 152:3 153:1,3
**deposits** 102:5 103:17 104:23
**describe** 13:24 14:19 18:25 22:13 26:2 49:8,12 52:9
**description** 2:9 3:2 4:2 72:4
**determine** 31:20 103:22
**develop** 50:5
**device** 2:12,12 4:10,11 42:12 49:10,12 64:16 70:19 72:23 74:14 76:7,12 79:7,13 85:12 85:23 103:22 112:16 124:14 125:9 130:13 132:11,21 133:7,8,15 134:22 136:20 137:14,16 147:14,17
**devices** 15:20 38:20,21 39:17 49:2 50:7 53:15 63:15 70:9 71:11,13 72:12,14,18 73:8,21 74:19 75:7,21,21 76:17,19 77:6 77:11,20 78:6 79:18 80:19,22 81:4,7,11 87:13,24 88:5 90:7 91:22 92:13,24 93:3 93:8,19 94:20 94:24 105:10 105:14,15 106:2 107:2,9 107:10,16 108:6,14,25 123:1,16 125:13,14,15 126:10 127:7 127:10 128:17 128:20,23 129:2,6 130:3 130:5,6,16,17 130:24 131:10 131:14,21 133:21,22,25

136:13,15 137:7,21 138:22 139:6 140:23 141:3,9 141:16 143:19 143:20
**dictated** 75:22
**different** 26:19 33:8 43:3 50:8 57:8 58:1 68:14,15 73:21 79:19 125:20 127:1,1 134:8 134:21 135:4,4
**direct** 16:12 18:9 29:8,21 135:13
**directed** 83:20
**direction** 150:10
**directly** 42:17 42:21 54:8 55:16,18,25 101:6 141:6
**disclaimer** 67:2
**discount** 94:24
**discussed** 19:25 92:14 111:22 121:9 132:19 134:9
**discussion** 120:24 122:24 123:15
**discussions** 84:8
**disoriented** 52:6
**dispense** 27:24
**display** 73:10
**dispute** 50:10
**disputes** 60:1
**dissimilar** 125:15
**distinguish** 49:18
**distributed** 143:25
**district** 1:1,2 8:16,16 89:24 123:23
**divide** 41:6
**division** 1:3 8:17 42:2
**document** 50:3 64:7 66:16,18 66:19,20,22 67:6,11,13,23 67:24 68:9 82:16 83:25 85:10,16,18 86:20,21 87:17 88:20 89:9 96:16,21,22 119:10,12,16 120:19 121:15 121:22 122:1,2 122:5,14,15,18 122:21,21 123:9 124:5 125:13 128:11 135:14
**documents** 72:11 115:25 116:4,8,11 117:2 118:12 118:18,23
**doing** 10:25 29:6 49:17 58:17 89:15 100:15 133:9
**draft** 148:22
**drafting** 65:4
**drive** 16:3
**dropped** 39:13
**dry** 40:10
**due** 146:22
**duly** 150:7
**duties** 20:1,2

**e**

**e** 2:1 9:22,22,22 10:1,8,8,9,9,9 29:16 94:10 142:2
**earlier** 43:5 47:7 53:20 59:20 63:2 70:24 76:20 93:25 104:5 105:7 141:18 142:1,23 147:13
**earned** 25:6
**easier** 10:16 80:8
**east** 6:21
**eastern** 1:2,3 8:16,17
**effort** 104:21
**efforts** 112:1,5
**eight** 110:18
**either** 31:8 50:6 52:13 54:23 60:10 117:7,11 118:11,17 125:14 132:20
**electronic** 73:9
**electronics** 1:8 3:3 8:15 13:25 14:3,13 26:24 36:6,8 40:21 45:18,21 56:18 56:22,23,25 57:4,6,22,23 59:21 65:23 66:19,20 87:12 87:23 89:5,12 96:14 101:25 102:5,11 104:13,17 111:23 112:22 112:25 119:11 119:23 123:22 146:7 151:7 152:3 153:3
**element** 76:6
**else's** 52:23
**email** 3:24 29:4 34:12 36:23,24 116:15,16,18

116:22 117:1 120:18 121:6 121:11 151:17
**emails** 14:10 34:17
**employ** 63:3
**employed** 145:2 150:11 150:14
**employee** 34:20 34:21,23,25 56:7 143:16,17 150:14
**employees** 17:25 35:7,9 95:9 97:20
**employer** 142:4
**employment** 144:21
**enclosed** 151:12
**encourage** 129:7,8,9
**encourages** 129:13,14,15
**enforcement** 92:12,19 95:15 141:15
**engaged** 35:13 112:2
**engages** 135:24
**enter** 58:13
**entered** 153:9
**entertain** 148:1
**entertaining** 73:10
**entertainment** 94:10,10 142:2 142:21 143:13 144:8,12,17,20 144:25 145:3,6
**entire** 152:5 153:5
**entirety** 15:4
**entities** 107:2
**equal** 23:5
**errata** 151:14 151:19 153:7 153:10,18 154:1
**especially** 127:14,15
**et** 8:15 89:24 89:25 151:7 152:3 153:3
**evaluate** 78:6
**event** 114:1,11 136:3,8 137:5 137:9,15 139:4 139:8
**events** 112:24 113:8,13
**everybody** 18:3 21:20
**everything's** 146:22
**evidence** 4:4 121:23
**exactly** 39:16 80:12
**examination** 2:6 9:15 148:4
**examined** 5:4 9:13
**example** 31:25 46:20,22 72:22
**examples** 50:9
**exception** 11:20
**exceptions** 55:24
**excerpt** 67:21
**excuse** 48:13 72:11 75:20 82:24 122:25 142:9
**executed** 153:10
**execution** 152:14 153:19
**exhibit** 2:10,10 2:11,13,15,16 2:18,20,22 3:3 3:5,7,10,12,14 3:16,18,20,22 3:24 4:3,5,7,9 4:11,12 49:22 63:25 64:4 67:8 68:11 82:11 84:17 86:3 87:3,4,9 89:1,19 90:11 91:11 100:6 132:4
**exhibits** 2:8 3:1 4:1,18 49:17 49:19 114:20 115:4,13 124:8
**existence** 28:11
**exists** 76:6
**expect** 34:3
**expert** 34:3 65:13 75:25 134:2,25 136:17,22 137:11,18 138:25
**expertise** 32:15 32:24 33:10,11 139:19
**expiration** 152:19 153:25 154:25
**explain** 65:10
**explains** 64:10
**expressly** 8:6
**extent** 63:11 70:12

**f**

**f** 18:20,20
**facebook** 37:17
**fact** 75:6 79:17 80:21
**fair** 14:9 31:7 33:23 44:9 72:17 73:7 74:5,11,12,18 77:5 79:24,25

83:21 86:19 91:7,20 93:5 93:10 95:2 99:11 105:4 110:1 127:4 130:2 131:2 140:16 148:3
**fairly** 48:5
**familiar** 33:17 50:15,18,24 68:18 72:7 73:20 75:11,20 78:24 79:2 90:2 91:17 98:3 100:14 120:4 122:2 126:6 132:13 146:25
**familiarity** 89:9 91:4 95:18
**familiarize** 85:9
**far** 19:24 41:15 58:17 69:5 76:25 78:9 114:7 118:14 118:16
**farley** 78:25 79:3
**fashion** 11:4
**fast** 123:18
**faster** 78:4 90:24
**fault** 17:20 83:2
**feature** 74:21 74:24 75:12,16
**february** 91:16
**fed** 24:7
**federal** 29:21 57:8 92:24 96:13 99:3
**fedex** 36:15
**fee** 48:25
**feeds** 98:25
**feel** 51:24 99:17 133:10
**feels** 105:19 107:19
**figure** 46:17 104:19 120:11
**file** 119:14
**filed** 8:15 91:15 96:12 105:23 119:23 123:22
**files** 99:2 117:10,12
**final** 148:20
**finally** 12:1
**financial** 94:15 98:12 99:11
**financially** 150:15
**financials** 58:3 58:4,9,10 98:10 99:6
**find** 138:3,6 151:12
**fine** 11:15 16:1 82:3,15 86:10 108:3 135:8
**finish** 131:6
**finished** 83:4
**finite** 75:23 98:4
**finneran** 2:6 6:8 9:3,3,16 15:10 33:5 44:17 46:8 48:13 49:15,24 49:25 50:19 51:7,12,20 53:11 54:20 55:23 63:8,13 64:6 65:14 66:8 67:10,20 68:13 70:14 73:14 74:1 76:2,10,16 77:11 79:10,15 79:21 81:3,24 82:10,13,16 83:21,22 84:15 84:19 85:2,6,8 86:2,5,9,12,15 87:3,6,11 88:19,22,24 89:3,21 90:13 91:2,3,13 92:18 100:3,5 100:23 104:11 106:19 107:8 107:14,22 114:19,24 115:9,16,17 116:3 118:3,6 119:8,9 120:2 120:7 121:20 121:21 124:4 124:10 125:19 127:11 128:8 130:1,11,21 131:18,24 132:2,6,25 133:4 134:3 135:2 136:19 136:25 137:13 137:20 138:18 139:2,12,21 140:7 142:13 142:16,19 143:23 148:3,6 148:9,11,19
**fire** 81:25 118:22
**firm** 18:13,14 62:12,14 98:6
**first** 3:13,15 10:12,19 13:4 13:14 16:5,24 17:24 41:17 51:21 52:25 54:25 67:11,12 80:1 82:24 86:6 100:6 105:17 107:15 108:13 115:11 115:18,19

116:3 119:5 124:18 125:5 126:13 135:14 135:21 136:9 140:22
**five** 51:11 113:22 139:23
**fix** 33:1 40:22 40:24
**flip** 89:3 121:7
**flyer** 32:11
**follows** 9:14
**foregoing** 150:7 152:13 153:18
**forfeiture** 2:22 87:12,22
**forgive** 71:6 141:14
**forgot** 83:2 98:7
**form** 33:3 44:16 46:5 48:12 50:17 53:10 55:20 60:25 62:3 63:7 65:12 66:6 70:11 73:12 75:24 76:8,14 77:9 79:9,14,20 81:1,21 83:18 92:15 100:20 106:16 107:6 107:11,18 125:16 127:8 128:6 129:23 130:8,18 131:15 134:1 134:24 136:16 136:22 137:10 137:17 138:14 138:24 143:21
**former** 59:2,12 59:17
**forms** 62:7,12 134:8
**forward** 28:17 151:16
**four** 22:17 30:14 31:16,17 31:19 74:5 113:22 114:3 140:5
**fox** 108:19
**frame** 84:7
**free** 152:14 153:20
**frequent** 34:12
**frequently** 35:12 81:4
**front** 50:14 64:7 67:25 68:16 88:23,24 100:7
**fronts** 127:2
**full** 10:7 80:10
**fun** 82:4
**function** 22:7 22:10 25:14
**fundraiser** 114:2
**fundraising** 113:13
**funny** 73:4
**further** 150:13
**future** 136:3 139:4,8
**fwd** 3:24

**g**

**g** 9:22 10:9
**gamble** 148:1
**gamblers** 130:23 131:4,9 131:14,20
**gambling** 85:12 85:23 87:13,23 88:5 105:15 112:3,7,16 130:3,5,6,13,16 130:23 131:9 131:13,20 132:10,10,20 132:20 133:7,7 133:15,22,25 134:22 135:18 135:24 143:11 143:12
**game** 26:17 42:16 72:8 73:9 75:8,9 76:13 80:2,3 138:12 139:16
**games** 2:15 42:25 52:19,21 72:12,16,20 75:16 77:1 79:19
**gaming** 2:13 62:17 70:25 71:1 84:4,10 90:6 91:22 93:2
**garrett** 6:13
**garris** 145:17 145:18
**gather** 115:25 116:8
**general** 19:2 103:3
**generally** 21:10 77:12 81:11 107:4
**generator** 98:1
**gentleman** 93:24 109:8,12
**gentlemen** 55:16,17
**genuinely** 148:7
**getting** 23:15 84:25 99:20 100:1
**gift** 3:10 91:14
**give** 11:1,12,23 22:21 26:20 28:4 69:12 72:3 74:6 75:7 80:10 97:6 99:21 107:25

139:23 140:16 140:16
**given** 13:11 18:6 67:4 81:20 140:12
**giving** 28:2
**go** 10:11,16 22:16,19 24:19 28:17 30:14 39:22 40:19,22 40:23 43:6,9 50:13 59:7 67:6 69:6 71:19,20 92:5 92:19 94:7 99:2 109:22 111:15 114:8 115:11 118:3,4 123:20 124:6 130:9 145:14
**goal** 10:13
**goals** 47:12
**god** 108:10
**goes** 69:5 78:9
**going** 10:10,11 11:13 12:1 13:17 28:19 43:8 44:21 52:2 55:10 62:15 63:24,25 67:5 73:15,23 74:1 78:2 81:25 82:1 84:20,21 101:20,25 103:13 105:3 114:19 115:11 118:1,22 124:4 135:20
**good** 8:10 19:7 48:5 51:4 114:25
**goodness** 16:8 19:3
**gosh** 19:5
**government** 92:9 93:6
**grab** 96:10 114:20
**grace** 6:9 9:5 147:10
**gracie** 3:8 90:16
**graves** 6:13
**gravesgarrett....** 6:18
**great** 10:10 41:9 51:8 93:14 140:15 147:12 148:14 148:23
**greene** 121:24 122:10
**greg** 114:15
**grew** 39:15
**ground** 10:11 10:16 13:8
**group** 21:6 109:14
**grover** 62:16 62:22 63:1 70:24 71:1
**growing** 16:17
**grown** 99:12,16
**guess** 13:7 22:5 40:12 45:6 100:3,7,23 106:10,18
**guys** 54:10,12 54:13 78:19 114:3

**h**

**h** 10:1 29:16
**half** 22:21,23 24:25 25:3 106:7
**hand** 24:25 27:23 67:7 84:20 98:18 115:12 118:1
**handed** 50:1 89:21 90:14 118:7 119:9 121:21 122:13 124:10 132:7 135:15
**handle** 18:11 98:9
**handled** 62:11 62:11
**handles** 21:15
**hands** 53:24
**happen** 24:24 39:11 55:22 58:7 104:12 116:25
**happened** 26:14 47:25 48:2,3
**happens** 24:5 59:4
**harris** 145:9,13 145:17
**head** 40:12 43:18
**hear** 48:20
**heard** 18:12 37:10,13 74:2 75:1 87:25 88:2,3,4,7,8,10 91:20 95:20,23
**hearing** 76:3 84:3 85:22 86:22 87:22 89:11 90:19
**held** 8:19
**hello** 9:17
**help** 24:4 32:5 32:10
**helpful** 41:9
**helping** 16:20 47:16 76:24
**hessel** 4:6 122:16,24
**hierarchy** 21:5
**high** 80:23
**higher** 24:1
**highway** 92:21

**hired** 46:14
**historically** 47:25
**hit** 28:15 75:9
**hmm** 12:20 13:3 15:6 16:15 19:12,25 23:7 28:25 30:16 47:15,20 54:18 59:10 68:5 71:17 94:14 104:8 109:18 132:12 134:13 135:19 142:6,14
**hold** 86:7
**holds** 19:18
**holts** 123:5,16
**honest** 33:21 39:10 77:18 117:20 147:19
**hope** 123:18
**hopefully** 10:15 115:11 143:6
**hosted** 112:25 113:9,11
**hourly** 30:11
**house** 110:22 114:3
**housekeeping** 115:10
**huh** 45:10 66:9
**hundred** 17:16 63:22 105:20 107:20
**hunter** 73:3
**husband** 10:3 17:17 18:1 49:18 87:23 88:4 96:14 113:5,9 114:10 117:7,11 118:17 121:5 133:20 142:3
**husband's** 10:7 52:10

**i**

**idea** 23:18 40:13 41:23 68:18 75:20 97:25
**identification** 49:20,23 50:2 63:25 64:5 67:9 68:12 82:12 84:18 86:4 87:10 89:2,20 90:12 91:12 115:5 122:14 124:5,9 132:5
**identify** 67:19
**ids** 58:1
**ignoring** 126:20
**il** 5:10
**illegal** 105:15 106:2 107:10 107:17 134:19
**illinois** 143:13
**image** 147:23
**imagine** 47:8
**implicit** 144:23
**important** 10:22
**improper** 131:16
**inaudible** 15:9 49:14 51:3 87:5
**inc.'s** 3:13,15 3:17,19
**included** 151:14
**including** 110:12
**income** 14:24 99:3,3
**incorporated** 3:8 19:13 56:24 90:17 93:22 95:19,24 153:12
**incorrectly** 68:7
**increased** 99:23
**independent** 16:13 18:4,8 21:4,5,10 22:1 22:4,6 25:22 28:20 31:23 56:7 59:11,15 63:4 95:12 97:22
**indicating** 151:14
**individual** 25:10
**individuals** 21:4 24:12
**influence** 136:5 139:5,9
**information** 2:20 57:1 86:18 98:19,21 100:25 101:2 103:16,24 116:22 117:23
**initially** 41:10
**inquiries** 92:12 92:20,23 93:1
**inquiry** 93:6
**ins** 134:15 135:11
**insert** 43:9 73:10 136:21
**inserted** 81:18
**installing** 41:11
**instant** 148:24
**instruct** 129:1 129:5
**integrity** 93:15 93:19
**interact** 55:3
**interest** 17:12 57:14 144:11
**interested** 12:4 150:16

**interesting** 96:24
**interface** 32:24 70:25
**internal** 60:10 60:16,21
**interrogatories** 3:13,19 115:20 117:16,24 118:8
**interrupt** 46:13
**interviewed** 141:15
**interviews** 108:25
**introduce** 9:2
**invade** 12:15
**investigative** 3:3 89:4
**investigator** 92:24
**invoice** 109:11 146:9,16,17
**invoices** 69:2 146:4
**invoicing** 70:17 145:23
**involve** 136:13 137:7 138:23
**involved** 16:5 17:9 41:17 69:14,19 77:1
**involvement** 15:13,16 16:25 17:4,5 68:21 68:24 70:2 116:12 144:3
**involves** 78:22
**irrelevant** 94:6
**issue** 29:21 33:2
**issued** 61:8,11 61:17,20,23 62:3,6,13 122:10
**issues** 31:25 141:7
**it'll** 10:16 86:11

**j**

**j** 6:17
**jam** 40:24,25
**james** 2:17,21 85:12 86:19,24 93:25
**jammed** 30:25 31:1
**january** 122:17 122:25 142:5 144:7,7
**jar** 1:7
**jason** 121:25
**jefferson** 6:22
**jim** 97:1,13 105:8 106:1
**job** 20:1,2 58:13,22 59:6
**john** 4:6 122:16
**joint** 58:8
**july** 2:16 3:4 84:8 89:5 121:4,11
**jump** 62:16
**june** 89:6,12

**k**

**kansas** 6:15
**kay** 16:14
**keep** 57:21,23 89:14 103:2 111:19
**keller** 114:15
**kelly** 146:13,13
**kept** 25:6,9 60:5 104:12,15 104:16
**kind** 16:22 21:9 39:21 49:9 52:4,22 55:11 57:18 59:6 72:23 98:25 126:23 133:3 133:10 143:20
**kinda** 28:6 29:5 52:24 53:23 78:20 99:2 107:23
**kinds** 72:14 127:1 148:2
**kiosk** 43:9
**kiosks** 42:24
**know** 10:12,20 11:6,14 12:2 12:22 13:20,22 14:12,17,18 19:5,6,9,18 21:14 22:16,18 25:8,12,19,24 26:4,23 27:20 28:3 29:5 32:10,13 33:2 33:4,19 34:7 34:21 37:12,12 38:7,9 39:10 39:16 40:23 41:16,18 42:4 42:7,7,9,18,22 43:1,4,11,12,16 44:7 45:1,5 46:20 48:3,5,9 48:16 49:4,7 49:13 52:12,12 52:23 53:25 54:5,15,16,23 54:25 55:9,10 55:12 58:7,18 59:5,19 60:18 60:23 61:3,7 61:10,13,15,16 62:4,9,16,23,25 63:11,12,23 64:11,12,14,22 64:24 65:15,16 65:17,20 69:4 69:5,6,13,16,17 69:18,22,25 70:12 72:6 74:22,23,25 75:4,18 76:4,9 76:15,17,21,22 76:24 77:10,16 77:19,23,24,25

78:11,12,15,18 78:20,21 79:16 79:22 80:6,12 81:2,12,13,23 83:4 88:1,5 94:23,25 95:3 96:5 97:13,15 99:14,24 100:21,22 101:16,17,18 101:18,18,19 101:22 102:9 102:12 103:25 104:2,12 105:19,21,21 107:7 108:12 108:18 109:7 109:14,23 110:3,6,23 111:16 112:9 112:13,17,20 114:9,13,14,15 115:24 116:25 119:3 125:3,17 126:4,25 127:2 127:11,15,15 127:16 128:1 128:10,21 129:18,19,24 129:25 130:9 130:19,20,21 130:25 131:1 131:23 132:1 132:18 133:2,8 133:10,10 134:9,9,11,12 134:14,15,15 134:16 135:1,7 135:9,9,10,11 135:11,12,12 136:18 137:12 137:19,20,22 137:23 138:17 139:1,13,20 140:25 143:9 143:11,22,23 143:24 144:10 145:8,12,15,22 145:22 147:7 147:18,23
**knowing** 78:3
**knowledge** 55:4 63:11 70:8 72:18 73:17 74:19 75:15 76:18 77:6 94:5 95:8 95:12 96:25 97:10,19 105:8 105:9 128:25 129:4
**knows** 101:24 138:15

**l**

**l** 9:22 10:1,9 18:20,22 94:10 119:14 142:2
**label** 49:17,18 49:20
**labeled** 117:16
**lack** 94:5
**language** 64:20 65:4,7,18 69:14,20 70:3
**late** 84:7
**law** 78:7 92:12 92:18 95:15 128:16,18 132:9,21 141:15
**lawful** 9:12
**laws** 112:3,7
**lawsuit** 123:24 124:2,12,18,22 124:24
**lawyer** 12:16 12:23
**learn** 112:19
**learned** 105:17 107:15
**learning** 90:5 122:9
**lease** 38:13 49:5
**leasing** 38:21
**legal** 7:4 8:23 8:25 19:21 92:4 134:2 136:17 137:11 137:18 138:25 139:11,19 151:1 154:1
**legality** 141:9
**legally** 19:21
**legends** 102:19
**legislature** 112:6
**leighton** 5:6 6:4 8:20
**letter** 2:16 3:22 3:24 4:5,7 82:20,21,25 83:16,19 84:1 84:3,7,9 120:15 121:9 121:18 122:15 123:4,6,7 151:20
**letters** 14:10
**life** 81:17
**likely** 82:6
**likewise** 38:18
**line** 151:14 153:7 154:3
**lines** 12:12
**linkedin** 142:4
**linn** 119:13 120:16,25
**list** 2:10 50:4 50:14,16,25
**listed** 142:4 153:7,17
**listing** 153:7
**literally** 24:25
**little** 23:2,14 26:6 28:6 45:6 58:11 62:16 76:22 80:8,10

110:14,17 133:9 134:17
**llc** 1:8 6:13,20 8:15 19:11,23 56:24 57:6,17 57:20 65:22 96:14 151:7 152:3 153:3
**llp** 6:4
**load** 39:23
**loan** 49:11
**lobbying** 111:22
**lobbyists** 109:6
**location** 22:21 23:8,9 24:8,19 24:23,23 25:11 26:24 30:9,14 31:17 39:18,25 40:19,23 41:11 42:11,15 43:13 43:23 48:4,8 50:22 53:2 60:2,5,20 62:8 71:7 72:19 100:16,16 103:22,23 129:1,5,15
**locations** 2:10 21:12,14 22:13 22:16 23:20 24:13 38:3,19 38:20 40:18 41:22 42:2,6 43:7 44:6,9,14 46:25 47:18,22 48:11,14 49:1 49:2,6,10 50:4 50:6,15 52:19 53:6,9,15 59:7 59:22 70:10 72:24 73:8 74:20 100:14 101:8 103:16 126:24
**logistics** 134:16
**long** 10:2 82:20 84:22,23 99:8
**look** 19:1 38:8 50:13,16 67:11 100:8 122:2 125:5 126:7,22 127:2 140:24
**looked** 66:12 117:1
**looking** 23:1 117:23 125:20 126:20,21
**looks** 68:7 100:9 120:8
**lose** 139:7
**loser** 76:13 139:17
**loss** 98:15
**lost** 85:3 120:3
**lot** 13:16 16:9 52:11 78:3,4
**lottery** 112:16 112:17
**louis** 5:7 6:6 7:6 8:22 18:16 78:16 108:22 108:23
**low** 80:23
**lower** 24:1
**lunch** 111:14 111:16,17

**m**

**m** 9:22 10:9 49:17,20,22 50:2 61:11 64:1,4 67:6,8 68:10,11,15 69:20 82:10,11 84:16,17 86:2 86:3,16 87:7,9 88:20 89:1,18 89:19 90:9,11 91:11 115:4 122:16 124:5,8 132:4
**machine** 23:4 24:6,7,9,20 26:13 27:18,21 27:24 28:7 30:13,18 31:7 31:10 32:25 38:25 41:11,17 43:10 59:8 62:20 64:13 81:16 126:22 126:22 132:11 134:21 136:21
**machines** 22:17 22:22 23:3 25:7 26:1 31:16,19 32:17 33:15,18 38:3 38:7,11,13,15 38:24 40:20 43:14,14 44:15 46:25 52:17 60:7,17,22 66:23,24,25 72:1,4 73:5,9 104:6,7 105:10 106:12,15 126:3,5,11,23 127:19,22,25 128:5 129:10 129:16,22 130:3 134:19 138:8
**madam** 151:10
**made** 22:22 42:17,21 70:9 103:23 112:22 113:5 114:10 127:15 146:6,7 152:7
**maiden** 9:25
**mail** 36:9,9,14
**mailing** 36:11 36:13
**main** 6:14 38:2 54:10,13
**maintain** 102:21

**majority** 21:15
**make** 10:14,16 10:24 11:8 12:19,25 17:19 23:4 27:12 28:14 32:20 33:24 34:11 47:2 50:2 72:13 74:1 80:7 86:13 102:4 104:21 111:19 125:12 135:22 139:23
**makes** 43:3 47:3 94:21 134:21 140:11
**making** 19:4 33:14 68:22 120:9
**manage** 43:14
**manager** 19:10 19:16,21 20:24 20:24 25:1 27:4,4,10,13,17 27:23 28:1,3
**managers** 24:24 60:6,20 71:8
**managing** 53:14
**march** 3:5,8 87:24 88:16 89:22 90:15 96:13 105:22 123:23 142:5
**mark** 49:15 63:24 67:5 68:9 82:10 84:15 88:20 124:5,6 132:3
**marked** 49:22 50:1 64:4 67:7 67:8 68:11 82:11,14 84:17 86:3 87:9 89:1 89:19 90:11 91:11 115:4,12 118:2 121:22 122:14 124:8 125:6 132:4
**market** 7:5
**marketing** 15:16 31:25 32:9,10 53:8 53:12 63:4,5,6 63:9 143:18,18 144:3
**markets** 105:10
**marking** 115:13
**marla** 97:11
**marriage** 16:20
**married** 9:23 10:3 99:8
**mary** 6:9 9:5 16:14
**marygrace.w...** 6:11
**matter** 8:14 35:6
**matters** 32:6 115:10
**maximum** 81:8
**mayle** 3:5 89:24
**mccarty** 6:21
**mcmahon** 3:23 120:16,25
**mcnutt** 2:21 85:12,22 86:19 86:24 93:25
**mean** 14:20 19:20,23 22:3 22:14 29:14 33:21 34:14,24 34:25 38:5,7 40:7 45:13,20 46:9,10 48:24 52:14,14,20 53:1,12,20,21 55:7,8 58:17 59:8 61:9 64:11 66:12 67:1,17 68:1,3 69:17 76:22 77:15 79:22 81:12 102:8,12 102:16,20 106:3,17 107:7 107:12,19,25 108:11,12,21 109:13,21 110:13,18 112:9 113:2,17 116:24 117:3 127:13,13 129:18 130:25 133:8 134:12 135:6 138:2 147:18
**meaning** 52:16 102:15
**means** 11:13 36:21 38:6
**meant** 26:2 35:2 80:13,15
**mechanical** 33:2
**media** 8:12 37:20 51:18 115:7 140:5
**medium** 80:23
**meet** 110:15 111:4,8,9,10
**meeting** 111:2 111:3,18,21
**member** 93:2
**members** 92:20
**memorializing** 42:2
**mentioned** 23:18 32:15 36:10 41:23 43:5 44:23 62:7 76:20 98:6 104:5 124:12 147:13
**menu** 80:22
**mess** 84:21

**message** 35:17 35:20
**messages** 117:6 117:8 141:19 141:21
**messenger** 37:18
**met** 110:9 111:4,12
**mgc** 2:16 3:24 121:9
**mic** 114:20
**middle** 138:19
**midwest** 7:8 94:3 151:17 154:1
**miltenberger** 1:9,9,18 2:5 5:4 8:13 9:11 9:17,21 10:9 17:17 51:21 54:2 55:3,15 55:25 56:2 57:11 69:13,19 84:9 85:8 86:15 87:13,16 89:8 90:2,13 91:17 102:3 103:21 115:10 121:5 123:21 132:6 140:8 144:11,16,19 151:9 152:4,9 153:4,13 154:20
**mind** 57:2 105:6 134:20
**minute** 112:8
**minutes** 51:11 139:23
**misc** 61:11
**miscommuni...** 125:25
**misdemeanor** 2:20 86:19,23
**missed** 139:23
**missouri** 1:2 2:18,22 4:12 5:7,11 6:6,15 6:22 7:6 8:17 8:22 56:24,25 57:3,7,22 63:15 65:23 72:19 73:9 74:15,20 75:16 78:7 84:4,10 87:14 92:8,9 92:21 93:2,18 113:6,10,14 119:11 123:5 123:23 132:7,9 132:14,21 150:5,21
**missouri's** 112:3,7
**misspoke** 40:5
**misunderstan...** 47:11
**misunderstood** 45:7 47:6
**mm** 12:20 13:3 15:6 16:15 19:12,25 23:7 28:25 30:16 47:15,20 54:18 59:10 71:17 94:14 104:8 109:18 132:12 134:13 135:19 142:6,14
**mo** 5:10
**model** 74:6,14
**models** 73:21
**modification** 79:7,13
**modifications** 33:14
**modifying** 69:14
**moment** 19:8 20:1 23:17 34:10 40:11 44:23 67:7 69:11 82:20 83:15 85:9 100:6 126:21
**money** 24:7,7,8 24:19,22 25:6 25:10 26:18 27:18,19,24 42:11 53:21 60:6 73:11,11 81:19 101:7 103:1,9,23 136:21 137:15 137:21,23 138:9,13 139:7
**moneys** 103:2
**month** 108:15 146:23
**months** 43:19 110:18 113:22 113:22
**mor** 151:6 152:3 153:3
**morning** 8:10
**mouth** 40:10
**move** 12:13 121:18 123:19
**msblawfirm....** 6:25
**mshp** 2:18
**mutually** 47:12

**n**

**n** 2:1 9:21,22 10:8,9 119:14 119:14 147:8
**nail** 111:20
**name** 8:22 9:18 9:23,25 10:7 14:13 44:24 48:7 78:25 93:25 95:20,21 95:23 98:7 102:17 145:9 147:8,10 151:6 152:3,4,15 153:3,4,21
**named** 93:25 97:1,11 109:8

109:12 145:12
**names** 54:23,25 101:19 114:4 145:15
**nature** 59:21
**ncg** 74:3
**nec** 62:2
**need** 11:16,17 11:23 12:10 31:17 36:18,20 40:23 44:8 46:6 50:13 51:24 55:12 71:4 73:17 96:10 100:23 118:24 148:21
**needed** 16:18 34:20,21
**needs** 31:17 76:23
**negotiated** 95:5
**neither** 150:10
**never** 12:4 35:20,23 37:10 37:13 39:11 82:3 91:7,20 105:6 106:14 147:13,17
**new** 13:8 43:19 47:18,24 48:8 53:8 62:1
**news** 106:11 107:1,1,1,5,9 107:13,16 108:11,16,19
**newspaper** 106:14,17,23 107:16
**nick** 78:25 79:3
**night** 52:15
**non** 133:7 137:16
**north** 3:11 5:6 6:5 8:20 39:4 59:8 91:14,15 91:21
**notarized** 151:15
**notary** 5:11 8:4 150:4,20 151:25 152:10 152:18 153:15 153:23 154:23
**note** 151:13
**november** 120:15 121:1 123:4,7
**number** 8:17 51:18 74:14 92:2 98:1 99:21,21 115:7 119:5 121:3,19 135:17 140:5 151:8,14
**numbered** 96:17 120:12
**numbers** 22:20 22:25 23:1,5 74:6 103:20 153:7

**o**

**o** 9:21 18:20,22
**oath** 13:12
**object** 33:3 44:16 46:5 48:12 50:17 53:10 55:20 65:12 66:6 70:11 73:12 75:24 76:8,14 77:9 79:9,14 79:20 81:1,21 83:18 92:15 100:20 106:16 107:6,11,18 125:16 127:8 128:6 129:23 130:8,18 131:15 134:1 134:24 136:16 136:22 137:10 137:17 138:14 138:24 143:21
**objection** 63:7 63:10 131:22 139:10,18
**obtain** 101:2
**obviously** 13:20 32:5 119:2
**occasion** 36:7 70:25
**occupation** 144:6
**occurred** 88:14
**october** 85:24 86:24 93:18
**offense** 4:4 121:24
**offered** 43:20 47:22
**offers** 43:12
**office** 88:7
**officers** 59:2,12 59:13,17,18
**offices** 5:5
**official** 93:6 141:15,16 152:15 153:21
**oh** 15:12 17:3 19:3 34:16,19 53:3 82:4 83:1 84:19 95:23 102:24 105:5 105:24 108:10 110:17 112:8 116:5,10 119:6 125:19 126:2,2 130:4 140:25 143:5 144:1 145:18,19
**ohio** 3:6 89:23 89:25 90:6 151:2
**okay** 10:2 11:4 11:16,25 12:6 12:14,21,24 13:7,14,19 14:4,15 15:2

15:25 16:4,23
17:7,11,19,23
18:6,11,17,22
18:24 19:7,22
19:25 20:8,19
20:23 21:2,3,9
21:16,23 22:12
22:24 23:7,11
23:14 24:4,11
24:18 25:5,13
25:16,20,25
26:10,16,20
27:5,17,21
28:8,14 29:9
29:18 30:2,11
30:21 31:3,6
31:12,14,23
32:8,14 33:5
33:13,17,20
34:9 35:11,15
35:23 36:7,12
36:18,25 37:11
38:4,24 39:15
40:1,9,15 41:1
41:13,19 42:14
42:23 43:12
44:12 45:13,25
46:8,18 47:1,4
47:6,24 48:7
48:10,23,25
49:8 50:24
51:2,10,20
52:2 53:3 54:2
54:7,13,16
55:2 56:2,21
57:10,21 58:7
58:11,20 59:1
59:20 60:4,24
61:7,10,15
62:1,6,15 63:2
63:13,21,24,24
64:19 65:1,3,9
65:17 66:2
67:3 68:17
69:2,7,9,12,12
69:18 70:5,7
70:14,24 71:5
72:3,7,10,22
73:7,14,20
74:9,18,18
75:3,6,11,15,19
76:5,10,16
77:2,14,17
78:10,17,21,24
79:5,17,24
80:7,11,18
81:3,24 82:4,8
82:9,19 83:1,8
83:13,14 84:2
84:12 85:2,7
86:1,14 87:2,6
88:10,18,25
89:14 90:9
91:1,7,10,24
92:11,18 93:21
94:23 95:8,23
96:11,20,25
97:4,13,17,25
99:10,25
100:11 102:1
102:17 103:6
103:13 104:1,3
104:18,21
105:4,7,12,24
106:9,19
107:22 108:24
109:2,16,23
110:9,15,19,25
111:12,18,25
112:13,18,21
113:4,12,19,24
114:6,9,15,18
116:7,12,15
117:4,6,10,15
117:22 118:1
118:14,20
119:1,4,21,25
119:25 121:3
122:13 123:3
123:18,19
124:4,21
125:11 126:4,9
126:13 127:4
127:17 128:4
129:20 130:12
130:21 131:12
132:2 133:12
133:17,24
134:18,20
135:16,20
136:12,25
137:13,25
138:18 139:2
139:14,21,21
139:25 140:7
140:15 141:1,5
141:13,18
142:1,18,24
143:14,23
144:2,6,10,15
144:23 145:8
145:16,19,21
145:24 146:12
146:15,21,25
147:7,12 148:3
148:8,11
**old** 130:10
**once** 22:18
39:11 80:2
**ones** 92:13 93:7
**online** 106:17
**ooo** 5:1
**op** 1:5 151:6
152:3 153:3
**operate** 43:14
44:14 76:18
**operated** 38:22
38:23
**operates** 53:2
**operator** 80:23
**operators** 62:8
71:8 129:5
**opinion** 133:24
134:4,5 137:11
**opinions**
136:17
**orally** 13:12
**order** 30:4
70:18 115:25
116:22 117:23

136:20
**ordered** 75:23 78:6
**originally** 103:3
**outcome** 75:8 80:1 136:2,8 137:5,9,16 138:20 150:16
**outcomes** 75:22 75:23
**outs** 134:16 135:12
**outside** 18:13 32:2 62:12,14 73:17 98:6
**own** 42:23 45:21 46:1 56:13 57:11 65:9
**owned** 38:22 38:23 56:11
**owner** 24:8 38:15 42:15 105:9
**owners** 24:23 38:21 43:13 44:2 49:6 50:22 60:2,5 60:20 62:8 129:1,5
**ownership** 17:11 57:14 144:11 145:5
**owns** 17:14 45:11 97:15

**p**

**p** 29:16
**page** 2:3,9 3:2 4:2 33:24 67:11,12 68:8 82:24 84:23,24 86:6 87:7 96:16 135:14 151:14,16 153:7 154:3
**pages** 83:2 121:8
**paid** 25:10 26:8 26:17,18 28:23 30:5,11,13,17 31:3,7,8,21 32:9 40:16 43:6,8,10 60:6 109:11
**pair** 86:23
**paisner** 5:6 6:4 8:20
**paper** 23:2 26:1 26:3,12 117:10 117:12
**paragraph** 82:21 83:3,10
**paragraphs** 83:20,23 96:17
**parent** 56:10
**part** 9:13 14:25 14:25,25 25:13 39:22 52:24 58:5 62:20 72:10 98:25 104:2 124:19 124:24 135:11 143:18 153:9
**particular** 39:18 74:14 80:3 100:14 103:16 139:16
**parties** 150:12 150:15
**partly** 17:20
**past** 74:11 100:1
**patrol** 92:21
**pay** 26:25 27:1 27:18,21 32:2 32:5 69:2,6 80:19 81:5,8 95:2 99:4 109:21 137:21 137:22 138:9
**payable** 15:1,5 36:11 98:24 146:2
**paychex** 29:7,9 29:10,12,13,20 34:19
**paying** 19:5 38:6 42:15 70:21,23 94:19 110:7
**payment** 42:11 42:16,21,24 77:7
**payments** 77:20,21 94:20
**payout** 80:24
**payouts** 60:12 60:16,21 81:20
**payroll** 14:2,14 21:18 29:3,12 29:13 76:25
**pays** 27:2 110:3
**pending** 11:22
**pennsylvania** 3:9 90:16,17
**people** 4:11 12:3,3 15:20 17:23 18:7 41:3 44:3 50:25 53:25 54:7,11 70:16 71:1 101:21,21 110:9 127:14 145:15
**percent** 17:16 77:16 105:2 134:16 135:12
**percentage** 24:1 81:10
**performed** 78:12
**period** 23:12
**periods** 142:25
**permit** 129:6
**permitted** 129:21 130:7 130:17

**perry** 7:3 8:22
**person** 13:15 53:2 78:24 97:1,10 133:20 135:24 145:8 145:12 146:8 147:7
**person's** 29:24
**personal** 63:11
**personally** 34:15 113:14 152:11 153:15
**perspective** 76:18
**petition** 2:22 87:12
**petroleum** 94:3
**phelps** 102:19
**phone** 36:5 52:12 151:3
**photograph** 125:9 126:1,13 126:18
**photographs** 96:17,24 124:11 127:5 127:18
**photos** 123:20 124:13,15,19 124:20,22 125:6
**photoshop** 125:22
**phrase** 44:21
**physical** 126:10
**pick** 44:8
**picked** 39:1
**picture** 4:9,11
**pictures** 125:2
**piece** 103:14
**pinball** 73:5
**place** 15:20 70:8 72:23
**placed** 38:20
**places** 72:18 73:8 74:19 126:23
**placing** 39:19 49:1,10 70:18
**plaintiff** 1:6 3:12,14,16,18 6:3 8:2,14 9:4
**plaintiffs** 1:19 2:4 9:13
**platte** 88:6 93:17
**play** 1:5 75:9 79:19 127:16 128:4 129:2,6 129:9,16,21 130:7,10,17 136:14,20 151:6 152:3 153:3
**played** 71:13 71:18 72:1 147:13,17,19
**player** 26:9,17 27:22 42:15,17 42:21 61:8,11 61:18,21,24,25 62:3 73:10 75:7 76:11 77:7 79:18 80:2 136:13,20 137:8,14 138:11,15 139:7,15
**players** 26:17 43:5 52:19,21 60:7,17 71:11 71:23 81:18,20 138:23
**playing** 4:10,11 42:16 71:23 124:12 127:7 127:10,19,22 127:25 128:16 128:20,23 130:24 131:10 131:14,21 138:12,23 147:22
**plays** 26:17
**please** 9:2,9,18 15:25 44:18 60:13 100:6 132:3 151:12 151:12
**plus** 96:16
**pm** 148:25
**point** 33:22 50:8,12 51:5 55:21 65:7 68:19,22 105:13 142:3 147:4
**points** 28:15 50:8
**police** 59:2,12 59:12,16,17
**policemen** 58:15,24,24 59:6
**policy** 128:22 141:2
**political** 112:21 113:1,6,9 114:10
**pool** 73:1 75:23 98:4
**portion** 67:22 67:24 68:14
**possession** 85:11,23 86:23
**possibilities** 33:9
**possible** 112:12 138:13
**possibly** 81:25
**post** 2:17
**postal** 36:17
**potentially** 73:11
**predetermined** 75:22
**prepares** 58:8
**present** 48:17

**president** 19:19
**presume** 11:13
**pretty** 29:8 64:10 126:6
**prevent** 127:25 128:20 130:22 131:3,9,13,20
**prevents** 128:16,22
**previously** 66:22 121:9 127:6,18
**principally** 53:7,13
**print** 76:20
**printed** 23:3
**prints** 26:7
**prior** 51:25 105:25 118:24 144:19
**privilege** 12:16
**prize** 27:22 74:20,23 75:12
**probable** 2:18 3:20 85:10 119:10,22
**probably** 16:21 17:8 39:11 51:22 52:2 62:22 90:20 96:22 99:25 105:13 110:14 118:23 120:4 124:23
**problem** 130:23 131:4,9 131:14,20
**procedure** 28:10 152:5 153:5
**proceed** 11:3
**process** 12:22 29:2,2 41:16 116:13
**produce** 26:13 81:11 98:12,15 99:3
**produced** 5:4 9:12
**produces** 137:16
**production** 3:15,17 115:18 118:8 141:20 151:16,17,22
**products** 53:8 143:24 146:19
**professional** 5:8 150:4
**profile** 142:4
**profit** 98:15
**program** 29:10
**programmed** 80:19 81:5
**proposition** 10:13
**proprietor** 52:24 53:1
**proprietors** 25:11 43:24 49:1 52:19 59:22 60:11
**prosecuting** 88:6 120:16,25
**prosecutor** 95:16
**provide** 48:11 48:14 60:25 98:22 116:8,22 117:7,11 118:16
**provided** 115:19,20 116:11 118:9 124:11
**providing** 98:18 147:4
**public** 3:6 5:11 8:4 89:25 150:4,20 152:10,18 153:15,23 154:23
**published** 107:1
**pull** 68:8 140:23
**pulling** 59:8
**purchase** 146:6 146:7,20
**purchases** 146:19
**purpose** 65:11 111:2
**pursuant** 2:22 87:14
**put** 14:6 23:4 29:7,19 30:7,8 30:8 36:9 46:25 64:7 66:23,24,25,25 67:23 69:10 100:7 118:20 141:2
**puts** 72:14

**q**

**qr** 28:6
**qt** 46:21
**qualifications** 58:12,21
**question** 11:1,3 11:7,12,14,21 11:22,23 12:7 13:21 16:1 34:4,7 35:16 74:16 79:11 80:14 83:12 91:4 131:6 137:18,24 141:1,14 142:12,17,19 142:22 143:2
**questions** 9:16 12:21 13:16,18 33:24 36:19,20 47:14 52:3 69:7 73:16

77:3 90:23 94:6 115:22 134:10 140:19
**quick** 10:12 89:16 94:7 114:21 120:11
**quickbooks** 98:23
**quickly** 115:11 140:21
**quiktrip** 46:19
**quite** 102:9 142:16
**quote** 23:1 72:20 135:23 137:1 138:19 139:3

**r**

**r** 9:21,22,22 10:1,9,9 18:22 147:8
**radio** 108:24
**raised** 105:17 141:8
**randolph** 146:14
**random** 52:3 98:1 140:18
**rapid** 81:25 118:22
**rarely** 35:24
**rate** 80:18
**rather** 80:8 120:8
**reached** 42:6 95:15
**read** 66:4 73:23 74:5 82:20 83:3,10,11,16 83:19,22,23 96:1,20 106:22 116:5 117:20 135:20,22,23 136:9 137:1 138:19 139:3 148:17 149:1 152:5,6,12 153:5,6,17
**reading** 83:4 117:15 135:22 151:20
**real** 10:11,12 94:7 114:21 120:11 135:6 135:10
**really** 10:23 14:16 21:14 28:7 30:9 34:22 53:24 62:25 63:23 64:11 66:12 71:21 75:2,4 76:22 81:13 96:23 100:4 109:15 126:7 127:16 133:11 147:18,20 148:7
**realtime** 5:9 8:4
**reason** 10:22 14:7 59:1 129:20 147:16 151:15 153:8 154:3
**recall** 42:19 82:7 83:16 88:10 89:11 90:5 107:14 108:3,8,13,16 108:24 117:15 117:22 123:21 133:19 135:1 147:3
**recalled** 143:4
**receipt** 26:4 40:25 151:19
**receipts** 104:6 104:12,23
**receive** 27:22 56:2,5 136:7 137:4,8
**received** 101:1 127:18,21
**receives** 56:8 61:1
**recent** 47:18
**recently** 44:13 113:18,21
**recognize** 64:6 66:16,17 67:12 67:17 85:16 86:16 87:16 119:16 120:19 122:18 125:14
**recollection** 83:24 84:2,6 85:21 86:22 87:21 90:18 96:9,18 105:16 108:1 120:23 121:10 122:8 122:20,23 123:8,14 142:20 143:7 145:12
**recollections** 140:17
**reconcile** 53:23
**reconciliations** 15:1 19:4
**record** 8:11 9:2 9:19 10:24 15:11 27:12 51:14,16,18,21 67:21 80:8 115:1,3,7 135:21 140:1,3 140:5,8 148:13 153:9
**recorded** 1:18 5:3 8:12
**records** 23:8 25:5,9,18,23 60:4 104:19
**recruit** 59:2
**redo** 120:9

**reduced** 150:9
**refer** 24:13 44:4,5,10 72:19
**reference** 151:8 152:2 153:2
**referenced** 152:11 153:15
**referring** 35:8 43:23 54:14
**reflect** 60:6 142:7
**reflected** 119:13
**refresh** 83:24 96:9 142:20 145:11
**refreshed** 143:6
**regarding** 60:11
**register** 23:9 27:19
**registered** 5:8 150:3
**regular** 146:5 146:18
**regularly** 34:18
**regulatory** 141:16
**relate** 141:21
**related** 150:11
**relating** 42:11 85:11 90:6 91:21 92:4,12 92:24 93:2,7 93:18 122:25
**relations** 22:10
**relationship** 144:16,20
**relationships** 53:14 59:11,16
**relative** 150:13
**remember** 11:1 20:5,6,7 42:13 88:12 96:23 102:18 108:19 114:5 124:24 124:25 142:22 146:14
**remove** 24:19
**rendered** 3:5 89:22
**rendering** 94:5
**rent** 38:13
**rental** 49:11
**repeat** 11:9 32:21 44:20 59:14 60:13 79:11 129:3 131:17
**repeating** 32:19
**rephrase** 55:5 67:14 116:2
**report** 18:7,9 54:8,12 55:2,6 55:8,16
**reporter** 5:8,9 5:10,10 7:1 8:5 8:24 10:20 11:9 49:23 64:5 67:9 68:12 82:12 84:18 86:4 87:10 89:2,20 90:12 91:12 115:5 124:9 131:7 132:5 148:15,21 150:1,4 152:7
**reporting** 60:10,15,19 106:11
**reports** 108:5,9 127:19,22
**representation** 50:3
**request** 115:18 118:7 141:20 153:9,11
**requested** 79:6 79:12
**requests** 3:15 3:17 116:1 117:2,13 118:18
**required** 151:25
**requirement** 60:25
**reserve** 29:21
**reserved** 8:7
**reside** 102:8
**respect** 38:18 53:18 115:24
**respond** 117:12 117:24 118:15 118:18
**responsibilities** 52:9,10
**responsible** 41:10 53:8,14
**responsive** 116:1 117:2
**rest** 126:22
**restroom** 51:5
**retail** 26:5
**retain** 22:5,9
**retired** 58:15 58:23 59:17
**return** 73:11 81:11 89:6 99:3
**returned** 151:19
**returns** 24:1
**revealing** 12:9
**revenue** 22:21 23:19 41:24 42:3 60:10,16 60:21 99:23 101:1,2
**revenues** 100:16,19 103:1
**review** 23:7 29:5,6 99:5,10 116:9 151:13

152:1 153:1
**reviewed** 116:21 124:1 141:19
**reviewing** 22:25 65:6
**revised** 2:23 4:12 87:14 132:8
**rewarded** 112:17
**reword** 32:18 44:18,20
**rhythm** 16:3
**richard** 6:8 9:3
**richard.finne...** 6:10
**right** 12:16 13:14 18:24 19:14 21:2,18 23:7 26:25 27:1 28:14,16 29:16,23 30:4 34:5,9 37:12 45:17 66:21 78:2 83:6,11 84:22 86:1,11 86:13 88:19 89:14 92:1 95:4 96:15 104:20 105:4 106:24 115:9 118:20,21 119:7 123:20 130:14 132:25
133:23 138:5
**risks** 135:25
**robert** 85:12
**rocket** 109:3
**role** 13:24 15:4 53:17 65:3,6 146:1
**roles** 21:10
**romano** 123:24
**rough** 63:17 81:14 99:15 148:19,22
**roundabout** 142:25
**rpr** 7:2
**rule** 11:21 103:4
**rules** 10:11,16 13:8 152:5 153:5
**run** 76:24 84:14 107:13

**s**

**s** 9:21 10:8 61:11 151:16 153:8,8 154:3
**safety** 3:6 59:7 89:25
**salary** 20:8,11 20:14,17 54:3 54:5
**sales** 15:14 16:12,13 22:7
**salespeople** 21:24,25 22:4
**sat** 71:25
**save** 78:2
**saw** 108:13 124:22 127:14
**saying** 44:12 47:17 52:18 69:23 74:2 80:9,16 117:19 135:9
**says** 67:1 108:11 119:15 135:17,18,23 137:1 138:19 139:3
**scenario** 47:21
**scenarios** 42:14
**schwake** 5:8 7:2 8:4,24 150:3
**seal** 152:15 153:21
**search** 4:3 121:23 122:9
**second** 3:17,19 27:9 114:20 118:7,8 121:7 125:13,25 145:20
**secondly** 11:6
**section** 2:23 87:14 132:8,13
**see** 46:17 66:22 68:2 84:7 117:1 120:9,11 121:8 125:8,21
135:17
**seeing** 53:22 82:7 83:16 96:23 121:11 122:21 127:5,5 127:17
**seem** 36:19 52:3,5
**seen** 16:17 39:11 42:10 56:21 64:17 66:10 67:24 68:1 71:18,22 82:2,3,6,7,17 83:24 84:1 85:18 86:20,21 87:19 91:7 105:13 106:14 108:5 116:4,5 118:11,13,23 119:2,18 120:5 120:21,22 121:14,16 122:5 123:11 124:15,19,19 124:20 134:22
**sees** 103:19
**seizure** 93:19
**selected** 80:2
**sell** 143:19
**senate** 114:3
**send** 146:4,9
**sending** 34:18
**sense** 11:8 12:19 32:20

43:3 47:2,3 63:17 81:14,18 99:15
**sentence** 80:10 129:11 135:21
**separate** 42:24 57:5 58:4,8,10 68:9 116:16
**sequentially** 75:23
**sergeant** 121:25
**series** 52:3 140:18
**serve** 25:14
**service** 30:6,7 30:22,24 31:2 31:4,8,11,17 36:15,17 37:20 40:17 60:10,16 60:21
**serviced** 31:19
**services** 147:4
**set** 3:13,19 30:17 47:18 115:19 118:8
**setting** 41:17
**seven** 16:16
**share** 95:9
**she'll** 10:24 67:6
**sheet** 29:1 30:3 30:4 151:14 153:7,10,18 154:1
**sherri** 145:9,12 145:17
**shiante** 3:22
**shinate** 120:15
**shipped** 39:1,4 39:5,7
**shop** 39:9,14,18 147:20
**short** 51:8,12 83:10
**shorthand** 5:9
**show** 67:5 82:1 104:23 118:23
**showing** 120:14
**shown** 58:18 92:1 93:7 151:16
**sic** 39:21
**side** 125:18,18
**sigmund** 3:22 4:6,8 6:20,24 120:5,17 122:16 123:6
**sign** 148:18
**signal** 37:14
**signatory** 101:13
**signature** 8:6 14:10 101:16 148:16 150:19 151:15
**signed** 120:17 149:1 152:13 153:18
**significant** 135:5
**signing** 151:20
**silently** 82:21
**similar** 20:2 125:14 143:20
**simply** 143:3 146:18
**simultaneous** 15:9 49:14 51:3 87:5
**sincerely** 151:21
**single** 26:12 103:2
**sir** 11:5,25 12:18 17:10 18:5 27:16 28:13 29:17 30:1 31:22 37:16 47:23 144:9 151:10
**site** 24:24
**situation** 80:13
**situations** 48:1
**six** 16:16 79:18
**size** 48:5
**skimmed** 96:22
**skip** 23:14
**skipped** 52:4
**slack** 37:8 39:21 40:6,11
**slash** 40:7,8
**slip** 26:12
**slips** 23:2 26:1 26:2
**slot** 132:11
**smaller** 14:25 26:6
**social** 37:20
**software** 32:16 32:24 33:10,13 33:15,18
**sold** 143:25
**solutions** 7:4 8:25 151:1 154:1
**somebody** 46:14 61:1 72:1 146:13 147:9
**somewhat** 140:18
**son** 49:17,20,22 50:2 64:1,4 67:6,8 68:10 68:11,15 69:20 82:10,11 84:16 84:17 86:2,3 86:16 87:7,9 88:20 89:1,18 89:19 90:9,11 91:11 100:5 115:4 124:5,8 132:4
**sondra** 1:9,18 2:5 5:4 8:13 9:11,20 151:9 152:4,9 153:4

153:13 154:20
**sooner** 90:24
**sorry** 12:10 15:7,12 17:22 27:3 36:1,18 40:4 45:7 47:8 54:20 66:3 67:6 69:24 70:6 73:4,24 77:23 80:6 82:24 83:9 88:4 89:14 91:1 93:13 96:4,5 104:9 104:10 106:21 108:23 111:6,7 111:19 112:8 116:10 118:4 119:6 125:19 125:24 129:8 131:6,24 138:2 142:8,18 145:18
**sort** 22:10 24:5 25:23 32:12 33:1 34:17 48:10 51:25 70:15 71:25 81:25 84:3 94:24 98:21 105:9 116:6 118:21 141:2 143:24
**sounds** 47:9
**source** 27:19
**space** 49:5
**speak** 11:19
**speaker** 110:22
**speaking** 15:9 49:14 51:3 55:24 87:5
**specialist** 8:23
**specific** 41:22
**specifically** 39:7 144:4
**speculation** 33:4 65:13 81:22 131:16 138:15 139:11 139:18
**spell** 9:18 18:19
**spelled** 9:20,21 18:20 29:15
**spin** 139:16
**split** 23:19 24:23 41:23 59:23 60:2 87:7
**spot** 26:22
**st** 2:17 5:7 6:6 7:6 8:22 18:16 78:16 108:22 108:23
**stack** 120:3
**stakes** 135:25
**staking** 136:14
**stamp** 119:14
**standpoint** 104:22
**stapled** 64:1 68:7 120:8
**start** 10:25 13:23 58:22 103:14
**started** 16:10 16:20,22,24 17:8 47:19 51:6
**state** 3:11 5:11 9:18 63:15 91:15 113:13 119:11 150:5 150:21 152:10 153:15
**statement** 2:18 3:20 53:22 85:11 98:24 119:10,22 152:13,14 153:19,19
**statements** 98:13,16,19,25 99:11 101:4 118:24
**states** 1:1 36:17
**station** 108:16
**statute** 2:23 4:12 87:14 132:2,8
**statutes** 132:14
**step** 11:19
**steps** 116:7 118:16 127:24 128:2 130:22
131:3,8,20
**steve** 109:9,12 109:13 110:11 110:12
**steven** 1:9 10:8 16:8,10,18 17:15 21:14,15 29:3 39:25 46:20,24 48:22 48:24 59:4 62:23 74:25 75:1 78:18 87:13 99:8 101:18,23 103:19 111:4 111:10,11,15 112:20 116:10 116:18 133:13 134:9
**steven's** 14:6 19:8 20:23 116:16
**stick** 147:1,4
**sticker** 2:12 64:15 66:4,10 66:13 70:8 125:9,12,18 126:17,21 141:2
**stickers** 64:20 140:23
**stipulated** 8:1
**stop** 61:16 67:4
**stopping** 51:5

**store** 26:5 27:3 27:4,10,13,17 27:23 28:1,3 44:1,2 52:16 71:20 147:21
**stores** 45:4,11 45:14,15,16,19 45:21 46:1
**story** 16:6 108:14
**strange** 49:16
**strategic** 109:17 110:4 110:10 112:2
**street** 6:14,21 7:5
**strictly** 40:16
**strike** 146:16
**structure** 57:19
**stuff** 14:18,21 76:25,25 78:3
**subject** 3:24
**submit** 31:18
**subpoena** 3:3 89:4,11
**subscribed** 152:10 153:14 154:21
**subsequently** 127:21
**subsidiaries** 56:15
**sufficiently** 139:22
**suite** 5:7 6:5,14 6:21 7:5 151:2
**summit** 123:5 123:16
**superior** 151:1
**supervisor** 18:9
**supervisors** 21:6
**supposed** 128:7 128:9
**supreme** 91:14
**sure** 9:20 10:24 17:19 19:4 23:4 27:12 28:15 33:24 44:11 46:11 47:10 64:1 67:20,21 69:4 72:13 73:18 74:2 86:13 111:19 112:12 114:24 125:22 126:19 135:22 139:23
**surplus** 3:10 91:15
**surprise** 118:10
**suspecting** 73:15
**swat** 58:25
**swear** 9:9
**swizzle** 147:1,4
**sworn** 5:4 9:12 150:7 152:10 152:13 153:14 153:18 154:21
**system** 27:25 29:20,22

**t**

**t** 6:24 9:22 10:1 10:8,9 18:22
**tables** 73:1
**take** 11:17,17 11:18,24 12:22 20:8 22:22,22 24:8,25 25:3 39:24 43:6 51:7,12,22 52:23 54:3 58:5 76:23 82:20 85:6,9 98:24 100:8 114:19,22 116:7 131:20 138:4 148:19
**taken** 1:19 8:3 8:13 20:14 67:22 118:16 146:24 150:8 150:13
**takes** 127:24 130:22 131:3,9
**talk** 10:22 12:23 15:25 16:11 17:19 26:16 34:10 41:21 72:11 75:1 101:17 123:18
**talked** 38:19 51:9 52:8 53:6 53:20 58:11 59:20 63:2 70:24 94:12 111:17 121:18
**talking** 23:12 27:8 35:16 39:16 52:5 62:4 112:10,10
**talks** 101:23,23
**tara** 5:7 7:2 8:4 8:24 9:8 150:3
**tax** 58:1 62:12 99:3
**taxes** 14:24,24 18:12
**taylor** 18:16,21 18:22 58:6,8 98:8,9
**team** 58:25
**technical** 32:15 32:23 33:10,11 135:6,10 137:11,18 138:25 139:11 139:19
**technician** 39:21,22
**technicians** 39:23 40:6,7 40:13,14,15,20 41:4,7,12 58:20,21

**technologies** 3:8 90:16
**telephone** 35:11,12,17,24 35:24 36:4
**television** 108:5 108:14
**tell** 11:10 13:21 14:21 16:4,6 21:9 30:3 33:22 38:1 43:3 45:2 46:16 50:14 67:15,18 74:13 76:16 85:10 111:1 118:9
**telling** 13:24 64:12
**ten** 63:19 130:10
**tend** 98:21 99:9
**tends** 59:2
**tennessee** 57:4 57:11,24
**tenth** 89:23
**term** 24:13 35:4 72:7 98:3
**terminal** 74:3
**terms** 21:6 49:10 81:20 132:10
**testified** 9:13 13:9
**testimony** 13:11 47:7 51:25 65:13 75:25 83:17 134:2,25 136:23 137:18 138:25 140:12 150:6,8 152:6 152:7 153:6,9 153:12
**testing** 78:5,8 78:11,13,21
**text** 35:17,20 117:6,8 141:19 141:21
**thank** 9:8 10:6 13:3 46:9 47:11,16 49:24 51:2 52:1 91:24 93:14 100:8 115:15 118:5 120:1 140:8,14 148:6
**thanks** 120:6
**that'd** 148:23
**thereabouts** 88:16
**thereto** 150:15
**theys** 129:11
**thing** 10:19 47:24 59:7 64:3 76:3 106:18 108:10 108:12 112:11 112:12 124:18
**things** 36:9,9 51:9 52:4 82:1 84:13 92:2,20 95:5 96:8 100:1 105:1 112:16 132:9 140:17 148:2
**think** 13:18 35:6 40:5 45:7 46:6 49:4 50:9 52:1 57:3 62:19 71:5 81:12 84:22 86:12 100:13 109:22 110:24 112:9 120:5 125:24 139:21 140:14 141:5 143:4,17 144:23
**thinking** 35:16 43:18 102:22 109:16 114:1 147:9
**third** 121:8
**thirty** 151:19
**thought** 51:23 80:15 105:5 128:10 137:24
**three** 102:15 107:21 115:7 146:11
**throwing** 107:23
**ticket** 28:5 30:25 31:18
**tickets** 76:21
**tilley** 109:9,12 109:13,20,24 110:16,21 111:3,13,22 112:2
**tim** 7:3 8:22 120:3,17 123:6
**time** 11:16,20 19:21 20:4,14 23:12 26:14 28:12 41:17 42:20 50:8 51:18,22 55:22 64:20,25 65:25 68:15 78:3,19 84:7 88:14 99:16 105:2 114:25 115:7 118:15 119:22 124:7 128:3 131:5 140:5,10 142:25 144:7 148:7
**timothy** 3:22 4:6,8 6:24
**title** 14:4,8 19:8 19:16,19
**titled** 119:10
**tnt** 1:5 3:12,14 3:16,18 8:14 9:4 50:7,10 95:19,22,23 96:12 97:2,15 97:20 105:8,10

105:14,17 106:1 151:6 152:3 153:3
**tnt's** 97:23 118:7
**today** 18:25 20:1 95:25 127:5 140:9,13 144:17
**together** 16:19 46:17 50:5 64:2 84:20,25 120:8
**told** 59:23 83:15 133:11 133:14 141:5
**top** 85:15
**topic** 28:18
**topics** 23:15
**torch** 1:8 2:12 2:14,15 3:3 4:10,11 8:15 13:15,16,25 14:2,13 16:5,7 17:14,24 19:1 19:9 20:9,15 22:2,5,9 26:24 28:20 36:5,8 38:16,22,23 40:4,21 42:12 42:17,20,20,23 43:7,12 45:8 45:18,20 46:3 46:15 47:18 48:25 49:5,9 50:7 52:9 54:3 56:8,10,18,22 56:23,25 57:4 57:6,22,23 59:1,10,15,21 60:7,7,11,15 61:7,10,15,17 61:20,23 62:2 62:6 63:3,5,6,9 63:14 64:16 65:23 66:19,20 68:19 70:8,9 70:13,19 72:14 72:18 73:8,21 74:14,19 75:7 75:16,21,21 76:7,12,19 77:6,11,19 78:6 79:6,12 79:18 80:19,22 81:4,7,11 87:12,23 89:4 89:12 90:21 92:4,7,12,24 93:3,7 94:16 94:21,23,25 95:8,11,15 96:14 100:15 100:18 101:1 101:25 102:5 102:11,21 104:13,16 105:14 107:9 108:25 109:5 110:3 111:23 112:22,25 115:19,20 119:11,23 122:25 123:16 123:22 124:13 125:9,12,15 126:2,5,11,17 126:21,23 127:7,10,24 128:22,25 129:4,13,15,17 130:17,22,24 130:25 131:3,9 131:10,13,14 131:19,21 133:21 134:21 136:13 137:6 137:14,21 138:22 139:6 141:9,16,21 143:20 145:5 146:7,17 147:5 147:14,17 151:6 152:3 153:3
**torch's** 23:22 28:11 53:8 67:22 68:22,25 69:3 99:12 101:2 102:7 106:2,12,15 107:2,16 108:6 108:14 134:19 141:1
**torches** 127:3
**totally** 35:3 47:6,10 117:20 125:1
**track** 100:16,18 103:16
**tracking** 103:18
**trained** 58:19
**training** 43:20 43:20,22,24,25 44:13 47:21 48:10 58:22
**trainings** 43:13 48:18,21
**trammell** 121:25
**transactions** 25:18
**transcribed** 8:5 152:7
**transcribing** 10:21
**transcript** 4:18 151:12,13 152:5,12 153:5 153:11,17
**transfer** 103:1
**transferred** 103:9
**transfers** 103:5
**tried** 103:14
**truck** 39:10,24
**true** 23:11

**try** 10:25 17:21 28:18 32:19 43:2 44:21 49:17 78:15 86:13 96:8 145:11
**trying** 12:15,17 12:25 44:2 47:4 94:6 97:9 123:19 138:3,5 140:20 142:15 145:14 147:20
**tsigmund** 6:25
**turn** 29:1 30:2 76:12
**turntine** 97:1 97:11,14 105:8 106:2
**two** 33:8 48:4 51:18 54:16 55:16,17 58:3 58:9 60:15 64:2 68:2 83:2 83:20,23 87:13 87:23 88:5 102:15 106:7,7 106:7 107:20 120:8 121:6 122:13 124:11 125:6 129:11
**typewriting** 8:5 150:10
**typical** 55:14
**typically** 15:22 36:14 48:11,14 50:21 58:13 62:10 103:9 105:1 126:23 141:6 146:9

**u**

**uh** 45:10
**um** 11:6 14:1,5 14:5,6 16:4,8,8 16:10,23 19:4 19:6,6 20:5 22:15,17,20 26:4 28:1 30:8 30:8 34:20,20 34:22 38:6,14 39:8,20 43:18 43:21 45:8 46:12 52:11,11 55:5,11 58:14 58:16,16 63:24 64:10,11 67:20 71:19 76:20 78:8 87:11 99:1,7,19 102:19 105:20 108:10 112:24 118:21 124:18 126:6,16,25 128:1,11,24 131:2,17 143:10
**uncomfortable** 10:14
**under** 13:1,12 66:21 128:8 132:21 136:4 139:5,8 146:9 150:10
**understand** 11:10 24:4 34:8 35:3 46:23 47:13,15 64:15 65:10 73:19 77:4 80:15,17 94:8 97:7 100:24 101:5 105:14 116:21 117:22 135:13
**understandable** 34:2 125:1
**understanding** 56:21 63:3,14 72:5,13 75:12 76:5,11 80:1 99:20,22 107:5 118:15 128:15 135:3 136:6,12 137:3,7 138:12 144:4
**understands** 138:16
**understood** 11:13 16:25 30:19
**undertaken** 112:6
**unfamiliar** 50:16
**unfortunately** 96:7
**uniform** 23:22
**unit** 8:12 51:18 115:7 140:5
**united** 1:1 36:17
**updates** 69:3
**ups** 36:15
**use** 24:13 34:12 35:4,12,23,24 36:4,5,14,22,25 37:5,8,14,17,21 44:14 46:19 95:11 98:23
**used** 16:2 99:7 101:19
**using** 27:18 46:22
**usual** 140:9
**usually** 22:19 28:5 39:12 78:14

**v**

**v** 3:6 10:8 151:6 152:3 153:3
**validate** 30:4
**valley** 39:8,14
**value** 136:1,7 136:14 137:4,8
**various** 92:8 101:7
**vary** 36:16
**vegas** 134:12 134:23

**vending** 93:15 93:19
**vendor** 38:2,4,6 38:8
**vendors** 31:24
**verbal** 42:8
**verifies** 28:6
**veritext** 7:4 8:25 151:1,8 154:1
**veritext.com** 7:8
**veritext.com.** 151:17
**version** 26:21 74:3
**versions** 73:21
**versus** 3:9,11 8:15 14:20 89:25 90:17 91:15 119:11
**vfw** 2:17
**video** 1:18 5:3 8:12,23 112:15 148:13
**videoconfere...** 37:2
**videographer** 7:3 8:10 9:8 51:14,17 115:1 115:6 140:1,4 148:12
**view** 75:8
**viewer** 74:20 74:23 75:13
**vlt** 112:11,15
**voucher** 27:22 43:6,9
**vs** 1:7

**w**

**w** 10:1 18:20 61:18,20,23
**wait** 11:2 86:5 112:8
**waived** 151:20
**walther** 10:1
**want** 10:23 16:9 27:12 35:8 39:23 46:13 50:13 59:3 72:13 77:15 84:24 86:9 97:5 99:20 111:19 115:21 118:10 132:17 140:11 140:15,24 143:12 147:21 147:24,25
**wanted** 23:16 28:18 147:25 147:25
**warned** 62:15
**warrant** 4:3 121:23 122:9
**warren** 6:9 9:5 85:1
**way** 12:12 14:6 20:3 29:18 34:11 38:8 43:3,7 44:5,10 44:22 49:16 55:22 56:19 59:4 64:22 76:17 77:20 80:12 94:19 101:9 103:15 104:18 135:5
**wayne** 121:5
**we've** 10:20 16:19 38:19 49:16 50:1 67:22,23 84:13 92:13 93:7 99:7 125:24 134:10 139:22 146:6
**website** 2:14,15 32:11 67:22 68:3,14,19,22 68:25 69:3,14
**week** 20:12 22:18 29:2 54:6 118:10
**weeks** 68:2
**welcome** 11:9 11:10 91:25 115:16
**went** 26:7 43:18 51:5
**western** 123:23
**whatsapp** 37:5
**wife** 14:6 147:22
**win** 73:11 138:13 139:7
**winner** 76:13 139:16
**winning** 137:15
**wins** 26:18 42:16
**wire** 146:23
**wisconsin** 39:3
**wise** 19:21
**witness** 5:3 6:19 8:6 9:9 73:25 91:1 148:5,8,14 149:2 150:6,8 151:9,12 152:1 152:4,11 153:1 153:4,15
**witnessed** 89:6
**witnesses** 2:2,3
**witness’** 151:15
**woilco.com** 121:7
**wolff** 18:16,19 18:20 58:6,8 98:7,8,9
**word** 40:12 44:8 101:22 135:18
**words** 38:10 65:10 71:22 102:3
**work** 14:1 19:1 19:5 29:19 31:25 32:24

35:13,18,21 36:2,8 40:20 47:19 51:10 58:17 59:3 63:4 72:4 76:19 101:21
**worked** 16:18 16:19 50:5 58:24 142:23
**working** 144:8
**works** 26:21 28:20 43:21 101:10 145:13 147:10
**world** 32:9
**worries** 89:17
**wrap** 139:24
**writing** 42:7
**written** 42:1
**wrong** 62:22

**x**

**x** 2:1 29:16

**y**

**y** 18:22 29:16 147:8
**yeah** 14:12 15:3 16:22,22 17:6 18:18 19:20,23 20:6 22:1 23:6 24:17,21 26:11 27:6,11 28:2,9 29:14,14,15 30:10 31:1,2 31:15 32:19,21 32:21 34:22 35:1,5,25 36:10,13 39:11 40:2,5,8,10,12 41:2,20 43:21 44:21 48:2,2,6 51:7 59:9 60:14 61:9 62:24 63:1,20 63:23 66:20 67:20 68:1 69:1,6,10,23 70:13 71:19,19 71:20 77:13,13 77:15 78:1 79:22 86:9 87:25 88:15,17 88:22,24 95:4 97:4,18 102:14 102:24 103:7 103:18 104:2,4 105:4 107:12 107:12,19 108:2 110:6,13 110:14,20 111:14 112:13 113:17,20 114:24 116:3,5 116:24 117:5 117:19 124:17 124:20 125:3,7 125:10,22 126:8,12,12 129:7,7 131:18 133:1,18 134:5 135:6 136:24 137:22 138:17 140:25,25 142:10 143:1,1 143:2 145:25 146:3,7,22 148:17,23
**year** 61:2 65:25 96:13 99:4,12 99:23,23 105:22 123:24
**years** 16:17 99:9 105:20,21 106:7,8 107:20 107:20,21,24 130:10
**yell** 10:24
**yep** 100:10
**yesterday** 68:2
**younger** 58:23

**z**

**zero** 137:16
**zoom** 36:25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.