# Exhibit 63

Deposition of Jim Turntine
Corporate Representative of
TNT Amusements, Inc.
December 22, 2023



# PohlmanUSA®
## Court Reporting and Litigation Services

---

James Turntine - Volume II

December 22, 2023

---

TNT Amusements, Inc., d/b/a Play-Mor Coin-Op

vs.

Torch Electronics, LLC, et al.

<pre>
 1              IN THE UNITED STATES DISTRICT COURT FOR

 2                 THE EASTERN DISTRICT OF MISSOURI

 3                         EASTERN DISTRICT

 4   ------------------------   x

 5   TNT AMUSEMENTS, INC.,          :

 6   d/b/a PLAY-MOR COIN-OP,        :

 7          Plaintiff,              :   Case No.

 8   v.                            :   4:23-cv-00330-JAR

 9   TORCH ELECTRONICS, LLC,        :

10   STEVEN MILTENBERGER, and       :

11   SONDRA MILTENBERGER,           :

12          Defendants.             :

13   ------------------------   X

14                   Continued from 10/19/23

15            VOLUME II OF III - Pages 289-567

16              Remote Zoom Video-recorded

17             30(b)(6) Deposition Transcript of

18                   JAMES DEAN TURNTINE

19                Friday, December 22, 2023

20                 9:20 AM to 5:21 PM CST

21

22   PohlmanUSA Job No.: 288924

23   Pages: 289-567

24   Reported by: Melody Stephenson, BBA,

25   FCRR, CRR, CRC, RPR, RSA, MO CCR 406, IA CSR 974
</pre>

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1              A P P E A R A N C E S
 2        ON BEHALF OF PLAINTIFF:
 3             RICHARD FINNERAN, ESQUIRE
 4             MARY GRACE WARREN, ESQUIRE
 5             BRYAN CAVE LEIGHTON PAISNER, LLP
 6             One Metropolitan Square
 7             211 North Broadway, Suite 3600
 8             St. Louis, MO 63102
 9             (314) 259-2000
10             richard.finneran@bclplaw.com
11             marygrace.warren@bclplaw.com
12
13        ON BEHALF OF DEFENDANTS:
14             J. AARON CRAIG, ESQUIRE
15             GRAVES GARRETT, LLC
16             1100 Main Street, Suite 2700
17             Kansas City, MO 64105
18             (816) 256-3181
19             acraig@gravesgarrett.com
20
21
22
23
24
25
```

```
 1                    C O N T E N T S
 2   EXAMINATION OF JAMES DEAN TURNTINE              PAGE
 3      By Mr. Craig                                 295
 4                      * * * * *
 5                    E X H I B I T S
 6                (Electronically attached)
 7   DEPOSITION EXHIBIT                              PAGE
 8      4   Notice of Deposition                     296
 9      5   Midwest Petroleum typewritten note       298
10      6   5/14/17 Turntine to Brown email          313
11          thread re: Gambling expansion...
12      7   5/4/17 Turntine to Chipman email         323
13          thread re: Gambling expansion...
14      8   5/4/17 Turntine to Tate email thread     339
15          re: Gambling expansion...
16      9   5/4/17 Turntine to Jones email thread    341
17          re: MO Lottery overreach...
18     10   8/28/18 Harness to Turntine, et al.,     347
19          email re: Amusement Machine Operators
20     11   10/22/18 Turntine to Harness, et al.,    357
21          email thread re: ATC Final Order...
22     12   10/24/18 Harness to Turntine, et al.,    371
23          email thread re: Correspondence in
24          support of illegal gaming machines...
25     13   1/25/19 Havey to Turntine email          406
```

291

```
 1              thread re: Torch machines in

 2              St. James convenience store

 3      14   2/12/19 Turntine to Cobb, et al.,        435

 4              email re: DGE subcontracting info

 5      15   3/29/19 Turntine to Harness, et al.,     459

 6              email thread re: SB 431 regarding

 7              illegal gaming machines

 8      16   (no date) Turntine to Havey & Marla      489

 9              re: New gambling law

10      17   4/15/19 Turntine to Havey email          490

11              thread re: Boards

12      18   4/17/19 Cobb to Turntine, et al.,        493

13              email re: Update on legislative

14              efforts...

15      19   4/18/19 Harness to Cobb, et al.,         504

16              email thread re: Update on

17              legislative efforts...

18      20   6/3/19 Turntine to Harness, et al.,      507

19              email thread re: Subject: Re:

20      21   6/20/19 Turntine to Harness, et al.,     509

21              email thread re: House Interim

22              Committee on gaming named

23      22   10/19/23 Deposition transcript of        518

24              James Turntine, Volume I

25      23   6/24/19 Turntine to Smith email re:      522
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

Emailing: Gaming letter

24    7/1/19 Turntine to Kleinsorge email       535
      thread re: Address for VFW machine on
      gray machines

25    7/1/19 Turntine to Havey email re:        538
      Letter from VFW needed

26    7/8/19 Turntine to Cobb email thread      540
      re: Pre-reveal gambling machines...

27    7/19/19 Turntine to Schatz, et al.,       541
      re: MO Amusement Operators...

28    7/20/19 Turntine to Murphy email          547
      thread re: MO Amusement Operators...

29    7/23/19 Turntine to Smith, et al.,        550
      re: Pre-reveal gambling machines...

30    7/23/19 Nelson to Turntine email          553
      thread re: Pre-reveal gambling
      machines...

31    7/31/19 Murphy to Turntine email          556
      thread re: What's at stake

                        * * * * *

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1                P R O C E E D I N G S
 2          VIDEOGRAPHER:  We are on the record.  This
 3     is the videotaped deposition of James Turntine.
 4     Today's date is December 22nd, 2023, and the time
 5     is 9:20 AM Central Time in the case of TNT
 6     Amusements, Incorporated, et al., versus Torch
 7     Electronics, LLC, et al.  The case number is
 8     4:23-cv-00330-JAR, pending in the United States
 9     District Court for the Eastern District of
10     Missouri Eastern District.
11          This deposition is being held remotely via
12     Zoom.  My name is Frank Holmes, the videographer,
13     associated with PohlmanUSA Court Reporting,
14     located at 10 South Broadway, Suite 1400,
15     St. Louis, Missouri.  The court reporter is Melody
16     Stephenson also with PohlmanUSA Court Reporting.
17          Counsel, will you please state your
18     appearance for the record.
19          MR. FINNERAN:  Richard Finneran and Mary
20     Grace Warren on behalf of Plaintiff TNT
21     Amusements, Incorporated.
22          MR. CRAIG:  This is Aaron Craig on behalf
23     of defendants.
24          VIDEOGRAPHER:  Will the court reporter
25     please swear in the witness, and we may proceed.
```

1    Whereupon,

 2                    JAMES DEAN TURNTINE,

 3    being first duly sworn or affirmed to testify to

 4    the truth, the whole truth, and nothing but the

 5    truth, under penalties of perjury, was examined

 6    and testified as follows:

 7                    DIRECT EXAMINATION

 8    QUESTIONS BY MR. CRAIG:

 9        Q  All right.  Mr. Turntine, we are back to

10    continue what we started on October 19th of this

11    year which was your corporate representative

12    deposition testimony on behalf of TNT Amusements;

13    correct?

14        A  Yes, sir.

15        Q  All right.  Where are you currently

16    located?

17        A  I'm in my office at 196 Highway FF,

18    Sullivan, Missouri.

19        Q  Is there any reason why you couldn't have

20    made an appearance today at Bryan Cave's offices

21    in St. Louis?

22        A  Not necessarily.  I could've.

23        Q  Okay.  All right.  I'm going to show --

24            MR. CRAIG:  Let's see.  I think -- Rich,

25    correct me if I'm wrong, but I think we marked

```
 1    three exhibits to his initial 30(b)(6) on the 19th
 2    of October; is that right?
 3            MR. FINNERAN:  I -- I don't recall
 4    exactly.
 5            Do you -- do you know if that's right?
 6            MS. WARREN:  Yeah.  It was the two things
 7    that we produced and then -- let me -- I have the
 8    list.
 9            MR. FINNERAN:  We can pull it up for you,
10    Aaron, if you need us to.
11            MR. CRAIG:  I -- I -- I'm pretty -- I'm
12    pretty sure it was the deposition notice and the
13    two exhibits that you produced.
14            MR. FINNERAN:  Okay.
15            MR. CRAIG:  Okay.  So I'm going to --
16            MR. FINNERAN:  Go ahead.
17            MR. CRAIG:  I'm going to start at four.
18       Q  (By Mr. Craig)  Okay.  So, now, you should
19    be able to see a new document that will populate
20    on your end that is titled 20 -- well, if you're
21    looking at it, it's the Notice of Deposition
22    Continuance of Corporate Representative of
23    Plaintiff TNT Amusements, Inc., and it has been
24    marked at the bottom as Exhibit 4; correct?
25       A  Yeah.
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1        Q  Okay.  Have you seen this Notice before
 2   today?
 3        A  I believe I have.  Yeah.
 4        Q  And then it includes an attachment of the
 5   original Amended Notice that you received prior to
 6   October 19th, correct, if you look at Page 3
 7   continuing?
 8        A  Yeah.  I mean, it all kind of looks the
 9   same, so -- till you start --
10        Q  Yeah.  And I'll --
11        A  -- to figure out there's a difference
12   but --
13        Q  Yeah.  No.  I'll represent it's -- it's --
14   it's exactly the same thing.  There are no
15   differences.  We just attached and reincorporated
16   that prior deposition notice to -- to make clear,
17   you know, as we stated, on Page 1, that, you know,
18   we're -- we're here to talk about all the topics
19   again in Exhibit A.  So it's just a continuation
20   as if, you know, we pick up now where we left off
21   where we ended on the 19th; okay?
22        A  Okay.
23        Q  Okay.  And -- and since that time, I think
24   you understand that there's been some significant
25   discovery that has been produced by TNT that would
```

1  be responsive to many of the topics in the

2  original Amended Notice that we sent prior to your

3  October 19th deposition; correct?

4      A  I do.

5      Q  And then I -- last night, I received a few

6  more exhibits, four or five, and -- and we may

7  look at those later today, but a -- a few more

8  exhibits that I believe your counsel said you,

9  with probably their cooperation, had put together

10  to respond to a few more topics in -- in greater

11  detail.  You were aware of that; right?

12      A  I think so.

13      Q  All right.  Now, I've -- I've shown you a

14  new document.  This is document three in your

15  list.  It's been marked as Deposition Exhibit 5

16  for identification.  And I will represent to you

17  that this is one of the documents that your

18  counsel sent late last night that I was told was

19  responsive to topic 23 of our Notice relating to

20  move tickets.  Is that consistent with your

21  understanding based on just looking at this

22  document?

23      A  The document looks to me like a

24  memorialization done by Donna Havey of a

25  conversation that she had or a phone call she

1  received on 8/17 of 2018.  One of three types of

2  memorializing, if you will, are underlying

3  documents that is tied to some of the moves of

4  equipment out of that location, equipment that --

5  that TNT owned out of that location to make room

6  for Torch devices in one way or another.

7      Q  If you look at Page 2, there's work

8  orders.  Is that -- and you continue.  I -- I know

9  that you said the top page is a memorialization,

10  but you would agree with me that there's more

11  attached to this document in that there's --

12      A  Yeah.  I -- I see that now.  I -- I didn't

13  know which one you were referring to in your

14  question, so I went with the first page.  There

15  are additional pages.  The second page is an

16  actual work order out of our system that says,

17  basically, the same thing, that her personal

18  memorialization to, I guess, herself that she

19  saved or -- or added to the file.  And the third

20  page, wherever the third page starts, is more of

21  the work order where it's completed.  And the

22  fourth page is more of the work order.

23      Q  If we get to the sixth page, it looks like

24  we get into actual move tickets; right?

25      A  Okay.  This is the fifth page.  The fifth

```
 1      page is a move ticket for one of the devices
 2      that's sideways.  So --
 3          Q  Well, I think on my -- on mine at least,
 4      Page 5 would be a work order detailed by a
 5      location that is upright?
 6          A  On -- on my page -- okay.  Page 6.  I
 7      guess I'm looking at the number at the top, and
 8      the number's at the bottom.  Page 6 is the first
 9      move ticket which is one of our additional
10      documentations that we -- that we use inhouse here
11      to track the work throughout, you know, the day
12      or -- or whatever's happening.
13          Q  Okay.
14          MR. FINNERAN:  Aaron?  Aaron, just for the
15      record, you're marking this whole thing as
16      Exhibit 5?  I don't think I heard you say an
17      exhibit number yet.
18          MR. CRAIG:  Yeah, I did.  I said it had
19      been marked as Exhibit 5 for identification.
20          MR. FINNERAN:  I might've missed it.
21      Sorry.  Thank you.
22          MR. CRAIG:  No worries.
23          Q  (By Mr. Craig)  Okay.  So then I did want
24      to ask you about the very first page.  Do you know
25      when this information was created?
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    A  Not expressly, no.  I assume it was

2    written by Donna, either around that date or

3    sometime thereafter, and I don't know, really, why

4    it's included, because we, obviously, have the

5    other actual work orders and move tickets, but she

6    may have just wanted to memorialize, you know, the

7    event.  I -- I don't know the -- the actual date

8    it was written.  It doesn't say.

9    Q  So as you sit here today, you can't tell

10   me if this information was created by Donna Havey

11   contemporaneous with this event that she says

12   happens on 8/17/18?

13   A  Define contemporaneous for me.  What do

14   you mean by that word inserted in that sentence?

15   Q  Yeah, basically, happening at the same

16   time or right after the same time.

17   A  Well, I -- I don't know.  I think I said

18   that.  I'm not sure.  It doesn't say when she

19   wrote this.

20   Q  Okay.

21   A  So all I can say is she memorialized her

22   accounting of, on the 17th of August, 2018, Tracy,

23   the manager, called her.

24   Q  No, I -- I can read it.  No.  I'm just --

25   I'm -- I'm just interested in when this took

1    place.  Because, you know, to be a business record
2    within the definition of the law, there's some
3    requirements.  So when this was written and why it
4    was written is important.  And I take it you don't
5    understand or have appreciation at this time for
6    when this was specifically drafted by Donna Havey;
7    correct?
8        A  Well, since -- since she is -- I haven't
9    really looked hard at our call log records.  So
10   this could actually be what our call log record
11   looks like.  We -- we have a call log built in.
12   So I don't know if she wrote this to herself or if
13   it's actually what she typed in the call log and
14   this is how it comes out looking.
15       So the best answer I can give you is until
16   I see maybe a little bit more of what our call log
17   looked like -- because I haven't sit and studied
18   one for quite a while.  I -- if -- if I'm told
19   you, yeah, there's a call log, and -- and I know
20   there is, but having printed it out or what it
21   looks like when it's printed out or scanned in, I
22   haven't -- I can't say that I know what date this
23   was written or --
24       Q  That's fine.
25       A  -- if that's what it is.

1      Q  If you had a call log, wouldn't --

2   wouldn't this be included with the other call

3   logs?  Why would it be segregated and then

4   attached to move --

5      A  That could be what this is.  This could be

6   a call log printed version.

7      Q  So that call -- what you're saying is is

8   that TNT's call log may include every work order,

9   regardless of the day, just as one compiled list

10  of --

11     A  No.  That's not what I'm saying.  That's

12  not what I'm saying.

13     Q  Well, this is.  I mean, this was produced

14  as one document.  So I'm just trying to -- I'm

15  trying to understand how this list of --

16     A  Okay.

17     Q  -- you know --

18     A  Okay.

19     Q  -- numerous, numerous documents could

20  possibly be a contemporaneous call log or even a

21  contemporaneous, you know, business record of

22  these events.  And -- and my -- I -- I -- you just

23  don't know, right, as you sit here?

24     A  Well, I think I do know.  I -- I'm -- I'm

25  trying to tell you what I know.  You -- the way

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1   you presented it to me this morning, it looks like

2   it's one exhibit that's multiple pages that are

3   different documents assembled together associated

4   with the activity that happened as a result of

5   this phone call.

6        Q   That's right.

7        A   And --

8        Q   I'm -- what I want to know is -- so this

9   is how it was produced to us both last night and

10  in our files separately when TNT produced it to

11  us.

12       A   Okay.

13       Q   So, yeah, I don't understand why all these

14  21 pages would be kept together in the regular

15  course of your business and then have just one

16  page on top that would explain the 22 pages that

17  follow.  I don't know how that would be.

18       A   I don't think they are kept in our records

19  that way.  I think they were put together for you

20  as part of discovery as the underlining documents

21  that support the move that occurred because of

22  that phone call.

23       Q   So you think that this top-level page was,

24  basically, a -- a summary that was drafted to help

25  us better understand why those move tickets were

given to us and what the move tickets say?

     A  I think they're included along with the
move tickets and the work orders to tell the whole
story of the under- -- the underlying documents,
as I've said, to the actual things that happen
because of the Torch machines coming into that
location and us needing to move our machines out.

     Q  Okay.

     A  They're the underlying document.  That's
the discovery that we presented and -- and shared
with our attorneys, and they, apparently, passed
it on to you.

     Q  And -- and did you ask Donna Havey to do
that sort of summary for the move tickets as part
of the --

     A  I -- I -- I think you might --

     Q  -- litigation process?  Sorry.

     A  I'm sorry.  I didn't mean to talk over
you.  I think I did ask her to write down anything
that she could remember as well as the documents
that we have.  And whether she wrote it that day
on the 17th of August, 2018, or whether she wrote
it, you know, two months ago as she was pulling
the documents together, sitting here right this
moment, I can't say because I don't know if that's

1    what a version of our call log looks like.

2          And I'm -- I'm honestly saying I know we

3    have a call log where when we receive a service

4    call or, you know, activity that's going to create

5    work, we log it.  And I don't know that I've ever

6    seen one printed out.

7       Q  Okay.

8       A  And it may be printed out and look just

9    like this, and that could be her call log document

10   printed out, or it could just be here's the

11   underlying document we have, and this is my memory

12   of what else went along with that.  I don't know,

13   honestly, which it is yet.  I might be able to

14   figure it out if you show me more.  As the day

15   goes along, I may back up and say, "Yeah.  That's

16   our -- apparently, that's what our call log looks

17   like when it's printed."  I --

18      Q  Okay.

19      A  -- I --

20      Q  Okay.  Yeah.

21      A  -- honestly at this moment don't know what

22   the call log itself looks like.

23      Q  Sure.  No.  Yeah.  That's -- that's fine.

24   Do you know if the call log has been produced in

25   this case?

1       A  Well, on one of the other documents that
2    we've shared through discovery, we have -- in each
3    instance of machines being moved, we have a header
4    that tells us do we have a work order?  Do we have
5    a call log?  Do we have move tickets?
6         And so without seeing that document or
7    have it in front of me in association with this
8    particular move, I don't want to answer and say,
9    yes.  This is the call log.  Or, no, it's not the
10   call log.  It's just her personal recollection
11   that she memorialized along with the other
12   documents that are associated with that move.
13      Q  Okay.  Can we agree that if this -- if
14   these cover pages on these, you know, move
15   ticket-type documents were, in fact, you know, her
16   attempt to memorialize her recollection, you know,
17   about those documents for purposes of this
18   litigation, then that -- that, obviously, would've
19   happened sometime between March 15th of this year
20   and today; right?
21      A  I don't know if I can agree with that,
22   Aaron.  I -- I -- I'm speaking for a third party
23   that I'd have to ask and say when do you think you
24   wrote this?  Or is this a version of our call log?
25   I don't mean to be difficult, but I don't want to

```
 1    answer something that I honestly don't know the --
 2    the -- the truth of.
 3        Q   Yeah.  Well, and that's fair.  But I think
 4    you said as well that you think you may have asked
 5    Donna Havey to memorialize in writing what she
 6    could remember about these types of move tickets.
 7    And I think we could both agree that if that
 8    happened, it would have happened sometime during
 9    the pendency of this litigation; correct?
10        A   Not necessarily done.  This is --
11            MR. FINNERAN:  Hold on.  Hold on, Jim.
12    I've got to -- we've got to make sure there's time
13    for me to object.
14            Objection.  Calls for speculation.
15            You may answer.
16        A   Okay.  No.  We've had previous legal
17    action, and we've been dealing with the Torch
18    problem since 2000, what, '17?  And so once we
19    became aware we've got a problem and we don't know
20    how to deal with this, we're going to have to
21    figure out a legal recourse or something, I've
22    instructed her to -- to keep notes and keep --
23    keep a diary, so to speak, keep notes if you have
24    anything that -- that's affected or caused by
25    this.  And so I don't know if this is that.
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1      I'd have to ask her.  What is this?  Is

2      this the call log printed off?  Or is this a note

3      you made recently that just supports what's

4      already shown in the move tickets?  I think it's

5      very consistent with the work orders and move

6      tickets.  It seems to me to be more helpful.  And

7      so I -- I don't understand, you know, when it

8      happened, really.

9           And I guess there's a reason you're

10     asking, but without understanding more, I don't

11     know how to answer the question any more honestly

12     than I'm not sure what the top page is without

13     seeing more or stopping and asking Donna Havey,

14     when -- when do you think you wrote this and --

15     and why?

16          Q  Okay.  That's fine.  I believe that you'll

17     probably recall that a number of our topics for

18     the 30(b)(6), when we met last, they talked about

19     communications between TNT, anybody associated

20     with TNT, and a -- and a broad range of people,

21     entities, and organizations to include Senator

22     Schatz, topic 9; news media, topic 10; Missouri

23     Department of Public Safety, topic 11; Missouri

24     Division of Alcohol and Tobacco Control was topic

25     12; communications with Missouri Gaming Commission

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    was topic 13; communications with the Missouri

2    State Highway Patrol was topic 14; communications

3    between TNT and the Missouri Lottery was topic 15.

4    Let's see.  Communications between TNT and any

5    lobbyists was topic 17; communications between TNT

6    and Matthew Becker, topic 18; communications

7    between TNT and the Missouri Gaming Association or

8    anybody associated with the gaming association,

9    topic 19; any trade association-related

10   communications, topic 21.  You generally recall

11   that; right?

12       A  Yes.

13       Q  Okay.  And then at that time, you'll

14   recall that it -- I think there was some back and

15   forth about, you know, what you had done to

16   prepare to respond to those topics and,

17   eventually, we got to a point where I think you

18   said, yeah, it -- it would've potentially been

19   possible, given enough time, for me to search for

20   those things and, you know, bring them to the

21   deposition.  That is not something that you had

22   done prior to October 19th; correct?

23       A  I don't -- I don't know what your question

24   there was, Aaron, exactly.

25       Q  Yeah.  No.  I mean, I -- I had asked you,

1    you know, if -- what you did to prepare to discuss

2    the various communications that you or TNT may

3    have had with all of those different people or

4    entities.  And I -- I think we can both agree

5    that, you know, you hadn't had an opportunity at

6    that point to, you know, look through TNT's

7    records and, you know, come to a conclusion or

8    understanding about the totality of all of those

9    communications which hadn't been produced yet;

10   right?

11       A   No.  I think what I told you in my

12   previous deposition on the 19th was that I had

13   spent all of the prior week going through my own

14   emails, talking to my staff, finding everything we

15   could about everything that you were asking for,

16   which was, you know, 25 items, and the one that

17   you just went through was a -- was -- was a whole

18   bunch of things within the one item.  And

19   everything that I could remember that I had seen

20   or heard from my staff I shared with you during

21   that deposition.

22          I also said that there were things that

23   we -- we -- we, obviously, couldn't get to every

24   single thing because there were -- that 25

25   extrapolates out to probably -- I don't know --

```
1    thousands of potential emails and -- and -- and
2    things to remember.  I couldn't remember
3    everything, and I said that, I think, in my
4    deposition.  And then we went on to -- to
5    supplement the deposition --
6        Q   What -- I -- I -- well, I -- I -- and
7    look.  I'm not trying to be rude at all and -- but
8    I think maybe you feel like I'm -- I'm not trying
9    to trick you here at all.  I'm literally -- I'm
10   just trying to lay the foundation for what I'm
11   going to do next which is ask you a lot of
12   questions about documents that were not produced
13   by the -- by October 19th.  So neither of us had
14   an opportunity to discuss them at that point and
15   the fact that they are, I believe, responsive to
16   those topics.
17           And that's -- that's really why I was
18   asking you that question.  I think we can agree
19   that neither of us had that level of detail
20   available to either one of us to walk through
21   specific documents and talk about this
22   communication and that communication on
23   October 19th; correct?
24       A   I think that's fair enough.  Yes.
25       Q   My computer was doing something wonky on
```

1    me here.  I'm sorry.  Give me a second.

2         A  I know the feeling.

3         Q  Yeah.  Okay.  All right.  So I've now

4    shown what should be a document four in your list,

5    and it has been marked as Deposition Exhibit 6 for

6    identification.  I'm going to move the exhibit

7    sticker.  Okay.  And this is an email from

8    yourself to danbrown@senate.mo.gov and ccing Dave

9    Schatz on 5/4/2017; correct?

10        A  It looks like an email from me to them,

11   yes.

12        Q  If you look down at the -- the bottom of

13   Page 2.  It's usually helpful to start these, you

14   know, email chains at the bottom because we're

15   working -- we're working up in the chronology.  So

16   we'll be doing that a decent amount today.

17        Do you see at the bottom of Page 2,

18   there's an email from yourself, dated March 6th,

19   2017, to danbrown@senate.mo.gov.  Subject:

20   Missouri Lottery overreach.  Video lottery

21   terminals, VTLs [sic].  Do you see that?

22        A  Well, you say in the bottom of Page 2?

23        Q  Yeah.  And when I'm -- when I'm saying

24   Page 2 -- yeah.  When I'm saying -- it is Page 2.

25   It's -- it's literally Page 2.  But if you look at

1    2/3 at the bottom of your screen where there's the

2    up and down arrows and then there's a number slash

3    number --

4        A  Uh-huh.

5        Q  -- that will, basically, always show you

6    what page of the PDF of the exhibit we're looking

7    at.

8        A  Okay.

9        Q  So it should say 2/3.  Do you see that?

10       A  Yes.

11       Q  And then what might also help us as we

12   have these discussions is at the bottom of, I

13   think, every page of the communications or

14   exhibits that we'll look at, aside from the ones

15   that I received last night, there will be a

16   marking at the bottom that says something like TNT

17   with a whole bunch of zeroes and then a number.

18   Do you see that?

19       A  I'm sorry.  I was distracted.  What --

20   what -- what'd you say?

21       Q  Yeah.  At the bottom of the page where

22   you're looking at, you know, Page 2 dash 3 --

23       A  Right.

24       Q  -- or 2/3, right at the bottom, the last

25   thing on the page would be a number.  It -- it's

314

1    TNT, a whole bunch of zeroes, and then a -- a

2    number.  277.  Do you see that?

3        A  I see it.

4        Q  Okay.  So every -- for the most part, most

5    of the documents that we're looking through today

6    will have that identification with a number and

7    every page will be individually numbered.  And

8    just for the record, I will say that we received

9    all of TNT's production without any Bates numbers.

10        So these are -- are just internal control

11    numbers as it got printed out automatically in our

12    relativity system.  So these are not the -- TNT's

13    Bates numbers, but they will, hopefully, help us

14    to the extent that you've got a question as to

15    what page I am on and the software, you know, that

16    you're looking at is confusing, you can always

17    look to the bottom of the page.  And you can say,

18    "It's Page 227 ending in 227," and then we can get

19    on the same page; okay?

20        A  I think so.  Yeah.

21        Q  All right.  So if you're looking at

22    Page 2/3 or TNT 277, do you now see an email from

23    yourself dated March 6th, 2017, to Dan Brown?

24        A  I -- I see the one that -- that then

25    starts there and goes on to Page 3.  Is that what

```
 1    you're talking about?
 2         Q  Correct.
 3         A  Yeah.
 4         Q  Okay.  Yeah.  And then if you go to
 5    Page 3, you start that email.  You say, "Senator
 6    Brown.  I am a constituent and business owner in
 7    Sullivan, Missouri.  I own Play-Mor Coin-Op,
 8    Biermann and Turntine Properties, LLC, and I am
 9    the chairman of the Board of Trustees for the town
10    of West Sullivan, Missouri."  Did I read that
11    correctly?
12         A  Yes.
13         Q  Okay.  And Play-Mor Coin-Op, that is, for
14    all intents and purposes, TNT Amusements that
15    we've been -- if I refer to TNT, we're also
16    talking about Play-Mor Coin-Op; correct?
17         A  TNT does business as, d/b/a, Play-Mor
18    Coin-Op.
19         Q  Right.  So one in the same, essentially --
20         A  Yeah.
21         Q  -- correct?
22         A  Yes.
23         Q  Okay.  Now, what is Biermann and Turntine
24    Properties?
25         A  It's pronounced Biermann.  Biermann and
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1   Turntine Properties is an LLC that -- that I own,
2   well, maybe my trust owns or my wife's trust, some
3   ownership structure there.  But this is a real
4   estate business where we own residential,
5   commercial, industrial properties.
6       Q   Okay.  Does Biermann -- Biermann and
7   Turntine Properties, does it own any type of
8   amusement devices or any sort of electronic gaming
9   devices?
10      A   No.  The only company that I own any of
11  those types of devices in is TNT Amusements doing
12  business as Play-Mor Coin-Op.  Biermann and
13  Turntine Properties is a real estate holding
14  company business.
15      Q   Okay.  Other than owning any business, do
16  you have any financial interest in any other
17  entity that operates other amusement devices or
18  electronic, you know, gaming devices of any -- of
19  any type?
20      A   No.
21      Q   Okay.  And that's -- that's true for you
22  personally or any trust that you may be a
23  beneficiary of or any family member, like your
24  wife?  Same -- same answer?
25      A   Same answer.  Yes.  We own no company or

1    part of a company or anything else that operates
2    gaming devices.
3        Q  Well, and my question was broader.  It
4    included anything that you might describe as
5    amusement devices as well.
6        A  All the amusement devices that we own are
7    operated by TNT Amusements doing business as
8    Play-Mor Coin-Op.
9        Q  Right.  Do you have a financial interest,
10   any type of financial interest, like, you -- you
11   might get some share or you might, you know, get
12   some dividend or you might just, you know, have a
13   financial interest, however the -- broadly that is
14   described, in any other company, entity, or
15   organization that operates amusement devices?
16       A  Amusement devices, no, or gaming devices,
17   no.
18       Q  Okay.  All right.  And then if you skip
19   down to the next paragraph, you state to Senator
20   Brown, "Unfortunately, the proliferation of the
21   Missouri Lottery and Diamond Games pull tab
22   machine program, 267 machines, takes businesses --
23   I'm sorry -- takes business opportunities from my
24   company.  I do not support competing for
25   entertainment dolu- -- dollars with the state of

1   Missouri Lottery and an out-state company, Diamond
2   Games."  Did I read that correctly?
3        A  Yes.
4        Q  Who's Diamond?  What's -- what is Diamond
5   Games?
6        A  Diamond Games is a company that is a
7   subcontractor or, I guess, a contractor -- not a
8   subcontractor, a contractor to the lottery, the
9   Missouri Lottery, and they operate pull tab
10  machines under the auspices and in cooperation
11  with and licensing, or whatever the right legal
12  terminology is, with the Missouri Lottery.
13       Q  Okay.  And then I'm going to skip a
14  sentence.  And you continue and -- and you say,
15  "Without any authority from the general" -- sorry.
16  I'm going to start again because I have a hard
17  time reading words.
18           You say, "Without any authority from the
19  general assembly, the lottery and Diamond Games
20  expanded their program from 100 machines to 267
21  machines and put some of those machines in other
22  liquor-by-the-drink bars and taverns."  Do you see
23  where I'm talking about there?
24       A  Yes.
25       Q  Did I read that correctly?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com

1     A  Yes.

2     Q  What do you mean by liquor-by-the-drink

3  bars and taverns?

4     A  I'm trying to distinguish, for the

5  Senator's benefit, the difference between a

6  fraternal -- a fraternal location and a

7  traditional either mom-and-pop bar or a

8  corporate-owned bar and restaurant.  So a

9  fraternal is, for your benefit, if -- if you don't

10  already know, an Eagles Club or a Moose Lodge or a

11  VFW or an American Legion, those sorts of, you

12  know, typically, in our world known as fraternal

13  organizations.

14     Q  Okay.  Thank you for that clarification.

15     A  Sure.

16     Q  You continue and you say, "It was our

17  understanding the general assembly was going to

18  hold the lottery and Diamond Games' feet to the

19  fire and go back to the pilot program standard.

20  It is now my understanding the lottery and Diamond

21  Games has HOODWINKED" -- I say that because it's

22  in all caps, right? -- "the House of

23  Representatives into continuing with, now, 267

24  machines, but only in fraternal organizations, by

25  representing there is some difference between

```
 1    fraternal organizations and liquor-by-the-drink
 2    locations."  Did I read that correctly?
 3        A  Yes.
 4        Q  Okay.  Why did you capitalize -- why did
 5    you make hoodwink -- sorry.  Why did you make the
 6    word hoodwinked an all-caps word?
 7        A  Apparently, I was angry.  I was somewhat
 8    disappointed in what had been going -- what had
 9    happened.  And, apparently, if I remember right,
10    we had had previous conversations with the Senator
11    and others.  When I say "we," at -- at this
12    juncture in my career -- this is seven years ago
13    almost, I -- I was working with the state
14    association, the Missouri AMOA, that we spoke
15    about earlier.
16            And, apparently, we had had some meetings
17    and been told that they were going to rein this
18    in, is my recollection, and they hadn't, and I was
19    upset about it.  I think that's why I used the
20    word "hoodwinked," meaning you were tricked or
21    somehow somebody fooled somebody because all of a
22    sudden, these gambling devices were being placed
23    in bars and taverns.
24            And I -- if I remember at the time, it was
25    in Springfield, Missouri.  And I don't operate in
```

1    that area, but one of our other members did, and

2    he was very upset, because it was impacting his

3    business.  And that's how the association worked.

4    We were there to lobby for our membership's best

5    interests.  And that's part of what this is.  I --

6    I think that's the best description I can -- can

7    give you for it.

8        Q  I appreciate the description.  So, I mean,

9    yeah, fair to say I -- it seems like you were

10   upset that maybe Diamond Games was trying to pull

11   a fast one on the legislature; fair?

12       A  Them and the lottery together, I felt,

13   were -- were kind of pulling a fast one on

14   everybody.  Yeah.

15       Q  Gotcha.  And then if you go down to that

16   next paragraph -- skip the first sentence.  You

17   say, "We oppose Diamond Games and the Missouri

18   Lottery operating ANY machines in any type of

19   location here in Missouri because doing so

20   directly competes with our business"; correct?

21       A  That is correct.

22       Q  And the word "any" after "operating" is,

23   again, in all caps; correct?

24       A  Yes.

25       Q  And -- and why was it that you were

1    opposed to Diamond Games and the Missouri

2    lottering -- lottery operating any machines of

3    this type in any location in Missouri?

4        A  For the reasons I just explained that they

5    compete with amusement devices in a -- in a

6    establishment and for revenue.  So it hurts -- it

7    potentially hurts our business or the business of

8    our members.

9        Q  So they're being allowed to operate --

10   yeah.  That's fine.  That's -- I -- I got it.  I

11   understand.

12        Okay.  I've -- I've put a new document up,

13   and I've marked this document Exhibit 7 for

14   identification.  Let me know when you've got that

15   document pulled up.  It should be document five in

16   your list.

17       A  I have it.

18       Q  Okay.  So, again, Exhibit 7 has been put

19   in front of you, which is an email from you to a

20   jasonchipman@house.mo.gov dated May 4th, 2017;

21   correct?

22       A  Correct.

23       Q  Well -- sorry.  Let's -- let's pull it

24   back to -- let's talk about six again -- I only --

25   I only asked you about one email on six -- which

```
 1    might help us move more quickly through seven.
 2    All right.  So are you -- are you back at
 3    Exhibit 6?
 4         A  I am.
 5         Q  Okay.  So we talked about the first email
 6    that you sent Dan Brown on March 6th.  And then if
 7    you go directly above that, there's another email
 8    that you sent to Dan Brown on April 12th, 2017;
 9    correct?
10         A  Yes.
11         Q  And you say, "I'm sending this letter to
12    reiterate all of my feelings that were shared with
13    you in the prior email on March 6th."  And then --
14    but I want to focus on the next sentence where you
15    say, "However, your staff was able to indicate you
16    remained steadfast in your support of our Missouri
17    small businesses in this issue concerning Diamond
18    Games and their inappropriate expansion of a
19    Missouri Lottery pilot program.  I say, quote,
20    abuse, end quote, because, obviously, the 100
21    machine pilot program has been expanded to, now,
22    275 machines in an unknown number of locations and
23    all done without legislative oversight or
24    permission whatsoever.  This is wrong and must be
25    stopped."  Did I read that correctly?
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1     A  You did.

2     Q  Okay.  So this is just you again trying to

3  make your -- essentially the same point that you

4  made in the email that we talked about below;

5  right?

6     A  Correct.

7     Q  If you skip to the last paragraph of this

8  email, you say, "A few minutes ago, I received a

9  very troubling email from our MO AMAO [sic] friend

10  and lobbyist Kathi Harness.  What is AMAO -- I'm

11  sorry -- AMOA?

12     A  As I explained earlier in the previous

13  deposition, we -- we refer to it as MO AMOA

14  Missouri Amusement Machine Operators Association.

15     Q  Okay.  There's a space there, and my mind

16  did not process those two things together, but,

17  yes.  So MO -- MO, period, AMOA is MO AMOA, which

18  is the trade organization that we did discuss back

19  in October; correct?

20     A  Correct.  It -- it existed at that time in

21  2017.  It's since become defunct.

22     Q  When -- and maybe you told me this again.

23  I'm sorry.  I've slept since which means memory.

24  When abouts did MO AMOA disband?

25     A  Oh, I think, if I remember, I -- 2019 or

1    somewhere in that session, I think.  Maybe 2020

2    with COVID on top of the -- kind of the discontent

3    that had unfolded and the retirement plans of our

4    long term dominant leader kind of -- I -- I think

5    it was, you know, somewhere in the '19, '20 era.

6        Q  Who was the long term dominant leader that

7    you just mentioned?

8        A  A man named Ron Kinney.  Ron Kinney --

9    Kinney, K-i-n-n-e-y -- from Springfield, Missouri.

10       Q  Okay.  And then who is this Kathi Harness?

11       A  Kathi Harness is the lobbyist that I've

12   known for 30 years or so that worked --

13   represented MO AMOA when it existed.

14       Q  And did -- I -- I assume -- well, let me

15   go back.  Strike that.

16           I -- I assume Kathi Harness is a

17   registered lobbyist in the state of Missouri at

18   that time at least?

19       A  Yes.  And still is to my knowledge.

20       Q  Okay.  Do you still work with Kathi

21   Harness?

22       A  I do.

23       Q  Is she retained as TNT's lobbyist

24   presently still?

25       A  No.  I have a company called Promotional

1    Services that I -- I keep her on a small retainer,
2    just to kind of be a lookout, so to speak, for our
3    interests.  Promotional Services is my -- our --
4    our dart league program that -- that I run and I
5    own that is -- is -- it doesn't own any equipment,
6    but we promote the sport of soft tip darts, which
7    is owned by TNT, but we have separate -- we keep
8    it separate because we have other people that we
9    work with and promote the -- the sport of soft tip
10   darts for as well.
11       Q  And what -- what was the name of that
12   company again?
13       A  Promotional Services, Inc.
14       Q  Okay.  So is Promotional Services, Inc.,
15   its operation, limited exclusively to dartboard
16   dart leagues?
17          COURT REPORTER:  I'm sorry.  You cut out.
18       Q  (By Mr. Craig)  Yeah.  Is Promotional
19   Services, Inc., its business and operations, are
20   they entirely limited to just promoting soft tip
21   dart leagues?
22       A  And tournaments.  Leagues and tournaments.
23       Q  So I guess -- well, why would Promotional
24   Services league -- Promotional Services, Inc.,
25   need a -- a lobbyist on its -- on its team like

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

Kathi Harness?

    A  The same as any other business or
activity.  If -- if you are concerned about,
perhaps, you know, legislation or something
popping up that could affect you or impact your
business interests, then you -- you'll want to
know, and you'll want to be in a position to,
hopefully, complain to the right people or beg the
right people to help solve the problem before it
gets worse, something to that effect.

    Q  And in this case -- in this case, you --
you allege that so TNT's devices harm your
amusement business by allegedly removing
dartboards.  So would, like, a thing like that, a
removal, according to you, of dartboards, you
know, related to Torch or Torch-type devices,
would that be something that Kathi Harness would
be looking into for you for her work with
Promotional Services, Inc., any legislation that
might impact --

    A  I --

        MR. FINNERAN:  Hold on.  Let me -- let me
jump in.  Objection.  Vague.  I -- I think --
Aaron, at the beginning of your question, I think
you said "TNT" when you meant Torch.  So I think

```
 1    your question doesn't make sense.
 2           MR. CRAIG:  Oh, okay.  Well --
 3           MR. FINNERAN:  You said TNT's devices
 4    compete or something like that.  So you may want
 5    to try restating it.
 6           MR. CRAIG:  Yeah.  Let me restate it.  It
 7    was -- it was long.
 8        Q  (By Mr. Craig)  Okay.  So I think what --
 9    your -- your claim here, and I don't know that I
10    necessarily agree with it, but, essentially, even
11    your dartboards compete with Torch devices.
12    That's your position, as far as this case goes;
13    right?
14        A  In this case meaning this lawsuit that
15    we're in --
16        Q  Correct.
17        A  -- with you?  Yes.  I say that
18    dartboards --
19        Q  I --
20        A  -- have been --
21        Q  I -- I get -- I -- I don't want to cut you
22    off, but it's going to be a long day.  And -- and
23    so if -- you said, "yes" and -- and that's --
24    that's good.  And we'll just go a little faster if
25    kind of the long narrative responses to every
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1   question -- like, we will never finish.  I'm just
2   going to tell you.  Okay?
3           So, yes, you agree that that is something
4   that you, for whatever reason, I didn't ask for
5   the explanation, but that is your position in this
6   case and that -- you said yes to that.  So I think
7   we can, then, let me ask a new question.  Okay?
8           And -- and I'm not trying to be rude.  I'm
9   not.  I -- I get it.  You -- you want to say
10  stuff, and there will be times when I will give
11  you that opportunity, I promise.  But I just --
12  I -- I understand your position.  And so that's --
13  I just wanted to make it clear that we both
14  understand your position.
15          So what -- I can predict the words that
16  are going to come out of your mouth because I
17  think I've heard them either from you or your
18  counsel.  So I don't need to hear them again for
19  the tenth time.  Okay?  All right.
20      A  Is that a question?
21      Q  No.  It's -- it's, hopefully, just some
22  guidance that can help us maybe move through this
23  thing a little bit quicker.
24      A  I -- I'm happy to move as fast as we can,
25  Aaron.

1     Q  Okay.  All right.  So we agree that one of

2     the things that you allege in this case is that

3     TNT's dartboards compete with Torch devices;

4     right?

5     A  Yes.

6     Q  Okay.  Now, with that said, would it be

7     fair to say that, then, Promotional Services,

8     Inc., in retaining Kathi Harness, one thing that

9     you, as the owner of Promotional Services, Inc.,

10    would be interested in Kathi doing is both

11    alerting you to anything that might, you know,

12    relate to Torch or no chance devices and thus

13    impact your business vis-a-vis the dart league?

14          MR. FINNERAN:  Objection.  Vague.

15          But you may answer, if you understand the

16    question.

17    A  I -- I don't.  Are we still talking about

18    document number four?  Or are we -- or are we --

19    are we off of that and we're talking about in

20    today's time or 2017's time?

21    Q  (By Mr. Craig)  Well, right now.  You said

22    she's still employed as a lobbyist for one of your

23    entities, Promotional Services, Inc.  So I --

24    A  Yeah.

25    Q  I'm asking you.

1      A  Yes.

2      Q  Okay.  And -- and she does that to both

3  apprise you of any legislation that might involve

4  Torch or other no chance devices, I assume?

5      A  So -- and I don't mean to have a long

6  answer.  I don't know of any legislation involving

7  Torch devices or no chance devices, specifically,

8  ever.  I don't think there's ever been any.

9      Q  It -- you -- you're not aware of any

10  proposed legislation that would impact or

11  change --

12      A  Currently?  Today?

13      Q  You said ever.

14      A  No.  I -- I don't think there has been.

15  I -- I -- I -- and that's -- that's true.  I --

16  I -- I said ev- -- ever because I don't think

17  there has been.  There's been legislation about

18  adding penalties for operating illegal gambling

19  devices generally, but I just don't remember if

20  they specifically carved out or identified Torch

21  or even the terminology "no chance."  So that's --

22  that's what I was responding to, that part of your

23  question.

24      Q  How about any games that have a preview?

25      A  Pre-reveal?  Maybe the --

```
 1       Q   Sure.

 2       A   Maybe the words "pre-reveal" may have been

 3   included in some of the legislation, but that --

 4   that's just my memory.  So I don't know if it's

 5   true or not.  I don't know.

 6       Q   Yeah.  And -- and -- and as you sit here

 7   today -- go ahead.

 8           MR. FINNERAN:  Hello?  Aaron, can you hear

 9   me?

10           MR. CRAIG:  Yeah.

11           MR. FINNERAN:  Okay.  Sorry.  I had some

12   sort of audio issue a moment ago when a phone call

13   came in, and I missed the last couple questions.

14   I just wanted to make sure you guys can hear me.

15   And I can -- I can hear you again now.  So I

16   apologize.  But I -- I -- I don't think there's

17   anything we need to worry about.  I just want to

18   make sure I didn't lose my audio.  So my

19   apologies.

20           MR. CRAIG:  Okay.

21       Q   (By Mr. Craig)  Yeah.  So you're saying

22   that you -- you may recall some prior proposed

23   legislation that specifically discussed, like, a

24   pre-reveal feature that you would find in a Torch

25   device; correct?
```

```
 1        A   No.  I think I told you I can't remember
 2    for sure, and I -- I don't remember for sure.
 3    It -- there might've been the words "pre-reveal"
 4    in some proposed legislation, but I don't remember
 5    for sure.  So I -- that's the best I can say.
 6        Q   And -- and in your mind, those two things,
 7    you know, Torch and the pre-reveal and any
 8    proposed legislation, you don't -- you don't put
 9    those together?  Is that what --
10        A   No.
11        Q   Okay.
12            MR. FINNERAN:  Aaron, I'm sorry.  Can --
13    can -- can you hold on for just one second?
14    Someone keeps calling me, and I keep losing my
15    audio.  So I'm going to try and switch to my
16    computer audio, but I just need a second to do
17    that, if you don't mind.
18            MR. CRAIG:  Okay.  Yeah.  That's fine.
19            MR. FINNERAN:  Sorry about that.
20            MR. CRAIG:  No.  No worries.  Been there.
21            MR. FINNERAN:  I don't know why I'm
22    getting called four times in -- in a row, but
23    I'll -- I'll hopefully solve that in a second.  So
24    hold on.  Let me switch.
25            MR. CRAIG:  Is it an emergency?  Do you
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1    need to take -- and I don't just mean a client
 2    that's pesky because that's -- they usually think
 3    it's an emergency, but I usually differ on my
 4    opinion.
 5           MR. FINNERAN:  So I -- I -- Aaron, I
 6    didn't hear everything you just said.  I just -- I
 7    just got my audio reconnected, but I think I heard
 8    you just making a comment.  I think we can move on
 9    unless -- unless you need to go back for anything.
10           MR. CRAIG:  No.  No.  I think we're good.
11    I mean, it's not an emergency; right?  That's all
12    I was asking.
13           MR. FINNERAN:  It doesn't look like it.
14    I'm -- I'm -- I'm going to try and figure it out.
15    But you guys keep going.  I'll tell you if we have
16    to take a break.
17           MR. CRAIG:  Okay.
18       Q   (By Mr. Craig)  All right.  So I'm -- I'm
19    not saying that there is any current legislation
20    pending that would impact Torch or no chance or
21    pre-reveal devices, but I am saying that if there
22    was something like that that might impact your --
23    your dart league or, frankly, your, you know,
24    business at TNT, I assume you would expect that
25    your lobbyist, Kathi Harness, would tell you about
```

1    it; right?

2        A  That is the -- the hope.  Yes.

3        Q  And I -- I assume that the flip side of

4    that, one other reason why somebody hires a

5    lobbyist would be to lobby in favor or against a

6    thing that, for whatever reason, you might want or

7    not want; fair?

8        A  Fair.

9        Q  All right.  And so I would assume that if

10   there was some current proposed legislation that

11   bared on Torch devices or similar pre-reveal-type

12   devices, that you would expect Kathi Harness would

13   lobby, I assume, against, but either way, for or

14   against, depending on your position in that

15   matter, on behalf of Promotional Services and TNT;

16   right?

17       A  Perhaps, depending on what it is.  It --

18   you know, hypothetically, yes.

19       Q  Okay.  All right.  And then if we go to

20   the very first page of this email, now, we're

21   back, again, looking directly at Exhibit 6.  Let

22   me know when you're on that first page.

23       A  I -- I'm still there.  You said the first

24   page?

25       Q  Yep.  The very first page.  Exhibit 6.

1      A  Okay.

2      Q  All right.  So this is an email from

3   yourself, again, to Dan Brown, and you've copied

4   daveschatz@- -- you know -- senate.mo.gov.  And

5   this is dated May 4th, 2017; correct?

6      A  Yes.

7      Q  Okay.  And this appears to be, generally,

8   a follow-up to your previous two emails to Senator

9   Brown; correct?

10     A  Appears to be.  Yes.

11     Q  And your first lines there, you say,

12  "Senator Brown, I was disappointed to hear that

13  the Missouri Legislature had decided to reward

14  Diamond Games and the Missouri Lottery's gambling

15  expansion with full funding of $4,321,000 in the

16  2017 budget even though both ignored and

17  circumvented the legislative process during their

18  possibly illegal gambling expansion last year."

19  Did I read that correctly?

20     A  Yes.

21     Q  It's fair to say that at least at this

22  time, in May 2017, that you believe there was a

23  decent chance that what Diamond Games and the

24  Missouri Lottery had done with respect to

25  expanding the scope of the pull tab games, that we

1    talked about earlier, was possibly illegal

2    gambling expansion; right?

3        A  At that time, yes.

4        Q  All right.  Now, if you look at the next

5    document, document five, in your list, that

6    document has been marked as Exhibit 7 for

7    identification.  Please let me know when you have

8    that in front of you.

9        A  I do.

10       Q  Okay.  And this document, marked for

11   identification as Exhibit 7, is an email from

12   yourself to jasonchipman@house.mo.gov dated

13   May 4th, 2017; correct?

14       A  Yes.

15       Q  And it's the same subject line as the

16   subject line that we just saw in Exhibit 6; right?

17   Gambling expansion, dash, Missouri Lottery and

18   Diamond Games; correct?

19       A  Yes.

20       Q  And I believe that, basically, this is the

21   same exact -- from scrolling from the bottom up,

22   this is, basically, the same exact email that you

23   sent to Senator Brown, except for the very first

24   line which is addressed to Representative Chipman;

25   right?

1      A  Yes.

2      Q  Okay.  Who's Representative Chipman?

3  Who's -- who's Jason Chipman?

4      A  He was the state representative for my

5  residency in my office at that time.

6      Q  And why were you -- why were you sending

7  this email to House Member Chipman?

8      A  Because he was my state representative at

9  that time.

10     Q  And -- and you just -- you wanted to

11  express your frustra- -- frustrations that we

12  already discussed; right?

13     A  Yes.

14     Q  Okay.  All right.  I've marked another

15  exhibit, Exhibit 8, for identification.  It should

16  be document six on your list.  And this is an

17  email from yourself to natetate@house.mo.gov dated

18  the same date, May 4th, 2017; correct?

19     A  Correct.

20     Q  With the same subject line and, except for

21  the word Representative Tate, I believe the same

22  content as the prior two emails that we just

23  discussed; right?

24     A  It looks the same.  Yes.

25     Q  So -- so you -- well, who's Nate Tate?

1    A  It looks like he was another House member.
2   I don't know for which district, but it looks like
3   he's a House member.
4    Q  So, again, you were just contacting
5   another member of the Missouri Legislation to
6   express your displeasure with the goings-on that
7   we already talked about; right?
8    A  Slightly different.  I think that he
9   probably was in a position of either a budget
10  committeeman or was somehow involved in the
11  appropriations and the budget discussions.  And I
12  would've -- otherwise, I probably would've --
13  would've only sent it to my own local
14  representatives.  And I -- I don't remember what
15  Nate Tate's position was, but I suspect he was on
16  one of those committees, more -- more than likely.
17   Q  Why -- why do you think you otherwise
18  would've just sent it to your own representatives?
19   A  Because that's -- that's what we normally
20  did.  As members of our state association, our
21  efforts -- when we had something of concern, there
22  were six directors across the state, and I think,
23  at the time, maybe 50ish, 50 odd other members,
24  and we would collectively reach out to our -- each
25  of our own state Senators and/or House members

```
 1    to -- to -- you know, to inform them, ask them,
 2    however you want to kind of characterize it, of
 3    whatever the problem might be.  So that was
 4    typically what I think any association, business
 5    organization probably does.
 6          So if I sent it to one that -- that wasn't
 7    my state rep, then I would -- I'm -- I'm ju- --
 8    I'm trying to remember as to kind of how we did
 9    it.  You know, the officers and members of the
10    association or it may have been somebody that was
11    on a committee that I had talked to previously.
12          But for whatever reason, I sent this --
13    this same concerning letter to Representative Tate
14    and -- and I think it was probably because he
15    might've been on one of those committees, not
16    one -- not one of my actual local representatives.
17       Q   Were you a director of MO AMOA at the
18    time?
19       A   Yes, I would've been a director.
20       Q   All right.  I've marked another document
21    for identification as Exhibit 9.  And this is a --
22    well, first of all, do you see what's been marked
23    as Exhibit 9 for identification?
24       A   I do.
25       Q   Okay.  And this is another email from
```

```
 1     yourself to a calebjones@governor.mo.gov dated
 2     5/4/2017; correct?
 3          A  Yes.
 4          Q  Same subject line as the prior three
 5     Exhibits 6, 7, and 8 that we just talked about;
 6     right?
 7          A  Yes.
 8          Q  I think the content's a little bit
 9     different, at least the first opening paragraph;
10     agree?
11          A  Agreed.
12          Q  Okay.  Who's Caleb Jones?
13          A  I am guessing -- I don't remember exactly
14     who everybody is.  But by his email address, I'm
15     guessing he might've been the governor's aide or
16     in the governor's office.  And me being angry.  I
17     was reaching out to the governor's office as well,
18     perhaps, if that's what @governor.mo.gov means.
19     So I'm guessing Caleb might've been an associate
20     or -- or a member of the governor's staff.
21          Q  Okay.  And you -- you tell Caleb, "I'm
22     writing you on this matter because it seems the
23     Missouri Legislature is about to approve millions
24     of dollars in funding for a shady gambling
25     expansion deal between the Missouri Lottery and an
```

out-of-state company, Diamond Games.  This
haphazard gaming -- this haphazard gambling
expansion will be a train wreck for my industry
and for Missouri because it will create an unfair
anti-capitalistic environment for thousands of
have-not bars, taverns, and fraternal clubs across
Missouri.  Diamond Games --"  Well, I'll stop
there.  Did I read -- so far, have I read that
correctly?

    A  Yes.

    Q  Okay.  What did you mean by "shady
gambling expansion deal"?

    A  If you read the earlier exhibits that we
just went through, I kind of characterize and
explain that that program started out as a pilot.
And it's not my word.  That's the word that I
remember being told that the program was which is,
essentially, a test program of the equipment.

       And my understanding and recollection is
that it had expanded well beyond 100 units, in
fraternal organizations only, to something
approaching 300 units that had popped up in
traditional mom-and-pop bars in Springfield,
Missouri, at that time.

       And all of our membership became very

```
 1      concerned about what that meant and what was going
 2      to happen next.  And so we were trying to make
 3      sure that people knew about our small businesses
 4      and that we were upset that this was something
 5      that was going to and it already was affecting at
 6      least my -- my -- my friend in Springfield.  And
 7      he was particularly upset and I was channelling
 8      his upsetness in my letters to my representatives
 9      and the people that we had all agreed to reach out
10      to.  And, apparently, Caleb Jones was one of them.
11          Q  And then you go on to say, "Diamond Games
12      is an out-of-state company and their gambling
13      machines directly compete with many small
14      businesses across Missouri, including my small
15      business where I and my employees provide
16      amusement games to bars, taverns, and fraternal
17      clubs."  Did I read that correctly?
18          A  Yes.
19          Q  Okay.  Is it true that Diamond Games
20      competed with your small business?
21          A  I'm trying to remember.  But I -- I -- if
22      I said it, then they must've had some in my area
23      in some of the fraternal clubs that I served at
24      that time.  So if I said it, I feel it must've
25      been true.  So, yes.
```

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com

1    Q  And then you go on and say, "I was
2    disappointed to hear that, yesterday, the Missouri
3    Legislature in Conference Committee has decided to
4    reward Diamond Games and the Missouri Lottery's
5    gambling expansion with full funding of more
6    than -- it's the same.  This is the same language
7    from there on, basically, that we've seen in the
8    prior three exhibits; correct?
9    A  Appears to be.  Yes.
10   Q  Okay.  Did you ever get a response from
11   Caleb Jones?
12   A  I don't think so.
13   Q  Did you ever get a response to your email
14   shown in Exhibit 8 from Nate Tate?
15   A  I don't -- I don't think so.
16   Q  Did you ever get a response to your email
17   shown in Exhibit 7 from House Representative Jason
18   Chipman?
19   A  I think I did.
20   Q  Do you recall what he responded?
21   A  Not off the top of my head.  I'm sorry.
22   I -- I can't remember what was said, but I do know
23   that I had future conversations, further
24   conversations with Jason.
25   Q  How about Exhibit 6 to Dan Brown?  Did Dan

1    Brown ever respond to the email that we discussed
2    on Exhibit 6?
3         A  When you say "response," do you mean an
4    email response or do you mean did we have
5    conversations later?
6         Q  Yeah.  Let's start with email response.
7    So directly, you know, to -- in response to your
8    email.
9         A  I don't think so, because if I did you
10   would've -- I assume it would've been also
11   provided through discovery.  So my recollection is
12   there was no email responses, but there were
13   probably follow-ups with some of these folks in
14   later visits to Jefferson City when -- when we
15   would go and talk to them about, you know, what's
16   happening next or what transpired in between, that
17   sort of thing.  Does that make sense?
18        Q  Yes.  Do you recall any of those specific
19   occasions where you did, then, speak to Dan Brown
20   about something that's in this email?
21        A  Gosh.  It -- it's -- I -- I can't say that
22   I recall specifically, no.  But I -- I recall
23   other conversations and future trips because I
24   continued to go to Jeff City on behalf of my state
25   association and meet with people on this concern

1   and others, you know.  So there had to be, but,

2   specifically, I -- Aaron, I'm sorry.  I can't

3   account -- you know, pull up exactly what, you

4   know --

5       Q  Yeah.

6       A  -- when, where, and how they all fit

7   together in my --

8       Q  I get that.  But -- but you do believe

9   that sometime after this, you had further

10  interactions with Dan Brown?

11      A  I -- I do.  Yes.

12      Q  Okay.  What in the world?  All right.  I'm

13  showing another exhibit that has been marked as

14  Exhibit 10 for identification, which you should

15  see as an email from, at the top, Kathi Harness to

16  yourself sent 8/28/2018.  Do you see that?

17      A  I do.

18      Q  Now, if you look at Kathi's email to you

19  and others -- well, first of all, let's talk about

20  the others.  So Kathi's email is not just sent to

21  you.  It's also sent to a tomcobb@acmemusic.us and

22  a Scott Swain at swaingroup.biz; correct?

23      A  Yes.

24      Q  Who is Tom Cobb?

25      A  Tom Cobb is a fellow association member at

1     that time and a -- a -- a friend of mine, also
2     owns an amusement business similar to Play-Mor
3     Coin-Op.
4         Q  Where's his business located?
5         A  Saint Joseph, Missouri.
6         Q  Was he a director in MO AMOA at the time?
7         A  Yes.
8         Q  How long had -- had you known Tom Cobb at
9     this point in time in 2018?
10        A  Twenty-five years or more.
11        Q  And then Scott Swain.  Who's Scott --
12    who's Scott Swain?
13        A  Scott Swain is a lobbyist associate of
14    Kathi's.
15        Q  Swaingroup.biz.  Is that also Kathi
16    Harness's group or is he --
17        A  No.  I -- I -- I -- no.  I think they're
18    separate.
19        Q  Okay.  So he's a separate lobbyist from
20    Kathi Harness?
21        A  Yeah.  I think they're separate -- they're
22    separate lobbyists, separate people.  They
23    don't --
24        Q  And do you know why Scott Swain is on this
25    email?

1          A   At this point in time, I think he was on

2     board to help us.  I think things had evolved

3     during the months between this and when we had

4     gotten upset about what the lottery was doing.

5     And there were conversations beginning of what

6     could the Missouri Amusement Machine Operators

7     Association members -- what could our members do

8     to work with the lottery instead of being beat up

9     by the lottery or, you know, Diamond Games and the

10    lottery's project.

11         Q   And she -- so Kathi -- going to the

12    subject content, she's got next steps of what

13    she's doing, but then she gets into the

14    discussion.  There's an attachment called "Letter

15    to Herschend.docx."  It's d-o-c-x at the top.  Do

16    you see that?

17         A   Yeah.

18         Q   Who's Hershend?

19         A   Peter Hershend is the owner of Silver

20    Dollar City.

21         Q   And why would you and other members of MO

22    AMOA and your lobbyist be drafting a letter to the

23    owner of Silver Dollar City?

24         A   Because by this time, which was -- I think

25    this is, what, a year and a half later from the

```
 1    point where we were upset with what Diamond Games
 2    and the lottery were doing to where we were
 3    talking with them about ways that we could be --
 4    our association, our membership, could become
 5    involved with or become a part of something with
 6    Diamond Games and the lottery instead of being on
 7    the wrong end of that.
 8            And Peter Herschend also has a lobbyist.
 9    And I don't remember who it is.  He is very
10    conservative and very much opposed to any
11    expansion of gambling at all in Missouri.  And by
12    this point, the conversation had turned to, well,
13    if we could be involved, there would have to be
14    enough pull tab machines with the lottery that our
15    members could help to service to make -- to make
16    money and not be on the wrong end of -- of the
17    expansion.
18            So there was a discussion about would he
19    support the expansion that would enable this to be
20    a viable project for our Missouri AMOA members and
21    the lottery and Diamond Games.  So -- so I think
22    this was Kathi's kind of framing up what we could
23    do into 20- -- into the 2018/2019 legislative
24    session to find out -- to find out what we could
25    maybe do.
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1     Q  Why would the owner of Silver Dollar City

2     be an integral part of that plan?  And I'm asking

3     just because, you know, as a long time season pass

4     member down there, I don't remember seeing any

5     sort of, you know, pull tab machines or electronic

6     gaming-type machines anywhere in Silver Dollar

7     City.  So I'm -- I'm a little confused why you're

8     emailing him.

9          MR. FINNERAN:  Aaron?  Sorry.  I'm not

10    sure if Jim could hear you, but at least the

11    beginning of your question broke up for me.  I

12    don't know if the court reporter heard it and

13    could read it back, otherwise, maybe you could

14    repeat it.

15        Q  (By Mr. Craig)  Yeah.  Yeah.  I guess

16    my -- my question -- and it's just because I -- I

17    don't know.  But my question would be why would

18    the owner of Silver Dollar City be an integral

19    part of this, I guess, new -- new -- turning over

20    a new leaf?  And -- and that's me asking just

21    because as a long time season pass holder of

22    Silver Dollar City, I've never seen pull tabs

23    there or electronic gaming devices.  So I -- I

24    just -- I was hoping you could explain for me how

25    the owner of Silver Dollar City would be relevant

```
 1    to this conversation.

 2        A   Okay.

 3            THE WITNESS:  Any objections to that,

 4    Rich?  I just --

 5            MR. FINNERAN:  No -- no -- no objection.

 6    I just couldn't -- I didn't hear the question

 7    initially --

 8            THE WITNESS:  Okay.

 9            MR. FINNERAN:  -- because it broke up.

10    But you can go ahead, Jim.

11            THE WITNESS:  Okay.

12        A   My recollection, Aaron -- and I don't want

13    to give you too long of an answer and -- and we're

14    kind of getting off --

15        Q   (By Mr. Craig)  Well, I asked for it.  I

16    asked for it.

17        A   Good.

18        Q   It's on me.

19        A   You asked for it.  So here you go.  If

20    you -- you might remember in that area, there was

21    a casino proposed on one of the lakes down there,

22    near Lake Taneyco- -- somewhere.  I don't remember

23    where.  Branson area.  A Branson area casino

24    was -- was being discussed.  I think it was maybe

25    even on the ballot or something.  And -- and Peter
```

1    Herschend, basically, single-handedly said, "We're
2    not doing that."  And -- and I think there was TV
3    ads and things like that going on.  And so he was
4    viewed as a -- a very engaged party with a lot of
5    power because he, you know, can afford it.  He
6    donated a lot more money than old Jim Turntine
7    could afford to donate to anybody.
8         And so I think we were concerned that if
9    we're going to go down this path and try to figure
10   out a way that we could do something with -- with
11   our membership for our -- for our little mom and
12   pop Missouri Amusement Machine Operators
13   Association members, one of the best guys that we
14   could get on our side to help, you know, sell that
15   to the legislature would be somebody like Peter
16   Herschend.  And I -- I -- that's my recollection
17   and why -- why he would've been important to have
18   educated and informed and -- and, hopefully, on
19   our side.  I don't think we ever got that done.
20   But I think at this point in the process, that's
21   why he's being talked about.  Okay?
22      Q  Got it.  So I -- and -- and I think what I
23   hear you're saying -- you saying is that you knew
24   that to have an -- have any real hope of this
25   going forward -- well, let's put it this way.  I

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    think what I heard you saying was without Peter's

2    stamp of approval, he would be a very powerful

3    opponent against any plan that, you know, the

4    members in MO AMOA might have to combine forces on

5    this new venture; right?

6        A   That's similar to what I said.  Yes.

7        Q   Okay.  And so I think you said this is --

8    this is forward -- fast-forwarding in time into

9    the next year from the documents that we

10   previously looked at when you were, you know,

11   talking about Diamond Games and this expansion.

12           And, I mean, would it be fair to say that,

13   basically, by this point, you were considering

14   sort of if we can't beat 'em, let's join 'em type

15   strategy?

16       A   That's probably a fair way to describe it.

17       Q   So it looked like at this time there was a

18   good chance that whatever your legislative efforts

19   would be to stop this expansion by the Missouri

20   Lottery and Diamond Games, that it was more likely

21   than not it was going to happen whether you liked

22   it or not; right?

23       A   I'm sorry.  You'll have to repeat that

24   question.  I -- I don't --

25       Q   Yeah.  It may not have been -- it may

```
 1    not -- it may not have been a perfect question.
 2    But by this point in 2018, would it be fair to say
 3    that you and other members had, basically, came to
 4    the realization that it was more likely than not
 5    whatever your efforts would be to shut this
 6    program down would likely fail?  So it would be
 7    more beneficial for the members to find a way to
 8    inject themselves into that process so that, then,
 9    they could benefit as well?
10        A  Well, I'd like to say you're right and
11    that I agree and keep it short, but I can't.  It's
12    very --
13        Q  Okay.
14        A  This was an unfolding situation that we
15    were against it whenever we couldn't be even
16    considered as having some sort of a future with it
17    and that it was going to hurt our businesses.  But
18    by this point, we had turned the corner and
19    were -- were looking at how can we be a part of
20    it.
21            And I think, by August of 2018, when you
22    say we couldn't shut it down, I think we had shut
23    it down.  I think we actually had lobbied through
24    the 2017/2018 session against it, following up on
25    my anger of what happened earlier in 2017, which
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1   would've been the end of the 2015/2016 session,

2   right, or -- yeah.

3          So I believe, if my recollection serves,

4   that during the 2017/2018 session, we had -- we

5   were able to successfully lobby as an organization

6   to reduce the numbers down to 215 machines.

7   That's -- that's what I believe happened, which

8   was -- and also restricted to fraternal

9   organizations again so that they were removed from

10  some of the higher earning bars and taverns in

11  Springfield where my friend Ron Kinney had been

12  affected.

13         And so, otherwise, by then, we wouldn't

14  have had a concern about what Diamond Games lobby

15  is.  We were -- we were by at this point in some

16  sort of conversations with Diamond Games about,

17  okay.  Yeah.  Maybe we could work together.  And

18  everybody was talking about, well, how -- how does

19  that work and what do we -- what can we maybe do?

20         But we also knew that 215 machines wasn't

21  going to be enough to -- to make sense out of it

22  for 50 members or even five members across the

23  state of Missouri to -- to be involved in

24  servicing or making repairs or -- or delivering.

25         And that was the concept, as I recollect,

1    that we could just be involved.  We're already in

2    these areas.  We have personnel.  We have

3    equipment.  We have capabilities and experience in

4    repairing or installing, you know, any kind of

5    electronic device, you know, not much different

6    than a -- a -- a jukebox or a -- a -- you know, a

7    golf game or what have you, you know.

8         So -- so I think that's where we were

9    in -- in this time era and summarizes our --

10   our -- our strategy or our feelings about what we

11   could accomplish and -- and why we would want

12   someone like Peter Herschend, again, to become

13   aware and -- and support us if -- if we could do

14   that.  And I don't think we ever got that done,

15   but I think that's where we were in the process of

16   that.  Okay?

17   Q   Yep.  All right.  We're going to look at

18   what's been marked as Exhibit 11 for

19   identification.  Okay.  This is an email chain.

20   It starts at the top, just to identify it, as an

21   email from yourself, dated October 22nd, 2018, to

22   Kathi Harness, Tom Cobb, and Tom Newman, and Ron

23   Kinney; correct?

24   A   That's what it looks like.  Yes.

25   Q   Okay.  So there's a new player here, Tom

```
1    Newman, at tcmax.net.  Can you tell me who Tom --
2    Tom Newman is?
3         A  Tom Newman is another member of that state
4    association at the time and a director from Poplar
5    Bluff, Missouri.
6         Q  Oh, was he -- so he was a director in MO
7    AMOA?
8         A  I believe -- yeah.
9         Q  If you go down to the bottom of Page 1
10   where there's an email from a Charles Smarr --
11   that's S-m-a-r-r for the court reporter -- to
12   Kathi Harness and Brad Bates.  Do you see that?
13        A  I do.
14        Q  Okay.  Do you know -- do you know who Brad
15   Bates is?
16        A  No.  I mean, not personally.
17        Q  Do you know generally who he is?
18        A  Well, reading the email and refreshing my
19   memory on what this says, I'm sure it would help
20   me to understand.  But since you were talking
21   while I was looking, I'm not there yet.  Do you
22   want me to take a few minutes to review it so I
23   can figure that out?
24        Q  I don't -- I mean, it -- his -- his email
25   address is mobeer.org.  Does that help?  I don't
```

358

1    know that he's addressed more specifically.  You

2    don't recognize him as a member of MO AMOA?

3        A  No.

4        Q  Okay.

5        A  But -- but up above it -- it says, "The

6    information below is from the attorney who does

7    work for the Missouri Beer Wholesalers

8    Association, Kathi."  So I assume, now, that Brad

9    Bates is either the director or the representative

10   of that association.  So that -- that's what I

11   deduce from reading a little bit of it.

12       Q  I mean, yeah, it would make sense he's --

13   he's somewhere in the beer industry, given his --

14   his email address, but I -- I'm not sure his --

15   when Kathi forwards that, like you said, the

16   information below is from an attorney.  I think

17   she's meaning Char- -- Charles Smarr, but that

18   would be my next question.  Do you know who

19   Charles Smarr is?

20       A  No.  But this seems to indicate he's the

21   attorney for that association.

22       Q  Okay.  That -- I -- I will agree with you

23   on that.  I think that's right.  But that's fine.

24   I'm not holding you to it.  But I'm just curious.

25       A  That's fine.

1    Q  And then at the -- so if we go back to the

2    top email, there's -- just, I guess, fair to say

3    there's a discussion about the alcohol -- well,

4    what -- what's the ATC?  Do you know what the ATC

5    is?

6    A  ATC is what I always called liquor

7    control, but I think it -- their official is

8    alcohol tobacco control I think is what ATC stands

9    for.

10    Q  And there's -- there's a discussion about

11    the ATC in that first email on October 21st from

12    Charles Smarr to your lobbyist, Kathi Harness,

13    where Charles says -- and I'm skipping down to

14    about the middle.  "It has been ATC's practice for

15    about 15 years to only take action against a

16    licensee for gambling or gambling devices if local

17    law enforcement/highway patrol gets a criminal

18    conviction for gambling or gambling devices on the

19    license permit.

20        'After a gambling -- after a criminal

21    gambling case conviction is made, ATC then

22    prepares a violation report against the licensee

23    for violation of" and he continues.  I guess why

24    was -- do you know why this information was being

25    forwarded to you and other members of MO AMOA?

1     A  Well, it's -- it's certainly relevant to
2  all the things we've been talking about and even
3  this case.  It -- it's -- it's -- apparently, an
4  official change is underway.  And the ATC's
5  position -- which traditionally, they were -- they
6  had agents on the street when I first got in
7  business back in the late '80s and through the
8  '90s, and they were really the enforcement of all
9  the laws in bars and taverns.
10        But somewhere in the earlier 2000s or
11  maybe around the tens or the teens -- I -- I don't
12  remember, but I know that their budget was cut and
13  their agents on the street were reduced.  And then
14  by this point, in 2018, it looks like, among
15  other -- maybe other things that were going on,
16  I -- I don't know, but this seems to be saying
17  they're going to change their -- reduce their
18  authority to enforce the gambling on premises
19  of -- of -- of liquor license holders.  And given
20  everything else that was going on, that was a
21  concern.
22     Q  So would it be fair to say that around
23  this time, you were generally aware that the ATC
24  had regulatory, you know, supervisory powers to
25  some degree over the, you know, liquor

1  license-type entities that it governed, I guess?

2      A   Yeah.  They always had, Aaron.  They --

3  they had for decades.  And I think even the

4  content of the -- I'm just trying to browse in it

5  while you were talking.  It says they had gotten

6  out of it.  So how do you just get out of

7  something as an agency?  I -- I don't know how

8  that worked but -- but that's kind of why we're in

9  this case too because agencies seem to just decide

10  from one day to the next what -- what they're

11  going to enforce and what they're not.  But in

12  this case, that -- that all is -- was of concern

13  then and would be of concern today the same.

14      Q   And based on -- I mean, based on this

15  email that you received in October of 2018, at

16  least in that time -- at that point in time, you

17  know, you had an opportunity to at least read

18  this, whether or not you agreed with the practice

19  or the statement, I guess, but you had had an

20  opportunity to -- to read this email stating that

21  it's been an ATC practice for about 15 years to

22  only take action against its licensees for

23  gambling or gambling devices if it had a criminal

24  conviction for gambling or gambling devices on

25  that premises; right?

1     A   What's your question?

2     Q   Yeah.  I mean, at -- at this point, you

3  were aware that it was the ATC's position that

4  even though it regulated these entities and could

5  potentially pull their license if it found what it

6  believed to be gambling -- you know, illegal

7  gambling devices, it was the ATC's position, at

8  least according to Charles Smarr, that for some

9  period of, like, 15 years, that they would not do

10  that unless they had a criminal gambling

11  conviction for the licensee; right?

12     A   Am I agreeing that that's what Charles is

13  saying in this letter or am I agreeing with that's

14  what was happening in reality?  I -- I'm sorry.  I

15  really don't know what you're asking me.  Which --

16  which -- which -- can you help me understand?

17     Q   Yeah.  That -- that -- that is something

18  that you had read in October of 2018 at least,

19  based on this email; right?

20     A   It's part of the -- this letter.  Yes.

21     Q   And you don't deny that you read it

22  because you responded.  Well, you don't deny that

23  you read it; right?

24     A   No.  I -- I -- I had to have read it.

25  That -- that particular part may not have been the

most concerning part for me.  So I may not have

        really absorbed it or recollect that as being the

        biggest concern, as far as what Charles Smarr is

        saying had been happening versus what was getting

        ready to happen versus what was really happening

        in -- to my knowledge anyway.  They're all

        different things but --

            Q  Well, and my point --

            A  -- to answer your question --

            Q  Yeah.

            A  I can answer you're -- go ahead.  I'm

        sorry.

            Q  I -- I don't want to -- I didn't mean to

        interrupt you.  I just -- I -- I think would it be

        fair to say that at this point in time, you were

        aware that the ATC, in order to move forward on

        what they believed to be illegal gambling at a

        ATC-licensed establishment, required a criminal

        gambling conviction before it would take action as

        far as the ATC's regulatory policy?

            A  I'm not going to say I was aware of it.

        I -- I -- I don't believe that I really was.  I

        think what I read was probably the first sentence

        or the first paragraph talking about they were

        getting ready to amend -- amend to where they

```
 1    don't have authority.  And that probably alerted
 2    me, and I probably stopped reading or may not
 3    really have comprehended much more after that
 4    because it was almost irrelevant to me.
 5         My concern was there's not enough happen
 6    already, and they're going to -- they're going to
 7    amend the rules or -- or arbitrarily here change
 8    what they've been doing.  So I can't say that I
 9    comprehended it or that I read it and I really
10    understood all that Charles Smarr is claiming in
11    his letter or that I even agree with it, to be
12    honest with you --
13         Q  Yeah.
14         A  -- because I don't know that he knew
15    exactly what was going on in -- in the real world
16    on the street with -- with my customers and -- and
17    locations of other Missouri AMOA members across
18    the state.  I'm not trying to be difficult.  I'm
19    sorry.
20         Q  Oh, I get it.  That -- I --
21         A  But it -- it -- it --
22         Q  -- I understand.
23         A  Okay.  Thank you.
24         Q  Yeah.  And I think -- I think -- so I
25    think what I hear you saying is even at this time,
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1   before you heard about maybe some new regulatory
2   changes to further decrease the agency's
3   willingness or ability to, you know, somehow
4   sanction or, you know, penalize their licensees
5   for what you believed to be illegal gambling
6   devices on the premises, you were already
7   frustrated with their lack of willingness to jump
8   in and do that before this proposed change; right?
9       A   I was frustrated with all the agencies
10  that have -- have told me one thing and then were
11  doing another.  I guess you could say it that way.
12  So I don't know that I was any more frustrated
13  with the ATC than I was, you know, the gaming
14  commission or anybody else, because over my
15  career, I have been told in meetings with various
16  agencies -- at times, it was liquor control.  At
17  times, it was on the street with a liquor control
18  agent in one of my taverns back in the '90s or
19  back in the early 2000s -- that, hey, here's what
20  you've got to do.  Here's the rules.  And this
21  is -- you know, I'm telling you this, and that's
22  what you need to do.
23          And so when those things changed, either
24  arbitrarily or just because I don't even why,
25  yeah.  I'm frustrated by that, whether it would be

1    ATC or anybody else, because it's, like, I just
2    want to play by the rules and I want to play by
3    the same rules as everybody else.
4         And if I've been told the rules are one
5    thing and all of a sudden one of the agencies that
6    are enforcing those rules is arbitrarily going to
7    amend their regulations and say they're not going
8    to do something, now what -- what do I do?  What
9    do I tell my customers?  What do I tell my
10   employees?  How do I continue my business?  So
11   this is a problem.  I'm concerned.  That -- that's
12   how I think I'm responding to what was happening
13   on that day.
14        Q  Yeah.  Right.  And that seems to be Kathi
15   Harness's reaction too when she says "This needs
16   to be prevented"; right?  I mean, it seems like
17   you too were, basically, on the same page; right?
18        A  Yeah.  And that led me into saying this is
19   not good at all.  Yeah.
20        Q  I'm sorry.  This was from you.  I think
21   maybe I represented that was Kathi Harness's
22   words.  But that was you saying, "This --
23        A  Yeah.
24        Q  -- needs to be prevented"; correct?
25        A  Yeah.  Yeah.

1    Q  Okay.  And then the next line, you say,

2    "But at some point in the near 'fireweed,' we need

3    ATC."  Was that supposed to be "future"?

4    A  I would suspect that was a typo that

5    should've said "future."

6    Q  Okay.  "We will need ATC to help entice

7    retailers to rid themselves of illegal gambling

8    devices because local law enforcement never will.

9    Gaming and state patrol won't act without local

10   law enfor- -- enforcement requests which will not

11   happen consistently statewide as we'll need.  ATC

12   is our best chance when the timing makes sense."

13   Okay.  Did I read that correctly?

14   A  I think so.  Yes.

15   Q  I -- I take it you were also frustrated at

16   this point in time with the lack of willingness or

17   desire on behalf of local law enforcement to get

18   involved in what you saw as illegal gambling

19   devices, such as Torch devices, in the

20   marketplace?

21   A  Maybe, but I also might've been referring

22   to the context of what this Charles Smarr said,

23   because I think he said that, or he made mention

24   of local law enforcement and highway patrol

25   getting a criminal conviction.  So I think I was

1    responding to that part of his comments, perhaps.

2    But, shoot.  I can't remember exactly, you know,

3    how I felt and what I was saying.  But, obviously,

4    I was agreeing with this a concern, pretty --

5    pretty --

6        Q  What did you mean when you said, "ATC is

7    our best chance when the timing makes sense"?

8    What about -- what were you talking about "when

9    the timing makes sense"?

10       A  Well, whenever we could -- whenever we

11   could meet with them and -- and have some

12   influence over whatever they were talking about

13   here.  That's --

14       Q  Did that ever happen?

15       A  You know, I don't remember.  I -- I -- I

16   think -- and perhaps maybe -- again, I'm -- I'm

17   working on a memory here.  I -- I don't -- if

18   there was anything else in writing, I would

19   suspect it would be included with this.  But we

20   may have met with them in Jeff City at a later

21   date or we may have figured out that it doesn't

22   matter.  They're not doing anything and haven't

23   done anything and they don't have a budget.  They

24   don't have any manpower.

25           So it may have been I read this all wrong

1    and was concerned about it more than I should've
2    been because, ultimately, it was moot, if they
3    weren't able to do anything with no manpower
4    anyway.  And that happens.
5         I'm not perfect.  I -- I -- I'm emotional
6    sometimes in my business and respond in an email
7    way that, like, gosh darn it, this is just another
8    stab in the back sort of moment, you know.  So I
9    don't think so, Aaron, but I -- you know, I -- I
10   don't remember.
11      Q  Do you know if -- these changes and/or
12   amendments proposed to this regulation 111 CSR
13   70-2.140, do you -- do you know if that ever
14   passed?
15      A  I don't know.
16      Q  Okay.
17      A  Sitting here today, I don't know.  If --
18   if I do know, then it -- it's -- it wasn't
19   important enough for me to remember.
20      Q  Okay.
21         MR. CRAIG:  We've been going for quite a
22   long time.  I think this -- would it be nice to
23   have a break?  I think it would be nice for me to
24   have a break.  Anybody else feel that way?
25         THE WITNESS:  I'm -- I'm fine, but if you

```
 1    need a break, I -- I understand.
 2          MR. CRAIG:  Yeah.  Let's take -- let's
 3    take five.  I need to get some more water and use
 4    the restroom.  Do you want to take five?
 5          THE WITNESS:  Sure.
 6          MR. FINNERAN:  That sounds good.  Do we
 7    have the ability to go to the break-out room in
 8    this Zoom or do -- do you know if the court
 9    reporter can do that for us?  Or, otherwise, we
10    can --
11          MR. CRAIG:  No.  I don't --
12          VIDEOGRAPHER:  This is the videographer.
13    I can do that.  We're going off the record.  The
14    time is 11:06 AM.
15          (Off the record 11:06 to 11:28.)
16          VIDEOGRAPHER:  We are back on the record
17    at 11:28 AM.
18       Q  (By Mr. Craig)  All right.  I'm putting
19    another exhibit in front of you that has been
20    marked Deposition Exhibit 12 for identification.
21    I'm going to move that sticker.  Do you see the
22    document?
23       A  Yes, I do.
24       Q  All right.  So Deposition Exhibit 11 for
25    identification is an email from Kathi Harness to
```

1    Jim Turntine, Tim Cobb, cc to Scott Swain, and

2    Jonathan F. Dalton at armstrongteasdale.com;

3    correct?

4        A  Correct.

5        Q  Who -- do you know why Jonathon Dalton

6    from Armstrong Teasdale is a recipient?

7        A  He is an attorney that I think was helping

8    us -- well, I know he was helping us with

9    structuring how might we -- how we could be

10   involved as a group, the Missouri Amusement

11   Machine Operators members, with Diamond Game and

12   the lottery, if that --

13       Q  Yeah.  I don't -- that -- I don't need

14   any -- yeah.  I don't --

15       A  Okay.

16       Q  -- need details.  That's fine.  I just

17   generally wanted to know.  Okay.  Let's see.

18   Where do I want to start this?  So if we go down

19   to the email that was forwarded to Kathi at the

20   bottom of Page 1, that's an email from Andy Arnold

21   to Kathi Harness, dated October 24th, 2018, with

22   the subject line "correspondence in support of

23   illegal gaming machines popping up."  Do you see

24   that?

25       A  I do.

1      Q  Can you tell me who Andy Arnold is?

2      A  Andy Arnold is a lobbyist in Jefferson

3   City, does not work for our association, but he's

4   another associate of -- of Kathi's as, I guess,

5   all the lobbyists there would in one way or

6   another, you know, communicate between themselves.

7      Q  Okay.  And he says, "Kathi, attached are

8   two correspondence we spoke about.  One you

9   mentioned is -- is a letter from an attorney,

10  Benjamin -- sorry -- Ben Gray, in Kirksville,

11  Missouri, to Adair County Prosecutor Matt Wilson

12  and the other one an email from Phelps County

13  Prosecutor Brendon Fox"; right?

14     A  I see that.

15     Q  And then if we go down and we look at

16  those attachments, let's start at the -- the

17  bottom.  So Page 6, I think.  Yeah.  Page 6 is the

18  attachment, which is Brendon Fox, his email;

19  right?

20     A  I see it.

21     Q  Okay.  And -- and at the bottom,

22  Brendon -- Brendon Fox says that he's a

23  prosecuting attorney for Phelps County in

24  Missouri; correct?

25     A  That's what he said.  Yeah.

1          Q  And I -- I -- you have no reason to
         2     dispute that he was, in fact, the Phelps County
         3     prosecutor at this time; right?
         4          A  As far as I know.
         5          Q  Do you know is he still the Phelps County
         6     prosecutor?
         7          A  I don't know.
         8          Q  Okay.  And do you know any of the people
         9     that Brendon Fox sent this email to?
        10          A  No.
        11          Q  Okay.  And Brendon Fox, Prosecuting
        12     Attorney for Phelps County, Missouri, says,
        13     "Gentlemen, it was brought to my attention that
        14     Torch Electronics, LLC, hereinafter Torch, has
        15     recently installed several game machines at gas
        16     stations, restaurants, and bars throughout the
        17     county.  I know some of you may have concerns that
        18     the machines are illegal gambling machines;
        19     however, I have researched the issue and am of the
        20     opinion that they are, in fact, legal.  I have
        21     advised Torch that I would not be prosecuting them
        22     for any of their gaming systems located in Phelps
        23     County."  Did I read that correctly?
        24          A  You did.
        25          Q  And then he says, "If any of you have any

1  questions, please don't hesitate to ask."  Do you

2  see that?

3      A  I see that.

4      Q  Did you ever have any subsequent

5  conversations with Brendon Fox about Torch devices

6  or his opinion here that Torch devices operate in

7  a manner that makes them legal under Missouri law?

8      A  I do not recall any conversations with

9  Brendon -- Brendon Fox.

10     Q  You don't deny that you saw this -- this

11 email and the attachments sometime around

12 October of 2018; right?

13     A  I do not deny that I remember seeing this

14 email in 2018.

15     Q  Now, I mean, do you -- I mean, is it your

16 opinion that Attorney Brendon Fox just doesn't

17 know what he's talking about when it comes to how

18 Torch devices operate and how Missouri's gambling

19 laws should be enforced in his county?

20     A  That's --

21         MR. FINNERAN:  Hold -- hold on.  Hold on.

22 Objection.  Calls for a legal conclusion.

23         But, Jim, you may answer.

24     A  I'm of the opinion that Brendon Fox is

25 absolutely wrong, was absolutely wrong at that

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1    time and would still be today.

 2        Q   (By Mr. Craig)  And -- and you believe

 3    that you're better situated than Brendon Fox to

 4    know and understand what Missouri's criminal

 5    gambling statutes say and how they should be

 6    interpreted?

 7        A   I believe what I just said.  I don't know

 8    how he's situated.  I don't know how he came to

 9    his conclusion.  I don't know what he had to

10    support his conclusion.  But I believe he's wrong.

11        Q   Well, do you believe that he went to law

12    school?

13        A   Well --

14            MR. FINNERAN:  Objection.  Calls for

15    speculation.  Relevance.

16            You may answer.

17        A   Well, I watched a movie where a guy

18    pretends to be a lawyer for a long time and he

19    never went to law school.  And I -- I -- I assume

20    he went to law school.

21        Q   I seen that too.  Leonardo DiCaprio was

22    great.  It's called Catch Me If You Can; right?

23        A   Yeah.  Yeah.  And --

24        Q   Yeah.  But do you have any reason to

25    believe that Brendon Fox, who was either appointed
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    or elected as prosecuting attorney for Phelps
2    County in Missouri, was lying about, you know, the
3    fact that he went to law school, passed the
4    Missouri bar, was admitted to the Missouri bar?
5    Is that what you're saying?
6        A   I -- I am not saying any of that.  No.
7    I'm not --
8        Q   It seemed like that's what you were
9    implying, sir.
10       A   Well, I apologize if it came off that way.
11   I thought I was making a -- a reasonable joke
12   under the circumstances.
13       Q   I think it's funny.  I do.  I -- I get it.
14       A   Okay.
15       Q   It's a joke.
16       A   Okay.
17       Q   But for our purposes here, would it be
18   reasonable to assume that Brendon Fox did, in
19   fact, go to law school?
20       A   Reasonable.  Yes.
21       Q   And that he graduated from law school?
22       A   Maybe barely.  I don't know.
23           MR. FINNERAN:  Objection.  These questions
24   call for speculation.
25           But you may answer.

1        Q  (By Mr. Craig)  Yeah.  And I assume that
        2    you have no reason, as you sit here today, to
        3    believe that Brendon Fox, you know, has never
        4    passed the Missouri bar?
        5        A  As far as I know, he did.
        6        Q  Yeah.  And -- and you -- you understand
        7    that that at least requires a -- a degree from a
        8    qualified law school, right, to sit for the bar?
        9    Do you know that?
       10            MR. FINNERAN:  Objection.  Calls for a
       11    legal conclusion.
       12            But you may answer.
       13        A  I believe I understand that to be the
       14    case.  Yes.
       15        Q  (By Mr. Craig)  And that, you know, just
       16    passing the bar is not necessarily a -- an -- an
       17    easy task if you -- is that something that you are
       18    generally aware of?
       19            MR. FINNERAN:  Same objection.
       20            You may answer.
       21        A  Generally aware of.  Yes.
       22        Q  (By Mr. Craig)  Okay.  And then I -- I
       23    take it that you have no reason to dispute the
       24    fact that Brendon Fox was either appointed or
       25    elected to represent the constituents of Phelps

                      PohlmanUSA Court Reporting
                  (877) 421-0099   www.PohlmanUSA.com

1   County as Phelps County's designated prosecuting
2   attorney; right?
3       A   I -- you can deduce --
4           MR. FINNERAN:  Objection.  Calls -- hold
5   on.  Same objection.  Calls for speculation.
6           You may answer.  And, sorry, Jim, you just
7   need to pause a little bit for this line of
8   questioning because I -- I have not had to object
9   must so far, but, yeah, I may have a few here.  So
10  just -- just if you could pause briefly before you
11  answer.  You may answer the question.
12      A   I -- I can deduce those things that you
13  said, Aaron.  I can deduce that.  Yes.
14      Q   (By Mr. Craig)  When I take -- I -- my
15  question was is as you sit here, you've got no
16  reason to dispute it; right?
17          MR. FINNERAN:  Same objection.
18          You may answer.
19      A   I have no reason to dispute it.  Right.
20      Q   (By Mr. Craig)  And just, I mean,
21  generally, based on your understanding of how, you
22  know, governance works and the role of county
23  prosecutors in Missouri, you would, I think, agree
24  with me that a county prosecutor, like Brendon
25  Fox, who has been either elected or appointed to

1    that position, would be a person who would have

2    the responsibility for reading, interpreting, and

3    enforcing criminal laws and acting upon them

4    within the scope of that county prosecutor's

5    jurisdiction; right?

6              MR. FINNERAN:  Objection.  The question's

7    also a compound question.

8              But you may answer.

9        A   You're -- I apologize.  Say it again,

10    Aaron.  I -- I don't know what you're asking me

11    there.

12        Q   (By Mr. Craig)  Yeah.  Generally, just

13    based on your understanding of how federal --

14    sorry -- how state county prosecuting attorneys

15    operate and how they're -- back it up.  You're

16    generally aware that there are county prosecutors

17    for every county in the state of Missouri;

18    correct?

19        A   Yeah.  Yes.

20        Q   And are you aware that one job that the

21    county prosecutors for every county in the state

22    of Missouri would be tasked with would be

23    interpreting and enforcing the criminal laws to

24    the extent necessary within the jurisdiction that

25    they cover?

1          MR. FINNERAN:  Objection.  Calls for a
2    legal conclusion.
3          But you may answer.  You may answer, Jim.
4      A   Okay.  I'm trying to figure out -- the
5    question is do I understand he has an obligation
6    to interpret the laws and enforce them?
7      Q   (By Mr. Craig)  Right.
8      A   Yes, he has an obligation to do that.
9      Q   Okay.  And you're just saying that you
10   disagree with how he is interpreting and choosing
11   to enforce the laws in his particular county,
12   Phelps County, Missouri?
13     A   I disagree with --
14         MR. FINNERAN:  Jim.  Jim.  Jim.
15         THE WITNESS:  Sorry.
16         MR. FINNERAN:  Excuse me.  Same objection.
17         You may answer.
18     A   I -- I disagree with his philosophy or his
19   opinion that he is expressing here, and I think
20   the context of the entire package that this is an
21   attachment to does the same thing.
22     Q   (By Mr. Craig)  Yeah.  You're not a
23   lawyer; right?
24     A   No.
25     Q   You've never went to law school?

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1       A   No.

2       Q   Never sat for the bar in any state; right?

3       A   Right.

4       Q   You never passed the Missouri bar; right?

5       A   Right.

6       Q   Okay.  Yeah.  I mean, have you ever sat in

7    on any law school courses?

8       A   No.

9       Q   I take it you don't have any certification

10   or certificates like a paralegal certificate;

11   right?

12      A   No.  No.  No.

13      Q   Have you had any, you know, didactic

14   formal training to help you understand how to read

15   and interpret Missouri Statutes?

16      A   I was waiting for Rich, if he was going to

17   say something.  I don't know what didac- -- I'm --

18   what -- what is didactic?  Is that the word you

19   used?  What does that mean?

20      Q   Yeah.  It means formal, like in -- in

21   the -- in the setting of a university or some

22   formal course.

23      A   No.

24      Q   Okay.  If you go to Page 4 of 7.  Again,

25   this is Exhibit 12 for identification.  Do you see

1      the attachment that is the letter by Benjamin J.

2      Gray?  Correct?

3          A  I see it.

4          Q  Okay.  Do you know who Benjamin J. Gray

5      is?

6          A  Only by the header on the letter.  It says

7      he's a lawyer.

8          Q  Okay.  And I take it -- well, I take it

9      that you would disagree with the opinions that

10     Benjamin Gray, an attorney at law, arrived at in

11     this opinion letter.  Is that fair?

12         A  I haven't read it today.  It's a lot

13     longer letter than the other one.  Do you want me

14     to read it before I -- I -- I -- if -- if he's

15     coming to the same conclusion as the prosecutor in

16     Phelps County, then I would disagree with this

17     lawyer as well.

18         Q  Okay.  Yes.  And I will represent that,

19     yeah, he -- ultimately, he concludes that based on

20     his legal analysis and the -- and -- and his legal

21     opinion is that Torch devices operate in a manner

22     that they are legal under Missouri law and they

23     are not gambling devices.  And you would disagree

24     with that legal opinion; correct?

25             MR. FINNERAN:  Objection.  Calls for a

```
1    legal conclusion.
2         But you may answer.
3         A  I -- I did and I do disagree with his
4    opinion, as does the majority if -- if not a whole
5    bunch of other lawyers and law enforcement people
6    in this state.
7         Q  All right.  Well, now, you're just
8    speculating and not mentioning specific people.
9    So, yeah, that's -- there -- yeah.  I -- I agree
10   that, you know, you disagree.  Other people may
11   disagree.  I'm asking you about this one opinion,
12   and I was specifically asking about your opinion.
13   So --
14        A  Okay.  My apologies.
15        Q  Right?  I'm -- yeah.  I think it -- it
16   would be fair -- fair to say that, you know --
17   well, that -- that's fine.  We'll go -- we'll
18   go -- we'll go with that.
19        A  Okay.
20        Q  All right.  Now, if we go to Page 1, we go
21   to the bottom of Page 1, Andy Arnold to Kathi
22   Harness.  We've talked about this one; right?
23   Well, I -- I mean, we talked about it, and I think
24   I mentioned that -- to set up the -- he's attached
25   these two letters that we just talked about;
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1 right? We talked about that?

2     A  Yes.

3     Q  Okay.  And then he says, continuing, "As

4 you can see by the correspondence, the general

5 belief is that the games attributed to Torch

6 Electronics that are popping up everywhere are no

7 chance games because the player can preview the

8 outcome of the next play, a future event, to see

9 whether or not they will win a prize."  And it is

10 Andy Arnold's opinion that "this seems to fly in

11 the face of the definitions in Section 572.010 as

12 they relate to a contest of chance and gambling

13 and the Missouri Constitution"; right?

14     A  I see that.

15     Q  Okay.  So you -- you have one champion

16 here that -- that is not a lawyer who thinks that

17 these opinions, like you, seem to fly in the face

18 of Missouri law; right?

19     A  Seems to.  Yes.

20     Q  Okay.  And then so going to the top email,

21 you've got Kathi Harness sending you, Tom Cobb,

22 and Scott Swain, as well as Jonathan Dalton, the

23 email and the attachments that Andy Arnold sent

24 her; correct?

25     A  Correct.

1      Q  And she says, at one point, "The Phelps
2   County prosecutor didn't explain his reasoning
3   that these games are, quote, legal, end quote, but
4   says he's happy to discuss."  Did I read that
5   correctly?
6      A  Where -- where are you?  I -- you lost me.
7      Q  Yeah.  It's the third line down towards
8   the end of the third line, "the Phelps County
9   prosecutor."  Do you see that?
10     A  Third line.  Yeah.  I see it now.
11     Q  So "the Phelps County prosecutor didn't
12  explain his reasoning that these games are, quote,
13  legal, end quote, but says he is happy to
14  discuss."  Did I read that correctly?
15     A  You do read that correctly.  Yes.
16     Q  Do you know if Kathi Harness ever took the
17  Phelps County prosecutor up on his invitation to
18  discuss his legal opinion?
19     A  I know I tried, but I don't know if Kathi
20  did.
21     Q  So you tried to talk to -- to Brandon?
22     A  I did.
23     Q  And I thought earlier you said that you --
24  you didn't.
25     A  No.  I don't -- I -- I didn't talk to him.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1   I tried to talk to him.
 2       Q  Okay.
 3       A  He didn't return my call.
 4       Q  Fair point.  So how long after -- after
 5   this did you try to talk to Brendon Fox?
 6       A  I believe it was in the spring of 2019.  I
 7   would say early summer maybe.  It wasn't
 8   initia- -- it wasn't around this time in late
 9   2018.  It was around -- it was around the time
10   that my VFW commander, who is in Phelps County --
11   Saint James, Missouri, is in Phelps County.
12   And -- and I operated -- our company operated that
13   Saint James VFW who was impacted by Torch's slot
14   machines at the gas station just up the road and
15   one of the slot machines.  We talked about that
16   earlier in the previous deposition.
17          So around that time, I know I called the
18   Phelps County prosecutor to -- to ask for more
19   information.  He didn't -- he never called me
20   back, and I left several messages.  So he wasn't
21   really willing to discuss, I think.  I think he
22   might've misspoke in his letter or it wasn't
23   addressed to me.  But, ultimately, he didn't -- he
24   never called me back, and I -- I feel that says
25   something about the man too.
```

1    Q  You -- you would agree that you're

2    speculating as to why he did or didn't call you

3    back; right?

4    A  That's all I can do.

5    Q  Are you sure you have the right number?

6    A  Yep.  Yes.

7    Q  How do you know?

8    A  Well, it's -- it's fairly easy to obtain

9    on Google or calling the courthouse.

10   Q  Okay.

11   A  I -- I forget how I got it, but I -- I

12   know I -- I called and left a couple of messages

13   asking to talk to him.

14   Q  All right.  And the VFW that you just

15   mentioned, was that Nathan Howard's VFW?

16   A  Nathan Howard, yes, the commander of the

17   VFW, in Saint James, Missouri.

18   Q  Yeah.

19   A  I forget the post number off the top of my

20   head but --

21   Q  That's fair.

22   A  -- we spoke about that quite a bit

23   earlier.

24   Q  Yep.  I know what you're talking about.

25   Do you know if Kathi -- I think you said you're

1    not sure if Kathi Harness ever tried to contact

    2    the Phelps County prosecutor; right?

    3        A   I do not know.  No recollection of her

    4    telling me whether she did or did not.

    5        Q   And then if we continue into Kathi's

    6    email, six lines down, she says, "I don't know how

    7    the Adair County prosecutor has responded."  So I

    8    think she's talking about responded to -- to

    9    Benjamin Gray's email of May 30th, 2018, to the

   10    Adair prosecuting attorney; right?

   11        A   I see that.

   12        Q   And she asks you and the other people, "Do

   13    we want Jon to research these matters?  One, we

   14    need to be able to explain why these no chance

   15    Torch games are illegal as well as the black

   16    market games.  Two, we also need to determine what

   17    the governor's authority is to address these games

   18    and how to proceed."  Do you see that?

   19        A   I do.

   20        Q   Okay.  First of all, she seems to mention

   21    both Torch no chance games as illegal as well as

   22    the black market games.  Were -- I mean, when you

   23    guys were talking about these things, is -- was

   24    there -- is there a distinction between those two

   25    black market games versus Torch games or was there

1    a general understanding that Torch games are, in

2    your MO AMOA parlance, I guess, black market games

3    as well?

4       A  I think what Kathi is referring to -- and

5    I'm -- I'm basing just off of my reading of it

6    today -- Torch games -- no chance Torch games were

7    kind of new to the scene.  So I think they were

8    sort of automatically distinguished as, like,

9    something new here.

10        They were -- they were all illegal in --

11   in her opinion, from what she's saying, and -- and

12   in all of our opinions still to this day.  But the

13   black market games that were there precursor --

14   and very, very few of them compared to what has

15   happened since Torch has came on the scene.

16        But they were a different style of machine

17   and they didn't advertise that they pay out and

18   that -- that it's legal to play them, and people

19   actually went the other direction.  They --

20   they -- people who operate or had black market

21   machines of the type that I think she's referring

22   to that are different, they are different because

23   they -- they pretend not to be a gambling device

24   and it's -- it's -- it's kind of a whole other

25   business model of illegal activity, if you will.

1  Did that help?

2      Q  Yeah.  And I would just say, I mean,

3  it's -- it's -- it's your opinion that the Torch

4  devices are illegal; right?

5      A  I've said that's my opinion, but I was

6  also referring to what she was saying in -- in

7  your question.

8      Q  Oh, I get that.  Okay.  So but in your

9  mind, then, I think what you're saying that at

10  least as you -- well, what you're saying is to

11  you, there's no difference between black market

12  games and Torch games; fair?

13      A  Not -- not fair.  And not to be

14  hypothetical in what you're saying, they are

15  different.  They're completely different business

16  models.  They're both illegal.  That's --

17      Q  Well --

18      A  -- that's my opinion.

19      Q  -- I mean, I'm just saying, the definition

20  of black market games you're excluding from your

21  understanding of that phrase "Torch devices"?  Is

22  that what you're saying?

23      A  No.  I'm saying they're all illegal.  But

24  a black market machine, as she is referring to it

25  here, is something different.  They're both

1    illegal, and they both are illegal business
2    models --
3        Q   In her opinion.
4        A   -- they're just slightly different.  And
5    you said do I believe they're the same?  And it --
6    it's a little hard to know -- in the context of
7    this sentence of what she's saying, no, I don't
8    believe they're the same.  They're -- they're
9    different business models, and that's why she's
10   using two different terminologies.
11       Q   Okay.  That -- that's open.  Her -- her
12   second point was we also need to determine what
13   the governor's authority is to address these
14   games.  Do you know what she was talking about
15   there based on your interactions with her?
16       A   Well, yeah.  I think it -- I think it
17   speaks for itself here.  But at the same time,
18   this was still in the context of trying --
19   apparently, trying to work with various people in
20   Jefferson City to determine what can be done about
21   the illegal machines that were -- that were
22   blossoming or blooming or starting to come out of
23   the woodwork at the same time that I know Andy
24   Arnold was promoting a bill for VLT, which is an
25   acronym for video lottery terminals, and we were

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com

1    talking about what we refer to as VPTs.  That
2    acronym is aimed at the video pull tabs that
3    Diamond Games and the lottery were legally
4    operating.
5         And Andy wanted to -- to -- to -- Andy is
6    a proponent, has been a proponent for a couple of
7    years prior to that and still to a -- a different
8    kind of expansion of video lottery terminals.  And
9    so these conversations were going on amongst
10   various sanctions, if you will, of -- of people
11   that were trying to figure out what to do.
12        And in the -- and in the -- in the -- in
13   the -- in the middle of the beginning of that
14   sorting out, there is this new player on the
15   street and the old player of the black market
16   games that she's referring to.  But the new player
17   on the street is, obviously, the Torch devices
18   that they're talking about here.  So, hopefully,
19   that puts it all into kind of perspective for you.
20    Q  And then if we look at her last line in
21   that paragraph, it says, "If we have to repla- --"
22   I'm sorry.  "If we have a replacement for them."
23   And by "them," she's referring, you understood
24   her, to the Torch devices and the black market
25   game devices; right?

1     A  No.  I think when you read the thing --

2 she's talking about the "fraternal and the

3 veterans organizations and maybe taverns and

4 convenience stores, to a lesser extent, if they

5 are forced to give up their black market games.

6 If we have a replacement for them, it would be an

7 easier transition for everyone."  So that's --

8     Q  Okay.

9     A  -- what I was just explaining.  Andy

10 Arnold is a proponent to -- to a bill -- or has

11 been and still is -- a bill to expand the lottery

12 to be able to put out video lottery terminals

13 through various structures whether -- and -- and

14 their bill has evolved over the years but -- and I

15 don't know every single detail of all of them, but

16 the VPTs, transversely, weren't required new

17 legislation.

18        They were already on the street legal,

19 just weren't regulated properly.  And we were

20 trying to figure out how can we regulate them

21 properly and, perhaps, get our industry, our

22 membership, a way to be involved so we could

23 survive and be a part of whatever was legal.

24 That -- that's the -- that's what was happening

25 there.

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1     Q  Yeah.  I -- and I think what -- what she
2     was saying, I think I've seen some other stuff
3     where it seemed like you were in agreement that,
4     really, without some sort of alternative like
5     that, VLTs or some other expansion of a -- of a,
6     you know, electronic gaming device, that you could
7     offer up the fraternal organizations or the
8     taverns, it would be -- it would be difficult to,
9     you know, get rid of what you thought were illegal
10    or black market gaming devices; right?
11        A  Based on what she's saying, the push she
12    was concerned about, "the push back the governor
13    risks from fraternal and veterans organizations
14    and maybe taverns and convenience stores."
15             So I'm not sure if I understand your
16    question.  She's saying what she's talking about
17    and -- and I think I've articulated that I
18    understand now and then what she was saying.
19        Q  Did you agree with it now and then?
20        A  Well, I -- I think I did.  I think I do.
21        Q  Okay.
22        A  That it is part --
23        Q  No.  That --
24        A  -- of a process --
25        Q  Yeah.

1      A  -- to figure out how -- how you deal with

        2   the political aspects of ridding a fraternal

        3   organization, I think, in particularly, because

        4   everybody loves the military and loves veterans

        5   and -- and realize that they're charitable

        6   organizations.  So, yeah, I think I understood and

        7   agreed with what she was saying.

        8      Q  Would it be fair to say that you are not

        9   against the expansion of gambling, just you want

       10   the expansion of gambling to be devices that you

       11   believe comport with your understanding of

       12   Missouri's criminal gambling laws?

       13      A  You better say that again because I -- I

       14   have trouble with the number of things you said

       15   there.

       16      Q  Yeah.

       17         MR. CRAIG:  Yeah.  Madam Reporter, could

       18   you please read back my question?

       19         COURT REPORTER:  Yes, sir.  One moment.

       20         Question:  "Would it be fair to say that

       21   you are not against the expansion of gambling,

       22   just you want the expansion of gambling to be

       23   devices that you believe comport with your

       24   understanding of Missouri's -- excuse me --

       25   Missouri's criminal gambling laws?"

                PohlmanUSA Court Reporting
            (877) 421-0099   www.PohlmanUSA.com

1      A  I do not agree with all of that is my
2   answer.
3      Q  (By Mr. Craig)  You -- so you are not fine
4   with expanding gambling in the state of Missouri
5   so long as the expansion is, in your opinion,
6   legal?
7      A  Expansion is the word I'm struggling with,
8   Aaron.  Quite frankly, I -- I don't know that
9   there needs to be any expansion.  I think we, as
10  voters and as citizens, have already approved, by
11  the ballot box, enough gambling in Missouri.  So I
12  guess that's my answer.  So, no, I can't agree
13  with what you -- you -- you -- what you said.  I
14  don't think we need expansion necessarily of
15  gaming in Missouri.
16     Q  Well, I -- I mean, I think -- I think here
17  what Kathi Harness is saying, and I believe you
18  said you generally agreed with, was that one --
19  one strategy for, you know, overcoming the
20  political hurdles would be that you needed to
21  offer up these locations that might have what you
22  believe were illegal or black market gaming
23  devices a different alternative of what you
24  believe to be legal gaming devices; right?
25     A  That is right, but I don't know that that

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    is technically a -- an expansion.
       2        Q  Well, it would certainly, in your opinion,
       3    be an expansion of what you consider to be legal
       4    gaming devices; right?
       5        A  I think you could say that.
       6        Q  Okay.  And you were okay with that; right?
       7        A  Yeah.  It's an existing gaming activity.
       8    It's existing to authorize legal activity in the
       9    state.
      10        Q  So as long as the device that we're
      11    talking about is a device that you personally
      12    believe is legal to gamble on in the state of
      13    Missouri, you're okay with that device replacing a
      14    device that, in your opinion, is illegal under
      15    Missouri's criminal gambling statutes; right?
      16        A  I think I can agree with that.
      17        Q  So it's -- it's not -- it's not really
      18    that what your -- your position would be is is
      19    that I am so against gambling that what I want is
      20    for all the black market or illegal gambling
      21    devices that I think are illegal under Missouri's
      22    gambling statutes to be wiped off the market
      23    because they are, you know, immoral and bad for
      24    society; right?  That's not -- that's not what
      25    your opinion is; correct?

```
 1        A   I think that's what I said earlier in my
 2    previous deposition.  I'm -- I'm not a far right
 3    wing, Bible-thumping, ultraconservative person.  I
 4    just want to play by the same rules as everybody
 5    else, and I want everybody to play by the same
 6    rules I have to play by.  And so that's -- that's
 7    what my personal opinions and my opinions on
 8    behalf of TNT are driven by.
 9        Q   And, ultimately, you would like for either
10    yourself or your members to have some commercial
11    vested interest or ability to profit from the
12    devices that would replace these illegal, in your
13    opinion, or black market gambling devices; right?
14        A   I would like to do everything and I have
15    tried to do everything I can to -- to keep my
16    industry alive for my -- for my employees and --
17    or for my family and for my friends across the
18    state who are involved and some that aren't even
19    friends.
20            But just kind of on the principle of the
21    industry that I'm in, I've tried to do the right
22    thing for -- for everyone that I represent or
23    have -- have represented myself as -- as being
24    a -- a leader for.  And in -- in -- and in this
25    era, I was a director, if -- if not an officer.  I
```

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com

1    may have been a vice president or something at the
2    time.  I can't remember.
3        But I always tried to look out for the
4    industry separately from my own best interests
5    even, at times, and -- and you may or may not
6    believe that.  I don't mean to go on and on, but
7    I'm trying to answer your question 100 percent
8    clearly and honestly.
9        Q  Well, if we just take Diamond Games as an
10   example, we looked back at, you know, the first
11   instance that I could see you talking about
12   Diamond Games, and you're telling state officials
13   that you believe that Diamond Games games and how
14   they were placing them in the state of Missouri
15   was, I think you said, potentially illegal; right?
16       A  Yeah.  And that --
17       Q  Okay.
18       A  -- statement there --
19       Q  Yeah.  That's -- I -- I'm -- so I --
20       A  Well, but that statement was --
21       Q  Okay.
22       A  -- referring to -- when I say potentially,
23   I'm referring to at that time -- you may not know
24   this, but the casino industry was up in arms
25   probably more than the -- the lowly mom and pop

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com

1    amusement business industry.

2         The casino industry was suing Diamond

3    Games at that time and the lottery, I think, for

4    that activity, claiming it was illegal.  And

5    that's why without you knowing that, you would

6    interpret me saying that I'm judging them to be

7    illegal.

8         I was throwing the -- the information that

9    was out there and I know was circulating and

10   percolating in the capital, because the casino

11   industry wields a lot of power up there, and those

12   lobbyists were telling the same people that I was

13   writing those letters to that what they're doing

14   is illegal expanding that pilot program without

15   legislative oversight.  And so that -- that's what

16   I was referring to for clarification for you.

17   Q  Yeah.  But you don't disagree that, you

18   know, even with that background, which I think is

19   a little bit -- you don't disagree that you did

20   represent that it was your opinion, when you were

21   expressing those to the representatives that you

22   talked to, that you thought Diamond's games might

23   potentially be illegal; right?

24   A  I think that's -- if we go back and read

25   it, I think that's exactly what I said.

1      Q   Okay.  We can agree.  And -- and you are

2   saying you're against Diamond Games being placed

3   anywhere in the state of Missouri as a blanket

4   statement; right?

5      A   You're saying I was saying that I was

6   against or was not against?  I -- I -- I'm

7   confused on --

8      Q   You were.  You were against Diamond Games

9   operating in the state of Missouri anywhere?

10     A   In 2017?

11     Q   Correct.

12     A   At that time, yes.  That was the point I

13  was making.  I was fighting, if you will, elbowing

14  my way into the conversation.  And that's what --

15     Q   Yeah.  Yeah.

16     A   -- what I was saying at that time.  Yes.

17     Q   All right.  And I then, eventually, I

18  think what you kind of foreshadowed was you did

19  elbow your way -- well, back up.  Yeah.  You did

20  elbow your way into that competitive arena; right?

21  And you got eventually a deal struck between

22  yourself and other members of MO AMOA to actually

23  start working with Diamond Games; correct?

24     A   Eventually, we did come to terms with some

25  opportunities that we could work together to try

1    to expand the VPTs in a way that our members could

2    potentially then make money and help to service

3    and place those machines and maintain them.

4        Q  Right.  So for whatever reason, between,

5    you know, that -- that first time that we talked

6    about in 2017 and then sometime in, you know, late

7    2018 to 2019, you went from the opinion that

8    "Diamond Games are super illegal.  They're harming

9    my business, you said, "and I don't want them

10   placed anywhere in the state of Missouri" to

11   "Diamond Games is great.  We've signed up with

12   them.  We want to expand what they're doing in the

13   state of Missouri"; right?

14       MR. FINNERAN:  Objection.  Argumentative.

15   Misstates testimony.

16       But, Jim, you may answer, if you would

17   like or you can actually --

18       MR. CRAIG:  I don't think it does.

19       Q  (By Mr. Craig)  You can answer.

20       MR. FINNERAN:  Yes.

21       A  I -- I think that's -- there was -- there

22   was a -- an agreement that we were able to reach

23   that if things could go the right way, that we

24   could -- we could have our industry membership

25   involved.  And so then, yes, at that point, I was

```
 1    willing to work and help to -- help Diamond Games
 2    to -- to get the -- the program expanded, the
 3    existing program expanded.
 4        Q  (By Mr. Craig)  So as -- as long as -- as
 5    you and yours got your piece of that pie, you were
 6    willing to not only, you know, bless Diamond
 7    Games's operations in the state of Missouri but
 8    participate in their expansion; correct?
 9            MR. FINNERAN:  Same objection.
10            You may answer.
11        A  When you say "you and yours," no, not --
12    not me and mine, but my industry, my --
13        Q  (By Mr. Craig)  Well, you -- you --
14        A  -- brotherhood, if you will, my -- my
15    industry.
16        Q  You testified earlier, when I pointed out
17    the fact that you had made representations, that
18    your business personally had been adversely
19    impacted by what you believed might be illegal
20    conduct by Diamond Games; correct?  Do you
21    remember when we had that conversation?
22        A  I do.
23        Q  Okay.  So are you saying that that is not
24    true?
25        A  I'm not saying that at all.
```

```
 1        Q  All right.  So then if you're saying that
 2    you went from the point of representing that your
 3    own business was being impacted by Diamond Games'
 4    allegedly illegal activity to then saying, well,
 5    we've reached -- we, being me and everybody else
 6    in MO AMOA, have reached an agreement that will
 7    benefit all of us, that by implication, you and
 8    your businesses would also benefit?
 9        A  I think that it's unfair the way you're
10    characterizing that.  If you go back and see what
11    I said, I was talking about me and my friends then
12    and I'm talking about me and my friends now.
13        Q  Right.  You were all benefiting by the
14    fact that you were able to, as you say, elbow your
15    way into the conversation and get yourselves a
16    seat at that table to play along with Diamond;
17    right?
18        A  I think we've --
19            MR. FINNERAN:  Objection.  Argumentative.
20        A  Yeah.  I -- I -- I think we've said that.
21    It just seemed like you were --
22        Q  (By Mr. Craig)  Okay.
23        A  -- characterizing it in the latter sense
24    that it was all self-serving versus being more
25    of -- of a -- of a blanket that helped everybody
```

1    in my industry which was what I was actually doing

2    both times --

3        Q  Well --

4        A  -- all -- all the way through.

5        Q  Tomato tomato or tomato tomato.

6        A  From your perspective -- from your

7    perspective, yes.  From mine, it's a difference

8    in -- in -- in -- and it's -- it's -- it's a

9    difference in my character when it's self-serving

10   versus -- because I benefit and everybody else

11   benefits, the people that I'm trying to help,

12   there's a difference, instead of just I benefit.

13   There's a big difference, and I think you can see

14   that.

15       Q  I'm not sure I can, but I -- I get your --

16   I see what -- I've heard you.  Let's say that.

17       A  Okay.  Okay.  Fair enough.

18       Q  All right.  I'm marking a new exhibit that

19   will be marked as Deposition Exhibit 13 for

20   identification.  Let me know when you can see it.

21       A  I see it.

22       Q  Okay.  At the top of what's been marked as

23   Deposition Exhibit 13 for identification, there is

24   an email chain that starts from Donna Havey to

25   yourself, Jim Turntine, dated January 25th, 2019;

1    correct?

2         A  I see that.

3              MR. FINNERAN:  I'm sorry.  I'm sorry.

4    Hold on, Aaron.  I can't see the document.  Did

5    you say there's a new one in the --

6              MR. CRAIG:  Yeah.  Exhibit 13.  It should

7    be document 11 in the chain -- in the line.  You

8    might re- -- re- -- refresh your browser.

9              MR. FINNERAN:  Okay.  Yeah, let me try

10   to -- sorry.  The -- I'm -- the last one I can see

11   is the one that we were just looking at.  Let's

12   see.  Exhibit 13.  Yes.  Okay.  I see it now.  I

13   apologize.  Thank you.

14             MR. CRAIG:  No worries.

15        Q  (By Mr. Craig)  Okay.  So you -- you agree

16   with me that Exhibit 13 for identification is an

17   email that was sent from Donna Havey to yourself

18   at Jim -- Jim Turntine, on January 25th, 2019;

19   correct?

20        A  I see that.  Yes.

21        Q  Okay.  And Donna Havey is an employee of

22   Play-Mor; correct?

23        A  Correct.

24        Q  Which is also TNT; correct?

25        A  Correct.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1      Q  What is Donna Havey's title?

2      A  I believe we gave that to you.  She is the

3   route manager, I think is what we referred to her

4   title as.

5      Q  I'm sure you did.  I'm sure we talked

6   about it before.  But just so I don't have to go

7   back and look, do you recall about how long she's

8   been working for you?

9      A  A long time.  Maybe 15 years or more.

10  It -- it's a long time.  I -- off the top of my

11  head, I don't remember how long, but a long time.

12     Q  Yeah.  I won't hold it to you.  But longer

13  than a decade?

14     A  I'm sure.  Yes.

15     Q  Okay.  So if you go all the way to the

16  bottom of Page 3 of Exhibit 13, you should see an

17  email from Donna Havey to yourself and Marla

18  Turntine, your wife, sent Monday, January 21st,

19  2019; correct?

20     A  I see that.

21     Q  And she says, "I talked to Nate Howard

22  from the VFW Saint James.  He said he started the

23  process, calling the gaming commission head

24  office.  He told them he wanted to make a

25  complaint about illegal gambling."  Did -- did I

1    read that correctly?

2        A  Yes.

3        Q  Do you believe that this is -- well, do

4    you know, based on any other information, whether

5    Nate Howard -- this complaint that he wanted to

6    make about illegal gambling, did this involve a

7    Torch device?

8        A  Say what now?  Ask that again, please.

9        Q  Yeah.  Do you know if this illegal

10   gambling thing that's being discussed here as

11   something Nate Howard wanted to make a complaint

12   to the Missouri Gaming Commission about, do you

13   know if that involved Torch devices?

14       A  I believe it did.  Yes.  In the gas

15   station, remember, I mentioned earlier up the

16   street from his post.

17       Q  Okay.  So -- so that conversation that

18   you've referred to a few times, that conversation

19   initially happened January 1st, 2019?

20       A  Well, this conversation happened

21   January 21st, 2019.

22       Q  Okay.  And I take it that Nate Howard

23   believed that those Torch devices, if we can agree

24   that that's what he's talking about, were illegal

25   at that time in January 21st of 2019; right?

1        A   That's what it -- that's what it says.
2    That's what it indicates.
3        Q   Okay.  And then if you skip down to the --
4    the paragraphs are a little wonky, but it would be
5    the fourth line from the bottom.  Donna says,
6    "Nate had told the location manager, prior to
7    reporting them, that the machines were illegal,
8    but the manager said that his corporate office
9    told him that their lawyer told them they were not
10   illegal."  Do you see that?
11       A   I see that.
12       Q   Okay.  So, I mean, at least assuming that
13   Donna was being truthful with what Nate had told
14   her, Nate had informed her that he specifically
15   told this location manager that the Torch devices
16   were illegal; right?
17       A   That's what it says.
18       Q   Well, did you ever talk to this location
19   manager?
20       A   No.
21       Q   Do you know whether Donna Havey ever had a
22   separate conversation with this location manager
23   of this gas station?
24       A   I don't believe she did.
25           MR. FINNERAN:  Let me -- objection.  Vague

```
 1   as to time frame.
 2           MR. CRAIG:  Yeah.
 3           MR. FINNERAN:  You may answer.
 4       A  Yeah.  I -- I have no idea.  I don't see
 5   why she would've.  I -- I don't think that she
 6   did.  I don't think she would've, but who knows.
 7   She could've stopped in and asked a question.
 8   I -- I don't know.
 9       Q  (By Mr. Craig)  Okay.  All right.  And
10   then one -- one email up, we got an email from you
11   to a whole bunch of people dated January 21st,
12   2019.  Do you see that?
13       A  Which date?
14       Q  That would be the one right above the
15   Donny Ha- -- Donna Havey email that we just looked
16   at.  So January 21st, 2019.  It's the same date,
17   actually.
18       A  Okay.  It's also on Page 3, barely.  Okay.
19       Q  Correct.  Yeah.  So it looks like you
20   forwarded on Don Havey's email to you, that we
21   just discussed, to a number of people; right?
22       A  Yes.
23       Q  Okay.  Ron Kinney we've discussed;
24   correct?
25       A  Yes.  Yes.
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1        Q   Who is Chuck Bengimina?

 2        A   Chuck Bengimina is another member of the

 3   Missouri AMOA and was a director at that time as

 4   well, as I recall.

 5        Q   And for the court reporter, that's

 6   B-e-n-g-i-m-i-n-a.

 7            Who's Stephanie Turntine?

 8        A   That is my daughter.

 9        Q   And she's got a @playmor.com address.

10   Stephanie is an employee at TNT?

11        A   She was for a short while.

12        Q   Was she a TNT employee at this time in

13   January of 2019?

14        A   I can only assume so.  I can't say for

15   certain, but I had her copied on there.  So at

16   that time, she probably was but --

17        Q   Okay.  And then Marla -- sorry.  I didn't

18   mean to cut you off.

19        A   That's okay.

20        Q   And Mar- --

21        A   I just want -- I just want to make sure

22   you know that I -- I don't know if she's tied to

23   the payroll on the same date, but I'm assuming --

24   you know, that's my daughter that I wanted to take

25   over the company, but because of circumstances,
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1    frankly, she wants nothing to do with it now.
 2    But -- but that's --
 3         Q   Gotcha.
 4         A   -- another story.
 5         Q   Okay.  And Marla Turntine, that's your
 6    wife; right?
 7         A   That is correct.
 8         Q   John Newman.  Who's John Newman?
 9         A   John Newman is the son of Tom Newman in
10    Poplar Bluff, the same family, a family
11    business --
12         Q   Okay.
13         A   -- a member of the association.
14         Q   And then there's a Tommy Bengimina.  Who's
15    that?
16         A   The same.  Son of Chuck in the Kansas City
17    area.
18         Q   Said like an endorsement, you know.
19             Emily Carroll?
20         A   Daughter of Ron Kinney, also a member of
21    the association, in Springfield, Missouri.
22         Q   Okay.  And why were you passing this story
23    on?
24         A   Because they were all members.  And as we
25    were moving forward through the process of trying
```

```
 1    to figure out what to do with our -- within our

 2    industry and our efforts to -- to -- to -- to deal

 3    with this emerging problem, I thought this was

 4    relevant information that, hey, somebody's found

 5    out a way to deal with this.  It looks like you

 6    can report this to the Missouri Gaming Commission.

 7         And according to the letter that Donna

 8    sent, she had said that the state patrol wound of

 9    showing up and unplugging them and telling them

10    they had to take them out.  So I was encouraged,

11    and I wanted to share that information with other

12    members that, hey, there might be a solution.

13    Maybe the Missouri Gaming Commission is going to

14    do something here and the state patrol.  So I

15    shared the information that my employee had told

16    me that she had been told by Nate Howard.

17    Q  Do you know if those machines were later

18    given back and plugged back in?

19    A  Well, I don't know if they were taken,

20    sir.  I -- I -- I honestly don't know what

21    happened other than what Donna told me at this

22    date.

23    Q  Gotcha.

24    A  And I don't know if they were ever taken.

25    So I don't -- I can't say -- I can't really answer
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1    your question.
 2        Q  Okay.  I thought that's what you said.
 3    I -- I don't know one way or another as I sit
 4    here.  So that's fine.
 5        A  Okay.  Okay.
 6        Q  Okay.  And then if we go up to your -- to
 7    the next email on the chain, it's an email from
 8    you, Jim Turntine, to Tom Cobb, Stephanie
 9    Turntine, and Marla Turntine, and
10    scott@swaingroup.biz dated January 23rd, 2019;
11    correct?
12        A  I see that.  Yes.
13        Q  But, yeah, and maybe -- I don't know if I
14    mentioned Kathi Harness, but she's also a
15    recipient; right?
16        A  Yes.
17        Q  Okay.  I wanted to go down to the part
18    where you say, "Is the gaming commission
19    activity --"; do you see that?
20        A  -- public information?
21        Q  Yeah.
22        A  I see that.
23        Q  Okay.  So you say, "Is the gaming
24    commission activity public information?  Can we
25    request the details of the enforcement event which
```

1    would enable us to share that information with
2    legislatures and especially in the governor's
3    office staff today because the governor has
4    accepted large donations from Torch Electronics
5    and should be made aware of his exposure to his
6    good name.  If he and his staff are unaware of the
7    governor's vulnerability, we should at least clue
8    them in.  His friendship with Tilley aside, this
9    matter may blow up on the governor if we advise
10   Senator Schatz to file the bill he wants."  Did I
11   read that correctly?
12       A  I think so.
13       Q  Okay.  And I wanted to key in on the part
14   where you say, "If we advise Senator Schatz to
15   file the bill he wants to file."  What did you
16   mean by that?
17       A  Well, I think it speaks for itself.  And,
18   I believe, at the time, Senator Schatz had a bill
19   that was going to increase the penalties for
20   operating illegal gambling machines and was going
21   to draw attention to the black market problem.
22   And, honestly, I think this -- this -- at this
23   time, I was just shocked to -- things were
24   unfolding and I was learning things that,
25   honestly, to this day I still can't believe was

1    happening and happened.  But this --
2        Q   Okay.  What about the part where you say,
3    "If we advise Senator Schatz to file"?  Doesn't
4    that -- well, when I read that, I'm thinking,
5    well, it sounds like you're saying, "whether
6    Senator Schatz and the timing of when he files,"
7    that would be something that you and your advisors
8    might have some control in.  Would that be fair?
9        A   I think I -- it probably overstates it.
10   I -- you know, I would say we could influence
11   or -- or ask or have some sort of participation
12   in -- in what we feel might work and be best for
13   the things that we were trying to deal with.  So,
14   you know --
15       Q   Well, Senator --
16       A   Go ahead.
17       Q   At -- at this time, was Senator Schatz --
18   had he told you or anybody else, as far as you
19   were aware, that he wanted to fi- -- file the bill
20   that you say, quote, he wants to file, but he was
21   waiting to see whether or not you wanted or your
22   group wanted him to do so?
23       A   Yeah.  I think this was his first term as
24   the Senate pro tem maybe or -- I -- I think that's
25   what it was.  And during the summer of 2018, we

1    had really kind of begun to learn about some of
 2    this stuff.  And I remember talking to him, during
 3    the summer, at a barbecue, a family barbecue,
 4    because I've told you he's a -- kind of a
 5    member of my extended family.  And, you know,
 6    Kathi Harness, especially, she's -- she's been a
 7    lobbyist for 30 some odd years.  And, you know,
 8    they know the ropes.  And -- and, ultimately, I'm
 9    engaged in a conversation talking about what --
10    what do we do?  And I was shocked to -- to
11    learn --
12        Q  Well, I -- yeah.  I'm sorry.  You're
13    going -- you're -- this is totally not actually
14    responsive to my question.
15        A  Okay.  Okay.  Tell me what you want.  I'll
16    start over.
17        Q  No.  I just -- I mean, I just -- again,
18    there's a lot to get through.  I want to make sure
19    we do that.  And I understand you've got other
20    things that you want to say, but I was just simply
21    asking --
22        A  Well, not really.  I'm -- I'm just trying
23    to answer your question.  I'm not trying to say
24    anything other than --
25        Q  Okay.  All right.

                     PohlmanUSA Court Reporting
              (877) 421-0099    www.PohlmanUSA.com

1        A  -- answering your question.

2        Q  Yeah.  And -- and I'm not trying to be

3    rude by cutting you off.  I really am not.  But

4    you -- I think you more than answered my question,

5    and I was trying to get us back --

6        A  Okay.

7        Q  -- on track; okay?

8        A  Great.  Great.

9        Q  Okay.  So I -- I think that the first

10   thing you said in response to my question of

11   whether your group might've had some influence

12   into when, in particular, Senator Schatz might

13   file the bill that you said he wants to file, I

14   think, was, "yeah."  So would you agree that your

15   understanding was is that maybe you and your group

16   might've had some input into the timing of when

17   Senator Schatz might file that bill?

18       A  I think that's what this letter says.  I

19   think we --

20       Q  Okay.

21       A  -- did have some influence over, you know,

22   whether he was going to file a bill or would it be

23   helpful in -- in what we were trying to do.

24       Q  And -- yeah.  And did you also have some

25   influence in, you know, suggesting language that

419

might go into Senator Schatz's proposed bill?

A  I -- I don't -- I don't know off the top of my head because there's -- there's multiple years.  This goes back many years.  I -- I don't remember when and what everything happened.  So --

Q  Okay.

A  -- I can only tell you what I must've felt at this day during this letter.  I -- I felt like at that time, he must've been willing to, you know, take our input in -- in the decision of whether he's going to file a bill or not.

Q  Okay.  And then if we skip down a few lines, where it says, "The result is leaving a vacuum"; do you see that?

A  No.  Not yet.

Q  So five lines down from where we just were.  "The result is leaving a vacuum."

A  The result.  Okay.  The result.

Q  Okay.

A  I see it.

Q  So skip a little bit, and you say, "The result is leaving a vacuum that leaves the leadership in this matter open to happenstance." Does that -- I mean, are you talking about if this bill that Senator Schatz was wanting to file, if

1    that was filed and then passed into law to e- --

2    eradicate -- I think in the line above, you use

3    eradicate what you believe were these illegal

4    games and -- and they were all shut down

5    instantaneously, I think -- I think I understand

6    what you're saying was, essentially, that would

7    leave a vacuum in all of these locations in the

8    state of Missouri that then, those places would be

9    trying to fill with something; right?  So there

10   needed to be something to fill that vacuum in your

11   opinion; is that fair?

12       A  Can I read what I wrote above it so I know

13   what I'm talking about and referring to?

14       Q  Oh, absolutely.  Yeah.  Absolutely.  Yeah.

15       A  All right.

16          MR. FINNERAN:  Aaron, while Jim is

17   reading, do you have a sense of when you will want

18   us to take a lunch break?  I've got a client who's

19   asking for a call around 1:15, and so that would

20   be convenient for me.  But if you wanted to pick a

21   different time, I can try and schedule it

22   differently.

23          MR. CRAIG:  Yeah.  No.  That's fine.  We

24   can -- we can keep going till, I don't know, 1:00

25   or 1:10, whenever you need to get off for that

1    call.

2         MR. FINNERAN:  Okay.

3      A   Okay.  So to answer what I think your

4    question was, you -- you -- you -- you asked if my

5    vacuum was in reference to machines and I -- if

6    you read what it says above it, I'm talking about

7    the leadership, meaning -- meaning in January of a

8    legislative session, we were talking about whether

9    the governor would do anything, but he won't

10   because his friend, Tilley, represents Torch

11   Electronics.  We knew that by then.  And if the

12   governor won't do anything, it -- it's going to

13   leave a vacuum in the leadership, not a vacuum in

14   machine or inventories or something -- whatever it

15   was that you were saying.

16     Q   Gotcha.

17     A   But I literally talk about the leadership

18   of the -- the Missouri Legislature, not knowing

19   where the governor stands on this.  What does he

20   want us to do?  That's what I'm talking about.

21     Q   Okay.  Nope.  That's fair.

22     A   Okay.

23     Q   You say, then, "By default, Senator

24   Schatz' bill, if filed, will become the

25   leadership."  What did you mean by that?

1          A  Well, his -- his bill was coming out

         2     taking a stance on the problem versus the governor

         3     just refusing to take a stance because of Tilley,

         4     or whatever his reasons are, taking donations or

         5     whatever.  But at that point, apparently, when you

         6     read what I was -- what I've written, I was told

         7     that the governor's not going to do anything.  And

         8     if Schatz files a bill that takes a strong stance,

         9     as Senate pro tem, that -- that is going to be the

        10     leadership that's going to set the tone.

        11          And so that's what I think I was

        12     describing, whether it was right or not is another

        13     conversation, but that's me trying to read the tea

        14     leaves of all the things that were happening

        15     during that time; okay?

        16          Q  And -- yeah.  And you're aware that

        17     sometime after this, Senator Schatz did introduce

        18     a -- a Senate bill that would have, if passed,

        19     made Torch devices explicitly illegal given the

        20     prize viewer function; right?

        21          A  No.  Not right.  I can't say that.  I -- I

        22     know that Senator --

        23          Q  You're not aware of that?

        24          A  I'm sorry?

        25          Q  You're not -- you're not aware that

1  Senator Schatz did that at some point?

2      A  I don't remember if he ever filed a bill

3  that specifically was aimed at Torch and

4  pre-reveal or whatever you just said.  I know that

5  he filed a bill at one point that -- that was to

6  add penalties -- increase the penalties for people

7  convicted of operating, owning, or

8  participating -- however -- whatever it said.  I

9  don't remember the exact words.

10        And I don't know what year that this was

11  versus other versions because the bills were filed

12  mult- -- every year.  I think even last year.  And

13  Senator Schatz isn't there anymore.  The same

14  basic bill continues to be filed by someone, if

15  not multiple people, on the House and the Senate

16  side.

17        And in this year, if this is the year I'm

18  thinking of, out of my memory, out of all of the

19  years that it's gone on, I -- I can't remember

20  what bill he put forward, if he even put one

21  forward, because, normally, what he did was he

22  would have someone else put it forward.  The pro

23  tem normally doesn't put forward a bill.  But I

24  think one year he did.  But I think other people

25  did too, and he might've been, like, the third

1   one.

2          And it -- that's all part of how they get

3   laws passed and -- and the de- -- the -- the ebb

4   and flow how legislation makes its way through is

5   what committee chair puts this bill forward versus

6   who that, you know, does that?  And who's doing

7   what in the House?

8          So I -- I can't say what year what

9   happened, Aaron.  And I apologize.  I'm not trying

10  to be argumentative to your question either.  But

11  I know that things happened, and it was all in the

12  context of trying to figure out how to move

13  forward with -- with our industry's needs in the

14  context of whatever I'm talking about.

15      Q  Would it be fair to say that you were --

16  you are aware that during those same years that

17  we've been talking about that there was

18  numerous -- I think, as you just mentioned,

19  numerous attempts to change Missouri's gambling

20  laws, including Revised Statute 572.010, and

21  you're aware that all of those attempts at the

22  legislative level to change that law, they all

23  failed; right?

24      A  To my knowledge, they all failed.  To my

25  knowledge, they -- they were -- I don't know that

1   it was 572.010 alone.  It could've been other
2   statutes.  And I also hate to add it, but I don't
3   think the law ever needed to be changed.
4   Increasing penalties wasn't even necessary.  I --
5        Q  Okay.
6        A  That was -- that was my --
7        Q  All right.
8        A  -- feeling all the way through it.
9        Q  I think I may have seen some documents
10  that -- that suggest otherwise, but I understand
11  that that's your opinion as you sit here today.
12  Okay.  You also talked a lot in here about Steve
13  Tilley and his relationship to the governor.  And
14  is it my understanding that you believe Steve
15  Tilley was a Torch -- was a -- a lobbyist that was
16  somehow associated with Torch?
17       A  I -- I -- I believe I was told that it --
18  that's their registered lobbyist.
19       Q  Okay.  And so, I mean, you don't disagree
20  that, like -- like -- well -- sorry.  Fair to say
21  that you and your trade association, obviously,
22  used lobbyists to try to, to the extent that you
23  could, influence any lawmaking that would impact
24  your industry from 2014 to the present; correct?
25       A  Correct.

1      Q  Okay.  And -- and so, I mean, you're not
2   necessarily surprised that Torch Electronics would
3   also engage with a lobbyist to represent Torch's
4   interest, what Torch believes its legal interests
5   are in the state of Missouri; right?
6      A  I think that's right.
7      Q  Right.  And, I mean, I -- I take it that
8   if -- if you had some -- if -- if your -- if
9   your -- well, I'll strike that.  I think we're
10  good there.  That's fine.
11         I guess, would it be fair to say that you
12  were frustrated by the effectiveness, as you saw
13  it, of Steve Tilley's lobbying efforts during this
14  time frame?
15     A  I think I was beginning to -- to feel like
16  there was something going on there and frustrated
17  by it.  Yeah.
18     Q  Were you, then, also frustrated and
19  potentially disappointed by the results of your
20  own lobbyists?
21     A  I don't think so.  I think -- I don't
22  think so.
23     Q  Okay.  Well, just like anything else in
24  life, there's better lobbyists maybe than other
25  lobbyists; right?

427

1      A  I guess so.

2      Q  Okay.  You would hope that you retained

3   the better lobbyist, right, I expect?

4      A  And I hope I retained a better lawyer.  I

5   hope I retained a better lawyer.

6          MR. CRAIG:  Ouch.  Ouch, Rich.  Dang.

7   That's -- that's harsh.  I wasn't even asking for

8   that one.

9          MR. FINNERAN:  That --

10         THE WITNESS:  Well --

11         MR. FINNERAN:  That was uncalled for.

12     A  I'm sorry.  I'm sorry.  My -- my bad.

13  I -- I -- I -- I think -- the reason I hesitated

14  there, better is a weird term when it comes to

15  lobbyists because I think that Tilley served in --

16  in the legislature with the governor and had a

17  different relationship than maybe my lobbyist did.

18  And -- and so better is a -- is a -- is a term

19  that might not -- a better position?

20     Q  (By Mr. Craig)  Yeah.

21     A  A better relationship maybe?

22     Q  That's a fair distinction.

23     A  A better person or a better professional?

24  I don't know that that's fair to say.

25     Q  How about it -- it would be fair to say

```
 1    that you would like to hire the most effective

 2    lobbyist for your cause as you possibly could?

 3        A  Man, that's a hard question.  I -- I --

 4    you're going to think I'm being argumentative,

 5    but, you know, I --

 6        Q  You'd like to hire what?  What?  You'd

 7    like to hire the least effective?

 8        A  No.

 9        Q  The --

10        A  No.

11        Q  The --

12        A  I -- I'm -- I'm --

13        Q  -- lobbyist?

14        A  No.

15        Q  Or the best?

16        A  No.  I'm sorry.  I don't mean to keep -- I

17    was trying to answer.  I'm a loyal person, and I

18    had known Kathi and I -- and -- and her associates

19    for decades.  So it -- to me, it wasn't better.

20    It -- it's who -- you know, she knows me; I know

21    her and --

22        Q  I'm not -- I -- just so you -- I'm not

23    disparaging Kathi.  I'm not.  I'm just saying as a

24    general principle, right, I assume the general

25    principle would be that given all other options,
```

```
 1    right, from -- from terribly ineffective political
 2    lobbyists to whatever defines the most effective
 3    political lobbyist, if you had a preference and
 4    you could pick anybody on that scale, I assume you
 5    would say, "please give me the most effective
 6    lobbyist"; fair?
 7        A  Not necessarily.  I -- I'm loyal, and I
 8    want to stick with the lobbyist I have.  I want to
 9    win.  If you're asking if I want to win, I want to
10    succeed?  Yes.
11        Q  Well, I'm -- I'm literally -- I'm not
12    saying that there is a lobbyist that is even in
13    mind.  This is a pure hypothetical question.
14    There's no loyalty.  You've never -- in my
15    hypothetical, you've never picked a lobbyist and
16    you have no experience.  So I'm telling you detach
17    yourself from history with any prior lobbyist.
18    I'm just saying, you, as a business owner, who has
19    never hired a lobbyist, for the first time, before
20    there's any loyalty that ever develops, it would
21    make sense, from a business judgment standpoint,
22    to pick on the sliding scale of completely
23    ineffective lobbyist to whatever qualifies as the
24    most effective lobbyist, it would make a good
25    business decision to pick the most effective
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1    lobbyist; right?
 2         MR. FINNERAN:  Objection.  Relevance.
 3    Calls for speculation.
 4         But, Jim, you may answer, if you know.
 5      A  I'm struggling with how you would even
 6    know.  Where do you find this magical scale that
 7    tells you this guy is going to be better than that
 8    guy?  I -- I don't -- I think all things being
 9    equal and everybody follow the law and everybody
10    doing right and wrong, you -- you should all have
11    the same opportunity.  And that --
12      Q  (By Mr. Craig)  Okay.
13      A  -- that kind of goes to the heart of
14    everything that I have a problem with.  I -- I
15    follow the rules and --
16      Q  Well, I mean, you would -- you would agree
17    with me that some lob- -- I mean, most lobbyists
18    have their job because they've, you know, either
19    worked in legislation, with legislation, been
20    somehow an aide; right?  I mean, everybody is
21    there because of the relationships that they have
22    developed with other members of the legislation;
23    fair?
24      A  I don't know how they all get there.  I --
25    I know a lot of them are expoliticians.
```

```
 1        Q  That's fine.

 2        A  I -- I don't know how they all got there.

 3        Q  Well, let's stop wasting our time here.  I

 4     think --

 5        A  Well, okay.  Because I'm sorry because

 6     I -- I --

 7        Q  Well, I -- that's fine.  I get it.  I get

 8     it.

 9        A  Okay.

10        Q  Okay.

11           MR. FINNERAN:  Just a reminder, Jim.

12     Please try not to talk over Aaron for the benefit

13     of the court reporter.  I know that it's tough on

14     Zoom, but please let him finish his questions.

15        Q  (By Mr. Craig)  Okay.  Sorry.  I'm looking

16     at my document.  All right.  And then we're again

17     focusing on Exhibit 13.  All right.  If you go to

18     Page 1 of 13, I guess, the second -- the second

19     email from the bottom, if we're counting the start

20     of the new email.  It would be the email from

21     yourself to -- to Donna Havey at January 25th,

22     2019, at 10:25 AM.  Do you see that?

23        A  I do.

24        Q  At one point, if you kind of skip down,

25     right after "Understand?" that's just hanging out
```

1    there?

2         A   Yeah.  I see it.

3         Q   You say, "I still need the most important

4    details from Nate on all that happened in Saint

5    James so that we can try to get a copy of the file

6    from the agency to enable us to develop a copy of

7    that event where we need to elsewhere."  What did

8    you mean?

9         A   What it says.  I -- I was asking her for

10   more details on how did they get the gaming

11   commission to do what they did.  This was before

12   the gaming commission has their current hotline

13   website link where you can just go on and --

14   and -- and, you know, file your complaint with the

15   information.

16        So I was trying to understand exactly how

17   everything happened so that I could share that

18   with the same people that I mentioned earlier that

19   were all concerned how do -- how do we duplicate

20   that?  How do we file these complaints and make

21   the agency that's, apparently, at that point, we

22   thought, had our hopes pinned on, was going to do

23   something about this problem.  And this was early

24   enough when all those other things weren't there

25   that are there -- had been there since.

1        Q   Okay.  And --

2            MR. FINNERAN:  Aaron?

3        Q   (By Mr. Craig)  And then --

4            MR. FINNERAN:  On the document, you say

5    you're on Page 1?  And, if so, where are you?  I'm

6    sorry.  I just couldn't find the spot you were

7    referring to.

8            MR. CRAIG:  Yes.  Page 1 of Exhibit 13.

9            MR. FINNERAN:  Mm-hmm.

10           MR. CRAIG:  It's the -- it's the phrase

11   that starts under the "Understand?" that's just

12   hanging there by itself.  Do you see that?

13           MR. FINNERAN:  Oh.  Sorry.  Gotcha.  I was

14   looking at the email above that.  Thank you.

15       Q   (By Mr. Craig)  But -- and then if we go

16   down to the bottom of your message.  So three

17   lines up from "Jim" where it says, "Since Nate

18   said."  Do you see that?

19       A   I do.

20       Q   Okay.  "Since Nate said he is going to do

21   it all again... get these details now for this new

22   effort for sure."  Did I read that correctly?

23       A   I think you did.  Yeah.

24       Q   We're -- we're still talking about Nate

25   Howard; right?

1     A  Yeah.

2     Q  And what was your understanding -- Nate

3  was going to do the complaint process to the

4  Missouri Gaming Commission again, is that what --

5  your understanding?

6     A  That's what it appears to say.  And so

7  without reading everything else I said, I think

8  that's what it's indicating.

9     Q  Okay.  Well, and it's just this is

10  consistent with what -- you were trying to gather

11  the -- the details about how Nate went about

12  reporting that complaint to the Missouri Gaming

13  Commission so that other members of your MO AMOA

14  could file the same kind of complaints; right?

15     A  Yes.  So we knew how to -- how to proceed

16  with -- with getting something done about the

17  illegal machines; yes.

18     Q  Okay.  All right.  I'm marking deposition

19  Exhibit 14 for identification.  Let me know when

20  you can see it.

21     A  I got it.

22     Q  Okay.  And this is a -- an email that you

23  sent to Tom Cobb, Ron Kinney, and a number of

24  other people dated February 12th, 2019, with a

25  subject of forward DGE subcontracting information;

```
 1    correct?

 2        A  Yes.

 3        Q  All right.  It starts, "Hello everyone.

 4    Tom Cobb called to tell me about an incident that

 5    happened to Brandon at a VFW in St. Joe yesterday.

 6    Brandon had arranged a meeting with a VFW

 7    commander and his Board to explain options for the

 8    VFW to obtain GE -- sorry -- DGE lottery MPTs."

 9    Did I read that correctly except for --

10        A  You did.

11        Q  -- screwing up DGE?

12        A  No.  You did.

13        Q  What is "DGE"?

14        A  Diamond Games.  That's the acronym for

15    Diamond Games, the company that works with the

16    lottery that I had mentioned.  This is now in

17    February.  So it appears that in -- by then, we

18    were trying to help them place their machines and

19    find -- and find places to put them or suggested

20    to the VFW.  I don't know exactly, without reading

21    more.  But, obviously, we were trying to help put

22    the two together.

23        Q  Okay.  And what does "MPTs" stand for?

24        A  I think -- I think we had been trying to

25    settle on what we -- what acronym was best.
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1   Earlier, we had a VPT, video pull tab, and I think
2   we put "M" in -- in -- in thinking a -- a -- a
3   mechanized pull tab, instead of video pull tab, or
4   something to that effect.  But it's the same -- it
5   means the same thing, if that helps.
6        Q   Okay.  And then you continue by saying,
7   "When Brandon arrived at the meeting, there were
8   several extra and unexpected people in the room.
9   Someone set Brandon up for an awkward, even
10  uncomfortable situation by inviting
11  representatives from the sweets -- sweepstakes
12  vendor and the local newspaper to the meeting
13  without telling Brandon."  Did I read that
14  correctly?
15       A   You did.
16       Q   What is -- what do you mean by
17  "sweepstakes vendor"?
18       A   There is a -- another machine that has
19  been operated in fraternal organizations, I -- I
20  think, exclusively.  But, again, it seems like
21  things have -- have came out of the woodwork, you
22  know, since 2017.  So the sweepstakes machine is
23  also a slot machine simulator-type machine that is
24  operated by another company, not Torch, not
25  whoever makes the Torch machine.  And so that's

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1    what I'm referring to.  Whoever the vendor is for
 2    those machines was there and -- and Tom had told
 3    me the story, and I'm articulating it to everyone
 4    else here of what Tom had told me had happened.
 5        Q  Okay.  And was it your understanding
 6    that -- the sweepstake vendors or, I guess, their
 7    trade organization or whoever was representing
 8    their interests with regards to their particular
 9    devices, was it their opinion that maybe these DGE
10    lottery-type games were potentially illegal under
11    Missouri law?
12        MR. FINNERAN:  Objection to the extent it
13    calls for a legal conclusion.
14        But you may answer, if you know.
15        A  You -- you -- you confused me.  The --
16    the -- are you talking about the -- the -- the
17    video lottery terminals of Diamond Games or are
18    you talking about the sweepstakes machines?
19        Q  (By Mr. Craig)  I'm saying that -- well,
20    is it your understanding that around this time --
21    the sweepstakes vendors for those sweepstakes
22    separate devices that you just talked about, was
23    it your understanding that the sweepstakes vendors
24    were expressing some concerns that maybe Diamond
25    Games machines were illegal gambling devices under
```

```
 1    Missouri law?

 2        A  No, I don't think so.  I think it was the

 3    other way around.

 4        Q  What -- so the sweepstakes vendors showed

 5    up and ambushed am- -- Brandon for the purpose of

 6    explaining that they believed their games were

 7    illegal and that Diamond Games lottery devices

 8    were legal?

 9        A  Yes.  I -- I think -- I think what -- what

10    happened --

11           MR. FINNERAN:  I'm sorry.  Sorry.

12        Q  (By Mr. Craig)  That is interesting.

13           MR. FINNERAN:  Sorry.  Sorry.  Sor- --

14    sorry, Jim.  Sa- -- same objection.

15           But you may answer.

16        A  Okay.  So I think what happened, Aaron, is

17    that Brandon had been to this VFW and the

18    sweepstakes machines were there.  And that's a

19    concern for his family in their business in

20    St. Joe just like it was for Ron Kinney and his

21    family and their business in Springfield when they

22    showed up and found the video lottery terminal

23    machines there or just like it was for my business

24    and my employees when we showed up at a location

25    and found Torch machines there.
```

```
 1          So Brandon's theory and strategy and --
 2   and Tom Cobb's strategy in St. Joe was, look.  You
 3   know, we're trying to make this deal with Diamond
 4   Games, and we're trying to get to where we can
 5   service those machines and -- and be involved in a
 6   legal activity with the Missouri Lottery as a --
 7   as a -- you know, through their contractor or
 8   their contract with Diamond Games.
 9          So why don't we tell the guys that -- that
10   we do business with at -- at VFW and have done
11   business with them for generations -- the Cobbs
12   have been in St. Joe for, like, 90 years doing
13   that business there.  It's incredible.  And
14   they -- they -- they know everybody.
15          And I think the context of this is Brandon
16   had told the VFW guys, hey, there's a legal
17   machine you can get from the lottery to offer.
18   You don't need those illegal sweepstakes machines.
19   And I actually think at that time, the -- the
20   Missouri Gaming Commission had issued, around that
21   time or maybe previous to that date, a letter
22   stating specifically that the sweepstakes machines
23   were also illegal, much like they did in July of
24   2019 on the pre-reveal machines.
25          So -- so Brandon was trying to kind of
```

```
 1    protect his business in St. Joe and protect his
 2    friends in that VFW and say, "Hey, if you're going
 3    to have the machines, you ought to get these legal
 4    machines from Diamond Games and Missouri Lottery."
 5         And he went back for a meeting to talk to
 6    them about that.  And meanwhile, somebody had
 7    tipped off the -- the sweepstakes vendor, and they
 8    were there.  And it -- and it was -- it was an
 9    upsetting situation for Tom Cobb, my friend, to --
10    to tell me about his son going there and being
11    sort of -- set up is the word I used.  I think
12    that -- I used the word that Tom had used.
13         Q  Yeah.  No.  I -- I get it.  And I think
14    it's possible you misunderstood -- you
15    misunderstood my question --
16         A  Okay.
17         Q  -- because you're -- you're answering it
18    based on what Brandon's perspective was and what
19    I -- how I had phrased my question was.  And so
20    just so, hopefully, we're on the same page is
21    you're saying that Brandon's position during this
22    meeting was that the Diamond Games machines were
23    legal under Missouri law and that he was,
24    essentially, being potentially attacked or
25    ambushed by this sweepstakes vendor that showed up
```

1    to potentially question the legality of or somehow

2    undermine this Diamond Games expansion; right?

3        A  I don't think anywhere in here I say

4    anything about the -- the sweepstakes people

5    saying the Diamond Games machines are illegal.

6        Q  Okay.  They repeatedly -- there's a --

7    point.  Okay.  We'll just read.  We'll read.

8    So --

9        A  Yes.

10        Q  -- in the meeting?  That part?  You can

11    see that?

12        A  Yeah.

13        Q  Okay.  "In this meeting of Brandon's, the

14    sweepstakes reps were somewhat aggressive and

15    tried to intimidate Brandon."  What -- what did

16    you mean by that?  What were the sweep- -- what

17    were the sweepstakes reps trying to intimidate

18    Brandon with?

19        A  My recollection is that Tom told me that

20    they threatened to sue him for interfering with

21    their business relationship or something under --

22    I don't know what they were going to sue him over.

23    But they -- they -- he didn't know they were even

24    going to be there.  He thought he was going in to

25    talk to the officers that -- that he does business

```
 1    with and have been doing business with, and these
 2    other people are there and they were very upset.
 3    And they were trying to intimidate him and
 4    threatened him with being sued, in -- in part, is
 5    my recollection; okay?
 6        Q  They -- they did not want him to place
 7    Diamond Games MPTs in his VFW; right?  "They"
 8    being the sweepstakes reps?
 9        A  No.  He couldn't place them there.  They
10    didn't want him to even -- into -- they didn't
11    want him to tell the guys at the VFW that, hey,
12    those machines are illegal.  You can't have them.
13    You ought to contact the lottery and get these
14    lottery machines.  That -- that's what he was
15    telling them or the auspices, if you will, of
16    the -- the -- the meeting.  And --
17        Q  But he -- he's telling them that he --
18    Brandon is telling the VFW people that he believes
19    the sweepstake vendors machines weren't legal, but
20    there are these other Diamond Games machines that
21    he believes are legal?
22        A  That is, essentially, what I remember.
23    Yes.
24        Q  Okay.  And the sweepstakes representatives
25    were there, basically, trying to unwind that
```

1    messaging and say, "Where's your basis that you
2    claim our machines are illegal?"  Would that be
3    fair?
4        A  Yeah.  I -- I wasn't there.  So I'm trying
5    to tell you what I remember Tom telling me that
6    Brandon told him.  So --
7        Q  Okay.
8        A  -- it's -- it's -- it's pretty far
9    separated.  But I think you can visualize and
10   imagine, you know, an -- an ambush sort of meeting
11   like that where he wasn't expecting someone to be
12   there to be pushing back at all.  He was going to
13   explain there's this legal alternative that I know
14   you could reach out to the lottery and ask about.
15       He -- we didn't have -- he did not have
16   any right to place them.  We weren't engaged in
17   business with them.  We had no contract.  There
18   was nothing in place.  It was a good faith -- a
19   total good faith effort is my recollection and --
20   and -- and interpretation of what was going on
21   there that Brandon was trying to help his customer
22   go down the right road, instead of inadvertently
23   doing something that -- that -- number one, why
24   would you even want to do something questionable
25   when you have a legal option?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1          And that -- that's just the -- the simple
2     logic that I -- I think was going on.  And the
3     best I can describe it to you is what my
4     recollection today is of what was happening then.
5          Q  And, I think, hopefully, helpful to that,
6     at one point here, a few lines down, you say,
7     "They repeatedly asked Brandon to give his
8     opinions -- his opinion if their machines were
9     illegal or not."  Do you see that?
10         A  I do.
11         Q  And by "they," you're referring to the
12    sweepstakes reps; right?
13         A  Yes.
14         Q  Okay.  So you're saying that one of the
15    things they ambushed Brandon with during this
16    meeting was to get him to admit or deny that he
17    believed that their sweepstakes games were illegal
18    under Missouri law?
19         A  That's what I said.  Yeah.  Where I'm
20    reading that now, that's what it says.
21         Q  Okay.  And then you skip down a little bit
22    to the last paragraph before you start into the
23    numbering.  And you say, "I wanted to share some
24    of my experience on a few things to help anyone
25    else that might find themselves in a -- any sort

1  of similar meeting."  And then you go on to talk
2  about your opinions with respect to a number of
3  things, including how you understand a tortious
4  interference claim under Missouri law, how you
5  understand sweepstakes under Missouri law, your
6  understanding of the case Thole versus Westfall,
7  and your understanding that opinions are not
8  grounds for legal action; correct?
9       A  There's a lot there.  So --
10      Q  I'm just saying, generally, those are the
11 topics upon which you --
12      A  Those --
13      Q  -- that -- that you put into your letter
14 to everybody; correct?
15      A  That is the topics.  Yes.
16      Q  Okay.  On your "one," you say this is
17 regarding tort- -- tortious interference.  "This
18 legal term is not applicable in what Brandon was
19 doing or did."  And that's just you giving your, I
20 guess, nonlegal legal opinion; fair?
21      A  That was my opinion based on what I know
22 about that law.  I think if you read on, that's
23 what I'm saying.  That's what I say.
24      Q  Okay.  Skip the next things.  And you say,
25 "I'm currently involved in a tortious interference

```
 1    case where the other party has admitted
 2    wrongdoing."  Can you tell me about that case?
 3    Who was the other party?
 4        A  The other party in that case at that time
 5    was a company called BFC Enterprises in St. Louis,
 6    Missouri.
 7        Q  And what was that tortious interference?
 8    Well, first of all, what kind of -- go ahead.
 9          MR. FINNERAN:  Can -- can you repeat
10    the -- can you spell the name of that company for
11    the record, please.
12          THE WITNESS:  BFC -- b as in "boy," f as
13    in "Frank," c as in "Charlie" -- Enterprises.
14          MR. FINNERAN:  Thank you.  I couldn't -- a
15    "B" or a "V."  So thank you.  Go ahead, Aaron.
16    Sorry.
17        Q  (By Mr. Craig)  Yeah.  What kind of
18    business did -- sorry -- BFC run?
19        A  An amusement business similar to TNT.
20        Q  Okay.  And did you sue BFC for tortious
21    interference?
22        A  I did.
23        Q  And when I say, "you," was that TNT?
24        A  TNT.  TNT.
25        Q  And you --
```

```
 1       A  Yeah.

 2       Q  Okay.  Did you personally sue that

 3   company?

 4       A  I just said --

 5       Q  I'm sorry.

 6       A  TN- --

 7       Q  Were -- were you personally named?  So

 8   well, on the pleading, does it say Jim Turntine as

 9   well as TNT or was it just TNT as a plaintiff?

10       A  I don't remember.

11       Q  Okay.

12       A  I -- I don't -- I don't know how it was

13   structured from my memory.

14       Q  And what did you allege that company had

15   done wrong in that instance?

16       A  Tortiously interfered with a -- a contract

17   in a business relationship I had with a customer.

18       Q  Can you be a little more specific?

19       A  If you've got the time.  I mean, it went

20   on for a long time.  But, ultimately --

21       Q  Were they just -- were -- did -- did they

22   operate what you would classify as the same just

23   amusement devices, nongambling devices --

24       A  Amusement devices.

25       Q  -- as you define them?
```

```
 1        A   Yes.

 2        Q   Okay.

 3        A   What they did was --

 4        Q   That -- that's fine.

 5        A   They --

 6        Q   That -- that -- that Q I -- I appreciate

 7    what you said.  And with that, I'm going to --

 8        A   Okay.

 9        Q   -- not ask you for a long question [sic]

10    because I think Rich needs to go pretty quick.

11            MR. FINNERAN:  Yeah.  I mean, take -- take

12    your time, Aaron.  It's -- I -- I've -- I've told

13    them that after 1:15, I'll be available and I'll

14    give them a call.  So I -- I can be a little

15    flexible.

16            MR. CRAIG:  Okay.  Well, certainly, after

17    we get done with this document, we can take a

18    break.

19        Q   (By Mr. Craig)  You say, "This is not the

20    first tortious interference case I have been

21    involved in during my 30 years here in middle

22    Missouri fighting off countless aggressive

23    competitors who have, in fact, tortiously

24    interfered in my business."  Did I read that

25    correctly?
```

1      A  You did.

2      Q  Okay.  How many tortious interference

3   cases do you think you've had to either file or --

4   or defend against in your 30 years as you've

5   described them here?

6      A  Hmm.  There may have only been -- I

7   can't -- may- -- maybe one or two others and --

8   but I -- I'm going to have to think on that for

9   awhile.  But -- but there was other situations

10  that were similar that I didn't have to file.

11  Once I notified the other party that I had a

12  contract in place and explained to them the

13  tortious interference law, they typically would --

14  would honor the law and -- and back off, so to

15  speak.

16     Q  Okay.  And then -- a -- a line I've heard

17  a lot.  Not from you.  Just in general.  The next

18  line that you say is "I'm not a lawyer, but on

19  this subject, I feel I can speak with some

20  authority and knowledge"; right?  That's what you

21  say?

22     A  Well, it sounded a little sarcastic the

23  way you read it, but it is what I said.  Yeah.

24     Q  Yeah.  Touché.  And then you go on to

25  explain your understanding of Missouri's tortious

```
 1    interference law; right?

 2         A  I think that's what I did.

 3         Q  Okay.  If you skip to the next page at the

 4    top, you say that based on your understanding,

 5    again, of Missouri law, you say, quote, even then,

 6    it cannot be done unless there is a provable loss

 7    attributed to the outcome of the activity."  Do

 8    you see that?

 9         A  I do.

10         Q  Okay.  So is that -- is that you saying

11    that, at least for tortious interference, you

12    understand that out of any sort of claim, these

13    sweepstakes guys would have to prove, not just

14    that what he said was maybe wrong, but they would

15    also have to show that somehow they were actually

16    harmed by those statements; right?

17         A  I don't know if I'm referring to the

18    sweepstakes guys there.  I'm just talking in

19    general understanding of the law that if you don't

20    have a loss, you really don't have anything to sue

21    for.  I think that's what that indicates.

22         Q  Yeah.  Is -- is that your just general

23    understanding of -- of the law that you need to

24    have a loss in order to have a claim?  Is that

25    your general understanding in general or is that
```

1    only confined to your understanding of tortious
2    interference?
3            MR. FINNERAN:  Objection.  Calls for a
4    legal conclusion.
5            But you may answer, if you know.
6        A  In general, that is my understanding from
7    what I've been told from various legal counsel
8    or --
9        Q  (By Mr. Craig)  Well, I don't -- I really
10   don't -- I don't want to know -- yeah.  I don't
11   want to -- I don't want to know what you've been
12   told by various legal counsel.
13       A  Well, that -- that's how I got my general
14   understanding.  I'm sorry.  But that's the truth.
15       Q  Okay.  Well, you can say -- I just -- it's
16   safe for you to say I have a general understanding
17   about X, but that's -- I -- I'm just saying I
18   don't want to probe you on what you -- what
19   conversations specifically you might've had or
20   specifically what you were told; right?  I'm
21   higher level.
22       A  I appreciate that.  And I'm not trying
23   to -- you know, I'm -- I'm sorry I said that.
24   I -- I guess I didn't need to.
25       Q  No, no.  No.  That's fine.  Okay.  And

1    then your -- your second topic here is you're
        2    giving your opinions about how you understand
        3    sweepstakes in Missouri, how sort of that
        4    framework operates; right?
        5        A  I think so.  Yes.
        6        Q  Okay.  And you say, "Sweepstakes tied to
        7    nonprofit charities can be legal in Missouri, but
        8    it does not mean that the sweepstakes at this VFW
        9    is or isn't."  Did I read that correctly?
       10        A  I think so.
       11        Q  And then your next line says, "It is not
       12    our job or responsibility to know."  Did I read
       13    that correctly?
       14        A  I think so.
       15        Q  Okay.  And you're saying that it's not
       16    your job, either yours personally or as, I guess,
       17    a group trade organization to know one way or
       18    another whether sweepstakes that are how you
       19    describe them are legal or illegal in Missouri;
       20    right?
       21        A  That's what I said.
       22        Q  Okay.  And then you go on to say, "The
       23    reality is that all gaming enforcement in Missouri
       24    has been lax for years now.  So who knows?  We
       25    certainly do not need to know."  I'll stop there.

What are you saying here?

A  I think I'm saying what I said.  I'm --
I'm explaining to them, my friends, that if we're
talking to somebody in similar circumstances,
we -- we don't know if that machine -- at that --
at that point, apparently, what I'm -- what I'm --
what I'm deducing from what I wrote at that time,
I didn't know the gaming commission had written a
letter saying that the sweepstakes machines were
illegal, because if I had known that, then I
would've been saying right here, attached is a
copy of a gaming letter -- a gaming commission
letter stating that these sweepstakes machines
are, in fact, illegal.  So I didn't do that.  So
I'm saying what I said because we don't need to
know.

And I think I told you earlier that what
Brandon was trying to do, as I think all of us as
we were evolving to trying to figure out how can
we get involved with the lottery, how can we find
a way to be a participant in something that's
legal and save our business from competing against
the illegal activity that's not regulated and
being enforced properly, what do we do?

And so this is part of all of us figuring

1    that out together and me being a leader in the

2    process here trying to help my friends know what I

3    know and what I believe about how we handle these

4    situations.

5         So if I was talking to one of my VFWs and

6    they had sweepstakes machines in them and in good

7    faith, I'm telling them, "Hey, you could -- you

8    could call the lottery.  They've got some machines

9    that -- that are legal that will make you some

10   money too, and you're not -- why risk breaking the

11   law?"

12        Again, I don't mean to be repetitive, but

13   putting it all into context, you're saying what am

14   I trying to say?  That's what I'm trying to say.

15        Q  Okay.

16        A  No.  That's fair game.

17        Q  All right.  If we skip down to your

18   paragraph for where you give the recipients of

19   this letter your opinion that opinions are not

20   grounds for legal action, you say, "Opinions are

21   an open door and not grounds for any sort of legal

22   action at all"; right?

23        A  That's what I said.

24        Q  Then if you skip down, you say, "If things

25   change, then we may find out that these particular

1  sweepstakes are legal or not.  But in the

2  meantime, if the MPTs make more money for the VFW,

3  then they will want more when they can get them

4  and vice versa.  We pick our battles.  So for now,

5  we need to worry more about the outright gambling

6  in gas stations and those that are inundating our

7  bar accounts."  Did I read that correctly?

8      A   I think you did.  Yeah.

9      Q   Okay.  I'm good.  What did -- I guess, I

10  should ask.  Yeah.  What -- what did you mean by

11  that?

12      A   What did I mean by what?

13      Q   Yeah.  If things change, you know, and we

14  find out these sweepstakes are legal or not, you

15  know, maybe -- but then you say, "In the meantime,

16  if the Diamond Games MPTs make more money for the

17  VFW, then they will want more when they can get

18  them."  I mean, are -- what did you mean by that

19  "In the meantime if the Diamond Games MPTs make

20  more money for the VFW, then they will want more

21  of them"?

22      MR. FINNERAN:  Objection.  Calls --

23  compound question.

24      But you may answer, if you understand the

25  question.

```
 1        A   I -- I honestly feel like the sentence
 2     speaks for itself and especially with the other
 3     information that I provided, as far as the
 4     background and the context of what was going on
 5     with our association, and we were trying to, in
 6     good faith, make a difference in -- in legal
 7     activity being informed -- people being informed
 8     about there is a legal option here.  Why do
 9     something illegal?  And if you can make money and
10     things go forward and in our good faith is -- is
11     successful, Diamond Games and the lottery would
12     see some value in these local yokals here,
13     these -- these small mom-and-pop businesses and
14     want to do some business with us.
15        Q   (By Mr. Craig)  And --
16        A   That's -- that's --
17        Q   If -- yeah.
18        A   That's -- that's what I was talking
19     about --
20        Q   Right.
21        A   -- at first.
22        Q   And -- and assuming that you or -- and
23     other operators within the trade association were,
24     you know, brought within some sort of agreement
25     with Diamond Games, right, the more of Diamond
```

```
 1    Games MPTs that you could put into the market, the

 2    better for everybody; right?

 3        A  We were -- we were -- we were working on

 4    a -- an -- an arrangement that would, hopefully,

 5    allow us to -- to -- to service and place the

 6    machines.  And so in good faith, we had -- we had

 7    stopped, you know, working against them and were

 8    trying to show them that we -- we can -- we can

 9    help.  We can make a difference.  We can bring

10    value to the table.

11        Q  And -- and also get value for yourself and

12    your members in the process; right?

13        A  And -- and help our -- help our industry

14    in the process.  Yes.

15        Q  Okay.  All right.  I'm done with that.

16            MR. CRAIG:  And then we can take a break.

17    So take a lunch break.  What do we need?

18    Forty-five minutes?  Do we need longer?

19            MR. FINNERAN:  Forty-five minutes, I

20    think, should be okay for me.  Jim, is that okay

21    for you?

22            THE WITNESS:  Oh, it's fine.  I'm -- I'm

23    good with whatever you guys want.

24            MR. CRAIG:  Okay.

25            VIDEOGRAPHER:  This is the videographer.
```

1      We are going off the record.  The time is 1:19 PM.
 2              (Off the record 1:19 to 2:16.)
 3              VIDEOGRAPHER:  We are back on the record
 4      at 2:16 PM.
 5          Q  (By Mr. Craig)  All right.  We're back
 6      after lunch.  I think we just got done with
 7      Exhibit 14 before the break.  I'm going to mark a
 8      new document as Exhibit 15 for identification.
 9      Let me know when you've got it pulled up.
10          A  I have it.
11          Q  Okay.  So at the top, just to identify the
12      document, this is an email from you to Kathi
13      Harness and Tom Cobb and Scott, the Swain Group,
14      dated March 29th, 2019; correct?
15          A  Yes.
16          Q  And the subject line is "SB 431 regarding
17      illegal gaming machines," correct?
18          A  Yes.
19          Q  And, just generally, this is a discussion
20      about a proposed -- a potential proposed language
21      for a Senate Bill 431; correct?
22          A  It looks like.  Yes.
23          Q  All right.  So if we go down to Page 2 and
24      we start at the bottom email from Kathi Harness
25      to -- I don't know who to, but I assume you were

```
 1    on it.  For some reason, there's no information by
 2    the "To"; right?
 3         A   Well, I don't know what you're looking at.
 4         Q   The -- the last email that shows on Page 2
 5    of --
 6         A   Page 2.
 7         Q   -- Exhibit 15.
 8         A   The last --
 9         Q   Kathi Harness, February 26th, 2019, at
10    5:13 PM?
11         A   Oh.  Okay.  From Kathi.  Sent -- yeah.
12    I -- I see what you're saying.  It doesn't say who
13    to.  I don't know.
14         Q   Glitch in the matrix.  All right.  That's
15    fine.
16         A   Okay.
17         Q   But you see the email I'm talking about;
18    right?
19         A   I do.
20         Q   Okay.  And Kathi says, "Members."  So I
21    assume she's addressing that to the members of
22    your trade organization; fair?
23         A   I think so.
24         Q   Okay.  She says, "Please be aware that
25    SB 431 was filed on Monday, February 25th."  And
```

1       then she attaches -- she says, "The bill is
2       attached."  And I don't think the bill was
3       actually attached to this email, but that's
4       because, usually, only the top line would -- the
5       top line email would have the attachment.  So I
6       just wanted to set the stage.  She's telling the
7       members on Febru- -- that on February 25th, there
8       was a new Senate Bill Number 431 that was filed;
9       fair?
10           A   That's what it looks like.  Yes.
11           Q   And then she goes on to give, I guess, her
12      general understanding of what that Senate bill was
13      targeted to do?
14           A   Okay.
15           Q   You would agree with that; right?
16           A   What -- without reading every word, just
17      browsing it, yeah, that looks like that's what
18      she's giving is a summary of what that particular
19      bill is and does.
20           Q   Okay.  And then if you go to Page 3, her
21      last paragraph.  She says, "This act modifies the
22      definition of, quote, gambling device, end quote,
23      for the purposes of provisions of law relating to
24      the prosecution of illegal gambling by including
25      any device, machine, paraphernalia, or equipment

1    not approved by the Missouri Gaming Commission or

2    state lottery commission."  And then she says

3    that's Section 572.010; correct?

4         A   Yeah.  That's what it says.

5         Q   Were you aware of this Senate Bill 431

6    prior to Ms. Harness's email on February 26th,

7    2019?

8         A   I would assume I was not.  That is the

9    best I can recall.  But I wouldn't know how I

10   would be if she's making me or us aware of it at

11   that time.

12        Q   Do you know was this something that

13   Senator Schatz proposed?

14        A   I don't remember.  It could be.  It -- or

15   it could've been a version of one that he had

16   proposed before.  As I mentioned earlier, every

17   year a -- a similar version would be put forth.

18   So I -- I'm sorry, Aaron.  I just don't remember

19   every single step of the way.

20        Q   Well, maybe this will help.  If you look

21   at the email right above it --

22        A   Okay.

23        Q   -- it's an email from you, sent

24   March 27th, 2019, to Kathi Harness and -- and some

25   others.  And you say, "I'm thinking about a fix

1   for Dave's law dash [sic] ha ha ha."  I mean, does
2   that refresh your recollection about whether this
3   was Dave Schatz' proposed law?
4       A  Maybe.  But, re- -- remember, a lot of
5   times, other people would file the law.  And I
6   might've just been referencing -- I know it's the
7   same version that David proposed the year before.
8   So, I -- I -- I'm sorry.  I -- I don't know in --
9   at this period -- I mean, this is March of 2019.
10  I can't remember where we were in the last one,
11  but we were further down the road.  So I -- it --
12  it could -- it -- I don't know how else to answer
13  the question until I read more and -- and know if
14  this is the bill that Dave was filing or not.
15      Q  Well, what do you mean by, quote, Dave's
16  law, end quote?
17      A  Well, he had been -- as I've said before,
18  from dating back to when we first talked about it,
19  I think, in the summer of 2018 about what can be
20  done about this problem, he wanted to add
21  additional penalties to the activity to people
22  that were convicted of the activity.  And that was
23  the -- the main purpose, which at -- I'll tell
24  you -- whatever we can do to solve the problem,
25  I'm -- I'm onboard.  That kind of was my general

```
 1    feeling about it.  But I think, as I said before,
 2    I wasn't necessarily --
 3         Q  That's fair.
 4         A  -- feeling that the law had to be changed
 5    either, but for what that's worth.
 6         Q  Well, I know you keep saying that, but
 7    then, I mean, you did work very hard, and I would
 8    say almost tirelessly over a span of years to try
 9    to actually change the language in Missouri law to
10    include Section 572.010 to, in fact, redefine that
11    law; right?
12              MR. FINNERAN:  Objection.  Argumentative.
13    Calls for a legal conclusion.
14              But, Jim, you may answer, if you know.
15         A  No, I don't think that's right.  I work
16    hard at everything I do.  And if I'm doing
17    something, it might look like I've worked
18    tirelessly compared to someone else, but I don't
19    think that was -- it -- for what it's worth, yeah.
20    Would I have been happy if the law passed and it
21    helped solve the problem?  Yes.  But it was not
22    the only thing I was doing to try to solve the
23    problem.
24         Q  No.  I -- I will agree with that too.  All
25    right.  But here, you're actually -- you're
```

saying, "I think this language could do it.  I was
not the best English writing student, so I need
some help on where to place the commas, but I
really think this language might work to stop the
casino-type of black market activity while
enabling everything else that has been deemed
harmless to go on as it has for decades."  Did I
read that correctly?

     A  You did.

     Q  Okay.  Well, what did you mean by
"everything else that had been deemed harmless"?

     A  Things like toy cranes.  Things like
Chuck E. Cheese's business model.  Those folks
were pretty powerful and sort of similar to what I
said earlier about Silver Dollar City's owner,
Mr. Herschend.

          I think you're in the political
environment here, and I'm engaged with my party or
my -- the people I came to the dance with.  And
what I'm talking about is if something's going to
get passed, you have to consider those other
things that you're not -- you're not trying to
throw the baby out with the bath water sort of
thing.

          And you don't want to draw fire from

```
 1    somebody that really -- nobody really had a
 2    problem or has had a problem with what Dave &
 3    Buster's does for their kids.  You've been there;
 4    I've been there.
 5          But if you're not careful and the law gets
 6    written so -- so strictly that then all of a
 7    sudden some -- some power-mongering Barney Fife
 8    decides to -- to, you know, make a name for
 9    himself, that's the slippery slope of trying to do
10    things and -- and whether you believe me or not,
11    why I kept -- I still feel like -- maybe it's not
12    in writing.  I don't know.
13          But I always felt like the law was strong
14    enough as it was.  We just needed to enforce it,
15    and it's not been enforced.  But that's aside --
16    aside of what you're asking me now, I understand.
17       Q  You mentioned crane games.  I mean, can
18    you tell me your authority to, like, what -- what
19    case or what agency has declared that, like, crane
20    games have an operator setting that can dictate
21    the, you know, potential outcome of a turn on a
22    crane game has said that those games are harmless
23    or do not fall within the definition of gambling
24    device under Missouri law?
25       A  I don't know that it -- I don't believe --
```

```
 1          MR. FINNERAN:  Objection.  Excuse me, Jim.
 2    Just give me a second on questions like this.
 3    Objection.  Calls for a legal conclusion.
 4          You may answer.
 5      A  I don't know that anybody has actually
 6    said what you just said or that I've heard it said
 7    that way, but I did speak with -- and I think I
 8    told you this that -- maybe in the last deposition
 9    we talked about a meeting in the early 2000s that
10    I had had with the Missouri Gaming Commission, the
11    entire commission.
12          And I believe our lobbyist and -- and
13    our -- it was, again, on behalf of the Missouri
14    Amusement Machine Association.  And we were there
15    at that time asking for guidance from the Missouri
16    Gaming Commission on what we could tell our
17    members and our customers and what was -- you
18    know, to help us get some black and white into the
19    picture of what --
20      Q  (By Mr. Craig)  Well, that's fine.  I --
21    I -- I understand.
22      A  Okay.
23      Q  You've already answered my question, like,
24    probably a minute and a half ago when you said you
25    don't know of any authority, which was the
```

467

```
 1    question that I asked.  So I don't -- I don't mean
 2    to be rude --
 3         A  Okay.
 4         Q  -- okay?  I don't --
 5         A  Okay.
 6         Q  I don't mean to be rude, but I think
 7    you -- I think you did answer my question.
 8         A  Okay.  I hope so.
 9         Q  Would -- would it be fair to say, I think,
10    based on what you just said, that minor changes in
11    the language of a statute could have potential
12    significant effects that -- on -- on a given
13    device classification?
14         MR. FINNERAN:  Objection.  Calls for a
15    legal conclusion.
16         You may answer.
17         A  Well, I -- I think so.
18         Q  (By Mr. Craig)  Yeah.  And when -- that's,
19    basically, what you were expressing here is
20    what -- we've got to be very careful in, you know,
21    what language we propose to potentially change
22    Missouri's gambling -- criminal gambling statute
23    so that we don't accidentally include some of our
24    games in that definition; right?
25         A  That's not what it says.  What it says, it
```

1    speaks to the what I tried to add explanation to.

        2    It says what it says.

        3        Q   Yeah.  One -- one fair reading of that,

        4    though, is, basically, we don't want the language

        5    to somehow be expanded to include, you know, the

        6    types of games, like Dave & Buster's has, Worlds

        7    of Fun has, Six Flags has, or TNT has; right?

        8        A   No.  That's -- that's not what I was

        9    saying.  I --

       10        Q   Do you operate any redemption machines,

       11    like Dave & Buster's?

       12        A   I don't know if I did at that time or not

       13    when I wrote this.

       14        Q   Did you operate crane games?

       15        A   I have some crane games, and I did then

       16    too.

       17        Q   All right.  And, I mean, I think it's --

       18    it's fair to say what you were saying is you

       19    wouldn't want this, you know, language modified in

       20    some manner that might accidentally include one of

       21    your crane games; right?

       22        A   I don't -- I don't think any of my crane

       23    games would've qualified exactly as -- as -- I

       24    mean, perhaps, I -- I -- I don't know at that

       25    particular point --

```
 1        Q   Yeah.

 2        A   -- in time if I had a crane game that

 3   could be impacted by it because --

 4        Q   You know -- you know my feeling about the

 5   crane games with the operator's setting.  I'm --

 6   I -- I think those are, you know, probably illegal

 7   gambling devices, given what I've learned, you

 8   know, about Missouri gambling laws now.  But it's

 9   not a question.  I digress.

10        So you say here -- you continue to say

11   "This act modifies the definition of gambling

12   device for the purposes of provisions of the law

13   relating to the prosecution of illegal gambling by

14   including any device, machine, paraphernalia, or

15   equipment."  And then there's some larger text

16   that is in bold and underlined.  Is that your

17   proposed modifications that you're talking about

18   above?

19        A   Yeah.  I think I was putting this forth to

20   the group for -- for feedback of this might work.

21        Q   And -- and -- yeah.  And -- and you're

22   saying that this may be something -- your language

23   that you're coming up with here, this might be

24   something that would be a, quote, fix for Dave's

25   law, ha, ha, ha; right?
```

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com

1      A   Yeah.  I think that all ties together
2   to --
3      Q   Okay.
4      A   -- to say that.
5      Q   And then so after you give your opinion
6   about, you know, how the language should be
7   modified, you say why you believe your proposed
8   language would be good.  And you explain, quote, I
9   think this would allow Dave & Buster's, Worlds of
10  Fun, Six Flags, FEC's bowling redemption centers,
11  and Chuck E. Cheese to continue their operations
12  as is for prizes but would stop Torch and all
13  other black market devices in bars and all other
14  types of locations; right?
15     A   And just need to enforce the law as is
16  from there.  That's what it says.
17     Q   Right.  Yeah.  And -- and I -- I was going
18  to ask you about that.  But let -- we'll get
19  there.  We'll get there.  But you do say that you
20  are specifically crafting this new proposed
21  legislative language to modify Section 572.010 of
22  Missouri's criminal gambling statutes to, quote,
23  fix Dave's law in a manner that would allow what
24  you call legal amusement devices to continue to
25  operate but would, quote, stop Torch; right?

```
 1        A   And all other black market devices in bars
 2   and other types of locations.
 3        Q   Yeah.  Thanks for that clarification.  But
 4   with that clarification, you agree with me;
 5   correct?
 6        A   Agree with what?
 7        Q   My question.
 8        A   What was it?
 9            MR. CRAIG:  Madam Court Reporter, could
10   you please read back my --
11            MR. FINNERAN:  That's what the document
12   says is what I understood the question to be.
13            MR. CRAIG:  No, it wasn't.  But, Madam
14   Reporter, could you please repeat my original
15   question?
16            COURT REPORTER:  Yes, but give me a moment
17   to search back, please.  Feel free to stop me if
18   this is not the right question.  Okay, Mr. Craig?
19            MR. CRAIG:  Okay.
20            Question:  "Right.  And I was going to ask
21   you about that.  But let -- we'll get there.
22   We'll get there.  But you do say that you are
23   specifically crafting this new proposed
24   legislative language to modify Section 572.010 of
25   Missouri criminal gambling statutes to, quote, fix
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    Dave's law in a manner that would allow what you

2    call legal amusement devices to continue to

3    operate but would, quote, stop Torch; right?"

4        A  And my answer is, no, that's not right.

5    It's not specifically for Torch at the end.

6    You -- you also would have to include all other

7    black market devices in all other types of

8    locations as the sentence actually reads.

9        Q  (By Mr. Craig)  Do you understand that

10   implication of the word "and"?  I say would stop

11   Torch and other people.  It doesn't -- it doesn't

12   mean that you don't -- that it is untrue you also

13   wanted to stop Torch.

14       A  That's not what your question was.  With

15   all due respect, you said I specifically proposed

16   this language to stop Torch.  That would single

17   out Torch specifically.  That's what the word

18   "specifically" means to me, sir.

19       Q  I didn't single out Torch.  You singled

20   out Torch.  You specifically singled out Torch.

21   And you said Torch and all other black market.

22   And so what I'm saying is is there's no

23   distinction in my question versus your

24   clarification.  There really isn't because I said

25   it would stop Torch.  Yeah.  The answer is --

```
 1        A  Specifically.

 2        Q  -- yes, it would -- it would stop Torch

 3    and, in your opinion, it would also top these

 4    other things; right?

 5        A  It would include -- it would include them

 6    all.

 7            MR. FINNERAN:  Excuse me.  Excuse me.

 8    Hold on.  Objection.  Argumentative.  Compound

 9    question.

10            You may answer, if you know.

11            MR. CRAIG:  We're just talking about how

12    the ling -- the English language functions, Rich.

13    But, all right.

14        Q  (By Mr. Craig)  With the clarification --

15    I'll -- I'll throw it -- I'll throw it in.  All

16    right?  So you would agree with me that here, what

17    you are doing is proposing completely new language

18    that you think might be useful to including in

19    Missouri Revised Statute 572.010, which is

20    Missouri's criminal gambling statute, to, quote,

21    fix Dave's law to continue to allow the operation

22    of what you claim to be legal amusement devices

23    while stopping Torch as well as all other black

24    market devices in bars and all other types of

25    locations; correct?
```

```
 1      A  Sorry to be argu- -- no.  It's not

 2   correct.  If you read what I wrote, that's not

 3   what it says.

 4      Q  How is that incorrect?

 5      A  Well, for one thing, you said that I'm

 6   claiming that what Dave & Buster's and Worlds of

 7   Fun and Six Flags and FECs and bowling redemption

 8   centers and Chuck E. Cheese are doing is legal

 9   because I don't know that everything is legal that

10   they're all doing.

11         But what I did say was the things that had

12   been deemed harmless and go on as it has for

13   decades.  So there's a distinction there that

14   because there is a lack of enforcement, has been a

15   lack of enforcement, there's -- there's things,

16   like Dave & Buster's, that is significantly bigger

17   than Chuck E. Cheese, but they both make a lot of

18   money and do what they do.

19         At the end of the day, politically, we

20   didn't want to draw fire from that if you're going

21   to be successful in getting a -- a change in the

22   law to try to solve a problem with this -- with

23   this, by all accounts, exploding illegal slot

24   machine activity whether -- whether it was Torch

25   alone or others by them starting to copycat them
```

```
 1    because, by now, there's been all sorts of growth.
 2    We're into 2019.
 3          But the short answer is what you said is
 4    not what my writing says.  And so I have to
 5    disagree.  That -- that's all.  That's all I can
 6    say.
 7       Q  Okay.  I mean, I think you actually
 8    previously did agree with what I said.  You just
 9    wanted the caveat of me finishing the sentence.
10    And, now, you're saying that even if I finish the
11    sentence and include that you said all other black
12    market devices in bars and all other types of
13    locations, now you're disagreeing.  That's what
14    I'm hearing?
15       A  You heard what I said.  I -- I -- I don't
16    know what you're hearing.  But what I said was, if
17    you read what I wrote, I'm not specifically --
18    although I don't know if there's anything wrong
19    with specifically pointing out that Torch is a
20    problem and we need to do something and that's
21    what Senator Schatz is trying to deal with, but at
22    the same time, I included the other problems that
23    I'm aware of too.  I'm a participant in a
24    conversation about how to get a problem solved and
25    how we can get there.
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1       Q  Without hurting your business; right?

 2       A  Without hurting anyone's business that has

 3   already been deemed harmless for decades.

 4       Q  Well, by who?  That's the thing is -- I --

 5   I just asked you deemed by who?  And you said I

 6   can't give you any authority for who's deemed

 7   these games that you didn't specify as being

 8   harmless.  But I -- I take it that you include

 9   your games as among those games that have been

10   deemed harmless?

11            MR. FINNERAN:  Objection.  Arg- --

12       A  With all due respect --

13            MR. FINNERAN:  Hold -- Jim, hold on.

14   Objection.  Argumentative.  Compound question.

15            You may answer the question, if you

16   understand it.

17            THE WITNESS:  I think I understand it,

18   Rich.

19       A  And -- and, I think, with all due respect,

20   Mr. Craig, I did try to tell you who deems them

21   harmless and who didn't.  I tried to go into the

22   story about the early 2000s when I met, along with

23   other members of our association, with the gaming

24   commission and all of their enforcement people.

25   And they, basically, tried to tell us what -- what
```

1    could and couldn't be done.  But, also, they put

2    it in a practical reality of but here's where --

3    here's where we get called.  Here's when we get a

4    phone call.  Here's when we're -- we're going to

5    help enforce the law to the full extent.  And if

6    you do these things, then -- then you're going to

7    be on the wrong side of us.  So if that helps you,

8    I hope it does.  If it doesn't, I'm sorry.

9         But I know 30 -- I know 30 years --  I was

10   just going to finish, and I'll shut up.  I know 30

11   years of -- of conversations with these various

12   agencies and people and lawyers that I've hired to

13   try to tell me what can I do and what can I not

14   do.  And that all comes into my head when I'm

15   trying to share information back in 2019 with

16   my -- with my friends and -- and the people that

17   we're working with.  That's it.

18      Q  Yeah.  Oh, I -- and the example that you

19   gave me was the Missouri Gaming Commission once

20   told you that they didn't have a problem with

21   your -- your games.  But I think we both

22   established the last time we talked that at least

23   currently, the gaming commission, I think, maybe

24   looked at their enabling statute and decided that,

25   yeah, it actually means that we don't have any

1    authority to regulate or do anything outside of
2    licensed casinos, excursion boats, or bingo halls
3    in the state of Missouri; right?
4        A  We just talked --
5            MR. FINNERAN:  Objection.  Calls --
6    objection.  Calls for a legal conclusion.
7            But you may answer.
8        A  We did talk about that, and I think the
9    conclusion of that conversation was the gaming
10   commission's position has changed.  It changes
11   over time, and it has changed, depending on who
12   the governor's appointed on the Board of the
13   gaming commission, among other things.  But their
14   position --
15       Q  Sorry.
16       A  -- their position at times has been very
17   strong.  Other times, it's less strong.
18   Recently --
19       Q  All right.  And you would agree --
20       A  -- it's strong.
21       Q  Yeah.  You would agree with me that if
22   their, you know, current position has always been
23   the correct position that the enabling statute
24   that we operate under doesn't allow us to regulate
25   or issue any proclamations or regulations with

```
 1   respect to places outside of our purview, then
 2   whatever they told you about, you know, your
 3   particular amusement devices, legal or illegal,
 4   that I think we can both agree are not placed
 5   anywhere inside bingo halls or Missouri casinos,
 6   right, would be moot?
 7        MR. FINNERAN:  Objection.  Calls for a
 8   legal conclusion.
 9        You may answer.
10     A   No, I -- I disagree because --
11     Q   (By Mr. Craig)  Okay.  Well, that's fine.
12   That's all you've got to say.  We can agree to
13   disagree.
14     A   Right.
15     Q   All right.  In any event, I think you'll
16   agree with me that you were proposing here, to the
17   other members of your trade association and your
18   lobbyists, your thoughts on potential ways to
19   further amend, quote, Dave's law in a way that
20   would stop Torch and all other black market
21   devices in bars and all other types of locations;
22   correct?
23     A   That was my idea.  Yes.
24     Q   Okay.  And then you -- you wanted to talk
25   about it.  So let's talk about it.  You say just
```

1    need to enforce the law is -- I'm sorry.  You say,

2    "just need to enforce the law as is from there,

3    dot, dot, dot, dot"; right?  What you're saying is

4    is once we got this new language approved, then

5    all we needed to do was enforce this new language,

6    and then that new language would stop Torch and

7    all other black market devices in bars and all

8    other types of locations; correct?

9       A  That was my thought.

10      Q  Okay.  Well, we can both agree that Dave's

11   law was never passed into Missouri law; right?

12      A  That is correct.

13      Q  So this language that you proposed, at

14   least in part, to stop Torch, that never was

15   accepted and passed in the state of Missouri into

16   Missouri law; right?

17      A  I don't recollect my suggestion here ever

18   going anywhere.  I think this was about as far as

19   it went.  It was not included, in my recollection,

20   in the bill at all.

21      Q  So you -- you're saying that you don't

22   believe this ever got funneled to even your buddy,

23   Dave Schatz?

24      A  No, I don't -- I don't -- I don't remember

25   that happening.  I -- I think that --

1    Q  So are you saying that it may have, it may
2    not have, but as you sit here today, you can't say
3    one way or the other?
4    A  I'm -- I'm almost certain that this
5    particular language that I wrote on this day did
6    not get included in any -- any law, proposed law.
7    Some version, some pieces could, but as it's
8    written right there, I -- I have no recollection
9    of that actually happening.
10   Q  All right.  Then let's look at the bottom
11   of Page 1 where Kathi Harness emails Dave Schatz
12   and forwards this email which would include your
13   suggestions on how to revise Dave's law.  And
14   Kathi Harness, on March 27th, 2019, at 2:46 PM,
15   says, "Senator Schatz and Dan, as per our
16   discussion yesterday, please see the language
17   below to clarify the illegal gambling games and
18   Jim's explanation."  Do you see that?
19   A  I do.
20   Q  Does that refresh your recollection as to
21   whether Dave Schatz and Senator Dan Kleinsorge
22   were offered your proposed amendments to Dave's
23   law?
24   A  Dan -- Daniel Kleinsorge was his
25   administrative assistant at the time, not a

1    Senator.  And I think I didn't -- I didn't say
        2    that Senator Schatz wasn't aware of my suggestion.
        3    I said I don't think it ever went anywhere.  I
        4    don't think it got included in the law.  That's
        5    what I said.
        6        Q  Well, none of this got included in the
        7    law.
        8        A  Right.
        9        Q  It's the exact way you just said.
       10    Whatever Dave's law was, as proposed in SB 431 or
       11    any other Senate bill that might have tried to
       12    amend 572.010 or other gambling statutes, none of
       13    them ever passed; correct?
       14        A  Correct.
       15        Q  All right.  But my point was is did you
       16    try to influence your friend, Dave Schatz, a
       17    Senator at the time, by showing him your proposed
       18    language?  And you did.  Didn't you?
       19        A  I -- I -- I shared my thoughts with my
       20    group.  Then Kathi shared it to Dave Schatz.  So
       21    Dave Schatz became aware of what Jim Turntine
       22    thought.  Did it get included in his bill?  Did he
       23    amend his bill?  I don't think so.  And that's
       24    what I said and was referring to earlier.  I don't
       25    think I said anything about did Senator Schatz

                    PohlmanUSA Court Reporting
                (877) 421-0099   www.PohlmanUSA.com

1  ever see what I wrote or suggested.  And I don't
2  know if he did or didn't.  I can't remember.  I
3  don't think it wound up being in the bill.  I
4  don't think it went anywhere after this.  Now, you
5  might show me the next email and maybe there's a
6  bill that had that language or some part of it,
7  but I don't remember that actually going anywhere.
8      Q  Yeah.  No.  I think -- I -- I -- maybe
9  we're --
10     A  That's what I said.
11     Q  We could maybe not be on the same page.
12  When you said, "I don't think my proposed language
13  went anywhere," what I heard was -- because my
14  question was about Senator Schatz, I assumed you
15  were saying my proposal here didn't actually make
16  it's way to Senator Schatz.  But we can both agree
17  that that is not an accurate statement; right?
18     A  Yeah.  And -- and if you interpreted my
19  statement that way, then I apologize, Aaron,
20  because that's not what I meant when I said it
21  didn't go anywhere.  I meant it didn't grow.  It
22  didn't take off.  It didn't wind up meaning
23  anything.  That's what I meant.
24         So if you took it that way, I apologize.
25  I don't remember you actually saying did it get to

1   Senator Schatz or the way you structured it just
2   now isn't what I thought you said.  If you said it
3   that way, I -- I'm -- I'm sorry.  I didn't
4   interpret what you said that way.
5       Q  No, and I may have misinterpreted what you
6   said.  And, now, we -- now, we're on the same
7   page.  Okay.  With that clarification, we both
8   agree that very shortly after you proposed your
9   language we've discussed on March 27th, 2019, that
10  Kathi Harness did, in fact, send that proposed
11  language by yourself to Dave Schatz and his staff
12  member; correct?
13      A  I -- I agree that she sent that
14  information on to Dave Schatz and his
15  administrative assistant.  Yes.
16      Q  And she also mentions that she had
17  discussions with Dave Schatz the day before.  Did
18  you ever learn what those discussions entailed?
19      A  Not -- not that I can remember.  I -- I --
20  I would hazard to take a chance in surmising
21  today.
22      Q  I don't want you to guess.  That's fine.
23  All right.  Right above that, it looks like there
24  is another -- there's another email from a
25  Daniel -- well, it's -- it's Daniel who is Senator

1  Schatz', I think, assistant or staff member;

2  right?

3       A  Yes.  Daniel Kleinsorge was Dave Schatz's

4  administrative assistant at that time.

5       Q  Okay.  And then do you know who Joshua

6  Norberg is?

7       A  I -- I honestly don't.

8       Q  Okay.  But he's got an @senate.mo.gov.  So

9  I assume he works in some capacity.  He was

10  employed by the Missouri Senate; right?

11      A  Yeah.  I was just scrolling up to try to

12  see if there was a hint there.  But I'm not sure

13  that I've been able to comprehend from what I'm

14  looking at who -- who he is.  I don't re- -- I

15  don't know off the top of my head who Joshua --

16      Q  Yeah.

17      A  -- Norberg is.

18      Q  I -- okay.  That's fine.  I don't want you

19  to speculate and guess.  But we can both agree

20  that whoever Joshua Norberg was, he has an

21  @senate.mo.gov email address; correct?

22      A  Yeah.  Yes.

23      Q  Okay.  And he says to Daniel, "Do you

24  think this solves a problem?"  And then one line

25  up, you've got Joshua Norberg responding, "I'm not

sure Dave & Buster's, Worlds of Fun, et cetera,
would be considered gambling activities that would
be captured by your bill, but Jim's language is
certainly more targeted."  Do you see that?

    A  I do.

    Q  Do you know -- I mean, then Kathi Harness
actually -- I don't know.  Maybe it looks like she
cut and pasted or she forwarded all these emails
that she received to Tom Cobb and yourself and
Scott from swaingroup.biz; right?

    A  Well, I haven't studied it enough, Aaron,
to know what it looks like.  If -- if you're
saying that's what's -- you've got more experience
than I do maybe on --

    Q  Oh, no.  I don't know.  I mean, I'm just
saying it -- it's -- it's in your files, and so I
was wondering.  It -- I think she just forwards a
message that she received that contained a whole
bunch of the back and forth, I guess, between the
Dan, Joshua, herself, at the top; right?  She's
just forwarding that information to your group,
whatever it is; right?

    A  I think so.  Yes.

    Q  Okay.  And then at the very top, Kathi
Harness -- no.  I'm sorry.  At the very top, you

1    email Kathi Harness on 3/29/2019.  And you say, "I
2    have read it and like it."  I assume that you are
3    saying that you read and liked something besides
4    the language that you proposed on Page 2.  But
5    tell me if I'm wrong.
6        A  Okay.  Okay.  It says, "I have read it and
7    I like it.  It does have our suggested language
8    included.  I could not see it yesterday using my
9    iPhone only."  So what was your question again?
10   I'm sorry, Aaron.
11       Q  Yeah.  I -- I think if you -- if you read
12   your whole message there, how I interpret that is
13   that you are saying that you have, since your
14   prior discussion, saw a draft of Dave's bill that
15   now includes your suggested language.  Would that
16   be consistent with your understanding of what
17   you're saying?
18       A  That -- that's what I think I'm saying
19   there.  So it -- maybe it -- maybe it was in there
20   for a time.  I -- I don't know.  I -- I can't
21   remember.  But that's what it seems to say.
22       Q  Okay.
23       A  So maybe it did get included and I could
24   stand corrected.
25       Q  And you liked seeing your own language in

1    that proposed bill; right?

2        A  Well, that's what I said.  Yeah.

3        Q  Okay.  Actually, I think this next exhibit

4    might help maybe.  So I've marked what's been

5    marked for identification as Exhibit 16, which is

6    an email from Jim Turntine to Donna Havey, Marla

7    Turntine.  Subject:  New gambling law.  And

8    there's an attachment that seems to be the new

9    proposed Senate Bill 431; right?

10       A  It looks like it.  Yes.

11       Q  And do you know if this version contained

12   the language that we just talked about that you

13   proposed?

14       A  I don't know yet, but I suppose, if we

15   looked through it.  And you may already know, so I

16   don't know yet.

17       Q  If I knew, I would have specifically asked

18   you.  I'm looking too.

19       A  It looks like, on Page 19, some of -- some

20   of the suggested language is in there.

21       Q  Okay.  I mean, I -- I don't -- I don't

22   know, obviously.  But, I mean, as you sit here

23   today, do you think that this is what you saw and

24   you were responding to in that prior email?  And I

25   don't want you to speculate, but I just saw it,

1    saw the dates were similar and wanted to ask you a

2    question.

3        A   I'm -- I'm guessing.  You know, I'm sorry.

4    I mean, I would have to speculate.

5        Q   No.  That's fine.  I don't want you to

6    guess.

7        A   It seems like it could be.  Yeah.  Yeah.

8        Q   Yeah.

9        A   It seems like it could be.  I mean, it

10   makes sense that it would be.

11       Q   Okay.  But you don't know one way or

12   another for certain; right?  Fair?

13       A   Yeah.  I don't -- is there a date on this

14   when it's put -- put out or -- a lot of times

15   there's a date.

16       Q   There isn't actually, which was one of the

17   conundrums that I had.  I can't tie it any more

18   other than the -- the date, I think, of the -- the

19   final that we got was marked, I think, 2019,

20   March, on the 29th.  But there is no -- yeah.

21   There's no time stamp actually on the document.

22   So that's fine.  It's fine.  We can -- we will

23   forever wonder.

24           All right.  I've marked a new document as

25   Exhibit 17 for identification.

1          A  Okay.

2          Q  And this is a email communication, a

3     couple emails between yourself and Donna

4     Harvey [sic].  The top email, Friday, 4/5/2019.

5     Subject line:  Re:  Boards; correct?

6          A  Yes.

7          Q  Okay.  And the bottom email is from Donna

8     Harvey [sic] on April 5th at 2:57 PM.  And she

9     says, "Jim, I been looking through RePlay magazine

10    and didn't see the Torch boards, so I started

11    looking online.  I have found a lot of boards that

12    may be close, but none of them so far.  I have

13    found the feature of letting you know if you will

14    win on your next spin or not.

15         'I asked Michelle [sic] how I can tell if

16    they are the exact same -- the exact boards, and

17    he said, "Hard to tell without matching them up.

18    This is the company that my search OD Torch

19    Electronics kept leading me to, but hard to tell

20    from there."  And, first of all, did I read that

21    correctly?

22         A  I think you did.

23         Q  Okay.  And your instruction to Donna was

24    call them to discuss; correct?

25         A  That's what it says.  Yes.

1      Q  Okay.  Now, is this -- does this email
2   show -- well, let's back up.  I think you
3   previously told me that at some time in or before,
4   I guess, July of 2019, TNT bought its own
5   Banilla-type no chance device; right?
6      A  That is right.
7      Q  Okay.  And I -- am I correct in assuming
8   that this is part of the hunt for a no chance type
9   pre-reveal device that you believed would be the
10  same as a Torch device?
11     A  I think that that is probably what was
12  going on here.  We were trying to find out more
13  about the machine and where they came from, it
14  seems, which I don't remember this part, but I
15  know that they came from Legacy Distributors in
16  South Carolina.  So that -- it's clear to me now.
17  I don't know why then we didn't know.  But,
18  apparently, at that point, we were looking trying
19  to understand and find out where they come from.
20     Q  Okay.  Thank you.  All right.  I've
21  marked --
22        MR. FINNERAN:  Aaron, I know we're only
23  about an hour in, but I could use a break in a few
24  minutes whenever you get to a stopping point.
25        MR. CRAIG:  All right.  Yeah.  Since I

```
 1    just marked this one, can we talk about this and
 2    then we'll take a break?
 3              MR. FINNERAN:  Yeah.  Sure.
 4         Q   (By Mr. Craig)  Okay.  So I've just
 5    revealed and marked Deposition Exhibit 18, which
 6    at the top, for identification, is an email sent
 7    from Tom Cobb to yourself with a cc to a whole
 8    bunch of people on April 17th, 2019; correct?
 9         A   I see that.
10         Q   Okay.  And if we start at the first email
11    chronologically, it would be your email on
12    April 17th, 2019, at 9:59 AM; right?
13         A   I see -- yeah.  I see that.
14         Q   It doesn't say who you wrote that email
15    to.  Do you remember the individuals that you sent
16    that email that follows below to?
17         A   I -- I don't remember, and I don't know
18    why it doesn't show it either.
19         Q   Okay.  You say, "Good morning.  The news
20    is measured and still fluid.  Don't kill this
21    messenger.  Good news is that yesterday, the
22    governor signed the supplemental fiscal year 2019
23    which should mean we can get back to work helping
24    to arrange for meetings and placement of the
25    remaining 100 MPTs of the 375."
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

Okay.  I'll stop there.  I believe, now, I
have a little bit better understanding of what was
being discussed here.  We're talking about your
and your group's efforts now to help place more of
the Diamond Games MPT games in locations in
Missouri; correct?

     A  That is correct.

     Q  And then you say, "And we should finally
get paid for our work through this date."  Get
paid for what work?

     A  We were -- had been in good faith working
with Diamond Games to -- to -- you know, to help
turn the corner and promote the placement of the
MPTs and had been promised that if -- if we were
of value and useful and helpful that -- that we
could enter into an agreement with them to -- to
get -- to get paid, our industry, and -- and the
people that could help place the machines and
service the machines.

         And I don't remember when we did finally
reach an agreement with them or -- or I have to --
I have to look, but we -- we had been in -- for
some time trying to get into a deal with Diamond
Games that we could begin to establish a
relationship and a -- and an opportunity for our

```
 1    industry.
 2       Q  Okay.  And then if you go -- let's skip
 3    ahead because this is a very long email that you
 4    wrote.  Let's go to Page 2.  And I want to start
 5    on the new paragraph that says, "On this same
 6    front."  Do you see that?
 7       A  Let me find -- it is a long email or a
 8    long message, whatever.  I don't see "on the same
 9    front."
10       Q  It's right after a sweepstakes.  Right
11    about the middle of the page.  "On this same
12    front, I'm working with Senator Brown and Schatz."
13       A  I don't see it.  I'm still not seeing it.
14    You said on Page 2.
15       Q  Yes.  Page 2 of 3.  Just what -- there's a
16    paragraph break.
17       A  I found it.  On this same front.  Okay.
18       Q  Yeah.
19       A  So there's a lot above it, so I don't know
20    what the front is.
21       Q  Sure.  And I'm -- I'm going to ask you a
22    question.  And if you need time to read what's
23    above it to get context, that -- that's totally
24    fine with me.  Well, actually, I mean, go ahead.
25    Go ahead and read.  I don't want to --
```

```
1        A  Okay.

2        Q  I don't want you to feel like I'm trapping

3   you here.  Go ahead and read what you need to read

4   there.  Let me know when you're done.

5        A  Okay.

6        Q  Are you still reading, Jim?

7        A  Yeah.

8        Q  Okay.

9        VIDEOGRAPHER:  This is the videographer.

10  Are you wanting to go off the record for this?

11       MR. CRAIG:  Well, I don't know.

12       Q  (By Mr. Craig)  How much longer do you

13  think you need, Jim?

14       A  I'm down to where it says, "on this same

15  front."

16       Q  All right.  Good.  Okay.  So about midway

17  through, on Page 2, you say, "On this same front,

18  I am working with Senator Brown and Schatz to

19  coordinate with five county prosecutors along I-44

20  (Franklin, Crawford, Phelps, Pulaski, Laclede) the

21  state's patrol Division of Drug and Crime Control

22  (DDCC) and the state's attorney general's office

23  to designate a special prosecutor altogether to

24  investigate, confiscate, and prosecute the Torch

25  Electronics business model."  Did I read that
```

1    correctly?

2         A  You did.

3         Q  Okay.  It sounds to me like you, in

4    connection with two then Missouri Senators were

5    leading an offensive aimed specifically to

6    investigate, confiscate, and prosecute the Torch

7    Electronic business model; correct?

8         A  It sounds like that.

9         Q  Well, and, in fact, that is exactly your

10   intention, wasn't it?

11        A  I had hoped we could.  Yes.

12        Q  And you say, "Prosecutor Dave Smith, in

13   Crawford County, has taken the lead in acquiring

14   the support and coordination of these other state

15   and multi-jurisdictional local resources to

16   activate a task force specifically to deal with

17   the proliferation of Torch's business model;

18   correct?

19        A  That's what it says.

20        Q  Okay.  Now, Phelps County is the county

21   that we talked about previously where that

22   prosecutor had told you or at least you had seen

23   where he had been telling other people that he

24   looked at the law and he thought Torch's devices

25   were illegal under Missouri criminal gambling

1  laws; right?

2      A  That is right.

3      Q  And I take it you were never able to

4  convince -- you, along with Senator Brown or

5  Senator Schatz, were never able to convince

6  Pulaski County's prosecuting attorney that you

7  were correct and he was mistaken; correct?

8      A  I don't remember talking to the Pulaski

9  County or Laclede.  I remember talking to Crawford

10  and Franklin.  And that's about all I remember of

11  all of that.

12      Q  Well, as far as you're aware, Phelps

13  County, there was never any charges brought by the

14  Phelps County prosecutor against Torch or related

15  to Torch devices to this day; right?

16      A  Not -- yeah.  Not that I'm aware of.

17      Q  Okay.  How about Pulaski?  Are you aware

18  of any cases filed by the Pulaski County

19  prosecutor against Torch or Torch devices?

20      A  For some reason, I thought there -- I --

21  I -- I'm going to say "no."  I -- I don't think so

22  but --

23      Q  How about --

24      A  -- I don't know.

25      Q  How about Laclede County?  Same answer?

1        A   That is Lebanon.  I don't know.  I -- I --
2   I don't know.
3        Q   Okay.  Did you have any conversations with
4   Prosecutor Dave Smith from Crawford County
5   regarding your plans for this offensive against
6   Torch Electronics?
7        A   I do remember having a conversation with
8   Dave Smith, and I don't know why I
9   characterized -- frankly, I -- I seemed to be
10  pretty excited about things that were going on at
11  that time.  I don't remember why I characterized
12  this activity in the way that I did here.  But,
13  yeah, I do remember having a conversation with
14  Dave Smith.
15       Q   Was Senator Brown and/or Senator Schatz
16  also involved in those communications?
17       A   I don't think so, unless there's emails
18  that they were copied on.  I don't think so.
19       Q   So is it your testimony that neither
20  Senator Brown nor Senator Schatz ever petitioned
21  Prosecutor Dave Smith of Crawford County, you
22  know, on -- on your behalf to look in or
23  investigate, confiscate, or prosecute Torch
24  Electronics as you represented was your intention
25  here?

```
1        A   To my knowledge, no.  I think I probably
2    over spoke or outspoke or misspoke, whatever the
3    right -- I -- I don't know that Senator Brown ever
4    did anything.  I do know that Senator Schatz had
5    followed up with Franklin County's prosecutor,
6    Brendon -- not Brendon.  What's his -- I've
7    forgotten the Franklin County prosecutor's name,
8    but I know that Senator Schatz did have a
9    conversation, because I was there, with the
10   Franklin County prosecutor.  I don't remember if
11   it was -- it wasn't during this time frame.  It
12   was much later in 2019.  So, you know, again, I
13   seemed to have been pretty excited about all the
14   things that were going on at this time and
15   completely misspoke in this section of what I
16   wrote.
17        Q   What do you mean you misspoke?
18        A   Well, I'm saying there was a task force,
19   and I don't think there ever was one.  I -- I
20   might've been thinking we're headed this direction
21   and I -- I -- I over -- I over spoke where we
22   actually were, and I don't think we ever wound up
23   succeeding or achieving anything.  I couldn't even
24   get the Phelps County prosecutor on the phone.  So
25   in the -- in my excitement of -- of trying to
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1    catch up all of my friends on what I thought was a
 2    lot of progress, I flat out misstated some things
 3    here, and I feel bad about that today.  Reading it
 4    right now, I feel a little bit silly because it
 5    dealt with --
 6         Q  What I hear -- I -- I mean, what I hear
 7    you saying is is although these are things that I
 8    wanted and intended to do, I feel silly because
 9    they didn't come to fruition; is that fair?
10         A  I think that -- I think that's a fair -- I
11    had hoped to accomplish some good things for
12    our -- for our side.
13         Q  But you don't deny that it was your
14    intention at this time, in April 2019, to work
15    with Senator Brown and Schatz to coordinate with
16    five county prosecutors along I-44, including
17    Franklin, Crawford, Phelps, Pulaski, and Laclede,
18    the state patrol's Division of Drug and Crime
19    Control, and the state attorney's -- attorney
20    general's office to designate a special -- special
21    prosecutor altogether to investigate, confiscate,
22    and prosecute the Torch Electronics business
23    model; correct?
24         A  That's -- that's -- that's -- that's what
25    I hoped to do.  Yes.
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    Q  I -- had -- had you -- I mean, you

2    mentioned you tried to kind of back off the

3    Senator Brown aspect, but had you -- previously

4    before sending this out, had you actually worked

5    with Senator Brown towards that coordinated goal?

6    A  And -- and the terminology "working with"

7    is probably not right.  I had spoke with him in

8    the capitol, I think, and he seemed to be just as

9    upset about the proliferation of the slot machines

10   as I was and -- and many others in the capitol.

11   And I think that's why I characterized it that

12   way.  I felt like he was going to follow-up.

13        I think that was what was -- we were each

14   going to see if we could get some -- something

15   started with -- with some sort of enforcement, law

16   enforcement.  And I think Senator Brown may

17   have -- and, again, I'm trying to work out of

18   memory, because if I didn't remember even writing

19   this, I can't remember everything that was in --

20   in it or made me write it, but I -- but I think

21   Senator Brown may have indicated he would give the

22   Pulaski County prosecutor a phone call because I

23   think that's where he lives.  And that's the best

24   recollection I can give you of -- of that.

25   Q  Okay.  And I think you would agree with me

```
 1    that, in fact, you and Senator Schatz did work
 2    together to coordinate with at least one of these
 3    five county prosecutors to specifically
 4    investigate, confiscate, and prosecute the Torch
 5    business model, that prosecutor being the Franklin
 6    County prosecutor; correct?
 7        A  We did go visit the Franklin County
 8    prosecutor.  I've -- I've said that multiple
 9    times.  And asked if he would prosecute, if he has
10    a probable cause statement from the state patrol
11    investigators who investigate all of the crimes
12    that are reported to the Missouri Gaming
13    Commission.
14        Q  Right.  You and Senator Schatz; right?
15        A  We both visited that county prosecutor.
16    Yes.
17        Q  And then -- and I think when we talked on
18    the 19th of October, you said that it was after
19    that meeting that the Franklin County prosecutor
20    did go ahead and pursue criminal charges against
21    James McNutt for alleged possession of illegal
22    Torch devices?
23        A  Some -- some time later.  Yes.
24        Q  Okay.  All right.  We're done with that
25    exhibit.
```

```
 1          MR. CRAIG:  And let's take a break.

 2          How long do you need, Rich?

 3          MR. FINNERAN:  If I could get ten minutes,

 4    that would be great, Aaron.

 5          MR. CRAIG:  Ten sounds good.  All right.

 6    We'll see everybody in ten.

 7          VIDEOGRAPHER:  This is the videographer.

 8    We're going off the record.  The time is 3:24 PM.

 9          (Off the record 3:24 to 3:37.)

10          MR. CRAIG:  All right.  We're back on the

11    record after that break.

12      Q  (By Mr. Craig)  Okay.  I'll show you

13    another document.  It's going to be marked as

14    Exhibit 19 for identification with a sticker.

15    Okay.  So identi-- Exhibit 19.  Start over.

16          So you have in front of you what's been

17    marked as Exhibit 19 for identification which

18    starts with an email at the top from Kathi Harness

19    to Tom Cobb, yourself, Ron Kinney, and then cc's a

20    number of other people; correct?

21      A  Yes.

22      Q  And this is dated 4/18/2019; correct?

23      A  Yep.

24      Q  Okay.  And if we scroll down to Page 4 --

25    nope.  I'm sorry.  Page 3.  I believe you'll see
```

504

```
 1    the same email that we just spoke about on your

 2    April 17th, 2019, email.  Do you see that?

 3        A  Yes.  It looks like the same content.

 4        Q  Okay.  And then that gets forwarded in a

 5    new and slightly different chain.  And if we go

 6    to -- well, the -- the next line up, you've got

 7    Tom Cobb responding to your email and copying

 8    the -- the rest of the members of the group and

 9    saying, "Jim's assessment of our current situation

10    is correct and detailed.  Not exactly where we

11    expected to be.  Also not what we promised -- I'm

12    sorry.  Also not what we were promised to be last

13    week, but that is Jeff City and who we have to

14    deal with.  It seems like we've been on an

15    emotional roller coaster for almost two years.

16    One step forward and two steps back."

17            So anyway, he's responding to your -- your

18    email.  And then you respond to that email, on

19    April 18th, 2019, at 9:04 AM.  And you write, "The

20    news is not good.  I'm sorry.  Yesterday, Senator

21    Lincoln Hough, Vice Chair of the Senate

22    Appropriations Committee, failed to accomplish his

23    promise of getting our desired language in the

24    2020 budget."  Can you tell me what language

25    you're talking about there in the 2020 budget?
```

```
 1    Was that language for the Diamond Game devices

 2    we've been talking about or something else?

 3         A  No.  It's Linc- -- it's -- Lincoln Hough

 4    is a Senator.  It's -- it's Lincoln Hough.  And

 5    the language, I don't -- I don't remember exactly

 6    what the language was.  But what I can tell you,

 7    Aaron, is that the -- the pull tab program by --

 8    well, a few years earlier had become a line item

 9    issue in the budget so that it was controlled by

10    the legislature, af- -- essentially, after our

11    memberships having complained the solution to

12    getting the legislature kind of in control of what

13    was going on with the lottery and this -- this

14    pilot project, that it -- that it made us fearful

15    of being in competition with it, was to make it a

16    line item issue in the budget to pay Diamond

17    Games.

18         And so the budget language had to be

19    adjusted every year in order to deploy any more

20    than a certain number, whatever the previous

21    year's number was or whatever the number has been.

22    And I think we were hoping to get 500 machines

23    approved and -- and they knew what they made.  So

24    they would actually create a number in the budget

25    that would cover that number of machines.
```

1          And so as I recall and as I think I'm

        2     seeing here a little bit, that we have been told

        3     that they were going to allow 500 of these pull

        4     tab machines, but it wound up being 375.  I think

        5     that's what happened that year.

        6          And, of course, our effort was a still

        7     trying to show value and help Diamond Games and

        8     the lottery and do good things so that we could

        9     show value for us in our industry to be able to

       10     become a working subcontractor to Diamond Games,

       11     the contractor to the lottery.  Does that make

       12     sense?

       13          Q  Yeah.  It does.

       14          A  Okay.

       15          Q  Thank you.

       16          A  You're welcome.

       17          Q  I'm marking Deposition Exhibit 20 for

       18     identification.  Let me know when you can see it.

       19          A  I see it.

       20          Q  Okay.  And at the top of Exhibit 20, we've

       21     got an email from Kathi Harn- -- I'm sorry.  We've

       22     got an email from yourself, Jim Turntine, to Kathi

       23     Harness, Emily Carroll, Tom Cobb, Tom Newman, with

       24     cc's to Scott Swain and Casey Wasser; correct?

       25          A  Yep.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    Q  And that's dated June 3rd, 2019; correct?

2    A  Yes.

3    Q  And then if you look down, one, two -- two

4    down, there's another email from you to the same

5    group of people, dated the same day, but just a

6    bit earlier.  Do you see that one?

7    A  I think I see the one you're talking

8    about.

9    Q  And there you say, "I need some help as I

10   am continuing to work strategies to kill the black

11   market.  Can someone remember the number down that

12   the lottery is and we attribute to Torch

13   Electronics and black market gaming?"  Do you see

14   that?

15   A  I do.

16   Q  Okay.  What strategies to kill the black

17   market are you talking about there?

18   A  I don't remember exactly what, but I

19   remember that that was during that summer of 2019,

20   there was a special House subcommittee put

21   together because, as I mentioned in my long

22   extrapolated email in the last exhibit, that --

23   Q  Just -- I'm -- I'm sorry.  I don't want to

24   cut you off again.  But I asked you a question,

25   and you said, "I don't remember" to answer my

```
 1    question.
 2         A   I -- I don't remember what that strategy
 3    was.  No.
 4         Q   Okay.  All right.  That's good.  I mean --
 5         A   Okay.
 6         Q   -- it's not good that you don't remember.
 7    I'm just saying that's a sufficient answer to the
 8    question that I asked.
 9         A   Fair enough.
10         Q   Okay.  Okay.  I've marked a new exhibit --
11    a new document as Exhibit 21 for identification.
12    Let me know when you see that document.
13         A   I see it.
14         Q   Okay.  So this is an email from yourself
15    to Kathi Harness and a number of other people sent
16    Thursday, June 20th, 2019; correct?
17         A   I see that.  Yes.
18         Q   Subject line:  Re:  House interim
19    committee on gaming named; right?
20         A   Yes.
21         Q   And then if you look at the second
22    paragraph, you write to the group, "As an update
23    on another note, one of the things I have been
24    doing to help make something happen on the black
25    market gaming crisis is to have my attorneys
```

1    investigate if I can sue Torch Electronics for
2    tortious interference in some of my locations
3    where they have placed illegal games because I
4    can't provide same.  They've informed me that I
5    can and that during the discovery process, we will
6    demand a machine be submitted to the Missouri
7    Gaming Commission for them to determine if the
8    machines are illegal or not.  We already know they
9    are not and well remember them telling us, quote,
10   if it looks like a duck, quacks like a duck, it's
11   a duck, exclamation mark, end quote."  Did I read
12   that correctly?
13       A  You did.
14       Q  Okay.  So you're telling everybody, I
15   guess, what you told your attorneys and then also
16   what your attorneys told you in this section?
17       A  I'm -- I'm sorry.  Now, let's -- are you
18   talking about that last sentence how I was
19   referring to what the attorneys told me?
20       Q  No.  I'm saying within this, you're saying
21   that I have asked my attorneys to investigate if I
22   can sue Torch for tortious interference at some of
23   my locations.  So you're telling the group what
24   you have asked your attorney, as far as a legal
25   opinion, about whether or not you have claims --

1    potential claims for tortious interference you
2    could file in some of your locations; right?
3        A  That is correct.  Yes.
4        Q  Okay.  And then -- then you go on to tell
5    the group what it is that your attorneys said in
6    response to that request for legal advice by
7    saying, "They've informed me that I can and that
8    during the discovery process, we will demand a
9    machine be submitted to the Missouri Gaming
10   Commission for them to determine if the machines
11   are illegal or not"; correct?
12       A  That is what it says.  Yes.
13       Q  All right.  I -- we'll just -- hold on.
14   The next paragraph, you say, "This civil action
15   could seriously speed up the process of getting
16   that legal determination made"; right?
17       A  Correct.
18       Q  Okay.  So you're looking for new creative,
19   I would say, law fair ways to potentially get the
20   gaming commission to somehow intervene on your
21   behalf to make a determination about Torch's
22   devices; fair?
23           MR. FINNERAN:  Objection.  Argumentative.
24           You may answer.
25       A  It's fair for you to say that.

1      Q   (By Mr. Craig)  Okay.  So we agree that
2    that's a fair statement for me to say?
3         MR. FINNERAN:  Same objection.
4      A   It's fair for you to say that.  If you're
5    saying that I'm -- you used the term "law fair,"
6    which I think is a play on the word warfare or
7    something.  I don't know what you're intimating
8    there.  I'm -- I'm working on strategies to get
9    the law enforced to solve the problem of the
10   illegal gambling machines.  That's what it says to
11   me.  That's what I would say.
12     Q   You're working on ways to potentially file
13   your own lawsuit, but not just that, get the
14   Missouri Gaming Commission to come in and
15   intervene in some manner to do the thing that you
16   want, which is, hopefully, declare Torch devices
17   illegal; right?
18     A   I think so.  Yes.
19     Q   Okay.  And this is June 20th of 2019;
20   right?
21     A   Yes.  Yes.
22     Q   Okay.  You go on to say, "The first
23   question about this strategy from my attorneys."
24   So you're telling this group, again, what it was
25   that your attorneys informed you about this

```
 1    strategy; right?

 2        A  I think so.  Yeah.

 3        Q  And you go on to say -- so I'll -- I'll

 4    just repeat it.  "The first question about this

 5    strategy from my attorneys is will the gaming

 6    commission have to be forced to get involved when

 7    we submit to them that they will be receiving a

 8    gaming device to make said determination or will

 9    they gladly get involved in this civil matter?"

10    Did I read that correctly?

11        A  You did.

12        Q  So, what, your attorneys ask you your

13    opinion about whether the gaming commission would

14    be forced to get involved or whether they would

15    gladly get involved in this civil matter you might

16    file against Torch?

17        A  I think that's what it says that there was

18    a question or a concern that the gaming commission

19    would help or not willingly.

20        Q  Okay.  And then you tell the group what it

21    was that you responded to your attorney.  And you

22    say here, "I said I would ask Senator Schatz to

23    inquire, which he is doing that now."  That's what

24    you said; right?

25        A  That's what it says.  Yes.
```

513

1    Q  Okay.  So, again, you're telling this
2    group what it was that your lawyers asked you
3    questions about the strategy and then what it was
4    that you told your lawyers about the strategy;
5    correct?
6    A  I'm sorry.  Say that again.  I -- I was
7    distracted.
8    Q  I'll withdraw the question.
9    A  Okay.  Sorry.
10   Q  Well, no.  That's fine.  You continued to
11   say "he contacted," and I am assuming now that
12   when you say "he," you meant Senator Schatz; is
13   that correct?
14   A  I believe I did.
15   Q  Okay.  "So Senator Schatz contacted the
16   Senate's legal council to start the process and
17   said he thinks the lottery ought to file their own
18   civil case so I do not have to."  Did I read that
19   correctly?
20   A  You did.
21   Q  Okay.  Well, I'm -- I -- okay.  So do you
22   think he meant Senator Schatz or do you think he
23   meant your attorney?
24   A  He meant Senator Schatz.
25   Q  Okay.  And then when you say, again, "and

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
 1    said he thinks the lottery ought to file their own
 2    case," the "he" there is who?
 3         A  The "he" is -- is Senator Schatz.
 4         Q  Okay.  And then you say -- I think your
 5    last paragraph or -- or your last sentence is,
 6    "And look into what might have to be done to get
 7    the gaming commission to evaluate the device that
 8    we intend to get Torch Electronics to turn over to
 9    the gaming commission via my proposed civil suit."
10    Do you see that?
11         A  I do.
12         Q  Okay.  After this, you did file a lawsuit
13    against Torch in state court; correct?
14         A  I believe we did.  Yes.
15         Q  Okay.  And that case was pending for, I
16    don't know, a little over two years; fair?
17         A  I don't remember the amount of time
18    exactly.  I'm -- I'm sorry.  But it -- it -- it --
19    it -- it took quite a while.
20         Q  Okay.  And you would agree with me that at
21    no time, however long that litigation was or
22    discovery went on, did you ever succeed in
23    requesting or getting a Torch device for
24    inspection by either yourself or the gaming
25    commission; true?
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    A  No.  No, we did not.

    2    Q  So it is true that during that time that

    3  your Missouri state court case was pending against

    4  TNT that you did not, through discovery, ever get

    5  an inspection of a Missouri -- of a Torch device;

    6  correct?

    7    A  Not -- I did not.  No.

    8    Q  And your lawyers didn't on your or TNT's

    9  behalf; correct?

   10    A  Not related to our tortious interference

   11  case at all.  No.

   12    Q  And that tortious interference case,

   13  that -- that is the same case that was dismissed

   14  the day before this case, in the Eastern District

   15  case, was filed on March 15th of this year;

   16  correct?

   17    A  I believe it was.

   18    Q  Yeah.  So and -- and then in -- in this

   19  case, I deposed Stacy Friedman just the other day,

   20  and he told me that he was retained on March 2nd,

   21  I believe.  It was the 1st or 2nd of 2023.  Does

   22  that sound about right to you?

   23    A  It could be.

   24    Q  Okay.  And he also told me, I think

   25  consistent with what you told me the first time

                     PohlmanUSA Court Reporting
                (877) 421-0099   www.PohlmanUSA.com

1   that we spoke on October 19th, that shortly after
2   you retained him in March, that you sent him a
3   device that TNT had independently purchased
4   through a distributor that you believed was the
5   same Banilla device that Torch operated in
6   Missouri; correct?
7        A  Certainly similar to, but it was the -- it
8   was the machine that a distributor told me was
9   what Torch had been purchasing, and we had
10  purchased it originally for the -- you'll -- you
11  might remember.  It was about this time in 2019
12  when the VFW, Nathan Howard, who has a bingo --
13       Q  But we'll --
14       A  -- machine --
15       Q  We'll -- yeah.  We'll get to that.
16       A  -- machine --
17       Q  We will -- yeah.  We will get to that.
18  But for now --
19       A  -- which is -- it's the same machine is
20  what I'm trying to say, Aaron.
21       Q  Okay.  Yeah.  So, yeah.
22       A  The same machine that we bought for the
23  VFW in Saint James and submitted to the gaming
24  commission is the same machine that I eventually
25  sent to Mr. -- Stacy Friedman is the last name, I

1     think it is.

 2          Q  Right.

 3          A  Well, so, yeah, to that degree.  And --

 4     and it was a Banilla machine.  Is that what you're

 5     asking me?

 6          Q  Yes.  Yes.  Okay.  I want to mark your

 7     prior testimony on October 19th as Exhibit 22 for

 8     identification.  Could you open that up for me?

 9          A  It's not here yet.

10          Q  It will actually be document one because

11     it was the first one that I revealed.

12          A  Oh, okay.

13          Q  Give me a second.  It's real long.

14          A  Sure.  Yeah.  It is.

15          Q  Okay.  One downfall of Agile Law is

16     there's no ability to search within it.  Give me

17     one second.  Apologies, but I'm fighting with

18     technology.  Bear with me.

19          Okay.  So if you would, turn to Page 147.

20     And because it's long, you can -- you can click

21     where it says, you know, 1/369.  You can click

22     that and just type in 147, and it'll take you

23     right to the page.

24          A  I'm there.

25          Q  Okay.  And, I guess, just for context, if

```
 1    you'd go one page up and you look kind of towards
 2    the bottom of Page 144, where you start and you
 3    say, "And ultimately, I offered to buy a machine."
 4    Do you see that?
 5         A   Which page?
 6         Q   144.
 7         A   Okay.  144.
 8         Q   Last par- -- last full paragraph on 144.
 9         A   Okay.
10         Q   "And ultimately."
11         A   I see it.
12         Q   Okay.  So I'll just represent to you this
13    was, you know, when we were talking about how that
14    July 2019 meeting with the MGC came up -- came
15    about, and you told me, "And ultimately, I offered
16    to buy a machine for them to approve, for them to
17    test, for them to interact with because they
18    didn't have one or have access to one at that
19    point."  Do you see that?
20         A   I do.
21         Q   Okay.  And then you confirm that you did,
22    in fact, buy one of those Banilla games from -- I
23    think it was Ed Chermark [sic] from Legacy Coin?
24         A   Ed Chermak, Legacy Coin.  Yes.
25         Q   And then if you go to the bottom of
```

1    Page 145, you say, "But I knew they were the same

2    machine"; right?  Yeah.  You told me then you knew

3    the machine that you bought, at least in your

4    opinion, was the same machine that Torch had;

5    correct?

6        A  From what I knew, it was the same brand --

7            MR. FINNERAN:  Hold on.

8        A  -- and the same --

9            MR. FINNERAN:  Hold on.  Hold on.

10           THE WITNESS:  I'm sorry.

11           MR. FINNERAN:  Sorry.  Objection.

12   Misstates the testimony.

13           You may answer the question.

14       A  Yeah.  I -- I think it says what it says.

15   I knew it was the same machine that had been being

16   sold to -- I think that's what it says above.  We

17   were talking about Torch's machines, the same

18   brand.  And that's -- that's all I knew at that

19   point.  It was the same brand.  I know there's,

20   apparently, different versions, but it was

21   definitely the same brand.

22       Q  (By Mr. Craig)  Okay.  Well, I'm just --

23   you've told me that at least -- in 20- -- I'm

24   sorry.  In -- October 19, 2023, when we talked

25   last time, you said, "But I knew they were the

1     same machines."  That was your testimony then;
2     wasn't it?
3          A  Yes, what it says.  Yes, sir.
4          Q  Okay.
5          A  Mm-hmm.
6          Q  All right.  So I don't know if you're
7     aware, but in this case, are -- are you aware that
8     expert disclosures were due on November 6th in
9     this case?
10         A  I'm not aware of all of the particular
11    details of the, you know, schedule, but I -- I
12    know there are deadlines on several of these
13    things.
14         Q  Okay.  So we've established that sometime
15    close to, say, let's say the end of March 2019,
16    you sent Stacy Friedman a Banilla device that you
17    told me on October 19th of this year you believe
18    were the same machine as Torch had in Missouri;
19    right?
20         A  That is what -- that's what I said.  Yes.
21         Q  And I assume that your intention, when you
22    did that, was to have your expert, Stacy Friedman,
23    who has a Harvard undergraduate degree in
24    mathematic -- or in computer science what you
25    intended in your mind was to have him look at that

```
 1    device and do an investigation of that device,

 2    testing and analysis, and then put that into his

 3    expert report; is that fair?

 4        A  I believe that's fair.  Yes.

 5        Q  Do you know that that did not happen

 6    before November 6th and that, in fact, Stacy

 7    Friedman told me on Wednesday that he never did

 8    any sort of device inspection of that Banilla

 9    device that you sent him back sometime close to

10    the end of March 3rd?

11        A  This is --

12           MR. FINNERAN:  Objection.  Misstates the

13    evidence.

14           You may answer, if you know.

15        A  This -- I do not know that.  This is the

16    first I've heard of -- of that possibility.

17        Q  (By Mr. Craig)  Okay.  All right.  I'm

18    marking a new devi- -- a new document.  It's going

19    to be identified as Exhibit 23 for identification.

20    Do you see that document?

21        A  Do you -- you're saying document number

22    20?

23        Q  Yeah.  It would be document number 20 in

24    the -- in the line, and it is marked as

25    Exhibit 23.
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1      A   Yes.  I have that.

2      Q   Okay.  And at the top, we see an email

3   from yourself, sent Monday, 6/24/2019, to Dave

4   Smith at prosecutors.mo.gov.  Do you see that?

5      A   I see that.

6      Q   In this -- well, first of all, who -- can

7   you remind me again who Dave Smith is, what county

8   he's a prosecutor in?

9      A   He was and I believe still is the

10  prosecutor in Crawford County, Missouri, the

11  county that I reside in.

12     Q   If you look -- well, in your opening, you

13  say, "Hello, David.  I hope all is well with you.

14  Last week I became aware of the attached letter

15  from 2017.  I thought you might find this

16  interesting and perhaps helpful as well.  The

17  e-raffle machines mentioned in this letter are

18  just one more, quote, gimmick, end quote, that

19  out-of-state companies have tried to use to

20  distribute black market gaming in Missouri."  And

21  then you go on to explain some other things about

22  this letter that you attached.

23          And then if we continue down, this is the

24  part I wanted to ask you about.  You say,

25  "Notably, this letter has shown me yet another

1     path to help fight the black market gaming
2     machines of Torch Electronics here in Crawford
3     County and possibly to help you and other
4     prosecutors here in Missouri.  My attorney, Elkin
5     Kistner, is working with me to potentially file a
6     tortious interference case against Torch
7     Electronics in locations where I have reasonable
8     business expectancies and/or where a contract that
9     has been infringed upon due to the placement of
10    Torch Electronic machines in my customer locations
11    across Mid-Missouri."  Did I read that correctly
12    so far?
13         A  I believe you did.
14         Q  Okay.  And then you continue, "Our feeling
15    is this suit could be expanded to include others,
16    perhaps, even the Missouri Lottery, and that,
17    through discovery, we can determine the machine's
18    legality be evaluated by the gaming commission."
19    Did I read that correctly?
20         A  No.  You misspoke.  The word "determine"
21    was -- actually says "demand."
22         Q  Oh.  Okay.  Good correction.  So that
23    sentence should read, "And that through discovery,
24    we can demand the machines legality be evaluated
25    by the gaming commission."  Did I read that

```
 1    sentence correctly?

 2        A  You did.

 3        Q  So had you -- I mean, at that point, had

 4    you solicited other people, such as the Missouri

 5    gaming -- the -- sorry -- the Missouri Lottery to

 6    perhaps join a litigation against Torch

 7    Electronics?

 8        A  I don't think so.  I think this was

 9    working off the same theory in perhaps the comment

10    that Senator Schatz had made to me that maybe the

11    lottery ought to be the one suing them, instead of

12    you, because the lottery was losing money to

13    Torch's activities.  That was all playing out

14    through that special committee House subcommittee

15    that was put together and having meetings talking

16    about the impact of Torch at that time.

17        Q  And you go on to say, "To speed that up

18    even more, this letter has given me the idea to

19    obtain a machine exactly like those Torch is

20    placing in my customer locations, then work with a

21    licensed bingo location to submit that machine to

22    the gaming commission for a definitive

23    determination of its legality much quicker yet."

24    Did I read that correctly?

25        A  You did.
```

525

1    Q  Is this when you were first hatching the
2    plan to work with Nate -- Nathan Howard to involve
3    Nathan Howard in this process of trying to get the
4    Missouri Gaming Commission to come to your house
5    and review a independently sourced TNT Banilla no
6    chance game?
7    A  This was June 24th, 2019.  And a week
8    later, I believe, is when the machine arrived that
9    Nathan -- I think Nathan Howard was already doing
10   what I described there.  I just didn't want to
11   name Nathan Howard but wanted to make my local
12   prosecutor aware of what was happening.  And so
13   I -- I don't think it's a fair characteteration --
14   characterization to say was this when I thought of
15   it.  I, apparently, already thought of it and
16   already was -- had worked -- maybe ordered to buy
17   the machine and get it here for the gaming
18   commission to test the machine to see if it could,
19   in fact, be put into a bingo facility.  Does that
20   make sense?
21   Q  It does.  But you would agree, when we
22   talked about how that July meeting with the
23   Missouri Gaming Commission came about in October,
24   on October 19th, the last time we spoke, the story
25   that I heard is slightly different.

1          What I heard was that you said you had a
2     customer, Nathan Howard, who came to you and said,
3     "I'm -- I -- I would like to maybe place these
4     devices in my VFW Hall.  Would you, TNT, please
5     supply them?"  And your response was is "Hold up.
6     I'm not sure that I think they're legal, but I'll
7     tell you what.  Let's get the gaming commission to
8     maybe come look at this device that I will buy,
9     and, hopefully, they will approve it."  Do you
10    remember telling me that?
11         A  Not that.  Not at all.  I didn't
12    characterize it that way or describe it that way,
13    I don't think.
14         Q  Well -- all right.  Let's go to Page 144
15    of Exhibit 22 which is a copy of your prior
16    deposition testimony.
17         A  Okay.
18         Q  All right.  If you look at Line 2, I
19    asked, "Does TNT own any no chance devices?"  Your
20    response, "I'm -- I don't know that.  Are you
21    talking about Torch devices?  Slot machines like
22    Torch has?"  My question --
23         A  Aaron, hold on.  I -- I'm not on the --
24         MR. FINNERAN:  Hold on.  Yeah.  That's not
25    on 144, I don't think.

1          THE WITNESS:  No.

           2          MR. FINNERAN:  Aaron, what page did you

           3    say?

           4          MR. CRAIG:  Sorry.  143, if I misspoke.

           5          MR. FINNERAN:  Okay.

           6       A  Okay.  I'm on 143.

           7       Q  (By Mr. Craig)  Okay.  So 143, in

           8    Exhibit 22, which is your prior deposition

           9    testimony, on October 19th, 2023.  Starting at

          10    Line 2, you -- I asked you, "Does TNT own any no

          11    chance devices?"  Your response was, "I'm -- I

          12    don't know what -- are you talking about Torch

          13    devices, like slot machine, like Torch's --" I'm

          14    sorry.  Sheez.  I'm going to start this all over.

          15          So if we look at Exhibit 22, which is a

          16    copy of your transcript from October 19th, 2023 --

          17       A  Yes.

          18       Q  -- starting on Page 143 at Line 2, I asked

          19    you, "Does TNT own any no chance devices?"  Your

          20    response was, "I'm -- I don't know what -- are you

          21    talking about Torch devices, slot machines, like

          22    Torch has?"  My question, "I'm talking devices

          23    similar maybe to what Torch has."  Your response,

          24    "Absolutely not."  My question, "You don't -- you

          25    don't own any games manufactured by Manilla [sic]

                        PohlmanUSA Court Reporting
                 (877) 421-0099   www.PohlmanUSA.com

```
 1    that would be classified as no chance devices?"
 2    Your response, "Oh, I'm glad you asked that way.
 3    We purchased -- yes.  Well, sort of.  In the
 4    spring of 2019, we had a VFW Commander, Nathan
 5    Howard, Saint James, Missouri, who had became
 6    aware of the Torch devices in a gas station about
 7    a mile from his VFW post.
 8           'And subsequent to him becoming aware of
 9    those, he asked us to supply those machines to his
10    VFW because we had a jukebox and pool table or
11    darts or whatever we had in there at the time.  He
12    knew that that was our field of expertise.  I told
13    him that we did not have those machines.
14           'And by that point, I had become aware of
15    what Torch machines were from other locations
16    where the Torch machines had been placed.  And I
17    was also aware that the VFW had, in Saint James,
18    Missouri, a bingo license, and I knew that the
19    bingo license made him subject to the Missouri
20    Gaming Commission.
21           'And so when my staff told me -- and by
22    staff, I mean, Donna Havey told me -- that Nathan
23    Howard, the commander, was asking for those
24    machines, I instructed her to tell him that he
25    needed to check with the Missouri Gaming
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    Association -- Missouri Gaming Commission --
2    Missouri Gaming Commission to find out if he could
3    have those machines with his bingo license.
4         'And I went so far -- that continued --
5    that process took a week or two to get the
6    information back and forth.  And I -- we told him
7    that if -- if they approve it, then we would buy
8    machines.  And, ultimately, I offered to buy a
9    machine for them to approve -- to approve."  Did I
10   read everything to that point correctly?
11        A  I think you did.  Yeah.
12        Q  All right.  "Now, I originally said that
13   when I first heard how this meeting came about, it
14   was my understanding, based on what you told me,
15   that this came about because Nathan Howard of the
16   VFW had informed Donna Havey that he was
17   interested in having TNT supply the games for his
18   VFW."  And that does appear to check out based on
19   what we just read from your testimony on
20   October 19th; correct?
21        A  Mm-hmm.  Yeah.
22        Q  Is that a "yes"?
23        A  Yeah.
24        Q  Okay.  And would you disagree with me when
25   I say that we've looked at some documents earlier

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

today that far pre-date the -- what you say, "The
        process took a week or two to get the information
        back and forth."  We looked at documents earlier
        where Nathan Howard was saying, in January of
        2019, that he believed the Torch devices were so
        illegal that he was filing complaints with the
        Missouri Gaming Commission about this location,
        this gas station, up the road; right?
        A  Yes.
        Q  Okay.  So am I to believe that Nathan
        Howard, sometime after that, then came to you and
        said, "Hey, I would like to see if you could
        supply me these devices."  And you, thereafter
        said, "You know what?  I will go so far as to buy
        a machine for the purpose of getting the Missouri
        Gaming Commission to approve it.  And if they
        approve it, I will sell them to you."  Do you want
        me to believe that?
        A  You -- you shouldn't believe that.  I --
        I -- I -- it's not true.  I didn't sell --
        Q  Oh, I agree.
        A  I don't sell machines to people, Aaron,
        first off.  And -- and, secondly, there was about
        six months in between there, almost seven months.
        And the man was frustrated in January, if -- if --

1     okay.  I'm not sure -- are you wanting me to

2     answer or --

3         Q  Yeah.  No.  I'm listening.  Sorry.  I had

4     to --

5         A  Okay.

6         Q  -- crack my back.

7         A  Well, I'm not sure what the question is

8     now that I'm trying to answer.

9         Q  I think you've actually already answered

10    my question.  So --

11        A  Well, good.  Then -- then we're good.

12        Q  Would you disagree today, as you sit here,

13    with your statement on October 19th, that,

14    "Ultimately, I offered to buy a machine --" we're

15    talking about the Banilla device that you say you

16    believed was the same as the Torch device -- "for

17    them," meaning the Missouri Gaming Commission, "to

18    approve"?  Would you agree that that was actually

19    your intention in setting this meeting up with the

20    Missouri Gaming Commission?

21        A  I'm not sure what your question is.

22    You're -- you're asking what it -- can you say it

23    again because I don't understand what you're

24    asking.

25        Q  Yeah.  I mean, we just read -- we just

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    read another email where you said that you had an
2    epiphany that you could set up a situation where
3    Nathan Howard, via the VFW, essentially, would
4    force the Missouri Gaming Commission to make a
5    determination that Torch's devices were illegal.
6           But when you told me what the purpose for
7    that meeting was on October 19th, you said, quote,
8    "And, ultimately, I offered to buy a machine for
9    them to approve"; didn't you?
10       A  That is what I said, and that is what we
11   did.  Had they --
12       Q  You wanted them to not approve the games.
13   That's --
14       A  I wanted clari- -- I wanted clarifica- --
15   I'm sorry.  I don't want to speak over you.  I
16   wanted clarification.  If the Missouri Gaming
17   Commission was going to approve the machines, that
18   we would have clarification, and that's what
19   Mr. Howard wanted.  By that time, the machines had
20   not left Phelps County, the gas station up the
21   road.  And he's, like, "I've got to do something,
22   and I would like to go ahead and try the
23   machines."  And we said, "Well, we don't believe
24   they're legal."  I think that's what I said.  I
25   think that's -- that's how I've always said it.

1     But if the Missouri Gaming Commission approves it

2     for your bingo facility, then I'll buy machines

3     and put 'em in there.  And so both can be true.

4     Both can be true that we were trying to serve our

5     customer, that he was concerned they were illegal

6     and believed they were illegal but also by six or

7     seven months later felt I need to do something for

8     my business because I can't compete without them.

9     So all of those things in context can be true,

10    sir.

11         Q  Okay.  So you want me to believe that in

12    those months, despite Nathan Howard being the guy

13    who you said you were trying to learn from to

14    watch complaints with the Missouri Gaming

15    Commission about how illegal these Torch devices

16    were, it's your testimony that in those months

17    that preceded, Nathan Howard had a change of heart

18    to the extent that he said, "Despite me believing

19    these games are illegal, to the extent I wanted to

20    lodge all kinds of complaints about them to the

21    Missouri Gaming Commission, I would really like

22    you to buy these games so that I can put these

23    illegal games in my VFW?"

24         MR. FINNERAN:  Objection.  Calls for

25    speculation as to Mr. Howard's mindset.

```
 1          You can answer what you know, Jim.
 2     A   Well, that's exactly what I was thinking.
 3   But my recollection is, yes, and I'm sorry you
 4   don't believe it, if you don't.  But part of what
 5   I can say is we don't have that customer anymore,
 6   and he has sweepstakes machines in there now.  So
 7   it adds up.
 8     Q   Okay.  Well -- all right.  Let's look at
 9   what's been marked as document Exhibit 21.  I'm
10   sorry.  Exhibit 24 for identification.  Let me
11   know when you see that.  This would be document 21
12   in your stack marked for identification as
13   Exhibit 24.
14     A   I see it.
15     Q   Okay.  So this is an email at the top from
16   Daniel Kleinsorge to yourself 7/21/2019; correct?
17     A   Yes.
18     Q   Okay.  And who's Dan again?
19     A   Dan is Senator -- was Senator Schatz's
20   administrative assistant.
21     Q   Okay.  And right below that, there is
22   another -- I'm sorry.  The top -- I may have
23   misspoke.  But this -- the top email is an email
24   from you to Dan; right?
25     A   Yes.
```

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

Q   Okay.  And then on the bottom email below

that, you got an email from Daniel on the same

day, and he gave you an address for a VFW machine

on the gray machines -- I'm sorry.  I just --

well, is there any information -- I -- I can't

tell.  That's not his signature block; right?  So

is -- did he send you the information about

Dave M. Gorth- -- Gor- -- Gorthaus [sic]?

         A   David M. Grothaus was the director of the

Missouri Gaming Commission at that time in July of

2019.  For whatever reason, it looks to me --

you're asking me what I see.  Daniel Kleinsorge

sent me the address for the VFW machine on gray

games, gray machines.  And he included David

Grothaus the director's contact information along

with the address for their office in Jefferson

City.

         Q   Okay.  And then so he was giving you the

Missouri Gaming Commission's contact so that you

could touch base or Nathan Howard could touch base

about this idea to have whatever game that you

purchased reviewed by the Missouri Gaming

Commission?

         A   I don't really know, to tell you the

truth, what -- what -- this is a little odd,

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    because by July 1st -- I think the machine arrived
        2    on July 1st of 2019, at my office, not my home, as
        3    you said earlier, but at my office --
        4        Q  Gotcha.
        5        A  -- where I am today.  So I -- I don't
        6    really know why that was sent to me.  It could've
        7    been some misunderstanding or something.  Maybe
        8    Senator Schatz asked him to find out, you know,
        9    where the machine was or what was happening.  I --
       10    I don't know.  I don't remember.  I don't know
       11    what this is about.
       12        Q  I think the meeting with the MGC was the
       13    next day on the 2nd of July 2019; is that correct?
       14        A  I don't remember.  But if -- if you say
       15    so, you -- you may have something that shows that.
       16    Off the top of my head, I -- I know it was around
       17    the first of the month when the game got here
       18    and -- and the inspection happened.  So I -- I
       19    mean, I'm just -- I really don't know what is
       20    happening in this particular email, other than me
       21    answering and telling Daniel that I'm working with
       22    Nathan Howard and the VFW in Saint James, but I --
       23    I don't know.  I don't know what the rest of it's
       24    about.  Sorry.  But --
       25        Q  Oh, no.  That's fine.  All right.  Now,

1  going to another document that's been marked as
2  Deposition Exhibit 25 for identification.  Let me
3  know when you see it.
4      A  I have it.
5      Q  And this is an email from you to Donna
6  Havey that is dated July 1st, 2019, with the
7  subject of "letter from VFW needed."  Do you see
8  that?
9      A  I do.
10     Q  Okay.  And your email from you to Donna
11 starts with "Nathan."  "Nathan, please call David
12 Grothaus, Director of Missouri Gaming Commission,
13 or speak to anyone else you feel comfortable with
14 at GC, the letter below or edits as you feel best.
15 Ask that GC expedite getting the device inspected
16 for their determination as to its legality.  We
17 will assist in every way."  Did I read that
18 correctly?
19     A  You do.
20     Q  Okay.  So, I mean, would it be fair to say
21 that you -- you wrote the initial email that you
22 proposed Nathan Howard send to the Missouri Gaming
23 Commission about why he --
24     A  Yeah.  I --
25     Q  I'm sorry. -- about why he needed this

1    inspection?

2        A  Yeah.  I think that's fair to say.

3        Q  And then I assume that Nathan Howard did

4    use this email that you drafted or some close

5    approximation thereof to send to the Missouri

6    Gaming Commission; right?

7        A  I think that's fair to assume.  I -- I

8    don't remember or know if I know exactly what he

9    sent to them, but he probably used this outline.

10       Q  And you wrote in that letter, "Our local

11   amusement machine vendor," which would be you,

12   TNT; right?

13       A  Yes.

14       Q  " -- has purchased video gaming machines

15   exactly like those that have been installed in

16   many -- many of the nearby bars, convenience

17   stores, and truck stops.  We have an agreement to

18   place these machines in our post."  Did I read

19   that correctly?

20       A  You did.

21       Q  At that time is it true that you had an

22   agreement with Nathan Howard to place these

23   machines at Nathan Howard's VFW post?

24       A  Yeah.  I think that's accurate.

25       Q  And then, skipping down, you proposed that

1    the machines could be inspected at the location of

         2    the vendor, TNT Amusements, doing business as

         3    Play-Mor Coin-Op, in West Sullivan, Missouri.  And

         4    that is your office; correct?

         5         A  That is correct.

         6         Q  Okay.  All right.  I marked another

         7    document as Exhibit 26.  Do you see that?

         8         A  I do.

         9         Q  It starts at the top.  To identify the

        10    document, there's an email from yourself, sent

        11    Monday, July 6th, 2019, to Tom Cobb.  "Subject:

        12    Forward:  Pre-reveal gambling machines, a/k/a no

        13    contest, et cetera, declared illegal in Missouri

        14    7/3/2019."  Do you see that?

        15         A  I do.

        16         Q  Okay.  And if you look down just below

        17    that, there's a -- there's an email from you to

        18    Daniel and Dave Schatz and Tom Cobb cc'd where you

        19    say, "Thanks, Dan.  Dan [sic] is aware of this.

        20    We spoke Friday.  He said he'd get with you and

        21    public safety to see if we can get the division of

        22    crime and drug to begin some enforcement in

        23    Franklin, Crawford, and Phelps County where these

        24    GC agents found more than two dozen of the exact

        25    machines last week while conducting this analysis

```
 1    and investigation."  Do you see that?  And did I
 2    read it correctly?
 3        A  I think you did.  I see it.
 4        Q  Okay.  And here, I think, you're talking
 5    about the Missouri Gaming Commission's letter
 6    that -- I -- I don't remember if we talked about
 7    it, but I've seen it before where they -- Ed
 8    Grewach, the former general counsel for the
 9    Missouri Gaming Commission, said that the
10    independently sourced Banilla no chance device
11    that TNT owned and was inspected, in his opinion,
12    was an illegal gambling device; right?
13        A  Yes.
14        Q  Okay.  And then it looks by this email,
15    you were using that to further your previous
16    stated goal of working with at least Senator
17    Schatz to get various law enforcement agencies in
18    Franklin, Crawford, and Phelps County to go after
19    Torch devices; correct?
20        A  I believe so.
21        Q  Okay.  All right.  I've marked a new
22    document as Exhibit 27.  It's document 24 in your
23    file.  Let me know when you see it.
24        A  I see it.
25        Q  The top email, just for identification, to
```

1    Exhibit 27 is an email from yourself to Dave
2    Schatz with cc'd Tom Cobb and a blind copy to
3    Kathi Harness and Scott Swain as well as Casey
4    Wasser; correct?
5        A  Yes.
6        Q  And this is dated 7/19/2019; correct?
7        A  Yes.
8        Q  In the email directly below that -- well,
9    hang on.  I'm violating my own rule just starting
10   in reverse chronological order.  So let's go to
11   the bottom of the document on Page 3.
12       A  Page 3?
13       Q  Yep.  Do you see that last email?
14       A  Yes.
15       Q  And I think you have to go back just to
16   the bottom of Page 2 to see that that email was
17   from you on June 17th, 2019, at 4:10 PM, and it
18   was sent to a Michael Winter --
19       A  I see that.  Yes.
20       Q  -- with a cc to -- with a cc to Tom Cobb;
21   correct?
22       A  Correct.
23       Q  I think brent@brenthempill.com is also
24   copied or a recipient; correct?
25       A  Yes.

542

1      Q   Who's Brent?

2      A   He's a lobbyist for one of the casinos or

3    one of the casino ownership groups.  I'm not sure

4    which one.  I don't remember.  Mike Winter is a

5    lobbyist that represents the Missouri Gaming

6    Association, I believe.

7      Q   And that was going to be my next question

8    is who was Michael Winter.  And then your response

9    there is Michael Winter was one of the Missouri

10   Gaming Association's lobbyists?

11     A   I think he's the on- -- I think he's the

12   only lob- -- the lobbyist for the Missouri Gaming

13   Association.

14     Q   Okay.  And you said, "Mike and Brent,

15   thank you for meeting with Tom and I last week in

16   Senator Schatz' office."  Did I read that

17   correctly?

18     A   You did.

19     Q   Okay.  So fair to say that the week prior,

20   yourself and Senator Schatz had a meeting with

21   Michael Winter of the -- associated with the

22   Missouri Gaming Association and this Brent

23   Hemphill; correct?

24     A   That -- that's what that says.  Yes.

25     Q   Okay.  And what -- what was discussed

```
1    during that meeting?

2        A  Oh, I -- hopefully, this letter will tell

3    us, if you want to go that route.  I -- I'm not

4    going to remember exactly, but I -- I know we were

5    trying to find mutual ground to try to not have

6    push back from them.  It's just like all the

7    others I've mentioned.  If you're -- you're going

8    to try to do something to move forward, you -- you

9    don't want to try to draw fire from people that

10    can prevent legislation from being passed.

11    They're lobbyists.  So --

12        Q  At the bottom, kind of over towards the

13    right-hand side, about three lines up, you say,

14    "We hope you agree."  Do you see that?

15        A  At the bottom --

16        Q  Yes.

17        A  -- of page --

18        Q  Well, I'll tell you what.  It's Page 3.

19    It would be, from your name, go up one, two,

20    three, four, five, six, seven where it says, "We

21    feel sharing this idea."

22        A  Yeah.  I see that now.

23        Q  Okay.  So you say, "We feel sharing this

24    idea now will further indicate our sincere desire

25    to find common ground with you and the casinos you
```

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1    represent.  To accomplish the outcome, we both
2    need to secure a better future for our industries
3    in this state.  We hope you agree and that this
4    concept can be incorporated into our path to
5    successfully eradicating the black market illegal
6    gaming that has plagued Missouri for decades while
7    simultaneously staving off the aggressive VLT
8    business model being shoved upon us by out of
9    state gaming industry competitors."  Do you see
10   that?
11       A  I do.
12       Q  Would it be fair to say that what you were
13   attempting to do here was potentially join forces
14   with the Missouri Gaming Association to further
15   both your goals and other members of your goals as
16   well as the Missouri Gaming Association's goals?
17       A  I don't think it's fair to characterize it
18   quite that way.  I -- I think it says what it
19   says, and I was looking for a compromise with
20   them.  We were looking for a compromise with them,
21   not -- not to join forces, so to speak.  They have
22   their own agenda and -- and we were still trying
23   to find a way to add value and bring value to
24   Diamond Games.  So I don't think that's a joining
25   of forces.  I think we have mutual interests, and

1    that's, you know, what it says.
        2        Q   Yeah.  I mean, you wanted the Missouri
        3    Gaming Association at least on your side, right,
        4    so that they wouldn't be an impediment to whatever
        5    goals that you or your organization might have;
        6    correct?
        7        A   I didn't want them to work against us.
        8        Q   Right.  You'd rather work with --
        9        A   I'm sorry.
       10        Q   You'd rather work with -- yeah.  You'd
       11    rather work with them than against them; correct?
       12        A   I was hoping to get their blessing.  I
       13    don't know that I could say they were going to
       14    work with me ever.  And -- and - and I don't mean
       15    to be -- I'm not trying to be argumentative or
       16    split hairs, but it's not like there was a
       17    partnership.  It was -- you know, if -- if we can
       18    find common ground, that's what we were look- --
       19    that's what I was trying to establish.
       20        Q   Well, one piece of common ground that both
       21    you and the Missouri Gaming Association have in --
       22    in common would be an extreme dislike of Torch
       23    Electronics; fair?
       24        A   From my side, yes.  I can't speak for them
       25    because --

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1      Q  So you're not aware -- you've never heard

2   in all of your lobbying efforts, the discussions

3   with Mike Winters, the Missouri gaming

4   association's lobbyist, or your own lobbyist, that

5   the casinos that formed the Missouri Gaming

6   Association disliked Torch and other no chance

7   preview-type games in the state of Missouri?

8           MR. FINNERAN:  Objection.  Calls for

9   hearsay and speculation.

10          But you can answer, if you know.

11      A  I think I've heard something to that

12  effect --

13      Q  (By Mr. Craig)  Yeah.

14      A  -- along the way.

15      Q  I assumed you had.  I've marked another

16  exhibit, called Exhibit 28, for identification

17  which is an email from yourself to a Ben Murphy at

18  americafirstmo.com, dated July 20th, 2019.  Do you

19  see that?

20      A  I do.

21      Q  And it says, "Missouri Amusement

22  Operators, MPTs, and casinos."  Do you see that?

23      A  I do.

24      Q  You say, "My friend, Dave Smith, Crawford

25  County Prosecutor, told me that about a year and a

1    half ago, he wanted to take some action on some
2    illegal gambling machines.  So he called the then
3    AG's office to ask for direction and to know what
4    the AG would do to support his actions were his
5    case -- I think it should say -- to go to
6    appellate court.  At the time, the people in the
7    AG's office told him they were not interested in
8    gambling.  All paraphrased, but boiled down was a
9    stand down result."  Did I read that correctly?
10       A  You did.
11       Q  Is that consistent with your current
12   recollection of how that conversation went between
13   yourself and David Smith?
14       A  I think that's a -- that's a fair
15   representation of my memory of what Dave Smith
16   told me.
17       Q  Do you know who Ben Murphy is?
18       A  Ben Murphy is -- yeah.  I -- he -- he had
19   a blog or was part of a blog or -- or -- I don't
20   want to call it a radio show, but similar to that.
21   I'm trying to remember his -- he -- he called this
22   thing "America First."  And he's an old family
23   friend.  He -- he -- he -- well, I shouldn't say
24   old family friend.  His -- I -- I've known him for
25   probably 20 years.  And so, I guess, yeah, you

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
1    could say he's an old family friend.

2       Q   There's some confusion.  And I -- that's

3    one of the things I wanted to ask.  If you go to

4    the bottom, the last email that I can see on this

5    document is an email from you, dated July 18th,

6    2019, at 8:58 PM.  Do you see that?

7       A   July -- say that again.

8       Q   Yeah.  Go to the bottom of Page 1.  It's

9    the very last thing that's written there.

10      A   Okay.  Page 1.  I see that.

11      Q   And then if you go down is the message,

12   and you just say, "Whether they are pull tab

13   machines operated through the lottery or

14   standalone VLTs, the industry has concerns about

15   the expansion of these types of machines, and

16   there's nothing else written there."

17          And then it looks like in response to

18   that, then Murphy sends you an email that says,

19   "Jim, this last part of casino response is

20   telling."  Do you have any idea what he's

21   responding to?  Because I couldn't tell.

22      A   I don't.  He must've read that somewhere

23   and was asking me what it -- you know, about it,

24   apparently.  That's only a -- that's what it seems

25   to be.
```

1    Q  Okay.  That's fine.  Okay.  I've marked
2    what's been marked for identification as
3    Exhibit 29, which at the top, has an email to Dave
4    Smith and a few other people from yourself dated
5    7/23/2019.  Do you see that?
6    A  I do.
7    Q  If you go to -- if you go to the bottom of
8    Page 1 --
9    A  Okay.
10   Q  -- you send an email to Randy Counts --
11   A  Yes.
12   Q  -- and a number of other people to include
13   Dave Schatz on July 23rd, 2019; correct?
14   A  Yes.
15   Q  You say, "Chief Counts.  Plea- -- please
16   find the attached letter dated July 3rd, 2019.
17   The letter is from lead counsel -- lead legal
18   counsel of the Missouri Gaming Commission."  And
19   this was regarding the -- the Nathan Howard
20   letter; right?
21   A  Yes.
22   Q  Okay.  Who's Chief Counts?
23   A  He was the chief of police for the city of
24   Sullivan, Missouri.
25   Q  Okay.  And I take it you wanted to file

1  this as your formal complaint against what you
2  believed was illegal activity?
3      A  I think when I read it, it -- it -- I was
4  letting Chief Counts know of what had unfolded
5  recently with -- with the Missouri Gaming
6  Commission's determination on the gambling
7  machines, on the slot machines that are in
8  Sullivan.  So I -- I -- I don't -- I don't see it
9  saying that it's a complaint necessarily.  He
10  already knew they were there.
11      Q  I'm not -- I'm not trying to trip you up,
12  and I didn't ask you to read the whole thing.  So
13  if you'd go to Page 2 and you look down one, two,
14  three paragraphs down, you say, "I desire this
15  letter to be considered my formal complaint
16  against this illegal activity and for multiple
17  reasons"; correct?
18      A  Okay.  I see that now.  As -- as you said,
19  I had not read it.  It was on the next page.  So
20  it says what it says and --
21      Q  I mean --
22      A  -- and it also -- it brought the Chief
23  Counts up to date on what had transpired.  So
24  it -- it did all -- both of the above.
25      Q  Yeah.  And you -- you don't disagree that

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1      at least part of the reason why you've sent this
2      email to Chief Counts was to make a formal
3      complaint; correct?
4          A  He did -- that's what it says.  So, yes, I
5      was doing that as well.
6          Q  And -- and -- I'm sorry.  Where, again,
7      did you say Chiefs Count -- Chief Counts was
8      located?
9          A  The city of Sullivan in Missouri, which is
10     adjacent to the town of West Sullivan where I
11     live.
12         Q  And then do you know if -- Chief Counts,
13     did he ever do anything in response to your email
14     here?
15         A  I don't think so.  I -- I don't know if he
16     did or didn't.
17         Q  If you look at the top email again, we've
18     got an email from you to David Smith and a few
19     others.  And David Smith is a prosecutor where?
20         A  Crawford County, Missouri, the county that
21     I reside in.
22         Q  And you say, "David, please let me know if
23     we could work with you to repeat this action in
24     Crawford County at any of the many locations in
25     our county that have these machines too."  What

1   did you mean by "repeat this action in Crawford

2   County"?

3       A  Well, I guess I would have to open up

4   those links and see what those actions were.  But

5   I think in simplest form, I was trying to get

6   someone to enforce the law and help get rid of

7   these slot machines, Adam -- or Aaron.  That's

8   consistent with everything that I've been trying

9   to figure out how to do for quite some time.

10      Q  All right.  I've marked another document

11  as Exhibit 30 for identification.  For

12  identification, at the top, this is a document

13  from Todd A. Nelson to yourself dated July 23rd,

14  2019; correct?

15      A  Yes.

16      Q  Okay.  And who's Todd Nelson?

17      A  Todd Nelson was an agent or investigator

18  for the Missouri Gaming Commission.  He is not

19  there today, but that's who he was then.

20      Q  And you sent your prior email that we just

21  looked at to Chief Counts.  You forwarded that on

22  to Todd Nelson.  I guess Todd Nelson was a

23  recipient to that email correspondence; correct?

24  I'll -- I'll start over because I think I -- I

25  realized midstream what had happened here.  So

1    what we see is the lower email after the first

2    email is the same email we just talked about on

3    Exhibit 29 that you sent to Chief Counts; right?

4        A  Yes.  It appears to be.  Yes.

5        Q  And Todd Nelson was one of the recipients

6    as a carbon copy; correct?

7        A  I think so.  Yeah.  Yes.

8        Q  And Todd Nelson then responds to you and

9    everybody else on your email, "Mr. Turntine, as

10   previously discussed, MGC's jurisdiction is

11   limited by statute to our licensee.  However,

12   should local or state law enforcement request

13   assistance, I have been authorized to provide

14   technical support related to the investigation of

15   illegal gambling machines."  And then he -- he

16   offered, I think, general counsel for the Missouri

17   Gaming Commission to -- his contact information;

18   right?

19       A  Yes.

20       Q  And, now, prior to this, had you spoken

21   with Todd Nelson?

22       A  I had met Todd Nel- -- Todd Nelson when he

23   came to my office on July 2nd, I think you said it

24   was, when he inspected the machine here in my

25   office.

1    Q  And had you asked Todd Nelson, prior to

2    this email, whether the MGC would be willing to

3    help TNT get law enforcement or other state

4    prosecute -- prosecutors to start prosecuting

5    Torch?

6    A  I don't -- I don't remember if I did or

7    didn't.  I -- I don't know.

8    Q  Okay.  So you don't know if this was,

9    basically, volunteered assistance on behalf of

10   Todd Nelson and the Missouri Gaming Commission or

11   if it was something that either you or Dave Schatz

12   or you and Dave Schatz had asked the Missouri

13   Gaming Commission to jump in and help with; fair?

14   A  I'm -- I'm -- yeah.  I'm sorry.  I don't

15   remember exactly.  There was a lot going on

16   through that time, and -- and I don't remember

17   exactly how that played out.

18         MR. FINNERAN:  Aaron, I don't want to

19   interrupt the line of questioning, but if you want

20   to either take a break in a second or we can go

21   off the record and just talk about what the plan's

22   going to be whenever you get to --

23         MR. CRAIG:  Yeah.

24         MR. FINNERAN:  -- the next topic.

25         MR. CRAIG:  Yeah.  I just marked another

1    exhibit.  It's a one-pager.  It's really short.

2    It shouldn't take long.  And then we'll take a

3    break.

4         MR. FINNERAN:  Okay.  Sounds good.  Go

5    ahead.

6         Q  (By Mr. Craig)  All right.  So I just put

7    another exhibit in front of you.  It's been marked

8    Exhibit 31 for identification.  Do you see that?

9         A  I see it.

10        Q  The top line of the email is Ben Murphy

11   sent this email to you, Jim Turntine, on

12   Wednesday, July 31st.  Do you see that top email?

13        A  I -- I do.

14        Q  And this is 2019; correct?

15        A  It is.

16        Q  He says, "I should have cc'd you."  And

17   the message that was being forwarded was a message

18   from Ben to an slewis@sccmo.org; correct?

19        A  I see that.  Yes.

20        Q  Do you know who slewis@sccmo.org is?

21        A  I do not know exactly who that is, or if I

22   did, I don't remember.  Somebody that Ben knows.

23        Q  One thing, I guess, that he says there,

24   towards the end of his message, is "Our AG" -- so

25   I think he means our attorney general -- "has said

1   he can't act unilaterally on this because his

2   prosecutors haven't called for action.  BS, ask

3   Crawford County prosecutor."  Did I read that

4   right?

5       A  You did.

6       Q  Okay.  Was -- was he expressing

7   frustration, as far as you can understand, with a

8   lack of what -- well, let me back up.  When you

9   read this, what did you think he meant by that?

10      A  I've got to tell you, it -- I -- I

11  don't -- I don't know.  Ben -- Ben is a -- a

12  really nice guy and a -- and a -- and a good old

13  friend, and he knows a lot of people in -- in the

14  St. Louis political environment -- or claims that

15  he does and -- and I guess he does.  But I -- I

16  don't know exactly what he's saying here, except

17  for he -- he sees some of the same nonsense in

18  what was going on as -- as I do.  And he -- it

19  looks like he is somewhat frustrated by it and

20  telling whoever slewis is that.

21      Q  Would it be fair to say that you, at

22  least, by this time, you know, despite having got

23  the letter that you wanted from the Missouri

24  Gaming Commission, were frustrated by the lack of

25  willingness on behalf of prosecutors in various

```
 1   counties or the attorney general in Missouri to
 2   act on what you believe were illegal Torch no
 3   chance devices?
 4          MR. FINNERAN:  Aaron, I -- I'm sorry.
 5   I -- you might've broken up, at least on my end.
 6   I couldn't hear your question.
 7          MR. CRAIG:  Yeah.  Madam Reporter, did you
 8   catch that?
 9          COURT REPORTER:  Yes.  Would you like me
10   to read it?
11          MR. CRAIG:  I would.  Thank you.
12          FINNERAN:  Sorry.  Thank you.
13          COURT REPORTER:  Question:  "Would it be
14   fair to say that you, at least, by this time, you
15   know, despite having got the letter that you
16   wanted from the Missouri Gaming Commission, were
17   frustrated by the lack of willingness on behalf of
18   prosecutors in various counties or the attorney
19   general in Missouri to act on what you believe
20   were illegal Torch no chance devices?"
21          MR. FINNERAN:  Thank you.
22      A  So the question was asking me.  It's not
23   about this exhibit, right, Aaron?
24      Q  (By Mr. Craig)  No.
25      A  That's your question?
```

558

```
 1       Q   Right.

 2       A   Okay.  Yes.  Yes.  I was and remain

 3   frustrated that the law is not being enforced on

 4   these slot machines.  Yes.

 5       Q   Yeah.  And I -- I, obviously, disagree

 6   with you calling Torch devices slot machines, but

 7   I --

 8       A   I -- I'm --

 9       Q   -- understand your frustration.

10       A   Would -- okay.

11       Q   I mean, I -- I hear you.  Let's say that.

12   But, yeah.  I disagree with your turn of phrase,

13   let's say.  And with that, let's take a break.

14           THE WITNESS:  Are we going to a break-out

15   room again or --

16           VIDEOGRAPHER:  We're going --

17           MR. FINNERAN:  Well, I -- I want -- I've

18   got to talk to Aaron.

19           MR. CRAIG:  Are we off the record?

20           VIDEOGRAPHER:  Yes.  I just read us off

21   the record at 5:08 PM.

22           MR. CRAIG:  I didn't even hear that.

23   Okay.  That's fine.  Thanks.

24           MR. FINNERAN:  I think you might've muted,

25   Frank.  Nobody heard you say it.
```

1          MR. CRAIG:  Okay.

2          (Off the record 5:08 to 5:17.)

3          MR. CRAIG:  So based on a discussion with

4    Mr. Finneran and his client, Mr. Turntine, we have

5    decided to hold this 30(b)(6) deposition open and

6    reconvene on a date sometime before the end of

7    next week at which time we will come back.  We

8    will spend some time not -- not exactly specified

9    yet, but some time to finish up the 30(b)(6) and

10   then move into Mr. Turntine's personal deposition

11   for some follow-up and, hopefully, not be in

12   depositions all day, but that is the current plan.

13   And I believe that all parties, to include

14   Mr. Finneran and Jim Turntine, are agreeable to

15   said plan.  All in favor say "I."

16         MR. FINNERAN:  "I."  And just so it's

17   clear for the record, we have agreed that we will

18   continue the deposition to a later date and that

19   the parties will work together to determine the

20   length of the 30(b)(6) and also to determine if

21   additional testimony is required from Mr. Turntine

22   personally, that we will also conduct that

23   testimony at that time.  And so there's no actual

24   agreement as to the number of hours for this

25   deposition to continue, but the parties will work,

```
 1    as I say, to complete the 30(b)(6) deposition.
 2    And that is all I have to say.
 3            MR. CRAIG:  Sounds good.  And with that, I
 4    would wish everyone on this video my sincerest
 5    thank you and a Merry Christmas as well.  I'd say
 6    Happy New Year, but we'll be seeing each other
 7    before that.  So I hope you have a wonderful,
 8    safe, and joyous Merry Christmas.
 9            MR. FINNERAN:  Same to you, Aaron.
10            THE WITNESS:  Same to you, Aaron.
11            MR. FINNERAN:  Thank you all.
12            MR. CRAIG:  All right.  We'll see ya.
13            COURT REPORTER:  Gentlemen, before you
14    leave --
15            (Mr. Craig left the virtual room.)
16            MR. FINNERAN:  Oh, he left but --
17            COURT REPORTER:  I'll speak with you then.
18    Deposition and video order, please.
19            MR. FINNERAN:  I'm sorry?
20            COURT REPORTER:  I'll need your video and
21    your transcript, rather, order, please.
22            MR. FINNERAN:  Oh, orders.  I'm sorry.
23    I -- I understand.  So -- and I believe this is
24    true for Mr. Craig as well, but you're free to
25    confirm with him by email.  We'd like a rough
```

1  transcript with exhibits as soon as possible.  We

2  don't need a rush on either the final transcript

3  or the video.

4          COURT REPORTER:  Got it.

5          (Mr. Craig rejoined the virtual room.)

6          MR. FINNERAN:  It looks like he -- he

7  heard you say "don't go," and he's rejoined us.

8          COURT REPORTER:  Okay.

9          MR. CRAIG:  Sorry.  I clicked -- I clicked

10  the wrong -- I was -- I was really in a hurry to

11  go enjoy Christmas.

12          MR. FINNERAN:  That's okay, Aaron.

13  They -- they just asked us what we want.

14          And I -- I said that we would like rough

15  transcripts with exhibits as soon as possible, but

16  no need to expedite the final or video.  And I

17  assume that's what you're thinking as well.

18          MR. CRAIG:  Right.  That is exactly right.

19  I will say the one problem with the exhibits is

20  I -- I can't -- I don't know that I can give them

21  in the final format with the stickers on them

22  until I close and end this session.  And if I

23  close and end this session, I won't be able to

24  reopen it.  So we might have to wait on exhibits

25  until we reconvene.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

1          MR. FINNERAN:  And that's -- I have no

2     objection to that.

3          MR. CRAIG:  Okay.

4          (The remote Zoom video-recorded deposition

5     was suspended on 12/22/23 5:21 PM until 12/29/23.)

6          (Exhibits 4-31 are attached.)

7          (Signature is not waived.)

8                    * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
1              CERTIFICATE OF SHORTHAND REPORTER

2          I, Melody Stephenson, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the foregoing transcript is a true

5    and correct record of the testimony given; that

6    said testimony was taken by me stenographically

7    and thereafter reduced to typewriting under my

8    direction; that reading and signing was requested;

9    and that I am neither counsel for, related to, nor

10   employed by any of the parties to this case and

11   have no interest, financial or otherwise, in its

12   outcome.

13

14   _____
     Melody Stephenson, Certified Court Reporter, BBA,
15   FCRR, CRR, CRC, RPR, RSA, MO CCR 406, IA CSR 974

16

17

18

19

20

21

22

23

24

25
```

564

```
 1   Friday, January 5, 2024

 2   RICHARD FINNERAN, ESQUIRE
     BRYAN CAVE LEIGHTON PAISNER LLP
 3   One Metropolitan Square
     211 North Broadway, Suite 3600
 4   St. Louis, MO 63102
     (314) 259-2000
 5   richard.finneran@bclplaw.com

 6   RE:  PohlmanUSA Job No. 288924
     12/22/23 30(b)(6) Deposition Transcript of James
 7   Dean Turntine, TNT Amusements, Inc., d/b/a
     Play-Mor Coin-Op v. Torch Electronics, LLC, et al.
 8   Case No. 4:23-cv-00330-JAR

 9   Dear Mr. Finneran:

10   This letter, incorporated as the last page of
     Mr. Turntine's 30(b)(6) deposition transcript,
11   taken on Friday, December 22, 2023, will serve as
     notice to you that Mr. Turntine's testimony is now
12   ready for his reading and signing of same due to
     his not waiving his signature at the time of the
13   deposition.

14   Enclosed, please find a copy of the deposition
     transcript, along with the original signature page
15   and errata sheet.  Please have Mr. Turntine read
     his deposition transcript at his earliest possible
16   convenience, making whatever changes he feels are
     necessary, if any, on the errata sheet, along with
17   his reason for making same.

18   Please have Mr. Turntine sign the original
     signature page and errata sheet before any notary,
19   and email the notarized signature page and errata
     sheet to production@pohlmanusa.com for
20   distribution within 20 days from today's date or
     the transcript will stand as transcribed, unless
21   otherwise agreed to by the parties.

22   Thank you for your cooperation in this regard.

23   Sincerely,

24
     Melody Stephenson
25   PohlmanUSA Court Reporter
```

```
 1          DEPOSITION CORRECTION SHEET ____ OF ____

 2     WITNESS NAME:  JAMES DEAN TURNTINE - 30(b)(6)

 3     CASE NAME:  TNT AMUSEMENTS, INC., d/b/a PLAY-MOR

 4     COIN-OP v TORCH ELECTRONICS, LLC, et al.

 5     CASE NO. 4:23-cv-00330-JAR; DATE TAKEN:  12/22/2023

 6

 7     Page #_____   Line #_____

 8     Should read: _____

 9     Reason for change: _____

10

11     Page #_____   Line #_____

12     Should read: _____

13     Reason for change: _____

14

15     Page #_____   Line #_____

16     Should read: _____

17     Reason for change: _____

18

19     Page #_____   Line #_____

20     Should read: _____

21     Reason for change: _____

22

23     Page #_____   Line #_____

24     Should read: _____

25     Reason for change: _____
```

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

```
1                    WITNESS SIGNATURE PAGE

2

3      STATE OF MISSOURI          )

4      COUNTY OF _____)

5

6      WITNESS NAME:  JAMES DEAN TURNTINE - 30(b)(6)

7      CASE NAME:  TNT AMUSEMENTS, INC., d/b/a PLAY-MOR

8      COIN-OP v TORCH ELECTRONICS, LLC, et al.

9      CASE NO. 4:23-cv-00330-JAR; DATE TAKEN:  12/22/2023

10

11     I, JAMES DEAN TURNTINE, do hereby certify:

12             That I have read the foregoing deposition;

13             That I have made such changes in form

14     and/or substance to the within deposition as might

15     be necessary to render the same true and correct;

16             That having made such changes thereon, I

17     hereby subscribe my name to the deposition.

18             I declare under penalty of perjury that

19     the foregoing is true and correct.

20             Executed this _____ day of

21     _____, 2024, at

22     _____.

23     _____
       Witness/Deponent
24

25     _____
```

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

**A**

**a/k/a**
540:12
**Aaron**
290:14
294:22
296:10
300:14,14
307:22
310:24
328:24
330:25
333:8
334:12
335:5
347:2
351:9
352:12
362:2
370:9
379:13
380:10
397:8
407:4
421:16
425:9
432:12
434:2
439:16
447:15
449:12
462:18
484:19
487:11
488:10
492:22
504:4
506:7
517:20
527:23
528:2
531:22
553:7
555:18
558:4,23
559:18
561:9,10
562:12
**ability**

366:3 371:7
399:11
518:16
**able**
296:19
306:13
324:15
356:5
370:3
389:14
394:12
403:22
405:14
486:13
498:3,5
507:9
562:23
**abouts**
325:24
**absolutely**
375:25,25
421:14,14
528:24
**absorbed**
364:2
**abuse**
324:20
**accepted**
416:4
481:15
**access**
519:18
**accident...**
468:23
469:20
**accomplish**
357:11
501:11
505:22
545:1
**account**
347:3
**accounting**
301:22
**accounts**
456:7
475:23
**accurate**
484:17

539:24
**achieving**
500:23
**acquiring**
497:13
**acraig@g...**
290:19
**acronym**
392:25
393:2
436:14,25
**act**
368:9
461:21
470:11
557:1
558:2,19
**acting**
380:3
**action**
308:17
360:15
362:22
364:19
446:8
455:20,22
511:14
548:1
552:23
553:1
557:2
**actions**
548:4 553:4
**activate**
497:16
**activities**
487:2
525:13
**activity**
304:4 306:4
328:3
390:25
398:7,8
401:4
405:4
415:19,24
440:6
451:7
454:23

457:7
463:21,22
465:5
475:24
499:12
551:2,16
**actual**
299:16,24
301:5,7
305:5
341:16
560:23
**Adair**
373:11
389:7,10
**Adam**
553:7
**add**
424:6 426:2
463:20
469:1
545:23
**added**
299:19
**adding**
332:18
**additional**
299:15
300:9
463:21
560:21
**address**
293:3
342:14
358:25
359:14
389:17
392:13
412:9
486:21
536:3,13
536:16
**addressed**
338:24
359:1
387:23
**addressing**
460:21
**adds**

535:7
**adjacent**
552:10
**adjusted**
506:19
**administ...**
482:25
485:15
486:4
535:20
**admit**
445:16
**admitted**
377:4 447:1
**ads**
353:3
**adversely**
404:18
**advertise**
390:17
**advice**
511:6
**advise**
416:9,14
417:3
**advised**
374:21
**advisors**
417:7
**af-**
506:10
**affect**
328:5
**affirmed**
295:3
**afford**
353:5,7
**AG**
548:4
556:24
**AG's**
548:3,7
**agencies**
362:9 366:9
366:16
367:5
478:12
541:17
**agency**

362:7
433:6,21
466:19
**agency's**
366:2
**agenda**
545:22
**agent**
366:18
553:17
**agents**
361:6,13
540:24
**aggressive**
442:14
449:22
545:7
**Agile**
518:15
**ago**
305:23
321:12
325:8
333:12
467:24
548:1
**agree**
299:10
307:13,21
308:7
311:4
312:18
329:10
330:3
331:1
342:10
355:11
359:22
365:11
379:23
384:9
388:1
395:19
397:1,12
398:16
402:1
407:15
409:23
419:14

431:16
461:15
464:24
472:4,6
474:16
476:8
479:19,21
480:4,12
480:16
481:10
484:16
485:8,13
486:19
502:25
512:1
515:20
526:21
531:21
532:18
544:14
545:3
**agreeable**
560:14
**agreed**
342:11
344:9
362:18
396:7
397:18
560:17
565:21
**agreeing**
363:12,13
369:4
**agreement**
395:3
403:22
405:6
457:24
494:16,21
539:17,22
560:24
**ahead**
296:16
333:7
352:10
364:11
417:16
447:8,15
495:3,24

495:25
496:3
503:20
533:22
556:5
**aide**
342:15
431:20
**aimed**
393:2 424:3
497:5
**al**
291:18,20
291:22
292:3,5,12
292:15,18
292:20
293:9,13
294:6,7
565:7
566:4
567:8
**alcohol**
309:24
360:3,8
**alerted**
365:1
**alerting**
331:11
**alive**
399:16
**all-caps**
321:6
**allege**
328:12
331:2
448:14
**alleged**
503:21
**allegedly**
328:13
405:4
**allow**
458:5 471:9
471:23
473:1
474:21
479:24
507:3

**allowed**
323:9
**alternative**
395:4
397:23
444:13
**altogether**
496:23
501:21
**am-**
439:5
**AMAO**
325:9,10
**ambush**
444:10
**ambushed**
439:5
441:25
445:15
**amend**
364:25,25
365:7
367:7
480:19
483:12,23
**Amended**
297:5 298:2
**amendments**
370:12
482:22
**America**
548:22
**americaf...**
547:18
**American**
320:11
**AMOA**
321:14
325:11,13
325:17,17
325:24
326:13
341:17
348:6
349:22
350:20
354:4
358:7
359:2

360:25
365:17
390:2
402:22
405:6
412:3
435:13
**amount**
313:16
515:17
**amusement**
291:19
293:10,12
317:8,17
318:5,6,15
318:16
323:5
325:14
328:13
344:16
348:2
349:6
353:12
372:10
401:1
447:19
448:23,24
467:14
471:24
473:2
474:22
480:3
539:11
547:21
**Amusements**
289:5 294:6
294:21
295:12
296:23
316:14
317:11
318:7
540:2
565:7
566:3
567:7
**analysis**
383:20
522:2
540:25

569

and/or
340:25
  370:11
  499:15
  524:8
  567:14
**Andy**
372:20
  373:1,2
  384:21
  385:10,23
  392:23
  393:5,5
  394:9
**anger**
355:25
**angry**
321:7
  342:16
**answer**
302:15
  307:8
  308:1,15
  309:11
  317:24,25
  331:15
  332:6
  352:13
  364:9,11
  375:23
  376:16
  377:25
  378:12,20
  379:6,11
  379:11,18
  380:8
  381:3,3,17
  384:2
  397:2,12
  400:7
  403:16,19
  404:10
  411:3
  414:25
  418:23
  422:3
  429:17
  431:4
  438:14
  439:15

452:5
456:24
463:12
464:14
467:4
468:7,16
473:4,25
474:10
476:3
477:15
479:7
480:9
498:25
508:25
509:7
511:24
520:13
522:14
532:2,8
535:1
547:10
**answered**
419:4
  467:23
  532:9
**answering**
419:1
  441:17
  537:21
**anti-cap...**
343:5
**anybody**
309:19
  310:8
  353:7
  366:14
  367:1
  370:24
  417:18
  430:4
  467:5
**anymore**
424:13
  535:5
**anyone's**
477:2
**anyway**
364:6 370:4
  505:17

**apologies**
333:19
  384:14
  518:17
**apologize**
333:16
  377:10
  380:9
  407:13
  425:9
  484:19,24
**apparently**
305:11
  306:16
  321:7,9,16
  344:10
  361:3
  392:19
  423:5
  433:21
  454:6
  492:18
  520:20
  526:15
  549:24
**appear**
530:18
**appearance**
294:18
  295:20
**appears**
337:7,10
  345:9
  435:6
  436:17
  554:4
**appellate**
548:6
**applicable**
446:18
**appointed**
376:25
  378:24
  379:25
  479:12
**appreciate**
322:8 449:6
  452:22
**apprecia...**

302:5
**apprise**
332:3
**approaching**
343:22
**appropri...**
340:11
  505:22
**approval**
354:2
**approve**
342:23
  519:16
  527:9
  530:7,9,9
  531:16,17
  532:18
  533:9,12
  533:17
**approved**
397:10
  462:1
  481:4
  506:23
**approves**
534:1
**approxim...**
539:5
**April**
324:8 491:8
  493:8,12
  501:14
  505:2,19
**arbitrarily**
365:7
  366:24
  367:6
**area**
322:1
  344:22
  352:20,23
  352:23
  413:17
**areas**
357:2
**arena**
402:20
**Arg-**
477:11

**argu-**
475:1
**argument...**
403:14
  405:19
  425:10
  429:4
  464:12
  474:8
  477:14
  511:23
  546:15
**arms**
400:24
**Armstrong**
372:6
**armstron...**
372:2
**Arnold**
372:20
  373:1,2
  384:21
  385:23
  392:24
  394:10
**Arnold's**
385:10
**arrange**
493:24
**arranged**
436:6
**arrangement**
458:4
**arrived**
383:10
  437:7
  526:8
  537:1
**arrows**
314:2
**articulated**
395:17
**articula...**
438:3
**aside**
314:14
  416:8
  466:15,16
**asked**

308:4
310:25
323:25
352:15,16
352:19
411:7
422:4
445:7
468:1
477:5
489:17
491:15
503:9
508:24
509:8
510:21,24
514:2
527:19
528:10,18
529:2,9
537:8
555:1,12
562:13
**asking**
309:10,13
311:15
312:18
331:25
335:12
351:2,20
363:15
380:10
384:11,12
388:13
418:21
421:19
428:7
430:9
433:9
466:16
467:15
518:5
529:23
532:22,24
536:12
549:23
558:22
**asks**
389:12
**aspect**

502:3
**aspects**
396:2
**assembled**
304:3
**assembly**
319:19
320:17
**assessment**
505:9
**assist**
538:17
**assistance**
554:13
555:9
**assistant**
482:25
485:15
486:1,4
535:20
**associate**
342:19
348:13
373:4
**associated**
294:13
304:3
307:12
309:19
310:8
426:16
543:21
**associates**
429:18
**association**
307:7  310:7
310:8
321:14
322:3
325:14
340:20
341:4,10
346:25
347:25
349:7
350:4
353:13
358:4
359:8,10

359:21
373:3
413:13,21
426:21
457:5,23
467:14
477:23
480:17
530:1
543:6,13
543:22
545:14
546:3,21
547:6
**associat...**
543:10
545:16
547:4
**associat...**
310:9
**assume**
301:1
326:14,16
332:4
335:24
336:3,9,13
346:10
359:8
376:19
377:18
378:1
412:14
429:24
430:4
459:25
460:21
462:8
486:9
488:2
521:21
539:3,7
562:17
**assumed**
484:14
547:15
**assuming**
410:12
412:23
457:22
492:7

514:11
**ATC**
291:21
360:4,4,6
360:8,11
360:21
361:23
362:21
364:16
366:13
367:1
368:3,6,11
369:6
**ATC's**
360:14
361:4
363:3,7
364:20
**ATC-lice...**
364:18
**attached**
291:6
297:15
299:11
303:4
373:7
384:24
454:11
461:2,3
523:14,22
550:16
563:6
**attaches**
461:1
**attachment**
297:4
349:14
373:18
381:21
383:1
461:5
489:8
**attachments**
373:16
375:11
385:23
**attacked**
441:24
**attempt**

307:16
**attempting**
545:13
**attempts**
425:19,21
**attention**
374:13
416:21
**attorney**
359:6,16,21
372:7
373:9,23
374:12
375:16
377:1
379:2
383:10
389:10
496:22
498:6
501:19
510:24
513:21
514:23
524:4
556:25
558:1,18
**attorney's**
501:19
**attorneys**
305:11
380:14
509:25
510:15,16
510:19,21
511:5
512:23,25
513:5,12
**attribute**
508:12
**attributed**
385:5  451:7
**audio**
333:12,18
334:15,16
335:7
**August**
301:22
305:22

355:21
**auspices**
319:10
443:15
**authority**
319:15,18
361:18
365:1
389:17
392:13
450:20
466:18
467:25
477:6
479:1
**authorize**
398:8
**authorized**
554:13
**automati...**
315:11
390:8
**available**
312:20
449:13
**aware**
298:11
308:19
332:9
357:13
361:23
363:3
364:16,21
378:18,21
380:16,20
416:5
417:19
423:16,23
423:25
425:16,21
460:24
462:5,10
476:23
483:2,21
498:12,16
498:17
521:7,7,10
523:14
526:12

529:6,8,14
529:17
540:19
547:1
**awhile**
450:9
**awkward**
437:9

### B

**b**
291:5
447:12,15
**B-e-n-g-...**
412:6
**baby**
465:23
**back**
295:9
306:15
310:14
320:19
323:24
324:2
325:18
326:15
335:9
336:21
351:13
360:1
361:7
366:18,19
370:8
371:16
380:15
387:20,24
388:3
395:12
396:18
400:10
401:24
402:19
405:10
408:7
414:18,18
419:5
420:4
441:5
444:12
450:14

459:3,5
463:18
472:10,17
478:15
487:19
492:2
493:23
502:2
504:10
505:16
522:9
530:6
531:3
532:6
542:15
544:6
557:8
560:7
**background**
401:18
457:4
**bad**
398:23
428:12
501:3
**ballot**
352:25
397:11
**Banilla**
517:5 518:4
519:22
521:16
522:8
526:5
532:15
541:10
**Banilla-...**
492:5
**bar**
320:7,8
377:4,4
378:4,8,16
382:2,4
456:7
**barbecue**
418:3,3
**bared**
336:11
**barely**

377:22
411:18
**Barney**
466:7
**bars**
319:22
320:3
321:23
343:6,23
344:16
356:10
361:9
374:16
471:13
472:1
474:24
476:12
480:21
481:7
539:16
**base**
536:20,20
**based**
298:21
362:14,14
363:19
379:21
380:13
383:19
392:15
395:11
409:4
441:18
446:21
451:4
468:10
530:14,18
560:3
**basic**
424:14
**basically**
299:17
301:15
304:24
314:5
338:20,22
345:7
353:1
354:13
355:3

367:17
443:25
468:19
469:4
477:25
555:9
**basing**
390:5
**basis**
444:1
**Bates**
315:9,13
358:12,15
359:9
**bath**
465:23
**battles**
456:4
**BBA**
289:24
564:14
**Bear**
518:18
**beat**
349:8
354:14
**Becker**
310:6
**becoming**
529:8
**beer**
359:7,13
**beg**
328:8
**beginning**
328:24
349:5
351:11
393:13
427:15
**begun**
418:1
**behalf**
290:2,13
294:20,22
295:12
336:15
346:24
368:17

572

399:8
467:13
499:22
511:21
516:9
555:9
557:25
558:17
**belief**
385:5
**believe**
297:3 298:8
309:16
312:15
337:22
338:20
339:21
347:8
356:3,7
358:8
364:22
376:2,7,10
376:11,25
378:3,13
387:6
392:5,8
396:11,23
397:17,22
397:24
398:12
400:6,13
408:2
409:3,14
410:24
416:18,25
421:3
426:14,17
455:3
466:10,25
467:12
471:7
481:22
494:1
504:25
514:14
515:14
516:17,21
521:17
522:4
523:9

524:13
526:8
531:10,18
531:19
533:23
534:11
535:4
541:20
543:6
558:2,19
560:13
561:23
**believed**
363:6
364:17
366:5
404:19
409:23
439:6
445:17
492:9
517:4
531:5
532:16
534:6
551:2
**believes**
427:4
443:18,21
**believing**
534:18
**Ben**
373:10
547:17
548:17,18
556:10,18
556:22
557:11,11
**beneficial**
355:7
**beneficiary**
317:23
**benefit**
320:5,9
355:9
405:7,8
406:10,12
432:12
**benefiting**

405:13
**benefits**
406:11
**Bengimina**
412:1,2
413:14
**Benjamin**
373:10
383:1,4,10
389:9
**best**
302:15
322:4,6
334:5
353:13
368:12
369:7
400:4
417:12
429:15
436:25
445:3
462:9
465:2
502:23
538:14
**better**
304:25
376:3
396:13
427:24
428:3,4,5
428:14,18
428:19,21
428:23,23
429:19
431:7
458:2
494:2
545:2
**beyond**
343:20
**BFC**
447:5,12,18
447:20
**Bible-th...**
399:3
**Biermann**
316:8,23,25

316:25
317:6,6,12
**big**
406:13
**bigger**
475:16
**biggest**
364:3
**bill**
392:24
394:10,11
394:14
416:10,15
416:18
417:19
419:13,17
419:22
420:1,11
420:25
422:24
423:1,8,18
424:2,5,14
424:20,23
425:5
459:21
461:1,2,8
461:12,19
462:5
463:14
481:20
483:11,22
483:23
484:3,6
487:3
488:14
489:1,9
**bills**
424:11
**bingo**
479:2 480:5
517:12
525:21
526:19
529:18,19
530:3
534:2
**bit**
302:16
330:23

342:8
359:11
379:7
388:22
401:19
420:21
445:21
494:2
501:4
507:2
508:6
**black**
389:15,22
389:25
390:2,13
390:20
391:11,20
391:24
393:15,24
394:5
395:10
397:22
398:20
399:13
416:21
465:5
467:18
471:13
472:1
473:7,21
474:23
476:11
480:20
481:7
508:10,13
508:16
509:24
523:20
524:1
545:5
**blanket**
402:3
405:25
**bless**
404:6
**blessing**
546:12
**blind**
542:2
**block**

536:6
**blog**
548:19,19
**blooming**
392:22
**blossoming**
392:22
**blow**
416:9
**Bluff**
358:5
413:10
**board**
316:9 349:2
436:7
479:12
**boards**
292:11
491:5,10
491:11,16
**boats**
479:2
**boiled**
548:8
**bold**
470:16
**bottom**
296:24
300:8
313:12,14
313:17,22
314:1,12
314:16,21
314:24
315:17
338:21
358:9
372:20
373:17,21
384:21
408:16
410:5
432:19
434:16
459:24
482:10
491:7
519:2,25
536:1

542:11,16
544:12,15
549:4,8
550:7
**bought**
492:4
517:22
520:3
**bowling**
471:10
475:7
**box**
397:11
**boy**
447:12
**Brad**
358:12,14
359:8
**brand**
520:6,18,19
520:21
**Brandon**
386:21
436:5,6
437:7,9,13
439:5,17
440:15,25
442:15,18
443:18
444:6,21
445:7,15
446:18
454:18
**Brandon's**
440:1
441:18,21
442:13
**Branson**
352:23,23
**break**
335:16
370:23,24
371:1
421:18
449:18
458:16,17
459:7
492:23
493:2

495:16
504:1,11
555:20
556:3
559:13
**break-out**
371:7
559:14
**breaking**
455:10
**Brendon**
373:13,18
373:22,22
374:9,11
375:5,9,9
375:16,24
376:3,25
377:18
378:3,24
379:24
387:5
500:6,6
**Brent**
543:1,14,22
**brent@br...**
542:23
**briefly**
379:10
**bring**
310:20
458:9
545:23
**broad**
309:20
**broader**
318:3
**broadly**
318:13
**Broadway**
290:7
294:14
565:3
**broke**
351:11
352:9
**broken**
558:5
**brotherhood**
404:14

**brought**
374:13
457:24
498:13
551:22
**Brown**
291:10
315:23
316:6
318:20
324:6,8
337:3,9,12
338:23
345:25
346:1,19
347:10
495:12
496:18
498:4
499:15,20
500:3
501:15
502:3,5,16
502:21
**browse**
362:4
**browser**
407:8
**browsing**
461:17
**Bryan**
290:5
295:20
565:2
**BS**
557:2
**buddy**
481:22
**budget**
337:16
340:9,11
361:12
369:23
505:24,25
506:9,16
506:18,24
**built**
302:11
**bunch**

311:18
314:17
315:1
384:5
411:11
487:19
493:8
**business**
302:1
303:21
304:15
316:6,17
317:4,12
317:14,15
318:7,23
322:3,20
323:7,7
327:19
328:2,6,13
331:13
335:24
341:4
344:15,20
348:2,4
361:7
367:10
370:6
390:25
391:15
392:1,9
401:1
403:9
404:18
405:3
413:11
430:18,21
430:25
439:19,21
439:23
440:10,11
440:13
441:1
442:21,25
443:1
444:17
447:18,19
448:17
449:24
454:22
457:14

465:13
477:1,2
496:25
497:7,17
501:22
503:5
524:8
534:8
540:2
545:8
**businesses**
318:22
324:17
344:3,14
355:17
405:8
457:13
**Buster's**
466:3 469:6
469:11
471:9
475:6,16
487:1
**buy**
519:3,16,22
526:16
527:8
530:7,8
531:14
532:14
533:8
534:2,22

---

**C**

**c**
290:1 291:1
294:1
447:13
**Caleb**
342:12,19
342:21
344:10
345:11
**calebjon...**
342:1
**call**
298:25
302:9,10
302:11,13
302:16,19

303:1,2,6
303:7,8,20
304:5,22
306:1,3,4
306:9,16
306:22,24
307:5,9,10
307:24
309:2
333:12
377:24
387:3
388:2
421:19
422:1
449:14
455:8
471:24
473:2
478:4
491:24
502:22
538:11
548:20
**called**
301:23
326:25
334:22
349:14
360:6
376:22
387:17,19
387:24
388:12
436:4
447:5
478:3
547:16
548:2,21
557:2
**calling**
334:14
388:9
408:23
559:6
**calls**
308:14
375:22
376:14
378:10

379:4,5
381:1
383:25
431:3
438:13
452:3
456:22
464:13
467:3
468:14
479:5,6
480:7
534:24
547:8
**capabili...**
357:3
**capacity**
486:9
**capital**
401:10
**capitalize**
321:4
**capitol**
502:8,10
**caps**
320:22
322:23
**captured**
487:3
**carbon**
554:6
**career**
321:12
366:15
**careful**
466:5
468:20
**Carolina**
492:16
**Carroll**
413:19
507:23
**carved**
332:20
**case**
289:7 294:5
294:7
306:25
328:11,11

329:12,14
330:6
331:2
360:21
361:3
362:9,12
378:14
446:6
447:1,2,4
449:20
466:19
514:18
515:2,15
516:3,11
516:12,13
516:14,15
516:19
521:7,9
524:6
548:5
564:10
565:8
566:3,5
567:7,9
**cases**
450:3
498:18
**Casey**
507:24
542:3
**casino**
352:21,23
400:24
401:2,10
543:3
549:19
**casino-type**
465:5
**casinos**
479:2 480:5
543:2
544:25
547:5,22
**catch**
376:22
501:1
558:8
**cause**
429:2

503:10
**caused**
308:24
**CAVE**
290:5 565:2
**Cave's**
295:20
**caveat**
476:9
**cc**
372:1 493:7
542:20,20
**cc'd**
540:18
542:2
556:16
**cc's**
504:19
507:24
**ccing**
313:8
**CCR**
289:25
564:15
**centers**
471:10
475:8
**Central**
294:5
**certain**
412:15
482:4
490:12
506:20
**certainly**
361:1 398:2
449:16
453:25
487:4
517:7
**certificate**
382:10
564:1
**certific...**
382:10
**certific...**
382:9
**Certified**
564:14

575

certify
564:4
  567:11
cetera
487:1
  540:13
chain
357:19
  406:24
  407:7
  415:7
  505:5
chains
313:14
chair
425:5
  505:21
chairman
316:9
champion
385:15
chance
331:12
  332:4,7,21
  335:20
  337:23
  354:18
  368:12
  369:7
  385:7,12
  389:14,21
  390:6
  485:20
  492:5,8
  526:6
  527:19
  528:11,19
  529:1
  541:10
  547:6
  558:3,20
change
332:11
  361:4,17
  365:7
  366:8
  425:19,22
  455:25
  456:13

464:9
468:21
475:21
534:17
566:9,13
566:17,21
566:25
changed
366:23
  426:3
  464:4
  479:10,11
changes
366:2
  370:11
  468:10
  479:10
  565:16
  567:13,16
channelling
344:7
Char-
359:17
character
406:9
characte...
526:13
characte...
526:14
characte...
341:2
  343:14
  527:12
  545:17
characte...
499:9,11
  502:11
characte...
405:10,23
charges
498:13
  503:20
charitable
396:5
charities
453:7
Charles
358:10
  359:17,19

360:12,13
363:8,12
364:3
365:10
368:22
Charlie
447:13
check
529:25
  530:18
Cheese
471:11
  475:8,17
Cheese's
465:13
Chermak
519:24
Chermark
519:23
chief
550:15,22
  550:23
  551:4,22
  552:2,7,12
  553:21
  554:3
Chiefs
552:7
Chipman
291:12
  338:24
  339:2,3,7
  345:18
choosing
381:10
Christmas
561:5,8
  562:11
chronolo...
542:10
chronolo...
493:11
chronology
313:15
Chuck
412:1,2
  413:16
  465:13
  471:11

475:8,17
circulating
401:9
circumst...
377:12
  412:25
  454:4
circumve...
337:17
citizens
397:10
city
290:17
  346:14,24
  349:20,23
  351:1,7,18
  351:22,25
  369:20
  373:3
  392:20
  413:16
  505:13
  536:17
  550:23
  552:9
City's
465:15
civil
511:14
  513:9,15
  514:18
  515:9
claim
329:9 444:2
  446:4
  451:12,24
  474:22
claiming
365:10
  401:4
  475:6
claims
510:25
  511:1
  557:14
clari-
533:14
clarifica-
533:14

clarific...
320:14
  401:16
  472:3,4
  473:24
  474:14
  485:7
  533:16,18
clarify
482:17
classifi...
468:13
classified
529:1
classify
448:22
clear
297:16
  330:13
  492:16
  560:17
clearly
400:8
click
518:20,21
clicked
562:9,9
client
335:1
  421:18
  560:4
close
491:12
  521:15
  522:9
  539:4
  562:22,23
Club
320:10
clubs
343:6
  344:17,23
clue
416:7
coaster
505:15
Cobb
292:3,12,15
  293:7

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

347:24,25
348:8
357:22
372:1
385:21
415:8
435:23
436:4
441:9
459:13
487:9
493:7
504:19
505:7
507:23
540:11,18
542:2,20
**Cobb's**
440:2
**Cobbs**
440:11
**Coin**
519:23,24
**Coin-Op**
289:6 316:7
316:13,16
316:18
317:12
318:8
348:3
540:3
565:7
566:4
567:8
**collecti...**
340:24
**combine**
354:4
**come**
311:7
330:16
392:22
402:24
492:19
501:9
512:14
526:4
527:8
560:7

**comes**
302:14
375:17
428:14
478:14
**comfortable**
538:13
**coming**
305:6
383:15
423:1
470:23
**commander**
387:10
388:16
436:7
529:4,23
**commas**
465:3
**comment**
335:8 525:9
**comments**
369:1
**commercial**
317:5
399:10
**commission**
309:25
366:14
408:23
409:12
414:6,13
415:18,24
433:11,12
435:4,13
440:20
454:8,12
462:1,2
467:10,11
467:16
477:24
478:19,23
479:13
503:13
510:7
511:10,20
512:14
513:6,13
513:18

515:7,9,25
517:24
524:18,25
525:22
526:4,18
526:23
527:7
529:20
530:1,2
531:7,16
532:17,20
533:4,17
534:1,15
534:21
536:10,23
538:12,23
539:6
541:9
550:18
553:18
554:17
555:10,13
557:24
558:16
**commissi...**
479:10
536:19
541:5
551:6
**committee**
292:22
341:11
345:3
425:5
505:22
509:19
525:14
**committe...**
340:10
**committees**
340:16
341:15
**common**
544:25
546:18,20
546:22
**communicate**
373:6
**communic...**

312:22,22
491:2
**communic...**
309:19,25
310:1,2,4
310:5,6,10
311:2,9
314:13
499:16
**companies**
523:19
**company**
317:10,14
317:25
318:1,14
318:24
319:1,6
326:25
327:12
343:1
344:12
387:12
412:25
436:15
437:24
447:5,10
448:3,14
491:18
**compared**
390:14
464:18
**compete**
323:5 329:4
329:11
331:3
344:13
534:8
**competed**
344:20
**competes**
322:20
**competing**
318:24
454:22
**competition**
506:15
**competitive**
402:20
**competitors**

449:23
545:9
**compiled**
303:9
**complain**
328:8
**complained**
506:11
**complaint**
408:25
409:5,11
433:14
435:3,12
551:1,9,15
552:3
**complaints**
433:20
435:14
531:6
534:14,20
**complete**
561:1
**completed**
299:21
**completely**
391:15
430:22
474:17
500:15
**comport**
396:11,23
**compound**
380:7
456:23
474:8
477:14
**comprehend**
486:13
**comprehe...**
365:3,9
**compromise**
545:19,20
**computer**
312:25
334:16
521:24
**concept**
356:25
545:4

concern
340:21
346:25
356:14
361:21
362:12,13
364:3
365:5
369:4
439:19
513:18
concerned
328:3 344:1
353:8
367:11
370:1
395:12
433:19
534:5
concerning
324:17
341:13
364:1
concerns
374:17
438:24
549:14
concludes
383:19
conclusion
311:7
375:22
376:9,10
378:11
381:2
383:15
384:1
438:13
452:4
464:13
467:3
468:15
479:6,9
480:8
conduct
404:20
560:22
conducting
540:25

Conference
345:3
confined
452:1
confirm
519:21
561:25
confiscate
496:24
497:6
499:23
501:21
503:4
confused
351:7 402:7
438:15
confusing
315:16
confusion
549:2
connection
497:4
conserva...
350:10
consider
398:3
465:21
considered
355:16
487:2
551:15
considering
354:13
consistent
298:20
309:5
435:10
488:16
516:25
548:11
553:8
consiste...
368:11
constituent
316:6
constitu...
378:25
Constitu...
385:13

contact
389:1
443:13
536:15,19
554:17
contacted
514:11,15
contacting
340:4
contained
487:18
489:11
contempo...
301:11,13
303:20,21
content
339:22
349:12
362:4
505:3
content's
342:8
contest
385:12
540:13
context
368:22
381:20
392:6,18
425:12,14
440:15
455:13
457:4
495:23
518:25
534:9
Continuance
296:22
continua...
297:19
continue
295:10
299:8
319:14
320:16
367:10
389:5
437:6
470:10

471:11,24
473:2
474:21
523:23
524:14
560:18,25
continued
289:14
346:24
514:10
530:4
continues
360:23
424:14
continuing
297:7
320:23
385:3
508:10
contract
440:8
444:17
448:16
450:12
524:8
contractor
319:7,8
440:7
507:11
control
309:24
315:10
360:7,8
366:16,17
417:8
496:21
501:19
506:12
controlled
506:9
conundrums
490:17
convenience
292:2 394:4
395:14
539:16
565:16
convenient
421:20

conversa...
298:25
350:12
352:1
402:14
404:21
405:15
409:17,18
409:20
410:22
418:9
423:13
476:24
479:9
499:7,13
500:9
548:12
conversa...
321:10
345:23,24
346:5,23
349:5
356:16
375:5,8
393:9
452:19
478:11
499:3
convicted
424:7
463:22
conviction
360:18,21
362:24
363:11
364:19
368:25
convince
498:4,5
cooperation
298:9
319:10
565:22
coordinate
496:19
501:15
503:2
coordinated
502:5

578

coordina...
497:14
**copied**
337:3
 412:15
 499:18
 542:24
**copy**
433:5,6
 454:12
 527:15
 528:16
 542:2
 554:6
 565:14
**copycat**
475:25
**copying**
505:7
**corner**
355:18
 494:13
**corporate**
295:11
 296:22
 410:8
**corporat...**
320:8
**correct**
295:13,25
 296:24
 297:6
 298:3
 302:7
 308:9
 310:22
 312:23
 313:9
 316:2,16
 316:21
 322:20,21
 322:23
 323:21,22
 324:9
 325:6,19
 325:20
 329:16
 333:25
 337:5,9

338:13,18
339:18,19
342:2
345:8
347:22
357:23
367:24
372:3,4
373:24
380:18
383:2,24
385:24,25
398:25
402:11,23
404:8,20
407:1,19
407:22,23
407:24,25
408:19
411:19,24
413:7
415:11
426:24,25
436:1
446:8,14
459:14,17
459:21
462:3
472:5
474:25
475:2
479:23
480:22
481:8,12
483:13,14
485:12
486:21
491:5,24
492:7
493:8
494:6,7
497:7,18
498:7,7
501:23
503:6
504:20,22
505:10
507:24
508:1
509:16

511:3,11
511:17
514:5,13
515:13
516:6,9,16
517:6
520:5
530:20
535:16
537:13
540:4,5
541:19
542:4,6,21
542:22,24
543:23
546:6,11
550:13
551:17
552:3
553:14,23
554:6
556:14,18
564:5
567:15,19
**corrected**
488:24
**correction**
524:22
 566:1
**correctly**
316:11
 319:2,25
 321:2
 324:25
 337:19
 343:9
 344:17
 368:13
 374:23
 386:5,14
 386:15
 409:1
 416:11
 434:22
 436:9
 437:14
 449:25
 453:9,13
 456:7
 465:8

491:21
497:1
510:12
513:10
514:19
524:11,19
525:1,24
530:10
538:18
539:19
541:2
543:17
548:9
**correspo...**
291:23
 372:22
 373:8
 385:4
 553:23
**could've**
295:22
 411:7
 426:1
 462:15
 537:6
**council**
514:16
**counsel**
294:17
 298:8,18
 330:18
 452:7,12
 541:8
 550:17,18
 554:16
 564:9
**Count**
552:7
**counties**
558:1,18
**counting**
432:19
**countless**
449:22
**Counts**
550:10,15
 550:22
 551:4,23
 552:2,7,12

553:21
554:3
**county**
373:11,12
 373:23
 374:2,5,12
 374:17,23
 375:19
 377:2
 379:1,22
 379:24
 380:4,14
 380:16,17
 380:21,21
 381:11,12
 383:16
 386:2,8,11
 386:17
 387:10,11
 387:18
 389:2,7
 496:19
 497:13,20
 497:20
 498:9,13
 498:14,18
 498:25
 499:4,21
 500:7,10
 500:24
 501:16
 502:22
 503:3,6,7
 503:15,19
 523:7,10
 523:11
 524:3
 533:20
 540:23
 541:18
 547:25
 552:20,20
 552:24,25
 553:2
 557:3
 567:4
**County's**
379:1 498:6
 500:5
**couple**

333:13
388:12
393:6
491:3
**course**
304:15
382:22
507:6
**courses**
382:7
**court**
289:1 294:9
294:13,15
294:16,24
327:17
351:12
358:11
371:8
396:19
412:5
432:13
472:9,16
515:13
516:3
548:6
558:9,13
561:13,17
561:20
562:4,8
564:14
565:25
**courthouse**
388:9
**cover**
307:14
380:25
506:25
**COVID**
326:2
**crack**
532:6
**crafting**
471:20
472:23
**Craig**
290:14
291:3
294:22,22
295:8,24

296:11,15
296:17,18
300:18,22
300:23
327:18
329:2,6,8
331:21
333:10,20
333:21
334:18,20
334:25
335:10,17
335:18
351:15
352:15
370:21
371:2,11
371:18
376:2
378:1,15
378:22
379:14,20
380:12
381:7,22
396:17
397:3
403:18,19
404:4,13
405:22
407:6,14
407:15
411:2,9
421:23
428:6,20
431:12
432:15
434:3,8,10
434:15
438:19
439:12
447:17
449:16,19
452:9
457:15
458:16,24
459:5
467:20
468:18
472:9,13
472:18,19

473:9
474:11,14
477:20
480:11
492:25
493:4
496:11,12
504:1,5,10
504:12
512:1
520:22
522:17
528:4,7
547:13
555:23,25
556:6
558:7,11
558:24
559:19,22
560:1,3
561:3,12
561:15,24
562:5,9,18
563:3
**crane**
466:17,19
466:22
469:14,15
469:21,22
470:2,5
**cranes**
465:12
**Crawford**
496:20
497:13
498:9
499:4,21
501:17
523:10
524:2
540:23
541:18
547:24
552:20,24
553:1
557:3
**CRC**
289:25
564:15
**create**

306:4 343:4
506:24
**created**
300:25
301:10
**creative**
511:18
**crime**
496:21
501:18
540:22
**crimes**
503:11
**criminal**
360:17,20
362:23
363:10
364:18
368:25
376:4
380:3,23
396:12,25
398:15
468:22
471:22
472:25
474:20
497:25
503:20
**crisis**
509:25
**CRR**
289:25
564:15
**CSR**
289:25
370:12
564:15
**CST**
289:20
**curious**
359:24
**current**
335:19
336:10
433:12
479:22
505:9
548:11

560:12
**currently**
295:15
332:12
446:25
478:23
**customer**
444:21
448:17
524:10
525:20
527:2
534:5
535:5
**customers**
365:16
367:9
467:17
**cut**
327:17
329:21
361:12
412:18
487:8
508:24
**cutting**
419:3

---
**D**
---

**D**
294:1
**d-o-c-x**
349:15
**d/b/a**
289:6
316:17
565:7
566:3
567:7
**Dalton**
372:2,5
385:22
**Dan**
315:23
324:6,8
337:3
345:25,25
346:19
347:10

580

482:15,21
482:24
487:20
535:18,19
535:24
540:19,19
**danbrown...**
313:8,19
**dance**
465:19
**Dang**
428:6
**Daniel**
482:24
485:25,25
486:3,23
535:16
536:2,12
537:21
540:18
**darn**
370:7
**dart**
327:4,16,21
331:13
335:23
**dartboard**
327:15
**dartboards**
328:14,15
329:11,18
331:3
**darts**
327:6,10
529:11
**dash**
314:22
338:17
463:1
**date**
292:8 294:4
301:2,7
302:22
339:18
369:21
411:13,16
412:23
414:22
440:21

490:13,15
490:18
494:9
551:23
560:6,18
565:20
566:5
567:9
**dated**
313:18
315:23
323:20
337:5
338:12
339:17
342:1
357:21
372:21
406:25
411:11
415:10
435:24
459:14
504:22
508:1,5
538:6
542:6
547:18
549:5
550:4,16
553:13
**dates**
490:1
**dating**
463:18
**daughter**
412:8,24
413:20
**Dave**
313:8 463:3
463:14
466:2
469:6,11
471:9
475:6,16
481:23
482:11,21
483:16,20
483:21
485:11,14

485:17
486:3
487:1
497:12
499:4,8,14
499:21
523:3,7
536:8
540:18
542:1
547:24
548:15
550:3,13
555:11,12
**Dave's**
463:1,15
470:24
471:23
473:1
474:21
480:19
481:10
482:13,22
483:10
488:14
**davescha...**
337:4
**David**
463:7
523:13
536:9,14
538:11
548:13
552:18,19
552:22
**day**
300:11
303:9
305:21
306:14
329:22
362:10
367:13
390:12
416:25
420:8
475:19
482:5
485:17
498:15

508:5
516:14,19
536:3
537:13
560:12
567:20
**days**
565:20
**DDCC**
496:22
**de-**
425:3
**deadlines**
521:12
**deal**
308:20
342:25
343:12
396:1
402:21
414:2,5
417:13
440:3
476:21
494:23
497:16
505:14
**dealing**
308:17
**dealt**
501:5
**Dean**
289:18
291:2
295:2
565:7
566:2
567:6,11
**Dear**
565:9
**decade**
408:13
**decades**
362:3
429:19
465:7
475:13
477:3
545:6

**December**
289:19
294:4
565:11
**decent**
313:16
337:23
**decide**
362:9
**decided**
337:13
345:3
478:24
560:5
**decides**
466:8
**decision**
420:10
430:25
**declare**
512:16
567:18
**declared**
466:19
540:13
**decrease**
366:2
**deduce**
359:11
379:3,12
379:13
**deducing**
454:7
**deemed**
465:6,11
475:12
477:3,5,6
477:10
**deems**
477:20
**default**
422:23
**defend**
450:4
**defendants**
289:12
290:13
294:23
**define**

581

301:13
448:25
**defines**
430:2
**definitely**
520:21
**definition**
302:2
391:19
461:22
466:23
468:24
470:11
**definitions**
385:11
**definitive**
525:22
**defunct**
325:21
**degree**
361:25
378:7
518:3
521:23
**delivering**
356:24
**demand**
510:6 511:8
524:21,24
**deny**
363:21,22
375:10,13
445:16
501:13
**Department**
309:23
**depending**
336:14,17
479:11
**deploy**
506:19
**deposed**
516:19
**deposition**
289:17
291:7,8
292:23
294:3,11
295:12

296:12,21
297:16
298:3,15
310:21
311:12,21
312:4,5
313:5
325:13
371:20,24
387:16
399:2
406:19,23
435:18
467:8
493:5
507:17
527:16
528:8
538:2
560:5,10
560:18,25
561:1,18
563:4
564:3
565:6,10
565:13,14
565:15
566:1
567:12,14
567:17
**depositions**
560:12
**describe**
318:4
354:16
445:3
453:19
527:12
**described**
318:14
450:5
526:10
**describing**
423:12
**description**
322:6,8
**designate**
496:23
501:20

**designated**
379:1
**desire**
368:17
544:24
551:14
**desired**
505:23
**despite**
534:12,18
557:22
558:15
**detach**
430:16
**detail**
298:11
312:19
394:15
**detailed**
300:4
505:10
**details**
372:16
415:25
433:4,10
434:21
435:11
521:11
**determin...**
511:16,21
513:8
525:23
533:5
538:16
551:6
**determine**
389:16
392:12,20
510:7
511:10
524:17,20
560:19,20
**develop**
433:6
**developed**
431:22
**develops**
430:20
**devi-**

522:18
**device**
333:25
357:5
390:23
395:6
398:10,11
398:13,14
409:7
461:22,25
466:24
468:13
470:12,14
492:5,9,10
513:8
515:7,23
516:5
517:3,5
521:16
522:1,1,8
522:9
527:8
532:15,16
538:15
541:10,12
**devices**
299:6 300:1
317:8,9,11
317:17,18
318:2,5,6
318:15,16
318:16
321:22
323:5
328:12,16
329:3,11
331:3,12
332:4,7,7
332:19
335:21
336:11,12
351:23
360:16,18
362:23,24
363:7
366:6
368:8,19
368:19
375:5,6,18
383:21,23

391:4,21
393:17,24
393:25
395:10
396:10,23
397:23,24
398:4,21
399:12,13
409:13,23
410:15
423:19
438:9,22
438:25
439:7
448:23,23
448:24
470:7
471:13,24
472:1
473:2,7
474:22,24
476:12
480:3,21
481:7
497:24
498:15,19
503:22
506:1
511:22
512:16
527:4,19
527:21
528:11,13
528:19,21
528:22
529:1,6
531:5,13
533:5
534:15
541:19
558:3,20
559:6
**DGE**
292:4
435:25
436:8,11
436:13
438:9
**Diamond**
318:21

319:1,4,4
319:6,19
320:18,20
322:10,17
323:1
324:17
337:14,23
338:18
343:1,7
344:11,19
345:4
349:9
350:1,6,21
354:11,20
356:14,16
372:11
393:3
400:9,12
400:13
401:2
402:2,8,23
403:8,11
404:1,6,20
405:3,16
436:14,15
438:17,24
439:7
440:3,8
441:4,22
442:2,5
443:7,20
456:16,19
457:11,25
457:25
494:5,12
494:23
506:1,16
507:7,10
545:24
**Diamond's**
401:22
**diary**
308:23
**DiCaprio**
376:21
**dictate**
466:20
**didac-**
382:17
**didactic**

382:13,18
**differ**
335:3
**difference**
297:11
320:5,25
391:11
406:7,9,12
406:13
457:6
458:9
**differences**
297:15
**different**
304:3  311:3
340:8
342:9
357:5
364:7
390:16,22
390:22
391:15,15
391:25
392:4,9,10
393:7
397:23
421:21
428:17
505:5
520:20
526:25
**differently**
421:22
**difficult**
307:25
365:18
395:8
**digress**
470:9
**DIRECT**
295:7
**direction**
390:19
500:20
548:3
564:8
**directly**
322:20
324:7

336:21
344:13
346:7
542:8
**director**
341:17,19
348:6
358:4,6
359:9
399:25
412:3
536:9
538:12
**director's**
536:15
**directors**
340:22
**disagree**
381:10,13
381:18
383:9,16
383:23
384:3,10
384:11
401:17,19
426:19
476:5
480:10,13
530:24
532:12
551:25
559:5,12
**disagreeing**
476:13
**disappoi...**
321:8
337:12
345:2
427:19
**disband**
325:24
**disclosures**
521:8
**discontent**
326:2
**discovery**
297:25
304:20
305:10

307:2
346:11
510:5
511:8
515:22
516:4
524:17,23
**discuss**
311:1
312:14
325:18
386:4,14
386:18
387:21
491:24
**discussed**
333:23
339:12,23
346:1
352:24
409:10
411:21,23
485:9
494:3
543:25
554:10
**discussion**
349:14
350:18
360:3,10
459:19
482:16
488:14
560:3
**discussions**
314:12
340:11
485:17,18
547:2
**dislike**
546:22
**disliked**
547:6
**dismissed**
516:13
**disparaging**
429:23
**displeasure**
340:6

**dispute**
374:2
378:23
379:16,19
**distinction**
389:24
428:22
473:23
475:13
**distinguish**
320:1
**distingu...**
390:8
**distracted**
314:19
514:7
**distribute**
523:20
**distribu...**
565:20
**distributor**
517:4,8
**Distribu...**
492:15
**district**
289:1,2,3
294:9,9,10
340:2
516:14
**dividend**
318:12
**division**
309:24
496:21
501:18
540:21
**document**
296:19
298:14,14
298:22,23
299:11
303:14
305:9
306:9,11
307:6
313:4
323:12,13
323:15,15
331:18

583

338:5,5,6
338:10
339:16
341:20
371:22
407:4,7
432:16
434:4
449:17
459:8,12
472:11
490:21,24
504:13
509:11,12
518:10
522:18,20
522:21,23
535:9,11
538:1
540:7,10
541:22,22
542:11
549:5
553:10,12
**document...**
300:10
**documents**
298:17
299:3
303:19
304:3,20
305:4,20
305:24
307:1,12
307:15,17
312:12,21
315:5
354:9
426:9
530:25
531:3
**doing**
312:25
313:16
317:11
318:7
322:19
331:10
349:4,13
350:2

353:2
365:8
366:11
369:22
401:13
403:12
406:1
425:6
431:10
440:12
443:1
444:23
446:19
464:16,22
474:17
475:8,10
509:24
513:23
526:9
540:2
552:5
**Dollar**
349:20,23
351:1,6,18
351:22,25
465:15
**dollars**
318:25
342:24
**dolu-**
318:25
**dominant**
326:4,6
**Don**
411:20
**donate**
353:7
**donated**
353:6
**donations**
416:4 423:4
**Donna**
298:24
301:2,10
302:6
305:13
308:5
309:13
406:24

407:17,21
408:1,17
410:5,13
410:21
411:15
414:7,21
432:21
489:6
491:3,7,23
529:22
530:16
538:5,10
**Donny**
411:15
**door**
455:21
**dot**
481:3,3,3,3
**downfall**
518:15
**dozen**
540:24
**draft**
488:14
**drafted**
302:6
304:24
539:4
**drafting**
349:22
**draw**
416:21
465:25
475:20
544:9
**driven**
399:8
**drug**
496:21
501:18
540:22
**duck**
510:10,10
510:11
**due**
473:15
477:12,19
521:8
524:9

565:12
**duly**
295:3
**duplicate**
433:19

---

## E

**e-**
421:1
**E**
290:1,1
291:1,5
294:1,1
465:13
471:11
475:8,17
**e-raffle**
523:17
**Eagles**
320:10
**earlier**
321:15
325:12
338:1
343:13
355:25
361:10
386:23
387:16
388:23
399:1
404:16
409:15
433:18
437:1
454:17
462:16
465:15
483:24
506:8
508:6
530:25
531:3
537:3
**earliest**
565:15
**early**
366:19
387:7

433:23
467:9
477:22
**earning**
356:10
**easier**
394:7
**Eastern**
289:2,3
294:9,10
516:14
**easy**
378:17
388:8
**ebb**
425:3
**Ed**
519:23,24
541:7
**edits**
538:14
**educated**
353:18
**effect**
328:10
437:4
547:12
**effective**
429:1,7
430:2,5,24
430:25
**effectiv...**
427:12
**effects**
468:12
**effort**
434:22
444:19
507:6
**efforts**
292:14,17
340:21
354:18
355:5
414:2
427:13
494:4
547:2
**either**

301:2
312:20
320:7
330:17
336:13
340:9
359:9
366:23
376:25
378:24
379:25
399:9
425:10
431:18
450:3
453:16
464:5
493:18
515:24
555:11,20
562:2
**elbow**
402:19,20
405:14
**elbowing**
402:13
**elected**
377:1
378:25
379:25
**electronic**
317:8,18
351:5,23
357:5
395:6
497:7
524:10
**Electron...**
291:6
**Electronics**
289:9 294:7
374:14
385:6
416:4
422:11
427:2
491:19
496:25
499:6,24
501:22

508:13
510:1
515:8
524:2,7
525:7
546:23
565:7
566:4
567:8
**Elkin**
524:4
**em**
354:14,14
534:3
**email**
291:10,12
291:14,16
291:19,21
291:23,25
292:4,6,10
292:13,16
292:19,21
292:25
293:2,5,7
293:11,15
293:18
313:7,10
313:14,18
315:22
316:5
323:19,25
324:5,7,13
325:4,8,9
336:20
337:2
338:11,22
339:7,17
341:25
342:14
345:13,16
346:1,4,6
346:8,12
346:20
347:15,18
347:20
348:25
357:19,21
358:10,18
358:24
359:14

360:2,11
362:15,20
363:19
370:6
371:25
372:19,20
373:12,18
374:9
375:11,14
385:20,23
389:6,9
406:24
407:17
408:17
411:10,10
411:15,20
415:7,7
432:19,20
432:20
434:14
435:22
459:12,24
460:4,17
461:3,5
462:6,21
462:23
482:12
484:5
485:24
486:21
488:1
489:6,24
491:2,4,7
492:1
493:6,10
493:11,14
493:16
495:3,7
504:18
505:1,2,7
505:18,18
507:21,22
508:4,22
509:14
523:2
533:1
535:15,23
535:23
536:1,2
537:20

538:5,10
538:21
539:4
540:10,17
541:14,25
542:1,8,13
542:16
547:17
549:4,5,18
550:3,10
552:2,13
552:17,18
553:20,23
554:1,2,2
554:9
555:2
556:10,11
556:12
561:25
565:19
**emailing**
293:1 351:8
**emails**
311:14
312:1
337:8
339:22
482:11
487:8
491:3
499:17
**emergency**
334:25
335:3,11
**emerging**
414:3
**Emily**
413:19
507:23
**emotional**
370:5
505:15
**employed**
331:22
486:10
564:10
**employee**
407:21
412:10,12

414:15
**employees**
344:15
367:10
399:16
439:24
**enable**
350:19
416:1
433:6
**enabling**
465:6
478:24
479:23
**Enclosed**
565:14
**encouraged**
414:10
**ended**
297:21
**endorsement**
413:18
**enfor-**
368:10
**enforce**
361:18
362:11
381:6,11
466:14
471:15
478:5
481:1,2,5
553:6
**enforced**
375:19
454:24
466:15
512:9
559:3
**enforcement**
361:8 368:8
368:10,17
368:24
384:5
415:25
453:23
475:14,15
477:24
502:15,16

540:22
541:17
554:12
555:3
**enforcem...**
360:17
**enforcing**
367:6 380:3
380:23
**engage**
427:3
**engaged**
353:4 418:9
444:16
465:18
**English**
465:2
474:12
**enjoy**
562:11
**entailed**
485:18
**enter**
494:16
**Enterprises**
447:5,13
**entertai...**
318:25
**entice**
368:6
**entire**
381:20
467:11
**entirely**
327:20
**entities**
309:21
311:4
331:23
362:1
363:4
**entity**
317:17
318:14
**environment**
343:5
465:18
557:14
**epiphany**

533:2
**equal**
431:9
**equipment**
299:4,4
327:5
343:18
357:3
461:25
470:15
**era**
326:5 357:9
399:25
**eradicate**
421:2,3
**eradicating**
545:5
**errata**
565:15,16
565:18,19
**especially**
416:2 418:6
457:2
**ESQUIRE**
290:3,4,14
565:2
**essentially**
316:19
325:3
329:10
343:18
421:6
441:24
443:22
506:10
533:3
**establish**
494:24
546:19
**established**
478:22
521:14
**establis...**
323:6
364:18
**estate**
317:4,13
**et**
291:18,20

291:22
292:3,5,12
292:15,18
292:20
293:9,13
294:6,7
487:1
540:13
565:7
566:4
567:8
**ev-**
332:16
**evaluate**
515:7
**evaluated**
524:18,24
**event**
301:7,11
385:8
415:25
433:7
480:15
**events**
303:22
**eventually**
310:17
402:17,21
402:24
517:24
**everybody**
322:14
342:14
356:18
367:3
396:4
399:4,5
405:5,25
406:10
431:9,9,20
440:14
446:14
458:2
504:6
510:14
554:9
**evidence**
522:13
**evolved**

349:2
394:14
**evolving**
454:19
**exact**
338:21,22
424:9
483:9
491:16,16
540:24
**exactly**
296:4
297:14
310:24
342:13
347:3
365:15
369:2
401:25
433:16
436:20
469:23
497:9
505:10
506:5
508:18
515:18
525:19
535:2
539:8,15
544:4
555:15,17
556:21
557:16
560:8
562:18
**EXAMINATION**
291:2 295:7
**examined**
295:5
**example**
400:10
478:18
**excited**
499:10
500:13
**excitement**
500:25
**exclamation**

510:11
**excluding**
391:20
**exclusively**
327:15
437:20
**excursion**
479:2
**excuse**
381:16
396:24
467:1
474:7,7
**Executed**
567:20
**exhibit**
291:7
296:24
297:19
298:15
300:16,17
300:19
304:2
313:5,6
314:6
323:13,18
324:3
336:21,25
338:6,11
338:16
339:15,15
341:21,23
345:14,17
345:25
346:2
347:13,14
357:18
371:19,20
371:24
382:25
406:18,19
406:23
407:6,12
407:16
408:16
432:17
434:8
435:19
459:7,8
460:7

489:3,5
490:25
493:5
503:25
504:14,15
504:17
507:17,20
508:22
509:10,11
518:7
522:19,25
527:15
528:8,15
535:9,10
535:13
538:2
540:7
541:22
542:1
547:16,16
550:3
553:11
554:3
556:1,7,8
558:23
**exhibits**
296:1,13
298:6,8
314:14
342:5
343:13
345:8
562:1,15
562:19,24
563:6
**existed**
325:20
326:13
**existing**
398:7,8
404:3
**expand**
394:11
403:1,12
**expanded**
319:20
324:21
343:20
404:2,3
469:5

524:15
**expanding**
337:25
397:4
401:14
**expansion**
291:11,13
291:15
324:18
337:15,18
338:2,17
342:25
343:3,12
345:5
350:11,17
350:19
354:11,19
393:8
395:5
396:9,10
396:21,22
397:5,7,9
397:14
398:1,3
404:8
442:2
549:15
**expect**
335:24
336:12
428:3
**expectan...**
524:8
**expected**
505:11
**expecting**
444:11
**expedite**
538:15
562:16
**experience**
357:3
430:16
445:24
487:13
**expert**
521:8,22
522:3
**expertise**

529:12
**explain**
304:16
343:15
351:24
386:2,12
389:14
436:7
444:13
450:25
471:8
523:21
**explained**
323:4
325:12
450:12
**explaining**
394:9 439:6
454:3
**explanation**
330:5 469:1
482:18
**explicitly**
423:19
**exploding**
475:23
**expoliti...**
431:25
**exposure**
416:5
**express**
339:11
340:6
**expressing**
381:19
401:21
438:24
468:19
557:6
**expressly**
301:1
**extended**
418:5
**extent**
315:14
380:24
394:4
426:22
438:12

478:5
534:18,19
**extra**
437:8
**extrapol...**
508:22
**extrapol...**
311:25
**extreme**
546:22

---
**F**
**f**
372:2
447:12
**face**
385:11,17
**facility**
526:19
534:2
**fact**
307:15
312:15
374:2,20
377:3,19
378:24
404:17
405:14
449:23
454:14
464:10
485:10
497:9
503:1
519:22
522:6
526:19
**fail**
355:6
**failed**
425:23,24
505:22
**fair**
308:3
312:24
322:9,11
331:7
336:7,8
337:21

354:12,16
355:2
360:2
361:22
364:15
383:11
384:16,16
387:4
388:21
391:12,13
396:8,20
406:17
417:8
421:11
422:21
425:15
426:20
427:11
428:22,24
428:25
430:6
431:23
444:3
446:20
455:16
460:22
461:9
464:3
468:9
469:3,18
490:12
501:9,10
509:9
511:19,22
511:25
512:2,4,5
515:16
522:3,4
526:13
538:20
539:2,7
543:19
545:12,17
546:23
548:14
555:13
557:21
558:14
**fairly**
388:8

587

faith
444:18,19
  455:7
  457:6,10
  458:6
  494:11
fall
466:23
family
317:23
  399:17
  413:10,10
  418:3,5
  439:19,21
  548:22,24
  549:1
far
329:12
  343:8
  364:3,20
  374:4
  378:5
  379:9
  399:2
  417:18
  444:8
  457:3
  481:18
  491:12
  498:12
  510:24
  524:12
  530:4
  531:1,14
  557:7
fast
322:11,13
  330:24
fast-for...
354:8
faster
329:24
favor
336:5
  560:15
FCRR
289:25
  564:15
fearful

506:14
feature
333:24
  491:13
Febru-
461:7
February
435:24
  436:17
  460:9,25
  461:7
  462:6
FEC's
471:10
FECs
475:7
federal
380:13
feedback
470:20
feel
312:8
  344:24
  370:24
  387:24
  417:12
  427:15
  450:19
  457:1
  466:11
  472:17
  496:2
  501:3,4,8
  538:13,14
  544:21,23
feeling
313:2 426:8
  464:1,4
  470:4
  524:14
feelings
324:12
  357:10
feels
565:16
feet
320:18
fellow
347:25

felt
322:12
  369:3
  420:7,8
  466:13
  502:12
  534:7
FF
295:17
fi-
417:19
field
529:12
Fife
466:7
fifth
299:25,25
fight
524:1
fighting
402:13
  449:22
  518:17
figure
297:11
  306:14
  308:21
  335:14
  353:9
  358:23
  381:4
  393:11
  394:20
  396:1
  414:1
  425:12
  454:19
  553:9
figured
369:21
figuring
454:25
file
299:19
  416:10,15
  416:15
  417:3,19
  417:20
  419:13,13

419:17,22
  420:11,25
  433:5,14
  433:20
  435:14
  450:3,10
  463:5
  511:2
  512:12
  513:16
  514:17
  515:1,12
  524:5
  541:23
  550:25
filed
421:1
  422:24
  424:2,5,11
  424:14
  460:25
  461:8
  498:18
  516:15
files
304:10
  417:6
  423:8
  487:16
filing
463:14
  531:6
fill
421:9,10
final
291:21
  490:19
  562:2,16
  562:21
finally
494:8,20
financial
317:16
  318:9,10
  318:13
  564:11
find
333:24
  350:24,24

355:7
  431:6
  434:6
  436:19,19
  445:25
  454:20
  455:25
  456:14
  492:12,19
  495:7
  523:15
  530:2
  537:8
  544:5,25
  545:23
  546:18
  550:16
  565:14
finding
311:14
fine
302:24
  306:23
  309:16
  323:10
  334:18
  359:23,25
  370:25
  372:16
  384:17
  397:3
  415:4
  421:23
  427:10
  432:1,7
  449:4
  452:25
  458:22
  460:15
  467:20
  480:11
  485:22
  486:18
  490:5,22
  490:22
  495:24
  514:10
  537:25
  550:1
  559:23

finish
330:1
432:14
476:10
478:10
560:9
finishing
476:9
Finneran
290:3
294:19,19
296:3,9,14
296:16
300:14,20
308:11
328:22
329:3
331:14
333:8,11
334:12,19
334:21
335:5,13
351:9
352:5,9
371:6
375:21
376:14
377:23
378:10,19
379:4,17
380:6
381:1,14
381:16
383:25
403:14,20
404:9
405:19
407:3,9
410:25
411:3
421:16
422:2
428:9,11
431:2
432:11
434:2,4,9
434:13
438:12
439:11,13
447:9,14

449:11
452:3
456:22
458:19
464:12
467:1
468:14
472:11
474:7
477:11,13
479:5
480:7
492:22
493:3
504:3
511:23
512:3
520:7,9,11
522:12
527:24
528:2,5
534:24
547:8
555:18,24
556:4
558:4,12
558:21
559:17,24
560:4,14
560:16
561:9,11
561:16,19
561:22
562:6,12
563:1
565:2,9
fire
320:19
465:25
475:20
544:9
fireweed,'
368:2
first
295:3
299:14
300:8,24
322:16
324:5
336:20,22

336:23,25
337:11
338:23
341:22
342:9
347:19
360:11
361:6
364:23,24
389:20
400:10
403:5
417:23
419:9
430:19
447:8
449:20
457:21
463:18
491:20
493:10
512:22
513:4
516:25
518:11
522:16
523:6
526:1
530:13
531:23
537:17
548:22
554:1
fiscal
493:22
fit
347:6
five
298:6
323:15
338:5
356:22
371:3,4
420:16
496:19
501:16
503:3
544:20
fix
462:25

470:24
471:23
472:25
474:21
Flags
469:7
471:10
475:7
flat
501:2
flexible
449:15
flip
336:3
flow
425:4
fluid
493:20
fly
385:10,17
focus
324:14
focusing
432:17
folks
346:13
465:13
follow
304:17
431:9,15
follow-up
337:8
502:12
560:11
follow-ups
346:13
followed
500:5
following
355:24
follows
295:6
493:16
fooled
321:21
force
497:16
500:18
533:4

forced
394:5 513:6
513:14
forces
354:4
545:13,21
545:25
foregoing
564:3,4
567:12,19
foreshad...
402:18
forever
490:23
forget
388:11,19
forgotten
500:7
form
553:5
567:13
formal
382:14,20
382:22
551:1,15
552:2
format
562:21
formed
547:5
former
541:8
forth
310:15
462:17
470:19
487:19
530:6
531:3
Forty-five
458:18,19
forward
353:25
354:8
364:16
413:25
424:20,21
424:22,23
425:5,13

589

435:25
457:10
505:16
540:12
544:8
**forwarded**
360:25
372:19
411:20
487:8
505:4
553:21
556:17
**forwarding**
487:21
**forwards**
359:15
482:12
487:17
**found**
363:5 414:4
439:22,25
491:11,13
495:17
540:24
**foundation**
312:10
**four**
296:17
298:6
313:4
331:18
334:22
544:20
**fourth**
299:22
410:5
**Fox**
373:13,18
373:22
374:9,11
375:5,9,16
375:24
376:3,25
377:18
378:3,24
379:25
387:5
**frame**

411:1
427:14
500:11
**framework**
453:4
**framing**
350:22
**Frank**
294:12
447:13
559:25
**Franklin**
496:20
498:10
500:5,7,10
501:17
503:5,7,19
540:23
541:18
**frankly**
335:23
397:8
413:1
499:9
**fraternal**
320:6,6,9
320:12,24
321:1
343:6,21
344:16,23
356:8
394:2
395:7,13
396:2
437:19
**free**
472:17
561:24
**Friday**
289:19
491:4
540:20
565:1,11
**Friedman**
516:19
517:25
521:16,22
522:7
**friend**

325:9 344:6
348:1
356:11
422:10
441:9
483:16
547:24
548:23,24
549:1
557:13
**friends**
399:17,19
405:11,12
441:2
454:3
455:2
478:16
501:1
**friendship**
416:8
**front**
307:7
323:19
338:8
371:19
495:6,9,12
495:17,20
496:15,17
504:16
556:7
**fruition**
501:9
**frustra-**
339:11
**frustrated**
366:7,9,12
366:25
368:15
427:12,16
427:18
531:25
557:19,24
558:17
559:3
**frustration**
557:7 559:9
**frustrat...**
339:11
**full**

337:15
345:5
478:5
519:8
**Fun**
469:7
471:10
475:7
487:1
**function**
423:20
**functions**
474:12
**funding**
337:15
342:24
345:5
**funneled**
481:22
**funny**
377:13
**further**
345:23
347:9
366:2
463:11
480:19
541:15
544:24
545:14
**future**
345:23
346:23
355:16
368:3,5
385:8
545:2

---
G
---
**G**
294:1
**gamble**
398:12
**gambling**
291:11,13
291:15
292:9
293:8,14
293:16

321:22
332:18
337:14,18
338:2,17
342:24
343:2,12
344:12
345:5
350:11
360:16,16
360:18,18
360:20,21
361:18
362:23,23
362:24,24
363:6,7,10
364:17,19
366:5
368:7,18
374:18
375:18
376:5
383:23
385:12
390:23
396:9,10
396:12,21
396:22,25
397:4,11
398:15,19
398:20,22
399:13
408:25
409:6,10
416:20
425:19
438:25
456:5
461:22,24
466:23
468:22,22
470:7,8,11
470:13
471:22
472:25
474:20
482:17
483:12
487:2
489:7

590

497:25
512:10
540:12
541:12
548:2,8
551:6
554:15
**game**
357:7
372:11
374:15
393:25
455:16
466:22
470:2
506:1
526:6
536:21
537:17
**games**
318:21
319:2,5,6
319:19
320:21
322:10,17
323:1
324:18
332:24
337:14,23
337:25
338:18
343:1,7
344:11,16
344:19
345:4
349:9
350:1,6,21
354:11,20
356:14,16
385:5,7
386:3,12
389:15,16
389:17,21
389:22,25
389:25
390:1,2,6
390:6,13
391:12,12
391:20
392:14

393:3,16
394:5
400:9,12
400:13,13
401:3,22
402:2,8,23
403:8,11
404:1,20
421:4
436:14,15
438:10,17
438:25
439:6,7
440:4,8
441:4,22
442:2,5
443:7,20
445:17
456:16,19
457:11,25
458:1
466:17,20
466:22
468:24
469:6,14
469:15,21
469:23
470:5
477:7,9,9
478:21
482:17
494:5,5,12
494:24
506:17
507:7,10
510:3
519:22
528:25
530:17
533:12
534:19,22
534:23
536:14
545:24
547:7
**Games'**
320:18
405:3
**Games's**
404:7

**gaming**
291:24
292:7,22
293:1
309:25
310:7,8
317:8,18
318:2,16
343:2
351:23
366:13
368:9
372:23
374:22
395:6,10
397:15,22
397:24
398:4,7
408:23
409:12
414:6,13
415:18,23
433:10,12
435:4,12
440:20
453:23
454:8,12
454:12
459:17
462:1
467:10,16
477:23
478:19,23
479:9,13
503:12
508:13
509:19,25
510:7
511:9,20
512:14
513:5,8,13
513:18
515:7,9,24
517:23
523:20
524:1,18
524:25
525:5,22
526:4,17
526:23

527:7
529:20,25
530:1,2
531:7,16
532:17,20
533:4,16
534:1,14
534:21
536:10,19
536:22
538:12,22
539:6,14
541:5,9
543:5,10
543:12,22
545:6,9,14
545:16
546:3,21
547:3,5
550:18
551:5
553:18
554:17
555:10,13
557:24
558:16
**gaming-type**
351:6
**GARRETT**
290:15
**gas**
374:15
387:14
409:14
410:23
456:6
529:6
531:8
533:20
**gather**
435:10
**GC**
538:14,15
540:24
**GE**
436:8
**general**
319:15,19
320:17

385:4
390:1
429:24,24
450:17
451:19,22
451:25,25
452:6,13
452:16
461:12
463:25
541:8
554:16
556:25
558:1,19
**general's**
496:22
501:20
**generally**
310:10
332:19
337:7
358:17
361:23
372:17
378:18,21
379:21
380:12,16
397:18
446:10
459:19
**generations**
440:11
**Gentlemen**
374:13
561:13
**getting**
334:22
352:14
364:4,25
368:25
435:16
475:21
505:23
506:12
511:15
515:23
531:15
538:15
**gimmick**
523:18

give
302:15
313:1
322:7
330:10
352:13
394:5
430:5
445:7
449:14
455:18
461:11
467:2
471:5
472:16
477:6
502:21,24
518:13,16
562:20
given
305:1
310:19
359:13
361:19
414:18
423:19
429:25
468:12
470:7
525:18
564:5
giving
446:19
453:2
461:18
536:18
glad
529:2
gladly
513:9,15
Glitch
460:14
go
296:16
316:4
320:19
322:15
324:7
326:15

329:24
333:7
335:9
336:19
344:11
345:1
346:15,24
352:10,19
353:9
358:9
360:1
364:11
371:7
372:18
373:15
377:19
382:24
384:17,18
384:18,20
384:20
400:6
401:24
403:23
405:10
408:6,15
415:6,17
417:16
420:1
432:17
433:13
434:15
444:22
446:1
447:8,15
449:10
450:24
453:22
457:10
459:23
461:20
465:7
475:12
477:21
484:21
495:2,4,24
495:25
496:3,10
503:7,20
505:5
511:4

512:22
513:3
519:1,25
523:21
525:17
527:14
531:14
533:22
541:18
542:10,15
544:3,19
548:5
549:3,8,11
550:7,7
551:13
555:20
556:4
562:7,11
goal
502:5
541:16
goals
545:15,15
545:16
546:5
goes
306:15
315:25
329:12
420:4
431:13
461:11
going
295:23
296:15,17
306:4
308:20
311:13
312:11
313:6
319:13,16
320:17
321:8,17
329:22
330:2,16
334:15
335:14,15
344:1,5
349:11
353:3,9,25

354:21
355:17
356:21
357:17
361:15,17
361:20
362:11
364:21
365:6,6,15
367:6,7
370:21
371:13,21
382:16
385:20
393:9
414:13
416:19,20
418:13
419:22
420:11
421:24
422:12
423:7,9,10
427:16
429:4
431:7
433:22
434:20
435:3
441:2,10
442:22,24
442:24
444:12,20
445:2
449:7
450:8
457:4
459:1,7
465:20
471:17
472:20
475:20
478:4,6,10
481:18
484:7
492:12
495:21
498:21
499:10
500:14

502:12,14
504:8,13
506:13
507:3
522:18
528:14
533:17
538:1
543:7
544:4,7
546:13
555:15,22
557:18
559:14,16
goings-on
340:6
golf
357:7
good
329:24
335:10
352:17
354:18
367:19
371:6
416:6
427:10
430:24
444:18,19
455:6
456:9
457:6,10
458:6,23
471:8
493:19,21
494:11
496:16
501:11
504:5
505:20
507:8
509:4,6
524:22
532:11,11
556:4
557:12
561:3
Google
388:9
Gor-

592

536:8
**Gorth-**
536:8
**Gorthaus**
536:8
**gosh**
346:21
370:7
**Gotcha**
322:15
413:3
414:23
422:16
434:13
537:4
**gotten**
349:4 362:5
**governance**
379:22
**governed**
362:1
**governor**
395:12
416:3,9
422:9,12
422:19
423:2
426:13
428:16
493:22
**governor's**
342:15,16
342:17,20
389:17
392:13
416:2,7
423:7
479:12
**governor...**
342:18
**Grace**
290:4
294:20
**graduated**
377:21
**GRAVES**
290:15
**gray**
293:4

373:10
383:2,4,10
536:4,13
536:14
**Gray's**
389:9
**great**
376:22
403:11
419:8,8
504:4
**greater**
298:10
**Grewach**
541:8
**Grothaus**
536:9,15
538:12
**ground**
544:5,25
546:18,20
**grounds**
446:8
455:20,21
**group**
348:16
372:10
417:22
419:11,15
453:17
459:13
470:20
483:20
487:21
505:8
508:5
509:22
510:23
511:5
512:24
513:20
514:2
**group's**
494:4
**groups**
543:3
**grow**
484:21
**growth**

476:1
**guess**
299:18
300:7
309:9
319:7
327:23
351:15,19
360:2,23
362:1,19
366:11
373:4
390:2
397:12
427:11
428:1
432:18
438:6
446:20
452:24
453:16
456:9
461:11
485:22
486:19
487:19
490:6
492:4
510:15
518:25
548:25
553:3,22
556:23
557:15
**guessing**
342:13,15
342:19
490:3
**guidance**
330:22
467:15
**guy**
376:17
431:7,8
534:12
557:12
**guys**
333:14
335:15
353:13

389:23
440:9,16
443:11
451:13,18
458:23

---

**H**

**H**
291:5
**ha**
463:1,1,1
470:25,25
470:25
**Ha-**
411:15
**hairs**
546:16
**half**
349:25
467:24
548:1
**Hall**
527:4
**halls**
479:2 480:5
**handle**
455:3
**hang**
542:9
**hanging**
432:25
434:12
**haphazard**
343:2,2
**happen**
305:5 344:2
354:21
364:5
365:5
368:11
369:14
509:24
522:5
**happened**
304:4
307:19
308:8,8
309:8
321:9

355:25
356:7
390:15
409:19,20
414:21
417:1
420:5
425:9,11
433:4,17
436:5
438:4
439:10,16
507:5
537:18
553:25
**happening**
300:12
301:15
346:16
363:14
364:4,5
367:12
394:24
417:1
423:14
445:4
481:25
482:9
526:12
537:9,20
**happens**
301:12
370:4
**happenst...**
420:23
**happy**
330:24
386:4,13
464:20
561:6
**hard**
302:9
319:16
392:6
429:3
464:7,16
491:17,19
**harm**
328:12

593

harmed
451:16
harming
403:8
harmless
465:7,11
466:22
475:12
477:3,8,10
477:21
Harn-
507:21
Harness
291:18,20
291:22
292:5,15
292:18,20
325:10
326:10,11
326:16,21
328:1,17
331:8
335:25
336:12
347:15
348:20
357:22
358:12
360:12
371:25
372:21
384:22
385:21
386:16
389:1
397:17
415:14
418:6
459:13,24
460:9
462:24
482:11,14
485:10
487:6,25
488:1
504:18
507:23
509:15
542:3
Harness's

348:16
367:15,21
462:6
harsh
428:7
Harvard
521:23
Harvey
491:4,8
hatching
526:1
hate
426:2
have-not
343:6
Havey
291:25
292:8,10
293:5
298:24
301:10
302:6
305:13
308:5
309:13
406:24
407:17,21
408:17
410:21
411:15
432:21
489:6
529:22
530:16
538:6
Havey's
408:1
411:20
hazard
485:20
head
345:21
388:20
408:11,23
420:3
478:14
486:15
537:16
headed

500:20
header
307:3 383:6
hear
330:18
333:8,14
333:15
335:6
337:12
345:2
351:10
352:6
353:23
365:25
501:6,6
558:6
559:11,22
heard
300:16
311:20
330:17
335:7
351:12
354:1
366:1
406:16
450:16
467:6
476:15
484:13
522:16
526:25
527:1
530:13
547:1,11
559:25
562:7
hearing
476:14,16
hearsay
547:9
heart
431:13
534:17
held
294:11
Hello
333:8 436:3
523:13

help
304:24
314:11
315:13
324:1
328:9
330:22
349:2
350:15
353:14
358:19,25
363:16
368:6
382:14
391:1
403:2
404:1,1
406:11
436:18,21
444:21
445:24
455:2
458:9,13
458:13
462:20
465:3
467:18
478:5
489:4
494:4,12
494:18
507:7
508:9
509:24
513:19
524:1,3
553:6
555:3,13
helped
405:25
464:21
helpful
309:6
313:13
419:23
445:5
494:15
523:16
helping
372:7,8

493:23
helps
437:5 478:7
Hemphill
543:23
hereinafter
374:14
Herschend
350:8 353:1
353:16
357:12
465:16
Herschen...
349:15
Hershend
349:18,19
hesitate
375:1
hesitated
428:13
hey
366:19
414:4,12
440:16
441:2
443:11
455:7
531:12
higher
356:10
452:21
highway
295:17
310:2
368:24
hint
486:12
hire
429:1,6,7
hired
430:19
478:12
hires
336:4
history
430:17
Hmm
450:6
hold

594

308:11,11
320:18
328:22
334:13,24
375:21,21
375:21
379:4
407:4
408:12
474:8
477:13,13
511:13
520:7,9,9
527:5,23
527:24
560:5
**holder**
351:21
**holders**
361:19
**holding**
317:13
359:24
**Holmes**
294:12
**home**
537:2
**honest**
365:12
**honestly**
306:2,13,21
308:1
309:11
400:8
414:20
416:22,25
457:1
486:7
**honor**
450:14
**hoodwink**
321:5
**hoodwinked**
320:21
321:6,20
**hope**
336:2
353:24
428:2,4,5

468:8
478:8
523:13
544:14
545:3
561:7
**hoped**
497:11
501:11,25
**hopefully**
315:13
328:8
330:21
334:23
353:18
393:18
441:20
445:5
458:4
512:16
527:9
544:2
560:11
**hopes**
433:22
**hoping**
351:24
506:22
546:12
**hotline**
433:12
**Hough**
505:21
506:3,4
**hour**
492:23
**hours**
560:24
**house**
292:14
320:22
339:7
340:1,3,25
345:17
424:15
425:7
508:20
509:18
525:14

526:4
**Howard**
388:16
408:21
409:5,11
409:22
414:16
434:25
517:12
526:2,3,9
526:11
527:2
529:5,23
530:15
531:4,11
533:3,19
534:12,17
536:20
537:22
538:22
539:3,22
550:19
**Howard's**
388:15
534:25
539:23
**hunt**
492:8
**hurdles**
397:20
**hurry**
562:10
**hurt**
355:17
**hurting**
477:1,2
**hurts**
323:6,7
**hypothet...**
391:14
430:13,15
**hypothet...**
336:18

---
| I |
---
**I-44**
496:19
501:16
**IA**

289:25
564:15
**idea**
411:4
480:23
525:18
536:21
544:21,24
549:20
**identi--**
504:15
**identifi...**
298:16
300:19
313:6
315:6
323:14
338:7,11
339:15
341:21,23
347:14
357:19
371:20,25
382:25
406:20,23
407:16
435:19
459:8
489:5
490:25
493:6
504:14,17
507:18
509:11
518:8
522:19
535:10,12
538:2
541:25
547:16
550:2
553:11,12
556:8
**identified**
332:20
522:19
**identify**
357:20
459:11
540:9

**ignored**
337:16
**II**
289:15
**III**
289:15
**illegal**
291:24
292:7
332:18
337:18
338:1
363:6
364:17
366:5
368:7,18
372:23
374:18
389:15,21
390:10,25
391:4,16
391:23
392:1,1,21
395:9
397:22
398:14,20
398:21
399:12
400:15
401:4,7,14
401:23
403:8
404:19
405:4
408:25
409:6,9,24
410:7,10
410:16
416:20
421:3
423:19
435:17
438:10,25
439:7
440:18,23
442:5
443:12
444:2
445:9,17
453:19

454:10,14
454:23
457:9
459:17
461:24
470:6,13
475:23
480:3
482:17
497:25
503:21
510:3,8
511:11
512:10,17
531:6
533:5
534:5,6,15
534:19,23
540:13
541:12
545:5
548:2
551:2,16
554:15
558:2,20
**imagine**
444:10
**immoral**
398:23
**impact**
328:5,20
331:13
332:10
335:20,22
426:23
525:16
**impacted**
387:13
404:19
405:3
470:3
**impacting**
322:2
**impediment**
546:4
**implication**
405:7
473:10
**implying**

377:9
**important**
302:4
353:17
370:19
433:3
**inadvert...**
444:22
**inapprop...**
324:18
**incident**
436:4
**include**
303:8
309:21
464:10
468:23
469:5,20
473:6
474:5,5
476:11
477:8
482:12
524:15
550:12
560:13
**included**
301:4 303:2
305:2
318:4
333:3
369:19
476:22
481:19
482:6
483:4,6,22
488:8,23
536:14
**includes**
297:4
488:15
**including**
344:14
425:20
446:3
461:24
470:14
474:18
501:16

**incorpor...**
294:6,21
545:4
565:10
**incorrect**
475:4
**increase**
416:19
424:6
**Increasing**
426:4
**incredible**
440:13
**independ...**
517:3 526:5
541:10
**indicate**
324:15
359:20
544:24
**indicated**
502:21
**indicates**
410:2
451:21
**indicating**
435:8
**individu...**
315:7
**individuals**
493:15
**industrial**
317:5
**industries**
545:2
**industry**
343:3
359:13
394:21
399:16,21
400:4,24
401:1,2,11
403:24
404:12,15
406:1
414:2
426:24
458:13
494:17

495:1
507:9
545:9
549:14
**industry's**
425:13
**ineffective**
430:1,23
**influence**
369:12
417:10
419:11,21
419:25
426:23
483:16
**info**
292:4
**inform**
341:1
**information**
300:25
301:10
359:6,16
360:24
387:19
401:8
409:4
414:4,11
414:15
415:20,24
416:1
433:15
435:25
457:3
460:1
478:15
485:14
487:21
530:6
531:2
536:5,7,15
554:17
**informed**
353:18
410:14
457:7,7
510:4
511:7
512:25

530:16
**infringed**
524:9
**inhouse**
300:10
**initia-**
387:8
**initial**
296:1
538:21
**initially**
352:7
409:19
**inject**
355:8
**input**
419:16
420:10
**inquire**
513:23
**inserted**
301:14
**inside**
480:5
**inspected**
538:15
540:1
541:11
554:24
**inspection**
515:24
516:5
522:8
537:18
539:1
**installed**
374:15
539:15
**installing**
357:4
**instance**
307:3
400:11
448:15
**instanta...**
421:5
**instructed**
308:22
529:24

instruction 491:23
integral 351:2,18
intend 515:8
intended 501:8 521:25
intention 497:10 499:24 501:14 521:21 532:19
intents 316:14
interact 519:17
interact... 347:10 392:15
interest 317:16 318:9,10 318:13 399:11 427:4 564:11
interested 301:25 331:10 530:17 548:7
interesting 439:12 523:16
interests 322:5 327:3 328:6 400:4 427:4 438:8 545:25
interfered 448:16 449:24
interfer... 446:4,17,25

447:7,21
449:20
450:2,13
451:1,11
452:2
510:2,22
511:1
516:10,12
524:6
interfering 442:20
interim 292:21 509:18
internal 315:10
interpret 381:6 382:15 401:6 485:4 488:12
interpre... 444:20
interpreted 376:6 484:18
interpre... 380:2,23 381:10
interrupt 364:14 555:19
intervene 511:20 512:15
intimating 512:7
intimidate 442:15,17 443:3
introduce 423:17
inundating 456:6
inventories 422:14
investigate 496:24

497:6
499:23
501:21
503:4,11
510:1,21
investig... 522:1 541:1
554:14
investig... 553:17
investig... 503:11
invitation 386:17
inviting 437:10
involve 332:3 409:6 526:2
involved 340:10 350:5,13 356:23 357:1 368:18 372:10 394:22 399:18 403:25 409:13 440:5 446:25 449:21 454:20 499:16 513:6,9,14 513:15
involving 332:6
iPhone 488:9
irrelevant 365:4
issue 324:17 333:12 374:19 479:25 506:9,16

issued 440:20
it'll 518:22
item 311:18 506:8,16
items 311:16

_____

J

J 290:14 383:1,4
James 289:18 291:2 292:2,24 294:3 295:2 387:11,13 388:17 408:22 433:5 503:21 517:23 529:5,17 537:22 565:6 566:2 567:6,11
January 406:25 407:18 408:18 409:19,21 409:25 411:11,16 412:13 415:10 422:7 432:21 531:4,25 565:1
Jason 339:3 345:17,24
jasonchi... 323:20

338:12
Jeff 346:24 369:20 505:13
Jefferson 346:14 373:2 392:20 536:16
Jim 308:11 351:10 352:10 353:6 372:1 375:23 379:6 381:3,14 381:14,14 403:16 406:25 407:18,18 415:8 421:16 431:4 432:11 434:17 439:14 448:8 458:20 464:14 467:1 477:13 483:21 489:6 491:9 496:6,13 507:22 535:1 549:19 556:11 560:14
Jim's 482:18 487:3 505:9
job 289:22 380:20

597

431:18
453:12,16
565:6
**Joe**
436:5
439:20
440:2,12
441:1
**John**
413:8,8,9
**join**
354:14
525:6
545:13,21
**joining**
545:24
**joke**
377:11,15
**Jon**
389:13
**Jonathan**
372:2
385:22
**Jonathon**
372:5
**Jones**
291:16
342:12
344:10
345:11
**Joseph**
348:5
**Joshua**
486:5,15,20
486:25
487:20
**joyous**
561:8
**ju-**
341:7
**judging**
401:6
**judgment**
430:21
**jukebox**
357:6
529:10
**July**
440:23

492:4
519:14
526:22
536:10
537:1,2,13
538:6
540:11
547:18
549:5,7
550:13,16
553:13
554:23
556:12
**jump**
328:23
366:7
555:13
**juncture**
321:12
**June**
508:1
509:16
512:19
526:7
542:17
**jurisdic...**
380:5,24
554:10

---

**K**

**K-i-n-n-e-y**
326:9
**Kansas**
290:17
413:16
**Kathi**
325:10
326:10,11
326:16,20
328:1,17
331:8,10
335:25
336:12
347:15
348:15,20
349:11
357:22
358:12
359:8,15
360:12

367:14,21
371:25
372:19,21
373:7
384:21
385:21
386:16,19
388:25
389:1
390:4
397:17
415:14
418:6
429:18,23
459:12,24
460:9,11
460:20
462:24
482:11,14
483:20
485:10
487:6,24
488:1
504:18
507:21,22
509:15
542:3
**Kathi's**
347:18,20
348:14
350:22
373:4
389:5
**keep**
308:22,22
308:23,23
327:1,7
334:14
335:15
355:11
399:15
421:24
429:16
464:6
**keeps**
334:14
**kept**
304:14,18
466:11
491:19

**key**
416:13
**kids**
466:3
**kill**
493:20
508:10,16
**kind**
297:8
322:13
326:2,4
327:2
329:25
341:2,8
343:14
350:22
352:14
357:4
362:8
390:7,24
393:8,19
399:20
402:18
418:1,4
431:13
432:24
435:14
440:25
447:8,17
463:25
502:2
506:12
519:1
544:12
**kinds**
534:20
**Kinney**
326:8,8,9
356:11
357:23
411:23
413:20
435:23
439:20
504:19
**Kirksville**
373:10
**Kistner**
524:5

**Kleinsorge**
293:2
482:21,24
486:3
535:16
536:12
**knew**
344:3
353:23
356:20
365:14
422:11
435:15
489:17
506:23
520:1,2,6
520:15,18
520:25
529:12,18
551:10
**know**
296:5
297:17,17
297:20
299:8,13
300:11,24
301:3,6,7
301:17
302:1,12
302:19,22
303:17,21
303:23,24
303:25
304:8,17
305:23,25
306:2,4,5
306:12,21
306:24
307:14,15
307:16,21
308:1,19
308:25
309:7,11
310:15,20
310:23
311:1,5,6
311:7,16
311:25
313:2,14
314:22

315:15
317:18
318:11,12
320:10,12
323:14
326:5
328:4,7,16
329:9
331:11
332:6
333:4,5
334:7,21
335:23
336:18,22
337:4
338:7
340:2
341:1,9
345:22
346:7,15
347:1,3,4
348:24
349:9
351:3,5,12
351:17
353:5,14
354:3,10
357:4,5,6
357:7
358:14,14
358:17
359:1,18
360:4,24
361:12,16
361:24,25
362:7,17
363:6,15
365:14
366:3,4,12
366:13,21
369:2,15
370:8,9,11
370:13,15
370:17,18
371:8
372:5,8,17
373:6
374:4,5,7
374:8,17
375:17

376:4,7,8
376:9
377:2,22
378:3,5,9
378:15
379:22
380:10
382:13,17
383:4
384:10,16
386:16,19
386:19
387:17
388:7,12
388:24,25
389:3,6
392:6,14
392:23
394:15
395:6,9
397:8,19
397:25
398:23
400:10,23
401:9,18
403:5,6
404:6
406:20
409:4,9,13
410:21
411:8
412:22,22
412:24
413:18
414:17,19
414:20,24
415:3,13
417:10,14
418:5,7,8
419:21,25
420:2,10
421:12,24
423:22
424:4,10
425:6,11
425:25
428:24
429:5,20
429:20
431:4,6,18

431:24,25
432:2,13
433:14
435:19
436:20
437:22
438:14
440:3,7,14
442:22,23
444:10,13
446:21
448:12
451:17
452:5,10
452:11,23
453:12,17
453:25
454:5,8,16
455:2,3
456:13,15
457:24
458:7
459:9,25
460:3,13
462:9,12
463:6,8,12
463:13
464:6,14
466:8,12
466:21,25
467:5,18
467:25
468:20
469:5,12
469:19,24
470:4,4,6
470:8
471:6
474:10
475:9
476:16,18
478:9,9,10
479:22
480:2
484:2
486:5,15
487:6,7,12
487:15
488:20
489:11,14

489:15,16
489:22
490:3,11
491:13
492:15,17
492:17,22
493:17
494:12
495:19
496:4,11
498:24
499:1,2,8
499:22
500:3,4,8
500:12
507:18
509:12
510:8
512:7
515:16
518:21
519:13
520:19
521:6,11
521:12
522:5,14
522:15
527:20
528:12,20
531:14
535:1,11
536:24
537:6,8,10
537:10,16
537:19,23
537:23
538:3
539:8,8
541:23
544:4
546:1,13
546:17
547:10
548:3,17
549:23
551:4
552:12,15
552:22
555:7,8
556:20,21

557:11,16
557:22
558:15
562:20

**knowing**
401:5
422:18

**knowledge**
326:19
364:6
425:24,25
450:20
500:1

**known**
320:12
326:12
348:8
429:18
454:10
548:24

**knows**
411:6
429:20
453:24
556:22
557:13

---

**L**

**lack**
366:7
368:16
475:14,15
557:8,24
558:17

**Laclede**
496:20
498:9,25
501:17

**Lake**
352:22

**lakes**
352:21

**language**
345:6
419:25
459:20
464:9
465:1,4
468:11,21

599

469:4,19
470:22
471:6,8,21
472:24
473:16
474:12,17
481:4,5,6
481:13
482:5,16
483:18
484:6,12
485:9,11
487:3
488:4,7,15
488:25
489:12,20
505:23,24
506:1,5,6
506:18
**large**
416:4
**larger**
470:15
**late**
298:18
361:7
387:8
403:6
**law**
292:9 302:2
360:17
368:8,10
368:17,24
375:7
376:11,19
376:20
377:3,19
377:21
378:8
381:25
382:7
383:10,22
384:5
385:18
421:1
425:22
426:3
431:9
438:11
439:1

441:23
445:18
446:4,5,22
450:13,14
451:1,5,19
451:23
455:11
461:23
463:1,3,5
463:16
464:4,9,11
464:20
466:5,13
466:24
470:12,25
471:15,23
473:1
474:21
475:22
478:5
480:19
481:1,2,11
481:11,16
482:6,6,13
482:23
483:4,7,10
489:7
497:24
502:15
511:19
512:5,9
518:15
541:17
553:6
554:12
555:3
559:3
**lawmaking**
426:23
**laws**
361:9
375:19
380:3,23
381:6,11
396:12,25
425:3,20
470:8
498:1
**lawsuit**
329:14

512:13
515:12
**lawyer**
376:18
381:23
383:7,17
385:16
410:9
428:4,5
450:18
**lawyers**
384:5
478:12
514:2,4
516:8
**lax**
453:24
**lay**
312:10
**lead**
497:13
550:17,17
**leader**
326:4,6
399:24
455:1
**leadership**
420:23
422:7,13
422:17,25
423:10
**leading**
491:19
497:5
**leaf**
351:20
**league**
327:4,24
331:13
335:23
**leagues**
327:16,21
327:22
**learn**
418:1,11
485:18
534:13
**learned**
470:7

**learning**
416:24
**leave**
421:7
422:13
561:14
**leaves**
420:22
423:14
**leaving**
420:13,17
420:22
**Lebanon**
499:1
**led**
367:18
**left**
297:20
387:20
388:12
533:20
561:15,16
**Legacy**
492:15
519:23,24
**legal**
308:16,21
319:11
374:20
375:7,22
378:11
381:2
383:20,20
383:22,24
384:1
386:3,13
386:18
390:18
394:18,23
397:6,24
398:3,8,12
427:4
438:13
439:8
440:6,16
441:3,23
443:19,21
444:13,25
446:8,18

446:20
452:4,7,12
453:7,19
454:22
455:9,20
455:21
456:1,14
457:6,8
464:13
467:3
468:15
471:24
473:2
474:22
475:8,9
479:6
480:3,8
510:24
511:6,16
514:16
527:6
533:24
550:17
**legality**
442:1
524:18,24
525:23
538:16
**legally**
393:3
**Legion**
320:11
**legislation**
328:4,19
332:3,6,10
332:17
333:3,23
334:4,8
335:19
336:10
340:5
394:17
425:4
431:19,19
431:22
544:10
**legislative**
292:13,17
324:23
337:17

350:23
354:18
401:15
422:8
425:22
471:21
472:24
**legislature**
322:11
337:13
342:23
345:3
353:15
422:18
428:16
506:10,12
**legislat...**
416:2
**LEIGHTON**
290:5 565:2
**length**
560:20
**Leonardo**
376:21
**lesser**
394:4
**let's**
295:24
310:4
323:23,23
323:24
346:6
347:19
353:25
354:14
371:2,2
372:17
373:16
406:16
407:11
432:3
480:25
482:10
492:2
495:2,4
504:1
510:17
521:15
527:7,14

535:8
542:10
559:11,13
559:13
**letter**
293:1,6
324:11
341:13
349:14,22
363:13,20
365:11
373:9
383:1,6,11
383:13
387:22
414:7
419:18
420:8
440:21
446:13
454:9,12
454:13
455:19
523:14,17
523:22,25
525:18
538:7,14
539:10
541:5
544:2
550:16,17
550:20
551:15
557:23
558:15
565:10
**letters**
344:8
384:25
401:13
**letting**
491:13
551:4
**level**
312:19
425:22
452:21
**license**
360:19
361:19

363:5
529:18,19
530:3
**license-...**
362:1
**licensed**
479:2
525:21
**licensee**
360:16,22
363:11
554:11
**licensees**
362:22
366:4
**licensing**
319:11
**life**
427:24
**liked**
354:21
488:3,25
**limited**
327:15,20
554:11
**Linc-**
506:3
**Lincoln**
505:21
506:3,4
**line**
338:15,16
338:24
339:20
342:4
368:1
372:22
379:7
386:7,8,10
393:20
407:7
410:5
421:2
450:16,18
453:11
459:16
461:4,5
486:24
491:5

505:6
506:8,16
509:18
522:24
527:18
528:10,18
555:19
556:10
566:7,11
566:15,19
566:23
**lines**
337:11
389:6
420:13,16
434:17
445:6
544:13
**ling**
474:12
**link**
433:13
**links**
553:4
**liquor**
360:6
361:19,25
366:16,17
**liquor-b...**
319:22
320:2
321:1
**list**
296:8
298:15
303:9,15
313:4
323:16
338:5
339:16
**listening**
532:3
**literally**
312:9
313:25
422:17
430:11
**litigation**
305:17

307:18
308:9
515:21
525:6
**little**
302:16
329:24
330:23
342:8
351:7
353:11
359:11
379:7
392:6
401:19
410:4
420:21
445:21
448:18
449:14
450:22
494:2
501:4
507:2
515:16
536:25
**live**
552:11
**lives**
502:23
**LLC**
289:9
290:15
294:7
316:8
317:1
374:14
565:7
566:4
567:8
**LLP**
290:5 565:2
**lob-**
431:17
543:12
**lobbied**
355:23
**lobby**
322:4 336:5

336:13
356:5,14
**lobbying**
427:13
547:2
**lobbyist**
325:10
326:11,17
326:23
327:25
331:22
335:25
336:5
348:13,19
349:22
350:8
360:12
373:2
418:7
426:15,18
427:3
428:3,17
429:2,13
430:3,6,8
430:12,15
430:17,19
430:23,24
431:1
467:12
543:2,5,12
547:4,4
**lobbyists**
310:5
348:22
373:5
401:12
426:22
427:20,24
427:25
428:15
430:2
431:17
480:18
543:10
544:11
**local**
340:13
341:16
360:16
368:8,9,17

368:24
437:12
457:12
497:15
526:11
539:10
554:12
**located**
294:14
295:16
348:4
374:22
552:8
**location**
299:4,5
300:5
305:7
320:6
322:19
323:3
410:6,15
410:18,22
439:24
525:21
531:7
540:1
**locations**
321:2
324:22
365:17
397:21
421:7
471:14
472:2
473:8
474:25
476:13
480:21
481:8
494:5
510:2,23
511:2
524:7,10
525:20
529:15
552:24
**lodge**
320:10
534:20
**log**

302:9,10,11
302:13,16
302:19
303:1,6,8
303:20
306:1,3,5
306:9,16
306:22,24
307:5,9,10
307:24
309:2
**logic**
445:2
**logs**
303:3
**long**
326:4,6
329:7,22
329:25
332:5
348:8
351:3,21
352:13
370:22
376:18
387:4
397:5
398:10
404:4
408:7,9,10
408:11,11
448:20
449:9
495:3,7,8
504:2
508:21
515:21
518:13,20
556:2
**longer**
383:13
408:12
458:18
496:12
**look**
297:6 298:7
299:7
306:8
311:6
312:7

313:12,25
314:14
315:17
335:13
338:4
347:18
357:17
373:15
393:20
400:3
408:7
440:2
462:20
464:17
482:10
494:22
499:22
508:3
509:21
515:6
519:1
521:25
523:12
527:8,18
528:15
535:8
540:16
551:13
552:17
**look-**
546:18
**looked**
302:9,17
354:10,17
400:10
411:15
478:24
489:15
497:24
530:25
531:3
553:21
**looking**
296:21
298:21
300:7
302:14
314:6,22
315:5,16
315:21

328:18
336:21
355:19
358:21
407:11
432:15
434:14
460:3
486:14
489:18
491:9,11
492:18
511:18
545:19,20
**lookout**
327:2
**looks**
297:8
298:23
299:23
302:11,21
304:1
306:1,16
306:22
313:10
339:24
340:1,2
357:24
361:14
411:19
414:5
459:22
461:10,17
485:23
487:7,12
489:10,19
505:3
510:10
536:11
541:14
549:17
557:19
562:6
**lose**
333:18
**losing**
334:14
525:12
**loss**
451:6,20,24

602

| | | | | |
|---|---|---|---|---|
| **lost** | 443:13,14 | 536:9 | 293:4,8,14 | 511:10 |
| 386:6 | 444:14 | **machine** | 293:17 | 512:10 |
| **lot** | 454:20 | 291:19 | 305:6,7 | 520:17 |
| 312:11 | 455:8 | 293:3 | 307:3 | 521:1 |
| 353:4,6 | 457:11 | 318:22 | 318:22 | 523:17 |
| 383:12 | 462:2 | 324:21 | 319:10,20 | 524:2,10 |
| 401:11 | 506:13 | 325:14 | 319:21,21 | 524:24 |
| 418:18 | 507:8,11 | 349:6 | 320:24 | 527:21 |
| 426:12 | 508:12 | 353:12 | 322:18 | 528:21 |
| 431:25 | 514:17 | 372:11 | 323:2 | 529:9,13 |
| 446:9 | 515:1 | 390:16 | 324:22 | 529:15,16 |
| 450:17 | 524:16 | 391:24 | 344:13 | 529:24 |
| 463:4 | 525:5,11 | 422:14 | 350:14 | 530:3,8 |
| 475:17 | 525:12 | 437:18,22 | 351:5,6 | 531:22 |
| 490:14 | 549:13 | 437:23,23 | 356:6,20 | 533:17,19 |
| 491:11 | **lottery's** | 437:25 | 372:23 | 533:23 |
| 495:19 | 337:14 | 440:17 | 374:15,18 | 534:2 |
| 501:2 | 345:4 | 454:5 | 374:18 | 535:6 |
| 555:15 | 349:10 | 461:25 | 387:14,15 | 536:4,14 |
| 557:13 | **lottery-...** | 467:14 | 390:21 | 539:14,18 |
| **lottering** | 438:10 | 470:14 | 392:21 | 539:23 |
| 323:2 | **Louis** | 475:24 | 403:3 | 540:1,12 |
| **lottery** | 290:8 | 492:13 | 410:7 | 540:25 |
| 291:17 | 294:15 | 510:6 | 414:17 | 548:2 |
| 310:3 | 295:21 | 511:9 | 416:20 | 549:13,15 |
| 313:20,20 | 447:5 | 517:8,14 | 422:5 | 551:7,7 |
| 318:21 | 557:14 | 517:16,19 | 435:17 | 552:25 |
| 319:1,8,9 | 565:4 | 517:22,24 | 436:18 | 553:7 |
| 319:12,19 | **loves** | 518:4 | 438:2,18 | 554:15 |
| 320:18,20 | 396:4,4 | 519:3,16 | 438:25 | 559:4,6 |
| 322:12,18 | **lower** | 520:2,3,4 | 439:18,23 | **Madam** |
| 323:2 | 554:1 | 520:15 | 439:25 | 396:17 |
| 324:19 | **lowly** | 521:18 | 440:5,18 | 472:9,13 |
| 337:24 | 400:25 | 525:19,21 | 440:22,24 | 558:7 |
| 338:17 | **loyal** | 526:8,17 | 441:3,4,22 | **magazine** |
| 342:25 | 429:17 | 526:18 | 442:5 | 491:9 |
| 349:4,8,9 | 430:7 | 528:13 | 443:12,14 | **magical** |
| 350:2,6,14 | **loyalty** | 530:9 | 443:19,20 | 431:6 |
| 350:21 | 430:14,20 | 531:15 | 444:2 | **main** |
| 354:20 | **lunch** | 532:14 | 445:8 | 290:16 |
| 372:12 | 421:18 | 533:8 | 454:9,13 | 463:23 |
| 392:25 | 458:17 | 536:3,13 | 455:6,8 | **maintain** |
| 393:3,8 | 459:6 | 537:1,9 | 458:6 | 403:3 |
| 394:11,12 | **lying** | 539:11 | 459:17 | **majority** |
| 401:3 | 377:2 | 554:24 | 469:10 | 384:4 |
| 436:8,16 | | **machine's** | 494:18,19 | **making** |
| 438:17 | | 524:17 | 502:9 | 335:8 |
| 439:7,22 | **M** | **machines** | 506:22,25 | 356:24 |
| 440:6,17 | **M** | 291:24 | 507:4 | 377:11 |
| 441:4 | 437:2  536:8 | 292:1,7 | 510:8 | |

402:13
462:10
565:16,17
**man**
326:8
387:25
429:3
531:25
**manager**
301:23
408:3
410:6,8,15
410:19,22
**Manilla**
528:25
**manner**
375:7
383:21
469:20
471:23
473:1
512:15
**manpower**
369:24
370:3
**manufact...**
528:25
**Mar-**
412:20
**March**
307:19
313:18
315:23
324:6,13
459:14
462:24
463:9
482:14
485:9
490:20
516:15,20
517:2
521:15
522:10
**mark**
459:7
510:11
518:6
**marked**

295:25
296:24
298:15
300:19
313:5
323:13
338:6,10
339:14
341:20,22
347:13
357:18
371:20
406:19,22
489:4,5
490:19,24
492:21
493:1,5
504:13,17
509:10
522:24
535:9,12
538:1
540:6
541:21
547:15
550:1,2
553:10
555:25
556:7
**market**
389:16,22
389:25
390:2,13
390:20
391:11,20
391:24
393:15,24
394:5
395:10
397:22
398:20,22
399:13
416:21
458:1
465:5
471:13
472:1
473:7,21
474:24
476:12

480:20
481:7
508:11,13
508:17
509:25
523:20
524:1
545:5
**marketplace**
368:20
**marking**
300:15
314:16
406:18
435:18
507:17
522:18
**Marla**
292:8
408:17
412:17
413:5
415:9
489:6
**Mary**
290:4
294:19
**marygrac...**
290:11
**matching**
491:17
**mathematic**
521:24
**matrix**
460:14
**Matt**
373:11
**matter**
336:15
342:22
369:22
416:9
420:23
513:9,15
**matters**
389:13
**Matthew**
310:6
**may-**

450:7
**McNutt**
503:21
**mean**
297:8
301:14
303:13
305:18
307:25
310:25
320:2
322:8
332:5
335:1,11
343:11
346:3,4
354:12
358:16,24
359:12
362:14
363:2
364:13
367:16
369:6
375:15,15
379:20
382:6,19
384:23
389:22
391:2,19
397:16
400:6
410:12
412:18
416:16
418:17
420:24
422:25
426:19
427:1,7
429:16
431:16,17
431:20
433:8
437:16
442:16
448:19
449:11
453:8
455:12

456:10,12
456:18,18
463:1,9,15
464:7
465:10
466:17
468:1,6
469:17,24
473:12
476:7
487:6,15
489:21,22
490:4,9
493:23
495:24
500:17
501:6
502:1
509:4
525:3
529:2
532:25
537:19
538:20
546:2,14
551:21
553:1
559:11
**meaning**
321:20
329:14
359:17
422:7,7
484:22
532:17
**means**
325:23
342:18
382:20
437:5
473:18
478:25
556:25
**meant**
328:25
344:1
484:20,21
484:23
514:12,22
514:23,24

557:9
**measured**
493:20
**mechanized**
437:3
**media**
309:22
**meet**
346:25
369:11
**meeting**
436:6 437:7
437:12
441:5,22
442:10,13
443:16
444:10
445:16
446:1
467:9
503:19
519:14
526:22
530:13
532:19
533:7
537:12
543:15,20
544:1
**meetings**
321:16
366:15
493:24
525:15
**Melody**
289:24
294:15
564:2,14
565:24
**member**
317:23
339:7
340:1,3,5
342:20
347:25
351:4
358:3
359:2
412:2

413:13,20
418:5
485:12
486:1
**members**
322:1 323:8
340:20,23
340:25
341:9
349:7,7,21
350:15,20
353:13
354:4
355:3,7
356:22,22
360:25
365:17
372:11
399:10
402:22
403:1
413:24
414:12
431:22
435:13
458:12
460:20,21
461:7
467:17
477:23
480:17
505:8
545:15
**membership**
343:25
350:4
353:11
394:22
403:24
**membersh...**
322:4
**memberships**
506:11
**memorial...**
298:24
299:9,18
**memorialize**
301:6
307:16
308:5

**memorial...**
301:21
307:11
**memorial...**
299:2
**memory**
306:11
325:23
333:4
358:19
369:17
424:18
448:13
502:18
548:15
**mention**
368:23
389:20
**mentioned**
326:7 373:9
384:24
388:15
409:15
415:14
425:18
433:18
436:16
462:16
466:17
502:2
508:21
523:17
544:7
**mentioning**
384:8
**mentions**
485:16
**Merry**
561:5,8
**message**
434:16
487:18
488:12
495:8
549:11
556:17,17
556:24
**messages**
387:20

388:12
**messaging**
444:1
**messenger**
493:21
**met**
309:18
369:20
477:22
554:22
**Metropol...**
290:6 565:3
**MGC**
519:14
537:12
555:2
**MGC's**
554:10
**Michael**
542:18
543:8,9,21
**Michelle**
491:15
**Mid-Miss...**
524:11
**middle**
360:14
393:13
449:21
495:11
**midstream**
553:25
**midway**
496:16
**Midwest**
291:9
**might've**
300:20
334:3
341:15
342:15,19
368:21
387:22
419:11,16
424:25
452:19
463:6
500:20
558:5

559:24
**Mike**
543:4,14
547:3
**mile**
529:7
**military**
396:4
**millions**
342:23
**MILTENBE...**
289:10,11
**mind**
325:15
334:6,17
391:9
430:13
521:25
**mindset**
534:25
**mine**
300:3 348:1
404:12
406:7
**minor**
468:10
**minute**
467:24
**minutes**
325:8
358:22
458:18,19
492:24
504:3
**misinter...**
485:5
**missed**
300:20
333:13
**Missouri**
289:2
294:10,15
295:18
309:22,23
309:25
310:1,3,7
313:20
316:7,10
318:21

605

319:1,9,12
321:14,25
322:17,19
323:1,3
324:16,19
325:14
326:9,17
337:13,14
337:24
338:17
340:5
342:23,25
343:4,7,24
344:14
345:2,4
348:5
349:6
350:11,20
353:12
354:19
356:23
358:5
359:7
365:17
372:10
373:11,24
374:12
375:7
377:2,4,4
378:4
379:23
380:17,22
381:12
382:4,15
383:22
385:13,18
387:11
388:17
397:4,11
397:15
398:13
400:14
402:3,9
403:10,13
404:7
409:12
412:3
413:21
414:6,13
421:8

422:18
427:5
435:4,12
438:11
439:1
440:6,20
441:4,23
445:18
446:4,5
447:6
449:22
451:5
453:3,7,19
453:23
462:1
464:9
466:24
467:10,13
467:15
470:8
472:25
474:19
478:19
479:3
480:5
481:11,15
481:16
486:10
494:6
497:4,25
503:12
510:6
511:9
512:14
516:3,5
517:6
521:18
523:10,20
524:4,16
525:4,5
526:4,23
529:5,18
529:19,25
530:1,2
531:7,15
532:17,20
533:4,16
534:1,14
534:21
536:10,19

536:22
538:12,22
539:5
540:3,13
541:5,9
543:5,9,12
543:22
545:6,14
545:16
546:2,21
547:3,5,7
547:21
550:18,24
551:5
552:9,20
553:18
554:16
555:10,12
557:23
558:1,16
558:19
567:3

**Missouri's**
375:18
376:4
396:12,24
396:25
398:15,21
425:19
450:25
468:22
471:22
474:20

**misspoke**
387:22
500:2,15
500:17
524:20
528:4
535:23

**misstated**
501:2

**Misstates**
403:15
520:12
522:12

**mistaken**
498:7

**misunder...**
537:7

**misunder...**
441:14,15

**Mm-hmm**
434:9 521:5
530:21

**MO**
289:25
290:8,17
291:17
293:10,12
325:9,13
325:17,17
325:17,24
326:13
341:17
348:6
349:21
354:4
358:6
359:2
360:25
390:2
402:22
405:6
435:13
564:15
565:4

**mobeer.org**
358:25

**model**
390:25
465:13
496:25
497:7,17
501:23
503:5
545:8

**models**
391:16
392:2,9

**modifica...**
470:17

**modified**
469:19
471:7

**modifies**
461:21
470:11

**modify**

471:21
472:24

**mom**
353:11
400:25

**mom-and-pop**
320:7
343:23
457:13

**moment**
305:25
306:21
333:12
370:8
396:19
472:16

**Monday**
408:18
460:25
523:3
540:11

**money**
350:16
353:6
403:2
455:10
456:2,16
456:20
457:9
475:18
525:12

**month**
537:17

**months**
305:23
349:3
531:24,24
534:7,12
534:16

**Moose**
320:10

**moot**
370:2 480:6

**morning**
304:1
493:19

**mouth**
330:16

**move**

298:20
299:24
300:1,9
301:5
303:4
304:21,25
305:1,3,7
305:14
307:5,8,12
307:14
308:6
309:4,5
313:6
324:1
330:22,24
335:8
364:16
371:21
425:12
544:8
560:10
**moved**
307:3
**moves**
299:3
**movie**
376:17
**moving**
413:25
**MPT**
494:5
**MPTs**
436:8,23
443:7
456:2,16
456:19
458:1
493:25
494:14
547:22
**mult-**
424:12
**multi-ju...**
497:15
**multiple**
304:2 420:3
424:15
503:8
551:16

**Murphy**
293:11,18
547:17
548:17,18
549:18
556:10
**must've**
344:22,24
420:7,9
549:22
**muted**
559:24
**mutual**
544:5
545:25

---

**N**

**N**
290:1 291:1
291:1
294:1
**name**
294:12
327:11
416:6
447:10
466:8
500:7
517:25
526:11
544:19
566:2,3
567:6,7,17
**named**
292:22
326:8
448:7
509:19
**narrative**
329:25
**Nate**
339:25
340:15
345:14
408:21
409:5,11
409:22
410:6,13
410:14

414:16
433:4
434:17,20
434:24
435:2,11
526:2
**natetate...**
339:17
**Nathan**
388:15,16
517:12
526:2,3,9
526:9,11
527:2
529:4,22
530:15
531:4,10
533:3
534:12,17
536:20
537:22
538:11,11
538:22
539:3,22
539:23
550:19
**near**
352:22
368:2
**nearby**
539:16
**necessarily**
295:22
308:10
329:10
378:16
397:14
427:2
430:7
464:2
551:9
**necessary**
380:24
426:4
565:16
567:15
**need**
296:10
327:25

330:18
333:17
334:16
335:1,9
366:22
368:2,6,11
371:1,3
372:13,16
379:7
389:14,16
392:12
397:14
421:25
433:3,7
440:18
451:23
452:24
453:25
454:15
456:5
458:17,18
465:2
471:15
476:20
481:1,2
495:22
496:3,13
504:2
508:9
534:7
545:2
561:20
562:2,16
**needed**
293:6
397:20
421:10
426:3
466:14
481:5
529:25
538:7,25
**needing**
305:7
**needs**
367:15,24
397:9
425:13
449:10
**neither**

312:13,19
499:19
564:9
**Nel-**
554:22
**Nelson**
293:15
553:13,16
553:17,22
553:22
554:5,8,21
554:22
555:1,10
**never**
330:1
351:22
368:8
376:19
378:3
381:25
382:2,4
387:19,24
430:14,15
430:19
481:11,14
498:3,5,13
522:7
547:1
**new**
292:9
296:19
298:14
323:12
330:7
351:19,19
351:20
354:5
357:25
366:1
390:7,9
393:14,16
394:16
406:18
407:5
432:20
434:21
459:8
461:8
471:20
472:23

474:17
481:4,5,6
489:7,8
490:24
495:5
505:5
509:10,11
511:18
522:18,18
541:21
561:6
**Newman**
357:22
358:1,2,3
413:8,8,9
413:9
507:23
**news**
309:22
493:19,21
505:20
**newspaper**
437:12
**nice**
370:22,23
557:12
**night**
298:5,18
304:9
314:15
**nongambling**
448:23
**nonlegal**
446:20
**nonprofit**
453:7
**nonsense**
557:17
**nope**
422:21
504:25
**Norberg**
486:6,17,20
486:25
**normally**
340:19
424:21,23
**North**
290:7 565:3

**Notably**
523:25
**notarized**
565:19
**notary**
565:18
**note**
291:9 309:2
509:23
**notes**
308:22,23
**notice**
291:8
296:12,21
297:1,5,16
298:2,19
565:11
**notified**
450:11
**November**
521:8 522:6
**number**
294:7 300:7
300:17
309:17
314:2,3,17
314:25
315:2,6
324:22
331:18
388:5,19
396:14
411:21
435:23
444:23
446:2
461:8
504:20
506:20,21
506:21,24
506:25
508:11
509:15
522:21,23
550:12
560:24
**number's**
300:8
**numbered**

315:7
**numbering**
445:23
**numbers**
315:9,11,13
356:6
**numerous**
303:19,19
425:18,19

———————
**O**

**O**
291:1 294:1
**object**
308:13
379:8
**objection**
308:14
328:23
331:14
352:5
375:22
376:14
377:23
378:10,19
379:4,5,17
380:6
381:1,16
383:25
403:14
404:9
405:19
410:25
431:2
438:12
439:14
452:3
456:22
464:12
467:1,3
468:14
474:8
477:11,14
479:5,6
480:7
511:23
512:3
520:11
522:12
534:24

547:8
563:2
**objections**
352:3
**obligation**
381:5,8
**obtain**
388:8 436:8
525:19
**obviously**
301:4
307:18
311:23
324:20
369:3
393:17
426:21
436:21
489:22
559:5
**occasions**
346:19
**occurred**
304:21
**October**
295:10
296:2
297:6
298:3
310:22
312:13,23
325:19
357:21
360:11
362:15
363:18
372:21
375:12
503:18
517:1
518:7
520:24
521:17
526:23,24
528:9,16
530:20
532:13
533:7
**OD**

491:18
**odd**
340:23
418:7
536:25
**offensive**
497:5 499:5
**offer**
395:7
397:21
440:17
**offered**
482:22
519:3,15
530:8
532:14
533:8
554:16
**office**
295:17
339:5
342:16,17
408:24
410:8
416:3
496:22
501:20
536:16
537:2,3
540:4
543:16
548:3,7
554:23,25
**officer**
399:25
564:2
**officers**
341:9
442:25
**offices**
295:20
**official**
360:7 361:4
**officials**
400:12
**Oh**
325:25
329:2
358:6

608

| | | | | |
|---|---|---|---|---|
| 365:20 | 329:2,8 | 402:1 | 448:2,11 | 509:4,5,10 |
| 391:8 | 330:2,7,19 | 404:23 | 449:2,8,16 | 509:10,14 |
| 421:14 | 331:1,6 | 405:22 | 450:2,16 | 510:14 |
| 434:13 | 332:2 | 406:17,17 | 451:3,10 | 511:4,18 |
| 458:22 | 333:11,20 | 406:22 | 452:15,25 | 512:1,19 |
| 460:11 | 334:11,18 | 407:9,12 | 453:6,15 | 512:22 |
| 478:18 | 335:17 | 407:15,21 | 453:22 | 513:20 |
| 487:15 | 336:19 | 408:15 | 455:15 | 514:1,9,15 |
| 518:12 | 337:1,7 | 409:17,22 | 456:9 | 514:21,21 |
| 524:22 | 338:10 | 410:3,12 | 458:15,20 | 514:25 |
| 529:2 | 339:2,14 | 411:9,18 | 458:20,24 | 515:4,12 |
| 531:21 | 341:25 | 411:18,23 | 459:11 | 515:15,20 |
| 537:25 | 342:12,21 | 412:17,19 | 460:11,16 | 516:24 |
| 544:2 | 343:11 | 413:5,12 | 460:20,24 | 517:21 |
| 561:16,22 | 344:19 | 413:22 | 461:14,20 | 518:6,12 |
| **okay** | 345:10 | 415:2,5,5 | 462:22 | 518:15,19 |
| 295:23 | 347:12 | 415:6,17 | 465:10 | 518:25 |
| 296:14,15 | 348:19 | 415:23 | 467:22 | 519:7,9,12 |
| 296:18 | 352:2,8,11 | 416:13 | 468:3,4,5 | 519:21 |
| 297:1,21 | 353:21 | 417:2 | 468:8 | 520:22 |
| 297:22,23 | 354:7 | 418:15,15 | 471:3 | 521:4,14 |
| 299:25 | 355:13 | 418:25 | 472:18,19 | 522:17 |
| 300:6,13 | 356:17 | 419:6,7,9 | 476:7 | 523:2 |
| 300:23 | 357:16,19 | 419:20 | 480:11,24 | 524:14,22 |
| 301:20 | 357:25 | 420:6,12 | 481:10 | 527:17 |
| 303:16,18 | 358:14 | 420:18,19 | 485:7 | 528:5,6,7 |
| 304:12 | 359:4,22 | 422:2,3,21 | 486:5,8,18 | 530:24 |
| 305:8 | 365:23 | 422:22 | 486:23 | 531:10 |
| 306:7,18 | 368:1,6,13 | 423:15 | 487:24 | 532:1,5 |
| 306:20 | 370:16,20 | 426:5,12 | 488:6,6,22 | 534:11 |
| 307:13 | 372:15,17 | 426:19 | 489:3,21 | 535:8,15 |
| 308:16 | 373:7,21 | 427:1,23 | 490:11 | 535:18,21 |
| 309:16 | 374:8,11 | 428:2 | 491:1,7,23 | 536:1,18 |
| 310:13 | 377:14,16 | 431:12 | 492:1,7,20 | 538:10,20 |
| 313:3,7 | 378:22 | 432:5,9,10 | 493:4,10 | 540:6,16 |
| 314:8 | 381:4,9 | 432:15 | 493:19 | 541:4,14 |
| 315:4,19 | 382:6,24 | 434:1,20 | 494:1 | 541:21 |
| 316:4,13 | 383:4,8,18 | 435:9,18 | 495:2,17 | 543:14,19 |
| 316:23 | 384:14,19 | 435:22 | 496:1,5,8 | 543:25 |
| 317:6,15 | 385:3,15 | 436:23 | 496:16 | 544:23 |
| 317:21 | 385:20 | 437:6 | 497:3,20 | 549:10 |
| 318:18 | 387:2 | 438:5 | 498:17 | 550:1,9 |
| 319:13 | 388:10 | 439:16 | 499:3 | 550:22,25 |
| 320:14 | 389:20 | 441:16 | 502:25 | 551:18 |
| 321:4 | 391:8 | 442:6,7,13 | 503:24 | 553:16 |
| 323:12,18 | 392:11 | 443:5,24 | 504:12,15 | 555:8 |
| 324:5 | 394:8 | 444:7 | 504:24 | 556:4 |
| 325:2,15 | 395:21 | 445:14,21 | 505:4 | 557:6 |
| 326:10,20 | 398:6,6,13 | 446:16,24 | 507:14,20 | 559:2,10 |
| 327:14 | 400:17,21 | 447:20 | 508:16 | 559:23 |

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

560:1
562:8,12
563:3
**old**
353:6
393:15
548:22,24
549:1
557:12
**on-**
543:11
**onboard**
463:25
**once**
308:18
450:11
478:19
481:4
**one-pager**
556:1
**ones**
314:14
**online**
491:11
**open**
392:11
420:23
455:21
518:8
553:3
560:5
**opening**
342:9
523:12
**operate**
319:9
321:25
323:9
375:6,18
380:15
383:21
390:20
448:22
469:10,14
471:25
473:3
479:24
**operated**
318:7

387:12,12
437:19,24
517:5
549:13
**operates**
317:17
318:1,15
453:4
**operating**
322:18,22
323:2
332:18
393:4
402:9
416:20
424:7
**operation**
327:15
474:21
**operations**
327:19
404:7
471:11
**operator**
466:20
**operator's**
470:5
**operators**
291:19
293:10,12
325:14
349:6
353:12
372:11
457:23
547:22
**opinion**
335:4
374:20
375:6,16
375:24
381:19
383:11,21
383:24
384:4,11
384:12
385:10
386:18
390:11

391:3,5,18
392:3
397:5
398:2,14
398:25
399:13
401:20
403:7
421:11
426:11
438:9
445:8
446:20,21
455:19
471:5
474:3
510:25
513:13
520:4
541:11
**opinions**
383:9
385:17
390:12
399:7,7
445:8
446:2,7
453:2
455:19,20
**opponent**
354:3
**opportun...**
318:23
402:25
**opportunity**
311:5
312:14
330:11
362:17,20
431:11
494:25
**oppose**
322:17
**opposed**
323:1
350:10
**option**
444:25
457:8

**options**
429:25
436:7
**order**
291:21
299:16,21
299:22
300:4
303:8
307:4
364:16
451:24
506:19
542:10
561:18,21
**ordered**
526:16
**orders**
299:8 301:5
305:3
309:5
561:22
**organiza...**
318:15
325:18
341:5
356:5
396:3
438:7
453:17
460:22
546:5
**organiza...**
309:21
320:13,24
321:1
343:21
356:9
394:3
395:7,13
396:6
437:19
**original**
297:5 298:2
472:14
565:14,18
**originally**
517:10
530:12

**Ouch**
428:6,6
**ought**
441:3
443:13
514:17
515:1
525:11
**out-of-s...**
343:1
344:12
523:19
**out-state**
319:1
**outcome**
385:8 451:7
466:21
545:1
564:12
**outline**
539:9
**outright**
456:5
**outside**
479:1 480:1
**outspoke**
500:2
**overcoming**
397:19
**overreach**
291:17
313:20
**oversight**
324:23
401:15
**overstates**
417:9
**owned**
299:5 327:7
541:11
**owner**
316:6 331:9
349:19,23
351:1,18
351:25
430:18
465:15
**ownership**
317:3 543:3

owning
317:15
424:7
owns
317:2 348:2

**P**

P
290:1,1
294:1
package
381:20
page
291:2,7
297:6,17
299:7,9,14
299:15,20
299:20,22
299:23,25
300:1,4,6
300:6,8,24
304:16,23
309:12
313:13,17
313:22,24
313:24,25
314:6,13
314:21,22
314:25
315:7,15
315:17,18
315:19,22
315:25
316:5
336:20,22
336:24,25
358:9
367:17
372:20
373:17,17
382:24
384:20,21
408:16
411:18
432:18
434:5,8
441:20
451:3
459:23
460:4,6

461:20
482:11
484:11
485:7
488:4
489:19
495:4,11
495:14,15
496:17
504:24,25
518:19,23
519:1,2,5
520:1
527:14
528:2,18
542:11,12
542:16
544:17,18
549:8,10
550:8
551:13,19
565:10,14
565:18,19
566:7,11
566:15,19
566:23
567:1
pages
289:15,23
299:15
304:2,14
304:16
307:14
paid
494:9,10,17
PAISNER
290:5 565:2
par-
519:8
paragraph
318:19
322:16
325:7
342:9
364:24
393:21
445:22
455:18
461:21
495:5,16

509:22
511:14
515:5
519:8
paragraphs
410:4
551:14
paralegal
382:10
parapher...
461:25
470:14
paraphrased
548:8
parlance
390:2
part
304:20
305:14
315:4
318:1
322:5
332:22
350:5
351:2,19
355:19
363:20,25
364:1
369:1
394:23
395:22
415:17
416:13
417:2
425:2
442:10
443:4
454:25
481:14
484:6
492:8,14
523:24
535:4
548:19
549:19
552:1
participant
454:21
476:23

participate
404:8
particip...
424:8
particip...
417:11
particular
307:8
363:25
381:11
419:12
438:8
455:25
461:18
469:25
480:3
482:5
521:10
537:20
particul...
344:7 396:3
parties
560:13,19
560:25
564:10
565:21
partnership
546:17
party
307:22
353:4
447:1,3,4
450:11
465:18
pass
351:3,21
passed
305:11
370:14
377:3
378:4
382:4
421:1
423:18
425:3
464:20
465:21
481:11,15
483:13

544:10
passing
378:16
413:22
pasted
487:8
path
353:9 524:1
545:4
patrol
310:2
360:17
368:9,24
414:8,14
496:21
503:10
patrol's
501:18
pause
379:7,10
pay
390:17
506:16
payroll
412:23
PDF
314:6
penalize
366:4
penalties
295:5
332:18
416:19
424:6,6
426:4
463:21
penalty
567:18
pendency
308:9
pending
294:8
335:20
515:15
516:3
people
309:20
311:3
327:8

611

328:8,9
344:3,9
346:25
348:22
374:8
384:5,8,10
389:12
390:18,20
392:19
393:10
401:12
406:11
411:11,21
424:6,15
424:24
433:18
435:24
437:8
442:4
443:2,18
457:7
463:5,21
465:19
473:11
477:24
478:12,16
493:8
494:18
497:23
504:20
508:5
509:15
525:4
531:22
544:9
548:6
550:4,12
557:13
**percent**
400:7
**percolating**
401:10
**perfect**
355:1 370:5
**period**
325:17
363:9
463:9
**perjury**
295:5

567:18
**permission**
324:24
**permit**
360:19
**person**
380:1 399:3
428:23
429:17
**personal**
299:17
307:10
399:7
560:10
**personally**
317:22
358:16
398:11
404:18
448:2,7
453:16
560:22
**personnel**
357:2
**perspective**
393:19
406:6,7
441:18
**pesky**
335:2
**Peter**
349:19
350:8
352:25
353:15
357:12
**Peter's**
354:1
**petitioned**
499:20
**Petroleum**
291:9
**Phelps**
373:12,23
374:2,5,12
374:22
377:1
378:25
379:1

381:12
383:16
386:1,8,11
386:17
387:10,11
387:18
389:2
496:20
497:20
498:12,14
500:24
501:17
533:20
540:23
541:18
**philosophy**
381:18
**phone**
298:25
304:5,22
333:12
478:4
500:24
502:22
**phrase**
391:21
434:10
559:12
**phrased**
441:19
**pick**
297:20
421:20
430:4,22
430:25
456:4
**picked**
430:15
**picture**
467:19
**pie**
404:5
**piece**
404:5
546:20
**pieces**
482:7
**pilot**
320:19

324:19,21
343:15
401:14
506:14
**pinned**
433:22
**place**
302:1 403:3
436:18
443:6,9
444:16,18
450:12
458:5
465:3
494:4,18
527:3
539:18,22
**placed**
321:22
402:2
403:10
480:4
510:3
529:16
**placement**
493:24
494:13
524:9
**places**
421:8
436:19
480:1
**placing**
400:14
525:20
**plagued**
545:6
**plaintiff**
289:7 290:2
294:20
296:23
448:9
**plan**
351:2 354:3
526:2
560:12,15
**plan's**
555:21
**plans**

326:3 499:5
**play**
367:2,2
385:8
390:18
399:4,5,6
405:16
512:6
**Play-Mor**
289:6 316:7
316:13,16
316:17
317:12
318:8
348:2
407:22
540:3
565:7
566:3
567:7
**played**
555:17
**player**
357:25
385:7
393:14,15
393:16
**playing**
525:13
**playmor.com**
412:9
**Plea-**
550:15
**pleading**
448:8
**please**
294:17,25
338:7
375:1
396:18
409:8
430:5
432:12,14
447:11
460:24
472:10,14
472:17
482:16
527:4

612

538:11
550:15
552:22
561:18,21
565:14,15
565:18
**plugged**
414:18
**PM**
289:20
459:1,4
460:10
482:14
491:8
504:8
542:17
549:6
559:21
563:5
**PohlmanUSA**
289:22
294:13,16
565:6,25
**point**
310:17
311:6
312:14
325:3
348:9
349:1
350:1,12
353:20
354:13
355:2,18
356:15
361:14
362:16
363:2
364:8,15
368:2,16
386:1
387:4
392:12
402:12
403:25
405:2
423:5
424:1,5
432:24
433:21

442:7
445:6
454:6
469:25
483:15
492:18,24
519:19
520:19
525:3
529:14
530:10
**pointed**
404:16
**pointing**
476:19
**police**
550:23
**policy**
364:20
**political**
396:2
397:20
430:1,3
465:17
557:14
**politically**
475:19
**pool**
529:10
**pop**
353:12
400:25
**Poplar**
358:4
413:10
**popped**
343:22
**popping**
328:5
372:23
385:6
**populate**
296:19
**position**
328:7
329:12
330:5,12
330:14
336:14

340:9,15
361:5
363:3,7
380:1
398:18
428:19
441:21
479:10,14
479:16,22
479:23
**possession**
503:21
**possibility**
522:16
**possible**
310:19
441:14
562:1,15
565:15
**possibly**
303:20
337:18
338:1
429:2
524:3
**post**
388:19
409:16
529:7
539:18,23
**potential**
312:1
459:20
466:21
468:11
480:18
511:1
**potentially**
310:18
323:7
363:5
400:15,22
401:23
403:2
427:19
438:10
441:24
442:1
468:21

511:19
512:12
524:5
545:13
**power**
353:5
401:11
**power-mo...**
466:7
**powerful**
354:2
465:14
**powers**
361:24
**practical**
478:2
**practice**
360:14
362:18,21
**pre-date**
531:1
**pre-reveal**
293:8,14,16
332:25
333:2,24
334:3,7
335:21
424:4
440:24
492:9
540:12
**pre-reve...**
336:11
**preceded**
534:17
**precursor**
390:13
**predict**
330:15
**preference**
430:3
**premises**
361:18
362:25
366:6
**prepare**
310:16
311:1
**prepares**

360:22
**present**
426:24
**presented**
304:1
305:10
**presently**
326:24
**president**
400:1
**pretend**
390:23
**pretends**
376:18
**pretty**
296:11,12
369:4,5
444:8
449:10
465:14
499:10
500:13
**prevent**
544:10
**prevented**
367:16,24
**preview**
332:24
385:7
**preview-...**
547:7
**previous**
308:16
311:12
321:10
325:12
337:8
387:16
399:2
440:21
506:20
541:15
**previously**
341:11
354:10
476:8
492:3
497:21
502:3

613

554:10
**principle**
399:20
429:24,25
**printed**
302:20,21
303:6
306:6,8,10
306:17
309:2
315:11
**prior**
297:5,16
298:2
310:22
311:13
324:13
333:22
339:22
342:4
345:8
393:7
410:6
430:17
462:6
488:14
489:24
518:7
527:15
528:8
543:19
553:20
554:20
555:1
**prize**
385:9
423:20
**prizes**
471:12
**pro**
417:24
423:9
424:22
**probable**
503:10
**probably**
298:9
309:17
311:25

340:9,12
341:5,14
346:13
354:16
364:23
365:1,2
400:25
412:16
417:9
467:24
470:6
492:11
500:1
502:7
539:9
548:25
**probe**
452:18
**problem**
308:18,19
328:9
341:3
367:11
414:3
416:21
423:2
431:14
433:23
463:20,24
464:21,23
466:2,2
475:22
476:20,24
478:20
486:24
512:9
562:19
**problems**
476:22
**proceed**
294:25
389:18
435:15
**process**
305:17
325:16
337:17
353:20
355:8
357:15

395:24
408:23
413:25
435:3
455:2
458:12,14
510:5
511:8,15
514:16
526:3
530:5
531:2
**proclama...**
479:25
**produced**
296:7,13
297:25
303:13
304:9,10
306:24
311:9
312:12
**production**
315:9
**producti...**
565:19
**professi...**
428:23
**profit**
399:11
**program**
318:22
319:20
320:19
324:19,21
327:4
343:15,17
343:18
355:6
401:14
404:2,3
506:7
**progress**
501:2
**project**
349:10
350:20
506:14
**prolifer...**

318:20
497:17
502:9
**promise**
330:11
505:23
**promised**
494:14
505:11,12
**promote**
327:6,9
494:13
**promoting**
327:20
392:24
**Promotional**
326:25
327:3,13
327:14,18
327:23,24
328:19
331:7,9,23
336:15
**pronounced**
316:25
**properly**
394:19,21
454:24
**properties**
316:8,24
317:1,5,7
317:13
**proponent**
393:6,6
394:10
**proposal**
484:15
**propose**
468:21
**proposed**
332:10
333:22
334:4,8
336:10
352:21
366:8
370:12
420:1
459:20,20

462:13,16
463:3,7
470:17
471:7,20
472:23
473:15
481:13
482:6,22
483:10,17
484:12
485:8,10
488:4
489:1,9,13
515:9
538:22
539:25
**proposing**
474:17
480:16
**prosecute**
496:24
497:6
499:23
501:22
503:4,9
555:4
**prosecuting**
373:23
374:11,21
377:1
379:1
380:14
389:10
498:6
555:4
**prosecution**
461:24
470:13
**prosecutor**
373:11,13
374:3,6
379:24
383:15
386:2,9,11
386:17
387:18
389:2,7
496:23
497:12,22
498:14,19

614

499:4,21
500:5,10
500:24
501:21
502:22
503:5,6,8
503:15,19
523:8,10
526:12
547:25
552:19
557:3
**prosecut...**
380:4 500:7
**prosecutors**
379:23
380:16,21
496:19
501:16
503:3
524:4
555:4
557:2,25
558:18
**prosecut...**
523:4
**protect**
441:1,1
**provable**
451:6
**prove**
451:13
**provide**
344:15
510:4
554:13
**provided**
346:11
457:3
**provisions**
461:23
470:12
**public**
309:23
415:20,24
540:21
**Pulaski**
496:20
498:6,8,17

498:18
501:17
502:22
**pull**
296:9
318:21
319:9
322:10
323:23
337:25
347:3
350:14
351:5,22
363:5
393:2
437:1,3,3
506:7
507:3
549:12
**pulled**
323:15
459:9
**pulling**
305:23
322:13
**purchased**
517:3,10
529:3
536:22
539:14
**purchasing**
517:9
**pure**
430:13
**purpose**
439:5
463:23
531:15
533:6
**purposes**
307:17
316:14
377:17
461:23
470:12
**pursue**
503:20
**purview**
480:1

**push**
395:11,12
544:6
**pushing**
444:12
**put**
298:9
304:19
319:21
323:12,18
334:8
353:25
394:12
424:20,20
424:22,23
436:19,21
437:2
446:13
458:1
462:17
478:1
490:14,14
508:20
522:2
525:15
526:19
534:3,22
556:6
**puts**
393:19
425:5
**putting**
371:18
455:13
470:19

---
### Q
**quacks**
510:10
**qualified**
378:8
469:23
**qualifies**
430:23
**question**
299:14
309:11
310:23
312:18

315:14
318:3
328:24
329:1
330:1,7,20
331:16
332:23
351:11,16
351:17
352:6
354:24
355:1
359:18
363:1
364:9
379:11,15
380:7
381:5
391:7
395:16
396:18,20
400:7
411:7
415:1
418:14,23
419:1,4,10
422:4
425:10
429:3
430:13
441:15,19
442:1
449:9
456:23,25
463:13
467:23
468:1,7
470:9
472:7,12
472:15,18
472:20
473:14,23
474:9
477:14,15
484:14
488:9
490:2
495:22
508:24
509:1,8

512:23
513:4,18
514:8
520:13
527:22
528:22,24
532:7,10
532:21
543:7
558:6,13
558:22,25
**question's**
380:6
**question...**
444:24
**questioning**
379:8
555:19
**questions**
295:8
312:12
333:13
375:1
377:23
432:14
467:2
514:3
**quick**
449:10
**quicker**
330:23
525:23
**quickly**
324:1
**quite**
302:18
370:21
388:22
397:8
515:19
545:18
553:9
**quote**
324:19,20
386:3,3,12
386:13
417:20
451:5
461:22,22

615

463:15,16
470:24
471:8,22
471:25
472:25
473:3
474:20
480:19
510:9,11
523:18,18
533:7

---

**R**

R
290:1 294:1
**radio**
548:20
**Randy**
550:10
**range**
309:20
**re-**
407:8,8
463:4
486:14
**reach**
340:24
344:9
403:22
444:14
494:21
**reached**
405:5,6
**reaching**
342:17
**reaction**
367:15
**read**
301:24
316:10
319:2,25
321:2
324:25
337:19
343:8,8,13
344:17
351:13
362:17,20
363:18,21

363:23,24
364:23
365:9
368:13
369:25
374:23
382:14
383:12,14
386:4,14
386:15
394:1
396:18
401:24
409:1
416:11
417:4
421:12
422:6
423:6,13
434:22
436:9
437:13
442:7,7
446:22
449:24
450:23
453:9,12
456:7
463:13
465:8
472:10
475:2
476:17
488:2,3,6
488:11
491:20
495:22,25
496:3,3,25
510:11
513:10
514:18
524:11,19
524:23,25
525:24
530:10,19
532:25
533:1
538:17
539:18
541:2

543:16
548:9
549:22
551:3,12
551:19
557:3,9
558:10
559:20
565:15
566:8,12
566:16,20
566:24
567:12
**reading**
319:17
358:18
359:11
365:2
380:2
390:5
421:17
435:7
436:20
445:20
461:16
469:3
496:6
501:3
564:8
565:12
**reads**
473:8
**ready**
364:5,25
565:12
**real**
317:3,13
353:24
365:15
518:13
**reality**
363:14
453:23
478:2
**realization**
355:4
**realize**
396:5
**realized**

553:25
**really**
301:3 302:9
309:8
312:17
361:8
363:15
364:2,5,22
365:3,9
387:21
395:4
398:17
414:25
418:1,22
419:3
451:20
452:9
465:4
466:1,1
473:24
534:21
536:24
537:6,19
556:1
557:12
562:10
**reason**
295:19
309:9
330:4
336:4,6
341:12
374:1
376:24
378:2,23
379:16,19
403:4
428:13
460:1
498:20
536:11
552:1
565:17
566:9,13
566:17,21
566:25
**reasonable**
377:11,18
377:20
524:7

**reasoning**
386:2,12
**reasons**
323:4 423:4
551:17
**recall**
296:3
309:17
310:10,14
333:22
345:20
346:18,22
346:22
375:8
408:7
412:4
462:9
507:1
**receive**
306:3
**received**
297:5 298:5
299:1
314:15
315:8
325:8
362:15
487:9,18
**receiving**
513:7
**recipient**
372:6
415:15
542:24
553:23
**recipients**
455:18
554:5
**recognize**
359:2
**recollect**
356:25
364:2
481:17
**recollec...**
307:10,16
321:18
343:19
346:11

616

352:12
353:16
356:3
389:3
442:19
443:5
444:19
445:4
463:2
481:19
482:8,20
502:24
535:3
548:12
**reconnected**
335:7
**reconvene**
560:6
562:25
**record**
294:2,18
300:15
302:1,10
303:21
315:8
371:13,15
371:16
447:11
459:1,2,3
496:10
504:8,9,11
555:21
559:19,21
560:2,17
564:5
**records**
302:9
304:18
311:7
**recourse**
308:21
**redefine**
464:10
**redemption**
469:10
471:10
475:7
**reduce**
356:6

361:17
**reduced**
361:13
564:7
**refer**
316:15
325:13
393:1
**reference**
422:5
**referencing**
463:6
**referred**
408:3
409:18
**referring**
299:13
368:21
390:4,21
391:6,24
393:16,23
400:22,23
401:16
421:13
434:7
438:1
445:11
451:17
483:24
510:19
**refresh**
407:8 463:2
482:20
**refreshing**
358:18
**refusing**
423:3
**regard**
565:22
**regarding**
292:6
446:17
459:16
499:5
550:19
**regardless**
303:9
**regards**
438:8

**registered**
326:17
426:18
**regular**
304:14
**regulate**
394:20
479:1,24
**regulated**
363:4
394:19
454:23
**regulation**
370:12
**regulations**
367:7
479:25
**regulatory**
361:24
364:20
366:1
**rein**
321:17
**reincorp...**
297:15
**reiterate**
324:12
**rejoined**
562:5,7
**relate**
331:12
385:12
**related**
328:16
498:14
516:10
554:14
564:9
**relating**
298:19
461:23
470:13
**relation...**
426:13
428:17,21
442:21
448:17
494:25
**relation...**

431:21
**relativity**
315:12
**Relevance**
376:15
431:2
**relevant**
351:25
361:1
414:4
**remain**
559:2
**remained**
324:16
**remaining**
493:25
**remember**
305:20
308:6
311:19
312:2,2
321:9,24
325:25
332:19
334:1,2,4
340:14
341:8
342:13
343:17
344:21
345:22
350:9
351:4
352:20,22
361:12
369:2,15
370:10,19
375:13
400:2
404:21
408:11
409:15
418:2
420:5
424:2,9,19
443:22
444:5
448:10
462:14,18

463:4,10
481:24
484:2,7,25
485:19
488:21
492:14
493:15,17
494:20
498:8,9,10
499:7,11
499:13
500:10
502:18,19
506:5
508:11,18
508:19,25
509:2,6
510:9
515:17
517:11
527:10
537:10,14
539:8
541:6
543:4
544:4
548:21
555:6,15
555:16
556:22
**remind**
523:7
**reminder**
432:11
**remote**
289:16
563:4
**remotely**
294:11
**removal**
328:15
**removed**
356:9
**removing**
328:13
**render**
567:15
**reopen**
562:24

rep
341:7
repairing
357:4
repairs
356:24
repeat
351:14
354:23
447:9
472:14
513:4
552:23
553:1
repeatedly
442:6 445:7
repetitive
455:12
repla-
393:21
replace
399:12
replacement
393:22
394:6
replacing
398:13
RePlay
491:9
report
360:22
414:6
522:3
reported
289:24
503:12
reporter
294:15,24
327:17
351:12
358:11
371:9
396:17,19
412:5
432:13
472:9,14
472:16
558:7,9,13
561:13,17

561:20
562:4,8
564:1,14
565:25
reporting
294:13,16
410:7
435:12
represent
297:13
298:16
378:25
383:18
399:22
401:20
427:3
519:12
545:1
represen...
548:15
represen...
404:17
represen...
295:11
296:22
338:24
339:2,4,8
339:21
341:13
345:17
359:9
represen...
320:23
340:14,18
341:16
344:8
401:21
437:11
443:24
represented
326:13
367:21
399:23
499:24
represen...
320:25
405:2
438:7
represents

422:10
543:5
reps
442:14,17
443:8
445:12
request
415:25
511:6
554:12
requested
564:8
requesting
515:23
requests
368:10
required
364:18
394:16
560:21
requirem...
302:3
requires
378:7
research
389:13
researched
374:19
reside
523:11
552:21
residency
339:5
residential
317:4
resources
497:15
respect
337:24
446:2
473:15
477:12,19
480:1
respond
298:10
310:16
346:1
370:6
505:18

responded
345:20
363:22
389:7,8
513:21
responding
332:22
367:12
369:1
486:25
489:24
505:7,17
549:21
responds
554:8
response
345:10,13
345:16
346:3,4,6
346:7
419:10
511:6
527:5,20
528:11,20
528:23
529:2
543:8
549:17,19
552:13
responses
329:25
346:12
responsi...
380:2
453:12
responsive
298:1,19
312:15
418:14
rest
505:8
537:23
restate
329:6
restating
329:5
restaurant
320:8
restaurants

374:16
restricted
356:8
restroom
371:4
result
304:4
420:13,17
420:18,18
420:22
548:9
results
427:19
retailers
368:7
retained
326:23
428:2,4,5
516:20
517:2
retainer
327:1
retaining
331:8
retirement
326:3
return
387:3
revealed
493:5
518:11
revenue
323:6
reverse
542:10
review
358:22
526:5
reviewed
536:22
revise
482:13
Revised
425:20
474:19
reward
337:13
345:4
Rich

295:24
352:4
382:16
428:6
449:10
474:12
477:18
504:2
**Richard**
290:3
294:19
565:2
**richard....**
290:10
565:5
**rid**
368:7 395:9
553:6
**ridding**
396:2
**right**
295:9,15,23
296:2,5
298:11,13
299:24
301:16
303:23
304:6
305:24
307:20
310:11
311:10
313:3
314:23,24
315:21
316:19
318:9,18
319:11
320:22
321:9
324:2
325:5
328:8,9
329:13
330:19
331:1,4,21
335:11,18
336:1,9,16
336:19
337:2

338:2,4,16
338:25
339:12,14
339:23
340:7
341:20
342:6
347:12
354:5,22
355:10
356:2
357:17
359:23
362:25
363:11,19
363:23
366:8
367:14,16
367:17
371:18,24
373:13,19
374:3
375:12
376:22
378:8
379:2,16
379:19
380:5
381:7,23
382:2,3,4
382:5,11
384:7,15
384:20,22
385:1,13
385:18
388:3,5,14
389:2,10
391:4
393:25
395:10
397:24,25
398:4,6,15
398:24
399:2,13
399:21
400:15
401:23
402:4,17
402:20
403:4,13

403:23
405:1,13
405:17
406:18
409:25
410:16
411:9,14
411:21
413:6
415:15
418:25
421:9,15
423:12,20
423:21
425:23
426:7
427:5,6,7
427:25
428:3
429:24
430:1
431:1,10
431:20
432:16,17
432:25
434:25
435:14,18
436:3
442:2
443:7
444:16,22
445:12
450:20
451:1,16
452:20
453:4,20
454:11
455:17,22
457:20,25
458:2,12
458:15
459:5,23
460:2,14
460:18
461:15
462:21
464:11,15
464:25
468:24
469:7,17

469:21
470:25
471:14,17
471:25
472:18,20
473:3,4
474:4,13
474:16
477:1
479:3,19
480:6,14
480:15
481:3,11
481:16
482:8,10
483:8,15
484:17
485:23,23
486:2,10
487:10,20
487:22
489:1,9
490:12,24
492:5,6,20
492:25
493:12
495:10,10
496:16
498:1,2,15
500:3
501:4
502:7
503:14,14
503:24
504:5,10
509:4,19
511:2,13
511:16
512:17,20
513:1,24
516:22
518:2,23
520:2
521:6,19
522:17
527:14,18
530:12
531:8
535:8,21
535:24

536:6
537:25
539:6,12
540:6
541:12,21
546:3,8
550:20
553:10
554:3,18
556:6
557:4
558:23
559:1
561:12
562:18,18
**right-hand**
544:13
**risk**
455:10
**risks**
395:13
**road**
387:14
444:22
463:11
531:8
533:21
**role**
379:22
**roller**
505:15
**Ron**
326:8,8
356:11
357:22
411:23
413:20
435:23
439:20
504:19
**room**
299:5 371:7
437:8
559:15
561:15
562:5
**ropes**
418:8
**rough**

561:25
562:14
**route**
408:3 544:3
**row**
334:22
**RPR**
289:25
564:15
**RSA**
289:25
564:15
**rude**
312:7 330:8
419:3
468:2,6
**rule**
542:9
**rules**
365:7
366:20
367:2,3,4
367:6
399:4,6
431:15
**run**
327:4
447:18
**rush**
562:2

---

**S**

**S**
290:1 291:1
291:5
294:1
**S-m-a-r-r**
358:11
**Sa-**
439:14
**safe**
452:16
561:8
**safety**
309:23
540:21
**Saint**
348:5
387:11,13

388:17
408:22
433:4
517:23
529:5,17
537:22
**sanction**
366:4
**sanctions**
393:10
**sarcastic**
450:22
**sat**
382:2,6
**save**
454:22
**saved**
299:19
**saw**
338:16
368:18
375:10
427:12
488:14
489:23,25
490:1
**saying**
303:7,11,12
306:2
313:23,24
333:21
335:19,21
353:23,23
354:1
361:16
363:13
364:4
365:25
367:18,22
369:3
377:5,6
381:9
390:11
391:6,9,10
391:14,19
391:22,23
392:7
395:2,11
395:16,18

396:7
397:17
401:6
402:2,5,5
402:16
404:23,25
405:1,4
417:5
421:6
422:15
429:23
430:12,18
437:6
438:19
441:21
442:5
445:14
446:10,23
451:10
452:17
453:15
454:1,2,9
454:11,15
455:13
460:12
464:6
465:1
469:9,18
470:22
473:22
476:10
481:3,21
482:1
484:15,25
487:13,16
488:3,13
488:17,18
500:18
501:7
505:9
509:7
510:20,20
511:7
512:5
522:21
531:4
551:9
557:16
**says**
299:16

301:11
314:16
358:19
359:5
360:13
362:5
367:15
373:7,22
374:12,25
383:6
385:3
386:1,4,13
387:24
389:6
393:21
408:21
410:1,5,17
419:18
420:13
422:6
433:9
434:17
445:20
453:11
460:20,24
461:1,21
462:2,4
468:25,25
469:2,2
471:16
472:12
475:3
476:4
482:15
486:23
488:6
491:9,25
495:5
496:14
497:19
511:12
512:10
513:17,25
518:21
520:14,14
520:16
521:3
524:21
543:24
544:20

545:18,19
546:1
547:21
549:18
551:20,20
552:4
556:16,23
**SB**
292:6
459:16
460:25
483:10
**scale**
430:4,22
431:6
**scanned**
302:21
**scene**
390:7,15
**Schatz**
293:9
309:22
313:9
416:10,14
416:18
417:3,6,17
419:12,17
420:25
423:8,17
424:1,13
462:13
476:21
481:23
482:11,15
482:21
483:2,16
483:20,21
483:25
484:14,16
485:1,11
485:14,17
495:12
496:18
498:5
499:15,20
500:4,8
501:15
503:1,14
513:22
514:12,15

514:12,15
514:22,24
515:3
525:10
537:8
540:18
541:17
542:2
543:20
550:13
555:11,12
**Schatz'**
422:24
463:3
486:1
543:16
**Schatz's**
420:1 486:3
535:19
**schedule**
421:21
521:11
**school**
376:12,19
376:20
377:3,19
377:21
378:8
381:25
382:7
**science**
521:24
**scope**
337:25
380:4
**Scott**
347:22
348:11,11
348:12,13
348:24
372:1
385:22
459:13
487:10
507:24
542:3
**scott@sw...**
415:10
**screen**

314:1
**screwing**
436:11
**scroll**
504:24
**scrolling**
338:21
486:11
**search**
310:19
472:17
491:18
518:16
**season**
351:3,21
**seat**
405:16
**second**
299:15
313:1
334:13,16
334:23
392:12
432:18,18
453:1
467:2
509:21
518:13,17
555:20
**secondly**
531:23
**section**
385:11
462:3
464:10
471:21
472:24
500:15
510:16
**secure**
545:2
**see**
295:24
296:19
299:12
302:16
310:4
313:17,21
314:9,18

315:2,3,22
315:24
319:22
341:22
347:15,16
349:16
358:12
371:21
372:17,23
373:14,20
375:2,3
382:25
383:3
385:4,8,14
386:9,10
389:11,18
400:11
405:10
406:13,16
406:20,21
407:2,4,10
407:12,12
407:20
408:16,20
410:10,11
411:4,12
415:12,19
415:22
417:21
420:14,20
432:22
433:2
434:12,18
435:20
442:11
445:9
451:8
457:12
460:12,17
482:16,18
484:1
486:12
487:4
488:8
491:10
493:9,13
493:13
495:6,8,13
502:14
504:6,25

505:2
507:18,19
508:6,7,13
509:12,13
509:17
515:10
519:4,11
519:19
522:20
523:2,4,5
526:18
531:12
535:11,14
536:12
538:3,7
540:7,14
540:21
541:1,3,23
541:24
542:13,16
542:19
544:14,22
545:9
547:19,22
549:4,6,10
550:5
551:8,18
553:4
554:1
556:8,9,12
556:19
561:12
**seeing**
307:6
309:13
351:4
375:13
488:25
495:13
507:2
561:6
**seen**
297:1 306:6
311:19
345:7
351:22
376:21
395:2
426:9
497:22

541:7
**sees**
557:17
**segregated**
303:3
**self-ser...**
405:24
406:9
**sell**
353:14
531:17,20
531:22
**Senate**
417:24
423:9,18
424:15
459:21
461:8,12
462:5
483:11
486:10
489:9
505:21
**Senate's**
514:16
**senate.m...**
337:4 486:8
486:21
**Senator**
309:21
316:5
318:19
321:10
337:8,12
338:23
416:10,14
416:18
417:3,6,15
417:17
419:12,17
420:1,25
422:23
423:17,22
424:1,13
462:13
476:21
482:15,21
483:1,2,17
483:25

484:14,16
485:1,25
495:12
496:18
498:4,5
499:15,15
499:20,20
500:3,4,8
501:15
502:3,5,16
502:21
503:1,14
505:20
506:4
513:22
514:12,15
514:22,24
515:3
525:10
535:19,19
537:8
541:16
543:16,20
**Senator's**
320:5
**Senators**
340:25
497:4
**send**
485:10
536:7
538:22
539:5
550:10
**sending**
324:11
339:6
385:21
502:4
**sends**
549:18
**sense**
329:1
346:17
356:21
359:12
368:12
369:7,9
405:23
421:17

430:21
490:10
507:12
526:20
**sent**
298:2,18
324:6,8
338:23
340:13,18
341:6,12
347:16,20
347:21
374:9
385:23
407:17
408:18
414:8
435:23
460:11
462:23
485:13
493:6,15
509:15
517:2,25
521:16
522:9
523:3
536:13
537:6
539:9
540:10
542:18
552:1
553:20
554:3
556:11
**sentence**
301:14
319:14
322:16
324:14
364:23
392:7
457:1
473:8
476:9,11
510:18
515:5
524:23
525:1

**separate**
327:7,8
348:18,19
348:21,22
348:22
410:22
438:22
**separated**
444:9
**separately**
304:10
400:4
**seriously**
511:15
**serve**
534:4
565:11
**served**
344:23
428:15
**serves**
356:3
**service**
306:3
350:15
403:2
440:5
458:5
494:19
**Services**
327:1,3,13
327:14,19
327:24,24
328:19
331:7,9,23
336:15
**servicing**
356:24
**session**
326:1
350:24
355:24
356:1,4
422:8
562:22,23
**set**
384:24
423:10
437:9

441:11
461:6
533:2
**setting**
382:21
466:20
470:5
532:19
**settle**
436:25
**seven**
321:12
324:1
531:24
534:7
544:20
**shady**
342:24
343:11
**share**
318:11
414:11
416:1
433:17
445:23
478:15
**shared**
305:10
307:2
311:20
324:12
414:15
483:19,20
**sharing**
544:21,23
**sheet**
565:15,16
565:18,19
566:1
**Sheez**
528:14
**shocked**
416:23
418:10
**shoot**
369:2
**short**
355:11
412:11

476:3
556:1
**SHORTHAND**
564:1
**shortly**
485:8 517:1
**should've**
368:5 370:1
**shoved**
545:8
**show**
295:23
306:14
314:5
451:15
458:8
484:5
492:2
493:18
504:12
507:7,9
548:20
**showed**
439:4,22,24
441:25
**showing**
347:13
414:9
483:17
**shown**
298:13
309:4
313:4
345:14,17
523:25
**shows**
460:4
537:15
**shut**
355:5,22,22
421:4
478:10
**sic**
313:21
325:9
449:9
463:1
491:4,8,15
519:23

528:25
536:8
540:19
**side**
336:3
353:14,19
424:16
478:7
501:12
544:13
546:3,24
**sideways**
300:2
**sign**
565:18
**signature**
536:6 563:7
565:12,14
565:18,19
567:1
**signed**
403:11
493:22
**significant**
297:24
468:12
**signific...**
475:16
**signing**
564:8
565:12
**silly**
501:4,8
**Silver**
349:19,23
351:1,6,18
351:22,25
465:15
**similar**
336:11
348:2
354:6
446:1
447:19
450:10
454:4
462:17
465:14
490:1

517:7
528:23
548:20
**simple**
445:1
**simplest**
553:5
**simply**
418:20
**simulato...**
437:23
**simultan...**
545:7
**sincere**
544:24
**Sincerely**
565:23
**sincerest**
561:4
**single**
311:24
394:15
462:19
473:16,19
**single-h...**
353:1
**singled**
473:19,20
**sir**
295:14
377:9
396:19
414:20
473:18
521:3
534:10
**sit**
301:9
302:17
303:23
333:6
378:2,8
379:15
415:3
426:11
482:2
489:22
532:12
**sitting**

305:24
370:17
**situated**
376:3,8
**situation**
355:14
437:10
441:9
505:9
533:2
**situations**
450:9 455:4
**six**
323:24,25
339:16
340:22
389:6
469:7
471:10
475:7
531:24
534:6
544:20
**sixth**
299:23
**skip**
318:18
319:13
322:16
325:7
410:3
420:12,21
432:24
445:21
446:24
451:3
455:17,24
495:2
**skipping**
360:13
539:25
**slash**
314:2
**slept**
325:23
**slewis**
557:20
**slewis@s...**
556:18,20

**sliding**
430:22
**slightly**
340:8 392:4
505:5
526:25
**slippery**
466:9
**slope**
466:9
**slot**
387:13,15
437:23
475:23
502:9
527:21
528:13,21
551:7
553:7
559:4,6
**small**
324:17
327:1
344:3,13
344:14,20
457:13
**Smarr**
358:10
359:17,19
360:12
363:8
364:3
365:10
368:22
**Smith**
292:25
293:13
497:12
499:4,8,14
499:21
523:4,7
547:24
548:13,15
550:4
552:18,19
**society**
398:24
**soft**
327:6,9,20

**software**
315:15
**sold**
520:16
**solicited**
525:4
**solution**
414:12
506:11
**solve**
328:9
334:23
463:24
464:21,22
475:22
512:9
**solved**
476:24
**solves**
486:24
**somebody**
321:21,21
336:4
341:10
353:15
441:6
454:4
466:1
556:22
**somebody's**
414:4
**something's**
465:20
**somewhat**
321:7
442:14
557:19
**son**
413:9,16
441:10
**SONDRA**
289:11
**soon**
562:1,15
**Sor-**
439:13
**sorry**
300:21
305:17,18

313:1
314:19
318:23
319:15
321:5
323:23
325:11,23
327:17
333:11
334:12,19
345:21
347:2
351:9
354:23
363:14
364:12
365:19
367:20
373:10
379:6
380:14
381:15
393:22
407:3,3,10
412:17
418:12
423:24
426:20
428:12,12
429:16
432:5,15
434:6,13
436:8
439:11,11
439:13,13
439:14
447:16,18
448:5
452:14,23
462:18
463:8
475:1
478:8
479:15
481:1
485:3
487:25
488:10
490:3
504:25

505:12,20
507:21
508:23
510:17
514:6,9
515:18
520:10,11
520:24
525:5
528:4,14
532:3
533:15
535:3,10
535:22
536:4
537:24
538:25
546:9
552:6
555:14
558:4,12
561:19,22
562:9
**sort**
305:14
317:8
333:12
346:17
351:5
354:14
355:16
356:16
370:8
390:8
395:4
417:11
441:11
444:10
445:25
451:12
453:3
455:21
457:24
465:14,23
502:15
522:8
529:3
**sorting**
393:14
**sorts**

320:11
476:1
**sound**
516:22
**sounded**
450:22
**sounds**
371:6 417:5
497:3,8
504:5
556:4
561:3
**sourced**
526:5
541:10
**South**
294:14
492:16
**space**
325:15
**span**
464:8
**speak**
308:23
327:2
346:19
450:15,19
467:7
533:15
538:13
545:21
546:24
561:17
**speaking**
307:22
**speaks**
392:17
416:17
457:2
469:1
**special**
496:23
501:20,20
508:20
525:14
**specific**
312:21
346:18
384:8

448:18
**specific...**
302:6 332:7
332:20
333:23
346:22
347:2
359:1
384:12
410:14
424:3
440:22
452:19,20
471:20
472:23
473:5,15
473:17,18
473:20
474:1
476:17,19
489:17
497:5,16
503:3
**specified**
560:8
**specify**
477:7
**speculate**
486:19
489:25
490:4
**speculating**
384:8 388:2
**speculation**
308:14
376:15
377:24
379:5
431:3
534:25
547:9
**speed**
511:15
525:17
**spell**
447:10
**spend**
560:8
**spent**

311:13
**spin**
491:14
**split**
546:16
**spoke**
321:14
373:8
388:22
500:2,21
502:7
505:1
517:1
526:24
540:20
**spoken**
554:20
**sport**
327:6,9
**spot**
434:6
**spring**
387:6 529:4
**Springfield**
321:25
326:9
343:23
344:6
356:11
413:21
439:21
**Square**
290:6 565:3
**St**
290:8 292:2
294:15
295:21
436:5
439:20
440:2,12
441:1
447:5
557:14
565:4
**stab**
370:8
**stack**
535:12
**Stacy**

624

516:19
517:25
521:16,22
522:6
**staff**
311:14,20
324:15
342:20
416:3,6
485:11
486:1
529:21,22
**stage**
461:6
**stake**
293:19
**stamp**
354:2
490:21
**stance**
423:2,3,8
**stand**
436:23
488:24
548:9
565:20
**standalone**
549:14
**standard**
320:19
**standpoint**
430:21
**stands**
360:8
422:19
**start**
296:17
297:9
313:13
316:5
319:16
346:6
372:18
373:16
402:23
418:16
432:19
445:22
459:24

493:10
495:4
504:15
514:16
519:2
528:14
553:24
555:4
**started**
295:10
343:15
408:22
491:10
502:15
**starting**
392:22
475:25
528:9,18
542:9
**starts**
299:20
315:25
357:20
406:24
434:11
436:3
504:18
538:11
540:9
**state**
294:17
310:2
318:19,25
321:13
326:17
339:4,8
340:20,22
340:25
341:7
346:24
356:23
358:3
365:18
368:9
380:14,17
380:21
382:2
384:6
397:4
398:9,12

399:18
400:12,14
402:3,9
403:10,13
404:7
414:8,14
421:8
427:5
462:2
479:3
481:15
497:14
501:18,19
503:10
515:13
516:3
545:3,9
547:7
554:12
555:3
567:3
**state's**
496:21,22
**stated**
297:17
541:16
**statement**
362:19
400:18,20
402:4
484:17,19
503:10
512:2
532:13
**statements**
451:16
**States**
289:1 294:8
**statewide**
368:11
**stating**
362:20
440:22
454:13
**station**
387:14
409:15
410:23
529:6

531:8
533:20
**stations**
374:16
456:6
**statute**
425:20
468:11,22
474:19,20
478:24
479:23
554:11
**statutes**
376:5
382:15
398:15,22
426:2
471:22
472:25
483:12
**staving**
545:7
**steadfast**
324:16
**stenogra...**
564:6
**step**
462:19
505:16
**Stephanie**
412:7,10
415:8
**Stephenson**
289:24
294:16
564:2,14
565:24
**steps**
349:12
505:16
**Steve**
426:12,14
427:13
**STEVEN**
289:10
**stick**
430:8
**sticker**
313:7

371:21
504:14
**stickers**
562:21
**stop**
343:7
354:19
432:3
453:25
465:4
471:12,25
472:17
473:3,10
473:13,16
473:25
474:2
480:20
481:6,14
494:1
**stopped**
324:25
365:2
411:7
458:7
**stopping**
309:13
474:23
492:24
**stops**
539:17
**store**
292:2
**stores**
394:4
395:14
539:17
**story**
305:4 413:4
413:22
438:3
477:22
526:24
**strategies**
508:10,16
512:8
**strategy**
354:15
357:10
397:19

625

440:1,2
509:2
512:23
513:1,5
514:3,4
**street**
290:16
361:6,13
365:16
366:17
393:15,17
394:18
409:16
**strictly**
466:6
**strike**
326:15
427:9
**strong**
423:8
466:13
479:17,17
479:20
**struck**
402:21
**structure**
317:3
**structured**
448:13
485:1
**structures**
394:13
**structuring**
372:9
**struggling**
397:7 431:5
**student**
465:2
**studied**
302:17
487:11
**stuff**
330:10
395:2
418:2
**style**
390:16
**subcommi...**
508:20

525:14
**subcontr...**
292:4
435:25
**subcontr...**
319:7,8
507:10
**subject**
292:19
313:19
338:15,16
339:20
342:4
349:12
372:22
435:25
450:19
459:16
489:7
491:5
509:18
529:19
538:7
540:11
**submit**
513:7
525:21
**submitted**
510:6 511:9
517:23
**subscribe**
567:17
**subsequent**
375:4 529:8
**substance**
567:14
**succeed**
430:10
515:22
**succeeding**
500:23
**successful**
457:11
475:21
**successf...**
356:5 545:5
**sudden**
321:22
367:5

466:7
**sue**
442:20,22
447:20
448:2
451:20
510:1,22
**sued**
443:4
**sufficient**
509:7
**suggest**
426:10
**suggested**
436:19
484:1
488:7,15
489:20
**suggesting**
419:25
**suggestion**
481:17
483:2
**suggestions**
482:13
**suing**
401:2
525:11
**suit**
515:9
524:15
**Suite**
290:7,16
294:14
565:3
**Sullivan**
295:18
316:7,10
540:3
550:24
551:8
552:9,10
**summarizes**
357:9
**summary**
304:24
305:14
461:18
**summer**

387:7
417:25
418:3
463:19
508:19
**super**
403:8
**supervisory**
361:24
**supplement**
312:5
**suppleme...**
493:22
**supply**
527:5 529:9
530:17
531:13
**support**
291:24
304:21
318:24
324:16
350:19
357:13
372:22
376:10
497:14
548:4
554:14
**supports**
309:3
**suppose**
489:14
**supposed**
368:3
**sure**
296:12
301:18
306:23
308:12
309:12
320:15
333:1,14
333:18
334:2,2,5
344:3
351:10
358:19
359:14

371:5
388:5
389:1
395:15
406:15
408:5,5,14
412:21
418:18
434:22
486:12
487:1
493:3
495:21
518:14
527:6
532:1,7,21
543:3
**surmising**
485:20
**surprised**
427:2
**survive**
394:23
**suspect**
340:15
368:4
369:19
**suspended**
563:5
**Swain**
347:22
348:11,12
348:13,24
372:1
385:22
459:13
507:24
542:3
**swaingro...**
347:22
348:15
487:10
**swear**
294:25
**sweep-**
442:16
**sweepstake**
438:6
443:19

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

**sweepstakes**
437:11,17
437:22
438:18,21
438:21,23
439:4,18
440:18,22
441:7,25
442:4,14
442:17
443:8,24
445:12,17
446:5
451:13,18
453:3,6,8
453:18
454:9,13
455:6
456:1,14
495:10
535:6
**sweets**
437:11
**switch**
334:15,24
**sworn**
295:3
**system**
299:16
315:12
**systems**
374:22

---

**T**

**T**
291:1,1,5
**tab**
318:21
319:9
337:25
350:14
351:5
437:1,3,3
506:7
507:4
549:12
**table**
405:16
458:10

529:10
**tabs**
351:22
393:2
**take**
302:4  335:1
335:16
358:22
360:15
362:22
364:19
368:15
371:2,3,4
378:23
379:14
382:9
383:8,8
400:9
409:22
412:24
414:10
420:10
421:18
423:3
427:7
449:11,11
449:17
458:16,17
477:8
484:22
485:20
493:2
498:3
504:1
518:22
548:1
550:25
555:20
556:2,2
559:13
**taken**
414:19,24
497:13
564:3,6
565:11
566:5
567:9
**takes**
318:22,23
423:8

**talk**
297:18
305:18
312:21
323:24
346:15
347:19
386:21,25
387:1,5
388:13
410:18
422:17
432:12
441:5
442:25
446:1
479:8
480:24,25
493:1
555:21
559:18
**talked**
309:18
324:5
325:4
338:1
340:7
341:11
342:5
353:21
384:22,23
384:25
385:1
387:15
401:22
403:5
408:5,21
426:12
438:22
463:18
467:9
478:22
479:4
489:12
497:21
503:17
520:24
526:22
541:6
554:2

**talking**
311:14
316:1,16
319:23
331:17,19
350:3
354:11
356:18
358:20
361:2
362:5
364:24
369:8,12
375:17
388:24
389:8,23
392:14
393:1,18
394:2
395:16
398:11
400:11
405:11,12
409:24
418:2,9
420:24
421:13
422:6,8,20
425:14,17
434:24
438:16,18
451:18
454:4
455:5
457:18
460:17
465:20
470:17
474:11
494:3
498:8,9
505:25
506:2
508:7,17
510:18
519:13
520:17
525:15
527:21
528:12,21

528:22
532:15
541:4
**Taneyco-**
352:22
**targeted**
461:13
487:4
**task**
378:17
497:16
500:18
**tasked**
380:22
**Tate**
291:14
339:21,25
341:13
345:14
**Tate's**
340:15
**taverns**
319:22
320:3
321:23
343:6
344:16
356:10
361:9
366:18
394:3
395:8,14
**tcmax.net**
358:1
**tea**
423:13
**team**
327:25
**Teasdale**
372:6
**technical**
554:14
**technically**
398:1
**technology**
518:18
**teens**
361:11
**tell**

301:9
303:25
305:3
330:2
335:15,25
342:21
358:1
367:9,9
373:1
418:15
420:7
436:4
440:9
441:10
443:11
444:5
447:2
463:23
466:18
467:16
477:20,25
478:13
488:5
491:15,17
491:19
505:24
506:6
511:4
513:20
527:7
529:24
536:6,24
544:2,18
549:21
557:10
**telling**
366:21
389:4
400:12
401:12
414:9
430:16
437:13
443:15,17
443:18
444:5
455:7
461:6
497:23
510:9,14

510:23
512:24
514:1
527:10
537:21
549:20
557:20
**tells**
307:4 431:7
**tem**
417:24
423:9
424:23
**ten**
504:3,5,6
**tens**
361:11
**tenth**
330:19
**term**
326:4,6
417:23
428:14,18
446:18
512:5
**terminal**
439:22
**terminals**
313:21
392:25
393:8
394:12
438:17
**terminol...**
392:10
**terminology**
319:12
332:21
502:6
**terms**
402:24
**terribly**
430:1
**test**
343:18
519:17
526:18
**testified**
295:6

404:16
**testify**
295:3
**testimony**
295:12
403:15
499:19
518:7
520:12
521:1
527:16
528:9
530:19
534:16
560:21,23
564:5,6
565:11
**testing**
522:2
**text**
470:15
**thank**
300:21
320:14
365:23
407:13
434:14
447:14,15
492:20
507:15
543:15
558:11,12
558:21
561:5,11
565:22
**Thanks**
472:3
540:19
559:23
**theory**
440:1 525:9
**thereof**
539:5
**thereon**
567:16
**thing**
297:14
299:17
300:15

311:24
314:25
328:14
330:23
331:8
336:6
346:17
366:10
367:5
381:21
394:1
399:22
409:10
419:10
437:5
464:22
465:24
475:5
477:4
512:15
548:22
549:9
551:12
556:23
**things**
296:6 305:5
310:20
311:18,22
312:2
325:16
331:2
334:6
349:2
353:3
361:2,15
364:7
366:23
379:12
389:23
396:14
403:23
416:23,24
417:13
418:20
423:14
425:11
431:8
433:24
437:21
445:15,24

446:3,24
455:24
456:13
457:10
465:12,12
465:22
466:10
474:4
475:11,15
478:6
479:13
499:10
500:14
501:2,7,11
507:8
509:23
521:13
523:21
534:9
549:3
**think**
295:24,25
297:23
298:12
300:3,16
301:17
303:24
304:18,19
304:23
305:2,16
305:19
307:23
308:3,4,7
309:4,14
310:14,17
311:4,11
312:3,8,18
312:24
314:13
315:20
321:19
322:6
325:25
326:1,4
328:23,24
328:25
329:8
330:6,17
332:8,14
332:16

| | | | | |
|---|---|---|---|---|
| 333:16 | 397:9,14 | 453:5,10 | 508:7 | **Thole** |
| 334:1 | 397:16,16 | 453:14 | 512:6,18 | 446:6 |
| 335:2,7,8 | 398:5,16 | 454:2,17 | 513:2,17 | **thought** |
| 335:10 | 398:21 | 454:18 | 514:22,22 | 377:11 |
| 340:8,17 | 399:1 | 456:8 | 515:4 | 386:23 |
| 340:22 | 400:15 | 458:20 | 516:24 | 395:9 |
| 341:4,14 | 401:3,18 | 459:6 | 518:1 | 401:22 |
| 342:8 | 401:24,25 | 460:23 | 519:23 | 414:3 |
| 345:12,15 | 402:18 | 461:2 | 520:14,16 | 415:2 |
| 345:19 | 403:18,21 | 463:19 | 525:8,8 | 433:22 |
| 346:9 | 405:9,18 | 464:1,15 | 526:9,13 | 442:24 |
| 348:17,21 | 405:20 | 464:19 | 527:6,13 | 481:9 |
| 349:1,2,24 | 406:13 | 465:1,4,17 | 527:25 | 483:22 |
| 350:21 | 408:3 | 467:7 | 530:11 | 485:2 |
| 352:24 | 411:5,6 | 468:6,7,9 | 532:9 | 497:24 |
| 353:2,8,19 | 416:12,17 | 468:17 | 533:24,25 | 498:20 |
| 353:20,22 | 416:22 | 469:17,22 | 537:1,12 | 501:1 |
| 354:1,7 | 417:9,23 | 470:6,19 | 539:2,7,24 | 523:15 |
| 355:21,22 | 417:24 | 471:1,9 | 541:3,4 | 526:14,15 |
| 355:23 | 419:4,9,14 | 474:18 | 542:15,23 | **thoughts** |
| 357:8,14 | 419:18,19 | 476:7 | 543:11,11 | 480:18 |
| 357:15 | 421:2,5,5 | 477:17,19 | 545:17,18 | 483:19 |
| 359:16,23 | 422:3 | 478:21,23 | 545:24,25 | **thousands** |
| 360:7,8 | 423:11 | 479:8 | 547:11 | 312:1 343:5 |
| 362:3 | 424:12,24 | 480:4,15 | 548:5,14 | **thread** |
| 364:14,23 | 424:24 | 481:18,25 | 551:3 | 291:11,13 |
| 365:24,24 | 425:18 | 483:1,3,4 | 552:15 | 291:14,16 |
| 365:25 | 426:3,9 | 483:23,25 | 553:5,24 | 291:21,23 |
| 367:12,20 | 427:6,9,15 | 484:3,4,8 | 554:7,16 | 292:1,6,11 |
| 368:14,23 | 427:21,21 | 484:12 | 554:23 | 292:16,19 |
| 368:25 | 427:22 | 486:1,24 | 556:25 | 292:21 |
| 369:16 | 428:13,15 | 487:17,23 | 557:9 | 293:3,7,12 |
| 370:9,22 | 429:4 | 488:11,18 | 559:24 | 293:16,19 |
| 370:23 | 431:8 | 489:3,23 | **thinking** | **threatened** |
| 372:7 | 432:4 | 490:18,19 | 417:4 | 442:20 |
| 373:17 | 434:23 | 491:22 | 424:18 | 443:4 |
| 377:13 | 435:7 | 492:2,11 | 437:2 | **three** |
| 379:23 | 436:24,24 | 496:13 | 462:25 | 296:1 |
| 381:19 | 437:1,20 | 498:21 | 500:20 | 298:14 |
| 384:15,23 | 439:2,2,9 | 499:17,18 | 535:2 | 299:1 |
| 387:21,21 | 439:9,16 | 500:1,19 | 562:17 | 342:4 |
| 388:25 | 440:15,19 | 500:22 | **thinks** | 345:8 |
| 389:8 | 441:11,13 | 501:10,10 | 385:16 | 434:16 |
| 390:4,7,21 | 442:3 | 502:8,11 | 514:17 | 544:13,20 |
| 391:9 | 444:9 | 502:13,16 | 515:1 | 551:14 |
| 392:16,16 | 445:2,5 | 502:20,23 | **third** | **throw** |
| 394:1 | 446:22 | 502:25 | 299:19,20 | 465:23 |
| 395:1,2,17 | 449:10 | 503:17 | 307:22 | 474:15,15 |
| 395:20,20 | 450:3,8 | 506:22 | 386:7,8,10 | **throwing** |
| 396:3,6 | 451:2,21 | 507:1,4 | 424:25 | |

401:8
**Thursday**
509:16
**ticket**
300:1,9
**ticket-type**
307:15
**tickets**
298:20
  299:24
  301:5
  304:25
  305:1,3,14
  307:5
  308:6
  309:4,6
**tie**
490:17
**tied**
299:3
  412:22
  453:6
**ties**
471:1
**till**
297:9
  421:24
**Tilley**
416:8
  422:10
  423:3
  426:13,15
  428:15
**Tilley's**
427:13
**Tim**
372:1
**time**
294:4,5
  297:23
  301:16,16
  302:5
  308:12
  310:13,19
  319:17
  321:24
  325:20
  326:18
  330:19

331:20,20
337:22
338:3
339:5,9
340:23
341:18
343:24
344:24
348:1,6,9
349:1,24
351:3,21
354:8,17
357:9
358:4
361:23
362:16,16
364:15
365:25
368:16
370:22
371:14
374:3
376:1,18
387:8,9,17
392:17,23
400:2,23
401:3
402:12,16
403:5
408:9,10
408:11
409:25
411:1
412:3,12
412:16
416:18,23
417:17
420:9
421:21
423:15
427:14
430:19
432:3
438:20
440:19,21
447:4
448:19,20
449:12
454:7
459:1

462:11
467:15
469:12
470:2
476:22
478:22
479:11
482:25
483:17
486:4
488:20
490:21
492:3
494:23
495:22
499:11
500:11,14
501:14
503:23
504:8
515:17,21
516:2,25
517:11
520:25
525:16
526:24
529:11
533:19
536:10
539:21
548:6
553:9
555:16
557:22
558:14
560:7,8,9
560:23
565:12
**times**
330:10
  334:22
  366:16,17
  400:5
  406:2
  409:18
  463:5
  479:16,17
  490:14
  503:9
**timing**

368:12
  369:7,9
  417:6
  419:16
**tip**
327:6,9,20
**tipped**
441:7
**tirelessly**
464:8,18
**title**
408:1,4
**titled**
296:20
**TN-**
448:6
**TNT**
289:5 294:5
  294:20
  295:12
  296:23
  297:25
  299:5
  304:10
  309:19,20
  310:3,4,5
  310:7
  311:2
  314:16
  315:1,22
  316:14,15
  316:17
  317:11
  318:7
  327:7
  328:25
  335:24
  336:15
  399:8
  407:24
  412:10,12
  447:19,23
  447:24,24
  448:9,9
  469:7
  492:4
  516:4
  517:3
  526:5

527:4,19
528:10,19
530:17
539:12
540:2
541:11
555:3
565:7
566:3
567:7
**TNT's**
303:8 311:6
  315:9,12
  326:23
  328:12
  329:3
  331:3
  516:8
**tobacco**
309:24
  360:8
**today**
295:20
  297:2
  298:7
  301:9
  307:20
  313:16
  315:5
  332:12
  333:7
  362:13
  370:17
  376:1
  378:2
  383:12
  390:6
  416:3
  426:11
  445:4
  482:2
  485:21
  489:23
  501:3
  531:1
  532:12
  537:5
  553:19
**today's**
294:4

331:20
565:20
**Todd**
553:13,16
553:17,22
553:22
554:5,8,21
554:22,22
555:1,10
**told**
298:18
302:18
311:11
321:17
325:22
334:1
343:17
366:10,15
367:4
408:24
410:6,9,9
410:13,15
414:15,16
414:21
417:18
418:4
423:6
426:17
438:2,4
440:16
442:19
444:6
449:12
452:7,12
452:20
454:17
467:8
478:20
480:2
492:3
497:22
507:2
510:15,16
510:19
514:4
516:20,24
516:25
517:8
519:15
520:2,23

521:17
522:7
529:12,21
529:22
530:6,14
533:6
547:25
548:7,16
**Tom**
347:24,25
348:8
357:22,22
357:25
358:1,2,3
385:21
413:9
415:8
435:23
436:4
438:2,4
440:2
441:9,12
442:19
444:5
459:13
487:9
493:7
504:19
505:7
507:23,23
540:11,18
542:2,20
543:15
**tomato**
406:5,5,5,5
**tomcobb@...**
347:21
**Tommy**
413:14
**tone**
423:10
**top**
299:9 300:7
304:16
309:12
326:2
345:21
347:15
349:15
357:20

360:2
385:20
388:19
406:22
408:10
420:2
451:4
459:11
461:4,5
474:3
486:15
487:20,24
487:25
491:4
493:6
504:18
507:20
523:2
535:15,22
535:23
537:16
540:9
541:25
550:3
552:17
553:12
556:10,12
**top-level**
304:23
**topic**
298:19
309:22,22
309:23,24
310:1,2,3
310:5,6,9
310:10
453:1
555:24
**topics**
297:18
298:1,10
309:17
310:16
312:16
446:11,15
**Torch**
289:9 292:1
294:6
299:6
305:6

308:17
328:16,25
329:11
331:3,12
332:4,7,20
333:24
334:7
335:20
336:11
368:19
374:14,14
374:21
375:5,6,18
383:21
385:5
389:15,21
389:25
390:1,6,6
390:15
391:3,12
391:21
393:17,24
409:7,13
409:23
410:15
416:4
422:10
423:19
424:3
426:15,16
427:2,4
437:24,25
439:25
471:12,25
473:3,5,11
473:13,16
473:17,19
473:20,20
473:21,25
474:2,23
475:24
476:19
480:20
481:6,14
491:10,18
492:10
496:24
497:6
498:14,15
498:19,19

499:6,23
501:22
503:4,22
508:12
510:1,22
512:16
513:16
515:8,13
515:23
516:5
517:5,9
520:4
521:18
524:2,6,10
525:6,16
525:19
527:21,22
528:12,21
528:22,23
529:6,15
529:16
531:5
532:16
534:15
541:19
546:22
547:6
555:5
558:2,20
559:6
565:7
566:4
567:8
**Torch's**
387:13
427:3
497:17,24
511:21
520:17
525:13
528:13
533:5
**Torch-type**
328:16
**tort-**
446:17
**tortious**
446:3,17,25
447:7,20
449:20

631

450:2,13
450:25
451:11
452:1
510:2,22
511:1
516:10,12
524:6
**tortiously**
448:16
449:23
**total**
444:19
**totality**
311:8
**totally**
418:13
495:23
**touch**
536:20,20
**Touché**
450:24
**tough**
432:13
**tournaments**
327:22,22
**town**
316:9
552:10
**toy**
465:12
**track**
300:11
419:7
**Tracy**
301:22
**trade**
310:9
325:18
426:21
438:7
453:17
457:23
460:22
480:17
**traditional**
320:7
343:23
**traditio...**

361:5
**train**
343:3
**training**
382:14
**transcribed**
565:20
**transcript**
289:17
292:23
528:16
561:21
562:1,2
564:4
565:6,10
565:14,15
565:20
**transcripts**
562:15
**transition**
394:7
**transpired**
346:16
551:23
**transver...**
394:16
**trapping**
496:2
**trick**
312:9
**tricked**
321:20
**tried**
386:19,21
387:1
389:1
399:15,21
400:3
442:15
469:1
477:21,25
483:11
502:2
523:19
**trip**
551:11
**trips**
346:23
**trouble**

396:14
**troubling**
325:9
**truck**
539:17
**true**
317:21
332:15
333:5
344:19,25
404:24
515:25
516:2
531:20
534:3,4,9
539:21
561:24
564:4
567:15,19
**trust**
317:2,2,22
**Trustees**
316:9
**truth**
295:4,4,5
308:2
452:14
536:25
**truthful**
410:13
**try**
329:5
334:15
335:14
353:9
387:5
402:25
407:9
421:21
426:22
432:12
433:5
464:8,22
475:22
477:20
478:13
483:16
486:11
533:22

544:5,8,9
**trying**
303:14,15
303:25
312:7,8,10
320:4
322:10
325:2
330:8
341:8
344:2,21
362:4
365:18
381:4
392:18,19
393:11
394:20
400:7
406:11
413:25
417:13
418:22,23
419:2,5,23
421:9
423:13
425:9,12
429:17
433:16
435:10
436:18,21
436:24
440:3,4,25
442:17
443:3,25
444:4,21
452:22
454:18,19
455:2,14
455:14
457:5
458:8
465:22
466:9
476:21
478:15
492:12,18
494:23
500:25
502:17
507:7

517:20
526:3
532:8
534:4,13
544:5
545:22
546:15,19
548:21
551:11
553:5,8
**turn**
466:21
494:13
515:8
518:19
559:12
**turned**
350:12
355:18
**turning**
351:19
**Turntine**
289:18
291:2,10
291:12,14
291:16,18
291:20,22
291:25
292:3,5,8
292:10,12
292:18,20
292:24,25
293:2,5,7
293:9,11
293:13,15
293:18
294:3
295:2,9
316:8,23
317:1,7,13
353:6
372:1
406:25
407:18
408:18
412:7
413:5
415:8,9,9
448:8
483:21

489:6,7
507:22
554:9
556:11
560:4,14
560:21
565:7,15
565:18
566:2
567:6,11
**Turntine's**
560:10
565:10,11
**TV**
353:2
**Twenty-five**
348:10
**two**
296:6,13
305:23
325:16
334:6
337:8
339:22
373:8
384:25
389:16,24
392:10
436:22
450:7
497:4
505:15,16
508:3,3
515:16
530:5
531:2
540:24
544:19
551:13
**type**
317:7,19
318:10
322:18
323:3
354:14
390:21
492:8
518:22
**typed**
302:13

**types**
299:1 308:6
317:11
469:6
471:14
472:2
473:7
474:24
476:12
480:21
481:8
549:15
**typewriting**
564:7
**typewritten**
291:9
**typically**
320:12
341:4
450:13
**typo**
368:4

------

**U**

**Uh-huh**
314:4
**ultimately**
370:2
383:19
387:23
399:9
418:8
448:20
519:3,10
519:15
530:8
532:14
533:8
**ultracon...**
399:3
**unaware**
416:6
**uncalled**
428:11
**uncomfor...**
437:10
**under-**
305:4
**undergra...**

**types**
521:23
**underlined**
470:16
**underlining**
304:20
**underlying**
299:2 305:4
305:9
306:11
**undermine**
442:2
**understand**
297:24
302:5
303:15
304:13,25
309:7
323:11
330:12,14
331:15
358:20
363:16
365:22
371:1
376:4
378:6,13
381:5
382:14
395:15,18
418:19
421:5
426:10
432:25
433:16
434:11
446:3,5
451:12
453:2
456:24
466:16
467:21
473:9
477:16,17
492:19
532:23
557:7
559:9
561:23
**understa...**
298:21

309:10
311:8
320:17,20
343:19
379:21
380:13
390:1
391:21
396:11,24
419:15
426:14
435:2,5
438:5,20
438:23
446:6,7
450:25
451:4,19
451:23,25
452:1,6,14
452:16
461:12
488:16
494:2
530:14
**understood**
365:10
393:23
396:6
472:12
**underway**
361:4
**unexpected**
437:8
**unfair**
343:4 405:9
**unfolded**
326:3 551:4
**unfolding**
355:14
416:24
**Unfortun...**
318:20
**unilater...**
557:1
**United**
289:1 294:8
**units**
343:20,22
**university**

382:21
**unknown**
324:22
**unplugging**
414:9
**untrue**
473:12
**unwind**
443:25
**update**
292:13,16
509:22
**upright**
300:5
**upset**
321:19
322:2,10
344:4,7
349:4
350:1
443:2
502:9
**upsetness**
344:8
**upsetting**
441:9
**use**
300:10
371:3
421:2
492:23
523:19
539:4
**useful**
474:18
494:15
**usually**
313:13
335:2,3
461:4

------

**V**

**v**
289:8
447:15
565:7
566:4
567:8
**vacuum**

420:14,17
420:22
421:7,10
422:5,13
422:13

**Vague**
328:23
331:14
410:25

**value**
457:12
458:10,11
494:15
507:7,9
545:23,23

**various**
311:2
366:15
392:19
393:10
394:13
452:7,12
478:11
541:17
557:25
558:18

**vendor**
437:12,17
438:1
441:7,25
539:11
540:2

**vendors**
438:6,21,23
439:4
443:19

**venture**
354:5

**versa**
456:4

**version**
303:6 306:1
307:24
462:15,17
463:7
482:7
489:11

**versions**
424:11

520:20

**versus**
294:6 364:4
364:5
389:25
405:24
406:10
423:2
424:11
425:5
446:6
473:23

**vested**
399:11

**veterans**
394:3
395:13
396:4

**VFW**
293:3,6
320:11
387:10,13
388:14,15
388:17
408:22
436:5,6,8
436:20
439:17
440:10,16
441:2
443:7,11
443:18
453:8
456:2,17
456:20
517:12,23
527:4
529:4,7,10
529:17
530:16,18
533:3
534:23
536:3,13
537:22
538:7
539:23

**VFWs**
455:5

**viable**
350:20

**vice**
400:1 456:4
505:21

**video**
313:20
392:25
393:2,8
394:12
437:1,3
438:17
439:22
539:14
561:4,18
561:20
562:3,16

**video-re...**
289:16
563:4

**videogra...**
294:2,12,24
371:12,12
371:16
458:25,25
459:3
496:9,9
504:7,7
559:16,20

**videotaped**
294:3

**viewed**
353:4

**viewer**
423:20

**violating**
542:9

**violation**
360:22,23

**virtual**
561:15
562:5

**vis-a-vis**
331:13

**visit**
503:7

**visited**
503:15

**visits**
346:14

**visualize**

444:9

**VLT**
392:24
545:7

**VLTs**
395:5
549:14

**Volume**
289:15
292:24

**volunteered**
555:9

**voters**
397:10

**VPT**
437:1

**VPTs**
393:1
394:16
403:1

**VTLs**
313:21

**vulnerab...**
416:7

---

**W**

**wait**
562:24

**waiting**
382:16
417:21

**waived**
563:7

**waiving**
565:12

**walk**
312:20

**want**
300:23
304:8
307:8,25
324:14
328:6,7
329:4,21
330:9
333:17
336:6,7
341:2
352:12

357:11
358:22
364:13
367:2,2
371:4
372:18
383:13
389:13
396:9,22
398:19
399:4,5
403:9,12
412:21,21
418:15,18
418:20
421:17
422:20
430:8,8,9
430:9
443:6,10
443:11
444:24
452:10,11
452:11,18
456:3,17
456:20
457:14
458:23
465:25
469:4,19
475:20
485:22
486:18
489:25
490:5
495:4,25
496:2
508:23
512:16
518:6
526:10
531:17
533:15
534:11
544:3,9
546:7
548:20
555:18,19
559:17
562:13

wanted
301:6
330:13
333:14
339:10
372:17
393:5
408:24
409:5,11
412:24
414:11
415:17
416:13
417:19,21
417:22
421:20
445:23
461:6
463:20
473:13
476:9
480:24
490:1
501:8
523:24
526:11
533:12,14
533:14,16
533:19
534:19
546:2
548:1
549:3
550:25
557:23
558:16
wanting
420:25
496:10
532:1
wants
413:1
416:10,15
417:20
419:13
warfare
512:6
Warren
290:4
294:20

296:6
wasn't
341:6
356:20
370:18
387:7,8,20
387:22
426:4
428:7
429:19
444:4,11
464:2
472:13
483:2
497:10
500:11
521:2
Wasser
507:24
542:4
wasting
432:3
watch
534:14
watched
376:17
water
371:3
465:23
way
299:6
303:25
304:19
336:13
353:10,25
354:16
355:7
366:11
370:7,24
373:5
377:10
394:22
402:14,19
402:20
403:1,23
405:9,15
406:4
408:15
414:5

415:3
425:4
426:8
439:3
450:23
453:17
454:21
462:19
467:7
480:19
482:3
483:9
484:16,19
484:24
485:1,3,4
490:11
499:12
502:12
527:12,12
529:2
538:17
545:18,23
547:14
ways
350:3
480:18
511:19
512:12
we'll
313:16
314:14
329:24
368:11
384:17,17
384:18
442:7,7
471:18,19
472:21,22
493:2
504:6
511:13
517:13,15
517:15
556:2
561:6,12
we're
297:18,18
308:20
313:14,15
314:6

315:5
316:15
329:15
331:19
335:10
336:20
352:13
353:1,9
357:1,17
362:8
371:13
398:10
427:9
432:16,19
434:24,24
440:3,4
441:20
454:3
459:5
474:11
476:2
478:4,4,17
484:9
485:6
492:22
494:3
500:20
503:24
504:8,10
532:11,14
559:16
we've
307:2
308:12,16
308:17,19
316:15
345:7
361:2
370:21
384:22
403:11
405:5,18
405:20
411:23
425:17
468:20
485:9
505:14
506:2
507:20,21

521:14
530:25
552:17
website
433:13
Wednesday
522:7
556:12
week
311:13
505:13
523:14
526:7
530:5
531:2
540:25
543:15,19
560:7
weird
428:14
welcome
507:16
went
299:14
306:12
311:17
312:4
343:14
376:11,19
376:20
377:3
381:25
390:19
403:7
405:2
435:11
441:5
448:19
481:19
483:3
484:4,13
515:22
530:4
548:12
weren't
370:3
394:16,19
433:24
443:19

635

444:16
**West**
316:10
540:3
552:10
**Westfall**
446:6
**what'd**
314:20
**whatever's**
300:12
**whatsoever**
324:24
**white**
467:18
**Wholesalers**
359:7
**wields**
401:11
**wife**
317:24
408:18
413:6
**wife's**
317:2
**willing**
387:21
404:1,6
420:9
555:2
**willingly**
513:19
**willingness**
366:3,7
368:16
557:25
558:17
**Wilson**
373:11
**win**
385:9 430:9
430:9
491:14
**wind**
484:22
**wing**
399:3
**Winter**
542:18

543:4,8,9
543:21
**Winters**
547:3
**wiped**
398:22
**wish**
561:4
**withdraw**
514:8
**witness**
294:25
352:3,8,11
370:25
371:5
381:15
428:10
447:12
458:22
477:17
520:10
528:1
559:14
561:10
566:2
567:1,6
**Witness/...**
567:23
**wonder**
490:23
**wonderful**
561:7
**wondering**
487:17
**wonky**
312:25
410:4
**woodwork**
392:23
437:21
**word**
301:14
321:6,6,20
322:22
339:21
343:16,16
382:18
397:7
441:11,12

461:16
473:10,17
512:6
524:20
**words**
319:17
330:15
333:2
334:3
367:22
424:9
**work**
299:7,16,21
299:22
300:4,11
301:5
303:8
305:3
306:5
307:4
309:5
326:20
327:9
328:18
349:8
356:17,19
359:7
373:3
392:19
402:25
404:1
417:12
464:7,15
465:4
470:20
493:23
494:9,10
501:14
502:17
503:1
508:10
525:20
526:2
546:7,8,10
546:11,14
552:23
560:19,25
**worked**
322:3
326:12

362:8
431:19
464:17
502:4
526:16
**working**
313:15,15
321:13
369:17
402:23
408:8
458:3,7
478:17
494:11
495:12
496:18
502:6
507:10
512:8,12
524:5
525:9
537:21
541:16
**works**
379:22
436:15
486:9
**world**
320:12
347:12
365:15
**Worlds**
469:6 471:9
475:6
487:1
**worries**
300:22
334:20
407:14
**worry**
333:17
456:5
**worse**
328:10
**worth**
464:5,19
**would've**
307:18
310:18

340:12,12
340:13,18
341:19
346:10,10
353:17
356:1
411:5,6
454:11
469:23
**wouldn't**
303:1,2
356:13
462:9
469:19
546:4
**wound**
414:8 484:3
500:22
507:4
**wreck**
343:3
**write**
305:19
502:20
505:19
509:22
**writing**
308:5
342:22
369:18
401:13
465:2
466:12
476:4
502:18
**written**
301:2,8
302:3,4,23
423:6
454:8
466:6
482:8
549:9,16
**wrong**
295:25
324:24
350:7,16
369:25
375:25,25

| | | | | |
|---|---|---|---|---|
| 376:10 | 310:18,25 | 398:7 | 486:11,16 | 506:19 |
| 431:10 | 313:3,23 | 400:16,19 | 486:22 | 507:5 |
| 448:15 | 313:24 | 401:17 | 488:11 | 516:15 |
| 451:14 | 314:21 | 402:15,15 | 489:2 | 521:17 |
| 476:18 | 315:20 | 402:19 | 490:7,7,8 | 547:25 |
| 478:7 | 316:3,4,20 | 405:20 | 490:13,20 | 561:6 |
| 488:5 | 322:9,14 | 407:6,9 | 492:25 | **year's** |
| 562:10 | 323:10 | 408:12 | 493:3,13 | 506:21 |
| **wrongdoing** | 327:18 | 409:9 | 495:18 | **years** |
| 447:2 | 329:6 | 411:2,4,19 | 496:7 | 321:12 |
| **wrote** | 331:24 | 415:13,21 | 498:16 | 326:12 |
| 301:19 | 333:6,10 | 417:23 | 499:13 | 348:10 |
| 302:12 | 333:21 | 418:12 | 507:13 | 360:15 |
| 305:21,22 | 334:18 | 419:2,14 | 513:2 | 362:21 |
| 307:24 | 346:6 | 419:24 | 516:18 | 363:9 |
| 309:14 | 347:5 | 421:14,14 | 517:15,17 | 393:7 |
| 421:12 | 348:21 | 421:23 | 517:21,21 | 394:14 |
| 454:7 | 349:17 | 423:16 | 518:3,14 | 408:9 |
| 469:13 | 351:15,15 | 427:17 | 520:2,14 | 418:7 |
| 475:2 | 354:25 | 428:20 | 522:23 | 420:4,4 |
| 476:17 | 356:2,17 | 433:2 | 527:24 | 424:19 |
| 482:5 | 358:8 | 434:23 | 530:11,21 | 425:16 |
| 484:1 | 359:12 | 435:1 | 530:23 | 440:12 |
| 493:14 | 362:2 | 441:13 | 532:3,25 | 449:21 |
| 495:4 | 363:2,17 | 442:12 | 538:24 | 450:4 |
| 500:16 | 364:10 | 444:4 | 539:2,24 | 453:24 |
| 538:21 | 365:13,24 | 445:19 | 544:22 | 464:8 |
| 539:10 | 366:25 | 447:17 | 546:2,10 | 478:9,11 |
| | 367:14,18 | 448:1 | 547:13 | 505:15 |
| _____ X _____ | 367:19,23 | 449:11 | 548:18,25 | 506:8 |
| | 367:25,25 | 450:23,24 | 549:8 | 515:16 |
| **x** | 371:2 | 451:22 | 551:25 | 548:25 |
| 289:4,13 | 372:13,14 | 452:10 | 554:7 | **Yep** |
| 291:5 | 373:17,25 | 456:8,10 | 555:14,23 | 336:25 |
| 452:17 | 376:23,23 | 456:13 | 555:25 | 357:17 |
| | 376:24 | 457:17 | 558:7 | 388:6,24 |
| _____ Y _____ | 378:1,6 | 460:11 | 559:5,12 | 504:23 |
| **ya** | 379:9 | 461:17 | **year** | 507:25 |
| 561:12 | 380:12,19 | 462:4 | 295:11 | 542:13 |
| **yeah** | 381:22 | 464:19 | 307:19 | **yesterday** |
| 296:6,25 | 382:6,20 | 468:18 | 337:18 | 345:2 436:5 |
| 297:3,8,10 | 383:19 | 469:3 | 349:25 | 482:16 |
| 297:13 | 384:9,9,15 | 470:1,19 | 354:9 | 488:8 |
| 299:12 | 386:7,10 | 470:21 | 424:10,12 | 493:21 |
| 300:18 | 388:18 | 471:1,17 | 424:12,17 | 505:20 |
| 301:15 | 391:2 | 472:3 | 424:17,24 | **yokals** |
| 302:19 | 392:16 | 473:25 | 425:8 | 457:12 |
| 304:13 | 395:1,25 | 478:18,25 | 462:17 | |
| 306:15,20 | 396:6,16 | 479:21 | 463:7 | _____ Z _____ |
| 306:23 | 396:17 | 484:8,18 | 493:22 | **zeroes** |
| 308:3 | | | | |

314:17
315:1
**Zoom**
289:16
294:12
371:8
432:14
563:4

---
**0**
---
**1**
---
**1**
297:17
358:9
372:20
384:20,21
432:18
434:5,8
482:11
549:8,10
550:8
**1/25/19**
291:25
**1/369**
518:21
**1:00**
421:24
**1:10**
421:25
**1:15**
421:19
449:13
**1:19**
459:1,2
**10**
291:18
294:14
309:22
347:14
**10/19/23**
289:14
292:23
**10/22/18**
291:20
**10/24/18**
291:22
**10:25**
432:22

**100**
319:20
324:20
343:20
400:7
493:25
**11**
291:20
309:23
357:18
371:24
407:7
**11:06**
371:14,15
**11:28**
371:15,17
**1100**
290:16
**111**
370:12
**12**
291:22
309:25
371:20
382:25
**12/22/2023**
566:5 567:9
**12/22/23**
563:5 565:6
**12/29/23**
563:5
**12th**
324:8
435:24
**13**
291:25
310:1
406:19,23
407:6,12
407:16
408:16
432:17,18
434:8
**14**
292:3 310:2
435:19
459:7
**1400**
294:14

**143**
528:4,6,7
528:18
**144**
519:2,6,7,8
527:14,25
**145**
520:1
**147**
518:19,22
**15**
292:5 310:3
360:15
362:21
363:9
408:9
459:8
460:7
**15th**
307:19
516:15
**16**
292:8 489:5
**17**
292:10
308:18
310:5
490:25
**17th**
301:22
305:22
493:8,12
505:2
542:17
**18**
292:12
310:6
493:5
**18th**
505:19
549:5
**19**
292:15
310:9
326:5
489:19
504:14,15
504:17
520:24

**196**
295:17
**19th**
295:10
296:1
297:6,21
298:3
310:22
311:12
312:13,23
503:18
517:1
518:7
521:17
526:24
528:9,16
530:20
532:13
533:7
**1st**
409:19
516:21
537:1,2
538:6

---
**2**
---
**2**
299:7
313:13,17
313:22,24
313:24,25
314:22
459:23
460:4,6
488:4
495:4,14
495:15
496:17
527:18
528:10,18
542:16
551:13
**2/12/19**
292:3
**2/3**
314:1,9,24
315:22
**2:16**
459:2,4

**2:46**
482:14
**2:57**
491:8
**20**
292:18
296:20
326:5
507:17,20
522:22,23
548:25
565:20
**20-**
350:23
520:23
**2000**
308:18
**2000s**
361:10
366:19
467:9
477:22
**2014**
426:24
**2015/2016**
356:1
**2017**
313:19
315:23
323:20
324:8
325:21
337:5,16
337:22
338:13
339:18
355:25
402:10
403:6
437:22
523:15
**2017's**
331:20
**2017/2018**
355:24
356:4
**2018**
299:1
301:22

305:22
348:9
355:2,21
357:21
361:14
362:15
363:18
372:21
375:12,14
387:9
389:9
403:7
417:25
463:19
**2018/2019**
350:23
**2019**
325:25
387:6
403:7
406:25
407:18
408:19
409:19,21
409:25
411:12,16
412:13
415:10
432:22
435:24
440:24
459:14
460:9
462:7,24
463:9
476:2
478:15
482:14
485:9
490:19
492:4
493:8,12
493:22
500:12
501:14
505:2,19
508:1,19
509:16
512:19
517:11

519:14
521:15
526:7
529:4
531:5
536:11
537:2,13
538:6
540:11
542:17
547:18
549:6
550:13,16
553:14
556:14
**2020**
326:1
505:24,25
**2023**
289:19
294:4
516:21
520:24
528:9,16
565:11
**2024**
565:1
567:21
**20th**
509:16
512:19
547:18
**21**
292:20
304:14
310:10
509:11
535:9,11
**211**
290:7 565:3
**215**
356:6,20
**21st**
360:11
408:18
409:21,25
411:11,16
**22**
289:19

292:23
304:16
518:7
527:15
528:8,15
565:11
**227**
315:18,18
**22nd**
294:4
357:21
**23**
292:25
298:19
522:19,25
**23rd**
415:10
550:13
553:13
**24**
293:2
535:10,13
541:22
**24th**
372:21
526:7
**25**
293:5
311:16,24
538:2
**256-3181**
290:18
**259-2000**
290:9 565:4
**25th**
406:25
407:18
432:21
460:25
461:7
**26**
293:7 540:7
**267**
318:22
319:20
320:23
**26th**
460:9 462:6
**27**

293:9
541:22
542:1
**2700**
290:16
**275**
324:22
**277**
315:2,22
**27th**
462:24
482:14
485:9
**28**
293:11
547:16
**288924**
289:22
565:6
**289-567**
289:15,23
**29**
293:13
550:3
554:3
**295**
291:3
**296**
291:8
**298**
291:9
**29th**
459:14
490:20
**2nd**
516:20,21
537:13
554:23

---
**3**
---
**3**
297:6
314:22
315:25
316:5
408:16
411:18
461:20
495:15

504:25
542:11,12
544:18
**3/29/19**
292:5
**3/29/2019**
488:1
**3:24**
504:8,9
**3:37**
504:9
**30**
293:15
326:12
418:7
449:21
450:4
478:9,9,10
553:11
**30(b)(6)**
289:17
296:1
309:18
560:5,9,20
561:1
565:6,10
566:2
567:6
**300**
343:22
**30th**
389:9
**31**
293:18
556:8
**313**
291:10
**314**
290:9 565:4
**31st**
556:12
**323**
291:12
**339**
291:14
**341**
291:16
**347**
291:18

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com

**357**
291:20
**3600**
290:7 565:3
**371**
291:22
**375**
493:25
  507:4
**3rd**
508:1
  522:10
  550:16

---
**4**
**4**
291:8
  296:24
  382:24
  504:24
**4-31**
563:6
**4,321,000**
337:15
**4/15/19**
292:10
**4/17/19**
292:12
**4/18/19**
292:15
**4/18/2019**
504:22
**4/5/2019**
491:4
**4:10**
542:17
**4:23-cv-...**
289:8 294:8
  565:8
  566:5
  567:9
**406**
289:25
  291:25
  564:15
**431**
292:6
  459:16,21
  460:25

461:8
462:5
483:10
489:9
**435**
292:3
**459**
292:5
**489**
292:8
**490**
292:10
**493**
292:12
**4th**
323:20
  337:5
  338:13
  339:18

---
**5**
**5**
291:9
  298:15
  300:4,16
  300:19
  565:1
**5/14/17**
291:10
**5/4/17**
291:12,14
  291:16
**5/4/2017**
313:9 342:2
**5:08**
559:21
  560:2
**5:13**
460:10
**5:17**
560:2
**5:21**
289:20
  563:5
**50**
340:23
  356:22
**500**
506:22

  507:3
**504**
292:15
**507**
292:18
**509**
292:20
**50ish**
340:23
**518**
292:23
**522**
292:25
**535**
293:2
**538**
293:5
**540**
293:7
**541**
293:9
**547**
293:11
**550**
293:13
**553**
293:15
**556**
293:18
**572.010**
385:11
  425:20
  426:1
  462:3
  464:10
  471:21
  472:24
  474:19
  483:12
**5th**
491:8

---
**6**
**6**
291:10
  300:6,8
  313:5
  324:3
  336:21,25

  338:16
  342:5
  345:25
  346:2
  373:17,17
**6/20/19**
292:20
**6/24/19**
292:25
**6/24/2019**
523:3
**6/3/19**
292:18
**63102**
290:8 565:4
**64105**
290:17
**6th**
313:18
  315:23
  324:6,13
  521:8
  522:6
  540:11

---
**7**
**7**
291:12
  323:13,18
  338:6,11
  342:5
  345:17
  382:24
**7/1/19**
293:2,5
**7/19/19**
293:9
**7/19/2019**
542:6
**7/20/19**
293:11
**7/21/2019**
535:16
**7/23/19**
293:13,15
**7/23/2019**
550:5
**7/3/2019**
540:14

**7/31/19**
293:18
**7/8/19**
293:7
**70-2.140**
370:13

---
**8**
**8**
291:14
  339:15
  342:5
  345:14
**8/17**
299:1
**8/17/18**
301:12
**8/28/18**
291:18
**8/28/2018**
347:16
**8:58**
549:6
**80s**
361:7
**816**
290:18

---
**9**
**9**
291:16
  309:22
  341:21,23
**9:04**
505:19
**9:20**
289:20
  294:5
**9:59**
493:12
**90**
440:12
**90s**
361:8
  366:18
**974**
289:25
  564:15

640