1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MISSOURI
2

3    TNT AMUSEMENTS, INC.,        )
                                  )
4                Plaintiff,       )
                                  )
5                vs.              )   Cause No.4:23CV-330JAR
                                  )
6    TORCH ELECTRONICS, LLC et al.,)
                                  )
7                Defendant.       )
     _____
8                     DAUBERT HEARING

9          **BEFORE THE HONORABLE JOHN A. ROSS**
              **UNITED STATES DISTRICT JUDGE**
10
                  October 1, 2024
11   _____

12                    <u>APPEARANCES</u>

13   <u>For Plaintiff</u>:
     Mr. Richard Finneran
14   Ms. Zoe Brannon
     BRYAN CAVE LLP
15   One Metropolitan Square
     211 N. Broadway, Suite 3600
16   St. Louis, MO 63102

17   <u>For Defendant</u>:
     Mr. Aaron Craig
18   Mr. Todd Graves
     Mr. Chandler Carr
19   GRAVES GARRETT GREIM, LLC
     1100 Main Street, Suite 2700
20   Kansas City, MO 64105

21

22
                 <u>Stenographically Reported and Produced by</u>:
23               Lisa M. Paczkowski, CCR, CSR, RPR
                     Official Court Reporter
24               United States District Court
                     111 South 10th Street
25                   St. Louis, MO 63102

1                              INDEX

2   Nick Farley
                Direct Examination...................... 3
3               Cross Examination.......................40

4   Stacy Friedman
                Direct Examination......................43
5               Cross Examination.......................48
                Redirect Examination....................52
6               Recross Examination.....................59
                Redirect Examination....................60

7
    Robert Kneuper
8               Direct Examination......................62
                Cross Examination.......................65

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 3 of 74 PageID #: 20340

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    1

1            OCTOBER 1, 2024

2    (The proceedings commenced at 10:06 a.m.)

3            THE COURT:  Good morning.  I know it may feel like

4    we were just here, because we were.  In any event, we are

5    here and on the record in the case of TNT Amusements

6    Incorporated versus Torch Electronics LLC, et al.  It is

7    cause number 4:23CV-330.

8            The record should reflect the Plaintiff appears by

9    counsel Richard Finneran and co-counsel Zoe Brannon.  The

10   Defendants appear by counsel Aaron Craig, Todd Graves, and

11   Chandler Carr.

12           We are here today as a result of an order from the

13   Court.  We have had extensive briefing on the *Daubert*

14   Motions.  I thought it would be helpful for the Court, for my

15   understanding of the device, and the opinions of the people

16   you have identified as experts, to hear directly from them.

17   So I set the matter for a hearing here today.

18           Again, there has been extensive briefing on this.

19   I would ask that you not go back through all of the things

20   that we have already briefed.  I understand you are going to

21   highlight certain things, raise some issues with me.  I do

22   some time limitations.  So we essentially have got until

23   11:45 to get this done, which means that you have to be

24   economical with your time.

25           Having said that, it is the Court's understanding

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 4 of 74 PageID #:

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    2

1   from the parties that the way that you intend to do that is

2   that TNT is going to call Torch's identified expert.  Torch

3   is going to call TNT's identified experts, and that that's

4   how we are going to proceed here today.

5          So I'm going to go ahead and let Plaintiff TNT

6   begin.  Mr. Finneran, Ms. Brannon, if you will come to the

7   podium to ask questions of the witness, you can go ahead and

8   proceed.

9          We think the Elmo is working today.  I think it

10  wasn't before, but it is now.  To the extent that you have

11  hard copies of exhibits, it is easier for me I think to get

12  them handed to me.  We will talk about that portion that's

13  going to be on Zoom with Mr. Kneuper.

14         Ms. Brannon, are you ready to proceed?

15         MS. BRANNON:  Yes, your Honor.

16         THE COURT:  Great.

17         MS. BRANNON:  I'd like to call Mr. Farley to the

18  stand.

19         THE COURT:  Nick Farley, if you will step up here,

20  sir, the Clerk will administer the oath.

21         And Mr. Farley, if you will speak into the

22  microphone, it will help amplify your voice.  Counsel, you

23  may proceed.

24                         **NICK FARLEY**,

25  being produced and sworn, testified as follows:

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 5 of 74 PageID #: 2340

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    3

<u>**DIRECT EXAMINATION**</u>

1

2  MS. BRANNON:

3  Q.   Good morning, Mr. Farley.

4  A.   Good morning.

5  Q.   Since we are on limited time, I'm just going to jump

6  right in, if that's okay with you.  So prior to this case,

7  you had authored reports on five Torch devices; is that

8  correct?

9  A.   That's correct.

10  Q.   And those are between 2018 and 2021?

11  A.   That's correct.

12  Q.   And for that review, you did not personally review the

13  source code, correct?

14  A.   I did not personally review the source code but members

15  of my staff did.

16  Q.   Yeah.  And you also did not personally review the

17  database?

18  A.   I did not personally review the database at that time.

19  I have since done so, and -- but members of my staff did.

20  Q.   Okay.  So just to orient you, I'm specifically talking

21  about those five original reports.  So you did not review the

22  database at that time?

23  A.   At that time.

24  Q.   Okay.  And in this case, you authored a report dated

25  November 6, 2023; is that correct?

Case: 4:23-cv-00330-JAR    Doc. #: 300    Filed: 10/08/24    Page: 6 of 74 PageID #:

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing    2364 10    4

1  A.    That sounds correct.

2  Q.    And you nor your staff personally examined the devices

3  for that report, correct?

4  A.    I'm sorry, what was that?

5  Q.    You and your staff did not reexamine the devices for

6  that report, correct?

7  A.    Is this the drives that were sent to Mr. Friedman, is

8  that what we are referring to in this report?

9  Q.    No.  This is the November 6, 2023 report that you

10  attached the five original Torch reports with it?

11  A.    No additional examination was done at that time, no.

12  Q.    Okay.  And you also issued a rebuttal report in this

13  case, correct?

14  A.    That's correct.

15  Q.    And that was based on your staff's review, correct?

16  A.    My staff and myself.

17  Q.    You are saying that you personally reviewed it?

18  A.    I did.  I went through the operation of the games, and I

19  also went through the comparison of the stored procedures for

20  the games.

21  Q.    Okay.  Mr. Farley, do you remember giving a deposition

22  in April of 2023?

23  A.    I do recall that.

24  Q.    All right.  You had previously stated when asked about

25  that date, "Am I'm correct to understand that your

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 7 of 74 PageID #: 23641

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    5

1    conclusions, they are based upon information received by your

2    staff who performed the review of those database procedures."

3    And you said "That's correct."

4    A.   Yes.  My staff did the majority of that, and they

5    prepared the document that we presented -- at least the

6    findings of it -- and I did do a verification and

7    examination, but I didn't write the document.  My staff did,

8    and I reviewed it.

9    Q.   You didn't write the rebuttal report?

10   A.   I reviewed the rebuttal report.

11   Q.   Okay.  But my original question was about the

12   examination.  So what I just read to you, you are explaining

13   that your staff, not you, had done the examination for the

14   rebuttal report; is that accurate?

15   A.   My staff did the full examination.  When they were done,

16   at some time, I know I reviewed the game play.  I went

17   through how it operated, and before we sent the drives to Mr.

18   Friedman, I was provided a comparison of the store

19   procedures, and I personally examined that comparison.

20   Q.   Okay.  But that was not for the rebuttal report.  That

21   was for sending the drives?

22   A.   Well, ultimately, that worked its way into the rebuttal

23   report, because as I recall, the rebuttal report talked about

24   us sending the drives to Mr. Friedman.

25   Q.   Correct, but you are talking about review of the drives

Case: 4:23-cv-00330-JAR   Doc. #:  300   Filed: 10/08/24   Page: 8 of 74 PageID #:
2340 2

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                6

1    for the purpose of sending them to Mr. Friedman?

2    A.   That's correct.

3    Q.   Not for your review of the devices for the rebuttal

4    report?

5    A.   Well, I kind of look at it as one and the same.

6    Q.   Okay, well okay.  You received a copy of Mr. Friedman's

7    third supplemental report, correct?

8    A.   Correct.

9    Q.   And that was some time in March 2024?

10   A.   That sounds correct.

11   Q.   And that was the first time that you learned there was a

12   random number generator to select among the staring index in

13   the database file, correct?

14   A.   I believe so, yes.

15   Q.   Okay.  I'd like to -- I'll put this on the Elmo.  This

16   is going to be an excerpt from your November 6th report.  So

17   five or so months before the March 2024.

18        The first sentence is "The first game outcome

19   selected from each predetermined finite pool is selected

20   indiscriminately from the table of predefined starting

21   indexes."  Did I read that correctly, Mr. Farley?

22   A.   Yes, you did.

23   Q.   At the time you wrote that conclusion, you made that

24   conclusion without actual knowledge on how the selection

25   feature works, correct?

Case: 4:23-cv-00330-JAR   Doc. #:  300   Filed: 10/08/24   Page: 9 of 74 PageID #:

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing          2381 3

7

1   A.   Well, we knew that there was a selection, and we knew it

2   was outside of the player's control, so it was

3   indiscriminately.  Whether that was done by a human being at

4   Banilla, or the software, or a human being, or someone threw

5   darts at a dartboard to determine it, we didn't think it was

6   relevant, because it had no effect on the outcome of the

7   game.

8   Q.   Mr. Farley, it is conclusion that those features are not

9   relevant.  I'm just focusing on the methodology to understand

10  how that's not relevant.  So I'm just going to ask the

11  question again.

12         At the time you wrote that, you had no knowledge

13  about how it actually selected, correct?

14  A.   We just knew that it was selected indiscriminately.

15  Q.   Okay.

16         THE COURT:  Let me interrupt, counsel, and just ask

17  how is it that you didn't know how it was selected if you

18  examined the devices?

19         THE WITNESS:  Well, we examined the devices, and we

20  knew there was a starting point in the pool, but that didn't

21  determine what was going to be presented to the players and

22  the game outcome.  So we didn't really think it was relevant

23  as to how the start was determined.

24         There was discussion among us and whatnot that

25  perhaps it was done by a human being, or their software

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 10 of 74 PageID #: 8

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

```
 1    developer people.  My staff didn't inform me that there was a

 2    random process to select that at the time.

 3          We have since done a subsequent review with another

 4    staff member, and he did find that, and he pointed it out to

 5    me.

 6          THE COURT:  How many staff members do you have?

 7          THE WITNESS:  We don't have a lot.  We are

 8    currently about --

 9          THE COURT:  What's the number?

10          THE WITNESS:  We are about 10.

11          THE COURT:  And you don't know which staff member?

12          THE WITNESS:  Oh, I know which staff member it was.

13    The one that originally reviewed the code is no longer with

14    the company.

15          So when this came up, we have a new staff member --

16    well, we have a couple of new staff members that are doing

17    code reviews, and I asked one of them to look through it, and

18    he was able to find it, and identify it, and inform me of it.

19          THE COURT:  But it would seem that in understanding

20    how the device works, it would be key to know how the

21    selection is made.

22          THE WITNESS:  Yes.  You see this is about a game

23    where the outcome is predetermined and selected sequentially

24    from a pool.  So the randomness had nothing to do with how

25    the outcome was determined.  It just selected the starting
```

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 11 of 74 PageID #:
2360.5

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    9

 1   point in the pool.  And from there, the pool selects the

 2   outcome sequentially ad infinitum.  It never resets itself.

 3   It just keeps on repeating the same sequence over and over

 4   and over again.

 5          So the fact that it randomly picked the starting

 6   point had no bearing on the outcome that was presented to the

 7   player.  It just picked the starting point in the pool where

 8   that first outcome is derived.  It also presents that outcome

 9   in advance of the player playing the game.  It is called a

10   preview feature.

11          So the player can know what they are going to play

12   for.  So that random selection is not done at the time the

13   player presses the play bottom.  It is done in advance of

14   that, and it is done when the player selects the game theme,

15   and the play level, and hits the preview bottom, and then now

16   that outcome is presented.

17          THE COURT:  Okay.  All right, thank you.

18   Q.   (By Ms. Brannon)  You actually got to my next question.

19   You actually were able to make that -- you made that

20   conclusion, because your staff did not perform a sufficient

21   examination of the devices to determine that process?

22   A.   That staff member is no longer with the company.  I

23   can't say whether it was sufficient or insufficient.  I will

24   tell you that he did not inform me of the randomness for

25   that, whether that's because he didn't think it was relevant,

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

10

1   because it didn't affect the outcome, but whether he didn't

2   go to the stored procedure to see that, I'm not sure.

3   Q.   Mr. Farley, in your April 2024 deposition, Mr. Finneran

4   asked "So is it fair to say then that at the time once again

5   you haven't personally performed a sufficient examination of

6   the database to conclude how that process worked."  And your

7   answer said "That's a fair assessment.  That's correct."

8   A.   I didn't personally review it, that's correct, my staff

9   did.

10  Q.   Okay.  In fact, though, Banilla actually did not tell

11  you or your staff about the starting index selection feature;

12  is that correct?

13  A.   I don't know.  They didn't tell me personally, no, but

14  I'm not sure if anyone else on my team was aware of it.

15  Q.   Well, because Banilla did not tell you, you did not

16  investigate whether or not it existed?

17  A.   That's not necessarily true.  As I said, my staff did --

18  the staff member that did the initial review may have known,

19  but he didn't inform me of it, perhaps because he didn't

20  think it was relevant to the game outcome.

21  Q.   Isn't it true that part of your review process is that

22  you review selective portions of the device that is deemed

23  relevant?

24  A.   No, that's not true.

25  Q.   So then why was this part not reviewed?

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

1    A.   I didn't say it wasn't reviewed.  I said I don't know if

2    it was reviewed, or whether that information just wasn't

3    shared with me at the time that we put together the report.

4    Q.   Mr. Farley, isn't it your name on the report?

5    A.   Yes, it is.

6    Q.   So isn't it your conclusions then that something does or

7    does not have the random number generator to select the

8    index?

9    A.   I don't think we ever said in the report that it does or

10   does not have a random number generator.

11   Q.   Okay.  Mr. Farley, do you remember giving your

12   deposition on December 10, 2023?

13   A.   I'll take your word on the date.  I recall something

14   around that time.

15   Q.   Okay.  Bear with me for a second.  You stated "There is

16   nothing random about anything in this software or the

17   database."

18   A.   That's not what I was -- that was my belief at the time,

19   and that's what I said.

20   Q.   So you did give the opinion that there was nothing

21   random?

22   A.   I wasn't aware of anything random in the software at

23   that time.  Subsequent to that, we did a further examination,

24   and we did find randomness used to select a starting index

25   called current index for the start into the pools, and also

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 14 of 74 PageID #: 2363

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

12

1  there was a random process that determines the entertaining

2  display based upon the value of the prize selected from the

3  pool.

4  Q.   But it is your method that when you write a report -- at

5  least in this case -- that your opinions on, for instance,

6  the source code are based on the information that you have

7  learned from your staff?

8  A.   My staff, myself, yes.

9  Q.   It is also opinions that are in the database is

10 information that you have learned from your staff?

11 A.   Yes.

12 Q.   Because as we have already discussed earlier, you had

13 not personally reviewed that?

14 A.   My staff did inform me of the size of the pools, and how

15 that the pools were sequential in repeating.

16 Q.   But nonetheless, you felt able and confident to come to

17 the conclusion that there was no random generators in the

18 Torch devices, and that there was nothing random at all in

19 the Torch devices?

20 A.   Again, I didn't put that in the report that we wrote.

21 That was nowhere in the report I wrote.  That was brought out

22 in deposition at the time --

23 Q.   Well, I was --

24         THE COURT:  You can't speak over each other, so.

25 Q.   (By Ms. Brannon)  So it wasn't in your report, but you

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 15 of 74 PageID #: 23869

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

13

1  felt confident enough to say it under oath?

2  A.   Yes.

3  Q.   Okay.  I'd like to bring your attention to a declaration

4  that you signed.  We will come back to that.  Okay, so let's

5  start on the index selection feature.  You also later, after

6  the indiscriminately opinion, you later opined that it was

7  created by a human at Banilla?

8  A.   Yes.  And what I have learned is that -- is that the

9  starting points into the database are created by a human

10  being at Banilla, and then there is a randomness routine that

11  picks one of those human defined starting points to determine

12  the starting point into the pool.

13  Q.   Mr. Farley, I'm specifically asking you about the

14  feature that selects along the starting index, can we start

15  with that?

16  A.   I think that's what I just said.

17  Q.   And you had previously opined that a human at Banilla

18  selects that?

19  A.   A human at Banilla selects the starting point into which

20  the pool will begin.  There are several starting points in

21  there.  One of them is randomly chosen by the software, but a

22  human being determines the start points.

23  Q.   But it is done randomly, correct?

24  A.   It is randomly chosen from several possible options.  I

25  want to say that number is somewhere around a dozen.

1    Q.   Mr. Farley, you previously said today and in the reports

2    that you now admit that the first time that there is a

3    selection feature in the starting index it is done randomly

4    by random number generator?

5    A.   There is a random number generator that picks the

6    starting point into the pool from a finite quantity of

7    potential starting points.

8    Q.   Okay.  And when you opined, however, that it was done by

9    a human at Banilla, you took that based on your conversations

10   with Kevin Morris; is that correct?

11   A.   Yes.

12   Q.   And that's part of your trust but verify method,

13   correct?

14   A.   That's incorrect and a mischaracterization.

15   Q.   Okay.  Well, is that mischaracterization what?

16   A.   We are given information from our customers, in this

17   case Banilla.  We trust what they are giving us is factual

18   and accurate.  Sometimes there are misunderstandings, but we

19   go and verify everything, and we go deeper than just what

20   they tell us.

21   Q.   So your first step -- I'm trying to get this straight

22   for the record here -- your first step is to trust the word

23   of the manufacturer?

24   A.   No, I didn't say that.  They give us information, and we

25   trust that to be accurate.  I didn't say that was the first

Case: 4:23-cv-00330-JAR    Doc. #: 300    Filed: 10/08/24    Page: 17 of 74 PageID #: 23681

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

15

1    step.

2    Q.   Okay.  And then after you take the word of the

3    manufacturer, you verify what they said was true or not?

4    A.   Among other things, we engage in the operation of the

5    game, all of the configuration settings, everything like

6    that, and we go through the code and verify that all that's

7    accurate as well --

8    Q.   Okay, well --

9    A.   -- to see that there is nothing in there that would

10   preclude it from operating the way it is intended to.

11   Q.   Well, in this case you did verify, because you did not

12   verify how the selection feature was started?

13   A.   I don't know that or not.  I told my staff member, who

14   no longer works for us, he did not inform me of this random

15   process to pick the starting point in the pool.  I'm not sure

16   if he missed it, or if he just thought it wasn't relevant,

17   because it doesn't affect the outcome of the case.

18   Q.   Because had you verified, you would have known that this

19   selection was determined randomly by a random generator?

20   A.   Was that a question?

21   Q.   Yes, that's a "yes" or "no"?

22   A.   Could you repeat the question.  I didn't understand it.

23   Q.   Had you had verified, you would have known that the

24   selection method was done randomly?

25   A.   Again, I didn't hear your question.

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 18 of 74 PageID #: 2364

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

16

1   Q.   Had you verified, you would have known that the

2   selection method was done randomly.  You and your staff

3   admitted that, so I think the answer is yes, but I don't want

4   to answer it for you.

5           THE COURT:  Rephrase the question, if you would.

6   Q.   (By Ms. Brannon)  Okay, I'll move on.  That random

7   selection feature is found in the database; is that correct?

8   A.   Yes.

9   Q.   You had not personally reviewed the database, correct?

10  A.   Not at that time, but since I have, as I mentioned, I

11  have reviewed the comparison of the stored procedures.  That

12  was done to ensure that the drives that went to Mr. Friedman

13  were correct.

14  Q.   And that was after, I guess, just to orient the Court

15  and the timeline, you are talking about verifying it after

16  Mr. Friedman's third supplemental report, correct?

17  A.   I don't recall.  I think it was after the second

18  supplemental report.

19  Q.   His third --

20  A.   Or third.

21  Q.   His third supplemental report is the one that caused

22  your rebuttal report?

23  A.   I know that he did three supplemental reports.  I

24  thought the third supplemental report was the one based upon

25  the correct drives being sent to him, because there was a

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 19 of 74 PageID #:
TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing   2303  3

17

1  point when there were drives that weren't copied by us that

2  had gone to him that contained features that we didn't see,

3  and we then when we burned our -- you know, basically copied

4  our own drives, and sent them to him, and I personally

5  verified the stored procedures, and the software, and so I

6  thought that he wrote his third rebuttal, third supplemental

7  report, based upon the second set of drives that we sent to

8  him.  But if I have that incorrect, please let me know.

9  Q.   Okay.  I think that just trying to answer the question I

10  asked, I'm not talking about the drives that you -- the snafu

11  drives, or whatever you are calling it.  I'm simply asking

12  about the conclusion that we now agree with the features and

13  the functions, okay.

14        So, I think we have gotten a little lost, I just

15  want to clarify again that the selection feature that we are

16  talking about is found in the database, correct?

17  A.   That's correct.

18  Q.   Okay.  And you did not know about that until March 2024?

19  A.   That seems fair.

20  Q.   Okay.  Now, I'm going to turn to your November report,

21  November 2023.  Do you see this section that says "Section V

22  review of source code" right?

23  A.   Okay.

24  Q.   And to you, source code mean executable files or

25  software, correct?

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

1   A.   I never said that.

2   Q.   Okay, well, we have --

3   A.   A source code, it is what's provided to us by the

4   manufacturer in the programming language that they wrote it

5   in.

6   Q.   So are you saying that source code as it is written can

7   also mean database?

8   A.   I didn't say that either.

9   Q.   Okay.  So I'm asking you, does the source code, as

10  written here, mean database?

11  A.   It means source code.  It is usually the code written in

12  the programming language that the manufacturer provides us.

13  Q.   Mr. Farley, could you --

14  A.   It could mean that we have done a database review.  I'm

15  not sure where you are going here, but when we talk source

16  code, we are talking about the programming language.

17  Q.   I'm just asking you a simple question.  So is your

18  answer that the source code encompasses a database or not?

19  A.   I'm not certain at this point.  I think that it did not

20  encompass the database review.  But again, the staff member

21  that did that further when we wrote these reports -- I'm not

22  sure what report this is -- if this is one of the ones

23  written between 2018 and 21, were or were not, but if it was,

24  then that was a different staff member.

25  Q.   Mr. Farley, in your April 2023 deposition, when you were

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 21 of 74 PageID #:
TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing   2364 5

19

1   specifically asked "Okay, just to be clear, we have said that

2   source -- we have said the term source code" --

3   A.   Uh-huh.

4   Q.   -- "we are using that term to refer to the source code

5   for the executable files, not any stored procedures of the

6   database, correct, right," and then you answered "Correct."

7   A.   Okay.

8   Q.   Okay.  So, going back to your report where it says

9   "Review of source code."

10  A.   Okay.

11  Q.   Am I reading that correctly.  It is right before it --

12  A.   Okay.

13  Q.   All right.  You gave a conclusion or opinion that says

14  "The game outcomes are selected and delivered sequentially

15  from predetermined finite pools of game outcomes."  Did I

16  read that correctly?

17  A.   Yes.

18  Q.   The pool of outcomes are in the database, correct?

19  A.   Yes.

20  Q.   These pool amounts have nothing to do with source code;

21  is that correct?

22  A.   The pools are in the database, but the software and the

23  source code is selecting and going through picking what's in

24  the database.

25  Q.   But the pools are not in the database -- or the pools

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 22 of 74 PageID #: 23426

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

20

1   are not in the source code?

2   A.   The pools are in the database.

3   Q.   Okay.

4   A.   And the source code caused the database to bring up the

5   next entry.

6   Q.   Okay.  You also issued an opinion in this case that no

7   devices in Missouri contain a shuffle feature?

8   A.   That's correct.

9   Q.   You don't actually know the characteristics of Torch

10  devices in Missouri though?

11  A.   I know it was presented to me in my lab, and that was

12  represented to be what was being used in Missouri.

13  Q.   And that was represented by Torch?

14  A.   Torch and Banilla, yes.

15  Q.   So you trusted the word of Torch and Banilla that their

16  devices were representative of those in Missouri?

17  A.   No one asked me to come into Missouri and do an onsite

18  inspection to test the machines.

19  Q.   Mr. Farley, there is a typical verification method that

20  you use in your lab, correct?

21  A.   Yes.

22  Q.   It is called the file check?

23  A.   File check is something that we use to identify the

24  software, and it can be used to verify the software.

25  Q.   And that would verify that the software examined in your

1    lab was the same as the software installed in devices in the

2    field, correct?

3    A.   That's correct.

4    Q.   But you did not employ that verification method during

5    your review here?

6    A.   That's not true.  We use file check to get the signature

7    of the software that we examined, and then we publish that in

8    the report that we issue.  We were not invited into the field

9    to do a verification on what's installed in the field, so.

10   Q.   So you never verified that the Torch devices tested in

11   your lab are the same devices as those used in Missouri?

12   A.   I don't believe your expert has either, neither one of

13   us has.

14   Q.   Mr. Farley, I'm not asking about that.  I'm specifically

15   asking about your verification?

16   A.   And I answered it, and said that we weren't asked to do

17   that.

18   Q.   Okay.  So your answer is no.

19   A.   We were not asked to do that.

20   Q.   Okay.  You also have an opinion that the shuffle feature

21   is irrelevant to game classification, right?

22   A.   That's correct.

23   Q.   But you have never actually reviewed a Torch device with

24   a shuffling feature?

25   A.   Well, that's correct.  It wasn't submitted for our

1   review.

2   Q.    So your opinion that shuffle feature is irrelevant to

3   game classification comes from where?

4   A.    It doesn't change the fact that the player can preview

5   the next game outcome.  It doesn't change the fact that that

6   game outcome will remain static, and the player can review as

7   many game outcomes as they'd like based on the theme and the

8   play levels, so they can move around in different game themes

9   and move around in different play levels.  So whether it is

10  shuffled or delivered sequentially, they can still see the

11  next outcome.

12  Q.    So your opinion -- and I'm just trying to state it

13  correctly -- is that the viewer would be not necessary

14  because the prize viewer always eliminates chance?

15  A.    No.  If it were shuffled, we would have said that in our

16  report, but it is not, and they are not.  They are delivered

17  sequentially, and we said that in our report.

18  Q.    But you gave an opinion in this case that a shuffle

19  feature is irrelevant to game classification?

20  A.    That's correct.

21  Q.    And you did so without review of a Torch device with a

22  shuffle feature?

23  A.    Whether it is shuffled or delivered sequentially, it

24  wouldn't change the fact that there is a no chance preview

25  game.  So the outcome can be previewed by the player in

Case: 4:23-cv-00330-JAR    Doc. #: 300    Filed: 10/08/24    Page: 25 of 74 PageID #:
TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    23

23

1    advance of them comitting to play the game.

2    Q.    So because of the prize viewer, it eliminates the

3    element of chance?

4    A.    Yes.

5    Q.    Okay.  Regardless of other features that there are some

6    chance-based features or functions?

7    A.    I don't know of any chance-based features or functions

8    that affect the outcome of the game.

9    Q.    Well, the outcome of the game is your conclusion.  I'm

10   simply asking about whether there are exist chance-based

11   features, and it seems --

12   A.    We have talked about that already.  There is a random

13   feature that selects the entry point into a pool, and there

14   is a random feature that selects the entertaining display

15   based upon the prize value that has been selected from the

16   pool.

17   Q.    Yes.  I agree that there are chance-based features.

18   Okay, so we have talked a lot about your staff's verification

19   of these two chance-based features, correct?

20   A.    Yes.

21   Q.    All right.  So let's talk about first the random number

22   generator and the selection feature, and your staff verified

23   that by looking in the SQL database?

24   A.    There was a historic procedure in the sequel database,

25   yes.

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 26 of 74 PageID #:

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

24

1   Q.   And then you are not sure about the method that they

2   used to verify those functions, correct?

3   A.   I'm sorry, I don't understand your question.

4   Q.   What was the method that your staff used to verify that

5   those functions exist in the stored procedures in the

6   database?

7   A.   They went through the stored procedure and saw cause for

8   randomness.

9   Q.   How?

10  A.   They went through the code.

11  Q.   Did they use a certain application?

12  A.   I didn't get down to that level of detail with my staff.

13  From what I understood, they had the tools they needed to

14  review the stored procedure.

15  Q.   So you can't, as we are sitting here today, explain what

16  application they used to review the stored procedures?

17  A.   They opened the stored procedure, and they looked at

18  what was in there.  What they used to open the stored

19  procedure, I'm not certain, no.

20  Q.   Right, because something was needed --

21  A.   I can get the information if that's important to you.

22  Q.   Okay.  I'm asking specifically about your knowledge

23  about it, and it seems like you don't have any, so we can

24  move on from that.  Do you recognize this (indicating)?

25  A.   That didn't come from me.  They did not provide that.

1    That's not in anything.

2    Q.   Do you know what that is?

3    A.   No.

4    Q.   Okay.  Well, this is the stored procedure found in the

5    database.

6              MR. CRAIG:  I would object, this is --

7              THE COURT:  The objection is sustained.  He doesn't

8    know what it is.

9              MS. BRANNON:  Okay.  It is from Mr. Friedman's

10   third supplemental report.

11             THE COURT:  The objection is sustained.

12             MS. BRANNON:  Okay.  Mr. Farley --

13             MR. CRAIG:  Your Honor, same objection.

14             MS. BRANNON:  I haven't even asked my question, Mr.

15   Craig.

16             MR. CRAIG:  Sorry.

17             THE COURT:  You have to speak into the microphone.

18             MR. CRAIG:  Yeah.

19   Q.   (By Ms. Brannon)  Mr. Farley, are you aware that this is

20   the code for the random selection symbol?

21   A.   No.  That was not provided by me, or my staff, or anyone

22   at my company.  So I don't know what that is.

23   Q.   So you cannot read something like this?

24             MR. CRAIG:  Objection --

25             THE WITNESS:  I did, but I'm not going to do it on

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 28 of 74 PageID #: 23632

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    26

1    the witness stand.

2              THE COURT:  The question is can he read it.

3              MR. CRAIG:  Well, yeah, it is currently up, and so

4    I mean, I would object to this being up, if she wants to lay

5    more foundation, that's fine, but.

6              MS. BRANNON:  I will.

7              THE COURT:  Here is the question, can you read

8    that, or do you understand it?

9              THE WITNESS:  I can read it and understand it, but

10   I'm a little nervous on the witness stand in a *Daubert*

11   hearing, so I would rather not be under pressure to do that

12   right now.

13             THE COURT:  Okay, all right.

14   Q.   (By Ms. Brannon)  Mr. Farley, how many years of

15   experience have you had in this field?

16   A.   37 years.

17   Q.   In your 37 years, how many times would you say that you

18   have reviewed source codes?

19   A.   Thousands, tens of thousands, millions.

20   Q.   So someone that looked at source code, let's say tens of

21   thousands of times, would know that this is source code,

22   correct?

23   A.   That's fine.  It looks like source code.

24   Q.   And they would know that it is written in c-sharp?

25   A.   That is not something that I have prepared, delivered,

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 29 of 74 PageID #: 23363

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

27

1   or gave to this Court.  I don't know where it came from.  I

2   am aware that Mr. Friedman did not obtain the source code

3   from the software developer, and he reverse engineered it.

4   Q.   Mr. Farley, this --

5           THE COURT:  Move on to another issue.

6           MS. BRANNON:  Okay.

7   Q.   (By Ms. Brannon)  So you have spoken a lot about whether

8   or not there are these specific and random functions are

9   relevant or not, correct?  Sorry, let me rephrase that.  You

10  now admit that there are at least two random functions in the

11  Torch devices?

12  A.   Yes.

13  Q.   But your opinion is that these random functions are not

14  relevant?

15  A.   Correct.  They don't affect the outcome of the game.

16  Q.   So is the definition of relevant that?

17  A.   Well, if it doesn't affect the outcome of the game, it

18  doesn't affect characteristics of how the game operates, I

19  don't see the relevance of selecting the entry point of the

20  pool, or the entertaining display that's going to be

21  presented.

22  Q.   Mr. Farley, over the course of this litigation, haven't

23  you had several different definitions of what relevance

24  means?

25  A.   I don't believe so.

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 30 of 74 PageID #: 2363

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    28

1    Q.   Okay.  This is from your December 2023 deposition.  Mr.

2    Finneran asked -- or you had said they are not static or they

3    are not relevant, and then you had also said that's means

4    that they don't have any purpose for the operation of the

5    games.

6              So here, aren't you defining relevant to mean the

7    operation of the game?

8    A.   Was operation what I said in my deposition, or was that

9    outcome?

10   Q.   You said operation.

11   A.   I know that's what that transposed.  I know there was

12   another error in transposition from the video, and Mr.

13   Finneran pointed that out.  I think it got transposed to

14   overruled, but I said something else like overlooked or

15   something like that.

16             THE COURT:  Do you believe that's not what you

17   said?

18             THE WITNESS:  I mean, if I said outcome, that seems

19   to be in context.

20             THE COURT:  It says operations.  So you --

21             THE WITNESS:  Okay, well.

22   Q.   (By Ms. Brannon)  This was from December 2023, so it

23   makes --

24   A.   If you want to go with operation, your Honor, that's

25   fine.  I mean, the random function doesn't affect the

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 31 of 74 PageID #:
TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                2365

29

1   operation with regard to determining the outcome.

2   Q.   Mr. Farley, that's your conclusion.  I'm trying to

3   understand the methodology that you get to the conclusion

4   that these are not relevant, okay.

5   A.   Ask a question.

6   Q.   Okay.  So, let's go back to your definition of

7   relevance.  At other times, you have defined relevant as

8   something that does not affect your ultimate conclusion.

9   A.   Okay.

10  Q.   So that's different than outcome, right?

11  A.   Different context also.

12  Q.   Can you explain?

13  A.   Well, I mean, if we are talking about what determines

14  the game outcome, these random functions that determine the

15  entry point into the pool, and the entertaining display,

16  based upon the value of the prize, aren't relevant.  If --

17  I'm sorry, can you repeat what you just stated?

18  Q.   Yes.  We were talking about how your definition of

19  relevance was that it does not affect your ultimate

20  conclusion.

21  A.   That's correct.

22  Q.   So you decide on your con --

23  A.   That's also true.

24  Q.   Okay.  So you decide on your conclusions first then

25  before reviewing?

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 32 of 74 PageID #:
TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

30

1    A.   I never said that.

2    Q.   Then how can you determine something is or is not

3    relevant if it is based on your ultimate conclusion?

4    A.   If it doesn't affect the outcome, then it is not going

5    to affect my conclusion.

6    Q.   Okay.  There is another time where you said that

7    relevance is just something that you do not agree with.  Can

8    you please explain more about that?

9    A.   Can you provide me a cite to that?  I don't recall.

10   Q.   Yes.

11          THE COURT:  Counsel, can I ask you, let's move on

12   to another subject.  Again, just because of our limited time

13   here today.  Thank you.

14          MS. BRANNON:  Okay.

15   Q.   (By Ms. Brannon)  Part of your today's definition of

16   relevance, is that it does not have to do with outcome.  So

17   you, in your rebuttal report, now define outcome to be prize

18   or win amount, correct?

19   A.   That's correct.

20   Q.   When did you decide that outcome had that definition?

21   A.   37 years ago.

22   Q.   Okay.  You are saying that you haven't differentiated

23   between outcome and prize amount?

24   A.   The prize award is always the outcome of the game.

25   Q.   Okay.  I'd like to go to your November 6th report.

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 33 of 74 PageID #: 23637

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

31

1    First line, "Torch devices do not contain or use random

2    number generators to determine the outcome of the game or the

3    prize awarded."

4    A.   That is a correct statement.

5    Q.   That is a what?

6    A.   That's a correct statement.

7    Q.   Aren't you distinguishing between the two there?

8    A.   I don't think so.  The outcome of the game is the prize

9    awarded, but I mean, that's the way I said it that day.  But

10   it is a true statement any way you slice or dice it.

11   Q.   Well, I think we determined today that there is there no

12   -- there are random number generators, so.

13   A.   Not used in the determination of the game outcome.

14   Q.   Okay.  But here you are differentiating between the

15   outcome of the game and the prize awarded.  It is a "yes" or

16   "no" question?

17   A.   I don't think I'm differentiating it.  I know I put the

18   word "or" in there.  But to me, the game outcome is the prize

19   that's awarded in this particular game.

20   Q.   Okay.  I'd like to look at a declaration that you

21   submitted on April 27th of this year?

22   A.   Okay.

23   Q.   You say "None of the games on the Torch devices utilize

24   a random number generator to determine the outcome of the

25   game or the prize awarded.  The outcomes of the game and the

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

1    prizes awarded are, in fact, based on predetermined finite

2    outcomes that are in sequential order."  Did I read that

3    correctly?

4    A.   That's what it says.

5    Q.   So are you differentiating between the two there?

6    A.   The way the game is designed we can talk about the

7    outcome of the game and the prize awarded, but the outcome of

8    the game is the prize awarded.

9    Q.   Okay.  I'd like to look at one more.  This is from one

10   of your reports that was attached to your November 6th

11   report.  You state "The prize feature -- the prize viewer

12   feature displays the total win amount of the upcoming game

13   outcome."  Same question, Mr. Farley, are you differentiating

14   between the two there?

15   A.   The prize amount is the game outcome, so.

16   Q.   It says --

17   A.   I can read what it says.

18   Q.   It says total win amount.  I'm sorry, I'm asking you to

19   read there?

20   A.   Yeah, total win amount, prize amount, win amount, it is

21   all the same.

22   Q.   Okay.  Earlier we discussed the selection of the

23   starting index.  I want to now talk about your rebuttal

24   opinions on that topic.  You are now casted as a one-time

25   software setup function, correct?

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 35 of 74 PageID #: 23639

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

33

1  A.   The entry point into the pool is a one-time software

2  setup function, that's correct.

3  Q.   Isn't it true that the starting index is randomly

4  selected the first time that a Torch device is operated at a

5  given play level and game theme?

6  A.   Yes, and that's during the setup before any game is

7  played.

8  Q.   So for a Torch device that has let's say six game

9  themes, and five play levels, that means the starting index

10  is randomly selected not just once but 30 times?

11  A.   Five times in each pool based upon what you just said,

12  six game themes, six pools, and then five entry points for

13  each play level.

14  Q.   So it is not just one time, right?

15  A.   Well, that's -- it is one time for each play level for

16  each theme.

17  Q.   Okay.  You also stated -- and let's turn to this

18  opinion.

19       THE COURT:  When you are reading from a report, if

20  you will read a little slower so that the court reporter can

21  get it.  Thank you.

22  Q.   (By Ms. Brannon)  You also stated that the one time

23  software setup that we now discuss could happen at least 30

24  times, could also be again selected if it is reset,

25  reactivated, or impermissibly tampered with, correct?

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 36 of 74 PageID #: 2864

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

34

A.   That would cause the software to have to be reinitiated

and restarted, so it would setup again.

Q.   But you don't actually know what it means to activate a

device, right?

A.   I don't understand your question.

Q.   You do not know what it means to activate a device, do

you?

A.   Well, it could be the activation of a software license.

It could be an activation of initiating the game software, as

we are talking about with this random process, to select the

entry pool into the pool.

Q.   But you cannot explain how that activation process

works?

A.   If you gave me a more specific question, I may be able

to.

Q.   Well, Mr. Farley, these are your words -- or, I mean, I

guess they are a member of your staff's words, but you put

your name on the report.  So I am trying to ask when you say

activated here, how you possibly know that that would cause

the random selection index to start again?

A.   Because reactivated in this context means that it is

being reinitiated.

Q.   And I'm asking how that works?

A.   Well, that would be something that happened to the

software that caused it to be reinstalled, or reinitiated to

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 37 of 74 PageID #:
2564
TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    35

1   -- that could cause the indexes to have to be reinitialized.

2   Q.   Mr. Farley, how does the activation process work.  Can

3   you give me an answer today?

4   A.   Like I said, I mean, there is activation of the software

5   license, and there is activation of the software, which would

6   select the entry points.  But the entry points are selected

7   when a player selects a theme and a play level.

8   Q.   Mr. Farley, I'm not asking about the entry reports.  I'm

9   specifically asking about what you mean when a device is

10  reactivated?

11  A.   So restarted.

12  Q.   And how does that work?

13          MR. CRAIG:  Objection, asked and answered, your

14  Honor.

15          THE COURT:  I think it has been asked and answered.

16  Counsel, just because of the limited time that we have today,

17  if you -- I have a couple of more minutes, and then I need to

18  have you wrap it up.

19          MS. BRANNON:  Okay.

20  Q.   (By Ms. Brannon)  So you -- let me go to a different

21  one.  You testified that you have an expert in game

22  classification, correct?

23  A.   Well, that's what I'm told, and I have been classified

24  as a game classification expert hundreds of times.

25  Q.   Okay.  And that's not based on the specifics of a law in

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 38 of 74 PageID #: 2364

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

36

1   any jurisdiction?

2   A.   It is -- I have testified in Federal Court, State Court,

3   and Local Court in many jurisdictions.

4   Q.   But your expertise is not on the specific laws in the

5   jurisdiction?

6   A.   I'm not a legal expert, no.

7   Q.   Okay.  Instead, you classify games based on your

8   personal definition of gambling; is that correct?

9   A.   That's not true.

10  Q.   That's not true.  You don't use the three legged stool?

11  A.   A three legged stool is kind of a universal definition.

12  In reviewing Missouri's law for gambling, the three legged

13  stool holds true.  It is consideration, chance, and prize.

14  Q.   Mr. Farley, I'm asking about how you analyze whether

15  games are gambling.  And my question is, you did that based

16  on the three elements of chance, consideration, and prize; is

17  that correct?

18  A.   Yes.

19  Q.   It is not based on the Missouri definition, correct?

20  A.   The Missouri definition includes consideration, chance,

21  and prize.

22  Q.   Is that your interpretation of the statute?

23  A.   Yes, it is.  I don't remember the specific words, but it

24  is someone who engages in the risk of something of value,

25  which is consideration, based upon an outcome that is

Case: 4:23-cv-00330-JAR    Doc. #: 300    Filed: 10/08/24    Page: 39 of 74 PageID #: 23643

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                37

 1    determined outside of their control, or by chance, and in the

 2    hope of winning a prize.  I mean, that's paraphrasing it,

 3    but.

 4    Q.   Yeah, I didn't realize that you had an expertise of

 5    interpreting the statute.

 6              MR. CRAIG:  Objection, I mean, this is

 7    argumentative, your Honor.

 8              THE COURT:  The objection is sustained.

 9              MS. BRANNON:  Okay.  I would like to pull up the

10    Missouri statute.

11              THE COURT:  Actually, counsel, there is no point in

12    asking him to interpret the Missouri statute.

13              MS. BRANNON:  I'm not asking him to.

14              THE COURT:  Okay.  All right, go ahead.

15    Q.   (By Ms. Brannon)  Do you see how Missouri has its own

16    definition of gambling in Section 4?

17    A.   Yes, I do.

18    Q.   Okay.  And you are aware that gambling depends in

19    Missouri in this case what it means in Section 4?

20              MR. CRAIG:  Objection, your Honor.  She is asking

21    him now to interpret Missouri law.

22              THE COURT:  The objection is sustained.

23    Q.   (By Ms. Brannon)  Okay.  You are aware that it says that

24    gambling can be based on a contingent event, not a future

25    contingent event, correct?

1    MR. CRAIG:  Same objection.

2    MS. BRANNON:  Your Honor, I'm just asking him to

3    read what is said in the statute.  I'm not asking him what

4    future contingent event means.

5    MR. CRAIG:  Good, because nobody knows.

6    THE COURT:  The objection is sustained.

7  Q.   (By Ms. Brannon)  Okay.  Your three elements did not

8    contain chance, prize, and consideration, correct?

9  A.   A gambling device universally has three elements:

10   Consideration, chance, and prize.  I want just to clean it

11   up, because --

12  Q.   Okay, and --

13  A.   -- I think you said --

14   THE COURT:  I need you to lean forward and speak

15   into the microphone, if you would.

16   THE WITNESS:  Okay, sorry about that.

17  Q.   (By Ms. Brannon)  And in those three elements, there is

18   not future contingent event, correct?

19   MR. CRAIG:  Objection --

20   THE WITNESS:  Can you give me a definition of

21   future contingent event, but that seems like a chance

22   element.

23   MR. CRAIG:  Objection to the form, that's fine.

24   MS. BRANNON:  Okay.  I have one more very quick

25   question.

```
 1              THE COURT:  Go ahead.
 2   Q.   (By Ms. Brannon)  You learned about the random selection
 3   of the combination of symbols for the first time and assuming
 4   after Mr. Friedman's March 2023 report, correct?
 5   A.   I'm sorry, could you repeat that question?
 6   Q.   Yes.  The random selection of the combination of
 7   symbols, do you agree that that is existent now in the Torch
 8   devices?
 9   A.   No.  It is not a random selection of the combination of
10   symbols.  It is a random selection of the entertaining
11   display.  So the value of the prize determines --
12   Q.   Mr. Farley, I'm not asking you to explain it.  I'm just
13   asking --
14              MR. CRAIG:  Your Honor, she is interrupting the
15   witness.  Could he answer?
16              THE COURT:  The objection is overruled.  You can
17   ask him, go ahead.
18   Q.   (By Ms. Brannon)  You admit that there is a random
19   selection of the combination of symbols, or system displays,
20   or however you want to categorize it, okay.
21   A.   Yes.  It is the entertaining display that has to be
22   randomly selected.
23   Q.   Okay.  And you learned about that after Friedman's third
24   supplemental report?
25   A.   Yes.  Well, after one of the supplemental reports, I
```

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 42 of 74 PageID #: 40

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

1    forget which one.

2    Q.   Okay.  Nonetheless, you opined before that report that

3    there is no random selection of symbols in the Torch devices?

4    A.   I think we have already said that.

5    Q.   Okay.  So that's a yes?

6    A.   Okay.

7         MS. BRANNON:  Okay.  Nothing further, your Honor.

8         THE COURT:  Mr. Craig, if you want to ask him a few

9    questions, but then I'd like to move on.

10        MR. CRAIG:  Yeah.

11        THE COURT:  That's fine.

12        MR. CRAIG:  I think we submitted his CV as part of

13   our, you know, documents, your Honor.

14        THE COURT:  Yes.

15        MR. CRAIG:  And that's primarily what I was going

16   to focus on.  If the Court just wants to read that, that's

17   fine.

18        THE COURT:  I don't need you to go back over his

19   background and training.  You have set that forth in his CV.

20        MR. CRAIG:  Okay.

21                        <u>CROSS-EXAMINATION</u>

22   BY MR. CRAIG:

23   Q.   Specific to this case, Mr. Farley, are you aware of any

24   instances specific to how Torch devices function from a

25   computer science prospective where you have a different

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 43 of 74 PageID #: 2847

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

41

1   understanding of how a Torch device functions today, compared

2   to Mr. Friedman's technical opinions regarding functionality

3   of Torch devices today?

4   A.   No.   I believe Mr. Friedman and I are in agreement with

5   how Torch devices function.

6           MR. CRAIG:   No further questions.

7           THE COURT:   One thing that concerns me about your

8   testimony today is you relied extensively on your staff, and

9   that's not necessarily unusual for someone who has expertise,

10  but you have identified that one staff member left.   I gather

11  that there were some conclusions maybe that he reached, or

12  that that person reached, things that may not have been done

13  that you have since corrected; is that fair to say?

14          THE WITNESS:   That seems to be a fair assessment.

15  I mean, whatever gaps there may have been, we have been able

16  to fill, since his departure, and since this case started.

17          THE COURT:   Okay.   And that's the reason for some

18  of the changing statements, opinions; is that correct?

19          THE WITNESS:   Yes.   When this case started, I was

20  of the understanding that there were no random functions in

21  the software.   It was portrayed to me by the manufacturers,

22  portrayed to me by my staff, at least my staff didn't make me

23  aware that there were random functions in the stored

24  procedures in the database.

25          Mr. Friedman, in his report, indicated that it did

1    exist, and I then went back with my staff to look into his

2    accusations, and we were able to sustain that, and see that

3    yes, there are two random functions, neither of which affect

4    the result of the game.  There is one that is just an entry

5    point into the pool, and then the pool continues sequentially

6    ad infinitum, and the other is when the prize level is

7    selected in the pool, there is a random process that picks

8    from a finite number of possible entertaining displays that

9    will be displayed to represent the value of the prize.

10           THE COURT:  I'm unclear about how that second

11   random function doesn't make it a game of chance.  I don't

12   understand that.

13           THE WITNESS:  The prize value is known.  Let's say,

14   for example, the next game is going to present you with a $5

15   prize.  Okay, so there are several different ways that a $5

16   prize can be presented.  It can be presented as --

17           THE COURT:  So you are saying that random function

18   doesn't change the amount of the prize; and therefore, in

19   your view, it is not a game of chance.

20           THE WITNESS:  Correct.  That $5 prize will be

21   awarded to you regardless of whether it is displayed as three

22   sevens, or it goes into a bonus round, which makes you appear

23   like you are getting free plays, ultimately, it is going to

24   end up giving you a $5 dollar prize, because that prize is

25   known in advance, and they do what's called reverse mapping.

1          So it takes the prize, and reverse maps it, to

2     determine how the prize will be displayed.

3          THE COURT:  Okay.  All right, thank you very much.

4     You can step down.

5          THE WITNESS.  Thank you.

6          THE COURT:  Mr. Craig?

7          MR. CRAIG:  How do you -- do you care -- do I do

8     Kneuper, or do you want -- yeah, I'll do Kneuper.  That's

9     fine.

10         THE COURT:  I'd rather have you do Mr. Friedman,

11    just because they relate to the same topics.

12         MR. CRAIG:  Yeah.  This does make sense.  Okay, we

13    call Stacy Friedman to the stand.

14         THE COURT:  Mr. Friedman, if you will step up here,

15    and the Clerk will administer the oath.  Counsel, you may

16    proceed.

17                            **STACY FRIEDMAN,**

18    being produced and sworn, testified as follows:

19                         **DIRECT EXAMINATION**

20    BY MR. CRAIG:

21    Q.   Good morning, Mr. Friedman, how are you?

22    A.   I'm well, thank you.

23    Q.   Okay.  Do you understand this is a *Daubert* hearing,

24    right?

25    A.   I do.

Case: 4:23-cv-00330-JAR    Doc. #: 300    Filed: 10/08/24    Page: 46 of 74 PageID #: 28450

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

44

1   Q.   Do you understand Defendant's filed a motion to exclude

2   certain opinions that you expressed in your initial November

3   6th report, right?

4   A.   I'm not sure exactly which certain opinions you are

5   referring to, but I understand you are trying to exclude

6   something.

7   Q.   Have you read Defendant's *Daubert* motion specific to

8   you?

9   A.   I have.

10  Q.   Okay.  Then you are aware that Defendant's *Daubert*

11  motion is limited and focused on your ability and your

12  qualifications to offer what Defendant's view as legal

13  opinions in this case, right?

14  A.   I don't know about the characterization of that.  I'll

15  take your word for it.

16  Q.   You also gave additional opinions regarding how you

17  believe Torch devices work in your supplemental reports,

18  right?

19  A.   I gave additional opinions, that's correct, yes.

20  Q.   Yeah.  And do you understand the Defendants have not

21  moved to exclude those technical opinions pursuant to the

22  *Daubert* standard, correct?

23  A.   Again, I'll take your word for it.

24  Q.   Okay.  So we can both agree that the purposes of

25  Defendant's *Daubert* motion, if you can please keep your

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 47 of 74 PageID #: 2345

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                45

1  responses limited to the work that you did, and the opinions

2  that you expressed in your November 6, 2023 report?

3  A.   I will try to do that, yes.

4  Q.   You have a Bachelor of Arts Degree and Computer Science

5  from Harvard, right?

6  A.   That's correct.

7  Q.   You have no other degrees; is that correct?

8  A.   That's correct.

9  Q.   Now, TNT retained your services around March 2, 2023?

10  A.   Sounds about right, yes.

11  Q.   The one thing you were asked by TNT to render an opinion

12  about was the software design of the Torch device; is that

13  correct?

14  A.   Yes.

15  Q.   You submitted your initial expert report on November 6,

16  2023, right?

17  A.   That sounds like the right date, yes.

18  Q.   Prior to submitting that report, you never independently

19  analyzed the software design or operation of any Torch

20  device; isn't that true?

21  A.   I did not have access to that at that time, that's

22  correct.

23  Q.   Prior to November 6, 2023, you did not personally test

24  any Torch device, right?

25  A.   You mean in Missouri?

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 48 of 74 PageID #: 20457

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

46

1   Q.   Did you ever test a device that was operated or owned by

2   Torch Electronics prior to November 6, 2023?

3   A.   No, I did not.

4   Q.   As far as your statement that you made in your November

5   6, 2024 report regarding your understanding of how Torch

6   devices operate, you relied on the opinions of others?

7               THE COURT:   I think you November, November of 2024.

8               MR. CRAIG:   I'm sorry, November 6th.

9               THE COURT:   I was trying to figure out the dates.

10  Thank you.

11  Q.   (By Mr. Craig)   As far as the statements you made in

12  your November 6th report regarding your understanding of how

13  Torch devices operate, you relied on the opinions of others

14  regarding how Torch devices operate to then form your

15  opinions about how Torch devices operate, expressed in your

16  November 6th report, true?

17  A.   Those are some of the sources that I relied on, that's

18  correct.

19  Q.   At least prior to November 6, 2023, TNT asked you to

20  assume the veracity of those third party opinions; is that

21  correct?

22  A.   Of the portion of the evidence that I relied on that

23  that was opinion, yes, that's correct.

24  Q.   And you never attended law school; is that correct?

25  A.   That's right.

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 49 of 74 PageID #: 23653

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    47

1    Q.    You don't hold a paralegal certificate?

2    A.    Correct.

3    Q.    You never attend law school classes?

4    A.    Not as a law student.

5    Q.    You have never taken any classes on legal research,

6    right?

7    A.    That's correct.

8    Q.    You never have taken any classes on the proper methods

9    for statutory construction; is that correct?

10   A.    That's correct.

11   Q.    You cannot explain the applicable legal standards for

12   interpreting legal statutes under Missouri law; is that

13   right?

14   A.    That's right.

15   Q.    You, sir, are not a lawyer, correct?

16   A.    That's correct.

17   Q.    And, in fact, it was not your intent to offer legal

18   opinions in this case; isn't that true?

19   A.    It is not my intent to offer legal opinions, that's

20   correct.

21   Q.    As a non-lawyer, you would agree that it would be fair

22   to say it probably shouldn't take an expert in the specific

23   field to define what the legislature intended when it comes

24   to criminal penalties versus a given action; is that true?

25   A.    Versus, I'm sorry, what?

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 50 of 74 PageID #: 23454

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                          48

1   Q.   Versus a given action?

2   A.   I'm not sure.

3          THE COURT:  I'm not sure I understand the question.

4   So, you are going to have to rephrase it.

5   Q.   (By Mr. Craig)  Yeah, as a non-lawyer, you would agree

6   that it is fair to say, and it probably shouldn't take an

7   expert in the field -- in the specific field to define what

8   the legislature intended when trying to legislate criminal

9   penalties for a specific conduct, true?

10  A.   That sounds right, but again, I'm not a lawyer.

11  Q.   That's exactly the same response you gave to me earlier,

12  right?

13  A.   Are you talking about a deposition?  I need to see the

14  transcript.

15         MR. CRAIG:  Okay.  We did have a deposition --

16  never mind.  You have agreed with me.  I'm going to move on.

17  I have no further questions.

18         THE COURT:  Mr. Finneran?

19         MR. FINNERAN:  I'll be very brief.

20                    <u>CROSS-EXAMINATION</u>

21  BY MR. FINNERAN:

22  Q.   Mr. Friedman -- Mr. Friedman, can you hear me?  Okay,

23  sorry, I thought it was off.  Mr. Friedman, Mr. Craig just

24  asked you about your qualifications as a lawyer.  You are not

25  a lawyer?

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 51 of 74 PageID #: 2365

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

49

1    A.    That's still correct, yes.

2    Q.    Do you intend to offer any opinions in this case about

3    the meaning of the Missouri statutes?

4    A.    I do not.

5    Q.    Do you intend to offer any interpretation of the

6    Missouri statutes?

7    A.    I do not.

8    Q.    Now, you have in your report used certain words that are

9    in the Missouri Statute in order to recite your conclusions;

10   is that right?

11   A.    That's true, yes.

12   Q.    Is it your intention by doing that to form legal

13   conclusions?

14   A.    No, not at all.

15   Q.    What is your intent?

16   A.    So a lot of words in the Missouri Statute are some terms

17   of art, like chance, or gambling, or you know, money.  And so

18   when I use those phrases, it is based on my expertise in the

19   field, and examining whether -- in this case, whether the

20   Torch device has certain attributes.  I'm not intending to

21   say that those are the way the law should be interpreted.

22   I'm just describing the behavior of the machine.

23   Q.    Now, looking back over your report, do you acknowledge

24   that you used headers in your report that could

25   understandably have led the Defendants to believe that you

Case: 4:23-cv-00330-JAR  Doc. #: 300  Filed: 10/08/24  Page: 52 of 74 PageID #:
TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing
2565
50

1    were attempting to reach legal conclusions?

2    A.    I do.  I should have rephrased those in the form of

3    questions.

4    Q.    So, in other words, although there are bolded headings

5    in your report, where you cite portions of the Missouri

6    Statute, what was your purpose for including those headings

7    in the report?

8    A.    Well, so you had asked me to sort of organize my

9    analysis section-by-section based on certain -- based on

10   which portion of the Missouri Statute I was addressing at the

11   time.  In other words, which -- whether we were talking about

12   game of chance or -- I can't remember the rest of them -- but

13   that was basically just a way for me to organize the content

14   of my report.

15   Q.    So to be clear, are you able to assure the Court that

16   those bolded headings, you do not intend to make part of your

17   testimony if there is a trial in this case?

18   A.    That's correct.  I will not offer any opinions about

19   what the law means.

20   Q.    And I think as you went back through your report, you

21   may have identified a couple of other places where you feel

22   you may have crossed that line?

23   A.    I think that's right, yeah.  Again, I'm not going to do

24   that in front of the jury.

25   Q.    So just to make sure that I have it straight, so while

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 53 of 74 PageID #: 23567

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

51

1    you do intend to use words that are in the statute to express

2    your opinions based on your experience, you do not intend to

3    offer opinions that that's what the Missouri Statute means?

4    A.    That's correct.

5    Q.    All right.  The only last thing that I wanted to

6    mention, Mr. Craig asked you about relying upon some

7    information in your initial report.  It is correct you didn't

8    have access to the Torch devices at that time?

9    A.    That's correct.

10   Q.    And so what sources did you rely upon to reach your

11   conclusions in that initial report?

12   A.    I don't have that exhibit memorized, but there was a

13   number of prior depositions.  There was a machine manual.

14   There was earlier information from Mr. Farley, and I can't

15   recall the total list, but it is at the back of my report.

16   Q.    And at that time that you issued your report on November

17   6th, Mr. Farley had not yet issued a report in this case; is

18   that right?

19   A.    Yeah.  He had issued the declaration which is part of

20   what I looked at.

21   Q.    Right.  So your reports would be simultaneously on

22   November 6th, right?

23   A.    That's my recollection, yes.

24   Q.    So as a result of that, were you in the position prior

25   to that date to offer opinions about Mr. Farley's analysis in

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 54 of 74 PageID #: 23558

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

52

 1  those reports?

 2  A.   Oh, no.  I hadn't seen his analyses at that point.

 3  Q.   Okay.  And the documents that you did rely upon in your

 4  report -- which are reflected in the appendix of your report

 5  -- I won't bother pulling it up, but are those the sorts of

 6  documents that would be typically relied upon by an expert in

 7  your field in order to reach conclusions?

 8  A.   Yes, absolutely, I do it all of the time.

 9           MR. FINNERAN:  No further questions, your Honor.

10           THE COURT:  Mr. Craig, any other questions of the

11  witness?

12           MR. CRAIG:  Yeah, very quickly.

13                 **REDIRECT EXAMINATION**

14  BY MR. CRAIG:

15  Q.   Do you understand that it is something to analyze your

16  understanding of what Missouri law says, and its statutory

17  provisions, and what they mean, and then applying your

18  understanding of what Missouri law says to your understanding

19  of how Torch devices operate, is a form of legal analysis?

20           MR. FINNERAN:  Objection, calls for a legal

21  conclusion.

22           THE WITNESS:  I do not --

23           THE COURT:  You can answer, if you understand.

24           THE WITNESS:  I don't think I follow your question.

25  Q.   (By Mr. Craig)  Taking the law, and applying facts to

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 55 of 74 PageID #: 2365

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    53

1   the law to form new opinions, is a legal process to form

2   legal conclusions, true?

3   A.   I don't know.

4   Q.   You have never been to law school, right?

5   A.   Again, that's true.

6           THE COURT:  I think we have established that.

7           MR. CRAIG:  Yeah, okay.

8           THE COURT:  All right.  Mr. Friedman, at the end of

9   the day, I know there have been supplemental reports by Mr.

10  Farley, by you, at the end of the day, based on the last

11  report, is there any difference between your opinion of how

12  these games work and Mr. Farley's opinion?

13          THE WITNESS:  Well, I think there is probably some

14  technical differences.  I think he -- so I went through, and

15  actually looked at a code that I pulled out of the game

16  executable that he sent me.  They work in a different way

17  than I think he was expressing here today or maybe one or two

18  of his prior depositions.

19          THE COURT:  How is it different?

20          THE WITNESS:  Well, so today, if I recall, he said.

21          THE COURT:  I'm not really asking you to

22  necessarily comment on his testimony, but I'm just trying to

23  figure out is there any real difference between the way you

24  think the game works and Mr. Farley thinks the game works.

25          THE WITNESS:  Well, so, without intending to sound

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 56 of 74 PageID #: 2846

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

54

 1   flippant, I think the question is what do you mean by real

 2   difference.  So when I look at software --

 3             THE COURT:  Any difference.

 4             THE WITNESS:  There is a difference between the way

 5   I understand the game to work, and the way he understands it

 6   to work.

 7             THE COURT:  Can you tell me what that is.

 8             THE WITNESS:  Well, again, as I was sitting here

 9   today, he expressed the opinion that the software of the

10   game, and making the distinction between the visual software

11   that you see, that you interact with, on the terminal itself,

12   there is a database.  So the software makes calls to the

13   database.

14             He understands that the software sequentially draws

15   tickets from the pool.  That's actually not what the software

16   does.  The software simply makes a call called play game.

17   And the play game process on the database does whatever it

18   needs.

19             In this case, it is implemented in such a way that

20   the play game function goes and looks in the pool, but if it

21   doesn't know where to look, then it randomly picks where to

22   look, and then it starts drawing tickets.

23             One of the things that I wrote in either my second

24   or third supplements is that that call from the software to

25   the database on the back end could have done anything else.

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 57 of 74 PageID #: 20661

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    55

1    It could have, in fact, shuffled the prize beforehand.  And

2    in fact, that's what happened as a result of the second

3    supplement is that the Farley team sent me some drives where

4    the database instead of selecting for this, was shuffling the

5    prizes before it sent it back.  And that turned out to be a

6    mistake on their part.

7            But the point is you can't tell just by looking at

8    the game code, because it is all abstracted behind them on

9    what's going on in the database.

10           THE COURT:  Does that, in your opinion, inject an

11   element of randomness?

12           THE WITNESS:  Well, so the random selection of

13   where you start, I mean, I guess my knowledge of it would be

14   if you are shuffling a deck of cards, and the question is

15   where do you cut it.  If that's a random choice, then the

16   cards that you draw after that are going to depend on where

17   you started dealing from the top of the deck, and if you have

18   a --

19           THE COURT:  But does that happen every time you

20   play the game, or is it just at the beginning?

21           THE WITNESS:  So, in the what I think we are

22   calling the snafu drive, it happened on a more regular basis,

23   on the Torch device drive, that I understand that are at

24   issue here, that happens on whenever a player is drawing from

25   a new pool and play amount combination.

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 58 of 74 PageID #: 2646

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    56

1    In other words, the first time if there isn't a

2    location in this set of outcomes to start drawing from, the

3    game has to pick randomly, do I start here, or do I start

4    there.  And at that point, that's -- you have set the what's

5    called the current index in the code, and you just keep

6    incrementing that from that point forward.

7         THE COURT:  Okay.

8         MR. CRAIG:  Your Honor.

9         THE COURT:  Just a second.

10        MR. CRAIG:  Okay.

11        THE COURT:  Okay.  Did you have a question, Mr.

12   Craig, come up here to the podium.

13        MR. CRAIG:  Yeah, I mean, I have a full cross if we

14   want to get into the starting point index.  It is a setup

15   index, and it only happens once, and if we --

16        THE COURT:  If you have a few questions you want to

17   ask, go ahead.

18              <u>**REDIRECT EXAMINATION (cont'd)**</u>

19   BY MR. CRAIG:

20   Q.   This starting index situation, this is essentially a

21   device setup issue so that the computer knows where to go

22   within the database to make the call, right?

23   A.   That's not exactly right.

24   Q.   Well, once the current index is set, right, the computer

25   doesn't have to then use any random process to go back and

Case: 4:23-cv-00330-JAR    Doc. #: 300    Filed: 10/08/24    Page: 59 of 74 PageID #: 2364

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                                                    57

1    figure out where it is in the database, right?

2    A.    That's correct, yes.

3    Q.    Okay.  The current index can very well be set before any

4    money is ever placed in any machine, and certainly before the

5    play button is ever pushed, right?

6    A.    Well, the current index is on a machine-by-machine, and

7    in fact, pool-by-pool basis.  So the scope of your question

8    isn't quite right, but on a machine-by-machine basis, once

9    you have set the current index for a given pool and play

10   amount, then it is set, unless the game is reset, or that

11   information is deleted somehow.

12   Q.    There is a number of ways that that current index can

13   reset, right?

14   A.    That's right.

15   Q.    Okay.  So, for instance, if I walked up to a game, and

16   it is fresh, where it had never been touched, and it just got

17   plugged in and turned on, current index wasn't set, right.

18   And I go to game one at play level 25 cents, right, and I hit

19   preview, well, the computer needs to know where it is going

20   to go.

21          So, at that point, and before I put a dollar in the

22   machine, for that game at that play level, the current index

23   has already been set, right?

24   A.    That's correct.

25   Q.    And from there on after, it will never be undone,

 1  current index will be fixed, and it won't have to be a random

 2  call to figure out where in that index the machine needs to

 3  look for the next turn, right?

 4  A.   With the exception of the examples I gave in the report,

 5  that's correct.

 6  Q.   Yeah, the device was hacked, or it is shutdown and

 7  restarted, something like that, right?

 8  A.   Well, almost, there is a button in the administrative

 9  panel that allows it to restore the terminal that wipes away

10  the current indexes.

11  Q.   And you have no evidence in this case -- you haven't

12  seen any evidence that that's a function that has ever been

13  used by Torch, right?

14  A.   That's correct.  I don't know how they are doing that.

15  Q.   And in that same process, me walking up to a game that

16  is brand new, the current index isn't set, I could, as a

17  player, I could go through every single one of those games at

18  every single play level, and I can do that same play -- I can

19  say, well, lucky rubber ducky at 25 cents preview.  I just

20  set the current index, 50 cents, I can push preview, I just

21  set the current index.

22          And I can do that for every play level of every

23  game in the Torch device; is that correct?

24  A.   That's correct.

25  Q.   And when I did that, every single current index within

 1   the device would be set, right?

 2   A.   That's correct.

 3   Q.   And from that point, there would be no random function

 4   that dictates where in the database the machine has to go to

 5   look for the next outcome, right?

 6   A.   Again, with the caveat from before, that's correct.

 7             MR. CRAIG:  Okay.

 8             MR. FINNERAN:  May I?

 9             THE COURT:  Just a couple.

10             MR. FINNERAN:  Yes.

11                    **RECROSS EXAMINATION**

12   BY MR. FINNERAN:

13   Q.   Mr. Friedman, first, when you were answering those

14   questions for Mr. Craig, am I right that you were answering

15   them about the third supplemental report drives, the ones

16   that you got, that it did not include a shuffle feature?

17   A.   That's correct.

18   Q.   If you were asked those same questions about the devices

19   you were sent earlier that did that have a shuffle feature,

20   would your answers differ?

21   A.   Yes, the shuffle feature -- the answer is yes.  Do you

22   want me to explain the shuffle feature?

23   Q.   Just very briefly, please?

24   A.   So with the devices that I was sent first by the -- or

25   the drives that I was sent first by Mr. Farley, in the

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 62 of 74 PageID #: 2366

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

60

1   database, after I think 5,000 tickets had been drawn, it

2   would go and shuffle those.  So then instead of this idea of

3   sequentially drawing, and then looping around, and everything

4   being exactly the same, it would be you'd loop around, and

5   then each chunk of 5,000 tickets wouldn't be shuffled since

6   the prior time that you saw it.

7   Q.   Okay.  And then Mr. Craig asked you about a scenario

8   where the player goes in and hits the prize viewer for every

9   play level and game; is that right?

10  A.   Yes, that's right.

11  Q.   Now, if a player doesn't hit the prize viewer, and

12  assuming it is a brand new game, and no one has selected

13  anything, they don't hit the prize viewer and just hit the

14  play button, does that result in the starting index being

15  randomly selected?

16  A.   It does.

17          MR. FINNERAN:  No further questions.

18          MR. CRAIG:  Just very briefly.

19          THE COURT:  You have one question.

20          MR. CRAIG:  Okay.

21                  **REDIRECT EXAMINATION**

22  BY MR. CRAIG:

23  Q.   When these drives that you are talking about that

24  contain the shuffle feature, that shuffle feature was not

25  present in either of the TNT purchased no chance device that

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 63 of 74 PageID #: 23467

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

61

1   you looked at, or the corrected drives that you received from

2   Mr. Farley upon which you based your third report, correct?

3   There was no shuffle feature in either one of those, right?

4   A.   That's correct.

5            MR. CRAIG:  Okay.  Can I ask one more question?

6            THE COURT:  No.

7            MR. CRAIG:  Okay, thank you.  That's fair.

8            THE COURT:  You can step down.  Thank you.

9            THE WITNESS:  Thank you, your Honor.

10           THE COURT:  We will take a couple of minutes, and

11  then we'll do Mr. Kneuper.

12           MR. FINNERAN:  He pronounces it Kneuper.

13           THE COURT:  Kneuper, I have failed the name test in

14  the case.

15           MR. FINNERAN:  This is the craziest pronunciation

16  ever, so I don't blame you.  But I have texted him, and he

17  will be on the Zoom, if he is not already.

18           THE COURT:  Okay.  We will take two minutes, and

19  then we will proceed.

20           MR. FINNERAN:  Judge, do you think we will not do

21  argument today on either the summary judgement or the *Daubert*

22  motions or?

23           THE COURT:  We are not going to do argument today.

24  I have a couple of questions that I want to ask you about at

25  the conclusion of Mr. Kneuper.  All right, just two minutes,

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

```
 1   and then we will proceed.
 2        (At 11:24 a.m., the proceedings stood in temporary
 3        recess.  At 11:30 a.m., the proceedings resumed in open
 4        court.)
 5        THE COURT:  Mr. Craig, I understand that you are
 6   going to be examining Plaintiff's designated expert, Mr.
 7   Kneuper, and I think I was mispronouncing it, but I'll try to
 8   get it right.  Mr. Kneuper, you can hear us?
 9        THE WITNESS:  Yes, yes, and you actually pronounced
10   that correct, amazingly enough.
11        THE COURT:  Well, I had some help.  Mr. Craig, go
12   ahead.  I do need you to speak slowly.  It is a little harder
13   for the court reporter to get somebody who is on the Zoom but
14   go ahead.
15        MR. CRAIG:  We would call Dr. Kneuper to the stand.
16        THE COURT:  And if you can spell your name real
17   quickly.
18        THE WITNESS:  Yes.  My last name is spelled
19   K-N-E-U-P-E-R.  First name is Robert.
20        THE COURT:  Counsel, you may proceed.
21                 ROBERT KNEUPER (via Zoom),
22   being produced and sworn, testified as follows:
23                    DIRECT EXAMINATION
24   BY MR. CRAIG:
25   Q.  Dr. Kneuper, you were retained by TNT two or three weeks
```

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Damages Hearing

63

1   before your November 6th report was due; is that true?

2   A.   That sounds right.  It has been awhile, but that does

3   sound right.

4   Q.   And you issued a report dated November 6, 2023, correct?

5   A.   Yes, that's correct.

6   Q.   Nothing in your November 6th report contains your own

7   independent analysis of the underlying data that TNT might

8   have had which you looked at in order to form your own

9   independent opinions about TNT's damages, correct?

10  A.   That's correct.

11  Q.   And even with respect to your November 6th report, you

12  were simply assuming liability and causation were

13  established, right?

14  A.   Yes.  That's pretty typical as a damages expert that you

15  make assumptions such as that.

16  Q.   Prior to issuing your November 6th report, you did not

17  analyze TNT's underlying financial data, correct?

18  A.   I don't remember analyzing it.  So to the best of my

19  recollection, that's correct.

20  Q.   Prior to November 6th, you didn't even have TNT's

21  underlying financial data, right?

22  A.   To my recollection, I didn't have it prior to that first

23  November 6th report, yes.

24  Q.   And your approach for the November 6th report was just

25  to discuss what TNT had attempted to do to calculate its

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 66 of 74 PageID #: 23640

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                    64

1   alleged damages, and then discuss some of the steps that

2   could be taken to fine tune or fix that estimate, correct?

3   A.   That sounds right.  It was basically a preliminary

4   assessment of their damages methodology, and some suggestions

5   in terms of the kinds of refinements that I would do with

6   that kind of measure.

7   Q.   And you made no attempt prior to November 6th to

8   actually refine or fix any of TNT's own damages analysis in

9   your November 6th report, right?

10  A.   That's correct.  It was focused primarily on methodology

11  not on the actual numbers.

12  Q.   And the reason in your attempt prior to November 6th to

13  refine or fix TNT's own damages analysis is because at that

14  point in time, you had not been asked by TNT to do so,

15  correct?

16  A.   Again my -- that's correct, my assignment was to focus

17  on, as I said, the preliminary assessment of their

18  methodology.

19  Q.   Your November 6th report was not intended to be your own

20  independent final damages analysis, true?

21  A.   That's correct.

22  Q.   And you cannot recall the exact date that you first

23  received your assignment from TNT to conduct an independent

24  analysis of TNT's financial information, and undertake your

25  own independent analysis for your December 12th report, but

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 67 of 74 PageID #:

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing          2367

65

1   you can say that that did occur some time after November 6th,

2   right?

3   A.   Yes.  To my recollection the -- that assignment of my

4   own separate damage analysis was subsequent to November 6th.

5   Q.   Now, do you, in this case, intend to offer any opinion

6   suggesting that TNT's own estimate of its damages that TNT

7   came up with prior to your November 6th report was correctly

8   and accurately done?

9   A.   I wouldn't anticipate doing so.  That was very

10  preliminary, and I had not evaluated that, and later came up

11  with my own independent analysis.  So I certainly wouldn't

12  anticipate doing that.

13           MR. CRAIG:  Okay.  Well, unless they anticipate

14  having him do that, that was my main concern, your Honor.  I

15  have no further questions.

16           THE COURT:  Mr. Finneran?

17                    <u>CROSS-EXAMINATION</u>

18  BY MR. FINNERAN:

19  Q.   Mr. Kneuper, thank you for joining us remotely today.

20  Can you hear me okay?

21  A.   Yes.

22  Q.   Okay.  So I only have a few questions for you.  First,

23  when you were first retained as an expert in this case, am I

24  correct it was not merely with respect to assessing TNT's

25  damages methodology?

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 68 of 74 PageID #: 2367

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

66

1    A.    That's correct.

2    Q.    What else were you retained to do initially?

3    A.    Well, initially for the November 6th report, primarily,

4    I was focused on assessing the Torch's -- the Defendant's

5    antitrust counterclaims.

6    Q.    And so, is it fair to say, the majority of your report

7    focused -- your November 6th report, focused on that

8    question?

9    A.    Yes.

10   Q.    Is it your understanding that those counterclaims have

11   since been dropped?

12   A.    Yes.

13   Q.    All right.  So then referring then to the conclusions

14   you reached in your damages analysis, as you said during your

15   earlier examination, you had a fairly limited assignment at

16   that point; is that fair to say?

17   A.    Yes.

18   Q.    At that point, we did not ask you to undertake a

19   comprehensive analysis of TNT's damages, did we?

20   A.    No, not at that point.

21   Q.    Are you aware that as of the date of your report, TNT

22   had not received any responses from Torch or the other

23   Defendants?

24   A.    That's my understanding is, as I have described in that

25   report, the discovery was very limited at that point in time,

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 69 of 74 PageID #: 2567

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                                67

1   and I don't recall anything from Torch.

2   Q.   So ultimately, you issued a second supplemental report;

3   is that right, or a first supplemental report?

4   A.   Yes, I did.

5   Q.   Was it in that report that you undertook to engage in

6   your own independent analysis?

7   A.   Yes.

8   Q.   So with respect to the initial report, what, if any

9   opinions from that initial report relating to damages do you

10  intend to potentially offer in this case?

11  A.   I have nothing from the initial report.  I certainly

12  talked about the basic damages construct, which I also do in

13  the supplemental report, but I would plan to focus on my

14  analyses and opinions from my supplemental report.

15  Q.   So other than I think you said this is in your

16  supplemental report as well, but other than the conclusion

17  that the kind of approach that you ultimately took, and you

18  can see that TNT initially took, was broadly an accepted

19  method of calculating damages.  Is it fair to say that your

20  opinions were focused exclusively on what you said in your

21  supplemental report, if this case goes to trial?

22  A.   Yes.

23           MR. FINNERAN:  Okay.  No further questions, your

24  Honor.

25           THE COURT:  Any other questions of the witness, Mr.

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 70 of 74 PageID #: 23674

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing                                                    68

1    Craig?

2            MR. CRAIG:  No.  I think that was the focus of our

3    *Daubert* Motion.

4            THE COURT:  Okay.  Mr. Kneuper, thank you very much

5    for participating here today on Zoom.  Thank you very much.

6            THE WITNESS:  Thank you, your Honor.

7            MR. FINNERAN:  Judge, so I know that we are very

8    short on time.  We had anticipated calling Mr. Friedman

9    briefly as a witness on our motion to strike Mr. Farley.  We

10   just had a couple of slides to go over.  It sounds like we

11   don't have any time to do that today.  So I don't know how

12   you wanted to proceed with that.

13           THE COURT:  If you want to submit the slides.

14           MR. FINNERAN:  We can certainly add a little

15   explanation to make it clear what the slides say, and then if

16   Aaron has any disagreements or what have you, we can try to

17   work those out before we submit them.

18           THE COURT:  Actually, what I would probably

19   propose, is that you submit them with whatever explanation

20   you want to submit, do it with within seven days, and then

21   give Mr. Craig, counsel, seven days to file any response; is

22   that agreeable?

23           MR. CRAIG:  I think it is unnecessary, but I will

24   agree to it if you want it.

25           THE COURT:  Well, if you think it is unnecessary

1    then.

2            MR. CRAIG:  Well, I mean, his submission.  But yes,

3    if they submit, I would like seven days to respond, your

4    Honor, yes.

5            THE COURT:  Okay.  I don't know what they are going

6    to submit.

7            MR. CRAIG:  I don't know either.

8            MR. FINNERAN:  We'll talk to each other and see if

9    we can work something out.  And if we file something, we

10   would agree they should have a chance to respond.

11           THE COURT:  Okay.  I want to ask you about anything

12   that is pending.  I know at one point, you talked about a

13   criminal prosecution.  Mr. Rosenblum was here with you

14   indicating there was a criminal case that was coming up for

15   trial.  I think that that timeframe has passed.  Do you know

16   the status of the criminal case?

17           MR. CRAIG:  I think it is currently set some time

18   in October, but I don't know -- I mean, I think I'm just

19   referring back to something that you said at some point.

20           MR. FINNERAN:  We can check, your Honor.  The last

21   time that I checked the docket, they had set a status

22   conference in October to set a new trial date.  So I don't

23   know if there has been a new trial date set.  We can look it

24   up and advise the Court.

25           THE COURT:  And I'll ask both of you, if you know,

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

```
1    is there anything pending at the Missouri Gaming Commission,

2    any action that is pending before the Missouri Gaming

3    Commission, Mr. Craig?

4              MR. CRAIG:  Regarding Torch?

5              THE COURT:  Regarding Torch.

6              MR. CRAIG:  No.  We don't operate in any

7    jurisdictions where they would have authority to say

8    anything.  So no.

9              And the -- any Missouri Court of Appeals decision

10   that we have discussed in the past, so I think we did put

11   this in the brief, but that we tried to transfer it to the

12   Missouri Supreme Court, and the transfer was denied.  So the

13   Missouri Court of Appeals --

14             THE COURT:  Is that the final --

15             MR. CRAIG:  That's a final.

16             THE COURT:  -- judgment.

17             MR. CRAIG:  That's a final judgment, yeah.  I won't

18   say more, but we have made those arguments.  What that means

19   and why, you know, what they said there would apply here

20   equally well.  The legality is it shouldn't be decided in a

21   civil context.

22             MR. FINNERAN:  Of course, your Honor, we did file

23   yesterday -- after one of our previous hearings, we filed a

24   response on that point.  I know the Court has reviewed it,

25   but we disagree with Mr. Craig's characterization.
```

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing

```
 1              THE COURT:  Okay.  All right, thank you all for
 2   being here today.  I appreciate it.  We got it done.  Thank
 3   you.
 4              MR. FINNERAN:  Do you want to set or have arguments
 5   on either of these motions in the future?  Would it be
 6   helpful to the Court to do so?  I know we were going to do so
 7   today, but we have run out of time today.
 8              THE COURT:  I want to have an opportunity to digest
 9   what we have done over the last two hearings.  If I believe
10   oral argument will be helpful, I'll set it.
11              MR. FINNERAN:  Okay.
12              THE COURT:  I do need you to let me know if you are
13   going to file something supplemental as it relates to the
14   motion to strike.
15              MR. FINNERAN:  We will let you know before the end
16   of the week easily.
17              THE COURT:  Okay.  All right, thank you very much.
18   I appreciate everybody being here.
19   (The proceedings concluded at 11:43 a.m.)
20
21
22
23
24
25
```

Case: 4:23-cv-00330-JAR   Doc. #: 300   Filed: 10/08/24   Page: 74 of 74 PageID #: 72

TNT Amusements, Inc vs. Torch Electronics, LLC et al - Daubert Hearing   20478

1                    REPORTER'S CERTIFICATE

2

3          I, Lisa M. Paczkowski, Registered Professional

4   Reporter, do hereby certify that I am a duly appointed

5   Official Court Reporter for the United States District Court,

6   Eastern District of Missouri, and that the foregoing is a

7   true and accurate reproduction of requested proceedings had

8   in the matter of:

9   TNT Amusements, Inc., vs. Torch Electronics, LLC, et al.

10         In the event copies are made of the transcript

11  herein, the court reporter takes no responsibility for

12  missing or damaged pages.

13              Dated this 8th day of October, 2024.

14

15

16           /s/  Lisa M. Paczkowski
             Lisa M. Paczkowski
17           Official Court Reporter
             United States District Court
18           Eastern District of Missouri

19

20

21

22

23

24

25