**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TNT AMUSEMENTS, INC., | ) | |
| d/b/a PLAY-MOR COIN-OP, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | Case No. 4:23-CV-330-JAR |
| | ) | |
| TORCH ELECTRONICS, LLC, *et al.,* | ) | |
| | ) | |
|     Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment in this dispute between competitors in the retail amusement device industry. Plaintiff centrally alleges that Defendants operate illegal slot machines that divert Plaintiff's customers. Plaintiff asserts federal and state claims of false advertising and four counts of racketeering. Plaintiff also seeks a declaration of Missouri state gaming law as applied to the devices in question. For the reasons set forth below, Plaintiff's motion for partial summary judgment on its legal claims in Counts I-VI will be denied. With respect to the declaratory judgment sought in Count VII, the Court abstains and will dismiss the count. Defendants' motion for summary judgment will be denied as to Plaintiff's false advertising claims and granted as to its RICO claims.

## BACKGROUND

### The Parties

Plaintiff TNT Amusements, a Missouri corporation doing business as Play-Mor Coin-Op, owns and leases out traditional arcade games and similar amusement equipment (e.g., foosball and pool tables, dart boards, pinball machines, juke boxes) in retail locations throughout

Missouri. James Turntine is the President, Chief Executive Officer, and owner of TNT.

Defendant Torch Electronics is a Missouri limited liability company that leases "no-chance" gaming machines in retail locations throughout Missouri. Defendant Steven Miltenberger owns 51% of Torch and serves as its President and Manager. The remaining 49% is held in trust for the Miltenberger family.

### **Missouri's Regulatory Framework**

Chapter 313 of the Missouri Revised Statutes governs activities regulated by the Missouri Gaming Commission, such as riverboat gambling, bingo, the state lottery, horse racing, and fantasy sports. The Commission's extensive regulatory framework is set forth in 11 C.S.R. 45. The Commission is part of the Department of Public Safety and consists of five members appointed by the governor with approval of the state senate. Mo. Rev. Stat. § 313.004.  The Commission issues licenses to businesses and individuals, collects taxes and fees, and enforces gaming laws in the state. Sections 313.800 to 313.840 govern riverboat gambling. Section 313.805 empowers the Commission to license riverboat casinos, adopt standards of operation, investigate and sanction violations, and confiscate unauthorized games. If the Commission has reasonable grounds to believe that a violation of the provisions governing riverboat gambling has occurred, the Commission refers such matters to the Missouri Attorney General and local prosecuting attorney. § 313.830.7. In coordination with the Commission, the Gaming Division of the Missouri State Highway Patrol provides criminal and regulatory enforcement of gaming operations in the state.[1] The Commission views its regulatory authority as limited to licensed businesses, with the additional ability to provide technical support to law enforcement agencies

---

[1]    Gaming (last visited March 26, 2025). Perma | MSHP Gaming Division [https://perma.cc/YJ7U-BR6H]. The Court may take judicial notice of government websites. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016).

investigating illegal gambling machines located on unlicensed premises. (Doc. 226-22 at 3; Doc. 226-23 at 7, 13; Doc. 242-34 at 32-34, 69).

Gaming taxes are a considerable source of revenue in Missouri. In addition to standard income and property taxes, casinos pay a gaming tax of 21% of their adjusted gross revenue. (Doc. 242-34 at 157). Ten percent of the gaming tax goes to the local jurisdiction, and the remaining 90% is paid into an education fund. In fiscal year 2024, Missouri casinos contributed over $357 million to the education fund.[2]

Chapter 572 of the Missouri Revised Statutes is the part of the state criminal code that creates certain offenses and punishments regarding illegal gambling. As relevant here, § 572.010 contains the following definitions.

> (3) "**Contest of chance**", any contest, game, gaming scheme or **gaming device in which the outcome depends in a material degree upon an element of chance**, notwithstanding that the skill of the contestants may also be a factor therein;
>
> (4) "**Gambling**", a person engages in gambling when he or she **stakes or risks something of value upon the outcome of a contest of chance** or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome. Gambling does not include bona fide business transactions valid under the law of contracts, including but not limited to contracts for the purchase or sale at a future date of securities or commodities, and agreements to compensate for loss caused by the happening of chance, including but not limited to contracts of indemnity or guaranty and life, health or accident insurance; nor does gambling include playing an amusement device that confers only an immediate right of replay not exchangeable for something of value. Gambling does not include any licensed activity, or persons participating in such games which are covered by sections 313.800 to 313.840;[3]
>
> (5) "**Gambling device**", any device, machine, paraphernalia or equipment that is **used or usable in the playing phases of any gambling activity**, whether that activity consists of gambling between persons or gambling by a person with a machine. However, lottery tickets, policy slips and other items used in the playing

---

[2]    2024 Missouri Gaming Commission Annual Report 2024 at p. 9 (last visited March 24, 2025). Perma | Missouri Gaming Commission Annual Report 2024 [https://perma.cc/TL4K-WKF2].

[3]    Sections 313.800 to 313.840 govern riverboat gambling.

3

phases of lottery and policy schemes are not gambling devices within this definition . . .

(11) "**Slot machine**", a gambling device that as a result of the insertion of a coin or other object operates, either completely automatically or with the aid of some physical act by the player, in such a manner that, **depending upon elements of chance**, it may eject something of value. A device so constructed or readily adaptable or convertible to such use is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. **Nor is it any less a slot machine because apart from its use or adaptability as such it may also sell or deliver something of value on a basis other than chance.**

§ 572.010 (emphasis added).

Possession of a gambling device is a Class A misdemeanor, punishable by no more than one year in prison. § 572.070; § 558.011(6). A person commits the Class A misdemeanor of promotion of gambling in the second degree when he knowingly profits from unlawful gambling. § 572.040. The promotion of gambling in the first degree, involving a gambling device staking more than $100 in a day or operating any slot machine, is a Class E felony punishable by up to four years in prison. § 572.030; § 558.011(5). Any building used for unlawful gambling is considered a public nuisance, which a court may enjoin from occupation for up to one year. § 572.090.

**<u>Torch Devices</u>**

Torch markets, distributes, and services "no-chance" game machines throughout Missouri.[4] Torch purchases these devices from Banilla Games in North Carolina. Each device features at least five game themes, and each theme offers several play levels. A game theme is a series of visual images displayed to entertain the player, revealing a combination of winning or

---

[4]    The devices are: No Chance Game Suite I Terminal version 2.3.0.23596; No Chance Game Suite II Terminal version 3.2.0.19403; No Chance Game Suite 3 Terminal version 3.4.0.1; NCG Suite 4 Terminal version 4.2.1.31972; NCG Deluxe Terminal version 5.5.0.17; NCG 5; NCG Deluxe 1; NCG Deluxe 2; NCG Deluxe 3; NCG Deluxe 4; NCG Dual; NCG Skyriser; and NCG Hot Locks.

losing symbols on each turn.[5] A play level dictates the payment required to play the next turn.

A Torch Device resembles the machine depicted in this image:[6]



(Doc. 245-2).

After much back-and-forth during discovery, the parties' experts now agree on how

Torch devices operate. (Doc. 300 at 43). The underlying software in all devices is the same. The

---

[5]     Torch device game themes include Lucky's Loot, Lucky Lollipop, Lucky Striker, Lightning Strike, Bourbon Street Dice, Fabulous Las Vegas, Searing Sevens, Shammy 7's, Spooky's Loot, Wheel Deal, Arabian Riches, Bathtime Bucks, Party Crashers, Super Keno, Frozen Sevens, Kitty Kash, Major Ca$h, Oil Rush, St. Patty's Payday, Box Office, Double Shot, Mega Money Reel, Nut Shack, Piggy Bank Busy, Silver & Gold Spins, Kiss Me I'm Irish, Sparky's Firehouse, Ticket to Ride, and Dr. Jekyll & Mr. Hyde.

[6]     The Court provides this visual aid only for general context. Notwithstanding the Torch Electronics sticker on the machine, Defendants do not admit that this is an actual Torch Device.

starting point is randomly selected from a database when the device is first placed into service or when the software reinitiates. (*Id*. at 35–36). There are 12 possible starting points on each play level of each game theme. (Doc. 244-4 at 3). So, for a Torch device with six game themes and five play levels, the starting index would be randomly selected five times in each of the six themes. (Doc. 300 at 35). From any given starting point, for each turn of play, the software cycles through pre-determined and finite sequential pools of 60,000 to 100,000 outcomes, depending on the game theme. (Doc. 239-4 at 5; Doc. 239-7 at 5). A useful analogy would be a Rolodex of outcomes from 1 to 1000, eventually cycling back to 1. Based on the resulting prize amount, the device randomly reverse-maps the visual display of numbers and symbols appearing on the screen. (Doc. 300 at 44–45). As Defendant's expert summarized to the Court at the last hearing, "There is a random feature that selects the entry point into a pool, and there is a random feature that selects the entertaining display based upon the prize value that has been selected from the pool." (*Id*. at 25). There are no discernible patterns within the sequential pools. There is nothing a player can do to alter the payout amount of a turn before or after the player inserts money. There is no element of skill. According to Banilla, the intentional distribution of prize values in each pool is part of the "secret sauce" that makes the games so popular. (Doc. 244-4 at 3).

The lowest bill denomination a player may insert into a Torch device is $1.00. Torch devices do not accept quarters, so, if there is a balance of $0.25 when a player decides to stop playing, there is no way to recover that amount. When a player runs out of sufficient funds for the next turn, she must insert more money to continue playing. The percentage at which a Torch device pays out winnings to a player depends on the payout setting in the game: low, medium, high, or highest. Torch devices are uniformly set to low, yielding a payout of 91- 92% of receipts

over the life of the machine.[7] The highest setting yields a 98% payout. A device set on low uses a different pool of outcomes than a game set on a higher level.

<u>Prize Viewer</u>

Each Torch Device is coded and designed to contain an optional "prize viewer" that allows the player to preview the next payout amount. The prize viewer reveals only the dollar amount of the next turn. It does not display the combination of symbols that will appear, nor does it reveal the outcome of the following turn. So, for example, if a player selects the prize viewer and sees that the next payout amount is $0 and she wants to obtain a better result, she must play through that $0 turn and continue playing. She cannot skip ahead. If she wants to know the payout of the second, third, or any future turn, she must pay for and play through those additional turns.

The prize viewer is an optional feature. Not all players use it or use it every time. Using the prize viewer does not increase the odds of a better payout. Torch devices are configured to enable the commercial operator to adjust the settings to require a player to pay extra to use the prize viewer. According to a specialist with the Missouri Gaming Commission, absent the preview feature, Torch machines "essentially play just like a slot machine." (Doc. 226-23 at 12).

The parties dispute whether playing a Torch device constitutes gambling when a player can know the outcome of the next turn in advance using the prize viewer. TNT contends that the devices are still "usable" as a gambling device (referring to § 572.010(5)) because, among other reasons, the prize viewer is optional.

---

[7]      For context only, § 313.805(12) mandates a minimum payout of 80% for gambling devices regulated by the Missouri Gaming Commission.

<u>Defendants' "No Contest/No-Chance" Representations</u>

In marketing and promoting Torch devices, Defendants represent to customers and consumers that the devices are not gambling machines. Until September 2022, Torch's website asserted the following:

**Torch's No Chance Game Machines are legal.**

Torch's No Chance Game Machines are an innovative non-gambling game machine.

**Why are No Chance Game Machines different?**

Under Missouri law, a "gambling device" is defined as having three elements: consideration (money in), prize (money out), and chance (unknown outcome).

Torch's No Chance Games obviously have the elements of "consideration" and "prize", but have been carefully designed to eliminate the element of "chance" (which Missouri law defines as the material component of a gambling device). If the player does not like the predetermined outcome, they can choose not to play. If they have a balance on the machine, they can redeem their balance at any time.

The "Prize Viewer" option on NCGs eliminates chance.

(Doc. 245-17). Sometime in mid-September 2022, Torch revised its website to state only this:

**About No Chance Games**

Torch's No Chance Games are the first of an entirely new entertainment concept; a game in which there is no element of chance.

Importantly, the player may view each and every outcome which may entitle them a prize before playing the game. They may simply touch the "Prize Viewer" button on the game console and view the result of the game before playing. As such, the player can decide if they want to play the game or not based on the pre-determined outcome.

(Doc. 245-18).

Additionally, Defendants affix the following disclaimer to each Torch device:

The Amusement Device to which this disclaimer is attached provides each player of the device with information on the specific outcome of each electronic amusement game offered thereon. The information with respect to each such outcome is provided prior to such player's participation in any such game. Consequently, this amusement device is designed to provide no contest and no chance in the games offered to its players.

8

Section 572.010(4) of the Missouri revised Statutes defines what constitutes "gambling" in the state of Missouri. Chapter 572 of the Missouri Revised Statute further has various restrictions on certain activities and equipment related to "gambling." Only those activities that meet the definition of gambling are restricted under Chapter 572.

In Missouri (as in most states), in order to be considered "gambling," an element of chance or a contest must be present in the activity as noted in the highlighted section in Missouri's gambling definition set forth below. Further, in order for the device to be considered as a "gambling device," the device must be designed for use in the playing phase of "gambling." As noted above, this amusement device is designed to offer no contest of chance as the outcome is known by players before any amusement game is initiated. Therefore, the activity offered by this device clearly does not meet the definition of "gambling." As a result, this amusement device does not fit any definition of "gambling device" in the state of Missouri and is not prohibited for use by you.

_____

"Gambling", a person engages in gambling when he or she states or risks something of value ==upon the outcome of a contest of chance== or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome.

9

The foregoing disclaimer is affixed to each Torch device in the form of this decal:

# No Contest/No Chance Amusement Device

The Amusement Device to which this disclaimer is attached provides each player of the device with information on the specific outcome of each electronic amusement game offered thereon. The information with respect to each such outcome is provided prior to such player's participation in any such game. Consequently, this amusement device is designed to provide no contest and no chance in the games offered to its players.

Section §572.010(4) of the Missouri Revised Statutes defines what constitutes "gambling" in the state of Missouri. Chapter 572 of the Missouri Revised Statutes further has various restrictions on certain activities and equipment related to "gambling". Only those activities that meet the definition of gambling are restricted under Chapter 572.

In Missouri (as in most states), in order to be considered "gambling" an element of chance or a contest must be present in the activity, as noted in the highlighted section of Missouri's gambling definition set forth below.1 Further, in order for a device to be considered a "gambling device", the device must be designed for use in the playing phase of "gambling". As noted above, this amusement device is designed to offer no contest of chance as the outcome is known by players before any amusement game is initiated. Therefore, the activity offered by this device clearly does not meet the definition of "gambling". As a result, this amusement device does not fit any definition of a "gambling device" in the state of Missouri and is not prohibited for use by you.

1. "Gambling", a person engages in gambling when he or she stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome. §572.010(4)

(Doc. 245-16).

Defendants also share advertisement flyers with their actual and potential customers containing representations such as the following depiction:



(Doc. 245-19).

Defendants have made oral representations to their actual and potential customers that Torch devices are legal and do not involve an element of chance. (Doc. 239-2 at 56). As such, Defendants have not taken measures to prevent problem gamblers or gambling addicts from playing Torch devices, nor have they taken measures to prevent children from playing other than instructing customers not to allow it. (Doc. 239-2 at 228, 233). Defendants do not have a license from the Missouri Gaming Commission.

**Competition between the Parties**

The amusement game industry is highly competitive, with finite space available in existing retail locations. TNT and Torch compete for customers and revenue in the Missouri market, sharing collections from their machines with their customers typically in a 50/50 split. At least 20 locations where Defendants operate Torch devices are current or previous customers of TNT. Defendants have placed at least 130 Torch devices in those overlapping locations. An electronic gaming specialist with the Missouri Gaming Commission, Cody Hanavan, estimates that there have been as many as 15,000 Torch devices in Missouri. (Doc. 245-12 at 99).

TNT's total net revenues from 2018 through 2022 averaged around $725,000 per year.[8] (Doc. 226-26 at 6; Doc. 242-18 at 6). From 2018 through 2023, Torch devices in overlapping locations alone collected over $32 million, resulting in net receipts of nearly $5.6 million after payouts to players and revenue-sharing with customers. (Doc. 239 at 17–18; Doc. 109 at 5). TNT's custodian of records, Marla Turntine, stated that TNT's customers have directed TNT to remove at least 19 machines from overlapping locations in order to make room for Torch devices. (Doc. 242-17). TNT "move tickets" (i.e., work orders) and internal notes reflect that Torch machines have replaced TNT machines in some overlapping locations. (Doc. 242-19). TNT employee Donna Havey testified that Torch devices replaced TNT games in several locations, sometimes immediately and other times within the next collection cycle. (Doc. 297 at 49).

TNT internal records indicate that its customer Midwest Petroleum wanted TNT machines moved out of a game room to make space for Torch machines (Doc. 242-19 at 42). The store manager explained in deposition that the objective was to move Torch devices from

---

[8]    This figure excludes 2020 due to the COVID-19 pandemic.

the front of the store where travelers circulate to the back of the store near the truckers' lounge. (Doc. 226-6 at 21–22). The manager stated that TNT's games "were not doing very well," and the Torch devices were expected to make more money. (*Id.* at 19–20). Some TNT machines remained on site and were moved to other parts of the store. In 2022, the store was acquired by TA Travel Center, which removed everything to contract with its own vendors. (*Id.* at 22–23). In another instance, a Moose Lodge representative testified that a Torch device replaced a TNT arcade game that "wasn't making enough money." (Doc. 297 at 17).

TNT's expert estimates that, from 2018 to 2022, Torch substitutions cost TNT approximately $231,000 in revenue and $134,000 in lost profits. (Doc. 226-26 at 4; 242-18 at 4). TNT contends that Defendants have engaged in unfair competition by misrepresenting the legality of its machines. Defendants maintain that their machines are legal, their representations are accurate, and they have simply prevailed through fair competition in the market. At the same time, Defendants deny that their devices were the direct cause of TNT's losses in overlapping locations. Torch points to one instance where a customer terminated a lease with TNT because TNT's representative threatened to alert the Gaming Commission of any illegal machines on the premises. (Doc. 226-24).

### **Missouri's Legal Landscape**

Over 100 years ago, in *City of Moberly v. Deskin*, 155 S.W. 842 (Mo. App. 1913), a Missouri appellate court was asked to determine whether a slot-machine-like gum dispenser was a gambling device. The machine had a prize preview feature showing in advance what the player would receive on the next play. *Id.* at 843. The defendant argued that each turn was a separate and independent business transaction and there was no chance involved as the player knew in advance what he would receive for his nickel. *Id.* at 844. The court rejected this theory, finding

the defendant's position "unsound" because the "contrivance" was clearly intended to "allure" the player into continuing in the hope of a better outcome. *Id*. at 844–45. Thus, as early as 1913, Missouri jurisprudence denounced the prize viewer as a cunning attempt to comply with the letter of the law while doing violence to the spirit and purpose of it. *Id*. at 844. *Deskin* is still good law, cited on other grounds as recently as 1982. *Briggs v. Baker*, 631 S.W.2d 948, 953 (Mo. App. W.D. 1982) (discussing the admissibility of an ordinance).

The state of Missouri legalized riverboat gambling and slot machines in 1994. Mo. Const. art. III, § 39(e). That same year, the General Assembly established the Missouri Gaming Commission (§ 313.004) and adopted chapter 572 of the Missouri Revised Statutes governing gambling activities. Nothing in its definitions abrogated *Deskin*. § 572.010.

For the past several years, the parties to this lawsuit and other operators and officials have contested the legality of Banilla's "no-chance" prize viewer games. TNT's owner, Jim Turntine, has worked with lobbyists and the Missouri Amusement & Machine Operators Association since 2014 to advance legislation explicitly prohibiting the unregulated operation of these types of devices. (Doc. 226, Ex. 1, 4, 8–11, 16). In 2019, Senate Bill 431 proposed a revised definition of "gambling device" in § 572.010 to include any machine not approved by the Missouri Gaming Commission. In 2022, Senate Bill 632 proposed definitions of "gambling device" and "slot machine" specifically drafted to encompass machines with a preview feature. (Doc. 226-11 at 21-25). Similar versions had been filed in 2020 and 2021. (Doc. 226-10). The General Assembly has yet to pass any proposed amendments.

Correspondence in the summary judgment record chronicles that, in January 2017, Torch obtained a legal opinion from a Chicago law firm concluding that "no chance" gaming devices were legal under Missouri law. (Doc. 242-37). In May 2018, a Kirksville lawyer for Torch wrote

to the Adair County prosecutor explaining that Torch devices were legal by virtue of the prize viewer. (Doc. 226-19 at 5-6). In late 2018, Torch's owner, Defendant Steven Miltenberger, personally met with the Phelps County prosecuting attorney, who subsequently informed local law enforcement that he would not pursue prosecution involving Torch devices. ((Doc. 226-21 at 8; Doc. 245-29). However, around the same time, local officials in Franklin County warned Miltenberger that the Missouri Gaming Commission deemed the devices illegal and the prosecutor would "absolutely consider prosecution regardless of Phelps County opinion." (Doc. 245-29).

In 2019, TNT and one of its customers in Phelps County, a VFW post with a bingo license, sought an advisory opinion from the Missouri Gaming Commission regarding Banilla prize viewer devices leased by a different distributor. (Doc. 226-2 at 41–42). Upon examination, the Commission determined that the devices were indeed gambling devices and slot machines as defined in § 572.010 notwithstanding the prize viewer feature. (Doc. 245-23). The opinion, dated July 2019 and issued by the Commission's general counsel, advised that operation of the machines "would be illegal in violation of sections 572.030, 572.040, and 572.070, RSMo." (*Id.*) Counsel cited consistent determinations in Iowa,[9] Wyoming,[10] Florida,[11] and Ohio,[12] and cautioned the VFW that its possession of the devices would be deemed illegal. "The Missouri Gaming Commission maintains a zero tolerance for illegal gambling and will take immediate

---

[9]    *Banilla Games, Inc. v. Iowa Dep't of Inspections & Appeals*, 919 N.W.2d 6 (Iowa 2018).

[10]    *See* Wyoming Attorney General - Formal Opinions, Formal Opinion 2018-002 (Dec. 11, 2018). Perma | Wyoming Attorney General Formal Opinion 2018-002 [https://perma.cc/55GK-7UXH].

[11]    *Gator Coin II, Inc. v. Fla. Dep't of Bus. & Pro. Regul., Div. of Alcoholic Beverages & Tobacco*, 254 So. 3d 1113 (Fla. Dist. Ct. App. 2018).

[12]    The Court did not locate the Ohio advisory opinion referenced in the Commission's letter but notes that an Ohio appellate court later reached the same conclusion. *See Mayle Bingo Co. v. Ohio Dep't of Pub. Safety*, 152 N.E.3d 1237 (Ohio Ct. App. 2020).

action to revoke the bingo license of any organization that engages in any form of criminal activity." (*Id*.) In advising Torch on a media response about the opinion, Torch's lawyer acknowledged the Commission's position but recommended that Torch maintain its stance that that "MGC has nothing to say about Torch's games." (Doc. 242-33). Later correspondence in the record reflects that, in June 2023, Defendants were denied a business license in Branson (Taney County) based on the Gaming Commission's position that Torch devices are illegal. (Doc. 245-30).

In April 2019, a Platte County prosecutor charged a business with a class E felony for operating slot machines in local convenience stores.[13] The machines in question were Banilla "no chance" prize viewer devices. The parties' pre-trial briefs focused specifically on whether the devices fell within § 572.010. The court held a bench trial during which the Gaming Commission's specialist, Cody Hanavan, testified for the prosecution. The court rendered a guilty verdict in December 2020. No appeal was taken. Reflecting the statewide interest in this case, the post-trial docket sheet contains several requests for transcripts and records sought by other prosecutors and law firms, the latest dated August 2024.

In December 2019, the Brookfield police filed a probable cause statement against Torch in Linn County alleging the presence of illegal slot machines at a local convenience store. (Doc. 226-20). According to Defendant Miltenberger, the case was dismissed at the probable cause hearing and the machines were returned. (Doc. 226-21 at 6).

---

[13]     *State v. Integrity Vending*, Case No. 19AE-CR00948-01, filed April 30, 2019, 6th Judicial Circuit of Missouri (Platte County); *see also* Doc. 245-15; Guilty verdict puts halt to Parkville gambling operation — The Platte County Citizen (last visited March 24, 2025) Perma | Guilty verdict puts halt to Parkville gambling operation — The Platte County Citizen [https://perma.cc/HP3Q-3U4F].

The Court takes judicial notice of multiple state court cases available on the public record through Missouri CaseNet. *Nationwide Mut. Ins. Co. v. Richardson*, 108 F.4th 673, 677 n.2 (8th Cir. 2024) (noting that the court may take judicial notice of public records).

In November 2020, a Henry County prosecutor filed a suit in equity against Clinton Convenience and its owners seeking to shutter the store as an illegal gambling house.[14] The defendants answered in March 2021, after which the case lay dormant until December 2024, when a new prosecutor entered her appearance. That case remains pending. In a related case filed in December 2020, the Henry County prosecutor filed a criminal complaint against the owner of the Clinton Convenience store.[15] The issue of the legality of the Torch devices was presented to the court at the probable cause stage in the spring of 2022, and the court found probable cause to support a criminal information.[16] That case was continued repeatedly and dismissed in December 2024.

Also in November 2020, a Franklin County prosecutor filed a criminal information against the operator of a Phillips 66 on three misdemeanor counts of possession of gambling devices, in violation of § 572.070.[17] That case, too, has been continued repeatedly. Most recently, the defendant filed a motion to appoint a special prosecutor in November 2024 and then withdrew the motion in February 2025.

In early 2021, the Missouri Highway Patrol seized Torch devices from several convenience stores on the basis that the machines were illegal gambling devices. Torch responded with a state court lawsuit, filed in Cole County, against the Missouri Department of Public Safety and Highway Patrol seeking a declaration that its devices are not illegal gambling

---

[14]    *State ex rel. Shields v. Ranza Inc.*, Case No. 20HE-CC00064, 27th Judicial Circuit of Missouri (Henry County), filed Nov. 18, 2020.

[15]    *State v. Hussain*, Case No. 20HE-CR00629, 27th Judicial Circuit of Missouri (Henry County).

[16]    *State v. Hussain*, Case No. 20HE-CR00629-01, 27th Judicial Circuit of Missouri (Henry County).

[17]    *State v. McNutt*, Case No. 20AB-CR03465, 20th Judicial Circuit of Missouri (Franklin County), filed Nov. 16, 2020.

devices and an injunction preventing the Highway Patrol from seizing them.[18] The Missouri Gaming Association, whose members are casinos licensed by the Missouri Gaming Commission, intervened and filed a counterclaim seeking a declaration that the devices are indeed gambling devices and an injunction preventing Torch from operating them.

Discovery in that case reflects that Torch machines were seized in Branson in 2019, West Sullivan in 2020, and St. Clair County in 2021. (Doc. 242-34 at 14–16, 94–95). Gaming Commission representatives inspected the machines and sent their reports to law enforcement. In a deposition in July 2023, the Commission's Deputy Director confirmed that the Commission's position on no-chance devices had not changed since the July 2019 opinion letter. (Doc. 242-34 at 34–36, 108). Referring to the devices as "gray market" machines, he said that they "are not legal in the state of Missouri." (Doc. 242-34 at 53). He also confirmed that Defendant Miltenberger is on a list of known suppliers of illegal gaming devices. (Doc. 242-34 at 110-111). The deputy explained, however, that the Commission had not taken any action against Torch because, as a non-licensed entity, "they don't fall under our purview." (Doc. 242-34 at 34).

In that same deposition, the Commission's gaming specialist, Cody Hanavan, confirmed that, with 75,000 to 100,000 outcomes per game, multiplied by each play level and game theme, the number of predetermined finite outcomes could be three million, and the player has no way of knowing where the game will land in the pool. (Doc. 242-34 at 116–17). In their field investigations, Commission representatives observed consumers playing Torch devices like slot machines without using the prize viewers. (Doc. 242-34 at 127–28).

---

[18]    *Torch Elecs., LLC v. Mo. Dep't of Pub. Safety*, Case No. 21AC-CC00044, 19th Judicial Circuit of Missouri (Cole County), *aff'd*, 694 S.W.3d 548, 556 (Mo. App. W.D. 2024), *transfer denied* (Sept. 3, 2024).

In October 2023, the Cole County circuit court dismissed all claims in that case, reasoning that Missouri's declaratory judgment act was not a proper vehicle for construing a state criminal statute (§ 572.010) without a constitutional question. In May 2024, the Missouri Court of Appeals affirmed, explaining, "Missouri courts do not provide equitable relief that interferes with the enforcement of criminal law absent a challenge to the law's constitutionality or validity." *Torch Elecs., LLC v. Mo. Dep't of Pub. Safety*, 694 S.W.3d 548, 556 (Mo. App. W.D. 2024), *transfer denied* (Sept. 3, 2024). The court thus did not opine on the legality of Torch devices.

In November 2019, TNT filed suit against Torch and Midwest Petroleum in Crawford County seeking a declaratory judgment that the defendants were operating illegal devices at a Midwest Travel Plaza.[19] The petition also claimed that Torch had interfered with TNT's business expectation by convincing Midwest to replace TNT games with Torch devices. That case was transferred to St. Louis County in March 2020 and apparently stalled there, perhaps due in part to the COVID-19 pandemic.[20] TNT voluntarily dismissed the case in March 2023 concurrent with its filing of the instant complaint in federal court.

However, in January 2020, TNT's owner, James Turntine, also filed a taxpayer derivative lawsuit in Crawford County against Torch, Midwest Petroleum, and the county itself, seeking a declaration that Torch and Midwest failed to pay (and the county failed to collect) taxes owed on revenues from Torch's illegal gambling and slot machine devices.[21] That case was transferred to

---

[19]    *TNT Amusements, Inc. v. Torch Elecs., LLC*, Case No. 19CF-CC00065, 42nd Judicial Circuit of Missouri (Crawford County), filed Nov. 26, 2019.

[20]    *TNT Amusements, Inc. v. Torch Elecs., LLC*, Case No. 20SL-CC03002, 21st Judicial Circuit of Missouri (St. Louis County), dismissed March 20, 2023.

[21]    *Turntine v. Torch Elecs., LLC*, Case No. 20CF-CC00007, 42nd Judicial Circuit of Missouri (Crawford County), filed Jan. 29, 2020.

St. Louis County in June 2020.[22] In September 2021, the court denied a motion to dismiss challenging Turntine's standing. From March to November 2023, the case was stayed pending resolution of the Cole County case. Since then, it has been continued repeatedly due to the pendency of this federal case, with the next status conference set for April 2025.

In March 2023, several individuals who lost money playing Torch devices sued Torch in federal court asserting claims under RICO and the Missouri Merchandising Practices Act, alleging that the devices are illegal, rigged, and poorly regulated. *Romano v. Torch Elecs., LLC*, No. 2:23-CV-04043-BCW, 2023 WL 9064602, at *1–3 (W.D. Mo. Aug. 21, 2023). Referring to the devices as slot machines, the court dismissed the RICO claim for lack of standing, reasoning that the proximate cause of the plaintiffs' injury was their own gambling. *Id*. at *4

In February 2024, the City of Springfield passed a municipal ordinance prohibiting the operation and use of entertainment devices offering monetary prizes.[23] Within days, the city issued citations to local convenience stores and confiscated several Torch devices. Torch swiftly filed a petition in Greene County challenging the validity of the ordinance and seeking declaratory and injunctive relief and then filed a second action for replevin in August 2024.[24] Torch dismissed the first case in February 2025, opting to litigate in administrative proceedings and municipal court. The second case remains pending.

---

[22]     *Turntine v. Torch Elecs., LLC.*, Case No. 20SL-CC03000, 21st Judicial Circuit of Missouri (St. Louis County), filed June 2, 2020

[23]     Springfield, Mo., Code of Ordinances, Ch. 78, Art. I, § 78-10 (2024).

[24]     *Torch Elecs., LLC v. City of Springfield*, Case No. 2431-CC00242, 31st Judicial Circuit of Missouri (Greene County), filed Feb. 2, 2024; *Torch Elecs., LLC v. City of Springfield*, Case No. 2431-CC01027 31st Judicial Circuit of Missouri (Greene County), filed Aug. 29, 2024.

**Procedural History**

TNT filed its federal complaint in March 2023 asserting claims of unfair competition under the Lanham Act (Count I); unfair competition under Missouri common law (Count II); and civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, related to conduct of a criminal enterprise under 18 U.S.C. § 1962(c) (Count III); use of proceeds of a criminal enterprise under RICO (Count IV); control of criminal enterprise under RICO (Count V); and conspiracy to commit those RICO violations (Count VI). TNT also seeks a declaratory judgment that Defendants' devices are slot machines and illegal gambling devices under § 572.010 (Count VII). TNT seeks monetary damages for its loss of business to Defendants and an injunction to stop Defendants' ongoing activities. In April 2023, TNT filed a motion for preliminary injunction. (Doc. 15). After a hearing on the motion and further briefing, in August 2023 the Court consolidated preliminary injunction proceedings with the trial on the merits as permitted by Rule 65(a)(2), Fed. R. Civ. P. (Doc. 38).

The parties filed their original motions for summary judgment in January 2024. (Doc. 81 and 83). However, due to numerous discovery disputes and some confusion regarding the data drives reviewed by the parties' expert witnesses, expert discovery extended into May 2024, yielding new information raised in the parties' *Daubert* motions. Consequently, after a status conference with counsel, the Court denied the parties' original summary judgment and *Daubert* motions as moot (Doc. 218) and issued a revised case management order, pursuant to which the parties filed renewed motions in August 2024. (Doc. 223). The Court has since resolved the *Daubert* motions (Doc. 310, 311) and now addresses the parties' respective motions for summary judgment and related pending matters.

TNT asks the Court to grant partial summary judgment in its favor, both as to Defendants' liability on Counts I-VI and as to the declaratory and injunctive relief requested in Count VII. TNT reserves for a jury the questions of damages and the disgorgement of Defendants' profits. Defendants seek summary judgment on the entirety of TNT's complaint, principally asserting that TNT has failed to create a triable issue on causation. Defendants argue that TNT's losses could be attributable to any number of market forces. Defendants also submit that their "no-chance" representation is a statement of opinion and not fact for purposes of Lanham Act liability. Hearings were held on July 11 and September 26, 2024.[25] The Court has reviewed the pleadings and extensive memoranda of law and exhibits submitted by the parties.

## LEGAL STANDARD

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the nonmoving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Davison v. City of Minneapolis*, 490 F.3d 648, 654 (8th Cir. 2007); Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.* "The basic inquiry is whether . . . it is so one-sided that one party must

---

[25]    TNT subpoenaed Kathy Biles, administrator of the Moose Lodge in Owensville, to testify at the hearing on September 26.  Torch objected and filed a motion for sanctions (Doc. 282) because TNT had not previously disclosed Biles as a potential witness. In response (Doc. 289), TNT explained that Biles had been disclosed as a customer in October 2023 but only became relevant as a witness in early 2024, after the close of discovery, when TNT learned that its devices had been replaced by Torch devices at that location. TNT also argued that it was entitled to update its evidence for purposes of the hearing and, further, Torch failed to meet and confer before filing its motion. The Court addressed this matter on the record and allowed Biles to testify, finding no prejudice to Torch. (Doc. 297 at 12). Torch's motion for sanctions will be denied.

prevail as a matter of law." *Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Once the moving party has met its burden, "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Id.*

To survive a motion for summary judgment, the "nonmoving party must 'substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy.'" *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003) (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)). "Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Found. v. Gaines,* 536 F.3d 813, 818 (8th Cir. 2008). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson,* 477 U.S. at 252; *see also Davidson & Assocs. v. Jung,* 422 F.3d 630, 638 (8th Cir. 2005).

## DISCUSSION

### Lanham Act (Count I)

The Lanham Act protects persons engaged in commerce against false advertising and unfair competition. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992) (citing 15 U.S.C. § 1127). The Act prohibits commercial advertising or promotion that misrepresents the nature, characteristics, or qualities of the advertiser's services or commercial activities. *Rhone–Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc*., 93 F.3d 511, 514

(8th Cir. 1996) (citing 15 U.S.C. § 1125(a)(1)(B)).

To establish a Lanham Act false advertising claim, a plaintiff must prove "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Buetow v. A.L.S. Enters., Inc.,* 650 F.3d 1178, 1182–83 (8th Cir. 2011) (quoting *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1180 (8th Cir. 1998)).

<u>Standing</u>

As a threshold matter, Defendants assert that TNT lacks standing to invoke the Court's jurisdiction to entertain its claims. Standing requires that (1) the plaintiff suffered an injury in fact, (2) there exists a causal relationship between the injury and the defendant's conduct, and (3) a favorable decision by the court will redress the alleged injury. *Missouri v. Trump*, 128 F.4th 979, 989 (8th Cir. 2025). "The plaintiff must have suffered . . . a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). In a Lanham Act context, a plaintiff must show economic injury, such as lost sales, flowing from the defendant's deceptive advertising. *Id*. at 125, 133. A classic Lanham Act false advertising claim exists when a competitor injures another by making false statements that induce customers to switch. *Id*. at 137. Diversion of sales is "the paradigmatic direct injury from false advertising." *Id.* at 138. "A plaintiff may establish an injury 'by creating

24

a chain of inferences showing how defendant's false advertising could harm plaintiff's business. . . . Evidence of direct competition is strong proof' of injury in fact." *Corizon, Inc. v. Wexford Health Sources, Inc*., No. 4:10 CV 2430 DDN, 2013 WL 3821268, at *4 (E.D. Mo. July 23, 2013) (quoting *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825–26 (9th Cir. 2011)).

With respect to the burden of proof, a plaintiff must support each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Thus, where the parties have taken discovery, the plaintiff cannot rest on mere allegations but must instead point to factual evidence. *Id*.

The parties agree that they are competitors in the amusement device industry. And there is no dispute that Torch represents to potential customers and consumers that its devices are legal. But Torch argues that TNT's alleged injuries (i.e., lost revenues) are speculative and have no causal connection to Torch.

To show actual injury, TNT offers the report of damages expert Robert Kneuper, who reviewed TNT's collections from locations where its devices were replaced by Torch devices and estimated that TNT lost $231,190 in lost revenues and $134,090 in lost profits between 2018 and 2022 at those locations. (Doc. 242-18 at 4). These figures logically did not include any lost opportunities with potential new customers, future lost profits, or a reduction in the value of TNT's business as a going concern. (*Id*.). Kneuper clarified that his role was limited to a preliminary estimate of historical lost profits, assuming TNT proves Torch's liability. (*Id*. at 3).

To show a causal connection, TNT offers its business records and the testimony of several witnesses. At a hearing on September 26, 2024, TNT's operations manager, Donna Havey, testified about the company's internal "move tickets" and related notes reflecting the displacement of TNT machines by Torch devices in several overlapping locations. (Doc. 242-

19). She confirmed that she had personally visited customer locations where TNT machines were replaced with Torch devices either immediately or within the next collection cycle. (Doc. 297 at 35–49). Many customers have asked her if TNT offers products similar to Torch games. (Doc. 297 at 35–36). TNT serviced 141 customer locations when Torch entered the market in 2017 and had lost 44 of those locations by 2023. (Doc. 297 at 52). The manager of a Moose Lodge, Kathy Biles, testified that a TNT Pac-Man was replaced by a Torch device at her location. (Doc. 297 at 18). Similarly, a manager of Midwest Petroleum, Tracy Head, stated in deposition that TNT games were displaced to make room for Torch devices at that location. (Doc. 226-6 at 19–22). TNT's owner, Jim Turntine, testified that the company had lost customers because they "just can't compete with the people that are operating the slot machines," which earn far more money than amusement devices. (Doc. 297 at 78). Referring to a spreadsheet of customers, Turntine gave the example of Slinger's in Hot Springs where TNT "lost everything … so they could put the slot machines in." (*Id*.).

Disputing the foregoing evidence, Torch points to witness testimony suggesting other explanations why customers removed TNT devices. For example, Turntine acknowledged on cross-examination that there could be other reasons. (Doc. 297 at 86). He conceded that one customer simply wanted newer equipment. (*Id*. at 78). Customer Biles stated that the Pac-Man at the Moose Lodge could have been moved to a different spot, but it was not making enough money. (*Id*. at 17–19). Similarly, customer Head stated that TNT's devices at Midwest Petroleum were not making enough money, and some were moved to another part of the store before being eliminated due to a change in ownership. (Doc. 226-6 at 19–23).

While Torch disclaims *any* responsibility for TNT's lost revenues, Torch simultaneously implies that it simply bests TNT in fair competition by providing a superior product. This ignores

TNT's central premise that Torch's competition is *unfair* because its *illegal* machines entice consumer dollars away from TNT's traditional games. TNT claims that it no longer generates enough revenue in overlapping locations precisely *because of* Torch's misrepresentations about the legality of its devices. Torch's factual dispute to the contrary is misplaced here. By attempting to litigate the evidence relevant to causation in a light most favorable to itself, Torch disregards the proper standard for summary judgment, let alone the threshold issue of standing.

The Court has reviewed Kneuper's expert report and related spreadsheets, TNT's move tickets and corresponding notes, and the witnesses' full testimony. TNT's revenue losses appear to be "fairly traceable" to Defendants' challenged conduct. *Lexmark*, 572 U.S. at 125. Taking the testimony and other evidence in context, as a whole, and in a light most favorable to TNT, the Court finds that TNT has readily established its standing here.

Merits

A plaintiff can prove that advertising is false by showing that it contains a statement that is "literally false" or a statement that, while literally true, implicitly conveys a false message, is misleading, or is likely to deceive consumers. *United Indus.*, 140 F.3d at 1180. The standard for proving literal falsity is rigorous. "[O]nly an *unambiguous* message can be literally false." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007). Lanham Act false advertising cases invariably involve claims asserted by "competitors of the wrongdoer" or by plaintiffs protecting other commercial interests. *See Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.,* 434 F.3d 1100, 1103–04 (8th Cir. 2006).

Missouri law defines a "contest of chance" to include any "gaming device in which the outcome depends in a material degree upon an element of chance." § 572.010(3). Until September 2022, Torch represented on its website that its machines were legal in Missouri

because the prize viewer option eliminates chance. (Doc. 245-17). Each Torch device is labeled with a lengthy disclaimer stating in part:

> [T]his amusement device is designed to offer no contest of chance as the outcome is known by players before any amusement game is initiated. Therefore, the activity offered by this device clearly does not meet the definition of "gambling." As a result, this amusement device does not fit any definition of "gambling device" in the state of Missouri and is not prohibited for use by you.

(Doc. 245-16). Additionally, Torch advertising materials state that "chance has absolutely no role in any possible outcome." (Doc. 245-19 at 2).

TNT centrally contends that Defendants' "no-chance" representations and assurances of legality of Torch devices are literally false statements of fact. Defendants counter that these representations are opinion statements not actionable under the Lanham Act.

Defendants rely on *Dial A Car, Inc. v. Transportation, Inc*., 82 F.3d 484 (D.C. Cir. 1996), where two taxicab companies made representations of their authority to provide corporate services in the District of Columbia using cars not licensed there. The parties disputed the interpretation of a Taxicab Commission administrative order on the subject, which had not been tested. *Id.* at 486. In response to the defendants' motion to dismiss, the plaintiff presented a declaration of the commission's general counsel opining that the order applied to the defendants. *Id.* The court refused to consider it and dismissed the complaint, reasoning that the commission had not yet resolved the question at the time of the defendants' statements. *Id.* The D.C. Circuit affirmed, holding, "there must be a clear and unambiguous statement *from the Taxicab Commission*" such that "the law was unambiguous *at the time [the] alleged misstatements were made*." *Id*. at 489.

Similarly, in *Coastal Abstract Service, Inc. v. First American Title Insurance. Co*., 173 F.3d 725 (9th Cir. 1999), the statement at issue involved whether an escrow agent was required to be licensed in California pursuant to a state statute. *Id*. at 731. At the time of the statement,

there was no clear authority on the question. The Ninth Circuit thus held that the statement was not actionable because the correct application of the statute was not knowable to the parties at the time. *Id.* at 732. The court instructed, "[a]bsent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." *Id.* at 731.

Though the Eighth Circuit has not directly opined on the issue, it has quoted *Coastal Abstract* for the general proposition that, to be actionable, the statement must be a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact" and not merely opinion. *Am. Italian Pasta Co. v. New World Pasta Co*., 371 F.3d 387, 391 (8th Cir. 2004) (quoting 173 F.3d at 731).

As relevant to the present case, the Court also finds instructive *ThermoLife International, LLC v. Gaspari Nutrition Inc.*, 648 Fed. Appx. 609 (9th Cir. 2016). There, the defendant advertised its products as "legal" and "DSHEA-compliant"[26] when the record contained numerous emails reflecting the defendant's knowledge to the contrary. *Id.* at 614–15.  The Ninth Circuit thus found a triable issue of falsity and reversed summary judgment. *Id.*

In this District, the Court has recognized a viable Lanham Act claim where a defendant represented that its product was compliant with EPA regulations when technically it was not. *Dental Recycling N. Am., Inc. v. Stoma Ventures, LLC*, No. 4:23 CV 670 CDP, 2023 WL 6389071, at *5 (E.D. Mo. Oct. 2, 2023). Citing *ThermoLife*, the Court reasoned, "an opinion by a speaker who lacks a good faith belief in the truth of the statement is actionable."  *Id*. (quoting 648 Fed. Appx. at 614–15).

---

[26]    DSHEA refers to the Dietary Supplement Health Education Act.

Applying the foregoing principles here, this Court finds the evidence sufficient to withstand summary judgment on TNT's claims of false advertising and unfair competition. The representations on Torch's website and devices are clearly intended to be "reasonably interpreted as a statement of objective fact" and not merely opinion. *Am. Italian Pasta*, 371 F.3d at 391. Again, § 572.010(3) requires only "***an*** element of chance." After some confusion and clarification from the parties' experts, it is now undisputed that Torch devices contain random entry points at each play level in each game theme, starting the sequences of up to 100,000 outcomes in each pool. According to the Gaming Commission's specialist, Cody Hanavan, there could be as many as three million potential outcomes.[27] (Doc. 242-34 at 116). This evidence reveals a material degree of chance such that a jury could find literally false Defendants' unambiguous representation that "chance has absolutely no role." Moreover, section 572.010(11) states that a slot machine is no less a slot machine when it delivers something of value on a basis *other than* chance – e.g., large sequential pools.[28]

Century-old Missouri precedent holds that a slot machine with a prize preview feature is still a slot machine. *Deskin*, 155 S.W. at 844–45. In attempt to discount this longstanding precedent last cited in 1982, Defendants argue that the state of Missouri has long since embraced gambling, so the Court should ignore this antiquated instruction. But the state of Missouri has

---

[27]    To wit, as the Court understands it, five game themes multiplied by six play levels in each theme equals 30 entry points. Thirty entry points multiplied by 100,000 sequential outcomes in each pool yields three million possibilities.

[28]    The Court fails to discern a meaningful difference between random shuffles and random-entry-point 100,000-outcome pools yielding three million possibilities. The Court can think of no rationale to assume that the Missouri General Assembly intended to regulate machines employing one technology but not the other. *See Thole v. Westfall*, 682 S.W.2d 33, 37 (Mo. App. E.D. 1984) ("In the slot machine games, the objects that appear on the screen are determined by the devices' electronic circuitry and the player has no control over which combination of objects will appear. Thus, from the player's point of view, winning is purely a matter of luck, a matter of chance.").

sanctioned gambling in the last half-century only as strictly regulated by the Missouri Gaming Commission and heavily taxed for the benefit of the public pursuant to Missouri law. Nothing in Missouri's statutory scheme abrogates *Deskin*, and appellate courts in other states have adopted a similar intolerance of prize preview features purporting to evade gambling regulations.[29] As recently as 2023, a federal court in Missouri characterized Torch devices as slot machines and a form of gambling, albeit in *dicta*. *Romano* 2023 WL 9064602, at *1–3.  Based on these authorities, along with the firm opinion of the Missouri Gaming Commission, a jury could find literally false Defendants' unambiguous representation that the prize viewer exempts Torch devices from the definition of a slot machine.

Additionally, "[i]n assessing whether an advertisement is literally false, a court must analyze the message conveyed within its full context." *United Indus.*, 140 F.3d at 1180. Here, the full context establishes Torch's actual knowledge that its legal assurances were false, or at least patently misleading. A police sergeant in Union advised Defendant Miltenberger in October 2018 that the Gaming Commission "has not changed their opinion on the status of your games" and the Franklin County prosecutor would "absolutely consider prosecution." (Doc. 245-29). Miltenberger was advised that any games operating in Union would result in prosecution of game and store owners for the promotion of gambling. (*Id*.). In April 2019, criminal charges were filed in Platte County against a convenience store owner operating Banilla "no chance" prize viewer devices. The defendant was convicted after a bench trial in September 2020. Other

---

[29]     *See e.g.*, *Mayle Bingo Co.*, 152 N.E.3d at 1242–43 (reasoning that a preview does not eliminate a hope for gain in subsequent turns); *Gator Coin II, Inc.*, 254 So. 3d at 1118 (reasoning that the previewed outcome is unpredictable to the user and the statute does not require each game to be analyzed in isolation); *Gracie Techs., Inc. v. Commonwealth*, No. 627 C.D. 2019, 2020 WL 1231395, at *2 (Pa. Commw. Ct. Mar. 13, 2020) (affirming the trial court's finding that machines using a prize viewer, with prizes pulled from a pre-determined, sequential, and finite pool of outcomes, were gambling devices).

criminal charges have been filed in Henry and Franklin Counties, the latter still pending. The Gaming Commission's advisory opinion of July 2019 provides unambiguous evidence of its regulatory position with respect to "no chance" prize viewer devices. In June 2023, Defendants were denied a business license in Branson (Taney County) based on the Gaming Commission's position that Torch devices are illegal. (Doc. 245-30). In February 2024, Torch devices were confiscated in Springfield. In July 2023, the Commission's Deputy Director testified in the Cole County case that the Commission continued to maintain the position that no-chance devices are illegal, as stated in the July 2019 opinion letter. (Doc. 242-34 at 36, 108). He said that Defendant Miltenberger is on a list of known suppliers of illegal gaming devices. (*Id.* at 110-111).

Unlike *Coastal Abstract* and *Dial A Car*, where no clear guidance existed at the time of the statements, Defendants have been well aware since 2018 that the Missouri Gaming Commission, state and local law enforcement,[30] numerous county prosecutors, and at least one state circuit court have deemed Torch devices illegal under Missouri law. After a bench trial in 2020, the presiding judge of Platte County found a store owner guilty of promoting gambling for operating Banilla "no-chance" gaming machines. Even absent appellate review, this is a "clear and unambiguous ruling from a court … of competent jurisdiction." *Coastal Abstract*, 173 F.3d at 731. The Gaming Commission's 2019 opinion is an equally clear declaration by the competent agency. *Id.* On this record, Defendants cannot credibly claim that their unambiguous representations of legality – asserted as unequivocal fact on the website and on each device – were mere lay opinions lacking the benefit of clarity from a court or agency. Defendants' efforts

---

[30]    The Missouri Court of Appeals has held that testimony by a qualified law enforcement officer constitutes sufficient evidence to support a finding that gaming devices are illegal gambling machines. *Veterans of Foreign Wars Post 6477 v. Missouri Gaming Comm'n*, 260 S.W.3d 388, 392 (Mo. App. W.D. 2008).

to obscure the issue do not make the Commission's position, law enforcement's warnings, or a state court judgment any less clear.

Even short of literal falsity, a jury could readily find that Defendants' assurances of legality convey a false message, are misleading, or are likely to deceive customers and consumers, especially given that law enforcement officials explicitly warned Defendants that their customers would be prosecuted for operating the devices. (Doc. 245-29). Torch was so acutely aware of this real risk that it offered to fund customers' legal defense. (Doc. 242-25 at 83–84). This belies good faith and at least creates a triable issue as to Defendants' knowledge.

In contrast to the facts in *Dial A Car* and *Coastal Abstract*, and consistent with the Ninth Circuit's opinion in *ThermoLife* and this District's ruling in *Dental Recycling*, the Court finds ample evidence in the record to create a jury question as to the false and/or misleading nature of Defendants' statements. *See ThermoLife*, 648 F. Appx. at 615 (identifying a triable issue of falsity where company emails contradicted defendant's representations that its products were "legal" and "DSHEA-compliant").

Likewise on the element of causation, as discussed above, the evidence in the summary judgment record is sufficient to give rise to a jury question as to whether TNT suffered a diversion of revenues due to Defendants' representations and their influence on customer leasing and consumer play. TNT's "move tickets" reflect displacements by Torch devices. (Doc. 242-19). TNT's manager testified that Torch devices replaced TNT machines in several locations, either immediately or within the next collection cycle. (Doc. 297 at 49). The manager of Midwest Petroleum conceded that the facility removed TNT machines because Torch devices were more profitable. (Doc. 226-6 at 19–20).

Given the present record and overall context, and viewing the evidence and reasonable inferences in a light favorable to TNT, the Court cannot say that Defendants are entitled to summary judgment on TNT's false advertising claim. Nor will the Court invade the province of the jury by granting TNT's motion as to Defendants' liability. Summary judgment is not proper when the evidence is such that a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. The parties' respective motions will be denied as to Count I.

### Unfair Competition under Missouri Common Law (Count II)

When a commercial plaintiff asserts pendent state law claims under the Lanham Act, the Eighth Circuit has noted that the pendent claims "are coextensive with the federal claims." *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 935 n.3 (8th Cir. 2003). "A claim for unfair competition under Missouri law uses the same elements as a claim under the Lanham Act, so courts faced with both claims discuss only the alleged violation of the Lanham Act." *Dental Recycling*, 2023 WL 6389071, at *3 (citing *Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 491 n.2 (8th Cir. 1998) ("Because the Missouri common law action utilizes the same elements as an action under the Lanham Act, we need discuss only the alleged Lanham Act violation.") (cleaned up)). For the reasons discussed above, the parties' motions will also be denied as to Count II.

### RICO (Counts III-VI)

Enacted to strengthen criminal and civil remedies against organized crime, the Racketeer Influenced and Corrupt Organizations Act (RICO) provides a private right of action for any person "injured in his business or property by reason of a violation of" the Act's substantive provisions. *Dahlgren v. First Nat'l Bank of Holdrege*, 533 F.3d 681, 689 (8th Cir. 2008) (citing 18 U.S.C. § 1964(c)). In pertinent part, "It shall be unlawful for any person employed by or

associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "Racketeering activity" includes gambling chargeable under state law and punishable by imprisonment for more than one year, as well as wire and mail fraud. 18 U.S.C. § 1961(1)(A)–(B).

Thus, to advance a civil RICO claim, a plaintiff must be able to prove that the defendant committed a crime, i.e., a predicate act. Civil liability under RICO does not hinge on a defendant's conviction for the predicate racketeering acts. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 493 (1985). However, RICO "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *H & Q Properties, Inc. v. Doll*, 793 F.3d 852, 855 (8th Cir. 2015). The Eighth Circuit has repeatedly rejected attempts to convert ordinary civil disputes into RICO cases. *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.,* 528 F.3d 1001, 1029 (8th Cir. 2008).

TNT asserts four claims against Defendants under RICO: conduct of a criminal enterprise (Count III); use of proceeds of a criminal enterprise (Count IV); control of criminal enterprise (Count V); and conspiracy to commit the foregoing (Count VI). The premise underlying each count is that Defendants' entire business promoting and operating Torch devices is illegal. In its complaint, TNT alleges that Defendants have engaged in racketeering in the form of wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), interstate travel in furtherance of unlawful activity (18 U.S.C. § 1952), and the operation of an illegal gambling business (18 U.S.C. § 1955). In their motion for summary judgment on these claims, Defendants argue *inter alia* that

the record lacks evidence of a predicate act or criminal intent. The Court agrees, and this defect is dispositive.

Mail and wire fraud require a showing of a plan or scheme to defraud and an intent to defraud. 18 U.S.C. §§ 1341, 1343; *H & Q Properties*, 793 F.3d at 856. "[T]he term 'scheme to defraud' connotes some degree of planning by the perpetrator, [and] it is essential that the evidence show [that] the defendant entertained an intent to defraud." *Id*. Both mail and wire fraud require "proof of intent to defraud, proof that the defendant willfully participated in a scheme with knowledge of its fraudulent nature[,] and the intent to achieve illicit objectives." *United States v. Hagen*, 917 F.3d 668, 672 (8th Cir. 2019).

Here, even if Defendants' commercial representations could be found false or misleading for purposes of Lanham Act liability, the Court finds the record devoid of evidence of criminal *mens rea*, i.e., that Defendants willfully schemed and intended to criminally defraud customers or consumers to achieve illicit objectives. RICO provides a private right of action for business injury resulting from criminally indictable fraud. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). But "RICO was not intended to apply to ordinary commercial fraud" even viewing Defendants' statements as such. *In re Crop Inputs Antitrust Litig.*, 749 F. Supp. 3d 992, 1015 (E.D. Mo. 2024) (quoting *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015)). Anticompetitive conduct may be unacceptable, but it is not fraud. *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 406 (9th Cir. 1991).

Likewise, § 1952 and § 1955 require evidence of a specific and willful intent to violate state law. *United States v. Stagman*, 446 F.2d 489 (6th Cir. 1971). Given Defendants' disregard for state authorities, this may appear to be a closer call, but it is not. Again, while Defendants' commercial representations are sufficiently contrary to regulatory reality to create a triable claim

Case: 4:23-cv-00330-JAR    Doc. #: 312    Filed: 03/28/25    Page: 37 of 42 PageID #:
23716

for false advertising, the evidence does not support the leap from Lanham to RICO permitting a jury finding of racketeering. RICO imposes a much higher standard.

For example, in *Stagman*, the defendant established a bingo operation in Kentucky after local officials told him it was legal, though it was not. *Id*. at 490. The district court refused to instruct the jury that attempted compliance with state law is a defense under the Travel Act (§ 1952). Noting that other circuits including the Eighth Circuit require specific intent as an element of the offense, the Sixth Circuit reversed, reasoning that the jury must find that the defendant "intended with bad purpose" to violate state law. *Id*. at 494.

Similarly, in *United States v. Bala*, 489 F.3d 334 (8th Cir. 2007), the owner of a betting operation was convicted for violating a North Dakota law requiring the disbursement of proceeds to charity, though the racing commission's rules provided no clear definitions or procedures on how and when to do so. The Eighth Circuit reversed because the government's evidence fell short of proving that the defendant never intended to comply. *Id*. 341. The court further reasoned that, in close cases, the rule of lenity must favor the defendant. *Id*.

Here, the evidence cannot support a jury finding of specific intent to violate state law rising to the level of RICO liability. Defendants obtained an opinion letter – albeit from an Illinois law firm – supporting their position that Torch devices are legal, and Defendants have managed to persuade at least some elected officials not to pursue prosecution or legislation against their interests. While these facts are not relevant to the false advertising analysis under *Coastal Abstract*, which examines the guidance of state regulatory and judicial authorities, this evidence of "plausible deniability" does effectively negate the element of specific criminal intent under RICO, thus defeating TNT's racketeering claims.

The Court will grant summary judgment for Defendants on Counts III-VI.

### Declaratory Relief (Count VII)

In Count VII, TNT asks the Court to declare as a matter of law that Torch devices are illegal gambling devices and slot machines. After careful consideration, the Court concludes that a federal declaratory judgment would offend principles of comity, particularly insofar as a declaration of state law is unnecessary to resolve TNT's federal claims here.

Federal courts have a "'virtually unflagging obligation' to decide cases that fall within their jurisdiction." *Wassef v. Tibben*, 68 F.4th 1083, 1086 (8th Cir. 2023) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Specific doctrines of abstention create exceptions to this general rule. Federal abstention doctrines are not jurisdictional. *Hunter v. Page Cnty.*, 102 F.4th 853, 874 n.12 (8th Cir. 2024). If parties do not raise them, federal courts have no duty to do so *sua sponte*. *Id.* But a court *may* raise the issue *sua sponte*, *Cincinnati Indem. Co. v. A & K Constr. Co.*, 542 F.3d 623, 625 (8th Cir. 2008), and the Court must do so here.

*Wilton/Brillhart* abstention refers to the district court's discretion to dismiss a declaratory judgment action. *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942). Under the Declaratory Judgment Act, a district court *may* declare the rights and other legal relations of any interested party seeking a declaration, but the court is under no compulsion to do so. 28 U.S.C. § 2201(a); *EMCASCO Ins. Co. v. Walker*, 108 F.4th 634, 636 (8th Cir. 2024). "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Lexington Ins. Co. v. Integrity Land Title Co.*, 721 F.3d 958, 967 (8th Cir. 2013) (quoting *Wilton*, 151 U.S. at 282). Where no parallel state action is

pending,[31] the district court's discretion is informed by a six-factor test: (1) whether declaratory judgment will clarify and settle the legal relations at issue; (2) whether declaratory judgment will resolve the uncertainty and controversy giving rise to the federal case; (3) the state's interest in having the issues decided in state courts; (4) whether the issues can more efficiently be resolved in state court; (5) whether the federal action would result in unnecessary entanglement between the federal and state court systems due to overlapping issues of fact or law; and (6) whether the declaratory judgment action is being used merely as a device for "procedural fencing" in a race for *res judicata*. *Id.* at 968 (citing *Scottsdale Ins. Co. v. Detco Indus., Inc.*, 426 F.3d 994, 998 (8th Cir. 2005). Considering the foregoing factors, while the Court acknowledges the parties' desire for a specific declaration as to the legality of Torch devices under Missouri law, such a declaration is unnecessary to resolve TNT's federal claims, and the Court firmly believes that any such holding should issue from a Missouri appellate court given the importance of the state interest at issue.

*Younger* abstention requires federal courts to refrain from interfering with pending state court criminal proceedings except under special circumstances such as a bad-faith prosecution or when a criminal statute is patently unconstitutional. *Wassef*, 68 F.4th at 1086–87 (citing *Younger v. Harris*, 401 U.S. 37, 41 (1971)). Again, while the Court understands TNT's frustration with the lack of progress in pending criminal cases, the Court must avoid influencing those proceedings with its own declaration of a Missouri criminal statute and instead defers to the state courts to interpret § 572.010 as applicable to the facts before them. "A private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Pratt v. Helms*,

---

[31]    Suits are parallel if "substantially the same parties are litigating in state court substantially the same issues" not governed by federal law. *Lexington Ins. Co.*, 721 F.3d at 968. While the parties here have been and still are involved in various state court lawsuits, TNT dismissed its parallel state case, and no others involve the same parties.

73 F.4th 592, 594 (8th Cir. 2023).

In earlier briefing (Doc. 211), TNT argued that the Court need not be constrained by principles of comity because Missouri appellate courts recognize federal courts' authority to interpret state gambling statutes, citing *People ex rel. Small v. Harrah's N. Kan. City Corp.*, 24 S.W.3d 60 (Mo. App. W.D. 2000). This Court is not convinced that *Small* invites a federal declaration here. That plaintiff filed his federal case first and only sought relief in state court a year later. *Id.* at 61. It was proper that he should exhaust his case in the federal system rather than be permitted to solicit a more favorable answer on a second bite in state court. *Id.* at 66 ("Under Missouri law, no action for declaratory judgment will lie where an adequate alternative remedy exists."). Here, by contrast, the statewide political and procedural history of the parties' dispute is entirely different and far more complex, and it originated and continues in various state offices and courts in Missouri.

Additionally, TNT cites numerous cases where federal courts have interpreted state gaming laws predicating RICO claims. (Doc. 211 at 4–5). But those cases involved simple applications of law to facts and basic statutory construction. *See e.g.*, *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1361 (11th Cir. 2004) (deeming phone charges a form of consideration to play a game of chance by phone);[32] *United States v. Atiyeh*, 402 F.3d 354, 370 (3d Cir. 2005) (construing the interplay of multiple subsections of a statute); *United States v. Tripp*, 782 F.2d 38, 43 (6th Cir. 1986) (where defendant argued that rigged poker games were not gambling but rather larceny by trick). These cases do not supply authority for this Court to insert itself into a

---

[32]     In *Kemp*, the underlying trial record reflects that the district court submitted to the jury as questions of fact whether AT&T's "Let's Make a Deal" game constituted illegal gambling as defined by Georgia law. *See Sikes et al. v. AT&T et al.*, Case No. 6:92-cv-00147-AAA-WLB, Doc. 370 and 372 (S.D. Ga.).

politically fraught state regulatory matter currently pending in multiple state trial courts, particularly when TNT's civil RICO claims are inviable.[33]

For the foregoing reasons, the Court declines to exercise its equitable jurisdiction with respect to Count VII and will dismiss that count.

## CONCLUSION

Defendants' unambiguous representations as to the legality of Torch devices are sufficiently contrary to existing state regulatory and judicial guidance and the evidence in the record to create triable issues of fact on TNT's claims of false advertising under the Lanham Act and Missouri common law. However, the evidence does not reflect the level of fraudulent intent required to advance TNT's RICO claims. And because a declaration of Missouri law is unnecessary to disposition, and in the interest of comity, Court declines to exercise its equitable jurisdiction with respect to Count VII.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for partial summary judgment is **DENIED**. (Doc. 237).

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment is **DENIED** as to Counts I and II and **GRANTED** as to Counts III through VI. (Doc. 224).

**IT IS FURTHER ORDERED** that Count VII of Plaintiff's complaint is **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendants' motion to strike Plaintiff's post-hearing

---

[33]     The Court has also considered abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), which "applies when a state has established a complex regulatory scheme supervised by state courts and serving important state interests, and when resolution of the case demands specialized knowledge and the application of complicated state laws." *Doe v. McCulloch*, 835 F.3d 785, 788 (8th Cir. 2016) (citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)).  Although Missouri's gaming regulations are complex as applied to licensed entities, the question presented in this case does not require specialized knowledge or the application of complicated state laws.

brief is **DENIED**. (Doc. 307).

      **IT IS FURTHER ORDERED** that Defendant's motion for sanctions is **DENIED**.

(Doc. 282).

      **IT IS FINALLY ORDERED** that the parties are directed to confer and submit within **14**

**days** a proposed schedule for further proceedings.

      Dated this 28th day of March, 2025.

                                  JOHN A. ROSS
                                    UNITED STATES DISTRICT JUDGE