# EXHIBIT 7

EXCERPTS FROM THE DECEMBER 15, 2023
DEPOSITION OF STEVEN MILTENBERGER

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF MISSOURI

3                    EASTERN DIVISION

4

5     TNT AMUSEMENTS, INC.,                  )

6                                            )

7        Plaintiff,                          )

8                                            ) Cause No.

9     vs.                                    ) 4:23-cv-330

10                                           ) JAR

11    TORCH ELECTRONICS, LLC, et al.,        )

12                                           )

13       Defendants.                         )

14

15         VIDEO DEPOSITION OF STEVEN MILTENBERGER

16            Taken on behalf of the Plaintiff

17                 December 15, 2023

18

19             Sheryl A. Pautler, RPR,

20          MO-CCR 871, IL-CSR 084-004585

21

22

23         (The proceedings began at 9:21 a.m.)

24

25

Page 55

1   three elements that -- that are involved;

2   consideration, chance and prize.  I would explain to

3   them that, you know, by removing one of those

4   elements, the game is -- is a -- by removing one of

5   those elements, the game complies with the law.

6           The game operates, you know, as far

7   as the operation is concerned, it has a prize viewer

8   feature that allows for the player to see the prize

9   before any money is put into the game, as well as

10  any play after, the player is able to see that next

11  play.

12          In addition to that, I would describe

13  the games as a -- also having a predetermined set of

14  events in a finite pool that would go through that

15  finite pool and that static script.  And then it

16  would repeat after that.  The script itself does not

17  shuffle.  There isn't a random number generator in

18  the machine.  And so when it is done with those --

19  that sequence of outcomes, it starts back over at

20  outcome number one.  That is how I describe the

21  games.

22      Q.   Would you ever receive questions from the

23  people that you were pitching as to whether the

24  machines were, in fact, legal devices?

25      A.   Would I receive questions from them during

Page 56

1   the pitch?

2        Q.   Yes.

3        A.   During while I'm talking to them, yes.

4   And then we would go through what I just described.

5        Q.   Okay.  So as I said before, I'm not asking

6   you to reveal a communication with any attorney.

7   But where did you get the understanding that you

8   just recited to me that you would have given to

9   the -- to the owners as to whether the machines did

10  or did not comply with Missouri law?  And, again, if

11  you can't answer the question without revealing a

12  communication with an attorney, then you can decline

13  to answer the question.

14       A.   I'll decline to answer that.

15       Q.   Okay.

16       A.   Yeah.

17       Q.   Okay.  We're going to divert from that

18  topic of conversation then for a moment to talk

19  about your wife, Sandra's role at Torch.  So could

20  you just describe what her job title is first?

21       A.   She does accounting work for the company.

22  So she pays invoices and reconciles bank statements.

23       Q.   And does she have a job title?

24       A.   I don't know that there's a job title.

25       Q.   Okay.  Does she have a person she reports

Page 66

1        Q.   And when you said design a game, that's

2   what I was trying to get back to.  So are you a game

3   designer?

4        A.   Am I a game designer, no.

5        Q.   So who did you work with to design the

6   games that ultimately became the devices that you

7   market and place in locations in Missouri?

8             MR. CRAIG:  Before you respond, I'll say

9        if it was a lawyer, keep in mind that you're

10       not to give any testimony that involves your

11       discussions with an attorney.

12            MR. FINNERAN:  Of course.

13            THE WITNESS:  Yeah.  I can't answer that.

14            MR. FINNERAN:  I'm sorry.  I actually

15       forgot what my question was.  I didn't think I

16       asked -- can you repeat my question, please.

17       Sorry.

18            THE COURT REPORTER:  Question:  So who did

19       you work with to design the games that

20       ultimately became the devices that you market

21       and place in locations in Missouri?

22       Q.   (By Mr. Finneran)  I understand.

23            So other than attorneys, was there

24   anybody else you worked with to design the games

25   that are today marketed and placed by Torch in

1  repeated after -- after we -- after the game went

2  through that script.  We also needed a game that the

3  player is able to see the prize before any money was

4  put into the game.  And at any time they're playing

5  the game, be able to see that next prize.

6      Q.   In your view, was each of the things you

7  just described a necessary modification or change to

8  the game?

9          MR. CRAIG:  Object to form, calls for a

10          legal conclusion.

11     Q.  (By Mr. Finneran)  Actually, let me restate

12  the question, because that's a fair -- a fair

13  objection.

14          I'm asking about your mindset at the

15  time.  In your mind at the time, would you have

16  required Banilla to produce a game that had all

17  those characteristics?

18     A.   Yes.

19     Q.   Okay.  You mentioned the idea of a finite

20  pool.  Can you tell me why you believe it was

21  important to have a finite pool?

22          MR. CRAIG:  Object to form.

23          Again, I mean if you have your own

24          independent understanding.  If it calls for

25          communications or advice of counsel, I instruct

1       you not to answer.

2             THE WITNESS:  I can't answer that.

3       Q.  (By Mr. Finneran)  So I'm not asking you to

4   reveal communication with your attorney.  All I'm

5   asking you to do is tell me if you had a reason or

6   what -- a reason that you believe that it was

7   important that a finite pool be involved, other than

8   some communication with your attorney.

9             So is there any other reason, other

10  than a communication with your attorney, that you

11  believe that a finite pool was an important

12  characteristic?

13      A.   No.  It was the communication with our

14  attorney.

15      Q.   Okay.  I don't want you to reveal that

16  communication.

17            Other than communications with your

18  attorneys, are there any reasons that you thought

19  that it was important to have the sequence repeated?

20      A.   Again, it's with our attorney.

21      Q.   Okay.  Other than communications with your

22  attorney, is there any reason that you thought it

23  was important that there be no shuffling of the

24  predetermined pool?

25            MR. CRAIG:  I'll just -- before you

1      respond, rather than saying it was our attorney

2      or something of the sort --

3            MR. FINNERAN:  Just say no.

4            MR. CRAIG:  -- just say no.

5            THE WITNESS:  okay.

6            MR. FINNERAN:  I agree.

7      A.   No.

8      Q.   (By Mr. Finneran)  Other than a

9  communication with your attorney, is there any

10  reason you believe it was important that the device

11  have a prize viewer?

12      A.   No.

13      Q.   Other than a communication with your

14  attorney, is there any reason you thought it was

15  important that there be no random number generator?

16      A.   No.

17      Q.   Okay.  Was -- was your communication with

18  Banilla and your setting up -- soliciting a design

19  of these games, was that your first experience with

20  so-called No Chance Games or had you had prior

21  experience with them?

22      A.   That was my first experience.

23      Q.   Were you aware prior to that, that No

24  Chance Games existed?

25      A.   No.

1    Q.   Where did you get the idea to creating a

2    no chance -- to ask Banilla to design a No Chance

3    Game you could market in Missouri, other than any

4    communication you might have had with a lawyer?

5         A.   Communication with our lawyer.

6         Q.   No, no.  Sorry.

7              MR. CRAIG:  Don't respond.

8              MR. FINNERAN:  Why don't you instruct him

9         on that so we don't keep doing it.

10             THE WITNESS:  But he asked it in a -- I'll

11        say no.

12             MR. CRAIG:  Yeah.  Say no.

13             MR. FINNERAN:  I'm sorry.  I probably

14        didn't phrase the question very well.  I'm

15        concerned that if you tell me it was a

16        communication with your lawyer, it could be

17        that I'm -- that you are then revealing the

18        communication to me, and I don't want you to do

19        that.  So the way that I -- if there is a

20        question like that that you can't answer, then

21        I would just simply say either no, as Aaron

22        suggested, or you can also say, I don't believe

23        I can answer your question without revealing

24        communication with an attorney.  Then I'll move

25        on or rephrase the question; is that fair?

1        whether you had other reasons that are not

2        protected by privileged.

3              MR. CRAIG:  I just -- I want -- we're not

4        waiving anything --

5              MR. FINNERAN:  Of course.

6              MR. CRAIG:  -- by the way that you're

7        forming your questions and his response

8        obviously.

9              MR. FINNERAN:  I totally understand,

10       Aaron.  Thank you.

11       Q.  (By Mr. Finneran)  Is there a reason you

12  didn't choose any kind of entertainment game, let's,

13  you know, just say for example, a racing game or a

14  PAC-MAN game; is there a reason you decided you

15  wanted to pursue No Chance Games instead, other than

16  some communication with an attorney?

17       A.   No.

18       Q.   Okay.  Do you agree with me that No Chance

19  Games tend to be more profitable than other kinds of

20  amusement games like a racing game or a PAC-MAN

21  game?

22             MR. CRAIG:  Object to form, calls for

23       speculation.

24             You can answer if you know.

25       A.   I'm not sure.  I don't know.

1  this decal is placed on every Torch device; is that

2  correct?

3      A.   It -- the de -- yes, that is correct.  The

4  decal is supposed to be placed on every Torch

5  device.

6      Q.   When is the decal placed on the device?

7  Is it placed on the device, for example, prior to it

8  being placed in a location, is it placed on the

9  device once it arrives to the location or do you

10 know?

11     A.   The majority of the time it's placed

12 before it arrives at the location.

13     Q.   Okay.

14     A.   The majority of the time.

15     Q.   Okay.  What is the reason that Torch

16 chooses to place these decals on each of its

17 devices?  And, again, please do not disclose any

18 communication with an attorney in your answer.

19     A.   That was an attorney --

20          MR. CRAIG:  No.

21          MR. FINNERAN:  No.

22          MR. CRAIG:  Just say no.

23          MR. FINNERAN:  Just say I cannot answer

24     the question.

25          THE WITNESS:  I cannot answer the

Page 125

1      question.

2           Q.   (By Mr. Finneran)   Thank you.

3                Do you know if there were any earlier

4    drafts of this document prepared?

5           A.   Again, no.

6           Q.   You can't -- no, you can't answer?

7           A.   Correct.

8           Q.   Thank you.

9                Do you recall any customers ever

10   raising questions with you about the contents of

11   this decal?

12          A.   I don't remember that.

13          Q.   Do you recall any players ever raising

14   questions with you about the contents of this decal?

15               MR. CRAIG:   Object to form.

16          Q.   (By Mr. Finneran)   Sorry.   When I say

17   player, just to define my term, I mean a person who

18   is actually playing one of the Torch devices.

19               MR. CRAIG:   Object to form still.

20               You can answer if you know.

21          A.   I don't remember.   I don't remember.

22               MR. FINNERAN:   I think that's probably a

23       good stopping point, Aaron.

24               MR. CRAIG:   Okay.   Great.

25               THE VIDEOGRAPHER:   We are off the record

Page 196

```
 1   produced to us by Torch so I can't probably give you
 2   too great of an explanation.  But my guess is that
 3   if you look at the top of the second page, Dan
 4   Lewicki sends this entire chain to Jason Smith.  It
 5   looks like his signature then got appended to the
 6   bottom.  But we can see that the bottom e-mail there
 7   is from Jason@Grovergaming.com.  But that's really
 8   not pertinent to my question.  Hopefully we can just
 9   focus on the text of the e-mail.  If you see the
10   bottom of Page 2.
11        A.   Okay.
12        Q.   Do you see where it says:  Steven
13   Miltenberger engaged with Nick Farley?
14        A.   Okay.  Yes.
15        Q.   It says:  Steven Miltenberger engaged with
16   Nick Farley and sent him a check for a retainer
17   already.  He is trying to expedise -- expedite this
18   process as fast as possible so he can obtain a
19   declaratory ruling for his market, and time is of
20   the essence since Steven has encountered a few
21   isolated scenarios with ABC, Lottery, etc. asking
22   further questions about NCG.
23             So first of all, is it true that you
24   engaged Nick Farley on behalf of Torch Electronics
25   in or around February of 2018?
```

Page 197

1          MR. CRAIG:  Object to form.

2      A.    Again, that's with our attorney.

3      Q.    (By Mr. Finneran)  Well, I'm not asking you

4  for communication with the attorney.  I'm simply

5  asking did you.  And if the answer is, no, I did

6  not.  But did you engage an attorney -- excuse me --

7  engage Nick Farley in and around February 2018?

8          MR. CRAIG:  Object to form.

9          If that's something you can't answer

10      without disclosing --

11          THE WITNESS:  I can't answer.

12      Q.    (By Mr. Finneran)  Okay.  It says you're

13  trying to expedite this process as fast as possible

14  so you can obtain a declaratory ruling.

15              Was there a point in 2018 where you

16  were seeking some declaratory ruling in Missouri

17  relating to the no chance devices?

18      A.    I can't answer that.

19      Q.    Okay.

20          MR. CRAIG:  Is it you can't answer that

21      because it would disclose attorney-client

22      privilege.

23          THE WITNESS:  That's right.

24      Q.    (By Mr. Finneran)  Okay.  All right.  I'd

25  like you to look down further in that document where

Page 222

1    number 24.

2                          (Whereupon the reporter marked

3                          Exhibit 24 for identification.)

4            THE WITNESS:  Thank you.

5        Q.  (By Mr. Finneran)  I have just handed you

6    the decision of the Supreme Court of McMahon in Gift

7    Surplus, LLC versus State of North Carolina, dated

8    February 11, 2022.  Before my handing this decision

9    to you, do you have any recollection of learning of

10   this decision?

11       A.   No.

12       Q.   Okay.  We can move forward.

13                    So the reason I asked you to look at

14   all of those documents is because I was interested

15   to know whether you ever looked to other states

16   decisional law to help you inform your view as to

17   whether or not the Torch devices are legal -- legal

18   under Missouri law.  And so again, if you can answer

19   this question without disclosing a communication

20   with your attorneys, have you ever looked to the

21   decisional law of any other state to help inform

22   your personal view as to whether or not the Torch

23   devices comply with the law of Missouri?

24                    MR. CRAIG:  Object to form.

25       Q.   (By Mr. Finneran)  Again, if you can't

Page 223

1    answer without having to refer to a communication

2    with your attorney, say I cannot answer your

3    question without having to disclose communication

4    with an attorney.

5         A.    I cannot answer your question.

6         Q.    Okay.  Are you aware that prior, in fact,

7    to the current lawsuit being initiated, that there

8    was a class action lawsuit initiated against Torch

9    in the Western District of Missouri called Ramano

10   against Torch Electronics?

11        A.    Can you say it again?

12        Q.    I'm just asking if you were aware of a

13   lawsuit brought against Torch Electronics earlier

14   this year in the Western District of Missouri called

15   Ramano versus Torch Electronics?

16        A.    Yes.

17        Q.    Okay.  Do you recall whether you ever

18   reviewed the complaint in that case?

19        A.    That would be -- I can't answer that.

20        Q.    Okay.  Do you recall seeing photographs of

21   children playing electronic gaming devices in that

22   complaint?

23        A.    I do.

24             MR. FINNERAN:  Okay.  I'm going to show

25        you a copy of what I'll mark as STM 25.  And

Page 232

1          A.    Say it again.

2          Q.    Does Torch take any steps to prevent

3    people with gambling addiction issues from playing

4    Torch devices?

5          A.    No.

6          Q.    Does Torch take any steps to prevent

7    people who identify themselves as problem gamblers

8    from playing Torch devices?

9          A.    No.

10          Q.    Does Torch believe that gambling addicts

11    play Torch devices?

12              MR. CRAIG:  Object to form, speculation.

13          A.    I don't know that.

14          Q.  (By Mr. Finneran)  Are you aware of problem

15    gamblers playing Torch devices?

16              MR. CRAIG:  Object to form, speculation.

17          A.    I don't know that.

18          Q.  (By Mr. Finneran)  Okay.  Can you tell me

19    the reasons that you believe, as you just said, that

20    Torch devices are not gambling devices?

21              MR. CRAIG:  Objection.

22              I'll say it's got to be your own

23          independent analysis.  If it comes from an

24          attorney, do not give a response based on an

25          attorney's information or your understanding of

Page 233

1       that information.

2           THE WITNESS:  Yeah, I can't answer that.

3       Q.  (By Mr. Finneran)  Okay.  Fair enough.

4               Just for the record, I'm going to ask

5   a series of questions that I expect you'll have the

6   same answer to, but I just need to get them on the

7   record.

8           MR. CRAIG:  Can I have a running

9       objection?

10          MR. FINNERAN:  Yes, you can have a running

11      objection if you'd like.

12          MR. CRAIG:  Same objection.

13          MR. FINNERAN:  And same instruction as

14      well.  So in other words, don't answer the

15      question if you can't answer it without

16      revealing communication with an attorney.

17          MR. CRAIG:  Yeah, I might just actually --

18          MR. FINNERAN:  Do one by one?

19          MR. CRAIG:  Yeah, to be safe.

20          MR. FINNERAN:  And you can repeat same or

21      whatever you want to do.

22          MR. CRAIG:  Okay.

23      Q.  (By Mr. Finneran)  All right.  Can you tell

24  me the reasons that you believe that the Torch

25  devices are not -- do not offer a contest of chance?

Page 234

1           MR. CRAIG:  Objection to the extent that

2      your answer would call upon any information

3      that you learned by an attorney or opinions

4      you've formed because of an attorney's input.

5      Q.   (By Mr. Finneran)  Same answer?

6      A.   Yes.

7      Q.   You can just say same answer each time.

8      A.   Same answer.

9      Q.   Can you tell me why you believe Torch

10 devices do not involve a future contingent event

11 outside the control of the player?

12           MR. CRAIG:  Same as my prior objection.

13      A.   Same answer.

14      Q.   (By Mr. Finneran)  Do you -- can you tell

15 me why you believe that the Torch devices are not

16 used or useable in any phase of a gambling activity?

17           MR. CRAIG:  Same as my prior objection.

18      A.   Same answer.

19      Q.   (By Mr. Finneran)  Can you tell me why you

20 believe that Torch devices are not slot machines?

21           MR. CRAIG:  Same as my prior objection.

22      A.   Same answer.

23      Q.   (By Mr. Finneran)  Can you tell me why you

24 believe that Torch devices cannot be modified to

25 function as slot machines?

Page 235

1          MR. CRAIG:  Same as my prior objection.

2      A.    Same answer.

3          MR. FINNERAN:  Okay.  Thank you.  We've

4      been going for -- do you need a break?  Sorry.

5      I just saw you check your watch.  I actually

6      have no sense of how long we've been going.

7          MR. CRAIG:  Me neither.

8          MR. FINNERAN:  Do we know how long it's

9      been?  I don't want to...

10          THE VIDEOGRAPHER:  We've been going about

11      an hour and six minutes since our last break.

12          MR. FINNERAN:  Okay.  I'm happy to keep

13      going unless you'd like a break.

14          THE WITNESS:  Sure.

15          MR. CRAIG:  Do you want a break?

16          THE WITNESS:  I don't.

17          MR. CRAIG:  Do you want to go another 15,

18      20, 30 minutes?

19          THE WITNESS:  Yeah, 20 minutes is...

20          MR. FINNERAN:  Sounds good.  We'll keep

21      going.  Can you get me the letters on these

22      decisions?  Okay.  We did that already.

23      Q.  (By Mr. Finneran)  Are you familiar with

24    the phrase "gray machines" or "gray gaming"?

25      A.    I've heard that, yes.

Page 277

1    Missouri Revised Statutes, Section 572.010.  It is
2    definitions relating to gambling.
3                    First, are you familiar with this
4    section of Missouri's statutes?
5             MR. CRAIG:  Object to form, ambiguous,
6         familiar.
7         A.   I've seen it.
8         Q.   (By Mr. Finneran)  Okay.  I'm going to ask
9    you a general question to hopefully short circuit
10   some of this.  Do you have an understanding of the
11   meaning of any section of this that does not depend
12   upon some communication you've had with an attorney;
13   in other words, do you have any independent
14   understanding of what any of the terms in this
15   statute means?
16        A.   No.
17        Q.   Is it fair to say that if I were to ask
18   you to go through this statute with me and discuss
19   whether or not the Torch devices meet or don't meet
20   any of the various definitions in this section, that
21   you would answer that question by telling me that
22   you cannot do so without having to reveal
23   communication with an attorney?
24        A.   That's correct.
25        Q.   Okay.  Then we will move on.

1    I'm not asking you to reveal a communication with

2    your attorney.  I'm asking you to tell me what your

3    belief is about the legality of the device.  So my

4    question is, do you believe that the device, if it

5    did not have a prize viewer, would be legal or not

6    in the State of Missouri?

7            MR. CRAIG:  Calls for a legal conclusion.

8        And just to clarify, he didn't -- didn't invoke

9        an attorney privilege on that last answer.  He

10       just said he couldn't answer it.

11           MR. FINNERAN:  Oh, I misunderstood.  I

12       will -- I will make sure I understand your

13       answer this time.  So please answer my

14       question.

15           MR. CRAIG:  Same objection, calls for a

16       legal conclusion.

17           THE WITNESS:  Yeah, I can't answer.

18       Q.  (By Mr. Finneran)  Is the reason you can't

19   answer because it would require you to disclose a

20   communication with an attorney or do you have some

21   other reason you can't answer?

22       A.   Requires disclosure of communication with

23   an attorney.

24       Q.   Okay.  I don't want you to reveal

25   communication with an attorney, but I just need to

Page 309

1  understand.  When you first reached out to Banilla
2  to set up the design of these games, had you prior
3  to that time consulted with an attorney as to what
4  the requirements of Missouri law was?
5       A.   Yes.
6       Q.   Okay.  That's going to make that hard too.
7  And I -- I appreciate it if you give me the same
8  answer, but I still have to ask the question.  So I
9  hope you understand.
10            In your view in the Torch devices,
11  instead of having a predetermined sequence of
12  outcomes, instead employed a random number
13  generator, would that make them illegal gambling
14  devices under Missouri law?
15       MR. CRAIG:  Object, calls for a legal
16    conclusion and expert testimony.
17       THE WITNESS:  I can't answer.
18       Q.   (By Mr. Finneran)  Is the reason you can't
19  answer because to do so, you believe would require
20  you to disclose communication with an attorney?
21       A.   That's correct.
22       Q.   Okay.  Let me just ask you then about how
23  the prize viewer is set up in the Torch devices.  So
24  is there an operator setting that allows the
25  operator of the machine to choose how many prizes

Page 318

1    presses the prize viewer.  The player does, does he

2    not, have the option to cash out without hitting the

3    play button?

4         A.   The player has the option to cash out.

5    The player also has the option to go to a different

6    game and a different play amount and look at that

7    option.  You can really look at all of the play

8    amounts for all of the games and then make a

9    decision.

10        Q.   Okay.  Given the fact that the machines,

11   the Torch machines as you've described them to me,

12   do not inform the player of any outcome other than

13   the immediately next outcome or where that outcome

14   appears in the list of predetermined outcomes, do

15   you not agree that that means that the game involves

16   an element of chance?

17             MR. CRAIG:  Object to form, calls for a

18        legal conclusion and a legal opinion.

19             THE WITNESS:  Yeah, I can't answer that.

20        Q.   (By Mr. Finneran)  Okay.  Is it possible to

21   play the Torch device without accessing the prize

22   viewer feature?

23        A.   Yes.

24        Q.   Is a -- in your view, is a player who uses

25   the Torch device without accessing the prize viewer

Page 319

1    feature, is that player using the device in -- in --
2    excuse me -- in an illegal manner?
3            MR. CRAIG:  Object to form, calls for a
4        legal conclusion and expert testimony.
5            THE WITNESS:  Yeah, I can't answer that.
6        Q.  (By Mr. Finneran)  Why can you not answer
7    it?
8        A.    Ask the question again.
9        Q.    I'm asking you if a player who does not
10   use the prize viewer while playing the Torch device,
11   is that player operating the device in an illegal
12   manner?
13           MR. CRAIG:  Calls for a legal conclusion.
14       Object to form, calls for a legal conclusion,
15       legal opinion and expert testimony.
16           THE WITNESS:  Yeah, I can't answer that.
17       Q.  (By Mr. Finneran)  And what is the reason
18   you can't answer?
19       A.    Discussion with our counsel.
20           MR. CRAIG:  I mean, do you know
21       independently?  Do you have your own
22       independent -- aside from any discussions with
23       counsel, have you looked and analyzed the law,
24       went to law school such that you feel like
25       you're an expert to give legal opinions?

Page 320

1        THE WITNESS:  I have not.

2        MR. CRAIG:  Okay.  I think that helps you.

3        Q.  (By Mr. Finneran)  Fair enough.  And I'm

4   not seeking a legal opinion from you on the topic.

5        MR. CRAIG:  But you are.  That's literally

6        what you're asking him.

7        Q.  (By Mr. Finneran)  I'm asking you for your

8   understanding of whether or not a play -- well, fair

9   enough.  I did ask about it being illegal.

10            In your view, is a player who uses

11   the Torch device without accessioning the prize

12   viewer, is that player playing a game of chance?

13        MR. CRAIG:  Same objection, form, calls

14        for a legal conclusion, calls for an expert

15        opinion, ambiguous as to what "chance" means.

16        Q.  (By Mr. Finneran)  You may answer.

17        A.  I can't answer that.

18        Q.  And is the reason -- what is the reason

19   you can't answer?

20        A.  Discussions with our attorney.

21        Q.  Okay.  We do agree it's possible for a

22   player -- the Torch device does not have a mandatory

23   prize viewer feature; is that correct?

24        A.  That's correct.  It's not mandatory.

25        Q.  Is there a reason that you did not ask for

Page 324

1          CERTIFICATE OF REPORTER

2          I, Sheryl A. Pautler, RPR, Certified Court

3    Reporter (MO), Certified Shorthand Reporter

4    (IL), do hereby certify that the witness whose

5    testimony appears in the foregoing deposition

6    was duly sworn by me; the testimony of said

7    witness was taken by me to the best of my

8    ability and thereafter reduced to typewriting

9    under my direction; that I am neither counsel

10   for, related to, nor employed by any of the

11   parties to the action in which this deposition

12   was taken, and further that I am not a relative

13   or employee of any attorney or counsel employed

14   by the parties thereto, nor financially or

15   otherwise interested in the outcome of the

16   action.

17

18

19

20        Registered Professional Reporter

21         Certified Court Reporter (MO)

22     Certified Shorthand Reporter (IL)

23

24

25