IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TNT AMUSEMENTS, INC., d/b/a PLAY-MOR COIN-OP, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 4:23-cv-00330-JAR |
| TORCH ELECTRONICS, LLC, *et al.*, | ) ) ) |
| Defendants. | ) |

**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF PLAINTIFF'S CASE**

Pursuant to Federal Rule of Civil Procedure 50, Defendants move for judgment as a matter of law against Plaintiff TNT.

TNT's remaining claims in this case are for false advertising. TNT's false advertising claims require proof of false or misleading statements in commercial advertisement or promotion that (a) were deceptive—meaning, some substantial set of purchasers were led to believe a false fact based on the statement and (b) were material—meaning, those purchasers were induced to spend their money on Torch's games (whether by placing them or playing them) based on that false fact. TNT further had the burden to prove that a *specific* commercial advertisement that TNT alleges is false or misleading (c) proximately caused commercial harm to TNT. As the Supreme Court has emphasized, TNT "cannot obtain relief without *evidence* of injury proximately caused by . . . [the] alleged misrepresentations." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014) (emphasis in original). As the Supreme Court explained in *Anza v. Ideal Steel Supply Corporation*, 547 U.S. 451, 458-59 (1991) (and was directly quoted in *Lexmark*), where the alleged harm might instead have resulted from "any number of [other] reason" beyond

1

the specific allegedly literally false or misleading commercial advertising statements, proximate case fails. *See also Lexmark*, 572 U.S. at 140 (citing and quoting *Anza*, 547 U.S. at 458-59).

Here, TNT's corporate representative, Mr. Turntine, took the stand and admitted that the are an "infinite" number of reasons that a retail location owner might choose to remove a TNT device from a location. TNT's damages expert, Dr. Knueper repeatedly admitted that TNT failed to ask him to perform any type of causation analysis and, instead, he was instructed to simply assume proximate causation. Dr. Knueper admitted that numerous devices TNT instructed him to include in his damages calculations were not making more than 50 cents per day (multiple TNT devise were not making more than 14 cents per day in gross revenue). Mr. Turntine was forced to admit that location owners' decisions regarding whether to keep or remove a TNT device are nearly always driven simply by profit motives (i.e., what product or service would make me [the location owner] the most money if I sat product A or product B in this particular spot). Without tying any location owner's decision to remove any specific TNT device to a specific commercial advertising statement Torch allegedly made and *proving* that statement was (a) literally false or misleading and (b) was the reason the location owner actually decided to remove a TNT device and replace it with a Torch device, there is no proximate causation . . . there is only free market capitalism at play.

If the Court were to allow TNT's claims to survive under a theory that TNT had introduced circumstantial evidence that (a) TNT had a device at a specific retail location, (b) the owner of that retail location subsequently asked TNT to remove that TNT device, (c) the owner of that retail location thereafter decided to place a Torch device in the spot where TNT's device once stood, and (d) that retail location owner's decision to remove TNT's device and place the Torch device was driven simply by the location owner's belief that Torch's devices would be more profitable

2

than TNT's device . . . then TNT could similarly successfully sue Frito-Lay® if a location owner decided to replace a TNT device with a Frito-Lay®'s potato chips stand because the location owner believed the potato chip stand might generate more profit than TNT's device. That result would end free market competition. That hypothetical scenario presents nothing more than fair, non-tortious competition. To sue Frito-Lay®'s *and succeed* on Lanham Act claim in the aforementioned hypothetical, TNT would have to *prove* Frito-Lay® made an actionable false or misleading statement of fact that was the "but for" cause of the location owner's decision to remove TNT's device.

Here, the Court and the jury are left to speculate about why any given retail location owner mentioned during trial actually decided to ask TNT to remove a TNT device or place a Torch device. Maybe it was, as Mr. Turntine said, simply driven by a profit motive (not tortious). Maybe it was because the location owner simply wanted to try something new (not tortious). At the conclusion of TNT's case-in-chief, the one thing the Court, the jury, and the parties can all be certain of is that, for whatever reason, TNT chose not to put a single location owner on the stand to tell the jury *why* he or she actually made such decisions. *Nothing* prevented TNT in this case from making that happen. The identity of the owners of the locations in dispute is not a secret— they are all current or former locations were TNT conducted its business. During discovery, TNT chose only to depose one *manager* of a retail location (Tracy Head). That deposition went so poorly for TNT that TNT decided not to play any of that witness's deposition by designations despite the parties agreeing that Mr. Head was an unavailable witness. Regardless, the jury can never do anything more now than *speculate* about why a given location owner made a decision to remove any TNT device or install any Torch device. Was it some specific Torch commercial advertising statement TNT alleges is false or misleading? If so, which statement was it? When was it made?

3

Who actually even *read* those statements . . . let alone relied on them? *None* of those questions can be answered based on the evidence TNT presented in its case in chief. In fact, at this point—after the close of Plaintiff's case—Defendants still have no idea what specific commercial advertising statements the jury will be asked to analyze.

TNT's case fails for lack of proof. TNT's burden of proof required it to establish that an advertising statement itself, rather than the introduction of a product or service, changed the market landscape and caused harm to TNT. There is no evidence of that. The Court should render judgment against TNT.

## I.   Legal Standard

Judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have legally sufficient evidentiary basis to find for the party on that issue[.]" Fed. R. Civ. P. 50(a). "A motion for judgment as a matter of law presents a legal question to the district court and this court on review: whether there is sufficient evidence to support a jury verdict." *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 830 (8th Cir. 1996) (citation modified). Although the nonmoving party is given "the benefit of all reasonable inferences," the Court "may not accord a party the benefit of unreasonable inferences or those at war with the undisputed facts." *Id*. (citation modified). "A reasonable inference is one 'which may be drawn from the evidence without resort to speculation.'" *Id*. "When the record contains no proof beyond speculation to support the verdict, judgment as a matter of law is appropriate." *Id*.

## II.  Elements of a False Advertising Claim

A false advertising claim requires the plaintiff to prove: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the

4

deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1182 (8th Cir. 2011).

To prove a "literally false" claim, TNT must identify a statement that satisfies the "rigorous" requirements identified by the Eighth Circuit. *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011). Most critically, the statement must convey the same thing to anyone that reads it. *See id*. It must be "patently false" – false on its face, not after pondering what the statement might entail. *Id*. And, as with any Lanham Act false advertising claim in the Eighth Circuit, it must be *empirically* false. There has to be something by which it is made true or false that does not rely on the jury's subjective evaluation. In *American Italian Pasta Co. v. New World Pasta Co*., the Eighth Circuit explained—using an "i.e."—that "reasonably interpreted as being a factual claim" means "***i.e., one capable of verification***." 371 F.3d 387, 391 (8th Cir. 2004). The Eighth Circuit went on to explain the converse: a claim that is neither "specific and measurable," nor capable of being "reasonably interpreted ***as providing a benchmark by which the veracity of the statement can be ascertained***," is unactionable and is not a statement of fact. *Id.* (emphasis added).

For any statement that TNT identifies that does not satisfy these "rigorous" requirements, TNT must prove that the statement actually misled a substantial segment of the relevant consuming population. "Where advertising is not literally false, the plaintiffs bear the ultimate burden of proving actual deception by using reliable consumer or market research." *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1043 (8th Cir. 1999). *See also Fair Isaac Corp. v.*

5

*Experian Info. Sols., Inc.*, 650 F.3d 1139, 1151–52 (8th Cir. 2011) ("A claim that a statement is implicitly false requires proof that the statement is deceptive or misleading, and the success of such a claim usually turns on the persuasiveness of a consumer survey.").

And, further, to present a triable Lanham Act noncomparative false advertising case, TNT needs to identify "at least one challenged statement of fact that satisfies all five Lanham Act [elements] . . . a Lanham Act claimant may not mix and match statements, with some satisfying one Lanham Act element and some satisfying others." *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 299 (4th Cir. 2017).

### III. There is No Evidence that Torch's Advertisements Were Deceptive or Material to Even One Relevant Person or Entity

That any advertising statement deceived retail location owners or players must be **affirmatively proven**. *See Everest Capital Ltd. v. Everest Funds Mgt., L.L.C.*, 393 F.3d 755, 764 (8th Cir. 2005) ("We reject as contrary to law Everest Capital's further contention that the district court abused its discretion by refusing to instruct the jury that a 'literally false' statement is presumed to be likely to deceive."). There has not been any testimony or other evidence, circumstantial or otherwise, indicating whether any consumers or location owners read (a) the decal, (b) the 2022 website, or (c) the NCG flyer.[1] Presumably, some did. We can say that the expert witnesses and parties read them. But as for any other readers: were they at the shared

---

[1] There was an email in 2019, which appears to reflect that the flyer was sent to "Jeff Wood" and "Mike Fletcher" (Ex. 311). There was no evidence presented regarding who these people are, whether they were TNT customers, whether they read the flyer, what part of the flyer they thought was pertinent, what they thought it meant, whether they made a purchasing decision based on any of the language, or whether those decisions harmed TNT. There was also evidence introduced about a separate presentation (that Torch had no notice TNT thought was a "false advertisement" until day three of trial) with Wallis Oil Company, though the testimony was that this did not lead to a deal (and that Wallis Oil, who does not appear to have been a TNT customer, only became a Torch customer several years later). While it appears this presentation was at least read, it cannot support a Lanham Act claim, or any legal claim by TNT that Article III could allow for that matter.

6

locations? Did they read the parts that TNT has highlighted as being at issue? Did they understand them to mean what TNT has insinuated they do mean?

Similarly, TNT must prove to the jury that not only were relevant consumers (location owners and players) deceived as TNT alleges they were, but that *that* deception is what drove purchasing decisions. *See Select Comfort Corp. v. Baxter*, 996 F.3d 925, 939 (8th Cir. 2021). Considering there is zero evidence beyond pure speculation what any relevant consumer did as a result of reading statements (that we do not know what any consumer actually read), TNT has failed to satisfy this element. No reasonable jury could find otherwise.

This is not a fraud or negligent misrepresentation case. This is a false advertising case. The case here does not turn on whether there is some group to which Torch made statements about legality, it turns on the much more concrete issues about who read specific advertising statements and how they understood and reacted to them (and how that impacted TNT). This question remains completely unanswered by TNT's case-in-chief. There is no admitted evidence that anyone read the decal. We can assume many people have seen it, considering it is on Torch's games all over Missouri. But how many people sit and read a small legal disclaimer before deciding whether to play a shiny flashy game? And how many location owners read the decal before deciding whether to do business with Torch? There are speculative reasons to assume the answer to both questions is very low. But that does not matter. There is no evidence one way or the other.

Without knowing who read the message, there is no way of knowing how they understood it. There is no way of knowing whether they thought any given statement was material. And it would be improper to fill in these complete gaps with speculation in an effort to satisfy TNT's burden. No reasonable jury could find in favor of TNT on these elements.

### IV. TNT Does Not and Cannot Distinguish Between Damages "Caused" by Torch Existing and a Single Cent of Damage Caused by Advertising Statements

Similarly, TNT presented no evidence that TNT suffered any damages caused by any statement made by Defendants. As Dr. Kneuper testified, his analysis presumed causation, and it presumed causation from Torch's *machines*, not Torch's statements. Donna Havey testified that she saw some Torch auditors collect money from Torch machines near in time to when TNT was asked to remove its games, with the suggested inference being that competition with Torch drove away TNT devices. Jim Turntine offered similar opinion evidence, though on an even less direct foundation (Turntine testified, for instance, that he has never been back to see what replaced the machines he removed from Midwest Petroleum, and otherwise disclaimed knowledge of what replaced them, which is hard to square with suing Torch for replacing those devices). Mr. Turntine also admitted there are an "infinite" number of reasons a location owner might choose to remove a TNT device . . . yet TNT chose not to put a *single* location owner on the stand to explain *any* of those reasons. And, obviously, TNT failed to put any consumer who allegedly chose to put a single dollar in a Torch device to explain his or her reason for deciding to do so. No evidence TNT introduced during its case-in-chief answered the causation question at hand: did any one of Torch's at-issue statements (that also independently satisfied every other false advertising element) cause a cent of harm to TNT? No one can answer that question based on the evidence TNT presented without engaging in sheer speculation.

The Supreme Court has emphasized that a false advertising plaintiff "cannot obtain relief without *evidence* of injury proximately caused by . . . [the] alleged misrepresentations." *Lexmark*, 572 U.S. at 140 (emphasis in original). Lacking any such evidence, TNT's claims fail here, too, and no reasonable jury could find otherwise.

8

V. **Independently, TNT Has Failed to Support Any Damages with Evidence Beyond Speculation and, Accordingly, Defendants Are Entitled to Judgment on TNT's Request for Damages**

TNT presented no evidence establishing its damages beyond pure speculation. TNT introduced expert testimony from Dr. Kneuper, but Dr. Kneuper, as he repeatedly admitted, assumed causation and presented a model based crudely on the concept that any TNT device removed was removed because of Torch's conduct. Lacking any non-speculative evidence of that, there was no evidence presented that could provide legally sufficient support for an award of any damages. Accordingly, Defendants respectfully request the Court strike TNT's claim for damages and enter judgment as a matter of law on this basis.

VI. **TNT's Own Testimony Demonstrates that Laches Bars Its Claims**

If a Lanham Act claim is brought outside the statute of limitations borrowed from the most analogous limitation period under state law, the elements of laches are presumptively satisfied. In other words, both prejudice to Torch and unreasonable delay by TNT are presumed. *See Jarrow Formulas, Inc. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002) (in Lanham Act claims, "the presumption of laches is triggered if any part of the claimed wrongful conduct occurred beyond the limitations period").[2]

Donna Havey testified that she knew that Torch devices were being placed in what she called "our locations," referring to locations at which TNT does business, in 2017. She also testified that she always sees the decal on the devices. Further, Mr. Turntine admitted that when TNT first noticed what he called "the Torch problem," which Donna Havey admitted was 2017,

---

[2] *Accord Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999) (discussing same presumption); *Santana Products, Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005) (same); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) (same); *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir. 2011) (same; noting courts "strongly presume" the doctrine bars claims brought outside the analogous statute of limitations period); *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985).

9

TNT started weighing its legal options. The most analogous state statute of limitations is five years, making the presumption period March 15, 2018. Considering the mere existence of the decal on Torch devices in TNT's locations is TNT's theory of causation and liability, these same events in 2017 triggers the presumption of laches. No evidence was presented to rebut the presumption. TNT was on notice of Torch devices moving into TNT's locations in 2017, TNT was aware of the same statement it alleged were violative of the Lanham Act and Missouri common law in this case, and at that point, once TNT was on notice of a potential problem, TNT starting investigating options for legal recourse. The Court should grant judgment against TNT on this independent basis.

### VII.   TNT Did Not Present Any Potentially "Literally False" Statement of Fact

TNT's counsel aggressively examined Mr. Miltenberger concerning the meaning of "outcome." TNT's expert testified about "visual outcomes," "game outcomes," "prize outcomes," and so forth. The supposed force of this line of questioning and testimony was to vindicate TNT's perspective that "outcome" must mean more than just a win amount in a play of the game. To prevail on a literally false claim, TNT must identify a statement that, in context, means the exact same thing to every reasonable reader without need for selecting between competing definitions. It does not even matter if one definition is far more reasonable than the other; a possible, if strained, interpretation (that some reasonable person might understand the statement to mean) is sufficient to defeat a literally false claim. *See Buetow*, 650 F.3d at 1186 (claim that product would "eliminate odor" could reasonably be interpreted to mean that the product eliminated less than all odor, defeating literally false claim). TNT argued to the jury "outcome" could, in fact, mean three distinct things, which is fatal to TNT's literally false Lanham Act claims.

Similarly, TNT's counsel attempted to probe whether representations about eliminating the "element of chance" means that there is no random functionality in the entertaining display. Whether TNT's interpretation of that phrase is rational or not (Defendants maintain it is not) does

10

not matter. The statement cannot be literally false, because most interpreters would understand it to be consistent with Defendants' intended meaning (namely, that it is referring to whether a prize is awarded based on chance).

Of course, even that assumes that "chance" basically means "random," but that is only one interpretation of "chance." No lesser authorities than the Missouri Supreme Court and the United States Supreme Court have described chance as "what a man does not know and cannot find out." *State ex. Inf. McKittrick v. Globe-Democrat Pub. Co.*, 341 Mo. 862, 882, 110 S.W.2d 705, 718 (1937) ("And as Mr. Justice Holmes said in *Dillingham v. McLaughlin*, 264 U.S. 370, 373 (1924), 'what a man does not know and cannot find out is chance as to him, and is recognized as chance by the law.'"). A perusal through dictionaries reveals numerous other rational definitions, including, e.g., "a possibility that an indicated or likely future happening, condition, or combination of circumstances will come to pass" (accompanied, in Webster's Third New International, with the quip of C.W. Mills that "if you guarantee a chance, it is no longer a chance; it is a sinecure"). Many more definitions could be introduced and argued. Those arguments could turn interesting and lively, but they would be arguments between competing rational interpretations, defeating the premise that these statements can support a literally false claim under the Lanham Act. Defendants' statements at issue were non-actionable opinion statements. But even if they could be deemed actionable factual statements, TNT failed to present evidence of a "literally false" statement of fact under the Lanham Act.

**VIII.   TNT Failed to Present Evidence of a Misleading Claim**

There is no evidence from which a reasonable juror could find that any of Torch's statements were implicitly false or misleading without being literally false. Such claims require proof of how consumers understand and react to specific advertising statements. TNT did not procure or present any such evidence. "Where advertising is not literally false, the plaintiffs bear

11

the ultimate burden of proving actual deception by using reliable consumer or market research." *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1043 (8th Cir. 1999). *See also Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1151–52 (8th Cir. 2011) ("A claim that a statement is implicitly false requires proof that the statement is deceptive or misleading, and the success of such a claim usually turns on the persuasiveness of a consumer survey."). TNT failed to put any consumer or player of a Torch device on the stand to offer testimony. TNT failed to hire any consumer marketing expert, and TNT presented no reliable consumer or market research from which a jury might conclude any statement at issue was misleading. TNT's misleading claim must fail as a matter of law and the evidence (or, more correctly, the lack thereof).

## IX. There Is No Evidence of Any Conduct by Steven or Sondra Miltenberger Causing Harm to TNT in Their Individual Capacities

In the alternative, if the Court permits any claim in this case to proceed, it should not be against either Defendant Steven Miltenberger or Defendant Sondra Miltenberger. There is no evidence that either of them published any advertising statements at issue separately from in their capacities as representatives of Torch (if at all), and there otherwise exists no basis for imposing liability on them in their personal capacities.

## X. Conclusion

For the foregoing reasons, Defendants respectfully request the Court enter judgment as a matter of law in their favor on all claims in this matter, and further request the Court grant any additional relief the Court deems just and proper.

Dated: October 4, 2025                    GRAVES GARRETT GREIM LLC,

                                              By:  */s/ J. Aaron Craig*
                                                  Todd P. Graves #41319 (MO)
                                                  J. Aaron Craig #62041 (MO)
                                                  Chandler E. Carr #68836 (MO)

1100 Main Street, Suite 2700
Kansas City, MO 64105
Phone: (816) 256-3181
Fax: (816) 256-5958
tgraves@gravesgarrett.com
acraig@gravesgarrett.com
ccarr@gravesgarrett.com

**Attorneys for Defendants Torch Electronics, LLC, Steven Miltenberger, and Sondra Miltenberger**

### CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2025, the foregoing was filed with the Court's electronic CM/ECF filing system, which automatically served counsel for Plaintiff TNT Amusements, Inc., d/b/a Play-Mor Coin-Op with a notice of filing the same.

      /s/ J. Aaron Craig
      Attorney for Defendants