IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


TNT AMUSEMENTS, INC., d/b/a   )
PLAY-MORE COIN-OP,           )
                              )
    Plaintiff,          )  No. 4:23-cv-00330-JAR
                              )
vs.                     )
                              )
TORCH ELECTRONICS, LLC, et   )
al.,                   )
                              )
    Defendants.        )


JURY TRIAL - VOLUME 1

BEFORE THE HONORABLE JOHN A. ROSS
UNITED STATES DISTRICT JUDGE

September 29, 2025

APPEARANCES:
For Plaintiff:        Richard E. Finneran, Esq.
                  Zoe Brannon, Esq.
                  Bryan Cave LLP
                  211 North Broadway, Suite 3600
                  St. Louis, MO 63102

For Defendants:       James A. Craig, Esq.
                  Chandler E. Carr, Esq.
                  Todd P. Graves, Esq.
                  GRAVES GARRETT GREIM LLC
                  1100 Main Street, Suite 2700
                  Kansas City, MO 64105


Reported by:          PAMELA HARRISON, RDR, CRR, CRC, CCR, CSR
                  Official Court Reporter
                  United States District Court
                  111 South Tenth Street, Third Floor
                  St. Louis, MO 63102
                  (314) 244-7987

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

1                            <u>**I N D E X**</u>

2                                                              Page

3        Introductory Jury Instructions                       10

4        <u>OPENING STATEMENTS</u>
              By Mr. Finneran                                 21
5              By Mr. Graves                                  33

6
         *Plaintiff's Evidence*
7        *Witness:*

8        <u>STACY FRIEDMAN</u>
         Direct Examination by Mr. Finneran                   43
9

10       Reporter Certificate                                 125

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               September 29, 2025

2          (The proceedings commenced at 1:56 p.m.)

3          (The following proceedings were held in open court,

4     out of the presence of the jury:)

5          THE COURT:  Court will be in session.  You can

6     remain seated.

7          Okay.  So that's where you want the device; is that

8     right?

9          MR. FINNERAN:  Yes, Judge.  That's, I think, what

10    we've --

11         MR. CRAIG:  With the understanding -- and this is a

12    little bit of a housekeeping issue.  But when Stacy comes up,

13    he can work with it there.  But for the cross-examination, I

14    would like it moved, because I can't even see the witnesses.

15    So I don't --

16         THE COURT:  Well, you're going to be at the podium,

17    or whoever is going to cross-examine is going to be at the

18    podium.  So I don't see it as a problem, necessarily, other

19    than maybe it needs to back up.

20         MR. CRAIG:  That's -- if that's Your Honor's desire,

21    then that's fine.  I would like to be able to see the witness,

22    but if I have to do it blind, I'll do it.  We could back it up

23    if we need to.  We can back it up.

24         MR. FINNERAN:  But this is going to be gone.  So

25    they're going to be standing here.  I mean, you've got a decent

1    sight line.  But if you want to move it back, that's fine.  We

2    have no objection.

3            **MR. CRAIG:**  It's a distraction I would like to not

4    have while I'm crossing.

5            **THE COURT:**  We can move the mobile podium after

6    opening statements.  You know, I'm -- I'm fine with doing that.

7    Will that help you?

8            **MR. CRAIG:**  Yeah, that's fine.  I will accommodate,

9    Your Honor.

10           The other housekeeping issue before Stacy Friedman,

11   assuming that you don't want to take a break after openings and

12   we want to go straight into it, we do have some objections to

13   some slides and what looks like will be some information that

14   we believe Your Honor has already excluded.  So now would

15   probably be a good time to take that up, or if you want to take

16   a break, or we can do it at the sidebar with the white noise

17   going.  That's up to you.

18           **THE COURT:**  What are the issues?  Can I just ask --

19   who you are?  Yes, sir.

20           **MR. FINNERAN:**  Oh, sorry.  He's our paralegal,

21   Jeremy Minster.

22           **THE COURT:**  Okay.

23           **MR. FINNERAN:**  We are on the record?

24           **THE COURT:**  We are on the record.

25           **MR. CRAIG:**  May I approach?

1          **THE COURT:**  Yes.

2          **MR. CRAIG:**  So we received these slides last night.

3    They're slides that Mr. Finneran said that he would like to use

4    with Stacy Friedman.  I have flagged the -- what I think are

5    offending slides.  I would like to direct you to the second

6    tabbed slide, especially.

7          So Stacy Friedman is a computer scientist with a

8    Harvard degree, which is laudable.  Last I knew, he didn't have

9    a degree in old, antiquey machines without any computers in

10   them.  And it seems to me that -- I mean, we're talking about

11   many states had gambling laws.

12          **THE COURT:**  I see what the issue is.

13          Mr. Finneran, I thought we talked about this, that

14   we weren't going to get into many states' laws and other

15   machines.  So I'm not sure I understand why you would have this

16   slide.

17          **MR. FINNERAN:**  I'm sorry, Judge.  Is that the one

18   that we're talking about, the one that's on your screen?

19          **MS. BRANNON:**  Number 8?

20          **MR. CRAIG:**  No.  I want 7 --

21          **MS. BRANNON:**  Well, 7 doesn't say "many states."

22          **MR. CRAIG:**  Well, it's a machine that he's going to

23   be talking about in 1960 --

24          **THE COURT:**  Look, you two can't argue with each

25   other.  If you've got an objection, make the objection.

1          **MR. CRAIG:**  Can I?

2          So, Your Honor, for the reasons that I think you

3    stated you already realize, I object to Slides 7, Slides 8, and

4    Slide 9, and any other testimony from Stacy Friedman that

5    relates to any other states' laws, any other devices that are

6    not Torch devices, anything that is not computer science-based,

7    and anything that goes to an ultimate question or his legal

8    analysis.

9          **THE COURT:**  You've made your objection as to

10   Exhibits 7, 8, and 9 -- Slides 7, 8, and 9.

11         **MR. FINNERAN:**  Yes, Judge.

12         **THE COURT:**  I don't understand the relevance of

13   them.

14         **MR. FINNERAN:**  So, Judge, as I understood the

15   Court's prior rulings, the experts are not to testify about the

16   contents of -- excuse me -- of whether the devices comply with

17   Missouri law or not to express an opinion as to whether or not

18   Missouri law regarding chance is satisfied with respect to the

19   devices.  That is what the Court said in its *Daubert* ruling.

20         The vast majority of what Mr. Friedman is testifying

21   to, therefore, is simply the technical aspects of the Torch

22   device.  This is the beginning of the presentation.  The

23   purpose of it is to give the jury an understanding, if they,

24   you know, had an idea what a slot machine is, here's how a

25   mechanical slot machine used to work, and then there's a

1  parallel drawn to how slot machines work nowadays.  That's

2  Slide Number 7.

3           Slides Number 8 and 9 discuss how there were

4  gimmicks relating to mechanical slot machines similar to the

5  one here that were designed in order to make -- basically evade

6  other historical laws.  We don't think that that -- we're not

7  going to then say later in the presentation, "Well, it broke

8  some other law."  We're trying to give the jury some historical

9  background.

10          I should mention that all of this was in

11 Mr. Friedman's initial report.  I don't understand it to be a

12 part of what the defendants argued he was not capable as an

13 expert testifying to.  And so that's why it's included in our

14 proposed presentation.

15          **THE COURT:**  I'm going to sustain the objection to

16 Slides 7, 8, and 9.  I simply don't see them as relevant at

17 this point.  I don't know whether or not, during

18 cross-examination, they will be become relevant.  But the issue

19 for the jury is the Torch devices, how prior efforts were made

20 to evade the gaming laws.  It's just not relevant.  I'm going

21 to sustain the objection to Slides 7, 8, and 9.

22          **MR. FINNERAN:**  Understood, Judge.

23          And just for the completeness of the record, and so

24 Mr. Craig is aware, there is a reference on a later slide,

25 which I'll give you a number, to the future pay device.  We

1   will also remove that from that slide.  But you may need to

2   reprint that slide or I need to get you another copy, since

3   we'll take that off.

4          **MR. CRAIG:**  What number is that?

5          **MR. FINNERAN:**  Julie will tell you that in a second.

6          **MR. CRAIG:**  I appreciate that.

7          **MR. FINNERAN:**  Thank you, Judge.

8          **THE COURT:**  We're going to go ahead and get the

9   jury.

10          Yes, sir, Mr. Graves.

11          **MR. GRAVES:**  We would like to invoke the rule of

12   witness sequestration, the witnesses in the courtroom.

13          **THE COURT:**  The Court will order that witnesses that

14   you anticipate calling, other than an expert witness who can be

15   in the courtroom, that they be excluded until after they

16   testify.

17          **MR. FINNERAN:**  Judge, I assume that excludes our

18   party representative, Mr. Turntine, or does Mr. Turntine need

19   to be excluded as well?

20          **THE COURT:**  He's not excluded.  The party

21   representatives can be in the courtroom.  So Mr. Turntine can

22   stay.

23          **MR. FINNERAN:**  And Miltenbergers can stay?

24          **THE COURT:**  Well, they're defendants.

25          **MR. FINNERAN:**  They're parties.

1          **MR. CRAIG:** I just had one -- did you say

2   Mrs. Turntine?

3          **THE COURT:** No. He said Mr. Turntine.

4          **MR. FINNERAN:** Mr. Turntine.

5          **MR. CRAIG:** I just wanted to make sure.

6          **MR. FINNERAN:** Ms. Turntine is not in the room,

7   Judge.

8          **THE COURT:** Let me make it clear, one person is

9   going to make objections, one person is going to be taking each

10  stage of the trial, each witness of the trial. So what I don't

11  want to have is multiple people making objections. Again, you

12  can talk to each other, but just for purposes of clarity, it

13  will help the court reporter, it will help the process. All

14  right?

15         **MR. FINNERAN:** Yes, Judge.

16         **THE COURT:** Anything else before we get the jury

17  panel?

18         **MR. FINNERAN:** Not from the plaintiff.

19         **THE COURT:** Anything else?

20         **MR. GRAVES:** Nothing, Your Honor.

21         **THE COURT:** Okay. We'll go ahead and get the jury

22  panel.

23         So again, as they come in, it will be the 3, 3, and

24  3. The chair that was at issue we think we fixed.

25         **(Pause in proceedings.)**

1      Please rise.

2      **(Enter jury.)**

3      **(The following proceedings were held in open court,**

4   **in the presence of the jury:)**

5      **THE COURT:**  Court will be in session.  You can be

6   seated.

7      Ladies and gentlemen, you've now been selected as

8   the jurors to hear and decide the case.  We positioned you in

9   the jury box so that you're closer to the monitor and the

10  exhibits.  So hopefully, you can see all of those things.

11     You'll notice there's a notebook on your chairs.

12  I'm going to read an instruction to you in just a moment about

13  the notebooks.

14     I'm going to give you some further instructions when

15  we go to have our first break, just about procedures here in

16  the courtroom, reporting to the jury room from here on.

17     As I've indicated to you, you've now been selected

18  to hear and decide this case.

19     If you would please rise now and be sworn to serve

20  as jurors.

21     **(Jury panel sworn in by the deputy clerk.)**

22     **THE COURT:**  And if you'll be seated.

23     Members of the jury, I am now going to give you some

24  instructions about this case and about your duties as jurors.

25     At the end of the trial, I will give you more

1   instructions.  I may also give you instructions during the

2   trial.  All of the instructions, those I give you now and those

3   I give you later, whether they are in writing or given to you

4   orally, are equally important, and you must follow them.

5         You must leave your cell phone, iPhone, computer,

6   and any other wireless communication devices off during the

7   trial and may only use them during breaks.  It's important for

8   you to understand you are not allowed to have those devices in

9   the jury room during your deliberations.  You must give them to

10   the deputy clerk for safekeeping before you start your

11   deliberations.  They will be returned to you when your

12   deliberations are complete.

13         This is a civil case brought by Plaintiff TNT

14   Amusements, Incorporated -- which I will refer to as "TNT" --

15   against Defendant Torch Electronics, LLC -- which I will refer

16   to you as "Torch."

17         Also named as defendants are Steven Miltenberger,

18   who is the president of Torch, and Sondra Miltenberger, who is

19   an employee of Torch and married to Mr. Miltenberger.  I will

20   refer to Torch and the Miltenbergers collectively as "the

21   defendants."

22         TNT, which is the company that brought this case, is

23   a distributor of amusement devices such as pool tables,

24   dartboards, and pinball machines.  Torch is a distributor of

25   devices Torch called "no-chance amusement devices," which I

 1   will refer to as "the Torch devices."

 2          The Torch devices each offer a number of electronic

 3   games.  The defendants advertised the Torch devices as legal,

 4   no-chance devices, claiming that even though a player pays

 5   money to play a game on Torch devices and can win additional

 6   money, Torch devices are not gambling devices under Missouri

 7   law because they are designed in a manner that Torch claims

 8   eliminates the element of chance.

 9          TNT alleges that defendants' advertisements are

10   false.  TNT claims that the Torch devices are illegal gambling

11   devices because they either are used or could be used in the

12   playing phase of gambling activity, which, if true, TNT alleges

13   would make the devices illegal to operate.

14          TNT further alleges that contrary to the defendants'

15   advertisements, the Torch devices involve elements of chance

16   and further contingent events that are outside of the player's

17   control.

18          TNT alleges that it has lost customers to Torch

19   because of Defendants' false advertisements and seeks damages

20   for those losses exceeding $100,000.

21          The defendants deny TNT's allegations.  They claim

22   that the Torch devices are legal no-chance amusement devices

23   because they claim the outcomes are predetermined and because

24   players have the option to view the game outcome before

25   committing their money to a game.  The defendants claim that

1  these features eliminate any material element of chance from

2  the Torch devices and that the Torch devices are, therefore,

3  not illegal gambling devices.

4         The defendants further claim that their

5  advertisements accurately reflect Defendants' opinion of

6  Missouri's criminal gambling laws as applied to Torch devices.

7  The defendants deny that Defendants' advertisements caused TNT

8  to suffer any damages.

9         Your duty is to decide what the facts are from the

10  evidence.  You are allowed to consider the evidence in the

11  light of your own observations and experiences.  After you have

12  decided what the facts are, you will have to apply those facts

13  to the law that I give you in these and in my other

14  instructions.  That is how you will reach your verdict.

15         Only you will decide what the facts are.  However,

16  you must follow my instructions whether you agree with them or

17  not.  You have taken an oath to follow the law that I give you

18  in my instructions.

19         In deciding what the facts are, you may have to

20  decide what testimony you believe and what testimony you do not

21  believe.  You may believe all of what a witness says or only

22  part of it or none of it.  In deciding what testimony to

23  believe, consider the witnesses' intelligence, their

24  opportunity to have seen or heard the things they testify

25  about, their memories, any reasons they might have to testify a

1  certain way, how they act while testifying, whether they said

2  something different at another time, whether their testimony is

3  generally reasonable, and how consistent their testimony is

4  with other evidence that you believe.

5       Do not let sympathy or your own likes or dislikes

6  influence you.  The law requires you to come to a just verdict

7  based only on the evidence, your common sense, and the law that

8  I give you in my instructions and nothing else.  Nothing I say

9  or do during this trial is meant to suggest what I think of the

10  evidence or what I think your verdict should be.

11       In these instructions, and throughout the trial, you

12  will hear me and the attorneys refer to evidence.  When I use

13  the word "evidence," I mean the testimony of witnesses,

14  documents, and other things I receive as exhibits, facts that I

15  tell you the parties have agreed are true, and other -- any

16  other facts that I tell you to accept as true.  Some things are

17  not evidence.  I will tell you now what is not evidence.

18       First, lawyers' statements, arguments, questions,

19  and comments are not evidence.

20       Second, documents or other things that might be

21  shown in court or talked about but that I do not receive as

22  exhibits are not evidence.

23       Third, objections are not evidence.  Lawyers have a

24  right and sometimes a duty to object when they believe

25  something should not be part of the trial.  Do not be

1   influenced one way or the other by objections.  If I sustain a

2   lawyer's objection to a question or an exhibit, that means that

3   the law does not allow you to consider that information.  When

4   that happens, you have to ignore the question or the exhibit,

5   and you must not try to guess what the information might have

6   been.

7           Fourth, testimony and exhibits that I strike from

8   the record or that I tell you to disregard are not evidence,

9   and you must not consider them.

10          Fifth, anything you see or hear about this case

11  outside the courtroom is not evidence, and you must not

12  consider it unless I specifically tell you otherwise.

13          Also, I might tell you that you can consider a piece

14  of evidence for one purpose only and not for any other purpose.

15  If that happens, I will tell you what purpose you can consider

16  the evidence for and what you are not allowed to consider it

17  for.  You need to pay close attention when I give an

18  instruction about evidence that you can consider for only

19  certain purposes, because you might not have that instruction

20  in writing later in the jury room.

21          Some of you may have heard the terms "direct

22  evidence" and "circumstantial evidence."  You should not be

23  concerned with those terms, since the law makes no distinction

24  between the weight to be given to direct and circumstantial

25  evidence.

1      During the trial, I will sometimes need to talk

2  privately with the lawyers.  I may talk with them here at the

3  bench while you are in the courtroom, or I may call a recess

4  and let you leave the courtroom while I talk to the lawyers.

5  Either way, please understand that while you are waiting, we

6  are working.  We have these conferences to make sure that the

7  trial is proceeding according to the law and to avoid confusion

8  or mistakes.  We will do what we can to limit the number of

9  these conferences and to keep them as short as possible.

10      At the end of the trial, you will have to make your

11  decision based on what you recall of the evidence.  You will

12  not have a written copy of the testimony to refer to.  Because

13  of this, you must pay close attention to the testimony and

14  other evidence as it is presented here in the courtroom.  If

15  you wish, however, you may take notes to help you remember what

16  the witnesses say.  If you do take notes, don't show them to

17  anyone until you and your fellow jurors go to the jury room to

18  decide the case after you have heard and seen all of the

19  evidence.  And do not let taking notes distract you from paying

20  close attention to the evidence as it is presented.

21      The clerk will provide each of you with a pad of

22  paper and a pen or pencil.  At each recess or adjournment of

23  the court, leave them on your seat.  When you leave at night,

24  your notes will be locked up and returned to you when you

25  return.  When the trial is over, your notes will be destroyed.

1    They will not be read by anyone other than you.

2             Jurors, to make sure this trial is fair to all

3    parties, you must follow these rules.

4             First, do not talk or communicate among yourselves

5    about the case or about anyone involved with it until the end

6    of the trial, when you go to the jury room to consider your

7    verdict.

8             Second, do not talk with anyone else about the case

9    or about anyone involved with it until the trial has ended and

10   you have been discharged as jurors.

11            Third, when you are outside the courtroom, do not

12   let anyone tell you anything about the case or about anyone

13   involved with it until the trial has ended and your verdict has

14   been accepted by me.  If someone tries to talk to you about the

15   case during the trial, please report it to the deputy clerk or

16   the court security officer.

17            Fourth, during the trial, do not talk with or speak

18   to any of the parties, lawyers, or witnesses in this case, not

19   even to pass the time of day.  It is important not only that

20   you do justice in this case, but also that you act accordingly.

21   If a person from one side of the lawsuit sees you talking to a

22   person from the other side, even if it is just about the

23   weather, that might raise a suspicion about your fairness.  So

24   when the lawyers, parties, and witnesses do not speak to you in

25   the halls or in the elevator or the like, please understand

1   they are not being rude.  They know they are not supposed to

2   talk with you while the trial is going on, and they are just

3   following the rules.

4           Fifth, you may need to tell your family, close

5   friends, and other people that you are part of this trial.  You

6   can tell them when you have to be in court, but you must warn

7   them not to ask you about the case, tell you anything about the

8   case, or anything they think they know about the case, or talk

9   about the case in your presence.

10          Remember, you must not communicate with anyone in

11  any manner about anything or anyone, including the Court,

12  related to this case.  You must not tell anyone anything about

13  the jury's deliberations in the case until after I accept your

14  verdict or until I give you specific permission to do so.  If

15  you do talk about the case with someone besides the other

16  jurors during deliberations, it looks as if you might have

17  already decided the case or that you might be influenced in

18  your verdict by their opinions.  That would not be fair to the

19  parties, and it might result in the verdict being thrown out

20  and the case having to be retried again.  During the trial,

21  while you are in the courthouse, and after you leave for the

22  day, do not give anyone any information by any means about this

23  case.

24          Sixth, do not do any research or investigate the

25  case facts or the law on the internet, in libraries,

1   newspapers, dictionaries, or otherwise.  Do not visit or view

2   any place discussed in the case, and do not use the internet or

3   other means to search for or view any place discussed in the

4   testimony.

5            Seventh, do not read or otherwise receive any

6   information, including any news stories or internet articles or

7   blogs that are about the case or about anyone involved with it.

8   Do not listen to any radio or television reports or digital

9   streaming about the case or about anyone involved with it.

10  Until -- in fact, until the trial is over, I suggest that you

11  avoid at all reading or receiving any digital streaming or news

12  journals and avoid listening to television or radio newscasts

13  at all.

14           I don't know whether there will be news reports

15  about the case, but if there are, you might accidentally find

16  yourself reading or listening to something about the case.  If

17  you want, you can have someone collect information or any

18  stories about the case to be given to you when the trial is

19  over.  I assure you that by the time you have heard all of the

20  evidence in this case, you will know what you need to know to

21  decide it.

22           The parties have a right to have you decide their

23  case based only on evidence admitted here in court.  If you

24  research, investigate or experiment on your own or get

25  information from other sources, your verdict might be

1    influenced by inaccurate, incomplete, or misleading

2    information.

3              Witnesses here in court take an oath to tell the

4    truth, and the accuracy of their testimony is tested through

5    cross-examination.  All of the parties are entitled to a fair

6    trial before an impartial jury, and you have to conduct

7    yourselves in a way that assures the integrity of the trial

8    process.  If you decide a case based on information not

9    admitted here in court, you will deny the parties a fair trial.

10   You will deny them justice.  Remember, you have taken an oath

11   to follow the rules, and you must do so.  If you do not, the

12   case might have been to be retried.

13             Eighth, do not make your mind up during the trial

14   about what your verdict should be.  Keep an open mind until

15   after you and your fellow jurors have discussed all of the

16   evidence.

17             The trial will proceed in the following manner:

18   First, the plaintiff's lawyer may make an opening statement.

19             Next, the defendants' lawyer may make an opening

20   statement.  An opening statement is not evidence; it is a

21   summary of the evidence the lawyers expect you will see and

22   hear during the trial.

23             After opening statements, the plaintiff will then

24   present evidence.  The defendants' lawyer will have an

25   opportunity and a chance to cross-examine the plaintiff's

 1  witnesses.  After the plaintiff has finished presenting its

 2  case, the defendants may present evidence, and the plaintiff's

 3  lawyer will have a chance to cross-examine their witnesses.

 4          After you have seen and heard all of the evidence

 5  from both sides, the lawyers will make closing arguments that

 6  summarize and interpret the evidence.  Just as with opening

 7  statements, closing arguments are not evidence.

 8          After the closing arguments, I will instruct you

 9  further on the law.  After the lawyers' arguments and the

10  Court's instructions, you will go to the jury room to

11  deliberate and decide on your verdict.

12          And at this time, we'll have the opening statement

13  by Plaintiff's counsel.  Counsel, you may proceed.

14          Ladies and gentlemen, just so you are aware, the

15  attorneys have asked for, the Court has agreed to give each

16  side up to 20 minutes for opening statement.

17          Counsel, you may proceed.

18          **MR. FINNERAN:**  Thank you, Your Honor.

19          May it please the Court.

20          Ladies and gentlemen of the jury, I want to begin,

21  as I did when I first spoke to you, by thanking you.  You are

22  here today fulfilling a solemn oath you have taken, as American

23  citizens and as people of our community, to help judge the

24  facts of this case.  As the judge has just explained to you,

25  that is really what you are.  You are the judges of the facts.

1          So over the course of the next few days, you're

2    going to hear from witnesses.  You're going to hear from

3    experts.  You're going to see exhibits.  You'll actually even

4    see one of the Torch machines in operation.  And it's your duty

5    and your job to determine whether Torch has been falsely

6    advertising these devices as legal amusement devices when, in

7    fact, they're illegal slot machine games.  And that is what

8    this case is about.

9          This is a case -- sorry.  Could I get the screen,

10   please.

11         Thank you.

12         This is a case about slot machines.  You see one of

13   them here standing in front of you.

14         This is a picture of another slot machine game that

15   Torch has created -- or has distributed from a flyer that Torch

16   distributes.  They come in many different shapes and sizes, but

17   they all work basically the same, as a game that you might see

18   in a casino in Las Vegas.  Gamblers take money, feed money into

19   the bill acceptor of the machine, watch the wheels spin around

20   on the screen, hoping that they might win money, but more often

21   than not, losing more than they put in.

22         These games, including this one in front of you and

23   every game you'll hear us talk about during this trial, use

24   random computer processes and the software to decide what

25   visual outcome to display, what reels to spin in front of the

1  player, what dice to roll.  Gamblers have no way of predicting

2  what those reels will show or what those visual outcomes will

3  be.

4          On any given spin, a player might win.  They might

5  lose.  As I said, in the long run, the house always wins.

6          Over the past many years, gamblers have wagered

7  millions of dollars on Torch machines, hoping to hit the

8  jackpot.  But as anyone who has been to a casino knows, in the

9  long run, the house always wins.  But in this case, the house

10  isn't a casino.  In this case, the house is Sondra and Steven

11  Miltenberger and their company, Torch Electronics.

12          Before starting Torch Electronics, Mr. Miltenberger,

13  as you'll hear during this case, worked for a company called

14  Accel Entertainment, which you will hear Mr. Miltenberger admit

15  to you was a gambling company that sold licensed,

16  random-number-generated slot machines, just like you would see

17  in a casino.  But the defendants, the Miltenbergers and Torch,

18  don't put their slot machines in casinos.  They don't put them

19  in bingo halls.  Instead -- they don't put them in any licensed

20  establishment.  Instead, they put them at your local bar, at

21  your local gas station, at a local restaurant, places that

22  anyone can walk into without an ID and just start betting their

23  money.

24          As the Court will instruct you at the end of this

25  case, it's illegal in Missouri to possess or play a slot

1   machine outside of a casino or other licensed establishment.

2   But for years, the defendants have tried to evade that law by

3   misrepresenting to customers, players, and the public at large

4   that these devices are not slot machines.  Instead, they have

5   claimed that they are what the defendants call NCGs, or

6   no-chance amusement games.

7           According to the defendants, even though players put

8   money in and hope to get more money out, the devices don't

9   involve wagering, winning or losing money on a game of chance.

10  Instead, as you see in this excerpt from one of their

11  advertisements, that they are perfectly legal games in which

12  chance plays, quote, "absolutely no role in any possible

13  outcome."  They have repeated those claims not just in printed

14  advertisements but on their website and in innumerable

15  face-to-face pitches to business owners across the state which

16  have allowed the defendants to place their games into their

17  establishments, their bars, their restaurants, their gas

18  stations, based upon Torch's expressed assurance that games

19  like this are not illegal gambling devices.

20          In fact, every single one of Torch's devices has a

21  sticker on it.  In fact, on this demonstrative, you can see it

22  right there.  It's blown up on the screen for you.  And what

23  this advertisement says, which is actually on the sides of this

24  device, as well as at the bottom, and which appears on every

25  Torch device in the state of Missouri -- what it says is that

these devices are not games of chance and, therefore, legal

under Missouri law.  But neither of those things is true.

Instead, as the evidence at trial will show you, the

defendants' games are just what they look like:  illegal slot

machines.

Now, to prove that to you -- which it is our burden

to prove to you that that is more likely than not -- you will

hear multiple sources of evidence confirming the true nature of

the defendants' devices.  You will hear testimony from two

people who have knowledge about how this machine works under

the hood.  One of those people will be Kevin Morse, who you'll

hear recorded deposition testimony from.  He is the corporate

representative of the company that manufactures these devices:

Banilla Games.

You will also hear from Stacy Friedman, a

Harvard-educated computer scientist and gambling mathematician,

who analyzed the actual underlying source code of this machine

and identified what was really going on under the hood.

Mr. Morse and Mr. Friedman will agree about how this

device actually works.  They will peel back the visual display

of this device and show you what's going on inside.  And when

they do, this is what you will find:  a series of computer

algorithms' subroutines, all of which are designed to randomize

the visual outcomes provided by these devices, and to make the

behavior of these devices unpredictable to the players that

1    play them.

2           What you see on the screen is just a sample of the

3    more than a dozen random functions and variables that

4    Mr. Friedman identified when reviewing drives that were

5    provided to him directly by Torch Electronics as part of the

6    discovery in this case.

7           He will tell you that it also is the case that these

8    devices use one of these random functions to decide where in a

9    list of up to 100,000 results to start giving wins and losses

10   to players.  He will also tell you that on a few of the drives

11   he received, there was also a random shuffling feature that

12   would then reshuffle those prize pools so that even if there

13   had been a discernible pattern, it couldn't be tracked the next

14   time the machine got played 100,000 times.

15          Now, originally, the defendants hired their own

16   expert named Nick Farley to refute these facts.  But after

17   being confronted with Mr. Friedman's analysis and Mr. Morse's

18   testimony, the representative of the manufacturer of the

19   device, even the defendants' paid expert had to recant his

20   earlier testimony and admit that Torch's slot machines used

21   multiple random number generators and have multiple random

22   functions.

23          So at this point, you may be wondering if

24   Defendants' own expert and the manufacturer and the plaintiff's

25   expert all agree, then why did we bring you to court?  It seems

1  pretty obvious, based on what I told you, that these are what I

2  told you they are:  illegal slot machines.  Well, the answer to

3  that question is because for years, the defendants have

4  profited by refusing to admit the obvious.  They've refused to

5  admit that their machines are games of chance or gambling

6  devices, and that is because of a gimmick that they have

7  falsely claimed exempts their slot machine games from Missouri

8  law.  It's something that they call "the prize viewer."

9          The prize viewer is an optional button that takes up

10  probably less than 2 square inches of that screen.  It's tucked

11  in the corner of most of these different games' touch screens.

12  And if you touch it, the slot machine will show to you a dollar

13  amount.  Now, you won't know what that dollar amount means

14  unless you actually go and read the rules somewhere in this

15  machine that explains what it's doing.  But, in fact, that

16  dollar amount will show you the amount of money that you will

17  win after the game shows its next entertaining display of the

18  wheels spinning or the dice rolling.

19          The defendants say that that makes their games not

20  games of chance because the players can choose not to play if

21  they don't like the prize they're shown.  But the evidence you

22  will hear during this trial will show you that just as -- that

23  that claim is just as false as all the defendants' other

24  claims.

25          And I'll just give you three reasons now, but you'll

1    hear many more over the course of the trial.

2            First, as I told you, the prize viewer is an

3    optional feature, which means that players don't have to use

4    it.  And as the Court will instruct you at the end of this

5    case, Missouri law defines a gambling device not to be a

6    machine that must always be used to gamble, but instead is any

7    machine that is used or usable in any phase of a gambling

8    activity -- excuse me -- the playing phase of a gambling

9    activity.  And as you'll hear, even Mr. Miltenberger admits

10   that not all players who use these devices ever use that prize

11   viewer feature.

12           Second, as you'll also hear, even if a gambler

13   understands what the prize viewer is and is aware of how it

14   works, the most common thing the prize viewer will display is

15   zero dollars.  That means, in the overwhelming majority of

16   cases, the gambler is not spending his money to get zero

17   dollars.  Instead, he's spending his money in the hope that the

18   next outcome might be more than zero dollars.  In other words,

19   he's wagering, not on the zero dollar outcome he already knows

20   about, but in the hope that the next outcome might be a

21   jackpot.

22           Finally, as the evidence shows you, contrary to what

23   Defendants have said, you don't always have the ability to get

24   your money back.  The way that the Torch devices work, they

25   actually will round down your winnings to the nearest dollar.

1  So if you've got $1.75 -- let's say you put $2.00 in the

2  machine, you wager a quarter and you lose that quarter.  Let's

3  say you looked at the prize viewer and you knew that was a

4  loser.  Well, you can get your dollar back, but the other $0.75

5  stays on the machine.  You can't get it back.  The only way to

6  get it back is to keep gambling.

7          And so, in that situation, even if that player knows

8  what the prize viewer is and clicks that button, he has no way

9  of knowing what those next three spins are going to show when

10  he's already lost that $0.75.

11          Now, the defendants have known all of what I just

12  told you for years.  Their internal emails, which you'll see

13  during this case, which they were forced to disclose during the

14  discovery in this case, will show you the defendants' knowledge

15  of the shuffling feature in the Torch machines and of random

16  functions in their devices.  Importantly, Torch has even

17  offered to pay the legal fees for customers when law

18  enforcement have seized these devices and prosecuted those

19  customers.

20          As you you'll see, the defendants also will tell

21  you, as the sticker says down here, that they don't allow

22  children to play these games.  And when asked why that is,

23  Mr. Miltenberger couldn't explain it other than saying simply,

24  "It was a business decision."

25          Ms. Miltenberger, for her part, asked, "Well, if you

1  go into a casino in Vegas, you don't see people playing at

2  10 years old, do you?"  Well, of course not.  That's because we

3  don't allow children to play those kinds of gambling devices.

4          And when Ms. Miltenberger was asked why she herself

5  chose not to play slot machines, you will see her on video

6  saying her answer, "I just don't gamble."

7          Now, despite the defendants' claims that their

8  machines are not gambling devices, the players of the Torch

9  devices have lost millions by wagering on these supposed

10  no-chance games.  But the players aren't the only ones who have

11  lost out because of the defendants' false claims.  It's also

12  affected small businesses, like the plaintiff in this case, TNT

13  Amusements.

14          So TNT Amusements, which also goes -- and you'll

15  hear this during the case -- also goes by Play-Mor Coin-Op.

16  That's the same company.  So don't get confused about that.

17  It's a company that Jim Turntine, who is sitting at this table,

18  started with his dad more than 35 years ago, when Jim was in

19  his 20s.  He bought the business from his dad and helped it

20  grow into one of the most successful distributors of pool

21  tables, dartboards, pinball machines, and other amusement

22  devices across the state of Missouri.  For more than 3 decades,

23  Jim and his colleagues and wife at TNT worked hard to build its

24  business and keep the loyalty of their customers, customer

25  relationships that in many cases have lasted for 20 years,

1    30 years, or more.

2            That all started to change once the Miltenbergers

3    and Torch came onto the scene.  Since that time, numerous of

4    TNT's customers had kicked out TNT Amusements' games out of

5    their locations in order to make room for these slot machines.

6            Now, Torch expressly told those business owners that

7    what they were doing was legal, that they were not games of

8    chance, that they were not slot machines.  But because those

9    false, misleading statements were believed by TNT's customers,

10   TNT has been unable to compete for the floor space in those

11   businesses, has lost more than $100,000 in lost profits as a

12   result.

13           You'll hear testimony from TNT's long-time route

14   manager, Donna Havey, who will tell you that, for years, the

15   same story has occurred over and over.  Customers will call,

16   ask to have TNT's games removed, and within as little as a day,

17   or maybe even a few hours, one of these slot machines would be

18   standing in their place.

19           Mr. Turntine will also take the stand in this trial

20   to talk about how Torch's false advertising has completely

21   stifled what was once a thriving business.  So much so that a

22   company that he had hoped to hand over to his employees when he

23   retired, to help them build a legacy just like he did with his

24   dad, is now effectively a sinking ship with no real prospects

25   for a future in this state as long as these devices stay on the

 1   street.

 2        Ladies and gentlemen, the defendants have been

 3   falsely advertising their slot machines to the public for

 4   years.  They've convinced hundreds of businesses across the

 5   state to allow illegal slot machines onto their premises by

 6   misrepresenting what the Torch devices are and how they work.

 7   And the result has been to destroy small businesses like TNT,

 8   who have had their pool tables, pinball machines, and

 9   dartboards cleaned out to make room for these illegal slot

10   machines.

11        At the end of the case, you'll basically be asked to

12   answer two questions:  first, are these ads false?  Have the

13   defendants falsely said that these are not gambling devices

14   when, in fact, they are?

15        And second, what do you believe is a fair amount of

16   damages to compensate TNT for the harms caused to them by the

17   defendants' campaign of falsely advertising their devices as

18   legal no-chance devices, when, in fact, they're illegal slot

19   machines.

20        At the end of this trial, I will come back before

21   you once more to ask you to find Torch and the Miltenbergers

22   liable for falsely advertising their devices under federal and

23   state law and to award TNT such damages you believe will fairly

24   compensate them for the harm done to their business by these

25   illegal slot machines.

1          Thank you.

2               **THE COURT:**  Thank you, Counsel.

3          Mr. Graves, you may proceed.  If you need to

4     adjust --

5               **MR. GRAVES:**  See if I can pull this off.

6          May it please the Court.

7          Good afternoon.

8          Let me tell you a little bit about the

9     Miltenbergers.

10         Steven and Sondra Miltenberger, who you've met

11    before, are sitting at counsel table.  They met in Boonville,

12    Missouri.  Steven's father was a nuclear scientist who built

13    nuclear plants.  So he moved around a little bit.  He was born

14    here in St. Louis.  And later in life, his father decided that

15    he wanted to be an entrepreneur, and they bought a truck stop

16    in Boonville, Missouri, called the Bobber.  I don't know if any

17    of you are familiar with it, but that's how he got his start in

18    the oil business.

19         And they were at the Bobber -- and it's really kind

20    of a funny story.  He had a friend at the bank.  They'd make

21    deposits.  He was the young guy in the business.  He'd take the

22    deposits to the bank.  He had an older woman who was his

23    friend, and she asked him a lot, and they became friends.  And

24    she said, "Are you seeing anyone?"

25              He said, "No, but there's this girl down at the

1  rent-all" for video -- movies.  You know how we used to rent

2  movies at stores? -- "that I'm really interested in."

3          She said, "What's she look like?"  And he told her,

4  and she said, "Oh, my goodness, that's my daughter."

5          He said, "Well, that's interesting, because she

6  won't even talk to me."

7          And suffice it to say, after that, Mother had a talk

8  with Daughter, and they got together and they ended up getting

9  married.  They had two kids.  They live here in St. Louis.

10 They started a business in their garage, and their business now

11 operates out of a warehouse.  It's an American success story.

12          It's a local business.  It's been 10 years in

13 business, open and obvious, you know, out in the marketplace.

14 And in that business, they take devices into convenience stores

15 and other spots, much like Mr. Turntine does.  He has devices

16 as well, not just pool tables and dartboards, but the claw

17 machine and other devices.  And they take them in and they

18 split the profits -- not the profits.  They split the income

19 50/50 with the store owner, and then all the other thing -- all

20 the other costs come out of the side of Mr. Turntine or

21 Mr. Miltenberger in this case.

22          And they do a lot of things for the device.  They

23 stand behind their machines when they're on-site.  They supply

24 and repair the machines.  They cover the risk of damage to the

25 machine if one of them gets knocked over or something.  If

1  someone comes in and breaks the cash box open and takes the

2  money, they don't take that out of the half of the business

3  owner.  They stand the loss of that.  So it's an operating

4  business, has been for 10 years.

5          We're here today about a particular case, and the

6  evidence will show that Mr. Turntine does not like his business

7  competitor, Torch Electronics, from the same region, similar

8  business.  They provide amusement devices to truck stops and

9  other locations, Torch devices, claw machines, horoscope

10 machines, other things.  And not only does Mr. Turntine not

11 like his business competitor, Mr. Turntine has some very

12 powerful friends.

13         Now, this case that you're here to hear is styled --

14 I'm going the wrong way.  As you've already heard, it's styled

15 *TNT Amusements, Inc., d/b/a Play-More Coin-Op v. Torch*

16 *Electronics*.

17         And they didn't just sue Torch Electronics, the

18 company.  They also sued Mr. Miltenberger personally, they also

19 sued Mrs. Miltenberger personally, and they did that,

20 especially in the case of Mrs. Miltenberger, despite there's no

21 evidence and you will hear no evidence that Sondra Miltenberger

22 had any role whatsoever in any commercial statements in this

23 case.

24         Plaintiffs are not the attorney general.  They're

25 not a prosecutor in a location or jurisdiction or county in the

1  state.  And this case is not brought on behalf of the State or

2  a regulatory body of the State.  It's a private suit brought on

3  behalf of Mr. Turntine's TNT.  And at the end of the day, what

4  you're going to be asked is to take money from this family and

5  give it to that family; nothing more, nothing less.

6          This case is -- you're going to hear a lot about the

7  legality.  You've already heard about the legality of these

8  devices.  And there's going to be a lot of evidence about that.

9  You'll learn more about that than you'll probably ever want to

10 know.  But the device is what the device is, and the law is

11 what the law is.  Here in a minute, that device is going to be

12 flashing and ringing and spinning and inviting you to look at

13 it, just like it is designed to do.

14          For that matter, like a pinball machine or any other

15 device is designed to do, it's designed to draw you in.  But

16 don't be distracted by the bells and whistles of that evidence.

17 At the end of the day, the judge is going to give you

18 instructions, and you won't be asked to determine if the

19 blinking box should be illegal or legal, whether it's a good

20 idea or it's a bad idea.  That's not the case.  This whole

21 thing is about commercial statements made in business

22 competition.  So it's kind of the device versus the decal.

23 There's the device, there's the decal.  The decal is what the

24 case is about, but there will be a lot of evidence as well

25 about the device.

1          So there's going to be that evidence.  The decal is

2     what's important.  But the devices are legal in Missouri.

3     Mr. Miltenberger has 10 years of open and successful business

4     at retail locations across the state.  They operate all across

5     the state.  They're at 110 of 114 counties today of the state.

6     They all operate their business in a prudent and professional

7     manner.  They apply for business licenses in the cities and

8     counties where they -- where they place them.

9          So it's not like no one knows -- the governments

10    don't know where the machines are.  They all know where the

11    machines are.  There's nothing hidden here.  Mr. Miltenberger

12    regularly meets with people about the devices:  police,

13    prosecutors, agencies, city council, state legislatures.  He

14    will meet with anyone at any time, and you're going to hear a

15    lot of evidence about that.  If questions are raised, Torch

16    stands behind their devices.  They pay for attorneys for the

17    locations, especially the smaller locations, and they do that

18    because they know they are right about these devices.

19         Now, you've already heard about no-chance games.

20    And, you know, all law is an exercise in line drawing.  Very

21    small differences can make a very big difference under the law.

22    The law is what the law is, and Torch complies with it.  And

23    right on the label, you'll see 572.010, and you'll hear about

24    that.  And the three things that you'll hear testimony about is

25    the law basically says you must have consideration, prize, and

1    chance for it to be gambling under Missouri.  And in Missouri,

2    the chance is very important in this case.

3              You know, a wise man once said that chance is what a

4    man does not know and cannot find out.  And no-chance devices

5    are designed to eliminate chance.

6              Let me grab something here.

7              One way that they're designed to eliminate chance is

8    what's called the -- we call it the "Rolodex" feature.  And

9    some of you may remember Rolodexes.  So when a normal slot

10   machines operates, every single play, it's random, it's

11   unpredictable, you cannot know what happens.

12             In a Torch device, there's a set of outcomes, and

13   the machine starts at the beginning.  It cycles all the way

14   through back to the beginning.  So they're not random in that

15   sense.  And in fact, there will be testimony that you couldn't

16   even place one of these devices in a casino, in a slot machine

17   in a casino, because they're not random; and they're required

18   to be random in the state of Missouri.  So that's one way they

19   eliminate chance.

20             The other way that they eliminate chance is through

21   the prize previewer.  And the prize previewer is, every single

22   time you put money in the machine, you can punch a button and

23   find out what the very next outcome will be if you play the

24   game.  And what's funny is there are people that -- you'll hear

25   evidence there are people that come into these locations, and

1  they'll go through all the games on the machine and see if

2  there's money on them.  If there is, they'll collect the money.

3  And Mr. Miltenberger will testify that he's had locations

4  complain about that, and he says that's just the way the device

5  works, and so we can't change that.

6          So every large truck stop in the state of

7  Missouri -- not every large truck stop.  Every large truck stop

8  chain that Torch works with has their own lawyers.  They dig

9  into this issue, they look at Missouri law, they render their

10 own opinions.  Love's truck stops, MFA Oil, FastLane, Ayerco,

11 Rapid Robert's, Fast n' Friendly, they've looked at it, they've

12 had their lawyers look at; and our devices, Torch's devices,

13 are in those locations.

14         You heard a little bit about Banilla a minute ago.

15 Banilla is based out of North Carolina.  They have facilities

16 in Georgia and, I think, Wisconsin.  And they make these games

17 to strict legal specifications.  Once they're made to the

18 specifications, then Torch has their outside expert test the

19 games to make sure that they match those specifications.  So

20 it's trust that they're making them right and hire an expert to

21 verify that they're making them right.

22         And all that evidence, all this evidence about --

23 about the legality of the games is going to be -- it will be

24 interesting to talk about, and we'll talk about that a lot.

25 But that's not the heart of the case.

1          The heart of the case is statements made in business

2    competition.  It's the decal on the bottom of the device and

3    some other statements.

4          Now, that decal is a legal opinion, a "legal notice"

5    opinion, we call it, that was written by an attorney with the

6    law firm of Lathrop & Gage and given to Mr. Miltenberger, and

7    he placed it on the device.

8          So the key is that those are opinions; they're not

9    facts.  And you're going to hear lots of opinions in this case.

10   And, you know, opinions, everybody has one.  So you're going to

11   hear a lot of opinions.

12         The other thing to focus on, the critical thing to

13   focus on, in this case, is causation.  And so we're going to

14   talk about the devices.  We're going to talk about the

15   statements.  The statements are what's important.  And then

16   we're going to talk about causation.  And, basically, that

17   means what difference does a statement make.  And Torch's

18   statements of opinion -- the question is:  Did Torch's

19   statements of opinion actually affect Mr. Turntine in any way?

20         You'll hear evidence that Torch -- or that TNT did

21   not undertake any studies, any marketing studies or surveys to

22   show that anyone was misled by any commercial statement by

23   Torch.

24         You will hear evidence that TNT's expert failed to

25   even do a causation analysis.  When he was adding up the money

1   in damages that he's going to allege that Mr. Turntine

2   suffered, he didn't even analyze whether what

3   Mr. Miltenberger's company did had anything to do with his

4   damages.

5          There's about 20 overlapping locations that you'll

6   hear about.  Some here, some there, some now and some later.

7   And TNT still has its own amusement devices in most of those

8   locations, or many of those locations.

9          Torch, you'll hear evidence, has never asked to have

10  a TNT device removed from any location.  Not a single witness

11  will testify that they relied on any statement by Torch that

12  caused them to put a single cent in a Torch device that

13  otherwise would have gone to Mr. Turntine.

14         Not a single customer will testify that they read

15  and relied on any of Torch's opinion notice or other commercial

16  statements to make a decision.

17         There will be no evidence showing that TNT suffered

18  any actual harm from any of the commercial statements.  In

19  fact, Mr. Turntine will say that there's an infinite number of

20  reasons why a location owner might want to remove a TNT device.

21         Finally, we're going to talk about damages.  Experts

22  are going to testify about damages.  One of the things that

23  you'll hear is that TNT's expert didn't even consider

24  causation.  And I mentioned that a minute ago.

25         And you will also hear that there really are no

1    actual financial damages to Mr. Turntine's business.

2              So at the close of all of the evidence, we are

3    confident that you will return a verdict for Steven and Sondra

4    Miltenberger in their individual capacity and for Torch

5    Electronics.

6              Thank you.

7              **THE COURT:**  Counsel, Mr. Finneran, you may proceed

8    with evidence on behalf of the plaintiffs.  I don't know if you

9    want the mobile podium moved.

10             **MR. FINNERAN:**  Yes, Your Honor, I think we probably

11   will.

12             Your Honor, the plaintiff calls Stacy Friedman to

13   the stand.

14             **THE COURT:**  Mr. Friedman, if you'll step up here,

15   the clerk will administer the oath.  You can really come here,

16   and I think he can administer the oath here.

17             **(Witness sworn in by the deputy clerk.)**

18             **THE COURT:**  If you'll spell your name for the court

19   reporter.

20             **THE WITNESS:**  Stacy, S-T-A-C-Y.  Friedman,

21   F-R-I-E-D-M-A-N.

22             **THE COURT:**  And then, Mr. Friedman, you can pull

23   that microphone a little bit closer to you.  Just keep your

24   voice up so that everybody can hear your testimony.

25             **THE WITNESS:**  How is this?  Can everyone hear me?

1          **THE COURT:**  That's fine, yes.

2          **MR. FINNERAN:**  John, would you mind turning on the

3     screen.

4          Do you have it on?  Is it on?

5          **THE CLERK:**  Just make sure the connection is

6     secured.

7          **MR. FINNERAN:**  There we go.  Okay.  Very good.

8          Your Honor, may I inquire?

9          **THE COURT:**  You may.

10                         **STACY FRIEDMAN,**

11    having been first duly sworn in by the clerk, testified:

12                         **DIRECT EXAMINATION**

13    **QUESTIONS BY MR. FINNERAN:**

14    Q.   Mr. Friedman, would you please introduce yourself to the

15    jury, please.

16    A.    Hi.  My name is Stacy Friedman.  I'm a technical expert

17    in the casino gaming industry.

18    Q.    Mr. Friedman, in order to -- have you been retained as an

19    expert by TNT in this case?

20    A.    Yes, I have.

21    Q.    Move the mic a little closer for the benefit of the court

22    reporter.  Thank you.

23          And as part of your preparation for your testimony

24    today, have you created some visual aids to help assist the

25    jury in understanding your testimony?

1   A.    That's right.  I made these slides.

2   Q.    All right.  So the first slide here, can you just tell us

3   what it reflects and what we're going to see as we go forward?

4   A.    This is the cover slide.  It reflects the name of the

5   case -- I understand it's *TNT Amusements v. Torch*

6   *Electronics* -- my name, and the name of my company, Olympian

7   Gaming, LLC.

8   Q.    Okay.  So why don't we begin first by giving the jury a

9   little background about yourself.

10         Can you tell us what, in your view, qualifies you to

11  provide expert testimony in this case?

12  A.    Sure.

13         So in -- well, I graduated in 1996.  In '98, I

14  joined a slot machine company called Silicon Gaming.  They were

15  in Palo Alto.  And I was a mathematician and game designer for

16  them.  So I actually made slot machine math.  I helped design

17  the game play, the graphics, the way the games behaved.  Sold

18  some games in Las Vegas and Atlantic City.  This was in the

19  '90s, again.

20         In 2001, I started my own consulting practice.

21  Because right around then, online casinos became really

22  popular.  I acted as a consultant to them, helping them to know

23  how to make their games.

24         Through my company, I've developed a number of

25  different kinds of games:  slot machines, table games, bingo,

1  lottery-style games.  I've received approvals in a number of

2  different gaming jurisdictions.  I've had my games out in the

3  market.

4          And I've also -- among the other things I've worked

5  on is I've developed my own patented games.  So I have patents

6  on several of my game concepts.

7  Q.    Now, in terms of your -- that's sort of your experience

8  in the field.

9          In terms of your experience as an expert witness,

10  have you testified as an expert before?

11  A.    I have, yes.  Many times.  In fact, just a couple of

12  months ago, I was in a different trial.

13  Q.    In what -- generally, what sort of cases have you

14  testified previously?

15  A.    Well, they're all related to gaming technology in one

16  form or another.  I've worked on a lot of patent cases where

17  someone accuses a product of infringement of a patent, and I

18  have to either look at the internal technology of the accused

19  product, compare that against what the patent says, and see if

20  there's a match.  But I've done contract matters, regulatory

21  disputes, whether games meet the regulatory requirements in

22  certain jurisdictions.  And I've done a lot of underlying

23  technical analysis for that, including source code review.

24  Q.    Now, that's your experience and your -- both as an expert

25  in the field.

1          What about your education?  How are you educated in

2    the field of computer science?

3    A.     Yes.  I have a degree from Harvard in computer science.

4    I graduated in '96 magna cum laude.

5    Q.     So let's talk, then, about what specifically you were

6    asked to look at in this case.

7          So tell the jury, what have you done in this case to

8    prepare for your expert testimony?

9    A.     Sure.

10          So I reviewed -- well, I received a number of -- a

11    number of physical objects, a bunch of drives.  So SSDs, the

12    sort of thing that you would normally find in a computer or

13    laptop.  I received a box full of parts from TNT which

14    contained a little computer.  You'll see a photo of that.  That

15    computer contained a different one of these drives.

16          I looked at a lot of documentation, evidence,

17    testimony from the parties but also the expert for Torch, a

18    fellow named Nick Farley, and other materials that you folks

19    sent me.

20    Q.     All right.  And you mentioned a moment ago drives.

21    A.     Yes.

22    Q.     I actually believe I have a few of them right here.  So

23    I'm just going to take out this one, which is marked for

24    identification as Exhibit 240.

25          MR. FINNERAN:  May I approach the witness, Your

1    Honor?

2            **THE COURT:**  You may.

3    QUESTIONS BY MR. FINNERAN:

4    Q.    So I don't keep walking back and forth.

5    A.    Okay.

6    Q.    So I've just handed you Exhibits 240 through 243.

7            And just looking at 240, can you explain to the jury

8    what you're holding in your hand?

9    A.    Yeah.  This is what's called a solid-state drive, or SSD.

10   Q.    What is an SSD, or solid-state drive?

11   A.    It's essentially computer storage media.  These are

12   common parts.  You can buy them on Amazon or at Best Buy.  I

13   personally have bought this particular model before.  In fact,

14   as part of this case.  This specific drive, however, was sent

15   to me by TNT -- sorry -- by Torch.

16   Q.    "By Torch," meaning the defendants in this case?

17   A.    Yeah.  Yes, that's correct.

18   Q.    Okay.  So we're looking here at, standing in the

19   courtroom, a very large device.

20           Does this device have, inside of it, a drive similar

21   to the one that you just showed the jury?

22   A.    It does.  In fact, it's my understanding that the drive

23   that's in there is equivalent to one of the drives that's in

24   this bag.

25   Q.    So why don't you tell us about the other drives in the

1    bag which have been premarked as Exhibits 241, 242, and 243.

2    A.    Sure.

3          So they're all solid-state drives.  They're just

4    different versions or models, I guess, or suites of the game

5    contents that can be operated on machines like this.  They're

6    labeled "NCG Deluxe," which is Exhibit 243, and that's what I

7    believe is in this machine.

8          Exhibit 242 is labeled "NCG4."

9          Exhibit 240 is labeled "NCG Suite 2."

10         And Exhibit 241 is labeled "NCG3."

11   Q.    So you reviewed more than just these four drives; is that

12   correct?

13   A.    That's correct.

14   Q.    But are these four drives that I just handed to you the

15   original versions that you were sent by the defendants?

16   A.    I believe these were the second versions that were sent

17   to me by the defendants.

18   Q.    Okay.

19         MR. FINNERAN:  Your Honor, at this time, we'd seek

20   to move into evidence Exhibits 240 through 243.

21         THE COURT:  Any objection, Mr. Craig?

22         MR. CRAIG:  No objection, Your Honor.

23         THE COURT:  Exhibits 240, 241, 242, 243 are

24   admitted.

25         MR. FINNERAN:  You can place those to the side.

1   QUESTIONS BY MR. FINNERAN:

2   Q.    So now let's talk about the techniques you used to

3   conduct your analysis of these drives.

4          So can you, first, tell the jury what you did with

5   respect to what we call the executable software?  And try not

6   to get too technical if you can.

7   A.    Understood.

8          Well, so the bottom line, because this is a standard

9   computer part, I was able to plug it into a commodity drive

10  reader, basically an external dock, and plug it into my own

11  computer and use open-source tools to review what was on here.

12  And I did that for all of the drives.

13          And so what I was able to do is I found the game

14  code, the actual executable program code on here, and I used a

15  tool called JetBrains dotPeek that can open up that code and

16  show me the English version of the source code essentially the

17  computer programmer would write.

18  Q.    So can you just define -- when you say "source code," for

19  those on the jury who might not be familiar with that term, how

20  does source code relate to a computer program, just at a very

21  basic level?

22  A.    Sure.

23          So what you might find on your desktop on Windows is

24  an executable program.  In order to run it, you might

25  double-click, that sort of thing.

1          The source code is the language that program was

2     written in.  It was written by a programmer and what's called

3     "compiled" into that program that you would then double-click.

4          The particular language that these programs were

5     written in is called Microsoft .NET.  It's a framework by

6     Microsoft.  It's easily de-compilable.  And so there are tools

7     that allow you to turn it back from the clickable program into

8     the language that is readable by programmers.

9          So that's what I did.

10    Q.   So did you also evaluate the, what are called, "database

11    files" on those and other drives?

12    A.   Yes.  That's right.  So also on these drives is a

13    Microsoft database that stores information related to the games

14    that the programs run.  So I opened that up using a different

15    tool, Microsoft Visual Studio.  Again, these are all developer

16    tools that are provided.  In this case, Microsoft Visual

17    Studio, as you might suspect, is provided by Microsoft.

18    Q.   Also on your slide, you have mention of metadata

19    analysis.

20         Just very basic level, can you explain what

21    "metadata" refers to in this slide?

22    A.   Yes.

23         So metadata is data about the files:  when it was

24    created, how big it is.  And there's a program called a

25    checksum or a tool called a checksum that essentially takes a

1  giant file and turns it down into a small piece of data.  And

2  that small piece of data is really good at allowing you to

3  compare whether two different giant files are the same.

4  Q.    And the tool used for that, is that what's referred to

5  here as FileCheck?

6  A.    That's correct.

7  Q.    In addition to reviewing what was on the drives received

8  from Torch, did you also inspect components provided to you by

9  TNT?

10 A.    That's right.  They shipped me a rather large box.  I

11 think it was 2 feet by 2 feet or so.  It had a monitor, power

12 supply, computer.  Inside the computer was one of these drives,

13 number of other components.  So when I received that, I

14 actually plugged it together and observed the machine in

15 operation.

16 Q.    All right.  So we're going to now take quite a bit of

17 time to go through how you reached your findings.

18        But just to help the jury as we get started here,

19 can we summarize the conclusions that you reached at the end of

20 your analysis with respect to these drives?

21        So let's start first with whether these drives

22 included any random functions.

23 A.    Yeah.  In fact, all of them did.  I opened up each of

24 these drives, and I looked through the source code of the game

25 program and also inside the database.  There's programs inside

1    the database as well, and I found evidence of random number

2    generation in both of those places.

3    Q.    So you've detailed here three of those places.

4          So what is the first place where you identified

5    random functions within this Torch device?

6    A.    Right.

7          So the way these games work is they pull a prize

8    amount from a database.  When the game program gets this

9    amount, that's all it gets.  So what it has to do is figure out

10   how to display that amount.  It's not just going to just say a

11   dollar; it's going to spin reels and show graphics and all of

12   that.  And all of that depends on the game themes.  So there's

13   a whole bunch of different game themes.  You will see that, I

14   think, when we turn this on.

15         There are random functions in deciding what those

16   visual outcomes look like.

17   Q.    So you just used this term "RNG," or random number

18   generator.

19         Again, at the most basic level possible, can you

20   explain to the jury what you mean by "random number generator"?

21   A.    A random number generator is a mathematical function

22   inside of a computer that produces a sequence of unpredictable

23   numbers.

24   Q.    And what, generally, in software design is the purpose of

25   a random number generator?

1  A.    Well, it's to produce a sequence of unpredictable

2  numbers.  Generally speaking, there are lots of reasons why you

3  might want randomness in a system.  In a case like this, you

4  might actually just want to simulate how dice are thrown, and

5  you have to be able to randomly pick, between one and six, what

6  side shows on the top of the die.  You can either roll a

7  physical die and write it down; but in computers, it's very

8  common and, frankly, convenient to be able to have software, a

9  piece of program code, that does that for you.

10  Q.    So that, then, is what you identified with respect to the

11  visual outcomes of the game; is that correct?

12  A.    That's correct.

13  Q.    What about the selection of the starting point in what

14  are called the prize pools?  Can you explain what you found

15  there to the jury at a high level?  Because we'll get into it.

16  A.    Understood.

17        So I just said that the game -- the visuals pulls a

18  number from a database.  Well, those numbers are stored in a

19  giant list in that database.  Where it starts picking numbers

20  from is selected randomly.

21  Q.    And then you also identified -- well, tell us what you

22  identified in three of the drives with respect to any random

23  shuffling.

24  A.    Yes.

25        So as the game is picking these numbers from this

1  list of prizes, on three of the drives that I evaluated, after

2  a certain number of these prizes were played, it would go back

3  and shuffle the order of the previously played prizes so that

4  the next time you went through the whole list, that batch or

5  that block of tickets would be in a different order.

6      **MR. CRAIG:**  Objection.

7      Your Honor, may we approach?

8      **THE COURT:**  Approach the sidebar.

9      **(A bench conference was held on the record and**

10  **outside of the hearing of the jury as follows:)**

11      **MR. CRAIG:**  Your Honor, this relates to the random

12  shuffle feature in the Torch devices that Mr. Farley sent

13  erroneously that we had previously mentioned in a motion in

14  limine.  It's all throughout all of their slides.  We think

15  this is highly prejudicial.  It's totally irrelevant.  It's not

16  going to be meaningful, because there's not going to be a

17  single witness, including this guy, who can say that it was

18  ever present in a single device anywhere in the state of

19  Missouri.

20      **MR. FINNERAN:**  Your Honor, I think you've

21  preliminarily ruled on this, but that goes to the weight of

22  this evidence.  If they wish to present evidence to the effect

23  that these are not in Missouri, they can.  So far, all we have

24  on that is the word of the defendants.  These were sent by the

25  defendants to Mr. Friedman.  He analyzed them.  And there's

 1    been motion practice on this before.

 2            **THE COURT:**  The objection will be overruled.

 3            **MR. CRAIG:**  To save us from coming back up here

 4    again, I'm sure that you're going to try to introduce these

 5    drives?

 6            **MR. FINNERAN:**  No.

 7            **MR. CRAIG:**  Okay.  Good.

 8            **(The proceedings returned to open court and in the**

 9    **presence of the jury.)**

10            **THE COURT:**  Counsel, if you'll repeat the question.

11            **MR. FINNERAN:**  I think the witness had concluded the

12    answer, Judge, but if you'd like, we can go back.

13            **THE COURT:**  I'm not sure I caught it, so --

14            **MR. FINNERAN:**  Okay.  Fair enough.  We'll do that,

15    then.

16    **QUESTIONS BY MR. FINNERAN:**

17    Q.    So, Mr. Friedman, could you just take one step back and

18    tell us, in these three drives that you mentioned, what, if

19    anything, did you identify with respect to the random shuffling

20    of prizes?

21    A.    Right.  I think -- essentially, the way it works is, as

22    you're playing through this list of prizes that's stored in a

23    database, after a certain number have been played, the program

24    will shuffle up the previous batch of tickets so that -- or

25    prize multipliers, you'll see -- so that the next time you play

1   through, those batch or the prizes in that batch are in a

2   different order.  So they've been shuffled.

3   Q.     Did you also, as part of your findings, identify elements

4   in the games that were not under the player's direct control?

5   A.     Yes, that's correct.

6   Q.     And just very briefly again, since we'll go through the

7   details, what did you find with respect to that?

8   A.     So first of all, that prize pool that we talked about,

9   list of game prizes, is in an order that's not controllable by

10  the player.  So I say here the pools are actually stored in

11  database tables as a multiplayer of the play mat.  And you'll

12  see 0.0, 1.2, that sort of thing.

13         In order to get the prize that's displayed on the

14  game, you have to multiply by how much you played.  So you have

15  a multiplier and you have, say, $5.00.  So multiplier of 1.2

16  times $5.00 would yield a $6.00 prize.

17  Q.     And then what with anything -- what, if anything, did you

18  find with respect to the ability of the player to control any

19  of the visual game outcomes?

20  A.     Yeah, they can't.  The game chooses that randomly.

21  Q.     Did you also make any assessments relating to the

22  optional prize viewer feature?

23  A.     Yes.  So the prize viewer feature, it shows a prize

24  amount.  First of all, it's optional, so you don't have to use

25  it.  There's a button.  We'll see the button.  And it shows the

1  amount of the next prize.  It doesn't show you what the reels

2  are going to display.  It doesn't show you the symbols.  It

3  doesn't show you, if there are any wins, what pay lines those

4  will be on.

5          You can't skip -- if it shows you a zero, you can't

6  skip that, so you have to essentially pay for that in order to

7  find out what the subsequent prize is going to be.  And the

8  player using the prize viewer, if they do press the button,

9  they don't know what the prize is for more than one play.

10 Q.    And then in terms of a player who doesn't use the prize

11 viewer, did you identify whether that player would have any

12 information about any play of the game before betting their

13 money?

14 A.    Yeah.

15          If they don't use the prize viewer, they can't view

16 any prizes, so they don't have any idea what's coming.

17 Q.    And just one more conclusion.

18          I think you may have said this earlier, but did you

19 identify two drives that actually had fundamentally identical

20 game software?

21 A.    That's right.  In fact, this drive right here, NCG

22 Suite 2 from Torch, had identical software, and specifically

23 the checksums on the game code was identical with the game

24 software on the drive in the computer that TNT sent me, and so

25 were the functions in the database.

1    Q.    All right.  So then let's now go through how you reached

2    some of those conclusions.

3          So first, as a matter of background, are you

4    familiar with the concept or the term "electronic gaming

5    machine"?

6    A.    Yes.  That's what modern slot machines are called, among

7    other things.

8    Q.    All right.  So tell us more about how, then, electronic

9    slot machines typically work.

10   A.    Yeah.

11         So all modern slots are essentially

12   computer-controlled.  They might still have mechanical reels,

13   physical reels that you can see spinning, but those are

14   controlled by computer-controlled stepper motors.  So they

15   don't spin freely and mechanically.  There's actually a motor

16   in there that can stop at any of the positions.  So that's

17   controlled by a computer.

18         Or in a large video screen, for example, there's no

19   mechanical reel.  So everything on the screen is just graphics.

20   You'll see reel animations, but all of that is generated by a

21   computer.  And either the reels spinning or the visual

22   animation, that's going to be generally controlled by a random

23   number generator.  We just talked about that, but I have a

24   definition here on the screen.

25         Random number generator, sometimes I'll say "RNG."

1    That's just me being short.  I apologize if I do.

2          RNG, what it means is it's a mathematical function.

3    It's designed to produce an unpredictable sequence of numbers.

4    Q.    Now, are you also familiar, based on your expertise, with

5    how EGMs, or electronic gaming machines, make a determination

6    as to whether or not any particular turn will produce a winning

7    or a losing prize amount?

8    A.    Yes.  So there are, effectively, two ways this happens.

9    In a traditional, typical Las Vegas-style slot machine, the

10   sort that I started out designing, the random number

11   generator -- sorry.  After you press the "Play" button, after

12   you've made your wager and you press the "Play" button, a

13   random number generator selects where the reels will stop.  So

14   the reels might be a large strip of symbols, and maybe there's

15   100 of them.

16         The random number generator has to pick, between 1

17   and 100, where the reels are going to stop spinning.  So it

18   does that for all the reels, it spins them, and then the game

19   evaluates what the prize is going to be.

20         So that's the way typical Las Vegas slot machines

21   work.

22         But there's what I call the sort of reverse way.

23   Essentially, you're going backwards.  You start with what's the

24   prize going to be, and then you spin the reels to match that

25   prize.  So in other words, if you start with the game has to

1  pay out $5.00 and you have these reels, then the question is,

2  how do you make the reels display the prize of $5.00 that

3  you've already determined?

4  Q.    And just since you just explained it as a preview, do you

5  know which of these two methods the Torch devices use in order

6  to dictate what the reels will show?

7  A.    Well, I do, because I've looked at the code.  But you

8  can't tell just by playing the game.

9  Q.    So tell me -- just say more about that.

10         Why is it that simply by looking at or playing the

11  game you couldn't tell whether either of these methods was

12  used?

13  A.    Well, because it's -- essentially, it's behind the

14  scenes.  When you press the "Play" button, all the player can

15  see is what's showing up on the screen.  You can't see what's

16  going on inside a database, if there even is a database,

17  whether in many cases the results can come in over a network.

18  This is the way a lot of tribal games work, for example, in

19  Washington State or the New York State lottery.  You just --

20         **MR. CRAIG:**  Objection, Your Honor.

21         May we approach?

22         **THE COURT:**  What's the objection?

23         **MR. CRAIG:**  I mean, we're talking about games in

24  other states and other regulated markets that are not Torch

25  games, which I think it falls within your --

1          **THE COURT:**  I'm not sure it's relevant.

2          **MR. FINNERAN:**  That's fine, Judge.  We can move on.

3    QUESTIONS BY MR. FINNERAN:

4    Q.    All right.  So finally, then, on this topic, are you

5    familiar with any electronic gaming machines that do have a

6    preview feature?

7    A.    I am, in fact, yes.

8    Q.    What do we mean by a "preview feature"?

9    A.    Well, what I mean by a "preview feature" is a feature

10   that lets the players see something about the game that's

11   coming up before they bet on it, before they play.

12   Q.    And what, if any, prior experience do you have with such

13   preview screen features?

14   A.    Right.

15          So I was involved in a patent case where a company

16   had a patent on -- the patent title, I think, involved the

17   phrase "preview screen."  So it was --

18          **MR. CRAIG:**  Objection, Your Honor.

19          May we approach?

20          **THE COURT:**  Approach the sidebar.

21          **(A bench conference was held on the record and**

22   **outside of the hearing of the jury as follows:)**

23          **MR. CRAIG:**  Judge, he's going into this patent case

24   about some other device that is not our device.  This is the

25   same thing we're going into.  It has --

1          **THE COURT:**  He's talking about a prize viewer.

2   Before, he started talking about tribal devices, and that, I

3   agree, was not relevant.  This, I'm going to overrule the

4   objection.

5          **MR. FINNERAN:**  Thank you, Judge.

6          **(The proceedings returned to open court and in the**

7   **presence of the jury.)**

8          **THE COURT:**  You may proceed.

9   QUESTIONS BY MR. FINNERAN:

10  Q.    I'm sorry, Mr. Friedman, you were just saying, in

11  response to my question, what, if any, experience do you have

12  analyzing preview screen features in electronic gaming

13  machines?

14  A.    Right.

15          So like I said, there was a patent case involving a

16  company that made games with a preview screen feature, and they

17  asserted a patent against another company.  And as part of my

18  work in that case, I actually looked not only at the patent,

19  but I looked at the code for the plaintiff, who owned the

20  patent, and I looked at their games and the code to see how it

21  worked.

22  Q.    So is it fair to say that based on your expertise and

23  experience, you're familiar with how, then, typical electronic

24  gaming machines, which would be called "slot machines" in

25  casinos, typically function?

1    A.    That's correct.

2    Q.    All right.  So can you walk the jury through, then, from

3    the perspective of a player, what typical slot machine game

4    play might feel like and look like in a casino?

5    A.    Sure.

6          So the first part is you've got to get money onto

7    the machine.  So you insert money usually with a bill acceptor.

8    It's not -- there are no more coin slots in slot machines.  You

9    put money in a bill acceptor, and what you'll see is there's a

10   credit meter on the screen.  There will be credits reflecting

11   the money that you just deposited.  And then you press a button

12   to initiate play.  Usually, it says "Spin" or "Bet" or "Play."

13   And then what you'll see is the credits on the meter will

14   decrease to correspond to the amount that you just wagered.

15         And then, what will happen is the reels will spin,

16   you'll observe the visual game outcome.  The game will reveal

17   what the prize is, what the outcome is, the final series of

18   reels, any winning pay lines.  You'll see all those graphics.

19         Generally speaking, you don't have -- the player, I

20   should say, doesn't have the ability to affect what the game

21   does.  That's all chosen randomly.

22         If there's a win, the player will see the credit

23   balance increase to correspond to that winning amount.  And

24   then you can use the prior -- any prior winnings to make

25   another play.  But if you decide you're done playing, there's a

1    cashout button, you can redeem your money.

2    Q.    So just to pause briefly on Step Number 4, you say that

3    the win/loss is revealed without the ability to affect it.

4          In most typical casino slot machine games that

5    you've seen, is there any element of skill on behalf of the

6    player?

7    A.    Most -- for most games, there is not.  There are subsets

8    of games, like video poker, where the player actually does make

9    decisions, or video versions of blackjack, for example.  If you

10   play poorly, you'll lose more.  But for most slot machine

11   games, the only game play interaction is press the button,

12   watch the reels spin, and then, eventually, the game ends.

13   There's no other player interaction.  So there's no opportunity

14   to exercise control.

15   Q.    Okay.  So -- and to be clear -- you may have said this

16   before, but with respect to the Torch devices that you've

17   reviewed, is there any element of skill in those games that you

18   observed?

19   A.    Not that I've observed, no.

20   Q.    All right.  So you've alluded to it a couple of times

21   that there is a Torch machine standing here.  And so I'd like

22   to now do a demonstration, if we could, to allow you to show

23   how game play proceeds on the Torch device.  There should be a

24   lavalier microphone near you.

25         Do you see that at the witness stand?

```
1   A.    I do.

2         THE COURT:  Mr. Friedman, I just need you to keep

3   your voice up when you step down and go over to the machine.

4         THE WITNESS:  Can you hear me?  Is that working?  I

5   can't tell.

6         MR. FINNERAN:  Speak up.

7         THE COURT:  Just keep your voice louder.

8         MR. FINNERAN:  Your Honor, with the Court's

9   permission, I'd like to turn the Torch device on.

10        THE COURT:  Go ahead.

11        THE WITNESS:  Check, check.  Can you hear me?

12        THE COURT:  We can hear you.

13        THE WITNESS:  Can you hear me?

14        THE COURT:  Yes.

15        THE WITNESS:  Okay.

16  QUESTIONS BY MR. FINNERAN:

17  Q.    Mr. Friedman, if you wouldn't mind, would you stand to

18  the other side of the machine just so I can see.

19  A.    I'll try not to block anything.

20        Can you still see?

21        THE COURT:  Mr. Friedman, don't worry about that

22  screen.  Just worry about the device.

23        THE WITNESS:  I understand.

24  QUESTIONS BY MR. FINNERAN:

25  Q.    Mr. Friedman, first of all, what is happening right now
```

1    as the machine is turning on?

2    A.    Well, this is in its boot-up phase, actually.  If you

3    look down here, you can see a Windows title bar.  There's a

4    mouse pointer in the middle.  So we're still booting up the

5    machine.

6    Q.    While we're waiting for the machine to boot up, prior to

7    working with this machine right now, have you previously

8    evaluated a complete, full Torch device as is standing in front

9    of you right now?

10   A.    Not in Missouri.  Or not -- no, not fully put together,

11   no.

12   Q.    You, instead, as I understood from your testimony,

13   reviewed the software that is inside a machine like this?

14   A.    That's correct.  I also, again, reviewed the components

15   that were sent to me, put them together at my home lab.

16   Q.    Mr. Friedman, is the screen now showing information?

17   A.    It is, yes.  We're at what's called an attract screen.

18   Q.    And for the benefit of the court reporter, I'll ask you

19   to just raise your voice.  We've got the mic as close as we

20   can.

21   A.    Yes.

22   Q.    But please speak loudly.

23   A.    Yes.

24          So that's attract.  In other words, to attract

25   people who are walking by.

1    Q.    So can you tell the jury just -- let's orient them first.

2          What do we see across the bottom of the screen in

3    terms of games?

4    A.    Right.

5          So there are five little panels.  Each one says

6    "Play."  There are five different game themes that are listed

7    here.  One is called *Sparky's Firehouse*.  One is called *Bourbon*

8    *Street Dice*.  One is called *The Curious Case of Dr. Jekyll &*

9    *Mr. Hyde*.  One is called *Ticket to Ride*, and one is called *Kiss*

10   *Me I'm Irish*.  And right above that, it says "Please choose a

11   game."

12   Q.    Would you please choose *Sparky's Firehouse*.

13   A.    All right.  I'm pressing the "Play" button underneath

14   *Sparky's Firehouse*.  And now you can see it's transitioning to

15   a loading screen, and now here we are on the game.

16   Q.    Okay.  So, again, just to orient the jury to what we're

17   seeing on the screen, if we look in the sort of center of the

18   screen where these dollar amounts are, do you know what those

19   dollar amounts are in the center of the screen?

20   A.    Yeah.  That represents the pay table.

21   Q.    What do you mean by the "pay table"?

22   A.    So pay table represents the winning payouts for

23   combinations of symbols.  And so here, for example, is -- looks

24   like a hatchet.  Pays $8.00.  And it's really hard to see, but

25   there are pay lines that crisscross behind the field of

1   symbols.  So if you get three in a row, it's going to pay out

2   $8.00.

3   Q.    Now, if we look over here, there's a button that says

4   "Play" on the screen.

5            Do you see that?

6   A.    I do.

7   Q.    And explain, if you can, what the "Play" button does.

8   A.    Well, what the "Play" button will do is it will take the

9   current play amount and essentially start play at that amount.

10  So right now, you can actually see there's credits, $0.25 in

11  credits, which means the current dollar play amount.  That's

12  too much.  You don't actually have that.  But if there were

13  more money on here, then pressing the "Play" button would start

14  the game at the dollar level.  It would decrement the credit

15  meter by a dollar and then start play.

16  Q.    I hope the jury can see.

17           Is there also a physical "Play" button on the device

18  itself?

19  A.    That's right.  So there's a physical button panel.

20  There's a cup holder, but then two "Play" buttons are about --

21  what is that -- 4 inches, an oval shape.  And they both say

22  "Play."  These are right here.

23  Q.    Do those buttons function any differently, to your

24  understanding, than the "Play" button on the screen?

25  A.    It's my understanding that either pressing this "Play"

1  button -- or the soft button, is what it's called -- on the

2  screen would activate the same code to start the game play.

3  Q.    Just one more orientation question.

4        You mentioned the play amount.  I see there's a plus

5  and a minus on either side of it.

6        Can you illustrate how that works?

7  A.    Yes.

8        So this is what we call the multi-denomination game

9  where the player can actually choose how much they're playing.

10  So right now, it's set to a dollar.  I'm pressing the "Minus"

11  button.  Now it's gone down to $0.50.

12        I'm going to press the "Minus" button again.  Now

13  it's down to $0.25.

14        And by the way, you saw the "Play" button go from

15  gray to yellow -- or orange indicating that it's active.  So

16  now I can play if I want to because there's a quarter already

17  on here.

18  Q.    Is it also true that the physical "Play" buttons have

19  also lit up?

20  A.    That's correct.

21  Q.    All right.  So let's do a short demonstration, then, for

22  the jury of how one might play the devices.  I'm going to hand

23  you, Mr. Friedman, a $5.00 bill, and if you would start by

24  inserting that bill into the machine.

25  A.    Okay.  So Counsel just handed me a $5.00 bill.  This blue

1  lit-up rectangle here, that's the bill validator.  So I'm going

2  to put the $5.00 bill in the bill validator, and you heard it

3  accept it.

4         Now, over here, you saw a little animation.  Now it

5  says $5.25 on the credit meter.  So I've just bought into the

6  machine.

7  Q.    Okay.  So is that step one of inserting money and causing

8  the credits on the meter to increase?

9  A.    That's right.  It's -- that's exactly what just happened.

10 Q.    So if a player then wanted to initiate play on this

11 machine, how could they do so?

12 A.    Well, they could either press the soft button here, which

13 is glowing, or down here, which is lit up, the physical button

14 on the button panel.

15 Q.    Would you please do so.

16 A.    All right.  I'm pressing the physical button on the

17 button panel.  You see the reels spinning.

18        And I didn't win anything.

19 Q.    How can you tell that you did not win anything?

20 A.    So, actually, there's a giant -- not giant, but the

21 number is larger -- meter in the middle of the screen that says

22 "Win."  This actually displays the game outcome.  The prize,

23 anyway, the zero -- you can see zero dollars and zero cents.

24 And this particular combination of symbols does not represent a

25 winning prize.  So my win is zero.  And that's just a term of

1  art.  Whatever comes out of the machine is called the "win" in

2  the gaming space.

3  Q.    So now that we've just done Steps 2 and 3 by playing and

4  observing a visual game outcome?

5  A.    Yes, that's correct.

6  Q.    And we just talked about the win result being

7  demonstrated.

8         Based upon your review of these devices, is there

9  any way for the player to change what that win amount would

10  have been?

11  A.    No, you can't change.  That comes out of a database.

12  I'll talk about that later.

13  Q.    All right.  So the next step, number 5, would be the

14  credits increasing if we win.

15         So would you continue to play the Torch device,

16  please, until there's a win, and if you can recite for the

17  record what's happening on each play.

18  A.    Sure.

19         So I'm going to press the "Play" button again.  The

20  reels are spinning.  And something glowed in the middle, but it

21  still says $0.00 win.

22         So I'm going to press the "Play" button again.  And

23  still $0.00 return.

24         I'm pressing the button again.  And it's glowing but

25  still no payout.

1   Q.    Before we move on, there's these lines that have appeared

2   behind the symbols?

3   A.    Yes.

4   Q.    Can you explain what that refers to?

5   A.    Right.

6         So those would typically be pay lines.

7         Now, just so we're clear, other games are going to

8   have different rules and different ways of displaying the win.

9   And if you'd like, we can go to one of those other games just

10  to illustrate the difference.  But those pay lines would

11  indicate where the winning symbols need to be in order to

12  reflect a nonzero prize.

13  Q.    Okay.  Let's keep playing until we get a win, if

14  possible.

15  A.    I'm pressing "Play" again.  Reels are spinning.  And

16  still nothing came out.

17        Pressing "Play" again.  I'm on a cold streak.

18        And I pressed "Play" again, and still no win.

19        I'm pressing "Play" again, and still no win.

20        Would you like to try a different game?  I can keep

21  going.

22  Q.    I think we should just keep going.  I don't want to

23  change the process.  So go ahead.

24  A.    All right.  I'll press "Play" yet again, and let's see

25  what happens.

1          Okay.  Still nothing.

2          Now, there's a "bonus" symbol on one reel and a

3  "bonus" symbol that showed up on a second reel but then still

4  showed me no win.

5          How about we go to a different game?  No?

6  Q.    I think we should keep just trying to --

7  A.    Okay.

8  Q.    -- make sure we get through this one if we can.

9  A.    If we can.  It's your $5.00.

10          So I pressed "Play" yet again, and still no prize.

11          We'll do it again.

12          And there, we got three fire extinguishers on the

13  bottom pay line for a win of $0.50.

14  Q.    Okay.  So you just said a win of $0.50.

15          So is that an example of the credits increasing on

16  the machine?

17  A.    Right.  Because down here, the credit meter, which had

18  been steadily decreasing by $0.25 every play, went up by $0.50

19  after the spin had ended.

20  Q.    Okay.  And that would correspond to Step 5, then?

21  A.    Yes, that's correct.

22  Q.    Okay.  So now that your credits have increased, do you

23  have the ability to use those credits to continue to play?

24  A.    I can.  In fact, I'll do that right now.

25          I'm pressing "Play" again, and the reels are

1  spinning, and --

2  Q.    Just want to ask one question here.

3  A.    Okay.

4  Q.    It says $0.50 there, but what does it say below it?

5  Because we're a little far away from the jury.

6  A.    It says "Last Win." Okay. So I put my money in, but it

7  didn't tell me that I just lost.

8  Q.    Right. So keep going.

9  A.    And it still says $0.50 last win even though I just put

10 my money in, and the credit meter has decreased.

11 Q.    So in other words, what the center is now displaying is

12 not the current win but the last time the player won; is that

13 correct?

14 A.    Last time the player won, that's right.

15 Q.    All right. Could you play two more times to get it down

16 to $1.75? Well, unless we win. Then we may have to keep --

17 A.    Well, let's see what happens.

18        I'm pressing the "Play" button again. That was not

19 a win.

20        And I'm pressing the "Play" button again.

21 Q.    Okay. And so now we've just used some winnings to make a

22 play.

23        Are you now able to do the final step of redeeming

24 your credit balance?

25 A.    Right. So for that, there are -- there's a physical

1   button right here that says "Collect," and the cashout button,

2   I think, is on the main screen.

3          Would you like me to press the -- the "Collect"

4   button doesn't appear to be active.  So I believe you have to

5   go back to the main screen in order to cash out.

6   Q.    Well, why don't you try pressing it.

7   A.    Right.  Pressing it.

8          Oh, there it goes.  It says, "Are you sure you want

9   to collect $1.00?"

10  Q.    Now, just very --

11  A.    It says "No" or "Yes."

12  Q.    Right.

13         So before you click that, can you compare $1.00 to

14  the 1.75?

15  A.    Well, so the dialogue box says "Are you sure you want to

16  collect $1.00?" and asked me "Yes" or "No."  The credit meter

17  says $1.75.

18  Q.    And so now let's hit the "Yes" button.

19  A.    I'm going to press "Yes" on the screen.  I can hear a

20  ticket printer going or something happening.

21         Okay.  And I am retrieving a ticket.  The back side

22  of the ticket says "Torch Electronics."  The front side of the

23  ticket has some numbers, including a ticket number, and it says

24  "Amount:  $1.00."  And then in English underneath that, "1 and

25  00/100."

1    Q.    Okay.  Would you mind just putting that receipt into the

2    cup and taking your water, and you can return to the stand.

3    A.    Thank you.

4    Q.    If you could remove the lavalier mic, turn it off.

5          **MR. FINNERAN:**  Your Honor, may I turn off the

6    machine?

7          **THE COURT:**  You may.

8          **MR. CRAIG:**  Rich, could you -- would you mind

9    leaving it on for my cross?

10          **MR. FINNERAN:**  Yeah, sure.

11          **MR. CRAIG:**  Yeah.

12   **QUESTIONS BY MR. FINNERAN:**

13   Q.    Okay.

14          **THE COURT:**  You can just set that on the -- there

15   you go.

16          **THE WITNESS:**  I turned that off.

17   **QUESTIONS BY MR. FINNERAN:**

18   Q.    Okay.  Mr. Friedman, so we've just shown how the device

19   works as a player is playing it.

20          But based upon your analysis, were you able to

21   analyze and determine how the device works internally, in terms

22   of its software?

23   A.    I was.  I opened up all of those drives.

24   Q.    All right.  And so why don't you tell us in a little more

25   detail what you looked at.

1    A.    Sure.

2          So the first thing I got was a physical computer.

3    And this is an image you see on the screen of the NCG2

4    computer.  It contained a hard drive that had essentially the

5    same software as this one that I'm currently holding.

6          Inside that computer, and inside the drive, was game

7    software that interacted with the database.  And that's all

8    inside this machine.  And so when I say "industrial computer"

9    on this slide, I'm talking about this little box.  It's not the

10   same size or shape as what you would normally find on your

11   desktop at home, but it's a machine that's meant to be put into

12   cabinets like this.

13   Q.    And so you said a moment ago -- you referred to the idea

14   of game software.

15          What is the function of the game software on a

16   physical device?

17   A.    That's what provides all of the visuals, the user

18   interface, the ability for the player to interact with the

19   game, cash in and cash out, and in this case, randomly

20   determine what the symbols are.

21   Q.    All right.  And then there's also, you mentioned,

22   something called a database file or a database?

23   A.    Yes.

24   Q.    Can you explain how that differs from the software?

25   A.    Well, so database is software, but it's implemented

1    differently.  It's a standard Microsoft SQL, or S-Q-L, database

2    built into the machine that maintains all of the information

3    storage, so how many times people played, what the prize pools

4    are, current balance for each of the -- for the player.  And

5    more importantly, it contains a number of what are called

6    "stored procedures."  Those are software functions inside the

7    database that actually serve to manipulate the data in the

8    database.

9    Q.    Okay.  So let's now, then, start talking through the

10   basis for the conclusions you discussed earlier about

11   randomness.

12         So first, can you tell us, what are the three places

13   in which you identified randomness in any of the nine drives

14   you reviewed?

15   A.    Sure.

16         The first that I found was in what's called the --

17   selecting the initial index of the prize in the pool.  So the

18   prizes don't --

19   Q.    We'll explain that in more detail.  Just the overview,

20   please.

21   A.    Understood.  Okay.

22         So second is, there's randomness in some of the

23   drives in shuffling batches of prizes in those prize pools.

24         And the third is, in generating the visual game

25   outcome, there's randomness there too.

1    Q.    Right.

2          So you mentioned random base tables a moment ago.

3          Can you help explain to the jury what do you mean by

4    the expression "database table"?

5    A.    Yeah, I mean a database table is a structured form for

6    storing information.  In this case, there are a number of

7    database tables inside the database inside each of these

8    machines.  One of the things the database stores are what are

9    called "prize pools."

10          So I've shown an excerpt on the right side of this

11    slide of just a small number of prizes in one of the database

12    tables.

13          Now, there are dozens, if not hundreds, of database

14    tables for these prize pools.  Not all of them are used for any

15    one machine.  But each one of them stores tens of thousands of

16    prizes.  The games I reviewed stored either 60,000, 75,000, or

17    100,000 prizes.  And so each game theme -- and we just saw five

18    game themes -- and play amount -- and we saw a number of play

19    amounts -- I think $1.00, $0.50, $0.25.  I believe it goes up

20    to $2.00 and $5.00, or can be configured that way.  So --

21    Q.    Just to slow you down a little bit to make sure we're

22    tracking you, can you help us through this table?

23          So there's two columns in the table.  What's the

24    first column?

25    A.    The first column is just essentially a number that

1   identifies the row.  So if you think about a table as a row of

2   entries, the first column is just what the number is from 1 to,

3   say, 100,000.

4   Q.    So you've indicated here the term "index" and you've, as

5   an example, pointed to 23513.

6         Does that simply reflect that that is the 23,513th

7   row in this table?

8   A.    That's right.  That's what that would represent.

9   Q.    And so as you use the term "index" going forward --

10  because I know you'll say that multiple times -- what will you

11  mean, so the jury will understand you?

12  A.    So "index" refers to a particular location into that

13  table.  In other words, if you've got the list of 100,000,

14  where are you?  So the index will point to a particular

15  location.

16  Q.    All right.  The second column says "multiplier" in it.

17        Can you help us understand what the "multiplier"

18  column is?

19  A.    Yes.

20        That's the actual prize in multiplier form.  So

21  regardless of how much you're playing, if it's $1.00, if it's

22  $0.50, that's the prize multiplier.

23        So, for example, if you're playing $5.00 at a time

24  and you -- well, you're on where the index is, you get zero.

25  So then you get zero.

1        That's a bad example, because zero times anything is

2   zero.

3        But if you go all the way down to the bottom of the

4   table, the multiplier is 1.0.  If you're playing for $0.25,

5   you'll get back $0.25.  If you're playing for $2.00, you'll get

6   back $2.00.  So this multiplies the play amount and provides

7   the final prize.

8   Q.    All right.  So -- well, as I understand it, casino

9   mathematicians have maybe a different use of the terms "win"

10  and "lose" than I might.

11       So can you help the jury understand what you mean by

12  a winner and a loser when we're looking at a table like this?

13  A.    Sure.

14       So from an economic standpoint, if you put a dollar

15  into a slot machine and you get back a dollar, you haven't

16  actually won anything; you've just gotten your money back.  And

17  more to the point, if you put a dollar in and you only get

18  $0.60 back, you've lost $0.40.

19       But that's not the way the gaming industry generally

20  calls it.  So if you put a dollar in and you get $0.40 back, it

21  will say, "Congratulations, you've won $0.40."

22       If you look at this table here, you can see

23  multipliers of 60 -- or .6, 1.0, .2, 1.2, .4, and 1.0.  The

24  only true financial winner in that whole list is 1.2.  So if

25  you put a dollar in, you get $1.20 back.  Every other one of

1   those winning amounts where it would tell you that you've won

2   and show you three symbols on the screen, every one of those,

3   other than that 1.2, does not result in an actual win of more

4   money than you put in.

5   Q.    So in other words, when we talk about an outcome being

6   positive, we just mean that it adds more than zero to the

7   balance, not that it is more than what was bet; is that fair to

8   say?

9   A.    That's correct.  Because the way -- the way these

10  machines work, is when -- as soon as you press "Play," the

11  credit meter is decremented.  So that money is gone.  It's not

12  like in blackjack where it's still sitting there, you can see

13  it, the dealer hasn't taken it yet, right?  In a gaming

14  machine, you press the money, your credits go down immediately.

15  So if you ever get anything back, the machine calls that a

16  "win."

17  Q.    What would you, in gaming mathematician and casino

18  mathematician parlance, call a loss?

19  A.    It's just when you don't get anything back.  It's a zero.

20  Q.    In other words, if we were looking at the visual display,

21  there would be no announcement of a win?

22  A.    That's right.  So for all of those times where I kept

23  saying I'm playing and I didn't get any win, those were all the

24  zeros in a table like this.

25  Q.    All right.  So now we're diving into the software a

1  little bit.

2  A.     Right.

3  Q.     So when the player presses that "Play" button, what does

4  the software do with respect to this database table and the

5  current index?

6  A.     It queries the database table.  It says "Tell me where

7  you are.  What's the index?  And give me the multiplier at that

8  index," and it returns that.

9          So in this case, if the index pointed to 23513 on

10  this table, it would return zero, and then it would move the

11  index forward one step.  So --

12          Go ahead.

13  Q.     I was going to say, so in other words, does that simply

14  mean that as the games proceeds, we'll move sequentially

15  through this table?

16  A.     Yes, that's correct.

17  Q.     However, are there -- well, first of all, does the player

18  have any ability to control where that index will set or

19  whether it will jump forward or backwards?

20  A.     No, they can't do any of those things.

21  Q.     And did you identify circumstances that we'll get into

22  more in detail in a moment where the index might not be set

23  already?

24  A.     That's correct.

25  Q.     In those instances, how did the Torch devices determine

1    where to start on that list of perhaps 100,000 outcomes?

2    A.    There's a random process that selects the starting index.

3    Q.    Before we move on from the table, though, one last

4    question.

5          Is there a predictable order or pattern that you

6    were able to discern from looking at the multiplier amounts?

7    A.    No.

8    Q.    So you mentioned a moment ago -- and I'll warn everybody,

9    this is the first piece of source code we're going to look

10   at -- or programing code, rather.

11          **THE COURT:**  Counsel, maybe this as good a time as

12   any to take a very short break and --

13          **MR. FINNERAN:**  Absolutely, Your Honor.

14          **THE COURT:**  -- let the jurors get a drink of water,

15   stretch your legs.

16          Ladies and gentlemen, I'll remind you what I tell

17   you at each recess or adjournment of the court -- you're going

18   to get tired of me saying this -- but keep an open mind about

19   the case until it's finally given to you to decide.  Don't talk

20   to anyone about the case until it's finally given to you to

21   decide.  Don't do any independent research of any kind into any

22   of the issues.

23          If you'll leave your notebooks there on the chair.

24   We're just going to take 10 minutes and we'll get you back in

25   here.

1          We'll be in temporary recess.

2          **THE CLERK:**  All rise.

3          **(Exit jury.)**

4          **(The following proceedings were held in open court,**

5   **out of the presence of the jury:)**

6          **THE COURT:**  Mr. Friedman, you can step down if you'd

7   like.

8          **THE WITNESS:**  Thank you.

9          **THE COURT:**  Counsel, let me just ask you real

10  briefly.  I mean, do you think we're going to finish with

11  Mr. Friedman?

12         **MR. FINNERAN:**  I would doubt if we would finish with

13  his cross-examination.  I believe I will finish with his direct

14  examination.  We're on Slide -- well, maybe not.  We're on

15  Slide 12 of about 30.  It's more plausible we'll either get

16  close to or finish his direct, and we can decide whether you

17  want to start his cross or not.

18         **THE COURT:**  I want to try and avoid killing the

19  jurors on the first day.  So I probably will try and see if we

20  can get through the direct examination.

21         All right.  Let's take just a couple of minutes and

22  let them stretch their legs and get a drink of water.

23         We'll be in recess.

24         **(At this time, the Court declares a recess.)**

25         **THE COURT:**  Counsel, are we all set to get the jury?

1          **MR. FINNERAN:**  Plaintiff is.

2          **MR. CRAIG:**  Yes, Your Honor.

3          **(Pause in proceedings.)**

4          **THE COURT:**  Please rise.

5          **(Enter jury.)**

6          **(The following proceedings were held in open court,**

7     **in the presence of the jury:)**

8          **THE COURT:**  Court will be back in session.  You can

9     be seated.

10         Mr. Friedman, you've retaken the witness stand.

11    You'll recall you're still under oath.

12         **THE WITNESS:**  Yes, Your Honor.

13         **THE COURT:**  And, ladies and gentlemen, if you'll

14    just double-check, make sure you have the correct notebook that

15    corresponds -- the number should correspond with your juror

16    number.  So that's 1, 2, 3, 4, 5, 6, 7, 8, and 9.

17         Anybody have an incorrect number?

18         And I don't see any hands.  From here on, I'll

19    assume you have the correct notebook.

20         Counsel, you may proceed with questions of the

21    witness.

22         **MR. FINNERAN:**  Thank you, Your Honor.

23    **QUESTIONS BY MR. FINNERAN:**

24    Q.   So, Mr. Friedman, as I said, we're about to show the jury

25    the first example of programing code.  So why don't we pull it

1  up, and then you can help us start to explain it.

2          So first, before we get into the code itself, what's

3  the conclusion that you drew based upon the code we're about to

4  see?

5  A.    Yeah.  In essence when the game starts drawing its prizes

6  from any particular database table, it doesn't start at the

7  top.  Those prizes were listed in order.  It doesn't start at

8  number 1; it starts at a randomly selected location.

9  Q.    All right.  And so -- now, if you look right below that

10  on the screen, can you tell the jury what is it that we're

11  looking at in that little black box or black border box?

12  A.    Yes, so this is code that I pulled out of the database.

13  This is in each one of these drives.  I used Microsoft Visual

14  Studio to open up the database.  And this code was there.  So I

15  can read it.

16          And there's only five lines here, but the first line

17  mentions a developer comments.  You see the two dashes.  That's

18  actually what the programmer wrote in the database code to

19  explain both to themselves but also to anyone else reading it

20  what it does.

21          And then the next -- in the middle is actually

22  calling a function, a different stored procedure called

23  .Randomize_start_index.

24  **QUESTIONS BY MR. FINNERAN:**

25  Q.    So let's make sure we break that down.

1          So the part that's in -- I can't tell if that's pink

2     or purple.  Is that what you're referring to as the developer

3     comments?

4     A.     Yes.  So just so we're clear, the color doesn't matter;

5     it's the fact that there's two dashes in front of it.  That's

6     how you can identify in this particular programing language.

7     So this is the developer saying, "We're going to start the pool

8     at a random starting index unique to the game."

9     Q.     And is the color coding basically used to help a person

10    like yourself or anybody else identify the different parts of

11    programing code?

12    A.     That's right.  It makes it much easier to read and

13    immediately key in on various different parts, whether it's a

14    function, a variable, that sort of thing.

15    Q.     So does that pink or purple part after those two

16    dashes -- does that have any actual effect on how the software

17    operates?

18    A.     No.  Comments are not actually executed; they're just

19    there to provide commentary.

20    Q.     So which part of what's on the screen, then, actually

21    controls how the device functions?

22    A.     Well, there's a -- essentially, it's the middle line that

23    says "EXEC," which is short for execute.  The function name is

24    dbo.Randomize_start_index.  And that calls a different function

25    elsewhere in the database.

1    Q.    Okay.  And so just to help a little bit, when you say a

2    "function," is that, like, a command that the computer

3    executes?  What do you mean by a "function"?

4    A.    A function is a series of commands sort of grouped into

5    one chunk or basically package of statements.  So they're

6    individual computer statements.  You can package those up into

7    what are called functions and then call that function.  It will

8    execute all of the statements.

9    Q.    So in order to understand what this

10   .Randomize_start_index function does, did you look to other

11   parts of the code that demonstrated that?

12   A.    Yes, I did.  So this is actually the call to

13   .Randomize_start_index.  Now, I'm going to show you the

14   definition; that is, what are the commands inside the

15   .Randomize_start_index function.

16   Q.    So before we get to the code itself, do you see

17   additional parts here that are in pink with the two dashes you

18   mentioned?

19   A.    That's right.

20   Q.    Are those additional developer comments?

21   A.    They are.

22   Q.    And what do those comments reflect?

23   A.    They reflect that the developer here described the

24   .Randomize_start_index stored procedure as -- and I'll just

25   quote here -- "Randomizes the start index of a pool for a newly

1    added play amount."

2    Q.    So I don't know if we've used this word much.

3          What do we mean by a "pool"?

4    A.    The pool is the list of prizes stored in a particular

5    table.

6    Q.    So we saw that table a few slides ago with multipliers.

7          Would that be what we would call the "pool," not

8    just that 17, but the whole 100,000, let's say?

9    A.    Yeah, that would be one pool.

10         If you remember, at the bottom of that, I said it

11   was an excerpt from a particular pool.  There are hundreds of

12   different pools on each database.

13   Q.    So the next line below the comment says "Create

14   Procedure," and I see there it says, again, a different

15   formulation of the words .Randomize_start_index.

16         So what is happening here?

17   A.    Yes, this is the definition of the .Randomize_start_index

18   procedure or method.

19   Q.    And if we go to the line below it, there's a similar line

20   that has an "at" symbol in front of it.

21         What's going on there?

22   A.    That's a parameter or variable that's passed into the

23   procedure.  It will get filled in with a value and get returned

24   back to whatever called that randomized procedure.  So in other

25   words, this is the code that ultimately will return what should

1    that starting index be.

2    Q.    And, lastly, we've got one other portion of programing

3    code on the screen.

4          Can you tell us what's significant about this?

5    A.    This is ultimately the code that goes through and

6    produces what that random start index is going to be.  And

7    if -- what I've done on here is I've highlighted a number of

8    different variables.

9          I think you can keep clicking a few times.

10         I highlighted a number of variables where various

11   different random elements are stored, but it's the last one,

12   This "ORDER BY Newid()."  That's a database command to

13   essentially shuffle a list of items in a table.  So what you're

14   doing is you're shuffling a list of possible places to start

15   and then picking one.

16   Q.    Okay.  So you've just shown us one example of how that

17   starting prize index can be selected randomly.

18         How common was that procedure in the nine drives

19   that you reviewed?

20   A.    Well, it was in all of the nine drives.

21   Q.    And did you identify what would cause that random

22   selection to be made?

23   A.    Yes.  There are essentially two -- two cases.

24         So the random selection is made whenever there's no

25   index set.  That is, whenever there's no current location for

1   where the next play will be pulled from in any of those pools.

2   That can happen, first, when the terminal is activated.  This

3   is a phrase that you can find in the code itself.  But

4   activation is something that can happen at the factory when

5   it's sort of rolled off the assembly line, as it were.  And it

6   can also happen if the computer is plugged into a remote

7   connection and a remote operator can log in and reactivate the

8   game.

9   Q.    Is there another example where that start index might be

10  empty, and therefore, this random selection might be made?

11  A.    That's right.  There's an administrator screen on the

12  machine itself.  We didn't turn the key and look at it.  But it

13  looks similar to the image that I have on the screen here.

14  There's a button within that operator panel or administrator's

15  screen that says "restore terminal."  If you press that, it

16  deletes those index numbers, and then you have to start over.

17  Q.    And so in those circumstance where the index has not been

18  determined or set in the game, once again, how would that be

19  selected after "restore terminal" is pressed?

20  A.    It's selected randomly using that code that we just

21  looked at.

22  Q.    Okay.  Did you also identify functions that related to

23  the shuffling of some of the prize pools?

24  A.    I did, yes.

25  Q.    And so how many of the drives contain these shuffle

1    features that you reviewed?

2    A.     Well, four of them mentioned it.  Only three of them

3    actually used it.

4    Q.     All right.  And so, again, we're going to show the jury

5    an example of some code.

6           But, again, do we have some purple comments here

7    that help us understand what's happening in this code?

8    A.     That's right.  Up at the top, it describes -- this is

9    what the developer wrote.  They said this function "Shuffles

10   ticket numbers in the given table for the given range of IDs."

11   Q.     And so is that a fair description, based on your

12   analysis, of then what follows?

13   A.     Yes, that's exactly what it does.

14   Q.     And does it refer to itself at this point as a

15   pool_shuffle feature?

16   A.     That's the name of this function, yes.  "Pool_shuffle" is

17   the name.

18   Q.     And so as you go further down, what else do the developer

19   comments describe that you found significant?

20   A.     Well, the first thing they're doing is they're describing

21   that they create a temporary table to hold certain numbers of

22   tickets.  And you can actually -- if you go back up to the top,

23   you can identify what the start and the end is in these tables.

24   You take that and you copy it into this temporary table, and

25   then you shuffle that all up.

1  Q.    And, again, that's a developer comment.

2        Is that reflected in the actual code below in terms

3  of how it works?

4  A.    It is.  In fact, the highlighted phrase at the bottom --

5  remember a couple slides ago I said "ORDER BY Newid()" was the

6  command for shuffling?  It's used here too.  And so you have

7  this temporary table, you shuffle it up, and then you put it

8  back where it came from.  So, essentially, you're overriding

9  what's in the pool with a shuffled version of a particular

10 block or section of that pool.

11 Q.    So we've covered the index and the shuffle.

12       Is there a third example you identified of where

13 randomness -- it appears in these games?

14 A.    Yes.

15 Q.    And what was that?

16 A.    That was on the visual game outcome, what the player sees

17 on the screen.

18 Q.    All right.  And so what did you find with respect to all

19 of the visual game outcomes on all nine devices you reviewed?

20 A.    They're all generated using one or more aspects of random

21 number generation.

22 Q.    So earlier, we looked at a demonstration where you played

23 the Sparky's Firehouse game?

24 A.    Correct.

25 Q.    I'll just walk up and touch it again so the jury can

1    recall what we're talking about.

2              But you'll recall that there were a series of

3    symbols and rows?

4    A.    Yes.

5    Q.    And every time you pressed the device, those reels spun?

6    A.    That's correct.

7    Q.    How, based upon your review of the software, did the

8    computer in this machine decide which symbols to show each time

9    you hit that "Play" button?

10   A.    It used a random number generator.

11   Q.    And did you identify that random number generator through

12   your analysis of the software?

13   A.    I did.

14   Q.    So, once again, there's an example of the code on the

15   screen.

16             Can you explain to us what is happening in this

17   portion of the code?

18   A.    Yeah.

19             So there's actually two different processes inside

20   the game code:  one, if you have a zero value that comes out,

21   and two is if you don't.  But I'm talking about the zero value

22   first.  It calls this function called "FindZeroBoard."

23             And so you remember there was a long series of

24   losing outcomes where I pressed the button and didn't win,

25   pressed the button and didn't win, but it wasn't the same set

1   of symbols each time.  It was always different.  This is the

2   function that does that.

3           So it starts with FindZeroBoard, and then it makes

4   another call to a function called "FillBoardWithFakes."

5   Q.    And what does FillBoardWithFakes do?

6   A.    That's on the next slide.  So I think let's walk through

7   that.

8   Q.    Okay.

9   A.    And so this is the definition of the FillBoardWithFakes

10  function, and what it does is it uses a different function

11  called "GenerateRandomSymbol()" to pick random symbols that go

12  in this board.  That's meant, ultimately, to display no prize.

13  Q.    And so each time that you were standing here earlier and

14  you hit the "Play" button, each time that you did a losing

15  outcome -- or excuse me -- received a losing prize amount,

16  would this function have been activated in this device?

17  A.    That's right.  That's exactly what was happening.  This

18  code was called, and it went through and then performed these

19  steps.

20  Q.    So you just mentioned a moment ago this is done using a

21  random number generator?

22  A.    Yes.

23  Q.    Can you explain in more detail how that works?

24  A.    So that FillBoardWithFakes function made several calls to

25  this function called GenerateRandomSymbol().

1   GenerateRandomSymbol() directly calls a random number

2   generator.  And that's what Random.Range() is.  It's actually

3   built into a programing environment called "Unity," which is a

4   common graphical engine for game development.

5   Q.    And then you've also highlighted the term

6   RandomGenerationWeight.

7         Can you tell us what that term referred to?

8   A.    Yes.

9         So the -- remember earlier when I was describing

10  what a reel strip is?  It's -- the reel strip is the list of

11  symbols on the reel.  And it's represented in memory, and

12  that's what the computer spins.

13        Well, there's a starting point, and then there's a

14  maximum length of that.  So this.maxWeight is the range on that

15  reel strip in memory that you're selecting from.  And

16  RandomGenerationWeight represents the weighting or the

17  frequency of each of those individual symbols.  So when you add

18  them all up, you get the total length of the reel strip.

19  Q.    I think I lost you.

20  A.    Sorry.

21  Q.    That's okay.  Let me try to put it in the terms of what

22  happens on the actual screen.

23        So suppose for the moment that there are ten symbols

24  in each column.

25  A.    Okay.

1    Q.    Would that, then, mean that the RandomGenerationWeight

2    would be equal to ten for this game?

3    A.    No.  Sorry.

4    Q.    No?

5    A.    No.  Because there are -- different symbols appear

6    different numbers of times on the in-memory reel.  So the first

7    symbol might appear five times.  The second symbol might only

8    appear twice.  The third symbol might appear 20 times.  These

9    are all shuffled up.  When you add all that up, you get to the

10   .maxWeight, and the RandomGenerationWeight for each game symbol

11   is how many times that one symbol itself appears on the reel.

12   Q.    So then let's say we now have determined that.  We

13   determined how many times each symbol appears on the reel.

14         How does this function then decide which of those

15   symbols to show on the display of the device?

16   A.    So that first line where I've highlighted Random.Range

17   between 0 and .maxWeight, that picks which spot on the reel the

18   game will spin to.  The rest of the code figures out what

19   symbol is there, and then it returns that symbol.

20   Q.    And is that determined randomly?

21   A.    Yes.  That's what the Random.Range function does in

22   that -- well, when it says that first line that we highlighted

23   underneath the function name.

24   Q.    Okay.  So you've just gone over the situation we were in

25   for most of your demonstration where you were getting a zero

1    prize amount.

2          Was there a different function you identified when

3    the prize amount is not zero?

4    A.    Yes.

5    Q.    And tell us what happens in that situation.

6    A.    So at the very top of this code snippet, it essentially

7    says, if the win amount is zero, then make the call to that

8    FindZeroBoard function.  We just walked through all of that.

9          What's left on this page is what happens when the

10   weight amount isn't zero.

11         So you can see, ultimately, that there are still

12   calls to random number generators in the code that results in

13   paying -- or displaying a nonzero prize.  And that gets much

14   more complicated, because when you have a nonzero prize, you

15   actually have to make the reels match that nonzero prize.  So

16   I'm not showing you all of the code for that.  It's far too

17   long.  But the bottom line is it uses random number generation

18   in that process as well.

19   Q.    So you've highlighted, as you said, the top.  It says "if

20   winAmt. equals zero."

21         So that's saying here's what to do if it's zero,

22   correct?

23   A.    Correct.

24   Q.    And then everything below that -- well, it also says

25   "FindZeroBoard."

1          We just went over that?

2    A.    Correct.

3    Q.    All right.

4          But then below that, if we say if usable play [sic]

5    count is less than zero, and what's below that, that what helps

6    determine what to show if the prize amount is positive?

7    A.    That's correct.  All of that is right.

8    Q.    And all that is?

9    A.    Right.

10   Q.    Okay.  And how are those -- that choice of symbols, how

11   is that decided?

12   A.    Well, so there's -- it's a rather complicated algorithm

13   which I don't know that you want me to go all the way into.

14   Q.    Let me ask a more basic question.

15   A.    Yes.

16   Q.    So let's say that the computer knows that this is

17   supposed to be a $5.00 win.

18   A.    Right.

19   Q.    Will the machine always display, for any given game, the

20   same set of three symbols, let's say, corresponding to that

21   $5.00 win?

22   A.    It will not.

23   Q.    How many -- how many possible combinations might there be

24   as a range?

25   A.    So I don't know the answer to that question generally,

1    because it's going to depend on each game and, more to the

2    point, what the play amount was.  Because if it's a $5.00 win

3    on a $5.00 play, that's different than a $5.00 win on a $0.25

4    play.

5    Q.    All right.  Let me try a different question, then.

6    A.    Sorry.

7    Q.    So let's say that it's a game where it's a $5.00 win on a

8    $1.00 play.

9          If, as you said a moment ago, there's more than one

10   way of displaying a $5.00 win, how does the game decide which

11   of those various ways to display a winning visual outcome to

12   the player?

13   A.    Well, ultimately, it creates a list of what all the

14   possibilities are and then randomly picks one.

15   Q.    Okay.  So, for example, let's say three diamonds or three

16   cherries both equaled a $5.00 win.

17         What -- how would the machine decide whether to show

18   me three diamonds or three cherries?

19   A.    It would randomly select between those two.

20   Q.    Now, what we've demonstrated so far on the device are

21   games that have a spinning set of reels, similar to an

22   electronic gaming machine or slot machine.

23         Is that true of all the games you reviewed on all

24   the devices?

25   A.    Many of them do.  There are some other types of graphics

1    that are displayed, other types of animations.

2    Q.    So I'm just going to touch the screen here.  The game is

3    called Bourbon Street Dice.

4          Is that a game that you are familiar with?

5    A.    Yes.  That's part of what I reviewed on one of these

6    drives.

7    Q.    And so are there circumstances in this game where

8    randomness is used not just to determine the reels but other

9    elements of the game as well?

10   A.    Yes, that's correct.

11   Q.    And what would an example of that be?

12   A.    Well, so there's a bonus round in *Bourbon Street Dice*

13   where the player gets to throw some dice, animated dice.  And

14   the first part of that bonus round is they actually get to pick

15   the initial orientation of the dice.  You can see there's

16   arrows.  But then, ultimately, when the dice are thrown

17   visually on the screen, the results of that throw are random.

18   Q.    So regardless of what the player picks in terms of what

19   the dice will show at the beginning, does the player have any

20   control over what the dice will ultimately reveal?

21   A.    They do not.

22   Q.    Now, did you look at the code to figure out how this was

23   done?

24   A.    I did, yes.

25   Q.    And so now, looking at this code, what can you tell us

1   about how those dice results are determined?

2   A.    Yes.

3         So this is -- this is an example of -- well, it's a

4   reference to what's called the "Mersenne Twister."  This is a

5   well-known random number generator, at least in the gaming

6   industry.  It's commonly used in slot machines and other

7   regulated gaming devices.  So this is an example of this code

8   calling that well-known random number generator.  And I think

9   on the next slide, I show you how it's used to randomly select

10  the dice.

11  Q.    So before we move on from that, it says "MersenneTwister

12  Random."

13  A.    Yes.

14  Q.    Is that a function?  Is that a term?  Like, what is that?

15  A.    So what's happening here, if you're talking about the

16  line basically right in the middle, it says "public static

17  MersenneTwister Random."

18        What that's doing is that's defining a property or

19  an object called "random," and it's saying it is the Mersenne

20  Twister.  So create this object called "random."  When I use

21  "random" later under the hood, it's actually using the Mersenne

22  Twister.

23  Q.    Is there a reason, in your experience, that the Mersenne

24  Twister is popularly used in computer programing?

25  A.    Yes.  It's very fast.  It has well-known statistical

1  properties.  It's good for generating the kind of game outcomes

2  that you want for gambling.  And it's been -- more to the

3  point, it's been widely approved by gaming regulators.

4  Q.    One more piece of source code here.  I think you

5  mentioned this a moment ago and I slowed you down.

6         What are we looking at here on the screen?

7  A.    Yeah, this is actually the code that selects the dice

8  combination.  So when you're throwing two dice, you have -- and

9  this is just a model of two six-sided dice, standard dice, from

10  one to six.  You go through all possible -- what this code does

11  is it goes through all possible combinations from 1 to 6 for

12  each die, puts them in a list, and then shuffles the list and

13  then picks one.

14  Q.    So does this then reflect both a random selection and a

15  shuffling?

16  A.    It does, yes.

17  Q.    And before I move on from that, is that shuffling feature

18  with the dice -- was that present in just those three devices

19  that had the pool_shuffle or all nine devices?

20  A.    Well, so this is the code from *Bourbon Street Dice*.  So I

21  believe this was only for this particular game.  But it's a

22  different shuffling function than was on the three dice --

23  sorry -- three drives.  That was a database function.  This is

24  actually in the user interface code, graphics code.

25  Q.    One more, apparently, piece of code here.

1      Can you tell us what we're looking at here on this

2  screen?  Does this still relate to the *Bourbon Street Dice*

3  game?

4  A.    It does.  This ultimately is the function that calls the

5  Mersenne Twister random number generator.

6  Q.    All right.  Were there other games that you -- oh, this

7  is still in here.  We've already done that.

8      Are there other games that you also identified that

9  had bonus features with other randomly selected visual

10  outcomes?

11  A.    Yes, I did.

12  Q.    And which one are we seeing here on the screen?

13  A.    This is a bonus round selection.  The player actually

14  gets to pick what kind of bonus round they want to play.  This

15  is from -- I believe the game is called *Arabian Riches* on NCG2,

16  and the -- one of the options for a bonus round, including free

17  spins, is that there are random multipliers awarded for each

18  free spin.

19  Q.    Now, you just said that the player can make a selection

20  among these games.

21      Does that mean that the player has the ability to

22  influence whether or not they will win a bonus round, lose a

23  bonus round, or how much they'll win or lose?

24  A.    It does not, no.  What actually happens is -- remember,

25  the game always comes back with a prize from the database, and

1   then the question is:  How do you display that?  This game

2   gives the player the option to pick three different display

3   mechanisms, but the first one -- actually, I'm not going to go

4   into all three details.

5            But the point is, regardless of which one the player

6   picks, the game then has to take that particular visual display

7   and match the prize that came back from the database.

8   Q.    And so the middle one actually says on the screen "Random

9   Multipliers Awarded Every Spin."

10           Is that a correct reflection of how the device

11  actually decides what multipliers to provide during this bonus

12  game?

13  A.    That's right.

14  Q.    And did you examine the source code to confirm that?

15  A.    I did.

16  Q.    So here we are again looking at some of that source code.

17           Can you explain what we're looking at here?

18  A.    Yes.

19           So the very top line, which isn't highlighted, but

20  it essentially takes the prize that you need to pay and creates

21  a set of free spins and their appropriate multipliers that will

22  add up to that.  And it puts those in a list, and then it

23  shuffles them.

24  Q.    And so moving through the code, is that shuffle

25  accomplished through a random process or some other process?

1  A.     That shuffle is accomplished using a random number

2  generator.

3  Q.     Similar to what we discussed before?

4  A.     That's correct.

5  Q.     Anything special we need to say here before we move on?

6  A.     It's just a random number generator.  It's a different

7  one than the code we just looked at, but this is actually the

8  built-in system one.

9  Q.     So we just talked about some particular things that you

10 found on particular drives.  I'd now like to ask how consistent

11 the drives were that you reviewed.

12        So across all of the nine drives you reviewed, what

13 are some ways in which all nine drives worked equivalently from

14 a programing perspective?

15 A.     Well, so the first was the fact that the starting index

16 into each prize table is randomly selected.  If it's not set,

17 the game picks randomly.  Or the database, I should say, picks

18 randomly.

19        And the second was what we were just talking about,

20 is that the symbols or other visual game outcomes -- that's

21 also generated randomly.

22 Q.     Okay.  And did you also do anything to compare the

23 software to make sure that you were identifying whether that

24 software is identical?

25 A.     Yes.  In fact, I used a program called "FileCheck."

1    Actually, you'll hear probably Mr. Farley tell you he used the

2    same program.  It generates what's called a checksum.  We

3    talked about this a little bit before.  It's a way of comparing

4    a short snippet of data that's generated from each of two

5    different files.  And if they're the same, there's a very, very

6    strong likelihood that the files themselves are the same.

7              So I compared the checksums of the files on this NCG

8    Suite 2 drive with the files on the device drive that TNT sent

9    me, and those checksums were the same.

10             And I also manually compared the database functions

11   that we've just been talking about, the random initial prize

12   selection.

13   Q.   And what did you find upon comparing those?

14   A.   Those two specific drives had the same of both the

15   software, as evaluated by the checksums, and the database

16   functions.

17   Q.   So was the random initial prize index selection procedure

18   missing from any of the nine drives you reviewed?

19   A.   No, it was not.  It was in all of them.

20   Q.   And is the same true, then, of the software for

21   determining the random visual game outcome?

22   A.   Yes, that was in all of them.

23   Q.   Now, did you also review the prize viewer feature in the

24   software that relates to that prize viewer feature?

25   A.   I did.

1    Q.    So let's maybe talk about that first.

2          So is the prize viewer feature a mandatory function

3    in these devices?

4    A.    It's not.  I mean, you saw me earlier.  I played through

5    the whole thing.  I didn't use the prize viewer once.

6    Q.    Okay.  So I'm going to walk over again to the machine,

7    and just for the record, I'm going to touch the prize viewer.

8          Do I have to go -- sorry.

9          Mr. Friedman, do I have to go into a game to get to

10   the prize viewer?

11   A.    You do.

12   Q.    So can you just generally describe where on the screen

13   the prize viewer can be found?

14         **THE COURT:**  Mr. Friedman, you've got to keep your

15   voice up if you're going to step away from the microphone.

16   **QUESTIONS BY MR. FINNERAN:**

17   Q.    Oh, I see it.

18   A.    In that game, it's in the lower left.

19   Q.    So this button right here that says "Prize Viewer," is

20   that what we're referring to as prize viewer?

21   A.    It is.

22   Q.    For the record, I'm now pressing it, and the prize viewer

23   displays $0.00.  Below it, it says the word "Close."

24         If I hit "Close," it disappears, but I'll bring the

25   prize viewer back up for the moment.

1          So we see here, on this example, the prize viewer is

2    showing $0.00.

3          How is the machine determining what to show on the

4    prize viewer?

5    A.    Well, so remember, before, we talked about the index that

6    points into the prize pool.  That's the prize that's currently

7    pointed at by the index.

8    Q.    So if one were to then hit the "Play" button, would the

9    next spin of the machine result in a visual display showing a

10   win, a loss, or something else?

11   A.    It would show a visual display representing the zero.

12   Q.    So in this scenario, there's $0.00.

13          So is it fair to say that when a player would play

14   this -- at this level, they would know that the next outcome

15   would not produce a win?

16   A.    That's correct.

17   Q.    Is there any way for the player to determine not whether

18   the next spin would be a win, but whether subsequent spins will

19   be a win without continuing to play the game?

20   A.    No, there's not.

21   Q.    So in other words, is it possible to skip this $0.00

22   amount and try to get to a winning combination by doing that?

23   A.    You can't skip outcomes.

24   Q.    So how, then, would a player who sees this $0.00 outcome

25   have any chance to win money on this machine?

1   A.    Well, if you see a zero-value prize, you have to

2   essentially accept it.  You have to pay for it in order to

3   reveal the next prize that would be pulled out of the database.

4   Q.    And so as you said earlier, the feature is optional.

5         Based on your experience as you were playing the

6   machine earlier, when the player is not viewing this prize

7   viewer feature and just hits the "Play" button, does the

8   machine operate, from the perspective of the player,

9   effectively in a way similar to a slot machine game you've

10  observed in casinos?

11  A.    It does, yes.

12  Q.    Did you also identify certain aspects of these devices

13  that were beyond the control of the player, whether they were

14  determined randomly or not?

15  A.    I did.

16  Q.    And so what were some of those factors that were outside

17  the player's control?

18  A.    Well, so first of all, that order of prizes that's in the

19  prize pool, the way the games works, it sequentially selects

20  the next prize and returns that to the game, which then

21  displays it.  So the player can't control that.  It's a

22  sequential algorithm.

23        The contents themselves of the prize pool, how many

24  losers, how many winners, where they are in the pool, that's

25  also not controllable.  That's set by the developer of the

1  game.

2          Where the player starts playing in that prize pool

3  when they first sit down -- for example, the player doesn't

4  know where the index is, so they don't know, from a short-term

5  standpoint, if the next few results are going to be positive

6  overall or negative overall.  And we saw I had a rather bad run

7  of losing when I played.  That's not always the way the game

8  works.

9          And so those short-term financial results are

10  unpredictable, and they're not controllable by the player.

11  Q.    Just to break it up a little bit, what about the visual

12  outcomes that we've seen, whether that's bonus rounds, spinning

13  of the reels?  Is there any way for the player to control any

14  of those visuals?

15  A.    No.  They're all randomly controlled.

16  Q.    You said earlier there were some bonus features where a

17  player can select from different visuals.

18          But when that happens, do the outcomes -- do the

19  outcomes of those visuals -- are those under the control of the

20  player?

21  A.    They're not.

22  Q.    And then, finally, what about the prize viewer?  What, if

23  any, control does the player have with respect to what is

24  displayed on the prize viewer?

25  A.    Well, so the prize viewer is also outside the control of

1    the player.  I should say what the prize viewer displays is

2    outside the control of the player.  When you press the prize

3    viewer, it pulls the current index from the database.  The

4    player can't control that.  They also can't control what might

5    be next.

6    Q.    All right.  So to, again, make sure that we understand

7    this testimony applies to all the drives, were you -- did you

8    also assess analysis that the defense expert, Mr. Farley, had

9    done of these same devices?

10   A.    I did.

11   Q.    And, in fact, your understanding, are the devices that

12   you reviewed and that are sitting there the same drives that

13   Mr. Farley was provided with to analyze by Torch?

14   A.    That's my understanding, yes.

15   Q.    And are you aware of what Mr. Farley initially said about

16   the existence of random number generators on the drives?

17   A.    It's my understanding he said there's nothing random

18   about any of these games.

19   Q.    And how did you come upon that understanding?

20   A.    I think he wrote it down or said it.  I can't remember

21   where.

22   Q.    Was Mr. Farley, in your estimation, correct about that

23   judgment?

24   A.    He was not.

25   Q.    So why not?

1    A.    Well, I -- in short, I went and looked at the code and

2    found all of the uses of random -- or many uses of random

3    number generators, which, I mean, any of -- any one of which

4    would have disproven his overall point.  But the larger issue

5    is I found random number generation use in the code when he

6    said there wasn't any.

7    Q.    And does that include, as they're displayed on the

8    screen, each of the conclusions that you've talked about during

9    your testimony today?

10   A.    That's right.

11        **MR. FINNERAN:**  Your Honor, I have no further

12   questions for the witness.

13        **THE COURT:**  Counsel, will you approach the sidebar

14   for just a moment.

15        **(A bench conference was held on the record and**

16   **outside of the hearing of the jury as follows:)**

17        **THE COURT:**  Here's my question:  Is there any point

18   in starting this?

19        **MR. CRAIG:**  Want to keep them here until 5:30?

20        **THE COURT:**  I was really thinking no later than

21   5:15.

22        **MR. CRAIG:**  Fine.  I'll do it tomorrow morning.

23   That's fine.

24        **MR. FINNERAN:**  No objection.

25        **THE COURT:**  So just start tomorrow morning?

1          **MR. CRAIG:**  Yeah.

2          **THE COURT:**  Okay.

3          **(The proceedings returned to open court and in the**

4   **presence of the jury.)**

5          **THE COURT:**  Ladies and gentlemen, I was trying to

6   determine how far we could get before we broke for the evening.

7   I know it's been a long day for you.  I truly appreciate your

8   patience and attentiveness as we went through the jury

9   selection process.

10          We're going to go ahead and break for the day.  I'd

11   like to have you back tomorrow morning at 8:45.

12          When you come back tomorrow, you'll report directly

13   to our jury room here on the third floor.  I know Mr. Bernsen's

14   going to show you where to report.

15          When you come into the courtroom, we'll have, again,

16   the notebooks on your chairs.  If you want to bring a bottle of

17   water and set that next to you on the floor, you're welcome to

18   do that.  Just keep in mind, generally, I'm going to try and go

19   about an hour and a half to 2 hours in a stretch.  So if you

20   need to take frequent breaks, just keep that in mind with

21   regard to how much water you drink.  But you're welcome to

22   bring a bottle of water with you into the courtroom.  We don't

23   allow other things.  Generally, it gets kicked around all over

24   the place.  So just bring a bottle of water if you'd like that.

25          I also want to tell you, just with regard to your

1    notebooks, again, they'll be collected at the end of the day.

2    Mr. Bernsen keeps them.  Nobody has access to them.  No one is

3    ever going to read your notes.  They are for your use and your

4    use alone at the time that you deliberate on the case.  So just

5    keep that in mind.

6            Also, I want to remind you again what I tell you at

7    each recess or adjournment of the Court.  Don't talk to anyone

8    about the case.  You can, obviously, tell family members,

9    friends, employers, where you are during the day, but you've

10   got to tell them you can't talk about the case.  You're free to

11   blame me for that, because I'm the one who's telling you you

12   can't talk about the case with anyone.

13           Don't do any independent research of any kind.  You

14   can't go on the internet.  You can't do those things.  You

15   can't investigate, do research on any of the parties, the

16   lawyers, anything related to this case.  When the case is over,

17   you can do whatever you'd like.  Again, just keep an open mind

18   about the case until it's finally given to you to decide.

19           We'll be in temporary recess until 8:45 tomorrow

20   morning.  If you'll leave your notebooks there on the chair,

21   and Mr. Bernsen will meet you back in the jury room.

22           Again, we appreciate your patience and understanding

23   as we go through the trial.

24           Thank you, all.  We'll be in recess.

25           **THE CLERK**:  All rise.

```
1              (Exit jury.)

2              (The following proceedings were held in open court,

3     out of the presence of the jury:)

4              THE COURT:  You can step down, Mr. Friedman.

5              THE WITNESS:  Thank you.

6              What should I do with these?

7              THE COURT:  You can leave them there, and I think

8     Mr. Finneran will collect them.

9              The drives, are you going to collect those?

10             MR. FINNERAN:  Yes, sir.

11             THE COURT:  Counsel, anything we need to take up

12    before we break for the day?  I know we're going to finish

13    Mr. Friedman tomorrow morning.  Do you know who your next

14    witness after that will be?

15             MR. FINNERAN:  Yes, Judge.  So our plan would have

16    been -- well, I don't think this one is objectionable.  Our

17    plan, then, would have been to play the deposition --

18    designated deposition testimony of Mr. Morse.  He's an

19    unavailable witness.  The parties have exchanged designations.

20    We would put that in.

21             And then we'd also put in the designated deposition

22    testimony of Sondra Miltenberger, who we do not intend to call

23    in our case-in-chief.

24             The total, I think, of those two is about half an

25    hour in total run time.  Might be even shorter after your
```

1  ruling this morning.

2          Then the next live witness we would call is going to

3  be Donna Havey.

4          **THE COURT:**  And, again, with regard to the

5  depositions, they're going to be played on the monitor with the

6  transcript underneath; is that correct?

7          **MR. FINNERAN:**  Yes, sir.

8          **THE COURT:**  There's been an agreement as to the

9  transcript, I'm assuming?

10         **MR. GRAVES:**  Yeah, especially after today.  But we

11  believe we've got a right to cross-examine her after they're

12  done.  I'm not sure if that's part of their plan.

13         **MR. FINNERAN:**  To cross-examine --

14         **THE COURT:**  I understand that they want to play a

15  portion of her deposition in their case-in-chief as it relates

16  to their case-in-chief.  You're going to have an opportunity to

17  do that.  I don't think there's any requirement that you be

18  able to do that right after the testimony is played.  I'm going

19  to allow them to do that.

20         You can certainly call Mrs. Miltenberger.  You can

21  call whoever you'd like, and you'll have an opportunity to

22  question them.

23         But they -- it is a statement of a party that they

24  have a right to play in their case-in-chief.  So I'm going to

25  allow them to do it.  If you want to make a -- I mean, you can

 1    object to the procedure that the Court is using.  But again, I

 2    think it's permissible.

 3            **MR. GRAVES:**  Would the Court also consider

 4    permissible to call Mr. Miltenberger by playing his deposition,

 5    not allowing us to cross-examine him about that deposition?

 6            **THE COURT:**  Explain that to me again.

 7            **MR. GRAVES:**  As we understand, Plaintiffs intend to

 8    play deposition testimony of Mr. Miltenberger.  Then they --

 9    their thought is then we would not be allowed to cross-examine

10    him about that deposition testimony.  And then later, they

11    would be able to call him if they so choose in their

12    case-in-chief again, after the deposition testimony.

13            **THE COURT:**  I mean, it seems to me that that's

14    repetitive.  So I'm not quite sure -- I'm not clear why you

15    would choose to do that.

16            **MR. FINNERAN:**  I'm sorry, Judge.

17            So first of all, we have spent many hours working

18    with opposing counsel to bring down the length of the

19    designated deposition testimony for Mr. Miltenberger.  It

20    totals a little more than an hour now that we are seeking to

21    designate.  We think that, again, as you just said, the rule

22    allows us to introduce -- Rule 32 allows us to introduce those

23    statements during our case-in-chief.

24            We do not intend to be cumulative of either among

25    the deposition designations, because there were three, nor with

1  our direct examination of Mr. Miltenberger.  But that is our

2  plan -- to introduce, by designation, the portions that we have

3  gone back and forth at great length with the other side about,

4  and then call Mr. Miltenberger, likely later in our

5  case-in-chief.  So very similar to what's going on with

6  Ms. Miltenberger except that we would then also call

7  Mr. Miltenberger.

8          **THE COURT:**  If you're going to call

9  Mr. Miltenberger, you've got to do it right after you play the

10  deposition.  It's just -- it's -- you're manipulating, at that

11  point, the procedure.  So if you're going to play a portion of

12  his deposition, you're going to have to call him right after

13  that --

14          **MR. FINNERAN:**  Okay.

15          **THE COURT:**  -- or choose not to call him, one or the

16  other.

17          **MR. FINNERAN:**  Okay.  We will abide by that.  Thank

18  you, Judge.

19          **THE COURT:**  Okay.  With regard to the deposition

20  testimony, the designations, you're going to have to provide

21  those to the court reporter.  It's going to have to have the --

22          **MR. FINNERAN:**  We've arranged everything necessary

23  with the court reporter.

24          **THE COURT:**  Okay.  All right.  Anything else before

25  we break for the evening?

1      **MR. FINNERAN:**  I guess I have two questions about

2   this machine right here.  So the first is:  We can put it back

3   in storage, if the Court would like.  If the room is going to

4   be locked, I understand the defendants have no objection to it

5   remaining in the courtroom.  But whatever the Court prefers,

6   we'll achieve.

7          **THE COURT:**  All right.  Okay.

8      **MR. FINNERAN:**  I do understand Mr. Craig wants to

9   have it here tomorrow morning, so it would save us a little

10   time.

11          **THE COURT:**  Okay.  I know that you want to have it

12   there when you cross-examine Mr. Friedman.

13          The courtroom is going to be locked.  There is a

14   cleaning crew that comes in.  So I just want you to be aware of

15   that.  But if that's agreeable to you-all to leave it there,

16   it's fine with me.

17          **MR. FINNERAN:**  And secondly, I recall the Court

18   mentioning at some point that the jurors would be given the

19   opportunity themselves to interact with the machine at some

20   point.  I don't know if we're going to want it back at any

21   point later in the case.  We may.  The defendants may.  But if

22   the Court had any thoughts about when it wanted that to occur,

23   we can factor that into our timing with witnesses.

24          **THE COURT:**  So it was my intent that the jurors

25   would like to be able to come up, see the machine, walk around

1    it.

2              Whether they're able to push the buttons, do you

3    have any thoughts about that?

4         **MR. FINNERAN:**  I think that we would like them to

5    have that opportunity.  We can put enough money into the

6    machine so that they would not, themselves, have to insert --

7         **THE COURT:**  So it can't just automatically work?

8    It's programmed to only work --

9         **MR. FINNERAN:**  It needs to have money in the

10   machine, but we have an agreement with the other side that the

11   money that I'm putting in the machine is going to be returned

12   to me so I'm not actually gambling anything, nor would the

13   jurors.  So I think that would be one way to accomplish it if

14   the jurors, which we think they should be permitted to do, are

15   allowed to interact with the machine in the same way that one

16   would in the field.  We can literally put, you know, $100 in

17   there, and they can take as much time as they'd like, from our

18   perspective.  And I'm assured that we will have it returned to

19   us.

20        **THE COURT:**  It's not my intent to have them spend a

21   lot of time with this.  I just want to give them the

22   opportunity to come up, walk around, look at the machine.

23             I mean, what's your --

24        **MR. GRAVES:**  Yeah, we wouldn't object to them being

25   able to come up and look around, walk around the machine, touch

1    the machine.  But we would object to counsel putting money in

2    it and then them playing through it, because we -- you know, we

3    don't know what that is or how long they're going to take or --

4    that's almost testimonial, I guess.

5              **MR. FINNERAN:**  Judge, I would --

6              **THE COURT:**  It's not -- it's definitely not

7    testimonial.  It would be my intent -- and I mentioned this to

8    you before.  The way I have done this in other cases is I would

9    clear the courtroom.  I'd be in the courtroom, the clerk, the

10   court reporter.  There's not going to be any discussion or

11   talk.  By row, I'll have them come down, and I think they

12   should be able to push the button and see what it looks like,

13   if it spins and how it looks.

14             But I don't see any reason for you to put $100 in

15   the machine.  I'm thinking that each one is going to push it

16   once or twice, and then I'm going to have them return to the

17   jury room and bring you-all back in, and we're going to

18   proceed.

19             So it would be my thought that once the questioning

20   of Mr. Friedman is over, as I understand it, at that point,

21   you-all don't see a need to have the machine in the courtroom.

22   So we would remove it.  But at that point, I'd allow them to

23   come off -- come out of the jury box and see, touch the

24   machine, push a button, and then have a seat.  So that's what

25   I'm inclined to do.  And I'll do it at the conclusion of

1  Mr. Friedman's testimony.

2          **MR. FINNERAN:**  Okay.  Thank you, Judge.

3          **THE COURT:**  So however you want to work that out,

4  that's -- that's fine.  But that's -- that's what I'm intending

5  on doing.

6          Anything else for the record, Mr. Finneran?

7          MR. FINNERAN:  Nothing from the plaintiff, Your

8  Honor.

9          **THE COURT:**  Mr. Graves, anything else?

10          **MR. GRAVES:**  Nothing.

11          **THE COURT:**  Okay.  I'd like to have you-all here at

12  8:30.  I'm going to have the jurors report at 8:45.  We'll try

13  and get going so we can keep moving along.

14          Okay.  We'll be in recess.  Thank you, all.

15          **(Off the record at 4:59 p.m.)**

16

17

18

19

20

21

22

23

24

25

1                          <u>**CERTIFICATE**</u>

2

3          I, Pamela Harrison, Registered Diplomat Reporter and

4    Certified Realtime Reporter, hereby certify that I am a duly

5    appointed Official Court Reporter of the United States District

6    Court for the Eastern District of Missouri.

7

8          I further certify that the foregoing is a true and

9    accurate transcript of the proceedings held in the

10   above-entitled case and that said transcript is a true and

11   correct transcription of my stenographic notes.

12

13         I further certify that this transcript contains pages 1

14   through 124 inclusive and was delivered electronically and that

15   this reporter takes no responsibility for missing or damaged

16   pages of this transcript when same transcript is copied by any

17   party other than this reporter.

18

19         Dated at St. Louis, Missouri, 11th of October, 2025.

20

21

22         /s/  Pamela Harrison
           _____
           Pamela Harrison, RDR, CRR, CRC, CCR, CSR
23         Official Court Reporter

24

25