IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


TNT AMUSEMENTS, INC., d/b/a   )
PLAY-MORE COIN-OP,          )
                         )
    Plaintiff,          )  No. 4:23-cv-00330-JAR
                         )
vs.                   )
                         )
TORCH ELECTRONICS, LLC, et   )
al.,                  )
                         )
    Defendants.        )


JURY TRIAL - VOLUME 2

BEFORE THE HONORABLE JOHN A. ROSS
UNITED STATES DISTRICT JUDGE

September 30, 2025

APPEARANCES:
For Plaintiff:         Richard E. Finneran, Esq.
                  Zoe Brannon, Esq.
                  Bryan Cave LLP
                  211 North Broadway, Suite 3600
                  St. Louis, MO 63102

For Defendants:        James A. Craig, Esq.
                  Chandler E. Carr, Esq.
                  Todd P. Graves, Esq.
                  GRAVES GARRETT GREIM LLC
                  1100 Main Street, Suite 2700
                  Kansas City, MO 64105


Reported by:           PAMELA HARRISON, RDR, CRR, CRC, CCR, CSR
                  Official Court Reporter
                  United States District Court
                  111 South Tenth Street, Third Floor
                  St. Louis, MO 63102
                  (314) 244-7987

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

1                        I N D E X

2                                                          Page

3     *Plaintiff's Evidence*
      *Witnesses:*

4

5     STACY FRIEDMAN
      Cross-examination by Mr. Craig                          8
      Redirect examination by Mr. Finneran                   47
6     Recross-examination by Mr. Craig                       64
      Further redirect examination by Mr. Finneran           70

7

      DONNA HAVEY
8     Direct examination by Mr. Finneran                     82
      Cross-examination by Mr. Craig                        194

9

      VIDEO DEPOSITIONS
10    Sondra Miltenberger - 12/8/2023                       200
      Kevin Morse - 1/10/2024                               200
11    Steven Miltenberger -  Individual - 12/15/2023        203
      Steven Miltenberger - 30(b)(6) - 1/9/2024             205

12

      Reporter Certification                                209

13

14

15

16

17

18

19

20

21

22

23

24

25

1              <u>September 30, 2025</u>

2          (The proceedings commenced at 8:53 a.m.)

3          (The following proceedings were held in open court

4    and out of the presence of the jury:)

5          THE COURT:  I wanted to make a quick record before

6    we get the jury in.  One of our jurors had some car trouble

7    this morning, so they are here in parking.  So we should be

8    ready to go here in just a minute.  But I wanted to make a

9    quick record.

10         A couple of things.  First of all, I just want to

11   remind counsel -- we talked about this.  Some evidence may come

12   in for a limited purpose.  You-all know when the evidence is

13   coming in much more than I do.  If you have a limiting

14   instruction, you're going to have to prepare it, have it ready

15   to go.  So I just want to remind you again about that.

16         I understand you're going to ask the Court to read

17   the stipulation; is that correct?

18         MR. FINNERAN:  At some point, we will, yes.

19         THE COURT:  Okay.  You're not going to do that this

20   morning or don't anticipate --

21         MR. FINNERAN:  That wasn't on my list.  We can if

22   you want to do it.

23         THE COURT:  No.  Whenever you want me to read the

24   stipulation, just let me know.

25         It is the Court's intent, as I've indicated

1   previously, and I wasn't certain that it was on the record, to

2   allow the jurors to walk around, touch the machine, the device,

3   press the buttons.  So at the conclusion of the present

4   witness, Mr. Friedman, as I understand it, you're going to take

5   the device out of the courtroom; is that correct?

6          **MR. FINNERAN:**  I believe so, Your Honor, yes.

7          **MR. CRAIG:**  It's my understanding as well.

8          **THE COURT:**  Okay.  So I would do it at the end of

9   Mr. Friedman's testimony.

10         What I had indicated to counsel was, my thought was

11  to have counsel, the parties basically clear the courtroom,

12  with the court reporter, court clerk, and me here in the

13  courtroom while the jurors, one row at a time, came up, walked

14  around, touched the device, pushed the buttons a few times, and

15  then sat down.  They'd go back to their jury room, and then

16  we'd reconvene.  So I want to know if there's any objection to

17  that procedure or if you want me to consider some other

18  procedure.

19         Mr. Finneran, on behalf of the plaintiff?

20         **MR. FINNERAN:**  We have no objection to the

21  procedure.

22         The one thing we did discuss yesterday is that we'll

23  need to load some more money into the machine so that it will

24  play correctly.  But other than that, nothing else to add, Your

25  Honor.

1          **THE COURT:**  As I understand it, there's no way to

2     just --

3          **MR. FINNERAN:**  Not that we're aware of.

4          **THE COURT:**  -- put some credits on the machine?

5          Mr. Craig, you're shaking your head no.

6          **MR. CRAIG:**  That's my understanding as well.  It

7     would be the easiest way, to just put a bill into the machine.

8     If it's Your Honor's intent to allow the players to push the

9     "Play" button, then we just ask that during -- like, after

10    Friedman is done, we take, like, a 5-minute break, they're out,

11    we put money in the device, then you bring them back in while

12    we're all gone and you do the process.

13         And I will just say for the record, we have no

14    problem with the jurors walking around, looking at the device,

15    you know, inspecting it visually, looking at what's the

16    labeling on the device.  But for the record, we would object to

17    the jurors interacting with the device.

18         **THE COURT:**  Okay.  I think, in light of the

19    testimony that I've heard, I anticipate hearing, that it makes

20    sense to allow them to see how the device works; and that's the

21    way do it, is to allow them to push the buttons.  So it is the

22    Court's intent to allow that.

23         Did you have anything else, Mr. Craig, while I have

24    you here, with regard to -- I understood there was some issue

25    with regard to possible impeachment?

1    **MR. CRAIG:**  Yeah, I mean, we have some video clips

2  that would be potentially used if there's an inconsistent

3  statement, if there's impeachment.  I don't know.  You know, I

4  also have the deposition testimony.  So it'll be a judgment

5  call on which one I might use.  Obviously, if it's the

6  deposition testimony or transcript, I wouldn't want -- we don't

7  need to put that on the screen for them.  He can have it, and

8  we'll read it like normal impeachment if you were doing it with

9  a transcript.

10         But if it were a video clip, it would be my intent

11  to say, "I intend to play a video," and then that can just be

12  published to the jury so it's not just his voice unattached to

13  a visual.

14         **THE COURT:**  I mean, the only thing I can say is

15  you're going to have to lay a proper foundation to impeach the

16  witness.  I have no idea exactly what you're talking about.  So

17  I guess we'll see how it goes.  That's the only thing I can say

18  to you.

19         **MR. CRAIG:**  Yeah, that's fair.

20         **THE COURT:**  Okay.  All right.  We'll go ahead and

21  see if we can get the jurors in and get ready to proceed.

22         Yes, sir.

23         **MR. CRAIG:**  I understand the Court's ruling on

24  allowing the players to push buttons.  We understand that.  But

25  as far as the procedure, can we agree to take a short break

1    after Mr. Friedman is done so that we can deposit money in

2    outside the presence of the jury, and then we'll all depart,

3    and then they can be brought in, which I understand we're not

4    going to be here for anyway, right?

5                **THE COURT:**  That would be the Court's thought, yes.

6            **MR. CRAIG:**  Okay.  Thank you, Your Honor.

7            **THE COURT:**  That's fine.

8            **MR. CRAIG:**  Thanks.

9            **THE COURT:**  Okay.  John, do you want to go check on

10   the jurors?

11           **THE CLERK:**  Yep.

12           **THE COURT:**  Mr. Friedman, if you want to come up and

13   retake the witness stand.

14           Please rise.

15           **(Enter jury.)**

16           **(The following proceedings were held in open court,**

17   **in the presence of the jury:)**

18           **THE COURT:**  Court will be back in session.  You can

19   be seated.

20           Good morning, ladies and gentlemen.  Thanks for

21   making your way in.  I know traffic was a little bit tough this

22   morning.  So we appreciate your getting in here on a timely

23   basis.

24           When we took a recess at the end of the day

25   yesterday, Plaintiff's counsel had completed their direct

1    examination of the witness, Mr. Friedman.

2            Mr. Friedman, I asked you to retake the witness

3    stand.

4            You'll recall you're still under oath, sir; is that

5    correct.

6            **THE WITNESS:**  Yes, Your Honor.

7            **THE COURT:**  And with that, Mr. Craig, you may

8    proceed with questions of the witness.

9                            **STACY FRIEDMAN,**

10    having previously been duly sworn in by the clerk, testified:

11                      **CROSS-EXAMINATION**

12    **QUESTIONS BY MR. CRAIG:**

13    Q.    Good morning, Mr. Friedman.  How are you?

14    A.    I'm well.  Good morning.

15    Q.    You don't have any certification regarding game

16    classification; isn't that true?

17    A.    That's true.

18    Q.    You're familiar with three -- the three main recognized

19    independent testing laboratories for gaming devices in the

20    country, right?

21            GLI, BMM Labs, Eclipse Compliance Testing, correct?

22    A.    I'm familiar with those names, yes.

23    Q.    Eclipse Compliance Testing is Nick Farley's company,

24    correct?

25    A.    I understand that, yes.

1   Q.    You've never worked for any of those independent testing

2   laboratories, have you?

3   A.    As an employee, that's correct, yes.

4   Q.    All right.  I want to talk about the -- I guess, the

5   randomness and the symbols that you spent some time on

6   yesterday.

7            You previously gave me some reports, right?

8   A.    Yes.

9   Q.    In those reports, you described the screen that the

10  player sees during game play on a Torch device as the, quote,

11  "entertaining display," right?

12  A.    I did.

13  Q.    The symbols that the player sees on the screen, like

14  yesterday when you were running through the game, the symbols

15  do not dictate the win amount, correct?

16  A.    When you say "dictate," do you mean determine?

17  Q.    Correct.

18  A.    That's correct.

19  Q.    The prize, or the win amount, actually shows up first,

20  and then the symbols are generated to match that prize or win

21  amount, correct?

22  A.    Well, on the screen, I think the symbols finish resolving

23  visually, and then the game shows you what the prize amount is.

24  Q.    Right.

25            So the prize or win amount shows up first.  It's

1   reverse-mapped, right?  This is what you said in your report.

2   It's the -- the win amount shows up first, and then the symbols

3   on the screen are generated to match the prize or win amount,

4   correct?

5   A.    So that's almost right.  What actually happens is that

6   the win amount is pulled out of the database and goes to the

7   visual part of the program.  But that doesn't show up first.

8   What happens is the reels spin, finish their animation, and

9   then the game reveals what the final set of symbols are, and

10  then the prize.  The prize doesn't show up first.

11  Q.    Okay.  So we've spent a couple of days, you and I, in a

12  deposition previously, right?

13  A.    Yes.

14  Q.    Okay.  There was a court reporter there?

15  A.    Presumably.

16  Q.    She was taking down everything that we were saying,

17  right?

18  A.    Yes.

19  Q.    You were under oath?

20  A.    I was.

21  Q.    Okay.  Let me show you.

22          Can you take a look on your screen there.  Take a

23  look at -- so this is -- this is your deposition taken on

24  4/16/2024.  If you look at page 139, line 17, and then we'll

25  continue on to the next page.

1    A.    Oh, I understand the disconnect here.

2    Q.    Hold on.  Hold on.

3    A.    Oh.

4    Q.    I haven't -- okay.

5    A.    I'm sorry.

6    Q.    When I asked you --

7          **THE COURT:**  Hold on.  You've got to pose a question.

8    I'm not clear that you've posed a question to the witness.  So

9    pose your question.

10         **MR. CRAIG:**  Well, I'm impeaching, Your Honor.  I

11   will.

12         **THE COURT:**  Pose a question to the witness.

13         **MR. CRAIG:**  Yeah.

14   QUESTIONS BY MR. CRAIG:

15   Q.    On that occasion, when we talked previously on 4/16/2024,

16   I asked you, "So the reverse mapping, the symbols do not

17   dictate the win outcome, correct?  We've established this?"

18         And your response was, "In the Torch, or in the

19   Farley drive, the code that I looked at -- actually, all of

20   those that I've looked at, the win amount shows up first, and

21   then the symbols are generated to match that win amount."

22         Correct, that's what you said?

23   A.    That's right.

24   Q.    Okay.  And then I said, "Right.  So the symbols do not

25   dictate the win amount.  That is true of the Farley drives, the

1    corrected drives, that you received most recently, correct?"

2             And you said, "Yes."

3             Isn't that true?

4    A.    I can't see the next screen.

5    Q.    Okay.  So if you go -- it was line 25.  I'll start there.

6    Okay?  So line 25 on the page in front of you.

7             **THE COURT:**  As you're reading, you're going to have

8    to read a little slower so the court reporter can get it.

9    **QUESTIONS BY MR. CRAIG:**

10   Q.    I said, "Right.  So the symbols do not dictate the win

11   amount.  That is true of the Farley drives, which we can agree

12   are the last set of drives that you received most recently,

13   correct?"

14            And you said, "Yes."

15            Isn't that true?

16   A.    That's correct.

17   Q.    Okay.  The prize or win amount is what the player -- we

18   can go ahead and take that down.

19            The prize or the win amount is what the player can

20   see by using the prize viewer, correct?

21   A.    That's correct, yes.

22   Q.    And in a Torch device, the prize, or winAmt., that is not

23   determined by a random number generator, right?

24   A.    Well, there are occasions when the winAmt. is randomly

25   selected, so I would disagree with that as a general statement.

1    Q.    When would that be?  Just when the device is first set

2    up?  Is that what you're talking about?

3    A.    Well, there are more situations than that.  I went

4    through that in my direct testimony.

5    Q.    Well, describe them for me now so I can understand that.

6    A.    Sure.

7          So if you'll recall, I found that

8    .Randomize_start_index function when the game is --

9    Q.    Okay.  That's randomize starting index.

10          What's the other one?

11   A.    Well, I was going through the situations when the

12   .Randomize_start_index function is actually called.

13   Q.    I'll actually address that, okay?

14   A.    Okay.

15   Q.    But I just want to make sure.

16          The one occasion is when the device is first powered

17   on and it's setting itself up in the pools, okay?  That's the

18   starting index function.

19          Is there another instance where the outcome is

20   allegedly determined by a random process?

21   A.    Well, so remember, the .Randomize_start_index function

22   can be called in numerous different occasions.  That's what I

23   was getting at.

24   Q.    Yeah, for each pool, right?  And we'll talk about that.

25   But other than that, okay, once current index is set after the

1    device is activated, right, then we can both agree that the

2    prize, or winAmt, in a Torch device is not determined by any

3    random number generator or random process, right?

4    A.    If the current index has been set already, that's

5    correct.

6    Q.    Okay.  And we will talk about that, okay?

7            Now, actually, I was going to talk about it next.

8            Assuming the current index is set for a given pool,

9    for a fixed sequential outcome of pools, the prize, or winAmt,

10   is just dictated by the predetermined sequential pool of

11   outcomes in the device, right?

12   A.    Can you ask that a different way?

13   Q.    Yeah.  I mean, so once current index -- once current

14   index is set, right, we've got essentially a Rolodex of digital

15   potential outcomes, right, for every pool at any game level at

16   any play level, right?

17   A.    Well, I disagree with the Rolodex analogy.  But --

18   Q.    Yeah, I mean --

19   A.    -- we're talking about a database table.

20   Q.    Right.

21   A.    Right.

22   Q.    We're talking -- I'm using this as an analogy, right?  If

23   there was a --

24           **THE COURT**:  Counsel, only one of you can talk at a

25   time.  So, please, just ask a question, let the witness answer

1  it, okay?  Thank you.

2  **QUESTIONS BY MR. CRAIG:**

3  Q.    If this was digital, if this was a digital table,

4  right -- I mean, it is an analogy, right?  But if this was a

5  digital table and this was a digital entry, right, there's a

6  pool of sequential digital outcomes on the digital table,

7  right?  Once the current index has been set, we can both agree

8  that the Torch device operates so that if the current index is

9  set to this card, right, we know that the next outcome in that

10  pool for that game, theme, at that play amount, is just going

11  to be this digital card, right?

12  A.    Unless the current index becomes unset, that's correct.

13  Q.    Yeah.  Right.  I said the current index is set.  Okay?

14  Can we agree on that?

15  A.    And remains set.

16  Q.    Yeah, and remains set.

17  A.    Yes.

18  Q.    Okay.  So if the current index is set and remains set,

19  right, then the next -- the next turn is just going to be this

20  card, right?

21  A.    That's correct.  They're selected in order.

22  Q.    Right.

23        And then the next turn is just going to be this

24  card, right?

25  A.    That's right.

1   Q.    And there's no -- there's no randomized process to select

2   what would be the next turn, is this card, right?

3   A.    That's correct.  It actually adds 1 to the index.

4   Q.    Yeah, okay.

5         No randomized process for that, correct?

6   A.    For that, correct, yes.

7   Q.    You're not suggesting that you think any players are

8   playing a Torch device because they only want to see a specific

9   combination of symbols -- or I think you kept repeatedly saying

10  "visual outcomes" -- and that's something they're risking money

11  to see, true?

12  A.    I don't know how to answer that question, I guess.  I

13  wasn't generally referring to what the players -- or I wasn't

14  really trying to get inside the player's head.  I was referring

15  to what the machine does.

16  Q.    You're not suggesting that you think any players are

17  playing a Torch device because they only want to see a specific

18  combination of symbols, and that's something they are risking

19  money to see, correct?

20  A.    I don't believe I am, no.

21  Q.    So you would agree with me that is not something that you

22  are saying?

23  A.    I don't think that's something I'm saying.

24  Q.    Okay.

25  A.    If I said that in my report, I'd like to see it, but I

1    don't recall saying that.

2    Q.    No, you didn't.  I just think it was kind of implied in

3    what you were doing, and I wanted to just clarify for everybody

4    that that was not something.  Because you keep talking about

5    the visual outcome and it's something the player can't know.

6          But we can both agree that you're not saying that

7    the players are playing a Torch device because they only want

8    to see a specific combination that shows up as a visual outcome

9    of the symbols on the screen, and that's something they are

10   risking money to see, right?

11         **MR. FINNERAN:**  Objection.  Asked and answered.

12   Argumentative.

13         **THE COURT:**  The objection is sustained.

14   **QUESTIONS BY MR. CRAIG:**

15   Q.    You did not form any opinion that the random symbol

16   display, or as you repeatedly said yesterday, the visual

17   outcome -- you don't know why any specific player chooses to

18   play any turn on a Torch device; isn't that true?

19   A.    That is true.

20   Q.    All right.  I want to talk about the shuffle feature.  I

21   heard you talk about it a few times.

22         I believe you said there was three out of the nine

23   drives that you had looked at that contained what you've called

24   a pool_shuffle feature, right?

25   A.    That's right.

1    Q.    Okay.

2    A.    Technically, it was four drives referenced it, but only

3    three of them actually implemented it.

4    Q.    Right.  You only found three drives that implemented this

5    random pool_shuffle feature, correct?

6    A.    That's correct.

7    Q.    You've seen Nick Farley's declaration addressing what he

8    swore under penalty of perjury was a discovery production error

9    where his team accidentally produced three incorrect device

10   drives that contained a random pool_shuffle feature that no

11   Torch device he had previously reviewed and issued a report on

12   contained, correct?

13          **MR. FINNERAN:**  Objection.  Hearsay and compound

14   question.

15          **THE COURT:**  The objection to the form of the

16   question is sustained.

17   **QUESTIONS BY MR. CRAIG:**

18   Q.    Have you seen Nick Farley's declaration?

19   A.    I've seen a number of declarations from Nick Farley.  I'm

20   not sure which one you're referring to.

21   Q.    Have you seen the declaration from Nick Farley that

22   addressed a production error for three drives that were sent to

23   you the first time?

24   A.    I believe I have, yes.

25   Q.    And in that declaration, which was sworn under penalty of

1  perjury, he did say that that was a production error, correct?

2          **MR. FINNERAN:**  Objection.  Hearsay.

3          **THE COURT:**  The objection is sustained to the form

4  of the question.

5          **MR. CRAIG:**  May we approach, Your Honor?

6          **THE COURT:**  Approach the sidebar.

7          **(A bench conference was held on the record and**

8  **outside of the hearing of the jury as follows:)**

9          **MR. CRAIG:**  Your Honor, this goes -- I mean, this

10 goes to impeachment of what he said yesterday.  If you want to

11 get up and say that this is -- I mean, Nick Farley, I assume,

12 is going to testify.

13         **THE COURT:**  Hold on.  You need to talk to me.

14         **MR. CRAIG:**  Okay.  Yeah.

15         **THE COURT:**  The objection is it's hearsay.  The way

16 I view it is you're asking him to comment on a sworn

17 declaration from someone else that isn't in evidence.

18         **MR. CRAIG:**  I'm not using it for the truth of the

19 matter, which means it is not a definition.

20         **THE COURT:**  You absolutely are using it for the

21 truth of the matter --

22         **MR. CRAIG:**  If he wants --

23         **THE COURT:**  -- if you're trying to prove that Nick

24 Farley said this.  I'm going to sustain the objection.

25         **MR. CRAIG:**  Well, it's for effect on the listener,

1   Your Honor.  Because if he wants to get back up and say Nick

2   Farley was just lying, then he's free to do that with the

3   witness.

4           **THE COURT:**  You're asking him about a sworn

5   declaration.  It's an out-of-court statement.  It is hearsay.

6   It's not been admitted into evidence, and you're asking him to

7   comment on it.  And the form that you've done that is

8   objectionable.

9           **MR. CRAIG:**  Okay.  Thanks, Your Honor.

10          **MR. FINNERAN:**  May I speak to Mr. Craig for one

11  second before we go away?

12          If you want to explicitly offer it without being

13  offered for the truth -- if you want to specify that we're not

14  offering it for the truth and request a limiting instruction,

15  I'll withdraw my objection.  But as you presented it, it's

16  being offered for the truth.

17          So if you want to go forward and ask him if he's

18  familiar with that statement and I object, you say, "We're not

19  offering it for the truth but just the fact that he's received

20  that," and the judge would be willing to offer a limiting

21  instruction, I'd --

22          **THE COURT:**  It's then not hearsay.

23          **MR. FINNERAN:**  -- then I'd be very amenable to that.

24          **MR. CRAIG:**  I agree with that.  Thanks.

25          **(The proceedings returned to open court and in the**

1   presence of the jury.)

2          THE COURT:  Counsel, rephrase the question.

3          MR. CRAIG:  Yes.

4   QUESTIONS BY MR. CRAIG:

5   Q.    Now, I'm not trying to offer for the truth of the matter

6   that Nick Farley said a thing and that it is true.  I'm just

7   offering -- I just want to be clear for the record that I'm

8   just asking you about a declaration that you have seen for its

9   effect on the listener, for the effect on you that you had when

10  you read it, okay?

11         MR. FINNERAN:  I'll still object and ask for an

12  instruction.

13         MR. CRAIG:  Okay.

14         MR. FINNERAN:  But go ahead and ask your question.

15  QUESTIONS BY MR. CRAIG:

16  Q.    Now, you have seen a declaration from Nick Farley

17  addressing what he said was a discovery production error where

18  his team accidentally produced three incorrect drives that did

19  contain a random pool shuffling feature, correct?

20         MR. FINNERAN:  Your Honor, we object to the extent

21  this is being offered for the truth of Mr. Farley's statements,

22  but if the Court will instruct, we will withdraw our objection.

23         THE COURT:  Ladies and gentlemen, as I understand

24  it, Counsel is not asking this for the truth of the matter, but

25  just that Mr. Friedman has seen the affidavit or the

1    declaration.

2              That being said, have you seen the declaration?

3              **THE WITNESS:** I have, Your Honor.

4              **THE COURT:** Do you have another question?

5              **MR. CRAIG:** Sure do.

6    **QUESTIONS BY MR. CRAIG:**

7    Q.    We can both agree that in the, I believe, five prior

8    expert reports by Torch's technical expert, Mr. Farley, that

9    Mr. Farley never reported finding any Torch device that he

10   analyzed as containing a random pool shuffling feature in one

11   of those Torch devices, correct?

12   A.    I believe that's correct, yes.

13   Q.    Then you also mentioned that you had personally analyzed

14   a Banilla No Chance device that TNT purchased and owns and

15   represent that that device operates in the same manner as the

16   Torch devices in Missouri operates, correct?

17   A.    Well, that was with specific regard to one of the drives

18   that Torch sent me, correct, yes.

19   Q.    You'll agree with me that based on your own independent

20   analysis of TNT's Banilla No Chance device, there was no

21   randomized pool shuffling function contained within that device

22   you analyzed, correct?

23   A.    That one is right.  That's right.

24   Q.    You also did your own independent analysis of the three

25   corrected Torch devices that Mr. Farley's team sent you and

1  told you were the corrected drives that mirror those

2  Mr. Farley's company, Eclipse Compliance Testing, had

3  previously analyzed and issued reports on, right?

4          **MR. FINNERAN:**  Objection.  Compound question.

5          **THE COURT:**  The objection to the form of the

6  question is sustained.

7  **QUESTIONS BY MR. CRAIG:**

8  Q.    You also did your own independent analysis of three

9  corrected Torch device hard drives that Mr. Farley's team sent

10  you after the three hard drives that we just discussed,

11  correct?

12  A.    I did, yes.

13  Q.    And you were told -- well, that's fine.

14          And you personally analyzed those three corrected

15  hard drives, right?

16  A.    I did, yes.

17  Q.    We can both agree that your own independent analysis of

18  those corrected Torch drives, consistent with Mr. Farley's

19  prior testing results and your testing of TNT's Banilla device,

20  revealed that those three corrected Torch device drives didn't

21  contain a randomized pool shuffling feature?

22  A.    The second set did not, that's correct, yes.

23  Q.    You have no evidence that any Torch device that Torch has

24  ever operated in Missouri did, in fact, contain such a

25  randomized pool shuffling function, correct?

1  A.     I mean, other than the drives that were sent to me,

2  that's correct.

3  Q.     Yeah.

4         You never actually analyzed any Torch device that is

5  sitting in any retail location in the state of Missouri, true?

6  A.     You mean by, like, taking the hard drive out?

7  Q.     Yeah.  Yes.

8         You haven't done that, right?

9  A.     I did not open up a device in Missouri to do that, that's

10  correct.

11  Q.     All right.  Now, I want to talk to you about the random

12  starting index thing that you brought up yesterday and again

13  with me, okay?

14         You would agree with me that once the current

15  index -- you brought it up, it's in the code, but there's a

16  code location that says "current index" in the code that you

17  presented to the jury yesterday, right?

18  A.     That's right.

19  Q.     Okay.  You would agree with me that once the current

20  index is set, the computer does not have to use any random

21  process to go back and figure out where it is in the database,

22  right?

23  A.     That's correct.

24  Q.     And so if the current index is set on a given game theme,

25  right -- so, like, *Sparky's Firehouse* would be a game theme,

1    correct?

2    A.    Yes.

3    Q.    Okay.  So if the current index is set on a given game

4    theme and a play amount -- which I'll define the play amount

5    would be, like, the $0.25 level, the $0.50 level, the $0.75

6    level, the $1.00 level -- we can agree that that's the play

7    amount, right?

8    A.    Yes.

9    Q.    So if the current index is set on a given game theme and

10   a play amount on the machine -- like $0.25 on *Sparky's*

11   *Firehouse* -- that index is set in stone -- or I guess in our

12   case, digital code -- for as long as the game is operational

13   and isn't reset using the terminal restore button, correct?

14   A.    Well, there are other ways of resetting that table, but

15   if that doesn't happen, then it doesn't get reset.

16   Q.    Yesterday, you told me there was two ways that that

17   would -- the current index wasn't set.  Yesterday, you said it

18   was -- it was fresh from the factory, and the device needs to

19   figure out how to set itself up and know where the current

20   index was or the device could be reset.

21          So is there a third option today?

22   A.    Well, remember when I said the game -- there's two ways,

23   activation or reset or restore?

24   Q.    Yeah.

25   A.    There are two ways to do the activation:  one is at the

1   factory, and one is by remote terminal.

2   Q.   Okay.  You're not aware that any of Torch's devices are

3   networked in a remote network, are you?

4   A.   I'm not.  I'm just looking at what's in the code.

5   Q.   Okay.  I just want to be clear there's no evidence that

6   Torch devices are networked remotely, right?

7   A.   That's correct.

8   Q.   Okay.

9   A.   Well, as far as I know.

10  Q.   Okay.  So if we take that off the board, right, then it's

11  device activation from the factory or it's using the terminal

12  reset, correct?

13          **MR. FINNERAN:**  Objection.  Vague.

14  QUESTIONS BY MR. CRAIG:

15  Q.   Those are the two ways --

16          **THE COURT:**  The objection will be overruled.

17          You can answer if you understand the question.

18          **THE WITNESS:**  I do, yeah.

19  A.   I mean, essentially, that's right.  Unless someone --

20  unless an operator presses the reset/restore terminal button --

21  QUESTIONS BY MR. CRAIG:

22  Q.   Yeah, I think we're on --

23  A.   -- then those indexes into the pool tables stay where --

24  they'll stay where they are.  They keep counting forward.

25  Q.   Okay.  Just so it's clear -- because we've went through

1  this. I want to -- so if the current index is set on a given

2  theme and a play amount on the machine, the index is set for as

3  long as the game is operational without using the terminal

4  reset button, correct?

5  A.     That's correct.

6  Q.     And we can both agree that the current index could very

7  well be set before money is even inserted in the game,

8  certainly before a player pushes the "Play" button, right?

9  A.     Yes, that's correct.

10  Q.     For a newly activated Torch device, okay, fresh from the

11  factory, the computer in the device has no current index set

12  for any game at any game theme at any game -- at any play level

13  upon activation, right?

14  A.     That's correct.

15  Q.     But the computer inside the Torch device, it needs to

16  know where within the pool of the sequential outcomes the

17  starting point will happen, right?

18  A.     That's right.

19  Q.     Now, what I believe you're saying is the computer in the

20  Torch device uses this random generation process to help pick

21  within that pool of sequential outcomes where the first turn

22  will be after activation, right?

23          **MR. FINNERAN:** Objection. Vague.

24          **THE COURT:** The objection will be overruled.

25          Again, if you understand the question, you can

1   answer it.

2   A.    Well, I mean, everything happens after activation.  But

3   until someone is at the machine and needs to know what a

4   particular prize is in a given game theme and play amount,

5   those -- those indexes aren't set.

6   **QUESTIONS BY MR. CRAIG:**

7   Q.    Yeah.  And I'm not -- I'm not -- I'm talking from a

8   device standpoint, more a computer, like, what's happening

9   internally in the computer, right?

10  A.    Right.  As am I.

11  Q.    Okay.  Well, you just talked about a player coming up.

12        But I'm just saying that the computer, it needs to

13  know where the first starting point in the index will be,

14  right?

15  A.    Well, you have to specify when the computer needs to know

16  that.  What I'm saying is that the computer only needs to know

17  that when a play is actually requested, when the first play out

18  of a pool is requested.

19  Q.    But it's something that it needs to know regardless of

20  when, right?

21  A.    Well, I mean, no, it doesn't.

22  Q.    Okay.  All right.  That's fair.

23        The process picks from a finite number of potential

24  starting points within a given pool of sequential outcomes,

25  right?

1    A.    I'm sorry.  Can you repeat that?

2    Q.    Yeah.

3          This random process of selecting the starting index

4    point, right, it picks from a finite number, like 12 potential

5    starting points within a given pool, right?

6    A.    Yes, that's correct.

7    Q.    Okay.  So this random process, there's -- I mean,

8    let's -- because I've got four fingers, let's make it four,

9    okay?

10         There's a random process, right, that we use to pick

11   one of these starting points, right, within the index?

12   A.    Within the pool.

13   Q.    Within the pool of the index of potential outcomes,

14   right?

15   A.    Yes.

16   Q.    Okay.  And let's say if the computer uses this process

17   and it picks the starting index point to be outcome in the

18   sequential pool that is listed in the table, the digital

19   table -- that is, 1,000 in the table -- then the current index

20   will be set to turn 1,000 in the index for that first play upon

21   device activation, correct?

22   A.    No, that's not how it works.

23   Q.    Okay.  How does that work?

24   A.    Well, so when the device is activated --

25   Q.    Uh-huh.

1    A.    -- the table that stores the indexes for each pool and

2    play amount is completely erased.  And it's only when a given

3    pool for a theme and play amount needs to select the next

4    prize -- that's when the index is set randomly.

5    Q.    Okay.  And when the index is set to the given turn, like

6    using this, like, process -- so we pick now the starting point

7    will be here using this process, right?  Can you agree with me?

8    A.    Well, if that's the hypothetical, then yes.

9    Q.    Okay.  And from that point forward, no random number

10   generation will happen.  We'll just go -- if this is the next

11   turn in sequence, the machine knows, without using any random

12   number process, the next turn will be this turn, right?

13   A.    Well, so what actually happens in the code is if you've

14   set the index to 1,000 -- I think --

15   Q.    Right.

16   A.    -- that was your example -- then that's the next result

17   that's returned out of the database.  And once the game has

18   been played once, then the index is set to 1,001.

19   Q.    Right.

20   A.    And if the game is played again, then the index is set to

21   1,002.  So it adds 1 each play.

22   Q.    Right.

23         And it will keep doing that every time.  So just

24   like you said, if it's set at 1,000, the next turn, we know,

25   without using any random number process, it will be 1,001,

1    right?

2    A.     Well, we know because we've seen the code, yes.

3    Q.     That's how the game operates internally, right?  We can

4    agree?

5    A.     Correct.

6    Q.     Yes.

7           And the next turn after that would be 1,002, right?

8    A.     Correct.

9    Q.     1,003 will be the next turn, right?

10   A.     For that play amount and game theme, yes.

11   Q.     The next turn will be 1 -- it just keeps going, correct,

12   in sequence without any random number generator being used,

13   correct?

14   A.     Right.

15   Q.     And it will -- unless the device is restored or

16   reactivated, as you have mentioned, it will keep doing that

17   infinity, right, just going through the Rolodex of potential

18   outcomes and just keep rolling through them, correct?

19   A.     It will keep incrementing that index each play, yes.

20   Q.     All right.  We talked about the current index can be set

21   before anybody plays the game or any money is put in the

22   device.

23           So, for instance, if I walked up to this device and

24   it was factory-fresh, it had never been touched, it just got

25   plugged in, turned on for the first time, we can both agree the

1    current index would not be set, right?

2    A.    That's correct.

3    Q.    And if I go to one of the game themes at the play level

4    $0.25 and I hit the prize viewer -- are you with me?

5    A.    I am.

6    Q.    Okay.

7          -- well, the computer needs to know, then, where

8    within that pool of sequential outcomes it's going to start,

9    right?

10   A.    It does.

11   Q.    Okay.  So at that point, and before I put a dollar in the

12   device for that game at that $0.25 play level, the current

13   index gets set, right?

14   A.    That's correct.

15   Q.    Okay.  And thereafter, unless the device is reset using

16   one of the methods we talked about, that current index for that

17   game at that game theme at that play level -- it won't have to

18   use any random call to figure out where in the index the

19   machine needs to look for the next sequential turn, correct?

20   A.    I think you meant where in the pool, but that's correct,

21   yes.

22   Q.    Yeah.

23          And in that same process of me walking up to a

24   brand-new device and the current index is not set, I could, as

25   a player -- I could go through every single one of those game

1  themes at every single play level, and I could do that same

2  thing for every play level of every game in the Torch device,

3  right?

4  A.    Sorry.  What same thing?

5  Q.    I could go to -- so within, like, *Sparky's Firehouse*,

6  right, I could go to the $0.25 level, I could hit the prize

7  viewer, right?

8  A.    Yes.

9  Q.    And at that point, the current index will be set, right?

10 A.    Hitting the prize viewer causes that to happen, yes.

11 Q.    Right.  Okay.

12        And then in that same game theme, I go to the $0.50

13 level and I hit the prize viewer, right.  That's going to set

14 the current index within that pool for *Sparky's Firehouse* at

15 the $0.50 level.  It gets set right then, right?

16 A.    That's correct.

17 Q.    Okay.  And if I did that at the $0.75 level, current

18 index gets set, right?

19 A.    At that point, yes.

20 Q.    And if I did that at the $1.00 level, current index gets

21 set, right?

22 A.    Correct.

23 Q.    And if I went to the next game theme, I could do that

24 again at the $0.25 level, $0.50 level, $0.75 level, $1.00

25 level, right?

1   A.    All of that is right.

2   Q.    Yeah.

3           And every time I did that, without putting any money

4   in the device, current index gets set, right?  I could do that

5   in the next game theme at the $0.25 level, the $0.50 level, the

6   $0.75 level, and the $1.00 level without putting any money in

7   the device, and the current index for all of those pools would

8   be set, right?

9   A.    That's correct.

10  Q.    And I could do that for the next three themes, correct?

11  A.    You could.

12  Q.    And I don't have to put any money in the device to do

13  that, right?

14  A.    I believe that's right, yes.

15  Q.    Okay.  And if that happened, every game theme for every

16  play level would have a fixed -- you don't like the word

17  "fixed," I know.  We've had this.  It would have a set current

18  index, right?

19  A.    That's correct.  The index would be set.  There would be

20  value in it.

21  Q.    Right.

22          And from that point on, this random number generated

23  process that you've talked about at length, that wouldn't

24  happen again for that device unless it was terminal restore and

25  it was reset, right?

1    A.    That's right.

2    Q.    You would also agree with me that if Torch's employees

3    were to simply test the Torch device in Torch's warehouse

4    before setting the game in a retail location and they did the

5    same thing as the hypothetical player that you and I just

6    described, they went through every game theme at every play

7    level and they just pushed the prize viewer, then at that point

8    in the warehouse, every one of those current indexes would be

9    set, right?

10   A.    Yes, that's right.

11   Q.    Okay.  And that could happen, obviously, before the

12   device ever gets placed at a retail location, correct?

13   A.    It could, yes.

14   Q.    You personally have no idea whether any Torch device that

15   Torch has ever placed in the state of Missouri has been set in

16   a retail location without the current indexes for any pool

17   having already been set, right?

18           **MR. FINNERAN:**  Objection.  Calls for speculation.

19           **THE COURT:**  Again, you can answer if you know.

20   A.    Well, I don't have any of that evidence, Your Honor.

21           **THE COURT:**  Okay.

22   **QUESTIONS BY MR. CRAIG:**

23   Q.    Thanks.

24           That wasn't an opinion that you were asked to offer

25   in this case, right?

1   A.     It was not.

2   Q.     Regardless of this current index stuff that happens in

3   the computer, you and I can both agree the prospective player

4   can always use the "Prize Viewer" button to see the outcome,

5   which I'll define as "the win or prize amount," for the next

6   turn, including the initial first turn on any Torch device

7   after device activation, correct?

8   A.     I think that's right.  That was a long question, so maybe

9   I didn't follow it.

10  Q.     Well, you would agree with me that a prospective player

11  can always use the "Prize Viewer" button to see the next

12  outcome, which I will define as "the prize or win outcome

13  amount," right?

14  A.     They can always press the prize viewer, is my

15  understanding.

16  Q.     And that's true even on the first initial turn on a Torch

17  device after device activation if current index isn't set,

18  right?

19  A.     That's right, yes.

20  Q.     Because when they push the button, it's going to display

21  what it is that they will win or the prize that will be given

22  if they decide to play that turn, right?

23  A.     That's the premise of the prize viewer, yes.

24  Q.     And you don't have any evidence that Torch uses the

25  "Restore Terminal" button, right?

1    A.    I do not.

2            **MR. CRAIG:**  Okay.  All right.  Now, I'm going to use

3    the device a little bit.  I'll try to speak loudly.  My wife

4    tells me I have a projecting voice, but if you can't hear me,

5    let me know, okay?

6            **THE COURT:**  I will do that.

7            **MR. CRAIG:**  Thank you.

8            **THE WITNESS:**  Is this something I should come down

9    and watch you for?

10            **MR. CRAIG:**  Yeah, you might want to look.

11            **THE WITNESS:**  Okay.

12            **THE COURT:**  Mr. Friedman, if do you that, you've got

13    to keep your voice up so the jury can hear and the court

14    reporter can hear.

15            **THE WITNESS:**  Understood.  I think I'll probably

16    walk back to the mic when answering.

17            **MR. CRAIG:**  Or just bring the mic to the corner.

18    Can you do that?

19            **THE COURT:**  Pose a question.

20            **MR. CRAIG:**  You got it.

21    **QUESTIONS BY MR. CRAIG:**

22    Q.    Okay.  Just to -- so everybody is aware, like, I -- we

23    shut this device down last night, and then I, before anybody

24    came, I turned it back on.

25            And you would agree with me that everything is set

1    here as it was before we turned it off and left tomorrow [sic]

2    night?  We set $0.75 on the credits, which I believe is what

3    Mr. Finneran blessed me with before we left, right?

4              **THE COURT:**  Counsel, just pose a question.

5              **MR. CRAIG:**  Yeah.

6    **QUESTIONS BY MR. CRAIG:**

7    Q.    Does this screen look exactly as it did before you got

8    off the stand and we broke for the night last night?

9    A.    I believe that's correct, but I don't have perfect

10   recollection of what the -- how the game ended up.

11   Q.    Okay.  Now, you would agree with me there are $0.75 in

12   credits on this device, right?

13   A.    That's what it says, yes.

14   Q.    Okay.  So the first thing -- there was a discussion

15   about, you know, pushing the "Collect" button, printing a

16   ticket, and there was $1.75, I think, on there.  The ticket

17   said you can redeem for $1.00, right?

18   A.    I believe that's what it said.  The ticket is right there

19   in the cup in front of you.

20   Q.    Okay.  Yeah, it says "Ticket 16, Amount: $1.00," right?

21   A.    Yes.

22   Q.    Now, you'll also agree with me this $0.75 stayed on the

23   machine, right?

24   A.    Yes.

25   Q.    Okay.  So there's nothing in the programing that wipes

1    that $75 -- $0.75 out when a player walks away from the device,

2    right?

3    A.    Not to my knowledge, no.

4    Q.    Okay.  So if I am the next hypothetical player, right, it

5    could be that there's a credit that's left on the device,

6    right?

7    A.    Yes.

8    Q.    And I, as the next hypothetical player, could get the

9    benefit of this $0.75 credit, right?

10   A.    Sure.

11   Q.    I could, in fact, get at least 3 free plays out of this,

12   right?

13   A.    If you're playing at the $0.25 level, yes.

14   Q.    Correct.  Okay.

15         Torch Electronics, they don't get this $0.75, right?

16   The next hypothetical player gets the benefit of this $0.75,

17   right?

18         **MR. FINNERAN:**  Objection, Your Honor.  Calls for

19   speculation.

20         **THE COURT:**  The objection is sustained.

21   **QUESTIONS BY MR. CRAIG:**

22   Q.    All right.  Now, there's a few things that you didn't

23   tell the jury about, information that is available to the jury

24   in the device.  One of them -- I don't think you ever -- see

25   this "Rules" button?

1    A.    I do.

2    Q.    Okay.  If you push the "Rules" button, there's some words

3    that come up, right?

4    A.    There are some words.

5    Q.    Okay.  And if you need to step closer, that's fine.  But

6    it says "Rules" at the top, right?

7    A.    I can see that, yes.

8    Q.    Okay.  "In NCG" -- which that's Banilla's No Chance

9    Games.  That's how they abbreviate it, right?

10   A.    That's my understanding.

11   Q.    "In NCG, the game does not determine the prize outcomes."

12          Did I read that correctly?

13   A.    I don't know.  I can't see it.

14          Would you like me to step forward?

15   Q.    Well, come.

16   A.    Yes, you read that correctly.

17   Q.    Okay.  And that's what we had already agreed to, right?

18   The prize amount, if you push the prize viewer, that's

19   determined -- that's fixed, right, assuming the current index

20   is set, right?

21   A.    What's fixed?

22   Q.    The win or prize outcome, right?

23   A.    The next prize is reflected by the current index pointing

24   at a particular prize in the database.

25   Q.    Right.

1        And as long as the current index is set, that is
2    just a sequential, no randomness process, right?
3    A.    The selection of the next prize in the database, that's
4    correct.
5    Q.    All right.  Why don't you step over here.  We'll shortcut
6    this.
7         "This is because all of the" -- and I'm reading the
8    next sentence of the Rules screen.
9         "This is because all of the prize outcomes in each
10   play level come from separate, predetermined, finite list of
11   prizes.  The game simply displays the predetermined outcomes in
12   an entertaining fashion."
13        Did I read that correctly?
14   A.    You did.
15   Q.    Okay.  Now, come back here, please.
16        So -- I'm continuing here.  "Importantly, you may
17   view each and every outcome which may entitle you to win a
18   prize before playing the game.  You may simply touch the 'Prize
19   Viewer' button on the game console and, thereby, view every
20   prize outcome, whether the prize outcome is zero or a positive
21   prize value, before playing the game."
22        Did I read that correctly?
23   A.    You did.
24   Q.    All right.  That's good.
25        Okay.  So I'm going to go into a game, right?  This

1   is a game theme, *Sparky's Firehouse*, right?

2   A.    Yes.

3   Q.    I'm going to push "Play."

4         Okay.  Now, I'm going to show you how -- the only

5   way -- this is the only way I play a Torch device, okay?

6         **THE COURT:**  Counsel, pose a question to the witness.

7         **MR. CRAIG:**  I am -- I will.  I will.

8   **QUESTIONS BY MR. CRAIG:**

9   Q.    Okay.  So you can agree that there is a "Prize Viewer"

10  button here, right?

11  A.    Yes.

12  Q.    Okay.  Say I'm a hypothetical potential player.  I can

13  push the prize viewer, and I can know that if I decide to play

14  this game at the $0.75 level, I'm not going to get anything,

15  right?

16  A.    That's actually set at the $1.00 level.

17  Q.    Oh, okay.  Ah, "play amount."  Sorry.  I confused it with

18  the credits.  You're right.

19        If I play this at the $1.00 amount, I'm not going to

20  get anything, right?

21  A.    It actually won't let you, because a dollar is more than

22  what you have.

23  Q.    Well, I don't have to put a dollar in to get that

24  information, right?  If I were to put a dollar in and push

25  "Play," I would know I am not going to get anything in exchange

1    for my dollar, right?

2    A.    That is true.

3    Q.    Okay.  Now, let's say I didn't like that, right?  So I

4    can change the play amount.  I can select from a different

5    pool, right?

6    A.    Yes, that's what happens.

7    Q.    Okay.  I'm going to go down to the $0.25 level.

8          So this is a whole new pool of potential outcomes,

9    right?

10   A.    It's a different pool, yes.

11   Q.    Right.  Okay.

12         I can use the "Prize Viewer" button, right?

13   A.    Yes.

14   Q.    And if I hit that, now, I know that if I put money in

15   this device and I decide to play this turn, I can know I'm not

16   going to get anything in exchange for my $0.25, right?

17   A.    That's because the prize viewer says $0.00, correct.

18   Q.    Right.

19         That's information that the player can always see,

20   right, if they choose to use the prize viewer?

21   A.    If they press the prize viewer, that's correct.

22   Q.    Right.

23         And the rules told them that that's something they

24   can do any time, right?

25   A.    Yes, that's right.

1  Q.    All right.  Now, if I go to the $0.50 level, that's a new

2  pool, right?

3  A.    It's a different pool, yes.

4  Q.    Yeah.

5        I can hit the prize viewer?

6  A.    Yes.

7  Q.    I'm not going to win anything.

8        If I put a dollar in the machine, I push "Play," I

9  know my $0.50 is not going to get me anything, right?

10 A.    And, again, for the record, because the prize viewer

11 shows zero, yes.

12 Q.    No.  I haven't put money in the device, but I know

13 before -- if I choose from here to put a dollar into the device

14 so that I could play it, I know if I push "Play," I'm not

15 getting anything for my $0.50 on that turn, right?

16 A.    That's correct.  So again, I'm not disagreeing with you.

17 Just for the record, it reflects that the prize viewer shows

18 $0.00.

19 Q.    Okay.  We've already established the $1.00 prize pool,

20 right?  There's another $2.00 prize pool here.  That would be a

21 new pool, a different pool?

22 A.    Yes, that's correct.

23 Q.    Okay.  And I can use a prize viewer to see -- if I play

24 at the $2.00 amount, I can know whether I'm going to win or

25 lose, right?

1    A.     If you press the prize viewer, yes.

2    Q.     The prize viewer says if I put $2.00 in this machine and

3    I push this "Play" button, I'm getting nothing, right?

4    A.     Again, the prize viewer says $0.00, yes.

5    Q.     Right.

6           So I can make a decision as to whether or not I'm

7    going to put $2.00 in the machine and see what happens, right?

8    I can do that?

9           **MR. FINNERAN:**  Objection, Your Honor.  Asked and

10   answered.  I think this is getting repetitive.

11          **THE COURT:**  The objection is sustained.

12   **QUESTIONS BY MR. CRAIG:**

13   Q.     Can we agree that I can do this -- if I exit, I could go

14   through that same process for every one of these game themes at

15   every play level, right, and before I put any money in the

16   device, I can see whether there is any turn in any pool at any

17   play level that would pay me more than $0.00, right?

18   A.     That's correct.

19   Q.     Okay.  And let's say that I came to one, right -- sorry.

20   To go back.

21          We're in *Sparky's Firehouse* again.  We're at the

22   $2.00 -- we'll just go to the $1.00 level, okay?

23          Now, let's pretend that this says $10.00, the prize

24   viewer says $10.00, okay?

25   A.     Okay.

1  Q.    Now, I know -- I haven't put any money in the device, but

2  I know that if I stick a dollar in that device and I have at

3  least a dollar in credits here, right, and I choose to push

4  this "Play" button, I know that the machine is going to give me

5  $10.00 in exchange for the $1.00 that I played, right?

6  A.    That's right.

7  Q.    Okay.  And then at that point, before I -- before I've

8  committed anything other than the $1.00 that I needed to use to

9  play that device -- to play this game, I can push "Collect,"

10  I'd get a ticket, it'll say $10.00, I can take it, and I can

11  redeem it for $10.00, right?

12          MR. FINNERAN:  Objection.  Calls for speculation.

13          THE COURT:  You can answer if you know.

14  A.    If I understand your hypothetical, if the prize viewer

15  says $10.00 and there's no current balance on the game -- right

16  now there's $0.75, but if there's no current balance and you

17  put your dollar in and you play and then you get the $10.00,

18  then, yes, you can cash out for those $10.00.

19  QUESTIONS BY MR. CRAIG:

20  Q.    That's a certainty, right?  If it says I'm going to win

21  $10.00, I put $1.00 in, I play that turn, I'm going to get

22  $10.00, right?

23  A.    That's my understanding of how the code works, yes.

24  Q.    All right.  Just -- we'll agree I walked up to this

25  device and there was $0.75 in credits available, right?

1    A.    Yes.

2    Q.    So I haven't -- me personally, as the next player in the

3    chain, I've not put any money in the device, right?

4    A.    That's correct.

5    Q.    Okay.  Now, I can just hit that.  I didn't commit any

6    money to play that turn, right?

7    A.    Well, you committed the $0.25 of the credits that were on

8    there.

9    Q.    Not my money, right?  It was somebody else's?

10   A.    Sure.

11         **MR. CRAIG:**  Okay.  I think we're good.  No further

12   questions.

13         **THE COURT:**  Mr. Friedman, if you don't mind having a

14   seat.

15         Mr. Finneran, questions to the witness?

16         **MR. FINNERAN:**  Yes.  Thank you, Your Honor.

17                    **REDIRECT EXAMINATION**

18   QUESTIONS BY MR. FINNERAN:

19   Q.    Mr. Friedman, I'd just like to go over a few of the

20   questions that Mr. Craig asked you and make sure that we have a

21   clear understanding of them.

22   A.    Yes.

23   Q.    So you recall, at the beginning of your examination,

24   there was a discussion about when the prize amount would,

25   quote, "show up."

1    A.    Yes.

2    Q.    And I think that you -- he was presenting you with some

3    prior testimony that you'd given on that point.

4          Can you explain what -- what it is that, from the

5    player's perspective, the prize amount would show up on any

6    given play of the device?

7    A.    Right.

8          So when the player is actually playing the game and

9    they press the button, what they see is the reels spinning.

10   And then at the end of that visual display, the prize appears,

11   whatever it is, win or lose.

12         I understood his question to be asking me about what

13   is on the screen, because we were just talking about the

14   symbols.

15         What actually happens in the code, however, is that

16   the database sends a prize amount to the game display code.  So

17   the game display code has that number and then has to reverse

18   engineer, essentially, what the visuals are to match that

19   number.

20         So I think that was the disconnect.

21   Q.    Thank you.

22         So if I understand that correctly, then, although

23   the machine may communicate the current play amount to the

24   software in order to generate the visual display, that number,

25   that win or loss, is not displayed to the player until after

1   the visual outcome is displayed, as a general proposition?

2   A.    When you're pressing the "Play" button, that's correct.

3   Q.    Okay.  He also -- actually, one moment.

4         **MR. FINNERAN:**  Can I borrow the Rolodex?

5         **MR. CRAIG:**  Yeah.

6   **QUESTIONS BY MR. FINNERAN:**

7   Q.    So you recall when Mr. Craig brought this Rolodex up and

8   talked to you about that?

9   A.    Yes.

10  Q.    I think you indicated that you disagreed with the

11  analogy?

12  A.    Right.

13  Q.    Can you explain what your basis for disagreement with his

14  analogy would be?

15  A.    Well, so, I mean, I haven't used a Rolodex in forever.

16  But it's my understanding that when people use Rolodexes, they

17  sort their address cards or phone numbers or whatever.  They're

18  in an order so that, for example, if your name and my name,

19  right -- your last name is Finneran, my last name is

20  Friedman -- so mine would be after yours in the Rolodex.

21         The way the prize pool is ordered, it's not in any

22  discernible sorted order in the same way that a Rolodex is.  So

23  that's why I disagree with the analogy.

24  Q.    Could you move the microphone a little closer to your

25  face?  I think it's just point -- no, no.  If you push the

1   microphone away from you and tilt it down.

2   A.    Like this?

3   Q.    That's better, I think.

4   A.    Is that better?

5   Q.    Yes.

6   A.    All right.

7   Q.    Thank you.

8         Okay.  Also, Mr. Craig asked you about what

9   Mr. Farley sent you as -- in terms of drives.

10        Do you recall that discussion?

11  A.    Yes.

12  Q.    So is it correct to say that you received drives on two

13  different occasions from either Torch or Mr. Farley?

14  A.    Yes.

15  Q.    And the three drives you've mentioned that had that

16  pool_shuffle, were those part of the first or the second batch

17  of drives you received?

18  A.    They were part of the first batch.

19  Q.    And I believe Mr. Craig asked you if you understood that

20  Mr. Farley -- what Mr. Farley had said about why that first set

21  that you were sent had a pool_shuffle in it.

22        Do you recall that?

23  A.    I do.

24  Q.    Did you take any steps to verify what Mr. Farley was

25  claiming about why those drives were sent, whether it was an

1   error or not, or was that part of your investigation?

2   A.    It was not.  I had no access to that information.

3   Q.    So other than having Mr. Farley's word, you have no way

4   to validate, today, whether or not his claims were true?

5   A.    That's correct.

6   Q.    During your examination, Mr. Craig was frequently using

7   the term "outcome."  And I just want to make sure we're using

8   those terms consistently.

9         When you say that the outcome in the prize table

10  increments by 1, are you referring only to the prize amount?

11  A.    Yes.  So what's stored in the database tables -- we

12  actually saw a snippet of this yesterday.  It's a two-column

13  database table, and one column is -- the title of the column is

14  "Ticket Number."  So internally, they refer to them as

15  "tickets."  But it's just a number, which number of ticket are

16  you.

17        But then the data, the actual prize value, is stored

18  as a multiplier.  So that was the second column in the database

19  table.  And the multiplier is what gets returned to the game.

20  Q.    And so that table is what displays, as you said, prize

21  amounts, multipliers that produce price amounts?

22  A.    Correct.

23  Q.    However, the visual outcome of the game, how the reels

24  spin and what they show, is that stored in the database table?

25  A.    It is not.

1    Q.    Is that incremented one by one in an orderly sequence?

2    A.    No.

3    Q.    How is it determined?

4    A.    That's determined by the random processes that select

5    what reel symbols to pick, what -- in the one game with the

6    dice, what dice to throw.  All of that happens on the game code

7    that generates the display.

8    Q.    Okay.  I'm hoping to now add some clarity on this concept

9    of the current index and when that current index is set.

10   A.    Yes.

11   Q.    Do you recall that discussion with Mr. Craig?

12   A.    Yes.

13   Q.    So remind the jury, when you say the "current index,"

14   what exactly are we referring to?

15   A.    Right.

16         So I tried to simplify that because the code

17   actually is pretty complex.  But when I say "index," I'm

18   talking about -- it's a number.  That just points at where in

19   the table the next play will be drawn from.

20   Q.    So in other words, there were two columns:  one was a

21   sequential list of numbers running from 1 to, say, 100,000.

22   The second column had a whole bunch of multipliers.

23         When you're talking about the "index," you're

24   talking about the number in the first column?

25   A.    It's a number that refers to one of the numbers in the

1    first column.  That's how you know where you are.

2    Q.    And it just corresponds to what's in the second column,

3    right?

4    A.    Correct.

5    Q.    So back to the Rolodex, Mr. Craig was saying suppose this

6    is 1,000 and the next one is 1,001 and the next one is 1,002.

7              Do you recall that?

8    A.    Yes.

9    Q.    And I think he asked you we know that the next one is

10   going to be 1,003.

11             And when we say "we know," who knows?

12   A.    The game database knows.

13   Q.    Does the player have any way of discerning that

14   information from what the display provides?

15   A.    No, I don't think the player even understands that

16   there's a table in the first place.

17   Q.    Is there anything that you observed that informs the

18   player how many entries are on the Rolodex?  Whether it's

19   100,000 or 75,000 or 60,000?

20   A.    No.  That information is not available.

21   Q.    Is there any way for the player to find out what's on all

22   of the cards on the Rolodex without playing all the way through

23   those 100,000 outcomes?

24   A.    Sorry.  Ask that again?

25   Q.    Yeah.

1          Is there any way for the player -- and I'm using the

2    Rolodex, which I know you don't like this analogy, but is there

3    any way for the player to ascertain what the prize amounts are

4    going to be on each following turn throughout the game without

5    playing the game?

6    A.    No, there is not.

7    Q.    And even if they did play through 100,000 outcomes, if

8    they didn't know that there were 100,000 outcomes, could the

9    player know that the machine has reset and gone back to 1 based

10   upon what the game displays?

11   A.    No, they couldn't.

12   Q.    All right.  And so you also said that the first play is

13   determined -- or sorry -- the first index, the starting

14   index -- I think you confirmed for Mr. Craig that is determined

15   randomly by the game?

16   A.    It is.

17   Q.    And so he asked you about different circumstances under

18   which that random selection might be made.  And so I'm going to

19   step to the side slightly.  I'll keep my voice up.

20          But do you recall Mr. -- would you move so you can

21   also see?

22          Do you recall Mr. Craig showing you the *Sparky's*

23   *Firehouse* game?

24   A.    Yes.

25   Q.    So I'm going to press "Play" on that game to load it.

1              And do you recall Mr. Craig giving you a

2    hypothetical about a brand-new machine that had just been

3    activated?

4    A.    Yes.

5    Q.    At that time, let's say that that -- this is a brand-new

6    machine that had been activated and I click the *Sparky's*

7    *Firehouse* game.

8              At that point, would the game have yet decided where

9    on that Rolodex to start?

10   A.    No.

11   Q.    If I were to then change the play amount, would it then

12   decide where to start?

13   A.    No.

14   Q.    If I were to hit the rules, would it then tell me where

15   to start?

16   A.    No.

17   Q.    If I hit the "Play" button, would it then decide where to

18   start?

19   A.    Yes.

20   Q.    And how would it make that determination?

21   A.    That's using the .Randomize_start_index function.

22   Q.    Now, let's say I did that for the $0.25 level for

23   *Sparky's Firehouse*.

24             Does that mean that the index has been set for

25   *Bourbon Street Dice*?

1  A.    Assuming a freshly activated machine that has not yet

2  been set, that's correct.

3  Q.    What about the *Curious Case of Dr. Jekyll & Mr. Hyde*?

4  A.    No.

5  Q.    So each of these games would have to have a person press

6  the "Play" button or the prize viewer in order to select where

7  the random game is going to start at each play level -- each

8  combination of play level and game; is that right?

9  A.    Yes, that's my understanding.

10 Q.    So I think Mr. Craig also talked to you about the prize

11 viewer feature.

12        Do you recall that?

13 A.    Yes.

14 Q.    And so this prize viewer feature is over here on the left

15 side of the screen.

16        Can you see it?

17 A.    On that game, yes.

18 Q.    I'm pressing it.

19        When I press that button, how is the game

20 determining what number to show me?

21 A.    Well, under the assumption that the current index has

22 already been set, which I know it is because we've been playing

23 this game, that just returns the value of the multiplier from

24 the database table for that current game, *Sparky's Firehouse,*

25 and the current bet level, which is $0.25.  And so that zero is

1    what came out of the database.

2    Q.    And you gave me the example of it's a previously

3    activated and played device.

4          But assuming this was a brand-new device and no one

5    had ever played *Sparky's Firehouse* before at any level, the

6    player his this "Prize Viewer" button, how does the machine

7    decide what number -- what entry to display in the prize

8    viewer?

9    A.    It uses the same .Randomize_start_index function.

10   Q.    Okay.  I'm also going to ask you about the rules.

11         Do you recall Mr. Friedman talking about the rules?

12   A.    I'm Mr. Friedman.  But yes.

13   Q.    I'm sorry.

14         Do you recall Mr. Craig -- Mr. Friedman, do you

15   recall Mr. Craig asking about the rules screen?

16   A.    I do.

17   Q.    And I don't believe you discussed that on your direct

18   examination, but was that something you are aware of in the

19   game?

20   A.    I'm aware of game rules, yes.

21   Q.    Right.

22         And so if we -- this is a different set of rules.

23         Okay.  So the "Rules" button that Mr. Craig pressed

24   was actually on the main screen, not in the game; is that

25   right?

1   A.    That's correct.

2   Q.    Okay.  So if I click that "Rules" screen, do you see that

3   three paragraphs come up?

4   A.    Yes.

5   Q.    And now I'll ask you to, as you did for Mr. Craig,

6   approach me quickly.

7         It says the game -- "In NCG, the game does not

8   determine the prize outcomes.  This is because all the prize

9   outcomes at each play level come from a separate,

10  predetermined, finite list of prizes.  The game simply displays

11  the predetermined outcomes in an entertaining fashion."

12        First, did I read that correctly?

13  A.    Yes, you did.

14  Q.    And then if you'd come back here one more time.  Sorry.

15        Do you see where it says "Also, at any time, you may

16  simply touch the 'Collect' button to print a voucher with which

17  to redeem the balance"?

18  A.    Yes, I see that.

19  Q.    And do you see the next sentence says "You can always use

20  the 'Prize Viewer' button to view the upcoming prize outcomes

21  of the various play levels of each game without spending any

22  money"?

23        Did I read that correctly?

24  A.    You read that correctly.

25  Q.    Okay.  So what we just read, first of all, mentions the

1    prize outcomes being predetermined.

2            Is it true that the amount of the prize, if it's a

3    game that has been played before that is not a newly activated

4    machine, that does not have a terminal restored -- is it true

5    that those prizes are determined in a sequential order and sort

6    of ticked through on the Rolodex in the way that you described

7    before?

8    A.    Yes.

9    Q.    Is it true, however, that the visual outcome is

10   predetermined in any way by the game?

11   A.    It's not predetermined.

12   Q.    Instead, how is it determined?

13   A.    Well, the symbols, the graphics themselves, those are

14   part of the game.  But which symbols, which animations appear,

15   that's randomly determined.

16   Q.    And then you also recall me reading the part that said,

17   any time, you can touch the "Collect" button and redeem the

18   balance?  Do you remember reading that?

19   A.    I do.

20   Q.    Based on your observation of how this ticket printed

21   before, is that a correct description of how the game actually

22   behaves?

23   A.    It's not.

24   Q.    And why not?

25   A.    Well, you got -- we got to a point yesterday where there

1    was $1.75 on the credit balance, and we redeemed the ticket

2    only for $1.00.

3    Q.    In other words, as I think Mr. Craig asked you, any

4    balance load lower than $1.00 stays on the game?

5    A.    It did for that case, yes.

6         **MR. FINNERAN:**  May I have one moment, Your Honor?

7         **THE COURT:**  You may.

8    **QUESTIONS BY MR. FINNERAN:**

9    Q.    Mr. Friedman, do you recall yesterday that we actually

10   introduced, as Exhibits 240 through 243, four of the drives

11   that you actually reviewed?

12   A.    Yes.

13   Q.    We talked earlier about how you got two sets of drives.

14         Were these drives part of that first or second set?

15   A.    Those were the second set.

16   Q.    And were these drives represented to you to be reflective

17   of what is in Missouri?

18   A.    They were.

19   Q.    And was that representation made by Torch and Mr. Farley,

20   as you understand it?

21   A.    That's my understanding, yes.

22   Q.    And these drives, did these drives all have the random

23   functions that we've talked about picking the initial start

24   index?

25   A.    Yes.

1   Q.   Did these drives all have the random functions that we've

2   talked about, about deciding the visual outcome of the game?

3   A.   Yes.

4   Q.   The only difference that you observed of any material

5   difference was that these drives did not have that pool

6   shuffling feature that we talked about?

7   A.   That's correct.

8   Q.   So the devices with the pool shuffling feature, if that

9   Rolodex went all the way through, then it would re-sort them

10  before the player went through the next time, right?

11  A.   Yeah.  In chunks, yes.

12  Q.   But even on these drives where that pool_shuffle feature

13  is absent, it's still going to go through all those outcomes,

14  one to the next, after making a random selection of where to

15  start?

16  A.   That's correct.

17            **THE COURT:**  Counsel, just so the record is clear,

18  you kept referring to "these drives."  That's Exhibits 240 to

19  243?

20            **MR. FINNERAN:**  Yes, Your Honor.  Thank you.

21            **THE COURT:**  Thank you.

22  **QUESTIONS BY MR. FINNERAN:**

23  Q.   All right.  And I'm going to take this off.  Let's go to

24  *Sparky's Firehouse*.

25            So, Mr. Friedman, during the cross-examination by

1    Mr. Craig, he talked to you about the prize viewer and the

2    ability of the player to touch the prize viewer in order to see

3    that future outcome, correct, future prize amount?

4    A.    It shows you the prize value, yes.

5    Q.    So, first of all, is there anything on this screen that

6    you observed -- I don't think you need to get up.

7    A.    Oh.

8    Q.    Is there anything that you observed on this screen that

9    would tell the player that that's what the prize viewer means?

10   A.    On the screen itself?  I don't believe so, but I can't

11   actually see it right now.

12   Q.    The only way to ascertain that would be to go into that

13   "Rules" section we looked at before, based on your review of

14   the machines; is that fair to say?

15   A.    I think that's fair, yes.

16   Q.    And as we illustrated yesterday, is it possible for a

17   player to play these games without ever touching the prize

18   viewer?

19   A.    Yes.  I did it yesterday.

20   Q.    And in situations where the player does not touch the

21   prize viewer, is there any other way for the player to predict

22   what is going to happen next in the game?

23   A.    There is not.

24   Q.    Is there any way for the player to affect how much money

25   is going to be won in the game?

1   A.    There is not.

2   Q.    Is there any way for the player to affect what the visual

3   outcome of the game is going to be?

4   A.    No.

5   Q.    I just want to talk to you about that last $0.75 that

6   Mr. Craig was talking to you about.

7           When I -- we put a dollar in the machine and we pay

8   at that $0.25 level, how many of the next four outcomes can a

9   player see, based on this software -- excuse me -- next four

10  prize amounts can the player see using the prize viewer on this

11  software?

12  A.    Just one.

13  Q.    So in other words, if I have $1.00 in the machine, $0.25

14  play level and I hit "Prize Viewer," how many future prizes am

15  I shown?

16  A.    Just one.

17  Q.    Is there any way for the player even who presses the

18  prize viewer to know whether Plays 2, 3, and 4 for those last

19  $0.75 will be winners, losers, or otherwise?

20  A.    Not on this game.

21  Q.    And as we looked at before, at that point, does the

22  player have any way of getting that $0.75 off the machine

23  without continuing to play?

24  A.    No, I don't believe so.

25          **MR. FINNERAN:**  No further questions, Your Honor.

1    **THE COURT:**  Mr. Craig.

2         **MR. CRAIG:**  Just a couple of questions.

3              **RECROSS-EXAMINATION**

4    QUESTIONS BY MR. CRAIG:

5    Q.    You mentioned, at one point, he was asking you about the

6    table on the computer and the index, and I believe you said the

7    player doesn't know what's on the index card on the computer,

8    right?

9    A.    I can't exactly remember, but something to that effect.

10   They don't know that you're drawing from a database table.

11   Q.    Okay.  But if I were to go to the screen right now and I

12   push -- so in this pool, *Sparky's Firehouse* at the $0.25 play

13   amount, and I push the prize viewer, the player can know that

14   the index card for this turn that is in front of them says you

15   won't win anything if you play this turn, right?  0.00,

16   correct?

17   A.    Well, I mean, that's partly correct.  It shows the $0.00

18   amount.  It doesn't show anything about an index.

19   Q.    That is how the index outcome for that turn is displayed

20   to the user, correct?

21   A.    Well, I know that.  But you're asking what the user can

22   tell.  The user can't tell that there's the index and all of

23   the database code.

24   Q.    Because they don't have a Harvard degree in computer

25   science.  I get it.

1               But this is information that I can see as a player

2    that tells me what it is from this turn at that pool if I play

3    the money.  I pay $0.25.  I'm not going to get anything, right?

4    A.    It tells you the amount, yes.

5    Q.    Okay.  That's fine.  Thanks.

6               Also, okay, while we're here, the other thing would

7    be if I put $1.00 in, right, and I just wanted to play at the

8    $0.25 level, okay, there was a discussion just as we wrapped up

9    that if I -- that gives me four plays maximum if I played those

10   at the $0.25 level, right?

11   A.    Well, that would be minimum.

12   Q.    I'm sorry.  That's right.

13              But I could play four plays -- if I put $1.00 in, I

14   could play four plays at the $0.25 amount, right?

15   A.    Yes.

16   Q.    And I believe the testimony that I heard was, well, I

17   can't know what that -- if I play $0.25 here, I know I'm not

18   going to win anything on this turn, right?

19   A.    That's correct.

20   Q.    Okay.  But I can't know what the next turn is?

21   A.    I'm sorry.  Ask the question again.

22   Q.    I can't know what the next -- if I were to just decide

23   play the next turn in this pool of sequential outcomes, I can't

24   know what the next turn is, right?

25   A.    Not without playing.

1    Q.    But I do still have $0.75 left on this machine in this

2    hypothetical, right?

3    A.    Yes.

4    Q.    But I could, right?  I could close that out.  I know I'm

5    not going to win anything on that next turn.  So I could go, I

6    could exit, and I could go to *Bourbon Street*.

7            Okay.  This is a whole new game with a whole new set

8    of potential pools, right?

9    A.    Yes.

10   Q.    Okay.  And so there's now another pool.  I could choose

11   to play this game at the $0.25 level, right?

12   A.    Yes, that's correct.

13   Q.    So I don't have to stay in the same place that I just

14   played.  I could go -- I could exit out.  I could go to a

15   different game theme, and I could choose to see what happens

16   when I play this screen, right?

17   A.    Yes.

18   Q.    Or you could exit, and for my next $0.25, right, I could

19   play *Jekyll & Hyde*?  I'm just interested in seeing what happens

20   if I push the button.  I could use the next $0.25 to see what

21   happens in this pool, right?

22   A.    Yes.

23   Q.    Okay.  But before I do that, I could use the prize viewer

24   and I know I'm not going to get anything if I play the $0.25,

25   right?

```
1   A.      On this Jekyll & Hyde game, because the prize viewer says

2   zero, yes.

3   Q.      Right.

4           But if I wanted to, I know I'm not going to get

5   anything for my $0.25, but it's an interesting game, and I

6   could just push the button and see, does that guy drink it or

7   not, right?  I could see that, right?  What happens if I push

8   the screen?  That's reasonable, right?

9           MR. FINNERAN:  Objection.  Attorney is testifying.

10  Need a question.

11          THE COURT:  Just pose your question, Counsel.

12          MR. CRAIG:  Yeah.  Okay.

13  QUESTIONS BY MR. CRAIG:

14  Q.      So if I wanted to play -- even though I know I'm not

15  going to win anything, if I play $0.25, I can choose to push

16  the "Play" button for whatever my subjective reasons are, and

17  I'll know --

18          THE COURT:  Counsel, you've got to get to a

19  question.

20  QUESTIONS BY MR. CRAIG:

21  Q.      -- something is going to happen, right?

22          THE COURT:  What's the question?

23  QUESTIONS BY MR. CRAIG:

24  Q.      Something is going to happen when I push the "Play"

25  button, right?
```

1   A.    Yeah, something generally happens when you press the

2   "Play" button.

3   Q.    All right.  Yeah.

4         A thing, an entertaining display, reels turned,

5   correct?

6   A.    Yes, that's what happened.

7   Q.    All right.  Now, if I wanted to use that -- the last

8   $0.25 -- well, I guess I'm out.

9         But in my hypothetical, I would have one more $0.25,

10  and I could go exit, *Ticket to Ride*.

11        There's a now a new pool and a new game theme at the

12  $0.25 level that I could choose to play or not, right?

13  A.    You could, that's correct.

14  Q.    With my last $0.25, I could see what happens if I push

15  the "Play" button, right?

16  A.    Sure.

17  Q.    Okay.  And if I wanted to, even though I knew I could use

18  the prize viewer, if I just wanted to see what happens, I could

19  just push the "Play" button, right?  That's a decision I could

20  make?

21  A.    Sure.

22  Q.    But if I wanted to know what was going to happen, in

23  fact, I could push the prize viewer, and I would know, okay, if

24  I do that, I'm not going to get anything, right?

25  A.    Right.  So on this game, again, the prize viewer shows

1    zero.

2    Q.    But I don't know what's going to happen here, and I kind

3    of want to see.

4          **THE COURT:**  Counsel, I'm going to ask you to go back

5    to the podium, you to be on the witness stand.  Just pose

6    questions as opposed to just talking about what you're doing

7    with the machine.  We've kind of gone over those.

8          **MR. CRAIG:**  Right.

9    **QUESTIONS BY MR. CRAIG:**

10   Q.    Now, if I wanted to hit the "Play" button, I could do

11   that, correct?

12   A.    Yes, assuming you had sufficient credits.

13   Q.    The entertaining screen would then display, the reels

14   would do movements, right?

15         **MR. FINNERAN:**  Objection, Your Honor.  Asked and

16   answered.  Beyond the scope of my direct.

17         This is getting repetitive.

18         **THE COURT:**  The objection is sustained.

19   **QUESTIONS BY MR. CRAIG:**

20   Q.    We can agree that with that dollar that I put in, I could

21   go to four different game themes that are available to me at

22   the $0.25 level, and I could see what happens?  I could push

23   the "Play" button, and I could exhaust that $1.00 in four

24   plays -- in four different plays, correct?

25   A.    Yes, that's correct.

1          **MR. CRAIG:**  No further questions.

2          **THE COURT:**  Any other questions, Mr. Finneran?

3          **MR. FINNERAN:**  Yes, briefly, Your Honor.

4                  **FURTHER REDIRECT EXAMINATION**

5     **QUESTIONS BY MR. FINNERAN:**

6     Q.    So just to follow up on Mr. Craig's last question,

7     suppose that you did that and you went around and you -- let me

8     take a step back.

9            Suppose the $0.75 was still on the machine and you

10    did that, you went to every play level and every game theme and

11    you saw that the prize viewer showed zero.

12           To your knowledge, is there any way to get your

13    $0.75 back at that point?

14    A.    Not without playing more somehow.

15    Q.    Mr. Craig was also asking you about each of these games.

16           Is it correct that each game -- each combination of

17    game and play amount has its own separate prize pool?

18    A.    Yes, that's correct.

19    Q.    So when we talk about a pool of 100,000 prizes, that's

20    just for one game and one play amount?

21    A.    Yes.

22    Q.    And so there's five games on this device.

23           Does that mean there's at least 500,000 at one

24    single play amount?

25    A.    So actually, there's a whole bunch of different pools on

1   the hard drive.  Only some of them are in use for the games

2   that are activated, but you can activate or configure, I guess,

3   more games than are displayed on the screen.  I think you can

4   only play five at a -- I'm going too far.  Sorry.

5   Q.    Yeah, no, that's fine.  I mean, I don't care about games

6   that don't actually show up on the screen.  I'm saying that of

7   the five that show up on the screen, the total number of

8   potential index entries for those five games at a $0.25 level,

9   if it was 100,000 for one game, it's actually 500,000 across

10  those games and that play level, right?

11  A.    Just at the $0.25 level, correct.

12  Q.    And then we have another set of 500,000 potential prize

13  amounts for every other play level in each -- across the five

14  games, right?

15  A.    Yes.

16  Q.    And, again, is there anything on the device that would

17  tell the player there's 100,000, 75,000, 60,000, or a million

18  outcomes?

19  A.    Not that I've seen, no.

20  Q.    Mr. Craig was asking you about what he would know when he

21  hits the prize viewer, and he was saying, "At this point where

22  it shows zeros, I know that my next turn is going to be a

23  zero," right?

24        Do you remember that?

25  A.    Yes.

1   Q.    Does that -- does the prize viewer actually say those

2   words, that my next turn is going to be a loser?

3   A.    No.  It just says zero.

4   Q.    Just says "Prize viewer," zero dollars, and the word

5   "close"; is that right?

6   A.    That's what it says.

7   Q.    So does the device, to your understanding, outside of the

8   rules that Mr. Craig showed earlier, anything on the device

9   tell the player what the prize viewer even means?

10  A.    Other than those rules, not that I've seen, no.

11  Q.    And Mr. Craig mentioned the fact that a player wouldn't

12  know that this is actually an index, because they would not

13  have a Harvard degree in computer science.

14        What would a player need to have in order to know

15  anything about how these numbers are determined?  What would

16  they need to be able to do?

17  A.    They'd need to be able to actually look at the game code

18  and the database and see how the game was implemented.

19  Q.    Is there any way, from just a visual inspection of a

20  device like this, that a player or even a person with a Harvard

21  degree could tell whether the device generates outcomes

22  randomly or not?

23  A.    No, not by visual inspection.

24        **MR. FINNERAN**:  No further questions.

25        **THE COURT**:  Any other questions, Mr. Craig?

 1          **MR. CRAIG:**  No, Your Honor.

 2          **THE COURT:**  Okay.  You can step down, Mr. Friedman.

 3          Ladies and gentlemen, we're going to take a short

 4   break and let you stretch your legs and get a drink of water.

 5   When you come back into the courtroom -- we have discussed this

 6   with counsel -- we're going to have cleared the courtroom.

 7   We're going to give you an opportunity, by row, to come up

 8   here, look at the machine, touch the buttons.  I don't want you

 9   to say anything to each other or to the Court.  Just I'm going

10   to give you an opportunity to come up here, walk around, touch

11   the machine if you choose to do so.  We'll go row by row by

12   row, and then we'll take another short break.

13          So, again, we're going to take a short recess.

14          I'll remind you what I tell you at each recess or

15   adjournment of the Court.  Keep an open mind about the case

16   until it's finally given to you to decide.  Don't talk to

17   anyone about the case.  Don't do any independent research of

18   any kind into any of the issues.

19          We'll be in temporary recess for -- this will be a

20   quick one -- 5 minutes.  So if you'll leave your notebooks

21   there on the chair, we'll be in temporary recess.

22          **THE CLERK:**  All rise.

23          **(Exit jury.)**

24          **(The following proceedings were held in open court,**

25   **out of the presence of the jury:)**

1          **THE COURT:**  Court will be back in session for just a

2    moment.

3          Counsel, as I understand it, you're going to put

4    some money in the machine.

5          Again, I'm going to give the jurors just two or

6    three minutes per row to come up here, walk around, touch the

7    device, and then be seated again.  As I've instructed them,

8    they're not going to say anything to each other or anybody

9    else.  And then we'll bring you back in.  I will have excused

10   them again, and then we'll reconvene.

11         That's the agreement; is that correct, Mr. Craig?

12         **MR. FINNERAN:**  Subject to Mr. Craig's objection

13   earlier, I believe that is the agreement.

14         **MR. CRAIG:**  He covered it.

15         **THE COURT:**  Okay.  All right.  We'll be -- again,

16   I'll go ahead and have you put a little bit of money in the

17   machine.  If you can set it on the $0.25 level.

18         **MR. CRAIG:**  How much would you like?

19         **MR. FINNERAN:**  My only concern, Your Honor, would be

20   if they do manipulate the play amount to a higher amount and

21   that's how they play, they could run out of money, and then

22   we'd have to come back in and give you some more money, which

23   I'm sure we want to avoid doing.

24         I propose putting $40 in the machine, and that way,

25   even if they play it -- I think the highest -- let me see what

1   the highest level is.  I think the highest level is no larger

2   than $5.  So that should --

3            **THE COURT:**  I would say, if you put $20 in the

4   machine, that will be fine.

5            **MR. FINNERAN:**  Actually, it looks like it might even

6   be $2.00 on some of the games.  So we should be okay.

7            **THE COURT:**  I'm going to ask them not to change the

8   dollar amount level.  The whole idea is just that they have an

9   opportunity to see and touch the device.

10            **MR. FINNERAN:**  Fair enough.  Okay.

11            **THE COURT:**  All right.

12            **MR. FINNERAN:**  For the record, I have fed $20 into

13   the machine, and we have restored the terminal to its attract

14   screen that allows the player to select among one of five

15   games.

16            **THE COURT:**  Okay.  With that, I'm going to ask

17   everybody to step outside for a few minutes.  We'll bring you

18   right back in as soon as the jurors have had an opportunity to

19   observe and touch the device.  So I will ask everybody to exit

20   for just a few minutes.

21            **(Exit counsel, the parties, and gallery.)**

22            **(Pause in proceedings.)**

23            **THE COURT:**  The record should reflect that I've

24   asked everyone to step out.  This is the process that, with the

25   agreement of counsel, we are going to follow.

1          So I'll ask the deputy clerk to get the jurors, have

2     them seated in the jury box, and we'll go row by row to let

3     them come up and walk around the machine, touch the buttons,

4     and then be reseated.

5               **(Pause in proceedings.)**

6               **(Enter jury.)**

7               **(The following proceedings were held in closed**

8     **court, in the presence of the jury:)**

9               **THE COURT:**  Okay.  You can all be seated.

10          This is the process that the attorneys have agreed

11     to.  We're going to go row by row.

12          So the first row, you-all can step up here, walk

13     around the machine.  You can touch the device.  They've put a

14     little bit of money in there so you can actually push it, see

15     what happens.  But other than that, I'd like for you not to say

16     anything to each other, say anything to anyone else.

17          So the first row, come on up.  You can walk around,

18     touch the machine, press the device if you choose.

19               Okay.  The second row.

20               Okay.  The third row.

21               Okay.  Ladies and gentlemen, I'm going to ask that

22     you return to the jury room.  We're going to just take a few

23     minutes, and then we'll bring you back in and continue with the

24     evidence.  Thank you, all.

25               **(Exit jury.)**

```
1              (Enter counsel, parties, and gallery.)

2              (The following proceedings were held in open court,

3   out of the presence of the jury:)

4         THE COURT:  I just want to make a very quick record,

5   and then we're going to take a break.

6         MR. CRAIG:  Fine by me.

7         THE COURT:  Okay.  We're back on the record here in

8   the courtroom.  The jury has exited the courtroom.

9              The record should reflect the jurors, by row, had an

10  opportunity to come up and look at the device, touch the

11  device, and they've been returned to the jury room, understand

12  that the admonition remains in effect.

13             We're going to go ahead and take a short recess.  As

14  I understand it, you're going to remove the device from the

15  courtroom, and we'll get reset and ready to proceed with the

16  next witness.

17             The next witness is?

18        MR. FINNERAN:  So, Your Honor, our plan is to first

19  play deposition designations.  So we're going to play

20  Ms. Miltenberger's deposition designations, and then Kevin

21  Morse's deposition designations.  Neither of them are going to

22  be called as witnesses in our case in chief.  And then after

23  that, we will call Donna Havey as our next live witness.  Those

24  designations should take less than 45 minutes to play.

25  Probably significantly less.
```

1          **THE COURT:**  Do you have an instruction for me to

2   read to the jury before the depositions are played?

3          **MR. FINNERAN:**  I'm sorry.  I got distracted.  Go

4   ahead, Judge.

5          **THE COURT:**  The instruction prior to the playing of

6   the --

7          **MR. FINNERAN:**  Yeah, so actually, I shared a

8   suggestion with Mr. Craig.  He's reviewing it.  So we'll share

9   that with you when we come back from the break and make sure we

10  have an agreement.

11         **MR. CRAIG:**  What was this?

12         **THE COURT:**  I need it before we start, so -- okay.

13  That's fine.  We'll go ahead and take a --

14         **MR. FINNERAN:**  Yeah, sorry, and apparently, I've

15  misspoken.  We're going to putting Ms. Miltenberger's

16  deposition on, and then we're going to call Ms. Havey.  We're

17  not going to do Mr. Morse's until after Ms. Havey, because

18  she's here already.

19         **THE COURT:**  Okay.  All right.  Again, to the extent

20  that you're going to play a deposition, there is an instruction

21  for the Court to read prior to the playing of the deposition.

22  If you have multiple depositions, I'd like to only read that

23  instruction once, but if you want me to read it before every

24  deposition, I'll do that.  It's totally up to you.  I can

25  remind the jurors of the instruction.  That's something you-all

1    can decide.

2              We'll be in temporary recess for 10 minutes.

3              **MR. FINNERAN:**  Okay.  Thank you, Judge.

4              **(At this time, the Court declares a recess.)**

5              **THE COURT:**  Please rise.

6              **(Enter jury.)**

7              **(The following proceedings were held in open court,**

8    **in the presence of the jury:)**

9              **THE COURT:**  Court will be in session.  You can be

10   seated.

11             Counsel, Mr. Finneran, you may proceed with evidence

12   on behalf of the plaintiff.

13             **MR. FINNERAN:**  Yes, Your Honor.  At this time, we

14   would ask that the Court provide an instruction about the

15   designation -- the designated portions of testimony that we now

16   seek to play and admit by video.

17             **THE COURT:**  Okay.  And this is the deposition of

18   Sondra Miltenberger?

19             **MR. FINNERAN:**  Yes, Your Honor, Sondra Miltenberger.

20             **THE COURT:**  Ladies and gentlemen, I do have an

21   instruction to read to you.

22             Testimony will now be presented to you in the form

23   of a deposition.  The deposition is the recorded answers a

24   witness made under oath to questions asked by lawyers before

25   trial.  The deposition testimony to be offered was

1   electronically video-recorded, and that recording now will be

2   played for you.

3           You should consider the deposition testimony and

4   judge its credibility as you would that of any other witness

5   who testifies here in person.

6           With that, Counsel, you may proceed.

7           **MR. FINNERAN:**  Is the screen on?  Great.

8           **(Video deposition of Sondra Miltenberger dated**

9   **12/8/2023 played.)**

10          **MR. FINNERAN:**  Something is wrong with the

11  connection, maybe.

12          **THE CLERK:**  Make sure it's secure.

13          **MR. FINNERAN:**  Trying again.

14          **(Video deposition of Sondra Miltenberger dated**

15  **12/8/2023 played.)**

16          **MR. FINNERAN:**  Your Honor, I'm sorry.  There appears

17  to be some issue with some of the audio.  Is the volume at the

18  highest level that the Court can have?

19          Sorry, Your Honor.  We did test this on the break.

20  I'm not sure what's wrong.

21          I'll try exiting the program and restarting very

22  quickly.

23          I apologize.

24          **THE COURT:**  That's all right.

25          **MR. FINNERAN:**  All right, John.  Will you try

1  putting it back up?  Let's hope this works.

2          **(Video deposition of Sondra Miltenberger dated**

3  **12/8/2023 played.)**

4          **MR. FINNERAN:**  Your Honor, it appears we're having a

5  technical difficulty.  Can I ask that we delay this to later in

6  the day?

7          **THE COURT:**  That's fine.  Call your next witness.

8          **MR. FINNERAN:**  The plaintiff calls Donna Havey to

9  the stand.

10          **THE COURT:**  If you'll step up here, ma'am, the clerk

11  will administer the oath.

12          **(Witness sworn in by the deputy clerk.)**

13          **THE COURT:**  Ma'am, if you'll spell your name for the

14  court reporter.

15          **THE WITNESS:**  It's Donna Havey, D-O-N-N-A,

16  H-A-V-E-Y.

17          **THE COURT:**  And then it's right around there.  Thank

18  you.

19          Ms. Havey, that microphone, you can bend it down

20  there a little bit there.

21          There you go.

22          And if you speak into that microphone, it will help

23  amplify your voice so that we can all hear you.

24          **THE WITNESS:**  Okay.

25          **THE COURT:**  All right.  Counsel, you may proceed.

1      **MR. FINNERAN:**  Thank you, Judge.

2           One moment, please.  Just trying to make sure our

3    stuff is set up.

4           John, would you mind putting the screen on.

5           Your Honor, thank you for your indulgence.  I

6    apologize.

7           **THE COURT:**  That's fine.  Go ahead.

8                        **DONNA HAVEY,**

9    having been first duly sworn in by the clerk, testified:

10                    **DIRECT EXAMINATION**

11   QUESTIONS BY MR. FINNERAN:

12   Q.    Ms. Havey, would you please state your name for the

13   record.

14   A.    Donna Havey.

15   Q.    And, Ms. Havey, are you currently employed?

16   A.    No, I'm not.

17   Q.    Are you currently retired?

18   A.    Yes.  I just recently retired in July.

19   Q.    And prior to your retirement in July, where were you

20   employed?

21   A.    I was employed with Play-Mor Coin-Op, which is TNT

22   Amusements.

23   Q.    And how long were you an employee of TNT Amusements,

24   which does business as Play-Mor Coin-Op?

25   A.    Since early 2000.

1   Q.    And you say you retired in July?

2   A.    July of this year, yes.

3   Q.    So you worked there, then, continuously for more than

4   20 years?

5   A.    Yes.

6   Q.    And during your time there, what was your title?

7   A.    The last 8 years, I was the route manager.  And before

8   that, I did route collections.  I worked in the dart office.  I

9   did various other things.

10  Q.    Okay.  So you're the first person the jury is hearing

11  from TNT.  So you may need to explain a little bit what you

12  mean when you say "route" or "route management."

13        Can you tell the jury what you mean by that?

14  A.    Yes.

15        We do amusement accounts.  We have bars, bowling

16  alleys, things like that.  I oversaw the whole route.  I would

17  visit all the accounts, dealt with all of the managers at the

18  locations, and oversaw our staff.  We had service techs and

19  account managers that I oversaw.

20  Q.    Thank you.

21        You said something about the dart office?

22  A.    Yes.

23  Q.    Can you tell the jury what you mean by the "dart office"?

24  A.    We also run -- separately from Play-Mor, they had a -- we

25  do darts across the United States.  And prior to that, it was

1    just a local dart league.  And when I was first hired, I just

2    helped them get the dart league going.

3    Q.    Are dartboards one of the amusement devices that you

4    dealt with during your time at TNT?

5    A.    Yes, sir.

6    Q.    So in addition to the duties you just described, was one

7    of your duties also making what are called "collection calls"?

8    A.    Yes.

9    Q.    Explain to the jury, if you could, what's a collection

10   call?

11   A.    During the collection or -- is that what you're referring

12   to?

13   Q.    Sure.  I guess.

14   A.    Okay.  When we do the collections, we go into the

15   accounts that have jukeboxes and pool tables, dartboards, and

16   we would collect the money out of the machines, and we split it

17   with our customers while we're there and bring the rest back.

18   Q.    You said you would go into the accounts.  I think that

19   maybe is a word that you use differently than I might

20   understand it.

21          What do you mean when you say you go into an

22   account?

23   A.    Okay.  Our location, that would be one of our customers

24   that we provide the equipment for.

25   Q.    So if you use the term "account" during your testimony,

1   is it fair to say you're referring to a customer's actual

2   brick-and-mortar-store, typically?

3   A.   Correct.

4   Q.   Okay.  Did you also have a role with signing up any new

5   customers?

6   A.   Yes, sir.

7   Q.   And can you tell the jury what your role was with respect

8   to that?

9   A.   I spent a lot of time out through the St. Louis area and

10  other areas looking for new accounts.  I would go in and tell

11  them what we had to offer and try to add to our current list of

12  locations.

13  Q.   Did you have a role with respect to deposits of money

14  that was earned by the amusement machines of TNT's?

15  A.   Yes.  I did the deposits twice a week, and I would put

16  the deposit together of all the -- what the collectors had

17  brought in and take it to the bank and deposit it.

18  Q.   Was one of the people you worked with a woman named Marla

19  Turntine?

20  A.   Yes, sir.

21  Q.   And, first, what relation does Marla Turntine bear to Jim

22  Turntine?

23  A.   That's his wife.

24  Q.   And what role did Marla play with respect to the

25  business?

1    A.    Marla handled all of the financial end as far as paying

2    the bills, entering things into QuickBooks, and then she also

3    would turn everything she did in to our accountant.

4    Q.    Would you meet with Ms. Turntine on a regular basis

5    regarding the business?

6    A.    Yes, sir.  I met with Marla every morning before I

7    started my day, usually.

8    Q.    Now, prior to your retirement, did you take on an

9    additional role dealing with any issues relating to locations

10   where TNT and Torch Electronics might have run into each other?

11   A.    Yes, sir.

12   Q.    And just generally, can you tell the jury, what was that

13   role, and what did it involve?

14   A.    Well, while I was visiting the accounts, I would go in

15   and -- in our lease agreement, we have exclusivity to the games

16   that are put into the accounts.  And so I would always notice

17   if anything was in there that was not one of our pieces of

18   equipment, and I would note -- I started noticing Torch

19   machines appearing in our locations.

20   Q.    And when you say "our locations," what do you mean?

21   A.    Play-Mor locations.

22   Q.    But these are, just to --

23   A.    TNT locations.

24   Q.    Just to clarify for the jury, though, are these locations

25   that are owned by TNT or locations in which TNT has placed its

1   own devices, amusement devices, under some sort of exclusive

2   contractual arrangement?

3   A.    They are not owned by TNT.  We just -- like, if we have a

4   bar, it is owned by the person that owns the location, and we

5   are contracted in to provide them with the amusement games.

6   Q.    So in your course of time working at TNT, did you

7   personally observe at any time Torch devices in the same

8   locations where TNT previously had devices?

9   A.    Yes, sir.

10  Q.    Did you also, in that time, observe individuals, patrons,

11  of those establishments playing those devices?

12  A.    Yes, sir.

13  Q.    And tell the jury what you observed when you would see

14  these devices being played.

15  A.    Well, I would just -- people would be sitting at them,

16  putting their money in.  You know, they would -- if they won

17  the money, they -- you know, won anything on the machine, they

18  would get a little ticket printed out and go up either to the

19  bartender or a payout machine and get their payout for the

20  Torch game.

21  Q.    What would you say is the longest length of time that you

22  observed any one player playing a Torch device?

23  A.    Sometimes, they were there the entire collection, which

24  is -- it would vary, but an average of an hour.

25  Q.    Have you ever had customers inquire about whether TNT

1    could provide no-chance games or similar games to the ones you

2    saw to any of TNT's locations?

3                MR. CRAIG:  Objection, Your Honor.  Hearsay.

4                MR. FINNERAN:  All I've asked, Your Honor, is

5    whether there's been an inquiry.  There's no statement that is

6    being offered.

7                THE COURT:  The objection is sustained.

8                MR. FINNERAN:  Okay.

9    QUESTIONS BY MR. FINNERAN:

10   Q.    Do you recall ever receiving requests from customers to

11   supply any sort of NCG or slot machine game at any location?

12               MR. CRAIG:  Objection, Your Honor.  Hearsay.

13               MR. FINNERAN:  I'm only asking, Your Honor, whether

14   a request was made.

15               THE COURT:  The objection is sustained.

16               Counsel, you can approach the sidebar.

17               MR. FINNERAN:  Sorry, Judge.  Thank you.

18               **(A bench conference was held on the record and**

19   **outside of the hearing of the jury as follows:)**

20               MR. FINNERAN:  I apologize, Judge.  I forgot to not

21   argue from the table.  I apologize.

22               THE COURT:  You're fine.

23               It is hearsay even though you're not asking about --

24   or the question isn't about "Tell me what was said," it's an

25   inference of hearsay.  You're saying were there requests with

1    regard to a certain thing, and now I --

2         **MR. FINNERAN:**  So, Judge, what I believe I've

3    intended to asked her, and perhaps I phrased it poorly, is

4    simply whether she was asked whether TNT could provide those

5    sorts of devices.  There is no statement of fact in that -- in

6    that statement.  It is a question.  I'm simply asking whether

7    inquiries were made by customers.

8         **MR. CRAIG:**  Your last statement is asking for the

9    hearsay that she was told by some third party.

10        **MR. FINNERAN:**  But the fact that a statement --

11        **THE COURT:**  It is hearsay.  I don't -- you're

12   arguing that it's not for the proof of the matter?

13        **MR. FINNERAN:**  I don't believe the statement --

14   there's any statement being made.  But I'm not offering it to

15   prove that -- I'm not sure what the statement would be.  The

16   only statement that is being offered is, "I got a phone call

17   where somebody asked me a question."  That is not -- I'm not

18   offering it for the truth of what the person said.  They just

19   asked the question.

20        **THE COURT:**  But you are asking about the content of

21   the question, which makes it hearsay.

22        **MR. FINNERAN:**  But I'm not offering it to prove that

23   anything that person said was true.

24        **THE COURT:**  But you are asking for the truth of the

25   matter that this person was asking about a particular subject.

1          **MR. FINNERAN:** Right.

2          **THE COURT:** So there is an inference of hearsay in

3    the question that you're asking.

4          **MR. FINNERAN:** I guess I'm just confused what

5    statement that person is making. The person is not saying

6    anything; just asking a question.

7          **THE COURT:** If you said, "Was there a question asked

8    of you," yes, that's not hearsay. But when you say, "Was there

9    a question asked of you with regard to TNT games," or, "Can TNT

10   provide the Torch games," that is an inference of hearsay. So

11   it is objectionable.

12         **MR. FINNERAN:** Okay. If I make it clear that I'm

13   only offering it for the effect on Ms. Havey, does that resolve

14   the Court's concern?

15         **THE COURT:** No.

16         **MR. FINNERAN:** Okay.

17         **THE COURT:** Because what effect it -- I mean -- no,

18   it doesn't solve the issue.

19         **MR. FINNERAN:** Okay. Okay. If I can just make a

20   quick proffer, then.

21         So I believe that if the objection were overruled,

22   Ms. Havey would simply testify that customers have asked TNT

23   whether or not they can provide games to Torch locations, and

24   that would be foundation for Ms. Havey telling the Court and

25   the jury what information she provides to customers on those

1    occasions.

2            **MR. CRAIG:**  And if --

3            **THE COURT:**  Go ahead.

4            **MR. CRAIG:**  If TNT wanted to, they could have

5    deposed any of those customers, put them on the stand today and

6    put them on their witness list.

7            **THE COURT:**  Now we're really arguing.  I'm going to

8    sustain the objection.

9            **(The proceedings returned to open court and in the**

10   **presence of the jury.)**

11           **THE COURT:**  Counsel, pose another question to the

12   witness.

13           **MR. FINNERAN:**  Yes, Your Honor.

14   **QUESTIONS BY MR. FINNERAN:**

15   Q.    So, Ms. Havey, does TNT offer any devices that are

16   similar to the devices that we just discussed, the NCG devices,

17   in terms of their appearance and operation?

18   A.    No, we do not.

19   Q.    However, was there an occasion where one of your --

20           **MR. FINNERAN:**  Let me -- one moment, Your Honor.

21   **QUESTIONS BY MR. FINNERAN:**

22   Q.    Let me start here:  Are you aware of a customer of TNT's

23   named Nathan Howard?

24   A.    Yes, I am.

25   Q.    And can you explain to the jury who Nathan Howard is?

1    A.     At the -- when Nathan was our customer, he was the

2    commander at the VFW hall, the fraternal of veterans.

3    Q.     And where was that located?

4    A.     That was in St. James, Missouri.

5    Q.     And did there come a time where you explored whether or

6    not TNT could offer to Mr. Howard a similar device to the ones

7    that you'd seen offered by Torch?

8    A.     Yes, sir.

9    Q.     And what gave rise to that?

10              **MR. CRAIG:**  Object.

11              **THE WITNESS:**  Excuse me?

12              **MR. CRAIG:**  Object.  Hearsay.

13              May we approach?

14              **THE COURT:**  The only question right now is what gave

15   rise to it.  So I don't think it -- the objection is going to

16   be overruled.

17              **MR. CRAIG:**  Okay.

18   **QUESTIONS BY MR. FINNERAN:**

19   Q.     So just tell us what you -- if you can, what gave rise to

20   the -- to your exploration of whether or not you could offer a

21   device like that?

22              **THE COURT:**  Without telling us what someone else

23   said.

24              **THE WITNESS:**  Even with --

25              **THE COURT:**  Without telling us what someone else

1    said.

2    **QUESTIONS BY MR. FINNERAN:**

3    Q.    Did you hear the question, Ms. Havey?

4          Is it possible for you to tell us what gave rise to

5    your investigation of whether or not you could offer Mr. Howard

6    such a device?  Is it possible for you to answer that question

7    without telling us an out-of-court statement that somebody else

8    made?

9    A.    I'll try the best I can.

10         Nathan -- I'm the person Nathan would come to if he

11   wanted something put into the club, and Nathan --

12         **MR. CRAIG:**  Object.

13         May we approach, Your Honor?

14         **THE COURT:**  Approach the sidebar.

15         **(A bench conference was held on the record and**

16   **outside of the hearing of the jury as follows:)**

17         **MR. CRAIG:**  She's going to say what Nathan told her

18   to get this whole thing in, and he can do this -- this is about

19   the MGC letter and getting that, like, whole thing set up.

20   They can do it through Mr. Turntine, I believe, and we'll see.

21   But the next words out of her mouth were going to be "Nathan

22   Howard asked me if we can put games in," of whatever.  It's

23   hearsay.

24         **MR. FINNERAN:**  And again, Your Honor, if all she's

25   reporting is that a statement was made out of court, not that

1    the statement is true, then it is not hearsay.  She's saying,

2    "A person asked me if we could put the devices in, and so we

3    looked into it."  It's obviously the effect on the listener.  I

4    don't even know what statement that Mr. Craig thinks is being

5    offered that Mr. Howard said that is a statement of fact.

6    Mr. Howard is asking a question.

7            And so I think, based upon what the Court said a

8    moment ago, that if I'm -- I mean, I haven't asked her, you

9    know, "Did he ask you a question?"  But I think that if it's

10   only a question that's being asked, it just simply is a form of

11   hearsay.

12           **THE COURT:**  She can't say what someone else told

13   her.  That's hearsay.  It's an out-of-court statement.

14           And it -- it is being offered for the truth of the

15   matter, because she relied upon it, and then I suppose she took

16   some action which led them to look into the Gaming Commission

17   and the Gaming Commission letter.  That's all -- it's hearsay.

18           **MR. FINNERAN:**  Okay.  Judge, I think I'm -- I'll --

19           **THE COURT:**  Again, you can make an offer of proof.

20           **MR. FINNERAN:**  Yeah, I'll make my offer of proof and

21   just make sure that my position is stated clearly.

22           So if Ms. Havey were permitted to testify, she would

23   simply indicate that she received a phone call from somebody

24   who asked whether something could be done.  The hearsay rule

25   only precludes a party from offering a statement if it's being

1    offered to prove that the statement is true.

2              I am not offering the statement to prove the

3    statement is true.  I would offer it for the effect on the

4    listener and to explain her subsequent conduct.  I'm happy for

5    the Court to offer a limiting instruction to that effect.

6              And I believe that in addition to the extent that it

7    is -- maybe it could be viewed as a statement of the person's

8    then-existing mental state because they're curious about

9    whether they offered them, that's an exception of the hearsay

10   rule.  But I am not offering a statement and do not intend to

11   prove that what was said was true, and if the Court desires a

12   limiting instruction to accomplish that, I have no objection.

13             **MR. CRAIG:**  Your Honor, we would -- I wouldn't have

14   as much of a problem with this if Nathan Howard was going to

15   take the stand and testify as to what it was he actually said,

16   but he will not.  He's not on their list.

17             **THE COURT:**  Here's the only question, is whether or

18   not it is an exception to the hearsay rule in this sense, that

19   it explains her subsequent conduct.  But what is her subsequent

20   conduct?

21             **MR. FINNERAN:**  So her subsequent conduct is going to

22   be that she's going to investigate the availability of these

23   machines.  She's going to order a machine.  She is going to

24   provide it to the Missouri Gaming Commission.  She is going to

25   observe Missouri Gaming Commission agents, you know, review it.

 1   She is then going to receive a letter from the Missouri Gaming

 2   Commission that explains the Missouri Gaming Commission's

 3   position.  And then her subsequent conduct would be -- this

 4   might be objectionable -- but to tell Mr. Howard that "We will

 5   not offer you that game."

 6              **THE COURT:**  The question that you're asking right

 7   now about -- it seems to me you're asking, "What did Mr. Howard

 8   say to you?"

 9              **MR. FINNERAN:**  That is true, but I'm not offering

10   it --

11              **THE COURT:**  And that is hearsay.  She can say what

12   she did.  She can say that she ordered a machine.  She can say

13   that she asked the Missouri Gaming Commission for a decision

14   about it.

15              **MR. CRAIG:**  She didn't.

16              **MR. FINNERAN:**  She didn't, but that's fine.

17              **THE COURT:**  I mean, my point is, you can ask her

18   what she did but not what was said to her.  That is hearsay.

19              **MR. FINNERAN:**  It would be hearsay if I were

20   offering it to prove the truth of what was said.  But I'm not

21   offering it for that purpose.  I would ask the Court to admit

22   it with a limiting instruction to say that this is not being

23   offered to prove the truth of what Mr. Howard said; it's simply

24   for the effect and explanation to explain what Ms. Havey then

25   did.

1          So that's my last request --

2          **THE COURT:**  Any objection to that?

3          **MR. CRAIG:**  Yes.  I absolutely object.  As Your

4    Honor said, she can explain what she did, the actions that she

5    took.  But the conversation with Nathan Howard, no.

6          **THE COURT:**  Again, I think what Mr. Howard said is

7    hearsay.  So I'm going to sustain the objection to the

8    question.

9          **(The proceedings returned to open court and in the**

10   **presence of the jury.)**

11   **QUESTIONS BY MR. FINNERAN:**

12   Q.    Okay, Ms. Havey.  We'll try to move forward with less

13   interruption, I hope.

14          So was there then a time where you actually

15   investigated purchasing an NCG device similar to the ones you'd

16   seen in those establishments?

17   A.    Yes.

18   Q.    And how did you go about doing that?  How did you go

19   about investigating that?

20   A.    Well, I went and looked at one of the Torch machines and

21   found out the company that made them and called one of my

22   distributors who offered them, and he told me how to order

23   one --

24          **MR. CRAIG:**  Objection, speculation -- sorry.

25   Objection.  Hearsay.

1    **THE COURT:**  The objection is sustained.

2    Pose another question.

3    **MR. FINNERAN:**  I will.

4    QUESTIONS BY MR. FINNERAN:

5    Q.    So did you determine who the manufacturer of the devices

6    was?

7    A.    Yes, sir.

8    Q.    And tell the jury who you determined that was.

9    A.    Banilla Games.

10   Q.    And you said you reached out to a distributor of yours?

11   A.    Yes.  Ed Chermak of Legacy games.

12   Q.    And just explain to the jury what you mean by a

13   "distributor"?

14   A.    He's someone that we can purchase our equipment from,

15   because a vendor has to go through a distributor, and Ed was

16   one of my distributors who offered the game.

17   Q.    And were you ultimately able to purchase such a game

18   through Mr. Chermak, you said?

19   A.    Yes, sir.

20   Q.    And did you, as a consequence of that, receive an invoice

21   and a bill of lading?

22   A.    Yes, sir.

23   Q.    How did you go about ordering the device?  What, did

24   you make a phone call?  Did you --

25   A.    I just made a phone call to him and explained what I

1    needed.

2             **MR. CRAIG:**  Objection.  Hearsay.

3             **THE COURT:**  Actually, I don't think it is hearsay.

4    The objection will be overruled.

5    **QUESTIONS BY MR. FINNERAN:**

6    Q.    Okay.  So, Ms. Havey, I'd like to show you a document.

7             **MR. FINNERAN:**  John, if could you hide the screen

8    from the jury while we authenticate this.

9    **QUESTIONS BY MR. FINNERAN:**

10   Q.    It should pop up on your screen.  It is a document that

11   is marked for identification as Plaintiff's Exhibit 253.

12            Can you look at the document, please, and tell me

13   when you've seen both pages of it.

14   A.    Yes.

15   Q.    And just generally, what document am I showing you?

16   A.    It's the bill of lading for the machine that we purchased

17   from Legacy.

18   Q.    And does this also have a second page attached to it?

19   A.    Yes, sir.

20   Q.    And what does the second page reflect?

21   A.    It shows the no-chance game that we purchased and the

22   price of the game.

23   Q.    And does this appear to be a fair and accurate copy on

24   your screen of a document that you're familiar with?

25   A.    Yes, sir.

1          **MR. FINNERAN:**  Your Honor, we ask to move 253 into

2    evidence.

3          **THE COURT:**  Any objection, Counsel, to Exhibit 253?

4          **MR. CRAIG:**  No objection, Your Honor.

5          **THE COURT:**  Exhibit 253 will be admitted and can be

6    displayed to the jury.

7    **QUESTIONS BY MR. FINNERAN:**

8    Q.    Okay.  So, Ms. Havey, first, now, the jury is seeing it

9    for the first time.  So I'm going to ask you to go through it

10   with me.

11         Do you see this document that's a bill of lading?

12   A.    Yes, sir.

13   Q.    And do you see there's also a second page here that is

14   titled "Invoice"?

15   A.    Yes, sir.

16   Q.    All right.  So I'm going to zoom in at the top of the

17   page to assist you and the jury in seeing it.

18         Do you see that zoomed in on your screen?

19   A.    Yes, sir.

20   Q.    All right.  So, first, just what's the name at the top of

21   this document, and who is that?

22   A.    Legacy Coin Operated Distributors is the name of the

23   company I purchased the game from.

24   Q.    And below that, it says "To Play-Mor Coin-Op."

25         Who does that refer to?

1  A.    That refers to TNT Amusements.

2  Q.    If we go down a little bit further, we can see there that

3  it says "Date shipped."

4        Can you tell us what it says the date is?

5  A.    June 28, 2019.

6  Q.    And it says "Shipped via drop shipped."

7        Can you explain what that term means to the jury?

8  A.    It just meant it was shipped directly from him to us.

9  Q.    And what description appears on the invoice?

10  A.    It says the "New Banilla UR pre-reveal."

11  Q.    Does it also reflect a price?

12  A.    Yes.  $3,185.

13  Q.    And then, if we go down to the bottom, do we see here in

14  addition that there is a shipping and handling fee?

15  A.    Yes, sir.

16  Q.    So what is the total amount of money that TNT paid to

17  acquire this device?

18  A.    $3,339.70.

19  Q.    So if we then go up to the bill of lading, it's the first

20  page of this document.  Again, I'll zoom in on the top.

21        Again, just to move this hopefully a little quickly,

22  you see, again, Legacy Coin Op at the top?

23  A.    Yes, sir.

24  Q.    Is that the company that shipped it to you?

25  A.    Yes.

1   Q.    And then below Play-Mor Coin-Op, that's TNT?

2   A.    Yes, sir.

3   Q.    And then does this indicate that there is a third-party

4   freight charge as well?

5   A.    Yes, sir.

6   Q.    And then, if we go to the bottom, do we see a signature

7   for a person who actually picked up the device on June 28,

8   2019?

9   A.    Yes, sir.

10  Q.    All right.  So where precisely, then, was the device that

11  you ordered delivered to?

12  A.    It was delivered to our shop in Sullivan, our TNT

13  Amusements shop, which is where we run all of our -- it's our

14  central location of our business.

15  Q.    And so was your plan at that time to then take that

16  device and put it directly into service at a customer location?

17  A.    No, sir.

18  Q.    And what was it that you intended to do with the device

19  first?

20  A.    The intention was we ordered it so we could take it to

21  the Gaming Commission and find out if it was a legal device

22  that we could put out into our accounts when a customer

23  requested it.

24  Q.    Are you aware of whether the MG -- excuse me -- the

25  Missouri Gaming Commission actually did examine the device?

1    A.    Yes, they did.

2    Q.    Do you know where that took place?

3    A.    It took place in Jim Turntine's office.

4    Q.    And is that a part of TNT's offices?

5    A.    Yes.  It's all in one complex.

6    Q.    So basically, it was inspected at the same place to which

7    it was shipped and delivered?

8    A.    Yes.

9    Q.    An office within that?

10   A.    It's off -- yeah.  It came from the loading dock to Jim's

11   office.

12   Q.    The same address?

13   A.    Yes, same address.

14   Q.    And subsequent to that examination, did you receive a

15   copy of a letter that was authored by the Missouri Gaming

16   Commission about their examination?

17   A.    Yes.

18        **MR. FINNERAN:**  If you could hide the screen, John.

19   **QUESTIONS BY MR. FINNERAN:**

20   Q.    I'm showing you what's been premarked for identification

21   as Exhibit 102.

22        First, do you recognize this document?

23   A.    Yes, I do.

24   Q.    What do you recognize it to be?

25   A.    It's the document that they sent us after they examined

1    the game.

2    Q.    When you say "they," who are you referring to?

3    A.    The Gaming Commission.

4    Q.    I'm going to scroll to the second page.

5          Does this appear to you to be a fair and accurate

6    copy of that message -- or excuse me -- that letter?

7    A.    Yes, it does.

8    Q.    And did you receive this document near or at the time

9    that it was written?

10   A.    Yes.

11   Q.    And did you maintain a copy of this as part of your

12   business?

13   A.    Yes, we did.

14         MR. FINNERAN:  Your Honor, we'd move 102.

15         MR. CRAIG:  May we approach?

16         THE COURT:  Do you have an objection to Exhibit 102?

17         MR. CRAIG:  Sorry, Your Honor.  May we approach?

18         THE COURT:  Approach the sidebar.

19         **(A bench conference was held on the record and**

20   **outside of the hearing of the jury as follows:)**

21         MR. CRAIG:  Your Honor, as you know, we object to

22   the admission of the Gaming Commission's letter for the fact

23   that it's not a ruling.  It's not a clear and unambiguous

24   ruling that Torch devices are, in fact, illegal under Missouri

25   law, and we think it would be confusing and misleading to the

1    jury for them to put that in there and repeatedly keep saying

2    the devices are, in fact, criminally illegal because of this

3    opinion letter.

4            **THE COURT:**  Okay.  Any other objection?

5            **MR. CRAIG:**  No.

6            **THE COURT:**  That objection will be overruled.

7            **MR. CRAIG:**  Okay.  Sorry.

8            So with the overruling, this is the limiting

9    instruction we would ask Your Honor to --

10           **MR. FINNERAN:**  Do you have one for us?

11           **MR. CRAIG:**  That's true.  Sorry.

12           **MR. FINNERAN:**  That's okay.

13           Judge, would you like me to comment?

14           **MR. CRAIG:**  Let him read it.

15           **MR. FINNERAN:**  Oh, I'm sorry.  I thought you were

16   done.  My apologies.

17           **THE COURT:**  I'm finished.  Go ahead.

18           **MR. FINNERAN:**  Judge, we don't believe this is a

19   correct statement of the law.  We don't believe it is

20   consistent with your prior rulings.  We do believe this is a

21   ruling by a court or agency of competent jurisdiction.  We do

22   not believe it is true the Missouri Gaming Commission does not

23   have jurisdiction outside of casinos and licensed bingo halls.

24   In fact, to make an offer of proof, if we had to establish it,

25   we could establish that Mr. Howard was the owner and operator

1    of a licensed bingo hall.

2             And the last part, which says "that may be

3    considered only for its effect, state of mind and understanding

4    of the defendants," we don't believe that is a correct

5    statement of the law either, pursuant to the *Coastal*

6    *Abstract/Dial a Car* line of cases we've already discussed.

7             As I mentioned, this instruction was just shared

8    with me.  I have not had the chance to review it previously.

9    It's very fine.  I don't prejudice Aaron for that, but we would

10   object to it.  And moreover, we don't think it should be

11   provided at this point, at this juncture in the case,

12   especially when there's other valid purposes that are -- it's

13   being used for here.

14           **MR. CRAIG:**  Your Honor, in response, I would say

15   that, by definition, it is not a regulatory ruling.  That is a

16   specific thing that means something under the law.  This is not

17   a ruling.  This is not a rulemaking process.  It is an advisory

18   opinion to one VFW, and that is it.  So we believe that this is

19   true, this is accurate, and we would ask you to give us a

20   limiting instruction.

21           **THE COURT:**  Let me ask you this:  Do you have any

22   other form of a limiting instruction?

23           **MR. CRAIG:**  No.  We were -- we're happy to strike --

24   I mean, if there's something that you would like to change, I'm

25   happy to do that.  But, no, this is the limiting instruction

1    that we would ask.  If the Court wants to make a modification,

2    obviously, that's within your discretion.

3            **MR. FINNERAN:**  Judge, I'd also object to the

4    timeliness of this.  This has been an issue that the Court has

5    already ruled on previously.  If the defendants were going to

6    seek a limiting instruction --

7            **THE COURT:**  I'm not thrilled about the timing of it.

8            **MR. FINNERAN:**  I apologize.

9            **MR. CRAIG:**  I'm just making sure --

10           **THE COURT:**  I understand.  I think some limiting

11   instruction is appropriate.  I guess -- you know, again, we're

12   doing this on the fly.

13           So what the Court is inclined to do is to simply say

14   the Court has determined this evidence may be considered by

15   you.  The effect, weight, and value that you give to it will be

16   determined based on all of the evidence in the case.

17           **MR. FINNERAN:**  I have no objection to that

18   instruction.

19           **MR. CRAIG:**  I mean, we would like you to say it is

20   not a regulatory ruling and it is an advisory opinion, because

21   that is factually correct.  We're just -- this is -- this is an

22   advisory opinion by the Missouri Gaming Commission.

23           **MR. FINNERAN:**  If I can offer something.

24           **THE COURT:**  First of all, again, the only thing that

25   is in front of me is this written limiting instruction.  I'm

1  going to tell you that this written limiting instruction goes

2  way beyond any limiting instruction.  It is a comment on the

3  letter itself.  And that's what I don't believe is appropriate.

4          I will give the limiting instruction.  I understand

5  you're marking it all out with the exception of the last

6  sentence.

7          **MR. CRAIG:**  First sentence and last sentence, Your

8  Honor.  We would ask that you would simply --

9          **MR. FINNERAN:**  Judge, we would object.  Again, we

10  don't think that those statements are correct because it may

11  be -- these things may be considered for other purposes.  We're

12  not at a point in the case where we can determine that.  If a

13  limiting instruction is necessary later, the Court can provide

14  one.

15          **THE COURT:**  Again, I'm willing to give a limiting

16  instruction.  I think it is appropriate.  I'm just not going to

17  state facts.  And you're putting in facts that I think are not

18  proper at this point in time.

19          Again, I -- I'm going to instruct the jury that the

20  Court has determined that this evidence may be considered by

21  you, but the effect, weight, and value to be given to it will

22  be determined by all of the evidence in this case.

23          **MR. CRAIG:**  And just one clarification for the

24  record.  You said that we want to state facts.  But we do

25  believe that it is a matter of law that this is not a

1   regulatory ruling.

2          **THE COURT:**  And if that's going to be stated, it

3   would be appropriate to state it in final instructions to the

4   jury, not in a limiting instruction.

5          **MR. CRAIG:**  Okay, Your Honor.

6          **THE COURT:**  So, again, the form of this limiting

7   instruction is not proper, in the Court's view.  I'm going to

8   decline to give this limiting instruction.  It is the Court's

9   intent to instruct the jury as I've indicated.

10          **MR. CRAIG:**  Okay.

11          **MR. FINNERAN:**  Thank you, Judge.

12          **THE COURT:**  I'll make this --

13          **MR. CRAIG:**  So you will give --

14          **THE COURT:**  I'm going to give --

15          **MR. CRAIG:**  -- a limiting instruction.

16          **THE COURT:**  -- a limiting instruction.  This

17   limiting instruction is similar.

18          **MR. CRAIG:**  Okay.

19          **MR. FINNERAN:**  It's what he said a moment ago.

20          **THE COURT:**  So I'm going to mark this as Exhibit 1.

21          **MR. CRAIG:**  Can you make it 2?

22          **THE COURT:**  Okay.

23          **MR. CRAIG:**  That's the first one I gave you.

24          **THE COURT:**  Okay.  Okay.

25          **MR. CRAIG:**  Thanks.

1          **MR. FINNERAN:**  Thank you, Judge.

2          **(The proceedings returned to open court and in the**

3  **presence of the jury.)**

4          **MR. FINNERAN:**  Ms. Havey, I apologize.  Thank you

5  for your patience.

6          Your Honor, we would again move 102 into evidence.

7          **THE COURT:**  Ladies and gentlemen, the Court has

8  determined that the evidence that is about to be admitted may

9  be considered by you.  The weight, value, effect of this

10  exhibit, this letter, will be determined by you based on all of

11  the evidence in the case and the instructions of law as given

12  by the Court.

13          With that, and subject to that limiting instruction,

14  Exhibit 102 will be admitted.

15          **MR. FINNERAN:**  Thank you.

16          Thank you, John, for publishing.

17  **QUESTIONS BY MR. FINNERAN:**

18  Q.    So, Ms. Havey, if you could help us once again just

19  orient ourselves.

20          This is a two-page document?

21  A.    Yes.

22  Q.    And is this a -- sorry.  You always have to give a verbal

23  response for the court reporter's benefit.

24  A.    Yes, sir.

25  Q.    Thank you.

1          And is this a copy of a letter that you received

2    from the Missouri Gaming Commission?

3    A.    I did not directly receive the letter.  The letter went

4    to Nathan Howard, and Nathan passed the letter to me.

5    Q.    Okay.  If we look at the top of the letter, do you see

6    here to whom the letter is addressed?

7    A.    Yes, sir.  It's addressed to Mr. Howard.

8    Q.    Is Mr. Howard the customer in whose location you were

9    considering placing this device if it were determined to be

10   legal?

11   A.    Yes, sir.

12   Q.    And what is the date on this letter?

13   A.    The date is July 3, 2019.

14   Q.    All right.  Let's start with the top of the letter.  I'm

15   going to just read a portion of this, but I've blown it all up

16   for the jury on the screen.

17          Do you see where it says "This letter is in response

18   to your July 1 inquiry, in which you indicated your Post's

19   interest in acquiring certain electronic devices, and in which

20   you requested Missouri Gaming Commission's opinion on the

21   legality of the devices"?

22          Did I read that correctly?

23   A.    Yes, sir.

24   Q.    Does the next paragraph reflect that the MGC met on

25   July 2, 2019, at the offices of a vendor where the examination

1    occurred?

2    A.    Yes, sir.

3    Q.    Is TNT the vendor referred to in that paragraph?

4    A.    Yes, it is.

5    Q.    And, again, Banilla Games, who is Banilla Games?

6    A.    Banilla Games is the manufacturer of the game.

7    Q.    So if we go to the next paragraph, I'm going to read it

8    again out loud for you, and tell me if I've read it correctly.

9    It says "Upon examination and analysis of those devices, the

10   MGC determined that the machines are used or useable in the

11   playing phases of gambling activities and therefore constitute

12   'gambling devices' and 'slot machines,'" followed by a

13   statutory citation.

14          Do you see that?

15   A.    Yes, sir.

16   Q.    And do you then also see the next sentence where it says

17   "Setting up and operating these devices at your VFW Post would

18   be illegal"?

19   A.    Yes, sir.

20   Q.    What do you understand this letter to be communicating to

21   Nathan Howard and to yourself about whether you could place

22   that device in his post?

23          **MR. CRAIG:**  Objection.  Speculating as to Nathan

24   Howard.

25          **MR. FINNERAN:**  I'll rephrase, Your Honor.

1          **THE COURT:**  The objection will be sustained.

2          Rephrase the question.

3    QUESTIONS BY MR. FINNERAN:

4    Q.    I won't ask you to speculate about what you understood

5    Mr. Howard to be thinking.

6          Just based on your understanding of this letter,

7    what did you understand it to be telling you about whether you,

8    TNT, could place the device you purchased in his post?

9          **MR. CRAIG:**  Objection, Your Honor.

10         May we approach?

11         **THE COURT:**  I'm going to sustain the objection to

12   the question.

13         **MR. FINNERAN:**  Okay.

14   QUESTIONS BY MR. FINNERAN:

15   Q.    Based upon this letter, did you decide to place the

16   device that you purchased in Mr. Howard's post or not?

17   A.    No, we did not.

18   Q.    And what was your reason for deciding not to do so?

19   A.    Because we felt that what the letter said was --

20         **MR. CRAIG:**  Objection, Your Honor.

21         **THE COURT:**  What's the objection?

22         **MR. CRAIG:**  I'll withdraw it.

23   QUESTIONS BY MR. FINNERAN:

24   Q.    What was the reason that you decided not to place it?

25   A.    Because when we read the letter, we just -- we ourselves

1  determined, you know, we had the -- we read in the letter, the

2  way it was wrote, that the games were illegal, and we did not

3  place them at the location.

4  Q.   If we then look at the top paragraph of the second page,

5  do you see there where it says "If these particular devices or

6  any other devices substantially similar to them are found on

7  your organization's premises, the device will be deemed

8  illegal, and the Missouri Gaming Commission will take action to

9  discipline your organization's bingo license"?

10         Do you see that?

11 A.   Yes, sir.

12 Q.   Do you know what a bingo license is?

13 A.   I believe it allows the hall to let them operate bingo.

14 Q.   When you say the "hall," are you referring to the --

15 A.   The VFW hall.

16 Q.   Sorry.  Once again, Ms. Havey, for the benefit of the

17 court reporter, you have to let me finish my question so we

18 don't talk over each other.  She can't write down both what

19 we're saying at the same time.

20 A.   Okay.

21 Q.   So your understanding, then, was that the VFW hall was a

22 bingo licensee?

23 A.   Yes.

24 Q.   And -- okay.  That probably covers that.

25         I think --

1      **MR. FINNERAN:** Judge, actually, this might be a good

2  stopping point. I'm about to get into a whole new line of

3  questioning, and it's 11:45. I can keep going if you like.

4      **THE COURT:** Why don't you keep going for a period of

5  time.

6      **MR. FINNERAN:** Okay. Sounds good.

7  **QUESTIONS BY MR. FINNERAN:**

8  Q.   Have you spoken with customers who have the Torch devices

9  in common locations between you and TNT?

10 A.   Yes, I have.

11 Q.   And have those customers --

12     **MR. CRAIG:** Objection. Hearsay.

13     May we approach?

14     **MR. FINNERAN:** I'm not going to ask a question that

15 calls for --

16     **MR. CRAIG:** Okay.

17     **THE COURT:** Yeah, it's premature.

18     **MR. FINNERAN:** Yeah.

19 **QUESTIONS BY MR. FINNERAN:**

20 Q.   Have those customers permitted devices from Torch onto

21 their premises?

22 A.   Yes, they have.

23 Q.   And I'd like to talk to you about what you've observed.

24     Have you seen, on those devices, a sticker that

25 explains what the devices are and why they are or are not

1   legal?

2   A.    Yes, sir.

3         **MR. FINNERAN:**  If we could hide the screen, please.

4   **QUESTIONS BY MR. FINNERAN:**

5   Q.    I'm going to show you a copy now of what's been

6   previously marked for identification as Plaintiff's

7   Exhibit 100.

8         Do you see that on your screen?

9   A.    Yes, sir.

10  Q.    And can you just, for the record, tell us what this

11  document appears to be?

12  A.    It's the no-contest/no-chance amusement device, and it

13  explains in this that because they have the pre --

14  Q.    Sorry.

15  A.    Okay.

16  Q.    You shouldn't get into the substance of it yet.

17  A.    Okay.

18  Q.    Just tell me what it is, and then we'll --

19  A.    It's the no-contest/no-chance amusement device.

20  Q.    And is this a sticker that you would see on Torch devices

21  that you observed?

22  A.    Yes, sir.

23  Q.    Does it appear to be a fair and accurate copy of the

24  stickers that you observed?

25  A.    Yes.

1          **MR. FINNERAN:**  Your Honor, we'd move 100 into

2    evidence.

3          **THE COURT:**  Any objection, Counsel?

4          **MR. CRAIG:**  No objection, Your Honor.

5          **THE COURT:**  Exhibit 100 will be admitted and can be

6    displayed to the jury.

7    **QUESTIONS BY MR. FINNERAN:**

8    Q.    Now, Ms. Havey, you've started to get into what the

9    sticker said.  But first, let me just ask you where you've seen

10   it.

11         So where have you seen this sticker before?

12   A.    I see it on, usually, the front or the side of a Torch

13   machine in our locations.

14   Q.    And, again, when you say "our locations," you're

15   referring to --

16   A.    The Play-Mor TNT locations.

17   Q.    And, Ms. Havey, please make sure I finish my question so

18   we don't drive the court reporter crazy.  Thank you.

19         So I'm going to zoom in on the top of this where it

20   says "this amusement device."

21         Do you see the part that I'm highlighting?

22   A.    Yes.  Yes, sir.

23   Q.    Can you read aloud the last sentence of this paragraph?

24   A.    "Consequently, this amusement device is designed to

25   provide no contest and no chance in games offered to its

1  players."

2  Q.    And if we go to this paragraph, I'm not going to ask you

3  to get into great detail here, but does the second paragraph

4  recite what it purports to be some information about what is in

5  Missouri's statutes?

6  A.    I believe so, yes.

7  Q.    And if we look at the -- further down the last paragraph,

8  I'll just draw your attention to the middle, the sentence

9  beginning "As noted above."

10        Do you see that?

11  A.    Uh-huh, yes, sir.

12  Q.    I will just read it aloud and ask if I've read it

13  correctly.  It says "As noted above, this amusement device is

14  designed to offer no contest" --

15        MR. CRAIG:  Objection.  I'm not sure -- oh, never

16  mind.  I didn't know you were starting in the middle of the

17  paragraph.  But go ahead.  I apologize, Rich.

18        MR. FINNERAN:  You're fine.

19  QUESTIONS BY MR. FINNERAN:

20  Q.    So to repeat, Ms. Havey, for the good of the record, "As

21  noted above, this amusement device is designed to offer no

22  contest of chance, as the outcome is known by players before

23  any amusement game is initiated.  Therefore, the activity

24  offered by this device clearly does not meet the definition of

25  'gambling.'  As a result, this amusement device does not meet

1    any definition of a 'gambling device' in the state of Missouri

2    and is not prohibited for use by you."

3            First, did I read that correctly?

4    A.    Yes, you did.

5    Q.    Do you recall any occasions where locations that you

6    shared with Torch -- that would mean TNT shared with Torch --

7    where the owners of those locations would point to or make

8    reference to this sticker?

9    A.    Yes, sir.

10   Q.    And when -- under what circumstances would that occur?

11           **MR. CRAIG:**  Objection, Your Honor.  There was a --

12   may we approach?

13           **THE COURT:**  Ladies and gentlemen, we're going to go

14   ahead and take a lunch break.  So, again, I want to remind you

15   what I tell you at each recesses or adjournment of the Court.

16   Keep an open mind about the case until it's finally given to

17   you to decide.  Don't talk to anyone about the case until it's

18   finally given to you to decide.  Don't do any independent

19   research of any kind into any of the issues in this case,

20   particularly during the lunch hour.  There are lots of people

21   in the courthouse talking about different cases.  Just be aware

22   of that, avoid any contact with anyone who might be talking

23   about this case or some other case that would somehow affect

24   your decision in the case.

25           I'm going to ask that you be back in the jury room

1   at 1:15.  So it's almost an hour and a half, not quite an hour

2   and a half, and we'll try and get moving forward.

3            So, again, if you'll leave your notebooks there on

4   the chair, we'll be in temporary recess until 1:15.

5            **THE CLERK:**  All rise.

6            **(Exit jury.)**

7            **(The following proceedings were held in open court,**

8   **out of the presence of the jury:)**

9            **THE COURT:**  Ms. Havey, you can step down.

10           **THE WITNESS:**  Thank you.

11           **THE COURT:**  Court will be back in session.  Please

12  be seated for just a moment.

13           Tell me, Counsel, what the objection is.

14           **MR. CRAIG:**  Yeah, no, he's trying to use Ms. Havey

15  as a vehicle to say somebody somehow relied on this notice,

16  okay?  He's either going to do that through sheer speculation

17  or through, "Somebody told me that they did so."  That's the

18  only two pathways to this.  "Oh, did somebody -- did they look

19  at it?  Did you watch somebody looking at this notice?"  That

20  doesn't mean anything.  But if he wanted to ask that, that's

21  fine.

22           I just want to be really clear about what it is when

23  he's saying, "Well, what did you observe?"

24           **THE COURT:**  Okay.  I was really just asking you what

25  the objection to the last question was, but we -- in any

1   event --

2        **MR. FINNERAN:**  Judge, I'm not sure what to respond

3   to.  I mean, what we expect to elicit through Ms. Havey is her

4   information about her interactions with the various customers.

5   I think you're going to have to hear each objection as it

6   comes, because in many cases, what the customers are doing is

7   expressing their then-existing understanding based upon what

8   was told to them by Torch.

9        **THE COURT:**  Tell me how you think that isn't

10  hearsay.

11       **MR. FINNERAN:**  I'm sorry?

12       **THE COURT:**  How is it that you think what the

13  customers told Ms. Havey isn't hearsay.

14       **MR. FINNERAN:**  Depends totally on what the

15  particular statement is.  But, obviously, Torch's statements

16  are party-opponent admissions.  So there's no valid hearsay

17  objection there.

18       And, then, if the person is saying, "This is what

19  Torch reported to me," I'm not offering it to prove the truth

20  of what Torch said.  In fact, we think that what Torch said was

21  a false statement.

22       Instead, we're offering it to prove the fact that

23  Torch did make those statements, and to the extent that the

24  witness -- excuse me -- the witness is reciting what someone

25  else understood, then that would be a statement of the

1    witness's then-existing mental, physical, et cetera, condition.

2           **THE COURT:**  We'll go through it question by

3    question.  You can raise your objection.  We'll go from there.

4           **MR. CRAIG:**  Your Honor, in what he just talked

5    about, he's talking about double hearsay.  When he's saying a

6    statement of a party opponent, he is saying she's going to say,

7    "Some third party told me that Steven Miltenberger or somebody

8    else said a thing," and that is double hearsay, and he has to

9    find an exception for both of those, and it is offered for the

10   truth of the matter, okay?

11          If he wanted to, he could put those people, those

12   consumers or those location owners -- he could have deposed

13   them and put them on the stand, but they will not be here.  If

14   he would have put them on the stand, then I do agree there's

15   one level of hearsay.

16          **THE COURT:**  I understand.

17          **MR. FINNERAN:**  I think you understand, Judge.  We'll

18   address it as it comes up.

19          **THE COURT:**  Anything else before we break for lunch?

20          **MR. FINNERAN:**  Nothing from the plaintiff.

21          **MR. CRAIG:**  Nothing, Your Honor.

22          **THE COURT:**  Okay.  I'll see you at 1:15.

23          **(At this time, the Court declares a recess.)**

24          **THE COURT:**  Counsel, are we ready to proceed?

25          **MR. FINNERAN:**  We are, Judge.  I think we'd just

1  like to make a quick record on two things, if we could.

2          **THE COURT:** Okay.

3          **MR. FINNERAN:** So first, I was able to work with

4  your staff, and I want to thank them for taking the time over

5  the lunch hour. We did find a workaround for the audio issue

6  with Ms. Miltenberger's deposition designations, and so we will

7  put those in after Ms. Havey. But I just wanted the Court to

8  know we did resolve that issue.

9          Secondly, Mr. Craig and I have had a discussion

10  about some of the exhibits I plan to use with Ms. Havey. The

11  versions that have been previously provided to the Court, some

12  of these exhibits contain a -- what I'm just going to refer to

13  as a narrative page, sort of a cover page, that explains what

14  is coming afterwards and maybe add some other notes.

15          Mr. Craig, as I understand, objects to those

16  statements coming in because he doesn't believe any hearsay

17  exception applies. We've agreed to remove those from the

18  actual exhibits that we are going to show the jury. So, for

19  example, if previously there was a 77 document that had that

20  page at the front, we now have a 77A that has that page

21  removed.

22          I understand Mr. Craig just wants to make the record

23  clear that if he does not object to 77A, or what have you, that

24  he's not -- we're all in agreement that what's coming in is the

25  version of the document that is missing that initial page. So

1   we'll clean that up in terms of our exhibits, but Mr. Craig

2   wanted me to make a record that we discussed that and resolved

3   it.

4           **THE COURT:**  I'm not quite sure I completely

5   understand that.  There's going to be a 77 and a 77A?

6           **MR. FINNERAN:**  Let me --

7           **THE COURT:**  77A doesn't have the cover sheet?

8           **MR. FINNERAN:**  Judge, if I could maybe even ask John

9   to put it on the screen, I can illustrate it very quickly for

10  you.

11          **THE CLERK:**  You're hooked up there?  Okay.

12          **MR. FINNERAN:**  I'm hooked up, yeah.

13          **THE CLERK:**  Here you go.

14          **MR. FINNERAN:**  Well -- oh, there it is.

15          So, for example, Judge, this is Exhibit 77.  77

16  would have had this cover page on it followed by a move ticket.

17  77A, which I'll show you now, is just the move ticket.  So

18  we've removed the first page.

19          So I'm going to be referring to 77A, et cetera,

20  during the examination.  They're not -- those numbers would not

21  appear on the Court's exhibit list, but they are just modified

22  versions of each exhibit.  And moreover, the -- the other

23  exhibits won't be introduced into evidence, but I -- since the

24  Court, I know, has a paper copy, we didn't want the Court

25  confused about what it was looking at.  So I'll always be using

1    77A in every case.  It's just that first page has been removed.

2            **THE COURT:**  Am I correct, Mr. Craig, that there's

3    not an objection to Exhibit 77A?

4            **MR. CRAIG:**  There would not be an objection to

5    Plaintiff's Exhibit 77A.

6            **THE COURT:**  Okay.

7            **MR. CRAIG:**  But there will -- I believe this -- this

8    same thing would be recurring from Plaintiff's 77 until

9    Plaintiff's 88.

10            These are -- if the Court remembered, we had that

11   standing hearing, Ms. Havey was testifying, and there was some,

12   like, can she lay a foundation that these are business records.

13   And we took those out because they were made later in time.

14   That's what we're removing, just so the Court would understand

15   that.

16            But I will say, like, for their Exhibit 86, just so

17   we get this on the record too before we have to deal with it,

18   Rich, your Exhibit 86 --

19            **MR. FINNERAN:**  Yes, sir.  And you want 86A?

20            **MR. CRAIG:**  86 --

21            **MR. FINNERAN:**  It removed already?

22            **MR. CRAIG:**  Yeah, 86A.

23            **MR. FINNERAN:**  I should say that not every single

24   one of these had a narrative page, so in those cases, it will

25   still be the original exhibit number.  But here's 86A, Aaron.

1          **MR. CRAIG:** So from 77A until 85A, we won't have an

2    objection to any of those.

3          86, if you look at the first page, it says "Mike

4    would like the dartboards pulled because he doesn't have room

5    for them."

6          I mean, we would object that is hearsay within

7    hearsay that is covered by an exception. So there's a business

8    records exception for the work order itself, but that statement

9    is hearsay. Mike told her a thing, and then she's transmitting

10   that on. So we would object to those words, and we would ask

11   that those be redacted in their Exhibit 86A.

12          **MR. FINNERAN:** Judge, do you want to deal with this

13   now, outside the jury?

14          **THE COURT:** Go ahead. Yes.

15          **MR. FINNERAN:** So as Mr. Craig acknowledges, this is

16   a business record as a whole. This is a statement within the

17   business record, and we do not need to offer that statement for

18   the truth of the statements. Instead, this testimony is going

19   to relate to how, because of this customer's request, certain

20   steps were taken.

21          Again, we had a similar discussion earlier. In our

22   view, as long as we're not offering the out-of-court statement

23   to prove the fact that is asserted by the declarant, this

24   statement would not qualify as hearsay. This was, again, a

25   business record made near in time. It's for the purpose of

1  explaining to the person who's doing the move why it is being

2  moved.  So we don't think that there is a necessity to redact

3  this portion of the document.

4        **THE COURT:**  Anything else you want to tell me about

5  that, Mr. Craig?

6        **MR. CRAIG:**  Yeah, I mean, look, within this, she is

7  specifically saying "Mike doesn't have room for them with his

8  poker machines."  That is a statement that they want for the

9  truth of the matter because they want to show that they had to

10  remove one of TNT's devices to, in fact, make room for the

11  poker -- I mean, the Torch device, I guess, is what she was

12  meaning.  But this is hearsay within hearsay.  They would have

13  to find an exception for it, and it doesn't exist.

14        **MR. FINNERAN:**  I will offer a limiting instruction

15  that the plaintiff would accept to resolve Mr. Craig's concerns

16  if, when this document comes in, the Court would like to call

17  attention to this particular statement and say, "Ladies and

18  gentlemen of the jury, you should understand that this

19  statement about what Mike said is recorded on this document

20  simply to reflect the statement was made, not to prove that

21  what Mr. -- what Mike said was actually true, and you should

22  only consider it for that limited purpose."  We would be very

23  amenable to that limiting instruction.

24        **THE COURT:**  What's the limited purpose?  I don't get

25  it.

1          **MR. FINNERAN:**  I'm sorry?

2          **THE COURT:**  What's the limited purpose that you're

3    offering it for?

4          **MR. FINNERAN:**  The effect on the listener and the

5    people who are then preparing -- performing this work order as

6    to the reason why they're doing what they're doing.

7          **THE COURT:**  That isn't even relevant, why somebody's

8    moving something out.  What is relevant is that they're saying

9    that they don't have room because of the poker machines.  And

10   you are offering that for the truth of the matter.

11         I guess what I don't -- also don't understand, this

12   says it was a work order completed by Donna Havey.

13         Was this a statement made to Donna Havey?

14         **MR. FINNERAN:**  Without talking to her, I'm not sure

15   that I have the ability to answer the Court's question as to

16   whether Ms. Havey is the one who prepared that description or

17   if it was just reflected in the business record over whom she's

18   a custodian.  But I can lay that foundation one way or the

19   other, and I can also --

20         **THE COURT:**  Again, if it was a statement made to

21   Donna Havey, then it's a moot point.  I think she can say what

22   Mike told her.

23         **MR. FINNERAN:**  Right.

24         **THE COURT:**  The problem is, it is hearsay within the

25   business document.  There isn't an exception that makes it

1    admissible.

2            **MR. FINNERAN:**  So if I understand correctly, if I

3    lay a foundation with the witness that this is what Mike told

4    her, then we could admit the statement, just not to prove that

5    that's Mike's actual reason; just that that's what she heard

6    Mike say.

7            **MR. CRAIG:**  That's hearsay, Your Honor.

8            **MR. FINNERAN:**  Judge, I continue to be a little bit

9    perplexed by Mr. Craig's objections.  A statement that is out

10   of court is only hearsay if we are offering it to prove that

11   what the declarant asserted is a true fact.  If we're offering

12   it for some other purpose, then a limiting instruction may be

13   appropriate.

14           But we're not offering it to prove, for example,

15   that Mike doesn't have room for them.  What we are offering

16   them is to say, "Mike said this to you, and that's why you did

17   the next thing."  That is the effect on the listener, and I

18   believe it is plainly admissible under the hearsay rule.

19           **THE COURT:**  With a limiting instruction, it would be

20   admissible if the statement was made to Donna Havey.

21           **MR. FINNERAN:**  Right.

22           **THE COURT:**  So if you have a limiting instruction

23   that it only goes to her motivation, her reason for doing what

24   she did --

25           **MR. FINNERAN:**  Right.  And I'll find out --

1    **THE COURT:**  -- I think it is admissible.  If it

2    wasn't made to her, then it is just hearsay within hearsay.

3    It's not admissible.

4    **MR. FINNERAN:**  I'll find out if I can lay that

5    foundation, Judge.

6    **THE COURT:**  You've also got to have a limiting

7    instruction.

8    **MR. FINNERAN:**  Yes, Judge.

9    Do you want me to propose one to the Court in

10   writing?  Is that what you prefer?

11   **THE COURT:**  I mean, that's what I was trying to

12   explain to you at the final pretrial conference, before we

13   started the trial.  If you have evidence that you're offering

14   for a limited purpose, you need to have a proposed limiting

15   instruction.  I'll either accept that limiting instruction, or,

16   as I did with Defendants' limiting instruction, I'll revise it.

17   **MR. FINNERAN:**  Understood, Judge.

18   **THE COURT:**  But I need something in writing.

19   **MR. FINNERAN:**  We'll write something down for you.

20   Thank you.

21   **THE COURT:**  Okay.

22   **MR. CRAIG:**  Your Honor, are we redacting or not

23   redacting the hearsay within the hearsay in 86?

24   **THE COURT:**  What's on the monitor, I believe, is 87,

25   if I'm correct.

1          In any event, what's on the monitor, if he can lay a

2    foundation that the statement was made to Ms. Havey --

3          **MR. CRAIG:**  With the limiting instruction.

4          **THE COURT:**  -- with a limiting instruction, I'm

5    going to allow it.

6          **MR. CRAIG:**  Okay.

7          **THE COURT:**  If that foundation can't be laid, then

8    it is just strictly hearsay, there is no exception, and I'm not

9    going to allow it.

10          **MR. CRAIG:**  Thank you, Your Honor.

11          Just so you know, that same issue arises in what is

12    their 86, their 87, and their 88.

13          **MR. FINNERAN:**  Judge, I've just discussed off the

14    record with Ms. Havey.  I do believe we'll be able to lay that

15    foundation for this document.  If Mr. Craig would like to raise

16    an issue with another document, and if you'd like us to resolve

17    that outside the hearing of the jury, we can do that now as

18    well.

19          **THE COURT:**  Again, you're offering these statements

20    for a limited purpose.  So you need a limiting instruction to

21    offer with that.  And if you've got other exhibits where you're

22    going to have the same issue, you either need to resolve them

23    or you're going to have to make an objection, Mr. Craig, and

24    deal with it.

25          **MR. FINNERAN:**  I understand.

1        My question was simply -- I thought I just heard him

2   say he did have an objection on another exhibit.

3        **THE COURT:**  Apparently, he does.

4        **MR. FINNERAN:**  Would you like to resolve that issue

5   now, or would you like to do that --

6        **THE COURT:**  What's the objection?

7        **MR. CRAIG:**  It's the same objection to Exhibit 87A.

8   I mean, we could actually put Ms. Havey on the stand and I can

9   just ask her if -- I could ask her a question as to whether or

10  not these statements were made to her.

11       **MR. FINNERAN:**  May I have a moment, Judge?

12       **THE COURT:**  You may.

13       **MR. CRAIG:**  Well, I don't want him coaching the

14  witness on this, Your Honor.

15       **THE COURT:**  I understand.

16       Look, we're going to go ahead and get the jury.  You

17  should have done this before we started, as far as I'm

18  concerned.  You've got to have a limiting instruction.  If you

19  don't, I'm not going to allow it.

20       **MR. FINNERAN:**  Understood, Judge.  And I apologize

21  for not having resolved it earlier.  Mr. Craig had raised these

22  specific issues with me previously, but we will prepare a

23  limiting instruction and submit it to the Court.

24       **MR. CRAIG:**  I did mention that to Zoe this morning.

25       **MR. FINNERAN:**  I apologize.

1    **THE COURT:**  I'm going to give you five minutes.

2    Then we're going to get the jury.

3    **MR. CRAIG:**  I really don't want him talking with

4    her, if this is going to be a problem.  I don't want him, like,

5    coaching her up on what she has to say to get this in.  I do

6    have a problem with that.

7    **MR. FINNERAN:**  Judge, I will not coach --

8    **THE COURT:**  I assume that he's going to act

9    responsibly and ethically.  And I understand your concern, but,

10   again, I have complete faith that he's going to act ethically,

11   and we'll go from there.

12   **MR. FINNERAN:**  Okay.  Thank you, Judge.  We'll take

13   a moment.

14   **(Pause in proceedings.)**

15   **THE COURT:**  Let's go ahead and make a quick record

16   with regard to that.

17   So we've had a discussion about what we're calling

18   "move tickets," which are a number of exhibits.  Is it 77

19   through 87, ultimately?

20   **MR. CRAIG:**  88, Your Honor.

21   **THE COURT:**  77 through 88.

22   We've had a discussion about the objection of it

23   being hearsay, some of the things in the business records.

24   As I understand it, the Court indicated that if the

25   statement was made to Ms. Havey, that with a limiting

1    instruction, it would be admitted.  If the statement was not

2    made to Ms. Havey but to another person, then it is truly

3    double hearsay and it would not be admitted.

4            And I believe that's now an agreement; is that

5    correct, Mr. Craig?

6            **MR. CRAIG:**  Yes, Your Honor.  Over our objection,

7    which has been overruled, I agree.

8            **THE COURT:**  Okay.  Okay.

9            **MR. CRAIG:**  I mean, I would prefer not to come in

10   even with a limiting instruction, but I understand Your Honor's

11   ruling on that.  And with that, we will admit those exhibits,

12   yes.

13           **THE COURT:**  Okay.  All right.

14           **MS. BRANNON:**  We're just finishing the limiting

15   instruction.

16           **THE COURT:**  While he's finishing that, I'll be right

17   back.

18           **(Pause in proceedings.)**

19           **MS. BRANNON:**  Do you prefer the statement printed?

20           **THE COURT:**  I'm sorry?

21           **MS. BRANNON:**  Do you prefer the statement printed?

22           **THE COURT:**  Yeah, ideally, I'd like it printed.  You

23   can send it to John and we can print it.

24           **MS. BRANNON:**  Okay.  Great.  Thank you.

25           **MR. FINNERAN:**  We have an agreement on limiting

1    instruction.

2           **THE CLERK:**  If you guys are able to print it, that

3    will be faster.

4           **(Pause in proceedings.)**

5           **THE COURT:**  So, again, we're here in the courtroom

6    outside the hearing of the jury.  We've had a lengthy

7    discussion.  I think that Defendant is continuing to object,

8    but understanding that the Court believes that if the statement

9    contained in the business record was actually made to

10   Ms. Havey, then it would be an exception to the hearsay rule,

11   and it would be admissible for the limited purpose of

12   explaining her subsequent conduct, and that with a limiting

13   instruction, that that would be admissible.

14          The parties, I believe, have agreed on the limiting

15   instruction; although, you're not waiving your objection.

16          Is that correct, Mr. Craig?

17          **MR. CRAIG:**  That is correct, Your Honor.

18          **THE COURT:**  Okay.  With that, Mr. Finneran, are you

19   ready to proceed?

20          **MR. FINNERAN:**  I'm ready to proceed, Your Honor,

21   yes.

22          **THE COURT:**  Ms. Havey, if you want to make your way

23   up here to the witness stand, we'll go ahead and get the jury.

24          Just so everybody is clear, I'm happy to continue to

25   discuss these things.  We could argue about this all day.  My

1    concern is always with the jury that's sitting back there

2    waiting for us.  So that's why I will push you to ensure that

3    you've got whatever limiting instructions prior to the evidence

4    being presented.  So, please, just keep in mind my concern

5    about the jurors.

6                **MR. FINNERAN:**  Yes, Judge.  Thank you.  And I will

7    make sure I will discuss -- anticipate issues we'll have

8    tomorrow with Mr. Craig today so we can avoid that circumstance

9    again.

10               **THE COURT:**  Thank you.

11               Please rise.

12               **(Enter jury.)**

13               **(The following proceedings were held in open court,**

14   **in the presence of the jury:)**

15               **THE COURT:**  Court will be in session.  You can be

16   seated.

17               Ladies and gentlemen, I do want to apologize to you

18   for the delay.  It's -- I know it's frustrating for you to be

19   sitting back there.  Please, as I indicated to you in that one

20   early instruction, while you're waiting, we are working to

21   ensure that the evidence proceeds in an orderly manner and as

22   it should.

23               Again, we appreciate your patience.

24               Ms. Havey, you've retaken the witness stand.  You'll

25   recall you're still under oath.

1          **THE WITNESS:**  Yes, sir.

2          **THE COURT:**  With that, Counsel, you may proceed with

3   questions of the witness.

4          **MR. FINNERAN:**  Thank you, Your Honor.

5   **QUESTIONS BY MR. FINNERAN:**

6   Q.    So, Ms. Havey, I'd now like to talk to you about

7   particular locations where Torch has introduced devices where

8   TNT previously had devices.

9          So, first, do you know a place called the Midwest

10  Petroleum truck stop?

11  A.    Yes, sir.

12  Q.    And where is that truck stop located?

13  A.    It's located in Cuba, Missouri.

14  Q.    Do you know how long a relationship TNT had had with

15  Midwest Petroleum at the time you retired?

16  A.    When I started, we had -- 20 years ago, we already had

17  the account.  So I can say it's more than 20 years.

18  Q.    Now, I do want to clarify.

19         When you say the "account," does that just mean the

20  actual physical location?

21  A.    Yes.

22  Q.    Is it possible that over that time period, ownership

23  might have changed hands?

24  A.    Yes, sir.

25  Q.    Is that something that happens commonly in your industry?

1    A.    Yes.

2    Q.    And so when ownership does change hands, in general, does

3    that mean that you lose that location, or are you sometimes

4    able to maintain a presence in that location?

5    A.    We have first right, according to our lease agreement, to

6    talk to the new owners first and give them what we offer.  And

7    most -- I would say 95 percent of the time, the customers

8    continue to go with us.

9    Q.    Did Midwest Petroleum truck stop have an earlier name

10   that you're aware of?

11   A.    It was Voss Truck Port.

12   Q.    For the court reporter, can you spell Voss?

13   A.    Voss, V-O-S-S.

14   Q.    Did it -- how did it go from being Voss Truck Port to

15   Midwest Petroleum?  What caused that change?

16   A.    I just know it was Voss truck stop.  I was not there in

17   the time it switched the ownership.

18   Q.    Okay.  Can you tell us, just generally, what kind of

19   location is that?  What kind of clientele or customers

20   typically go to that truck stop?

21   A.    It's mainly a truck stop.  So we have people coming in

22   from out of state that would just be passing through to spend

23   the night there or to eat.  There was a restaurant there.  So

24   it was mainly people who traveled.  There were locals who came

25   in there also.

1    Q.    Was this a 24-hour establishment, or did it have shorter

2    hours?

3    A.    It was a 24-hour.

4    Q.    Relative to other locations that TNT has, was this one of

5    the more profitable locations?

6    A.    Yes, it was.

7    Q.    Is that, in part, due to the volume of traffic that goes

8    through there?

9    A.    The volume of traffic and the space the location had for

10   us to put our games in.

11   Q.    Okay.  Did there come a time where someone at Midwest

12   Petroleum requested that the games be removed?

13   A.    Yes.  It kind of came in phases.

14   Q.    Okay.  So do you recall one such issue arising with

15   respect to August of 2018?  Do you recall that time period

16   being one of the time periods?

17   A.    That was about when it started, that we were removing

18   some of our equipment, yes.

19          **MR. FINNERAN:**  If you could -- screen is off.

20   **QUESTIONS BY MR. FINNERAN:**

21   Q.    If I could show you what's been marked for identification

22   as Exhibit 83A.  And I'll scroll down through this document so

23   you can see what it consists of.

24          As I do that, do you recognize what I placed on the

25   screen for you?

1   A.     Yes, I do.

2   Q.     And can you describe what it is?

3   A.     The first part is the work order that's generated in our

4   system at Play-Mor that initiates for a game to be moved, our

5   games to be moved out.

6   Q.     And is there also, in here, something called a "move

7   ticket"?

8   A.     Yes.  The move ticket they write when they remove the

9   game, and they do one for each game that's in there.

10  Q.     And are records of this type, work orders and move

11  tickets -- are those the sorts of records at TNT you would keep

12  and maintain in the regular course of your business?

13  A.     Yes, sir.

14         **MR. FINNERAN:**  Your Honor, at this time, we'd seek

15  to move 83A into evidence.

16         **THE COURT:**  Any objection, Mr. Craig?

17         **MR. CRAIG:**  No objection, Your Honor.

18         **THE COURT:**  Exhibit 83A will be admitted.

19  **QUESTIONS BY MR. FINNERAN:**

20  Q.     So, again, to orient the jury to the document they're

21  looking at, is this the first page of 83A?  Do you see the

22  number at the bottom?

23  A.     Yes.

24  Q.     And I'll zoom in at the top.  We'll be looking at a

25  number of documents like this.  So just to understand it.

1          What does the "Date Created" date at the top

2     indicate?

3     A.    The "Date Created" is the date that we actually entered

4     that into the computer system.

5     Q.    And then if we look here at the "Date Printed," is that

6     just the date where this actual document was printed off the

7     computer?

8     A.    Yes, sir.

9     Q.    That's not related to when any of the work was done, is

10    it?

11    A.    No.

12    Q.    So if a jury was looking at a document like this and

13    trying to understand when it came in existence, is the "Date

14    Created" number the number to look at?

15    A.    Yes, sir.

16    Q.    And then here, it lists "Customer."

17          Obviously, this is Midwest Petroleum truck stop, but

18    what generally would be listed in the "customer" field on a

19    work order request?

20    A.    It would be the name of the account and the address that

21    the location is at.

22    Q.    And if we scroll down a little bit further in this

23    document, do you see the part that says "Short DESCR"?

24    A.    Yes, sir.

25    Q.    Just generally, what does that field on documents like

1   this represent?

2   A.    We would always put in the reason that we're creating the

3   work order.

4   Q.    And below that, is there a narrative statement as to why

5   you're doing it?

6   A.    Yes, sir.

7   Q.    And so I won't ask you about this particular statement

8   yet.  Let's finish the document.

9          You see here where it says "For machine: 15710

10  pinball - *Aerosmith*"?

11  A.    Yes, sir.

12  Q.    So what would this field on a form like this typically

13  show?

14  A.    It shows the name of the game that we're moving out,

15  which is an *Aerosmith* pinball.  And then the 15710, we have all

16  of our games with a game ID, and that's how we keep track of

17  our game inventory.

18  Q.    We see down here also, it says "Work order created by,"

19  and it that your name?

20  A.    Yes, sir.

21  Q.    What does that reflect?

22  A.    It means I was the person who received the call and that

23  entered it into the -- entered it into the system.

24  Q.    And then over here, we see "Work order completed by" with

25  a different name.

1    A.    Yes, sir.

2    Q.    I don't need to know who this specific person is, but

3    just generally, what does that field represent?

4    A.    Once we complete the work order and the work is done, we

5    go in and complete it and it goes off our record to -- or it's

6    stored in our records, but it goes off of our immediate work to

7    be done for the day.

8    Q.    And so if we go further down in this document, is this

9    what is called the "Work Order Detail"?

10   A.    Yes, sir.

11   Q.    And if I can zoom in here.

12         If we look at the top, it says "Work Order" followed

13   by a number.

14         Is that just a tracking number?

15   A.    Yes.  That's the amount -- the number of work orders

16   that's been created since we started our system.

17   Q.    After that, it says "Machine," and it says *Megatouch*

18   *Force*.

19         What does that reflect?

20   A.    That's the type of machine that it was that was in the

21   location.

22   Q.    Next, it says "Contact for this work order."

23         What would typically be reflected in that field?

24   A.    That's usually who called the work order in.

25   Q.    Okay.  And then it says "Created date" of 8/17?

1    A.    Yes, sir.

2    Q.    And also a "Completed" date of 8/21/2018?

3    A.    Yes, sir.

4    Q.    Are those the dates upon which the order was created and

5    the work of moving the device out was then completed?

6    A.    Yes, sir.

7    Q.    If you go down to "Work order request," is this similar

8    to what we saw before with a request and a description of the

9    reason?

10   A.    Yes, sir.

11   Q.    Now we'll go to the next page -- or three pages down, I

12   guess, just to orient us to a move ticket.

13          So I've zoomed in on one of the move tickets on

14   page 5 of Exhibit 83A, and so I'll first ask you:  What, in

15   general, is a move ticket?

16   A.    We have move tickets in the business to be able to put in

17   if we are moving a game into a location or out of the location.

18   Q.    And so we just saw the work order request.

19          How does the move ticket relate to the work order

20   request?

21   A.    The work order only tells us where we're going and what

22   we will be doing.  The move tickets we use to keep track of the

23   inventory once the ticket is filled out.  We get the meter off

24   of it and all the information of the game that was in there and

25   know what to do with it to update our inventory.

1  Q.    All right.  So let me now zoom in on just the top of that

2  first move ticket again to orient us to the format of these

3  documents.

4            So this date, would that reflect the date the move

5  occurred?

6  A.    Yes, sir.

7  Q.    The "Employee" line has a few letters there.

8            What would that reflect, generally?

9  A.    That's the -- on this one would be the initials of the

10  employees who went to move the game out of the location.

11  Q.    Further down, we see the name of a location; is that

12  right?

13  A.    Yes, sir.

14  Q.    The "Machine ID," is that the tracking number you

15  mentioned earlier?

16  A.    Yes, sir.

17  Q.    The name here, Cruis'n World, is that just a description

18  of the machine?

19  A.    Yes, that's the name of the game.

20  Q.    Now, a moment ago, you mentioned the idea of the current

21  meter.

22            Before talking about this one, can you tell the jury

23  what is a meter?

24  A.    We maintain meters on all our games.  So when we go to

25  collect them, we read a meter and calculate how many times it

1  has moved since the last time we collected, and that's how we

2  calculate our collections.

3  Q.    When you say "how much it's moved," you don't mean

4  physically moved?

5  A.    No.  By the numbers moving.  When they put a quarter in,

6  or a dollar, depending how the meter is set to register, it

7  will click the meter one click every time.  And then that's how

8  we do a calculation of money to turn in.

9  Q.    Is there also an indication here of whether there was any

10  money in the machine at the time that it was moved?

11  A.    Yes, sir.  Where it says "Was any cash in the box," our

12  staff is responsible to count the money that was in it.  And

13  it's usually when we move those out, it's not -- we do our

14  collections on a schedule.  So if it's not on a scheduled

15  collection, they move the money to another game in the location

16  and leave a copy of this ticket so that that can be reported

17  when they do the final collection at the end of the cycle.

18  Q.    And then it also says "To location," and it's followed by

19  "SS."

20         Can you tell us what that means?

21  A.    Yeah, that's just the abbreviation for Sullivan shop,

22  which is what Play-Mor/TNT calls our work area of the shop.

23  That's where the games are brought back to.

24  Q.    So now that we understand how to read these documents,

25  I'm going to scroll us up back to the earlier part of this

1  document.  And I can focus you here on the top of the document

2  where we just looked at the description.

3          Do you see the work order request short description

4  field?

5  A.    Yes, sir.

6          **MR. FINNERAN:**  May I have one moment, Judge?

7          **THE COURT:**  You may.

8  **QUESTIONS BY MR. FINNERAN:**

9  Q.    All right.  So, Ms. Havey, is there a statement here on

10  this document about the reason this move is occurring?

11  A.    Yes, sir.

12  Q.    And who wrote the text that we see here?

13  A.    I wrote the text that was in there, because the call came

14  in to me.

15  Q.    And is that based, then, upon a phone call that you would

16  have received from someone at Midwest Petroleum?

17  A.    Yes, sir.

18          **MR. FINNERAN:**  Your Honor, if you'd like, this would

19  be -- I've just discussed with Mr. Craig -- I think a good

20  point to provide a limiting instruction on this and similar

21  statements.

22          **THE COURT:**  Ladies and gentlemen, the statement that

23  you are about to hear is an out-of-court statement by a person

24  who is not testifying here today.  That evidence is offered for

25  the limited purpose of demonstrating that such a statement was

1    made to Ms. Havey and to explain her subsequent conduct, but

2    you should not take that statement for the truth of the matter

3    asserted.  In other words, you should not assume that what the

4    other person said to Ms. Havey was actually true.

5              So, again, it's being admitted for that limited

6    purpose.

7              With that, you may proceed.

8         **MR. FINNERAN:**  Thank you, Judge.

9    **QUESTIONS BY MR. FINNERAN:**

10   Q.    So, first, Ms. Havey, was this actually a quote from

11   Mr. Head and what he said?  Is it his own words?  Is it his own

12   words, or is it your understanding from the conversation?

13   A.    That's what -- it's his words that he told me that day.

14   Q.    Okay.  So we see the words "poker machines" there.

15             Is that a term that you use generally to refer to

16   the Torch devices?

17   A.    Yes.

18   Q.    Are you aware that -- are you now aware that the Torch

19   devices generally don't actually have any poker games on them?

20   A.    Yes, sir.  This was very new in the process of learning

21   about them, and the only gambling devices I knew anything about

22   was when I saw video pokers, and that is how it kind of stuck.

23   Q.    Okay.  So if we see the term "poker machines," that's

24   just your way of referring to the Torch devices; is that fair

25   to say?

1    A.    Yes, sir.

2    Q.    And so does this reflect, then, that, in part, these were

3    being -- your understanding from what you heard and the reason

4    you took these out was because you had been told that there was

5    going to be a game room for poker machines?

6    A.    Yes, sir.

7    Q.    Was there a subsequent time after this work order was

8    completed where you visited Midwest Petroleum?

9    A.    Yes, sir.

10   Q.    And did you observe Torch devices there?

11   A.    Yes, sir.

12   Q.    What devices were removed from Midwest Petroleum on that

13   occasion?

14   A.    The devices that were listed on the move ticket.

15   Q.    And do you recall, just generally, what those were?  And

16   if you need to look at the screen --

17   A.    Yeah, we had a *Megatouch*, a *Driver*, a *Buck Hunter*, some

18   driving games, a pinball machine.

19   Q.    Okay.  So just looking here, *Big Buck Pro OS*, would that

20   be an example of a *Big Buck* game?

21   A.    Yeah, that's a *Big Buck Hunter*.  It's a shooting game.

22   Q.    Pinball *Aerosmith* would be a pinball machine?

23   A.    Yes, sir.

24   Q.    If we go up again -- we already said pinball *Aerosmith*.

25         We've talked about *Megatouch Force*.

1               What type of game is that?

2    A.     It's a -- like, a touch-screen game that you can play

3    many games on, multiple games.

4    Q.     And *Cruis'n World Driver*, what kind of game is that?

5    A.     It's a sit-down driving game, a race game.

6    Q.     Were these all games that were removed from Midwest

7    Petroleum?

8    A.     Yes, sir.

9    Q.     You said a moment ago that you saw the Torch devices from

10   Midwest Petroleum.

11              Can you compare the location of the Torch devices to

12   where these games were located?

13   A.     They were in the exact spot that we moved the games out

14   of.  We had emptied a small room, and they were all put in and

15   filled in the room.

16   Q.     Was there another later time where you were asked to

17   remove another device from Midwest Petroleum?

18   A.     Yes, sir.

19   Q.     Was that in June of 2019?

20   A.     Yes.

21   Q.     If we scroll down in this document -- I'm now on page 8

22   of the document.

23              Do you see the date created for this request?

24   A.     Yes, sir.  6/18/2019.

25   Q.     And which device was moved out on this occasion?

1    A.    We moved out the *Route 66* duck crane.

2    Q.    Well, did you replace it with anything?

3    A.    No, we did not.

4    Q.    Did you later see what took place after the device was

5    removed with respect to that space?

6    A.    Yes, sir.  There was a Torch device moved in there.

7    Q.    I'd like to talk to you about a different customer of

8    TNT's.

9          Do you recall a customer called The Sand Bar?

10   A.    Yes, sir.

11   Q.    Where is The Sand Bar located?

12   A.    The Sand Bar is in Washington, Missouri.

13   Q.    And do you recall an occasion in 2022 where a work order

14   was requested for that location?

15   A.    Yes, sir.

16        **MR. FINNERAN:**  Screen's off.

17        If I could bring up 86A for identification.

18   **QUESTIONS BY MR. FINNERAN:**

19   Q.    Ms. Havey, do you see this document on your screen?

20   A.    Yes, sir.

21   Q.    Is this a work order and move tickets similar to the ones

22   we looked at before?

23   A.    Yes, sir.

24   Q.    Does this one relate -- does this set relate to The Sand

25   Bar?

1    A.    Yes.

2    Q.    And I can scroll through it, but do you believe this to

3    be a fair and accurate copy of those documents?

4    A.    Yes.

5              MR. FINNERAN:  Your Honor, we'd move 86A.

6              THE COURT:  Any objection, Mr. Craig, to 86A?

7              MR. CRAIG:  So long as any discussion of what anyone

8    said in this work order is preceded by or is given a limiting

9    instruction, we admit this.

10              THE COURT:  Exhibit 86A will be admitted subject to

11    a limiting instruction, if necessary.

12              MR. FINNERAN:  Thank you, Judge.

13    QUESTIONS BY MR. FINNERAN:

14    Q.    So we will now show the jury 86A.

15              Again, here, what sort of device -- actually --

16    yeah, can you tell from this what device was being moved?

17    A.    Yes.  We pulled out two dartboards.

18    Q.    And it says "*Galaxy III* dartboards."

19              Is "*Galaxy III*" the name of the dartboards?

20    A.    Yes, sir.

21    Q.    So this is actually only two dartboards, not three

22    dartboards?

23    A.    Yes, it's two dartboards, and the name of them are

24    *Galaxy IIIs*.

25    Q.    What date was this completed, if you can see at the

1    bottom?

2    A.    Says 1/9/23.

3    Q.    And I should have asked you before, but do you see when

4    the request was created?

5    A.    Yes.  12/13/22.

6    Q.    And then if we look at the move ticket, do these two move

7    tickets reflect that these devices were then moved out to the

8    shop that you described earlier?

9    A.    Yes, sir.

10   Q.    If we return to the first document, do you see, in the

11   short description field, the explanation?

12   A.    Yes, sir.

13   Q.    Who is the author of this explanation?

14   A.    I wrote that.

15          **MR. FINNERAN:**  Your Honor, again, with the same

16   limiting instruction, I seek to ask the witness what the

17   statement says.

18          **THE COURT:**  Any other objection?

19          **MR. CRAIG:**  I mean, our continuing objection would

20   apply, but as long as there is the limiting instruction --

21          **THE COURT:**  There's not a foundation that's been

22   laid that the statement was made to Ms. Havey.

23          **MR. FINNERAN:**  Thank you, Judge.  I will lay such a

24   foundation.

25

QUESTIONS BY MR. FINNERAN:

Q.    Ms. Havey, you just said you're the author of this statement?

A.    Yes, sir.

Q.    Was this based upon information that was directly conveyed to you by a person named Mike Turner?

A.    Yes, sir.

        **MR. FINNERAN:**  Your Honor, we now seek to inquire subject to the limiting instruction.

        **THE COURT:**  Subject to the limiting instruction, any other objection, Mr. Craig?

        **MR. CRAIG:**  No, Your Honor.

        **THE COURT:**  Ladies and gentlemen, the statement you're about to hear is an out-of-court statement made by a person who is not testifying here today.  That evidence is being offered for the limited purpose of demonstrating that such a statement was made to Ms. Havey and to explain her subsequent conduct, but you should not take the statement for the truth of the matter asserted.  In other words, you should not assume that what the other person said to Ms. Havey was actually true.

        With that, you may proceed.

        **MR. FINNERAN:**  Thank you, Judge.

QUESTIONS BY MR. FINNERAN:

Q.    Ms. Havey, was this work order executed, completed?

1    A.    Yes, sir.

2    Q.    Were the dartboards removed?

3    A.    Yes, sir.

4    Q.    Did you later go back to The Sand Bar to see what was in

5    their place?

6    A.    Yes, I did.

7    Q.    I'm now going to --

8              MR. FINNERAN:  If you can take the screen down.

9    QUESTIONS BY MR. FINNERAN:

10   Q.    -- show you a copy of what's been marked for

11   identification as 98.

12             Ms. Havey, do you recognize this document?

13   A.    Yes, sir.

14   Q.    What is it?

15   A.    It's a Torch machine in The Sand Bar.

16   Q.    Is it a photograph?

17   A.    Yes.

18   Q.    Does it appear to be a fair and accurate copy that

19   accurately reflects where this machine was in The Sand Bar?

20   A.    Yes.

21             MR. FINNERAN:  Your Honor, we'd seek to admit

22   Plaintiff's 98.

23             THE COURT:  Any objection to Exhibit 98?

24             MR. CRAIG:  No objection, Your Honor.

25             THE COURT:  Exhibit 98 will be admitted.

1    QUESTIONS BY MR. FINNERAN:

2    Q.    So, Ms. Havey, tell the jury now, since they weren't

3    seeing it until just now -- so tell the jury what they're

4    looking at, please.

5    A.    Tell the jury what?  I'm sorry.

6    Q.    What are they looking at?  What's in this photograph?

7    A.    This is a picture of the Torch machine sitting in The

8    Sand Bar.  And our dartboards used to be in that location.

9    Q.    We'll now go to Break Time Bar & Grill.

10         Do you know a bar called Break Time Bar & Grill?

11   A.    Yes, sir.

12   Q.    Where is that located?

13   A.    It was in Hazelwood, Missouri.

14   Q.    Did there come a time where Break Time Bar & Grill asked

15   you to remove a device from their location?

16         MR. CRAIG:  Your Honor, may we approach?

17         THE COURT:  Approach the sidebar.

18         (A bench conference was held on the record and

19   outside of the hearing of the jury as follows:)

20         MR. CRAIG:  We would object that this is becoming

21   very cumulative.  He's established that -- I mean, whatever

22   he's going to establish, he's already done it at two locations.

23   There was devices here, and then they went out, and then our

24   devices were there.  We believe this is cumulative evidence.

25         THE COURT:  It goes to the issue of damages.

1          **MR. CRAIG:** It doesn't matter. That's fine.

2          **THE COURT:** It may go to the issue of damages. So

3 although it's -- I understand your point. It's really not

4 cumulative.

5          **MR. CRAIG:** Okay. If it becomes cumulative, can we

6 have a continuing objection so I don't have to object anymore?

7 If we do this five more times --

8          **THE COURT:** I mean, I'll show it as a continuing

9 objection.

10          **MR. CRAIG:** Okay.

11          **THE COURT:** I believe that it goes -- it may go to

12 the issue of damages.

13          **MR. CRAIG:** Okay.

14          **MR. FINNERAN:** Thank you, Judge.

15          **(The proceedings returned to open court and in the**

16 **presence of the jury.)**

17 **QUESTIONS BY MR. FINNERAN:**

18 Q.    So, Ms. Havey, Break Time Bar & Grill -- I think I've

19 lost track, but I think I asked you -- where is it?

20 A.    It's in Hazelwood, Missouri.

21 Q.    And I -- my associate just pointed out to me I forgot to

22 ask you on The Sand Bar.

23          How long had The Sand Bar been a customer of TNT's?

24 A.    That would also be over 20 years.

25 Q.    All right. What about Break Time Bar & Grill? How long

1  had Break Time Bar & Grill been a customer of TNT's at the time

2  you retired?

3  A.    Approximately -- they're no longer there.  But they were

4  there 5 years when we had them.

5  Q.    Was there a time where you were asked to remove a device

6  from that location?

7  A.    Yes, sir.

8         **MR. FINNERAN:**  Screen off.

9  **QUESTIONS BY MR. FINNERAN:**

10 Q.    I'm going to show you 78A.

11        Now, do you see what's on your screen?

12 A.    Yes, sir.

13 Q.    Is this a work order detail report and a move ticket for

14 Break Time Bar & Grill?

15 A.    Yes, sir.

16 Q.    Is it a fair and accurate copy?

17 A.    Yes.

18 Q.    Is this the same sort of document you created in your

19 regular course of business as before?

20 A.    Yes.

21 Q.    And generally, so I don't have to keep asking you, are

22 all work tickets -- excuse me -- move tickets and work orders

23 that we're going to see today generally created in the regular

24 course of TNT's business?

25 A.    Yes, sir.

1   Q.    All right.

2           MR. FINNERAN:  Your Honor, we'd offer 78A.

3           THE COURT:  Any objection to Exhibit 78A?

4           MR. CRAIG:  No, Your Honor.

5           THE COURT:  Exhibit 78A will be admitted.

6           MR. FINNERAN:  If we can publish, please.

7   QUESTIONS BY MR. FINNERAN:

8   Q.    And, again, is this a work order detail report for Break

9   Time Bar & Grill?

10  A.    Yes, it is.

11  Q.    And which device was moved out on this occasion?

12  A.    We moved out a "Silver Strike Bowling" game.

13  Q.    And did you then later visit Break Time Bar & Grill to

14  see what was in its place?

15  A.    Yes.  There was a Torch machine in its spot.

16  Q.    I will now go to Daugherty's Pub.

17          Do you know where Daugherty's Pub is?

18  A.    Yes.  It's in Richland, Missouri.

19  Q.    How long had Daugherty's Pub, the location, been a client

20  of Torch's -- excuse me -- a customer of TNT's?

21  A.    I would say 15 years.

22  Q.    Was there a change of ownership during that time, to your

23  knowledge?

24  A.    Yes, there was.

25  Q.    Given that change of ownership, did TNT maintain the

1  account, or was there any period of lapse in the account?

2  A.    We maintained it the whole 15 years.

3  Q.    All right.  I'm going to show you Exhibit 79A.  Actually,

4  this one is just 79.

5        Ms. Havey, on your screen, do you see a work order

6  detail report and move ticket for Daugherty's Pub?

7  A.    Yes, sir.

8  Q.    Is it a fair and accurate copy?

9  A.    Yes, it is.

10       **MR. FINNERAN:**  Your Honor, we move 79.

11       **THE COURT:**  Any objection to Exhibit 79?

12       **MR. CRAIG:**  No objection, Your Honor.

13       **THE COURT:**  Exhibit 79 will be admitted and can be

14  displayed.

15  **QUESTIONS BY MR. FINNERAN:**

16  Q.    I'm going to zoom in once again on the top of the page.

17       Can you tell us what TNT devices were moved on this

18  occasion?

19  A.    We pulled out the dartboards.

20  Q.    And did you later -- do you know how many dartboards

21  there were?

22  A.    They had a total of three.

23  Q.    And this one actually says "To location:  Shop."

24       What does that refer to?  I don't think we've seen

25  that before.

1    A.    They wrote "shop," but it's still the Sullivan shop.  We

2    only have one shop.

3    Q.    Okay.  And did you later visit Daugherty's Pub to see

4    what was standing in the place of that -- those dartboards?

5    A.    Yes, sir.

6    Q.    What was there?

7    A.    There was Torch machines.

8    Q.    I'm going to ask you about the Tater Patch.

9          Do you know where the Tater Patch is?

10   A.    Yes, sir.  It's in Rolla, Missouri.

11   Q.    How long had the Tater Patch been a customer of TNT's?

12   A.    Over 20 years.

13   Q.    And did there come a time where you were asked to remove

14   devices from that location?

15   A.    Yes, sir.

16   Q.    I will now put on your screen what's been premarked for

17   identification as 87A.  For some reason, the label is not

18   filling in, but you can see, at the top of the screen, it says

19   87A.

20          And is this a work order request and set of move --

21   set of work order requests and move tickets for the Tater

22   Patch?

23   A.    Yes, sir.

24   Q.    And does it appear to be a fair and accurate copy of

25   those records?

1   A.    Yes, it is.

2           **MR. FINNERAN:**  Your Honor, we would move 79 into

3   evidence.

4           **THE COURT:**  79 is already admitted.

5           **MR. FINNERAN:**  I'm sorry.

6           **THE COURT:**  It's 87A.

7           **MR. FINNERAN:**  Thank you, Judge.  87A into evidence.

8           **THE COURT:**  Any objection to Exhibit 87A, Mr. Craig?

9           **MR. CRAIG:**  Subject to our previous discussion and a

10  limiting instruction being given, no.

11          **THE COURT:**  Subject to the previous objection and a

12  limiting instruction, if necessary, Exhibit 87A will be

13  admitted.

14  **QUESTIONS BY MR. FINNERAN:**

15  Q.    Okay.  Ms. Havey --

16          **MR. FINNERAN:**  If you could please publish.

17  **QUESTIONS BY MR. FINNERAN:**

18  Q.    -- do you see here, at the top of this work order

19  request, what was asked to be moved out of this location?

20  A.    Yes, sir.  On this one, it's a "Stacker" machine.

21  Q.    What is a "Stacker" machine?

22  A.    It's a game that they play and try to win little trinket

23  prizes.

24  Q.    And what was the creation date on this?

25  A.    It was 4/12/2019.

1   Q.    And if we go down in this document to see the date

2   completed, do you see the date there this request was

3   completed?

4   A.    Yes, sir.  On 4/19/2019.

5   Q.    Do you recall an additional request in December of 2020?

6   A.    Yes, sir.

7   Q.    I'm sorry.  I've actually -- I think I've skipped ahead.

8         Do you recall an additional request in June of 2019?

9   A.    Yes.

10  Q.    What was removed in June of 2019?

11  A.    Their pinball machine.

12  Q.    Do you recall an additional request in December of 2020?

13  A.    Yes.  We removed a "Target Toss" game.

14  Q.    And do you recall an additional request in January of

15  2021?

16  A.    Yes, sir.

17  Q.    And what was removed on that occasion?

18  A.    It was a "Target Toss" game.

19  Q.    Did you later go -- after each of these different

20  incidents, did you subsequently go back to the Tater Patch to

21  see what, if anything, was in the place of these devices?

22  A.    Yes, sir.

23  Q.    And what was in their place?

24  A.    At the beginning, there was nothing.  And then by the

25  time we got all of them out and it cleared the whole wall, then

1    they filled it with Torch machines.

2    Q.    Okay.  Are you also familiar with a bar or a restaurant

3    called The TAP?

4    A.    Yes, sir.

5    Q.    Where is The TAP located?

6    A.    The TAP is in Waynesville, Missouri.

7    Q.    And how long has The TAP been a customer of TNT's?

8    A.    I would say 15 years.

9    Q.    Do you recall an occasion where a "Pac-Man" game was

10   requested to be removed from that location?

11   A.    Yes.

12        **MR. CRAIG:**  Objection, Your Honor.

13        **THE COURT:**  What's the --

14        **MR. CRAIG:**  He just asked if somebody asked to

15   remove a game.  It's hearsay.

16        **THE COURT:**  To the form of the question, the

17   objection is sustained.

18        **MR. FINNERAN:**  Thank you.

19   **QUESTIONS BY MR. FINNERAN:**

20   Q.    Do you recall an occasion where TNT removed a Pac-Man

21   game from that location?

22   A.    Yes, sir, I do.

23   Q.    I will ask you to look at 88A.

24        And, again, is this a work order request and move

25   tickets for The TAP?

1    A.    Yes, it is.

2    Q.    And is it a fair and accurate copy?

3    A.    Yes.

4          **MR. FINNERAN:**  Your Honor, we would move 88.

5          **THE COURT:**  Any objection to Exhibit 88A?

6          **MR. CRAIG:**  Subject to our previous objection and

7    limiting instruction, no, Your Honor.

8          **MR. FINNERAN:**  Yes, Your Honor.

9          **THE COURT:**  Subject to that objection, Exhibit 88A

10   will be admitted.

11         **MR. FINNERAN:**  If you could please publish.

12   **QUESTIONS BY MR. FINNERAN:**

13   Q.    Again, do we see here a work order request for The TAP?

14   A.    Yes, sir.

15   Q.    When was this work order request created?

16   A.    7/10/19.

17   Q.    And what, if any, machine was removed pursuant to this

18   work order request?

19   A.    A "Pac-Man Galaga" game.

20   Q.    Was there a later request for the removal of another game

21   from this location?

22   A.    Yes.  I believe there was one more for a dartboard was

23   removed.

24   Q.    And when did that occur?

25   A.    That was 2/11/2021.

1   Q.    That's the date that the work order was created?

2   A.    Yes, sir.

3   Q.    And can you tell from this work order when was it

4   actually completed?

5   A.    It was completed 2/24/21.

6   Q.    Again, did you, after these moves, visit The TAP to see

7   what, if anything, was in the place of TNT's devices?

8   A.    Yes, sir.

9   Q.    What did you observe?

10  A.    They had Torch machines put in the place of them.

11  Q.    Are you familiar with a place called Joe Momma's Bar?

12  A.    Yes, sir.

13  Q.    Where is Joe Momma's Bar located?

14  A.    Joe Momma's is in Florissant, Missouri.

15  Q.    Is Joe Momma's a -- how long has Joe Momma's been a

16  customer of TNT's?

17  A.    I believe since 2005.

18  Q.    So 20 years?

19  A.    20 years, yes, sir.

20  Q.    Was there a time where you removed a device from that bar

21  pursuant to a work order?

22  A.    Yes, we did.

23       **MR. FINNERAN:**  I will now show the witness 80A.

24  **QUESTIONS BY MR. FINNERAN:**

25  Q.    Do you recognize the Document 80A?

1    A.    Yes, sir.

2    Q.    And is it a work order request relating to Joe Momma's

3    Bar?

4    A.    Yes, sir.

5    Q.    And later in this document, is there also a move ticket?

6    A.    Yes, there is.

7          **MR. FINNERAN:**  We move 80A subject to the prior

8    objection and limiting instruction.

9          **THE COURT:**  Any objection, Mr. Craig?

10         **MR. CRAIG:**  Well, I mean, subject to our prior

11   objection and limiting instruction, I will -- may we approach?

12         **THE COURT:**  Approach the sidebar.

13         **(A bench conference was held on the record and**

14   **outside of the hearing of the jury as follows:)**

15         **THE COURT:**  Counsel, if you'll approach the sidebar.

16         It doesn't do me any good if you're back there

17   arguing.

18         **MR. CRAIG:**  Well, it might if we can make an

19   agreement.

20         **THE COURT:**  I understand if you're going to see if

21   you can make it go away.  The last couple, we've done an

22   objection subject to a limiting instruction, and then you've

23   not offered any statements.

24         **MR. CRAIG:**  It's a problem.

25         **THE COURT:**  So no limiting instruction has been

1    given.  So I think you need to just be aware of that.

2           Anyway, do you have some additional instruction?

3           **MR. CRAIG:**  Well, I mean, that is my problem.  Now

4    this is in evidence.  They could potentially take it back to

5    the jury room.  This is hearsay, so that would be subject to a

6    limiting instruction that hasn't been given because you didn't

7    ask the questions.

8           **MR. FINNERAN:**  I was trying to move it along, but I

9    think we've got a proposal, if the Court would accept it, that

10   when I'm done with this portion of the examination, we could

11   give a very similar instruction saying, "You saw multiple

12   descriptive statements about what other people said," and then

13   read the rest of that.

14          **MR. CRAIG:**  I'm okay with that.

15          **MR. FINNERAN:**  And then that would solve it, from

16   our perspective.

17          **THE COURT:**  Okay.  All right.

18          **MR. FINNERAN:**  Thank you, Judge.

19          **(The proceedings returned to open court and in the**

20   **presence of the jury.)**

21   QUESTIONS BY MR. FINNERAN:

22   Q.   Ms. Havey, sorry once again, but we're back on the

23   record.

24          So here, we're talking about Joe Momma's.  And I'm

25   sorry.  I've forgotten where I left off with you again.

1                Did I ask you what kind of device this was?

2   A.    It was a "Target Toss" game.

3   Q.    Okay.  And when was this work order request created?

4   A.    On January 3rd of '22.

5   Q.    And can you tell us from looking at this document when

6   this would have been completed?

7   A.    On January 14, '22.

8   Q.    And did you subsequently go back to Joe Momma's Bar to

9   see what stood in the place of that device?

10  A.    Yes, sir.

11  Q.    And what was there?

12  A.    There were Torch machines in the spot.

13  Q.    I'm now going to show you what we've marked for

14  identification as 84A.

15                And do you see what's on your screen?

16  A.    Yes, sir.

17  Q.    Is this a pair of move tickets for Rehab Bar and Grill?

18  A.    Yes, sir.

19  Q.    And do they appear to be fair and accurate copies?

20  A.    I only see one right now.

21  Q.    There's a second one.

22  A.    Yes.

23        **MR. FINNERAN:**  Your Honor, we would move 84A.

24        **THE COURT:**  Any objection to Exhibit 84A?

25        **MR. CRAIG:**  No objection, Your Honor.

1           **THE COURT:**  Exhibit 84A will be admitted.

2    **QUESTIONS BY MR. FINNERAN:**

3    Q.    And so is this a move ticket relating to a bar called

4    Rehab?

5    A.    Yes, sir.

6    Q.    And where is Rehab located?

7    A.    Rehab's at The Grove in St. Louis.

8    Q.    In St. Louis City?

9    A.    St. Louis City, yes, sir.

10   Q.    And do you recall a time where you were asked to remove a

11   *Galaxy III* from that location?

12   A.    Yes, sir.

13   Q.    And when, around, did that occur?

14   A.    It was right around September, September 21, '22.

15   Q.    Okay.  And was there also, at that same time, a *Golden*

16   *Tee* removed?

17   A.    Yes, sir.

18   Q.    And these move tickets, they reflect these devices were

19   actually taken out of that location?

20   A.    Yes, sir.

21   Q.    Did you then later go to Rehab to see what was in their

22   place?

23   A.    Yes, I did.

24   Q.    And what was there?

25   A.    There were Torch machines.

1    Q.    I'm going to show you a copy of what I've marked for

2    identification --

3            **MR. FINNERAN:**  If you could take it down.

4    **QUESTIONS BY MR. FINNERAN:**

5    Q.    -- as 91.

6            Do you recognize this document?

7    A.    Yes, I do.

8    Q.    And what is it?

9    A.    It's a picture of one of the Torch machines that was put

10   in place of the dartboard at Rehab.

11   Q.    I'm also going to show you 99.

12           **MR. FINNERAN:**  Is that right?  I'm not sure.

13   **QUESTIONS BY MR. FINNERAN:**

14   Q.    Is this also a picture from Rehab?

15   A.    Yes, it is.

16           **THE COURT:**  Again, you believe that was Exhibit 99,

17   correct?

18           **MR. FINNERAN:**  Yes, Judge.  This one is 99.  I've

19   also shown her 91.

20   **QUESTIONS BY MR. FINNERAN:**

21   Q.    I'm going to ask:  Are both 91 and 99 fair and accurate

22   depictions of photographic images of Rehab?

23   A.    Yes, they are.

24           **MR. FINNERAN:**  Your Honor, we'd move 91 and 99.

25           **THE COURT:**  Any objection to Exhibits 91 and 99?

1      **MR. CRAIG:**  No objection, Your Honor.

2      **THE COURT:**  Exhibits 91 and 99 will be admitted in

3   evidence.

4   **QUESTIONS BY MR. FINNERAN:**

5   Q.   So I'm actually going to try to pull these up at the same

6   time.  If you can see -- well, that's the same photo twice.

7        Okay.  So I've got on the screen, Ms. Havey,

8   pictures that have been marked and admitted into evidence as

9   Exhibits 91 and 99.

10       Can you explain to the jury what these pictures are?

11  A.   The one on the left is the machine that was put in place

12  of our dartboard, and I just know that because the wire that

13  you see on the side was our internet line that went to our

14  dartboard.

15       And the second one is the machine that went in place

16  of the *Golden Tee* at Rehab.

17  Q.   Let me now ask you about a place called Bottoms Up.

18       Do you know where Bottoms Up is?

19  A.   Yes, sir.

20  Q.   Where is it?

21  A.   It's in Waynesville, Missouri.

22  Q.   How long had Bottoms Up been a customer of TNT's at the

23  time you left?

24  A.   Over 20 years.

25  Q.   I'm going to show you what's been marked for

1    identification as 77 -- sorry -- 77A -- and ask if you

2    recognize this document?

3    A.    Yes, sir.

4    Q.    And this is only one page.

5          Does it appear to be a fair and accurate copy of

6    that document?

7    A.    Yes, it is.

8          **MR. FINNERAN:**  Your Honor, we'd seek to admit

9    Exhibit 77A.

10          **THE COURT:**  Any objection to Exhibit 77A?

11          **MR. CRAIG:**  No objection, Your Honor.

12          **THE COURT:**  Exhibit 77A will be admitted.

13   **QUESTIONS BY MR. FINNERAN:**

14   Q.    And is this a move ticket from February of 2023?

15   A.    Yes, sir.

16   Q.    Does it reflect that a device of TNT's was removed from

17   Bottoms Up in Waynesville, Missouri?

18   A.    Yes, sir.

19   Q.    And what was removed?

20   A.    Pardon me?

21   Q.    What kind of device, name of the device?

22   A.    I'm sorry.  It was a *Knock Off* game.

23   Q.    And what -- did you later go to Bottoms Up and observe

24   what, if anything, was in place of the Knock Off game?

25   A.    Yes, sir.  They had moved the games and put the -- some

1    Torch machines in their place.

2    Q.    Are you aware of a location called Meramec Valley?

3    A.    Yes, sir.

4    Q.    Where is Meramec Valley?

5    A.    It's in Cuba, Missouri.

6    Q.    How long has TNT had that location as a customer?

7    A.    Over 20 years.

8    Q.    Has there been a change in ownership over that 20-year

9    period?

10   A.    They change officers of the -- it's a resort.  So they

11   have an officers group that runs it.  So they change groups,

12   but not ownership, I don't believe.

13   Q.    Okay.  I'm now going to show you what's been marked for

14   identification as 81A.

15          And do you see on your screen a work order request

16   relating to Meramec Valley?

17   A.    Yes, sir.

18   Q.    And is that a fair and accurate copy of such a work

19   order?

20   A.    Yes, sir.

21   Q.    If I go down, there's also a move ticket there, correct?

22   A.    Yes.

23   Q.    Does that also appear to be a fair and accurate copy?

24   A.    Yes.

25          **MR. FINNERAN:**  Your Honor, we'd seek to move 81A.

1      **THE COURT:**  Any objection to Exhibit 81A?

2      **MR. CRAIG:**  Subject to our prior objection and

3   agreement regarding the limiting statement, no objection.

4      **THE COURT:**  Subject to the limiting instruction, the

5   exhibit will be admitted.  Exhibit 81A will be admitted.

6   QUESTIONS BY MR. FINNERAN:

7   Q.    So looking at this document, can you tell us when the

8   work order request was made?

9   A.    In February 23rd of '23.

10  Q.    What kind of machine was moved out on this occasion?

11  A.    A massage chair.

12  Q.    And if we go down to the bottom here, do we see the date

13  on which the machine -- the massage chair was actually moved

14  out?

15  A.    Yes.  March 31st of '23.

16  Q.    And this one was also returned simply to the shop?

17  A.    Yes.  We moved it to Sullivan shop.

18  Q.    Not to some other location?  Into storage, basically?

19  A.    No.

20  Q.    I asked two -- my question was bad.

21        Did you move it to some other location?

22  A.    The chair?

23  Q.    The chair.

24  A.    No.  We moved it to the shop.

25  Q.    So basically, was it then kept in storage?

1    A.    Yes.

2    Q.    Thank you.

3          Did you later return to this location to see what

4    was in its place?

5    A.    Yes, sir.

6          **MR. FINNERAN:**  If you could hide the screen.

7    **QUESTIONS BY MR. FINNERAN:**

8    Q.    I'm now going to show you what's been marked for

9    identification as Exhibit 94.

10         Can you tell us what you're looking at?

11   A.    The three Torch machines.

12   Q.    Do you know where this is -- where this picture was

13   taken?

14   A.    It's in the lobby of Meramec Valley.

15   Q.    Does it appear to be a fair and accurate representation

16   and photographic image of that location?

17   A.    Yes, it is.

18         **MR. FINNERAN:**  Your Honor, we'd move Plaintiff's 94.

19         **THE COURT:**  Any objection to Exhibit 94?

20         **MR. CRAIG:**  No objection, Your Honor.

21         **THE COURT:**  Exhibit 94 will be admitted.

22   **QUESTIONS BY MR. FINNERAN:**

23   Q.    Ms. Havey, I'm going to zoom in a little bit, actually.

24         Well, let me start with the big picture.

25         What are we looking at here in terms of the

1  location?  The jury has just seen it.  So what location are we

2  looking at?

3  A.    We're at Meramec Valley, which is a resort.  This is the

4  lobby that you walk into to reserve your campground or do

5  anything like that.  This -- and it also goes out to the pool.

6  So it's a -- kind of a little community center at Meramec

7  Valley.

8  Q.    And you see here there are three different devices?

9  A.    Yes, sir.

10  Q.    Do you understand those to be Torch devices?

11  A.    Yes, sir.

12  Q.    What was previously standing where those devices now are

13  standing in this photograph?

14  A.    The one in -- only one of them replaced the massage

15  chair.

16  Q.    Okay.  And just to zoom in, since it's a clear picture,

17  do you see that this says "*Skyriser*"?

18  A.    Yes, sir.

19  Q.    Do you understand that to be one kind of NCG game?

20  A.    I do now, yes.

21  Q.    And over here, do we see "NCG Deluxe"?

22  A.    Yes, sir.

23  Q.    Does that also, to your understanding, represent one type

24  of Torch device?

25  A.    Yes, sir.

1    Q.    All right.  I'd like to talk to you about The Rose in

2    Cuba, Missouri.

3          How long has The Rose been a customer of TNT's?

4    A.    Also over 20 years.

5    Q.    And I'm going to show you what's been marked for

6    identification as 85A and ask you to just look at the screen as

7    I scroll.  It's two pages.

8          Is this a work order and move ticket relating to The

9    Rose?

10   A.    Yes, it is.

11         **MR. FINNERAN:**  And I'd seek to admit 85A.

12         **THE COURT:**  Any objection, Counsel?

13         **MR. CRAIG:**  No objection, Your Honor.

14         **THE COURT:**  Exhibit 85A will be admitted.

15   **QUESTIONS BY MR. FINNERAN:**

16   Q.    Now, on this occasion, actually, it just says "Move out

17   13145."

18         Do you happen to know what that refers to?

19   A.    Only because I know we moved out a horoscope machine out

20   of there.

21   Q.    Okay.  And when did this work order get created?

22   A.    It was 3 -- March 11th of 2019.

23   Q.    So if we go down to the move ticket, does this show the

24   actual date that the move occurred?

25   A.    Yes, sir.

1   Q.    And what was that date?

2   A.    It was March 12th of 2019.

3   Q.    And where was this one moved to?

4   A.    It was moved to our shop, Sullivan shop.

5   Q.    Did you later visit The Rose to see what, if anything,

6   was in place of that device?

7   A.    Yes.  There was a Torch machine in the location.

8   Q.    All right.  Are you also familiar with a location called

9   the Moose Lodge?

10  A.    Yes, sir.

11  Q.    Actually, there's more than one Moose Lodge.

12        The Moose Lodge at Owensville, Missouri?

13  A.    Yes, sir.

14  Q.    How long has that been a customer of TNT's?

15  A.    We had it for, I would say, probably 15 years.  There was

16  a lull in between when they changed officers, but then we

17  regained it back about 3, 4 years ago.

18  Q.    Was there a time where a *Pac-Man* game was removed from

19  that location?

20  A.    Yes, sir.

21  Q.    And do you recall when, about, that occurred?

22  A.    I'm not sure of the exact date.

23  Q.    Do you recall what year it was?

24  A.    I believe it was '23 or '24.

25  Q.    And when that device was removed, the *Pac-Man* device, did

1    you later go to see what was in its place?

2    A.    Yes, sir.

3    Q.    And what was in its place at the Moose Lodge?

4    A.    There was some Torch machines.

5    Q.    All right.  Are you also familiar with a place called the

6    Leslie Depot?

7    A.    Yes, sir.

8    Q.    And where is the Leslie Depot?

9    A.    It's in Leslie, Missouri.

10   Q.    All right.  Now, this is actually a slightly different

11   story.

12         Tell me about what happened at Leslie Depot with

13   respect to the possibility of putting dart machines in that

14   location.

15   A.    We had been working with the owner and one of his new

16   managers to set up a dart room and some of our arcade games,

17   and he had a whole area he was remodeling.  And in the midst of

18   us getting everything together, apparently, he was approached

19   by Torch, and we were told that he --

20         **MR. CRAIG:**  Objection, Your Honor.  Hearsay.

21         **THE COURT:**  The objection is sustained.

22   **QUESTIONS BY MR. FINNERAN:**

23   Q.    So, Ms. Havey, can you continue -- I'll ask you a

24   question in a moment, but please try not to say what anybody

25   else said out of court.  Just tell us what happened.

1          So you said there was this room and that there was a

2   plan to put TNT machines in the room; is this correct?

3   A.    Yes, sir.

4   Q.    So continue with the story from there, and do your best

5   not to tell us what anybody said outside of the courtroom, just

6   what happened.

7   A.    Okay.  We were asked to put a board --

8             **MR. CRAIG:**  Objection, Your Honor.  Hearsay.

9             **THE COURT:**  The objection is sustained.

10  **QUESTIONS BY MR. FINNERAN:**

11  Q.    So, Ms. Havey, I'll try to ask you a more specific

12  question to deal with this.

13          Did TNT have a plan to place dartboards into a room

14  at the Leslie Depot?

15  A.    Yes, sir.

16  Q.    Was there a time where that no longer was the plan?

17  A.    Yes, sir.

18  Q.    And after that happened, what was placed in the room

19  where you had originally planned to place a series of

20  dartboards?

21  A.    About 8 Torch machines.

22  Q.    Now, I'm going to -- if I could -- okay.

23          I'm going to show you what's been marked for

24  identification as 93.  I'm also going to show you, on the other

25  side of the screen, what's been marked for identification as

1  95.

2          Can you tell me what 93 and 95 represent?

3  A.    They're the Torch machines in Leslie Depot.

4  Q.    And are these fair and accurate photographs of the Leslie

5  Depot?

6  A.    Yes, sir.

7          **MR. FINNERAN:**  Your Honor, we'd move 93 and 95,

8  then.

9          **THE COURT:**  Any objection, Counsel?

10         **MR. CRAIG:**  No, Your Honor.

11         **THE COURT:**  Exhibits 93 and 95 will be admitted.

12 **QUESTIONS BY MR. FINNERAN:**

13 Q.    And so the jury has now just seen it, so could you tell

14 the jury what the jury is looking at?

15 A.    This in the -- it's a -- Leslie Depot is a bar/restaurant

16 in a small, rural town, and this is the front entryway of the

17 restaurant where they placed the machines.

18 Q.    I'm now just going to zoom in on a part of 95.

19         Is this -- do you see how many devices are there?

20 A.    Yes, sir.

21 Q.    How many?

22 A.    Eight.

23 Q.    And this one over here, I'll zoom in a little closer to

24 help you.

25         Is this an NCG Deluxe?

1   A.   Yes, sir.

2   Q.   As we move to the side -- I can't do that.

3        Is this an NCG Deluxe as well?

4   A.   Yes, sir.

5   Q.   Is this -- actually, can you make out what that is?

6   A.   No, I cannot.

7   Q.   Do you see a sticker there on the -- at the bottom of the

8   machine?

9   A.   Yes.  That's a Torch sticker.

10  Q.   And then if we go to the other side, do you see a couple

11  of devices here?

12  A.   Yes, sir.

13  Q.   Can you make out the one that says "NCG Deluxe 8"?

14  A.   Yes, sir.

15  Q.   Do you see one that says "*Piñata Party*"?

16  A.   Yes.

17  Q.   And then over here, are these the two devices that are

18  actually also depicted in the picture to the left,

19  Plaintiff's 93?

20  A.   Yes.

21  Q.   And does one say "NCG Deluxe 4"?

22  A.   Yes.

23  Q.   And does the other say *Safari Wilds*?

24  A.   Yes, sir.

25  Q.   Also in this photograph, there's a series of chairs in

1    front of the devices?

2    A.    Yes, sir.

3    Q.    In your observation, is that typical when you saw Torch

4    devices in the overlapping locations?

5    A.    Yes, sir.

6    Q.    Okay.  Is there also a location that TNT has called the

7    Southwest Bistro [sic]?

8    A.    Yes, sir.

9    Q.    And am I correct that TNT has not actually had to move

10   any -- to your knowledge, since you left, at least, has not had

11   to move out any actual devices from the Southwest Bistro [sic]?

12   A.    No, we haven't had to move them out.

13   Q.    To your knowledge, have any Torch devices been introduced

14   to the Southwest Bistro [sic]?

15   A.    Any more than there was or --

16   Q.    Sorry.  My question wasn't clear.

17         Are there Torch devices, to your knowledge, at the

18   Southwest Bistro [sic]?

19   A.    Yes, sir.

20   Q.    Did those come in over time?

21   A.    They came in pretty much all at once.

22   Q.    Okay.  And do you recall when, around, that might have

23   occurred?  A year, at least?

24   A.    I want to say the end of '22, maybe.

25   Q.    2022?

1    A.    2022, yes, sir.

2    Q.    And as you said, you haven't had to move anything out of

3    that location?

4    A.    We didn't have to move anything out, but we had to

5    relocate all the dartboards and the internet that was in the

6    location to clear out the room for them to put the machines in

7    the back area.

8    Q.    One more location.

9          The Hub -- actually, where is the Southwest Bistro

10   [sic]?  I forgot to ask.

11   A.    It's in St. Charles.

12   Q.    How long has the Southwest Bistro [sic] been a customer

13   of TNT's?

14   A.    I would say 15-plus years.

15   Q.    The last one that I'm going to ask you about is The Hub.

16   A.    Okay.

17   Q.    Where is The Hub located?

18   A.    The Hub is also in Waynesville.

19   Q.    And how long has The Hub been a customer?

20   A.    20-plus years.

21   Q.    Now, does TNT have a jukebox in The Hub?

22   A.    Yes.

23   Q.    Has it been asked to remove that jukebox, to your

24   knowledge?

25   A.    No, sir.

1  Q.    But have a series of Torch devices been introduced to The

2  Hub?

3  A.    Yes.

4  Q.    And do you know where -- have you been inside The Hub to

5  see that?

6  A.    Yes, I have.

7  Q.    And do you know where they stand in physical proximity to

8  TNT's machine?

9  A.    They're all around the jukebox.

10  Q.    Okay.

11  A.    There's quite a few.

12  Q.    Are there occasions where you've had your devices removed

13  by others as opposed to having the customer ask them to come

14  pick them up?  In other words, someone else took them out or

15  the owner took them out?

16  A.    Take our devices out?  No, sir.

17  Q.    So in each of these occasions, was it based on a customer

18  request?

19  A.    Yes.

20            **MR. CRAIG:**  Object to -- that's fine.  It's out.

21            Go ahead.

22            **THE COURT:**  It's been asked and answered.

23            Go ahead.  Pose another question.

24  **QUESTIONS BY MR. FINNERAN:**

25  Q.    Have you, over time, observed -- I think you did actually

1    say this in direct examination.

2            You observed some players playing the Torch devices

3    as you visited these locations?

4    A.    Yes, sir.

5    Q.    On those occasions, have you ever seen people hitting the

6    "Prize Viewer" button on those devices?

7    A.    No, sir.

8    Q.    Have you seen people win money on those devices?

9    A.    Yes.

10   Q.    And in some cases, have you seen them win significant

11   amounts of money?

12   A.    I haven't actually seen them.  I just hear their joy.

13   Q.    Hear their joy?

14   A.    Hear their joy of winning, yes.

15   Q.    I see.  Okay.

16           Now, earlier, I showed you Exhibit 100, which is in

17   evidence.

18   A.    Yes, sir.

19   Q.    And I'm going to ask you to do your best.  I don't want

20   you to tell me anything that somebody told you about this

21   sticker, okay?  But can you just first tell me:  Are you aware

22   of whether any of your customers -- the devices that your

23   customers had in their locations had these stickers on them?

24   A.    I'm aware that they do.

25   Q.    And were there any occasions where those customers would

1    point those stickers out to you?

2            **MR. CRAIG:**  Objection, Your Honor.

3            May we approach?

4            **THE COURT:**  I'm going to sustain the objection to

5    the question.

6            **MR. FINNERAN:**  Okay.  One moment, then, Your Honor.

7    **QUESTIONS BY MR. FINNERAN:**

8    Q.   So you mentioned the idea earlier of going to

9    collections.

10           Have there been times where collections for TNT have

11   occurred overlapping at the same time with collections for

12   Torch?

13   A.   Yes.

14   Q.   And in those occasions -- well, let me ask you this:

15   From your understanding, are TNT's devices more or less

16   profitable for location owners than Torch's devices?

17           **MR. CRAIG:**  Objection, Your Honor.  Speculation.

18           **THE COURT:**  There's no foundation.  The objection is

19   sustained.

20   **QUESTIONS BY MR. FINNERAN:**

21   Q.   Have you observed -- have you personally observed Torch

22   removing money from Torch devices at any of these locations?

23   A.   Yes.

24   Q.   And when you've seen that, have you then also seen them

25   divide that money with the location owners?

1    A.     Yes.

2    Q.     And I'm sure you didn't count it, but can you estimate,

3    based on your perception, on any of those occasions how much

4    money --

5              MR. CRAIG:  Objection, Your Honor.  Speculation.

6              THE COURT:  You've got to let him finish the

7    question.

8              MR. CRAIG:  Apologies.

9              THE COURT:  And I don't know whether or not there

10   will be a foundation.

11   QUESTIONS BY MR. FINNERAN:

12   Q.     So have you observed it closely enough to tell -- to be

13   able to estimate how much money was being taken out?

14             MR. CRAIG:  Objection, Your Honor.  Speculation.

15             MR. FINNERAN:  I just asked her whether she has.

16             THE COURT:  There's insufficient foundation.  The

17   objection will be sustained.

18   QUESTIONS BY MR. FINNERAN:

19   Q.     How close were you to observing that?

20   A.     Within a few feet.

21   Q.     And from that vantage point, could you -- did you have a

22   sufficient vantage point to fairly estimate how much money was

23   being taken out?

24             MR. CRAIG:  Objection, Your Honor.  Speculation.

25             MR. FINNERAN:  I'm trying to lay the foundation of

1    whether she has the opportunity.

2            **THE COURT:**  The objection will be overruled at this

3    time.

4    **QUESTIONS BY MR. FINNERAN:**

5    Q.    So the question, Ms. Havey, is:  Were you close enough to

6    be able to tell and provide a fair estimate of how much money

7    was being taken out?

8    A.    Yes.

9    Q.    And could you provide an estimate of what you saw on any

10   one occasion?

11           **MR. CRAIG:**  Objection, Your Honor.  This is

12   speculation.

13           **MR. FINNERAN:**  Your Honor, I think this is

14   rationally based on the perception of the witness.  She was a

15   few feet away observing the money being taken out of the

16   machines.

17           **MR. CRAIG:**  Your Honor, he already said --

18           **THE COURT:**  Ms. Havey, could you tell the dollar

19   amount, the number on the bills that were being taken out?

20           **THE WITNESS:**  I could tell how big the stacks were

21   and what dollar amount was in each stack.  Like, if it was a

22   stack of 20s or a stack of --

23           **THE COURT:**  How would you know whether or not the

24   stack was of a certain denomination?

25           **THE WITNESS:**  Because they were usually split out on

1    the table.  So --

2              **THE COURT:**  Okay.  Any other questions of the

3    witness?

4              **MR. FINNERAN:**  Yes.

5    **QUESTIONS BY MR. FINNERAN:**

6    Q.    So given that foundation, are you able to estimate how

7    much money you observed on that occasion?

8              **THE COURT:**  Any objection, Counsel?

9              **MR. CRAIG:**  Yes.  Speculation.  Lack of foundation.

10             **THE COURT:**  The objection is going to be overruled.

11             You can answer if you know.

12   **QUESTIONS BY MR. FINNERAN:**

13   Q.    Ms. Havey, you can answer with an estimate, if you can,

14   of how much money you saw on any one occasion.

15             **THE COURT:**  An estimate --

16             **MR. CRAIG:**  Yeah.

17             **THE COURT:**  -- isn't an appropriate question to ask

18   the witness.  That is speculation.

19             If you know, you can answer the question.

20   A.    I couldn't give an exact dollar amount.

21   **QUESTIONS BY MR. FINNERAN:**

22   Q.    Okay.  That's okay.

23             On those occasions, were you also collecting money

24   on behalf of TNT?

25   A.    I would be with someone that was collecting, yes.

1  Q.     And just by comparison, how much more money was TNT --

2  excuse me.

3          Compare the amount of money that TNT might be

4  collecting on such occasion and that Torch might be collecting

5  on such an occasion.

6          **MR. CRAIG:**  Objection, Your Honor.  Foundation and

7  speculation.

8          **THE COURT:**  The objection is sustained.

9  **QUESTIONS BY MR. FINNERAN:**

10 Q.     Was it a bigger or smaller amount of money?

11         **MR. CRAIG:**  Objection, Your Honor.  Same -- it's

12 foundation, speculation.

13         **THE COURT:**  The objection is sustained.

14 **QUESTIONS BY MR. FINNERAN:**

15 Q.     Okay.  I'll just ask you about TNT's machines.

16         So do TNT's machines make -- just estimate, how much

17 money might TNT's machines make in a week as a range from

18 lowest to highest?

19         **MR. CRAIG:**  Objection, Your Honor.  Foundation,

20 speculation.

21         **MR. FINNERAN:**  I can lay a foundation for that, I'm

22 sure.

23         **THE COURT:**  Go ahead.

24 **QUESTIONS BY MR. FINNERAN:**

25 Q.     Ms. Havey, in your role at TNT, did you have information

1   as to how much was being collected from each of these machines?

2          **MR. CRAIG:**  Objection.  "These machines" is not

3   defined.  So I object to the form of the question.

4          **MR. FINNERAN:**  Thank you.

5          **THE COURT:**  I think it's clear.  The objection will

6   be overruled.

7          You can answer.

8   A.    Like, each machine or --

9   **QUESTIONS BY MR. FINNERAN:**

10  Q.    Just generally.

11  A.    -- a location's collection?  I mean --

12  Q.    Yeah.  I'm basically -- what I'm trying to ask you is

13  when money is collected from machines by TNT --

14  A.    Uh-huh.

15  Q.    -- is that information that you would have access to in

16  the regular course of your business as an employee of TNT?

17  A.    Yes, it is.

18  Q.    All right.  And based on that knowledge, are you able to

19  provide a range of what the smallest collection amount might

20  typically be and what the largest collection might typically

21  be?

22  A.    Like, per machine?

23  Q.    Per machine.

24  A.    Per machine, okay.

25          Some machines, I'd say the least amount may be 20 to

1    25 a week.  Our largest amount could be 800 to 1,000, which

2    would probably be a jukebox.

3            **MR. FINNERAN:**  Your Honor, I have no further

4    questions.

5            **THE COURT:**  Mr. Craig.

6                          **CROSS-EXAMINATION**

7    **QUESTIONS BY MR. CRAIG:**

8    Q.    Good afternoon, Ms. Havey.

9    A.    Good afternoon.

10   Q.    Can you hear me now?

11   A.    Yes.

12   Q.    Okay.  I feel like I'm in an ad.

13          Hopefully my questioning will be shorter than

14   setting up this equipment.

15          Obviously, you're familiar with Torch Electronics

16   because of its games being in locations where TNT also does

17   business, correct?

18   A.    Yes, sir.

19   Q.    And you've been seeing Torch's devices and games since

20   2017, right?

21   A.    Yeah, right about then.

22   Q.    And you recall, I think, previously testifying you first

23   saw a Torch device at The Rose in Cuba, Missouri.

24          Would you agree with me on that?

25   A.    Yes, sir.

1   Q.    And when you see those Torch devices, I believe you

2   testified you always see the opinion notice or the sticker on

3   the side of the machines or the front of the machines, right?

4   A.    Yes, sir.

5   Q.    Okay.

6         **MR. CRAIG:**  No further questions, Your Honor.

7         **THE COURT:**  Mr. Finneran, any other questions of the

8   witness?

9         **MR. FINNERAN:**  No, Your Honor.

10        **THE COURT:**  You can step down, Ms. Havey.

11        **THE WITNESS:**  Thank you.

12        **THE COURT:**  Ladies and gentlemen, we're going to

13  take a very short recess for 10 minutes, I promise.

14        I want to remind you what I tell you at each recess

15  or adjournment of the Court:  Until you retire to consider your

16  verdict, you must keep an open mind about the case.  You can't

17  talk to anyone about the case until it's finally given to you

18  to decide.  Don't do any independent research of any kind into

19  any of the issues.

20        If you'll leave your notebooks there on the chair.

21        We'll be in temporary recess.

22        **THE CLERK:**  All rise.

23        **(Exit jury.)**

24        **(The following proceedings were held in open court,**

25  **out of the presence of the jury:)**

1          THE COURT:  Mr. Finneran, who's your next witness?

2          MR. FINNERAN:  So now, Judge, we're going to try to

3   do the deposition designations for Ms. Miltenberger that we

4   didn't get to earlier.  We're then going to follow that up with

5   the deposition designations for Kevin Morse, who is another

6   unavailable witness.  And then, if time permits and the Court

7   wants to get us started, we could start playing the deposition

8   designations for Mr. Miltenberger, who we would be calling as

9   our next live witness.

10          We won't finish it today, I don't think, with the

11  hours remaining.  So I don't know if the Court wants to end

12  early or run a little late.

13          The first set of deposition designations for

14  Mr. Miltenberger are relatively short.  So I think we might be

15  able to do the first of his and then move from there.

16          THE COURT:  I'm not sure I understand what you're

17  saying with regard to Mr. Miltenberger.

18          There are two different depositions that you're

19  going to play?

20          MR. FINNERAN:  There are three, Your Honor.  So if

21  you recall, he testified in his personal capacity; he testified

22  as a corporate representative --

23          THE COURT:  As a 30(b)(6) witness.

24          MR. FINNERAN:  -- and then you ordered him to sit

25  for a second, shorter one.  That's a very short set of

 1    additional designations.  And so we have three.  I think,

 2    total, they run a little less than an hour.

 3            **THE COURT:**  How long is Mr. Morse, his deposition?

 4            **MR. FINNERAN:**  Mr. Morse's designations are

 5    30 minutes, around 30 minutes, and Ms. Miltenberger is around,

 6    like, 8 minutes.

 7            **THE COURT:**  We're going to get through all of those.

 8    It's 3 o'clock.  We're going to begin here in a few minutes.

 9    We're going to get through all of them.

10            **MR. FINNERAN:**  Is it 3 o'clock?  I thought it was a

11    totally different time of the day.  I'm sorry.  I thought it

12    was 3:55.  I apologize.

13            **THE COURT:**  Okay.  We'll get through all of those.

14            You had talked about me reading another aspect of

15    the limiting instruction.

16            Do you still want me to do that with regard to those

17    move tickets?

18            **MR. CRAIG:**  I would, Your Honor.  Any statement by

19    anybody in the move tickets, I mean, just because they're going

20    to come into evidence, we would like the limiting instruction,

21    per our agreement.

22            **MR. FINNERAN:**  So if you'd like, we could slightly

23    revise what we've handed you to accomplish that on this break.

24            **THE COURT:**  That's fine.

25            **MR. FINNERAN:**  Okay.

1      **THE COURT:**  That's great.

2          Okay.  We'll go ahead and take a break.  Make sure

3   we get back in here in 10 minutes, since I promised them.

4          **(At this time, the Court declares a recess.)**

5          **THE COURT:**  Please rise.

6          **(Enter jury.)**

7          **(The following proceedings were held in open court,**

8   **in the presence of the jury:)**

9          **THE COURT:**  Court will be back in session.  You can

10  be seated.

11         Ladies and gentlemen, I have an instruction to read

12  to you with regard to the testimony you heard from Ms. Donna

13  Havey.  This instruction concerns any statements you just saw

14  or heard in the move tickets that contained an out-of-court

15  statement made by a person who is not testifying here today.

16  That evidence has been offered for the limited purpose of

17  demonstrating that such a statement was made to Ms. Havey and

18  to explain her subsequent conduct, but you should not take that

19  statement for the truth of the matter asserted.  In other

20  words, you should not assume that what that other person said

21  to Ms. Havey was actually true.

22         Please keep that in mind.

23         As I understand it, Plaintiff is going to call their

24  next witnesses by way of video deposition.

25         Is that correct, Mr. Finneran?

1      **MR. FINNERAN:** Yes, Your Honor. I can make a record

2  one by one or talk about all of them right now, as you prefer.

3      **THE COURT:** You can go ahead and just state for the

4  record who those witnesses are going to be.

5      **MR. FINNERAN:** Yes, Your Honor.

6      The first witness that the jury will hear deposition

7  testimony from is the defendant Sondra Miltenberger.

8      The second is Kevin Morse as corporate

9  representative of Banilla Games, Incorporated.

10     The third is Mr. Miltenberger in his personal

11  capacity.

12     And the fourth and fifth are Mr. Miltenberger in his

13  capacity as the corporate representative of Torch Electronics,

14  LLC.

15     **THE COURT:** And, ladies and gentlemen, with regard

16  to these depositions, again, I have an instruction to read to

17  you.

18     Testimony will now be presented to you in the form

19  of a deposition. A deposition is the recorded answers a

20  witness made under oath to questions asked by lawyers before

21  trial. The deposition testimony to be offered was

22  electronically video-recorded, and that recording will now be

23  played for you. You should consider the deposition testimony

24  and judge its credibility as you would that of any other

25  witness who testifies here in person.

1          And at this time, you may proceed with the

2   deposition of Sondra Miltenberger.

3          **(Video deposition of Sondra Miltenberger dated**

4   **12/8/2023 being played.)**

5          **MR. FINNERAN:**  Your Honor, I'll now play the

6   deposition of Kevin Morse as corporate representative of

7   Banilla Games, Incorporated.

8          **THE COURT:**  You may proceed.

9          **(Video deposition of Kevin Morse dated 1/10/2024**

10  **being played.)**

11         **MR. FINNERAN:**  Your Honor, I will now play portions

12  of the personal deposition of the defendant Steven

13  Miltenberger.

14         **THE COURT:**  How long is this depo?

15         Let me just say this:  Ladies and gentlemen, if you

16  want to stand up and stretch your legs for a minute before we

17  start this next depo, you can do so.

18         **MR. GRAVES:**  Your Honor, could we approach the Court

19  briefly, counsel?

20         **THE COURT:**  Sure.

21         **(A bench conference was held on the record and**

22  **outside of the hearing of the jury as follows:)**

23         **MR. GRAVES:**  This morning, I mentioned on one of the

24  30(b)(6) -- did you take care of it?

25         **MS. BRANNON:**  It's the first 30(b)(6).  We're

1    playing the personal right now.

2             **MR. GRAVES:**  I know.  I don't want to interrupt.

3             There's a display of something they've been talking

4    about, and it takes up the whole screen, and so you can read

5    it.  And he's not even talking about the display; it's just

6    being displayed to the jury.

7             **MR. FINNERAN:**  Yes, so I was wondering -- because

8    you say you didn't -- what was the part you cared about?

9    Because we didn't finish our conversation.  You said you didn't

10   care about the --

11            **MR. GRAVES:**  The summary stuff.  Because he's kind

12   of talking about that.  It's this display of an advertisement

13   from Torch that he's not even talking about, and it's not

14   something -- I didn't think you were going to introduce it into

15   evidence.  It's being published to the jury.

16            **MR. FINNERAN:**  I'm sorry.  We didn't have a chance

17   to quite finish this conversation.

18            So did you guys figure out -- where in the, like,

19   the deposition transcript it is?

20            **MR. GRAVES:**  I don't know exactly where it is.

21            **MR. FINNERAN:**  Because if we can find it, I can

22   manually, you know, put up another window to block that part of

23   the screen for that.  I mean, that would be the easiest,

24   fastest way to do it.

25            **MR. GRAVES:**  Okay.  I'll find out.  And that's only

1    in the second one; it's not in the first one.

2              **MR. FINNERAN:**  Okay.  So I think we'll resolve this,

3    Judge.

4              **THE COURT:**  Okay.  If you can identify where in the

5    depo it is, then, hopefully, you can --

6              **MR. FINNERAN:**  I'll find a way to obscure it.  If I

7    have to pull up a block box, I'll --

8              **THE COURT:**  You just don't want this advertisement?

9              **MR. GRAVES:**  This document that's not --

10             **THE COURT:**  Being referenced.

11             **MR. GRAVES:**  -- relevant to this case, yeah.

12             **THE COURT:**  Okay.

13             **MR. FINNERAN:**  I think the issue, Judge, is that it

14   may have been referenced in some other part of the deposition,

15   but the part we're playing, it's just kind of up on the screen.

16             There are other parts, just to be clear, where

17   there's a spreadsheet on the screen.  He's being asked what the

18   spreadsheet says, and I understand --

19             **MR. GRAVES:**  We're not objecting to that.

20             **MR. FINNERAN:**  -- there's no objection to that.

21             **THE COURT:**  Okay.

22             **(The proceedings returned to open court and in the**

23   **presence of the jury.)**

24             **THE COURT:**  Okay.  Counsel, you may proceed with the

25   deposition of Steven Miltenberger in his personal capacity.

1          **(Video deposition of Steven Miltenberger dated**

2     **12/15/2023 being played.)**

3          **MR. FINNERAN:** Your Honor, just a moment to discuss

4     the issue we discussed at sidebar, maybe two minutes at most.

5          **THE COURT:** Okay. Again, ladies and gentlemen of

6     the jury, I know you've been sitting for a while. If you want

7     to stand up and stretch your legs, please do so.

8          **(Pause in proceedings.)**

9          **MR. FINNERAN:** John, would you turn off the display

10    for a moment.

11         **THE CLERK:** Sure.

12         **(Pause in proceedings.)**

13         **THE COURT:** Do you-all want to go back in the jury

14    room for just a moment?

15         You're ready to proceed?

16         I see the head shakes.

17         Do you want to take a break? Okay. We'll just

18    take -- can't go by yourself. You've all got to go. It's

19    fine. We'll go ahead and take 2 minutes. Come on back after

20    that.

21         **(Exit jury.)**

22         **(The following proceedings were held in open court,**

23    **out of the presence of the jury:)**

24         **THE COURT:** Rich, you're set?

25         **MR. FINNERAN:** I'm almost there. I was just --

1  actually, this is going to help a lot, because I can actually

2  go to the exact spot and make sure it works.  So let me just do

3  that real quick.

4              **(Pause in proceedings.)**

5              **THE COURT:**  Please rise.

6              **(Enter jury.)**

7              **(The following proceedings were held in open court,**

8  **in the presence of the jury:)**

9              **THE COURT:**  Okay.  Court will be back in session.

10             Ladies and gentlemen, the next portion of the

11 depositions to be played are, again, of Steven Miltenberger in

12 his corporate capacity.  In total, it's about an hour.  I'd

13 like to be able to get through it this evening, if you're

14 amenable to that.  If at some point you get just desperately

15 tired or need a break, raise your hand, and I'll know what that

16 means.

17             With that, we're going to go ahead and try and get

18 through it.

19             Okay.  Counsel.

20             **MR. FINNERAN:**  Your Honor, I think Juror Number 2

21 may have --

22             **THE COURT:**  Why don't you go -- Ms. Stevens, I'm

23 going to have you talk -- just talk to the clerk and tell the

24 clerk.

25             Ladies and gentlemen, as I understand it, the first

1    video is a -- and I'm going to give you approximate numbers.

2    It's about 45 minutes, which would take us to 5:15.  We're

3    going to stop at that point.

4            The second portion is a much shorter portion.  We

5    can finish that in the morning.  So that's what we're going to

6    do.

7            With that, you can proceed, Mr. Finneran, with the

8    first portion of the deposition.

9            **MR. FINNERAN:**  John, would you turn the screen on?

10           **THE CLERK:**  Yep.

11           **(Video deposition of 30(b)(6) Steven Miltenberger**

12   **dated 1/9/2024 being played.)**

13           **THE COURT:**  Counsel, I'm going to ask you to stop

14   the deposition at this point.

15           **MR. FINNERAN:**  I'm sorry, Judge.

16           **THE COURT:**  We agreed to go to 5:15, and that's

17   where we're at.

18           Ladies and gentlemen, we're going to go ahead and

19   recess for the evening.  Again, I appreciate your patience as

20   we go through the process.

21           I'll remind you what I tell you at each recess or

22   adjournment of the Court.  Don't talk to anyone about the case

23   unless it's finally given to you to decide.  Don't do any

24   independent research of any kind into any of the issues related

25   to this case.  Keep an open mind about the case.

1          If you'll leave your notebooks there on the chair.

2     I'd like to have you back in the jury room tomorrow morning at

3     8:45.  We're moving well through the case, so, again, I

4     appreciate your patience.

5          So we'll be in temporary recess until tomorrow

6     morning.  Again, you'll report to the jury room at 8:45.  Thank

7     you very much.

8          **THE CLERK:**  All rise.

9          **(Exit jury.)**

10         **(The following proceedings were held in open court,**

11    **out of the presence of the jury:)**

12         **THE COURT:**  Okay.  Court will be back in session, if

13    you don't mind being seated for a few minutes.

14         Counsel, Ms. Stevens had an issue with her ride

15    home, and I was not going to push it where she would miss her

16    ride.  So that's why we broke when we did.

17         When you get finished with the depositions,

18    Mr. Finneran, who is your next witness?

19         **MR. FINNERAN:**  I believe the Court indicated that it

20    would require us to call Mr. Miltenberger after the depositions

21    were played.  So he'll be our next witness.

22         **THE COURT:**  I indicated if you were going to call

23    him --

24         **MR. FINNERAN:**  Yes, correct.

25         **THE COURT:**  -- that, yes, it would have to be in

1   conjunction with the playing of the depositions.

2          **MR. FINNERAN:** And that is our intention. So we

3   will call Mr. Miltenberger next.

4          **THE COURT:** Okay. All right. Anything we need to

5   take up tonight?

6          **MR. FINNERAN:** Not that I know of, Your Honor.

7          **MR. GRAVES:** No, Your Honor.

8          **THE COURT:** Okay. I want to talk to you for a

9   moment about the instructions.

10          I really do want you to start looking at the

11  instructions more carefully. There are three defendants in the

12  case, assuming that all three defendants survive any motions

13  that may occur. It's my thought that there probably needs to

14  be a separate verdict director for each defendant so that it's

15  clear what the jury is finding as to the separate defendants.

16  Whether or not Torch Electronics and -- well, I think that

17  there are three defendants, that there may need to be three

18  separate verdict directors, one for each defendant.

19          Depending on how you -- again, assuming that we get

20  past any motions that are made at the conclusion of Plaintiff's

21  case or at the conclusion of the evidence, depending on how you

22  choose or want to submit the case, there are two counts as to

23  the Lanham Act count.

24          The Lanham Act can be violated by a false statement

25  or a misleading statement. I need you to think about whether

1   or not there need to be perhaps separate instructions as it

2   relates to that.  I know Torch has submitted a number of

3   different instructions, but I need you to think through that

4   carefully.

5            I'm going to want to talk in more detail about the

6   instructions at the end of the day tomorrow, because I want to

7   be able to have some understanding of the direction that we're

8   heading before we break on Thursday.

9            So I would just ask that you, I guess I'll say, talk

10  among yourselves and each other about the instructions.  Again,

11  I know that you're not going to -- you may have differences,

12  but there may be things that you can agree upon.

13           So, again, I want to be clear.  We're going to talk

14  at the end of the day tomorrow about the instructions, and I

15  want you to be able to give me some indication of the direction

16  and where you're at.

17           Any question about any of that, Mr. Finneran?

18           **MR. FINNERAN:**  No, Judge.

19           **THE COURT:**  Mr. Graves?  Mr. Craig?

20           **MR. GRAVES:**  No, Your Honor.

21           **THE COURT:**  Okay.  All right.  I'll see you in the

22  morning, preferably around 8:30.  Again, I've got the jury

23  coming in at 8:45.  Hopefully we can get started promptly.

24           I'll see you in the morning.

25           **(Off the record at 5:17 p.m.)**

1                                    <u>CERTIFICATE</u>

2

3          I, Pamela Harrison, Registered Diplomat Reporter and

4    Certified Realtime Reporter, hereby certify that I am a duly

5    appointed Official Court Reporter of the United States District

6    Court for the Eastern District of Missouri.

7

8          I further certify that the foregoing is a true and

9    accurate transcript of the proceedings held in the

10   above-entitled case and that said transcript is a true and

11   correct transcription of my stenographic notes.

12

13         I further certify that this transcript contains pages 1

14   through 208 inclusive and was delivered electronically and that

15   this reporter takes no responsibility for missing or damaged

16   pages of this transcript when same transcript is copied by any

17   party other than this reporter.

18

19         Dated at St. Louis, Missouri, 11th of October, 2025.

20

21

22         /s/  Pamela Harrison
           Pamela Harrison, RDR, CRR, CRC, CCR, CSR
23         Official Court Reporter

24

25