IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TNT AMUSEMENTS, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:23-cv-330-JAR |
| TORCH ELECTRONICS, LLC, et al., | ) ) ) |
| Defendants. | ) |

### [PROPOSED] MEMORANDUM AND ORDER

Before the Court is Count Seven of the Complaint filed by Plaintiff TNT Amusements, Inc. ("TNT"), which seeks a declaratory judgment regarding the so-called "No Chance" gaming devices marketed and distributed by Defendant Torch Electronics, LLC ("Torch") (hereafter, the "Torch Devices"). The Court previously held that it would "reserve ruling on this count until after trial, with the benefit of factual determinations by the jury." Order (Doc. # 332) at 8.

The parties tried Counts One and Two to a jury during a five-day trial beginning on September 29, 2025. To find liability on Counts One and Two, the jury had to find that that one or more of the following representations were false or misleading:

- In the No Chance Game, chance has absolutely no role in any possible outcome;

- The "Prize Viewer" option on NCGs eliminates chance;

- Every "No Chance" Game is carefully designed to ensure that the element of chance has no role in the outcome; or

- As a result, this amusement device does not fit any definition of a "gambling device" in the state of Missouri and is not prohibited for use by you.

Jury Instrs. (Doc. #400) at 7, 9, 12. After approximately two hours of deliberation, the jury returned a verdict in favor of TNT on both counts.

1

Count Seven seeks a declaratory judgment that the Torch Devices are illegal "gambling devices" and "slot machines" under Mo. Rev. Stat. § 572.010 and that Torch operates an "illegal gambling business" under 18 U.S.C. § 1955. Compl. (Doc. #1) ¶¶ 387, 399. Based on the evidence adduced, the Court finds that TNT has made both showings by a preponderance of the evidence and is entitled to declaratory judgment as pled in Count Seven of its Complaint.

**Declaratory Judgment Standard**

The Declaratory Judgment Act provides, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). To determine whether a substantial controversy exists, courts consider whether "there is a substantial controversy, between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Caldwell v. Gurley Refining Co.*, 755 F.2d 645, 649 (8th Cir. 1985) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Declaratory relief is proper: "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Alsager v. Dist. Ct. of Polk Cty.*, 518 F.2d 1160, 1163 (8th Cir. 1975).

**Missouri's Regulatory Framework**[1]

Chapter 313 of the Missouri Revised Statutes governs activities regulated by the Missouri Gaming Commission, such as riverboat gambling, bingo, the state lottery, horse racing, and fantasy sports. The Commission's extensive regulatory framework is set forth in 11 C.S.R. 45. The Commission is part of the Department of Public Safety and consists of five members appointed by

---

[1] [**Note to Court**: This section is taken verbatim from the Court's Order (Doc. #312) 2–4.]

the governor with approval of the state senate. Mo. Rev. Stat. § 313.004. The Commission issues licenses to businesses and individuals, collects taxes and fees, and enforces gaming laws in the state. Sections 313.800 to 313.840 govern riverboat gambling. Section 313.805 empowers the Commission to license riverboat casinos, adopt standards of operation, investigate and sanction violations, and confiscate unauthorized games. If the Commission has reasonable grounds to believe that a violation of the provisions governing riverboat gambling has occurred, the Commission refers such matters to the Missouri Attorney General and local prosecuting attorney. § 313.830.7. In coordination with the Commission, the Gaming Division of the Missouri State Highway Patrol provides criminal and regulatory enforcement of gaming operations in the state.[2] The Commission views its regulatory authority as limited to licensed businesses, with the additional ability to provide technical support to law enforcement agencies investigating illegal gambling machines located on unlicensed premises. (Doc. 226-22 at 3; Doc.226-23 at 7, 13; Doc. 242-34 at 32-34, 69).

Gaming taxes are a considerable source of revenue in Missouri. In addition to standard income and property taxes, casinos pay a gaming tax of 21% of their adjusted gross revenue. (Doc. 242-34 at 157). Ten percent of the gaming tax goes to the local jurisdiction, and the remaining 90% is paid into an education fund. In fiscal year 2024, Missouri casinos contributed over $357 million to the education fund.[3]

Chapter 572 of the Missouri Revised Statutes is the part of the state criminal code that

---

[2] Gaming (last visited March 26, 2025). Perma | MSHP Gaming Division [https://perma.cc/YJ7U-BR6H]. The Court may take judicial notice of government websites. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016).

[3] 2024 Missouri Gaming Commission Annual Report 2024 at p. 9 (last visited March 24, 2025). Perma | Missouri Gaming Commission Annual Report 2024 [https://perma.cc/TL4K-WKF2].

creates certain offenses and punishments regarding illegal gambling. As relevant here, § 572.010 contains the following definitions.

> (3) "**Contest of chance**", any contest, game, gaming scheme or **gaming device in which the outcome depends in a material degree upon an element of chance**, notwithstanding that the skill of the contestants may also be a factor therein;
>
> (4) "**Gambling**", a person engages in gambling when he or she **stakes or risks something of value upon the outcome of a contest of chance** or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome. Gambling does not include bona fide business transactions valid under the law of contracts, including but not limited to contracts for the purchase or sale at a future date of securities or commodities, and agreements to compensate for loss caused by the happening of chance, including but not limited to contracts of indemnity or guaranty and life, health or accident insurance; nor does gambling include playing an amusement device that confers only an immediate right of replay not exchangeable for something of value. Gambling does not include any licensed activity, or persons participating in such games which are covered by sections 313.800 to 313.840;[4]
>
> (5) "**Gambling device**", any device, machine, paraphernalia or equipment that is **used or usable in the playing phases of any gambling activity**, whether that activity consists of gambling between persons or gambling by a person with a machine. However, lottery tickets, policy slips and other items used in the playing phases of lottery and policy schemes are not gambling devices within this definition
>
> (11) "**Slot machine**", a gambling device that as a result of the insertion of a coin or other object operates, either completely automatically or with the aid of some physical act by the player, in such a manner that, **depending upon elements of chance**, it may eject something of value. A device so constructed or readily adaptable or convertible to such use is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. **Nor is it any less a slot machine because apart from its use or adaptability as such it may also sell or deliver something of value on a basis other than chance.**

§ 572.010 (emphasis added).

---

[4] Sections 313.800 to 313.840 govern riverboat gambling.

**Torch Devices**[5]

Torch markets, distributes, and services "no-chance" game machines throughout Missouri.[6] Torch purchases these devices from Banilla Games in North Carolina. Each device features at least five game themes, and each theme offers several play levels. A game theme is a series of visual images displayed to the player, revealing a combination of winning or losing symbols on each turn.[7] A play level dictates the payment required to play the next turn.

At trial, the jury was permitted to examine an exemplar Torch Device provided by the Defendants (a Torch NCG Deluxe 5). The jury also heard testimony from experts from both sides, Stacy Friedman (for TNT) and Nick Farley (for Defendants), who described the functions of the Torch Devices. The two experts largely agreed on how the Torch Devices functioned; their few disagreements are not dispositive to the Court's analysis of Count Seven.[8]

---

[5] [**Note to Court**: This section is adapted from the Court's discussion in its Order (Doc. #312) at 4–7, to conform to the evidence as presented at trial.]

[6] The Torch Devices include: No Chance Game Suite I Terminal version 2.3.0.23596; No Chance Game Suite II Terminal version 3.2.0.19403; No Chance Game Suite 3 Terminal version 3.4.0.1; NCG Suite 4 Terminal version 4.2.1.31972; NCG Deluxe Terminal version 5.5.0.17; NCG 5; NCG Deluxe 1; NCG Deluxe 2; NCG Deluxe 3; NCG Deluxe 4; NCG Dual; NCG Skyriser; and NCG Hot Locks.

[7] Torch Device game themes include Lucky's Loot, Lucky Lollipop, Lucky Striker, Lightning Strike, Bourbon Street Dice, Fabulous Las Vegas, Searing Sevens, Shammy 7's, Spooky's Loot, Wheel Deal, Arabian Riches, Bathtime Bucks, Party Crashers, Super Keno, Frozen Sevens, Kitty Kash, Major Ca$h, Oil Rush, St. Patty's Payday, Box Office, Double Shot, Mega Money Reel, Nut Shack, Piggy Bank Busy, Silver & Gold Spins, Kiss Me I'm Irish, Sparky's Firehouse, Ticket to Ride, and Dr. Jekyll & Mr. Hyde.

[8] Mr. Friedman testified that three of the exemplar drives sent to him by Mr. Farley contained a feature that would shuffle the list of potential prize multipliers during the course of a single Torch Device's operation. Mr. Farley claimed that these three exemplars were sent in error and were not representative of the Torch Devices he understood to be in operation in Missouri, while acknowledging that he did not have personal knowledge as to what particular software was on any Torch Device in Missouri. Mr. Friedman also acknowledged that the other exemplars of Banilla "no chance" devices he examined did not contain any active software feature that would shuffle the order of prize multipliers after the devices' activation. Thus, the parties at least agree that not

5

Although the game themes differ among the Torch Devices, the underlying software used to determine the outcomes in all Torch Devices is, for all relevant purposes, the same. Each Torch Device contains, for each of its game themes, an ordered list of "prize multipliers," such as a 0.0, 0.2, 0.4, or 1.2, each of which may contain as many as 100,000 entries. On each play, the prize multiplier is multiplied by the play amount to determine what prize (if any) to award to the player. Those prize multipliers are stored in a database within each of the Torch Devices.

For each individual Torch Device, Banilla shuffles the list of prize multipliers before the device is shipped to Torch. Then, the first time that a particular game theme on a Torch Device is played at a particular play level, the starting point within the ordered list is determined using a random number generator contained within the Torch Devices. There are 12 possible starting points on each play level of each game theme. So, for a Torch device with six game themes and five play levels, the starting index would be randomly selected five times in each of the six themes. From any given starting point, for each turn of play, the software cycles through pre-determined and finite sequential pools of 60,000 to 100,000 prize multipliers, depending on the game theme, which is then multiplied by the selected play amount. Based on the resulting "prize amount" (which may be either $0.00 or a positive dollar amount), the device uses a random number generator to reverse-map a visual outcome, which in most cases is a combination of symbols on a spinning reel, similar in appearance to a standard casino slot machine game. The game may also randomly initiate "bonus" features, where players will see additional randomly generated images corresponding to

---

all Torch Devices contain a "shuffle" feature of the sort observed by Mr. Friedman. The Court therefore does not need to rely upon the existence or absence of any such "shuffle" feature in reaching its holding, especially as the Torch Devices undisputedly possess several other characteristics that are based on "chance." To the extent, however, that any Torch Devices in operation today do contain the shuffle feature identified by Mr. Friedman, the Court finds that that is an additional element of chance that would be sufficient on its own to make the Torch Devices illegal gambling devices and slot machines under Missouri law.

the "prize amount." A player has no control over which combination of symbols will appear.

There are no discernible patterns within the sequential pools of prize multipliers. There is nothing a player can do to alter the payout amount of a turn before or after the player inserts money. There is no element of skill in any of the game themes on the Torch Devices.

The lowest bill denomination a player may insert into a Torch Device is $1.00. Torch Devices do not accept quarters, so, if there is a balance of $0.25 when a player decides to stop playing, there is no way to recover that amount. For example, if a player decides to stop playing when there is a balance of $1.75 left on the machine, when the player cashes out, he or she will receive only $1.00 back—the remaining $0.75 stays on the machine. When a player runs out of sufficient funds for the next turn, she must insert more money to continue playing.

Each Torch Device has an optional "prize viewer" that, when pressed, displays the next prize amount that will be won if the player continues to play a game theme at the selected play level. The prize viewer does not itself explain that the number shown is the prize amount to be awarded on the next play, but a set of rules within the electronic menus of the game could, at least theoretically, allow a player to ascertain that that is what the "prize viewer" reflects.

The prize viewer is an optional feature. Not all players use it or use it every time. Using the prize viewer does not increase the likelihood (or unlikelihood) of a better payout. The prize viewer shows only the prize amount (in dollars and cents) of the next turn. It does not display the visual outcome (i.e., the combination of symbols that will appear) of the next turn, nor does it reveal the prize amount of any subsequent turn beyond the next turn. So, for example, if a player selects the prize viewer and sees that the next payout amount is $0 and she wants to obtain a better result, she must play through that $0 turn and continue playing to do so. She cannot skip ahead. If she wants to know the payout of the second, third, or any future turn, she must pay for and play

through those additional turns.

The evidence at trial established that, in July 2019, representatives of the Missouri Gaming Commission examined an NCG 2 device (which was functionally identical to the NCG 2 device exemplar that Mr. Farley provided to Mr. Friedman) and determined that the device was an illegal gambling device. A letter subsequently issued by the Missouri Gaming Commission stated, in pertinent part:

> Upon examination and analysis of those devices, the MGC determined that the machines are used or USABLE in the playing phases of gambling activities and therefore constitute "gambling devices" and "slot machines" as defined in sections 572.010(5) and (11), RSMo. Therefore, setting up and operating these devices at your VFW Post would be illegal, in violation of sections 572.030, 572.040 and 572.070. RSMo.
>
> In our opinion, the fact that the player can choose to reveal a prize prior to the first game play, and the nominal existence of some element of skill in the game, does not remove the devices from the prohibitions cited above.
>
> If these particular devices or any other devices substantially similar to them are found on your organization's premises, the device will be deemed illegal. . . .

**<u>Torch Devices Are "Gambling Devices" Under Missouri Law</u>**

Based upon the evidence adduced at trial, the Court finds, like the Missouri Gaming Commission before it, that the Torch Devices are "gambling devices" under Missouri law. A device is a gambling device under Missouri law if the device is "used" or "usable" in the playing phases of any gambling activity. Mo. Rev. Stat. § 572.010(5). The evidence at trial established that Torch Devices are "usable" in the playing phases of gambling activities and have been "used" in such a manner, each of which is sufficient on its own to make them gambling devices.

To qualify as a "gambling device" under Missouri law, it is enough for the Torch Devices to allow a player to "stake[] or risk[] something of value upon the outcome of a contest of chance or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome,"

8

Mo. Rev. Stat. § 572.010(4), regardless of whether the device may also be used for some other, non-gambling purpose. And Missouri law defines a "contest of chance" to include "any contest, game, gaming scheme or gaming device in which the outcome depends *in a material degree* upon an element of chance, notwithstanding that the skill of the contestants may also be a factor therein." Mo. Rev. Stat. § 572.010(3) (emphasis added). Based on the evidence adduced at trial, the Court finds that the Torch Devices readily meet those definitions, for several, independently sufficient reasons.

First, the visual outcome of the Torch Devices is, in every instance, determined entirely randomly (not just to a "material degree"). Defendants argue that the visual outcome of the game is only an "entertaining display" because the prize amount is determined independently of the visual outcome, which is then "reverse-mapped" based upon the predetermined prize amount. That may be true—but it does not exempt the Torch Devices from the definition of "gambling device" under Missouri law. Despite the fact that Banilla has programmed the Torch devices to determine the visual outcome based on the prize amount (rather than having the visual outcome determined first and the prize amount determined second), the Torch Devices still allow a player to "stake[] or risk[] something of value" (i.e., the play amount) "upon the outcome of a contest of chance" (i.e., the random determination of the visual outcome) "upon an agreement or understanding that he or she will receive something of value" (i.e., the prize amount) "in the event of a certain outcome" (i.e., the random determination of the visual outcome). Mo. Rev. Stat. § 572.010(4). To take an example, a player who plays a spinning-reel game on the Torch Devices and wagers $1.00 on the understanding that, if the reels show three cherries, he will win $2.00, is gambling within the meaning of the Missouri statute—and since the Torch Devices are "usable" in such a manner, they are "gambling devices" under Missouri law. And even a player who knows of, understands,

9

and uses the "prize viewer" feature has no way of predicting that randomly determined visual outcome.

Second, even if the random determination of visual outcomes were not sufficient on its own to make the Torch Devices "gambling devices" under Missouri law, the Torch Devices still allow players to "risk[] something of value upon the outcome of a contest of chance or future contingent event not under his or her control or influence," thus making them "usable" in the "playing phases" of gambling. As the evidence at trial demonstrated, the pools of up to 100,000 prize multipliers in the Torch Devices are arranged in no discernible pattern, and Banilla shuffles the pools on each and every Torch Device before they are shipped to Torch. The order of the prize multipliers in the pools, and thus the future prize amounts delivered on each play, is therefore determined randomly before the player ever interacts with the machine. Like the order of a shuffled deck of cards, the list of prize multipliers is unpredictable and beyond the player's control, and a player who lacks knowledge as to the sequence of prize multipliers in the pools and who does not use the "prize viewer" has no way of predicting the prize amounts for any turn until after she has "risk[ed]" her money. That, too, makes the Torch Devices "usable" in the playing phases of a gambling activity, and thus, gambling devices under Mo. Rev. Stat. § 572.010(4).

Defendants counter that the Torch Devices do not involve any element of "chance" because the "prize viewer" allows a player to see the prize amount for the very next play for each game theme and play level, and thus the Torch Devices allow a player to know the prize amount of the next game without committing her funds. Defendants' argument fails for at least three independently sufficient reasons.

First, the evidence at trial demonstrated that it is not possible for a player to redeem a balance of less than $1.00 from any of the Torch Devices, and that the "prize viewer" only allows

10

a player to see the very next prize amount, not prize outcomes two or three turns in the future. Thus, as Mr. Friedman demonstrated at trial, a player who wagers $1.00 at the $0.25 play level and who knows of, understands, and uses the prize may be able to determine what (or whether) she will win on the next turn, she cannot determine the prize amount for the second, third, or fourth plays—and once she plays the first turn, she has committed the entire $1.00. In such an instance, she has, at the very least, gambled the remaining $0.75, without any ability to determine what the prize amounts will be for the subsequent turns.

Second, as discussed above, the "prize viewer" only allows the player to see the next prize amount, not the entire outcome of the game (including the visual outcome). Thus, even though a player who knows of, understands, and uses the prize viewer can predict the next prize amount, the Missouri statute distinguishes between the "outcome" of the game itself and the "something of value" sought by the player (i.e., the prize amount). *See* Mo. Rev. Stat. § 572.010(4).

Third, even if some players might use the "prize viewer" to determine what the prize amount for the next turn will be before committing their funds, the Missouri statute makes a device a "gambling device" so long as it is "usable" for gambling. Defendants acknowledge that the "prize viewer" is an entirely optional feature. Evidence at trial, including testimony from Mr. Miltenberger himself, established that at least some players have played the Torch Device without using the "prize viewer." A player who does not use the prize viewer is able to use the device for gambling in a way that is all but indistinguishable from a standard casino slot machine game. The availability of the prize viewer feature is therefore immaterial to whether the Torch Devices qualify as "gambling devices" under Missouri law.

But even players who use the "prize viewer" will, in the ordinary case, be using the Torch Devices to gamble. As established at trial, the most common prize multipliers within the Torch

11

Devices' pools is zero—in other words, the majority of plays on the Torch Devices will produce a $0.00 "win amount" (or, more accurately, a loss amount). Thus, even a player who uses the "prize viewer" every time that she plays a Torch Device will, most often, see that she will lose her wager on the next turn. Yet the Torch Device permits her to spend the play amount in the hopes that the *next* time she presses the prize viewer on the *next* turn, she will see a positive prize amount. A player who does so has wagered the play amount on "outcome of a contest of chance"—i.e., what the prize viewer will show on the next turn—that she has no way of knowing or predicting. Thus, even for the player who knows of, understands, and uses the "prize viewer" on each and every play, the Torch Devices are "usable" in the playing phases of gambling activity.

For each of the foregoing, independently sufficient reasons, the Court finds that the Torch Devices are "gambling devices" within the meaning of Mo. Rev. Stat. § 572.010(5).

**Torch Devices Are "Slot Machines"**

Under Missouri law, a gambling device is a slot machine if, "as a result of the insertion of a coin or other object operates, either completely automatically or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value." Mo. Rev. Stat. § 572.010(11). The Missouri statute further provides that "[a] device so constructed or readily adaptable or convertible to such use is no less a slot machine . . . because apart from its use or adaptability as such it may also sell or deliver something of value on a basis other than chance." *Id.* The Torch Devices readily meet that definition as well. The Torch Devices allow players to insert dollar bills and print vouchers for any winnings which, as explained above, are determined at least in part by elements of chance. For those reasons, the Torch Devices qualify as "slot machines" under Mo. Rev. Stat. § 572.010(11).

12

**Defendants Operate an "Illegal Gambling Business"**

TNT also seeks a declaration that Defendants operate an "illegal gambling business" within the meaning of 18 U.S.C. § 1955(b)(1), which defines an "illegal gambling business" as a business that (1) "is a violation of the law of a state or political subdivision in which it is conducted"; (2) "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business"; and (3) "has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." Based on the evidence adduced, Defendants' business readily meets that definition as well.

First, as explained above, the Torch Devices are "gambling devices" and "slot machines" under Missouri law. Possession of a gambling device is a Class A misdemeanor, punishable by no more than one year in prison. § 572.070; § 558.011(6). A person commits the Class A misdemeanor of promotion of gambling in the second degree when he knowingly profits from unlawful gambling. § 572.040. The promotion of gambling in the first degree, involving a gambling device staking more than $100 in a day or operating any slot machine, is a Class E felony punishable by up to four years in prison. § 572.030; § 558.011(5). And any building used for unlawful gambling is considered a public nuisance, which a court may enjoin from occupation for up to one year. § 572.090. On any of these bases, Defendants' business operates in violation of Missouri law, thereby satisfying the first element under § 1955(b)(1).

Second, it is undisputed that Defendants' business involves more than five individuals who "conduct," "manage," "supervise," "direct," or "own" at least "part of such business." In addition to Defendant Steven Miltenberger, who owns 51% of Torch, and Sondra Miltenberger, who is the trustee of a trust that owns the remaining 49% of Torch, Defendants utilize more than 100 independent contractors who service and collect money from the more than 6,000 Torch Devices

13

in hundreds of customer-owned locations, with whom Defendants share illegal gambling revenue, all of whom "conduct" at least part of the Defendants' business. The second element of § 1955(b)(1) is therefore satisfied.

Finally, it is undisputed that the Defendants' business has been in continuous operation since at least 2017 and that players have inserted more than $32 million into just 101 of the Torch Devices over the course of just a few years. Based only on the locations that both TNT and Torch have had as customers, Defendants' gross revenue thus exceeded an average amount of $10,000 per day throughout that period, satisfying the third and final element of § 1955(b)(1).

Thus, for all the foregoing reasons, the Defendants' marketing of, distribution of, and collection of money from Torch Devices constitutes an "illegal gambling business" under 18 U.S.C. § 1955.

### **Missouri Case Law**[9]

The Court's analysis of Missouri law is based on a straightforward application of the plain language of the Missouri statutes. But its conclusion that the Torch Devices are illegal gambling devices and slot machines under Missouri law is also bolstered by Missouri's decisional law. As the Court noted in its order denying summary judgment on TNT's unfair competition claims, "[c]entury-old Missouri precedent holds that a slot machine with a prize preview feature is still a slot machine." Order (Doc. #312) (citing *City of Moberly v. Deskin*, 155 S.W. 842, 844–45 (Mo. App. 1913)). Much like the Torch Devices, the machine in *Deskin* had a prize preview feature showing in advance what the player would receive on the next play. *Id.* at 843. The defendant argued that each turn was a separate and independent business transaction and there was no chance involved as the player knew in advance what he would receive for his nickel. *Id.* at 844. The court

---

[9] [**Note to Court**: This section is adapted from the Court's discussion in its Order (Doc. #312) at 13–14 and 30–31.]

rejected that theory, finding the defendant's position "unsound" because the "contrivance" was clearly intended to "allure" the player into continuing in the hope of a better outcome. *Id*. at 844–45. Thus, as early as 1913, Missouri jurisprudence denounced the prize viewer as a cunning attempt to comply with the letter of the law while doing violence to the spirit and purpose of it. *Id*. at 844.[10]

A similar result obtained in *Thole v. Westfall*, 682 S.W.2d 33 (Mo. App. E.D. 1984), which interpreted the statute at issue here. In *Thole*, the Missouri Court of Appeals considered slot-machine-like games in which "[t]he electronic circuitry of the slot machine devices [was] programmed to produce, at random, images of various objects which 'rotate[d]' on the screen." *Id.* at 35. "When the 'rotation' stop[ped], the player [was] awarded 'points' if designated combinations of objects are shown or highlighted." *Id.* "[T]he objects that appear[ed] on the screen [were] determined by the devices' electronic circuitry and the player ha[d] no control over which combination of objects will appear. Thus, from the player's point of view, winning [was] purely a matter of luck, a matter of chance." *Id.* at 37. For those reasons, the court held that "the outcome of the games depend[ed], in a material way, upon the element of chance," thereby making them "gambling devices" under Mo. Rev. Stat. § 572.010(5).

**Persuasive Authority**

The Court notes that its analysis above is consistent with the analysis of numerous other courts analyzing similar devices under similar state laws. While none of those authorities are binding as to the interpretation of Missouri's laws and therefore are not controlling as to this Court's analysis of the application of Missouri law to the Torch Devices, the Courts finds that their analysis is persuasive and reinforces the Court's confidence in its determination that the Torch

---

[10] As the Court's prior order explained, *Deskin* is still good law, cited on other grounds as recently as 1982. *Briggs v. Baker*, 631 S.W.2d 948, 953 (Mo. App. W.D. 1982). There is no authority suggesting that the Missouri legislature intended to abrogate *Deskin* or its reasoning when it enacted the current Missouri gambling statute.

15

Devices are illegal games of chance. *See Thole*, 682 S.W.2d at 38 (noting similarity in application of other states' laws).

Most relevantly, the Court of Chancery of Tennessee (the "Chancery Court") recently evaluated similar devices to those at issue in this case to determine whether or not they were illegal gambling devices under Tennessee law. On July 14, 2025, the Chancery Court issued a Final Order in a suit brought by Torch against Steven Mulroy, the District Attorney General for Shelby County, Tennessee, in a case styled as *Torch Electronics, LLC. v. Steven J. Mulroy* (CH-24-0985). After review of the record, a three-judge panel unanimously concluded that the "No Chance Games" owned and operated by Torch in the State of Tennessee were illegal gambling devices. *See* Order (Doc. #330-1). The Chancery Court further held that the Torch Devices' "key distinctions" from ordinary slot machines, including the "prize viewer" feature, made "no material difference in the machine's character." *Id.* at 11. Ultimately, the Chancery Court held, the "future uncertainty" of prize amounts not displayed by the "prize viewer" made the Torch Devices "contingent on chance" and thus illegal gambling devices under Tennessee law. *Id.*.

Although the Chancery Court's decision does not purport to interpret Missouri's gambling laws, Missouri's and Tennessee's gambling laws are nearly identical in all material respects. Tennessee's criminal statute defines a gambling device as one where a player "risk[s] anything of value for a profit whose return is to any degree of contingent on chance." Tenn. Code Ann. § 39-17-501(2) (emphasis added); *cf.* Mo. Rev. Stat. § 572.010 (defining gambling to include "risk[ing] something of value upon the outcome of a contest of chance or a future contingent event not under [the player's] control or influence"). And, like Missouri, it is illegal to possess or use an unlicensed "gambling device" in Tennessee. *Compare* Tenn. Code Ann. § 39-17-505(a)(1), *with* Mo. Rev. Stat. §§ 572.020, 572.070.

16

In the Chancery Court, Torch made a similar argument to the one Defendants press here: that the "prize viewer" is what makes the Torch Devices legal. *Id.* at 9–11. The Chancery Court rejected that argument, holding that "moving a player's expectations some spins into the future does not alter the fundamental nature" of the Torch Devices as illegal gambling devices. *Id.* at 10. The Chancery Court unanimously reached that holding despite the fact that the prize viewer on the Torch Devices in Tennessee (unlike the Torch Devices in Missouri) allowed the player to see not only the ***next*** prize amount, but as many future plays as his credit balance would permit. *See id*. at 3. The Torch Devices at issue here, by contrast, only allow a player to see the ***very next*** prize amount, not multiple future prize amounts. *See* Order (Doc. #312) at 7. Mr. Miltenberger also testified in the Chancery Court that the devices at issue there did not contain random number generators, which the Torch Devices in this case indisputably do. *See* Tr. (Doc. #330-2) (excerpt of transcript of Chancery Court proceedings) at 29 (exhibit p. 5).

Similar results have been reached in other jurisdictions involving games with similar features to the Torch Devices. The Ohio Court of Appeals, evaluating another Banilla device with a "pre-reveal" feature called it a "façade" intended to "take an otherwise illegal game outside of the scope of" state laws, that, like Missouri, make such devices illegal. *Mayle Bingo Co., L.L.C. v. Ohio Dep't of Pub. Safety*, 152 N.E.2d 1237 (Ohio Ct. App. 2020). And the Supreme Court of Iowa—which also dealt with devices manufactured by Banilla—held that the devices were illegal and agreed that the "prize viewer" did not change that determination. *Banilla Games, Inc. v. Iowa Dep't of Inspections & Appeals*, 919 N.W.2d 6, 17–19 (Iowa 2018).

A Florida court of appeals finding similar devices to be illegal slot machines discussed a "pre-reveal" feature similar to that of the Torch Devices and noted:

> While it is true that the user is advised of the outcome of the game at hand ahead of time through the preview feature, the user cannot predict that outcome until it is

17

randomly generated and then displayed by the machine. Nor can the user predict the outcome of Game 2 while playing Game 1.

*Gator Coin II, Inc. v. Fla. Dep't of Bus. & Prof'l Regulation*, 254 So. 3d 1113, 1118 (Fla. Dist. Ct. App. 2018). A Pennsylvania appellate court, affirming the trial court, similarly held that machines like Torch's were illegal gambling devices:.

> This Court cannot ignore the reality that chance ultimately determines losing outcomes, winning outcomes, and the different prize levels: which are programmed into the [machine's] finite pool for random sequential delivery . . . here a large random element is always present, and it predominates . . . the [machines] are games of chance.

*Gracie Techs., Inc. v. Commonwealth*, 225 A.3d 943 (Pa. Commw. Ct. 2020). And the Supreme Court of North Carolina evaluated machines similar to Torch's and recognized that, "chance controls plaintiffs' game . . . . Accordingly, just as is the case with a traditional slot machine, the return to the player in plaintiffs' game is dependent on chance." *Gift Surplus, LLC v. State ex rel. Cooper*, 868 S.E.2d 20, 29 (N.C. 2022) ("Gift Surplus's kiosks . . . offer five similar games, all featuring reel-spinning video resembling a slot machine.").

While the laws and the particular devices in those cases may differ in some respects from those at issue in the instant case, the fact that such "pre-reveal" gimmicks have been universally found by courts applying similar laws as insufficient to exempt similar games from their own state gambling laws reinforces the Court's conclusion that the "prize viewer" feature in Torch Devices does not take them outside the reach of Missouri's similar gambling laws. The Court is aware of no other court in the country that has found "pre-reveal" devices like the Torch Devices to be legal amusement devices. This Court will not be the first to do so.

Accordingly, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

(a) that the Torch Devices marketed and distributed by Defendants are "gambling devices" under Mo. Rev. Stat. § 572.010;

18

(b) that the Torch Devices marketed and distributed by Defendants are "slot machines" under Mo. Rev. Stat. § 572.010; and

(c) that Defendants' marketing of, distribution of, and collection of money from Torch Devices constitutes an "illegal gambling business" under 18 U.S.C. § 1955(b)(1).

SO ORDERED this ___ day of November, 2025.

 _____
 THE HONORABLE JOHN A. ROSS
 UNITED STATES DISTRICT JUDGE