IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TNT AMUSEMENTS, INC., | ) | |
| d/b/a PLAY-MOR COIN-OP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-CV-330-JAR |
| | ) | |
| TORCH ELECTRONICS, LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's Count VII seeking declaratory judgment in this dispute between competitors in the retail amusement device industry. For the reasons set forth below, the Court will enter a partial declaratory judgment in Plaintiff's favor.

### INTRODUCTION

Plaintiff TNT Amusements (TNT) owns and leases traditional arcade games and similar amusement equipment (e.g., dart boards, pinball machines) in retail locations throughout Missouri. Defendant Torch Electronics (Torch) leases "no-chance" gaming machines in the same territory. Defendant Steven Miltenberger is Torch's president and majority owner. TNT centrally alleges that Torch's devices are illegal slot machines that divert TNT's customers.

Litigation between these parties precedes and exceeds this case.[1] TNT filed this federal action in March 2023 asserting claims of false advertising under the Lanham Act (Count I), unfair competition under Missouri common law (Count II), four counts under the Racketeer

---

[1]    For a full chronology and greater context, see *TNT Amusements, Inc. v. Torch Elecs., LLC*, No. 4:23-CV-330-JAR, 2025 WL 947506, at *1 (E.D. Mo. Mar. 28, 2025), *vacated in part on reconsideration*, No. 4:23-CV-330-JAR, 2025 WL 2336858 (E.D. Mo. Aug. 13, 2025).

Influenced and Corrupt Organizations Act (RICO) (Counts III-VI), and this seventh count seeking a declaration that Torch devices are illegal gambling devices and slot machines under Missouri law. The Court granted summary judgment in Torch's favor on TNT's RICO claims, allowed Counts I and II to proceed to trial, and initially dismissed Count VII on principles of abstention. (Doc. 312). On Torch's subsequent motion for reconsideration, the Court vacated its earlier dismissal of Count VII but reserved ruling on it pending factual determinations by the jury on Counts I and II. (Doc. 332). The parties tried those counts during a five-day jury trial starting September 29, 2025. To find liability, the jury had to find that that one or more of the following commercial representations by Torch were false or misleading:

- In the No Chance Game, chance has absolutely no role in any possible outcome;

- The "Prize Viewer" option on NCGs eliminates chance;

- Every "No Chance" Game is carefully designed to ensure that the element of chance has no role in the outcome; or

- As a result, this amusement device does not fit any definition of a "gambling device" in the state of Missouri and is not prohibited for use by you.

Jury Instrs. (Doc. 400 at 7, 9, 12). After two hours of deliberation, the jury returned a verdict in favor of TNT on both counts, specifically finding falsity in one or more statements. (Doc. 401).

The Court now revisits Count VII, in which TNT seeks a declaratory judgment that (1) Torch Devices are illegal gambling devices and slot machines under Mo. Rev. Stat. § 572.010 and (2) Torch operates an "illegal gambling business" under 18 U.S.C. § 1955 (a predicate act for civil RICO liability). Compl. (Doc. 1 ¶¶ 387, 399). The Court had two opportunities to hear from both parties' technical experts in this case, at a *Daubert* hearing in October 2024 and again at trial. Their testimony demonstrated clearly and conclusively that Torch Devices contain multiple elements of chance. Based on the evidence adduced at trial, the factual findings of the jury, and the Court's review of applicable law, the Court concludes that the devices meet the

2

statutory definition of "gambling device" and are therefore illegal under Missouri law when played outside a licensed casino. Mindful of the principles of restraint that led the Court to abstain in the first instance, the Court deems any further declarations redundant and unnecessary.

## BACKGROUND

### Missouri's Regulatory Framework

Chapter 313 of the Missouri Revised Statutes governs activities regulated by the Missouri Gaming Commission, such as riverboat gambling, bingo, the state lottery, horse racing, and fantasy sports. The Commission's extensive regulatory framework is set forth in 11 C.S.R. 45. The Commission is part of the Department of Public Safety and consists of five members appointed by the governor with approval of the state senate. Mo. Rev. Stat. § 313.004. The Commission issues licenses to businesses and individuals, collects taxes and fees, and enforces gaming laws in the state. Sections 313.800 to 313.840 govern riverboat gambling. Section 313.805 empowers the Commission to license riverboat casinos, adopt standards of operation, investigate and sanction violations, and confiscate unauthorized games. If the Commission has reasonable grounds to believe that a violation of the provisions governing riverboat gambling has occurred, the Commission refers such matters to the Missouri Attorney General and local prosecuting attorney. § 313.830.7. In coordination with the Commission, the Gaming Division of the Missouri State Highway Patrol provides criminal and regulatory enforcement of gaming operations in the state.[2] The Commission views its regulatory authority as limited to licensed businesses, with the additional ability to provide technical support to law enforcement agencies

---

[2] Gaming (last visited March 26, 2025). Perma | MSHP Gaming Division [https://perma.cc/YJ7U-BR6H]. The Court may take judicial notice of government websites. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016).

investigating illegal gambling machines located on unlicensed premises. (Doc. 226-22 at 3; Doc.226-23 at 7, 13; Doc. 242-34 at 32-34, 69).

Gaming taxes are a considerable source of revenue in Missouri. In addition to standard income and property taxes, casinos pay a gaming tax of 21% of their adjusted gross revenue. (Doc. 242-34 at 157). Ten percent of the gaming tax goes to the local jurisdiction, and the remaining 90% is paid into an education fund. In fiscal year 2024, Missouri casinos contributed over $357 million to the education fund.[3]

Chapter 572 of the Missouri Revised Statutes is the part of the state criminal code that creates certain offenses and punishments regarding illegal gambling. As relevant here, § 572.010 contains the following definitions.

> (3) "**Contest of chance**", any contest, game, gaming scheme or **gaming device in which the outcome depends in a material degree upon an element of chance**, notwithstanding that the skill of the contestants may also be a factor therein;
>
> (4) "**Gambling**", a person engages in gambling when he or she **stakes or risks something of value upon the outcome of a contest of chance** or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome. Gambling does not include bona fide business transactions valid under the law of contracts, including but not limited to contracts for the purchase or sale at a future date of securities or commodities, and agreements to compensate for loss caused by the happening of chance, including but not limited to contracts of indemnity or guaranty and life, health or accident insurance; nor does gambling include playing an amusement device that confers only an immediate right of replay not exchangeable for something of value. Gambling does not include any licensed activity, or persons participating in such games which are covered by sections 313.800 to 313.840;[4]
>
> (5) "**Gambling device**", any device, machine, paraphernalia or equipment that is **used or usable in the playing phases of any gambling activity**, whether that activity consists of gambling between persons or gambling by a person with a

---

[3] 2024 Missouri Gaming Commission Annual Report 2024 at p. 9 (last visited March 24, 2025). Perma | Missouri Gaming Commission Annual Report 2024 [https://perma.cc/TL4K-WKF2].

[4] Sections 313.800 to 313.840 govern riverboat gambling.

machine. However, lottery tickets, policy slips and other items used in the playing phases of lottery and policy schemes are not gambling devices within this definition

(11) "**Slot machine**", a gambling device that as a result of the insertion of a coin or other object operates, either completely automatically or with the aid of some physical act by the player, in such a manner that, **depending upon elements of chance**, it may eject something of value. A device so constructed or readily adaptable or convertible to such use is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. **Nor is it any less a slot machine because apart from its use or adaptability as such it may also sell or deliver something of value on a basis other than chance.**

§ 572.010 (emphasis added).

### Torch Devices

Torch markets, distributes, and services "no-chance" game machines throughout Missouri.[5] Torch purchases these devices from Banilla Games in North Carolina. Each device features at least five game themes, and each theme offers several play levels. A game theme is a series of visual images displayed to the player, revealing a combination of winning or losing symbols on each turn.[6] A play level dictates the payment required to play the next turn.

At trial, the jury was permitted to examine an exemplar Torch Device provided by the Defendants (a Torch NCG Deluxe 5). The jury also heard testimony from experts from both sides, Stacy Friedman (for TNT) and Nick Farley (for Defendants), who described the functions

---

[5] The Torch Devices include: No Chance Game Suite I Terminal version 2.3.0.23596; No Chance Game Suite II Terminal version 3.2.0.19403; No Chance Game Suite 3 Terminal version 3.4.0.1; NCG Suite 4 Terminal version 4.2.1.31972; NCG Deluxe Terminal version 5.5.0.17; NCG 5; NCG Deluxe 1; NCG Deluxe 2; NCG Deluxe 3; NCG Deluxe 4; NCG Dual; NCG Skyriser; and NCG Hot Locks.

[6] Torch Device game themes include Lucky's Loot, Lucky Lollipop, Lucky Striker, Lightning Strike, Bourbon Street Dice, Fabulous Las Vegas, Searing Sevens, Shammy 7's, Spooky's Loot, Wheel Deal, Arabian Riches, Bathtime Bucks, Party Crashers, Super Keno, Frozen Sevens, Kitty Kash, Major Ca$h, Oil Rush, St. Patty's Payday, Box Office, Double Shot, Mega Money Reel, Nut Shack, Piggy Bank Busy, Silver & Gold Spins, Kiss Me I'm Irish, Sparky's Firehouse, Ticket to Ride, and Dr. Jekyll & Mr. Hyde.

of the Torch Devices. The two experts largely agreed on how the Torch Devices functioned; their few disagreements are not dispositive to the Court's analysis of Count VII.[7]

Although the game themes differ among the Torch Devices, the underlying software used to determine the outcomes in all Torch Devices is, for all relevant purposes, the same. Each Torch Device contains, for each of its game themes, an ordered list of "prize multipliers," such as a 0.0, 0.2, 0.4, or 1.2, each of which may contain as many as 100,000 entries. On each play, the prize multiplier is multiplied by the play amount to determine what prize (if any) to award to the player. Those prize multipliers are stored in a database within each of the Torch Devices.

For each individual Torch Device, Banilla shuffles the list of prize multipliers before the device is shipped to Torch. Then, the first time that a particular game theme on a Torch Device is played at a particular play level, the starting point within the ordered list is determined using a random number generator contained within the Torch Devices. There are 12 possible starting points on each play level of each game theme. So, for a Torch Device with six game themes and five play levels, the starting index would be randomly selected five times in each of the six themes. From any given starting point, for each turn of play, the software cycles through pre-

---

[7] Mr. Friedman testified that three of the exemplar drives sent to him by Mr. Farley contained a feature that would shuffle the list of potential prize multipliers during the course of a single Torch Device's operation. Mr. Farley claimed that these three exemplars were sent in error and were not representative of the Torch Devices he understood to be in operation in Missouri, while acknowledging that he did not have personal knowledge as to what particular software was on any Torch Device in Missouri. Mr. Friedman also acknowledged that the other exemplars of Banilla "no chance" devices he examined did not contain any active software feature that would shuffle the order of prize multipliers after the devices' activation. Thus, the parties at least agree that not all Torch Devices contain a "shuffle" feature of the sort observed by Mr. Friedman. The Court therefore need not rely on the existence or absence of any such "shuffle" feature in reaching its conclusions, especially as the Torch Devices undisputedly possess other characteristics that are based on chance. To the extent, however, that any Torch Devices in operation today do contain the shuffle feature identified by Mr. Friedman, that is an additional element of chance that would be sufficient on its own to make the Torch Devices gambling devices and slot machines under Missouri law.

determined and finite sequential pools of 60,000 to 100,000 prize multipliers, depending on the game theme, which is then multiplied by the selected play amount. Based on the resulting "prize amount" (which may be either $0.00 or a positive dollar amount), the device uses a random number generator to reverse-map a visual outcome, which in most cases is a combination of symbols on a spinning reel, similar in appearance to a standard casino slot machine game. The game may also randomly initiate "bonus" features, where players will see additional randomly generated images corresponding to the "prize amount." A player has no control over which combination of symbols will appear.

There are no discernible patterns within the sequential pools of prize multipliers. There is nothing a player can do to alter the payout amount of a turn before or after the player inserts money. There is no element of skill in any of the game themes on the Torch Devices.

The lowest bill denomination a player may insert into a Torch Device is $1.00. Torch Devices do not accept quarters, so, if there is a balance of $0.25 when a player decides to stop playing, there is no way to recover that amount. For example, if a player decides to stop playing when there is a balance of $1.75 left on the machine, when the player cashes out, he or she will receive only $1.00 back—the remaining $0.75 stays on the machine. When a player runs out of sufficient funds for the next turn, she must insert more money to continue playing.

Each Torch Device has an optional "prize viewer" that, when pressed, displays the next prize amount to appear if the player continues to play a game theme at the selected play level. The prize viewer itself doesn't explain that the number shown is the prize amount for the next play; this information is contained in the rules within the electronic menus of the game.

The prize viewer is an optional feature. Not all players use it or use it every time. Using the prize viewer does not increase the likelihood (or unlikelihood) of a better payout. The prize

viewer shows only the prize amount (in dollars and cents) of the next turn. It does not display

the visual outcome (i.e., the combination of symbols that will appear) of the next turn, nor does

it reveal the prize amount of any subsequent turn beyond the next turn. So, for example, if a

player selects the prize viewer and sees that the next payout amount is $0 and she wants to

obtain a better result, she must play through that $0 turn and continue playing. She can't skip

ahead. If she wants to know the payout of the second, third, or any future turn, she must pay for

and play through those additional turns.

     The evidence at trial established that, in July 2019, representatives of the Missouri

Gaming Commission examined an NCG 2 device (which was functionally identical to the NCG

2 device exemplar that Mr. Farley provided to Mr. Friedman) and determined that the device

was an illegal gambling device. A letter subsequently issued by the general counsel of the

Missouri Gaming Commission stated in pertinent part:

> Upon examination and analysis of those devices, the MGC determined that the machines are used or USABLE in the playing phases of gambling activities and therefore constitute "gambling devices" and "slot machines" as defined in sections 572.010(5) and (11), RSMo. Therefore, setting up and operating these devices at your VFW Post would be illegal, in violation of sections 572.030, 572.040 and 572.070. RSMo.

> In our opinion, the fact that the player can choose to reveal a prize prior to the first game play, and the nominal existence of some element of skill in the game, does not remove the devices from the prohibitions cited above.

> If these particular devices or any other devices substantially similar to them are found on your organization's premises, the device will be deemed illegal. . . .

In this Count VII, TNT asks the Court to issue a similar declaration.

## LEGAL STANDARD

     The Declaratory Judgment Act provides, "[i]n a case of actual controversy within its

jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations

of any interested party seeking such declaration, whether or not further relief is or could be

sought." 28 U.S.C. § 2201(a). To determine whether a substantial controversy exists, courts consider whether "there is a substantial controversy, between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Caldwell v. Gurley Refining Co.*, 755 F.2d 645, 649 (8th Cir. 1985) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Declaratory relief is proper: "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Alsager v. Dist. Ct. of Polk Cty.*, 518 F.2d 1160, 1163 (8th Cir. 1975).

## ANALYSIS

### Torch Devices Are "Gambling Devices" Under Missouri Law

A device is a gambling device under Missouri law if the device is "used" or "usable" in the playing phases of any gambling activity. Mo. Rev. Stat. § 572.010(5). The evidence at trial established that Torch Devices are "usable" in the playing phases of gambling activities and have been "used" in such a manner.

A "gambling device" allows a player to "stake[] or risk[] something of value upon the outcome of a contest of chance or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome." Mo. Rev. Stat. § 572.010(4). A "contest of chance" includes "any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that the skill of the contestants may also be a factor therein." Mo. Rev. Stat. § 572.010(3).

On Counts I and II, the jury found to be false Torch's representations that chance played no role in its devices. Inherent in the jury's verdict is the inverse finding that Torch Devices do

9

involve an element of chance. As such, based on the evidence adduced at trial and jury's ultimate verdict, the Court finds that the Torch Devices readily meet the foregoing definitions in § 572.010 because they allow players to "risk[] something of value upon the outcome of a contest of chance or future contingent event not under his or her control or influence," thus making them "usable" in the "playing phases" of gambling.

As the evidence at trial demonstrated, the pools of up to 100,000 prize multipliers in the Torch Devices are arranged in no discernible pattern, and Banilla shuffles the pools on every Torch Device before they are shipped to Torch. The order of the prize multipliers in the pools, and thus the future prize amounts delivered on each play, is determined randomly before the player ever interacts with the machine. Like the order of a shuffled deck of cards, the list of prize multipliers is unpredictable and beyond the player's control, and a player who lacks knowledge as to the sequence of prize multipliers in the pools and who does not use the "prize viewer" has no way of predicting the prize amounts for any turn until after she has "risk[ed]" her money. That, too, makes the Torch Devices "usable" in the playing phases of a gambling activity, and thus, gambling devices under Mo. Rev. Stat. § 572.010(4).

Defendants counter that the Torch Devices don't involve any element of chance because the prize viewer allows a player to see the prize amount for the very next play for each game theme and play level, and thus the devices allow a player to know the prize amount of the next game without committing her funds. Defendants' argument is unavailing.

The evidence at trial demonstrated that it is impossible for a player to redeem a balance of less than $1.00 from any Torch Device, and the prize viewer only allows a player to see the very next prize amount, not prize outcomes two or three turns in the future. Thus, as Mr. Friedman demonstrated at trial, a player who wagers $1.00 at the $0.25 play level and uses the

10

prize may be able to determine what (or whether) she will win on the next turn, but she can't know the prize amount for the second, third, or fourth plays. Once she plays the first turn, she has committed the entire $1.00. In such an instance, she has gambled the remaining $0.75 without any ability to determine what the prize amounts will be for the subsequent turns.

Even if some players might use the prize viewer to determine what the prize amount for the next turn will be before committing their funds, the Missouri statute makes a device a gambling device so long as it is *usable* for gambling. Defendants acknowledge that the prize viewer is an entirely optional feature. Evidence at trial, including testimony from Defendant Miltenberger himself, established that some players forego the prize viewer. A player who doesn't use the prize viewer can use the device for gambling in a manner that is indistinguishable from a standard casino slot machine game. The availability of the prize viewer feature is therefore immaterial to whether the Torch Devices qualify as "gambling devices" under Missouri law.

Further, even players who use the prize viewer will use the Torch Devices to gamble. As established at trial, the most common prize multiplier within the sequential pools is zero. In other words, the majority of plays will produce a $0.00 "win amount" (or, more accurately, a loss amount). Thus, even a player who uses the prize viewer every time will, most often, see that she will lose her wager on the next turn. Yet the Torch Device permits her to spend the play amount in the hopes that the ***next*** time she presses the prize viewer on the ***next*** turn, she will see a positive prize amount. A player who does so has wagered the play amount on "outcome of a contest of chance"—i.e., what the prize viewer will show on the ***next*** turn—that she has no way of knowing or predicting. Thus, even for the player who knows of, understands, and uses the prize viewer on every play, the Torch Devices are "usable" in the playing phases of gambling

activity.

Additionally, the prize viewer only allows the player to see the next prize amount, not the entire outcome of the game (i.e., the visual outcome). The visual outcome of the Torch Devices is determined entirely randomly. On this point, Defendants argue that the visual outcome is only an "entertaining display" because the prize amount is determined independently of the visual outcome, which is "reverse-mapped" based upon the predetermined prize amount. That may be true, but the Court is not entirely persuaded that it matters. The statute distinguishes between the "outcome" of the game itself and the "something of value" sought by the player (i.e., the prize amount). *See* Mo. Rev. Stat. § 572.010(4). A consumer who plays a spinning-reel game and wagers $1.00 on the understanding that, if the reels show three cherries, he will win $2.00, is gambling within the meaning of the Missouri statute. Even a player using the prize viewer has no way of predicting the randomly generated visual outcome reverse-mapped to the prize amount. As the Torch Devices are "usable" in such a manner, they are "gambling devices" under Missouri law.

For all of the foregoing reasons and with the benefit of the jury's factual determinations, the Court finds that Torch Devices are "gambling devices" within the meaning of Mo. Rev. Stat. § 572.010(5). The Court declines to issue a declaration as to the term "slot machine" as the question wasn't explicitly submitted to the jury, and such a declaration is unnecessary to resolve TNT's claims.

**<u>Missouri Jurisprudence</u>**

The above analysis of Missouri law is based on a straightforward application of the plain language of the Missouri statutes applied to the evidence presented and the jury's factual findings at trial on Counts I and II. But the Court's conclusion that the Torch Devices are

gambling devices under Missouri law is also bolstered by Missouri jurisprudence.

Century-old Missouri precedent holds that a gaming machine with a prize preview feature is still a gambling device. *City of Moberly v. Deskin*, 155 S.W. 842, 844–45 (Mo. App. 1913)). Much like the Torch Devices, the machine in *Deskin* had a prize preview feature showing in advance what the player would receive on the next play. *Id.* at 843. The defendant argued that each turn was a separate and independent business transaction and there was no chance involved as the player knew in advance what he would receive for his nickel. *Id.* at 844. The court rejected that theory, finding the defendant's position "unsound" because the "contrivance" was clearly intended to "allure" the player into continuing in the hope of a better outcome. *Id*. at 844–45. Thus, as early as 1913, Missouri precedent denounced the prize viewer as a cunning attempt to comply with the letter of the law while doing violence to the spirit and purpose of it. *Id*. at 844.

Torch argues that *Deskin* was effectively abrogated by Proposition A legalizing riverboat gambling in 1992 and related statutes implementing Missouri's *legal* gaming regulatory scheme in 1994. Mo. Rev. Stat. § 313.004 *et seq*.  This argument overlooks the important fact that the current definitions of "gambling" and "contest of chance" contained in Missouri's *criminal* statute, Mo. Rev. Stat. § 572.010, haven't changed since 1978. And Missouri caselaw is consistent throughout history.

*Deskin* was decided in 1913. In 1937, the Supreme Court of Missouri cited *Deskin* in an opinion referencing a 1929 statute criminalizing "gaming devices" designed for the purpose of playing a "game of chance." *State ex rel. Igoe v. Joynt*, 110 S.W.2d 737 (Mo. banc 1937). In 1949, the Missouri Court of Appeals cited a 1939 statute with similar language. *State v. One "Jack & Jill" Pinball Machine*, 224 S.W.2d 854, 856 (Mo. App. S.D. 1949). *Deskin* was last cited in 1982, albeit for a different holding. *Briggs v. Baker*, 631 S.W.2d 948, 953 (Mo. App.

W.D. 1982) (confirming municipal authority to regulate gaming devices).

In 1984, the Missouri Court of Appeals referred to the 1978 statutory definitions that still exist today in *Thole v. Westfall*, 682 S.W.2d 33 (Mo. App. E.D. 1984). There, the court considered machines in which "[t]he electronic circuitry of the slot machine devices is programmed to produce, at random, images of various objects which 'rotate' on the screen." *Id.* at 35. "When the 'rotation' stops, the player is awarded 'points' if designated combinations of objects are shown or highlighted." *Id.* "[T]he objects that appear on the screen are determined by the devices' electronic circuitry and the player has no control over which combination of objects will appear. Thus, from the player's point of view, winning is purely a matter of luck, a matter of chance." *Id.* at 37. For those reasons, the court held that "the outcome of the games depends, in a material way, upon the element of chance," thereby making them "gambling devices" under Mo. Rev. Stat. § 572.010(5).

Proposition A and its implementing legislation in 1994 merely exempted *licensed* gambling from Missouri's longstanding criminal definitions. Nothing in Chapter 313 reflects legislative intent to abrogate the foregoing appellate decisions applying current and prior definitions of *illegal* gambling, including *Deskin*. Also noteworthy is the fact that *Deskin* is still cited in secondary sources today. § 24:148. Gaming devices, definitions and distinctions, 6A McQuillin Mun. Corp. § 24:148 (3d ed.); § 14:14. Gambling, 2 Local Government Law § 14:14.

In short, the Court finds no basis to conclude that Proposition A and Chapter 313 abrogated *Deskin*.  Rather, since 1913 and still today, a gaming machine with a prize viewer is still a gambling device.

**Persuasive Authority**

The Court's conclusions above are consistent with the analyses of other courts examining similar devices under comparable state laws. Most recently, a Tennessee chancery court evaluated Torch's own devices in *Torch Electronics, LLC. v. Steven J. Mulroy*, Case No. CH-24-0985, 30th Judicial District of Tennessee (filed July 30, 2024). Torch initiated that lawsuit against the District Attorney of Shelby County seeking a declaration that its devices didn't violate state gambling laws. In July 2025, a three-judge panel unanimously concluded that the "No Chance Games" owned and operated by Torch in Tennessee were indeed illegal gambling devices. (Doc. 330-1).[8] The court reasoned that the "key distinctions" from ordinary slot machines, including the prize viewer feature, made "no material difference in the machine's character." (*Id.* at 12). Rather, the "future uncertainty" of prize amounts not displayed by the prize viewer made Torch Devices "contingent on chance" and thus illegal gambling devices under Tennessee law. (*Id.*).

Missouri and Tennessee gambling laws are nearly identical in all material respects. Tennessee's criminal statute defines a gambling device as one where a player "risk[s] anything of value for a profit whose return is to any degree of contingent on chance." Tenn. Code Ann. § 39-17-501(2) (emphasis added); *cf.* Mo. Rev. Stat. § 572.010 (defining gambling to include "risk[ing] something of value upon the outcome of a contest of chance or a future contingent event not under [the player's] control or influence").

In the chancery court, Torch advanced the same argument Defendants press here, i.e., that the prize viewer eliminates chance and makes the devices legal. (*Id.* at 10-12). The court rejected that theory, reasoning that "moving a player's expectations some spins into the future does not

---

[8]    TNT filed the Chancery Court's order as supplementary authority in this case at Doc. 330. Record citations in this section refer to the ECF docket and page headers in this case.

alter the fundamental nature" of the devices as illegal gambling devices. (*Id.* at 11). The court reached that holding despite the fact that the prize viewer on the Torch Devices in Tennessee (unlike the Torch Devices in Missouri) allowed the player to see not only the very next prize amount but also future plays up to his credit balance. (*Id*. at 4-5). Additionally, Defendant Miltenberger testified in that case that the devices at issue there did not contain random number generators, whereas the Torch Devices in this case indisputably contain randomness in the start indices. (Doc. 330-2 at 5).

Other courts have reached similar conclusions involving games like Torch Devices. The Supreme Court of Iowa held that devices manufactured by Banilla were illegal notwithstanding the prize viewer. *Banilla Games, Inc. v. Iowa Dep't of Inspections & Appeals*, 919 N.W.2d 6, 17–19 (Iowa 2018). The Supreme Court of North Carolina evaluated machines similar to Torch's and recognized that, "chance controls plaintiffs' game … . Accordingly, just as is the case with a traditional slot machine, the return to the player in plaintiffs' game is dependent on chance." *Gift Surplus, LLC v. State ex rel. Cooper*, 868 S.E.2d 20, 29 (N.C. 2022) ("Gift Surplus's kiosks … offer five similar games, all featuring reel-spinning video resembling a slot machine.").

Examining another Banilla device with a "pre-reveal," the Ohio Court of Appeals called the feature a "façade" intended to "take an otherwise illegal game outside of the scope of" state laws that make such devices illegal. *Mayle Bingo Co., L.L.C. v. Ohio Dep't of Pub. Safety*, 152 N.E.3d 1237, 1242 (Ohio Ct. App. 2020). Additionally, the Florida Court of Appeals deemed devices with a "pre-reveal" illegal, reasoning:

> While it is true that the user is advised of the outcome of the game at hand ahead of time through the preview feature, the user cannot predict that outcome until it is randomly generated and then displayed by the machine. Nor can the user predict the outcome of Game 2 while playing Game 1.

*Gator Coin II, Inc. v. Fla. Dep't of Bus. & Prof'l Regulation*, 254 So. 3d 1113, 1118 (Fla. Dist. Ct.

App. 2018). Finally, an appellate court in Pennsylvania similarly found that machines like Torch's were illegal gambling devices, reasoning:

> This Court cannot ignore the reality that chance ultimately determines losing outcomes, winning outcomes, and the different prize levels which are programmed into the [machine's] finite pool for random sequential delivery . . . [H]ere a large random element is always present, and it predominates . . . [T]he [machines] are games of chance.

*Gracie Techs., Inc. v. Commonwealth*, No. 627 C.D. 2019, 2020 WL 1231395, at *2 (Pa. Commw. Ct. Mar. 13, 2020).

While the laws and the particular devices in the foregoing cases may differ in some respects, the fact remains that "pre-reveal" gimmicks have been universally rejected as a basis to exempt similar games from state gambling laws. This trend reinforces the Court's conclusion that the prize viewer feature in Torch Devices does not except them from Missouri gambling laws. Torch has cited no authority in America where a court found that a "pre-reveal" feature makes a gaming device legal. Here, the evidence overwhelmingly demonstrates that the prize viewer doesn't change the nature of Torch Devices and that they are still games of chance and thus gambling devices.

### Torch's Opposition

Torch asserts several theories in opposition to Count VII. On familiar ground, Torch urges the Court to abstain pursuant to *Younger* and *Burford*, now adding for the first time that a declaratory judgment would violate Missouri's Tenth Amendment right to regulate gambling as a state law issue.

As discussed in the Court's summary judgment order (Doc. 312), Torch sought a state court declaration on the legality of their devices in *Torch Electronics v. Missouri Department of Public Safety*, 694 S.W.3d 548 (Mo. App. W.D. 2024). That case was dismissed without a merits determination. One state criminal case has resulted in a conviction against Integrity Vending in

Platte County, though no appeal was taken.[9] Other cases have been dismissed or have stalled during the pendency of this case.

The Court has wrestled with principles of comity at each stage of this case and discussed the same in its orders at the summary judgment stage, initially abstaining but later recognizing the necessity of resolution due to ongoing delay, inconsistent outcomes, and resulting uncertainty in the state system. (Doc. 332). The Court need not address Torch's new Tenth Amendment argument separately, as it is foundational to the doctrines of abstention.

*Younger* Abstention

*Younger* abstention requires federal courts to refrain from enjoining a parallel pending state court criminal proceeding except under special circumstances such as a bad-faith prosecution or when a criminal statute is patently unconstitutional. *Courthouse News Serv. v. Gilmer*, 48 F.4th 908, 913 (8th Cir. 2022); *Wassef v. Tibben*, 68 F.4th 1083, 1087 (8th Cir. 2023) (referring to *Younger v. Harris*, 401 U.S. 37, 41 (1971)). The Court initially cited *Younger* in its order dismissing Count VII in light of pending state court cases. On closer examination, the Court concludes that abstention under *Younger* is not warranted.

The Court is aware of one pending criminal prosecution involving the issues presented here: that of Torch customer James McNutt, pending in Franklin County since 2020.[10] McNutt owns Midwest Petroleum and is charged with three counts of possessing an illegal gambling device (i.e., Torch Devices) on the premises. But the classic *Younger* situation is when a litigant "runs to federal court to cut off an impending or actual state-court proceeding that is unlikely to

---

[9]    *State v. Integrity Vending*, Case No. 19AE-CR00948-01, filed April 30, 2019, 6th Judicial Circuit of Missouri (Platte County).

[10]    *State v. McNutt*, Case No. 20AB-CR03465, 20th Judicial Circuit of Missouri (Franklin County), filed Nov. 16, 2020.

go well." *Courthouse News Serv. v. Gilmer*, 48 F.4th at 914. That is not the scenario here. Torch is not on trial in Franklin County. McNutt is not the federal plaintiff asking this Court to enjoin his criminal case. This Court's declaration isn't binding on the Franklin County trial court. "Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). Torch itself does not invoke the McNutt case or any other criminal gambling case as a basis for *Younger* abstention.

Additionally, *Younger* has been extended to certain types of state civil proceedings "akin to a criminal prosecution." *Id*. In deciding whether a civil case is "akin to criminal prosecution," courts consider: (1) Was the action commenced by the state in its sovereign capacity? (2) Was the proceeding initiated to sanction the federal plaintiff for some wrongful act? (3) Are there other similarities to criminal actions, such as a preliminary investigation culminating in the filing of formal charges? *Wassef*, 68 F.4th at 1088. If so, then to determine whether *Younger* abstention applies in a civil case, the Eighth Circuit applies the *Middlesex* factors. They are: the presence of (1) an ongoing state judicial proceeding that (2) implicates important state interests and (3) provides the federal plaintiff adequate opportunity to raise federal challenges, and (4) does not involve an extraordinary circumstance counseling against abstention. *Id*. (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432- 35 (1982)).  Using these tests, the Court again concludes that *Younger* doesn't apply here.

As the notable underlying state case justifying *Younger* abstention, Torch solely relies on its own final and closed civil case that was not remotely akin to a criminal prosecution, where the Missouri Court of Appeals declined to reach the merits of Torch's suit for declaratory relief, reasoning that it wasn't the proper vehicle for interpreting state criminal law. *Torch Elecs.*, 694 S.W.3d at 555. Though Torch urges the same result here, that case isn't binding on this Court or

relevant to the *Younger* analysis using the foregoing factors. It only underscores the persistent elusiveness of state court resolution.

The Court is aware of three pending civil cases that continue to languish in state court. None satisfy the *Younger* and *Middlesex* factors for civil proceedings akin to criminal prosecution. In Henry County, a suit in equity aiming to shutter Clinton Convenience as an illegal gambling house has been pending since 2020.[11] This case doesn't involve TNT or Torch. In St. Louis County, a taxpayer derivative lawsuit filed by TNT's owner against Torch, Midwest Petroleum, and Crawford County also remains pending since 2020.[12] That case was not commenced by the state to sanction this federal plaintiff for a wrongful act. In Cole County, Torch has appealed a decision upholding the City of Springfield's non-renewal of Torch's business license pursuant to a new ordinance prohibiting amusement devices offering monetary prizes.[13] That case was commenced by Torch and doesn't involve the legal issues presented here.

In sum, these cases don't justify abstention under *Younger*, and the parties have not alerted the Court of any other pending litigation warranting *Younger* analysis.

<u>*Burford* Abstention</u>

*Burford* abstention applies "when a state has established a complex regulatory scheme supervised by state courts and serving important state interests, and when resolution of the case demands specialized knowledge and the application of complicated state laws." *Doe v. McCulloch*, 835 F.3d 785, 788 (8th Cir. 2016) (citing *New Orleans Pub. Serv., Inc. v. Council of*

---

[11]     *State ex rel. Shields v. Ranza Inc.*, Case No. 20HE-CC00064, 27th Judicial Circuit of Missouri (Henry County), filed Nov. 18, 2020

[12]     *Turntine v. Torch Elecs., LLC.*, Case No. 20SL-CC03000, 21st Judicial Circuit of Missouri (St. Louis County), filed June 2, 2020.

[13]     *Torch Electronics, LLC v. City of Springfield*, Case No. 25AC-CC00548, 19th Judicial Circuit of Missouri (Cole County), filed January 23, 2025; Case No. WD88364, Missouri Court of Appeals, Western District, filed October 1, 2025

*City of New Orleans (NOPSI)*, 491 U.S. 350, 361 (1989), referring to *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)). "*Burford* is concerned with protecting complex state administrative processes from undue federal interference." *Id*. (quoting *NOPSI* 491 U.S. at 362).

This Court considered *Burford* at the summary judgment stage but found it inapplicable because, "[a]lthough Missouri's gaming regulations are complex as applied to licensed entities, the question presented in this case does not require specialized knowledge or the application of complicated state laws." (Doc. 312 at 41); *TNT Amusements*, 2025 WL 947506, at *19 n.33. Torch urges the Court to reconsider, arguing that this *is* a complicated area of state law, as demonstrated by failed attempts at resolution in state court. This argument is unpersuasive if not illogical. The jury took less than two hours to find Torch's commercial representations false. In Platte County, a state trial judge considered evidence and arguments on these issues and found Integrity Vending guilty of promoting gambling.[14]  In Henry County, a judge found probable cause to support a criminal information, though the case was later dismissed for reasons unknown.[15] The issues presented here do not involve specialized knowledge or complicated state laws.

The closer call here is whether a declaration by this Court would offend principles of comity. Torch cites *Johnson v. Collins Ent. Co.*, 199 F.3d 710 (4th Cir. 1999), where the Fourth Circuit admonished a district court for failing to abstain in a case involving the interpretation of state gambling laws. There, however, the very issues before the district court were concurrently pending before the state supreme court. *Id*. at 721. By contrast here, six years have passed since

---

[14]     *State v. Integrity Vending*, Case No. 19AE-CR00948-01, filed April 30, 2019, 6th Judicial Circuit of Missouri (Platte County).

[15]     *State v. Hussain*, Case No. 20HE-CR00629-01, 27th Judicial Circuit of Missouri (Henry County). This case is no longer accessible on CaseNet.

the Missouri Gaming Commission declared Torch-like devices illegal, and five years have

passed since Integrity Vending was convicted and McNutt was charged. Absent appellate

precedent, however, Torch continued to mischaracterize its devices during that period, according

to the jury.

"Where *timely and adequate* state-court review is available, a federal court sitting in

equity must decline to interfere with the proceedings or orders of *state administrative agencies*:

(1) when there are '*difficult questions of state law* bearing on policy problems of substantial

public import whose importance transcends the result in the case then at bar'; or (2) where the

'exercise of federal review of the question in a case and in similar cases would be disruptive of

state efforts to establish a *coherent policy* with respect to a matter of substantial public

concern.'" *NOPSI*, 491 U.S. at 361 (emphasis added). The Court finds these characteristics

lacking here. Timely state court review has proven unavailable except in the Integrity Vending

case, which Torch deems inadequately precedential to curtail its own operations. There are no

state administrative orders or proceedings implicated. The state law question is not particularly

difficult, but there is no statewide effort to establish a coherent policy due in part to Torch's

tactics, as evidenced in the summary judgment record.

Given the unique facts of this case, the Court continues to believe that *Burford* does not

compel abstention.

### *Wilton/Brillhart* Abstention

Under the Declaratory Judgment Act, a district court "may declare the rights and other

legal relations of any interested party seeking" a declaration." 28 U.S.C. § 2201(a).

*Wilton/Brillhart* abstention refers to a district court's discretion to dismiss a declaratory

judgment action when the controversy would be better settled in state court. *EMCASCO Ins. Co.*

*v. Walker*, 108 F.4th 634, 637 (8th Cir. 2024) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995), and *Brillhart v. Excess Inc. Co. of Am.*, 316 U.S. 491 (1942)).

The scope of a court's discretion differs depending on whether a parallel state court action is pending. *Lexington Ins. Co. v. Integrity Land Title Co.*, 721 F.3d 958, 967 (8th Cir. 2013). If so, then the court enjoys broad discretion to abstain from its "otherwise virtually unflagging obligation" to exercise the jurisdiction conferred by Congress. *EMCASCO*, 108 F.4th at 636. If not, then the court's discretion is narrower and should be exercised according to a six factor test: (1) whether the declaratory judgment sought will serve a useful purpose in clarifying and settling the legal relations in issue; (2) whether it will terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the federal proceeding; (3) the strength of the state's interest in having the issues decided in state court; (4) whether the issues raised in the federal action can be more efficiently resolved in the court in which the state action is pending; (5) whether the federal action would result in unnecessary entanglement between the state and federal systems due to overlapping issues of fact or law; and (6) whether the federal action is being used merely for "procedural fencing in a race for res judicata." *Lexington Ins. Co.*, 721 F.3d at 968.

As no parallel proceeding is pending, the Court considers the foregoing six factors and finds that they weigh against abstention. The Court's declaration on this Count VII aims to clarify and settle the legal issues presented in this case and put an end to the longstanding uncertainty giving rise to TNT's claims. While the Court acknowledges Missouri's state interests, the record demonstrates that these issues have not found efficient resolution in the state system in any manner Torch considers binding, notwithstanding the 2019 opinion of the Gaming Commission and the 2020 conviction of Integrity Vending. The Court's limited declaration here

23

aims to avoid unnecessary interference with state court proceedings of any nature, simply applying Missouri law to the facts found by the jury. And TNT's successful federal claim refutes any inference of procedural fencing. These factors support the Court's exercise of jurisdiction under 28 U.S.C. § 2201(a).

It bears noting that Torch itself didn't advocate for abstention at any point through the summary judgment phase. Rather, the Court raised it *sua sponte* initially in Torch's favor, after which Torch opened the door for reconsideration on its own motion. Torch now argues that the Court should abstain to avoid "the difficult position of predicting how the Missouri Supreme Court would resolve the conflict," and that such a declaration would be "duplicative and uneconomical" in light of the Missouri Supreme Court's denial of transfer in Torch's own declaratory judgment appeal in state court. *Capitol Indem. Corp. v. Haverfield*, 218 F.3d 872, 875 (8th Cir. 2000) (prescribing abstention where a parallel state court action was pending). But Torch's case didn't resolve the merits, and the state decision doesn't dictate this Court's authority under 28 U.S.C. § 2201(a). The issues here are straightforward, and the Court has no trouble predicting how the Missouri Supreme Court would rule, as many sister states have, but no such case is pending. Applying the six-factor test, the Court concludes that *Wilton/Brillhart* abstention is not warranted here.

Scope of the Court's Declaration

Finally, Torch contends that an explicit declaration of illegality of Torch Devices would constitute an advisory opinion lacking any concrete justiciable "case or controversy" touching the legal rights and relations of the parties in this case. It argues that any declaratory relief the Court grants must be limited by and consistent with the jury's findings on TNT's unfair competition claims. The Court's legal conclusions herein, informed by the expert evidence and

24

the jury's factual findings, comport with these principles. The jury readily found to be *false* at least one of Torch's statements that chance played no role in its games or that the "device does not fit any definition of a "gambling device" in the state of Missouri and is not prohibited for use by you." Given this central fact – i.e., that Torch Devices do indeed involve an element of chance – the devices clearly meet the definitions of gambling device in § 572.010, as alleged in Count I of TNT's complaint. (Doc. 1 at 35). Necessarily, then, outside of a licensed casino, the devices are prohibited in the state of Missouri – *i.e.*, they are illegal. This conclusion is far from advisory; rather, it is central to the controversy, as reflected in TNT's complaint and throughout the parties' briefing in this case. The Court has declared no more than necessary to resolve the parties' dispute.

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the Torch Devices marketed and distributed by Defendants are "gambling devices" under Mo. Rev. Stat. § 572.010 and therefore are illegal under Missouri law when operated outside a licensed casino. (Doc. 423).

Dated this 13th day of February 2026.

*John A. Ross*
_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE