# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| TNT AMUSEMENTS, INC., ) <br> d/b/a PLAY-MOR COIN-OP, ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> TORCH ELECTRONICS, LLC, *et al.,* ) <br> ) <br>     Defendants. ) | Case No. 4:23-CV-330-JAR |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's request for attorney fees and disgorgement of Defendants' profits after a jury verdict in Plaintiff's favor on claims of false advertising and unfair competition in this dispute between competitors in the retail amusement device industry. Upon review of the parties' arguments and for the reasons set forth below, the Court finds it appropriate to grant an award of attorney fees and a partial disgorgement of profits.

## BACKGROUND

The facts and procedural history of this case are set forth at length in the Court's Memorandum and Order on summary judgment (Doc. 312) and subsequent Declaratory Judgment (Doc. 437). To summarize, Plaintiff TNT Amusements leases traditional arcade games in retail locations throughout Missouri. Defendant Torch Electronics leases "no-chance" gaming devices in the same market. Defendant Steven Miltenberger is Torch's president and majority owner. TNT filed this lawsuit in March 2023 centrally alleging that Torch's devices are illegal slot machines that divert TNT's customers. In its complaint, TNT asserted claims of false advertising under the Lanham Act (Count I), unfair competition under Missouri common law

(Count II), and four counts under the Racketeer Influenced and Corrupt Organizations Act (RICO) (Counts III-VI). TNT also sought a declaratory judgment that Torch devices are illegal gambling devices and slot machines under Missouri law (Count VII). The Court granted summary judgment in Torch's favor on TNT's RICO claims, allowed Counts I and II to proceed to trial, and initially dismissed Count VII on principles of abstention. (Doc. 312). On Torch's subsequent motion for reconsideration, the Court vacated its earlier dismissal of Count VII but reserved ruling on it pending factual determinations by the jury on Counts I and II. (Doc. 332). The parties tried those counts during a five-day jury trial starting September 29, 2025. To find liability, the jury had to find that that one or more of the following commercial representations by Torch were false or misleading:

- In the No Chance Game, chance has absolutely no role in any possible outcome;
- The "Prize Viewer" option on NCGs eliminates chance;
- Every "No Chance" Game is carefully designed to ensure that the element of chance has no role in the outcome; or
- As a result, this amusement device does not fit any definition of a "gambling device" in the state of Missouri and is not prohibited for use by you.

Jury Instrs. (Doc. 400 at 7, 9, 12). After two hours of deliberation, the jury returned a verdict in favor of TNT on both counts, specifically finding falsity in one or more statements. (Doc. 401). In assessing damages, the jury was instructed to consider lost profits as well as any injury to TNT's reputation and goodwill. The evidence presented at trial reflected that TNT's lost profits for the relevant period were roughly $125,000. The jury awarded $500,000 in damages. The Court thus infers that the jury attributed $375,000 to injuries to TNT's reputation and goodwill.

Based on the jury's factual findings, the Court issued a declaratory judgment on Count VII finding that Torch Devices meet the definition of "gambling device" under Missouri law. (Doc. 437). As the prevailing party on Count I, TNT now seeks an award of attorney fees,

2

litigation costs, and disgorgement of Torch's profits as permitted under the Lanham Act, 15 U.S.C. § 1117(a).

## DISCUSSION

The Lanham Act states in pertinent part:

> When … a violation under section 1125(a) … of this title … shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, … subject to the principles of equity, to recover (1) **defendant's profits**, (2) any damages sustained by the plaintiff, and (3) the **costs of the action**. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in **exceptional cases** may award reasonable **attorney fees** to the prevailing party.

15 U.S.C. § 1117(a) (emphasis added).

### Attorney Fees and Costs

Given the jury's verdicts in TNT's favor, TNT is plainly entitled to recover the costs of the action pursuant to the first sentence of the foregoing section. Torch doesn't argue otherwise. The parties dispute only whether this is an "exceptional case" justifying an award of attorney fees pursuant to the last sentence.

"[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the

3

totality of the circumstances." *Id*. "Where a defendant's unlawful conduct was willful and deliberate, the court may well determine that this is the type of exceptional case for which an award of attorney's fees is appropriate." *Safeway Transit LLC v. Disc. Party Bus, Inc.*, 954 F.3d 1171, 1182 (8th Cir. 2020). Other factors include "objective unreasonableness" in the factual and legal components of the case and "the need in particular circumstances to advance considerations of compensation and deterrence." *Id*.

Applying these factors and considering the totality of unique circumstances presented here, the Court finds that this case is indeed exceptional. As discussed at length in the Court's orders denying summary judgment on Count I and later granting declaratory judgment on Count VII, the Missouri Gaming Commission declared Torch Devices illegal in 2019. However, because the Commission's jurisdiction is limited to *licensed* operators, Torch simply ignored the Commission's opinion and continued to operate outside the Commission's regulatory reach. Torch's strategy was to "keep its position that the MGC has nothing to say about Torch's games" because, in Torch's view, the Commission did not "get to determine whether a game is a gambling device or not."  (Doc. 245-27).

Further, the Missouri Highway Patrol and multiple local law enforcement agencies cautioned Torch of their position that its devices are illegal, and several prosecutors pursued charges against its customers, though Torch persuaded others to abstain. In 2020, a trial court in Platte County entered a conviction against a convenience store possessing similar "no-chance" devices. Missouri jurisprudence since 1913 has held that a gaming machine with a prize viewer is still a gambling device. Appellate courts in sister states have reached the same conclusion in recent years, as cited in the Commission's 2019 opinion.

The record thus demonstrates that Torch was on notice since at least 2019 that its commercial representations defied the realities of the legal landscape and were therefore willfully and deliberately false when viewed in context. Torch simply chose to ignore existing authority in pursuit of profit. For the same reasons, the substantive strength of TNT's position, both in fact and law, was exceptionally compelling, as reflected by the jury's swift and significant verdict in TNT's favor.

Additionally, the Court notes instances when Torch's litigation tactics or purported errors materially undermined case management efficiency and amplified TNT's costs. Most notably, the first exemplar hard drive provided to TNT's expert contained random functions that Torch's expert had not identified, causing extensive delays and expense related to further expert discovery and associated revised reports and evidentiary hearings. Also, TNT was forced to file a motion to compel a second deposition of Defendant Miltenberger after he was unprepared and refused to answer questions during his 30(b)(6) deposition. (Doc. 120). These issues alone necessitated multiple scheduling amendments and an entire second round of *Daubert* motions and voluminous summary judgment briefing in this already protracted case. "A party's unreasonable conduct need not be independently sanctionable for the case to be exceptional." *Pocket Plus, LLC v. Pike Brands, LLC*, 53 F.4th 425, 435 (8th Cir. 2022).

Given the foregoing circumstances and the balance of equities, the Court finds that an award of attorney fees is appropriate. The Court will direct TNT to file a motion and supporting documentation at the appropriate time upon further order of the Court.

**Disgorgement of Profits**

Disgorgement imposes a lower burden than money damages and injunctive relief because it serves a different purpose. *Watkins Inc. v. McCormick & Co., Inc.*, 574 F. Supp. 3d 644, 656 (D. Minn. 2021). "Disgorgement, an equitable remedy, targets the wrongdoer and seeks to deter improper conduct and prevent unjust enrichment." *Id*. "To achieve these purposes, any plaintiff with standing may seek to eliminate [a] defendant's ill-gotten gains by pursuing disgorgement of its profits." *Id*.

Though the Eighth Circuit has not adopted a specific set of factors, other circuits instruct district courts to consider "whether the defendant had the intent to confuse or deceive, whether sales have been diverted, the adequacy of other remedies, any unreasonable delay by the plaintiff in asserting its rights, the public interest in making the misconduct unprofitable, and whether the case involves palming off." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 2013 WL 12498332, at *3 (D. Minn. Aug. 6, 2013) (citations omitted). Under some circumstances, the egregiousness of the defendant's conduct may alone justify an accounting. *Id*. "A 'defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate.'" *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 38 (9th Cir. 2022) (quoting in a false advertising case *Romag Fasteners, Inc v. Fossil, Inc.*, 590 U.S. 212, 219 (2020)).

"In assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). In other words, the plaintiff need only prove sales of the falsely advertised products. *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 819 (D. Minn. 2011). A "recovery of profits is not necessarily limited to those profits earned *because of* the false advertising." *Aviva Sports*,

6

2013 WL 12498332 at *2 (emphasis added). Ultimately, "the district court is given broad discretion to award the monetary relief necessary to serve the interests of justice, provided it does not award such relief as a penalty." *Aviva Sports*, 829 F. Supp. 2d at 819 n.15 (citing *Metric & Multistandard Components Corp. v. Metric's Inc.*, 635 F. 2d 710, 715 (8th Cir. 1980)).

At trial, the evidence demonstrated that, from 2017 to 2023, Torch collected over $5.5 million from 100 machines in locations where it overlapped with TNT. The evidence also established that Torch operates more than 6,000 devices statewide. TNT estimates that Torch's total profits may exceed $68 million in the past year alone. (Doc. 424 at 6). TNT seeks disgorgement of Torch's profits statewide and asks this Court to order financial discovery accordingly.

Torch counters that disgorgement is not appropriate in this non-comparative advertising context, particularly insofar as the jury already awarded TNT monetary damages exceeding its lost profits. Torch cites *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869 (5th Cir. 2019), where the Fifth Circuit opined that disgorgement, separate from recovery of diverted profits, would have constituted a windfall to the plaintiff. *Id*. at 878. That case involved false representations about medical products marketed to a sophisticated clientele, where evidence of diversion (particularly causation) was speculative, and only a portion of the defendant's sales could be attributed to the misrepresentations. In the Court's view, this non-binding case is largely inapposite but ultimately affirms a district court's broad discretion in weighing the above-mentioned non-exclusive factors and other equities on a case-by-case basis. *Id*. at 876, 882.

Torch also contends that any disgorgement award would constitute an impermissible penalty, especially considering the evidence of Torch's good faith belief in the veracity of its

7

statements, namely a 2017 opinion letter from a Chicago law firm and the fact that some county prosecutors opted not to pursue charges involving Torch devices.[1] But the opinion letter was supplied by an Illinois lawyer prior to the Missouri Gaming Commission's unequivocal warning in 2019, and the county prosecutors who abstained from pursuing charges did so in direct reliance on Torch's false statements at issue here. Again, Torch's strategy was to maintain its subjective stance notwithstanding the position of the Gaming Commission and law enforcement. Overall, the evidence belies any objectively reasonable claim of good faith.

In the alternative, Torch argues that any disgorgement award should be limited to profits from the locations where TNT and Torch overlapped in the market, citing *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir. 1976). In that case, the district court awarded the plaintiff 20% of the infringer's profits from three states where the plaintiff had legally protectable interests. *Id*. at 1222. The Eighth Circuit affirmed the geographic limitation but remanded with instructions to award 100% of profits from that territory as a deterrent. *Id*. at 1223. Though this misappropriation case pre-dates the current version of the statute and is factually inapposite, the Court finds instruction in the Circuit's view that, where the evidence shows willfulness and bad faith, disgorgement may exceed a plaintiff's demonstrated losses in order to serve as a deterrent.

In reply, TNT argues that the jury's award covered only diverted sales that could be substantiated, but it didn't account for TNT's lost business opportunities elsewhere and overall inability to compete in the market. TNT submits that the Lanham Act offers multiple forms of recovery precisely due to the inadequacy of diverted sales and the difficulty of proving the full extent to which a defendant's misconduct has harmed the plaintiff or impacted the market. TNT

---

[1] This evidence was part of the summary judgment record, but the Court excluded it at trial because it was irrelevant to the issues presented to the jury.

urges the Court to order statewide financial discovery before considering any limitation on the scope of disgorgement.

Weighing the relevant factors[2] and considering all the equities, the Court finds that some disgorgement of Torch's profits is appropriate here. Torch intentionally sought to persuade customers and consumers that its devices eliminated chance and therefore were not gambling devices, contrary to the position of the Gaming Commission and law enforcement and even after the judgment against Integrity Vending. The evidence at trial demonstrated that Torch devices do indeed contain elements of chance, and the jury readily found Torch's statements to be false and misleading. The Court considers Torch's misrepresentations in defiance of state authorities sufficiently willful to justify an accounting.

Additionally, the evidence established an actual diversion of business from TNT to Torch. The jury's award compensated TNT only for demonstrable diverted profits from 2018 to 2023 (roughly $125,000) and loss of goodwill and reputation (presumably the balance of the verdict, i.e., $375,000). But the Court is not convinced that this remedy is adequate to fully compensate TNT for the totality of its market injury. TNT's owner, James Turntine, testified that he started the business with his father in 1988 and grew it through word of mouth, acquiring routes, and promoting dart leagues and pool tournaments. (Doc. 413 at 186-187). TNT serviced nearly 150 accounts with annual revenues of roughly $850,000 before Torch entered the market. (*Id*. at 191, 193). At the time of trial, TNT had only 94 customers, a loss of 35% (*Id*. at 198). Some of TNT's accounts lost to Torch had been TNT customers for 20 to 30 years. (*Id*. at 202).

---

[2] Factors examining any delay by the plaintiff or palming off by the defendant don't apply here. TNT learned that Torch's statements were false when the Gaming Commission deemed the devices illegal in July 2019. TNT filed this suit in March 2023, well within the five-year statute of limitations. And the absence of palming off should not be heavily weighed when a plaintiff has shown concrete harm such as diverted sales due to the false advertising. *Retractable Techs.*, 919 F.3d at 881.

Turntine explained that, though the parties compete for floor space, "it's not a fair fight." (Doc. 245-24 at 90). "We can't generate the revenue that slot machines generate." (*Id*. at 98). He said that Torch has had the "biggest single impact" on TNT's business. (*Id*. at 204).

Moreover, in the Court's view, the most important considerations in this particular case are those aiming to deter the defendant's conduct, further the public interest of making that conduct unprofitable, and serve the interests of justice. Again, Torch asserted its advertising statements in direct contravention to the position of the Missouri Gaming Commission and law enforcement, and the expert evidence demonstrated that Torch games do contain elements of chance. If Torch hadn't falsely represented and marketed its devices as "no-chance" games exempt from Missouri's definition of a gambling device, Torch couldn't have operated anywhere in its current territory. Rather, it could only have operated in licensed casinos subject to state gaming taxes benefiting public education. One hundred percent of its revenue is attributable to its misrepresentations.

As stated above, Torch collected over $5.5 million from 100 devices in overlapping locations alone, and Torch operates approximately 6,000 machines statewide. Given the scale of Torch's revenues, a disgorgement award sufficient to render Torch's advertising unprofitable would inevitably result in a "lottery-level windfall" to TNT. *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 214 (2d Cir. 2019) (instructing district courts to "fashion a remedy that may sufficiently deter willful misconduct without giving plaintiffs a lottery-level windfall"). Thus, mindful that disgorgement is not intended to serve as a penalty, the Court is not persuaded that an award of statewide profits is a reasonable and proportional remedy here. However, the Court believes that some disgorgement from overlapping locations is appropriate to deter Torch's willful conduct and render it at least slightly less profitable, to fully compensate TNT for

10

its market loss, and to serve the greater interests of justice given the unique circumstances of this case.

Finally, the Court notes that consumers spent over $32 million on Torch devices in overlapping locations alone during the relevant period. Torch has profited tremendously from its misrepresentations and had avoided regulation, taxation, and prosecution by virtue of its government relations efforts and the Gaming Commission's limited jurisdiction. In this regulatory void, TNT's lawsuit not only vindicates its own competitive interests but also protects consumers from the fallacy of "no-chance" gaming going forward. *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 n.8 (8th Cir. 1997) (recognizing congressional intent that commercial plaintiffs act as "vicarious avengers" of consumer rights).[3]

For all of the foregoing reasons, the Court finds that the equities weigh in favor of partial disgorgement. Torch already provided some relevant financial information during discovery, as reflected in the summary judgment record. (Doc. 239, 242). The Court will order the parties to confer and submit a proposal for the scope and schedule of additional financial discovery as necessary for the Court to consider an award of disgorged profits from the overlapping locations. If the parties cannot agree on specific issues, they may state their respective positions in the joint submission.

---

[3] Though *Porus Media* identified this purpose in the context of injunctive relief, which TNT didn't request here, the practical result for gaming consumers is the same in light of the jury's verdict on Counts I and II and the Court's declaratory judgment on Count VII.

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Plaintiff's request for relief on Counts I and II is **GRANTED in part**. (Doc. 424). Plaintiff will be directed to submit documentation in support of its request for attorney fees and costs at the appropriate time upon further order of the Court.

**IT IS FURTHER ORDERED** that the parties are directed to confer and submit by **February 23, 2026**, a joint plan proposing the scope and schedule of additional financial discovery covering overlapping locations, as relevant to Plaintiff's request for disgorgement of profits.

Dated this 13th day of February, 2026.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE