**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| TNT AMUSEMENTS, INC., | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:23-cv-330-JAR |
| | ) |
| TORCH ELECTRONICS, LLC, *et al.*, | ) **ORAL ARGUMENT REQUESTED** |
| | ) |
|    Defendants. | ) |

**PLAINTIFF TNT AMUSEMENTS, INC.'S**
**<u>MEMORANDUM IN SUPPORT OF MOTION TO COMPEL POST-TRIAL DISCOVERY</u>**

"[I]t matters not for the purpose of discovery which side's theory of the case might ultimately be proved correct. What matters is that each side is entitled to pursue intelligible theories of the case and [a party] cannot, by their sole insistence, declare evidence undiscoverable and irrelevant merely because it does not fit into their own theory of the case." *Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.2d 919, 926 (8th Cir. 2014). Those principles are so axiomatic that they scarcely require a citation. Yet Defendants attempt to do exactly what the Eighth Circuit (and the Federal Rules) have always forbidden: to preclude TNT from obtaining needed discovery based on Defendants' own predictions about this Court's ultimate disgorgement order.

After leading TNT to believe that they would produce statewide financial information in connection with their expert disclosures (which never arrived), Defendants now assert that TNT is not entitled to any of their financial information beyond a small subset of locations that the parties identified at the outset of this case. That stipulation, however, was a limited agreement made solely for the purpose of streamlining pretrial discovery, while expressly reserving TNT's right to obtain broader financial discovery after trial. *See* 2023 Stipulation (Doc. #58) ¶ 2(a) (providing that discovery of financial information beyond the agreed locations would be ***deferred*** until after trial

1

on the merits). The 2023 Stipulation was entered "without prejudice to [TNT's] right to seek discovery of information relating to Defendants' Financial Information if, after trial on the merits, [TNT] has succeeded on a claim under which [TNT] may pursue an award from Defendants' profits." 2023 Stipulation (Doc. #58) ¶ 2(c). TNT did exactly that, obtaining a unanimous (and swift) verdict that the Defendants had consistently misrepresented the nature and function of the Torch Devices. To preclude TNT from discovering Defendants' profits from those misrepresentations would run afoul of the broad scope of discovery guaranteed by the Federal Rules and Defendants' own agreement to "defer[]" such discovery until after trial. *See id.* ¶ 2(a).

Defendants do not stand on any firmer ground by relying upon this Court's February 13, 2026 Order (Doc. #438) (the "February Order"), in which the Court expressed its preliminary view that an award "sufficient to render Torch's advertising unprofitable" was inappropriate since it might result in a "lottery-level windfall" to TNT. *Id.* at 10. Defendants would have this Court construe that interlocutory statement not only as a conclusive determination precluding TNT from even ***requesting*** a broader disgorgement order at the end of the case, but also as a limitation on TNT's right to ***discovery*** under the Federal Rules. Indeed, Defendants attempt to construe that order so narrowly that it would deny TNT access to financial information relating not only to its locations across the state, but even to ***overlapping locations*** that had not yet been identified (or, in some cases, were not even overlapping yet) at the outset of this litigation in 2023. The February Order simply provides no warrant for such a limitation on TNT's right to discovery.

This Court should not brook any further obstructionism from Defendants. The Court has already had to order Mr. Miltenberger to sit for a second deposition after he pled ignorance of numerous identified topics in Torch's first Rule 30(b)(6) deposition, as well as require Defendants' expert Nick Farley to take the stand to explain his shifting (and ultimately disproven) claims

regarding the Torch Devices. *See* Order (Doc. #144) (granting TNT's motion to compel a second 30(b)(6) deposition); 10/1/2024 Hr'g Tr. (Doc #300) at 5–45 (testimony of Nick Farley). The information that TNT seeks is contained in internal databases readily accessible to Defendants, and Defendants can alleviate any confidentiality concerns they may have by continuing to mark their answers "confidential" under this Court's protective order—as they have already done.

After Defendants unsuccessfully sought to certify this Court's declaratory judgment order for interlocutory appeal, this Court noted that "[i]f Torch is impatient to commence the appellate phase, it could accelerate financial discovery so that a final judgment can be entered." Order (Doc. #446) at 6. Rather than accept this Court's invitation, the Defendants have continued to stonewall, holding up this Court's February Order as its supposed defense to that financial discovery. But whatever the February Order may portend about the disgorgement order this Court may ultimately impose, it has not limited TNT's right to request whatever disgorgement order it believes it is entitled to, nor has it limited the discovery that TNT may obtain in order to support its request. This Court should therefore compel Defendants to produce the financial information requested by TNT's First Interrogatories—just as Defendants indicated they would before they shifted strategies by deciding not to retain an expert after all.

**DISCUSSION**

**I. This Court Should Compel Defendants to Identify and Produce Financial Information Regarding All "Overlapping Locations" (Interrogatories 1, 2, 3, & 9)**

The Court indicated it may, at the conclusion of this litigation, limit TNT to recovering profits from "***overlapping***" locations. *See* Feb. Order (Doc. #438) at 10–11 (emphasis added). Defendants, however, refuse to disclose any overlapping locations beyond the locations identified in the parties' 2023 Stipulation, attempting to misuse the Court's interlocutory ruling to conceal additional overlapping locations from TNT (and from this Court). But contrary to Defendants'

3

claims, this Court's February Order does not limit disgorgement only to "agreed" locations identified by the parties way back in 2023.

There is no dispute that Defendants have continued to expand Torch's business during this litigation, including further interference with TNT's customers. Indeed, this Court **_heard testimony_** relating to one such location at its September 26, 2024, hearing. *See* 9/26/24 Hr'g Tr. (Doc. #297) at 14–29 (reflecting testimony of Moose Lodge operator Kathy Biles). And as TNT previously reported, Defendants placed new Torch Devices in at least one new overlapping location even after this Court's declaratory judgment order. *See* Resp. (Doc. #444) at 10–11. Permitting Defendants to hide profits from locations that were not "overlapping" until after the commencement of litigation would immunize Defendants' continued expansion of their false advertising even after Defendants were aware of TNT's claims against them (and in at least one case, after this Court had declared the devices to be illegal).

Defendants attempt to rely on the 2023 Stipulation to support their narrow reading of "overlapping locations," but this too fails. The stipulation in question was agreed to by the parties to expedite pretrial discovery. Contrary to Defendants' assertions that "[t]he early 2024 discovery cutoff was the demarcation line for the locations and issues to be tried at trial," Mot. Ex. B at 3, the 2023 Stipulation specifically provided that it was "made without prejudice to [TNT's] right to seek discovery of information relating to Defendants' Financial Information . . . after trial." 2023 Stipulation (Doc. #58) ¶ 2(c). The plain language of the 2023 Stipulation did not impose any limits on TNT's ability to seek post-trial discovery; to the contrary, the 2023 Stipulation expressly reserved TNT's right to seek the very post-trial discovery it now requests. *See id.* Defendants' attempt to keep TNT (and this Court) from learning of additional overlapping locations—and to withhold information about the three locations TNT has independently learned of, despite

4

Defendants' recalcitrance—should be rejected by this Court as inconsistent both with the February Order and Defendants' own binding agreement in the 2023 Stipulation.

**II.  This Court Should Compel Defendants to Disclose Information About the Bank Accounts into Which Torch's Revenues Were Deposited (Interrogatories 6 & 7)**

So far, Defendants' post-trial production of financial information consists entirely of secondhand spreadsheets prepared by Defendants' counsel, rather than any underlying financial records. TNT therefore requested that Defendants identify the bank accounts into which Defendants deposited their ill-gotten gains, so that TNT can confirm their self-serving attestations. But to date, Defendants' answer has essentially been, "just take our word for it."

That plainly insufficient response deprives TNT of the opportunity to confirm (or dispute) even the minimal financial information Defendants have provided so far. Although Defendants assert that less than $10 million was deposited into Torch accounts from the locations identified in the 2023 Stipulation, Defendants have produced no underlying documents to support that claim. And now Defendants refuse to provide the bank account information that would allow TNT to request those documents with any specificity, whether from Defendants or the banks themselves.

Defendants fail to present any persuasive explanation for why such information is not plainly discoverable, as is their burden to do. *See Jo Ann Howard & Assocs., P.C. v. Cassity,* 3030 F.R.D. 539, 542 (E.D. Mo. 2014) ("The burden is typically on the party resisting discovery to explain why discovery should be limited because the rules of discovery are broad."). Their objections—principally, that TNT should have sought such information pretrial—are groundless.

First, contrary to Defendants' claim otherwise, TNT ***did*** seek at least some discovery regarding the accounts into which Defendants deposited their revenues before trial. According to the prior deposition testimony of both Mrs. Miltenberger and Mr. Miltenberger, the Torch operation involved its "auditors" depositing funds into various bank accounts across the state, which would

then be transferred to an account at a particular, identified bank. Steven Miltenberger 12/15/2023 Dep. Tr. (Doc. #95-2) 62:11–23; Sondra Miltenberger 12/8/2023 Dep. Tr. (Doc. #95-47) 103:8–12. Obtaining further detail regarding those deposits is necessary to permit TNT to request specific bank records and confirm whether those records actually match Defendants' claimed deposits. And the 2023 Stipulation expressly allows TNT to request just that information. *See* 2023 Stipulation (Doc. #58) ¶ 2(c).

Second, Defendants complain that it would be difficult to do a tracing analysis to determine which dollars were attributable to which locations. Mot. Ex. B at 11. But TNT has not requested a tracing analysis. TNT has only asked for Defendants to identify specific bank accounts so that TNT may obtain the information necessary to assess the accuracy of Defendants' unsupported representations of their revenues. Once it has those records, TNT may choose to perform its own tracing analysis, but it has not asked Defendants to perform any analysis whatsoever—it has just asked Defendants to identify their bank accounts.

Lastly, Defendants cannot defend against TNT's reasonable discovery requests by presuming the Court will not award TNT the full disgorgement it seeks. Mot. Ex. B at 10–13. Discovery is not limited by what a party may ultimately be able to prove. *See Sentis*, 763 F.2d at 926. To limit TNT's entitlement to discovery based upon a forecasted potential outcome would violate the basic principles of discovery discussed in *Sentis* and encroach on this Court's ability to determine an appropriate remedy.

TNT is entitled to discovery related to Defendants' finances, even if the Court may ultimately limit the disgorgement remedy. Nor is TNT required to simply take Defendants at their word. Instead, TNT is entitled to test Defendants' unsubstantiated claims.

**III.  Financial Information for Defendants' Entire Operation Is Relevant and Discoverable, Notwithstanding Any Potential Limitation This Court May Place on the Ultimate Disgorgement Award (Interrogatories 4, 5, 7, & 9)**

TNT's requests for financial information relating to locations beyond those identified in the 2023 Stipulation are not precluded by any of this Court's prior orders. While Defendants make much of this Court's February Order, that order simply instructed the parties to submit a joint plan proposing the scope and schedule of "additional financial discovery as necessary for the Court to consider an award of disgorged profits from the overlapping locations." Feb. Order (Doc. #438) at 11. Defendants argue that interlocutory ruling was intended not only to preclude TNT from even *requesting* disgorgement of profits beyond the Torch locations recited in the parties' 2023 Stipulation, but from obtaining *any discovery* from Defendants that is not *exclusively* related to the locations identified in that Stipulation.

Whatever impact this Court's February Order may have on TNT's ultimate recovery, it provides no basis to limit discovery. The scope of discovery is broader than the merits. Not only is Defendants' financial information plainly relevant to this Court's determination of the appropriateness of any particular disgorgement award, but it is also essential for TNT to test the veracity of the Defendants' assertions regarding their claimed expenses, *even at the overlapping locations*. Without information for other locations, TNT and this Court will have no basis to place the information for the overlapping locations in context, in order to determine the veracity of Defendants' claims and the appropriateness of any deductions that they assert for their costs.

Indeed, Defendants' counsel originally agreed with that proposition. Defendants' counsel originally told TNT's counsel that he expected Defendants would produce statewide financial information in connection with their expert disclosures. But those disclosures never arrived. Defendants have evidently made the tactical decision not to hire an expert and not to claim any

allocation of their statewide expenses, in an apparent attempt to forestall discovery into the statewide financial data they had led TNT to believe it would receive. But Defendants' last-minute shift in strategy does not undermine TNT's entitlement to discovery under the Federal Rules.

**A. Even If This Court Were Ultimately to Limit Disgorgement to "Overlapping Locations," Broader Discovery of Defendants' Financial Information Is Still Appropriate**

The February Order acknowledged the staggering scope of Defendants' misconduct: more than 6,000 devices operated illegally with an estimated $68 million in total profits in the last year alone. Feb. Order (Doc. #438) at 7. So far, Defendants have not been required to produce evidence to validate (or contradict) those estimates.[1] The February Order did not close the door to discovery of that evidence. Quite the opposite. This Court acknowledged that "if Torch hadn't falsely represented and marketed its devices as 'no-chance' games exempt from Missouri's definition of a gambling device, Torch couldn't have operated anywhere in its current territory." *Id.* at 10. As a result, "[o]ne hundred percent of [Torch's] revenue is attributable to its misrepresentations." *Id.* The very fact that the February Order considered Defendants' statewide revenues in analyzing the availability and scope of disgorgement means the financial data from Torch's 6,000-plus devices is relevant to this Court's disgorgement determination and is ripe for discovery. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.").

Defendants argue that because this Court expressed skepticism about a statewide disgorgement award, the scope of discovery should be similarly cabined. Mot. Ex. B. at 2–4. But

---

[1]    Like TNT, the Court arrived at these numbers simply by multiply the average collections reported by Defendants from the ***known*** Torch Devices by Mr. Miltenberger's ***low-end*** estimate of the number of Torch Devices in operation in the state at the time of trial. Whether that is a true number can only be determined by compelling Defendants to answer TNT's Interrogatories.

that argument puts the cart before the horse. To determine the extent of Defendants' ill-gotten gains from the relevant market (whatever the Court may determine that to be), TNT (and this Court) require a clear picture of Defendants' total revenue and cost structure statewide. Without knowledge of the full scope of the revenues that Defendants' misconduct generated, neither TNT nor this Court will be able to meaningfully assess the extent to which any potential disgorgement award would render Defendants' misconduct "unprofitable," or to what degree. *See* Order (Doc. #58) at 10 (noting making Defendants' "conduct unprofitable" as goal of disgorgement).

TNT thought it would get the information it sought as part of Defendants' expert disclosures. In a surprise twist, Defendants now claim that they will not claim any deductions other than direct payments to players and the "agreed" locations—thus, they say, no expert witness is needed, and no statewide discovery will be produced. But Defendants' change in strategy does not render its financial data irrelevant.

### 1. Evidence of Statewide Financial Data Is Relevant

Discovery is not limited by the remedy that a plaintiff may seek, and it is surely not limited by a defendant's position that any particular remedy would be inappropriate. Discovery is permitted if it relates to "any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Colonial Funding Network, Inc. v. Genuine Builders, Inc.*, 326 F.R.D. 206, 211 (D.S.D. 2018) (internal citation omitted). Defendants' statewide financial information is relevant to several issues in this litigation, including TNT's ability to test the veracity of Defendants' claims regarding the overlapping locations, as elaborated above. TNT is entitled to ascertain whether the data from other locations shows vastly different profit margins or otherwise calls into question the truthfulness of Defendants' disclosures to date.

Additionally, statewide data is relevant to this Court's determination of many equitable

factors, including any determination of what award is "proportional." In its February Order, this Court preliminarily found that an award of statewide profits might not be "proportional," *see* Feb. Order (Doc. #438) at 10, but a final assessment of proportionality requires knowledge of the full extent of Defendants' illegal operation. *See Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir. 1976) (recognizing three states as relevant market for consideration of disgorgement award). At the very least, any determination of "proportionality" would require an assessment of overlapping *county* data—a market so obviously relevant that the Defendants previously pled it to be so. *See* Ans. (Doc. #44) at 36 (pleading 23 counties as "the relevant product and geographic market"). Without information beyond the overlapping locations, this Court will be deprived of the information it needs to have any basis of comparison to address any concerns of "proportionality."

### 2. Defendants' Claims of Undue Burden and Concerns of Confidentiality Are Meritless

Defendants also raise concerns of undue burden and confidentiality. Both are meritless. The requests are not unduly burdensome—they are narrowly tailored to only the underlying data necessary to support TNT's arguments for disgorgement. The Interrogatories that are the subject of this motion do not even request supporting documents. They simply request sworn answers based on data that are readily accessible to Defendants, likely with little more than a few clicks of the mouse.

Likewise, Defendants' alleged concerns about confidentiality are unfounded. There is a protective order in this case. *See* Order (Doc. #52). Throughout this litigation, TNT has assiduously complied with that order, and it will continue to do so. Defendants have provided no explanation (nor can they) for why the Protective Order is insufficient to assuage any confidentiality concerns.

**B. This Court's February Order Does Not Preclude TNT from *Requesting* a Disgorgement Award Beyond the Overlapping Locations**

In any event, Defendants are wrong to suggest that this Court's February Order conclusively precluded TNT from ***requesting*** any disgorgement beyond the overlapping locations. Instead, the February Order was an interlocutory ruling in which the Court expressed its preliminary views, prior to discovery, as to the likely appropriate scope of disgorgement. *See* Feb. Order (Doc. #438). At most, the February Order expressed the Court's prediction as to what sort of disgorgement order the equities might ultimately favor, especially considering the Court did not have the information (nor does TNT) to balance the equities to reach any particular disgorgement award. To read the February Order as an *a priori* limitation on TNT's right to seek disgorgement would ignore its role as an interlocutory, pre-discovery order. It would also place the February Order in contradiction with the express language of the Court's prior order entering the parties' 2023 Stipulation, which provided for broad financial discovery post-trial. The February Order simply did not purport to prevent TNT from requesting a broader award at the conclusion of the case, nor did it place any limitations on the scope of discovery.

Instead, the Court ordered the parties to ***meet and confer on the scope*** of discovery, without stating any opinion as to what specific requests the Court might (or might not) deem appropriate. *Id.* at 11. At the time, both parties believed that statewide financial information would ultimately be produced, so there was nothing to raise with the Court at that time. This motion became necessary only after Defendants suddenly, and without explanation, changed positions and attempted to limit TNT's entitlement to that discovery. Had Defendants claimed, at the time the parties negotiated their joint submission, that such a scope limitation was necessary, they could have sought one, and TNT could have objected to it. But because of Defendants' new tactics, this motion presents TNT with its first opportunity to contest Defendants' efforts to limit discovery to

the locations Defendants had identified as "overlapping" in 2023.

### C.  To the Extent That Defendants Contend That the February Order Limits TNT's Potential Recovery to Profits from the Overlapping Locations, TNT Respectfully Requests That the Court Clarify or Reconsider That Aspect of Its Order

If, however, the Court believes that Defendants are right to read the February Order as precluding TNT from even *requesting* a disgorgement award any greater than Defendants' revenues from the overlapping locations, TNT respectfully requests that this Court reconsider any such limitation. Geographically limiting TNT's entitlement to discovery in such a manner would not only run afoul of the Eighth Circuit's prior ruling in *Truck Equipment*, as TNT previously argued, *see* Reply (Doc. #433) at 10–11, but it would also contradict the Supreme Court's recent guidance in *Sriptech v. SEC*, 146 S. Ct. 1403 (2026), decided mere weeks ago.

In that case, the Court unanimously held that provable losses to identifiable victims are not the *sine qua non* of disgorgement; instead, complete disgorgement of a defendant's ill-gotten gains is appropriate even where no victim suffered any loss whatsoever. *Sriptech*, 146 S. Ct. at 1412. As the Court recognized, "[u]nder traditional equitable principles, a victim seeking disgorgement of a defendant's wrongful gains does not need to prove that he has 'suffered a corresponding loss or,' indeed, 'any loss.'" *Id.* at 1410 (citing Restatement (First) of Restitution § 1 (1937)).

Instead, the Court held, a plaintiff that has suffered an interference with a legally protectable interests may be entitled to "restitution of [the defendant's] wrongful gain" without any consideration of the plaintiff's loss. *Id.* at 1410–11 (citing Restatement (Third) of Restitution & Unjust Enrichment § 3 (2011)). That is because the purpose of disgorgement is not to compensate the plaintiff for financial harm but for "the defendant . . . to give to the plaintiff the amount by which [the defendant] has been enriched" by the wrongful conduct. *Id.* at 1411 (citation omitted). Thus, "[w]hatever else traditional equitable principles demand, they do not require a

showing of pecuniary loss before a court may issue an award of unjust profits." *Id.* at 1412.

In reaching that holding, the Supreme Court spoke directly to the situation here, where a court is presented with the prospect of ordering disgorgement that may exceed a plaintiff's readily provable losses. In such circumstances, the Supreme Court said:

> [A] court must choose between two status quos: It can either restore the defendant to his prior position by stripping him of his unjust gains, or it can allow the defendant to benefit from his misconduct because the plaintiff's financial position has not changed. In those situations, ***equity traditionally prefers the first outcome***.

*Id.* at 1412 (citation modified). That is because, unlike damages remedies, which are designed merely "to put a plaintiff in as good a position as he would have been in absent the wrongdoer's actions," disgorgement is designed to "deprive wrongdoers of their net profits from unlawful activity." *Id.* at 1410 (citation modified).

In light of *Sriptech*, it would be inappropriate for this Court to preclude TNT from requesting disgorgement of some portion of Defendants' profits (or even seeking discovery thereof) for fear of producing a "windfall" for TNT. Feb. Order (Doc. #438) at 10. If anything, *Sriptech* makes it clear that the "windfall" that must be avoided is the one that would result from allowing "allow[ing] the defendant[s] to benefit from [their] misconduct." *Sriptech*, 146 S. Ct. at 1412. Yet if the maximum disgorgement Defendants might face is limited to the 100 devices in the locations Defendants identified in 2023, then Defendants will be permitted to retain more than ***98 percent*** of their gains from their illegal conduct.[2] That is hardly enough to render Defendants'

---

[2]    Given Defendants' refusal to produce statewide financial data, that is only an estimate. TNT arrives at that figure simply by dividing the 101 devices identified at trial by 6,000, Mr. Miltenberger's ***low-end*** estimate of Torch Devices in operation at the time of trial. If the Court orders the discovery requested by this motion, the Court will likely learn the true number of Torch Devices operating within the relevant market—and as a consequence, the enormity of Defendants' ill-gotten gains—is substantially larger.

conduct unprofitable or to discourage the next copycat—or even Defendants themselves—from engaging in similar unlawful conduct in the future. Instead, a rational actor in Defendants' position would simply view the risk of losing two percent of their ill-gotten profits as an acceptable cost of doing (illegal) business.[3]

Indeed, it is that very concern that caused the Eighth Circuit to reverse a similar limitation on a plaintiff's recovery in *Truck Equipment*, which Defendants previously cited and the Court relied upon in its February Order. In that case, the district court had limited the plaintiff's disgorgement award to only 20 percent of the defendant's profits in the relevant market, which covered ***three entire states***, after finding that only 20 percent of the sales were the result of the defendant's unlawful conduct. *See Truck Equip.*, 536 F.2d at 1221. But the Eighth Circuit reversed that limitation, holding that "[t]he award of only twenty percent of [the defendant's] profits is clearly inadequate ***to ensure that similar conduct will not reoccur in the future***." *Id.* at 1223 (emphasis added). Instead, it remanded with instructions to order disgorgement of "***all***" of the defendant's profits from the relevant market. *Id.* (emphasis added).

Here, by contrast, the Court has already found that "[o]ne hundred percent of [Torch's] revenue is attributable to its misrepresentations." Feb. Order (Doc. #438) at 10. Yet if the February Order were read as Defendants would like, TNT would be limited to requesting disgorgement of less than ***two percent*** of those profits. Such a limitation would not even satisfy the Second Circuit's instruction that a disgorgement order must "sufficiently deter willful misconduct," *see* Feb. Order (Doc. #438) at 10 (quoting *4 Pillar Dynasty LLC v. N.Y. & Co., Inc.*, 933 F.3d 202, 214 (2d Cir.

---

[3] Defendants even took that gamble in the context of this very case, whereby they continued operating their devices after the jury had ruled against them—and even after this Court ruled the devices to be illegal. *See* Resp. (Doc. #444) at 10–11 (detailing Defendants' efforts to continue and even expand their operations after this Court issued its declaratory judgment order).

14

2019)), much less the Eighth Circuit's requirement that the order be adequate "to *ensure* that similar conduct will not recur in the future," *Truck Equip.*, 536 F.2d at 1223 (emphasis added). Instead, the law permits TNT to seek a disgorgement award that will "restore [Defendants] to [their] prior position by stripping [them] of [their] unjust gains," *Sriptech*, 146 S. Ct. at 1412—not one that still allows them to "profit tremendously," Feb. Order (Doc. #438) at 11. *See also Liu v. SEC*, 591 U.S. 71, 92 (2020) (recognizing that "when the 'entire profit of a business or undertaking' results from . . . wrongdoing, a defendant should not receive deductions for illegitimate expenses, in order to "prevent defendants from profiting from their own wrongdoing").

Thus, to the extent that Defendants maintain that the February Order limits TNT even from *requesting* a disgorgement order beyond the overlapping locations, TNT respectfully requests that the Court clarify (or, if need be, reconsider) the February Order to make clear that TNT remains free at the conclusion of this case to request whatever disgorgement order it believes is appropriate—and that the Court will not make a final determination until it has all the facts.

## CONCLUSION

Whatever Defendants may contend about the appropriate scope of disgorgement, discovery is not so limited. Instead, discovery is expansive precisely so that parties like TNT can collect the information necessary to substantiate whatever relief they may seek. All TNT asks is that it be provided the discovery it needs to support the disgorgement award it believes it is entitled to.  TNT therefore respectfully requests this Court compel Defendants to answer TNT's interrogatories.

Dated: July 8, 2026

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/   Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
JONATHAN B. POTTS, #64091MO
HANNAH E. DEMAND, #74911MO
EMILY K.F. HEPPERMANN, #76614MO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*
*jonathan.potts@bryancave.com*
*hannah.demand@bryancave.com*
*emily.heppermann@bryancave.com*

*Attorneys for TNT Amusements, Inc.*
*d/b/a Play-Mor Coin-Op*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2026, a copy of the foregoing was served on all counsel of record by operation of the Court's electronic filing system.

*/s/   Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO