**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| TNT AMUSEMENTS, INC., | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:23-cv-330-JAR |
| | ) |
| TORCH ELECTRONICS, LLC, *et al.*, | ) **ORAL ARGUMENT REQUESTED** |
| | ) |
|    Defendants. | ) |

**PLAINTIFF TNT AMUSEMENTS, INC.'S**
**REPLY IN SUPPORT OF MOTION TO COMPEL POST-TRIAL DISCOVERY**

Defendants' Memorandum in Opposition (Doc. #451) (the "Response") should be titled "The Cart Before the Horse." Defendants' attempt to conflate this Court's February Order's discussion of the scope of ***disgorgement*** with a ruling on the scope of ***discovery*** is belied by the language of the order itself, which merely ordered "***the parties*** to confer and submit ***a proposal for the scope*** and schedule of additional financial discovery." Feb. Order (Doc. #438) at 11. Defendants neither sought nor obtained any limitation on the scope of discovery in the course of conferring upon and proposing the scheduling order—to the contrary, Defendants' counsel stated he expected to produce the very discovery TNT now seeks in connection with Defendants' expert disclosures. Defendants' retreat from that position is the only reason TNT's motion is even necessary.

As such, this Court need not reconsider its February Order to grant TNT the discovery it requests. It need only recognize, as TNT explained in its opening memorandum, that a party's right to discovery is not limited by the relief that it is entitled to seek, much less the relief it may ultimately obtain. *See* Mem. (Doc. #449) at 1. The discovery requested here is necessary regardless of whether the Court ultimately orders disgorgement of profits from only the overlapping locations,

1

from the overlapping counties, or from the state as a whole. Indeed, as the Response itself acknowledges, Defendants intend "to argue in favor of limiting any disgorgement award based on the totality of the circumstances, fairness, . . . the [claim] that disgorgement is not to be punitive, [and] the need to prevent a windfall to TNT." Resp. (Doc. #451) at 7. For the Court to evaluate any of those factors, it must have access to Defendants' statewide financial information so it can evaluate whether any award would be "fair[]," "punitive," or produce an improper "windfall." TNT is thus entitled to discover information bearing on the very factors Defendants plan to rely upon. This Court should therefore order Defendants to perform the few clicks of the mouse it will take to produce the requested financial information, subject to whatever confidential designation Defendants may request. *See* Protective Order (Doc. #52).

## DISCUSSION

### I.    Even If the February Order May Have Limited Disgorgement, It Did Not Limit Discovery

The Response erroneously claims that the February Order "denied" TNT's request for statewide financial discovery. Resp. (Doc. #451) at 2, 5 (claiming that the "only reasonable interpretation" of this Court's February Order was that it limited discovery *sub silentio*). But the February Order did nothing of the sort.

Whatever this Court's February Order may have suggested about the potential disgorgement award TNT will ultimately be entitled to, it did not impose any limits on ***discovery***. To justify its contrary claim, the Response points out that the parties both ***asked*** the Court to set the bounds for ongoing financial discovery in their briefing prior to the February Order. *See* Resp. (Doc. #451) at 2–3. While that much is true, the Court did not ***grant*** either party's request; instead, it instructed the parties to ***confer regarding the scope*** of post-trial discovery. Feb. Order (Doc. #438) at 11.

2

In that conference, Defendants' counsel indicated that he expected to produce statewide financial information in connection with Defendants' expert disclosures (as the Response effectively admits). *See* Mot. (Doc. #448) ¶ 10; *see also* Resp. (Doc. #451) at 7 (acknowledging TNT's "expectation" of such discovery). Three months later, on May 19, 2026, Defendants informed TNT that they were changing positions and had chosen not to retain an expert at all. While the Response claims that tactic was "not gamesmanship," Resp. (Doc. #451) at 7, Defendants nonetheless use that decision as a basis to withhold the discovery they previously suggested TNT would receive.

Defendants' claims are unconvincing. Were it "not gamesmanship," Defendants would not object to answering TNT's plainly stated interrogatories, which seek information that Defendants acknowledge is readily within their reach, *see id.* (noting that the information is contained in an "industry standard records keeping system"), and which they previously indicated they would provide—they would simply produce that information, whose confidentiality can be readily assured under this Court's protective order. *See* Mem. (Doc. #449) at 10. Defendants' bait-and-switch is reminiscent of their prior efforts to impede discovery in this case, which the Court previously addressed in the same order Defendants now rely upon to excuse their further obstruction. *See* Feb. Order (Doc. #438) at 5 (noting "instances when Torch's litigation tactics or purported errors materially undermined case management efficiency and amplified TNT's costs").

Gamesmanship or not, Defendants' tactics have needlessly impaired TNT's access to discovery of their financial information and thereby impeded the ultimate termination of this litigation. Had Defendants told TNT in February that they would ***not*** produce statewide financial information, then TNT could have sought resolution of the issue at that time. *See* Feb. Order (Doc. #438) at 11 ("If the parties cannot agree on specific issues, they may state their respective positions

3

in the joint submission."). But Defendants waited three months to change positions, and then another month to provide a supplemental interrogatory response that merely doubled down on withholding the requested information. *See* Mot. Ex. C (Doc. #448-3) (supplemental responses). And Defendants have now filed a motion for protective order that seeks to further delay the conclusion of discovery past the agreed cut-off. *See* Mot. (Doc. #452). Defendants continue to decline the Court's invitation to "accelerate financial discovery," Order (Doc. #446) at 6, by refusing to live up to their prior commitments in the 2023 Stipulation itself and the representations they made in their discussions with TNT's counsel. This Court should not brook any further delays.[1]

The Response envisions an inversion of the ordinary sequence of discovery-and-decision: TNT should make its request for a disgorgement award, ***then*** Defendants can respond, and the Court can make a "final" decision. *See* Resp. (Doc. #451) at 6. But Defendants ask TNT to make that request with one hand tied behind its back, having been given access to financial information for only a subset of overlapping locations that were known to TNT when this litigation began over three years ago. Such an approach commits the same error undergirding each of Defendants' objections: it conflates TNT's right to ***discovery*** with TNT's ultimate right to ***relief***. If TNT is not

---

[1]    The Response faults TNT for waiting five months to file the instant motion, evidently counting from the date of the February Order. Resp. (Doc. #451) at 3. But until May 19, TNT fully expected that it would receive statewide financial information as part of Defendants' expert disclosures. *See* Resp. (Doc. #451) at 7 (acknowledging as much). That same day, TNT requested that Defendants supplement their interrogatory responses, but Defendants did not do so until June 15. Notably, as Defendants' counsel knows, Mr. Finneran was on his second leg of parental leave from March 23 to June 23, having welcomed his first child late last year, and Ms. Brannon was on parental leave following the birth of her first child during that period as well (and still is). Notwithstanding those competing obligations, Mr. Finneran conferred at length with Defendants' counsel both over the phone and email on multiple occasions during his leave period in an effort to find a mutually agreeable resolution of the parties' disputes and diligently worked to prepare the motion to compel upon his return from leave, once those efforts had proven fruitless.

permitted to obtain the discovery needed to even make its *request* for disgorgement, then the Court may well find itself in the position of having to permit additional discovery after the parties' requests have been filed in order to have the information it needs to rule (or worse, ordering additional discovery after remand if the Eighth Circuit ultimately overturns any limitation on disgorgement, as it did in *Truck Equipment*). Instead, discovery should proceed along a normal course: Defendants should produce the requested financial information, TNT can use that information to make and preserve its request for full disgorgement of Defendants' profits, and then the Court can rule, once it has all the facts.

## II.    Defendants' Attempt to Withhold Information for Additional Overlapping Locations Is Meritless

The Response spends only one paragraph addressing TNT's first request for relief—namely, that Defendants should be required to disclose the existence of any overlapping locations TNT had not initially identified at the outset of this litigation in 2023. Resp. (Doc. #451) at 11–12. Its only defense of that position is its claim that, when the Court referred to "overlapping locations" in its February Order, it meant instead to refer to the "agreed locations" the parties identified in their 2023 Stipulation. *Id.* at 12. The Response provides no warrant for that rereading of the February Order.

Instead, Defendants assert the close of pretrial discovery in February 2024 was some sort of magic deadline after which Defendants were free to waltz into TNT customers' locations, falsely advertise their devices, and displace TNT's devices without incurring any additional liability therefrom. *See* Mot. (Doc. #448-2) at 3 (arguing that "TNT was free to seek discovery regarding the overlapping/Agreed Locations prior to the close of discovery in early 2024" and that TNT was "free *prior to the close of discovery* to seek expansion of the overlapping/Agreed Locations if TNT

became aware Torch added devices to new locations were [sic] TNT had devices"[2]) (emphasis in original). But Defendants' own words in the 2023 Stipulation belie any such purported understanding. That Stipulation provided that discovery "beyond the agreed-upon set of locations" was "*deferred* until after trial on the merits," not closed off altogether. 2023 Stip. (Doc. #58) ¶ 2(a) (emphasis added).

The 2023 Stipulation was never designed to limit TNT's entitlement to post-trial discovery—to the contrary, it expressly provided that TNT would receive such discovery if it prevailed on its Lanham Act claim, as it ultimately did. *See id.* ¶ 2(c) (expressly stating stipulation was made "without prejudice to *Plaintiff's right* to seek discovery" of *any* of Defendants' financial information after trial) (emphasis added). Instead, the purpose of the 2023 Stipulation was merely to *defer* such discovery until after trial. *See id.* ¶ 2(a).

That stipulation came with a cost: the 2023 Stipulation prevented TNT from obtaining not only information about Defendants' statewide profits before trial, but also any information about profits from the overlapping locations that were only later identified in the course of the litigation, such as the Moose Lodge and Marquart's Landing. As a result, at trial TNT was only able to present financial information relating to Defendants' profits at the locations specified in the 2023 Stipulation. TNT now seeks to obtain the benefit of that bargain by requiring Defendants to identify any overlapping locations that were not known at the time of the 2023 Stipulation and disclose the financial information for those locations (and Defendants' locations more broadly).

---

[2]    This claim is likewise false. The parties stipulated in 2023 that, aside from the identified locations, TNT would *not* be entitled to such discovery until after trial. 2023 Stipulation (Doc. #58) ¶ 2(a). Unlike Defendants, TNT has honored its agreements in the 2023 Stipulation.

As long as Defendants refuse even to identify the other locations at which TNT and Defendants have overlapped, TNT is not able to make a disgorgement request sufficient to cover the overlapping locations, much less the overlapping counties or the state more broadly. This Court should compel Defendants to identify any additional overlapping locations to permit TNT to make its request.[3]

### III. The Response Does Not Claim Any Burden from the Requested Discovery Itself, Nor Does It Offer Any Defense of Defendants' Refusal to Provide Bank Account Information

The Response asserts that discovery of the requested financial information would be "unlimited, overly broad, irrelevant, highly intrusive, and overly complicated," Resp. (Doc. #451) at 8, but it offers no basis for any of those claims. Notably, despite their lengthy list of adverbs and adjectives, Defendants do *not* claim that it will be ***unduly burdensome*** to produce the requested information—to the contrary, they seemingly acknowledge that the information can be readily retrieved from the "industry standard records keeping system" that they use to track their devices' revenues. Resp. (Doc. #451) at 7. They claim only that "[g]ranting TNT's motion would lead to further motion practice, wasted time and resources, and prolonged further litigation before final judgment." *Id.* at 6. But it is not TNT's motion that has prolonged matters—it is Defendants' refusal to answer a few, simple questions that could be addressed by merely exporting data that is sitting on their computers, as they had initially suggested they would. Defendants' refusal to provide the

---

[3] In the course of meet-and-confer discussions regarding TNT's interrogatories, Defendants' counsel has complained about the purported burden of searching Defendants' databases in order to identify additional overlapping locations, despite TNT's providing Defendants with a comprehensive list of its current and former locations and their addresses. To ease any purported burden on Defendants, TNT has offered, in lieu of requiring a response to Interrogatory No. 1, to permit Defendants to produce a complete list of their current and former locations and their addresses, in which case TNT can bear the burden of identifying which additional, previously undisclosed locations are overlapping. Defendants have yet to take TNT up on its offer.

requested information has resulted in the "further motion practice" Defendants claim to want to avoid.

Instead, Defendants complain about TNT's ***more recent*** discovery requests, which were served on July 8, 2026 (the deadline under the scheduling order for serving such requests) after efforts to reach a mutually agreeable resolution of the parties' discovery disputes proved unsuccessful. *Id.* at 8–9. If the Response's broader arguments put the cart before the horse, this one puts the luggage before the cart. Defendants have not served objections to any of those more recent requests, and the parties have not had any opportunity to meet and confer regarding any potential objections. Nor does the instant motion seek to compel Defendants to respond to those later requests. Defendants have separately moved for a protective order with respect to TNT's July 8 requests, and TNT will respond to that motion in due time. But the existence of other requests that are not yet before the Court is not a reason to excuse Defendants from answering the straightforward, unburdensome questions TNT has presented in its interrogatories.

The Response likewise fails to offer any defense of Defendants' refusal to provide bank account information, either for the accounts into which profits from the overlapping locations were deposited, or more broadly. TNT specifically moved to compel production of that information, *see* Mot. (Doc. #448) ¶ 25, Mem. (Doc. #449) at 5–6, and the Response offers no rebuttal. On that basis alone, the motion to compel should be granted.

## IV. Defendants' Purported Deactivation of the Torch Devices Was Not Voluntary, and Is Irrelevant in Any Event

### A. Defendants Have Continued to Falsely Advertise Their Devices as "Legal" "No Chance" Games, Even After This Court's Declaratory Judgment Order

Once again leapfrogging the discovery issues presented by TNT's motion, Defendants claim that this Court need not even ***consider*** the need for deterrence in assessing an appropriate

disgorgement award because Torch "voluntarily shut down its devices throughout all of Missouri." Resp. (Doc. #451) at 10. Defendants argue, as a result, that "deterrence is really a moot point." *Id.* But Defendants' argument both misunderstands the law and misrepresents the facts.

For starters, Defendants' deactivation of their devices can hardly be described as "voluntary." The jury returned a unanimous verdict in favor of TNT on October 6, 2025 (Doc. #401), more than nine months ago, finding that Torch had violated the Lanham Act by falsely claiming that their devices were not "gambling devices," but instead "legal" "no chance" devices. Following the trial and extensive post-trial briefing, this Court issued a declaratory judgment more than five months ago (Doc. #437), definitively finding that the Torch Devices were in fact operating in violation of Missouri law. That, however, did nothing to deter Defendants from continuing to operate within the state of Missouri. Despite the Court's ruling, Defendants continued to operate in Missouri and even placed new Torch Devices in at least one TNT customer location *after* the Court's declaratory judgment. Opp. to Mot. for Cert. of Interlocutory Appeal (Doc. #444) at 11; Mot. Ex. A (Doc. #444-1) (showing photos installed at the Gem Miner Arcade ten days after this Court's declaratory judgment order).

It wasn't until the Missouri Attorney General, county prosecutors, and the U.S. Department of Justice began threatening potential prosecution that Defendants supposedly suspended their operations.[4] *See* **Ex. D** (April 6, 2026 letter to Torch customers provided to Fox 4 Kansas City, indicating that it was "pausing" operations in light of investigations by the Attorney General and the U.S. Department of Justice—not based on the jury's verdict or this Court's declaratory judgment). But even then, rather than be deterred, Defendants have continued their false

---

[4]   Press Release, Mo. Atty. Gen.'s Office, *Torch Electronics Agrees to Suspend All Operations to Avoid Prosecution* (April 8, 2026), https://ago.mo.gov/torch-electronics-agrees-to-suspend-all-operations-to-avoid-prosecution/.

9

advertising campaign by telling their customers an "independent expert" had "confirmed that [Defendants'] machines were, *in fact*, no chance devices"—despite Nick Farley's opinions having been thoroughly debunked by TNT and rejected by both the jury and this Court in its declaratory judgment order. *See id.* Defendants' recent communications with their customers have further asserted, despite this Court's finding that Defendants' representations as to the legality of their devices were made in bad faith, that Defendants "truly believe" (present tense!) that the Torch Devices are "legal." *See id.* (making no mention of this Court's contrary rulings); *see* Feb. Order (Doc. #438) ("Overall, the evidence belies any objectively reasonable claim of good faith.").

As a result of those continued false representations, Defendants have tricked their customers into allowing their devices to remain in locations all over Missouri, with signs indicating that the Torch Devices are only "out of service *for the time being*." *See* **Ex. E** (photograph of Torch sign) (emphasis added). Despite the fact that Missouri law prohibits *possession* of gambling devices, Mo. Rev. Stat. § 572.070, and expressly provides that a device is "no less a slot machine because it is not in working order," *id.* § 572.010(11), Defendants have feigned compliance with Missouri law by simply unplugging their devices "for the time being"—and nothing prevents Defendants from plugging any of their devices back in tomorrow.

Meanwhile, Defendants' continued false advertising has caused the Torch Devices to continue to occupy valuable floorspace in hundreds (thousands?) of establishments across the state while Defendants' lobbyists attempt (so far, without success) to push legislation to legalize video lottery terminals, effectively boxing out TNT and other legal amusement businesses from competing for those establishments' business. *See also* **Ex. F** (*Missouri Independent* article dated April 10, 2026) ("After years of opposing legislation that would supplant its games with licensed machines regulated by the Missouri Lottery Commission, Torch has switched to backing it.").

10

Contrary to what Defendants would have this Court believe, Defendants did not suspend their operations out of the goodness of their hearts or because they wanted to comply with this Court's orders—Defendants turned off their devices only after their customers started receiving widespread threats of prosecution from the Missouri Attorney General and county prosecutors, and even then, continue to falsely represent their devices to be "legal" "no chance" games. If anything, Defendants' conduct since the jury's verdict has amplified, not decreased, the need for deterrence.

**B. Beyond the Need to Deter Defendants, This Court's Disgorgement Determination Requires It to Consider Deterrence of Other Would-Be Purveyors of Illegal Gambling Devices**

The record is clear: Defendants were not at all deterred by the jury's verdict or this Court's declaratory judgment. But aside from Defendants' own ongoing illegal conduct, the consideration of deterrence is not aimed solely at the bad actor in each individual case—the purpose of disgorgement is also to deter other would-be bad actors from engaging in the same conduct. *See Masters v. UHS of Delaware, Inc.,* 631 F.3d 464, 473 (8th Cir. 2011) ("Disgorgement exists to deter ***would-be*** infringers and to safeguard against unjust enrichment." (emphasis added)); *4 Pillar Dynasty LLC v. N.Y. & Co.* 933 F.3d 202, 213 (2d Cir. 2019) ("Tethering the power of district courts to require a defendant's disgorgement of profits to a plaintiff's showing of actual consumer confusion would hamper the courts' ability to deter willful misconduct, contrary to the purpose of the Lanham Act."); *SEC v. Markusen,* 143 F. Supp. 3d 877, 893 (D. Minn. 2015) ("Disgorgement is designed to . . . deter ***others*** . . . by making violations unprofitable." (emphasis added)).

As outlined in the memorandum in support of the instant motion, limiting disgorgement to only the overlapping locations identified at the outset of this litigation would result in a disgorgement of less than two percent of Defendants' ill-gotten gains. *See* Mem. (Doc. #449) at 13–15. It can hardly be said that a two percent haircut—a percentage so small that it that could be

11

attributed to a simple rounding error—would be sufficient to deter other would-be wrongdoers from engaging in similar conduct. Even if these particular Defendants had been sufficiently deterred from continuing to operate their illegal business (they have clearly not been), Defendants have not (and cannot) argue that any other potential wrongdoer has been (or would be) deterred without a significant disgorgement award.

## V.    Concern About a Possible "Lottery-Level Windfall" Is Not a Basis to Limit Discovery

Defendants further suggest that TNT is not entitled to **request** a disgorgement award beyond the overlapping locations because it would produce a "lottery-level windfall," and that awarding anything beyond the damages TNT obtained at trial would constitute an impermissible "penalty." Resp. (Doc. #451) at 10–11. But that concern is likewise not a reason to keep TNT from obtaining the requested discovery.

First, the February Order did not suggest that any disgorgement beyond the overlapping locations would constitute a "lottery-level windfall"; it simply indicated that "a disgorgement award **sufficient to render Torch's advertising unprofitable**" would be. *See* Feb. Order (Doc. #438) at 10 (emphasis added). Although the Court indicated that it was "not persuaded that an award of **statewide** profits is a reasonable and appropriate remedy here" and that TNT was at least entitled to "some disgorgement from overlapping locations," *see* Feb. Order (Doc. #438) at 10–11 (emphasis added), it did not foreclose the possibility of TNT's obtaining disgorgement from some larger market within the state—e.g., the overlapping counties, which Defendants themselves previously pled as a relevant market. *See* Ans. (Doc. #44) at 36–37; *see also* Reply in Supp. of Relief (Doc. #433) at 11 (identifying overlapping counties as potential relevant market based on Defendants' own pleading). Such a disgorgement award would still be "[in]sufficient to render Torch's advertising unprofitable," since it would fall short of disgorgement of the entirety of their

12

ill-gotten gains. But it would be consistent with the February Order's holding that "the equities weigh in favor of partial disgorgement." Feb. Order (Doc. #438) at 11.

Second, the Second Circuit decision that the February Order cited (and which Defendants rely upon) discussing "lottery-level windfall[s]" dealt with a situation not present here, i.e., one in which there was no evidence of consumer confusion. *See 4 Pillar Dynasty*, 933 F.3d at 214 (holding that the consideration of a possible "lottery-level windfall" for the plaintiff is an appropriate consideration only "in the absence of any evidence of actual confusion"); *see also id.* (noting that, if "a plaintiff sustains its burden of proving willfulness," the court should consider whether the "disgorgement of *all* profits . . . is necessary to achieve the desired deterrent effect." (emphasis in original)). Here, by contrast, this Court has already found that "the evidence established actual diversion of business from TNT to Torch," that "[o]ne hundred percent of [Torch's] revenue is attributable to its misrepresentations," and that Torch's conduct was "willful" and "intentional[]." Feb. Order (Doc. #438) at 9–10. Thus, even if it were mandatory authority, *4 Pillar Dynasty* does not foreclose any disgorgement award here.

Finally, Defendants entirely misapprehend the Lanham Act's provision specifying that any disgorgement award shall not be considered a penalty—indeed, even an award of ***statewide*** profits would not constitute a "penalty" here. In the context of disgorgement, it is not considered a "penalty" to strip a defendant of his ill-gotten gains, since that remedy simply restores the defendant to the position he would have been if not for the wrongful conduct. *See Liu v. SEC,* 591 U.S. 71, 79 (2020) ("[T]o ***avoid*** transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's ***net profits*** to be awarded for victims." (emphasis added)); *Sripetch v. SEC*, 146 S. Ct. 1403, 1412 (2026) (holding that equity traditionally prefers to "restore the defendant to his prior position by stripping him of his unjust gains"). Such

13

remedies are necessary to incentivize plaintiffs like TNT to combat false advertising like that distributed by Defendants, especially considering the expense of pursuing such litigation and the difficulty of proving direct lost sales from false advertising. *See* Feb. Order (Doc. #438) at 8–9, 11 (acknowledging Congress's intent to incentivize plaintiffs like TNT to act as "vicarious avenger[s]" of the public's rights). Frankly, if not for the prospect of recovering Defendants' profits resulting from its false representations, the readily provable damages TNT suffered at the locations identified in the 2023 Stipulation would not have come close to justifying the expense of litigating a matter such as this, especially given the ways in which Defendants' litigation conduct has driven up TNT's litigation expenses—and continues to do so.

## CONCLUSION

TNT believes it is entitled under the law to disgorgement of Defendants' statewide profits. But it also recognizes that the Court has not yet been "persuaded" that remedy is appropriate. Feb. Order (Doc. #438) at 10. All TNT seeks by this motion is the information it needs to make its case. Whether the Court ultimately orders disgorgement from all of Defendants' locations, the overlapping counties, the overlapping locations, or only the locations identified in the 2023 Stipulation, TNT is entitled to obtain the discovery needed to request the disgorgement it believes the law entitles it to. Especially considering that Defendants do not identify any undue burden that prevents them from producing the readily accessible data requested by TNT's interrogatories, upholding Defendants' objections would only needlessly protract these proceedings and require TNT to pursue additional discovery, much of which can be avoided if Defendants simply provide the under-oath attestation as to their revenues and profits that TNT's Interrogatories request. TNT therefore respectfully requests that the Court grant its motion to compel.

Dated: July 22, 2026

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
JONATHAN B. POTTS, #64091MO
HANNAH E. DEMAND, #74911MO
EMILY K.F. HEPPERMANN, #76614MO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*
*jonathan.potts@bryancave.com*
*hannah.demand@bryancave.com*
*emily.heppermann@bryancave.com*

*Attorneys for TNT Amusements, Inc.*
*d/b/a Play-Mor Coin-Op*

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2026, a copy of the foregoing was served on all counsel of record by operation of the Court's electronic filing system.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO